1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6            PLAINTIFF,                )      CASE NO.
                                       )
7            vs.                       )      CR 20-00326-JFW
                                       )
8   RAYMOND SHE WAH CHAN,              )
                                       )      PAGES 1 TO 58
9            DEFENDANT.                )
    _____)

10

11

12

13                  **REPORTER'S TRANSCRIPT OF**
            **TRIAL SETTING CONFERENCE VIA ZOOM**
14               **FRIDAY, DECEMBER 4, 2020**
                      **8:09 A.M.**
15              **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23

                **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24              FEDERAL OFFICIAL COURT REPORTER
                350 WEST 1ST STREET, SUITE 4455
25              LOS ANGELES, CALIFORNIA 90012
                   MIRANDAALGORRI@GMAIL.COM

1                **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       NICOLA T. HANNA
      UNITED STATES ATTORNEY

5       BY:  MACK JENKINS
      BY:  VERONICA DRAGALIN

6       BY:  MELISSA MILLS
      Assistant United States Attorneys

7       United States Courthouse
      312 North Spring Street

8       Los Angeles, California 90012

9

10   **FOR THE DEFENDANT:**

11       BRAUN & BRAUN, LLP
      BY:  HARLAND W. BRAUN

12       10250 Constellation Boulevard
      Suite 1020

13       Los Angeles, California 90067

14   ALSO PRESENT:

15       Special Agent Andrew Civetti

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 4, 2020**

2                          **8:09 A.M.**

3                           **---**

4

5          THE CLERK:  Calling CR 20-326A-JFW, United States

6   of America versus Raymond She Wah Chan.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9   Mack Jenkins on behalf of the United States.  Joining me off

10  camera and socially distanced is AUSA Veronica Dragalin,

11  AUSA Melissa Mills, and FBI Special Agent Andrew Civetti.

12         MR. BRAUN:  Good morning, Your Honor.

13         Harland Braun, B-r-a-u-n, for Defendant

14  Raymond Chan who is also attending via Zoom.

15         THE COURT:  All right.  Good morning to all.

16         This matter is on the Court's calendar for the --

17  a Trial Setting Conference for Mr. Chan.  Before we discuss the

18  dates that the Court has previously set in this action pursuant

19  to the Court's Criminal Trial Order as modified by

20  docket No. 63, I'm going to ask the Government to advise us of

21  what it expects to prove with respect to this defendant.

22         Although I am familiar with the nature of the

23  charges and the evidence based upon the original Indictment and

24  the extensive Trial Setting Conference that we had in August,

25  the filing -- the First Superseding Indictment, which was just

1    recently unsealed, expands the case obviously as to Mr. Chan.

2    And in its most recent notice of complex case, the Government

3    now estimates that it will take 20 to 25 days to try this case.

4              It appears that many of the names of individuals

5    and entities that were not used in the original Indictment,

6    because according to the Government, they were, quote,

7    "masked," they have now been unmasked and included in the First

8    Superseding Indictment which makes it a little easier to review

9    the allegations.

10             And I appreciate Government counsel's efforts in

11   filing the revised notice this week with respect to the names

12   of individuals and entities in the First Superseding

13   Indictment.  However, I'm going to ask Government counsel to

14   rereview because I noticed that there were many entities and

15   names that are mentioned in the First Superseding Indictment

16   that were not included in the recent filing.

17             By way of introduction or beginning, the

18   Government has alleged in paragraph 15 that the defendant was

19   the general manager of the Los Angeles Department of Building

20   and Safety until about May of 2016 at which time he was

21   appointed by the mayor as the City's deputy mayor of Economic

22   Development, and he remained in that position until

23   approximately July of 2017 when he retired, and then he began

24   working with George Chiang, C-h-i-a-n-g, as a consultant and

25   lobbyist on behalf of various developers.

1           So I'm going to ask -- I assume, Mr. Jenkins, you

2    are going to speak for the Government this morning?

3                    MR. JENKINS:  That is correct, Your Honor.

4                    THE COURT:  All right.  I'm going to ask you to

5    go through the Government's evidence with respect to the five

6    schemes that are alleged in the RICO conspiracy and the mail

7    fraud counts which include the L.A. Grand Hotel,

8    940 Hill Street, the Luxe Hotel, Project M -- which I guess has

9    not been unmasked yet; is that correct?

10                   MR. JENKINS:  That is correct, Your Honor.

11                   THE COURT:  -- and Businessman A who, my memory

12   serves me, is the cabinetmaker.  And he has not been unmasked

13   yet; is that correct?

14                   MR. JENKINS:  Not publicly by the Government.

15   That is correct, Your Honor.

16                   THE COURT:  Okay.  As I indicated, I'm familiar

17   with the evidence with respect to those schemes but primarily

18   as to the Co-defendant Huizar because he was the only defendant

19   named in the original Indictment.  So I will then turn it over

20   to Mr. Jenkins.

21           As you indicated the last time, if you would

22   point out during your presentation the percipient witnesses and

23   especially those individuals who the Government believes are

24   going to provide testimony as percipient witnesses, namely, the

25   various cooperators that have entered pleas of guilty pursuant

```
 1   to cooperation plea agreements.

 2              I'm particularly interested in the -- when you

 3   get to that point in time, the Synergy consulting fees that

 4   were apparently, if I'm reading the First Superseding

 5   Indictment correctly, were paid -- allegedly paid to Mr. Chan

 6   during his tenure as the deputy mayor.  Also, I'm interested in

 7   an estimate as to the total amount that Mr. Chan has

 8   apparently -- the Government's theory in terms of what he has

 9   received in connection with the pay-to-play schemes.

10              So, Mr. Jenkins, I will hear from you.

11              MR. JENKINS:  Yes, Your Honor.

12              Beginning with the five schemes, the first, as

13   the Court noted, charges part of the racketeering conspiracy in

14   which Mr. Chan is charged is the L.A. Grand Hotel bribery

15   scheme.  Essentially this hotel is owned by a chairman named

16   Wei Huang, last name H-u-a-n-g.  The allegations are -- the

17   Court is somewhat familiar with.  This is the chairman who

18   ultimately took Jose Huizar on various luxury trips to

19   Las Vegas, Australia, and other locations.

20              It is alleged that he provided, that is,

21   Chairman Huang provided approximately $800,000 in benefits to

22   Jose Huizar and, in addition, helped fund a $600,000 loan that

23   ultimately served the purpose of resolving a sexual harassment

24   lawsuit against Jose Huizar.  One of the reasons that conduct

25   is important is because, as alleged in the First Superseding
```

1   Indictment, Mr. Chan, Defendant Chan, is the introductory point

2   as he provided and facilitated the introduction of

3   Chairman Huang to Jose Huizar in or about 2013.  That is

4   significant for various reasons including that the Indictment

5   also alleges the corrupt relationship between Chairman Huang or

6   Chairman Huang, H-u-a-n-g, and Huizar started shortly

7   thereafter.

8            It is also significant, the timing, because

9   around that same time period Defendant Chan, who had reached a

10  significant level of management, that is, the interim general

11  manager of the Los Angeles Department of Building and Safety or

12  LADBS, was proposed to be merged with another significant City

13  entity, that is, City Planning, around that time.

14           According to the defendant, as alleged in the

15  Indictment, there was some concern that that merger would

16  result in the elimination of Defendant Chan's supervision over

17  his department.  Essentially that department would get subsumed

18  into City Planning.  And the evidence is that is something that

19  Defendant Chan did not want to do, did not want to happen, and

20  enlisted the support of various people including

21  Council Member Huizar to, again, as alleged in the Indictment,

22  essentially overly simplistic but we believe supported by

23  evidence, helped save Defendant Chan's job as a management

24  level employee over LADBS.

25           In fact, that did result, meaning the proposed

1    merger did not occur.  Defendant Chan ultimately went from

2    interim general manager to the permanent general manager.  He

3    was very effusive and thankful to Jose Huizar for those efforts

4    and repeatedly stated so.  And around that same time is when

5    Councilman Huizar was suffering a significant both public

6    relations and internal political issue related to a lawsuit, a

7    sexual harassment lawsuit, filed by a female staffer against

8    him that was, according to our evidence, potentially adversely

9    affecting Jose Huizar's re-election which would occur in 2015.

10            Our evidence is that Jose Huizar was essentially

11   desperate to resolve the lawsuit privately and confidentially

12   and quickly in order to maintain and help his re-election bid.

13   In that effort, he solicited and Defendant Chan offered to

14   provide assistance to help resolve that issue meaning resolve

15   it in a way that would continue to allow Jose Huizar to serve

16   his position and hopefully get re-elected.

17            The evidence is that Defendant Huizar and

18   Defendant Chan reached out to -- or initially it was

19   Defendant Chan reached out to Chairman Huang, that

20   Chairman Huang or Huang -- I will try to keep my pronunciation

21   consistent -- that is the same chairman who owned the

22   L.A. Grand Hotel and, again, who ultimately would be the

23   primary, as alleged in the Indictment, bribers of

24   Defendant Huizar.

25            Defendant Chan reached out to this chairman and

1   requested that he facilitate or help fund this lawsuit or help

2   pay the ultimate settlement.  As alleged in the Indictment, the

3   chairman, through Defendant Chan, told Defendant Huizar

4   essentially, "How can I help?  I will do whatever to help."

5   The help he ultimately provided was that $600,000 collateral

6   that is alleged in the Indictment.

7                During that process, Defendant Chan served as the

8   go-between.  That is, Chairman Huang does not speak English.

9   He speaks Mandarin.  Defendant Chan would serve often as an

10  interpreter or go-between because he does speak Mandarin, and

11  he would be the person essentially negotiating the terms or

12  getting this collateral provided such that he was an integral

13  part of the process of ensuring that Chairman Huang provided

14  the $600,000 to fund the lawsuit as requested by

15  Defendant Huizar and also requested by Defendant Chan, meaning

16  Defendant Chan made it clear that this was what he also wanted

17  the chairman to do.  And ultimately the chairman did that.

18                Around the same time -- still on the

19  L.A. Grand Hotel scheme -- Chairman Huang was also making

20  several requests of Defendant Huizar.  Issues had arisen at the

21  L.A. Grand Hotel.  A couple that are alleged in the Indictment

22  are, one, the L.A. Grand Hotel -- I'm not sure if the Court is

23  familiar, but it's very close to the courthouse.  It's a large

24  hotel that is in a very precarious position for Downtown L.A.

25  because there is very little parking.  For a large hotel that

serves bar functions, social functions, in addition to actual

occupants commercially, it's in a difficult spot because there

is nowhere to park.  So they had a parking lot dispute which

was significant for that reason meaning that parking was a

major issue for the chairman, and he solicited both

Defendant Chan's help and Defendant Huizar's help.

Defendant Chan also is aware of asks such as a

union issue that was occurring at the hotel or with the hotel

employees, and Chairman Huang through Defendant Chan solicited

again Jose Huizar's help.  But, most significantly,

Defendant Chan was aware in his capacity as the LADBS general

manager and then later in his capacity as Deputy Mayor for

Economic Development.

Defendant Chan was intimately aware that this

chairman wanted to transform the L.A. Grand Hotel into a

77-floor tower which at the time -- and I think still today --

would be the second highest or the first highest tower west of

the Mississippi.  Obviously that sort of project would involve,

in Jose Huizar's district, significant entitlements in order

for it to go forward.

At the time Defendant Huizar was both the chair

of the PLUM Committee and the city council member over the

district where the hotel was located.  Defendant Chan

facilitated meetings in that regard with other City employees

and generally was aware that this was one of the -- was one of

1    Defendant Huang's goals for the hotel.

2           In addition --

3           THE COURT:  All that is well and good with

4    respect to Defendant Huizar, but why is that -- how does that

5    show that Mr. Chan is somehow involved in the bribery scheme?

6    So far I haven't heard any evidence other than the fact that

7    Mr. Chan made an introduction to Chairman Huang.  Then

8    Chairman Huang and Mr. Huizar entered into negotiations with

9    respect to the loan transaction which ultimately the $600,000

10    was used to settle his sexual harassment lawsuit.

11           There has to be something that -- it seems to me

12    the Government's theory is that, in exchange for that

13    arrangement, Mr. Huizar took certain action favoring the

14    development or the entitlements to the L.A. Grand Hotel.  But

15    so far we have Mr. Chan making introductions, being an

16    interpreter, and I don't see what his -- the evidence is with

17    respect to, one, his knowledge that Mr. Huizar was being asked

18    to take certain actions and his knowledge of what those actions

19    were in exchange for the various entitlements or -- I guess the

20    bribes that were being paid to Mr. Huizar.

21           I guess the first question is did Mr. Chan

22    receive any money from Chairman Huang in connection with the, I

23    take it, votes or favorable treatment that was received by

24    Chairman Huang and his company?  I don't see any allegations of

25    that in the Indictment.

1          MR. JENKINS:  That is correct because there is no

2   allegation that Defendant Chan received any money related to

3   the L.A. Grand Hotel scheme.  At this point there are no

4   allegations that he received money.  The allegation is that he

5   aided and abetted the bribery scheme between

6   Council Member Huizar who received money, $800,000, and

7   Las Vegas and other trip benefits in addition to the 600,000

8   collateral and that the way he received that money, that is,

9   the way Defendant Huizar received that money, was primarily

10  through Defendant Chan who at the time was a City employee who

11  also was intimately involved with Chairman Huang.

12          He knew that Chairman Huang, according to our

13  evidence, wanted something from Defendant Huizar.  In short, he

14  wanted lots of things.  The most significant thing was to

15  redevelop and transform his hotel.

16          THE COURT:  Well, I understand that.  But

17  Mr. Chan wasn't -- I don't know.  Was Mr. Chan involved in any

18  of the Las Vegas trips?

19          MR. JENKINS:  No.  That's why he is alleged to

20  have aided and abetted a bribery scheme between Jose Huizar.

21          THE COURT:  How do you aid and abet a bribery

22  scheme with a simple introduction of Mr. Huizar, who needs

23  money, to Chairman Huang?  You have to have some evidence, it

24  seems to me, that Mr. Chan knew that the result of that loan

25  transaction was going to be some favorable treatment.  And,

1    more importantly, what's the evidence that Mr. Chan knew that

2    Mr. Huizar was -- you know, walked away, for example, from

3    $65,000 worth of chips that had been provided to him by

4    Chairman Huang during the Las Vegas trips?

5              MR. JENKINS:  Well, the Court described multiple

6    ways that Defendant Huizar was bribed.  Defendant Chan is

7    alleged to aiding and abetting the bribery scheme relating to

8    the payment of the --

9              THE COURT:  I guess the more direct question is

10   what is your evidence -- what percipient witnesses do you have

11   with respect to Mr. Chan and his alleged aiding and abetting

12   the bribery scheme with respect to Mr. Huizar?  So far it

13   sounds to me like -- albeit, he's the head of the

14   L.A. Department of Building and Safety -- that he's simply

15   making introductions to -- introductions of various people

16   which I assume is nothing out of the ordinary when you have a

17   developer who is trying to develop a piece of property in

18   Los Angeles.

19             MR. JENKINS:  That's correct.  If that's where

20   the case ended, I would agree with the Court.  But that was the

21   first fact that was alleged.  It was the subsequent conduct.

22   Specifically, the Court asked what is the evidence for the

23   percipient witnesses?  What is Defendant Chan's knowledge?

24   Defendant Chan is the one who asked for and facilitated the

25   bribe payment to Defendant Huizar from Defendant Huang related

1  to the $600,000.

2           THE COURT:  You mean Mr. Chan called up Mr. --

3  Chairman Huang and said Mr. Huizar needs $600,000.  If you

4  arrange this $600,000 loan or, as you characterize, the bribe

5  then Mr. Huizar is going to do certain things for you?

6           MR. JENKINS:  Our evidence would be that was

7  their agreement, yes.  Whether they had that --

8           THE COURT:  Who is going to testify to that

9  agreement?  You have Chairman Huang who is a co-defendant in

10  this case; correct?

11           MR. JENKINS:  Yes, Your Honor.  I was saying most

12  bribery agreements are not that explicit.  Of course the

13  agreement, as how the Court described it, no one I would expect

14  is going to say that there is that specific individual

15  conversation.  However, multiple witnesses, but most

16  specifically the communications between Defendant Chan,

17  Defendant Huizar, between Defendant Huang including text

18  messages and e-mails will be consistent with that Government

19  theory meaning that, yes, it was Defendant Chan who reached out

20  to Chairman Huang to create and become the architect of this

21  payment scheme, that it was Defendant Chan who followed up with

22  both sides of the participants of the scheme, both

23  Defendant Huizar and Defendant Huang, to ensure that this deal

24  got done meaning that the payment was provided, that

25  Defendant Huang did provide it.

1          Ricky Zheng, who is an employee of the chairman,

2     will testify to that.  George Esparza will testify again to

3     these general agreements and the conversations that they were

4     having on their end, meaning Jose Huizar was having

5     conversations with Defendant Esparza saying --

6               THE COURT:  So let me -- so what did Huizar do in

7     order to -- in exchange for the $600,000 and the casino chips

8     and all the other items that he received allegedly as a bribe

9     with respect to the L.A. Grand Hotel?  And how is Mr. Chan

10    involved in those, if he was, those votes?

11              MR. JENKINS:  Sure.  So what Defendant Huizar

12    did, according to the evidence in the Indictment, is that he

13    agreed to help that project, that transformation.  That is,

14    the --

15              THE COURT:  Did he do -- go ahead.

16              Ultimately, as my memory was, the FBI served the

17    search warrant and basically shut down the development of the

18    hotel unless I'm misremembering.

19              MR. JENKINS:  I think you're conflating two

20    memories although your conclusion is still accurate, meaning

21    Jose Huizar did not vote on anything related to the

22    transformation of that hotel because at that point Jose Huizar

23    was publicly under investigation.  However, the Indictment

24    alleged that there was an agreement prior to that, and that

25    agreement was known to the parties including Defendant Huizar,

1    Defendant Huang, and Defendant Chan.  So the Court is correct

2    that, if there is a vote that we could show the Court to that

3    Defendant Huizar put -- I don't know if they use a gavel -- but

4    he voted on something related to the project, that certainly

5    would be significant.

6           Unfortunately for the Government's efforts, we

7    executed multiple search warrants right around that time.  And

8    so obviously at that point neither side could use Huizar at

9    that point.  But the conversations up to that point, as will be

10   testified to by Ricky Zheng, George Esparza, but also most

11   specifically the communications where Defendant Chan was

12   brokering these deals and in his role -- his City roles he was

13   aware of essentially what Defendant Huang wanted meaning what

14   needed to be done at the L.A. Grand Hotel to achieve this dream

15   of transforming it into the tallest building west of the

16   Mississippi because Defendant Chan was in those meetings.

17          Defendant Chan worked for the City.  He's a

18   career city server.  He knows that, to transform the

19   L.A. Grand Hotel, you're going to need a lot of City help, and

20   the biggest help that you can be provided would be through the

21   PLUM Committee and through the council member whose district

22   your project is.  So Defendant Chan's involvement or knowledge

23   we think is clear.

24          The Court, again, is accurate that we're not

25   alleging right now that Defendant Chan from that particular

1     scheme took any money directly.

2                 THE COURT:  Okay.  So are we done with the

3     L.A. Grand and move on to 940 Hill?

4                 MR. JENKINS:  Yes, Your Honor.  The 940 --

5                 THE COURT:  Which also now has been included

6     as -- the LLC has been included as a defendant as well as

7     David Lee.  He's also been named as a defendant in the First

8     Superseding Indictment.  That was formerly known as the masked

9     Development C; correct?

10                MR. JENKINS:  Yes, Your Honor.

11                THE COURT:  What is Mr. Chan's involvement,

12    according to the Government's theory, with the 940 Hill Street

13    development?

14                MR. JENKINS:  This one will be shorter because

15    there is no allegations, no agreements, no conduct.  This one

16    focuses primarily at least as to the defendants Defendant Lee,

17    his LLC, and Defendant Huizar.

18                THE COURT:  So Mr. Chan, according to the

19    Government's theory, does not have any direct involvement or

20    indirect involvement in the 940 Hill bribery scheme?

21                MR. JENKINS:  That is correct, Your Honor.

22                THE COURT:  Okay.  So then that takes us to the

23    Luxe Hotel scheme.

24                MR. JENKINS:  Yes, Your Honor.

25                THE COURT:  And Mr. Chan -- is there any alleged

1    involvement in that scheme?

2              MR. JENKINS:  Yes, Your Honor.

3              THE COURT:  Okay.  What's the Government's

4    theory?  Give me a minute here.  Let me turn to page 30 --

5              MR. JENKINS:  I believe 37, Your Honor.

6              THE COURT:  37 and 38.  Okay.  Why don't you

7    briefly tell us what the Government's theory is with respect to

8    Mr. Chan.

9              MR. JENKINS:  Yes, Your Honor.  So this one I

10   would describe -- we would describe it as consistent with the

11   L.A. Grand Hotel scheme in the sense that Defendant Chan's role

12   was as the introductory person, the connection between the

13   council member Defendant Huizar and a Chinese-speaking Chinese

14   national chairman of Hazens Real Estate Group who owns the --

15   and owns the Luxe Hotel in Downtown L.A. which is in

16   Defendant Huizar's district and was also seeking a major

17   redevelopment project or process which would go through PLUM

18   chaired by Defendant Huizar and ultimately city council.

19              In addition -- and this is where --

20              THE COURT:  Let me go back because your voice cut

21   out a little bit.  Let's first take the timetable.

22              Are the activities that you are alleging against

23   Mr. Chan, did they occur during either his tenure on the

24   Department of Building and Safety or as deputy mayor, or did

25   they occur after he retired in July of 2017?

1      MR. JENKINS:  Yes, Your Honor.  All three.  So
2  the introduction is approximately 2014 when Defendant Chan was
3  a higher up at Department of Building and Safety.
4      THE COURT:  And who did he introduce to -- I have
5  my notes.  So I don't want to -- I don't want to unmask some of
6  these individuals, and I can't -- I guess they are alleged in
7  the Indictment.
8      So we have the principals of the Luxe Hotel are
9  the -- the last name is Yuan, Y-u-a-n.
10      MR. JENKINS:  Correct.
11      THE COURT:  We have two Yuans.  There is another
12  Yuan.  I think it's a different one.  It's the Chairman Yuan,
13  which the first name is F-u-e-r.
14      Is that correct?
15      MR. JENKINS:  That is correct, Your Honor.  To
16  clarify, the prior Yuan is the LLC that owned the Luxe Hotel.
17  So that is actually the LLC where F-u-e-r Yuan, Y-u-a-n, is the
18  person or the chairman.
19      THE COURT:  Okay.  So he's the chair.  So let's
20  go back to the beginning.
21      So Mr. Chan is alleged to have introduced
22  principals of the Luxe Hotel, LLC, which the chair -- so who
23  did he introduce?
24      MR. JENKINS:  Yes.  So he introduced
25  Chairman Yuan -- I believe it's pronounced Y-u-a-n --

1    Chairman Yuan to Defendant Huizar.  That chairman -- we will

2    call him the Hazens chairman for a reference.  Hazens is the

3    Chinese mega-development company that owns the LLC.  That is

4    J-i-a Y-u-a-n.  So that is the LLC owned by Hazens' parent

5    company, and Chairman Yuan is the chairman who owns essentially

6    all of that.

7                THE COURT:  So what was the -- what was the

8    purpose of the introduction of the chairman by Mr. Chan to

9    Mr. Huizar?

10               MR. JENKINS:  I don't know the specific purpose

11   at that point.  The context was that Defendant Huizar was at

12   this point someone who Defendant Chan was very close to.

13   Defendant Chan was also close to many Chinese development

14   companies.  Again, Chairman Yuan or the Hazens chairman speaks

15   primarily Mandarin.  Does not speak English.  Defendant Chan,

16   again, as a bilingual speaker, was someone who made

17   introductions.  And Defendant Chan, again, without trying to

18   gain his intent at that time, it is clear one of the things he

19   did was connect Chinese companies to Defendant Huizar.

20               THE COURT:  What's wrong with that?

21               MR. JENKINS:  That alone absolutely --

22               THE COURT:  I mean, if a Chinese developer wants

23   to build a project or rehab a project and it happens to be in

24   Jose Huizar's district, doesn't it make sense that Mr. Chan

25   would introduce those Chinese developers to the councilman who

1     happens to be -- preside in the district where they want to

2     develop property?

3                   MR. JENKINS:  Yes.  That alone seems like

4     Defendant Chan is doing his job.  Great.  The problem, of

5     course, is what happens afterwards.

6                   THE COURT:  Okay.  Well, let's get to the

7     afterwards.

8                   MR. JENKINS:  Yes.  So the most significant

9     portion is beginning on overt act 131.  Essentially what is

10    alleged is there are different ways -- excuse me.  There are

11    different ways that the Indictment alleges that Hazens provided

12    benefits to Defendant Huizar to help with the Luxe Hotel

13    project.  One of the ways are consulting fees that are

14    described in subparagraph B that Defendant Chan is not alleged

15    to be involved in.  So I'm going to skip --

16                  THE COURT:  Okay.

17                  MR. JENKINS:  -- to C which begins on page 45.

18    And this paragraph -- these sections describe how

19    Defendant Chan, again, was privy to information, sort of the

20    role -- vitality -- the role that Defendant Huizar played in

21    this project meaning that he was the person that the Hazens

22    company really needed to get on their side to make their

23    project happen.

24                  And at this time we allege -- now we are moving

25    forward to around the 2017 time.  So we are jumping from around

1    2014 when the introduction is made.  All of this time Hazens is

2    going through this redevelopment process.  It's a slow process

3    often.  It was particularly slow here.

4              And there was the evidence, as alleged in the

5    Indictment, that Chairman Yuan, the Hazens chairman, was

6    concerned, to put it diplomatically, about the case of this

7    redevelopment project and that he wanted essentially it to go

8    faster.  Defendant Chan was aware of this and one of the people

9    that was attempting to make it essentially go faster meaning

10   that, to put the time frame, I think before the Court began

11   this inquiry.

12             In I believe May of 2016 up to that point,

13   Defendant Chan was at some various levels of significant

14   management over LADBS.  So the Hazens process is going through.

15   Defendant Chan appropriately, as far as we know, was aware of

16   the Hazens project.  He had a relationship or connection with

17   Chairman Yuan that he connected with Defendant Huizar.  At some

18   point, around May 2016, Defendant Chan's position, he's

19   promoted or appointed from his LADBS manager position to Deputy

20   Mayor for Economic Development in around May of 2016, a

21   position he holds until around July of 2017.  So a little over

22   a year.

23             During that whole time, again, the Hazens's

24   redevelopment process with the Luxe Hotel is going on slowly,

25   sluggishly according to the chairman, and it's wanted -- he

1    express a strong interest in wanting it to go faster.

2                    THE COURT:  Expresses that interest to who?

3    Mr. Chan?

4                    MR. JENKINS:  Yes, Your Honor.  Mr. Chan.

5                    THE COURT:  All right.  Well, that's not

6    unremarkable, is it, if you've got investment and Mr. Chan is

7    the head of building and safety, to call him up and say is

8    there anything I can do to move this along faster?

9                    MR. JENKINS:  Again, I don't think that is

10   unusual at all and in a vacuum seems like an appropriate

11   question.  The who you make that to is sometimes an issue, but

12   ultimately it's what's done as a result.  But also, of course,

13   it provides Defendant Chan the knowledge and notice that

14   Defendant Yuan has a motive to, again, alone not an illicit

15   motive, to increase the speed of the project.

16                   THE COURT:  Well, there is nothing wrong with

17   that.  It's not rocket science to figure out if somebody has a

18   project that is not moving as quickly as the developer might

19   like, that they're going to look for ways in order to move it.

20                   MR. JENKINS:  Absolutely.  However, what it does

21   is use the opposite example.  If Chairman Yuan was satisfied

22   with the speed of the project, which occasionally happens in

23   development projects, and never reached out to anyone about his

24   concerns, that would undermine a Government motive that there

25   was a need to bribe anyone at any time.

1          THE COURT:  But I take it that -- I don't know

2    the scope of the responsibilities in a Deputy Mayor for

3    Economic Development, but I assume that one of the

4    responsibilities would be to promote development in

5    Los Angeles.  And if you have a Chinese developer who is

6    unsatisfied with the progress at which a -- their development

7    is being approved by the City, that that would not -- that

8    would not bode well for other Chinese developers to want to

9    invest money in Los Angeles if they're simply going to get tied

10   up in the bureaucratic processes trying to get their projects

11   approved.

12          So it would seem to me it would be consistent

13   with Mr. Chan to want to help this particular development so it

14   didn't have the detrimental effect on any future consideration

15   by Chinese developers or any other type of developer to go to

16   some other jurisdiction and build their buildings.

17          MR. JENKINS:  Again, the Court's assessment is

18   100 percent accurate in that vacuum.  The problem here is that

19   Defendant Chan is alleged to have also agreed with the Hazens

20   consultant to a bribery scheme to facilitate that enhancement

21   of Chinese development which is what makes it illegal.

22          THE COURT:  And who did he agree with?

23          MR. JENKINS:  Co-defendant George Chiang,

24   Co-defendant Jose Huizar, and co-defendant -- not co-defendant.

25   Co-defendant George Chiang and Co-defendant Jose Huizar.

1    George Chiang was the consultant for the --

2                 THE COURT:  And the agreement was, Mr. Huizar,

3    you accept bribes and vote to move these developments along?

4                 MR. JENKINS:  That is the summation of the bribe.

5    But, of course, again, there is no explicit conversation like

6    that.  But that is the point of the bribe, I would say.  That

7    is the --

8                 THE COURT:  Well, obviously it's the point.  But

9    that jumps over a number of -- there has to be a number of

10   hurdles that has to be jumped over.  One, that Mr. Chan knew

11   that by introducing these developers to the councilman who was

12   responsible for their various districts, that that was going to

13   result in the payment of a bribe in order to enhance or promote

14   or speed up the development.  I just don't know what that

15   evidence is.

16                MR. JENKINS:  To clarify, that is not the

17   allegation.

18                THE COURT:  Okay.

19                MR. JENKINS:  The context is that Defendant Chan

20   knows these individuals, but there are several overt acts

21   afterwards that express the agreements.

22                THE COURT:  Okay.  Well, let's get to those.  I'm

23   looking for the -- obviously this Indictment is over 100 pages

24   long, and I slugged through it as best I can.  But I didn't see

25   what I will characterize as smoking gun evidence that Mr. Chan

```
 1   was doing whatever the Government has alleged he was doing
 2   other than the introductions that he was doing.  Anything else
 3   that would give rise to his becoming a member of the RICO
 4   conspiracy?
 5               So far he hasn't financially -- it doesn't appear
 6   he has financially benefited from any of this although he is
 7   apparently indebted to Mr. Huizar for preventing the merger of
 8   the Department of Building and Safety with the other agency.
 9               Go ahead.  I'm still waiting for the smoking gun.
10               MR. JENKINS:  And I'm always waiting for the
11   smoking gun, Your Honor.
12               Here I would say we have significant
13   circumstantial and direct evidence of, one, I would disagree
14   with Your Honor's assertion that he lacked the financial motive
15   as to the first scheme.  This defendant --
16               THE COURT:  I didn't say he lacked the financial
17   motive.  I just said he lacked any financial benefits.  I don't
18   see any money going into his pocket.  He might have had a
19   financial motive, but that motive doesn't seem to have come to
20   fruition.
21               MR. JENKINS:  And so that is where I would take
22   issue.  It came to fruition because, immediately after
23   Defendant Chan left city service, he immediately went to an
24   extremely lucrative consulting business consulting on some of
25   these exact same projects.  So not only did he have a financial
```

```
 1    motive, he had a financial gain after he left the City which is
 2    why the City employs strict ethics rules to prevent exactly
 3    what Defendant Chan did.  But more directly --
 4                THE COURT:  I understand that.  Basically, if
 5    I'm -- if my memory of my notes are correct, he ends up with --
 6    who does he end up in business with?  Let me just ask you.
 7                MR. JENKINS:  Yes.  Racketeering admitted
 8    co-conspirator George Chiang who he formed a company with while
 9    he --
10                THE COURT:  That's C-h-i-a-n-g; right?
11                MR. JENKINS:  That is correct, Your Honor.
12                THE COURT:  All right.  So he leaves -- retires
13    from the City in July of 2017.
14                MR. JENKINS:  Correct.
15                THE COURT:  And then he joins up with
16    Mr. George Chiang.  I assume that there is nothing improper or
17    illegal with respect to Mr. Chan's receiving compensation for
18    acting as a lobbyist or as a consultant for any of the
19    developers that are alleged as part of this RICO conspiracy if
20    he's no longer employed by the City.  He's free to earn a
21    living.
22                MR. JENKINS:  He's free to earn a living but not
23    in the way Your Honor just described.
24                THE COURT:  Okay.
25                MR. JENKINS:  Number one --
```

1          THE COURT:  Why is it illegal or improper for

2     Mr. Chan to earn a living after he -- as a consultant or as a

3     lobbyist for various developers after he leaves the employ of

4     the City in July of 2017?

5          MR. JENKINS:  For multiple reasons, and I would

6     say for the reason that this Indictment outlines is that the

7     City renewed an individual --

8          THE REPORTER:  Counsel, you just broke up a

9     little for me.  Can you please repeat?

10          MR. JENKINS:  Yes, madam court reporter.

11          The City ethics prevents exactly what this

12     Indictment outlines as a corrupt relationship meaning that City

13     ethics is concerned that, while individuals are working for the

14     City, they're secretly actually working to benefit their future

15     employment for future developers.  Accordingly, they have

16     ethics rules that Defendant Chan, a career civil servant,

17     received annual training at least on provisions that would bar

18     him from lobbying even through third party entities or agents,

19     city officials after he left government employment.

20          Moreover, he was permanently --

21          THE COURT:  But that bar doesn't last forever.

22          MR. JENKINS:  It lasts for a year.  And then

23     additionally there is a permanent, which does last forever, ban

24     against city employees who personally participated in a project

25     meaning they worked on a specific project.  For example,

1  Defendant Chan worked significantly, as the Court pointed out,

2  to help Hazens because, as the Court pointed out, he wanted to

3  help Chinese development companies.  All of that, okay.

4  However, according to the ethics rules, because he

5  substantially participated in helping Hazens, he would be

6  forever precluded from taking payment from Hazens to lobby city

7  officials.

8          And the whole reason is, again, exactly what one

9  of the outlines of this Indictment, that Defendant Chan was

10 actually, while working for the City, also working for himself.

11 From George Chiang the allegation is that he did agree to take

12 a bribe, bribes that were ultimately paid after he left the

13 City, bribes that totaled over $100,000.  But Defendant Chan,

14 being a sophisticated person, did not take money before that

15 time period, but he agreed to take it as alleged in the

16 Indictment.  Ultimately he did take it.  And, moreover, by any

17 standard, he violated multiple City ethics rules after he left

18 the city to achieve this purpose which again --

19          THE COURT:  Those are the allegations in overt

20 acts 203, 204, and 205 where George Chiang accepted from

21 Mr. Yuan the $100,000 check as the bonus payment for Synergy,

22 which I don't understand what Synergy is, for successfully

23 reaching the Planning Department Advisory Hearing that was

24 scheduled in May of 2017.  And then there was a conversation

25 between Mr. Chan, the defendant, and Mr. George Chiang about

 1    getting his share, which apparently is $20,000, and Mr. Chan

 2    said, no, he wanted to wait because he expected there was going

 3    to be larger payments.

 4            It looks like the timing of this was such that --

 5    this was in May of 2017.  Mr. Chan, recognizing his ethical

 6    obligations or -- in any event, strike that.  Mr. Chan,

 7    recognizing that it probably didn't -- he should wait until

 8    after he left L.A. and the city employment in July of 2017.  So

 9    he's agreeing with his future employer or partner that,

10    whatever monies are coming, let's wait.  I don't want to see

11    those monies until after I have left the city employment.

12            MR. JENKINS:  Yes, sir.

13            THE COURT:  Is that the Government's theory?

14            MR. JENKINS:  That is the Government's theory as

15    supported by the evidence.

16            THE COURT:  What is the Synergy just briefly?

17    Because I don't understand the Synergy.  You started overt act

18    No. 195 with the -- with Synergy, and somehow -- and I don't

19    know what Synergy is.  Somehow Synergy is taking over the

20    Luxe Hotel project with George Chiang and another consultant.

21    I don't understand that.  Can you explain it to me?

22            MR. JENKINS:  Certainly, Your Honor.

23            George Chiang, again, admitted co-conspirator in

24    this enterprise --

25            THE COURT:  He's testifying on behalf of the

```
1    Government in this case?

2              MR. JENKINS:  That is correct.  Yes.  He is one

3    of the individuals that testified in exchange for potential

4    leniency at sentencing.

5              THE COURT:  Okay.

6              MR. JENKINS:  He was the sole owner of Synergy

7    which was essentially a political consulting firm, essentially

8    real estate consulting.

9              THE COURT:  Okay.

10             MR. JENKINS:  At the time Defendant Chan and

11   George Chiang also had a professional and personal

12   relationship, meaning they knew each other.  And while

13   Defendant Chan was in the City, George Chiang was at Synergy.

14   They developed a plan that, when Defendant Chan would leave the

15   City, they would form a new consulting group focusing on

16   Chinese development companies with which they both had

17   connections and levels of expertise.  They would form this

18   company.

19             The company they did form and agreed to form was

20   CCC.  So three C's -- Chiang Chan Chan.  So Synergy was sort of

21   the predecessor to what becomes CCC once Defendant Chan left

22   the city employment.

23             THE COURT:  I see.  So Synergy is basically a

24   consultant.  And when you allege in 196 it is taking over the

25   Luxe Hotel project, it is taking over as a consultant.  It's
```

1    not taking over the project somehow and in any other fashion.

2              MR. JENKINS:  That is correct, Your Honor.

3              THE COURT:  So they're replacing the prior

4    consultant for Luxe Hotel project with Synergy which is a

5    George Chiang company which Mr. Chan is aware of.  Now I

6    understand it.  The thing was so artfully worded I couldn't

7    figure out what "taking it over" meant.

8              MR. JENKINS:  Understood.

9              THE COURT:  All right.  I interrupted you.  So

10   you've got these payments that are being made by the

11   Luxe Hotel.  And -- these, I assume, are going to be argued by

12   the defense as consulting fees.  And, in fact, in overt act 203

13   you have alleged that George Chiang accepted a $100,000 check

14   for his bonus payment for Synergy, the consulting firm,

15   successfully reaching the Planning Department Advisory Hearing

16   scheduled for May 24, 2017.

17             So I take it there is nothing improper about the

18   Luxe Hotel principals paying consulting fees for moving this

19   particular project closer to completion or at least approvals

20   in the Planning Department.  Is there something improper about

21   that?

22             MR. JENKINS:  No, Your Honor.  That alone is,

23   again, George Chiang doing George Chiang's job as a consultant

24   and the entity trying to utilize George Chiang.  So that alone,

25   no.  Again, what --

1           THE COURT:  Okay.  So basically your theory is

2    that Mr. Chan committed certain ethical violations when the --

3    when he left the City in July of 2017 by acting as a consultant

4    to certain of these developers during the relevant time period

5    and acting as a consultant for certain of the developers of

6    which he would -- there was a lifetime ban because he worked on

7    these projects while he was employed by the City.

8           MR. JENKINS:  Two points of clarification.  The

9    ethical violations are limited to lobbying meaning that you

10   have to lobby a city official, essentially try to get a city

11   official to make a decision to favor his client which we

12   believe he did.  That is the ethical violation.  But the

13   ethical violations mainly shows, in the Government's view, the

14   corrupt intent by Defendant Chan, Co-defendant Chiang because

15   the agreement was while Defendant Chan was a city employee.  It

16   is not an ethical violation here.  It is alleged to be a

17   bribery agreement.

18           THE COURT:  So is Mr. Huizar involved in this

19   bribery scheme?

20           MR. JENKINS:  He is involved sort of by the other

21   side, Your Honor, meaning that this -- here the conspiracy is

22   between George Chiang and Defendant Chan that they would

23   through bribery, meaning -- at this point Defendant Chan

24   actually is in the City.  So the person George Chiang wants to

25   bribe here is Defendant Chan, the city employee, the person who

1    is in charge of development, the person who is the gatekeeper

2    to Jose Huizar.

3              If Defendant Chiang got Defendant Chan to help

4    the Hazens project, the company for which he just took over,

5    Synergy, George Chiang's company just took over for the

6    chairman who was very upset about the slowness of the process,

7    he gets onboard, needs to get the job done.  He has his friend

8    Defendant Chan and says, Defendant Chan, this would be a great

9    idea.  We can make this project go through.  Let's agree to

10   share these consulting fees which the Government alleges are

11   transformed into bribe payments to Defendant Chan.

12             THE COURT:  All right.  So you've got an

13   allegation at page 53.  The heading we have been talking about,

14   benefits from George Chiang to Defendant Chan in exchange for

15   his official acts.  So what were the official acts that

16   Mr. Chan participated in or -- in exchange for the benefits

17   received from Mr. Chiang?

18             MR. JENKINS:  Yes, Your Honor.  The official acts

19   that Defendant Chan is alleged to have taken in furtherance of

20   this bribery scheme where he was the recipient of the bribe

21   come essentially in two forms.  Under *McDonnell*, the

22   Supreme Court case defining what an official act is, it makes

23   clear that, if a city official pressures another city official

24   to take action, that is an official act.  So here as alleged

25   in -- I will point to the one that is right in front of me,

1    overt act 202, and that's on page --

2              THE COURT:  I have it.

3              MR. JENKINS:  Okay.  We allege that as an overt

4    act because it is Defendant Chan in his capacity as deputy

5    mayor exerting pressure over a mayoral appointed public

6    official urging a planning commission official to take official

7    action.  Here essentially, again, it is Defendant Chan who was

8    appointed by the mayor, reaches out to a subordinate committee

9    whose job it is --

10             THE COURT:  How are you going to prove it?  Are

11   you going to have the -- I mean, it's one -- exerting pressure

12   over and urge the planning commission official to approve,

13   isn't that something that is normally done?

14             MR. JENKINS:  It's normally done, but it's

15   illegal, as normal however as it is, if you take money to do

16   it.  And, yes, planning commission official 1 will testify that

17   he was advocated -- that Defendant Chan advocated that he take

18   this action.  He will also testify that it was unusual that

19   Defendant Chan was taking such a personal interest in this

20   particular matter.

21             THE COURT:  Would this planning official No. 1

22   testify that he wouldn't have approved the Luxe Hotel project

23   if it hadn't been for the, quote, "exerted pressure" exerted by

24   Defendant Chan?

25             MR. JENKINS:  I don't know the answer off the top

1    of my head except legally our answer is that answer is

2    irrelevant because, regardless of whether it was the best

3    decision possible, the fact that Defendant Chan agreed to take

4    the money to exert that pressure makes it a federal crime.

5             THE COURT:  Okay.  All right.  Is there any

6    other -- there's other acts, but I think, given the time

7    constraints this morning, unless the Government wants to add

8    anything, let's move to Project M which is still masked.

9             Is Mr. Chan involved in the Project M bribery

10   scheme?

11            MR. JENKINS:  He is not, Your Honor.  But if I

12   could briefly take your invitation just for a second.  The

13   additional thing we would add -- because clearly the Court's

14   questions we take well.  The additional specific acts that

15   Defendant Chan is alleged to have taken on his own was -- and

16   he agreed to request a $100,000 PAC payment that would go from

17   Chairman Yuan, the Hazens chairman, to Defendant Huizar's wife

18   who was running at that point to succeed him.  And the

19   allegation there is that was in exchange for Defendant Huizar's

20   assistance with the Luxe Hotel project.

21            So for the time frame this is now --

22   Defendant Chan is in his private capacity.  So he's outside of

23   the City.  He's working, again, we think violating ethics

24   rules, but he's working as a consultant for Hazens, the project

25   we have been talking about.  Chairman Yuan, his -- the person

1    he has the relationship with, still needs his project done, and

2    the allegation is that, for Defendant Huizar's request for

3    $100,000 to this PAC for his wife, Defendant Huizar would then

4    further help the Hazens project.

5                So that is just another specific incident that we

6    allege shows a continuing theme and scheme of Defendant Chan

7    being the -- not just aider and abetter but one of the

8    individuals who was creating bribery arrangements between

9    Defendant Huizar and others.

10               THE COURT:  All right.  So Mr. Chan is not

11   involved in the project and bribery scheme.

12               And the last scheme is Businessperson A, and he's

13   the cabinetmaker that decided to work with the Government, work

14   with the FBI starting sometime in March of 2018?

15               MR. JENKINS:  That --

16               THE COURT:  Mr. Chan, is there any -- is it the

17   Government's theory that Mr. Chan is involved with

18   Businessperson A?

19               MR. JENKINS:  Yes.  I believe August 2017 is when

20   Businessperson A, AKA, the cabinetmaker, began working with the

21   FBI.  That Businessperson A is involved in the Indictment and

22   various schemes.  I will focus just on the ones where

23   Defendant Chan is alleged to have participated.

24               The eye level view is that Defendant Chan,

25   consistent with the evidence, that he was one of the

1    individuals trying to essentially create bribery opportunities

2    in order to further -- at this point he's outside of the City.

3    So Defendant Chan is trying to, in our view, now directly

4    benefit financially and professionally by being a consultant

5    who can get things done and by leveraging his relationship with

6    the City.

7                   So Businessperson A, who is a wealthy

8    cabinetmaker, was utilized by Defendant Chan to provide

9    benefits through other city officials.  For example, overt

10   act -- starting at overt act 221 --

11                  THE COURT:  221?

12                  MR. JENKINS:  Correct, Your Honor.  221.  This

13   one has the header "City commissioner's relative."  So the city

14   commissioner is someone who, according to Defendant Chan's own

15   chart, the chart that he had on his computer that was titled

16   "People to influence," on that people to influence there are

17   such individuals like Defendant Huizar who we obviously believe

18   was one of the main individuals that Defendant Chan --

19                  THE REPORTER:  Counsel, you froze up on me.

20                  MR. JENKINS:  No problem.  Thank you, madam court

21   reporter.

22                  That Defendant Chan sought to bribe or facilitate

23   bribes to.  In addition to Defendant Huizar, by

24   Defendant Chan's own admission or acknowledgment, another city

25   official that he sought to influence is City Commissioner 1

1    whose name is masked.  This individual's position was another

2    city position who could help facilitate entitlements or real

3    estate development projects.

4             The scheme that is alleged beginning at overt

5    act 221 in summary was that Defendant Chan was the architect of

6    a payment arrangement by which City Commissioner 1's wife would

7    be paid by Businessperson A for some form of vague employment

8    meaning it was not exactly clear what she would do.  The

9    point, at least as will be testified to by Businessperson A as

10   corroborated by the recorded interactions with Defendant Chan,

11   the point really was to curry favor with City Commissioner 1

12   through these payments.

13            So Businessperson A, in fact, did hire

14   City Commissioner 1's wife and ultimately paid her over a

15   period of four months $16,000.  Businessperson A will testify,

16   as corroborated by recorded conversations with Defendant Chan,

17   that the only reason he hired this person was at the direction

18   of Defendant Chan and to benefit the relationship with

19   City Commissioner 1 was a person Defendant Chan was seeking to

20   influence at the time.

21            THE COURT:  This was all after Mr. Chan left the

22   employment of the City?

23            MR. JENKINS:  Correct.

24            THE COURT:  These are all in April, May 2018?

25            MR. JENKINS:  Correct.  At this point he's

1     alleged to be the briber.  He was previously the bribee.  He

2     was previously before that a bribe facilitator.  He is alleged

3     to be a bribe facilitator, a bribe recipient, and a briber

4     throughout the years all for the goal of increasing development

5     projects and his financial interest as essentially being a

6     go-to person for development projects in Downtown L.A.

7               In addition, consistent with the -- our view of

8     the evidence that Defendant Chan would find surreptitious ways

9     to pay city officials, overt act 234 describes another secret

10    payment arrangement using a family member, this time a City

11    Staffer A-2, overt act 234 on page 61.

12              City Staffer A-2 was a significant senior

13    official on Defendant Huizar's staff, someone who had

14    significant influence over all of the planning projects, not

15    just CD-14 which the vast majority of the projects were going

16    through, but this individual also had oversight over all the

17    projects in the city because, in Defendant Huizar's capacity as

18    chair for the Planning & Land Use Management, Defendant Huizar

19    would oversee all the projects across the city.  So would this

20    City Staffer A-2.

21              THE COURT:  You closed a loop on that.  That is

22    covered in overt act No. 450 and overt act No. 451 with the

23    heading of Defendant Chan's attempt to witness tamper, and that

24    is in November of 2018 he, according to the Indictment, drafted

25    a document that he later provided to Businessperson A which

1    appeared to serve as the script for Businessperson A's

2    summarizing Defendant Chan's version of the facts regarding

3    Chan's plan of Businessperson A paid City Staffer A-2 a

4    finder's fee, and it goes on to describe the script.

5              I take it that the Government has that script

6    that was provided to Businessman A?

7              MR. JENKINS:  We do, Your Honor.

8              THE COURT:  And then, of course -- was this --

9    were these meetings -- because by this time it appears that

10   Businessperson A -- and that's why my notes reflected November

11   of 2018 -- he was obviously working for the bureau prior to

12   that, but at least November 2018 as working for the FBI, were

13   these conversations recorded?

14             MR. JENKINS:  Yes, Your Honor.  All those

15   interactions are recorded including the ones you just

16   described.

17             THE COURT:  Okay.  So the -- when Mr. Chan,

18   according to the Government's theory, changes hats from a

19   bribee to a briber, this is one of what the Government would

20   characterize as the smoking gun transaction which has evidence

21   of the actual consulting fees that were paid and then

22   Mr. Chan's efforts to cover those up by providing this script

23   to Businessperson A?

24             MR. JENKINS:  We would certainly describe that as

25   very direct evidence of a corrupt intent of a bribery scheme

```
 1   and consistent with all the other evidence that is alleged that

 2   he participated in.

 3               THE COURT:  So you disagree it was the smoking

 4   gun?

 5               MR. JENKINS:  I don't want to overstate anything

 6   and describe it as a smoking gun, but we are certainly

 7   confident that it informs our view of the defendant.

 8               THE COURT:  Okay.  Let's move to the substantive

 9   counts.  Count 28 -- let's first take count number -- Count 29

10   which is the false statement which is also covered by overt act

11   No. 452, and that's the -- on November 7, 2018, recorded

12   interview.

13               Who was present during the course of that

14   interview on November 7th?  You have alleged that he made

15   various false statements to the FBI, the first of which that he

16   was not involved and had no involvement in the settlement of

17   Defendant Huizar's 2013 sexual harassment lawsuit.  And we

18   talked about the evidence with respect to that.  And, B, the

19   false statement relates to Chairman Huang, H-u-a-n-g, doesn't

20   have anything in front of Jose Huizar's district but needs

21   Huizar's help or involvement.  And then the third is that Yuan

22   never asked Huizar for anything including help on the hotel.

23               I understand how the Government -- I think I

24   understand how the Government intends to prove those statements

25   are false.  But was anybody else -- who participated in this
```

1  November 7th interview?

2             MR. JENKINS:  Yes, Your Honor.  And it's now 39.

3  The interview was conducted by FBI Special Agents

4  Terri Tampubolon and Heath Smally who the interview was

5  recorded.  There is a transcript that has been provided --

6  excuse me -- a transcript that has been created and that will

7  be primary evidence, the witnesses in that report.

8             THE COURT:  Was he represented by counsel?

9             MR. JENKINS:  Not at that time, Your Honor.

10            THE COURT:  Okay.  The reason I ask is I remember

11 from your -- our discussion with respect to Mr. Huizar that

12 there were various interviews that were conducted that

13 Mr. Huizar was represented by counsel.  I guess my question is,

14 with respect to Mr. Chan, was there any proffer sessions or any

15 statements made by Mr. Chan during the time that he was -- that

16 counsel was present?

17            MR. JENKINS:  No, Your Honor.  He declined after

18 counsel was retained.

19            THE COURT:  Okay.  So the only -- the only

20 interview was the November 7, 2018, interview, and that was

21 prior to retaining counsel, and that forms the basis of the

22 false statement.  So there's no other statements that would be

23 involved in this case either -- other than during the course of

24 the conspiracy.  No post-arrest statements.

25            MR. JENKINS:  There is an additional -- he wasn't

1    arrested, to be clear, at the time of November 7th.  Also, the

2    next day, November 8th, 2018, Defendant Chan voluntarily

3    reached back out to Special Agent Tampubolon to further discuss

4    the topics that were discussed the prior day.

5              THE COURT:  And did he continue to lie allegedly?

6              MR. JENKINS:  We believe he provided incomplete

7    and misleading information, but it is not presently the subject

8    of any charges.  But we intend to admit evidence from it to

9    show a further misleading intent at minimum.

10             In addition, there is an additional interview

11   conducted at Defendant Chan's -- the CCC business that he had

12   with co-defendant George Chiang.  There was an interview of him

13   by Special Agent Andy Civetti.  So this is when Defendant Chan

14   essentially was in private practice in his private capacity.

15   There's an interview done there.  But I do not believe any

16   charge would result from that interview.

17             The only significant evidence, at least now that

18   is alleged in the Indictment related to that interview, is

19   that, immediately after Special Agent Civetti and the other

20   special agent left the interview and Defendant Chan's personal

21   private business office, he immediately went to the chairs, as

22   alleged in the Indictment, appears to have looked for

23   surveillance equipment on the chairs which we thought would be

24   significant.  But that is essentially the only conduct from

25   that interview that is alleged in the Indictment.

1          THE COURT:  All right.  Are there any searches

2    that were conducted that resulted in the seizure of any

3    property from Mr. Chan?

4          MR. JENKINS:  Yes, Your Honor.  The Government

5    seized -- searched and seized evidence from the CCC business

6    that is George Chiang and Defendant Chan's business.  Most

7    significantly these searches were digital meaning

8    Defendant Chan's e-mails, his phone from which there was

9    significant evidence or at least a volume of evidence that was

10   seized and is available -- will be available in digital format.

11          The most significant pieces of evidence are

12   alleged in the Indictment meaning there are e-mail

13   communications, text communications, the Google drive which

14   contains the people to influence chart.  Those are the evidence

15   in terms of things that were seized where they were derived

16   from.

17          THE COURT:  Were any of Mr. Chan's calls

18   intercepted by the Government?

19          MR. JENKINS:  Yes, Your Honor.  Defendant Chan

20   was the subject of one of the wiretap affidavits in this case.

21   So he was intercepted for a period.  The estimate is that there

22   were -- I think the best way to describe it is how many line

23   sheets or pages of line sheets.  So that would be pertinent for

24   recordings intercepted.  There's approximately 1,600 pages of

25   line sheets which again are pretty -- they're not verbatim

```
 1    transcripts, but the FBI did a pretty outstanding job -- so
 2    there's pretty close to it, or summaries, or if it's a text
 3    message, it's simply the text message.
 4             In addition, as alluded to by my prior comment,
 5    there was an audiovisual bug -- bugs installed in the CCC
 6    office surreptitiously by the Government pursuant to court
 7    order.  So there are recorded audio and recorded video from
 8    those bugs.
 9             THE COURT:  What office is that?
10             MR. JENKINS:  We call it the CCC office.  It was
11    formerly the Synergy office.  These are the consulting
12    companies first owned by George Chiang, and then when
13    Defendant Chan teamed with George Chiang, they used the same
14    office.  It's an office in Downtown L.A. for their consulting
15    firm.
16             THE COURT:  Okay.  The ultimate -- the LABXG,
17    which is alleged in paragraph 13 which was formed in August of
18    2017, is that -- is that -- you allege it as an Inc.  Who owns
19    that company?
20             MR. JENKINS:  Defendant Chan, Your Honor.
21             THE COURT:  And is Mr. Chiang part of that
22    company?
23             MR. JENKINS:  He is not as far as we know,
24    Your Honor.
25             THE COURT:  Okay.  So we talked about the
```

 1  statements.  We talked about the searches.  We talked about the

 2  wire intercept.

 3           What is the status of producing the discovery to

 4  Mr. Braun?  I realize this case has just -- PIA took place on

 5  Monday.

 6           MR. JENKINS:  That is correct, Your Honor.  On

 7  Tuesday or December 2nd, whichever day of the week that is, we

 8  sent an e-mail to Defendant Chan's counsel Mr. Braun outlining

 9  plans for discovery.  So there is a stipulation for a

10  protective order.  There is a draft transcript agreement.  We

11  requested a hard drive from him.  A significant portion of

12  discovery is essentially ready, but it will take some time to

13  upload it to a hard drive once we receive it from Mr. Braun.

14  So we sent an e-mail, made a request to meet with him to see

15  the most efficient way forward.

16           So presumably Mr. Braun is here, so we can have

17  that conversation at some point soon to get that process

18  rolling.  But it is in large part substantially done or ready

19  to be done.

20           THE COURT:  Is the discovery as voluminous as the

21  discovery in Mr. Huizar's case, or is there more or less or

22  about the same?

23           MR. JENKINS:  I would say more so because it

24  includes all of the same evidence because ultimately the

25  racketeering charge is alleged against them both.  The conduct

```
 1   therein is overlapping.  In addition, there is Defendant Chan's

 2   specific recordings, for example, and other individual things

 3   that weren't provided to Defendant Huizar at this point but

 4   would be provided to Defendant Chan.

 5              And, in addition, there's a couple additional

 6   items such as Defendant Chan's actual wiretaps that need to be

 7   processed and provided.  But discovery will be voluminous.

 8              THE COURT:  And the Title III applications have

 9   all been unsealed because my memory is they were produced to

10   counsel for Mr. Huizar.

11              MR. JENKINS:  All the ones relevant to this

12   charged case, yes, Your Honor.

13              THE COURT:  Okay.  So those are available for

14   Mr. Braun.

15              MR. JENKINS:  Yes, Your Honor.  They will be.

16              THE COURT:  Does the Government have any

17   intention of adding any additional -- filing a second

18   Superseding Indictment adding any defendants or any additional

19   charges?

20              MR. JENKINS:  The investigation is ongoing,

21   Your Honor.  However, I would say at this point the most

22   significant foreseeable charges have been brought.  So if I

23   could -- if the Court would indulge my hedging on this

24   question, it is an ongoing investigation.  Whether that results

25   in a Superseding Indictment in this case or a new Indictment in
```

1  a separate case or none of the above, it's difficult to tell.

2  But at this point, Your Honor, a significant portion of the

3  evidence has been reviewed, and we believe the appropriate

4  charges on defendant have been brought.

5           THE COURT:  All right.  The last question I have

6  is on the forfeiture counts.  I know we -- we had a discussion

7  on forfeiture allegations in the original Indictment.  Is there

8  any specific property that the Government is seeking to forfeit

9  with respect to Mr. Chan?

10          MR. JENKINS:  There is no specific property

11  identified right now to Defendant Chan, no.

12          THE COURT:  Okay.  Mr. Braun, I didn't mean to

13  exclude you from any of our discussion this morning, but I

14  realize that you're -- you have -- there's a lot of material

15  to -- for you to look at.

16          My question for you is the dates that have been

17  set in this case -- and I will issue today a Criminal Trial

18  Order, today or Monday.  But we have a trial date that was

19  agreed to by Mr. Huizar's counsel and the Government of June

20  22nd of 2021, and there are various deadlines to file pretrial

21  motions, all of which are set forth in docket No. 63.  I don't

22  know if you have had time to look at those dates and, more

23  importantly, whether or not you believe that you can work

24  within those -- within those dates.  I realize you're at

25  somewhat of a disadvantage because you haven't had the benefit

1   of any discovery, but I wanted to get your thoughts on that.

2                    MR. BRAUN:  Yes, Your Honor.  I just received

3   notice over Thanksgiving, Sunday, that this case was being

4   indicted for my client to show up.  I guess they had a press

5   release they wanted to beat.  So I didn't have anything.  But I

6   actually have another case involving a Chinese student in

7   custody pending in front of Judge Fitzgerald that we're trying

8   to take a deposition of a material witness.  To be blunt, that

9   case has priority.

10                   But I have been doing some background work on

11  this case anyway over the last number of months.  Perhaps --

12  there's obviously no way we could be ready before that June

13  trial date.  Maybe we could schedule another status, say, in 60

14  to 90 days.  That way we will have a better idea of what the

15  discovery is.

16                   THE COURT:  I'm sorry.  Your other case is in

17  front of which judge?

18                   MR. BRAUN:  Judge Fitzgerald, Michael Fitzgerald.

19                   THE COURT:  Judge Fitzgerald.  Okay.  What I'm

20  going to suggest is -- obviously I don't expect you to be

21  committed to these dates today, but we have got two other

22  groups of defendants.  We have got Chairman Huang, and we have

23  got Mr. Lee.  So it seems to me what makes sense is to have

24  another hearing -- I don't know if I need another Trial Setting

25  Conference with respect to those defendants although it may be

```
 1   helpful.  When is the PIA set for the other defendants?
 2              MR. JENKINS:  Next Monday, December 7th, PIA for
 3   Defendant Lee who is charged in a separate scheme that we did
 4   not discuss.  To the point of whether an additional trial
 5   setting will be necessary potentially for Defendant Lee and his
 6   LLC, those are both December 7th.  Subsequently, December 14,
 7   the following Monday, the PIA and initial appearance for
 8   Shen Zen Company, that is, the Chairman Wei Huang's company, is
 9   scheduled to make their appearance on December 14.  I would
10   also note that counsel for Defendant Huang has indicated that
11   his client does not intend to appear.  His client is currently
12   in China and has respectfully declined our invitation to appear
13   on this Indictment at this time.
14              THE COURT:  I take it we are going to have
15   some -- the initiation of some process in order to bring him to
16   Los Angeles to stand trial?
17              MR. JENKINS:  We are certainly exploring all our
18   options.  He is in China which makes it a little more
19   difficult, but we are certainly not done with that defendant,
20   Your Honor.  So we are exploring our options.  And we are
21   negotiating with his counsel, and we are hopeful, perhaps not
22   optimistic, that potentially we can reach some resolution.  I'm
23   not sure what resolution would be reached, but right now we
24   intend to let him know essentially he is a fugitive as of that
25   notice.
```

1    THE COURT:  And the LLC, the Shen, S-h-e-n,

2    second word for the reporter is Z-h-e-n, New World One -- my

3    memory was -- I could be wrong -- there was another LLC which

4    was Shen, S-h-e-n, Zen, Z-e-n, Corporation which was a

5    California LLC which was somehow involved in this Indictment,

6    but is my memory correct or my notes correct that that LLC is a

7    separate entity from the New World, LLC, but owned by

8    Chairman Huang?

9    MR. JENKINS:  I think you're right.  Essentially

10   there is a Shen Zen New World Chinese mega-development company

11   and Shen Zen the Provence.  There is also one of the domestic

12   subsidiaries, the formal name is Shen Zen One, LLC.  That is

13   the domestic LLC that has been indicted in this case.  And then

14   they do intend to appear through Richard Steingard on the 14th.

15   THE COURT:  Is the New World One, LLC -- that is

16   the California LLC or Chinese mega-company?

17   MR. JENKINS:  That is the domestic -- the LA LLC.

18   THE COURT:  Okay.  So -- all right.  So I was

19   confused as to why you hadn't charged the domestic LLC, but

20   apparently you have charged that entity.  So that entity is

21   going to appear, and that entity is represented by

22   Mr. Bruce Cohen?

23   MR. JENKINS:  He is now represented by

24   Richard Steingard, S-t-e-i-n-g-a-r-d.

25   THE COURT:  All right.  And Chairman Huang is

1    represented by Kenneth Klein?

2              MR. JENKINS:  Formerly Kenneth Klein, now

3    currently represented by Paul Meyer and Greg Wilke, W-i-l-k-e.

4              THE COURT:  Your voice cut out.

5              The PIA for Mr. Lee and his LLC 940 Hill is for

6    December 7th.  Did you indicate it would be worthwhile to have

7    a Trial Setting Conference, or you didn't think it was

8    necessary?

9              MR. JENKINS:  We do believe it would be

10   appropriate and helpful for all parties and would be distinct

11   information that was not discussed today.

12             THE COURT:  Okay.  Then what I will do is -- if

13   the PIA is on Monday, then I will tell the PIA clerk to set up

14   a Trial Setting Conference for next week for Mr. Lee and Hill.

15   Is there any day that the Government is not going to be

16   available?

17             MR. JENKINS:  We will make ourselves available.

18   We appreciate the offer.  We are pretty open next week,

19   Your Honor.

20             THE COURT:  All right.  Well, I will then get PIA

21   a date.  I will check my calendar for next week.

22             As I said, I think what makes sense is, once we

23   have all of the defendants making their -- let me ask you this.

24   The PIA for New World One, LLC, is there any reason to have a

25   Trial Setting Conference for the entity?

1        MR. JENKINS:  For that one we do not think so

2   until the individual defendant appears.

3        THE COURT:  Which the chances of that happening

4   are slim to none.

5        MR. JENKINS:  I'm not a betting person, but I

6   don't disagree with that assessment.

7        THE COURT:  Okay.  Well, to the extent you're

8   going to -- you're going to use the process of a court to

9   secure Chairman Huang's appearance, I suggest that you initiate

10  that effort promptly because, whatever trial date we do set, I

11  am not going to continue the trial waiting for Mr. -- for

12  Chairman Huang to show up, and I certainly don't want to try

13  this case twice.

14       MR. JENKINS:  Absolutely, Your Honor.  We will do

15  so.  Absolutely.

16       THE COURT:  And you will keep the Court advised

17  as to whether or not you made a decision whether or not to try

18  to secure his attendance?

19       MR. JENKINS:  Yes.  We will apprise the Court as

20  soon as we make a decision as to what that process is.

21       THE COURT:  So it seems to me, once we have

22  Mr. Lee on board, have conducted the Trial Setting Conference

23  next week, that maybe in early January counsel will get

24  together and meet and discuss the current dates that are set

25  forth in docket No. 63.  To the extent that those dates need to

1   be changed, come up with a stipulation as to the acceptable

2   dates for everybody's calendars, and then we can go from there.

3               Does that make sense, Mr. Braun?

4               MR. BRAUN:  Yes, Your Honor.

5               THE COURT:  Mr. Jenkins, are you on board with

6   that?

7               MR. JENKINS:  Yes, Your Honor.  Thank you.

8               THE COURT:  All right.  I don't have anything

9   else.  I appreciate --

10              MR. BRAUN:  This is Harland Braun.

11              The Government got an order that my client -- and

12  I talked to his son about this case.  I didn't pay much

13  attention to it at the time.  His son is a lawyer, licensed to

14  practice in California.  We intend to use him to help prepare

15  the case.  I just assumed the Government didn't realize that he

16  was a lawyer when they got that order.  But we intend to use

17  Jeremy Chan as an assistant to help prepare his father's case.

18  In that case, he will have to discuss the case with his father.

19              So I don't know if the Government is prepared to

20  concede that now or consider that problem.  But I think my

21  client has a right under *Lopez Guzman* to an attorney of his

22  choice even if it is his own son.  And I don't think there is

23  any evidence that the son was involved in any of these schemes.

24              THE COURT:  I will let you take that up with the

25  Government.  To the extent that it remains an issue, you can

```
 1   file something with the Court.

 2                 MR. BRAUN:  Yes, Your Honor.

 3                 MR. JENKINS:  And just for the record,

 4   Your Honor, the defendant's son is referenced in the First

 5   Superseding Indictment which would create potential conflict.

 6                 THE COURT:  Okay.  Well, I will let you fine

 7   lawyers work out the issues, and to the extent that you can't

 8   work out the issues, I'm always here to make rulings.

 9                 MR. JENKINS:  Understood.

10                 MR. BRAUN:  Thank you.

11                 MR. JENKINS:  Thank you very much.

12                 THE COURT:  All right.  Everybody stay safe.  I

13   don't know what's going to go on this week, but this is getting

14   to be --

15                 MR. BRAUN:  2,700 people died yesterday,

16   Your Honor.

17                 THE COURT:  In any event, I just can't imagine

18   continuing this way until the spring of next year.  Maybe we

19   will all be vaccinated by then.

20                 MR. JENKINS:  We hope.

21                 MR. BRAUN:  Or maybe like China everyone will put

22   on their mask.

23                 THE COURT:  Right.

24                 MR. BRAUN:  People have a problem doing that.

25                 THE COURT:  All right.  Well, in any event, stay
```

1    safe, and have a good weekend.

2                    MR. BRAUN:  Thank you.

3                    MR. JENKINS:  Thank you, Your Honor.  You as

4    well.

5                    THE DEFENDANT:  Thank you.

6                    THE COURT:  All right.  Unless there's anything

7    else, we will now close the record.  Anything else from the

8    Government?

9                    MR. JENKINS:  Nothing from the Government.  Thank

10   you, Your Honor.

11                   Thank you, madam court reporter.

12                   THE COURT:  Anything else from Mr. Braun?

13                   MR. BRAUN:  No, Your Honor.

14                   THE COURT:  All right.  Then the record will be

15   closed.

16                   (Proceedings concluded at 9:48 a.m.)

17

18

19

20

21

22

23

24

25

1               CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                DATED THIS  6TH  DAY OF DECEMBER, 2020.

16

17

18                /S/ MIRANDA ALGORRI

19                MIRANDA ALGORRI, CSR NO. 12743, CRR
                  FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25