1        **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5  UNITED STATES OF AMERICA,          )
                                       )
6            PLAINTIFF,                )      CASE NO.
                                       )
7            vs.                       )      CR 20-326-JFW
                                       )
8  JOSE LUIS HUIZAR, et al.,           )
                                       )      PAGES 1 TO 61
9            DEFENDANTS.               )
   _____   )

10

11

12

13              **REPORTER'S TRANSCRIPT OF**
                   **STATUS CONFERENCE**
14             **MONDAY, APRIL 5, 2021**
                     **8:21 A.M.**
15           **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23   _____

        **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24       F E D E R A L   O F F I C I A L   C O U R T   R E P O R T E R
         3 5 0   W E S T   1 S T   S T R E E T ,   S U I T E   4 4 5 5
25       L O S   A N G E L E S ,   C A L I F O R N I A   9 0 0 1 2
            M I R A N D A A L G O R R I @ G M A I L . C O M

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    NICOLA T. HANNA
    UNITED STATES ATTORNEY
    BY:  MACK JENKINS
    BY:  VERONICA DRAGALIN (Zoom)
    Assistant United States Attorney
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT HUIZAR:**

    HILARY L. POTASHNER
    FEDERAL PUBLIC DEFENDER
    BY:  CAREL ALE
    BY:  CHARLES SNYDER
    Deputy Federal Public Defenders
    Central District of California
    321 East Second Street
    Los Angeles, California 90012

**FOR THE DEFENDANTS CHAN AND SHEN ZHEN NEW WORLD I:**

    LAW OFFICES OF RICHARD M. STEINGARD
    BY:  RICHARD M. STEINGARD
    800 Wilshire Boulevard
    Suite 1050
    Los Angeles, California 90017

**FOR THE DEFENDANTS LEE AND 940 HILL:**

    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
    BY:  ARIEL A. NEUMAN
    BY:  JIMMY THREATT
    1875 Century Park East
    23rd Floor
    Los Angeles, California 90067

ALSO PRESENT:

    Special Agent Andrew Civetti
    Special Agent Barbara Johnson

1              **LOS ANGELES, CALIFORNIA; MONDAY, APRIL 5, 2021**

2                                **8:21 A.M.**

3                                  **---**

4

5              THE CLERK:  Calling item 1, case No. CR 20-326A,

6    United States of America versus Jose Luis Huizar, et al.

7              MR. JENKINS:  Good morning, Your Honor.

8              Mack Jenkins on behalf of the United States.

9    Joining me at counsel table is Special Agent of the FBI

10   Andrew Civetti, in the jury box Special Agent Barbara Johnson,

11   and participating via Zoom AUSA Veronica Dragalin.

12             MS. ALE:  Good morning, Your Honor.

13             Carel Ale and Charles Snyder from the Office of

14   the Federal Public Defender on behalf of Mr. Huizar who is

15   present and out of custody today.

16             MR. STEINGARD:  Good morning, Your Honor.

17             Richard Steingard.  I'm specially appearing for

18   Harland Braun on behalf of Raymond Chan who is present in the

19   audience, Your Honor.  I think -- I don't know if you are aware

20   of Mr. Braun's situation.  He had a medical situation over the

21   weekend.  I talked to him this morning.  He is still in the

22   hospital.  He hopes to be discharged today.  Mr. Chan consents

23   to my appearance.  Mr. Chan has discussed that with Mr. Braun

24   and myself.

25             THE COURT:  All right.  Well, tell Mr. Braun we

1    wish him a speedy recovery.

2              MR. STEINGARD:  As long as I'm here, I'm also

3    appearing on behalf of Shen Zen New World, the corporate

4    defendant.

5              THE COURT:  All right.

6              MR. STEINGARD:  Thank you.

7              MR. NEUMAN:  Good morning, Your Honor.

8              Ariel Neuman and Jimmy Threatt on behalf of

9    Dae Yong Lee who is present in court being assisted by a Korean

10   language interpreter.  Also appearing on behalf of the

11   corporation 940 Hill, LLC.

12             THE COURT:  All right.  And would the interpreter

13   please announce her appearance and confirm her oath is on file.

14             THE INTERPRETER:  Your Honor, my name is

15   Julie Wagner.  I'm a Korean interpreter, and my certification

16   number is 300979, and my oath is on file.

17             THE COURT:  All right.

18             THE INTERPRETER:  Your Honor, my name is

19   Maryann Yi, M-a-r-y-a-n-n, last name Y-i.  My certification

20   number is 301249.  My oath is on file.

21             THE COURT:  All right.  We're ready to proceed,

22   starting a little bit late.  Technology is great until it

23   doesn't work.

24             We have two matters on calendar this morning.  I

25   will take the defendant's renewed motion to inspect grand jury

1   records first, and then we will discuss the stipulation and the

2   setting of the trial date in this matter.

3          Let me ask counsel for Mr. Huizar who is going to

4   argue on behalf of Mr. Huizar this morning?

5          MS. ALE:  I am, Your Honor.

6          THE COURT:  All right.  And who is going to argue

7   on behalf of the Government?  I assume that, since,

8   Mr. Jenkins, you are the only one here, that would be you.

9          MR. JENKINS:  That is correct, Your Honor.

10         THE COURT:  All right.  Although there were

11  joinders that were filed to the Motion to Compel discovery

12  which I decided by minute order last Friday, there were no

13  joinders that were filed in connection with this motion that I

14  could see from the docket.

15         In any event, as I indicated, I am going to first

16  consider the defendant's renewed motion to inspect grand jury

17  records.  That motion was filed on -- it appears as -- the

18  first motion was -- this motion was filed on March 8th of 2021

19  and appears as docket No. 167.

20         The background with respect to this motion -- and

21  I want the record to reflect that I have reviewed the following

22  documents in connection with the defendant's renewed motion,

23  and those documents appear as docket Nos. 65, 66, 67, 70, 71.

24  And as I indicated, obviously I have read the document No. 167

25  which is the renewed motion plus the supplemental statement

1    which is 167-3.

2                By way of further background, on October 29th,

3    the Court issued an order granting in part defendant's motion

4    to inspect grand jury selection records pursuant to

5    28 USC Section 1867(f).  The Court ordered production of jury

6    selection records responsive to defendant's request Nos. 1, 4,

7    5, 12, 13, 14, and 16.  However, the Court limited production

8    to juror selection records relating to the 2019 Western

9    Division master jury wheel from which the Huizar grand jury was

10   selected in accordance with Section 12 of the Court's jury

11   plan.

12                The Court denied the remaining request without

13   prejudice.  The Court concluded that the Clerk's responses to

14   the request 1, 4, 5, 12, 13, 14, and 16 would likely reveal

15   much of the information sought by the remaining request and

16   defendant would likely find that many of the remaining requests

17   were unnecessary and/or duplicative.  To the extent defendant

18   wished to pursue any of the remaining requests after reviewing

19   the responses to the request that I ordered produced, the Court

20   permitted defendant to file a renewed motion.  And if such a

21   renewed motion was filed, the defendant was ordered to include

22   a joint statement prepared in accordance with the Court's prior

23   order.

24                The renewed requests that are at issue appear on

25   Exhibit A which is docket No. 167-1.  Those that are at issue

1    are 8, 9, 17, and 18 and then two additional requests relating

2    to the First Superseding Indictment, and those requests --

3    those new requests are request Nos. 19 and 20.

4              Before hearing argument, the Court will set forth

5    the legal standard applicable to the motion which will be

6    incorporated and made a part of the rulings that I will make

7    today.

8              The Jury Selection and Service Act of 1968, which

9    I will refer to and define as The Jury Act for purposes of this

10   hearing, 28 United States Code Section 1861 makes it clear that

11   it is the policy of the United States that all litigants in

12   federal courts entitled to a trial by jury shall have the right

13   to grand and trial juries selected at random from a fair

14   cross-section of the community in the district or division

15   wherein the Court convenes.

16             The Jury Act requires that district courts put in

17   place written plans for random selection of jurors that shall

18   be designated to achieve the objectives of The Jury Act.  The

19   plans for selecting jurors shall be designed to ensure the

20   random selection of a fair cross-section of the persons

21   residing in the community in the district or division wherein

22   the Court convenes.

23             The Jury Act allows defendants to challenge the

24   procedures used to select grand jurors for failure to comply

25   with the act.  Accordingly, Section 1867(f) provides that

1  parties shall be allowed to inspect, reproduce, and copy

2  records used by the jury commission or clerk in connection with

3  the jury selection process pursuant to the district court plan

4  or as may be necessary to prepare a motion challenging that

5  process.

6          As the Supreme Court stated in *Test*, T-e-s-t,

7  *versus United States* at 420 U.S. 28 -- and I'm quoting -- "This

8  provision of The Jury Act makes it clear that a litigant has

9  essentially an unqualified right to inspect jury lists.  It

10  grants access in order to aid parties in the preparation of

11  motions challenging jury selection procedures.  Indeed, without

12  inspection, a party invariably would be unable to determine

13  whether he has a potential meritorious jury challenge.  Thus,

14  an unqualified right to inspection is required not only by the

15  plain text of the statute but also by the statute's overall

16  purpose of ensuring grand and trial juries selected at random

17  from a fair cross-section of the community."  That is the end

18  of the quote.

19          The Central District of California's jury plan is

20  found in General Order 19-07.  It identifies certain records as

21  jury selection records and provides, in relevant part, a jury

22  selection record shall not be disclosed except as necessary in

23  the preparation or presentation of a motion under section

24  1867(a), (b), or (c).  A party preparing such motion may

25  inspect, reproduce and copy juror selection records regarding

the master wheel from which either the grand jury or the trial jury in the case was selected and all reasonable times and at the party's expense during the preparation or pendency of such a motion.

Except as otherwise provided in the jury plan, the contents of the records or papers not identified in the plan as juror selection records shall be disclosed only upon order of the Court.  Parties seeking the disclosure of anything not identified as a jury selection record must apply to the Court for an order of disclosure.  If such application is made, it shall be referred to the chief judge.

In this case the parties agree that the renewed requests are not jury selection records as defined in the jury plan.  Accordingly, pursuant to the jury plan, to the extent that the records sought are records used by the jury commission or clerk in connection with the jury selection process, these requests generally must be referred to the chief judge.

There are two other potentially relevant standards that are implicated by the renewed motion -- the rule of grand jury secrecy and the limited right of access to ministerial records of the grand jury.  Federal Rule of Criminal Procedure 6(e) codifies the principle of grand jury secrecy and provides that persons present at a grand jury proceeding must not disclose matters occurring before the grand jury.  There are limited exceptions to the rule.  For example,

the Court may authorize disclosure at a time and in a manner and subject to any other conditions that it directs of a grand jury matter at the request of the defendant who shows that a ground may exist to dismiss the Indictment because of a matter that occurred before the grand jury.

The Supreme Court has consistently construed the rule to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted. To demonstrate a particularized need, the defendant must show that the material he seeks is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that his request is structured to cover only materials so needed. It is well established that mere unsubstantiated, speculative assertions of improprieties in the proceedings do not supply the particularized need required to outweigh the policy of grand jury secrecy.

Despite the strong interest in maintaining grand jury secrecy, the 9th Circuit case entitled *In Re Special Grand Jury for Anchorage Alaska* at 674 F.2d 778 has recognized a limited right of public access to ministerial records of the grand jury. The 9th Circuit defined ministerial records as those that generally relate to the procedural aspects of impaneling and operation of the grand jury as opposed to records that relate to the substance of the grand jury's

investigation.  For example, the dates that the relevant grand

juries were impaneled and excused as well as their impaneling

instructions are ministerial records which are not entitled to

secrecy.

The 9th Circuit, however, noted that the use of

the term "ministerial records" should not be taken to indicate

any settled judgment on its part which records could be

classified as matters occurring before the grand jury as that

expression is used in the Federal Rule of Criminal Procedure

6(e).

The Court declined to attempt any detailed

characterization of the scope of the public access right as it

applies in this context, deferring instead to the district

court to work out the details of access doctrine in an

appropriate way.  In determining whether records should be

disclosed, the 9th Circuit directs the courts to consider

whether their disclosure would, in fact, threaten legitimate

interest of the Government, the grand jurors, or any other

persons connected with the grand jury proceedings.  The

9th Circuit thus set forth an instructive standard which

permits disclosure of ministerial grand jury records that do

not reveal the substance or essence of the grand jury 's

investigation or deliberations.

I am going to first consider the renewed request

Nos. 8 and 9, and I conclude that argument is not going to be

1    helpful because there are no documents responsive to those

2    requests as I will set forth in my ruling.

3              But I do have a question for the defense, and

4    that is as to statistical information.  And my question is the

5    letter from the jury supervisor Maria Rodriguez to Mr. Nichols

6    of Bluegrass Integrated Communications dated October 11, 2018,

7    which was produced in the production that occurred in the

8    letter of September 8, 2020, from Ms. Gray to Mr. Ortega.

9              My question is this letter was produced, and you

10   have reviewed the letter; correct?

11             MS. ALE:  Yes, Your Honor.

12             THE COURT:  All right.  With respect to the last

13   paragraph of this letter, the letter advises Bluegrass, who is

14   the third-party vendor, that, upon completion of Bluegrass's

15   work, Ms. Rodriguez requests an Excel report that statistically

16   shows the result of the extraction process for each individual

17   list, parentheses, the ROV and the DMV, the merged list, the

18   NCOA extraction, and the number and percentage of names in each

19   county and their respective divisions.

20             My question is have you also been provided with

21   the Excel spreadsheet that is referred to in the letter?

22             MS. ALE:  I do not believe so, Your Honor.

23             THE COURT:  You do not believe so or --

24             MS. ALE:  I do not believe so.  I would have to

25   confirm.

1          THE COURT:  Pardon me?

2          MS. ALE:  I would have to confirm, Your Honor.

3          THE COURT:  And how do you confirm?

4          MS. ALE:  I can reach out to our expert, and I

5   can also look at our own documents that we have received.

6          THE COURT:  Can you do that -- I will just go

7   ahead and proceed on the assumption that we don't know if you

8   do or do not have it.

9          In any event, the ruling as to request No. 9 is

10   as follows:

11          As to the national change of address which is

12   defined in the letter -- and I will use the definition for

13   purposes of the hearing -- as the NCOA database is created and

14   maintained by the U.S. Postal Service, the Clerk does not have

15   any specific information regarding how this database is

16   produced or compiled or when and how often it is updated.

17   Accordingly, the request for the documents sought by request

18   No. 9 is denied.

19          As to request No. 8, the ruling on request No. 8

20   is also rather straightforward because the third party vendor

21   Bluegrass who ran the names through the NCOA database did not

22   retain copies of any of the data it processed once it completed

23   its work and sent the data to the Clerk.  However, in order to

24   assist counsel and with the permission of the chief judge, I am

25   prepared to discuss and provide counsel with certain

1    statistical information that is available relating to the NCOA

2    procedure.  If you already have the spreadsheet, what I am

3    about to indicate is going to be irrelevant and redundant.

4                    MS. ALE:  Your Honor, the last time I looked at

5    the --

6                    THE COURT:  You have to pull the microphone

7    closer to you.

8                    MS. ALE:  I'm sorry, Your Honor.

9                    My last review of the Excel spreadsheets did not

10   include the information from the NCOA database.

11                   THE COURT:  All right.  Then I will make the

12   following ruling:

13                   The defendant has been advised in documents

14   previously produced, specifically the October 11, 2018, letter

15   that I just referred to from Maria Rodriguez to Bluegrass of

16   the steps used to create the master wheels for each division.

17   For example, the compilation of the source data, the merged

18   source data, and the step which involves the running of the

19   automated pure random selection program which selects 200,000

20   names from the Western Division counties, 100,000 names from

21   the Southern Division counties, and 100,000 from the Eastern

22   Division counties.  Although there were 200,000 names drawn for

23   the Western Division, those names are then run through the

24   National Change of Address, the NCOA program, to finalize the

25   list for the master wheel.

1          The Court has determined that, after running the

2    names of potential jurors through the NCOA database, the

3    Bluegrass updates those potential juror records with a new

4    address information obtained from the database.  If an

5    individual's new address is outside the Central District or if

6    there is no new address, that person's record is removed

7    entirely.  If the new address is in a different division within

8    the Central District, the record is coded with the county code

9    for the new county of residence so the record will end up in

10   the wheel for the division in which the county of residence is

11   located.

12          However, as I stated, Bluegrass does not retain

13   copies of any of the data it processes for the Clerk once it

14   completes its work.  However, Bluegrass and the Clerk do

15   maintain certain statistics, but there are no records

16   containing the participant numbers, names, addresses,

17   ZIP codes, or other personal identifying information for any

18   prospective juror removed from the Western Division's master

19   jury wheel or transferred to another wheel after their names

20   have been run through the National Change of Address database

21   as requested by the defense expert Mr. Martin in his

22   declaration which appears as docket No. 162-7.

23          As to the statistical information, in total there

24   were 400,000 names that were drawn from the merged source list

25   for all of the 2019 master wheels in the Central District of

1   California.  Of those 400,000 names, 236 were removed because

2   people moved but had no new addresses.  1,235 were removed

3   because they were identified as deceased.  6,728 were removed

4   because they moved out of the Central District.  Accordingly,

5   after the NCOA process, 391,801 names ultimately ended up in

6   the 2019 master wheels for the Central District.  Of that

7   number, a total of 7,245 individuals were transferred to a

8   master wheel for a division other than the one from whose

9   records their names were originally drawn, and the Clerk does

10  not have any record of how many of those individuals may have

11  moved out of or into any particular one of our three divisions.

12          As to the creation of the 2019 Western Division

13  master wheel, 200,000 names were randomly drawn from the merged

14  source list.  After the NCOA process described above, 196,271

15  names ultimately ended up in the 2019 Western Division master

16  wheel.  This statistical information is contained in an Excel

17  spreadsheet, and that is one of the spreadsheets that was

18  called for by the October 11, 2018, letter from Ms. Rodriguez.

19          The Court will order production of this Excel

20  spreadsheet.  And if counsel have any additional issues with

21  respect to this particular request, you can raise those issues

22  in an additional motion.

23          So with that information, I hope that it will

24  move the ball along, but the substance of request No. 8 is

25  denied primarily because we don't have any of the documents.

1          MS. ALE:  Thank you, Your Honor.

2          THE COURT:  All right.  The next request is

3    request No. 17 and 19, and those requests are for the juror

4    number -- for each grand juror who returned the Indictment in

5    this case on July 30 and the Superseding Indictment on

6    November 12.  I will hear argument from counsel with respect to

7    this motion.  I have several questions about Mr. Martin's two

8    declarations which are at 167 and 164 -- I'm sorry -- 167-2 and

9    167-4.

10         MS. ALE:  Yes, Your Honor.  And as to

11   Mr. Martin's declarations, I did want to correct one issue in

12   the declaration on the record.  Mr. Martin's February 24

13   declaration had one sentence in paragraph No. 5 that was

14   incorrect.  It stated that the participant numbers in pool

15   801190901 were in neither the Southern or the Western Division.

16   That was incorrect.  They are in the Southern Division.

17         THE COURT:  I'm sorry.  I didn't hear the last

18   part.

19         MS. ALE:  That was incorrect.  They are in the

20   Southern Division.

21         THE COURT:  Right.  Okay.  Well, I think there

22   has been a misunderstanding.  Certainly Mr. Martin was entitled

23   to raise these issues, but having worked through all of these

24   two requests, I think there was a misunderstanding.

25         It seems to me that the defense's contention with

respect to each of these requests is that, because you received

juror data from the Southern Division and what was supposed to

be limited to production of data from the Western Division,

that Mr. Martin raised an issue as to whether or not, one,

Mr. Huizar may have been indicted from a Southern District

grand jury and, two, that Southern Division jurors may have

somehow found their way into Mr. Huizar's grand jury which

would have violated the same division provision which is found

in Section 2 of the Court's jury plan.

Does that capsulize the argument?

MS. ALE:  Yes.  But the one correction,

Your Honor, is that we are not saying that Mr. Huizar was

indicted by a Southern Division grand jury.  Simply just a

second point that Southern Division potential jurors were in

the pool.

THE COURT:  Okay.  So in order to understand that

argument and that theory, you have to have an understanding of

the jury pool numbers, and the jury pool numbers are set forth

in Mr. Martin's declaration as well as the records and

specifically the juror list which is entitled the reporting

instructions or status that were attached to the letter from

Ms. Gray to the public defender's office.  Those ended up to be

paginated, and those -- by hand, and those records appear

commencing at page 42.

So do you have an understanding of what these

pool numbers mean?

MS. ALE:  Not specifically.  I understand that the pool numbers correspond with the participant numbers, but I don't know why they have the specific numbering that they do.

THE COURT:  Okay.  Because in order to understand the creation of the grand juries, you have to have an understanding of the jury pool number because, without that, I don't think any of it makes any sense.  So you haven't been provided with that?

MS. ALE:  In terms of the specific reason why a certain number pool is given the number?  No.

THE COURT:  Not the reason why they are given a number but an explanation as to the number.  For example, we have got jury pool No. 100191001.  Now, unless you have an understanding of what those numbers mean, understanding the rest of the documents appears to me to be very difficult.

MS. ALE:  Perhaps, Your Honor -- what I understood from seeing the Excel spreadsheets is that the numbers that were -- the participant numbers that were included in Ms. Gray's letter identifying the jurors in the pool that indicted -- that was selected -- from which the grand jury was selected from, those participant numbers matched the Excel spreadsheet in the Southern Division.  So that may be a basic understanding.

THE COURT:  Well, that is not true.  Well, it

1    depends.  I mean, if you're talking about the -- let me go

2    through the numbers because I think it will make your job much

3    easier if you have an understanding of the numbers.  And I

4    can't imagine why the explanation of the numbers hasn't been

5    provided.

6             Let's take the No. 100191001.  The number -- the

7    first three digits 100 represent the Western Division.  The

8    next number, 19, represents the year.  The next number, 10,

9    represents the month.  And the final two digits are numbers

10   that are randomly assigned by the clerk's office in order to

11   keep track of these pools.

12            So the other pool -- there are several pools that

13   are at issue.  But the one that you just alluded to or are

14   referring to is the 801190901.  The 801 number refers to a

15   Southern Division pool.  The 19 again represents the year 2019.

16   And the next number, 09, represents the month, September.  So

17   those jury pool numbers are -- it's important to understand

18   because, when you're looking at the juror list reporting

19   instructions status report for pool No. 100191001, you

20   have -- you do have this document; correct?  This is page 42 of

21   the Gray letter?

22            MS. ALE:  I don't have it in front of me, but I

23   know what you are referring to, Your Honor.

24            THE COURT:  This document is the juror list for

25   pool No. 100191001 which was used to list those jurors who were

1  called to report on October 3rd, 2019, for grand jury duty.  Is

2  that your understanding of this --

3            MS. ALE:  Given the Court's explanation, then,

4  yes, that would make sense.

5            THE COURT:  Okay.  So the other pool numbers --

6  the Indictment in this case and the first page of the

7  Indictment indicates that Mr. Huizar was indicted by an October

8  2019 grand jury; correct?

9            MS. ALE:  Correct.

10            THE COURT:  So the only jury pools that are

11  really relevant to the Huizar grand jury are those which have

12  the 11910 which is the October month.  All the other jury pools

13  for the Western Division are irrelevant when you tie that jury

14  pool number to the reporting instructions, and those are the

15  jurors who were summoned to report in October -- there's

16  actually two dates, two different pools for October 3rd and

17  October 4th.

18            MS. ALE:  Understood, Your Honor.

19            THE COURT:  Do you understand which of those

20  pools were impaneled and became the Huizar grand jury?

21            MS. ALE:  I understand that the jury -- the grand

22  jury that indicted Mr. Huizar was impaneled from the

23  October 2019 list.  However, in Ms. Gray's letter --

24            THE COURT:  Which list?

25            MS. ALE:  From the -- I don't have the numbers,

1    and I wasn't writing them down.  But I understand what the

2    Court's point is I think which is that the pool would come from

3    the two -- from the jurors who reported on those two dates.

4                    THE COURT:  No.  The pool -- it comes from the

5    pool that reported on a specific date because there are two

6    relevant dates, October 3rd and October 4th.  I happen to

7    know -- and I can share with you -- that it is the October 3rd

8    date that is the relevant date because it was those jurors that

9    were summoned to report and did report on October 3rd who were

10   impaneled as grand jurors for Mr. Huizar's grand jury.

11                   MS. ALE:  I understand that point, Your Honor.

12   Ms. Gray's letter included the information about the Southern

13   Division.

14                   THE COURT:  No.  I understand that.  So somebody

15   concluded that, well, this is only supposed to be a Western

16   Division production.  Ms. Gray included Southern Division.  So

17   Southern Division -- so there's a question as to whether or not

18   a Southern Division juror ended up on Mr. Huizar's grand jury.

19   I understand the issue, but what I'm trying to work through is

20   to explain why that is not correct and it was the result of an

21   improper production that created this issue.

22                   So you understand -- you knew that the Huizar

23   grand jury was the grand jury that was impaneled on

24   October 3rd?

25                   MS. ALE:  After the Court's explanation --

1          THE COURT:  No.  I mean prior to coming in today?

2          MS. ALE:  Not about that specific date,

3    Your Honor.  I did not know that about that specific date in

4    which the grand jury was impaneled.  But I think the confusion

5    points to the fact of why we need the documents.

6          THE COURT:  No, it doesn't because now I am going

7    to -- if you want to add anything, I will hear from you.  But I

8    am now going to rule.

9          MS. ALE:  Okay.  Yes, Your Honor.

10          Ms. Gray provided documents that included

11    information, as the Court knows, from the Southern Division.

12    Mr. Huizar is entitled to gauge what impact that had if that is

13    in fact true.  And so for the record, Your Honor, I would ask

14    that the Court provide Mr. Huizar the juror numbers so that we

15    can understand, if in fact it is true, as the evidence

16    suggests, that Southern Division potential jurors were included

17    in that pool.

18          THE COURT:  But the Southern Division pool, which

19    is No. 801190901, relates to a grand jury in the Southern

20    Division which was impaneled in September of 2019 as reflected

21    on the juror list listing all of the jurors that were summoned

22    to appear in this case to be impaneled on September 6, 2019,

23    Southern Division grand jury.

24          MS. ALE:  I understand that, Your Honor.

25          THE COURT:  Okay.  Then I will make the following

ruling:

The defendant's renewed request Nos. 17 and 19 were prompted by an inadvertent production of documents by the clerk's office. Specifically, the clerk's office erroneously produced data from the Southern Division notwithstanding the fact that the Court's order specifically limited production to the Western Division.

The Court has been advised that the Southern Division data was produced by mistake and the mistake was primarily due to the fact that the data had been previously produced to the Federal Public Defender's Office in connection with another case and was not pooled from the production in this case.

Based upon the erroneous production of Southern Division data, the defendant argues at page 5 that he needs to obtain the participant numbers for each grand juror who returned the Indictment and the First Superseding Indictment in this case in order to clarify whether the grand jury was selected from both the Western and Southern divisions as the information provided by the clerk suggests.

In support of this argument, defendant points to the fact that the Clerk of the Court provided information relating to five different grand jury pools, at least one of which appears to have consisted of jurors drawn from the Southern Division wheel which I have indicated was the pool

1  No. 801190901.

2           Specifically, Mr. Martin's first declaration, the

3  167-2, notes that data was produced for the following five

4  grand jury pools:  100190106, 100190602, 801190901, 100191001,

5  and 100191002.  Data was also produced for other pools as well,

6  but Martin was referring to the scanned paper records produced

7  as attachments to the November 20th -- November 10th, 2020,

8  letter from the Clerk to the public defender's office which

9  only reflect 2019 grand jury pools.  Mr. Martin correctly notes

10  that the data for pool 801190901 was included in the production

11  and that pool was from the Southern Division.

12           As a result of this production, Mr. Martin

13  expressed concern in paragraph 3 of his first declaration that

14  grand jurors from the Southern Division may have returned the

15  Indictment against Mr. Huizar.  Mr. Martin submitted a second

16  declaration, docket No. 167-4, to elaborate on his concern and

17  points specifically to page 57 of Ms. Gray's November 10th

18  letter.  Mr. Martin notes that the first participant number

19  listed on that page, which is 804585251 is found in the Excel

20  spreadsheet concerning data for the Southern Division wheel.

21  This is, of course, correct because it is a Southern Division

22  pool, and all participants in that pool were drawn from the

23  Southern Division wheel including participant No. 804585251.

24           In addition, Mr. Martin notes that pool

25  No. 801190901 did not exist in either the 2019 Southern

1    Division spreadsheet or the 2019 Western Division spreadsheet

2    produced to the defendant on the DVD enclosed with the November

3    letter from Ms. Gray.

4            Mr. Martin is correct that pool No. 801190901

5    does not exist on the 2009 Western Division spreadsheet.  The

6    Court, however, was able to find that pool on the Southern

7    Division spreadsheet, specifically when opened -- when the

8    Court opened the Southern Division spreadsheet and sorted by

9    pool number it was able to find pool No. 801190901.

10           The fact that records for pool No. 801190901 were

11   attached to Ms. Gray's letter does not mean that this pool or

12   any of its participants had anything to do with the selection

13   of the Huizar grand jury.  The Court has confirmed that pool

14   No. 801190901 was a Southern Division pool used to impanel a

15   Southern Division grand jury in September of 2019.  It was not

16   used to create the grand jury that returned the Indictment or

17   First Superseding Indictment in this case.

18           As I indicated, in order to interpret the data

19   produced for the five grand jury pools identified in

20   Mr. Martin's declaration, it is important to understand that

21   each grand jury pool contains only potential jurors summoned

22   for one grand jury impanelment on one day and in one location.

23   The first three digits of any pool number indicate the

24   division.  Pool number starting with 100 are Western Division

25   pools.  801 indicates a Southern Division pool.  The next two

1   digits are the year.  In this case 19 for all five grand jury

2   pools because each of the five grand jury pools are from 2019.

3   The next two digits indicate month.  In this case January is

4   01; June, 06; September, 09; and the two October pools

5   represented by the numeral 10.  The final two digits are just

6   consecutively assigned to each pool created for a given month

7   by the clerk's office.

8            The Indictment in this case indicates that it was

9   returned by an October '19 grand jury, thus only two of the

10  five pools for October -- the 100191001 and the 100191002 --

11  could be the pools from which the Huizar grand jury was drawn.

12  In order to remove any doubt, the Court has confirmed that pool

13  No. 100191001 was used to select Huizar grand jurors, and that

14  grand jury was impaneled on October 3rd, 2019.  The Court has

15  confirmed that no grand jurors on the Huizar grand jury were

16  from the Southern Division master wheel.

17           This information should satisfy the defendant's

18  concerns.  He has received all of the data not only for the

19  pool which was used to select the grand jury that returned the

20  Indictment and the First Superseding Indictment but the data

21  for all of the other Western Division jury pools.  This data

22  will allow him to determine if a motion challenging the grand

23  jury selection process is warranted.

24           Accordingly, defendant's renewed requests 17 and

25  19 are denied.

1          The next requests are 18 and 20.  Those requests

2   relate to the attendance record and reason for absence by date

3   for each grand juror who returned the Indictment in this case

4   on July 30 of 2020 and similarly for the First Superseding

5   Indictment on November 12, 2020.

6          If you have anything to add to your papers, I

7   will hear from you.  Otherwise, I am prepared to rule.

8          MS. ALE:  I will submit on the papers.

9          THE COURT:  All right.  Does the Government

10  submit on its papers?

11         MR. JENKINS:  Yes, Your Honor.

12         THE COURT:  All right.  The defendant claims that

13  these grand juror attendance records will assist him in

14  determining whether the ongoing pandemic had a constitutionally

15  or statutorily significant impact on the composition of the

16  grand jury that ultimately indicted him.  For example,

17  defendant contends that attendance records would show, for

18  example, whether grand jurors were excused after they were

19  impaneled and why and whether new grand jurors as opposed to

20  alternates were impaneled after the start of the grand jury

21  proceeding.

22         As an initial matter, the parties agree that

23  requests 18 and 20 are not juror selection records as defined

24  by the Court's jury plan.  In the Court's view, they also do

25  not appear to be records or papers used by the jury commission

or Clerk in connection with the jury selection process as that phase is used by The Jury Act.  Indeed, the attendance records and reason for absence by date of each grand juror who returned the Indictment or Superseding Indictment are not records used by the jury commission or Clerk in connection with the jury selection process but rather, to the extent they exist, are records used after the grand jury has been selected and impaneled.

Accordingly, the Court concludes the defendant does not have an unqualified right to these records.

However, the next question the Court must answer is whether these records are covered by Grand Jury Secrecy Doctrine in Rule 6(e) as a matter occurring before the grand jury or whether they are ministerial records.  The case that I cited before, the *In Re Special Grand Jury Anchorage Alaska* case, the 9th Circuit suggested without deciding the issue that it would be reasonable to hold that a request for roll sheets reflecting composition of the special grand jury, attendance records of the jurors, and any substitutions runs afoul of the Doctrine of Grand Jury Secrecy even if it technically falls outside the language of Rule 6(e).

Following the 9th Circuit's guidance, the district court in *United States versus Fuentes*, F-u-e-n-t-e-s, at 2008 WL 2557949 held that, even with the names of grand jurors replaced by numbers, the information sought could, if

revealed, impinge upon the freedom and integrity of the grand
jury's deliberative process.

Similarly, the district court in *United States
versus Diaz* at 236 F.R.D. 470 concluded that any records
reflecting the composition of the particular grand jury that
indict defendant including grand jury roll sheets, attendance
records, and records of substitutions whether disclosed in
camera or otherwise falls within the purview of 6(e).  The
Court agrees with those decisions.  Thus because the records
requested are covered by Grand Jury Secrecy Doctrine, the
defendant must demonstrate a particularized need before he is
entitled to the disclosure of these records.  The Court
concludes that the defendant has failed to do so.

The defendant claims that these grand jury
attendance records will assist him in determining whether the
ongoing pandemic had a constitutionally or statutorily
significant impact on the composition of the grand jury that
ultimately indicted him.  However, it is well-settled that the
defendant is not entitled to an impaneled grand jury with any
particular demographic characteristics.  As the 9th Circuit
stated in *United States versus Mitchell*, 502 F.3d 931, the
6th Amendment imposes no requirement that jurors actually
chosen must mirror the community and reflect various
distinctive groups in the populations.  Defendants are not
entitled to a jury of any particular composition.  Rather, as

1    indicated in The Jury Act, defendants are entitled to a grand

2    jury selected at random from a fair cross-section of the

3    community in the district or division wherein the Court

4    convenes.

5              Notably in this case the grand jury was selected

6    from a pool on October 3rd, 2019, and impaneled on the same day

7    well before the start of this horrible pandemic that we have

8    been suffering through.

9              Moreover, to alleviate defendant's concerns

10   regarding the impact of the pandemic on whether the grand jury

11   that indicted him was selected at random from a fair

12   cross-section of the community, the Court has determined that

13   there were no new grand jurors impaneled after the start of the

14   grand jury proceedings other than alternates who were selected

15   from a list created on the same date from the same pool as the

16   original set of grand jurors on October 3rd, 2019.

17             So for all of the foregoing reasons, these

18   requests 18 and 20 are denied.

19             All right.  That concludes the hearing on the

20   motion that we have pending.  The next issue is the trial date.

21   I have received -- and I appreciate counsel 's efforts in

22   meeting and conferring and agreeing on the dates that are set

23   forth in the stipulation that was filed on March 31st.  It

24   appears as docket No. 120.  But I have some concerns with

25   respect to the scheduling.

1          This case has been pending certainly with respect
2    to Mr. Huizar -- we had the initial Trial Setting Conference in
3    August of 2020, and the other defendants had initial
4    appearances later obviously because the First Superseding
5    Indictment wasn't returned until November.  Those appearances
6    were in December.
7          There's two sets of dates that I want to discuss
8    with counsel.  The first set of dates relate to pretrial
9    motions such as the Motion to Dismiss the Indictment, Motion to
10   Sever, Motion to Compel, basically all motions other than the
11   suppression motions.  I don't see -- and the dates for those
12   are -- filing date would be October, oppositions in November,
13   replies in December, and then the parties want to ruin my
14   Christmas holidays and have a hearing date on January 10th.
15         I don't see why that group of motions needs such
16   an extended schedule.  We have extremely experienced counsel in
17   this case.  I don't know how long the members of the federal
18   public defender have been practicing, but I know the other
19   lawyers in this case have been practicing for a long time,
20   probably collectively practicing over a hundred years certainly
21   before the Court.
22         The motions to dismiss, sever, motions to compel,
23   in my view, are all routine motions that I don't see how they
24   can be -- obviously this is a complex case because it involves
25   a very long and detailed investigation, and certainly there are

1    many issues that we are going to have to work through to get to

2    trial.  But I don't see that there is anything particularly

3    challenging about the group of motions other than the

4    suppression motion that require the dates that have been agreed

5    upon.

6                   I had sketched out what I thought would be a

7    reasonable set of dates for these types of motions which would

8    be June 1st, July 1st, July 12th, and a hearing date in August.

9    I will hear from anyone who wants to be heard, but I -- that's

10   my view.

11                  MR. JENKINS:  The Government does not object to

12   that.  We had discussions.  I will let the defense raise their

13   points.  We have no objection to that proposed schedule.

14                  MR. SNYDER:  Your Honor, if I can just have one

15   minute to confer.

16                  THE COURT:  I'm sorry.  What?

17                  MR. SNYDER:  If I can have just one minute to

18   confer about those dates with co-counsel very briefly.

19                  THE COURT:  Sure.

20                  (Counsel confer.)

21                  MR. SNYDER:  Thank you, Your Honor.  Sorry.

22   Charles Snyder.

23                  I think that -- I think we understand the Court's

24   thinking.  Obviously, you know, the legal challenges are a

25   little bit less factually involved.  But the reality is which

1   motions we bring is going to depend on what's in the discovery

2   to some degree, and it is going to depend on what we come up

3   with through the course of our review.

4          I will say that we came up with these dates as a

5   result of I think a pretty thorough conversation among all the

6   lawyers.  Like you said, they're very experienced lawyers who

7   understand what it takes to bring a case like this to trial.

8   And, also, between the defense lawyers and the Government --

9   and, you know, we're not -- it's not necessarily that the dates

10  that we selected would be absolutely set in stone, but I think

11  the Court's proposed schedule where we are filing all of our

12  pretrial motions within the next two months --

13         THE COURT:  I didn't say that.  I'm taking the

14  motions as set forth in the stipulation.  The suppression

15  motions are to me something -- you put them on a different

16  schedule, so I treat those on a different -- treat them

17  differently because I assume that counsel have collectively

18  concluded that the suppression motions are going to be more

19  complex than the other motions.

20         Unless you tell me there is some specific

21  dynamite motion that is going to be filed, I view these motions

22  that are in this first wave as being routine motions.  The

23  Motion to Sever, if that is going to be filed, the grounds for

24  a severance are undoubtedly known today.  A Motion to Dismiss

25  the Indictment, that is a motion that attacks the legal

1    sufficiency of the Indictment.  It doesn't really depend upon

2    the discovery production.

3              So those are my concerns because obviously -- and

4    I do appreciate counsel sitting down and trying to go through

5    these dates.  Unless somebody can explain to me that there is

6    some -- in this first wave of motions that there is something

7    that can't be done by, say, June 1st, I'm just at a loss.

8              The discovery in this case, as I understand it --

9    and Mr. Jenkins can enlighten me -- it's been -- the discovery

10   started back last year, and it's been moving on a rolling

11   basis.

12             On a percentage basis, what percent of the

13   discovery has been produced to the defense as we sit here

14   today?

15             MR. JENKINS:  It's a difficult math question,

16   Your Honor, although I do like math.  I would say all the

17   evidence that the Government intends to rely on in its case in

18   chief, I would say 90 to 95 percent of that has been produced.

19   But there are additional things that size-wise, for example, a

20   terabyte of electronic intercepted data -- terabyte obviously

21   is a lot of data -- that has not been produced although we

22   didn't rely on it for the Government's case in chief.  So it's

23   a little -- so that's why it's sort of evaluating two different

24   ways.

25             The 90 to 95 percent of what we believe the

1    Government will rely on its case in chief has been produced.

2    But it is fair -- to be fair to the defense, we have let them

3    know, for example, there would be 25 new recordings of

4    interviews that took place, say, in the last few months.

5    That's a significant portion.  Then I mentioned the terabyte of

6    electronic intercepted data.

7                THE COURT:  What are you referring to in the

8    terabytes of electronic data?

9                MR. JENKINS:  The way the interceptions for the

10   phones worked was that text messages and audio recordings were

11   intercepted and stored in a separate place than things that

12   were captured in Quantico in Virginia where the way the

13   technical recording interception process works, it gathers

14   certain data that a lot of it is gibberish, frankly, is the

15   summation.  That is why we didn't use it.  But it's a ton of

16   stuff.  It's like GIFs or portions of videos that didn't go all

17   the way through.  It captured things that were sent from phones

18   but are largely unusable, and we didn't use any of it.  So that

19   is examples.  It is a lot of gibberish unfortunately.

20               THE COURT:  So do those need to have transcripts

21   prepared, or is the Government simply going to produce the raw

22   data to the defense?

23               MR. JENKINS:  The latter, Your Honor.  We are

24   going to produce in a hard drive the underlying raw data for

25   that.

```
 1              THE COURT:  Why hasn't that been produced?
 2              MR. JENKINS:  For two reasons.  One, it was sort
 3   of last on the priority list given that it was gibberish.  And
 4   then, two, the technical procedures to get it from Quantico
 5   into Special Agent Civetti and the L.A. field offices took an
 6   inordinate amount of time.  I'm not exactly sure why, but it
 7   had been like that during the interception period as well.  The
 8   actual making it in a format that can be transmitted took a lot
 9   of time.
10              THE COURT:  All right.  But it is here.
11              MR. JENKINS:  It is here today.
12              THE COURT:  And it's ready to be -- it's ready to
13   be produced?
14              MR. JENKINS:  Yes.  Special Agent Civetti is
15   nodding enthusiastically yes.
16              THE COURT:  As to both questions that it is here
17   and it is ready to be produced?
18              SPECIAL AGENT CIVETTI:  That is correct.
19              MR. JENKINS:  Yes and yes.
20              MR. SNYDER:  I apologize.  I think I may have
21   either used the wrong word when I said all pretrial motions.  I
22   understand what it is the Court is talking about in terms of
23   legal challenges.
24              I guess there are two things that I would
25   mention.  The first is, like you said, to some degree these are
```

1    routine motions.  But I think this is a case of unusual legal

2    complexity.  We started to talk about that already.  But what

3    is and isn't a crime is actually something that is going to be

4    very difficult to determine in this case.  So Count 1 is a RICO

5    count.

6              THE COURT:  But you have been determining that

7    since the case was indicted and we had the initial Trial

8    Setting Conference.  That issue has been the issue based upon

9    what we talked about at the Trial Setting Conference when we

10   went through the elements of the crime, went through the

11   Government's evidence.  And nothing has changed with respect to

12   that particular issue, and it seems to me that issue could be

13   ginned up well before today.

14             MR. SNYDER:  I think that kind of speaks to the

15   second issue which is, as the Court knows, motions don't write

16   themselves.  You know we -- if we have a June motion date, we

17   will be off writing the motions.

18             And I think that -- one of the things that

19   Mr. Jenkins mentioned was the new discovery that is coming in.

20   But the reality of the discovery that we have in this case that

21   we are working to get through, it's an unusually voluminous set

22   of material.  So I think -- I mention this just because we have

23   to get through all of that.  We have to do our own independent

24   investigation as a -- as something else that has to go on in

25   this case.  And so --

1          THE COURT:  But that goes to the trial date.

2          MR. SNYDER:  Correct.  That goes to the trial

3   date.

4          THE COURT:  Which we haven't even got to yet.

5   I'm now just trying to move the case along with some structure

6   on motion practice because, quite frankly, it was my hope that

7   we have all of the motion practice concluded this year and then

8   we will be ready to try the case in 20 -- 2022.  That's where

9   I'm ultimately heading.  And if it's not doable, it's not

10  doable.  But so far I haven't heard anything, especially with

11  respect to the first wave of motions, that indicates to me that

12  it is not doable.

13         I realize it's a lot of work, but as I indicated

14  before, this case has been pending now for a very long period

15  of time.  And this motion attacking the Indictment, I fully

16  expected it -- fully expect a motion to be filed, and I fully

17  expect that it's going to be well done.  It's going to be

18  complex, and it's going to take the Court time to rule on it.

19  But it's not like -- it's not like it's -- I just don't see any

20  extraordinary issues that require the amount of time that is

21  set forth in this schedule.

22         MR. SNYDER:  Understood, Your Honor.  I guess --

23  one thing I would say is that, you know, in terms of thinking

24  about the amount of time that it's going to take us to be ready

25  in this case, I think it's fair to look at some degree at the

1    amount of time that the Government has spent on its side of the

2    case because, of course, we're trying to meet their case.

3              You know, they have had many years leading up to

4    this to do the review of information such that their plate is

5    cleared in a way where motion practice in two months is

6    something that is very realistic for them.  We are still kind

7    of drinking from the fire hose.  So I think that that is where

8    we're coming from.

9              I understand the Court's thinking that these are

10   legal challenges on the face of, for example, the Indictment,

11   but it's happening against the backdrop of all the other things

12   that we are working frantically to do.  I think we would be in

13   a much better position to --

14             THE COURT:  What is it that you're frantically

15   working to do if it isn't working on this first wave of

16   pretrial motions?

17             MR. SNYDER:  So what we're working frantically to

18   do at this point is to get through the discovery that has been

19   produced to us.  And I can talk more about that to give you a

20   sense of what that looks like, but that's taking an

21   extraordinary amount of time.

22             THE COURT:  There is no doubt it takes an

23   extraordinary amount of time, and I don't know how many

24   attorneys in your office you have working on it.  But to the

25   extent it takes additional manpower, that's the way to solve

1    that issue.

2             MR. NEUMAN:  Your Honor, if I may, Ariel Neuman

3    on behalf of Mr. Lee and 940 Hill.

4             Your Honor, I understand the Court's point,

5    especially on the straightforward legal issue motions.  I think

6    my concern as one of the newer parties to the case is that we

7    are just now beginning to identify what we see as potential

8    problems in the discovery, that we have begun the

9    meet-and-confer process on some of those issues.  I have a

10   draft of another letter on my desk on more complex issues.  And

11   I can anticipate that some of those, depending how they are

12   resolved, could result in motions to dismiss.  And I would

13   anticipate that some of those may require motion practice in

14   and of themselves meaning discovery motions if we can't reach

15   an agreement with the Government.

16            THE COURT:  Well, I can tell all of the parties

17   in this case that we are not going to have discovery issues.  I

18   don't -- I recognize this is a complex case.  This is an

19   important case.  But my view of the Government's discovery

20   obligation in this case is basically an open file.  So whatever

21   it is that the defense needs, I'm sure Mr. Jenkins is willing

22   to accommodate.

23            I'm not going to sit through a series of

24   discovery motions because my practice is to make counsel meet

25   and confer, and I will make you meet and confer every day for a

1    week until these issues are resolved.  So don't think that

2    you're going to come in here with a wheelbarrow full of

3    discovery motions because that's not going to happen.

4              MR. NEUMAN:  And I'm not anticipating that,

5    Your Honor, but I do anticipate at least one issue that, as

6    much as we meet and confer, we will see.  And Mr. Jenkins and I

7    I'm sure will do our best to work it out.

8              THE COURT:  What's the issue?

9              MR. NEUMAN:  Well, the issue that I have

10   identified thus far, Your Honor, is that the main cooperator

11   against our client, vast pages of the discovery related to his

12   interviews are redacted.  The Government has given us an

13   initial response as to why they are redacted.  We responded to

14   that.  I haven't heard back.  I'm not trying to put Mr. Jenkins

15   on the spot today.  I wasn't intending to raise this today.  I

16   believe the meet-and-confer process is still ongoing.

17             THE COURT:  And how is that going to affect

18   filing a Motion to Dismiss the Indictment?

19             MR. NEUMAN:  Here I'm speculating out,

20   Your Honor.

21             THE COURT:  Well, you don't need to speculate.

22   How many years have you been practicing?

23             MR. NEUMAN:  A good number, Your Honor.

24             THE COURT:  A good number.  We have all been

25   doing this for a very, very long period of time.  So, again,

1    it's important, and it's complex, but I just don't see the need

2    for the kind of time in terms of some of these motions.

3              MR. NEUMAN:  Your Honor, I think part of -- where

4    I'm going with the discovery leading to a Motion to Dismiss is

5    obviously based on how the Government conducted its

6    investigation.  At this point I'm not casting any aspersions on

7    that investigation, and I want to be clear about that.  But I

8    could anticipate, based on my experience, that it may come to a

9    point where I need to do that on behalf of my client.  And in

10   order to do that, I need to have reviewed the discovery in

11   full.  I need to have completed that meet-and-confer process

12   with the prosecution.

13             THE COURT:  Well, it sounds to me like you have

14   the necessary discovery.  It's just now it's in a form that is

15   not satisfactory to you.

16             MR. NEUMAN:  That is one issue, Your Honor.  I

17   have identified a number of issues that I haven't even raised

18   with the Government.  Like I said, I have a draft letter on my

19   desk.

20             For instance, the 302s, the FBI interviews of any

21   number of witnesses, at least as far as we can tell at this

22   point, don't seem to have the exhibits attached to them or

23   indicated anywhere in the discovery.  Now, I may be wrong.  I

24   haven't raised this with the Government yet, and they may tell

25   me here is where it is.

1          But these are the types of issues that we are

2    identifying now and likely identifying over the next couple

3    months.  To the extent those become bigger problems, I can see

4    those leading to issues, like I say, not purely legal issues.

5    I see the Court's point on those.  But I guess what I would say

6    is we would need some sort of reservation on issues related to

7    discovery or stemming from the way that this case was

8    investigated if the Court was going to do that.  I think the

9    easier way to do this is maybe something between what the Court

10   is suggesting and what we are suggesting.

11          That is the issue I see, Your Honor.

12          THE COURT:  What about --

13          MR. NEUMAN:  Mr. Steingard is nodding he has

14   something more to say.

15          THE COURT:  What about the suppression -- I

16   want -- what about the suppression motions?  What suppression

17   motions does the defense anticipate filing?

18          MR. NEUMAN:  Since I'm standing here, I will

19   answer, Your Honor.  I think we are in a bit of a unique

20   situation in that regard in that as of yet I'm not sure that we

21   have identified any for our client based on our client wasn't

22   intercepted on any telephones and it doesn't appear any

23   searches were conducted of his property or of the LLC's

24   properties.  I'm still confirming that.  I may not be the best

25   person to answer that question.

```
 1                    THE COURT:  So in other words, at this point in
 2     time you don't anticipate any motions to suppress.  I'm not
 3     holding you to --
 4                    MR. NEUMAN:  Right.  Standing here today, I'm not
 5     sure I have any.
 6                    THE COURT:  Okay.
 7                    MR. NEUMAN:  Obviously we are still evaluating.
 8                    THE COURT:  I appreciate that.  Okay.
 9                    MR. STEINGARD:  Your Honor, I wear two hats here,
10     so I will speak for Mr. Chan and then for Shen Zen.
11                    To answer your question directly, the suppression
12     motions may well relate to the wiretaps, to necessity issues,
13     and potentially minimization issues.  When you get into those
14     kind of issues, it's so time intensive.  We had I believe it's
15     five wiretaps and two bugs intercepting I think it's like a
16     dozen targets.  This is off the top of my head.  And so
17     theoretically those could be the subject of suppression
18     motions.
19                    The search warrants --
20                    THE COURT:  Let me interrupt you.
21                    MR. STEINGARD:  Yes.
22                    THE COURT:  You've got all the -- you have all of
23     the affidavits.
24                    MR. STEINGARD:  I believe that is correct.
25                    THE COURT:  So the initial question is whether or
```

1   not there was -- the Government made a sufficient showing in

2   order for the judge to issue the Title III.

3                MR. STEINGARD:  The probable cause issue.

4                THE COURT:  Right.

5                MR. STEINGARD:  Yes.

6                THE COURT:  So that issue -- if you have

7   everything now, that issue can be looked at, determined and

8   whether or not a motion is warranted such a motion can be

9   filed.

10                MR. STEINGARD:  I don't disagree with one caveat,

11   Your Honor.  When we get into the *Franks* issue, when we get

12   into looking at materials that are -- I'm going to use the

13   wrong word here but I'm going to say exculpatory but at least

14   place culpability in question, if those are not included which

15   is a typical basis for probable cause challenge is because the

16   material was left out, I'm aware that Your Honor was the one

17   who signed the wiretap orders here.

18                THE COURT:  Really?

19                MR. STEINGARD:  I am.  And I will tell you there

20   are 13,000 pages of pleadings that the Government has provided

21   in discovery.  And so the process of wading through that -- and

22   I literally have just begun it because I focused on other

23   areas.  I'm not telling you that there is going to be a

24   suppression motion on the wiretaps on probable cause or

25   necessity or a *Franks* base challenge.  When you ask what are

1  you looking for, those are the kind of things we would be

2  looking for, but that is no different from any case.

3        I'm going to digress a moment if I can away from

4  the suppression issues because I sense that Your Honor wants to

5  move this case particularly with these kinds of motions along

6  much quicker.  We are pushing back, but you are not -- you are

7  not adopting the October filing date.  We just ask that you be

8  more lenient, instead of it being June, maybe we can find a

9  middle ground if the Court can live with an August filing date,

10  at least you have given us a little bit more time and we can

11  still get a resolution before the end of the year of these kind

12  of motions.

13        THE COURT:  What about the suppression motions?

14  Because the suppression motions you put over into 2022.  My

15  hope, as I said, is to have all of the motion practice done

16  this year.  We are only in -- we are just beginning April.

17  Again, I'm not trying to, as the 9th Circuit characterized one

18  district court judge, rocket docket.  I'm not trying to put you

19  on a rocket docket.  I'm just trying to understand the reason

20  for the amount of time that is requested in the stipulation for

21  motion practice.

22        The trial date is another question.  It seems to

23  me that we all as trial lawyers like to have all of the motion

24  practice done and then focus on those very important issues

25  that come with preparing a trial.  We like to have the -- trial

1    lawyers like to have the quiet time before the trial to work on

2    those issues and prepare witnesses and prepare jury

3    instructions.  So that was my goal, and that was what I was

4    attempting to accomplish.

5                   MR. STEINGARD:  And, Your Honor, we appreciate

6    that.  When we started the process of talking to the Government

7    counsel, all of us, about a schedule, we began not with the

8    motions.  We began with the trial date and then worked

9    backwards.

10                  I don't know that the Court appreciates

11   completely the amount of time it's taking us to look at this

12   discovery.  I have been and all of us have been involved in big

13   cases before.  Typically, when you have a case with 2 million

14   pages of documents, a half of million of them are bank records.

15   You give them to an accountant, let me know if there is

16   anything in there.  That is not this case.  I don't even know

17   if we have bank records.  This case is of a totally different

18   nature than I have ever seen.

19                  All of us in preparation for today are prepared

20   to talk to you about the volume of material and the nature of

21   the material.

22                  THE COURT:  I appreciate that.  I guess my first

23   question is are you finding any resistance by the Government in

24   terms of providing you with the discovery that you need in

25   order to represent your respective clients in this motion

1    practice?

2              MR. STEINGARD:  Not in the least with the caveat

3    that the material comes to us in an encrypted format and the

4    Government made their paralegal who assists us -- literally

5    assists us, the defense, in trying to work through the

6    encryption.

7              But just the process of taking material and

8    putting it on our server took over a month.  Now I can review

9    the material as it began to be downloaded onto the server so it

10   wasn't like I was twiddling my thumbs.

11             I guess that's my point.  This case is just a

12   different animal.  I'm not faulting the Government.  They made

13   an early production in December to us.  I thought that was

14   great.  They made a second production to us about a month ago.

15   We now learned there is -- we knew there was a third one.

16   We're now getting a sense of what the volume is.

17             THE COURT:  Is this the gibberish production that

18   Mr. Jenkins alluded to?

19             MR. STEINGARD:  I'm interested in gibberish,

20   Your Honor, but I'm more interested in 25 new recordings of

21   interviews of prospective witnesses.

22             THE COURT:  Yeah.  But those are -- those are

23   easy.  I mean, there's nothing -- a witness is interviewed.

24   You have a copy of the interview.  You read it, and you

25   determine, okay, I put it in the witness file and the issues

1  related to this witness are X, Y, and Z.  To me that is well
2  down the ladder of complex matters to investigate.  Obviously
3  you have to figure out what the witness said and place it in
4  terms of what -- where the case is going.
5          MR. STEINGARD:  It's not quite that simple,
6  Your Honor, because what we do is we get a recording of -- I'm
7  just going to make this up -- a two-and-a-half-hour meeting
8  with a witness, and then we get a 302 report which could be six
9  pages, could be eight pages.  I don't doubt that they're
10  accurate.  It's not a transcript.
11          So I will speak for myself.  Right now I have not
12  listened to any of the recorded interviews.  I'm relying on the
13  agent's report presuming it is accurate.  But at some point
14  undoubtedly I am going to have to go over that actual
15  recording.
16          THE COURT:  Again, that doesn't go to motion
17  practice.
18          MR. STEINGARD:  Agreed.  Agreed.  That's why I'm
19  just suggesting to you what we are saying isn't that the June
20  date can't be done.  What we are saying is, if you can push it
21  back for us because we are so immeshed in trying to get through
22  this discovery and we are so far from being through the
23  discovery that, if we can buy us a month or two more, it would
24  be helpful.
25          THE COURT:  Okay.  Let me ask Mr. Jenkins.  When

1    is all of the discovery going to -- what's the target date for

2    producing all of the discovery to the defense?

3              MR. JENKINS:  The discovery that I earlier

4    mentioned, the target date is within the next 30 days.  As I

5    mentioned, Special Agent Civetti has the -- to use the

6    pejorative term gibberish.  We just need hard drives from

7    defense counsel as we have been doing.  I will agree it takes

8    time, as I have already noted, for that transmission of that

9    data.  So we will give it to them as soon as we get a hard

10   drive.  But as Mr. Steingard points out, it's not necessarily

11   determinative of when they get access to it.  We will make that

12   available today.

13             The remaining information such as the

14   25 recordings -- and to be clear, I also referenced and it is

15   in the stipulation that the 302s for those summaries that

16   Mr. Steingard is relying on have already been produced.  So

17   this is just the underlying recordings to support those.

18   Again, that is just because of processing time getting that

19   electronic data, but the 302s have been produced.

20             Those are the most significant portions, and it

21   will be available within the next 30 days and a lot of it is

22   available immediately.

23             THE COURT:  Well, maybe it makes sense to put

24   setting these dates off until the next 30 days when the

25   Government indicates -- I'm not going to call it a

1    representation but at least it is indicating that all of the --

2    quote, "All of the discovery is going to be provided to the

3    defense."  And you, as it is rolled out, review it.  And then

4    we can reconvene, and we can have a better understanding of

5    whether or not -- a better understanding of what makes most

6    sense.

7              Again, I'm not trying to rush the preparation of

8    this case or these motions, but it just seemed to me that some

9    of these dates could be adjusted.  So maybe that is a fairer

10   way of doing it.

11             MR. STEINGARD:  And with your thoughts in mind,

12   now that we understand where you're coming from, I think we can

13   probably within 30 days come up with an amended schedule,

14   probably not our wish list but taking into account your

15   feelings about this, and provide you with some new proposed

16   dates that will be on a more expedited schedule.  We understand

17   you would like the motion practice to be resolved in 2021.  We

18   get that.

19             THE COURT:  Right.  And with respect to the trial

20   date, you are talking about May of 2022.  Who knows where I

21   will be in May of 2022.

22             MR. STEINGARD:  I'm not sure what to take from

23   that, Your Honor.  I assume you will be sitting right here.

24             THE COURT:  Well, I hope so.  All right.  Well, I

25   think that to me sounds like it makes more sense now that --

1    and, again, I sent out the text entry to have you meet and

2    confer because I didn't want to start negotiating dates without

3    having in mind what counsel thought, and I went back and looked

4    at the case.

5              How many pages of Title III applications are

6    there, Mr. Steingard?  Is that the one you were talking about

7    thousands of pages?

8              MR. STEINGARD:  Well, there is a total of

9    pleadings.  There is one what we call folder of 13,000

10   pleadings that include the wiretaps, GPS, PIN registers, search

11   warrants.

12             THE COURT:  And those are all the items that

13   would possibly result in motions to suppress?

14             MR. STEINGARD:  Off the top of my head, yes.

15             MR. SNYDER:  Your Honor, I just -- I want to

16   caveat that.  Mr. Steingard may be right.  The number sounds

17   low to me.  Just given there are -- the discovery was broken up

18   into -- I think at this point we're around 20 productions.  And

19   so there were different sets of I think Title III applications

20   produced -- I could be wrong about this -- and then separately

21   warrant applications and then the orders.  And so I don't know

22   if 13,000 captures it all.  Off the top of my head it sounds

23   low.  It could be right.

24             THE COURT:  Well, I have already read them.

25             MR. SNYDER:  Yeah, I know.  You have read quite a

1  number of them.  But you would be surprised at how many other

2  ones were there and how many warrants were just flying off the

3  presses.

4          THE COURT:  All right.  Does anybody object to

5  continuing this or setting another status conference for

6  30 days out so Mr. Jenkins can hopefully expedite some of this

7  remaining discovery and then ask counsel to meet and confer

8  again and come up with a stipulation with respect to dates,

9  keeping in mind the conversations that we had?  Does anybody

10  object?

11          MS. ALE:  Your Honor, just a point of

12  clarification.  Is it that the Government will produce it in

13  30 days and so --

14          THE COURT:  I'm not holding the Government to

15  producing anything.  Mr. Jenkins indicated that his belief was

16  that he would hopefully be able to get it to you in 30 days.

17  I'm not going to make this an order, and you're not going to

18  have an order to come in and say Mr. Jenkins didn't do X, Y,

19  and Z.  We are trying to collectively work out acceptable

20  procedures and dates so everybody can represent their

21  respective clients.

22          MS. ALE:  And I understand that, Your Honor.  I

23  wasn't trying to hold the Government to any specific date.

24          THE COURT:  Let me ask the question.  Do you

25  object?

1          MS. ALE:  Only -- my question was if it was going

2    to take the 30 days because, as the Government noted, it takes

3    us a couple more sometimes weeks or months to download the

4    information.  So that is why I wanted to ask for potentially a

5    couple more weeks so we can build that in.

6          THE COURT:  All right.  So do you object?

7          MS. ALE:  No, Your Honor.

8          THE COURT:  All right.  Any objection?  All

9    right.  Hearing none, then that is what I will do.

10          Today is April 5th.  How about a status

11    conference on May 10th with the report on May 5th or

12    stipulation on May 5th.  Is that acceptable?

13          MR. JENKINS:  It is to the Government,

14    Your Honor.

15          MR. SNYDER:  Your Honor, if I can ask one

16    question as a point of clarification.

17          THE COURT:  You have to get closer to the

18    microphone.

19          MR. SNYDER:  Maybe this is just something we will

20    talk about next time.  For our own planning purposes, it might

21    be helpful to -- is the Court's main concern about the motion

22    dates or is this -- are we going to talk separately about the

23    trial date just so we have a sense of kind of where the Court's

24    thinking is?

25          THE COURT:  Well, I'm thinking that, if we get

1    all the motions resolved this year or early next year, that the

2    proposed trial date of May 24th, 2022, may be a little -- maybe

3    we can advance that.  Let's assume that by end of January we

4    have all of the motion practices.  That is February, March,

5    April, most of May, that is four months for final trial

6    preparation, and that seems to me to be a little long.

7              Again, I'm more than willing to work with counsel

8    on trial date, but my goal is to get all the motions done.  So

9    I can't answer your question.  I don't like the May 22 trial

10   date.  I think it should be earlier.  But given what has been

11   said this morning, that to me is not an unrealistic date if

12   that is helpful.

13             MR. SNYDER:  That is helpful, Your Honor, and it

14   sounds like something, if we need to talk about, we can talk

15   about next time.

16             THE COURT:  Right.  Status conference on May 10

17   at 11:00 a.m. and a stipulation or a joint report filed on

18   May 5th -- I would rather have it in the form of a stipulation

19   because then it allows me to work through the dates.

20             MR. JENKINS:  Understood, Your Honor.

21             THE COURT:  Let's do it at 8:00 o'clock on

22   May 10th.  Shannon likes the early start.

23             All right.  Is there anything else from any of

24   the defense?

25             MS. ALE:  Nothing further for Mr. Huizar.

1           MR. STEINGARD:  No, Your Honor.  Thank you.

2           MR. NEUMAN:  No, thank you, Your Honor.

3           THE COURT:  Anything from the Government?

4           MR. JENKINS:  Nothing from the Government.  Thank

5  you, Your Honor.

6           THE COURT:  I would just ask the Government to --

7  let me ask a question.  I'm ultimately going to issue an

8  amended Criminal Trial Order.  And what I do in cases of this

9  complexity is -- one of my goals is to have the Government

10  produce an exhibit list and all of its trial exhibits well

11  before trial and then a meet-and-confer process between counsel

12  for the defense and counsel for the Government to file any

13  objections that they may have to those exhibits.  Then there is

14  a meet-and-confer process, and I continue to work with counsel

15  so, when we do start the trial in this case -- and I know you

16  have got a long estimate but one of the case management

17  techniques that I think helps to shorten the trial is to make

18  sure that we have eliminated the objections to the trial

19  exhibits because then everybody knows what the trial exhibits

20  are going to be from the Government.

21           So what would be -- why don't you give this some

22  consideration, Mr. Jenkins.  What would be a reasonable amount

23  of time prior to trial where the Government would be in a

24  position to produce all of its trial exhibits as well as

25  obviously an exhibit list to the defense and to the Court?

1    Would four weeks sound reasonable?

2              MR. JENKINS:  Yes, Your Honor.  We can do it in

3    four weeks.

4              THE COURT:  Okay.

5              MR. JENKINS:  Sorry.  Four weeks before the --

6              THE COURT:  Four weeks prior to whenever the

7    trial is.  I want to alert counsel that to me that is one of

8    the ways to streamline the presentation of this or any other

9    complex case to the jury because then we don't have any

10   fights -- I will resolve the objection if there are fights, but

11   we will then have a clean set of exhibits and there is no need

12   to lay foundations and it just saves a lot of time.

13             MR. STEINGARD:  Your Honor, I think we can

14   include in the stipulation that we will be filing a line entry

15   for just that process.  I can tell you there may be a

16   disagreement on that point.  We may want it earlier than they

17   may want to do it, but we can at least discuss that with the

18   Government and come up with either an agreed-upon date or

19   advise you of what the two parties suggest.

20             THE COURT:  Okay.  It doesn't seem to me like

21   there should be that many objections to the trial exhibits that

22   are going to be offered by the Government.  There may be a lot

23   of trial exhibits, but most of them I find it -- I would find

24   it unique or unusual that there would be many legitimate

25   objections.

1          And, again, this process is not designed to have
2   everybody -- you know, as I tell lawyers in civil cases, you're
3   not going to have an associate sit down and pull out the
4   Evidence Code and go through the exhibits and start making
5   objections just for the sake of objections because if you're --
6   if they're boilerplate objections, I will just overrule them
7   all.
8          MR. STEINGARD:  The tricky part -- and I'm just
9   now letting you know.  The tricky part is that two defendants
10  have a RICO count.  The other defendants don't.  There's a lot
11  of evidence -- and the way this case is built with Mr. Huizar
12  in the middle and different alleged schemes going on, we have
13  got to figure out what is admissible against which defendant,
14  and that process may be complicated.  I have already had a
15  discussion with Mr. Jenkins about it.  That process may be
16  complicated so that we don't end up with sort of a
17  jack-in-the-box situation where we are constantly asking you
18  for a limiting instruction this only goes to that defendant.
19  It doesn't apply to this.  We have to work through that.  But
20  the process can begin with the meet and confer.
21          THE COURT:  I appreciate that, and I appreciate
22  the conversation that we are having because it enlightens me in
23  terms of some of the complexities which you folks are facing
24  which I am ultimately going to be facing in terms of managing
25  the trial.  So the more I can be educated in terms of the

1    issues and the problems you are experiencing, the easier the

2    preparation and the ultimate trial is going to be.

3              I respect and I am delighted that we have such

4    competent, experienced counsel that are obviously to this point

5    in time working cooperatively and professionally with each

6    other.  It will make this case -- it will make this case go

7    much more smoothly than it otherwise would.  So I would

8    encourage you to continue that.  And I will do my best to try

9    to accommodate counsel as well as counsel are accommodating

10   each other.

11             MR. STEINGARD:  We have not had any issues in

12   that regard at least from my end.

13             THE COURT:  Okay.  All right.  I guess we are

14   done.  So we will close the record, and everybody stay safe,

15   and hopefully we will get this -- we will get the courthouse

16   opened shortly.  I guess today we are moving into orange.  Is

17   that where we're going so we can hopefully get back to trying

18   cases?

19             All right.  Thank you very much.

20             MR. JENKINS:  Thank you, Your Honor.

21             MR. NEUMAN:  Thank you, Your Honor.

22             MR. STEINGARD:  Thank you, Your Honor.

23             (Proceedings concluded at 10:02 a.m.)

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7  THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8  PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15              DATED THIS  16TH  DAY OF APRIL, 2021.

16

17

18              /S/ MIRANDA ALGORRI

19              _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
20              FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25