CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Jose Huizar

[And on Behalf of Defendants Ray Chan
and Shen Zhen New World I, LLC]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSE LUIS HUIZAR, <br> RAYMOND SHE WAH CHAN <br> SHEN ZHEN NEW WORLD I, LLC, <br><br> Defendants. | Case No. CR-20-326-JFW <br><br> **JOSE HUIZAR, RAYMOND CHAN, AND SHEN ZHEN NEW WORLD I, LLC's JOINT MOTION TO DISMISS AND/OR STRIKE** <br><br> Date: November 15, 2021 <br> Time: 8:00 a.m. <br> Ctrm: 7A – Hon. John F. Walter |

TO THE ACTING UNITED STATES ATTORNEY AND HER COUNSEL OF

RECORD: PLEASE TAKE NOTICE THAT, at 8:00 a.m. on November 15, 2021, or as

soon thereafter as may be heard, Jose Huizar, Raymond Chan, and Shen Zhen New

World I, LLC ("SZNW") will, and hereby do, jointly move for an order dismissing or striking various portions of the First Superseding Indictment ("FSI") under Federal Rules of Criminal Procedure 12 and 7. Huizar, Chan, and SZNW base this motion on the attached memorandum and declaration, the files and records in this case, and any other argument or evidence that the Court may consider.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: September 7, 2021          /s/ *Charles J. Snyder*

Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Jose Huizar

[And on Behalf of Defendants Ray Chan and Shen Zhen New World I, LLC]

# **<u>TABLE OF CONTENTS</u>**

**Page(s)**

I.     INTRODUCTION……………………………………………………..1

II.    LEGAL STANDARD……………………………………………………3

III.   ARGUMENT……………………………………………………………4

     A. Count 1: The Court should dismiss or strike many of the RICO allegations because they do not describe "racketeering acts" and will mislead the jury about what is and is not a federal bribery crime………………………………4

        1. Particularly in cases involving state and local officials, the Supreme Court has limited federal bribery statutes to only the most blatant and specific acts of criminality…………………………………………………………..5

            a. Quid: Where the benefit is a political contribution in any form, the *quid-pro-quo* agreement must be explicit and unambiguous……….9

            b. Quo: In cases involving state and local officials, the object of the illicit agreement must be concrete action on a specific and focused matter involving the formal exercise of governmental power…….10

            c. Pro: The government must show that, at the time the benefit was conferred, it was linked to a particular official act………………..11

        2. The Court should strike many of the overt acts in Count 1………………13

            a. The Court should strike most of the "requests" from the "L.A. Grand Hotel Bribery Scheme" because they cannot support a bribery offense……………………………………………………..13

            b. The Court should strike the pressuring-labor-unions allegation from the "940 Hill Bribery Scheme" because it cannot support a bribery offense……………………………………………………..16

            c. The Court should strike allegations relating to Company M's first three contributions from the "Project M Bribery Scheme" because the FSI fails to allege a clear and unambiguous *quid pro quo*…….17

d. The Court should strike the business-meetings allegations from the "Businessperson A Bribery Scheme" because they cannot support a bribery offense and the Court previously stated that the conduct was not a bribe in *United States v. Englander*..............................21

e. The Court should strike the solicitation-of-foreign-nationals allegations because they do not allege racketeering acts.............22

B. Counts 2-17: The Court should strike certain charging language from the honest-services fraud counts because it targets lawful conduct, dismiss Count 2 as time-barred, and dismiss or strike portions of the honest-services fraud counts for the same reasons as in the RICO count..............................23

1. The Court should strike certain "means and methods" from the general charging language because they do not describe official acts or because they describe conduct that is time-barred or otherwise deficient...........23

a. Pressuring unions to resolve issues on projects and developers to affect their business practices………………………………………..23

b. Introducing a City Council resolution to enhance Wei Huang and SZNW's professional reputations…………………………………23

2. The Court should dismiss Count 2 because it is time-barred................26

3. The Court should dismiss or strike portions of the honest-services fraud counts for the same reasons as in Count 1…………………………………29

C. Counts 18-21: The Court should dismiss the Travel Act counts because the state-law predicate is broader than the generic federal definition of bribery; alternatively, for the state-law predicate, the Court should require the government to at least satisfy the *McDonnell quid-pro-quo* standard………29

1. The Travel Act……………………………………………………………...30

2. Defining the state predicate offense under the Travel Act………………31

3. The generic definition of Travel Act "bribery"…………………………34

ii

4. California bribery is broader than the Travel Act generic definition of bribery……………………………………………………………………39

5. The Travel Act charges in the FSI include a *quid pro quo* and an "official act"……………………………………………………………………42

D. Counts 22-30: The Court should dismiss Counts 22-23 as duplicitous and strike several portions as time-barred; strike the labor-unions portion of Count 24 for failing to allege a qualifying *quo*; and dismiss Count 29 as duplicitous and strike several portions for failing to state an offense…………………43

1. Counts 22 and 23…………………………………………………………43

a. Counts 22 and 23 are duplicitous…………………………………43

b. Many of the *quids* and *quos* alleged in Counts 22 and 23 are untimely………………………………………………………...45

2. Count 24……………………………………………………………………47

3. Count 29……………………………………………………………………47

E. Several of the charged statutes are facially unconstitutional or unconstitutional as applied………………………………………………48

1. 18 U.S.C. §§ 666(a)(1)(B) & (a)(2) are unconstitutional in violation of the Fifth, First, and Tenth Amendments……………………………………48

a. § 666 is facially unconstitutional under the Fifth Amendment because it is impermissibly vague……………………………….....48

b. § 666 is facially overbroad in violation of the First Amendment…53

c. § 666 violates the Tenth Amendment and is unconstitutional as applied……………………………………………………………...56

2. The reference to generic "bribery" in the RICO, Travel Act, and money-laundering statutes is unconstitutionally vague, and the mode of defining and expanding the element-less label through post-hoc judicial creation violates the separation of powers and Due Process clause………………62

iii

3. The honest-services statute is unconstitutionally vague on its face, the Hobbs Act does not apply to bribery, and both the honest-services statute and the Hobbs Act are unconstitutionally vague as applied................65

4. Unless subjected to the *McDonnell* limits, California's bribery statutes are unconstitutional when incorporated into federal law.........................65

IV.    CONCLUSION.................................................................................66

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*Bond v. United States,*
   564 U.S. 211 (2011)................................................................56

*Bond v. United States,*
   572 U.S. 844 (2014)................................................................57

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964)................................................................64

*Buckley v. Valeo,*
   424 U.S. 1 (1976)....................................................................6

*United States v. Lopez,*
   484 F.3d 1186 (9th Cir. 2007) ................................................4

*Citizens United v. Federal Election Comm'n,*
   558 U.S. 310 (2010)..........................................................*passim*

*City of Houston, Tex. v. Hill,*
   482 U.S. 451 (1987)................................................................53

*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971)................................................................63

*Crandon v. United States,*
   494 U.S. 152 (1990)................................................................64

*Esquivel-Quintana v. Sessions,*
   137 S.Ct. 1562 (2017)............................................................34

*Evans v. United States,*
   504 U.S. 255 (1992)......................................................5, 8, 11, 22

*Evers v. Custer County,*
   745 F.2d 1196 (9th Cir. 1984) ...............................................55

*F.C.C. v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012)................................................................48

v

*Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*,
  470 U.S. 480 (1985)..................................................................................8

*Gammoh v. City of La Habra*,
  395 F.3d 1114 (9th Cir. 2005) ..............................................................49

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)..........................................................................56, 57

*Hunt v. City of Los Angeles*,
  601 F.Supp.2d 1158 (C.D. Cal. 2009) ..................................................54

*Information Providers' Coalition for Defense of the First Amendment v. F.C.C.*,
  928 F.2d 866 (9th Cir. 1991) ...........................................................49, 64

*Kelly v. Robinson*,
  479 U.S. 36 (1986)..................................................................................57

*Kelly v. United States*,
  140 S.Ct. 1565 (2020).............................................................................7

*Kolender v. Lawson*,
  461 U.S. 352 (1983)................................................................................54

*Martinez-de Ryan v. Whitaker*,
  909 F.3d 247 (9th Cir. 2018) ................................................................52

*McCormick v. United States*,
  500 U.S. 257 (1991).......................................................................*passim*

*McCutcheon v. Fed. Election Comm'n*,
  572 U.S. 185 (2014).......................................................................*passim*

*McDonald v. Smith*,
  472 U.S. 479 (1985)................................................................................54

*McDonnell v. United States*,
  136 S.Ct. 2355 (2016)....................................................................*passim*

*McNally v. United States*,
  483 U.S. 350 (1987).........................................................................7, 13

*Moncrieffe v. Holder*,
  569 U.S. 184 (2013)................................................................................34

*Mont v. United States*,
   139 S.Ct. 1826 (2019)..................................................................................50

*Murphy v. National Collegiate Athletic Ass'n*,
   138 S.Ct. 1461 (2018)..................................................................................56

*NAACP v. Button*,
   371 U.S. 415 (1963)....................................................................................53

*Perrin v. United States*,
   444 U.S. 37 (1979)..............................................................................*passim*

*Rewis v. United States*,
   401 U.S. 808 (1971)....................................................................31, 32, 42

*Russell v. United States*,
   369 U.S. 749 (1962)....................................................................................43

*Salinas v. United States*,
   522 U.S. 52 (1997)........................................................................5, 59, 60, 61

*Scheidler v. National Organization for Women, Inc.*,
   537 U.S. 393 (2003)..............................................................................30, 34

*Silver v. United States*,
   141 S.Ct. 656 (2021)..................................................................................65

*Skilling v. United States*,
   561 U.S. 358 (2010)..........................................................................7, 8, 64

*Sorich v. United States*,
   555 U.S. 1308 (2009) ................................................................................61

*Taylor v. United States*,
   495 U.S. 575 (1990)..............................................................................33, 34

*United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n*,
   389 U.S. 217 (1967)..............................................................................53, 54

*United States v. Agne*,
   214 F.3d 47 (1st Cir. 2000)........................................................................28

*United States v. Arthur*,
   544 F.2d 730 (4th Cir. 1976) ......................................................................6

*United States v. Biaggi,*
   674 F.Supp. 86 (E.D.N.Y. 1987) ....................................................................37, 38

*United States v. Bynum,*
   327 F.3d 986 (9th Cir. 2003) ..................................................................................61

*United States v. Carollo,*
   2011 WL 5023241 (S.D.N.Y 2011) ........................................................................28

*United States v. Carpenter,*
   961 F.2d 824 (9th Cir. 1992) ..........................................................................10, 20

*United States v. Cecil,*
   608 F.2d 1294 (9th Cir. 1979) ...............................................................................42

*United States v. Chi,*
   936 F.3d 888 (9th Cir. 2019) ........................................................33, 37, 39, 63

*United States v. Cicco,*
   938 F.2d 441 (3d Cir. 1991) ...................................................................................44

*United States v. Craig,*
   528 F.2d 773 (7th Cir. 1976) .................................................................................58

*United States v. Davis,*
   139 S.Ct. 2319 (2019)...............................................................................48, 53

*United States v. Del Toro,*
   513 F.2d 656 (2d Cir. 1975) ..........................................................................58, 59

*United States v. Dorri,*
   15 F.3d 888 (9th Cir. 1994) ...................................................................................52

*United States v. Drebin,*
   557 F.2d 1316 (9th Cir. 1977) ...............................................................................27

*United States v. Ferber,*
   966 F.Supp. 90 (D. Mass. 1997)............................................................................33

*United States v. Frega,*
   179 F.3d 793 (9th Cir. 1999) .........................................................................30, 41

*United States v. Garcia-Paz,*
   282 F.3d 1212 (9th Cir. 2002) ................................................................................4

*United States v. Garrido,*
    713 F.3d 985 (9th Cir. 2013) ................................................................. 50

*United States v. Gonzales,*
    520 U.S. 1 (1997) ................................................................................. 39

*United States v. Grass,*
    274 F.Supp.2d 648 (M.D. Pa. 2003) ..................................................... 28

*United States v. Hathaway,*
    534 F.2d 386 (1st Cir. 1976) ................................................................. 31

*United States v. Hinton,*
    683 F.2d 195 (7th Cir. 1982) ................................................................. 58

*United States v. Huet,*
    665 F.3d 588 (3d Cir. 2012) ................................................................... 3

*United States v. Jefferson,*
    Case No. 07-CR-209, ECF No. 784 (E.D. Va., Oct. 4, 2017) ................. 14

*United States v. Jones,*
    676 F.Supp.2d 500 (W.D. Tex. 2009) ................................................... 46

*United States v. Keith,*
    605 F.2d 462 (9th Cir. 1979) ................................................................... 3

*United States v. Lopez,*
    514 U.S. 549 (1995) ............................................................................. 56

*United States v. Lowry,*
    409 F.Supp.2d 732 (W.D. Va. 2006) ..................................................... 27

*United States v. Malkus,*
    696 F.Appx. 251 (9th Cir. 2017) ............................................................. 8

*United States v. Manges,*
    110 F.3d 1162 (5th Cir. 1997) ............................................................... 27

*United States v. Manzo,*
    851 F.Supp.2d 797 (D.N.J. 2012) ................................................... 35, 37

*United States v. Marlinga,*
    No. 04-80372, 2005 WL 517964 (E.D. Mich. Mar. 2, 2005) ................... 4

*United States v. McDonnell,*
   No. 15-474 ..................................................................................................8

*United States v. McGeehan,*
   584 F.3d 560 (3d Cir. 2009) ........................................................................3

*United States v. Menendez,*
   291 F.Supp.3d 606 (D.N.J. 2018)..............................................................20

*United States v. Mosley,*
   659 F.2d 812 (7th Cir. 1981) ......................................................................59

*United States v. Musto,*
   No. 3:10-CR-338, 2012 WL 5879609 (M.D. Pa. Nov. 21, 2012).....................44

*United States v. Nader,*
   542 F.3d 713 (9th Cir. 2008) ......................................................................31

*United States v. Newell,*
   658 F.3d 1 (1st Cir. 2011)............................................................................45

*United States v. Nosal,*
   No. C 08-0237 MHP, 2010 WL 934257 (N.D. Cal. Jan. 6, 2010).....................3

*United States v. Nystrom,*
   No. 07-CR-30100-03-KES, 2008 WL 4833984 (D.S.D. Nov. 4, 2008)...........44

*United States v. Oakland Cannabis Buyers' Co-op.,*
   532 U.S. 483 (2001)....................................................................................64

*United States v. Parlavechhio,*
   903 F.Supp. 788 (D.N.J. 1995)...................................................................35

*United States v. Pirro,*
   212 F.3d 86 (2d Cir. 2000) ............................................................................4

*United States v. Poliak,*
   823 F.2d 371 (9th Cir. 1987) ......................................................................27

*United States v. Ramirez,*
   710 F.2d 535 (9th Cir. 1983) ........................................................................4

*United States v. Ramirez-Martinez,*
   273 F.3d 903 (9th Cir. 2001) ........................................................................4

x

*United States v. Reese*,
    92 U.S. 214 (1875) ................................................................................64

*United States v. Sherbondy*,
    865 F.2d 996 (9th Cir. 1988) ...............................................................64

*United States v. Silver*,
    203 F.Supp.3d 370 (S.D.N.Y. 2016) ...................................................26

*United States v. Silver ("Silver I")*,
    864 F.3d 102 (2d Cir. 2017) ...........................................................25, 26

*United States v. Silver ("Silver II")*,
    948 F.3d 538 (2d Cir. 2020) .................................................12, 25, 26

*United States v. Smith*,
    740 F.2d 734 (9th Cir. 1984) ...............................................................44

*United States v. Stargell*,
    738 F.3d 1018 (9th Cir. 2013) .............................................................27

*United States v. Stevens*,
    559 U.S. 460 (2010) ..............................................................................53

*United States v. Sun-Diamond Growers of Cal.*,
    526 U.S. 398 (1999) ....................................................................*passim*

*United States v. Tutein*,
    122 F.Supp.2d 575 (D.V.I. 2000) .................................................4, 44

*United States v. UCO Oil Co.*,
    546 F.2d 833 (9th Cir. 1976) .................................................................4

*United States v. Universal C. I. T. Credit Corp.*,
    344 U.S. 218 (1952) ................................................................................4

*United States v. Williams*,
    553 U.S. 285 (2008) ........................................................................53, 56

*United States v. Yashar*,
    166 F.3d 873 (7th Cir. 1999) ...............................................................46

**State Cases**

*People v. Diedrich,*
    31 Cal.3d 263 (1982) ............................................................................40

*People v. Gaio,*
    81 Cal.App.4th 919 (2000) .........................................................30, 40, 41

*People v. Hallner,*
    43 Cal.2d 715 (1954) ...........................................................................34

*People v. Kerns,*
    9 Cal.App.2d 72 (1935) .........................................................................40

**Constitutional Provisions**

U.S. Const., amend. I .............................................................................*passim*

U.S. Const., amend. V .................................................................48, 53, 54

U.S. Const., amend. X .................................................................48, 56, 57, 62

**Federal Statutes and Rules**

18 U.S.C. § 201 ....................................................................................*passim*

18 U.S.C. § 641 ......................................................................................58

18 U.S.C. § 666 ....................................................................................*passim*

18 U.S.C. § 922 ......................................................................................33

18 U.S.C. § 1343 ..................................................................................27, 38

18 U.S.C. § 1349 ....................................................................................38

18 U.S.C. § 1346 ..................................................................................*passim*

18 U.S.C. § 1951 ....................................................................................38

18 U.S.C. § 1952 ..................................................................................*passim*

18 U.S.C. § 1956 ..................................................................................36, 62

18 U.S.C. § 1957 ....................................................................................36

18 U.S.C. § 1961 ..................................................................................5, 22, 62

18 U.S.C. § 1962 ........................................................................................4, 5

18 U.S.C. § 3282 ..........................................................................................27

18 U.S.C. § 3293 ....................................................................................27, 28

Fed. R. Crim P. 12 ..........................................................................................3

Fed. R. Crim. P. 7 ...........................................................................................4

Fed. R. Evid. 403 ..........................................................................................26

**State Statutes and Rules**

Cal. Penal Code § 67 ................................................................30, 34, 39, 41, 42

Cal. Penal Code § 67.5 ..............................................................30, 34, 40, 41

Cal. Penal Code § 68 .................................................................30, 34, 40, 41

Cal. Penal Code § 165 ...................................................................................40

CALCRIM 2600 ............................................................................................42

CALCRIM 2601 ............................................................................................42

CALCRIM 2603 ............................................................................................42

Cal. R. Prof'l Conduct 3.6 ..............................................................................3

**Other Authorities**

Attorney General William P. Barr, Remarks at Hillsdale College
    Constitution Day Event (Sept. 16, 2020), https://bit.ly/2UYuusU ......................7

Black's Law Dictionary ...........................................................................36, 37

# **TABLE OF ARGUMENTS AND JOINERS**

| **Argument Section** | **Joining Defendant(s)** |
| --- | --- |
| III.A.2.a | All |
| III.A.2.b | Huizar and Chan |
| III.A.2.c | Huizar and Chan |
| III.A.2.d | Huizar and Chan |
| III.A.2.e | All |
| III.B | All |
| III.C | Huizar and SZNW |
| III.D.1 | All |
| III.D.2 | Huizar |
| III.D.3 | Huizar |
| III.E | All |

# I. **INTRODUCTION**

From the moment redistricting brought downtown into CD-14, Jose Huizar was an evangelist for robust development.  Part of his stump speech, often repeated at groundbreakings with city leaders beaming in the background, was that "every great city needs a great downtown."  Rather than antagonism toward developers, he, like Ray Chan, saw it as his responsibility to bring hotels, apartments, jobs, tourism, and entertainment to the urban core.  He viewed investment and high-density growth as good for all of his constituents – not to mention his own political ambitions and the city at large – and understood that essential services and widespread employment depended on economic vitality.

Fueled in significant part by foreign investment from companies like Shenzen New World I, LLC ("SZNW"), Huizar's tenure in office saw downtown boom with economic energy and cultural relevance.  Tens of thousands of people moved to the area; housing and job opportunities expanded; new businesses and entertainment venues opened; and the region became a livable and attractive destination for locals and tourists alike.  During this period, nearly everyone in Los Angeles talked or heard about how much downtown had improved.

Less visible – but no less important – the improvements downtown had effects well beyond the city core.  Community benefits extracted from major projects were earmarked for expiring rent covenants in Boyle Heights; TFAR payments were set aside for affordable housing along the Spring Street corridor.  Increased tourism, employment, and business activity added to the tax base.  And Huizar's ability to raise money from developers – who, like other interests, supported him because he supported them – helped to fund not only homelessness initiatives, but the campaigns of some of the most prominent local, state, and national politicians.

Flattening the complex tradeoffs inherent in American politics, the First Superseding Indictment ("FSI") reimagines this period as one permeated by corruption.  And without identifying a single project opposed in Committee or Council, the FSI

1

1    charges Huizar and Chan with selling out their constituents and running CD-14 as a

2    criminal enterprise.  In so doing, it casts a retrospective pall over nearly everything that

3    Huizar did, including the most basic tenets of being an elected official in a

4    representative democracy.

5          To be sure, the FSI contains some distasteful allegations.  But particularly in

6    cases involving state and local officials, the Supreme Court has made clear that its

7    interest is less in "tawdry tales" than the thicket of Constitutional concerns surrounding

8    overbroad federal corruption statutes.  *McDonnell v. United States*, 136 S.Ct. 2355,

9    2375 (2016).  Animated by those concerns, the Court has spent the last 30 years

10   imposing increasingly-narrow limits around federal bribery law.  In so doing, it has

11   expressly sought to rein in federal prosecutors bent on casting nets large enough to

12   catch nearly anything state or local officials do, while assigning themselves the task of

13   valiantly stepping in and selecting who should be charged and imprisoned

14         The FSI repeatedly transgresses the Supreme Court's careful limits, charging

15   *quo*-less *quids* as bribes (Section III.A.2.a., *infra*), deeming First Amendment-protected

16   contributions crimes (Section III.A.2.c, *infra*), and treating virtually everything that

17   Huizar did as an "official act" no matter how informal or disconnected from

18   government power (*e.g.,* Section III.A.2.b, d, *infra*).  The FSI also suffers from more

19   routine defects, like violating the statute of limitations (*e.g.,* Section III.B.2, III.D.1.b,

20   *infra*) and the rule against duplicity (*e.g.*, Section III.D.1.a, *infra*).  And while this

21   motion largely accepts the statutes and charges as given, several are fatally flawed.  For

22   example, the Travel Act charges purport to rely state statutes that are far broader than

23   the generic federal definition of bribery (Section III.C, *infra*).  And the Federal

24   Programs Bribery statute employs language so boundless and sweeping that even a

25   moment's reflection reveals it to be virtually meaningless (Section III.E.1, *infra*).

26         Relying heavily on cooperators, construing every ambiguity unfavorably, and

27

28

1   riding a self-generated crush of negative press,[1] the government has pursued this case

2   uncommon fervor.  But no case (or part of a case) should proceed to trial where the

3   conduct alleged does not violate the statutes charged, let alone where charges exceed

4   Constitutional limits.  For the reasons below, the Court should grant this motion in full.

## II. LEGAL STANDARD

6         Rule 12 authorizes motions to dismiss based on "any defense, objection, or

7   request that the court can determine without a trial of the general issue." Fed.R.Crim.P.

8   12(b).  Among the motions authorized under Rule 12 is a motion to dismiss for failure

9   to state an offense.  Fed. R. Crim P. 12(b)(3)(B)(v).  A court considering a motion to

10  dismiss must accept the indictment's allegations as true, but need not credit general,

11  conclusory allegations "when they are belied by the more specific facts in the

12  indictment." *United States v. Nosal*, No. C 08-0237 MHP, 2010 WL 934257, at *2

13  (N.D. Cal. Jan. 6, 2010) (dismissing multiple counts despite charging language that

14  tracked the statute where specific allegations refuted general charging language), *aff'd*

15  *en banc* 676 F.3d 854 (9th Cir. 2012) (cleaned up).  A charge is ripe for dismissal if it

16  fails to state an element of the offense, *United States v. Keith*, 605 F.2d 462, 464 (9th

17  Cir. 1979), or if, despite a general recitation of the statutory elements, the specific facts

18  alleged fall beyond the scope of the properly-construed criminal statute, *United States*

19  *v. McGeehan*, 584 F.3d 560, 565 (3d Cir. 2009) (partially vacating order where, despite

20  general charging language tracking the statute, specific allegations refuted honest-

21  services liability).  When faced with a motion to dismiss for failure to state an offense,

22  the Court's role is to "ensur[e] that legally-deficient charges do not go to a jury."

23  *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).

24        Rule 12 also subjects duplicitous counts to dismissal.  Fed. R. Crim P.

25

26        [1] Before the return of any indictment in this case, the then-U.S. Attorney told a
    room full of reporters that Huizar's conduct represented "a cancer – a disease of elected
27  officials and staff members breaking a series of laws in order to line their own pockets,
    maintain power, and keep open a spigot of illicit bribes and other benefits.  All of this
28  comes at the expense of the City's four million residents who simply want honest
    government." *See* https://youtu.be/5utcG-lQnrI; *compare* Cal. R. Prof'l Conduct 3.6.

3

12(b)(3)(B)(i).  "Duplicity is the joining in a single count of two or more distinct and separate offenses."  *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976).  Whether a single count alleges one or more offenses depends on the statutorily defined unit of prosecution.  *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221 (1952).  The usual remedy for a duplicitous count is dismissal without prejudice, *United States v. Tutein*, 122 F.Supp.2d 575, 578 (D.V.I. 2000) (dismissing duplicitous bribery counts), or an election, *United States v. Ramirez-Martinez*, 273 F.3d 903, 915 (9th Cir. 2001), *over'd on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007).  But where a duplicitous count joins together multiple offenses, one of which is valid on its face and one of which is invalid on its face, the proper course is striking the invalid count from the indictment.

Rule 7 separately empowers courts to "strike surplusage from the indictment."  Fed. R. Crim. P. 7(d).  The Ninth Circuit defines surplusage as "allegations . . . that are not necessary to establish a violation of a statute[.]"  *United States v. Garcia-Paz*, 282 F.3d 1212, 1217 (9th Cir. 2002).  "The purpose of a motion to strike . . . is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges."  *United States v. Ramirez*, 710 F.2d 535, 544-545 (9th Cir. 1983).  When a single count joins together actionable and non-actionable conduct – like in a multi-object conspiracy or scheme offense – a court can excise the legally-deficient portions of the count from the properly-pled ones by striking them from the indictment.  *United States v. Marlinga*, No. 04-80372, 2005 WL 517964 (E.D. Mich. Mar. 2, 2005) (striking portions of bribery indictment under Rule 7(d)); *United States v. Pirro*, 212 F.3d 86, 88 (2d Cir. 2000) (affirming jurisdiction over orders "dismissing a portion of a count" that, if valid, would offer a discrete basis for liability).

### III. <u>ARGUMENT</u>

**A. Count 1: The Court should dismiss or strike many of the RICO allegations because they do not describe "racketeering acts" and will mislead the jury about what is and is not a federal bribery crime.**

Count 1 charges Huizar and Chan with conspiring to violate 18 U.S.C. § 1962(c)

4

in violation of 18 U.S.C. § 1962(d).  While the FSI alleges 452 "overt acts" supposedly committed in furtherance of the conspiracy, RICO overt acts do not exist.  *Salinas v. United States*, 522 U.S. 52, 63 (1997).  Instead, when based on § 1962(c), § 1962(d) criminalizes an agreement to participate in a RICO "enterprise" engaged in a "pattern of racketeering activity."  18 U.S.C. § 1962(c)-(d).  The statute defines "racketeering activity" as a discrete list of specifically identified crimes. 18 U.S.C. § 1961(1).

Because, for all its complexity, this is fundamentally a bribery case, the principal "racketeering acts" identified in Count 1 include different iterations of that offense: generic federal bribery chargeable under state law, honest-services bribery, and color-of-right extortion under the Hobbs Act (which is bribery, *see Evans v. United States*, 504 U.S. 255, 260 (1992)).  FSI ¶¶ 40.a-c.  Other listed racketeering acts – like violations of the Travel Act and money-laundering statutes – depend on the occurrence of one or more of these predicate offenses.  *Id.* ¶¶ 40.d-e; *see also id.* ¶¶ 48, 58.

Whether any of these allegations should be dismissed or stricken depends on whether the FSI properly alleges them as bribery.  As discussed below, the correct answer to that question – that many should be dismissed or stricken – flows from the Supreme Court's continued narrowing of these Constitutionally-fraught offenses.

### 1. Particularly in cases involving state and local officials, the Supreme Court has limited federal bribery statutes to only the most blatant and specific acts of criminality.

In a representative democracy, public officials are expected to engage with their constituents, respond to their concerns, and express policy and partisan preferences through their actions.  From filling potholes to approving skyscrapers, that often means playing favorites and choosing sides.  It also means brokering deals – between affordability and growth, between competing factions, between idealistic demands and budgetary realities.  All of this occurs during 12-hour days spent raising money, taking calls, meeting constituents, and making countless decisions large and small.

Given the discretion vested in elected officials, constituents and constituencies are constantly seeking their favor and attention.  In the real world, those efforts often

5

involve not only making campaign contributions, but sometimes hosting events or providing gifts.  As with any profession, personal relationships also develop, and those relationships may involve the exchange of benefits and favors.  Whether this activity is protected by the First Amendment, crosses ethical lines, violates state law, or verges into federal bribery depends on sensitive questions of understanding and intent.

As a general rule, the federal corruption statutes – to say nothing of individual federal prosecutors – are ill-suited to reliably answer those questions for the nation's roughly 36,000 states and municipalities.  Rather than omnibus good-government provisions setting a national standard for ethics and good behavior, they were designed as blunt devices for addressing "the most blatant and specific attempts [to] influence governmental action." *Buckley v. Valeo*, 424 U.S. 1, 28 (1976).

Yet, over the last several decades, no class of charges has tempted ambitious prosecutors more.  Nor has any posed greater risks of illegitimate political pressures and personal interests intertwining with the legitimate pursuit of justice.  These risks are especially pronounced because the public conception of "corruption" – and the attendant pressures to root it out – is broader than the one proscribed by federal law.  And the risks are heightened further because the line demarcating federal bribery is vague and poorly defined. *United States v. Arthur*, 544 F.2d 730, 735 & n.9 (4th Cir. 1976) (commenting that a jury's seemingly inconsistent verdicts may have been due to "uncertainty as to the exact line of demarcation between bribery and lawful goodwill expenditures").

As the two-time former U.S. Attorney General recently said, this confluence of factors has led the Department of Justice repeatedly to insert itself into the political realm in self-aggrandizing and antidemocratic ways:

> In recent years, the Justice Department has sometimes acted more like a trade association for federal prosecutors than the administrator of a fair system of justice based on clear and sensible legal rules.  In case after case, we have advanced and defended hyper-aggressive extensions of the criminal law . . . . Rather than root out true crimes – while leaving ethically dubious conduct to the voters – our prosecutors have all too often inserted themselves into the political process based on the flimsiest of legal theories.  We have seen this time and again, with prosecutors

6

bringing ill-conceived charges against prominent political figures, or launching debilitating investigations that thrust the Justice Department into the middle of the political process and preempt the ability of the people to decide.[2]

Echoing this view, the Supreme Court has repeatedly stressed the narrow office occupied by the federal criminal law, warning that "not every [bad] act by state or local officials is a federal crime." *Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020). And because that warning has often been ignored, the Court has spent the last three decades issuing a nearly unbroken line of opinions rejecting the government's expansive reading of federal corruption statutes in favor of narrower constructions. *McNally v. United States*, 483 U.S. 350 (1987); *McCormick v. United States*, 500 U.S. 257 (1991); *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999); *Skilling v. United States*, 561 U.S. 358 (2010); *McDonnel*, 136 S.Ct. 2355; *Kelly*, 140 S. Ct. 1565; *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014).

Particularly in cases involving state and local officials, Constitutional concerns have permeated these decisions. From fair notice,[3] to overbreadth,[4] to federalism,[5] to

---

[2] Attorney General William P. Barr, Remarks at Hillsdale College Constitution Day Event (Sept. 16, 2020), https://bit.ly/2UYuusU.

[3] *Skilling*, 561 U.S. at 368 (rewriting honest-services statute to avoid "vagueness shoal"); *McDonnell*, 136 S.Ct. 2375 (rejecting vagueness challenge "under the facts," but only where "the parties defined [honest-services fraud and color-of-right extortion] with reference to § 201" and the court read the "official act" requirement narrowly).

[4] *McDonnell*, 136 S.Ct. 2372 (rejecting government's broad construction of quo requirement because its "standardless sweep" would "cast a pall" over basic functions of representative government whenever a constituent had previously conferred any benefit on an official); *Sun-Diamond*, 526 U.S. at 407 (rejecting broad construction of federal gratuity statute because a loose nexus between quid and quo would subject officials to prosecution for inevitable and long-accepted incidents of their positions); *McCormick*, 500 U.S. at 272 (rejecting broad reading of Hobbs Act because it would "open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable").

[5] *McDonnell*, 136 S.Ct. 2373 (rejecting broad quo theory because it would leave the law's "boundaries ambiguous and involve[] the Federal Government in setting standards of good government for local and state officials"); *Kelly*, 140 S.Ct. 1574 (rejecting government's expansive arguments in corruption prosecution, among other reasons, because they would allow "the Federal Government [to] use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking").

7

separation of powers,[6] to the First Amendment,[7] the Court has made clear that bribery prosecutions targeting state and local officials are encircled with risk.  As a result, whether styled as honest-services fraud, color-of-right extortion, or otherwise, the Court has sought to narrow these charges to the "core" of the offense.  *Skilling*, 561 U.S. at 368; *McDonnell*, 136 S.Ct. at 2373.

Stated generally, that core is a *quid pro quo* agreement to exchange private benefits in return for specific exercises of sovereign authority.  *See Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985) ("The hallmark of [bribery] is the financial *quid pro quo*: dollars for political favors"); *McDonnell*, 136 S.Ct. at 2371 (in honest-services fraud and Hobbs Act prosecution, defining the bribery question as "whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*"); *Evans*, 504 U.S. at 268 ("[Color-of-right extortion under the Hobbs Act] is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts"); *United States v. Malkus*, 696 F.Appx. 251, 252 (9th Cir. 2017) ("Before a defendant may be convicted of honest services fraud, the government must prove that the defendant committed or agreed to commit an 'official act' in exchange for something of value").  But because even that description criminalizes too much lawful conduct – and leaves too much of the remainder uncertain – the Supreme Court has further limited every element of the *quid-pro-quo* exchange.

---

[6] *McDonnell*, 136 S.Ct. at 2372-73 (rejecting government's broad construction because courts "cannot construe a criminal statute on the assumption that [prosecutors] will use it responsibly"); *Sun-Diamond*, 526 U.S. at 408 (rejecting broad reading of corruption statute because it would provide little protection beyond "[prosecutorial] discretion"); *United States v. McDonnell*, No. 15-474, Oral Arg. Tr. at 32:6-20 Apr. 27, 2016 (Justice Breyer describing broad interpretation of federal bribery law as a glaring "a separation of powers problem," in which DOJ "becomes the ultimate arbiter of how public officials are behaving . . . . [T]o give that kind of power to a criminal prosecutor, who is virtually uncontrollable, is dangerous in the separation of powers since.")

[7] *McCutcheon*, 572 U.S. at 192 (holding on First Amendment grounds that any regulation of political giving must be limited to "a direct exchange of an official act for money"); *Citizens United*, 558 U.S. at 360 (explaining that the "[f]avoritism and influence" generated by campaign contributions are not only unavoidable in electoral politics, but legitimate, Constitutionally protected, and beyond government regulation).

8

### a. *Quid*: where the benefit is a political contribution in any form, the *quid-pro-quo* agreement must be explicit and unambiguous.

On the "*quid*" side, at least where the benefit is a campaign contribution, the Supreme Court has determined that the *quid pro quo* must be "explicit," meaning there must be a clear understanding that the official's performance or nonperformance of "an official act . . . will be controlled by the terms of the promise or undertaking." *McCormick*, 500 U.S. at 273. This requirement reflects the reality that people donate to politicians because they want things, and, symbiotically and inescapably, politicians raise money from the people who want things from them. Were the coincidence of contributions and favorable official actions sufficient to subject officials or donors to federal charges, every politician in the country would be living at the local U.S. Attorney's whim. Indeed, as the Supreme Court explained in *McCormick*:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit [a federal crime] when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is . . . unrealistic . . . . To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.

*Id.* at 272.

Recent campaign-finance cases likewise hold that, under the First Amendment, the government may not regulate – let alone criminalize as bribery – political giving except to prevent true "*quid pro quo*[s]," meaning "a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192. And to the extent that "line between *quid pro quo* corruption and general influence may seem vague at times," the Supreme Court has emphasized the need to "err on the side of protecting political speech." *Id.* at 209. Thus, where the alleged *quid* is a campaign contribution, a criminal bribe occurs only

9

1  where "the *quid pro quo* [is] clear and unambiguous, leaving no uncertainty about the

2  terms of the bargain." *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992).

  b. ***Quo***: **In cases involving state and local officials, the object of the illicit agreement must be concrete action on a specific and focused matter involving the formal exercise of governmental power.**

5  The Supreme Court has similarly restricted the "*quo*" side of the exchange,

6  holding in *McDonnell* that the official action targeted by the bribe must be "specific

7  and focused," capable "by law [of being] brought before" an official, and involve a

8  "formal exercise of governmental power." *McDonnell*, 136 S.Ct at 2370, 2372.  While

9  *McDonnell* involved a number of bribery statutes – including two of the three charged

10  in Count 1 – its central premise rested on broader, recurring themes in the Court's

11  corruption cases.  At bottom, the Court reasoned that if anything can be a "*quid*," and if

12  juries can infer a "*pro*" from the circumstances, then an open-ended "*quo*" would

13  effectively reinstate the roving commission disallowed by prior decisions. *Id.* at 2372-

14  73.  So long as a prosecutor could identify a benefit and find some trivial act by an

15  official – from writing a letter, to hosting a meeting, to having a conversation – he or

16  she could transform an ethics inquiry into a federal bribery case.

17  At least in cases involving state and local officials,[8] *McDonnell* rejected that

18  return to pre-*Skilling* honest-services fraud and instead outlined two limiting

19  requirements for a valid *quo*.  First, the bribe must target a concrete, "specific," "and

20  focused" action involving the "formal exercise of governmental power that is similar in

21  nature to a lawsuit before a court, a determination before an agency, or a hearing before

22  a committee." *Id.*  at 2372.  Otherwise, the official-conduct requirement would be

23  "meaningless," as practically every activity by every public official could support

---

[8] In *McDonnell*, which involved the former Governor of Virginia receiving $175,000 in loans, gifts, and other benefits, the Supreme Court avoided "significant constitutional concerns" and a vagueness challenge to the honest-services and Hobbs Act statutes by importing § 201 into both charges and reading the quo requirement narrowly.  136 S.Ct. at 2372-75.  For the reasons stated in *McDonnell*, there is every reason to think that the Court would take the same approach with other federal statutes used to charge state and local officials with bribery.

1    federal charges. *Id.* at 2371. Second, the public official must agree to take a definite

2    decision or action *on* the specified matter. *Id.* at 2372. While, in some cases, this

3    requirement can be satisfied by exerting influence on another government official, it

4    places many routine or precatory activities – like "setting up a meeting, talking to

5    another official[,] organizing an event," or "simply expressing support" – beyond the

6    reach of federal bribery law. *Id.* at 2371-72.

7    ### c. *Pro*: The government must show that, at the time the benefit was conferred, it was linked to a particular official act.

8    Finally, when it comes to the "*pro*," the Supreme Court requires proof that, when

9    the private benefit was conferred, it was linked to a "specific and focused" official act.

10   This linkage requirement acknowledges that, in real-world settings, constituents and

11   lobbyists regularly confer benefits on public officials to "build a reservoir of goodwill

12   that might ultimately affect one or more of a multitude of unspecified acts, now and in

13   the future." *Sun-Diamond*, 526 U.S. at 405. Naturally, those benefits are sometimes

14   followed by favorable decisions, which in turn may be followed by more benefits and

15   more favorable decisions. While that may seem corrupt in the public mind, it is not

16   under federal law. *Citizens United*, 558 U.S. at 360 ("Ingratiation and access . . . are

17   not corruption").

18   Were it enough for prosecutors to simply identify a *quid*, identify a *quo*, then

19   throw the issue to a jury – leaving a jaded public to loosely infer causality from the fact

20   that one event followed the other – it would risk criminalizing a wide range of lawful,

21   long-accepted, and Constitutionally-protected conduct.

22   It would also risk violating the principle of concurrence. As the Supreme Court

23   has explained, the crime of bribery is completed, if at all, "*at the time when the public*

24   *official receives a payment* in return for his agreement to perform specific official

25   acts[.]" *Evans*, 504 U.S. at 268. For crimes with a mental-state element, like bribery,

26   "it is a basic premise of Anglo-American criminal law that the physical conduct and the

27   state of mind must concur." 1 Wayne R. LaFave, <u>Substantive Criminal Law</u> (3d ed.

28

2021) § 6.3(a).  Thus, if the exchange of benefits – the *actus reus* – occurred at Time 1, and some unlawful intent – the *mens rea* – developed at Time 2, the crime of bribery does not exist.

To prevent prosecutors from reverse-engineering "bribes" post-hoc based on the mere existence of a benefit and an official act, the Supreme Court has thus held that there must be proof of an agreement to perform a specific and focused official act "at the time" the benefit is conferred.  *McDonnell*, 136 S.Ct. at 2371.  Conversely, if a benefit is accepted without that discrete and conditional understanding, it is not a federal crime.  *McDonnell*, 136 S.Ct. at 2374 ("[S]everal of Governor McDonnell's subordinates testified that he asked them to attend a meeting, not that he expected them to do anything other than that.  If that testimony reflects what Governor McDonnell agreed to do at the time he accepted the loans and gifts from Williams, [he did not commit a crime]"); *United States v. Silver ("Silver II")*, 948 F.3d 538, 577 (2d Cir. 2020) ("An official who merely accepts a thing of value in an otherwise-legal manner . . . has not committed a crime.  If that official later acts to the benefit of the payor, [the official] still has not committed a crime.  It is only upon a showing that, *at the time the official accepted the payment*, [the official] understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of governmental power that the Government has met its burden.") (emph. added); *United States v. Huizar, et al*, CR-20-326-JFW, Docket No. 221, Govt. Opp. to Deft. Lee and 940 Hill's Mtn. to Compel, at 15 (arguing that a lobbyist "'suspected of engaging in illicit activities' such as taking PLUM committee members on deep-sea fishing trips . . . without more, is not a crime[]").

\*\*\*

Concededly, many of these limits exclude from federal criminal law conduct that ordinary citizens may consider "corrupt," or, in the words of *McDonnell*, "tawdry."  136 S.Ct. at 2375.  But because federal bribery charges are just one strand in a web of accountability – along with ethical codes, state laws, press scrutiny, and elections – the

1  Supreme Court has routinely opted for under-inclusivity to prevent criminalizing

2  ordinary political conduct, *Sun-Diamond*, 526 U.S. at 412, to respect the vertical and

3  horizontal separation of powers, *McDonnell*, 136 S.Ct. at 2372-73, and to avoid

4  anointing unelected federal prosecutors the national arbiters of "good government,"

5  *McNally*, 483 U.S. at 360.  As discussed below, against this focused standard, many of

6  the claimed overt acts in Count 1 should be stricken because they fail to allege a bribery

7  predicate and will only invite confusion about what is and isn't a crime.

8         **2.  The Court should strike many of the overt acts in Count 1.**

9             **a.  The Court should strike most of the "requests" from the "L.A.**
              **Grand Hotel Bribery Scheme" because they cannot support a**
10            **bribery offense.**

11         The first alleged scheme identified in Count 1 focuses on a years-long

12  relationship between Huizar and Wei Huang, a property owner and 50% shareholder in

13  Shen Zhen New World I, LLC ("SZNW").  Similar to *McDonnell*, where the former

14  Governor and his wife received $175,000 in loans and numerous "tawdry" gifts from a

15  pharmaceutical executive, the FSI contends that between 2013 and 2017, Huang gave

16  Huizar trips, cash, and benefits, *id.* at OAs 4-22, and in September 2014, Huang helped

17  Huizar qualify for a bank loan and obtain funds to settle a lawsuit. FSI at OAs 30-43.

18  While the FSI is replete with potential *quids*, however, *McDonnell* teaches that even

19  unseemly benefits are just one-third of the bribery equation.  And when it comes to

20  Huizar's interactions with Wei Huang, the other two-thirds are almost entirely absent.

21         Initially, it bears emphasizing that the FSI labels Huizar's interactions with Wei

22  Huang "the *L.A. Grand Hotel* Bribery Scheme," referring to the L.A. Grand Hotel

23  owned by SZNW.  *See* FSI at 15 (emph. added).  And, elsewhere, the FSI alleges that

24  Huizar accepted the benefits described in Count 1 "in connection with the L.A. Grand

25  Hotel Project."  *See id.* ¶ 49.[9]  But rather than alleging some specific and focused

26

27         [9] Overt Act 55 references a 2014 resolution that Huizar introduced before the
    City Council honoring Huang for his achievements.  There is no evidence that Huang
28  requested the resolution so its placement in the "Requests" section is puzzling.  More

                                          13

1    agreement relating to the hotel, Count 1 rattles off a succession of "Requests to
2    Defendant Huizar" as potential *quos*.  *See* FSI at OA 50-64.  Under *McDonnell,* all of
3    the cited requests are considered routine acts that elected officials undertake on behalf
4    of constituents and none can support a charged offense.

5          For instance, Overt Acts 50-54, 56, and 62-64 describe Huizar receiving an email
6    from a SZNW employee, writing letters to the Chinese consulate and Wei Huang, and
7    arranging meetings with private parties.  Not one of these allegations involves Huizar
8    taking action on any matter involving the "formal exercise of governmental power that
9    is similar in nature to a lawsuit before a court[.]"  *McDonnell*, 136 S.Ct. at 2372.  And
10   not only are these alleged requests incapable of satisfying the *quo* element of a bribe,
11   they have no relationship to the alleged object of the scheme.

12         While other claimed requests at least *mention* the L.A. Grand Hotel, they do so
13   only in connection with conduct that *McDonnell* expressly placed off-limits.  For
14   example, Overt Acts 57-61 and 65-67 describe setting up meetings, having
15   conversations about the hotel, and providing Wei Huang with a list of land-use
16   consultants.  None of these allegations describes an actionable quo.  *See, e.g.*, *United*
17   *States v. Jefferson*, Case No. 07-CR-209, ECF No. 784, at 29 (E.D. Va., Oct. 4, 2017)
18   (explaining that a meeting arranged and attended by a then-congressman with an Army
19   official at the request of an alleged briber was "unofficial in nature" since there was no
20   "specific application" then pending and thus not an official act).  To the contrary, they
21   describe the type of precatory conduct that the Supreme Court has held is beyond the
22   reach of federal bribery law.  *McDonnell*, 136 S.Ct. at 2361-64, 2370 (finding no
23   cognizable quo where, on behalf of an executive seeking a state-funded research study,
24   Governor forwarded article and research protocol to key government official, set up
25   official meetings with key government decisionmakers to discuss the executive's
26   desired research study, hosted events bringing together the executive and key

27   _____
28   importantly, as discussed *infra*, this arguable "official act" is unconnected to the
     claimed L.A. Grand Hotel Scheme and time-barred except under Count 1.

                                          14

government officials, and spoke with key decisionmakers about the executive's desired research study).

Other alleged requests describe things that government cooperators said about Huizar, which, if anything, refute the entire notion of a bribe.  For example, Overt Acts 68 and 69 refer to conversations involving George Esparza, Executive Director E, and one of Huizar's staffers.  In those conversations, they purportedly discuss Wei Huang putting "everything in front of" Huizar during a planned vacation trip (which Huizar did not attend) (OA 67), and Esparza opining that Huang has some sort of undefined "leverage" over Huizar.  What they do not discuss – and what is never identified – is any kind of specific and focused understanding related to the L.A. Grand Hotel.

Indeed, for all the alleged benefits flowing from Huang to Huizar, the paltry list of alleged requests makes clear that remarkably little was flowing in the other direction.  And what is alleged to have travelled back did not involve the type of formal and concrete exercises of Huizar's official authority capable of supporting a bribe, much less any kind of linkage between the purported *quid* and *quo*.

One of the loosely-stated upshots of the Supreme Court's recent corruption cases is that federal prosecutors are not the hall monitors for local government.  Federal bribery law neither needs nor empowers them to charge and imprison elected officials, on a case-by-case basis, for sending recommendation letters to USC or facilitating meetings between constituents.  If the government intends to prove that Huizar accepted benefits from Huang in exchange for specifically agreeing to introduce formal motions or taking committee or council votes to benefit the L.A. Grand Hotel, it can proceed on that theory.  But not every act a public official takes is an official act capable of supporting a federal bribery charge, *McDonnell*, 136 S.Ct. at 2370, and the jury should not be invited to believe otherwise.

Accordingly, the Court should strike all so-called "requests" listed in Overt Acts 50-67.  For the same reasons, the Court should strike Overt Acts 1 and 2, which reference Chan introducing Huizar and Esparza to Huang (OA 1) and Huizar and Chan

15

1    discussing a possible trip to China with Huang and Esparza (OA 2); and Overt Acts 71-

2    84, which address various individuals' thoughts, discussions, and actions in connection

3    with political donations.  In the alternative, the Court should enter an order specifying

4    that none of these purported overt acts can support a conviction as charged in Count 1.

### b. The Court should strike the pressuring-labor-unions allegation from the "940 Hill Bribery Scheme" because it cannot support a bribery offense.

7          The second alleged scheme identified in Count 1 centers on Huizar, Lee, and 940

8    Hill.  The core allegation is that Huizar agreed to accept some part of $500,000 in cash

9    in exchange for two things (1) pressuring Labor Organization A to dismiss a project

10   appeal and, if necessary, (2) voting to deny that appeal in PLUM.  *See* FSI ¶ 51.[10]  As

11   explained in Lee's concurrently filed motions to strike portions of Counts 5 and 25, and

12   the Travel Act argument below, Section III.C, *infra*, "pressuring" a private organization

13   is not the type of conduct that can support an official bribery conviction under the

14   honest-services statute, Hobbs Act, or generic federal definition of official bribery.

15   Indeed, because the *sine non qua* of public-official bribery is selling the sovereign

16   actions of the government, *McDonnell* decisively rejected the notion that an act is

17   official simply because an official acted.  Instead, the Supreme Court held that the

18   official must agree to make a decision or take an action on a matter involving an

19   exercise of *formal governmental power* similar to a lawsuit or legislative vote, or that

20   the official must agree to exert influence *on another government official* similarly

21   capable of exercising formal government authority.  *McDonnell*, 136 S.Ct. at 2370.  If

22   in fact Huizar took money from one private party to "pressure" another private party,

23   that may arguably be an example of bad government or violate ethics rules,[11] but it is

24

25         [10] This cash-in-a-bag-bribe allegation – which is notably unlike any others in the
     FSI – represents selected parts of shifting, mutually-inconsistent stories told over
26   several months by admitted liars, Esparza and Justin Kim, while attempting to obtain
     leniency for their own crimes by cooperating with the government.
27         [11] Of course, it is often the case that politicians take money from lobbyists or
     donors precisely and explicitly because the donors want the politician to exert pressure
28   on some private interest or industry – from tech giants, to Wall Street, to

not a federal bribe.  The Court should thus strike Overt Acts 97, 98, 100, 101, 102, 103, and 104 in their entirety, and strike from Overt Act 99 the words "defendant Huizar stated that he would talk to Lobbyist C to encourage Labor Organization A to withdraw the appeal."  In the alternative, the Court should enter an order specifying that an agreement to pressure a labor union cannot support a conviction as charged in Count 1.

### c. The Court should strike allegations relating to Company M's first three contributions from "Project M Bribery Scheme" because the FSI fails to allege a clear and unambiguous *quid pro quo*.

The fourth alleged scheme identified in Count 1 focuses on the relationship between Huizar, a Bay-area development company referred to as Company M, Executive M from that company, and Morrie Goldman, who served in a dual role as Company M's lobbyist and as an advisor to an independent-expenditure committee for which Huizar was raising money.[12]  The FSI contends that Company M was developing

---

pharmaceutical executives, to oil companies, to abortion providers, to unions.  If that fundamental and long-accepted element of representative democracy is now within the ambit of federal prosecution, many American citizens and politicians may be surprised to learn that what they once thought was political engagement is now a federal crime.

[12] Company M, a developer and prolific contributor to local politicians throughout the city and state, received a non-prosecution agreement in which it denied criminal conduct.  Executive M – who, if the FSI were to be believed – bribed a sitting elected official, also denied criminal conduct in multiple interviews and will not be charged.  *See* 12/7/20 Tr. at 48:16-22 (after interviewing Executive M multiple times, government representing that "the most significant foreseeable charges have been brought").  Huizar also denies criminal conduct.  As a result, the *only* person who says that there was a bribe involving Company M is Goldman.  Yet, when Goldman and his lawyer first sat for a multi-hour proffer with the government – which Goldman's lawyer surreptitiously recorded – Goldman said the exact opposite.  It was only in the weeks that followed, as the government applied pressure on him (and possibly his counsel), that Goldman reversed course and told a story entirely at odds with his original statement and the statements made by Huizar, Executive M, and Company M, Goldman has since pleaded guilty to a § 371 charge as part of a cooperation agreement and the government intends to sponsor his later version of events at trial.

The government's decision to credit Goldman's second story stands in stark contrast to its analysis of similar facts in *Englander*.  *See United States v. Englander*; CR-20-35-JFW, Docket No. 49 at 17:5-15 ("[W]hen [Englander] first elected to sit down for an interview, his criminal defense lawyer by his side, with the FBI and USAO who were conducting a pay-to-play corruption investigation into the City, [he] had plenty of time to think about exactly what he would do . . . .  Yet, during this extensive interview, [Englander] did not break down, he did not confess, he did not express accountability or suggest a hint of remorse.  He did the opposite; he lied and then he obstructed.").  The takeaway seems to be that the government will overlook lying through a multi-hour proffer while assisted by counsel – and indeed consider the liar

17

a project in CD-14 and, on four separate occasions between August 2016 and October 2018, made contributions or commitments to independent-expenditure committees with which Huizar was associated.  While the FSI labels each of those contributions as "bribes," only the last of the four alleges the clear-and-unambiguous *quid pro quo* necessary to state an offense.

In describing that final contribution, the FSI alleges that:

> On September 6, 2018, [Huizar] and Morrie Goldman met outside a restaurant in Boyle Heights . . . . At the meeting, Goldman conveyed the offer of an additional $50,000 contribution to PAC A, bringing the total to $100,000, and [Huizar] agreed to accept the contribution in exchange for voting to approve Project M over objections by the labor union.

FSI at OA 281.  Huizar concedes that, as alleged, this clear and unambiguous *quid pro quo* would be a crime under *McCormick*, *Carpenter*, and the Supreme Court's campaign-finance cases.  By stark contrast, however, the FSI's allegations for the first three contributions describe conduct that is not only not criminal, but falls into the wide range of activity protected by the First Amendment.

***Contribution 1.***  For the first contribution, the FSI alleges that Huizar met with Goldman and Executive M in August 2016.  During that meeting, and with no prior or contemporaneous discussion about a contribution, Huizar allegedly agreed to file a General Plan Amendment ("GPA") for Project M.  FSI at OA 241.  The FSI alleges that, several weeks later, after already stating that he would support a GPA, Huizar asked Goldman to ask his clients to support an independent-expenditure committee, PAC B.  *Id.* at OA 243.  The FSI then alleges that, several weeks after that, Goldman asked Executive M to support PAC B with a $25,000 contribution.  *Id.* at 246-47.  Unlike with the fourth contribution, where the FSI alleges an explicit tie to a specific act, the FSI does not allege any clear and unambiguous *quid pro quo* related to that request.  Instead, it alleges that Executive M asked whether it would make sense to set up a meeting with Huizar when delivering the checks to "talk big picture."  *Id.* at 248.

_____

credible enough to use in trying to convict an elected official – so long as the acknowledged liar eventually says what the government wants to hear.

18

Thus, for the first contribution, the FSI alleges that:

- without any discussion of a campaign contribution, let alone an explicit *quid pro quo*, Huizar agreed to support a project that aligned with his preexisting goals;

- later, he asked a lobbyist to ask his developer clients to support an independent-expenditure committee; and

- later, with no discussion of a *quid pro quo*, the developer client agreed to contribute to a politician with whom it was trying to cultivate access and goodwill.

This is the *exact* sequence that *McCormick*, *McCutcheon*, and their progeny place off limits. *See McCormick*, 500 U.S. at 272 ("[T]o hold that legislators commit [a federal crime] when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries . . . would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable [in our electoral system]"); *McCutcheon*, 572 U.S. at 192 (explaining that, to protect core political speech, "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford"; it "must instead target . . . a direct exchange of an official act for money"). Indeed, if this conduct is indictable as a federal crime without any allegation of a clear and unambiguous *quid pro quo*, every politician and major donor in the country is living at the noblesse oblige of the nearest U.S. Attorney's office. While "[m]any people might find [that] attractive," *McCutcheon*, 572 U.S. at 191, the Supreme Court has held that this conduct is core First Amendment activity, *id.* at 227, and not a crime, *McCormick*, 500 U.S. at 272.

**Contribution 2.** For the second contribution, the FSI alleges that, in February 2017, Huizar asked Executive M to support a homelessness initiative by contributing to PAC B. FSI at OAs 251-57.[13] As with the first contribution, but unlike the fourth contribution, the FSI does not allege that the request was part of an unambiguous *quid*

---

[13] Huizar did not control the spending for PAC B; in fact, the issues to which PAC B expended funds is a source of tension. *See* FSI at OAs 260-61.

*pro quo* exchange.  To the contrary, the FSI asserts that, after making the contribution, Executive M asked Goldman whether doing so had placed Company M in "a more favored status" with Huizar than another developer.  *Id.* at OA 259.  This sequence does not state an actionable bribe.  Instead, it shows that the contribution was aimed at obtaining general goodwill with no understanding as to any specific official act.  As if to highlight the point, Executive M's question – does this put us in "a more favored status" – almost perfectly situates this exchange within the First Amendment's core protection.  *Citizens United*, 558 U.S. at 359 ("Reliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle") (everything omitted).

**Contribution 3.**  For the third contribution, the FSI alleges that Huizar asked Goldman – who at his own insistence had become the principal advisor to a PAC for which Huizar was raising money – whether Company M would donate to the newly-formed PAC.  As alleged, Goldman's conflicted position as an advisor to both the PAC and Company M resulted in dual-track conversations, where he found himself discussing both fundraising and Project M with Huizar and Executive M.   But the FSI once again fails to allege a clear-and-unambiguous *quid pro quo*, including a particular official act that Huizar agreed to take in exchange for the contribution.  *See* FSI at OAs 262-275; s*ee Carpenter*, 961 F.2d at 827 ("[W]hat McCormick requires is that the *quid pro quo* be clear and unambiguous, leaving no uncertainty about the terms of the bargain"); *McCutcheon*, 572 U.S. at 185 (stating that, while "the line between *quid pro quo* corruption and general influence may seem vague at times . . . in drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it"); *United States v. Menendez*, 291 F.Supp.3d 606, 623-36 (D.N.J. 2018) (granting Rule 29 on campaign-contribution bribery counts where government introduced evidence of strong temporal connection, escalation, concealment, and a pattern of corrupt activity but failed to show that defendant entered into an explicit *quid pro quo* with full clarity about its terms).

Contribution-based bribery charges inch right to the edge of core Constitutional protections.  The clear-and-ambiguous *quid-pro-quo* element exists to draw a line in the sand between illegal bribery and political activity that has not only "long been thought to be well within the law," but "in a very real sense is unavoidable" in our system of privately financed elections.  *McCormick*, 500 U.S. at 272.  While the FSI properly alleges this element for Company M's fourth contribution, it falls short for the other three.  Without that element, the first three contributions cannot support a conviction.  The Court should thus strike Overt Acts 241-277.  In the alternative, it should enter an order specifying that none of Company M's first three contributions can support a conviction as alleged in Count 1.

> **d. The Court should strike the business-meetings allegations from the "Businessperson A Bribery Scheme" because they cannot support a bribery offense and the Court previously stated that the conduct was not a bribe in *United States v. Englander*.**

The fifth "scheme" identified in Count 1 centers on the relationship between Huizar and Businessperson A, who is also featured in the related prosecution of former Councilmember Mitchell Englander.  *See United States v. Englander*; CR-20-35-JFW, Indictment, ECF No. 1 ¶ 25.  As in that case, the FSI alleges that Businessperson A conferred benefits on Huizar in exchange for his agreement to make introductions with developers and recommend his business.  *See* FSI at OAs 301-33, 338-39.

In *Englander*, the Court correctly stated that receiving payment in exchange for agreeing to introduce Businessperson A to developers is not bribery:

> [Jenkins:] Moreover, shortly after the Las Vegas trip and the Palm Springs trip, Defendant Englander cashed in on that payment, and he set up a meeting, the exact thing Businessperson A was asking for, shortly after the Morongo trip where at that point he's gotten $15,000 in cash in bathrooms. He agrees from the person paying him illicit money that, yes, I will help you. I have a developer friend who does projects.
>
> [Court:] But that is not a crime.
>
> [Jenkins:] That is not yet a crime, Your Honor, but that is why –
>
> [Court:] Not yet a crime.  A simple introduction of the developer to Businessperson A is not a crime.  It's not done in his official capacity.
>
> [Jenkins:] Respectfully, Your Honor, that's to your question.  We were

21

investigating that interaction.  The Court's question was what were we looking at and when.  And we have agreed we didn't charge Defendant Englander with bribery.  But we were explaining there was an escalating conduct consistent with what Businessperson A was doing.  In a related case Indictment, there are overt acts charging Jose Huizar for similar conduct meaning –

[Court:] But I'm not sentencing this defendant for the [alleged] acts of Mr. Huizar.  Again, I have implied the witness tampering enhancement, but you appear in your papers and this morning to be seeking an imposition of a sentence related to this defendant committing bribery which there is simply no evidence of.

*See United States v. Englander*; CR-20-326, ECF No. 36:6-37:7.  If the conduct was not bribery in *Englander*, it did not become bribery in this case because the meetings actually occurred; the crime of bribery is committed, if at all, when the benefit is received in exchange for some agreement, not when the agreement is carried out.  *Evans*, 504 U.S. at 268.  The conduct also did not become bribery in this case simply because the FSI alleges that it happened more times with Huizar; just as zero multiplied by one is the same as zero multiplied by ten, a non-bribe doesn't become a bribe by virtue of repetition.  The Court should thus strike Overt Acts 301-33 and 338-39.  In the alternative, the Court should enter an order specifying the act of setting up business meetings or suggesting that private businesses work with Businessperson A cannot support a bribery conviction as alleged in Count 1.

### e.  The Court should strike the solicitation-of-foreign-nationals allegations because they do not allege racketeering acts.

Under the header "Solicitation of Political Contributions by Foreign Nationals to Help Maintain the Enterprise's Political Power," the government describes various conversations about possible campaign contributions.  *See* FSI at OAs 71-84.  While this section seems to vaguely allude to possible campaign-finance violations, those are neither charged nor chargeable as racketeering acts.  *See* 18 U.S.C. § 1961(1); *see also* FSI ¶ 40.  Because the government surely knows that, it appears to have included these allegations simply to inflame the jury with the specter of foreign influence.  Since none of these overt acts relate to an alleged bribe, the Court should strike them from the FSI. ///

22

**B. Counts 2-17: The Court should strike certain charging language from the honest-services fraud counts because it targets lawful conduct, dismiss Count 2 as time-barred, and dismiss or strike portions of the honest-services fraud counts for the same reasons as in the RICO count.**

**1. The Court should strike certain "means and methods" from the general charging language because they do not describe official acts or because they describe conduct that is time-barred or otherwise deficient.**

The preamble to Counts 2-17 alleges that all defendants participated in a scheme to defraud "the City of Los Angeles and its citizens of their right to the honest services of their public officials through bribery and kickbacks[.]"  In the "Methods and Means" section, the government alleges that defendants Huizar and Chan gave Wei Huang, SZNW, Lee, and 940 Hill LLC various benefits in exchange for their alleged bribes, including "(5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the City."  (FSI ¶ 45.b)  The Court should strike "means and methods" (5) and (6) because they do not allege official acts.  And at least for SZNW, the Court should strike "mean and method" (7) because the conduct is time-barred and because the FSI doesn't allege a valid "pro."

**a. Pressuring unions to resolve issues on projects and developers to affect their business practices.**

As explained above and in Lee's concurrently filed motion to strike portions of Count 5, the act of exerting pressuring on a labor union or private business to change the practices or decisions of the labor union or business are not official acts capable of predicating an honest-services conviction.  The Court should thus strike "means and methods" (5) and (6) from the preamble to Counts 2-17.

**b. Introducing a City Council resolution to enhance Wei Huang and SZNW's professional reputations.**

For "mean and method" (7) – alleging that Huizar introduced or voted on "City resolutions to enhance the professional reputation and marketability of businesspersons

23

in the City" – the honest-services-fraud counts do not claim that Huizar introduced a resolution to benefit any particular person, but the FSI elsewhere makes clear that this allegation refers to resolutions for Wei Huang and Businessperson A. *See* FSI at OAs 55, 336. Regarding Huang, an overt act in the RICO count asserts that, "[i]n April 2014, to benefit Wei Huang's reputation in the business community, defendant Huizar introduced and signed a resolution before the City Council recognizing Huang for his achievements and contributions to the economy of CD-14, which the City Council signed and adopted." FSI at Count 1, OA 55. This allegation refers to a resolution proposed by Huizar to the L.A. City Council commending Wei Huang for his humble roots and successful career and thanking him "for the contributions he has and will continue to make to the economy of the Fourteenth District, our beloved city and all over the world[.]"

Nowhere in the FSI is there any allegation that Huang requested the resolution or that Huizar obtained the resolution in exchange for benefits that Huang had allegedly conferred. And the idea that Huang would pay a bribe for an ineffectual local pronouncement – as if, without it, being a billionaire developer were not enough – stretches the limits of credulity. Indeed, the resolution was one of 19 proposed by various City Council members that day, which included commendations to a wide variety of individuals, groups, and institutions.[14] All the resolutions were simultaneously adopted in a proceeding that lasted approximately three seconds. *See* City of Los Angeles, City Council Meeting of Wednesday, April 23, 2014, http://lacity.granicus.com/MediaPlayer.php?view_id=130&clip_id=13003 at the 26:10

---

[14] The other resolutions included (1) declaring it "renter's day;" (2) recognizing a group called Military on Motorcycle Safety (M.O.M.S.); (3) naming a street intersection the Jesse Allen Wilkes Memorial Intersection; (4) declaring May 4, 2014 to be LA Union Station Day; (5) thanking a group called Fiesta Broadway (sponsored by Councilmember Huizar); (6) recognizing Steven Rosenthal for being named California Lawyer of the Year by *California Lawyer* magazine; (7) congratulating news reporter Bill Whitaker on his selection to be a host on the TV show *60 Minutes*; and (8) recognizing volunteers who work at the LA Public Library. http://clkrep.lacity.org/onlinedocs/2014/14-0004-S1_misc_04-23-14.pdf.

24

mark (Councilmember Wesson: "Parks moves, Martinez seconds").

Some guidance can be drawn from the government's prosecution of a former Speaker of the New York State Assembly, Sheldon Silver. *United States v. Silver* (*"Silver I"*), 864 F.3d 102 (2d Cir. 2017). There, Assemblymen Silver sought a similar tribute-type resolution in the State Assembly for a person subsequently accused of having given him a series of bribes. Silver was convicted and appealed. With the appeal pending, the Supreme Court decided *McDonnell*, which undermined the jury instructions given at Silver's trial, and the Second Circuit reversed. In doing so, the Court responded to the government's harmless error argument as it related to the Assembly's resolution:

> The evidence at trial, however, established that these honorary resolutions and proclamations were routine, *pro forma* exercises rubber stamped by Assembly members. Indeed, in the past year alone, the Assembly has passed hundreds of honorary resolutions that, among other things, congratulated newly designated Eagle Scouts, celebrated high school sports teams, commended retirees, and commemorated the "retirement" of a jersey worn by a Stony Brook University athlete. A rational jury could thus conclude that, though certainly "official," the prolific and perfunctory nature of these resolutions make them *de minimis quos* unworthy of a *quid*.

*Id.* at 121 (footnotes omitted).

On retrial, the government again convicted Silver based, in part, on the Assembly resolution honoring the alleged bribe-giver. On appeal, Silver conceded that the resolution was an "official act" but argued that there was insufficient evidence to sustain a conviction on that count, and that all other alleged "official acts" were time barred. The Second Circuit agreed and vacated Silver's conviction. *Silver II*, 948 F.3d 538. The Court stated: "While the Assembly resolution is indisputably an official act, we find no evidence on the record from which a jury could conclude Silver ever promised to pass the resolution or understood Taub's referrals were in exchange for his doing so." *Id.* at 570.

As applied to SZNW, "mean and method" (7) should be stricken. First, Huizar's resolution honoring Huang is time barred – it was passed in 2014, more than five years before the FSI was returned and therefore cannot serve as a predicate "official act." *Id.*

at 572-5.  Second, while the Second Circuit found the passage of such a resolution to be an "official act" because it was "a clear formal exercise of government power on a specific matter," the *de minimus* nature of the Huang resolution raises the question whether *any* inconsequential "exercise of government power" constitutes an "official act," as *McDonnell* intended that term.[15]  Third even accepting *arguendo* that the resolution was an "official act," there is no allegation or evidence that Huang requested it, or Huizar obtained it, as part of a *quid pro quo* arrangement, and "the prolific and perfunctory nature of these resolutions make them *de minimis quos* unworthy of a *quid*."  *Silver I*, 864 F.3d at 121.  Fourth, none of the substantive honest-services fraud counts refer to the resolution, much less identify it as the "specific and focused question or matter" constituting the "official act," and it is therefore irrelevant to those charges. *Silver II*, 948 F.3d at 568.  Lastly, its inclusion at trial will only serve to confuse the jury, as they may wrongly believe it an appropriate "official act" upon which to base a conviction.  *See* Fed. R. Evid. 403; *Silver I & II* (rejecting government's harmless error argument).

## 2.  The Court should dismiss Count 2 because it is time-barred.

Count 2 alleges that, as part of an ongoing honest-services fraud scheme, a wire was sent from Huizar's bank ("Bank 1") to Wells Fargo on September 23, 2014.  The general allegations supporting Count 2 are set forth in Count 1.  There, the FSI alleges

---

[15] In granting Silver bail on appeal, the district court judge noted: "Some of the acts that occurred within the statute of limitations arguably do not constitute official acts under *McDonnell*, and there is a possibility that the jury might have convicted Silver by relying on those later acts, which they would not have done had the charge more fully described what was necessary to find an 'official act.'  The acts falling within the statute of limitations period that the Government argued at trial were official include: (1) obtaining a resolution and proclamation in honor of Dr. Taub… [¶] Because resolutions and proclamations are passed by the Assembly, the resolution and proclamation brought to the Assembly floor by Silver was a formal exercise of governmental power on a specific matter brought by law, in accordance with *McDonnell*.  But, given the evidence of the pro forma, rubber stamp nature of these honorary resolutions and proclamations, there is a substantial question whether a rational jury would have found Silver guilty, absent the error in the charge, based solely on the resolution and proclamation."  *United States v. Silver*, 203 F.Supp.3d 370, 382 (S.D.N.Y. 2016) (cleaned up).

26

1   that Wei Huang provided collateral in the amount of $600,000 in order for Huizar to

2   qualify for a loan from Bank 1.  After the collateral was provided and the loan was

3   written, Bank 1 then wired $570,000 to a Wells Fargo account in September 2014 to

4   fund a settlement of a sexual-harassment lawsuit.  FSI at OAs 25-26, 30-46.

5          "[A] statute of limitations begins to run when 'the crime is complete,'" and a

6   "crime is complete as soon as every element . . . occurs."  *United States v. Drebin*, 557

7   F.2d 1316, 1333 (9th Cir. 1977) (citing *Toussie v. United States*, 397 U.S. 112, 115

8   (1970)).  Once a scheme to defraud exists, each wire or mailing is a separate offense,

9   *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987), meaning each wire triggers

10  the statute of limitations, *United States v. Lowry*, 409 F.Supp.2d 732, 738 (W.D. Va.

11  2006) (citing *United States v. Howard,* 350 F.3d 125, 128 (D.C. Cir. 2003)).

12         The statute of limitations for honest-services fraud is five years.  *See* 18 U.S.C. §

13  3282(a).  Neither the original Indictment nor the FSI was returned until 2020.  Because

14  the 2014 wire occurred outside the limitations period, it is plainly time-barred.  *United*

15  *States v. Manges*, 110 F.3d 1162, 1169 (5th Cir. 1997) ("To satisfy the statute of

16  limitations for mail fraud, the government must prove that the predicate mailing

17  occurred in the five years before the indictment").

18         Seeking to avoid that inevitable result, the government included in the preamble

19  to the honest-services counts language stating that all of the claimed violations

20  "affected at least one financial institution," possibly implicating the 10-year limitations

21  period under 18 U.S.C. § 3293(2).  But this potential argument – which rewrites "*affects*

22  a financial institution" to mean "*involves* a financial institution" – would be incorrect.

23         The definition of "affecting a financial institution" requires a "new or increased

24  risk of loss" to the financial institution  *United States v. Stargell*, 738 F.3d 1018 (9th

25  Cir. 2013) ("Regarding the definition of 'affects' in 18 U.S.C. § 1343, we join our sister

26  circuits in defining such term to include new or increased risk of loss to financial

27  institutions") (everything omitted).  Thus, a defendant's actions do not "affect a

28  financial institution" if the bank suffered no actual or "realistic prospect" of a financial

27

loss.  *United States v. Agne*, 214 F.3d 47, 52-3 (1st Cir. 2000) (reversing conviction as time barred and holding that, "at minimum there needs to be some impact on the financial institution to support a conviction.").  Nor is a financial institution affected "any time a wire fraud causes a bank to transfer funds."  *United States v. Grass*, 274 F.Supp.2d 648, 654 (M.D. Pa. 2003).  Rather, "the term 'affecting a financial institution' requires an allegation that the financial institution was affected in an adverse manner, rather than merely used as an instrumentality of the crime."  *Id.* at 653 (citing *United States v. Ubakanma,* 215 F.3d 421, 426 (4th Cir.2000) (holding enhanced sentencing provisions for wire fraud affecting a financial institution available only if "the institution itself were victimized by the fraud, as opposed to the scheme's mere utilization of the financial institution in the transfer of funds").

Here, the FSI does not allege *how* Bank 1 was financially affected, *or* that it sustained a loss, *or* that it was a victim of the offense, *or* that it was anything more than an instrumentality, precisely because it was none of these things.  As the FSI alleges in detail, Wei Huang sent the attorney assisting in the transaction $600,000 to fund a certificate of deposit account, which in turn was used to collateralize a *fully-secured* $570,000 bank loan.  FSI at OAs 40-42.  Between 2014 and 2018, Huizar made interest payments on the loan.  In 2018, after Huizar missed three months of payments, Bank 1 satisfied the outstanding debt – $575,269.61 – by foreclosing on the CD pledged as security.  *Id.* at OA 49.  Not only did Bank 1 not suffer any loss, it did not suffer any risk of loss for a loan that was overcollateralized throughout its lifecycle.  Thus, § 3293(2) does not apply.  *See United States v. Carollo*, 2011 WL 5023241, *4 (S.D.N.Y 2011) (dismissing count as time-barred prior to trial because "[a]lthough Congress intended the language 'affects a financial institution' to be broadly construed . . . this Court cannot interpret § 3293 to be so broad as to allow a ten-year statute of limitations to apply where, as here, the government has not alleged that the financial institutions suffered any actual loss or at most the risk of loss is *de minimis*") (citations omitted).  Because the wire alleged in Count 2 was sent more than five years before this case was

28

charged, the offense is time-barred and should be dismissed.

Further, as another basis to dismiss Count 2, the FSI does not adequately plead that a financial institution was in fact "affected." Rather, the *introduction* to the honest services fraud count states that *all defendants* "knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the City of Los Angeles and its citizens of their right to the honest services of their public officials through bribery and kickbacks, materially false and fraudulent pretenses and representations, and the concealment of material information, *which violation* [sic] *affected at least one financial institution.*" Yet the specific honest-services fraud counts – Counts 2-17 – charge different variations of defendants with wire and/or mail fraud with no indication which transactions, if any, "affected" a financial institution. Indeed, these counts identify *six* different banks with no indication which, if any, was "affected," whether it sustained a loss, or if it experienced a risk of loss. For this reason as well, Count 2 should be dismissed.

### 3. The Court should dismiss or strike portions of the honest-services fraud counts for the same reasons as in Count 1.

As explained by the government, the basic structure of the FSI is that the federal-program bribery counts identify the relevant official acts for each of the five principal "schemes," *see* Snyder Decl. ¶ 2 & Ex. 1,[16] while the RICO overt acts supply factual detail supporting both the RICO-predicate and substantive bribery charges, *see* Docket No. 225 at 5:5-9. In other words, the bribery allegations in Count 1 are more-detailed statements of the same theories repeated in Counts 2-17. To that end, the Court should enter orders for Counts 2-17 consistent with the above-requested orders for Count 1.

### C. Counts 18-21: The Court should dismiss the Travel Act counts because the state-law predicate is broader than the generic federal definition of bribery; alternatively, for the state-law predicate, the Court should require the government to *at least* satisfy the *McDonnell quid-pro-quo* standard.

---

[16] The government has indicated that it believes the California bribery statutes may not require an official act, but has also stated that it is unsure whether it will press that theory or will instead agree, as in *McDonnell*, that an official act is required under all of the charged bribery statutes. *See* Snyder Decl. ¶ 2 & Ex. 1.

Counts 18 to 21 charge Huizar and SZNW with violating the Travel Act (18 U.S.C. 1952(a)(3)) by committing bribery in violation of California law, specifically California Penal Code §§ 67, 67.5, and 68.  Federal and state courts have both held that *federal* bribery, defined generically, is distinct from *state* bribery.  *People v. Gaio*, 81 Cal.App.4th 919 (2000); *United States v. Frega*, 179 F.3d 793 (9th Cir. 1999).  Indeed, unlike the federal bribery statutes, state courts have interpreted §§ 67, 67.5 and 68 ***not*** to require (a) a *quid pro quo*, (b) an "official act," (c) linkage between acceptance of any bribe and an official action, or (d) unanimity on the particular act constituting the offense.  *See Gaio*, 81 Cal.App.4th at 929-30.  Because the state bribery statutes are broader than "generic" federal bribery, these state statutes cannot serve as predicates for Travel Act offenses.  *Perrin v. United States*, 444 U.S. 37, 41 (1979); *Scheidler v. National Organization for Women, Inc.,* 537 U.S. 393, 410 (2003).  Counts 18 to 21 fail to state an offense and must be dismissed.

Further, regardless of the state statute's parameters, the FSI charges Huizar and SZNW with Travel Act offenses that *explicitly* includes a *quid pro quo*, an "official act," and unequivocal linkage between them.  Thus, should the Court find that the state statutes survive a "categorical" assessment, discussed below, the Court should also find that these counts, as charged, require the government to provide the additional elements of a *quid pro quo*, an "official act," and linkage.

## 1. The Travel Act.

The Travel Act prohibits "travel[ing] in interstate or foreign commerce . . . with intent to **. . .** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."  18 U.S.C. § 1952 (a)(3).  The Act was codified as a crime in the anti-racketeering chapter of the federal criminal code, and in essence made it a crime to travel across state lines, or otherwise use facilities in interstate commerce (*e.g.*. the U.S. mail, telephone, or email), to commit acts of violence or promote "unlawful activity." 18 U.S.C. § 1952(a).  That latter term – "unlawful activity" – was defined to include "extortion, bribery, or arson

30

1  in violation of the laws of the State in which committed or of the United States."  18

2  U.S.C. § 1952(b)(2).

3      The Travel Act was one of several bills enacted in 1961 as part of Attorney

4  General Robert Kennedy's legislative program to address organized crime and

5  racketeering.  *Perrin,* 444 U.S. at 41.  The limited legislative history associated with the

6  Act indicates that its focus was on organized crime participants who avoided state

7  prosecution by operating their criminal enterprises from outside a state's boundaries.

8  *See Rewis v. United States*, 401 U.S. 808, 811 (1971) (citing S. Rep. No. 644, 87th

9  Cong., 1st Sess., 2-3 (1961) ("Our investigations also have made it quite clear that only

10 the Federal Government can shut off the funds which permit the top men of organized

11 crime to live far from the scene and, therefore, remain immune from the local

12 officials.").

13     Mindful that concurrent state and federal jurisdiction raises federalism concerns,

14 the Supreme Court mandated that the Travel Act be construed narrowly: " . . . Congress

15 would certainly recognize that an expansive Travel Act would alter sensitive federal-

16 state relationships, could overextend limited federal police resources, and might well

17 produce situations in which the geographic origin of [those charged], a matter of

18 happenstance, would transform relatively minor state offenses into federal felonies."

19 *Rewis*, 401 U.S. at 812.  Circuit precedent is in accord.  *See United States v. Hathaway*,

20 534 F.2d 386, 397-398 (1st Cir. 1976) ("In contrast to the broad interpretation given to

21 the Hobbs Act, the Supreme Court has indicated that the Travel Act is to be read in a

22 narrower and more restricted fashion"); *United States v. Nader*, 542 F.3d 713, 721–22

23 (9th Cir. 2008) ("The Travel Act establishes only concurrent federal jurisdiction over

24 what are already state or local crimes.... The federal government cannot usurp state

25 authority via the Travel Act because a state must first decide that the conduct at issue is

26 illegal").

27     **2.  Defining the state predicate offense under the Travel Act.**

28 Congress did not define the terms "extortion," "bribery," or "arson" in the Travel

31

Act and have struggled to determine when the scope of a state statute falls within the ambit of the federal statute.  The Supreme Court first addressed this issue in *United States v. Nardello*, an extortion case, where it noted that different states codify crimes in a myriad of ways – for instance, what the State of Illinois calls "extortion" may not be at all what is meant by that term in the State of Pennsylvania.  393 U.S. 286, 289-90 (1969) (discussing how different states criminalize the crimes of extortion and blackmail).  The Court rejected the proposition that the label a state gives a particular crime should be dispositive.  *Id*. at 294 ("Giving controlling effect to state classifications would result in coverage under § 1952 if appellees' activities were centered in Massachusetts, Michigan, or Oregon, but would deny coverage in Indiana, Kansas, Minnesota or Wisconsin although each of these States prohibits identical criminal activities").  Instead, the Court held that "the inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged."  *Id*. at 295.  Two years later, in *Rewis*, the Court narrowed the reach of the statute, reversing Travel Act convictions based on violations of Florida gambling laws where bettors had crossed state lines to place bets. Citing the federalism concerns discussed above, the Court wrote: "it cannot be said, with certainty sufficient to justify a criminal conviction, that Congress intended that interstate travel by mere customers of a gambling establishment should violate the Travel Act."  401 U.S. at 811.

Then, in *Perrin*, the Court again tackled the issue of how to define whether a state crime qualifies as a Travel Act predicate.  In *Perrin*, the defendants were indicted under the Travel Act for committing commercial bribery in violation of Louisiana law.  444 U.S. at 39.  They argued that their indictment failed to state an offense because "bribery" should be defined as it was at common law, which did not include commercial bribery.  *Id.* at 41.  The Court declined to adopt that approach, noting that when the Act was enacted in 1961, Congress knew that the term "bribery" had extended beyond its common law definition. The Court applied the maxim that "words

32

generally should be interpreted as taking their ordinary, contemporary meaning," and decided that Congress intended to define "bribery" in a generic way. *Id.* at 42-45. Although the Court did not put forth a comprehensive definition of 1961 generic bribery, it did hold that the definition included commercial bribery. *Id.* at 48-49.

The Supreme Court's decisions in *Nardello*, *Rewis,* and *Perrin* have been described as a Travel Acts "trilogy" establishing the basic principles of statutory construction for determining the validity of a state predicate. *See*, *e.g.. United States v. Ferber*, 966 F.Supp. 90, 101-103 (D. Mass. 1997). These principles include: "First, the conduct charged as a predicate Travel Act violation must actually be criminal under the laws of the state. Second, the label a state affixes to certain conduct is irrelevant so long as that criminal conduct fits within traditional, generic notions of 'extortion, bribery, or arson.'" Third, the Travel Act must not be read so expansively as to upset the delicate balance between the powers of the federal and state sovereigns." *Id.* at 102-103 (cleaned up).

As the Ninth Circuit recently recognized, this trilogy is the forerunner to what has come to be known as "the categorical approach." *See United States v. Chi*, 936 F.3d 888, 895 (9th Cir. 2019), *as amended* 942 F.3d 1159 (citing *Taylor v. United States*, 495 U.S. 575 (1990)). In *Taylor*, the Court examined the definition of "burglary" under 18 U.S.C. § 922(g)(1), (e) which carries a sentencing enhancement for a prior conviction for that offense. 495 U.S. at 577-78. The lower court had rejected the defendant's argument that his prior conviction did not qualify as a "burglary" under the federal statute because it did not meet the common law definition; the court decided that the term "burglary" "means 'burglary' however a state chooses to define it." *Id.* at 579. The Supreme Court disagreed with this position, noting that a State's definition of a crime could not control the word's meaning in a federal statute as that would allow for uneven application across the states. *Id.* at 580. Citing *Perrin*, the Court also rejected the claim that the common law definition of burglary should control. *Id*.

Instead, the Court held that "burglary" must be defined "in the generic sense in

33

1    which the term is now used in the criminal codes of most States." *Id.* at 595, 598.

2    Applying this approach, the Court instructed that lower courts should determine the

3    generic definition of the offense and compare it "categorically" to the state statute – if

4    the conduct prohibited by the state statute is the same or narrower than the generic

5    definition, the state statute is a categorical match and could serve as a basis to enhance

6    the federal statute. *Id.* at 598-600.  If, however, the state statute is broader than the

7    generic definition, it could not be so utilized.  The Court stressed that the only relevant

8    inquiry was the elements of the state statute, "not the particular facts" underlying the

9    conviction. *Id.* at 600.  As the Court later emphasized, the lower courts "must presume

10   that the [charge] rest[s] upon [nothing] more than the least of th[e] acts criminalized"

11   by the state statute. *Moncrieffe v. Holder*, 569 U.S. 184, 191-92 (2013) (cleaned up).

12       Since *Taylor*, the Court has refined this approach in a variety of contexts.  *See*

13   *Scheidler*, 537 U.S. at 409-10 (reversing judgment where predicate state "extortion"

14   statute in RICO case did not require obtaining property as part of crime as required

15   under generic definition based on Model Penal Code and a majority of state statutes);

16   *Esquivel-Quintana v. Sessions*, 137 S.Ct. 1562, 1568 (2017) (petitioner's conviction for

17   California statutory rape was not categorically sexual abuse of a minor as generic

18   federal definition requires victim to be under 16 while California statute sets age of

19   consent at 18).  As discussed below, these cases provide a blueprint for how to analyze

20   California's bribery statutes under the Travel Act.

21       **3.  The generic definition of Travel Act "bribery."**

22       As its predicate act, the FSI alleges "bribery" by Wei Huang as an agent of

23   SZNW, in violation of Cal. Penal Code §§ 67, and 67.5; for Jose Huizar, the predicate

24   act alleged is a violation of Cal. Penal Code § 68. Penal Code § 67 and 68 are

25   "complementary statutes" in that § 67 prohibits giving bribes, while § 68 prohibits

26   taking them.  *People v. Hallner*, 43 Cal.2d 715, 717 (1954).

27       No court has held that these state statutes qualify as predicate offenses under the

28   Travel Act, and there is not yet a comprehensive generic definition of bribery for

34

purposes of analyzing a Travel Act violation.  Thus, pursuant to *Perrin, Taylor,* and their progeny, the first step is to determine the "ordinary, contemporary, common meaning" – that is, the generic definition – of bribery as of 1961 when the Travel Act was enacted, and then compare it "categorically" to the elements of the California bribery statutes alleged in the FSI to determine whether they are a match.

Several cases provide guidance.  In *United States v. Dansker*, the defendant was charged with a Travel Act violation based on a claimed violation of New Jersey's bribery statute.  537 F.2d 40 (3d Cir. 1976), *abrogated on other grounds as recognized in Nat'l Labor Rel. Bod. v. New Vista Nursing and Rehab.*, 870 F.3d 113 (3d Cir. 2017).  The defendant had been paid by a developer to halt a vocal campaign against a proposed commercial development in his neighborhood; the defendant happened to be a public official, but "the government failed to produce any evidence whatsoever indicating that he had any ability, actual or apparent, to influence official decisions concerning the project in his official capacity, or that the alleged bribers believed he could do so by virtue of his public office" or even that the bribers were aware of his position. *Id.* at 49-50.  The Court reversed the conviction, finding it did not violate the charged New Jersey statute which fell within the generic understanding of bribery. *Id.* Although the Court did not set out a full definition of the generic offense, it identified its "traditional concern" as "conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action." *Id.* at 48; *see also United States v. Manzo*, 851 F.Supp.2d 797, 804-05 (D.N.J. 2012) (granting motion to dismiss indictment on grounds that it did not state a violation of the Travel Act because generic bribery does not include bribery of a candidate for public office who ultimately was not elected); *United States v. Parlavechhio*, 903 F.Supp. 788, 792-93 (D.N.J. 1995) (finding alleged conduct did not constitute generic bribery as it lacked donor/donee relationship where defendants concealed their interest in ownership of a building that was leased to their employer, the Board of Education).

In a more recent case that originated in this Court, the Ninth Circuit addressed

35

the definition of "bribery of a public official" in the context of a *different* statute, a

money laundering case.  In *United States v. Chi*, the defendant was charged with

violating 18 U.S.C. § 1957, which prohibits engaging in monetary transactions over

$10,000 derived from certain "offense[s] against a foreign nation" including "bribery of

a public official" as that phrase is defined in 18 U.S.C. § 1956.  936 F.3d at 890-91.

The defendant, a seismologist at a government-funded research institute in South

Korea, was charged with using his official position to provide business advantages to

British and California companies which manufactured equipment used to detect

earthquakes.  The "unlawful activity" alleged was a violation of Article 129 of the

South Korean Criminal Code.  On appeal, Chi argued that the term "bribery of a public

official" should be defined by the federal bribery statute, 18 U.S.C. § 201, which in a

categorical comparison, was narrower than Article 129.  The Ninth Circuit rejected

Chi's argument, relying on *Perrin* to determine that "bribery of a public official" in §

1956 should be defined instead by that phrase's "ordinary, contemporary, common

meaning" as of 2001, when the federal statute was enacted. *Id*. at 893.  Looking to the

2001 definition of "bribery" in Black's Law Dictionary, as well as the Model Penal

Code, the Ninth Circuit set forth these elements of generic bribery in the year 2001:

> First, it required two parties – one who "paid," "offered," or "conferred"
> the bribe, and one who "received," "solicited," or "agreed to accept" it.
> Second, it required something to be given by the bribe-giver – either a
> "private favor," a "pecuniary benefit," or "any benefit." And third, it
> required something to be given by the bribe-taker – either "official action,"
> "the recipient's decision, opinion, recommendation, vote or other exercise
> of discretion as a public servant," or "a violation of a known legal duty as
> public servant."

*Id.* at 897.  Comparing the elements of generic bribery to the Korean statute, the Court

determined it fell within the elements of the generic definition. *Id.* at 897-98.

The Third Circuit's analysis in *Dansker,* the New Jersey district court cases*,* and

the Ninth Circuit's findings in *Chi* are helpful.  Following *Nardello* and *Perrin*, each

addresses different aspects of generic bribery, albeit ones not strictly relevant here.

*Dansker* and *Manzo*, considering New Jersey's bribery statute, show the appropriate

36

remedy for an overbroad state statute is dismissal of the count.  Although *Chi* involved a foreign country's bribery law in the context of a money laundering statute, the Court notably cited the South Korean statute's requirement of  a *quid pro quo* and included it in the generic definition of an "official action" – what the Court called a "recipient's decision, opinion, recommendation, vote or other exercise of discretion as a public servant."  *Id.* at 897.

Following the procedure set out in these cases, this Court must first determine the generic definition of bribery that Congress intended in 1961 when the Travel Act was passed.  The Model Penal Code had not yet issued, but the relevant edition of Black's Law Dictionary was the 4th edition, published in 1951.  It defined "bribery" as "the offering, giving, receiving, or soliciting of any thing of value to influence action as official or in discharge of legal or public duty; "[t]he corrupt tendering or receiving of a price for official action"; "[t]he receiving or offering any undue reward by or to any person concerned in the administration of public justice or a public officer to influence his behavior in office; "[t]he taking or giving a reward for public office."  Black's Law Dictionary, 4th edition (1951) (citations omitted).  The requirement of *quid pro quo* and an "official action" are prominent in this definition. *See also United States v. Biaggi*, 674 F.Supp. 86 (E.D.N.Y. 1987) ("Dictionary definitions in the main support the defendants' position that the common meaning of the word bribery [when the Travel Act was passed] is the giving of a thing of value corruptly and with intent to influence a specific official act," but also recognizing "the elusiveness of a precise definition….")

There is one obvious clue as to what the 1961 Travel Act Congress intended by the term "bribery": at the same time it was enacting the Travel Act, it was also working on clarifications and consolidations to the federal bribery laws.  The result of these efforts was 18 U.S.C. § 201, what the Supreme Court later identified as "the federal bribery statute."  *See McDonnell*, 136 S.Ct. at 2365; *see also Manzo*, 851 F.Supp.2d at 813 (referring to § 201 as "the general federal bribery statute" and indicative as to how the common law definition had evolved).  The Travel Act and the new bribery statute

37

1  were debated contemporaneously and passed by the same Congress. *See Biaggi*, 674

2  F.Supp. at 88-89 (finding § 201 "more persuasive" as to what Congress intended by the

3  term in the Travel Act than dictionary definitions).  The point of departure for generic

4  bribery thus must be centered in Section 201, which requires both a *quid pro quo* and

5  an official act.

6      As discussed above, in *McDonnell*, the Supreme Court held that the definition of

7  an "official act" in § 201(a) requires: (1) a formal exercise of governmental power that

8  is similar in nature to a lawsuit or hearing; (2) something specific and focused that is

9  'pending' or 'may by law be brought' before a public official[;] and (3) a decision or

10  action *on* that matter. 136 S.Ct. at 2372.  Relying on *Sun-Diamond*, 136 S.Ct. 2355, the

11  Court ruled that "[s]etting up a meeting, talking to another official, or organizing an

12  event (or agreeing to do so) – without more – does not fit that definition of 'official

13  act.'"  *Id.* at 2372.  Importantly, the bribery offenses charged in *McDonnell* were not

14  violations of § 201 but instead were violations of the honest services fraud statutes, 18

15  U.S.C. §§ 1343, 1346, 1349, and the Hobbs Act extortion statute, 18 U.S.C. § 1951.

16  136 S. Ct. at 2365.  Neither of these statutes contains the term "official *act*" – Hobbs

17  Act extortion refers to "official *action*" – but because the theory under both statutes was

18  that Governor McDonnell had accepted bribes, the § 201 "official act" element was

19  incorporated.  *Id.*  In other words, *McDonnell* set forth the definition of "official act"

20  for generic federal bribery, and § 201 was used as a reference point for both statutes.

21  Here, where the predicate acts charged are bribery, the same logic applies: in the

22  context of the Travel Act, this Court should incorporate the principles of *McDonnell*

23  into the generic definition of bribery, requiring an "official act" as defined in that case

24  as well as a *quid pro quo*.

25      If generic bribery does not include the requirements of a *quid pro quo* and an

26  official act, it runs afoul of the constitutional concerns identified in *McDonnell* – that

27  such a "breathtaking expansion of public-corruption law would likely chill federal

28  officials' interactions with the people they serve and thus damage their ability

38

effectively to perform their duties." 136 S.Ct. at 2372 (quoting Brief for Former Federal Officials as Amici Curiae 6). The Court also identified serious vagueness and due process concerns as "public officials could be subject to prosecution without fair notice, for the most prosaic interactions." *Id.* at 2373. And finally, the Court raised federalism concerns – that is, to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials" would interfere with the States' right "to regulate the permissible scope of interactions between state officials and their constituents." *Id.* ( cleaned up).

In *Chi*, the defendant argued that *McDonnell* mandated a similar finding but, in a footnote, the Court distinguished *McDonnell*. The Court noted that Chi "was charged with a crime for engaging in a *quid pro quo* exchange with foreign businesses, not the 'people [he] serve[d]," and that because the predicate offense was a violation of a foreign nation's code, "the indictment and jury instructions did nothing to implicate the issues of federalism present in *McDonnell*." *Id.* at 898, n.7. By contrast, this case is conceptually identical to *McDonnell*: the government specifically alleges that Huang bribed Huizar – "the people he served" – which clearly implicates "issues of federalism present in *McDonnell*." Thus, for the same reasons that *McDonnell* did not apply in *Chi*, it should be applied here.

### 4. California bribery is broader than the Travel Act generic definition of bribery.

As referenced above, California's bribery statutes are quite different from "generic" bribery and have been interpreted broadly by the California courts. Section 67 uses expansive language including the offering of "*any* bribe" to any executive officer with "intent to influence him in respect to *any* act, decision, vote, *opinion*, or other proceeding . . . ." Cal. Penal Code § 67 (emphasis added). The use of the terms "any" and "in respect to," along with the disjunctive formulation with a final catch-all category of "other proceeding" suggest a sweeping reach. *See, e.g., United States v.*

1    *Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive

2    meaning, that is, 'one or some indiscriminately of whatever kind.") The California

3    courts have found this language dispositive, interpreting the bribery statutes as a whole,

4    reading various limitations from one into another, and rejecting calls to restrict their

5    reach even where the statute itself so suggests.  *See, e.g,. People v. Gaio*, 81

6    Cal.App.4th at 928 n.8 (interpreting the bribery statutes "collectively" and holding, for

7    example, that although § 68 uses the phrase "agreement or understanding," all that is

8    required is intent on the side of either the briber or bribee).

9        In *People v. Kerns*, 9 Cal.App.2d 72, 48 P.2d 750 (1935), a California appellate

10   court upheld a conviction where the defendant's Penal Code § 68 conviction rested on

11   his asking for a bribe for the purpose of influencing *inter alia* the defendant's *opinion*

12   on official matters. *Id.* at 73 ("Viewing the evidence in the light most favorable to the

13   respondent, the duties of the defendant involved (first) the formation of the opinion by

14   the inspector which would form (second) the basis of action in executing the law.") In

15   *People v. Diedrich*, 31 Cal.3d 263, 272, fn. 5 (1982), the California Supreme Court

16   addressed the application of Cal. Penal Code § 165 which is similar to §§ 67.5 and 68

17   but addresses bribery of county supervisors, city council members, and similar

18   members of local elective bodies. The Court held that § 165 is "not dependent on

19   identification of a specific official act as the object of the bribe." *See Diedrich*, 31

20   Cal.3d at 276. The Court focused on the statute's use of the word "may" which

21   "suggest[ed] that payments designed to alter the outcome of any matter that could

22   *conceivably* come before the official are within the prohibition of the statute." *Id.*

23   (emphasis added). The Court noted that there were matters "that *might* have come

24   before the board of supervisors" that could have benefitted the person who offered the

25   developer who allegedly gave the bribe. *Diedrich*, 31 Cal.3d at 276 (emph. added).[17]

26   _____

27       [17] Although Penal Code § 68 does not include the word "may," in *Gaio*, the
     Court read in this same requirement from *Diedrich*'s interpretation of § 165 into that

28   statute. *See Gaio*, 81 Cal.App.4th at 928-29 ("Diedrich thus both declares and

40

In *Gaio*, the Court also addressed whether the Supreme Court's decision in *Sun-Diamond* altered its earlier rulings, holding that it did not. *Id.* at 930. The *Gaio* Court held *Sun-Diamond* hinged on the unique statutory structure and text of 18 U.S.C. § 201(a)(3), rejecting the defendant's argument as to the similarity of § 201's definition of "official act" and the acts listed in § 67. 81 Cal.App.4th at 930-31 ("Contrary to Gaio's analysis, the federal and California bribery statutes are not "nearly identical"); compare § 201 ("the term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy …") with § 67 ("… with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding").  The Court  found that a bribe under Cal. Penal Code §§ 67.5 and 68 need not be tied to a specific official action: "proof of the offenses in this case did not require that each bribe have been given and received with intent to influence a specific official act …. The evidence was sufficient if it established that [the bribe recipient] received [the bribe payor's] payments, and [the payor] made them, with the intent … that [the recipient] be influenced in any one or more instances, types, or courses, of official action." *Id.* at 931, 933 (also rejecting unanimity instruction as "[w]hat particular official action or actions each [payment] was intended to influence did not define the offenses, and it was unnecessary for the jury to agree on that matter"); *see also United States v. Frega*, 179 F.3d at 805 ("Linkage between a payment and a specific official decision is not required under California bribery law.")

California's model jury instructions also reflect the broad reach of the statutes:

> **2600 Giving or Offering a Bribe to an Executive Officer (Pen. Code § 67):**
> To prove that the defendant is guilty of this crime, the People must prove that:
> 1. the defendant (gave/[or] offered) a bribe to an executive officer in this state [or someone acting on the officer's behalf);
> AND

---

demonstrates that bribery does not require that a specific official action be pending when the bribe is given, or that there be proof that the bribe was intended to influence any particular such act. Rather, it is sufficient that there existed subjects of potential action by the recipient, and that the bribe was given or received with the intent that some such action be influence.")

41

2. The defendant acted with the corrupt intent to unlawfully influence that officer's official (act[,]/decision[,]/vote[,] opinion[,]/[or] _____ <insert description of alleged conduct in other proceeding>).

CALCRIM 2600 (April 2021). A defendant thus can be guilty of Penal Code § 67 if he or she makes an offer with the corrupt intent to unlawfully influence the officer's opinion, or any other unknown alleged conduct. *See also* CALCRIM 2601, 2603 (similarly allowing liability based on corrupt intent to influence an official's opinion).

Because the California statutes define bribery more broadly than the generic definition, they cannot serve as Travel Act predicates. *See Perrin*, 444 U.S. at 50. To conclude otherwise would upset the delicate balance between state and federal police powers that Congress intended with the Travel Act's passage and transform local offenses into federal felonies. *Rewis*, 401 U.S. at 812. As such, Counts 18-21 fail to state an offense and must be dismissed. *See Perrin*, *Scheidler*, *Danzer*, *supra*.

### 5. The Travel Act charges in the FSI include a *quid pro quo* and an "official act."

The Travel Act violations in the FSI include the specific assertion that Huizar and SZNW committed the identified acts "in exchange for defendant HUIZAR agreeing to perform official acts to benefit the L.A. Grand Hotel Project." (FSI, Counts 18-21.) Thus, by its own language, the Travel Act counts contain a *quid pro quo* and an "official act" as elements of the charges, and a linkage between the two.

But the government's attempt to circumvent such issues was only partially successful, as all four Travel Act counts fail to identify a specific "official act" that Huizar allegedly performed or agreed to perform in exchange for the alleged benefit. As noted earlier, to pass constitutional muster, an indictment must include a "description of the charges" sufficiently detailed to (1) "enable [the defendant] to prepare his defense," (2) "ensure that the defendant is prosecuted on the basis of facts presented to the grand jury," (3) "enable him to plead jeopardy against a later prosecution," and (4) "inform the court of the facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).

42

Statutory language "may be used in the general description of the offense," but that description "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Russell v. United States,* 369 U.S. 749, 765 (1962) (cleaned up).

Just as an indictment must identify a specific *quid*, it must also do so for the *quo*. The failure of the Travel Acts counts to identify a specific "official act" is fatal. Counts 18-21 should therefore be dismissed.

**D. Counts 22-30: The Court should dismiss Counts 22-23 as duplicitous and strike several portions as time-barred; strike the labor-unions portion of Count 24 for failing to allege a qualifying quo; and dismiss Count 29 as duplicitous and strike several portions for failing to state an offense.**

**1. Counts 22 and 23.**

Counts 22 and 23 charge Huizar, Chan, Wei Huang, and SZNW with Federal Program Bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2), asserting in mirror-image charges that:

> Huizar, aided and abetted by defendant Chan, solicited, demanded, accepted, and agreed to accept financial benefits from Wei Huang, including casino gambling chips, accommodations, and travel expenses, and approximately $575,000 in collateral applied to defendant Huizar's personal loan from Bank 1, intending to be influenced and rewarded in connection with the L.A. Grand Hotel Project, including in: (1) presenting motions and resolutions in various City committees to benefit the L.A. Grand Hotel Project; (2) voting on the L.A. Grand Hotel Project in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of the L.A. Grand Hotel Project; and (4) exerting pressure on other City officials to influence the approval process of the L.A. Grand Hotel Project.

FSI ¶ 49; *see also* FSI ¶ 50 (making the same allegation from the perspective of Wei Huang and SZNW). The Court should dismiss both counts as duplicitous and further strike many of the alleged quids and quos as untimely.

**a. Counts 22 and 23 are duplicitous.**

§ 666(a)(1)(B)'s elements are: "(1) corrupt solicitation (2) of anything of value, (3) with the intention of being influenced in connection with any transaction of a local

43

government or organization receiving at least $10,000 in federal funds annually, (4) where the transaction involves anything of value of $5,000 or more." *United States v. Cicco*, 938 F.2d 441, 444 (3d Cir. 1991).[18]  § 666(a)(2)'s elements are similar, except from the perspective of the bribe-giver.

Because a "crime is complete when each element of the crime has occurred," *United States v. Smith*, 740 F.2d 734, 736 (9th Cir. 1984), a § 666 violation occurs the moment there exists (1) a corrupt solicitation (or offer), (2) of anything of value, (3) with the intent of being influenced (or influencing any person) in connection with a qualifying governmental transaction, (4) where the transaction involves any thing of at least $5,000 in value.  And because each qualifying act of § 666 bribery is a separate offense, *United States v. Nystrom*, No. 07-CR-30100-03-KES, 2008 WL 4833984, at *11 (D.S.D. Nov. 4, 2008), a § 666 count must be dismissed as duplicitous if multiple offenses meeting these elements are alleged in a single count, *Tutein*, 122 F.Supp.2d at 577-78.

In *Tutein*, for example, the trial court dismissed a § 666 bribery count as duplicitous where it alleged that, within a four-month period, the defendant offered two payments to a Senator to garner support for the same piece of legislation involving the defendant's employment.  *Id.*  Because both offers involved things of value and were made with the intent to influence the Senator in connection with a transaction involving something of at least $5,000 in value, they were separately chargeable offenses.  *Id.*; *see also, e.g., United States v. Musto*, No. 3:10-CR-338, 2012 WL 5879609, at *4 (M.D. Pa. Nov. 21, 2012) ("[T]he offense under § 666(a)(1)(B) is discrete, one that is committed and whose 'limitations period starts to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct'") (quoting *United States v. Yashar*, 166 F.3d 873, 878–79 (7th Cir. 1999)).

---

[18] "The one-year period [in element (3)] must begin no more than 12 months before the defendant committed these acts and must end no more than 12 months afterward." Fed. Crim. Jury Instr. 7th Cir. 666(a)(1)(B) (2020 ed.).

44

1    Here, like in *Tutein*, where the § 666 count was dismissed because it alleged two
2    distinct bribes, Counts 22 and 23 are duplicitous because they allege multiple distinct
3    bribes.  The FSI contends that Huizar solicited a host of "financial benefits from Wei
4    Huang, including casino gambling chips, accommodations, and travel expenses, and
5    approximately $575,000 in collateral[.]"  Even setting aside the loan, the FSI states that
6    Huizar went on *19 different Las Vegas trips over a period of four years*.  FSI at OAs 4-
7    22.  It further contends that he did so each time – and that Wei Huang and SZNW took
8    him on those trips each time – with the corrupt intent to influence or be influenced in
9    connection with the L.A. Grand Hotel project.  Those are all separate crimes – for
10   which the government must separately establish all the elements of § 666 – just as the
11   trips to Las Vegas in March 2013 (OA 4) and February 2017 (OA 22) are separate
12   alleged crimes from the September 2014 loan (OAs 40-42).

13   To be sure, establishing *with evidence* that Huizar had the same corrupt intent
14   when he received gambling chips in 2013, a loan in 2014, and a hotel room in 2017 – as
15   the FSI alleges – is much harder than throwing everything at the jury and saying: "it's
16   all bad, take your pick."  But that erosion of the government's burden is one of the
17   principal evils that the rule against the duplicity is meant to avoid.  *United States v.*
18   *Newell*, 658 F.3d 1, 27 (1st Cir. 2011) ("In aggregating multiple instances of the same
19   crime, the prosecution may bundle together alleged offenses that are strongly supported
20   by the evidence with ones that are only moderately, or even weakly, supported by the
21   evidence").  Because Counts 22 and 23 allege multiple separate offenses, the Court
22   should either dismiss them entirely or require the government to make a valid election.

23   **b.  Many of the *quids* and *quos* alleged in Counts 22 and 23 are untimely.**

24   The Court should further find that many of the *quids* and *quos* within Counts 22
25   and 23 are barred by the statute of limitations.

26   As discussed above, Counts 22 and 23 allege multiple discrete offenses, from
27   trips to Las Vegas in 2013 – supposedly for the corrupt purposes of being influenced in
28   connect with the L.A. Grand Hotel project which had not yet even been conceived – to

45

corruptly "presenting motions and resolutions . . . to benefit the L.A. Grand Hotel Project" – supposedly as a result of receiving a financial benefit from Wei Huang or SZNW.  Because a § 666 offense is time-barred if all the elements exist more than five years prior to the date the indictment is found, *all* of the discrete § 666 bribes completed more than five years prior to the Indictment are time-barred and must be dismissed.  *Yashar*, 166 F.3d at 879-80 (holding that a § 666 offense is committed and the statute of limitations begins to run once all the elements exist, "regardless of whether the defendant continues to engage in criminal conduct").

For Huizar, that precludes any benefit received or provided more than five years before July 30, 2020 (the date upon which the original Indictment was found); for SZNW, that precludes any benefits conferred before November 12, 2020 (when the FSI was returned).  By way of example, the FSI alleges that Huizar attended a Wei Huang-sponsored trip to Las Vegas in March 2013 during which he received gambling chips, accommodations, and travel expenses.  *See* FSI at OA 4.  If, as alleged, Huizar solicited or accepted those benefits with the intent required to violate § 666, the crime was completed in March 2013 and the statute of limitations ran in 2018.  (If he did not solicit or accept those benefits with the intent required to violate § 666, then no crime occurred.).  The same is true for several other Las Vegas trips (Huizar: OAs 5-12; SZNW: OAs 5-13), as well as the $600,000 loan, which, as described above, was provided in 2014 – more than five years before the Indictment was found – as well as any other benefit solicited or offered before July 30, 2015.  *See, e.g., United States v. Jones*, 676 F.Supp.2d 500, 518 (W.D. Tex. 2009) ("For bribery charged pursuant to section 666, the statute of limitation begins to run when each element of the statute is met, which is when the 'anything of value' is exchanged with the requisite intent to influence or be influenced").

In addition, to the extent that Wei Huang conferred a benefit on Huizar with the intent that he take some governmental action that was completed outside the limitations period, that alleged bribe must also be time-barred.  For example, Counts 22 and 23

46

refer to Huizar "(1) presenting motions and resolutions in various City committees to benefit the L.A. Grand Hotel Project."  If the reference to "resolutions" means Huizar's introduction of a City Council resolution commending Wei Huang in 2014, that event was completed in 2014.  Logically, any illicit agreement related to that resolution must have been completed *before* Huizar introduced the resolution, meaning more than five years before the filing of the Indictment and FSI.[19]  Thus, that and any other acts that Huizar completed outside the limitations period are time-barred.

### 2. Count 24.

Count 24 is the reverse side of Count 25, alleging that Huizar agreed to accept $500,000 in cash from Lee and 940 Hill in exchange for (1) pressuring Labor Organization A to dismiss a project appeal and, if necessary, (2) voting to deny that appeal in PLUM.  *See* FSI ¶ 51.  As explained above and in Lee's concurrently filed motion to strike portions of Count 25, the act of exerting pressuring on a labor union is not capable of predicating § 666(a)(1)(B) conviction.  The Court should thus strike from Count 24 the language "(1) pressuring Labor Organization A to dismiss its appeal against the 940 Hill Project."

### 3. Count 29.

Count 29 alleges that Huizar:

> agreed to accept from Company M $100,000 in contributions to PAC A, intending to be influenced and rewarded in connection with Project M, including in: (1) scheduling Project M on the PLUM agenda; (2) voting to deny a labor union's appeal against Project M in the PLUM Committee; and (3) voting to approve Project M in the PLUM Committee and City Council.

FSI ¶ 56.

For the same reasons as with Counts 22 and 23, the Court should dismiss Count 29 as duplicitous because it lumps together different contributions or commitments made at different points in time.  Further, the Court should dismiss with prejudice or

---

[19] It also was unrelated to the L.A. Grand Hotel Project, which had not yet been conceived.

47

strike from Count 29 Company M's third contribution[20] because, as discussed in connection with Count 1, it is not supported by a clear-and-unambiguous *quid pro quo*.

### E. Several of the charged statutes are facially unconstitutional or unconstitutional as applied.

#### 1. 18 U.S.C. §§ 666(a)(1)(B) & (a)(2) are unconstitutional in violation of the Fifth, First, and Tenth Amendments.

Defendants move to dismiss Counts 22-30 charging violations of §§ 666(a)(1)(B) and (a)(2) as unconstitutional in several respects. First, § 666 is facially unconstitutional under the Fifth Amendment's due process clause because it is impermissibly vague. Second, § 666 is unconstitutional under the First Amendment because it is facially overbroad. Third, § 666 violates the Tenth Amendment as applied in this case because it infringes on traditional areas of state power.

##### a. § 666 is facially unconstitutional under the Fifth Amendment because it is impermissibly vague.

§ 666 is impermissibly vague in violation of the Due Process clause of the Fifth Amendment because fails to delineate and provide notice of what conduct is proscribed.

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S.Ct. 2319, 2323 (2019). The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *Id.* at 2325. "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972)). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

---

[20] Count 1 mentions four contributions or commitments stretching back to 2016. *See* Section III.A.2.c, *supra*. Without explanation, Count 29 limits itself to the two contributions or commitments made in 2018. *See* FSI ¶ 56.

at 253-54. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) (explaining that when criminal statutes touch upon protected First Amendment activity a "greater degree of specificity and clarity is required"). *See Information Providers' Coalition for Defense of the First Amendment v. F.C.C.*, 928 F.2d 866, 874 (9th Cir. 1991) ("The requirement of clarity is enhanced when criminal sanctions are at issue or when the statute abut[s] upon sensitive areas of basic First Amendment freedoms.") (citations omitted).

§ 666 prohibits anyone from giving "anything of value to any person, with intent to influence or reward an agent" of a state or local government, "in connection with any business, transaction or series of transactions of such" government and for an official to accept anything of value under those terms. 18 U.S.C. § 666(a)(1)(B), (2). Section 666's broad, undefined statutory terms – "influence," "in connection with," "business," or "transaction" – are not defined by the statutes and are so unclear and imprecise as to provide no notice as to what conduct is actually prohibited. Under their ordinary meanings, "business" and "transaction" are far more expansive than "official act." "Business" means "dealings or transactions, especially of an economic nature." *Business*, Merriam-Webster's Online Dictionary, http://www.merriamwebster.com/dictionary/business (last visited Aug. 29, 2021). "Transaction" is even broader. "Transact" means "to carry to completion" or "to carry on the operation or management of"; transaction means "something transacted, especially: an exchange or transfer of goods, services, or funds." *Transact*, *id.*, http://www.merriamwebster.com/dictionary/transaction (last visited Aug. 29, 2021). These terms, made even more expansive by the word "any," have no limiting factor.

§ 666 is more expansive than § 201(b) in another significant respect. The text of § 666, does not have a requirement that the "intent to influence or reward" be in the performance of "any business, transaction or series of transactions," only that it be "in connection with any business, transaction, or series of transactions" of the government or organization at issue. That boundless condition contrasts with § 201(b), which

49

requires an intent to be "influenced in an official act" or "intent to influence an[]
official act." § 666's "in connection with" language, coupled with broad definition of
"influence,"[21] is no requirement at all; "'in connection with' is essentially indeterminate
because connections, like relations, stop nowhere.'" *Mont v. United States*, 139 S.Ct.
1826, 1833 (2019) (quoting *Maracich v. Spears*, 570 U.S. 48, 59 (2013)).

The vagueness of these terms and phrases is made especially stark when
compared with § 201. Even before *McDonnell*, § 201 was narrower than § 666. §
201(b) makes it unlawful for a public official to receive or accept anything of value
with the intent to be "influenced in the performance of any official act" or for someone
to give or offer an official a thing of value for that purpose. § 201(a)(3) defines
"official act" with at least some precision but the Court still found that it was
insufficient to provide adequate notice. "'[O]fficial act' is not defined with sufficient
definiteness that ordinary people can understand what conduct is prohibited, or in a
manner that does not encourage arbitrary and discriminatory enforcement."
*McDonnell*, 136 S.Ct. at 2373. Because the defined term "official act" was too vague,
*McDonnell* interpreted that element even more narrowly.[22] § 666, by contrast, has no
"official act" requirement within its text. *United States v. Garrido*, 713 F.3d 985, 1001
(9th Cir. 2013) ("Section 666 . . . makes no mention of an 'official act' or a requirement
that anything be given in exchange or return for an official act."). And the only conduct

---

[21] "Influence" is defined as "the power or capacity of causing an effect in indirect
or intangible ways: sway"; "the act or power of producing an effect without apparent
exertion of force or direct exercise of command"; "corrupt interference with authority
for personal gain." *Influence*, Merriam-Webster's Online Dictionary,
https://www.merriam-webster.com/dictionary/influence (last visited Sept. 4, 2021).

[22] Again, Governor McDonnell was charged with violations of honest services
wire fraud and Hobbs Act extortion, 18 U.S.C. §§ 1343, 1951(a), and not § 201. The
Court interpreted those statutes to incorporate the "official act" requirement of §
201(a)(3) because the parties agreed to define honest services fraud and Hobbs Act
extortion in that way. *McDonnell*, 136 S.Ct. at 2375.

The §666 allegations in the indictment in this case, include no similar "official
act" language, clearly or arguably. Nor has the government agreed to read "official act"
as defined by *McDonnell* into § 666. In fact, a reading of § 666 as encompassing an
"official act" requirement seems precluded by pre-*McDonnell* Ninth Circuit precedent.
*See Garrido*, 713 F.3d at 1001.

50

proscribed is not defined by the statute. It stands to reason that if the narrower, defined term "official act" is too broad to provide adequate notice, *McDonnell*, 136 S.Ct. at 2373, § 666's undefined, expansive terms and phrases do not provide sufficient notice either.

The Supreme Court's reliance on *Sun-Diamond*'s "official act" interpretation to narrow § 201 is instructive. *Sun-Diamond* was an illegal gratuities prosecution under § 201(c)(1)(A). *McDonnell* read *Sun-Diamond* to require, consistent with the definition of "official act" under § 201(a)(3), that the governmental "action or decision" be on the "question or matter" at issue, not simply related to the question or matter. *See McDonnell*, 136 S.Ct. at 2370. Under this interpretation of "official act," the meetings arranged, events hosted, and calls made to other officials in *McDonnell* were all actions related to the pending question or matter but were not governmental decisions or actions on the pending question or matter such as to qualify as "official acts." In narrowly defining "official act" in this way, the Supreme Court sought to avoid "absurdities," *id.* (quoting *Sun-Diamond*, 526 U.S. at 408), that would otherwise have resulted and raised significant vagueness problem. Section 666 leaves no room to avoid those same "absurdities" and their accompanying vagueness concern.

Applying § 666 to the three hypotheticals the Court used in *McDonnell* and *Sun-Diamond* to demonstrate the "absurdities" of a broader reading of § 201, illustrate the grave vagueness concerns remaining here. The *McDonnell* and *Sun-Diamond* examples involved criminalization of constituents' token gifts to their public officials in exchange for, or because of, ceremonial governmental action. The hypotheticals were: (1) the championship college sports team's token gift of replica jerseys to the President on the occasion of the team's ceremonial visit to the White House, while the President has before him matters that affect college sports, *McDonnell*, 136 S.Ct. at 2370; (2) the high school principal's token gift of the school's baseball cap to the Secretary of Education on her visit to the school, while she has before her matters affecting high schools, *id.*; and (3) a farmers group's token complementary lunch for the Secretary of

51

Agriculture in conjunction with his speech to the farmers group on U.S. Department of Agriculture pending policies affecting the farmers group, *id*.  *McDonnell* and *Sun-Diamond* side-stepped these hypothetical "absurdities" about criminalizing protected conduct by construing "official act" narrowly, reasoning that while these were all governmental actions "related to" prospective "official acts," they were not decisions. In this way, *McDonnell* and *Sun-Diamond* avoided the "absurdities" of criminalizing these innocuous exchanges for, or because of, ceremonial government action that do not fit within the definition of "official action." This narrow interpretation of "official act" in *McDonnell* and *Sun-Diamond* was not simply a matter of statutory construction. As *Sun-Diamond* explained:

> When, however, no particular "official act" need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents the foregoing examples from being prosecuted.

526 U.S. at 408.

Under § 666 any one of the Court's examples could be criminally prosecuted. Because the phrase "in connection with *any* business, transaction, or series of transactions" (emphasis added) has no readily ascertainable limiting principle, so long as the government believes the act was done "corruptly,"[23] any state or local official is in peril.  For this reason, too, do the same concerns about arbitrary enforcement the Court voiced as to § 201 apply with more force to § 666. Such vague statutes "encourage arbitrary and discriminatory enforcement," *McDonnell*, 136 S.Ct. at 2373

---

[23] Further, as interpreted, § 666's "corrupt" intent requirement is maddeningly circular and virtually meaningless.  According to the Ninth Circuit, an act is done corruptly under § 666 if it is done "for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means." *Martinez-de Ryan v. Whitaker*, 909 F.3d 247, 250 (9th Cir. 2018).  Thus, what makes an act unlawful under § 666 is that is done corruptly.  And what makes it corrupt is that it is unlawful.  So: "If [Huizar's] conduct was illegal, then he was using an unlawful method, which means he was acting corruptly, which means his conduct was illegal.  If [Huizar's] conduct was permissible, then he wasn't using an unlawful method, which means he wasn't acting corruptly, which means his conduct was lawful." *United States v. Dorri*, 15 F.3d 888, 895 (9th Cir. 1994) (Kozinski, J., dissenting) (declaring this formulation "hopelessly circular").

52

1   (quoting *Skilling*, 561 U.S. at 402-403), and "threaten to hand responsibility for
2   defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the
3   people's ability to oversee the creation of the laws they are expected to abide." *Davis*,
4   139 S.Ct. at 2325.

5       Because the text of § 666 does not clearly delineate the proscribed conduct, it
6   easily criminalizes the conduct in all of the *McDonnell* and *Sun-Diamond* hypotheticals
7   which the Court expressly aimed to avoid. Section 666 is unconstitutionally vague in
8   violation of the Fifth Amendment. The Court should dismiss Counts 22-30.

9                   **b.  § 666 is facially overbroad in violation of the First Amendment.**
10      § 666 is facially overbroad and violates the First Amendment because it
11   proscribes a substantial amount of protected First Amendment conduct.

12      A criminal statute is "facially invalid" under the First Amendment's overbreadth
13   doctrine "if it prohibits a substantial amount of protected speech" or "protected
14   expressive activity." *United States v. Williams*, 553 U.S. 285, 292, 297 (2008), *accord*
15   *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange*
16   *v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)) (statute facially
17   invalid as overbroad if "a substantial number of its applications are unconstitutional
18   judged in relation to the statute's plainly legitimate sweep")).  Laws that prohibit "a
19   substantial amount of constitutionally protected conduct may be held facially invalid
20   even if they also have legitimate application." *City of Houston, Tex. v. Hill*, 482 U.S.
21   451, 459 (1987).  Considering a defendant's First Amendment challenge to the facial
22   validity of a statute as overly broad, the Court should "take into account possible
23   applications of the statute in other factual contexts besides" that of the specific
24   defendant.  *NAACP v. Button*, 371 U.S. 415, 432 (1963).

25      The First Amendment protects, in part, the "freedom of speech, or of the press;
26   or the right of the people peaceably to assemble, and to petition the government for a
27   redress of grievances." U.S. Const., amend. I.  These rights are "intimately connected"
28   "in origin and purpose." *United Mine Workers of America, Dist. 12 v. Illinois State Bar*

*Ass'n*, 389 U.S. 217, 222 (1967).  *See also McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression.").  "The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such."  *United Mine Workers*, 389 U.S. at 222.  Accordingly, criminal statutes, like all statutes that touch upon these guarantees, must be precise to prevent chilling First Amendment protected activity.  *Hunt v. City of Los Angeles*, 601 F.Supp.2d 1158, 1170 (C.D. Cal. 2009).[24]

The proof of § 666's overbreadth is in the ease with which these expansive terms – "influence" "in connection with" "business," or "transaction," – criminalize a "substantial amount" of expressive activity and specifically the very associational, speech, and petitioning conduct that raised the Supreme Court's significant overbreadth concern in *McDonnell*.  *McDonnell* illustrated the overbreadth problem associated with an expansive interpretation of § 201's narrower "official act" through two hypotheticals – one pertaining to a concerned union official, the other a group of aggrieved homeowners.  136 S.Ct. at 2372.  Take *McDonnell*'s worried union official who had previously provided a campaign contribution to the elected official.  If, in petitioning his elected representative to prevent the plant's closure, he asked for the representative's help to arrange a meeting with the city's tax board to advocate for tax benefits to prevent the plant from closing, § 666 covers the exchange for both the union official and the representative.  The union leader's political support or contributions would be susceptible to framing as attempts to "influence" (or reward) the

---

[24] Where a statute affects expressive conduct protected under the First Amendment, as § 666 does, the vagueness doctrine under the Fifth Amendment and the overbreadth doctrine under the First Amendment overlap. *Hunt*, 601 F.Supp.2d at 1167 (explaining that "[t]he doctrines of overbreadth, unbridled discretion, and vagueness overlap").  *See also Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("we have traditionally viewed vagueness and overbreadth as logically related and similar doctrines").

54

representative to set up the meeting since it was done "in connection with" business or transactions of the local government, specifically, persuading the county's tax authority to give tax breaks to the plant.  That is so, even though this is clearly within the protected First Amendment right to petition the government.  *See, e.g.*, *Evers v. Custer County*, 745 F.2d 1196, 1204 (9th Cir. 1984) (explaining that activities such as "complain[ing]to the [County] Commissioners about the closing of the road," "attend[ing] the Commissioners' meetings and talk[ing] to individual Commissioners privately about the problem," and "urg[ing] the County to remedy the problem of the closing of what they believed was a public road" "falls within the first amendment's protection of the right to petition the government for redress of grievances").

Applying § 666 to *McDonnell*'s group of homeowners provides a similar constitutionally chilling example. 136 S.Ct. at 2372. There, the homeowners sought to discuss the slow restoration of power to their neighborhood by the city's power plant with their local city official.  *Id.*  If the homeowners invite the official to attend their annual outing to a ballgame and tell the state official that, along with enjoying a Dodger dog, they would like to discuss with her fixing the city's power plant response time, that too is criminalized under § 666.  The ballgame is a "thing of value" given to and accepted by the city official "intending to be influenced" "in connection with" "any business" involving the city, namely the city's power plant.  In *McDonnell*'s examples, the homeowners' associational and petitioning rights, like that of the union, fit squarely within the broad conduct proscribed by § 666. Section 666 imperils the very "democratic discourse" *McDonnell* sought to preserve.  *Id.*  Under § 666, officials would need to dramatically alter their approaches to "meet and greets" with constituents or speeches delivered at conferences or campaigning.  They would need to consider whether it is worth the risk of prosecution to interact with any person or group that has ever given them anything of value, including otherwise lawful campaign contributions or gifts.  Politicians may decide to forgo those interactions (and curtail citizens' opportunities to petition them directly) rather than risk federal prosecution.

55

The examples of conduct covered by § 666 are limitless and so too is § 666's capacity to cover, and therefore chill, "normal political interaction between public officials and their constituents." *McDonnell*, 136 S.Ct. at 2372.  By any measure, § 666 "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S at 297. §§ 666(a)(1)(B) and (a)(2) are, therefore, facially overbroad in violation of the First Amendment.

### c.  § 666 violates the Tenth Amendment and is unconstitutional as applied.

§ 666's application in this case implicates areas of traditional state power – state criminal law and state governance. The broad language of the statutes and the vast nature of federal appropriations means that applying §666 to any city or state that receives over $10,000 of federal funds creates a massive expansion of federal criminal law into these traditional areas of state power. Such broad federal encroachment into state powers runs counter to the Tenth Amendment.[25]

"The Constitution created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const., amend. X.  The federal government does retain the ability to regulate states but only so long as the federal government is acting within the powers granted under the Constitution and Congress speaks clearly.  *See Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1476 (2018) ("The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms.").

One area primarily left to the states is that of criminal law.  *See United States v.*

---

[25] Defendants have standing to assert the Tenth Amendment violation here. *See Bond v. United States*, 564 U.S. 211, 220 (2011) ("The individual, in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines.").

56

1  *Lopez*, 514 U.S. 549, 566 (1995) ("The Constitution . . . withhold[s] from Congress a
2  plenary police power . . . .").  "The right to formulate and enforce penal sanctions is an
3  important aspect of the sovereignty retained by the States," *Kelly v. Robinson*, 479
4  U.S. 36, 47 (1986), and is "[p]erhaps the clearest example of traditional state authority .
5  . . ." *Bond*, 572 U.S. at 858.  *See also* The Federalist No. 17 (Alexander Hamilton)
6  ("There is one transcendent advantage belonging to the province of the State
7  governments . . . the ordinary administration of criminal and civil justice.").  When the
8  federal government does attempt to legislate in this area traditionally reserved to the
9  states, "it is incumbent upon the federal courts to be certain of Congress' intent before
10  finding that federal law overrides the usual constitutional balance of federal and state
11  powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citation omitted).  That
12  need is even more pronounced here where both issues of state criminal law and state
13  governance are at play.

14      Mindful of these issues, the Supreme Court in *McDonnell* relied in part on the
15  Tenth Amendment and the significant federalism implications of a broad reading of §
16  201 when it narrowed the definition of "official act."  136 S. Ct. at 2373.  In avoiding
17  the significant federalism concerns raised by an expansive reading of the term "official
18  act," the Court looked to *Gregory v. Ashcroft*, 501 U.S. 452 (1991).  *Id.*  In *Gregory*,
19  the Court was asked to decide whether the Missouri Constitution's mandatory
20  retirement age violated the federal Age Discrimination in Employment Act of 1967.
21  501 U.S. at 455.  The Court held that it did not.  *Id.*  The Court explained that the state
22  constitutional provision was "beyond an area traditionally regulated by the States; it is a
23  decision of the most fundamental sort for a sovereign entity."  *Id.* at 460. The decision
24  to determine the qualification of a state's government officials "lies at the heart of
25  representative government" and "is a power reserved to the States under the Tenth
26  Amendment . . . ."  *Id.* at 463 (citation omitted). *McDonnell* understood from *Gregory*
27  that the Tenth Amendment not only protected a state's decisions about the
28  qualifications of its officials but "includes the prerogative to regulate the permissible

57

scope of interactions between state officials and their constituents."  136 S.Ct. at 2373.

These issues of federalism are acutely felt here. The federal government cannot legislate in these traditional areas of state power – criminal law and state governance – without a clear directive from Congress.  *See United States v. Craig*, 528 F.2d 773, 779 (7th Cir. 1976) ("While it is within the province of the United States Attorney to prosecute local officials who violate federal law, the primary responsibility for ferreting out their political corruption must rest, until Congress directs otherwise, with the State, the political unit most directly involved.").  But the legislative history here supports the conclusion that Congress did not intend to regulate states' governance.

Congress's aim in enacting § 666 was to protect the integrity of federal funds. Specifically, Congress was attempting to fill two gaps that had been revealed in existing legislation.  First, under 18 U.S.C. § 641, which proscribed the theft of property "belonging to the United States," theft of money distributed under federal programs could not be prosecuted if title to the funds had either passed to another entity or had become so commingled with other assets that the "federal character" of the funds could not be shown.  *See* S.Rep. No. 98-225, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510-11.  Second, the existing federal bribery statute, 18 U.S.C. § 201, was inadequate to ensure the integrity of federal programs because individuals administering the funds but employed by other entities had been found not to be "[f]ederal officials" as required under that statute.  The purpose of enacting § 666 was to "protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery." *Id.* at 3511. But, Congress explained, "[t]he concept is not unlimited" – "not every federal contract or disbursement of funds would be covered" – the point of the statute was to protect federal funds aimed at achieving federal policy objectives. *Id.*

The Senate Report went on to list three specific cases § 666 was created to answer to – *United States v. Del Toro*, 513 F.2d 656 (2d Cir. 1975), *United States v. Hinton*, 683 F.2d 195 (7th Cir. 1982), *aff'd sub nom.*, *United States v. Dixon*, 465 U.S.

58

482 (1982), and *United States v. Mosley*, 659 F.2d 812 (7th Cir. 1981).  *See* S.Rep. No.
98–225, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510-11
("the intent to reach thefts and bribery in situations of the types involved in the Del
Toro, Hinton, and Mosley . . .").  Each of these cases posed the question of whether
administering federal funds made the defendant a "federal public official" within the
meaning of §201.  *See, e.g.*, *Del Toro*, 513 F.2d at 662 ("We do not believe that
Morales was acting 'under or by authority of any such department, agency or branch'
of the federal government. He was a city employee, carrying out a task delegated to
him by his superior, another city employee."); *Dixson*, 465 U.S. at 496 (explaining that
"[t]o determine whether any particular individual falls within [§201's] category, the
proper inquiry is not simply whether the person had signed a contract with the United
States or agreed to serve as the Government's agent, but rather whether the person
occupies a position of public trust with official federal responsibilities"); *Mosley*, 659
F.2d at 815 (holding that the defendant was "acting on behalf of the federal
government" within the meaning of § 201 where the defendant "was a 'state employee'
in the sense that he had been hired by the state, [but] his salary and the entire cost of the
program he administered were funded by the federal Government for federal
objectives"). By enacting § 666 Congress intended to make sure that state and local
officials could be held accountable when federal funds were stolen and not avoid
liability for pilfering federal funds simply because they were not federal "public
officials" pursuant to § 201.  *See Salinas*, 522 U.S. at 58 ("Congress enacted § 666 and
made it clear that federal law applies to bribes of the kind offered to the state and local
officials in *Del Toro*, as well as those at issue in *Mosley* and *Hinton*.").  The emphasis
was on protecting federal funds.  Senate Reports exemplar highlights that fact.  In
enacting § 666, Congress explained what it believed were its limits, "[f]or example, if a
government agency lawfully purchases more than $10,000 in equipment from a
supplier, it is not the intent of this section to make a theft of $5,000 or more from the
supplier a federal crime." S. REP. 98-225, 370, 1984 U.S.C.C.A.N. 3182, 3511.

59

Applying the hypothetical in the context of this case makes clear that Congress did not intend for § 666 to reach the facts here.  If, using the example, the government provides more than $10,000 in a grant to a state or city, it was not the intent of Congress to make a theft of $5,000 or more from that state or city a federal crime.  Yet, that is exactly the government's position.

The Supreme Court in *Salinas*, acknowledged this ambiguity.  The specific question before the Court there was whether "the federal bribery statute codified at 18 U.S.C. § 666 [was] limited to cases in which the bribe has a demonstrated effect upon federal funds?" 522 U.S. at 54. There, the defendant-petitioner was a deputy sheriff for Hidalgo County, Texas.  *Id.*  At some point prior to the illegal conduct, Hidalgo County and the United States Marshals Service entered into an agreement whereby the county would take custody of federal prisoners in exchange for a per diem payment for each federal prisoner housed and a federal grant to Hidalgo County to improve its jails.  *Id.* The bribe in question concerned a federal prisoner who paid defendant-petitioner for contact visits with his wife.  *Id.* at 55.  The Court rejected defendant-petitioner's contention that federal funds must be affected to violate § 666(a)(1)(B) and held that "as a matter of statutory construction, § 666(a)(1)(B) does not require the Government to prove the bribe in question had any particular influence on federal funds and that under this construction the statute is constitutional as applied in this case." *Id.* at 61.  It expressly declined to answer "whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds," reasoning that whatever connection may be required, a bribe from a federal prisoner meant to influence his housing under a federal contract and paid by federal funds met whatever nexus the statute might require.  *Id.* at 59.

The issue of the connection between the bribe and the federal funds is not so easily dealt with here.  Counts 22 through 30 allege that Huizar and Chan took or received things of value intending to be influenced on motions, resolutions, votes, and "taking action[s]" in various City committees, "exerting pressure on other City officials

60

to influence the approval process" of various development projects, and scheduling projects to be heard in a committee. None of this conduct involves any connection to federal funds, much less the close nexus at issue in *Salinas*. *See also United States v. Bynum*, 327 F.3d 986, 991-92 (9th Cir. 2003) (acknowledging the open question left in *Salinas* but holding that if a "federal nexus . . . is required" it was satisfied where the defendant was convicted of aiding and abetting co-defendant of stealing more than $5,000 from Honolulu's general fund, which contained more than $898,224 in federal funds, and the co-defendant was a councilmember who voted on disbursement of those funds). The questions side-stepped in *Salinas* remain: does the statute require a connection between the federal funds and the illegally taken or procured thing of value? If so, what kind and how close of a connection? The import of these questions rests on what level of intrusion into state affairs did Congress intend in the promulgation of § 666. *Cf. Salinas*, 522 U.S. at 53 (explaining that § 666's "application to petitioner did not extend federal power beyond its proper bounds").

Even the Department of Justice recognizes this continued ambiguity. The Department of Justice's Resource Manual explains that "[t]he broad language of 18 U.S.C. §§ 666(a)(1)(A) and its legislative history raise a significant issue regarding the scope of the statute. The primary issue is whether the statute prohibits only the illegal taking of Federal program funds or property acquired with Federal funds or whether the statute prohibits the illegal taking of any funds or property of an organization or of a state or local government agency that receives Federal assistance." Dep't of Justice Manual, Title 9-1637§ 1001, The Scope of 18 U.S.C. § 666 (4th ed. 2021-3 Supp.). The federal government's acknowledgment of this significant ambiguity makes its extremely broad application in this case to actions that do not themselves implicate the theft of federal funds a harbinger of continued prosecutorial excesses. *Cf. Sorich v. United States*, 555 U.S. 1308, 1320 (2009) (Scalia, J., dissenting on denial of cert) ("Without some coherent limiting principle to define what 'the intangible right of honest services' is, whence it derives, and how it is violated, this expansive phrase

invites abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct.").

"A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.'" *McDonnell*, 136 S. Ct. at 2373 (quoting *Gregory*, 501 U.S. at 460). The vague text of § 666 implicates the traditional spheres of criminal law and public governance and in this case overrides the state's "ability to regulate the scope of interactions between local officials and their constituents." *Id.* Not only that, but § 666's vagueness as to what, if any connection, is required between the federal funds and the alleged "thing of value" stolen, applied in this context, violates the Tenth Amendment's reservation of power to the states and encroaches on state sovereignty. The driving purpose of §666 was to protect "federal funds," not merely to expand federal jurisdiction to the theft of anything of value from a city or state that receives federal funds. There is no reconciling the expansive nature of § 666's text and application in this case with the Tenth Amendment. This Court should dismiss Counts 22-30 as an unconstitutional violation of the Tenth Amendment as applied in this case.

**2.  The reference to generic "bribery" in the RICO, Travel Act, and money-laundering statutes is unconstitutionally vague, and the mode of defining and expanding the element-less label through post-hoc judicial creation violates the separation of powers and Due Process clause.**

The state-law predicates charged in the RICO, Travel Act, and money-laundering counts all depend on statutory prohibitions against undefined "bribery" indictable under state law. *See* 18 U.S.C. § 1961(1) ("bribery . . . chargeable under [s]tate law"); 18 U.S.C.A. § 1952(b) ("bribery . . . in violation of the laws of the State in which committed"); 18 U.S.C. § 1956(c)(7)(A) (incorporating RICO prohibition). As discussed above, determining what conduct violates these prohibitions requires first ascertaining the generic federal definition of bribery at the time of enactment – which entails a retrospective, nationwide analysis of bribery law – then determining which of

thousands of potential statutes, as interpreted, fall within or without that definition.  *See* Section III.C., *supra*.  While this is a difficult task for most lawyers, it makes it virtually impossible for a person of ordinary intelligence to read the law and know what conduct is proscribed.  Indeed, even today, controlling authorities have not articulated a comprehensive generic definition of bribery for RICO or the Travel Act, and the Ninth Circuit's decision in *Chi* – which, in addressing foreign-official bribery under the money-laundering statutes, noted that the question had "never [before been] resolved" – did not arrive until after the conduct in this case ended.  *See Chi*, 936 F.3d at 894.

The idea that a person of ordinary intelligence should be expected to read the word "bribery," know that it means the generic federal definition of bribery according to an analysis of decades-old secondary sources and a possible 50-state survey, predict correctly what that analysis entails, and then know which state laws qualify, is not realistic and does not provide sufficient notice of the crime.  Indeed, this is uniquely true in the case of bribery because, as the Ninth Circuit stated in *Chi*, even the unitary body of federal law is so complex that three Ninth Circuit judges could not identify a single federal law – among many statutes and rules with different elements – that it could fairly describe the one as criminalizing "bribery of a public official."  *Id.* at 896 ("[E]ven if 'bribery of a public official' were interpreted as a reference to a specific federal statute, it is not clear to which statute it would refer").  The lack of clarity is particularly problematic because, unlike murder or robbery, for which the lines are intuitively clear, the divisions between First Amendment-protected activity, permissible politics, and public-official bribery is poorly-defined.  And, as discussed, official-bribery prosecutions are ringed on all sides by pressing Constitutional concerns.

Public officials and ordinary citizens should not need an appellate clerkship or a crystal ball to know what the law prohibits in an area of significant Constitutional sensitivity.  But, with little exaggeration, that is what the generic references to "bribery" – an element-less label to be defined later – require.  The statutes are thus unconstitutionally vague in their references to generic "bribery."  *Coates v. City of*

63

*Cincinnati*, 402 U.S. 611, 614 (1971) (declaring ordinance unconstitutionally vague where, rather than "requir[ing] a person to conform his conduct to an imprecise but comprehensible normative standard," no "standard of conduct [was] specified at all," leaving "men of common intelligence [to] necessarily guess at its meaning"); *Information Providers' Coalition*, 928 F.2d at 874 (additional clarity is required "when criminal sanctions are at issue or when the statute abut[s] upon sensitive areas of basic First Amendment freedoms.").

Moreover, the entire mode of defining the crime through a post-hoc categorical analysis – particularly where that analysis *expands* bribery beyond the narrowest core – violates the separation of powers and the Due Process clause.  For that reason, too, the "bribery" references should be deemed unconstitutional.  *Skilling*, 561 U.S. at 415 (Scalia, J., concurring) (explaining that courts have no "power to define new federal crimes") (citing *United States v. Hudson,* 7 Cranch 32, 34 (1812)); *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 490 (2001) ("[U]nder our constitutional system . . . federal crimes are defined by statute rather than by common law"); *United States v. Reese*, 92 U.S. 214, 221 (1875) (explaining that the Constitutional separation of powers prohibits "the legislature [from setting] a net large enough to catch all possible offenders, and leav[ing] it to the courts to step inside and say who could be rightfully detained"); *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (explaining that unforeseeable, post-enactment judicial enlargements of vague criminal statutes violate the Due Process clause for *ex post facto*-like reasons).  At a minimum – and especially in federal prosecutions involving state or local officials – the absence of clear statutory text requires that generic bribery be given the narrowest possible construction.  *Crandon v. United States*, 494 U.S. 152, 158 (1990) (explaining that the rule of lenity "serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability"); *United States v. Sherbondy*, 865 F.2d 996, 1009 (9th Cir. 1988) ("Where the language of a penal statute admits of more than one interpretation, courts should choose the least

64

1   harsh construction" as it is "least likely to impose penalties Congress did not intend").

2   **3.   The honest-services statute is unconstitutionally vague on its face, the Hobbs Act does not apply to bribery, and both the honest-services statute and the Hobbs Act are unconstitutionally vague as applied.**

4   While this Court is bound to apply *Skilling* as decided, the honest-services statute

5   should be overruled as unconstitutionally vague.  The Hobbs Act should also be held

6   not to apply to official bribery.  *See Silver v. United States*, 141 S.Ct. 656 (2021)

7   (Gorsuch, J., dissenting from denial of certiorari) (noting that Chief Justice Rehnquist

8   and Justices Scalia, Thomas, and Breyer have all questioned the propriety of treating

9   bribery as Hobbs Act extortion).  At the very least, the honest-services statute and

10  Hobbs Act should be found unconstitutional as applied insofar as the government seeks

11  to convict Huizar, Chan, and SZNW of corruption not involving *quid pro quo* bribery.

12  **4.   Unless subjected to the *McDonnell* limits, California's bribery statutes are unconstitutional when incorporated into federal law.**

13  In *McDonnell*, the Supreme Court avoided a facial challenge to the honest-

14  services and Hobbs Act statutes by accepting the parties' agreement to incorporate §

15  201, then construing § 201 narrowly to avoid "significant constitutional concerns."  136

16  S.Ct. at 2372, 2375.  For the RICO, Travel Act, and money-laundering counts, the

17  government seeks to do the opposite: incorporate through generic references to

18  "bribery" capacious state statutes that reach broader than the careful limits imposed by

19  *McDonnell*.  *See* Section III.C, III.E.2, *supra*.  In so doing, the government seeks to

20  subject Huizar, Chan, and SZNW to serious *federal* punishment under *federal* law for

21  conduct that the logic of *McDonnell* deems off limits.

22  But *McDonnell*, like its forerunners, was not a pleading case that the government

23  can end run simply by finding another vague federal statute and continuing unabated.

24  When incorporated into federal law, the California bribery predicates referenced in the

25  RICO, Travel Act, and money-laundering counts raise the same concerns as § 201.  To

26  that end, unless limited as in *McDonnell*, they are unconstitutional as applied.  *See*

27  *McDonnell*, 136 S.Ct. at 2372 (construing § 201 narrowly to avoid "significant

28

65

constitutional concerns"); *id.* at 2375 (where parties limited broad statutory language by incorporating a narrower statute, and the Supreme Court further narrowed the narrowing statute by imposing additional limits, rejecting facial challenge to honest-services statute and Hobbs Act "under the facts").

## IV. <u>CONCLUSION</u>

For the reasons above, the Court should grant the motion.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: September 7, 2021

/s/ *Charles J. Snyder*

Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Jose Huizar

[And on Behalf of Defendants Ray Chan and Shen Zhen New World I, LLC]