Richard M. Steingard (SBN 106374)
*rsteingard@SteingardLaw.com*
LAW OFFICES OF RICHARD M. STEINGARD
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone:  (213) 260-9449
Facsimile:   (213) 260-9450

Attorney for Defendant
Shen Zhen New World I, LLC

[And on Behalf of Defendant Jose Huizar]

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS HUIZAR, ET AL.,<br><br>Defendants. | CR-20-326(A)-JFW<br><br>**NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE, DISMISS COUNTS, AND STRIKE ALLEGATIONS DUE TO GOVERNMENT'S VIOLATIONS OF ATTORNEY-CLIENT PRIVILEGE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL; EXHIBITS**<br><br>**Hearing Date: January 31, 2022**<br>**Hearing Time: 8:00 a.m.** |

**TO:  ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 31, 2022, at 8:00 a.m., or as soon thereafter as the matter may be heard, defendants Shen Zhen New World I, LLC ("SZNW") and Jose Huizar will move this Honorable Court to suppress all evidence concerning the government's improper review of attorney-client

communications and all evidence and testimony derived therefrom, and to dismiss the counts in the First Superseding Indictment, and strike all allegations, relating to the 2014 collateral and loan transactions alleged between Jose Huizar, Wei Huang, and SZNW.

This Motion is based on the attached Memorandum of Points and Authorities, declaration of counsel, exhibits, all pleadings and files in this matter, and such evidence and argument as may presented at the hearing on this motion.

Respectfully submitted,
**LAW OFFICES OF RICHARD M. STEINGARD**

Dated: November 15, 2021   By:  /s/ Richard M. Steingard

Richard M. Steingard
Attorney for Defendant
**SHEN ZHEN NEW WORLD I, LLC**

**OFFICE OF THE FEDERAL PUBLIC DEFENDER
CUAUHTEMOC ORTEGA**

Dated: November 15, 2021   By:  /s/

Carel Ale
Charles Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Defendant
**JOSE HUIZAR**

LAW
OFFICES OF
RICHARD M.
STEINGARD

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................1

II.    STATEMENT OF RELEVANT FACTS .................................................3
       A.    The Godoy Lawsuit, the Retention of Counsel,
             and the Collateral and Loan Transactions .................................3
       B.    The Government's Review of Attorney-Client
             Privileged Emails.........................................................................6
             1.  The July 2016 Applications to Obtain Emails .................6
             2.  The February 2017 Applications to Obtain
                 Additional Emails ............................................................7
             3.  Subsequent Warrant Applications ....................................8
       C.    The Government Interviewed Cooperating Witnesses
             About the Collateral and Loan Transactions.............................9
       D.    The Government Interviewed Guodi Sun and Henry Yong ...............11
             1.  Guodi Sun .......................................................................12
             2.  Henry Yong .....................................................................13

III.   ARGUMENT ........................................................................................13
       A.    The Attorney-Client Privilege ...................................................13
       B.    Communications Between Huang, Huizar, Their Agents,
             and their Joint Counsel Are Privileged .....................................15
       C.    Huang/SZNW and Huizar Did Not Waive Privilege
             by Involving Their Agents.........................................................17
       D.    The Appropriate Remedy is Suppression of the Evidence
             and Dismissal of Counts ...........................................................18

IV.    CONCLUSION .....................................................................................22

LAW
OFFICES OF
RICHARD M.
STEINGARD

# TABLE OF AUTHORITIES

**<u>FEDERAL CASES</u>**

*Admiral Ins. Co. v. U.S. Dist. Court,*
    881 F.2d 1486 (9th Cir. 1989) .........................................................................14

*Baylor v. Mitchell Rubenstein & Assocs. P.C.,*
    857 F.3d 939 (D.C. Cir. 2017)........................................................................18

*Commodity Futures Trading Comm'n v. Weintraub,*
    471 U.S. 343 (1985)........................................................................................14

*F.D.I.C. v. Ogden Corp.,*
    202 F.3d 454 (1st Cir. 2000) ..........................................................................16

*Griffith v. Davis,*
    161 F.R.D. 687 (C.D. Cal. 1995)....................................................................16

*Hicks v. Bush,*
    452 F. Supp. 2d 88 (D.D.C 2006) ..................................................................20

*In re Grand Jury Subpoenas,*
    454 F.3d 511 (6th Cir. 2006) ..........................................................................13

*In re Hotels Nevada, LLC,*
    458 B.R. 560 (Bankr. D. Nev. 2011) ..............................................................15

*In re Search Warrant Issued June 13, 2019,*
    942 F.3d. 159 (4th Cir. 2019) ........................................................................20

*In re Teleglobe Commc'ns Corp.,*
    493 F.3d 345 (3rd Cir. 2007) ........................................................................16

*Kastigar v. United States,*
    406 U.S. 441 (1972) ......................................................................................22

*KD ex rel. Dieffenbach v. United States,*
    715 F. Supp. 2d 587 (D. Del. 2010)................................................................15

LAW
OFFICES OF
RICHARD M.
STEINGARD

iv

*Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974,*
    406 F. Supp. 381 (S.D.N.Y. 1975) ...............................................................15

*Sky Valley Ltd. Partnership v. ATX Sky Valley, Ltd.,*
    150 F.R.D. 648 (N.D. Cal. 1993)..................................................................16

*Swidler & Berlin v. United States,*
    524 U.S. 399 (1998) .......................................................................................13

*United States v. BDO Seidman, LLP,*
    492 F.3d 806 (7th Cir. 2007) .......................................................................15

*United States v. Castro,*
    2020 WL 241112 (E.D. Mich. 2020) ..........................................................20

*United States v. Ceccolini,*
    435 U.S. 268 (1978) .......................................................................................19

*United States v. Chen,*
    99 F.3d 1495 (9th Cir. 1996) ................................................................14, 18

*United States v. Danielson,*
    325 F.3d 1054 (9th Cir. 2003) .....................................................................21

*United States v. Elbaz,*
    396 F. Supp. 3d 583 (D. Md. 2019) ............................................................18

*United States v. Graf,*
    610 F.3d 1148 (9th Cir. 2010) .....................................................................14

*United States v. Haynes,*
    216 F.3d 789 (9th Cir. 2000) .......................................................................18

*United States v. Kaplan,*
    2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ............................................20

*United States v. Marshank,*
    777 F. Supp. 1507 (N.D. Cal. 1991) ...........................................................19

*United States v. Neill,*
  952 F. Supp. 834 (D.D.C. 1997) .................................................................18

*United States v. Patel,*
  2017 WL 3394607 (S.D.N.Y. 2017).......................................................1, 18

*United States v. Patzer,*
  277 F.3d 1080 (9th Cir. 2002) ...............................................................19

*United States v. Ramirez-Sandoval,*
  872 F.2d 1392 (9th Cir. 1989) ...............................................................19

*United States v. Rebalcava-Montoya,*
  597 F.2d 140 (9th Cir. 1978) .................................................................19

*United States v. Ruehle,*
  583 F.3d 600 (9th Cir. 2009) .................................................................15

*United States v. SDI Future Health, Inc.,*
  464 F. Supp. 2d (D. Nev. 2007) .......................................................18-19

*Upjohn Co. v. United States,*
  449 U.S. 383 (1981)...................................................................13-14, 19

*Wong Sun v. United States,*
  371 U.S. 471 (1963) .............................................................................19

## STATE CASES

*City & Cnty. of San Francisco v. Superior Court,*
  37 Cal.2d 227 (1951) ...........................................................................17

*In re Dupont Estate,*
  60 Cal.App. 2d 276 (1943) ...................................................................14

## MISCELLANEOUS AUTHORITIES

McCormick on Evid. § 91.1 (8th ed.) ......................................................16

Restatement (Second) of Agency § 395 .................................................18

LAW
OFFICES OF
RICHARD M.
STEINGARD

The New Wigmore: A Treatise on Evidence:
Evidentiary Privileges, § 6.8.1 ...................................................................17

LAW
OFFICES OF
RICHARD M.
STEINGARD

## INDEX OF EXHIBITS

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| A | FD-302 for Ricky Zheng interview, Feb. 21, 2019 | 4:4 |
| B | FD-302 for George Esparza interview, June 6, 2019 | 4:6/10/11, 5:4, 7:12, 11:21, 17:10 |
| C | FD-302 for Henry Yong interview, Oct. 1, 2019 | 4:17, 6:4, 13:3 |
| D | Application for Search Warrant for Jose Huizar's Emails, July 1, 2016 | 6:15 |
| E | Application for Search Warrant for George Esparza's Emails, July 21, 2016 | 6:16 |
| F | Application for Search Warrant for Jose Huizar's Emails, Feb. 15, 2017 | 7:17, 8:3 |
| G | Application for Search Warrant for George Esparza's & Ricky Zheng's Emails, Feb. 15, 2016 | 7:17 |
| H | Affidavit in Support of an Application for Authorization to Intercept Wire and Electronic Communications Over Target Phones 1, 2 | 8:27, 21:26 |
| I | Transcript of Ricky Zheng interview, Nov. 11, 2018 | 10:21 |
| J | Transcript of Ricky Zheng interview, Feb. 21, 2019 | 11:8 |
| K | FD-302 for Ricky Zheng interview, Apr. 8, 2019 | 4:12, 11:12 |
| L | FD-302 for Guodi Sun interview, Sep. 23, 2019 | 12:9, 17:10 |
| M | Spreadsheet of Yong, Huizar & Sun Emails | 8:12 |
| N | Application for an Order Authorizing Interception of Wire & Electronic Communications | 9:5 |

LAW
OFFICES OF
RICHARD M.
STEINGARD

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

This motion addresses the government's unauthorized and improper review of privileged and confidential email messages and related privileged communications between the defendants and their attorneys.  The law is clear: "Indisputably, when the Government obtains access to a defendant's email account, the Government is not entitled to rely on privileged materials contained therein." *United States v. Patel*, 2017 WL 3394607, *6 (S.D.N.Y. 2017).  Yet that is precisely what occurred here.

In June of 2014, in the run up to a contested reelection, Jose Huizar was sued by a former employee, Francine Godoy.  Amid this litigation, Huizar sought a private loan to obtain funds for a possible confidential settlement of the lawsuit.  A friend, Wei Huang, who was the owner of Shen Zhen New World I, LLC ("SZNW"), agreed to extend a loan to Huizar.  Huang instructed Ricky Zheng, SZNW's then-Executive Director, to retain an attorney to legally and properly effectuate the loan.  As directed, Zheng hired Attorney Henry Yong to counsel the parties and prepare the necessary paperwork to lawfully document the loan.  Yong brought in co-counsel, Attorney Guodi Sun, to assist him.

Because Huang largely resided in China, Zheng and another SZNW employee named Yan Yan served as his agents to work with the attorneys on the loan.  Huizar, an elected official with innumerable obligations and a busy schedule, relied on his Special Assistant, George Esparza, who was also a member of his campaign staff, to serve as his agent with the attorneys.  Attorney Yong primarily communicated with Huizar, Esparza, and/or Huang/SZNW (via Zheng) through emails, keeping them abreast of his actions and progress and sending them drafts of promissory notes and other documents.  In turn, Huizar, Esparza, and/or Huang/SZNW (through Zheng) emailed Attorney Yong about various issues

LAW
OFFICES OF
RICHARD M.
STEINGARD

related to the loan, including proposed changes to the draft promissory notes, feedback on the collateral for the loan, and the timetable for completion of the loan.  In or about August 2014, Huang/SZNW caused the funds serving as collateral to be wired into Attorney Sun's attorney-trust account.  The loan was executed shortly thereafter.

Two years later, during the government's bribery investigation of Huizar, the government obtained warrants for Huizar's and Esparza's email carriers to produce their respective email records.  The companies complied; the produced emails included the confidential and privileged communications between Attorney Yong, Huizar, Esparza, and Zheng.  The government bypassed any privileged "taint team's" review and, instead, reviewed the emails. The government thereafter obtained additional warrants for Zheng's emails.  Aware that these emails would include communications with Attorney Yong, the government again disregarded any "taint team" procedures and reviewed the privileged communications.

The privileged emails contained a documentary history of Huang/SZNW and Huizar, either individually or through their agents, seeking and receiving legal advice on how to structure and effectuate the collateral and loan transactions.  With privileged emails in hand, the government interviewed Esparza, Zheng, Yan Yan, *and even* Attorneys Yong and Sun about their participation in the transactions, including their many privileged communications and interactions, and obtained the attorneys' case files and other privileged documents.  During the witness and attorney interviews, the interviewees all confirmed that attorneys were hired to legally process the transactions.  Relying on the emails and witnesses' narratives, the government included allegations about the collateral and loan transactions in the charged RICO conspiracy (Huizar), honest services fraud (Huizar and SZNW), and federal program bribery (Huizar and SZNW) counts.

In short, the government disregarded the inviolability of the attorney-client privilege in its zeal to build a case against Huizar, Wei Huang, SZNW and others.

The government's indifference to the privilege – which neither the defendants' agents nor the attorneys were authorized to waive – was flagrant, intentional, and indefensible.  Accordingly, defendants Huizar and SZNW move to suppress all privileged communications, evidence, statements, and potential testimony, as well as all derivative evidence, concerning the government's review of privileged materials and acquisition of privileged communications.  Further, because the privileged emails are the foundation for the charges and allegations focusing on the collateral and loan transactions, defendants ask that Counts 2, 22, 23, 37, and 41 be dismissed and Count 1, Overt Acts ("OA") 31, 32, 34, 36, 38, and 40 through 43 be stricken.[1]

## II.

## STATEMENT OF RELEVANT FACTS

### A. The Godoy Lawsuit, the Retention of Counsel, and the Collateral and Loan Transactions

In or about 2013, Francine Godoy, a former employee of Los Angeles City Councilmember Jose Huizar, filed a lawsuit against Huizar.  (FSI, Count 1, OA 25.)  Huizar, who was running for re-election, denied the allegations but came to believe that it was politically advantageous to settle the matter with Godoy.  After consulting with an attorney specializing in election law, Huizar determined that obtaining a private loan was the best way to resolve the Godoy lawsuit confidentially.

In mid-2014, Huizar asked Wei Huang for a loan.  (FSI, Count 1, OA 26 & 30.)  Huang is a wealthy businessman who resides in China and owns SZNW and

---

[1]     Defendants have previously moved to dismiss Count 2 and the allegation in Counts 22 and 23 concerning the collateral and loan transactions because the alleged misconduct occurred outside the statute of limitations and is therefore time barred, and because Counts 22 and 23 are duplicitous.  (ECF 235.)

two hotels in the Los Angeles area, including the L.A. Grand Hotel. (*Id.* at ¶ 17.)[2]
Huang agreed to loan Huizar the funds necessary to settle the Godoy lawsuit and
instructed SZNW's Executive Director, Ricky Zheng, to retain an attorney to
prepare the appropriate documents. (*Id.* at ¶ 19, Ex. A (Zheng 2/21/2019 302) at
4.)[3]  Acting on Huang's instructions, Zheng sought counsel and was referred to
attorney Hock Loon Yong, also known as Henry Yong. (Ex. B (Esparza 6/6/2019
302) at 6.)

       In or about July 2014, Attorney Yong met with Huizar, Esparza (acting on
Huizar's behalf), and Zheng (acting on Huang and SZNW's behalf) about his
possible retention. (Ex. B (Esparza 6/6/2019 302) at 6.)  Huizar and Huang/SZNW
(through Zheng) decided to retain Yong at the recommendation of Zheng. (Ex. B
(Esparza 6/6/2019 302) at 6; Ex. K (Zheng 4/8/2019 302).)

       Yong was retained to counsel Huang/SZNW and Huizar on how to
accomplish the loan and drafting and executing the necessary paperwork to
effectuate the financial transactions. (FSI, Count 1, OA 31.)  Because Yong was
not licensed in California, he brought in another attorney, Guodi Sun, as co-
counsel. (Ex. C (10/1/2019 Yong 302) at 3.)[4]

---

[2]    For purposes of attaching corporate criminal liability, the government claims
that Huang was the agent for SZNW (ECF 228 at 2, n.2) ("Huang was the
Chairman and agent of SZNW"). The government has charged both Huang and
SZNW in Counts 2 (honest services fraud) and 23 (federal program bribery) in
connection to the collateral and loan transactions.

[3]    Because many of the exhibits have been designated as Confidential under
the Protective Order, all exhibits are being submitted under seal
contemporaneously with the filing of this motion.

[4]    Yong was admitted to the New York Bar in 2000 and to the California Bar
in 2003.  In 2008, the California Bar suspended his license and in 2009, ordered
him disbarred. http://members.calbar.ca.gov/fal/Licensee/Detail/225497.
https://iapps.courts.state.ny.us/attorneyservices/wicket/page?2.  Sun was admitted

LAW
OFFICES OF
RICHARD M.
STEINGARD

Huang was in China during most of the relevant events and had his agents, Zheng and another SZNW employee, Yan Yan, interact with Yong on Huang's behalf.  Huizar, largely relied on his Special Assistant, George Esparza, to act as his agent and communicate with Yong on Huizar's behalf.  (*See generally* Ex. B (Esparza 6/6/2019 302) at 10 (describing Esparza as Huizar's "middle man, he did what HUIZAR asked him to do")).  Yong prepared multiple retention letters, listing, at various times, the borrower (Huizar) or the lender (Huang/SZNW) as the client.  (Snyder Decl. ¶ 5.)[5]

Between June and September 2014, Zheng (on Huang/SZNW's behalf), Huizar, and Esparza (on Huizar's behalf) communicated with Attorney Yong in person, over the phone, by email, and through text messages concerning the collateral and loan transactions.  (*See e.g.*, FSI, Count 1, OAs 31-32, 34, 36, 40-43.)  With limited exceptions,[6] their communications all fell within the scope of the attorney-client privileges.  For example, many email messages included Yong's proposals about how to effectuate the transactions, Huizar's concerns about public filings, roundtable discussions about the terms for the loan, reviews of drafts for a promissory note, efforts to find a suitable bank to process the loan in the necessary time frame, and a slew of other matters.  In addition, Yong prepared numerous documents (*e.g.*, promissory notes, joint venture agreements, notary acknowledgements), and performed other professionally related tasks within the

---

to the California Bar in 2009 and remains a member of the bar in good standing. http://members.calbar.ca.gov/fal/Licensee/Detail/266538.

[5]     Ultimately, one of Huang's agents, Yan Yan, signed the retainer agreement on behalf of the company that provided the funds for the collateral to support the loan.  (*Id.*)

[6]     A few of the communications were simply logistical in nature, *e.g.*, deciding where or when to talk or meet.

LAW
OFFICES OF
RICHARD M.
STEINGARD

scope of his employment.  (Snyder Decl. ¶ 5.)  Hence, throughout this process, Yong jointly addressed both Huang and Huizar's concerns.  The emails also show that once the collateral and loan transactions were arranged, the attorneys used their attorney-trust account to receive and transfer funds.  (Ex. C (10/1/2019 Yong 302) at 3.)

To assist the Court, we have created a spreadsheet of the many emails in chronological order.  (Exhibit M (Chart of Privileged Emails).)  The chart identifies the date of the email, the sender, the intended recipient, anyone copied on the message, whether it contained an attachment, and the nature of any attachment.  (*Id.*)

**B.** **The Government's Review of Attorney-Client Privileged Emails**

1.   The July 2016 Applications to Obtain Emails

Two years after Huizar obtained his loan, the government obtained warrants for Google and Yahoo to produce the records for Huizar's and Esparza's email accounts as part of its bribery investigation.  (Ex. D (7/1/2016 Warrant Application for Huizar's Yahoo Account); Ex. E (7/21/2016 Warrant Application for Esparza's Google Account).)  The warrant applications, dated July 1 and 21, 2016, contained identical accounts of information that the government had uncovered to date.  (*Id.*) The applications did not mention the Huizar-Huang collateral and loan transactions, presumably because the government was not yet aware of these events.

The warrants were authorized, and the materials produced.  As noted above, Huizar's and Esparza's email records contained numerous privileged emails between Attorney Yong, Huizar, Esparza, and Zheng.  According to the government, the case agent reviewed the emails, purportedly looking to filter out those that might contain attorney-client privileged information to provide to a "taint" agent or prosecutor, or both. (Snyder Decl. ¶ 4.)  Per the government, with respect to the emails involving or related to Attorney Yong, the agent did not

1  identify any as being potentially privileged and, instead, passed them on to the
2  investigating prosecutors. (*Id*).

3      Importantly, there is no doubt that the government knew or should have
4  known that the attorneys-clients-agents emails were attorney-client privileged
5  communications. For example, Attorney Yong's email address is
6  "esqimmigrationlaw@gmail.com," an obvious "tip" that the messages involved an
7  attorney. Additionally, the emails included several draft retainer agreements
8  entitled "Attorney Fee Agreement," for Yong and Sun's legal services. The emails
9  themselves - *which the agent read* - contained Esparza's reference to Yong as "the
10 attorney," Yong's references to an "attorney-trust account," and Yong's reminder
11 to his clients/agents that the "attorney-client privilege will preclude us from
12 revealing this document to anyone." (*See generally* Ex. B (Esparza 6/6/2019 302)
13 at 5–17 (discussing privileged emails).)

14      2.    The February 2017 Applications to Obtain Additional Emails
15      In February 2017, the government sought a *second* set of warrants for
16 emails, one for Huizar's emails and another for Esparza's and Zheng's emails.
17 (Ex. F (2/15/2017 Warrant Application for Huizar's Yahoo Account); Ex. G
18 (2/15/2017 Warrant Application for Esparza & Zheng's Google Accounts).) The
19 government submitted identical supporting affidavits, authored by the same agent
20 who reviewed these privileged emails. The agent included a factual accounting of
21 the just-discovered collateral and loan transactions, derived solely from the
22 privileged and confidential emails between the attorneys-clients-agents. Yet, in
23 recounting these events, the agent intentionally omitted Attorney Yong's name,
24 role, and involvement in the transactions, even though virtually every email was to
25 or from him.

26      As an example of the government's concealment, the agent's affidavit
27 quoted one of Huizar's emails as follows:

28

On August 17, 2014, *Huizar emailed Esparza and Zheng* stating, "plaintiff attorney is asking for a deadline of Tuesday noon to sign settlement. Otherwise they pull the settlement offer. Let me know as soon as money has been transferred and available." (Ex. F (2/15/2017 Warrant Application for Huizar's Yahoo Account) at 53 (emphasis added).)

In fact, as the agent well knew, Huizar had not "emailed Esparza and Zheng"—Huizar had emailed *Attorney Yong.* Zheng was included as a second recipient and Esparza was "cc'ed" on the email, but they were not Huizar's primary recipient; that was Attorney Yong, who Huizar was asking to advise him when the "money has been transferred" into the attorney-trust account because Huizar "just need[ed] to know it is there before we sign" the promissory note. Attorney Yong was the only individual to receive the email—directly, cc'd, or otherwise—not identified in the case agent's affidavit. (*See* Ex. M (Chart of Privileged Emails) at 14.)

 After receiving and reviewing Zheng's emails, including those with Attorney Yong, the agent again did not flag any as being potentially privileged or provide them to a "taint" attorney or agent. Instead, he passed them on to the prosecutors.

### 3.   Subsequent Warrant Applications

Thereafter, the government continued to rely on Yong's emails to obtain additional warrants, consistently concealing the attorney's role. For instance, on April 13, 2017, the government submitted a Title III application to this Court seeking a wiretap on Huizar's and Esparza's phones. The agent's application noted:

On July 1, 2016, July 21, 2016 and February 15, 2017, I obtained a search warrant of the personal email accounts for Huizar, Esparza and Zheng… [which]… provided information related to further payments received by Huizar indirectly from Huang and Zheng, specifically the $600,000 Godoy settlement payment." (Ex. H (4/17/2019 Title III Application) at ¶ 138.)

The balance of the affidavit contained the same information about the loan that was included in the government's earlier warrant applications for emails. As before, the government concealed any reference to Attorney Yong's involvement in the loan process. A subsequent wiretap application contained the same descriptions of Yong's emails without acknowledging his involvement. (Ex. N (6/3/2017 Title III Application) at ¶ 56.)

Besides the wiretaps, the government also included information about the collateral and loan transactions – obtained from the attorney-client privileged emails – to secure a GPS tracking device on Esparza's car; cell site and GPS information about Huizar's, Esparza's, and Zheng's phones; and records from Google, Yahoo, and Apple for Huizar's, Esparza's, Zheng's, and George Chiang's accounts. The applications for these warrants never mentioned Attorney Yong or revealed that the information about the collateral and loan transactions was based on attorney-client confidential and privileged materials.

## C. **The Government Interviewed Cooperating Witnesses About the Collateral and Loan Transactions**

Now knowledgeable about the collateral and loan transactions and equipped with the many privileged emails, beginning in January 2018, the agents conducted interviews with George Esparza (November 13, 2018; January 15, 2019, June 6, 2019), Yan Yan (November 18, 2018) and Ricky Zheng (November 19, 2018, February 21, 2019, April 8, 2019.) The agents and prosecutors questioned these cooperating witnesses (and putative defendants) about the collateral and loan transactions based on information the agents derived from those emails. For instance, when interviewing Zheng on November 19, 2018, the agents repeatedly asked him about the details of the loan and ignored his repeated assertions, through an interpreter, that the transactions had been handled by an attorney:

//

//



Q:  Did Chairman provide money to the bank to pay that loan?

A:  It's been a long time. Chairman Huang deposited the amount of money. No, it wasn't him, it was some company made a deposit to the bank. The company deposited money into the bank. He said something about a business contract where a company provided a collateral to the bank, and then... He said that he forgot, but that he remembered that there was a contract. *A lawyer had a contract* that he forgot now, it's been a long time. So, the money was put in the bank as collateral, and then the money was loaned to Jose.

\*\*\*

Q:  Was Ricky involved in orchestrating or putting any of that together?

A:  Sometimes they will have him solve, deal with these problems. *And that he had a lawyer.* He doesn't know.

Q:  Did he coordinate or work with George Esparza to get this loan for Jose?

A:  He did help George in the past, but he didn't know this was going to happen. He did in the past. He knew that Jose was a government official, and Chairman Huang knew that, so *everything went through the bank and went through the lawyer.* Yeah.

\*\*\*

Q:  Who else was involved in setting up this loan, or arrangement?

A:  *It was the lawyer.*

Q:  Anyone else?

A:  As far as he knows, nobody else.

(Ex. I (Excerpts of 11/19/18 Zheng Interview) (emphasis added).)

On February 21, 2019, the agents re-interviewed Ricky Zheng, again questioning him about the loan.  Zheng yet again responded that an attorney had handled the matter for them:

Q:  But your boss told you he had promised already to Jose that he would help him?
A:  Yes. And he asked Ricky what he should do.  *So, I told my boss that, "If you want to loan him, you get an attorney, and then do a contract agreement."*

LAW OFFICES OF RICHARD M. STEINGARD

\*\*\*

Q:  Were you ever present for conversations between the chairman and Jose about this loan?

A:  I remember I was, but ***I threw the case over to the attorney. And then the attorney would directly contact George and Jose. And that if there's any mail between them, they will forward a copy of the email to him. Because my boss needs to know, and he needs to look at it.***

Q:  And this, what you're describing, was the conversations leading up to the loan? Is that correct?

A:  Yes.

(Ex. J (Excerpts of 2/21/2019 Zheng Interview) (emphasis added).)

On April 8, 2019, the government once again interviewed Zheng about the loan.  There is no recording of the interview but, according to the agent's report, "Zheng told Huang not to lend the money directly and that Huang should ***utilize a lawyer***" to effectuate the loan.  (Ex. K (4/8/2019 Zheng 302) (emphasis added).)

Other interviewees provided the same information about Attorneys Yong and Sun's involvement.  For example, on June 6, 2019, the government re-interviewed George Esparza about the collateral and loan transactions and showed him 30 email strings, almost all of which were to or from Attorney Yong.  The agents asked Esparza about his privileged and confidential conversations with Yong and/or Huizar.  Esparza repeated that Yong was an attorney who was retained to effectuate the collateral and loan transactions, and that his (Esparza's) job was to assist Huizar in communicating with Yong on Huizar's behalf.  (*See generally* Ex. B (6/6/2019 Esparza 302).)  Esparza told the government that "HUIZAR used YONG at the recommendation of ZHENG," and that Esparza routinely met with Yong alone if Huizar was unable to attend. (*Id.* at 6.)  Esparza similarly relayed that Huizar at times met alone with Yong. (*Id.* at 7.)  And Esparza added that he ultimately paid Yong approximately $5000 for his legal services from funds Huizar provided.  (*Id.* at 11.)

//

//

LAW OFFICES OF RICHARD M. STEINGARD

### D. **The Government Interviewed Guodi Sun and Henry Yong**

On September 23, 2019 and October 1, 2019, the government interviewed Goudi Sun and Henry Yong, respectively.  In these interviews, the government sought to delve even deeper into the privileged conversations and communications by and between the attorneys themselves, as well between the attorneys, Huizar, Zheng and Esparza.

    1. <u>Guodi Sun</u>

Initially, the agents asked Attorney Sun about his background and relationship with Attorney Yong.  (Ex. L (9/23/2019 Sun 302).)  Thereafter, the agents steered the conversation to the collateral and loan transactions and questioned Sun about his involvement.  (*Id*.)  Sun stated that in his initial conversations with Attorney Yong, Yong explained the proposed loan transaction and said, "everything was legal."  (*Id*.)  Sun described the progression of the collateral/loan process and the manner in which it was effectuated.  (*Id*.)  Sun stated that Yong told him that SZNW had "provid[ed] the money" for the loan and "recalled Yong referring to his client and the money being provided by Shenzhen New World."  (*Id*.)  Sun further stated that Esparza paid him his fees for the transactions.  (*Id.*)

In addition, the agents examined spreadsheets and emails on Sun's computer that were related to the collateral and loan transactions.  (*Id*.)  Sun printed all the emails, presumably at the agents' request, and gave them to the agents.  (*Id*.)  Sun also gave the agents his original case file for the collateral/loan transactions, including privileged emails between Attorneys Sun and Yong that the agents had not previously obtained via the Huizar/Esparza/Zheng email warrants.  (*Id*.)  Before leaving, the agents served Sun with a subpoena to testify before the grand jury.  (*Id*.)

//

//



2.  <u>Henry Yong</u>

The agents' and prosecutor's interview of Henry Yong proceeded in much the same manner.  (Ex. C (10/1/2019 Yong 302).)  Yong explained that he was referred "a case" by Simon Cao and met with Huizar, Esparza, and Zheng, who worked for Wei Huang, to devise and effectuate the collateral and loan process.  (*Id*.)  Yong said he proposed several approaches for the loan, but Huizar rejected them because the documentation would be public.  (*Id*.)  They later proposed proceeding through a bank loan with Wei Huang providing the collateral.  (*Id*.)  Yong said this was acceptable and he prepared a promissory note to act as a guarantee for Huang.  (*Id*.)  The agents showed Yong the joint venture agreement which had been an attachment to one of his emails.  (*Id*.)  Yong added that they wanted to "go through this law office… so in case anything happened, everything is well documented."  (*Id*.)  Yong said that in exchange for the attorneys' work, they were paid a flat fee of between $5000 and $6000, "just like a normal case."  (*Id*.)  Before departing, the agents asked Yong for a record of his emails and his case file.  (*Id*.)

## III.

## ARGUMENT

### A. <u>The Attorney-Client Privilege</u>

"The attorney-client privilege is one of the oldest recognized privileges for confidential communications."  *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998); *In re Grand Jury Subpoenas*, 454 F.3d 511, 519 (6th Cir. 2006) (explaining that "[t]he privilege protecting confidential communications between an attorney and his client dates back to the Tudor dynasty").  The privilege is designed to facilitate openness and full disclosure between the attorney and the client and shields from discovery advice given by the attorney as well as communications from the client to the attorney.  *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).

The Ninth Circuit has long acknowledged the sanctity of the attorney-client privilege and consistently condemned the government's attempts to violate its fundamental principles. As the Court stated 25 years ago, "The attorney-client privilege is essential to preservation of liberty against a powerful government. People need lawyers to guide them, through thickets of complex government requirements, and to get useful advice, they have to be able to talk other lawyers directly without fear that what they say to their own lawyers will be transmitted to the government." *United States v. Chen*, 99 F.3d 1495, 1499 (9th Cir. 1996).

The Supreme Court and Ninth Circuit have recognized that an attorney-client privilege can exist between a corporation and an attorney. *Upjohn Co. v. United States,* 449 U.S. at 388; *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) ("As fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation.") (citing *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343 (1985) and *Admiral Ins. Co. v. U.S. Dist. Court,* 881 F.2d 1486, 1492 (9th Cir. 1989). Thus, when a corporate officer – like Wei Huang for SZNW – hires a lawyer, the client is the corporation. *Id.*

Applying these principles to the instant case, Wei Huang/SZNW and Jose Huizar, through their agents, Ricky Zheng and George Esparza, retained Attorney Yong "to draft and execute the necessary paperwork to effectuate the financial transactions transferring funds to defendant Huizar." (FSI, Count 1, OA 31.) Initially, Yong met with Zheng, Huizar, Esparza, and Simon Cao (the referral source) to discuss the nature of Yong's possible retention. *In re Dupont Estate*, 60 Cal.App. 2d 276, 288 (1943) ("It is the almost universal rule in common–law jurisdictions that "Where a person consults an attorney with a view to employing him professionally, any information acquired by the attorney in the course of interviews or negotiations looking toward such employment is privileged and cannot be disclosed"). Thereafter, Yong brought in Attorney Sun as co-counsel to

assist with the representation.  Yong then communicated with his clients, Huang, Huizar, and SZNW, either directly (Huizar) or through their respective agents (Zheng and Esparza) on issues specifically related to the matter of the shared retention.

During the meet and confer process, counsel for the government indicated that it believed these communications were not privileged either because, depending on the specific communication: (i) no attorney-client relationship was established between the individuals communicating; or (ii) to the extent the privilege initially covered the communication, that protection was waived by being shared among Huang and Huizar's agents.  (Snyder Decl. ¶ 3.)  Neither argument is correct, and each of the communications at issue is privileged.

## B. **Communications Between Huang, Huizar, Their Agents, and Their Joint Counsel Are Privileged**

Huang/SZNW and Huizar retained counsel to represent both of them in effectuating the loan transaction, rendering their communications with those attorneys privileged.  "Under the joint-client privilege, clients may jointly retain (or one client may retain for the joint benefit of others) an attorney as their common agent on a legal matter of common interest." *In re Hotels Nevada, LLC*, 458 B.R. 560, 570 (Bankr. D. Nev. 2011).[7]  In such an arrangement,

---

[7]     Federal common law controls the privilege inquiry in a criminal case.  *See United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).  The concept of joint-client privilege exists within that body of law.  *See, e.g.*, *United States v. BDO Seidman, LLP*, 492 F.3d 806 (7th Cir. 2007) (applying joint-client privilege in defeating an IRS subpoena); *Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 386 (S.D.N.Y. 1975) ("Thus, for example, where there is consultation among several clients and their jointly retained counsel, allied in a common legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from exposure beyond the confines of the group…."). In evaluating the contours of this doctrine, the Court may consider cases interpreting it within the context of state law.  *See, e.g.*, *KD ex rel. Dieffenbach v. United States*, 715 F. Supp. 2d 587, 592 (D. Del. 2010) ("A federal court may

LAW OFFICES OF RICHARD M. STEINGARD

"communications among joint clients and their counsel are not privileged in disputes between the joint clients, but are protected from disclosure to others." *Griffith v. Davis*, 161 F.R.D. 687, 693 (C.D. Cal. 1995); *see also* 1 McCormick on Evid. § 91.1 (8th ed.) ("When two or more persons, each having an interest in some problem, or situation, jointly consult an attorney, their confidential communications, though known to each other, will of course be privileged in a controversy of either or both of the clients with the outside world, that is, with parties claiming adversely to both or either of those within the original charmed circle."). "The principal purpose of the joint client privilege is … to encourage the fullest possible communication between joint clients—and between them and their joint lawyer—with respect to matters related to the joint representation." *Sky Valley Ltd. Partnership v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 653 (N.D. Cal. 1993).

Whether multiple parties have entered into a joint-client arrangement is a flexible, common-sense inquiry. "[C]ourts may consider multiple factors, including but not limited to matters such as payment arrangements, allocation of decision-making roles, requests for advice, attendance at meetings, frequency and content of correspondence, and the like." *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("The keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas."). And a putative client's reasonable belief in the existence of a joint-client arrangement plays an instrumental role. *Ogden Corp.*, 202 F.3d at 463 (citing *Sky Valley Ltd. Partnership*, 150 F.R.D. at 651–52).

---

analogize to the state privilege and what a state court would do to guide the development of federal common law.").

LAW OFFICES OF RICHARD M. STEINGARD

The facts here support finding that Huang/SZNW and Huizar retained Yong (and in turn Sun) to jointly represent them in providing legal advice on and effectuating the loan and collateral transaction.  Throughout the transaction, Huang and Huizar, either personally or through their agents, communicated with their shared attorney, sought legal advice to structure their transaction, and relied on the advice that they received.  Each reasonably believed that Yong and Sun represented him.  For example, multiple retainer agreements were written with "Lender" or "Borrower" listed as the client.  (Snyder Decl. ¶ 5.)  While Huang's agent Zheng first made contact with Yong, Huizar's agent Esparza paid the fee. (Ex. L (9/23/2019 Sun 302); *see also* Ex. B (6/6/2019 Esparza 302) at 6 ("HUIZAR used YONG at the recommendation of ZHENG.").)  In turn, counsel provided their advice to Huang and Huizar jointly, via the same communications, rather than separately.[8]  At bottom, Huang/SZNW and Huizar shared a common legal problem—how to legally structure a collateral and loan transaction—that they wished to resolve by engaging the same counsel.

## C. **Huang/SZNW and Huizar Did Not Waive Privilege By Involving Their Agents**

Nor does the fact that Huang and Huizar, busy professionals with demanding schedules, relied on their respective agents at times in effectuating the loan transaction defeat privilege.[9]  It is well-established that principals may do so while maintaining attorney-client privilege.  *See, e.g.*, *City & Cnty. of San Francisco v.*

---

[8]     But even to the extent there are individual communications (*i.e.*, where only Huang or Huizar with his respective agents communicates with the attorneys), that would not defeat a finding of a joint-client relationship. *See* The New Wigmore: A Treatise on Evidence: Evidentiary Privileges, § 6.8.1 ("For that matter, so long as it is understood that the persons are joint clients, they need not all be physically present at the time of every communication with the professional.").

[9]     Huang, moreover, relied upon Zheng to provide necessary interpretation services.

LAW OFFICES OF RICHARD M. STEINGARD

*Superior Court*, 37 Cal.2d 227, 236-7 (1951) ("It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both. [T]he client's freedom of communication requires a liberty of employing other means than his own personal action. The privilege of confidence would be a vain one unless its exercise could be thus delegated. A communication, then, by any form of agency employed or set in motion by the client is within the privilege.) (internal quotations omitted); *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 949–50 (D.C. Cir. 2017) (affirming that under the applicable privilege law, "attorney-client privilege extends to communications between a client's agent and his attorney").  And an agent cannot waive a principal's privilege without a grant of authority to do so.  *See United States v. Chen*, 99 F.3d at 1502 ("An employee must generally keep an employer's confidences.") (citing Restatement (Second) of Agency § 395).  Thus, the fact Huang and Huizar sought legal advice in part through their respective agents does not render their communications non-privileged.

## D. <u>The Appropriate Remedy is Suppression of the Evidence and Dismissal of Counts</u>

Substantial questions of fundamental fairness are raised where, in connection with a criminal prosecution, the government invades that [attorney-client] privilege."  *United States v. Neill*, 952 F. Supp. 834, 839 (D.D.C. 1997). "Indisputably, when the Government obtains access to a defendant's email account, the Government is not entitled to rely on privileged materials contained therein."  *United States v. Patel*, 2017 WL 3394607at *6.

The general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial.  *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000); *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d at 1047 (D. Nev. 2007); *United States v. Elbaz*, 396 F. Supp.

3d 583, 165–67 (D. Md. 2019), ("Since the Lopez Emails contain privileged information, the Court will order that the Lopez Emails and any other communications relating to Lopez be excluded from the evidence at trial.") (citing *Upjohn Co.*, 449 U.S. at 389).  And where the government's conduct is flagrant, more severe sanctions can be appropriate, including dismissal of counts.  *See, e.g.*, *SDI Future Health*, 464 F. Supp. 2d at 1053; *United States v. Marshank*, 777 F. Supp. 1507, 1521–23 (N.D. Cal. 1991) (granting motion to dismiss based on flagrant violation of Sixth Amendment).

In the instant case, suppression should take several forms.  First, the privileged emails should be suppressed.  Second, to the extent Zheng, Esparza, and Yan Yan are called as trial witnesses, their testimony about the collateral and loan transactions, as it relates to the legal work discussed and/or performed by Yong and Sun, must also be suppressed as fruit of the poisonous tree.  *See e.g.*, *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395-96 (9th Cir. 1989) (citing *United States v. Ceccolini*, 435 U.S. 268, 275 (1978) & *Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("Verbal evidence, including live-witness testimony, may be no less the 'fruit' of official illegality than is tangible, documentary evidence."); *see also United States v. Rebalcava-Montoya*, 597 F.2d 140, 144 (9th Cir. 1978); *United States v. Patzer*, 277 F.3d 1080, 1086 n.21 (9th Cir. 2002). Lastly, absent an express waiver of the privileges, Attorneys Yong and Sun should be precluded as witnesses.  And any other evidence obtained through these violations should be suppressed as fruit of the poisonous tree.  *Wong Sun v. United States*, 371 U.S. at 487–88.

In addition, the defendants ask that the counts and allegations discussing the privileged materials be dismissed or stricken as a sanction for the government's utter disregard for the sanctity of the attorney-client privilege.  Here, not only did the government review privileged email communications, but it also capitalized on its misconduct by securing additional warrants and wiretaps, all the while

intentionally concealing from the courts that its request was based, in part, on privileged information.

And the Court should reject any assertion that the government's purported use of a "taint team" reduces the flagrancy of the violation. Not only are "taint teams" judicially disfavored,[10] but, here, its protocol and execution were hopelessly flawed. It began with the case agent - presumably a non-lawyer - reviewing all the emails, thereby circumventing the conceptual purpose and framework for a taint team entirely. Next, if the agent believed a document to be potentially privileged, he passed it along to a taint agent or prosecutor, or both. As to those documents the agent decided were not privileged – which includes the Yong emails at issue in this motion – the agent simply passed them on to the prosecutors and used them to continue the investigation.[11]

---

[10]   *See, e.g.*, *Hicks v. Bush*, 452 F. Supp. 2d 88, 102 (D.D.C. 2006); *United States v. Kaplan*, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ("Certainly this Opinion should be counted among those disapproving of the Government's use of an ethical wall team to 'protect' the attorney-client and work product privileges or to determine whether the crime-fraud exception applies, where potentially privileged materials are turned over to the trial team and case agents before any challenge to those determinations can be raised by a Defendant and determined by a court."); *In re Search Warrant Issued June 13, 2019*, 942 F.3d. 159, 175 (4th Cir. 2019) ("the Filter Team's review of the materials seized from the Law Firm was and is injurious to the Firm and its clients. And that harm is plainly irreparable, in that the Filter Team's review of those privileged materials cannot be undone"); *United States v. Castro*, 2020 WL 241112, *2 (E.D. Mich. 2020) ("The Court rejects the Government's proposal to utilize a U.S. Attorney 'Filter Team' to protect attorney-client information with regard to each defendant's prison calls.").

[11]   To the extent the prosecutors reviewing the emails could have initiated a "taint team" review, they did not do so here.

LAW
OFFICES OF
RICHARD M.
STEINGARD

Thus, the case agent was the arbiter of whether a document was potentially privileged. The defense is unaware of any training he received in this regard,[12] whether he was working from written instructions, and whether he was subject to any supervision or oversight. In any event, whether trained or untrained, the agent's "assessment" that the emails were not privileged is hard to fathom. Yong's email address includes the well-known abbreviation for attorneys "esq," and the emails themselves included several drafts of retainer agreements (with "Attorney Fee Agreement" emblazoned at the top) and unequivocal references to "attorneys," the "attorney-client trust account," and the "attorney-client privilege."

But to the extent the Court permits the government to proceed on the counts relying upon the communications, the Court should require the government to establish via *Kastigar* tracing that the evidence it intends to use at trial was not derived from the impermissibly reviewed privileged information. *See Kastigar v. United States*, 406 U.S. 441, 453-54 (1972) (requiring the government to "affirmatively establish a legitimate source for the prosecution wholly independent" of compelled testimony); *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003) ("In the analogous context of protecting a defendant against a violation of the Sixth Amendment, we believe that the *Kastigar* analysis should also apply."). Here, defendants have made a prima facie showing of prejudice because the government "acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information." *Id.* at 1071. The burden is therefore on the government to meet its "heavy burden", via a *Kastigar* hearing, that "all of the evidence it proposes to use, and all of its trial strategy, were derived from legitimate independent sources." *Id.* at 1072 (cleaned up).

---

[12]     Per the wiretap applications, Agent Civetti had been employed as a Special Agent with the FBI since September 2015. (Ex. H (4/17/2019 Title III Application) at ¶ 2.) Because the subpoenas were issued in July 2016 and February 2017, the agent had been with the FBI for approximately ten months when he first began reviewing the subpoenaed documents for privilege.

IV.

**CONCLUSION**

For the above reasons, defendants SZNW and Huizar respectfully request the Court enter an order suppressing the evidence described herein, including prospective testimony, dismissing the indicated counts, and striking the identified overt acts. In the alternative, defendants ask the Court to require the government to establish, via a *Kastigar* hearing, that their prosecution has an independent basis from the violation of the attorney-client privilege.

Respectfully submitted,

Dated: November 15, 2021        **LAW OFFICES OF RICHARD M. STEINGARD**

By:  /s/ Richard M. Steingard
Richard M. Steingard
Attorney for Defendant
**SHEN ZHEN NEW WORLD I, LLC**

**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**CUAUHTEMOC ORTEGA**

Dated: November 15, 2021     By:  /s/
Carel Ale
Charles Snyder
Adam Olin
Attorneys for Defendant
**JOSE HUIZAR**