STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal Bar. No. 342364)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3289
    Facsimile: (213) 894-6436
    E-mail:   Mack.Jenkins@usdoj.gov
            Susan.Har@usdoj.gov
            Jamari.Buxton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:20-326(A)-JFW-4 |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY FILED ON JULY 19, 2022 |
| v. | |
| SHEN ZHEN NEW WORLD I, LLC, | Hearing Date: August 8, 2022 Trial Time:  8:00 AM Location:  Courtroom of the Hon. of the Hon. John F. Walter |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby files its Opposition to Defendants Shen Zhen New World I, LLC, Jose Huizar, and Raymond Chan's Motion to Compel Discovery.  (Dkt. 613 ["Mot."].)

1      This opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, including the

3   Court's prior orders denying defendants' prior motions to compel, and

4   such further evidence and argument as the Court may permit.

5   Dated: July 27, 2022              Respectfully submitted,

6                                     STEPHANIE S. CHRISTENSEN
                                      Acting United States Attorney
7
                                      SCOTT M. GARRINGER
8                                     Assistant United States Attorney
                                      Chief, Criminal Division
9

10                                    _____/s/_____

11                                    J. JAMARI BUXTON
                                      MACK E. JENKINS
12                                    SUSAN S. HAR
                                      Assistant United States Attorneys

13                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      2

**TABLE OF CONTENTS**

I.    INTRODUCTION.....................................................1

II.   FACTUAL BACKGROUND.............................................3

      A.   Esparza Participates in Proffer Interviews with the
           Government and Details the L.A. Grand Hotel Bribery
           Scheme Involving Huang, Chan, Huizar, Esparza, and
           Others....................................................3

      B.   The Government Prepares and Sends a Proposed Factual
           Basis Regarding Esparza's Conduct.........................7

      C.   The Government Provides a Revised Factual Basis...........8

      D.   Esparza Participates in Another Proffer Interview
           Before Signing the Revised Factual Basis.................10

      E.   The Court Denies Defendants' March 2022 Motion to
           Compel Communications Between the Government and
           Counsel for Witnesses....................................11

      F.   The Parties Meet and Confer Regarding the Government's
           Communications with Esparza's Counsel....................13

III.  ARGUMENT......................................................15

      A.   The Government Has Repeatedly Confirmed That Its
           Conversations with Esparza's Attorney in March 2020
           Produced No Brady Information, and Defendants Have
           Failed to Otherwise Demonstrate a Brady Violation.......15

      B.   Defendants' Assertion that the Government Deliberately
           Provided False or Inaccurate Information to Esparza to
           Improve Its Likelihood of Prevailing at Trial Is
           Baseless.................................................16

IV.   CONCLUSION....................................................21

**TABLE OF AUTHORITIES**

**Cases**

Brady v. Maryland,
  373 U.S. 83 (1963) ............................................. 14

Giglio v. United States,
  405 U.S. 150 (1972) ............................................ 14

Pennsylvania v. Ritchie,
  480 U.S. 39 (1987) ............................................. 15

United States v. Bagley,
  473 U.S. 667 (1985) ............................................ 15

United States v. Lucas,
  841 F.3d 796 (9th Cir. 2016) .................................. 15

**Statutes**

Fed. R. Evid. 602............................................... 17
Fed. R. Evid. 612............................................... 18

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3       As the Court has identified several times on the record,[1]

4  throughout this case, the government has made full, complete, and

5  early discovery productions, including of all witness statements by

6  George Esparza, a cooperating witness.  Out of an abundance of

7  caution, the government also produced earlier, draft versions of the

8  Factual Basis for what would ultimately become the final Factual

9  Basis of Esparza's plea agreement.  Taking its disclosures further

10 still and continuing to exceed its discovery obligations, the

11 government produced copies of substantive emails between government

12 counsel and Esparza's counsel, Terrence Jones, relating to Esparza's

13 plea agreement and Factual Basis.  Collectively, that fulsome

14 discovery presents a clear picture and timeline of the process by

15 which the Factual Basis was finalized.  As the government has

16 repeatedly informed defendant Shen Zhen New World I, LLC ("SZNW" or

17 "defendant"), there is no other discoverable Brady information

18 arising from its (unrecorded) conversations with Mr. Jones and there

19 is already a wealth of information previously provided for defense

20 counsel to impeach Esparza on his criminality and his credibility.

21      Despite the Court's prior rulings stating that Brady motions

22 should not be "speculative" or "fishing expedition[s],"[2] the fulsome

23 productions as described by the Court and above, and the government's

24 unequivocal representations, defendants SZNW, Jose Huizar, and

25 Raymond Chan now move the Court on Brady grounds for a novel order

26 compelling government counsel to generate a detailed summary of these

27 _____

28      [1] See e.g., 4/25/22 Hr'g Tr. at 38-41.
        [2] See e.g., 4/25/22 Hr'g Tr. at 38:12-20.

1   conversations, claiming, without any credible evidence, that the

2   government sought to inappropriately shape Esparza's testimony by

3   injecting "new" facts, of which Esparza had no recollection, into

4   Esparza's final Factual Basis.

5          The Court should reject this baseless motion.  To be crystal

6   clear: the government is not aware of <u>any</u> information through its

7   conversations with Mr. Jones, or anywhere else, that Esparza adopted

8   and swore to facts in his Factual Basis that he did not believe were

9   accurate or that he did not recall to be true.  Indeed, this Court

10  accepted Esparza's plea where he swore under oath that his Factual

11  Basis was accurate and that his entry into his plea agreement was

12  knowing and voluntary.  Even further, Esparza has already testified

13  once in this matter, before this Court, and there was no evidence

14  adduced at that trial that any part of his Factual Basis was

15  untruthful.  And defendants have not demonstrated that the government

16  has, in fact, improperly withheld favorable evidence, which is

17  unsurprising because they have utterly failed to show such evidence

18  even exists in the first place.  This substantial record should be

19  the end of the matter.

20         Defendants' current claim is reminiscent of a nearly identical,

21  failed motion to compel in this case from several months ago, in

22  which defendants sought "all communications between the government

23  and the cooperators and their counsel."  (Dkt. 381 at 23.)  The Court

24  rejected that motion and, as part of the basis for that rejection,

25  specifically lauded the government's commitment to its discovery

26  obligations thus far.[3]  As was the case then, and continues to be the

27

28

_____

[3] <u>See</u> 4/25/22 Hr'g Tr. at 38-41.

1   case now, defendants have not made the requisite showing that the

2   government has withheld Brady information, particularly in light of

3   the government's full discovery productions and clear and express

4   representation that there is no such other information.

5          In addition, defendants' factual mischaracterization that the

6   government "spoon-fed" Esparza information the government "wanted,

7   expected, and needed him to say" is both meritless and misleading.

8   (See Mot. at 14.)  More fundamentally, it also demonstrates a

9   surprising misapprehension about how plea agreements and factual

10  bases are formed.  The factual record instead reflects that Esparza

11  discussed or at least referenced all the so-called "new" information

12  in his Factual Basis during earlier proffer interviews with the

13  government.  Then, to assure their accuracy and confirm relevant

14  details, he reviewed corroborating documents of certain specific

15  events regarding those same topics and confirmed they were true in

16  his sworn Factual Basis.  This is basic Factual Basis construction

17  that occurs or should occur in every federal criminal case where a

18  defendant is pleading guilty and has the opportunity to review

19  relevant evidence before doing so.  There is nothing improper about

20  that.

21         Put simply, defendants have failed (again) to show they are

22  entitled to relief.

23  **II.   FACTUAL BACKGROUND**

24         **A.    Esparza Participates in Proffer Interviews with the
               Government and Details the L.A. Grand Hotel Bribery Scheme**
25             **Involving Huang, Chan, Huizar, Esparza, and Others**

26  Between November 2018 and June 2019, Esparza, in the presence of

27  his counsel, Terrence Jones, participated in five proffer interviews

28  with the government.  During the interviews, Esparza described

3

various types of criminal conduct of which he was aware, including a bribery scheme related to the L.A. Grand Hotel involving, among others, Huizar, Esparza, Raymond Chan, SZNW, which owns the hotel, and SZNW's Chairman, Wei Huang.

Specifically, Esparza stated that he and Huizar met Huang in February 2013 through Chan, Huang's close friend, who was then the Interim General Manager of the Los Angeles Department of Building and Safety ("LADBS"). (Def. Ex. A-1 at 2, 14; Def. Ex. A-5 at 1.) At the time, Chan, who is Chinese, was introducing Huizar to numerous affluent Chinese investors/developers, like Huang, with whom Chan had connections. (Def. Ex. A-1 at 11; Def. Ex. A-3 at 2, 4; Def. Ex. A-4 at 3.) Soon after the introduction, in March 2013, Huang, Huang's right-hand man, Ricky Zheng, Huizar, and Esparza traveled on a private jet to Las Vegas, where Huang lavished Huizar and Esparza with various benefits, including thousands of dollars in casino chips. (Def. Ex. A-1 at 2-6.)

Esparza explained that as the Chair of the Planning and Land Use Management ("PLUM") Committee, Huizar had every major development project pass through him. (See Def. Ex. A-1 at 12; Def. Ex. A-5 at 1-2.) This meant that Huizar could stall and/or torpedo projects as he saw fit. (See Def. Ex. A-1 at 12.) Huizar used this power to extract benefits from investors/developers, often through Esparza, who interfaced with the various representatives. (See id.) According to Esparza, if investors/developers did not cooperate, and "pay to play," they did not get any type of treatment from Huizar or his office. (See id.)

According to Esparza, Chan would describe the importance of Huizar and PLUM to the Chinese developers. (See Def. Ex. A-3 at 6.)

4

This included Huang, SZNW's owner.  During a dinner one evening attended by Huang, for example, Chan explained to representatives from another company that Huizar, as the Chairman of PLUM, had the power to (1) put things on the agenda, (2) overturn rules, and (3) change ordinances.  (Id.)  Chan went on to say, "if you do not have a relationship with Jose [Huizar] your project would be at the end of the list."  (Id.)  On another occasion, Chan told Huang that that Huizar was the "downtown guy" so that whatever Huang needed, Chan and Huizar could do.  (Id. at 5.)  Esparza said that on yet another occasion, Chan put it to Huang as follows: "the idea of Huizar is the investment." (Id.)

Huang took Chan's advice and invested in Huizar.  In 2014, Huizar and Chan persuaded Huang to supply approximately $600,000 to enable Huizar to settle a lawsuit against him by a former staffer discretely and confidentially, so as not to jeopardize Huizar's 2015 re-election bid.  (See Def. Ex. A-1 at 11-12; Def. Ex. A-3 at 2-3.)  According to Esparza, the parties structured the transaction to conceal the connection between Huang and Huizar.  (See Def. Ex. A-3 at 2-3.)  Huizar told Esparza that Huang could not give the $600,000 directly to Huizar because it was a conflict of interest for Huang in that he had a development in Huizar's district.  (See Id. at 3.)  Zheng, Huang's right-hand guy, separately told Esparza that Huang, who had two hotels in Los Angeles, did not want to be seen giving a gift or a bribe to Huizar.  (Id.)  Esparza told the government that both Huang and Huizar wanted the payment to look clean and to have no ties to Huang.  (Id.)

Esparza also described the various benefits he and Huizar received during approximately nineteen trips Huang, Zheng, Huizar,

5

and Esparza took to Las Vegas between 2013 and 2018.  Esparza said that Huang supplied Huizar with approximately $10,000 to $20,000 in casino chips each trip, the proceeds of which Huizar often concealed when cashing out.  (See Def. Ex. A-1 at 4-5.)[4]  Esparza said that he and Huizar sometimes rode in private jets and limos, regularly stayed in luxurious villas, played golf, and partied at nightclubs where the bills were regularly in the tens of thousands of dollars, all free of charge for them.  (Id. at 3-6.)

Esparza said the benefits Huang gave Huizar came with certain expectations.  Specifically, Esparza told the government that because of the settlement payment and the money provided in Las Vegas, there was an expectation that Huizar would be there no matter what if Huang needed something.  (See Def. Ex. A-3 at 5.)  Esparza said that when Huang told Huizar to jump, Huizar jumped.  (See id. at 4.)  Esparza said that everyone saw Huang's payment of the settlement as a long-term investment so if Huang needed something from Huizar down the road, Huizar would help.[5]  (See Def. Ex. A-5 at 4.)

Along these lines, Esparza told the government during a January 15, 2019 proffer interview that Huang wanted to build "the tallest tower in downtown and West of the Mississippi."  (Id. at 5.)  Esparza said the topic of Huang's hotel expansion came up many times, including during a meeting at Huizar's office attended by Huang, Chan, LADBS representatives, and other city officials.  (Id.)[6]

---

[4] Esparza said he got approximately $2,000 to $5,000 in casino chips each trip.  (See id.)

[5] At the same time, Esparza stated during the same proffer interview that he did not know if there was a "quid pro quo" associated with Huang loaning Huizar the settlement funds.  (See id.)

[6] Records reflect that this meeting took place on August 4, 2016.

1   According to Esparza, Huizar told Huang that he would help Huang

2   because "this tallest building would be [Huizar's] penis downtown."

3   (Id.)  Huizar said on multiple occasions that the L.A. Grand Hotel

4   "would be the tallest thing there" and this would be his "big dick

5   above the city."[7]  (Id.)

6       **B.   The Government Prepares and Sends a Proposed Factual Basis
          Regarding Esparza's Conduct**

7

8        On February 15, 2020, counsel for the government sent Esparza's

9   attorney, Mr. Jones, a proposed Factual Basis to be incorporated into

10  a forthcoming plea agreement.  (Def. Ex. B)  The first paragraph of

11  the proposed Factual Basis stated that the parties agreed the

12  statement of facts contained therein "is not meant to be a complete

13  recitation of all facts relevant to the underlying criminal conduct

14  or all facts known to either party that relate to that conduct."

15  (Id. at 1 (emphasis added).)  The proposed Factual Basis described in

16  summary fashion many of the events Esparza discussed during his

17  initial proffer interviews, including certain aspects of the L.A.

18  Grand Hotel bribery scheme.

19       In particular, the proposed Factual Basis described Huizar's and

20  Esparza's introduction to Huang through Chan (id. at 4-5 ¶ 11);

21  benefits Huang supplied to Huizar and Esparza during trips to Las

22  Vegas between 2013 and 2018 (id. at 5 ¶ 12); Huang, in 2014,

23  supplying $600,000 to enable Huizar to privately and confidentially

24

25  ───────────────

26      [7] Esparza also told the government about a number of smaller
    asks Huang made of Huizar, including a request that Huizar help get
    Huang's son into USC; a resolution Huizar provided to Huang; a letter
27  of support addressed to the Chinese government; for a list of land
    use attorneys to hire; and a request that Huizar get the media to
28  cover a press conference for a school located on the L.A. Grand Hotel
    property.  (See Def. Ex. A-3 at 7-9.)

settle a lawsuit against him (id. at 7 ¶ 16); and the fact that Huang provided benefits to Huizar because Huizar, as the CD-14 Councilmember and the Chair of the PLUM Committee, was poised to help Huang achieve his goal to redevelop the L.A. Grand Hotel into the tallest building west of the Mississippi though official acts at various stages of the City approval process (id. at 8 ¶ 19).

**C.   The Government Provides a Revised Factual Basis**

Several weeks later, on March 10, 2020, counsel for the government sent Mr. Jones an email attaching five FBI reports regarding the proffer interviews described above.  (Def. Ex. C at 3.) The email went on to state: "As we mentioned on the phone, the particular areas we want [Esparza] to focus on are the . . . settlement and his role in facilitating/arranging that payment, and the concept that [Huang] asked Huizar for favors in return, specifically with regard to the LA Grand hotel redevelopment project. The January 15, 2019 report has the most detail on this latter subject."  (Id.)

The parties thereafter communicated over email and attempted to schedule a meeting between the government and Esparza/Mr. Jones to discuss the Factual Basis.  (See id. at 1-3.)

Before the parties had settled on a date, counsel for the government on March 23, 2020 sent Mr. Jones an email that contained a revised proposed Factual Basis for Esparza.  (See id. at  1.)  The email read:

> Mr. Jones – as discussed, please find attached a revised draft Factual Basis for your client.  We have gone through it based on conversations with you, and [another AUSA] has identified where particular evidence would help enlighten Mr. Esparza's recollection (those areas are highlighted in yellow).  For that same reason and

1  based on such evidence, we have added more
   relevant paragraphs.  We also highlight in blue
2  an exchange we would like [Esparza's] further
   input on.

3
   Please confirm receipt and let us know if we can
4  meet with your client tomorrow or soon thereafter
   to finalize this.  Thanks.

5

6  (Id.) (emphasis in original.)

7      The revised Factual Basis contained seven new paragraphs in the

8  section of the document titled "L.A. Grand Hotel Bribery Scheme."

9  There was corroborating documentation or records for each of the

10 events described in the seven new paragraphs.  Those new paragraphs,

11 which the government highlighted in yellow, stated as follows:

12         20. On August 4, 2016 , HUIZAR, CHAN, officials
           from the Planning Department, and CD-14 staff
13         members met with HUANG and his team to discuss
           the expansion of the L.A. Grand Hotel, including
14         HUANG's interest in pursuing TOT rebates, TFAR,
           and other incentives from the City.
15
           21. On August 15, 2016, defendant ESPARZA texted
16         HUIZAR regarding HUANG's expansion project:
           "Reminder boss to decide what land use expediters
17         you want to recommend to the Chairman [HUANG]."

18         22. On December 16, 2016 , defendant ESPARZA
           forwarded an e-mail to HUIZAR from SHAWN KUK, the
19         CD-14 Planning Director, listing a number of
           consultants, writing: "Hi Boss, Here is the list
20         of land use consultants per [KUK]'s past
           recommendations.  Chairman [HUANG] would like us
21         to schedule interviews on Monday."

22         23. On April 27, 2017, in a telephone call
           between defendant ESPARZA and ZHENG, the two
23         discussed a proposed consultant for the L.A.
           Grand Hotel expansion project. Defendant ESPARZA
24         stated: "So, remember, the Chairman (HUANG) was
           gonna hire (a specific consultant]? ... JOSE
25         [HUIZAR] wanted me to tell the Chairman [HUANG]
           not to hire him anymore." When ZHENG asked why,
26         defendant ESPARZA responded: "Because, ah, JOSE
           [HUIZAR] can't trust him he's too loyal to
27         another elected official, to another person. So
           JOSE [HUIZAR] doesn't think it's a good idea,

28

                                   9

it's not a good idea to—to put him on the
project."

24. Co-conspirator HUANG brought up the L.A.
Grand Hotel expansion project on numerous
occasions in the presence of defendant ESPARZA
and HUIZAR.  HUANG, through translation provided
by ZHENG, expressed to HUIZAR that he wanted to
build the tallest tower west of the Mississippi.
In response, HUIZAR expressed his support of the
project.

25. On May 9, 2017, in a telephone call,
defendant ESPARZA and ZHENG discussed the
relationship between HUANG and HUIZAR. ZHENG
stated that HUANG expected to lay everything in
front of HUIZAR at an upcoming trip to Cabo San
Lucas, which defendant ESPARZA understood to
refer to the assistance HUANG expected from
HUIZAR on the L.A. Grand Hotel expansion project.
ZHENG added that HUANG was "going to make
[HUIZAR] think that, make it, otherwise Chairman
[HUANG] ask him to, uh, pay back that $600,000
already. Last night." When defendant ESPARZA
stated that "[HUIZAR]'s not going to do that
either," ZHENG responded: "Chairman [HUANG ] will
push him."  According to ZHENG, HUANG raised this
issue with HUIZAR the previous evening at the
same time that HUANG told HUIZAR that HUANG heard
from multiple sources that the FBI was looking
into HUIZAR.

26. On May 9, 2017, in a telephone call between
defendant ESPARZA and another HUIZAR staff
member, defendant ESPARZA stated: "Chairman
[HUANG] should have all the leverage in the world
[be]cause of what [HUIZAR] owes [HUANG]."
Defendant ESPARZA meant that HUANG expected
HUIZAR's assistance on the L.A. Grand Hotel
expansion project, or any other requested
assistance, from HUIZAR because of the financial
benefits HUANG had provided to HUIZAR.

(Def. Ex. D at 8-10 ¶¶ 20-26.)

> **D.   Esparza Participates in Another Proffer Interview Before
> Signing the Revised Factual Basis**

On March 25, 2020, Esparza and Mr. Jones met again with the

government, during which the parties discussed Esparza's Factual

Basis.  (Def. Ex. A-6 at 1.)  At no point during that interview did

Esparza or Mr. Jones express that any of the seven new paragraphs were inaccurate. Esparza also provided additional information to the government. Among other things, Esparza spoke about an August 4, 2016 meeting between Huizar, Huang, Chan, and others regarding the L.A. Grand Hotel redevelopment project, which Esparza discussed during a previous proffer interview (id.; Def. Ex. A-3 at 5), and he said that Huang at one point asked Huizar to recommend a land use attorney, and Esparza explained that Huizar did not want to recommend a certain person for fear they might develop a similar relationship with Huang. (Def. Ex. A-6 at 1.)

That same day, the government sent Mr. Jones an clean, un-highlighted copy of Esparza's revised Factual Basis. (Def. Ex. E.) Several days later, on April 1, 2020, Mr. Jones sent the government a copy of Esparza's revised Factual Basis signed by Esparza and him. (Def. Ex. F.) Each and every page of the Factual Basis was initialed by Esparza, and the final page was signed by both Esparza and Mr. Jones. (Id.)

   E.   **The Court Denies Defendants' March 2022 Motion to Compel Communications Between the Government and Counsel for Witnesses**

On March 3, 2022, all defendants, including SZNW, moved to compel the government to produce, among other things, "all communications between the government and any witnesses or cooperators and their counsel, including non-privileged notes, scheduling notices, and all records of communications." (Dkt. 381 at 1 (emphasis added).) Defendants argued that such materials were discoverable under Rule 16, Brady, and Giglio. (See id. at 8-11, 13, 23-25.) In particular, defendants argued that because certain cooperating witness' statements had evolved over time, obtaining

11

communications between the government and the cooperators' counsel, which conversations could have involved whether the government believed the cooperators' testimony, was central to understanding the changing accounts.  (See id. at 15.)

In its opposition, the government stated that it will continue to produce Rule 16, Brady/Giglio, and Jencks discovery, consistent with its duty to make prospective decisions about what falls into those categories.  (Dkt. 418 at 23.)  The government acknowledged that if it learns Brady/Giglio information from a witness' counsel, or if the prosecutors document such information in their notes, the government has a duty to disclose those underlying facts.  (Id. at 23-24.)  Even so, the government argued that defendants had failed to make a threshold showing of materiality for many of the requested items, for example, communications between the government and counsel for non-testifying witnesses or various non-substantive communications.  (See id. at 21-23.)

On April 25, 2022, the Court denied defendants' motion to compel.  (See Dkt. 436.)  In the Court's order, which it verbally provided at the hearing, the Court said the following:

> Based upon the prosecution team handling of this
> case to date, the Court concludes that the
> prosecutors fully understand and will continue to
> comply with their discovery obligations.  The
> Government's understanding and compliance with
> its obligation is evidenced by the incredibly
> detailed description defendants were able to make
> in their motion and reply briefs and in Mr.
> Snyder's declaration that I have been referring
> to regarding the alleged changes in Goldman and
> Businessperson A's testimony which are obviously
> based on discovery already produced and can and
> will be used to impeach both witnesses.  The
> Court thus denies the defendants' motion for
> additional discovery relating to those
> communications.  Should the defendants believe
> that the Government is not in compliance with its

12

discovery obligations, the defendants are free to
raise these issues at an appropriate later point
in time, hopefully with a full record so I can
make a determination without spending an enormous
amount of time going through all of the
documents.

(4/25/22 Hr'g Tr. at 40:19-41:13.)

Earlier, the Court set the government's deadline to produce
Brady/Giglio materials in connection with the Dae Yong Lee/940 Hill,
LLC trial for April 29, 2020.  On April 29, the government produced a
number of materials to defendants, including the fulsome
communications between the government and Esparza's counsel, as well
as the draft versions of the Factual Basis, that are the subject of
the instant motion to compel.

**F.    The Parties Meet and Confer Regarding the Government's
        Communications with Esparza's Counsel**

On May 17, 2022, counsel for defendant SZNW emailed the
government and requested "copies of all notes . . . of government
counsel's conversation with Mr. Jones" regarding a need to "enlighten
Mr. Esparza's recollection," as well as an accounting of that
conversation.  (Def. Ex. G at 7.)  The government responded on June
3, 2022 that it does not believe, based on a reasonably diligent
search, that it possessed any notes by government counsel other than
what has already been produced and further said the government would
maintain that any such communications are not discoverable under Rule
16(a)(2).  (See id. at 5.)  On June 6, 2022, defense counsel inquired
regarding possible agent notes of the conversation and whether the
government would, in any event, prepare an accounting of that
conversation.  (See id.)  The government responded several days
later, on June 10, 2022.  (Id. at 4.)  The government told defense

13

1 counsel that it is not aware of any Brady/Giglio or Jencks material

2 regarding the conversation, nor is it aware of any authority

3 requiring the government to create such a record.  (Id.)  Five days

4 later, on June 15, 2022, defense counsel further clarified its

5 request for Brady material and its purported legal basis.  Later that

6 day, the government wrote back to defense counsel and stated: "There

7 is no Brady information to produce in response to your below

8 request."  (Id. at 3.)

9      The parties conferred again several weeks later.  In a July 14,

10 2022 email to defense counsel, the government again explained that

11 the conversation with Mr. Jones at issue generated no Brady

12 information:

13          We have reviewed and our position is that there
            is no Brady and I nor any agents have no notes of
14          phone calls with Mr. Jones (as stated below).  I
            am not sure what there is to litigate in that
15          posture.  Moreover, the issue of AUSA
            communications as Brady has already been
16          litigated and resolved (denied absent threshold
            showing of materiality).  So to the extent you
17          seek to further litigate our position is that you
            should file a motion for reconsideration and
18          specifically identify materiality.

19 (Id. at 1.)

20      According to defense counsel, he spoke with Esparza's counsel,

21 Mr. Jones, who stated that he could not recall the substance of his

22 conversations with the government.  (See Mot. at 17.)  Defendants'

23 motion to compel followed.

24

25

26

27

28

                                14

**III.  ARGUMENT**

    **A.  The Government Has Repeatedly Confirmed That Its Conversations with Esparza's Attorney in March 2020 Produced No <u>Brady</u> Information, and Defendants Have Failed to Otherwise Demonstrate a <u>Brady</u> Violation**

Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the government must turn over evidence in its possession that is favorable to the defense or that may be used by the defense for impeachment purposes.  Specifically, <u>Brady</u>, "requires disclosure only of evidence that is both favorable to the accused and material either to guilt or to punishment." <u>United States v. Bagley</u>, 473 U.S. 667, 674 (1985) (citations omitted).  The Ninth Circuit has held that "[i]t is the government, not the defendant or the trial court, that decides <u>prospectively</u> what information, if any, is material and must be disclosed under <u>Brady</u>." <u>United States v. Lucas</u>, 841 F.3d 796, 807 (9th Cir. 2016) (emphasis in original).  For that reason, "the prosecutor's decision on disclosure is final" unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention.  <u>Id.</u> (quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 60 (1987)).  To challenge the government's representation that it lacks <u>Brady</u> information, a defendant must either make a showing of materiality under Rule 16 or otherwise demonstrate that the government improperly withheld favorable evidence.  <u>Lucas</u>, 841 F.3d at 808.  Defendants make no such showing here.

Although not entirely clear, defendants' claim seems to be that the unrecorded conversations between government counsel and Mr. Jones would reveal that Esparza agreed to certain facts in the Factual Basis only because it was what prosecutors "wanted, expected, and

1    needed him to say" and because he was unable to "push-back on [the

2    government's] claimed version of events."  (See Mot. at 14.)   In

3    other words, defendants apparently claim that the government is

4    withholding information that Esparza adopted facts in the Factual

5    Basis that were false or that he did not believe to be true.

6         This claim is utterly false.  *First* and most importantly, no

7    such information exists.  To the contrary, the government's fulsome

8    productions and express representations prove that what defendants

9    insinuate occurred did <u>not</u> occur.  (See 4/25/22 Hr'g Tr. at 40:19-22)

10   ("Based upon the prosecution team handling of this case to date, the

11   Court concludes that the prosecutors fully understand and will

12   continue to comply with their discovery obligations.")  *Second*,

13   defendants fail to make any threshold showing or point to any

14   evidence that would demonstrate that the government is, contrary to

15   its representations, withholding such <u>Brady</u> information.  This is

16   particularly true given not only the government's repeated

17   disclosures, but Mr. Jones' own statements directly to defense

18   counsel that he did not recall the substance of the conversations

19   with the prosecutors, without more.  (See Mot. at 17.)  And it is

20   likely that had government counsel insisted his client swear under

21   oath to false information that would be something Mr. Jones would

22   remember.

23        In short, defendants' bald speculation is insufficient to

24   warrant relief.

25        **B.    Defendants' Assertion that the Government Deliberately
                 Provided False or Inaccurate Information to Esparza to
26               Improve Its Likelihood of Prevailing at Trial Is Baseless**

27        Defendants assert that the government "spoon-fed[] [Esparza] a

28   series of 'facts' and events, none of which he had previously

                                      16

1   recounted," by including in his revised Factual Basis references to
2   several dates, communications, and events.  (See Mot. at 18.)
3   Defendants go on to allege that the government took these actions so
4   Esparza would say "what the prosecutors wanted, expected, and needed
5   him to say," presumably to improve the government's chances.  (Id. at
6   19.)  Defendants' assertion is as fantastical as it is false.

7        Most importantly, the "new" facts defendants accuse the
8   government of planting are all events of which Esparza has personal
9   knowledge and that are specifically corroborated, including written
10  communications Esparza himself previously sent or received, events
11  Esparza observed, and things Esparza said in recordings.  See Fed. R.
12  Evid. 602 ("A witness may testify to a matter only if evidence is
13  introduced sufficient to support a finding that the witness has
14  personal knowledge of the matter.")  What is more, defendants
15  fundamentally misunderstand what a Factual Basis is.  It is a
16  statement supporting the plea agreement in which the pleading
17  defendant swears that the facts contained therein are true.  There is
18  no requirement that a defendant can only swear to facts that were (a)
19  previously discussed at a proffer session and (b) ones the defendant
20  had a perfect memory of at the time of said initial proffer, as
21  defendants' motion incorrectly and bewilderingly suggests.  Indeed,
22  many defendants opt not to cooperate or speak with the government at
23  all, and it is commonplace for the government to offer a plea
24  agreement with a Factual Basis in the absence of a prior
25  conversation.  In other occasions, it is also routine for government
26  counsel to meet numerous times with a defendant before s/he agrees to
27  a Factual Basis.  Moreover, many defense counsel have repeated
28  conversations with their client during which they go over the

evidence the government has provided before their client enters a plea that discusses such evidence.  No credible argument can be made that a defense attorney going over the evidence with his/her client before signing a plea agreement has acted improperly by seeking to improve the client's chances of the plea being accepted.

Nor is there anything nefarious about providing the pleading defendant with corroborating documentation of objective events described in a Factual Basis or drilling down on specific details in finalizing a Factual Basis.  Indeed, litigants preparing for trial are routinely required to jog a potential witness' memory of people, places, and events with various items, as are parties engaged in actual trial.  See Fed. R. Evid. 612.  Defendants' own motion seemingly acknowledges that it would be perfectly permissible for the government to ask Esparza about his recollection of a conversation that occurred three years earlier; plant a seed that might lead Esparza to remember a specific call; or play a recorded call and ask leading questions about Esparza's state of mind at the time.  (See Mot. at 14.)  Ultimately, if that defendant can recall and truthfully swear to the contents of the Factual Basis, it is properly incorporated therein.

But in any event, the record here reflects that Esparza previously discussed -- or at minimum referenced -- nearly all of the so-called "new" facts contained in Esparza's revised Factual Basis. For example, paragraph 20 of Esparza's revised Factual Basis states that on August 4, 2016, Huang met with Huizar, Chan, and other city officials to discuss Huang's plans to expand the L.A. Grand Hotel project, including his interest in TOT rebates, TFAR, and other incentives from the City.  (See Def. Ex. F at 7 ¶ 20.)  But

defendants concede that during his January 15, 2019 proffer interview, Esparza stated that on one occasion Huang went to Huizar's office with Chan and representatives of LADBS and LADCP and presented Huang's expansion plans.  (See Def. Ex. A-3 at 5.)  Likewise, paragraphs 21, 21, and 23 of Esparza's revised Factual Basis reference specific texts, emails, and (recorded) telephone calls Esparza had regarding Huang's request for a list of land use consultants.  (See Def. Ex. F at 8 ¶¶ 21-23.)  And again, defendants concede that Esparza referenced Huang seeking Huizar's help securing a land use attorney during an earlier proffer session, albeit in a potentially different context. (See Mot. at 3 n.2, 6-7.)[8]

Paragraph 24 of Esparza's revised Factual Basis states that Huang brought up the L.A. Grand Hotel expansion project on numerous occasions in the presence of Huizar and Esparza. (See Def. Ex. F at 8 ¶ 24.)  Esparza again talked about this during an proffer interview, a fact defendants acknowledge in the motion.  (See Mot. at 7.)  And while paragraph 25 of the revised Factual Basis describes that Esparza and Zheng spoke by phone on May 9, 2017 and discussed Huang pressuring Huizar to repay the $600,000 Huang posted as collateral for the loan, including during an upcoming trip to Mexico, (see Def. Ex. F at 8-9 ¶ 25), Esparza stated during multiple earlier proffer interviews that Huang and/or Zheng had expressed their desire for Huizar to repay the money, albeit at somewhat later stages.  (See Def. Ex. A-3 at 4; Def. Ext A-5 at 8, 12.)

---

[8] It appears that Esparza did not previously discuss Huizar's disapproval of Huang selecting a particular land use consultant whom Huizar viewed as untrustworthy.  (See id. at 12.)  But this fact can hardly be said to dramatically affect the government's chances at trial.

1        Finally, paragraph 26 of Esparza's revised Factual Basis
2    describes a recorded May 9, 2017 telephone call in which Esparza
3    remarked that Huang "should have all the leverage in the world" over
4    Huizar because of what Huizar owes Huang, referring to Huang's
5    payment of the settlement collateral and his payments to Huizar in
6    Las Vegas.  (See Def. Ex. F at 9 ¶ 26.)  Here, defendants contend
7    that the government simply told Esparza what to say by explaining
8    what Esparza meant by the statement.  (See Mot. at 14.)  Critically,
9    though, Esparza stated during his January 15, 2019 proffer interview
10   that because of Huang's settlement payment and the money Huang gave
11   Huizar during the Las Vegas trips, there was an expectation that
12   Huizar would be there no matter what if Huang needed something.  (See
13   Def. Ex. A-3 at 4.)  Esparza further stated during proffer interviews
14   that when Huang told Huizar to jump, Huizar jumped, (see id. at 4),
15   and that Huizar told Huang he would help Huang with the L.A. Grand
16   Hotel redevelopment project, which would be a symbol of Huizar's
17   power in Los Angeles.  (See id. at 5.)  These previous statements
18   regarding Esparza's understanding of the Huang-Huizar relationship
19   are fully consistent with the language in paragraph 26 of the revised
20   Factual Basis, undermining defendants' claim that the government was
21   telling Esparza what the facts were and "what he was thinking and
22   what he meant."  (See Mot. at 9.)
23        Put simply, defendants' assertion that the government spoon-fed
24   Esparza information and attempted to replace Esparza's understanding
25   of the facts with its own agenda rings hollow.  Defendants' claims of
26   inappropriate witness engineering are therefore completely unfounded.
27        At most, defendants' motion showcases a potential point of
28   cross-examination for Esparza.  As this Court has previously

                                   20

1  observed, this may be proper impeachment, but it is <u>not</u> a basis to

2  compel government counsel to create a record about conversations with

3  cooperator counsel that it already confirmed did not raise any <u>Brady</u>

4  information.  (<u>See</u> 4/25/22 Hr'g Tr. at 40:23-41:05) ("The

5  Government's understanding and compliance with its obligation is

6  evidenced by the incredibly detailed description defendants were able

7  to make in their motion and reply briefs and in Mr. Snyder's

8  declaration that I have been referring to regarding the alleged

9  changes in Goldman and Businessperson A's testimony which are

10 obviously based on discovery already produced and can and will be

11 used to impeach both witnesses.")  Moreover, as stated above, due to

12 the government's fulsome discovery production and its requirement

13 that Esparza admit to a robust Factual Basis, impeachment material

14 for his testimony is not lacking.  This fact further demonstrates

15 that defendants' instant baseless and confused motion, which seeks to

16 contrive nonexistent <u>Brady</u> material, is unnecessary and unwarranted.

17 **IV.  CONCLUSION**

18      For the foregoing reasons, the Court should deny defendants'

19 motion to compel.