Richard M. Steingard (SBN 106374)
rsteingard@SteingardLaw.com
LAW OFFICES OF RICHARD M. STEINGARD
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone: (213) 260-9449
Facsimile: (213) 260-9450

Attorney for Defendant
Shen Zhen New World I, LLC

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SHEN ZHEN NEW WORLD I, LLC,<br><br>　　　　　Defendant. | CR-20-326(A)-JFW<br><br>**SHEN ZHEN NEW WORLD I, LLC'S SUBMISSION IN RESPONSE TO GOVERNMENT'S POSITION REGARDING ITS EXHIBIT LIST**<br><br>Trial Date: October 18, 2022<br>Trial Time: 8:00 a.m.<br>Crtrm: 7A<br><br>Assigned to Hon. John F. Walter |

1

1  Defendant Shen Zhen New World I, LLC, by and thorough its counsel of
2  record, Richard M. Steingard, hereby submits this declaration per the Court's order
3  at the August 8, 2022 hearing on the parties Joint Filing Regarding the
4  Government's Disclosure of Its Witness and Exhibit Lists.  (See ECF 621.)
5  Counsel's declaration responds to the government's August 15, 2022 submission
6  on this matter (ECF 631) and addresses the Court's inquiry into prejudice sustained
7  by the defendant based on the government's untimely attempts to add trial exhibits.

DATED: August 19, 2022

RICHARD M. STEINGARD
Law Offices of Richard M. Steingard

By: /s/
RICHARD M. STEINGARD
Attorney for Defendant Shen Zhen
New World I, LLC

**DECLARATION OF RICHARD M. STEINGARD**

I, Richard M. Steingard, state and declare as follows:

1. I am an attorney licensed to practice in the state of California and before this Court. I represent Shen Zhen New World I, LLC ("SZNW") in the above-pending matter and submit this declaration in response to the government's filing concerning untimely exhibits (ECF 631), and to address the issue of prejudice with respect to the government's untimely addition of new trial exhibits.

A. **The Government's Submission**

2. Throughout this case, I have brought to the Court's attention the manner and timing of the government's discovery. Because the discovery is so voluminous – now approximately 2.1 million pages – on several occasions I have asked that the Court direct the government to identify the documents that it will seek to introduce at trial. The Court has done so, often at a slower pace than what I had hoped but based, at least in part, on the government's representations that it was attempting to provide the defendants with its case exhibits.

3. For instance, on August 20, 2021, I brought a motion asking that the Court advance the date for the government to disclose its trial exhibits, which was then set for February 15, 2022. (ECF 209.) At a hearing on September 20, 2021, the Court questioned the government's delay in producing an informal list of exhibits, stating, "I find it strange that the Government doesn't have a ready stack of exhibits that it could provide the defense with respect to the various allegations of this First Superseding Indictment. Also, the Complaint was very extensive, and I can't imagine that whoever was the drafter or the scriber of the Complaint or First Superseding Indictment or the original Indictment for that matter didn't have a full set of documents that would assist in providing the very specific information that is set forth in the overt acts. What happened to those documents, or am I wrong that those documents didn't exist?" (RT 9/20/21 at 37-8.) On behalf of the government, AUSA Mack Jenkins responded that the Court "[was] not wrong" and that the government was working with three databases to

identify and collect its trial exhibits. (*Id*. at 3845.) Asked "how many people are responsible for searching for the trial exhibits," Mr. Jenkins responded, "Three AUSAs, three agents, one to two paralegals." (*Id*. at 45.) Asked "how much of your time do you spend searching the database," Mr. Jenkins responded, "The answer would be different for each person, but it is the priority of myself and AUSA Dragalin. So I would say in excess of 60 percent for us and AUSA Mills as well. Agent Civetti, Agent Logan, and Agent Johnson, this is a primary case of theirs, but I don't know specific proportion of their workflow. (*Id*.) Based in part on the government's representations, the Court declined to advance the date for disclosure of its exhibits lists.

4. That colloquy occurred almost one year ago. Now, the government asks that the Court permit numerous untimely additions to its exhibit lists. The government claims inadvertence as to some exhibits that were "mis-tagged;" for other, the government contends they were belatedly added due to "[i]nput from the Lee/940 Hill [t]rial [t]eam;" still others were added based on witness interviews; and a final group were located during "supplemental quality control checks." (ECF 631.)

5. As to the first group – the mis-tagged exhibits – the government refers to Huizar and Esparza's alleged efforts to conceal money that they received in Las Vegas. (*Id*. at 3-4.) These exhibits, the government claims, were mis-tagged as "Concealment" rather than tagged as "SZNW." (*Id*. at 4.)

6. Although the government does not specifically identify the mis-tagged documents, SZNW did so in the parties' Joint Filing, noting that the untimely exhibits included (a) Huizar's relatives' bank records and (b) Huizar and Esparza's text messages concerning the exchange of Australian currency. (ECF 621 at 5.) While the government's declaration obliquely refers to the Las Vegas trip money, it makes no mention of the text exchanges concerning the Australian money. Further, these are not the only instances of Huizar and Esparza's alleged concealment; the First Superseding Indictment contains other alleged incidents (*e.g.*, Overt Acts 73), but for some reason,

the other "concealment" exhibits were not mis-tagged. The government's submission does not provide any answer.

7. The government attributes a second group of untimely exhibits to the fact that it had to try the *940 Hill/Lee* case. (ECF 631 at 5-7.) Here, the government does not allege inadvertence, but rather a purported manpower shortage. This claim is dubious, at best, given that in September 2021, long before any case was set to go to trial, the government advised that it had seven or eight prosecution team members working diligently on identifying its trial exhibits. It seems unlikely that the prosecution team would *shrink* or work any less diligently as the cases got closer to trial. In addition, it bears noting that the parties agreed to the exhibit list disclosure date in late March and early April 2022 (ECF 427), when the *940 Hill/Lee* trial was still several months away.

8. The government also refers to a third group of exhibits that were identified during pre-trial witness interviews. (ECF 631 at 7-8.) Those exhibits were specifically carved-out from the agreed-upon exhibit disclosure date. SZNW does not challenge the inclusion of those exhibits.

9. The government advises that its final group of untimely exhibits derive from "supplemental quality control checks." (*Id.* at 8-9.) The government does not explain the meaning of this phrase, but it sounds like the government simply looked at its exhibits and found flaws in some of them. Without conceding that such a procedure qualifies as inadvertence, the identified exhibits are relatively innocuous and SZNW does not oppose their inclusion.

**B.     Prejudice**

10. During the hearing on August 8, 2022, the Court ordered SZNW to provide a declaration stating how it is prejudiced by the government's addition of untimely new exhibits. The scope of prejudice can take many forms. Certainly, prejudice can occur when a party is surprised by a new exhibit that should have been produced earlier and lacks sufficient time to properly assess the new materials and

incorporate it into its case.  For the most part, that is not this case.  Here, the prejudice takes a different form.

11. It is difficult to describe the vast scope of this case.  The charges and allegations span five years, but the actual evidence encompasses several decades.  As might be expected from a case of such magnitude, the discovery is massive.  As the parties recently advised the Court, "The discovery produced to date includes over 2,068,000 pages of written documents (including reports, e-mails, third-party productions, and wire line sheets), over 93,000 files of intercepted wire sessions, including audio and data files. In addition, the productions included extraction reports for over a dozen digital devices, over 260 hours of audio recordings in addition to intercepted wire sessions, pen register data for over two dozen phones, GPS phone tracker data for multiple devices, and dozens of pleadings for wiretap applications, search warrants, cell site and GPS warrants, and pen registers. The government currently anticipates producing additional discovery (including audio recordings of more recently conducted FBI interviews), and will continue to produce discovery that is generated as part of trial preparation during the pendency of this case." (ECF 632 at ¶12c.)

12. From this discovery, the government identified 40 trial witnesses and, irrespective of the new untimely exhibits, approximately 500 trial exhibits.  Against this backdrop, every new untimely exhibit requires a search for corroborating, connecting, clarifying, or contradictory evidence.  Because of the vastness of the discovery, this is a time consuming "needle in a haystack" experience.  When each new exhibit is added, my staff and I must search for linked evidence, not to mention consider possible motions, re-prep potential witnesses, tweak anticipated arguments, and revise projected strategies.  It is not as simple as merely adding a new document to an already massive stack of exhibits.

13. I am a solo practitioner with a small staff.[1] Going back in time, I agreed to the June 7 witness and exhibit lists disclosure date, and the other deadlines and filing dates, because I believed I would have sufficient time to prepare for the October 18 trial date (or the proposed October 25 date). In accordance with the agreed upon schedule, on June 7, the government provided its trial exhibit list, eliminating almost 500 previously identified trial exhibits on its April exhibit list and adding 150 new exhibits. While working with what I thought was the final exhibit list, in July, the government began identifying untimely new exhibits, a practice that has continued to date, as there are references to new exhibits in the government's submission that I just recently became aware of. Every new untimely exhibit infringes on my preparation, as did the preparation of the Joint Filing to address the government's belief that the June 7 list was a mere draft. Thus, it is not that a single untimely new exhibit is prejudicial, but the ongoing nature of these productions and the totality of the circumstances that create the prejudice. This form of prejudice – what may be referred to as "cumulative prejudice" – may be different than being handed a surprise exhibit, but it is no less significant.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of August, 2022.

Richard M. Steingard

---

[1] I have engaged another attorney (Craig Wilke) to assist me at trial, but he has been preparing for a two-week federal trial in Orange County that starts next week and, with a few exceptions, has not been able to meaningfully help me with the pretrial preparations.