Exhibit A

1  NICOLA T. HANNA
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   MACK E. JENKINS (Cal. Bar No. 242101)
4  Assistant United States Attorney
   Chief, Public Corruption & Civil Rights Section
5  VERONICA DRAGALIN (Cal. Bar No. 281370)
   Assistant United States Attorney
6  Public Corruption & Civil Rights Section
        1500 United States Courthouse
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone: (213) 894-2091/0647
        Facsimile: (213) 894-6436
9       E-mail:    Mack.Jenkins@usdoj.gov
                   Veronica.Dragalin@usdooj.gov
10
   Attorneys for Applicant
11 UNITED STATES OF AMERICA

```
FILED
CLERK, U.S. DISTRICT COURT

JUL 2 0 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY
```

12              UNITED STATES DISTRICT COURT

13           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 | IN THE MATTER OF THE APPLICATION     CR Misc. No. 17-CM-508(E)-JFW
   | OF THE UNITED  STATES OF AMERICA
15 | FOR AN ORDER AUTHORIZING (1) THE     NOTICE OF LODGING OF EXHIBITS C
   | INTERCEPTION OF WIRE,                AND D AND AMENDED PROPOSED ORDER
16 | ELECTRONIC, AND ORAL
   | COMMUNICATIONS; (2) THE              (UNDER SEAL PURSUANT TO 18 U.S.C.
17 | INSTALLATION AND USE OF A PEN        § 2518(8))
   | REGISTER AND A TRAP AND TRACE
18 | DEVICE; AND (3) THE RELEASE OF       [Exhibits C & D and Amended
   | SUBSCRIBER INFORMATION               Proposed Order filed concurrently]
19
20
21      Plaintiff United States of America, by and through its counsel

22 of record, the United States Attorney for the Central District of

23 California and Assistant United States Attorneys Mack E. Jenkins and

24 Veronica Dragalin hereby lodges this Notice of Lodging of Exhibits C

25 and D and Amended Proposed Order.

26      1.   On June 6, 2018, the government filed an Application for an

27 Order Authorizing (1) the Interception of Wire, Electronic, and Oral

28 Communications; (2) the Installation and Use of a Pen Register and a

1　Trap and Trace Device; and (3) the Release of Subscriber Information
2　and Cell Site Information in CR Misc. No. 17-CM-508(E)-JFW (the "Wire
3　Application"). This Wire Application is still pending before the
4　Court.

5　　2.　After the filing of the Wire Application on June 6, 2018,
6　the hearing on the filed application was delayed. The delay was due
7　to operational and technical procedures (required by the FBI and
8　third parties) necessary for the FBI to effectively execute the Order
9　for the audio and video interception of the Target Locations.

10　　3.　Pursuant to Section 2516(1) of Title 18, United States
11　Code, an appropriate official of the Criminal Division, United States
12　Department of Justice, specifically Bruce C. Swartz, Deputy Assistant
13　Attorney General, Criminal Division, having been specially designated
14　by the Attorney General pursuant to Order Number 3854-2017, dated
15　February 27, 2017, authorized the Wire Application. Lodged as
16　**Exhibit C** is a copy of a memoranda of continued authorization
17　approving the Wire Application, by an appropriate official of the
18　Criminal Division, United States Department of Justice, specifically
19　Raymond N. Hulser, Deputy Assistant Attorney General, Criminal
20　Division. In addition, pursuant to 18 U.S.C. § 2516(3), I, as an
21　attorney for the government, have again authorized the application
22　for an order approving the interception of electronic communications.
23　Moreover, I have received initial and continued approval from the
24　above-noted appropriate officials for this application, respectively,
25　and have attached this supplemental authorization within **Exhibit C** as
26　well.

27　　4.　Lodged as **Exhibit D** is a supplemental affidavit of Special
28　Agent Andrew Civetti. This supplemental affidavit provides

2

1  additional probable cause and additional facts supporting necessity

2  of the requested interceptions gathered through a variety of

3  attempted investigative means since the filing of the Wire

4  Application.

5      5.    On June 22, 2018, in <u>Carpenter v. United States</u>, 685 U.S.

6  ___ (June 22, 2018), the Supreme Court held that the government's

7  acquisition of seven days or more of historical cell-site location

8  records created and maintained by a cell-service provider is a Fourth

9  Amendment search generally subject to the warrant requirement.  The

10  lodged **Amended Proposed Order** strikes all language referring to cell-

11  site information arguably affected by the <u>Carpenter</u> decision.  The

12  government will file separately with the duty magistrate judge a

13  warrant seeking cell-site information in compliance with <u>Carpenter</u>.

14      6.    The original proposed order filed under this case number

15  can be disregarded.

16

17  Dated: July 13, 2018          NICOLA T. HANNA
                        United States Attorney

18

19                          LAWRENCE S. MIDDLETON
                        Assistant United States Attorney

20                          Chief, Criminal Division

21

22                          MACK E. JENKINS

23                          VERONICA DRAGALIN
                        Assistant United States Attorneys

24                          Public Corruption & Civil Rights
                        Section

25

26                          Attorneys for Plaintiff
                        UNITED STATES OF AMERICA

27

28

3

# Exhibit C



**U.S. Department of Justice**

Criminal Division

Washington, D.C. 20530

<u>MEMORANDUM</u>

JUL 1 2 2018

TO:     Jennifer A.H. Hodge, Director
        Office of Enforcement Operations
        Criminal Division

ATTN:   Veronica Dragalin

FROM:   John P. Cronan
        Acting Assistant Attorney General
        Criminal Division

SUBJECT: Authorization for Interception Order Application


        This is with regard to your recommendation that
an appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
continued interception of wire communications occurring to and
from the cellular telephones bearing the numbers (626) 261-9240,
subscribed to by Hui Wen Cheng, 11859 Tolentino Drive, Rancho
Cucamonga, California, and accessed through international mobile
subscriber identity ("IMSI") number 310260131811145, (626) 230-
6463, subscribed to by Sarah C. Chan, 1585 Kempton Avenue,
Monterey Park, California, and accessed through IMSI number
310260656782536, and ███████████████████████████ California, and
███████████████████████████████████████████████ and the initial
interception of oral communications occurring within a specified
conference room and office of the "CCC Investment Group," at the
"Pacific Financial Center," 800 W. 6th Street, Suite 900, Los
Angeles, California, in connection with an investigation into
possible violations of Title 18, United States Code, Sections 2,
371, 666, 1014, 1341, 1343, 1344, 1346, 1349, 1951, and 1956,
and Title 52, United States Code, Section 30121, by Jose Huizar,
George Esparza, Wei Huang, Ricky Zheng, Isidra Huizar, Salvador
Huizar, George Chiang, Raymond Chan, ████████████ Justin Kim,
Michael Bai, Christopher Pak, ████████████ Mitchell Englander,

Johnny Green, Fuer Yuan, Richelle Rios, Yan Yan, Shawn Kuk, Joel Jacinto, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 3854-2017, dated February 27, 2017, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty-day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

John P. Cronan
Acting Assistant Attorney General
Criminal Division

7/12/18
Date

RAYMOND N. HULSER
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION



**U.S. Department of Justice**

Criminal Division

Washington, D.C.  20530

JUL 1 2 2018

The Honorable Nicola T. Hanna
United States Attorney
Central District of California
Los Angeles, California

    Attention:  Veronica Dragalin
          Assistant United States Attorney

Dear Mr. Hanna:

  An appropriate official hereby approves an application to
be made to a federal judge of competent jurisdiction for an
order under Section 2518 of Title 18, United States Code,
authorizing for a thirty (30) day period the continued
interception of electronic communications occurring to and from
the cellular telephones bearing the numbers (626) 261-9240,
subscribed to by Hui Wen Cheng, 11859 Tolentino Drive, Rancho
Cucamonga, California, and accessed through international mobile
subscriber identity ("IMSI") number 310260131811145, (626) 230-
6463, subscribed to by Sarah C. Chan, 1585 Kempton Avenue,
Monterey Park, California, and accessed through IMSI number
310260656782536, and ███████████████████ California, and
accessed through IMSI number ██████████████ in connection with
an investigation into possible violations of federal felonies,
by Jose Huizar, George Esparza, Wei Huang, Ricky Zheng, Isidra
Huizar, Salvador Huizar, George Chiang, Raymond Chan, ███████
████████ Justin Kim, Michael Bai, Christopher Pak, ████████
█████ Mitchell Englander, Johnny Green, Fuer Yuan, Richelle
Rios, Yan Yan, Shawn Kuk, Joel Jacinto, and others as yet
unknown.

  The above-described application may be made by you or any
other attorney on your staff who is an investigative or law

enforcement officer of the United States within the meaning of
Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to
the target telephone numbers listed above, but also to any other
telephone numbers or telephones accessed through the above-
referenced IMSI numbers, and to any other IMSI numbers accessed
through the target telephone numbers referenced above, within
the thirty-day period.  The authorization is also intended to
apply to the target telephone numbers referenced above
regardless of service provider.

Sincerely,

John P. Cronan
Acting Assistant Attorney General
Criminal Division

_7|12|18_
Date

RAYMOND N. HULSER
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

# Exhibit D

## Table of Contents

I.    PURPOSE OF SUPPLEMENTAL AFFIDAVIT......................... 1

II.   FACTS AND CIRCUMSTANCES IN SUPPORT OF PROBABLE CAUSE...... 3

    A.    CHAN AND CHIANG CONTINUE TO UTILIZE THE **TARGET LOCATIONS** TO MEET WITH MEMBERS OF THE HUIZAR ORGANIZATION IN FURTHERANCE OF THE TARGET OFFENSES... 3

        1. Source 8's Meetings at the **TARGET LOCATIONS**....... 3

        2. Development of Possible Quid Pro Quo Between CHIANG, CHAN and JOEL JACINTO ................... 4

        3. CHAN Describes Quid Pro Quo Scheme Utilizing HUIZAR's Planning Director, SHAWN KUK .......... 10

III.  TOLL ANALYSIS TARGET PHONE 4 (CHIANG) ................... 17

IV.   TOLL ANALYSIS TARGET PHONE 5 (CHAN) ..................... 22

V.    TOLL ANALYSIS TARGET PHONE 6 ███████ ................. 25

VI.   NECESSITY FOR INTERCEPTION.............................. 27

    A.    Sources and Undercover Agents Will Not Satisfy the Goals of this Investigation Without the Requested Interception....................................... 29

    B.    Investigators Are Still Seeking to Determine All of the Precise Official Acts HUIZAR, ███████ KUK, JACINTO and Possibly Others Have Performed, Are Performing, or Have Agreed to Perform in Exchange for Payments and Other Financial Benefits.............. 32

    C.    A Financial Investigation of the Violators and Others Has Not Satisfied the Goals of the Investigation Without the Requested Interception................. 33

    D.    Search Warrants.................................... 34

    E.    Tracking Devices.................................. 35

VII.  PRIOR APPLICATIONS..................................... 36

VIII. MINIMIZATION.......................................... 37

IX.   AUTHORIZATION REQUESTED................................ 37

X.    CONCLUSION............................................ 37

i

## SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AUTHORIZATION TO INTERCEPT WIRE AND ELECTRONIC COMMUNICATIONS OVER TARGET PHONES 4, 5, & 6 AND AUTHORIZATION TO INTERCEPT ORAL COMMUNICATIONS AND VISUAL, NON-VERBAL CONDUCT AT TARGET LOCATIONS 1 AND 2

I, Andrew Civetti, Special Agent of the Federal Bureau of Investigation, being duly sworn, declare and state as follows:

### I. PURPOSE OF SUPPLEMENTAL AFFIDAVIT

1. This affidavit is made as a supplement to a prior affidavit filed with the Court on June 6, 2018 ("Affidavit 6"), in support of an application ("Application 6") for an order authorizing the continued interception of **TARGET PHONE 4 (CHIANG'S PHONE), TARGET PHONE 5 (CHAN'S PHONE),** and **TARGET PHONE 6** ████████████ of wire and electronic communications of JOSE HUIZAR, GEORGE ESPARZA, WEI HUANG, RICKY ZHENG, ISIDRA HUIZAR, SALVADOR HUIZAR, GEORGE CHIANG, RAYMOND CHAN, ████████ ████████ JUSTIN KIM, MICHAEL BAI, CHRISTOPHER PAK, ████████ ████████ MITCHELL ENGLANDER, JOHNNY GREEN, FUER YUAN, RICHELLE RIOS, SHAWN KUK, JOEL JACINTO, YAN YAN and others yet unknown, occurring to and from the cellular telephones known to be used by CHIANG, CHAN, and ████████ respectively. Affidavit 6 is incorporated by reference herein as if included in full.

2. In addition, this affidavit is made as a supplement to a prior affidavit (Affidavit 6) filed with the Court on June 6, 2018, in support of an application pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III"), for an Order of Interception authorizing the initial interception of oral communications and, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the All Writs Act, 28 U.S.C.

1

§ 1651, interception of visual, non-verbal conduct of the Violators specified below occurring within the premises of CHAN and CHIANG's political lobbying business suite, located at 800 W. 6th Street, Suite 900, Los Angeles, California 90017. Specifically, the intercepted areas within the business suite will include the conference room ("**TARGET LOCATION 1**") and CHAN's office ("**TARGET LOCATION 2**") (collectively, the "**TARGET LOCATIONS**").

3.    This supplemental affidavit provides additional probable cause and additional facts supporting necessity of the requested interceptions gathered through a variety of attempted investigative means since the filing of Affidavit 6.

4.    After the filing of Affidavit 6 on June 6, 2018, the hearing on the filed applications (for which Affidavit 6 was appended in support thereof) was delayed.  The delay was due to operational and technical procedures (required by the FBI and third parties) necessary for the FBI to effectively execute the Order for the audio and video interception of the **TARGET LOCATIONS**.  As described in Affidavit 6, the **TARGET LOCATIONS** are located in a high-rise building in downtown Los Angeles that has 24-hour security.  In addition, CHAN and CHIANG are close associates of one of the building's owners.  Additional investigative procedures had to occur in order to limit the risk of exposure that would jeopardize the investigation.  In addition, many unexpected technical and logistical obstacles have made the FBI unable to cause all necessary components to be installed surreptitiously and successfully.  These technical and

2

logistical obstacles have been resolved (as of July 12, 2018) to allow successful implementation of the Order.

## II. FACTS AND CIRCUMSTANCES IN SUPPORT OF PROBABLE CAUSE

5.   The following is a summary of information and material that investigators have gathered since the filing of Affidavit 6, which is provided for the limited purposes stated above.[1] Thus, this Supplemental Affidavit does not represent my complete knowledge of this investigation.

### A.   CHAN AND CHIANG CONTINUE TO UTILIZE THE TARGET LOCATIONS TO MEET WITH MEMBERS OF THE HUIZAR ORGANIZATION IN FURTHERANCE OF THE TARGET OFFENSES

#### 1.   Source 8's Meetings at the TARGET LOCATIONS

6.   In addition to the meetings outlined in Affidavit 6 (VI.F.1), Source 8 met and consensually recorded CHAN and/or CHIANG at the **TARGET LOCATIONS** to include, but not limited to, on the following dates: April 25, 2018, May 9, 2018, May 16, 2018, May 31, 2018, June 7, 2018, June 14, 2018, June 21, 2018, June 29, 2018, and July 10, 2018.

---

[1] In certain points below, I summarize wire and electronic communications that investigators intercepted pursuant to the Orders.  In other points, I quote from or paraphrase those interceptions.  I do not represent those summaries to be verbatim transcriptions of interceptions of the **TARGET PHONES**, as they were only prepared for the purpose of near-real-time assistance to this ongoing investigation and because transcripts frequently change and evolve as investigators and monitors become more familiar with the facts of a case and engage in multiple playbacks of recordings.  All interpretations of said calls are based on my training, experience, knowledge of this investigation, and my personal review of calls/texts.

3

2. Development of Possible Quid Pro Quo Between
CHIANG, CHAN and JOEL JACINTO

7. On April 25, 2018, in a consensually recorded conversation in **TARGET LOCATION 1**, CHAN told Source 8 that Chairman HUANG[2] was visiting the **TARGET LOCATIONS** on April 26, 2018 and that Chairman Song[3] visited the **TARGET LOCATIONS** on April 24, 2018. In addition, CHAN said that approximately four to five developers per week meet with CHAN and/or CHIANG at the **TARGET LOCATIONS**. During this meeting, CHAN also instructed Ave to use her husband, JOEL JACINTO[4], to make introductions to different developers on behalf of Source 8's company. Based on my knowledge of the investigation, I understand this to mean that CHAN instructed Ave to utilize her husband in his official capacity to influence or encourage developers to utilize Source 8's company. I believe this to be part of a possible quid pro quo relationship between JACINTO, CHAN, and CHIANG as discussed in Affidavit 6 (VI.C.2).

8. Also during this April 25, 2018 meeting, CHAN told Source 8 that Kevin Chen[5] was expected to come to the **TARGET LOCATION** after HUANG on April 26, 2018. CHAN discussed that Chen had struggled for approximately five years with getting his

---

[2] WEI HUANG is a Chinese Citizen and the Chairman and President of SHENZHEN NEW WORLD GROUP, a China-based real estate development company with projects in HUIZAR's district.

[3] Chairman Song is the Chairman of a Chinese development company seeking to acquire projects in Los Angeles.

[4] JACINTO is a Public Works Commissioner for the city of Los Angeles.

[5] Kevin Chen is a developer representing the Arts District Center ("ADC") project that is located in HUIZAR's district.

4

Casino_2005632

development project supported and now that CHAN is working with Chen things are moving forward after just two months. CHIANG joined the conversation and said without HUIZAR, CHAN, and CHIANG, no one paid attention to Chen's project. CHAN and CHIANG just received support for the project from HUIZAR to have three additional floors and they were moving full speed forward. Based on intercepted communications, prior source reporting, and my knowledge of the investigation, I believe this was confirmation from CHAN and CHIANG that they were successful in making an arrangement with HUIZAR regarding Kevin Chen's Arts District Center (ADC) project that was discussed in Affidavit 6 (VI.B.3). In addition, CHAN and CHIANG utilized the **TARGET LOCATIONS** to meet with at least HUANG, Song, and Chen.

9. On May 9, 2018, in a consensually recorded conversation at **TARGET LOCATION 1**, CHAN instructed Ave that her "connectors" were JACINTO, CHAN, and Tim Piasky.[6] Source 8 understood "connectors" to mean individuals with placement or access to influence developers directly or through other public officials to utilize Source 8's company. CHAN told Source 8 that Kevin Chen attended an event for CURREN PRICE and that CHAN was successful in getting HUIZAR's support for the three additional floors for Chen's ADC project. These additional floors would add approximately twenty to thirty units, which was more profit for Chen. Source 8 then met CHAN privately in **TARGET LOCATION 2** to discuss a payment to Ave. This meeting was

---

[6] Tim Piasky is the President of the Business Industry Association (BIA).

5

also consensually recorded. Source 8 described that he/she knew the situation between JACINTO and CHAN in which CHAN wanted to provide JACINTO with money because JACINTO could help CHAN as a Public Works Commissioner. CHAN said that JACINTO did not help much, but only a little and CHAN wanted to see how things were for a few weeks and what Ave could do. CHAN said, "don't worry about it, I did a lot more favors for JACINTO, he only did a little for me." Source 8 believed CHAN seemed very "careful" with his words and different than he usually acted when discussing providing money to JACINTO. Based on my training, experience, and knowledge of the investigation, I believe CHAN was attempting to minimize his involvement with JACINTO. Previously CHAN pushed Source 8 to "hire" Ave because JACINTO was a Public Works Commissioner and needed money for his child's college. CHAN continually said that JACINTO would assist CHAN and CHIANG in his official capacity. I believe CHAN minimizing this arrangement was an example of CHAN being cautious of revealing the full extent of the quid pro quo relationship and that although CHAN utilizes Source 8 to make payments to Ave, CHAN still limits the information he provides to Source 8.

10. On May 16, 2018, Source 8 arrived at the **TARGET LOCATIONS** and observed CHIANG and his assistants, including YAN YAN[7], in **TARGET LOCATION 1**. In a consensually recorded meeting,

---

[7] YAN YAN is one of CHAN and CHIANG's assistants at the CCC Investment Group, at the **TARGET LOCATIONS**. YAN previously worked for Chairman HUANG and SHENZHEN NEW WORLD GROUP. As described in prior affidavits, YAN was involved in the $600,000 settlement arrangement facilitated by HUANG for HUIZAR in 2014. The settlement was for a sexual harassment lawsuit filed against

6

Source 8 met with CHAN in **TARGET LOCATION 2** and observed several files on CHAN's desk. One file was labeled, "ADC – timeline." Based on Source 8's observations, I believe CHAN utilizes his office when conducting business related to development projects in Los Angeles, including, but not limited to, Kevin Chen's ADC project.

11. On May 31, 2018, in a consensually recorded conversation in **TARGET LOCATION 2**, CHAN told Source 8 he was very busy in his office, doing real estate transactions for clients in China, helping hotels with entitlements and getting land approved. CHAN said he was looking to push Source 8's company to increase sales. CHAN discussed how Ave would assist Source 8's company to increase sales. CHAN mentioned redoing Source 8's company brochure and that Source 8 should put his/her bio in the brochure, if Source 8 felt comfortable given "the current situation." Source 8 understood "given the current situation" to mean the FBI investigation. Based on CHAN's comment and my knowledge of the investigation, I believe CHAN continues to be cognizant of the fact that Source 8 was interviewed by the FBI and that there was an ongoing investigation. Because of CHAN's awareness of the investigation, I believe CHAN is cautious and limits the information he provides to Source 8. Although CHAN limits the information, CHAN continues to appear to support Source 8's

---

HUIZAR by Francine Godoy, a former HUIZAR staff member. The settlement arrangement was discussed in Affidavit 1 (V.I.1, p. 61).

Casino_2005635

company to keep Source 8 loyal to CHAN, CHIANG, and other members of the HUIZAR Organization. CHAN previously discussed loyalty with Source 8 and that he considered Source 8 to be one of CHAN's "good brothers." Based on my knowledge of the investigation, including CHAN's other recorded uses of "good brothers," I understand "good brothers" to mean the individuals which CHAN trusts and/or possibly utilizes in furtherance of the Target Offenses.

12. On June 7, 2018, in a consensually recorded conversation at **TARGET LOCATION 1**, before Ave arrived, CHAN told Source 8 that he had a long talk with Ave the day before and that Ave was very frustrated because Source 8's staff was not responding to her inquires to Source 8's operating procedures. CHAN asked if Source 8 had a budget to pay Ave more. Source 8 told CHAN that Ave did not need to do work, but that Source 8 would pay Ave a full-time salary even if she did not actually work full-time. Ave then arrived and Source 8 told Ave that Source 8 would pay Ave $5,000 per month as a full-time salary. Ave said she could not actually work full-time because she had another job. Source 8 told CHAN and Ave that Ave would be paid as if she worked full-time, but that Ave did not need to do any work or full-time hours. Ave agreed to the arrangement.

13. CHAN, CHIANG, and Source 8 then left the suite and went into the elevators to the building's lobby. CHAN told Source 8 that Ave seemed much happier and because of this CHAN and CHIANG could talk to JOEL JACINTO and see how much work he could help with. Source 8 responded that Ave could ask JACINTO

8

Casino_2005636

for help to direct businesses to Source 8's company, but CHAN stated, "it's not asking her husband for help, it is for JOEL [JACINTO] to do something for his own family... even though we don't get a lot of jobs from BIA, there is a lot of jobs to get from JOEL [JACINTO]." Based on my training, experience, and knowledge of the investigation, I believe CHAN said that JACINTO was doing "something for his own family" as a reference to using his official position to assist CHAN and CHIANG in exchange for a financial benefit (e.g., payments to Ave). Based on the above and the intercepted calls in Affidavit 6, I believe JACINTO was willing to help CHAN and CHIANG with HAZENS' Redevelopment Project (specifically, the required BOE clearances) because, as previously stated by CHAN, JACINTO needed financial assistance because of the expense of his child's college tuition. I believe that CHAN told Source 8, "even though we don't get a lot of jobs from BIA, there is a lot of jobs to get from JOEL [JACINTO]" to mean that JACINTO could direct developers to utilize Source 8's company. I believe that CHAN represented this as a benefit to Source 8 in exchange for Source 8 paying Ave; however, I believe CHAN's main purpose of Source 8's payment to Ave was in exchange for JACINTO's assistance with HAZENS' Redevelopment Project. I believe this is another example of CHAN concealing the full extent of the possible quid pro quo relationship between CHAN, CHIANG, and JACINTO.

14. On June 14, 2018, in a consensually recorded conversation at **TARGET LOCATION 1**, Source 8 told Ave, "we will pay you full time, $5,000 per month, but you do not have to work

9

like full time, full time, you know what I mean?  Your hours are flexible… I don't want you to feel like I assume you to work 9 to 5 or 8 to 4 or 8 to 5 whatever, just full time salary pay, but you do not have to work full time at all."  Ave replied, "I understand."  Source 8 replied, "when Ray [CHAN] comes in we can go over this thing quick."  Based on prior intercepted communications, Source 8's consensual recordings, and my knowledge of the investigation, I believe Ave accepted the $5,000 salary for a "full time" job for which she did not work full time as an indirect payment to her husband (JACINTO) and as part of the quid pro quo arrangement with CHAN and CHIANG.  As previously discussed, CHAN pushed Source 8 to hire Ave because JACINTO could help CHAN and CHIANG as a Public Works Commissioner.  As discussed in Affidavit 6 (VI.C.2), I believe this "help" to include JACINTO utilizing his official position to direct Bureau of Engineering[8] staff to assist in the clearances for HAZENS' Redevelopment Project.  In addition, CHAN told Source 8 that JACINTO could "get projects for them."  Based on my knowledge of the investigation, I believe this to mean that JACINTO could direct development projects to CHAN, CHIANG, and Source 8.

> 3.  CHAN Describes Quid Pro Quo Scheme Utilizing
>     HUIZAR's Planning Director, SHAWN KUK

15.  In the same meeting described above with Ave on June 14, 2018, in a consensually recorded conversation, when CHAN

---

[8] The Bureau of Engineering is a division of the Department of Public Works.

Casino_2005638

arrived to **TARGET LOCATION 1** he told Source 8, "I have really good news! You know Councilman JOSE HUIZAR... HUIZAR is for the South park district, downtown district, but in addition to **that he is the chair of the Planning and Land Use [PLUM] Committee where all the projects go through that committee to get approvals...** his planning deputy is willing to help... SHAWN KUK... he **would be good for a little finder's fee if things work out."** Source 8 replied, "finder's fee?" CHAN said, "he will talk to Ave and if nothing happens, nothing happens, but if it does then he will get a finder's fee... he is the one that sees more projects than anybody, period. Because whether you are in his district or you are out of the district you still have to talk to SHAWN [KUK]."

16. CHAN then drew a diagram on the white board that represented the fifteen different council districts in the City and committees as well as the City officials involved. As CHAN drew the picture he said, "There is the Planning and Land Use Committee, every project goes through there... **JOSE HUIZAR, MITCH ENGLANDER [CD 12], CURREN PRICE [CD 9], these are all brothers.** All of these projects talk to SHAWN KUK because he is HUIZAR's planning [deputy]... **he [KUK] is very useful... but I would like to keep it under wraps."** CHAN said that KUK was at the **TARGET LOCATIONS** the previous day. According to pen register data, CHAN was in communication with KUK's personal phone[9] on June 13,

---

[9] Based on my investigation, I know that KUK typically utilizes his work cell phone for legitimate business activities. Thus, I believe it is significant that CHAN communicates with KUK on KUK's personal cell phone.

11

2018, as well as prior to and during CHAN's meeting with Source 8 on June 14, 2018.

17.   CHAN and Source 8 then left the suite and entered the elevators to return to the lobby.  In Chinese, CHAN told Source 8 not to pay the finder's fee to KUK directly, but to create a purported consulting contract with KUK's mother to make the arrangement look legitimate.  CHAN said the contract should be for maintenance or childcare.  CHAN instructed Source 8 not to call it a finder's fee for Source 8's company or for any projects.  CHAN told Source 8 that Source 8 was not to use his/her company's name and that this should appear to be completely separate from Source 8's business.  CHAN also said to not explicitly discuss the arrangement with KUK and that CHAN would discuss the specifics with KUK himself.

18.   Source 8 expressed to CHAN that he/she was worried that HUIZAR would find out about the arrangement with KUK (in that KUK was getting payments that might otherwise go to HUIZAR).  CHAN told Source 8 not to worry because HUIZAR knew that Source 8 would support his wife, RICHELLE RIOS, in her campaign.  In addition, CHAN told Source 8 that Source 8 would be paying KUK's mother and not KUK himself.  CHAN wanted to know by tomorrow how much Source 8 was willing to pay in a finder's fee and how much CHAN could make on commission from any development deals facilitated by JACINTO.

19.   On June 15, 2018, in a recorded conversation, CHAN met with Source 8 and KUK at Source 8's business.  After KUK left, CHAN told Source 8, "think about it, SHAWN [KUK] knows the

12

projects happening and Ave has her husband JOEL [JACINTO] for Public Works and **if people know this they will give us projects."** Based on my training, experience, and knowledge of the investigation, I believe this to mean that developers would be enticed to use CHAN/CHIANG's consulting services because the developers could have CHAN/CHIANG utilize KUK and/or JACINTO to obtain project approvals, expedite the development process, and provide direction to other divisions/departments to assist their development project, and do so in a manner not available to other consultants. This is especially beneficial for projects that go through PLUM because KUK reviews all such projects on HUIZAR's behalf; thus, any direction from CHAN/CHIANG to KUK could greatly help the developer, as PLUM often helps determine the fate of projects throughout all 15 council districts. In addition, CHAN told Source 8 that KUK was recently divorced and had two kids so he was very hungry for money. Finally, CHAN said that KUK was a "good brother" and could be trusted.

20. CHAN told Source 8 that between JACINTO and KUK, CHAN was closer to KUK and that after KUK works for HUIZAR he would be coming to work for CHAN. CHAN instructed Source 8 to pay KUK $10,000 to $20,000, but to not draft any agreements until KUK directed the first project to Source 8. CHAN also told Source 8 that now that Ave has a salary she seems motivated. Source 8 told CHAN that Ave was being paid a full-time salary, but that she did not need to work. CHAN confirmed that this arrangement was good.

13

21. Based on pen register data, Source 8's reporting, my training, experience, and knowledge of the investigation, I believe that CHAN met with KUK at the **TARGET LOCATIONS** on June 13, 2018 and agreed to a quid pro quo arrangement with KUK. Although the specifics of CHAN and KUK's agreement are being investigated, I believe that this is further evidence of the illicit relationship between CHAN, CHIANG and KUK. Not only did CHAN instruct Source 8 on how to secretly provide KUK $10,000 to $20,000 for a "finder's fee," CHAN specifically instructed Source 8 on how to pay KUK to appear legitimate (i.e. Source 8 creating a fake entity to create a fake contract with KUK's mother). Of note, in this investigation, family members have been commonly used for these concealment purposes to launder illicit payments to public officials.

22. On June 21, 2018, in a recorded conversation at **TARGET LOCATION 1** while Source 8 was present, Ave asked when she would meet KUK, and CHAN responded not now because KUK is a more "sensitive person." Source 8 understood this to mean that because KUK was a public official, CHAN had to be careful in dealing with KUK. Based on my training, knowledge, and experience, I believe that CHAN did not want Ave to meet KUK yet because CHAN wanted to maintain control of the arrangement, limit the number of people aware of the arrangement, and limit the number of people who might discuss the matter with KUK and potentially alarm him that others knew of this arrangement.

23. On June 21, 2018, in the same consensually recorded meeting discussed above, CHAN requested Source 8 join him at

14

Casino_2005642

TARGET LOCATION 2 so that he could show Source 8 something. When Source 8 arrived to **TARGET LOCATION 2**, CHAN showed Source 8 how he was organized with different electronic files per project that CHAN accessed from a laptop or tablet. CHAN showed Source 8 a number of files, including, HAZENS' Redevelopment Project, Chen's ADC project, and OCEANWIDE's project. These electronic files included "action plans" and "timelines" for the projects. CHAN also showed Source 8 an "internal" file for CHAN and CHIANG's company. Based on Source 8's observations, I believe that the **TARGET LOCATIONS** contain evidence of the Target Offenses.

24. On June 29, 2018, in a consensually recorded conversation at **TARGET LOCATION 1**, Ave and CHAN confirmed that Source 8 would pay Ave $5,000 per month. The FBI conducted surveillance during this meeting and observed Source 8 and CHAN exit the building containing the **TARGET LOCATIONS**.

25. During the meetings noted above between Source 8, CHAN, CHIANG, and/or Ave at the **TARGET LOCATIONS**, Source 8 has observed CHAN and CHIANG's assistants, including YAN YAN and Stephanie Mkhalian[10], enter and have conversations with CHAN and/or CHIANG in both **TARGET LOCATIONS**. In addition, CHAN discussed meeting with other individuals, including KUK and HUANG, in "his office." It is not clear whether CHAN was referring specifically to **TARGET LOCATION 2** or the business suite as a whole; however, based on my knowledge of the

---

[10] Stephanie Mkhalian is one of CHAN and CHIANG's assistants at the CCC Investment Group, located at the **TARGET LOCATIONS**.

Casino_2005643

investigation, I believe CHAN does utilize **TARGET LOCATION 2** to hold conversations in furtherance of the Target Offenses.

26.   According to CHAN's Google calendar obtained from a search warrant authorized by the Honorable Magistrate Judge Alka Sagar on May 29, 2018, CHAN has scheduled weekly meetings and conference calls at the **TARGET LOCATIONS** on Mondays, Tuesdays, Thursdays, and Fridays.   These meetings are all on CHAN's calendar for each week in July 2018.   Specifically, the Tuesday meeting notice stated, "A- Team Meeting, 800 West 6th Street, Suite 900, Downtown Los Angeles, CA."   Based on this description and on previous intercepted calls, I believe the A-Team meeting is held in the conference room at the business suite (**TARGET LOCATION 1**).   The Thursday meeting notice stated, "1:30 - 2:30: Weekly mtg - Ray / [Source 8] / Ave, Ray's office [**TARGET LOCATION 2**]."   Source 8 indicated that almost every time he/she arrived at the business suite for the weekly meetings on Thursdays, Ave was already present.   CHAN previously told Source 8 that he spoke to Ave before speaking to Source 8 about her role.   Based on the Google calendar entry, the fact that Ave generally arrives at the weekly meeting before Source 8, and the fact that CHAN has had private conversations with Source 8 in **TARGET LOCATION 2**, I believe that CHAN likely has met with and has had conversations with Ave implicating the Target Offenses in **TARGET LOCATION 2**, and that he is likely to continue to do so on a weekly basis going forward.

27.   According to emails obtained from CHIANG's email account pursuant to a search warrant authorized by the Honorable

16

Magistrate Judge Alka Sagar on May 2, 2018, there is a BIA (Business Industry Association) event scheduled at the business suite of the **TARGET LOCATIONS** on August 15, 2018. There are approximately 20-22 people expected to attend. The e-mail thread (arranged by Mkhalian) does not specify where in the business suite the event is scheduled. However, based on the fact that CHAN has asked Source 8 to go to **TARGET LOCATION 2** to have private conversations, I believe that any private discussions CHAN may have with any known Violators or potential co-conspirators are likely to take place in **TARGET LOCATION 2**.

28. Lastly, CHAN, CHIANG, YAN, and Mkhalian all work at the **TARGET LOCATIONS**. Based on my knowledge of the investigation, including recorded meetings between Source 8 and CHAN/CHIANG, intercepted communications, and surveillance, I believe that CHAN, CHIANG, YAN, and Mkhalian have had conversations in **TARGET LOCATION 1** and **TARGET LOCATION 2** implicating the Target Offenses and will continue to do so going forward. As recently as July 10, 2018, Source 8 observed CHIANG and Mkhalian in the business suite of the **TARGET LOCATIONS**.

### III. TOLL ANALYSIS TARGET PHONE 4 (CHIANG)[11][12]

29. I have reviewed phone records from **TARGET PHONE 4** based on pen register data I obtained from May 16, 2017 to July

---

[11] Based on my knowledge of the investigation, I believe that HUIZAR, ESPARZA, and ZHENG all have knowledge, to a limited extent, that there is an FBI investigation ongoing. Due to that knowledge, the frequency of calls on their phone lines, TARGET PHONES 1, 2, and 3, has decreased.

[12] All referenced toll hits are to numbers used in the calls/texts discussed in this Affidavit and in Affidavit 6.

17

8, 2018.[13] According to those records:[14]

    a.    **TARGET PHONE 4** was in contact with TARGET PHONE 1 (HUIZAR) on 36 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on May 17, 2018.

    b.    **TARGET PHONE 4** was in contact with TARGET PHONE 2 (ESPARZA)[15] on 209 occasions. 207 of these communications were phone calls and 2 were text messages. As of July 8, 2018, the last phone call occurred on July 6, 2018, and the last text message occurred on July 27, 2017.

    c.    **TARGET PHONE 4** was in contact with TARGET PHONE 3 (ZHENG)[16] on 17 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on April 6, 2018.

    d.    **TARGET PHONE 4** was in contact with **TARGET PHONE 5** (CHAN) on 2506 occasions. 873 of these communications were phone calls and 1632 were text messages. As of July 8, 2018,

---

[13] CHIANG was out of the country from approximately June 15, 2018 to July 2, 2018, thus investigators were largely unable to obtain his tolls for this period.

[14] All communication counts are approximate.

[15] ESPARZA formerly worked for HUIZAR and is now employed by a CA State Assemblyperson. Based on intercepted calls over **TARGET PHONE 4**, ESPARZA appears to be continuing to assist CHIANG and/or CHAN with development projects in Los Angeles. In addition, based on toll records, ESPARZA continues to communicate with HUIZAR staff members. For at least these reasons, I continue to believe that ESPARZA has relevant conversations regarding the Target Offenses.

[16] ZHENG formerly worked for and still operates closely with Chairman WEI HUANG, owner of multiple Los Angeles hotels. For at least these reasons, I continue to believe that ZHENG has relevant conversations regarding the Target Offenses.

the last phone call occurred on July 6, 2018, and the last text message occurred on July 6, 2018.

     e.    **TARGET PHONE 4** was in contact with **TARGET PHONE 6** ██████████ on 143 occasions. 84 of these communications were phone calls and 59 were text messages. As of July 8, 2018, the last phone call occurred on July 6, 2018, and the last text message occurred on May 31, 2018.

     f.    **TARGET PHONE 4** was in contact with SHAWN KUK's City phone on 589 occasions. 125 of these communications were phone calls and 464 were text messages. As of July 8, 2018, the last phone call occurred on May 31, 2018, and the last text message occurred on May 31, 2018.

     g.    **TARGET PHONE 4** was in contact with SHAWN KUK's personal phone on 13 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on May 2, 2018.

     h.    **TARGET PHONE 4** was in contact with CURREN PRICE's[17] phone on 94 occasions. 29 of these communications were phone calls and 65 were text messages. As of July 8, 2018, the last phone call occurred on June 8, 2018, and the last text message occurred on July 3, 2018.

     i.    **TARGET PHONE 4** was in contact with JOEL JACINTO's phone on 30 occasions. All of these communications were phone

---

[17] CURREN PRICE is the Councilman for Council District 9 ("CD9"). PRICE is on the PLUM Committee with HUIZAR and chairs the City's Economic Development Committee. PRICE's phone number is 213-399-4609. This number is registered to "CM Curren Price."

calls. As of July 8, 2018, the last phone call occurred on May 7, 2018.

     j.   **TARGET PHONE 4** was in contact with YAN YAN's[18] phone on 126 occasions. 112 of these communications were phone calls and 14 were text messages. As of July 8, 2018, the last phone call occurred on July 6, 2018, and the last text message occurred on October 23, 2017.

     k.   **TARGET PHONE 4** was in contact with Jeremy Chan's[19] phone on 232 occasions. 92 of these communications were phone calls and 140 were text messages. As of July 8, 2018, the last phone call occurred on June 13, 2018, and the last text message occurred on June 13, 2018.

     l.   **TARGET PHONE 4** was in contact with Kevin Keller's[20] phone on 88 occasions. 6 of these communications were phone calls and 82 were text messages. As of July 8, 2018, the last phone call occurred on June 12, 2018, and the last text message occurred on July 5, 2018.

---

[18] Open source databases link this phone number to "Yan Yan." In addition, financial records for YAN YAN's bank accounts list the same phone number. Furthermore, during intercepted calls, CHAN and/or CHIANG refer to the caller using this phone number as "Yan."

[19] Jeremy Chan is CHAN's son and believed to be involved in HAZENS Redevelopment Project.

[20] Kevin Keller is the Executive Officer for the Los Angeles Department of City Planning (LADCP). Keller's phone number is 310-346-8182. This number is registered to "Kevin J. Keller." In addition, intercepted text messages from CHIANG to this phone number refer to "Kevin."

m. **TARGET PHONE 4** was in contact with Luci Ibarra's[21] phone on 5 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on June 4, 2018.

n. **TARGET PHONE 4** was in contact with Lincoln Lee's[22] phone on 706 occasions. 693 of these communications were phone calls and 13 were text messages. As of July 8, 2018, the last phone call occurred on June 11, 2018, and the last text message occurred on October 5, 2017.

o. **TARGET PHONE 4** was in contact with Mason Situ's[23] 626-636-0600 phone on 356 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on June 8, 2018.

p. **TARGET PHONE 4** was in contact with Mason Situ's 213-995-6833 phone on 10 occasions. All of these communications were phone calls. As of July 8, 2018, the last phone call occurred on July 5, 2018.

q. **TARGET PHONE 4** was in contact with Mason Situ's 213-800-3677 phone on 358 occasions. 18 of these communications were phone calls and 2 were text messages. As of July 8, 2018, the last phone call occurred on July 5, 2018, and the last text message occurred on June 30, 2017.

---

[21] Luci Ibarra is a LADCP employee.
[22] Lincoln Lee is believed to be an employee of HAZENS.
[23] Mason Situ is believed to be an employee of HAZENS.

Casino_2005649

r.   **TARGET PHONE 4** was in contact with Chairman Wang's[24] phone on 120 occasions. 44 of these communications were phone calls and 76 were text messages. As of July 8, 2018, the last phone call occurred on June 1, 2018, and the last text message occurred on June 1, 2018.

## IV. TOLL ANALYSIS TARGET PHONE 5 (CHAN)[25]

30.   I have reviewed phone records from **TARGET PHONE 5** based on pen register data I obtained from January 26, 2017 to July 8, 2018. According to those records:[26]

a.   **TARGET PHONE 5** was in contact with TARGET PHONE 1 (HUIZAR) on 209 occasions. 28 of these communications were phone calls and 174 were text messages. As of July 8, 2018, the last phone call occurred on June 5, 2018 and the last text message occurred on July 1, 2018.

b.   **TARGET PHONE 5** was in contact with TARGET PHONE 3 (ZHENG) on 46 occasions. 31 of these communications were phone calls and 15 were text messages. As of July 8, 2018, the last phone call occurred on May 16, 2018 and the last text message occurred on May 1, 2018.

c.   **TARGET PHONE 5** was in contact with **TARGET PHONE 6** ▇▇▇▇▇▇ on 165 occasions. 85 of these communications were

---

[24] Chairman Wang owns a Chinese development company. As discussed in Affidavit 6 (VI.B.1), on April 19, 2018, in an intercepted call, CHIANG and Wang discussed providing money to HUIZAR in exchange for assistance. It is unclear what assistance CHIANG was referring.

[25] All referenced toll hits are to numbers used in the calls/texts discussed in this Affidavit, if applicable.

[26] All communication counts are approximate.

22

phone calls and 80 were text messages. As of July 8, 2018, the last phone call occurred on June 27, 2018 and the last text message occurred on June 29, 2018.

      d. **TARGET PHONE 5** was in contact with HUANG's phone on 62 occasions. 51 of these communications were phone calls and 11 were text messages. As of July 8, 2018, the last phone call occurred on June 6, 2018 and the last text message occurred on June 4, 2018.

      e. **TARGET PHONE 5** was in contact with MITCHELL ENGLANDER's[27] phone on 37 occasions. 2 of these communications were phone calls and 35 were text messages.[28] As of July 8, 2018, the last phone call occurred on May 14, 2018 and the last text message occurred on May 14, 2018.

      f. **TARGET PHONE 5** was in contact with YAN YAN's phone on 555 occasions. 409 of these communications were phone calls and 145 were text messages. As of July 8, the last phone call occurred on July 7, 2018 and the last text message occurred on July 6, 2018.

      g. **TARGET PHONE 5** was in contact with SHAWN KUK's City phone on 45 occasions. 15 of these communications were phone calls and 30 were text messages. As of July 8, 2018, the last phone call occurred on June 14, 2018, and the last text message occurred on June 14, 2018.

---

[27] MITCHELL ENGLANDER is the Councilman for Council District 12 ("CD12"). ENGLANDER also serves as a member on the PLUM committee with HUIZAR and PRICE.

[28] In Affidavit 5, the call count and text message count were inadvertently flipped.

h.  **TARGET PHONE 5** was in contact with SHAWN KUK's personal phone on 50 occasions.  14 of these communications were phone calls and 36 were text messages.  As of July 8, 2018, the last phone call occurred on June 22, 2018, and the last text message occurred on June 22, 2018.

i.  **TARGET PHONE 5** was in contact with JOEL JACINTO's phone on 81 occasions.  25 of these communications were phone calls and 56 were text messages.  As of July 8, 2018, the last phone call occurred on May 22, 2018 and the last text message occurred on June 4, 2018.

j.  **TARGET PHONE 5** was in contact with Ave Jacinto's phone[29] on 92 occasions.  35 of these communications were phone calls and 57 were text messages.  As of July 8, 2018, the last phone call occurred on June 21, 2018 and the last text message occurred on June 6, 2018.

k.  **TARGET PHONE 5** was in contact with Luci Ibarra's phone on 190 occasions.  28 of these communications were phone calls and 162 were text messages.  As of July 8, 2018, the last phone call occurred on July 5, 2018 and the last text message occurred on July 6, 2018.

l.  **TARGET PHONE 5** was in contact with Lincoln Lee's[30] phone on 298 occasions.  105 of these communications were phone

---

[29] Ave Jacinto provided this number to Source 8.  In a consensually recorded conversation, Source 8 has contacted and spoken with Ave Jacinto on this number.

[30] Lincoln Lee formerly worked for LADBS as Chief of the Code Enforcement Bureau.  Lincoln is currently employed by HAZENS.

calls and 193 were text messages. As of July 8, 2018, the last phone call occurred on June 30, 2018 and the last text message occurred on June 30, 2018.

    m. **TARGET PHONE 5** was in contact with Al Hernandez's[31] phone on 198 occasions. 96 of these communications were phone calls and 102 were text messages. As of July 8, 2018, the last phone call occurred on July 6, 2018 and the last text message occurred on June 23, 2018.

    n. **TARGET PHONE 5** was in contact with Larry Galstian's[32] phone on 392 occasions. 183 of these communications were phone calls and 209 were text messages. As of July 8, 2018, the last phone call occurred on July 7, 2018 and the last text message occurred on July 7, 2018.

    o. **TARGET PHONE 5** was in contact with Kevin Chen's phone on 178 occasions. 74 of these communications were phone calls and 104 were text messages. As of July 8, 2018, the last phone call occurred on July 3, 2018 and the last text message occurred on July 3, 2018.

    V.   **TOLL ANALYSIS TARGET PHONE 6** ███████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

   [31] Al Hernandez is a fire, life, safety consultant and owns Fire Protection Group, Inc. Hernandez is a member of the A-Team. Hernandez is the former Los Angeles City/County Fire Department Chief.

   [32] Larry Galstian is a consultant and owns Galstian Consulting Group, Inc. Galstian is a member of the A-Team. Galstian worked for CHAN when CHAN was General Manager of LADBS. Galstian is the former LADBS Inspection Bureau Chief.

         Casino_2005653



26

Casino_2005654



## VI. NECESSITY FOR INTERCEPTION[39]

32. Based upon my training and experience, as well as the experience of the other Special Agents of the FBI with whom I have spoken about this investigation, and based upon all of the facts set forth herein, I believe that the requested



[39] This Section is meant to supplement the Necessity Section in Affidavit 6 and establish the continued necessity of the requested interceptions since the filing of Affidavit 6.

27

Casino_2005655

interception of wire and electronic communications of the **TARGET PHONES**, and the interception of oral communications and visual, non-verbal conduct within the **TARGET LOCATIONS** is necessary to establish a reasonable likelihood of meeting the goals of the investigation, which I set forth in Affidavit 6. In sum, the requested interception is necessary to secure all of the evidence required to prove beyond a reasonable doubt that each of the Violators and their unknown co-conspirators are engaged in the Target Offenses. As described in this Section, I believe the unique nature of this investigation and the information obtained thus far makes the interception of wire and electronic communications of the **TARGET PHONES**, and the interception of oral communications and visual, non-verbal conduct within the **TARGET LOCATIONS** essential.

33. As described in Affidavit 6, Agents have, since the granting of Order 5, tried or considered a variety of investigative procedures, which are usually employed in the investigation of this type of criminal case. The following are additional investigative procedures conducted by Agents since the filing of Affidavit 6 on June 6, 2018. These procedures (1) have been tried and have not been fully successful; (2) reasonably appear to be unlikely to be fully successful if they are tried; and/or (3) are too risky, in that they risk exposing the investigation or are too dangerous to employ.

Casino_2005656

A. **Sources and Undercover Agents Will Not Satisfy the Goals of this Investigation Without the Requested Interception.**

34. Source 8 continues to be in a position with access to some of the Violators; however, the information provided to Source 8 continues to be limited and does not reveal the full extent of the conspiracy in the furtherance of the Target Offenses. Specifically, Source 8 meets with CHAN and CHIANG routinely, but they are not completely forthcoming in all of their discussions. It appears that CHAN and CHIANG provide enough information to Source 8 that they believe will keep Source 8 loyal to them, but do not provide specific information on their illicit relationships with other co-conspirators unrelated to their use of Source 8. For example, based on intercepted communications, I know that CHAN and CHIANG have solicited JACINTO's help in providing pressure to the Bureau of Engineering to take favorable action on HAZENS' Redevelopment Project; however, CHAN did not provide this specific information to Source 8, rather he simply pushed Source 8 to pay Ave and vaguely referenced it was because JACINTO could "help" them. In addition, CHAN met with KUK to arrange the finder's fee discussed above, but told Source 8 not to directly contact KUK or speak to KUK about the arrangement. CHAN also told Ave that she could not meet with KUK because he is a "sensitive person" for them. Further, CHAN advised Source 8 not to discuss the arrangement with HUIZAR and it remains unclear what HUIZAR, or any other PLUM Committee member, knows, if anything, about CHAN's arrangement with KUK. Source 8 continues to receive

29

valuable information to assist the investigation, but Source 8 alone will not provide enough evidence to achieve the goals of the investigation.



30



31



B. **Investigators Are Still Seeking to Determine All of the Precise Official Acts HUIZAR, ▮▮▮▮ KUK, JACINTO and Possibly Others Have Performed, Are Performing, or Have Agreed to Perform in Exchange for Payments and Other Financial Benefits.**

38. Due to the complexity of the investigation, the number of potential co-conspirators, the alterations in the schemes, and the number of development projects, investigators have learned about some of the official acts they believe certain Violators have taken on behalf of other Violators but investigators are still trying to determine all of the specific quid pro quo arrangements that exist, how these arrangements are being conducted, and which public officials have knowledge of these arrangements. For example, CHAN proposed a surreptitious arrangement for Source 8 and KUK. CHAN described that a "finder's fee" concealed as "childcare" would be paid to KUK's

32

mother, from an un-attributable company, as a payment to KUK for his assistance. As discovered previously, the Violators are utilizing family members to conceal payments and launder the money. Based on toll data, CHAN and CHIANG communicate with KUK regularly. Interception will assist in determining the content of the communication with KUK in conjunction with the discussions between Source 8 and CHAN. Interception has been vital in determining CHAN's true purpose in pushing Source 8 to hire Ave but it remains unclear as to who else knows about this true purpose, including the members of the PLUM Committee.

   C.   **A Financial Investigation of the Violators and Others
        Has Not Satisfied the Goals of the Investigation
        Without the Requested Interception.**

39.   The FBI has added a forensic analyst to the investigative team. The financial records have revealed that YAN YAN appears to be laundering hundreds of thousands of dollars through her account with her father Jun Yan.[42] These records alone do not reveal the source of these large deposits or the purpose of these transactions. Interception is necessary to provide additional information regarding YAN's involvement in the conspiracy. As just one example related to a single Violator, the forensic analyst is working through the hundreds of records to conduct a similar analysis conducted on YAN's account to determine patterns in suspicious transactions, identifying possible co-conspirators and identifying possible

---

[42] June Yan is an employee of HUANG's company, Shenzhen New World.

additional bank accounts involved in additional suspicious transactions. A tax application is also being filed for each of the Violators.

### D. Search Warrants

40. Since Order 5, issued April 2, 2018, the FBI has served multiple search warrants for the e-mail accounts being used by HUIZAR, ESPARZA, ZHENG, CHAN, CHIANG, and ███████ As of July 1, 2018, returned records were received for each account except HUIZAR's account.[43] The returned record included approximately 60,000 e-mails to be reviewed, the vast majority of which are my responsibility to personally search. I am reviewing these e-mails and comparing the findings to the previously intercepted communications. The intercepted information has provided insight to the context of the e-mails, many of which at first appear to be innocent business relationships. By comparing the e-mail records with the intercepted communications, investigators are better suited to understanding the true nature of the e-mails (and vice versa). For example, in CHAN's account there are multiple documents titled "radar screen." These documents outline CHAN's "to do" list and track the status of various development projects. In

---

[43] The FBI served the search warrant for HUIZAR's account on the provider, but has not received the ordered documents. The provider was contacted through their law enforcement inquiry e-mail account to inquire into the return and no response was received. The FBI is attempting contact the provider directly to receive the return record. In my experience, this is a not uncommon issue with various providers who often fail to comply with or delay their responses to valid court orders commanding documents.

Casino_2005662

these documents CHAN used abbreviations and initials to represent individuals and steps in the development process. Due to the intercepted communication, investigators were able to determine some of this "coded" (or abbreviated) language. In one of the radar screens, CHAN had a line item, "BOE Clearances… TT JJ." Based on the intercepted communications it was determined that "BOE Clearances" was related to Bureau of Engineering and "TT JJ" was related to "Talk To JOEL JACINTO." Based on the intercepted communication and the e-mail records, I believe the e-mail accounts were used in furtherance of the Target Offenses; however, without the intercepted communications, the context of the documents and e-mails could not be fully understood. Based on my training, experience, and knowledge of the investigation, this is especially true in public corruption investigations. It is not common for public officials to specifically document their criminal intent and therefore it is necessary to utilize other investigative means, specifically, Title III interception to establish circumstantial evidence of intent, a critical element in PC cases.

### E. Tracking Devices

41. As described in Affidavit 6, GPS trackers have been obtained for HUIZAR's, ESPARZA's, HUANG's, ZHENG's, CHAN's, CHIANG's, ███████ and YAN's phones. We anticipate renewing these trackers in addition to adding KUK's city and/or personal phone. These trackers alone have not achieved the goals of the investigation because of their limited investigative value. Due to the tracker technology, the pings are not always a specific

35

location; rather they provide a radius that the phone is contained. These radii vary in size and at times can be close to a mile or two. Because the Violators tend to all operate in downtown and the size of the radii, it is difficult to determine whether the Violators are meeting solely by the tracker data. The interception has been used to provide additional information that can be corroborated by the tracker data and physical surveillance. For example, on May 2, 2018, in an intercepted call, KUK and CHIANG discussed meeting at CHAN's residence. Tracker data then confirmed that CHIANG's and CHAN's phones were located with a radius that included CHAN's residence. FBI surveillance was conducted and observed KUK's city vehicle located outside of CHAN's residence. Tracker data alone would not have provided the meeting arrangement or investigative lead to conduct surveillance and therefore interception is necessary in conjunction to the anticipated trackers.

### VII. **PRIOR APPLICATIONS**

42. On March 1, 8 and 14, 2017, May 3, 2017, June 7, 2017, July 13, 2017, October 27, 2017, January 3, 2018, March 16, 2018, May 16, 2018, and July 2, 2018 checks of the FBI Electronic Surveillance (ELSUR) Indices were completed as to all Violators and the **TARGET PHONES**. On October 27, 2017, January 3, 2018, March 15, 2018, May 16, 2018, and July 2, 2018 these checks were completed as to the **TARGET LOCATIONS**.

43. On March 2, 7, 14 and 15, 2017, May 4, 2017, June 7, 2017, July 11, 2017, October 27, 2017, January 4, 2018, March 14, 2018, May 15, 2018, and July 2, 2018 the Drug Enforcement

Administration and the Homeland Security Investigations –
Immigrations and Customs Enforcement Electronic Indices were
completed as to all Violators and the **TARGET PHONES**.  On October
27, 2017, January 4, 2018, March 14, 2018, May 15, 2018, July 2,
2018 these checks were completed as to the **TARGET LOCATIONS**.

44.   Other than what is disclosed herein, including the
interception chart set forth in Section III in Affidavit 6 (and
Application 6), no other applications are known to have been
made to any judge for authorization to intercept, or for
approval of interception of wire, oral, or electronic
communications involving Violators,[44] or the **TARGET PHONES** or the
**TARGET LOCATIONS**.

### VIII.      MINIMIZATION

45.   Minimization will be conducted as outlined in the
incorporated Affidavit 6.

### IX. AUTHORIZATION REQUESTED

46.   Authorization requested is outlined in the
incorporated Affidavit 6.

### X.   CONCLUSION

47.   Based on the foregoing and in addition to the
incorporated Affidavit 6, there continues to be probable cause



37

to believe that the Violators, and others as yet unknown, have committed and are continuing to commit the Target Offenses.

48. Based upon my investigation and experience, and the information contained in this supplemental affidavit in addition to Affidavit 6, I believe that interception of wire and electronic communications occurring on the **TARGET PHONES** and interception of oral communications and visual, non-verbal conduct at the **TARGET LOCATIONS** continues to be necessary to uncover the Target Offenses and meet the goals of the investigation described herein.

/s/
_____
ANDREW CIVETTI
Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Subscribed to and sworn before me
this 30th day of July, 2018.

JOHN F. WALTER
_____
HONORABLE JOHN F. WALTER
UNITED STATES DISTRICT JUDGE

38