Harland W. Braun, Esq.    [CASBN 41842]
(Email:  harland@braunlaw.com)
BRENDAN PRATT, Esq. [CASBN 341697]
(Email:  brendan@braunlaw.com)
BRAUN & BRAUN LLP
10880 Wilshire Boulevard, Suite 1020
Los Angeles, California 90024
Telephone:  (310) 277-4777
Facsimile:   (310) 507-0232
Attorneys for Defendant
RAYMOND CHAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMOND SHE WAH CHAN,<br><br>Defendant. | Case No. CR 20-326(A)-JFW<br><br>**DEFENDANT RAYMOND CHAN'S RESPONSE TO ORDER TO SHOW CAUSE FILED 1/31/2023 [ECF NO. 923]; DECLARATION OF RAYMOND SHE WAH CHAN [EXHIBIT A]; DECLARATION OF HARLAND W. BRAUN [EXHIBIT B]; RAYMOND CHAN'S BOND ORDER AND RELEASE FORM [EXHIBIT C]; REPORTER'S TRANSCRIPT OF DECEMBER 4, 2020, TRIAL SETTING CONFERENCE [EXHIBIT D]; HARLAND W. BRAUN'S INTERVIEW SCHEDULE [EXHIBIT E]** |

RAYMOND CHAN, through his attorneys HARLAND W. BRAUN and BRENDAN J. PRATT, hereby responds to the Order to Show Cause dated January 31, 2023, and entered on February 1, 2023, questioning whether he violated a bond condition by contacting *known* witnesses.

1   Mr. Chan also questions the constitutionality of the requirement that he disclose a

2   list of defense witnesses contacted since December 1, 2020.  Furthermore, although Mr.

3   Chan has agreed that his son, Jeremy Chan, cannot act as trial counsel, he disputes the

4   restriction that he cannot discuss the case with his son, who himself is a member of the

5   California Bar and an expert on the laws governing construction in Los Angeles County, as

6   a violation of his right to counsel.

7   The Trial Setting Conference, held via Zoom on December 4, 2020, was presided

8   over by District Judge John F. Walter and attended by Assistant United States Attorneys

9   Mack Jenkins, Veronica Dragalin and Melissa Mills, accompanied by FBI Special Agent

10  Andrew Civetti.  Defense attorney Harland W. Braun and Raymond Chan also appeared

11  via Zoom.

12  If Raymond Chan was prohibited from contacting any defense witnesses, then why

13  did this objection have to wait until days before the trial was to start?  If Raymond Chan

14  could not use a licensed attorney to consult with as part of his constitutional right to

15  counsel, then why was this not issue raised when it first came to the Government's

16  attention?  Waiver?

17  Raymond Chan is preparing for a trial on his indictment which is set to occur just

18  days away and which has been pending for over two years. He does not have time to brief

19  or argue constitutional issues which have been raised by the January 31, 2023, Order to

20  Show Cause ("OSC").  As will be discussed in the Declaration of his counsel, the

21  requirements of the OSC impacts his right to bail, his right to counsel, his right against

22  self-incrimination by forcing premature discovery, and his Fifth Amendment right against

23  self-incrimination.

24  It is regrettable that the prosecution did not consider whether its unilateral demands

25  did not render the entire trial a constitutional nullity, whether the failure to promptly raise

26  the issues was a waiver, or lastly, whether the issues should be litigated rather than decided

27  unilaterally without discussion.

28  ///

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

1   This response will consist of the Declaration of Raymond She Wah Chan [Exhibit
2   A]; Declaration of Harland W. Braun [Exhibit B]; Raymond Chan's Bond Order and
3   Release Form, dated December 1, 2020 [Exhibit C]; Reporter's Transcript of December 4,
4   2020, Trial Setting Conference via Zoom [Exhibit D]; and Harland W. Braun's Interview
5   Schedule for Raymond Chan's Witnesses for January 10-13, 2023 [Exhibit E].

7   Dated:   February 3, 2023                    Respectfully submitted,
8                                                BRAUN & BRAUN LLP

10  By: _____
11       Harland W. Braun
12       Attorney for Defendant Raymond Chan

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

3.

DEFENDANT RAYMOND CHAN'S RESPONSE TO ORDER TO SHOW CAUSE
FILED 1/31/2023 [ECF NO. 923]

# EXHIBIT A

## DECLARATION OF RAYMOND SHE WAH CHAN

I, RAYMOND SHE WAH CHAN, declare as follows:

1.  On or about November 7, 2018, early in the morning, the Government came to my house with a search warrant for the contents in my mobile phone. I also participated in a voluntary interview with FBI agent, Terri Tampubolon.

2.  On or about May 13, 2020, George Chiang, one of the co-defendants, agreed to plead guilty. At that time, I was not indicted yet. However, I was included in the plea agreement documents as "Individual 1."

3.  On or about November 30, 2020, I was informed by my attorney, Mr. Harland Braun, that I had been indicted.

4.  On or about December 2, 2020, I reported to custody. After my arraignment, I was asked to sign some paperwork. One document I signed was titled "CENTRAL DISTRICT OF CALIFORNIA ORDER AND RELEASE FORM" and contained a section titled "ADDITIONAL CONDITIONS OF RELEASE." This section of the document imposed two bond conditions on me which stated as follows:

a.  First, I was to "[a]void all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution . . . except Jeremy Chan (son) (No discussion of pending action)."

b.  Second, I was to "[a]void all contact, directly or indirectly (including by any electronic means), with any known codefendants except in the presence of counsel."

5.  Mr. Braun told me that he would raise with the Court the bond condition pertaining to my son, Jeremy Chan, at the upcoming Trial Setting Conference, set for December 4, 2020.

6.  At the Trial Setting Conference on December 4, 2020, Mr. Braun discussed Jeremy Chan's potential involvement in the preparation of my defense and advised the Court that my son, Jeremy Chan, was a licensed attorney in the State of California and would be available to Mr. Braun in an assistant role as I worked to prepare my case. In

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

1  response to Mr. Braun's remarks, the government's prosecutor in attendance, Mr. Mack

2  Jenkins, notified the Court that Jeremy Chan's involvement in the case would create a

3  potential conflict as Jeremy Chan had been referenced in the First Superseding Indictment.

4  The Court then indicated that he would leave it up to my attorney, Mr. Braun, and the

5  government's prosecutors to work out the issues regarding Jeremy Chan's involvement in

6  the case and informed the parties that the Court would be available to rule on this issue

7  should they fail to come to an agreement.

8      7.    However, at no point since the above discussion took place at the Trial

9  Setting Conference on December 4, 2020, have the government's prosecutors raised, either

10  with the Court or my attorneys, the issue of my son, Jeremy Chan's, participation in my

11  case as an assistant to my defense team.  In fact, over the past two years, the government's

12  prosecutors have had multiple encounters with my son, Jeremy Chan, in contexts that

13  clearly and unequivocally suggested that he was assisting me in the preparation of my

14  case.

15      a.    For example, the government's prosecutors copied Jeremy Chan on multiple

16  email exchanges between the U.S. Attorneys, Mr. Braun, and me, where the Government

17  alerted us to, among other things, upcoming pretrial deadlines, and discovery productions,

18  in addition to solicited mine and Jeremy Chan's availability for in-person meet and

19  conferrals.  Upon information and belief, in one email, dated November 25, 2022, Mack

20  Jenkins, the lead U.S. Attorney in this matter, openly acknowledged Jeremy Chan's role as

21  a member of my defense team when at the top of the email he wrote, "[Adding Harland,

22  Brendan, and Jeremy]", before inviting them to attend a meet and conferral at the U.S.

23  Attorney's Office to review the government's exhibit list chart.

24      b.    Indeed, it is my understanding that the government's prosecutors met

25  directly with my son, Jeremy Chan, when he appeared several times at the U.S. Attorney's

26  Office in his capacity as an assistant to my defense team.  On December 7, 2022, Jeremy

27  Chan, along with my attorneys Mr. Braun and Mr. Brendan Pratt, met with the

28  government's prosecutors to review and discuss the government's proposed trial exhibit

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

2.

1  chart.   And on January 9, 2023, Jeremy Chan and Mr. Braun met again with the
2  government's prosecutors, with me in attendance, at a reverse proffer meeting. It was at
3  this meeting that the government's prosecutors, for the first time since the Trial Setting
4  Conference on December 4, 2020, again raised the issue of the potential conflict regarding
5  my son's involvement as an assistant to my defense team. In fact, Mr. Jenkins did not
6  explicitly object to my son's participation in my defense but even conceded that there may
7  be an exception to the potential conflicts issue regarding my son, Jeremy Chan.

8         c.      Further, the government's prosecutors observed Jeremy Chan and me in the
9  courtroom gallery at several trials involving the other co-defendants in this matter.

10         8.      Given the above prior interactions between my son, Jeremy Chan, and the
11  government's prosecutors, I was surprised when at the Status Conference on January 25,
12  2023, U.S. Attorney Mack Jenkins, alerted the Court to Jeremy Chan's participation as a
13  member of my defense team and objected to his further involvement in the case on the
14  grounds that it violated one of my bond conditions.

15         9.      I did not intend to violate any of the conditions of my release by working on
16  my case with my defense team which is comprised of my attorneys, Mr. Braun and Mr.
17  Pratt (of BRAUN & BRAUN LLP), and my son, Jeremy Chan, because it was my
18  understanding that Jeremy Chan, for the purposes of my bond conditions, was not a victim
19  or a co-defendant in this case. Also, as I understand it, Jeremy Chan was not identified as
20  a government witness until sometime in or around December 2022.

21         10.     I strongly believe that prohibiting me and Jeremy from discussing the case
22  and/or working together to prepare my defense at trial would prejudice me and unduly
23  burden my ability to defend my case. Jeremy Chan is a licensed attorney in the State of
24  California and has an expert technical understanding of the evidence I intend to present at
25  trial. As my only son, he has understandably and passionately spent thousands of hours,
26  over the past 2 years, helping me to review, prepare, and organize trial exhibits and
27  demonstratives. In short, he has become an indispensable part of my defense team and his
28  exclusion would be an incalculable loss to me.

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

3.

DECLARATION OF DEFENDANT RAYMOND SHE WAH CHAN

11.    Regarding the condition of release prohibiting my contact with government witnesses, I did not intend to violate this condition by simply proclaiming my innocence to a select number of my friends and former colleagues.  Early on in this case, I did not believe the bond condition applied to these individuals because they were not victims, witnesses, or co-defendants at the time that I contacted them.  Addressing the Court's and the government prosecutors' concern that, in violation of my bond condition, I contacted potential witnesses (some of whom I only learned recently would be called to testify at trial), I offer the following explanations:

a.    In or around January 2019, the search warrant for my Gmail e-mail account was leaked through L.A. Times.  Subsequently, many of my friends and former colleagues contacted me to express their concern for my wellbeing and to pledge their support to me in my moment of extreme duress.  I explained to them that I was innocent.  At that time, I did not yet appreciate how this search would be a precursor to my indictment, and therefore did not know that some of these individuals would later be identified as witnesses in my case.

b.    In May 2020, co-defendant George Chiang's plea agreement was publicized with me listed as "Individual 1."  Subsequently, many more friends and former colleagues contacted me to offer their support.  I explained to them that I was innocent.  Again, given how early on it was in the case, I did not know that some of them would later be identified as witnesses.

c.    In December 2020, I was indicted.  Again, many friends and former colleagues, perplexed and upset by the charges leveled against me, contacted me to reach out in my time of need and to ask questions about my indictment.  I explained to them that I was innocent.  Many of these individuals offered to be my witnesses but as I had just begun to conceptualize my defense strategy, I did not yet know which of these individuals I would select as my witnesses.

///

///

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

4.

d.      With respect to my contact with one of these individuals in particular, Yan Yan, who I would later learn would be identified as a witness for the government, I offer the following explanations. Yan Yan and I have known each other for almost a decade. We have maintained a father-daughter like relationship since she joined my martial arts group sometime in 2014. We never discussed my alleged involvement in co-defendant José Huizar's ("Huizar") crimes until on or about November 8, 2018, when she disclosed to me that she had signed some loan paperwork related to the settlement of a lawsuit with Huizar's former aide. Shocked by this fact, I immediately called and informed FBI agent, Terri Tampubolon, with whom I had cooperated with on past investigations. At that time, given that I had not yet been indicted, I did not know that Yan Yan would later be a government witness in the case against me. For many years, my martial arts group and I maintained a group text messaging thread which included not only members of the martial arts group, but also some of their respective spouses. After I was indicted in December 2020, many members of this group messaged me in the group thread to express their support, and I continued to proclaim my innocence. At no point during this case did I ever intend to violate the bond conditions by providing honest and simple updates about my case. Importantly, I did not even know that Yan Yan would be involved in this case as a witness until in or around September or October 2022, when I saw Yan Yan's name on the government's witness list and when I subsequently observed her on the witness stand at the Shen Zhen New World, I, LLC trial.

e.      In or around December 2022, Mr. Braun asked me to select some of my friends and former colleagues as my witnesses. I provided him with a list of people. Given these individuals' potential reluctance to speak to any attorneys, even those purporting to represent me, Mr. Braun asked me to contact them to see if they would be willing to be my witnesses.

f.      I contacted approximately 20 of these potential witnesses and they all indicated to me that they would be willing to testify on my behalf. From these witnesses, Mr. Braun selected 15 of them and asked me to coordinate the scheduling of their Zoom

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

5.

DECLARATION OF DEFENDANT RAYMOND SHE WAH CHAN

1   interviews, which I subsequently did.  From January 10 to 13, 2023, I set up 15 Zoom

2   interviews for Mr. Braun.  In the beginning of each Zoom interview, I introduced the

3   witness to Mr. Braun, then immediately excused myself from the interview.  I reappeared

4   in the Zoom meeting at the end of the interview just to thank the witness for their time.  At

5   no point in this case did I ever reach out to any individuals, later identified by the

6   government's prosecutors as witnesses, to discuss the details of the pending case against

7   me, nor did I ever explicitly, or by suggestion, attempt to influence their recollection

8   and/or interpretation of case facts or evidence.  Even though every one of these individuals

9   has, unprompted by me, pledged their heartfelt support of my defense, if called upon to do

10   so they will testify at trial in their capacity alone and with an objective view of the case

11   facts and evidence.

12        I declare under penalty of perjury that the foregoing is true and correct.

13        Executed February 3, 2023, at Los Angeles, California.

14

15

16                                     RAYMOND SHE WAH CHAN

17

18

19

20

21

22

23

24

25

26

27

28

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

6.

DECLARATION OF DEFENDANT RAYMOND SHE WAH CHAN

# EXHIBIT B

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

1

## DECLARATION OF HARLAND W. BRAUN

2    I, HARLAND W. BRAUN, declare as follows:

3    1.    I am an attorney licensed to practice in the State of California and represent

4    defendant Raymond Chan in the matter of the <u>United States of America v. Raymond She</u>

5    <u>Wah Chan</u>, Case No. 20-00326-JFW.  I am also a criminal law specialist certified since

6    1973 by the California Board of Legal Specialization.

7    2.    I first met with defendant Ray Chan many months before he was indicted. Mr.

8    Chan was referred to me by the Law Firm of Mitchell Silberberg & Knupp for whom I have

9    done a number of criminal cases.

10   3.    I discussed with Mr. Chan what he knew about the case from his personal

11   knowledge as well as the publicity generated by the investigation.  I explained to him that

12   a reverse proffer is customarily used by both the Government and the defense to clarify

13   issues before an Indictment. I also explained to Mr. Chan that a reverse proffer is a way for

14   the defense counsel to know whether he is being lied to by his client, as well as presenting

15   the defense a chance to explain to the Government what would otherwise be incriminating

16   evidence. The other advantage to a reverse proffer is that it makes the defense much more

17   economical because the focus is usually narrowed, and the Government does not push some

18   unsupported criminal or legal theory.

19   4.    Therefore, based on this analysis, I *twice* offered AUSA Veronica Dragalin

20   that my client would like a reverse proffer. She rejected both requests. I have participated in

21   a number of reverse proffers, most of which resolved the cases prior to Indictment. Ms.

22   Dragalin rejected my request for a reverse proffer and only offered to talk to Raymond Chan

23   *after* he was indicted.

24   5.    I have reviewed the transcript of the December 4, 2020, Trial Setting

25   Conference, as well as the documentation used in the December 1, 2020, booking of

26   Raymond Chan. The review of the transcript refreshed my recollection about the Trial

27   Setting Conference, but I do not believe that I had read the five-page booking

28   documentation used on December 1, 2020.  I certainly did not accompany Raymond Chan

1   when he was photographed, fingerprinted, and booked, nor did I sign any of the five pages
2   of documentation.  I do not think I have ever accompanied a client through the booking
3   process.

4          6.       However, the transcript, attached as Exhibit D, does refresh my recollection
5   about the Trial Setting Conference that we attended via Zoom on December 4, 2020.
6   Through this Declaration, I will assert certain constitutional rights, not for the purpose of
7   delay but for the purpose of preserving my client's constitutional protections.  I also
8   recognize that with a jury trial scheduled for February 21, 2023, there is little time to litigate
9   Mr. Chan's constitutional claims.

10         7.       In reading page 2 of the Bond Order and Release Form, attached as Exhibit C,
11  I note that the language precludes defendant Chan from contacting any <u>known</u>
12  codefendants. This appears not to be an issue in this case because there is no allegation that
13  he has ever contacted known codefendants.  The Order also directs that defendant Chan not
14  contact any person who is "a known" victim or witness in the subject investigation.  I
15  assume that the word "known" applies both to the victim or the witness, otherwise the
16  admonition makes no sense.

17         8.       The admonition also restricts Raymond Chan from any contact with his son,
18  Jeremy Chan, except apparently discussion of the pending action.  This restriction raises a
19  constitutional issue of whether Raymond Chan can talk to his son who is a licensed attorney
20  about his case, but that is a matter to be litigated some other time. Also, Jeremy Chan is
21  fluent in both Mandarin and Cantonese and could correct the misinterpretations in the
22  proffered transcripts.

23         9.       In late December 2022, I asked Raymond Chan to provide a list of friends that
24  could be potential witnesses at his trial.  Attached as Exhibit E is a diagram of the witness
25  interview schedule for January 10 through 13, 2023, showing which days I contacted 15
26  witnesses by Zoom.  I requested that Raymond Chan contact these people and set up a
27  Zoom appointment at both my convenience and the witnesses' convenience. I presume that
28  Raymond Chan set up these Zoom appointments.

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

DECLARATION OF HARLAND W. BRAUN

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

10.    At the beginning of the Zoom appointments, Raymond Chan introduced me to the witness.  Ray Chan then disconnected from the Zoom appointment because I did not want to interview a witness with Mr. Chan present, as a witness might be reluctant to express an opinion or observation adverse to Mr. Chan.  I did not believe these persons were <u>known</u> witnesses because they had not been subpoenaed or even contacted by the Government when I interviewed them. Nor, with the exception of one person who was later subpoenaed, were the other fourteen witnesses ever listed as potential witnesses by the Government.  Therefore, I believe that Mr. Chan, even if he understood the restrictions on his bond, ever contacted a *known* witness. Each of these people were contacted by Mr. Chan at my direction because I had a duty to conduct a thorough investigation in the preparation of his criminal defense.

11.    The requirement that I disclose these fifteen witnesses as part of the litigation raises an issue about whether Raymond Chan's right to counsel was violated by this forced premature disclosure to the Government.  I wish to leave that issue for another time.  In any event, the FBI now has a list of all of defendant's potential witnesses and has unrestricted ability to interview them.  I was quite surprised that in interviewing these fifteen people, none of them have been subpoenaed, nor apparently had any of them ever been contacted by the FBI.

12.    The transcript [Exhibit D] on page 55 shows that I brought to the Court's attention on December 4, 2020, the restriction on Jeremy Chan. The court will note that I did not raise the issue of any restriction on Raymond Chan because I believe that I was unaware of it at the time.

13.    Had I been aware of the issue, I would have raised it with the Court on December 4, 2020 and questioned why the restriction simply did not list the witnesses that Mr. Chan should have been unable to contact.  I, therefore, do not believe that I was aware of that restriction. Customarily, I am not allowed to attend a booking by the U.S. Marshal, and I do not remember attending such a booking on December 1, 2020.

///

DECLARATION OF HARLAND W. BRAUN

1    14.    This matter has been pending in the Central District of California for over two
2    years.  Jeremy Chan attended portions of two related trials and attended discussions with
3    the United States Attorney's office about settling the case.  At no time was he asked to be
4    excluded as an outsider.  Not until the very last hearing has there ever been an issue raised
5    about his participation.

6    15.    I do question whether the Government is acting in good faith when it waits
7    over two years to raise the issue of Jeremy Chan's participation with the Court, and only
8    raises it just prior to the trial.  I concede, and have publicly conceded, that under the <u>Wheat</u>
9    case, Jeremy Chan could not be counsel of record appearing before the jury, both as counsel
10   and as a witness.

11   16.    I understand that the court has precluded Jeremy Chan from doing anything
12   in preparing the case with his father, even though he is a licensed attorney in California. As
13   I understand the <u>Wheat</u> case, there is a problem with an attorney appearing as a witness and
14   then arguing credibility to a jury.  That is why the defense conceded that Jeremy Chan
15   would not be counsel of record.  Because the time is late, the defense will not litigate
16   whether this restriction on a member of the Bar of the California and the relative of a
17   defendant constitutes an unreasonable restriction of Raymond Chan's right to counsel.  I
18   believe that Jeremy Chan should be allowed to participate in the preparation of the case
19   except that he cannot appear as counsel of record. That will be an issue litigated another
20   day.

21   17.    In conclusion, Raymond Chan did not contact any *known* witness as restricted
22   by the Release Order. The transcript of December 4, 2020 clearly indicates the only focus
23   was on Jeremy Chan's participation in the defense because the prosecution's theory
24   involved his participation in the underlying crime. This should not prohibit a father from
25   talking to his son, particularly when his son has gone to law school and is a licensed
26   attorney. Perhaps a lesser restriction could pass constitutional muster.

27   18.    I believe that Raymond Chan's bond should not be revoked for the following
28   reasons:

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

4.

DECLARATION OF HARLAND W. BRAUN

a.     The Government waived its objection by waiting over two years to bring the issue to the attention of the Court.

b.     Raymond Chan contacted these fifteen witnesses at the request of his counsel who had a duty to investigate the case.  None of the witnesses were Government witnesses. None of these persons were *known* witnesses.

c.     The proper procedure would be for the Government to list the witnesses that Raymond Chan is precluded from contacting so that his obligation would be clear rather than an amorphous direction that he not contact witnesses (when the witnesses could be anyone he has known throughout his career at the City of Los Angeles).

d.     Raymond Chan has conscientiously and promptly appeared at every occasion and has even observed two other trials related to his case.

I declare under penalty of perjury that the foregoing is true and correct and was executed February 3 2023, at Los Angeles, California.

Harland W. Braun
Attorney for Defendant Raymond Chan

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

# EXHIBIT C

# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

**Case Name:** United States of America v. **Raymond She Wah Chan**        Case No. 2:20-CR-00326-JFW-2

☑ Defendant        ☐ Material Witness

Violation of Title and Section: **18:1962(d); 18:1341; 18:1343; 18:1346, 2(b); 18:666(a)(1)(B), 2(a); 18:1001(a)(2)**

☐ Summons        ☐ Out of District        ☐ **UNDER SEAL**        ☐ Modified Date: _____

| *Check only one of the five numbered boxes below (unless one bond is to be replaced by another):* |
|---|

1. ☐ Personal Recognizance (*Signature Only*)

2. ☐ Unsecured Appearance Bond
$ _____

3. ☒ Appearance Bond
$ 150,000.00

(a). ☐ Cash Deposit (*Amount or %*) (*Form CR-7*)

(b). ☒ Affidavit of Surety Without
Justification (*Form CR-4*) Signed by:

Sarah Chan

*Signed
+ Affidavit to be
provided by 12 p.m.
Wed., Dec 2, 2020,*

(c). ☐ Affidavit of Surety With Justification
(*Form CR-3*) Signed by:

_____
_____

☐ With Full Deeding of Property:

_____
_____
_____
_____
_____

4. ☐ Collateral Bond in the Amount of (*Cash or Negotiable Securities*):
$ _____

5. ☐ Corporate Surety Bond in the Amount of:
$ _____

Release No.
**40594**

☐ **Release to Pretrial ONLY**
☐ **Release to Probation ONLY**
☒ Forthwith Release

☒ All Conditions of Bond
(*Except Clearing-Warrants Condition*) Must be Met
and Posted by:
12 pm   12/2/2020

☐ Third-Party Custody
Affidavit (*Form CR-31*)

☒ Bail Fixed by Court:
KS        / DL
(*Judge / Clerk's Initials*)

## PRECONDITIONS TO RELEASE

☐ The government has requested a <u>Nebbia</u> hearing under 18 U.S.C. § 3142(g)(4).

☐ The Court has ordered a <u>Nebbia</u> hearing under § 3142 (g)(4).

☐ The <u>Nebbia</u> hearing is set for _____ at _____ ☐ a.m. ☐ p.m.

## ADDITIONAL CONDITIONS OF RELEASE

In addition to the GENERAL CONDITIONS of RELEASE, the following conditions of release are imposed upon you:

☑ Submit to: ☑ Pretrial Services Agency (PSA) supervision as directed by PSA; ☐ Probation (USPO) supervision as directed by USPO.
(*The agency indicated above, PSA or USPO, will be referred to below as "Supervising Agency."*)

☑ Surrender all passports and travel documents to Supervising Agency no later than 12/2/2020 @ noon _____ , sign a Declaration
re Passport and Other Travel Documents (*Form CR-37*), and do not apply for a passport or other travel document during the pendency
of this case.

☑ Travel is restricted to CACD _____ unless prior permission is granted by Supervising
Agency to travel to a specific other location. Court permission is required for international travel.

☑ Reside as approved by Supervising Agency and do not relocate without prior permission from Supervising Agency.

☐ Maintain or actively seek employment and provide proof to Supervising Agency. ☐ Employment to be approved by Supervising Agency.

☐ Maintain or begin an educational program and provide proof to Supervising Agency.

Defendant's Initials: _RC_   Date: _12/1/20_

**Case Name:** United States of America v. Raymond She Wah Chan        Case No. 2:20-CR-00326-JFW-2

■ Defendant     ☐ Material Witness

■ Avoid all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution, ☐ including but not limited to _____ ; ☐ except Jeremy Chan (son) (No discussion of pending action) _____ .

■ Avoid all contact, directly or indirectly (including by any electronic means), with any known codefendants except in the presence of counsel. Notwithstanding this provision, you may contact the following codefendants without your counsel present: _____ .

☐ Do not possess any firearms, ammunition, destructive devices, or other dangerous weapons. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not use or possess any identification, mail matter, access device, or any identification-related material other than in your own legal or true name without prior permission from Supervising Agency. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not engage in telemarketing.

☐ Do not sell, transfer, or give away any asset valued at $ _____ or more without notifying and obtaining permission from the Court, except _____ .

☐ Do not engage in tax preparation for others.

☐ Do not use alcohol.

☐ Participate in the electronic remote alcohol monitoring program as directed by Supervising Agency and abide by all the rules and requirements of the program. You must pay all or part of the costs for treatment based upon your ability to pay as determined by Supervising Agency.

☐ Do not use or possess illegal drugs or state-authorized marijuana. ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not use for purposes of intoxication any controlled substance analogue as defined by federal law or street, synthetic, or designer psychoactive substance capable of impairing mental or physical functioning more than minimally, except as prescribed by a medical doctor.

☐ Submit to: ☐ drug and/or ☐ alcohol testing. If directed to do so, participate in outpatient treatment approved by Supervising Agency. You must pay all or part of the costs for testing and treatment based upon your ability to pay as determined by Supervising Agency.

☐ Participate in residential ☐ drug and/or ☐ alcohol treatment as directed by Supervising Agency. You must pay all or part of the costs of treatment based upon your ability to pay as determined by Supervising Agency. ☐ Release to PSA only ☐ Release to USPO only

☐ Submit to a mental health evaluation. If directed to do so, participate in mental health counseling and/or treatment approved by Supervising Agency. You must pay all or part of the costs based upon your ability to pay as determined by Supervising Agency.

☐ Participate in the Location Monitoring Program and abide by all of the requirements of the program, under the direction of Supervising Agency, which ☐ will or ☐ will not include a location monitoring bracelet. You must pay all or part of the costs of the program based upon your ability to pay as determined by Supervising Agency. You must be financially responsible for any lost or damaged equipment.

     ☐ Location monitoring only - no residential restrictions;

-or-

     ☐ You are restricted to your residence every day:

         ☐ from _____ ☐ a.m. ☐ p.m. to _____ ☐ a.m. ☐ p.m.

         ☐ as directed by Supervising Agency;

-or-

Defendant's Initials: _RC_   Date: _12/1/20_

**Case Name:** United States of America v. **Raymond She Wah Chan**    Case No. 2:20-CR-00326-JFW-2

☑ Defendant    ☐ Material Witness

☐ You are restricted to your residence at all times except for medical needs or treatment, attorney visits, court appearances, and

_____ , all of which must be preapproved by Supervising Agency;

☐ **Release to PSA only**    ☐ **Release to USPO only**

☐ You are placed in the third-party custody (*Form CR-31*) of _____ .

☐ Clear outstanding ☐ warrants or ☐ DMV and traffic violations and provide proof to Supervising Agency within _____ days of release from custody.

☐ Do not possess or have access to, in the home, the workplace, or any other location, any device that offers internet access except as approved by Supervising Agency.    ☐ In order to determine compliance, you agree to submit to a search of your person and/or property by Supervising Agency in conjunction with the U.S. Marshal.

☐ Do not associate or have verbal, written, telephonic, electronic, or any other communication with any person who is less than the age of 18 except in the presence of a parent or legal guardian of the minor.

☐ Do not loiter or be found within 100 feet of any schoolyard, park, playground, arcade, or other place primarily used by children under the age of 18.

☐ Do not be employed by, affiliated with, own, control, or otherwise participate directly or indirectly in the operation of any daycare facility, school, or other organization dealing with the care, custody, or control of children under the age of 18.

☐ Do not view or possess child pornography or child erotica.    ☐ In order to determine compliance, you agree to submit to a search of your person and/or property, including computer hardware and software, by Supervising Agency in conjunction with the U.S. Marshal.

☐ Other conditions:

_____

_____

_____

_____

_____

## GENERAL CONDITIONS OF RELEASE

I will appear in person in accordance with any and all directions and orders relating to my appearance in the above entitled matter as may be given or issued by the Court or any judicial officer thereof, in that Court or before any Magistrate Judge thereof, or in any other United States District Court to which I may be removed or to which the case may be transferred.

I will abide by any judgment entered in this matter by surrendering myself to serve any sentence imposed and will obey any order or direction in connection with such judgment as the Court may prescribe.

I will immediately inform my counsel of any change in my contact information, including my residence address and telephone number, so that I may be reached at all times.

I will not commit a federal, state, or local crime during the period of release.

I will not intimidate any witness, juror, or officer of the court or obstruct the criminal investigation in this case. Additionally, I will not tamper with, harass, or retaliate against any alleged witness, victim, or informant in this case. I understand that if I do so, I may be subject to further prosecution under the applicable statutes.

I will cooperate in the collection of a DNA sample under 42 U.S.C. § 14135a.

Defendant's Initials: _____    Date: _____

**Case Name:** United States of America v. **Raymond She Wah Chan**     Case No. 2:20-CR-00326-JFW-2

☑ Defendant     ☐ Material Witness

## ACKNOWLEDGMENT OF DEFENDANT/MATERIAL WITNESS

As a condition of my release on this bond, pursuant to Title 18 of the United States Code, I have read or have had interpreted to me and understand the general conditions of release, the preconditions, and the additional conditions of release and agree to comply with all conditions of release imposed on me and to be bound by the provisions of Local Criminal Rule 46-6.

Furthermore, it is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which will continue in full force and effect until such time as duly exonerated.

I understand that violation of any of the general and/or additional conditions of release of this bond may result in a revocation of release, an order of detention, and a new prosecution for an additional offense which could result in a term of imprisonment and/or fine.

I further understand that if I fail to obey and perform any of the general and/or additional conditions of release of this bond, this bond may be forfeited to the United States of America. If said **forfeiture is not set aside, judgment may be summarily entered in this Court against me and each surety, jointly and severally, for the bond amount, together with interest and costs. Execution of the judgment may be issued or payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States, and any cash or real or personal property or the collateral previously posted in connection with this bond may be forfeited.**

_____     _____     _____
Date     Signature of Defendant / Material Witness     Telephone Number

_____
City and State (**DO NOT INCLUDE ZIP CODE**)

☐ **Check if interpreter is used**: I have interpreted into the _____ language this entire form and have been told by the defendant that he or she understands all of it.

_____     _____
Interpreter's Signature     Date

Approved: _____     _____
United States District Judge / Magistrate Judge     Date

If cash deposited: Receipt # _____ for $ _____

(This bond may require surety agreements and affidavits pursuant to Local Criminal Rule 46.)

Defendant's Initials: _____     Date: _____

# EXHIBIT D

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,        )
                                    )
6             PLAINTIFF,            )     CASE NO.
                                    )
7             vs.                   )     CR 20-00326-JFW
                                    )
8  RAYMOND SHE WAH CHAN,            )
                                    )     PAGES 1 TO 58
9             DEFENDANT.            )
   _____)

10

11

12

13              REPORTER'S TRANSCRIPT OF
            TRIAL SETTING CONFERENCE VIA ZOOM
14              FRIDAY, DECEMBER 4, 2020
                      8:09 A.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22
   _____
23
            MIRANDA ALGORRI, CSR 12743, RPR, CRR
24           FEDERAL OFFICIAL COURT REPORTER
               350 WEST 1ST STREET, SUITE 4455
25             LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM

1           **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         NICOLA T. HANNA
          UNITED STATES ATTORNEY
5         BY:  MACK JENKINS
          BY:  VERONICA DRAGALIN
6         BY:  MELISSA MILLS
          Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California 90012

9

    **FOR THE DEFENDANT:**
10
          BRAUN & BRAUN, LLP
11        BY:  HARLAND W. BRAUN
          10250 Constellation Boulevard
12        Suite 1020
          Los Angeles, California 90067
13

14   ALSO PRESENT:

15        Special Agent Andrew Civetti

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 4, 2020**

2                        **8:09 A.M.**

3                          **---**

4

5          THE CLERK:  Calling CR 20-326A-JFW, United States

6    of America versus Raymond She Wah Chan.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9    Mack Jenkins on behalf of the United States.  Joining me off

10   camera and socially distanced is AUSA Veronica Dragalin,

11   AUSA Melissa Mills, and FBI Special Agent Andrew Civetti.

12         MR. BRAUN:  Good morning, Your Honor.

13         Harland Braun, B-r-a-u-n, for Defendant

14   Raymond Chan who is also attending via Zoom.

15         THE COURT:  All right.  Good morning to all.

16         This matter is on the Court's calendar for the --

17   a Trial Setting Conference for Mr. Chan.  Before we discuss the

18   dates that the Court has previously set in this action pursuant

19   to the Court's Criminal Trial Order as modified by

20   docket No. 63, I'm going to ask the Government to advise us of

21   what it expects to prove with respect to this defendant.

22         Although I am familiar with the nature of the

23   charges and the evidence based upon the original Indictment and

24   the extensive Trial Setting Conference that we had in August,

25   the filing -- the First Superseding Indictment, which was just

1    recently unsealed, expands the case obviously as to Mr. Chan.

2    And in its most recent notice of complex case, the Government

3    now estimates that it will take 20 to 25 days to try this case.

4           It appears that many of the names of individuals

5    and entities that were not used in the original Indictment,

6    because according to the Government, they were, quote,

7    "masked," they have now been unmasked and included in the First

8    Superseding Indictment which makes it a little easier to review

9    the allegations.

10          And I appreciate Government counsel's efforts in

11   filing the revised notice this week with respect to the names

12   of individuals and entities in the First Superseding

13   Indictment.  However, I'm going to ask Government counsel to

14   rereview because I noticed that there were many entities and

15   names that are mentioned in the First Superseding Indictment

16   that were not included in the recent filing.

17          By way of introduction or beginning, the

18   Government has alleged in paragraph 15 that the defendant was

19   the general manager of the Los Angeles Department of Building

20   and Safety until about May of 2016 at which time he was

21   appointed by the mayor as the City's deputy mayor of Economic

22   Development, and he remained in that position until

23   approximately July of 2017 when he retired, and then he began

24   working with George Chiang, C-h-i-a-n-g, as a consultant and

25   lobbyist on behalf of various developers.

```
 1                    So I'm going to ask -- I assume, Mr. Jenkins, you
 2      are going to speak for the Government this morning?
 3                    MR. JENKINS:  That is correct, Your Honor.
 4                    THE COURT:  All right.  I'm going to ask you to
 5      go through the Government's evidence with respect to the five
 6      schemes that are alleged in the RICO conspiracy and the mail
 7      fraud counts which include the L.A. Grand Hotel,
 8      940 Hill Street, the Luxe Hotel, Project M -- which I guess has
 9      not been unmasked yet; is that correct?
10                    MR. JENKINS: That is correct, Your Honor.
11                    THE COURT:  -- and Businessman A who, my memory
12      serves me, is the cabinetmaker.  And he has not been unmasked
13      yet; is that correct?
14                    MR. JENKINS:  Not publicly by the Government.
15      That is correct, Your Honor.
16                    THE COURT:  Okay.  As I indicated, I'm familiar
17      with the evidence with respect to those schemes but primarily
18      as to the Co-defendant Huizar because he was the only defendant
19      named in the original Indictment.  So I will then turn it over
20      to Mr. Jenkins.
21                    As you indicated the last time, if you would
22      point out during your presentation the percipient witnesses and
23      especially those individuals who the Government believes are
24      going to provide testimony as percipient witnesses, namely, the
25      various cooperators that have entered pleas of guilty pursuant
```

1    to cooperation plea agreements.

2              I'm particularly interested in the -- when you

3    get to that point in time, the Synergy consulting fees that

4    were apparently, if I'm reading the First Superseding

5    Indictment correctly, were paid -- allegedly paid to Mr. Chan

6    during his tenure as the deputy mayor.  Also, I'm interested in

7    an estimate as to the total amount that Mr. Chan has

8    apparently -- the Government's theory in terms of what he has

9    received in connection with the pay-to-play schemes.

10             So, Mr. Jenkins, I will hear from you.

11             MR. JENKINS:  Yes, Your Honor.

12             Beginning with the five schemes, the first, as

13   the Court noted, charges part of the racketeering conspiracy in

14   which Mr. Chan is charged is the L.A. Grand Hotel bribery

15   scheme.  Essentially this hotel is owned by a chairman named

16   Wei Huang, last name H-u-a-n-g.  The allegations are -- the

17   Court is somewhat familiar with.  This is the chairman who

18   ultimately took Jose Huizar on various luxury trips to

19   Las Vegas, Australia, and other locations.

20             It is alleged that he provided, that is,

21   Chairman Huang provided approximately $800,000 in benefits to

22   Jose Huizar and, in addition, helped fund a $600,000 loan that

23   ultimately served the purpose of resolving a sexual harassment

24   lawsuit against Jose Huizar.  One of the reasons that conduct

25   is important is because, as alleged in the First Superseding

 1    Indictment, Mr. Chan, Defendant Chan, is the introductory point

 2    as he provided and facilitated the introduction of

 3    Chairman Huang to Jose Huizar in or about 2013.  That is

 4    significant for various reasons including that the Indictment

 5    also alleges the corrupt relationship between Chairman Huang or

 6    Chairman Huang, H-u-a-n-g, and Huizar started shortly

 7    thereafter.

 8            It is also significant, the timing, because

 9    around that same time period Defendant Chan, who had reached a

10    significant level of management, that is, the interim general

11    manager of the Los Angeles Department of Building and Safety or

12    LADBS, was proposed to be merged with another significant City

13    entity, that is, City Planning, around that time.

14            According to the defendant, as alleged in the

15    Indictment, there was some concern that that merger would

16    result in the elimination of Defendant Chan's supervision over

17    his department.  Essentially that department would get subsumed

18    into City Planning.  And the evidence is that is something that

19    Defendant Chan did not want to do, did not want to happen, and

20    enlisted the support of various people including

21    Council Member Huizar to, again, as alleged in the Indictment,

22    essentially overly simplistic but we believe supported by

23    evidence, helped save Defendant Chan's job as a management

24    level employee over LADBS.

25            In fact, that did result, meaning the proposed

1    merger did not occur.  Defendant Chan ultimately went from

2    interim general manager to the permanent general manager.  He

3    was very effusive and thankful to Jose Huizar for those efforts

4    and repeatedly stated so.  And around that same time is when

5    Councilman Huizar was suffering a significant both public

6    relations and internal political issue related to a lawsuit, a

7    sexual harassment lawsuit, filed by a female staffer against

8    him that was, according to our evidence, potentially adversely

9    affecting Jose Huizar's re-election which would occur in 2015.

10           Our evidence is that Jose Huizar was essentially

11   desperate to resolve the lawsuit privately and confidentially

12   and quickly in order to maintain and help his re-election bid.

13   In that effort, he solicited and Defendant Chan offered to

14   provide assistance to help resolve that issue meaning resolve

15   it in a way that would continue to allow Jose Huizar to serve

16   his position and hopefully get re-elected.

17           The evidence is that Defendant Huizar and

18   Defendant Chan reached out to -- or initially it was

19   Defendant Chan reached out to Chairman Huang, that

20   Chairman Huang or Huang -- I will try to keep my pronunciation

21   consistent -- that is the same chairman who owned the

22   L.A. Grand Hotel and, again, who ultimately would be the

23   primary, as alleged in the Indictment, bribers of

24   Defendant Huizar.

25           Defendant Chan reached out to this chairman and

 1    requested that he facilitate or help fund this lawsuit or help

 2    pay the ultimate settlement.  As alleged in the Indictment, the

 3    chairman, through Defendant Chan, told Defendant Huizar

 4    essentially, "How can I help?  I will do whatever to help."

 5    The help he ultimately provided was that $600,000 collateral

 6    that is alleged in the Indictment.

 7              During that process, Defendant Chan served as the

 8    go-between.  That is, Chairman Huang does not speak English.

 9    He speaks Mandarin.  Defendant Chan would serve often as an

10    interpreter or go-between because he does speak Mandarin, and

11    he would be the person essentially negotiating the terms or

12    getting this collateral provided such that he was an integral

13    part of the process of ensuring that Chairman Huang provided

14    the $600,000 to fund the lawsuit as requested by

15    Defendant Huizar and also requested by Defendant Chan, meaning

16    Defendant Chan made it clear that this was what he also wanted

17    the chairman to do.  And ultimately the chairman did that.

18              Around the same time -- still on the

19    L.A. Grand Hotel scheme -- Chairman Huang was also making

20    several requests of Defendant Huizar.  Issues had arisen at the

21    L.A. Grand Hotel.  A couple that are alleged in the Indictment

22    are, one, the L.A. Grand Hotel -- I'm not sure if the Court is

23    familiar, but it's very close to the courthouse.  It's a large

24    hotel that is in a very precarious position for Downtown L.A.

25    because there is very little parking.  For a large hotel that

 1   serves bar functions, social functions, in addition to actual

 2   occupants commercially, it's in a difficult spot because there

 3   is nowhere to park.  So they had a parking lot dispute which

 4   was significant for that reason meaning that parking was a

 5   major issue for the chairman, and he solicited both

 6   Defendant Chan's help and Defendant Huizar's help.

 7            Defendant Chan also is aware of asks such as a

 8   union issue that was occurring at the hotel or with the hotel

 9   employees, and Chairman Huang through Defendant Chan solicited

10   again Jose Huizar's help.  But, most significantly,

11   Defendant Chan was aware in his capacity as the LADBS general

12   manager and then later in his capacity as Deputy Mayor for

13   Economic Development.

14            Defendant Chan was intimately aware that this

15   chairman wanted to transform the L.A. Grand Hotel into a

16   77-floor tower which at the time -- and I think still today --

17   would be the second highest or the first highest tower west of

18   the Mississippi.  Obviously that sort of project would involve,

19   in Jose Huizar's district, significant entitlements in order

20   for it to go forward.

21            At the time Defendant Huizar was both the chair

22   of the PLUM Committee and the city council member over the

23   district where the hotel was located.  Defendant Chan

24   facilitated meetings in that regard with other City employees

25   and generally was aware that this was one of the -- was one of

1    Defendant Huang's goals for the hotel.

2              In addition --

3              THE COURT:  All that is well and good with

4    respect to Defendant Huizar, but why is that -- how does that

5    show that Mr. Chan is somehow involved in the bribery scheme?

6    So far I haven't heard any evidence other than the fact that

7    Mr. Chan made an introduction to Chairman Huang.  Then

8    Chairman Huang and Mr. Huizar entered into negotiations with

9    respect to the loan transaction which ultimately the $600,000

10   was used to settle his sexual harassment lawsuit.

11             There has to be something that -- it seems to me

12   the Government's theory is that, in exchange for that

13   arrangement, Mr. Huizar took certain action favoring the

14   development or the entitlements to the L.A. Grand Hotel.  But

15   so far we have Mr. Chan making introductions, being an

16   interpreter, and I don't see what his -- the evidence is with

17   respect to, one, his knowledge that Mr. Huizar was being asked

18   to take certain actions and his knowledge of what those actions

19   were in exchange for the various entitlements or -- I guess the

20   bribes that were being paid to Mr. Huizar.

21             I guess the first question is did Mr. Chan

22   receive any money from Chairman Huang in connection with the, I

23   take it, votes or favorable treatment that was received by

24   Chairman Huang and his company?  I don't see any allegations of

25   that in the Indictment.

1           MR. JENKINS:  That is correct because there is no

2    allegation that Defendant Chan received any money related to

3    the L.A. Grand Hotel scheme.  At this point there are no

4    allegations that he received money.  The allegation is that he

5    aided and abetted the bribery scheme between

6    Council Member Huizar who received money, $800,000, and

7    Las Vegas and other trip benefits in addition to the 600,000

8    collateral and that the way he received that money, that is,

9    the way Defendant Huizar received that money, was primarily

10   through Defendant Chan who at the time was a City employee who

11   also was intimately involved with Chairman Huang.

12           He knew that Chairman Huang, according to our

13   evidence, wanted something from Defendant Huizar.  In short, he

14   wanted lots of things.  The most significant thing was to

15   redevelop and transform his hotel.

16           THE COURT:  Well, I understand that.  But

17   Mr. Chan wasn't -- I don't know.  Was Mr. Chan involved in any

18   of the Las Vegas trips?

19           MR. JENKINS:  No.  That's why he is alleged to

20   have aided and abetted a bribery scheme between Jose Huizar.

21           THE COURT:  How do you aid and abet a bribery

22   scheme with a simple introduction of Mr. Huizar, who needs

23   money, to Chairman Huang?  You have to have some evidence, it

24   seems to me, that Mr. Chan knew that the result of that loan

25   transaction was going to be some favorable treatment.  And,

1    more importantly, what's the evidence that Mr. Chan knew that

2    Mr. Huizar was -- you know, walked away, for example, from

3    $65,000 worth of chips that had been provided to him by

4    Chairman Huang during the Las Vegas trips?

5              MR. JENKINS:  Well, the Court described multiple

6    ways that Defendant Huizar was bribed.  Defendant Chan is

7    alleged to aiding and abetting the bribery scheme relating to

8    the payment of the --

9              THE COURT:  I guess the more direct question is

10   what is your evidence -- what percipient witnesses do you have

11   with respect to Mr. Chan and his alleged aiding and abetting

12   the bribery scheme with respect to Mr. Huizar?  So far it

13   sounds to me like -- albeit, he's the head of the

14   L.A. Department of Building and Safety -- that he's simply

15   making introductions to -- introductions of various people

16   which I assume is nothing out of the ordinary when you have a

17   developer who is trying to develop a piece of property in

18   Los Angeles.

19             MR. JENKINS:  That's correct.  If that's where

20   the case ended, I would agree with the Court.  But that was the

21   first fact that was alleged.  It was the subsequent conduct.

22   Specifically, the Court asked what is the evidence for the

23   percipient witnesses?  What is Defendant Chan's knowledge?

24   Defendant Chan is the one who asked for and facilitated the

25   bribe payment to Defendant Huizar from Defendant Huang related

 1    to the $600,000.

 2                THE COURT:  You mean Mr. Chan called up Mr. --

 3    Chairman Huang and said Mr. Huizar needs $600,000.  If you

 4    arrange this $600,000 loan or, as you characterize, the bribe

 5    then Mr. Huizar is going to do certain things for you?

 6                MR. JENKINS:  Our evidence would be that was

 7    their agreement, yes.  Whether they had that --

 8                THE COURT:  Who is going to testify to that

 9    agreement?  You have Chairman Huang who is a co-defendant in

10    this case; correct?

11                MR. JENKINS:  Yes, Your Honor.  I was saying most

12    bribery agreements are not that explicit.  Of course the

13    agreement, as how the Court described it, no one I would expect

14    is going to say that there is that specific individual

15    conversation.  However, multiple witnesses, but most

16    specifically the communications between Defendant Chan,

17    Defendant Huizar, between Defendant Huang including text

18    messages and e-mails will be consistent with that Government

19    theory meaning that, yes, it was Defendant Chan who reached out

20    to Chairman Huang to create and become the architect of this

21    payment scheme, that it was Defendant Chan who followed up with

22    both sides of the participants of the scheme, both

23    Defendant Huizar and Defendant Huang, to ensure that this deal

24    got done meaning that the payment was provided, that

25    Defendant Huang did provide it.

```
 1                    Ricky Zheng, who is an employee of the chairman,
 2      will testify to that.  George Esparza will testify again to
 3      these general agreements and the conversations that they were
 4      having on their end, meaning Jose Huizar was having
 5      conversations with Defendant Esparza saying --
 6                    THE COURT:  So let me -- so what did Huizar do in
 7      order to -- in exchange for the $600,000 and the casino chips
 8      and all the other items that he received allegedly as a bribe
 9      with respect to the L.A. Grand Hotel?  And how is Mr. Chan
10      involved in those, if he was, those votes?
11                    MR. JENKINS:  Sure.  So what Defendant Huizar
12      did, according to the evidence in the Indictment, is that he
13      agreed to help that project, that transformation.  That is,
14      the --
15                    THE COURT:  Did he do -- go ahead.
16                    Ultimately, as my memory was, the FBI served the
17      search warrant and basically shut down the development of the
18      hotel unless I'm misremembering.
19                    MR. JENKINS:  I think you're conflating two
20      memories although your conclusion is still accurate, meaning
21      Jose Huizar did not vote on anything related to the
22      transformation of that hotel because at that point Jose Huizar
23      was publicly under investigation.  However, the Indictment
24      alleged that there was an agreement prior to that, and that
25      agreement was known to the parties including Defendant Huizar,
```

1    Defendant Huang, and Defendant Chan.  So the Court is correct

2    that, if there is a vote that we could show the Court to that

3    Defendant Huizar put -- I don't know if they use a gavel -- but

4    he voted on something related to the project, that certainly

5    would be significant.

6           Unfortunately for the Government's efforts, we

7    executed multiple search warrants right around that time.  And

8    so obviously at that point neither side could use Huizar at

9    that point.  But the conversations up to that point, as will be

10   testified to by Ricky Zheng, George Esparza, but also most

11   specifically the communications where Defendant Chan was

12   brokering these deals and in his role -- his City roles he was

13   aware of essentially what Defendant Huang wanted meaning what

14   needed to be done at the L.A. Grand Hotel to achieve this dream

15   of transforming it into the tallest building west of the

16   Mississippi because Defendant Chan was in those meetings.

17          Defendant Chan worked for the City.  He's a

18   career city server.  He knows that, to transform the

19   L.A. Grand Hotel, you're going to need a lot of City help, and

20   the biggest help that you can be provided would be through the

21   PLUM Committee and through the council member whose district

22   your project is.  So Defendant Chan's involvement or knowledge

23   we think is clear.

24          The Court, again, is accurate that we're not

25   alleging right now that Defendant Chan from that particular

1   scheme took any money directly.

2                THE COURT:  Okay.  So are we done with the

3   L.A. Grand and move on to 940 Hill?

4                MR. JENKINS:  Yes, Your Honor.  The 940 --

5                THE COURT:  Which also now has been included

6   as -- the LLC has been included as a defendant as well as

7   David Lee.  He's also been named as a defendant in the First

8   Superseding Indictment.  That was formerly known as the masked

9   Development C; correct?

10               MR. JENKINS:  Yes, Your Honor.

11               THE COURT:  What is Mr. Chan's involvement,

12   according to the Government's theory, with the 940 Hill Street

13   development?

14               MR. JENKINS:  This one will be shorter because

15   there is no allegations, no agreements, no conduct.  This one

16   focuses primarily at least as to the defendants Defendant Lee,

17   his LLC, and Defendant Huizar.

18               THE COURT:  So Mr. Chan, according to the

19   Government's theory, does not have any direct involvement or

20   indirect involvement in the 940 Hill bribery scheme?

21               MR. JENKINS:  That is correct, Your Honor.

22               THE COURT:  Okay.  So then that takes us to the

23   Luxe Hotel scheme.

24               MR. JENKINS:  Yes, Your Honor.

25               THE COURT:  And Mr. Chan -- is there any alleged

1  involvement in that scheme?

2          MR. JENKINS:  Yes, Your Honor.

3          THE COURT:  Okay.  What's the Government's

4  theory?  Give me a minute here.  Let me turn to page 30 --

5          MR. JENKINS:  I believe 37, Your Honor.

6          THE COURT:  37 and 38.  Okay.  Why don't you

7  briefly tell us what the Government's theory is with respect to

8  Mr. Chan.

9          MR. JENKINS:  Yes, Your Honor.  So this one I

10  would describe -- we would describe it as consistent with the

11  L.A. Grand Hotel scheme in the sense that Defendant Chan's role

12  was as the introductory person, the connection between the

13  council member Defendant Huizar and a Chinese-speaking Chinese

14  national chairman of Hazens Real Estate Group who owns the --

15  and owns the Luxe Hotel in Downtown L.A. which is in

16  Defendant Huizar's district and was also seeking a major

17  redevelopment project or process which would go through PLUM

18  chaired by Defendant Huizar and ultimately city council.

19          In addition -- and this is where --

20          THE COURT:  Let me go back because your voice cut

21  out a little bit.  Let's first take the timetable.

22          Are the activities that you are alleging against

23  Mr. Chan, did they occur during either his tenure on the

24  Department of Building and Safety or as deputy mayor, or did

25  they occur after he retired in July of 2017?

1        MR. JENKINS:  Yes, Your Honor.  All three.  So
2   the introduction is approximately 2014 when Defendant Chan was
3   a higher up at Department of Building and Safety.
4        THE COURT:  And who did he introduce to -- I have
5   my notes.  So I don't want to -- I don't want to unmask some of
6   these individuals, and I can't -- I guess they are alleged in
7   the Indictment.
8        So we have the principals of the Luxe Hotel are
9   the -- the last name is Yuan, Y-u-a-n.
10       MR. JENKINS:  Correct.
11       THE COURT:  We have two Yuans.  There is another
12  Yuan.  I think it's a different one.  It's the Chairman Yuan,
13  which the first name is F-u-e-r.
14       Is that correct?
15       MR. JENKINS:  That is correct, Your Honor.  To
16  clarify, the prior Yuan is the LLC that owned the Luxe Hotel.
17  So that is actually the LLC where F-u-e-r Yuan, Y-u-a-n, is the
18  person or the chairman.
19       THE COURT:  Okay.  So he's the chair.  So let's
20  go back to the beginning.
21       So Mr. Chan is alleged to have introduced
22  principals of the Luxe Hotel, LLC, which the chair -- so who
23  did he introduce?
24       MR. JENKINS:  Yes.  So he introduced
25  Chairman Yuan -- I believe it's pronounced Y-u-a-n --

1    Chairman Yuan to Defendant Huizar.  That chairman -- we will
2    call him the Hazens chairman for a reference.  Hazens is the
3    Chinese mega-development company that owns the LLC.  That is
4    J-i-a Y-u-a-n.  So that is the LLC owned by Hazens' parent
5    company, and Chairman Yuan is the chairman who owns essentially
6    all of that.
7              THE COURT:  So what was the -- what was the
8    purpose of the introduction of the chairman by Mr. Chan to
9    Mr. Huizar?
10             MR. JENKINS:  I don't know the specific purpose
11   at that point.  The context was that Defendant Huizar was at
12   this point someone who Defendant Chan was very close to.
13   Defendant Chan was also close to many Chinese development
14   companies.  Again, Chairman Yuan or the Hazens chairman speaks
15   primarily Mandarin.  Does not speak English.  Defendant Chan,
16   again, as a bilingual speaker, was someone who made
17   introductions.  And Defendant Chan, again, without trying to
18   gain his intent at that time, it is clear one of the things he
19   did was connect Chinese companies to Defendant Huizar.
20             THE COURT:  What's wrong with that?
21             MR. JENKINS:  That alone absolutely --
22             THE COURT:  I mean, if a Chinese developer wants
23   to build a project or rehab a project and it happens to be in
24   Jose Huizar's district, doesn't it make sense that Mr. Chan
25   would introduce those Chinese developers to the councilman who

 1    happens to be -- preside in the district where they want to

 2    develop property?

 3                  MR. JENKINS:  Yes.  That alone seems like

 4    Defendant Chan is doing his job.  Great.  The problem, of

 5    course, is what happens afterwards.

 6                  THE COURT:  Okay.  Well, let's get to the

 7    afterwards.

 8                  MR. JENKINS:  Yes.  So the most significant

 9    portion is beginning on overt act 131.  Essentially what is

10    alleged is there are different ways -- excuse me.  There are

11    different ways that the Indictment alleges that Hazens provided

12    benefits to Defendant Huizar to help with the Luxe Hotel

13    project.  One of the ways are consulting fees that are

14    described in subparagraph B that Defendant Chan is not alleged

15    to be involved in.  So I'm going to skip --

16                  THE COURT:  Okay.

17                  MR. JENKINS:  -- to C which begins on page 45.

18    And this paragraph -- these sections describe how

19    Defendant Chan, again, was privy to information, sort of the

20    role -- vitality -- the role that Defendant Huizar played in

21    this project meaning that he was the person that the Hazens

22    company really needed to get on their side to make their

23    project happen.

24                  And at this time we allege -- now we are moving

25    forward to around the 2017 time.  So we are jumping from around

1    2014 when the introduction is made.  All of this time Hazens is

2    going through this redevelopment process.  It's a slow process

3    often.  It was particularly slow here.

4              And there was the evidence, as alleged in the

5    Indictment, that Chairman Yuan, the Hazens chairman, was

6    concerned, to put it diplomatically, about the case of this

7    redevelopment project and that he wanted essentially it to go

8    faster.  Defendant Chan was aware of this and one of the people

9    that was attempting to make it essentially go faster meaning

10   that, to put the time frame, I think before the Court began

11   this inquiry.

12             In I believe May of 2016 up to that point,

13   Defendant Chan was at some various levels of significant

14   management over LADBS.  So the Hazens process is going through.

15   Defendant Chan appropriately, as far as we know, was aware of

16   the Hazens project.  He had a relationship or connection with

17   Chairman Yuan that he connected with Defendant Huizar.  At some

18   point, around May 2016, Defendant Chan's position, he's

19   promoted or appointed from his LADBS manager position to Deputy

20   Mayor for Economic Development in around May of 2016, a

21   position he holds until around July of 2017.  So a little over

22   a year.

23             During that whole time, again, the Hazens's

24   redevelopment process with the Luxe Hotel is going on slowly,

25   sluggishly according to the chairman, and it's wanted -- he

1    express a strong interest in wanting it to go faster.

2              THE COURT:  Expresses that interest to who?

3    Mr. Chan?

4              MR. JENKINS:  Yes, Your Honor.  Mr. Chan.

5              THE COURT:  All right.  Well, that's not

6    unremarkable, is it, if you've got investment and Mr. Chan is

7    the head of building and safety, to call him up and say is

8    there anything I can do to move this along faster?

9              MR. JENKINS:  Again, I don't think that is

10   unusual at all and in a vacuum seems like an appropriate

11   question.  The who you make that to is sometimes an issue, but

12   ultimately it's what's done as a result.  But also, of course,

13   it provides Defendant Chan the knowledge and notice that

14   Defendant Yuan has a motive to, again, alone not an illicit

15   motive, to increase the speed of the project.

16             THE COURT:  Well, there is nothing wrong with

17   that.  It's not rocket science to figure out if somebody has a

18   project that is not moving as quickly as the developer might

19   like, that they're going to look for ways in order to move it.

20             MR. JENKINS:  Absolutely.  However, what it does

21   is use the opposite example.  If Chairman Yuan was satisfied

22   with the speed of the project, which occasionally happens in

23   development projects, and never reached out to anyone about his

24   concerns, that would undermine a Government motive that there

25   was a need to bribe anyone at any time.

```
 1              THE COURT:  But I take it that -- I don't know
 2   the scope of the responsibilities in a Deputy Mayor for
 3   Economic Development, but I assume that one of the
 4   responsibilities would be to promote development in
 5   Los Angeles.  And if you have a Chinese developer who is
 6   unsatisfied with the progress at which a -- their development
 7   is being approved by the City, that that would not -- that
 8   would not bode well for other Chinese developers to want to
 9   invest money in Los Angeles if they're simply going to get tied
10   up in the bureaucratic processes trying to get their projects
11   approved.
12              So it would seem to me it would be consistent
13   with Mr. Chan to want to help this particular development so it
14   didn't have the detrimental effect on any future consideration
15   by Chinese developers or any other type of developer to go to
16   some other jurisdiction and build their buildings.
17              MR. JENKINS:  Again, the Court's assessment is
18   100 percent accurate in that vacuum.  The problem here is that
19   Defendant Chan is alleged to have also agreed with the Hazens
20   consultant to a bribery scheme to facilitate that enhancement
21   of Chinese development which is what makes it illegal.
22              THE COURT:  And who did he agree with?
23              MR. JENKINS:  Co-defendant George Chiang,
24   Co-defendant Jose Huizar, and co-defendant -- not co-defendant.
25   Co-defendant George Chiang and Co-defendant Jose Huizar.
```

1    George Chiang was the consultant for the --

2              THE COURT:  And the agreement was, Mr. Huizar,

3    you accept bribes and vote to move these developments along?

4              MR. JENKINS:  That is the summation of the bribe.

5    But, of course, again, there is no explicit conversation like

6    that.  But that is the point of the bribe, I would say.  That

7    is the --

8              THE COURT:  Well, obviously it's the point.  But

9    that jumps over a number of -- there has to be a number of

10   hurdles that has to be jumped over.  One, that Mr. Chan knew

11   that by introducing these developers to the councilman who was

12   responsible for their various districts, that that was going to

13   result in the payment of a bribe in order to enhance or promote

14   or speed up the development.  I just don't know what that

15   evidence is.

16             MR. JENKINS:  To clarify, that is not the

17   allegation.

18             THE COURT:  Okay.

19             MR. JENKINS:  The context is that Defendant Chan

20   knows these individuals, but there are several overt acts

21   afterwards that express the agreements.

22             THE COURT:  Okay.  Well, let's get to those.  I'm

23   looking for the -- obviously this Indictment is over 100 pages

24   long, and I slugged through it as best I can.  But I didn't see

25   what I will characterize as smoking gun evidence that Mr. Chan

1  was doing whatever the Government has alleged he was doing

2  other than the introductions that he was doing.  Anything else

3  that would give rise to his becoming a member of the RICO

4  conspiracy?

5           So far he hasn't financially -- it doesn't appear

6  he has financially benefited from any of this although he is

7  apparently indebted to Mr. Huizar for preventing the merger of

8  the Department of Building and Safety with the other agency.

9           Go ahead.  I'm still waiting for the smoking gun.

10           MR. JENKINS:  And I'm always waiting for the

11  smoking gun, Your Honor.

12           Here I would say we have significant

13  circumstantial and direct evidence of, one, I would disagree

14  with Your Honor's assertion that he lacked the financial motive

15  as to the first scheme.  This defendant --

16           THE COURT:  I didn't say he lacked the financial

17  motive.  I just said he lacked any financial benefits.  I don't

18  see any money going into his pocket.  He might have had a

19  financial motive, but that motive doesn't seem to have come to

20  fruition.

21           MR. JENKINS:  And so that is where I would take

22  issue.  It came to fruition because, immediately after

23  Defendant Chan left city service, he immediately went to an

24  extremely lucrative consulting business consulting on some of

25  these exact same projects.  So not only did he have a financial

motive, he had a financial gain after he left the City which is why the City employs strict ethics rules to prevent exactly what Defendant Chan did.  But more directly --

THE COURT:  I understand that.  Basically, if I'm -- if my memory of my notes are correct, he ends up with -- who does he end up in business with?  Let me just ask you.

MR. JENKINS:  Yes.  Racketeering admitted co-conspirator George Chiang who he formed a company with while he --

THE COURT:  That's C-h-i-a-n-g; right?

MR. JENKINS:  That is correct, Your Honor.

THE COURT:  All right.  So he leaves -- retires from the City in July of 2017.

MR. JENKINS:  Correct.

THE COURT:  And then he joins up with Mr. George Chiang.  I assume that there is nothing improper or illegal with respect to Mr. Chan's receiving compensation for acting as a lobbyist or as a consultant for any of the developers that are alleged as part of this RICO conspiracy if he's no longer employed by the City.  He's free to earn a living.

MR. JENKINS:  He's free to earn a living but not in the way Your Honor just described.

THE COURT:  Okay.

MR. JENKINS:  Number one --

1           THE COURT:  Why is it illegal or improper for

2  Mr. Chan to earn a living after he -- as a consultant or as a

3  lobbyist for various developers after he leaves the employ of

4  the City in July of 2017?

5           MR. JENKINS:  For multiple reasons, and I would

6  say for the reason that this Indictment outlines is that the

7  City renewed an individual --

8           THE REPORTER:  Counsel, you just broke up a

9  little for me.  Can you please repeat?

10           MR. JENKINS:  Yes, madam court reporter.

11           The City ethics prevents exactly what this

12  Indictment outlines as a corrupt relationship meaning that City

13  ethics is concerned that, while individuals are working for the

14  City, they're secretly actually working to benefit their future

15  employment for future developers.  Accordingly, they have

16  ethics rules that Defendant Chan, a career civil servant,

17  received annual training at least on provisions that would bar

18  him from lobbying even through third party entities or agents,

19  city officials after he left government employment.

20           Moreover, he was permanently --

21           THE COURT:  But that bar doesn't last forever.

22           MR. JENKINS:  It lasts for a year.  And then

23  additionally there is a permanent, which does last forever, ban

24  against city employees who personally participated in a project

25  meaning they worked on a specific project.  For example,

1  Defendant Chan worked significantly, as the Court pointed out,

2  to help Hazens because, as the Court pointed out, he wanted to

3  help Chinese development companies.  All of that, okay.

4  However, according to the ethics rules, because he

5  substantially participated in helping Hazens, he would be

6  forever precluded from taking payment from Hazens to lobby city

7  officials.

8          And the whole reason is, again, exactly what one

9  of the outlines of this Indictment, that Defendant Chan was

10 actually, while working for the City, also working for himself.

11 From George Chiang the allegation is that he did agree to take

12 a bribe, bribes that were ultimately paid after he left the

13 City, bribes that totaled over $100,000.  But Defendant Chan,

14 being a sophisticated person, did not take money before that

15 time period, but he agreed to take it as alleged in the

16 Indictment.  Ultimately he did take it.  And, moreover, by any

17 standard, he violated multiple City ethics rules after he left

18 the city to achieve this purpose which again --

19          THE COURT:  Those are the allegations in overt

20 acts 203, 204, and 205 where George Chiang accepted from

21 Mr. Yuan the $100,000 check as the bonus payment for Synergy,

22 which I don't understand what Synergy is, for successfully

23 reaching the Planning Department Advisory Hearing that was

24 scheduled in May of 2017.  And then there was a conversation

25 between Mr. Chan, the defendant, and Mr. George Chiang about

1    getting his share, which apparently is $20,000, and Mr. Chan

2    said, no, he wanted to wait because he expected there was going

3    to be larger payments.

4              It looks like the timing of this was such that --

5    this was in May of 2017.  Mr. Chan, recognizing his ethical

6    obligations or -- in any event, strike that.  Mr. Chan,

7    recognizing that it probably didn't -- he should wait until

8    after he left L.A. and the city employment in July of 2017.  So

9    he's agreeing with his future employer or partner that,

10   whatever monies are coming, let's wait.  I don't want to see

11   those monies until after I have left the city employment.

12              MR. JENKINS:  Yes, sir.

13              THE COURT:  Is that the Government's theory?

14              MR. JENKINS:  That is the Government's theory as

15   supported by the evidence.

16              THE COURT:  What is the Synergy just briefly?

17   Because I don't understand the Synergy.  You started overt act

18   No. 195 with the -- with Synergy, and somehow -- and I don't

19   know what Synergy is.  Somehow Synergy is taking over the

20   Luxe Hotel project with George Chiang and another consultant.

21   I don't understand that.  Can you explain it to me?

22              MR. JENKINS:  Certainly, Your Honor.

23              George Chiang, again, admitted co-conspirator in

24   this enterprise --

25              THE COURT:  He's testifying on behalf of the

```
 1   Government in this case?
 2                MR. JENKINS:  That is correct.  Yes.  He is one
 3   of the individuals that testified in exchange for potential
 4   leniency at sentencing.
 5                THE COURT:  Okay.
 6                MR. JENKINS:  He was the sole owner of Synergy
 7   which was essentially a political consulting firm, essentially
 8   real estate consulting.
 9                THE COURT:  Okay.
10                MR. JENKINS:  At the time Defendant Chan and
11   George Chiang also had a professional and personal
12   relationship, meaning they knew each other.  And while
13   Defendant Chan was in the City, George Chiang was at Synergy.
14   They developed a plan that, when Defendant Chan would leave the
15   City, they would form a new consulting group focusing on
16   Chinese development companies with which they both had
17   connections and levels of expertise.  They would form this
18   company.
19                The company they did form and agreed to form was
20   CCC.  So three C's -- Chiang Chan Chan.  So Synergy was sort of
21   the predecessor to what becomes CCC once Defendant Chan left
22   the city employment.
23                THE COURT:  I see.  So Synergy is basically a
24   consultant.  And when you allege in 196 it is taking over the
25   Luxe Hotel project, it is taking over as a consultant.  It's
```

1    not taking over the project somehow and in any other fashion.

2             MR. JENKINS:  That is correct, Your Honor.

3             THE COURT:  So they're replacing the prior

4    consultant for Luxe Hotel project with Synergy which is a

5    George Chiang company which Mr. Chan is aware of.  Now I

6    understand it.  The thing was so artfully worded I couldn't

7    figure out what "taking it over" meant.

8             MR. JENKINS:  Understood.

9             THE COURT:  All right.  I interrupted you.  So

10   you've got these payments that are being made by the

11   Luxe Hotel.  And -- these, I assume, are going to be argued by

12   the defense as consulting fees.  And, in fact, in overt act 203

13   you have alleged that George Chiang accepted a $100,000 check

14   for his bonus payment for Synergy, the consulting firm,

15   successfully reaching the Planning Department Advisory Hearing

16   scheduled for May 24, 2017.

17            So I take it there is nothing improper about the

18   Luxe Hotel principals paying consulting fees for moving this

19   particular project closer to completion or at least approvals

20   in the Planning Department.  Is there something improper about

21   that?

22            MR. JENKINS:  No, Your Honor.  That alone is,

23   again, George Chiang doing George Chiang's job as a consultant

24   and the entity trying to utilize George Chiang.  So that alone,

25   no.  Again, what --

1        THE COURT:  Okay.  So basically your theory is

2  that Mr. Chan committed certain ethical violations when the --

3  when he left the City in July of 2017 by acting as a consultant

4  to certain of these developers during the relevant time period

5  and acting as a consultant for certain of the developers of

6  which he would -- there was a lifetime ban because he worked on

7  these projects while he was employed by the City.

8        MR. JENKINS:  Two points of clarification.  The

9  ethical violations are limited to lobbying meaning that you

10  have to lobby a city official, essentially try to get a city

11  official to make a decision to favor his client which we

12  believe he did.  That is the ethical violation.  But the

13  ethical violations mainly shows, in the Government's view, the

14  corrupt intent by Defendant Chan, Co-defendant Chiang because

15  the agreement was while Defendant Chan was a city employee.  It

16  is not an ethical violation here.  It is alleged to be a

17  bribery agreement.

18        THE COURT:  So is Mr. Huizar involved in this

19  bribery scheme?

20        MR. JENKINS:  He is involved sort of by the other

21  side, Your Honor, meaning that this -- here the conspiracy is

22  between George Chiang and Defendant Chan that they would

23  through bribery, meaning -- at this point Defendant Chan

24  actually is in the City.  So the person George Chiang wants to

25  bribe here is Defendant Chan, the city employee, the person who

1   is in charge of development, the person who is the gatekeeper

2   to Jose Huizar.

3        If Defendant Chiang got Defendant Chan to help

4   the Hazens project, the company for which he just took over,

5   Synergy, George Chiang's company just took over for the

6   chairman who was very upset about the slowness of the process,

7   he gets onboard, needs to get the job done.  He has his friend

8   Defendant Chan and says, Defendant Chan, this would be a great

9   idea.  We can make this project go through.  Let's agree to

10  share these consulting fees which the Government alleges are

11  transformed into bribe payments to Defendant Chan.

12        THE COURT:  All right.  So you've got an

13  allegation at page 53.  The heading we have been talking about,

14  benefits from George Chiang to Defendant Chan in exchange for

15  his official acts.  So what were the official acts that

16  Mr. Chan participated in or -- in exchange for the benefits

17  received from Mr. Chiang?

18        MR. JENKINS:  Yes, Your Honor.  The official acts

19  that Defendant Chan is alleged to have taken in furtherance of

20  this bribery scheme where he was the recipient of the bribe

21  come essentially in two forms.  Under *McDonnell*, the

22  Supreme Court case defining what an official act is, it makes

23  clear that, if a city official pressures another city official

24  to take action, that is an official act.  So here as alleged

25  in -- I will point to the one that is right in front of me,

1    overt act 202, and that's on page --

2                    THE COURT:  I have it.

3                    MR. JENKINS:  Okay.  We allege that as an overt

4    act because it is Defendant Chan in his capacity as deputy

5    mayor exerting pressure over a mayoral appointed public

6    official urging a planning commission official to take official

7    action.  Here essentially, again, it is Defendant Chan who was

8    appointed by the mayor, reaches out to a subordinate committee

9    whose job it is --

10                   THE COURT:  How are you going to prove it?  Are

11   you going to have the -- I mean, it's one -- exerting pressure

12   over and urge the planning commission official to approve,

13   isn't that something that is normally done?

14                   MR. JENKINS:  It's normally done, but it's

15   illegal, as normal however as it is, if you take money to do

16   it.  And, yes, planning commission official 1 will testify that

17   he was advocated -- that Defendant Chan advocated that he take

18   this action.  He will also testify that it was unusual that

19   Defendant Chan was taking such a personal interest in this

20   particular matter.

21                   THE COURT:  Would this planning official No. 1

22   testify that he wouldn't have approved the Luxe Hotel project

23   if it hadn't been for the, quote, "exerted pressure" exerted by

24   Defendant Chan?

25                   MR. JENKINS:  I don't know the answer off the top

1  of my head except legally our answer is that answer is

2  irrelevant because, regardless of whether it was the best

3  decision possible, the fact that Defendant Chan agreed to take

4  the money to exert that pressure makes it a federal crime.

5          THE COURT:  Okay.  All right.  Is there any

6  other -- there's other acts, but I think, given the time

7  constraints this morning, unless the Government wants to add

8  anything, let's move to Project M which is still masked.

9          Is Mr. Chan involved in the Project M bribery

10 scheme?

11         MR. JENKINS:  He is not, Your Honor.  But if I

12 could briefly take your invitation just for a second.  The

13 additional thing we would add -- because clearly the Court's

14 questions we take well.  The additional specific acts that

15 Defendant Chan is alleged to have taken on his own was -- and

16 he agreed to request a $100,000 PAC payment that would go from

17 Chairman Yuan, the Hazens chairman, to Defendant Huizar's wife

18 who was running at that point to succeed him.  And the

19 allegation there is that was in exchange for Defendant Huizar's

20 assistance with the Luxe Hotel project.

21         So for the time frame this is now --

22 Defendant Chan is in his private capacity.  So he's outside of

23 the City.  He's working, again, we think violating ethics

24 rules, but he's working as a consultant for Hazens, the project

25 we have been talking about.  Chairman Yuan, his -- the person

```
 1   he has the relationship with, still needs his project done, and
 2   the allegation is that, for Defendant Huizar's request for
 3   $100,000 to this PAC for his wife, Defendant Huizar would then
 4   further help the Hazens project.
 5                 So that is just another specific incident that we
 6   allege shows a continuing theme and scheme of Defendant Chan
 7   being the -- not just aider and abetter but one of the
 8   individuals who was creating bribery arrangements between
 9   Defendant Huizar and others.
10                 THE COURT:  All right.  So Mr. Chan is not
11   involved in the project and bribery scheme.
12                 And the last scheme is Businessperson A, and he's
13   the cabinetmaker that decided to work with the Government, work
14   with the FBI starting sometime in March of 2018?
15                 MR. JENKINS:  That --
16                 THE COURT:  Mr. Chan, is there any -- is it the
17   Government's theory that Mr. Chan is involved with
18   Businessperson A?
19                 MR. JENKINS:  Yes.  I believe August 2017 is when
20   Businessperson A, AKA, the cabinetmaker, began working with the
21   FBI.  That Businessperson A is involved in the Indictment and
22   various schemes.  I will focus just on the ones where
23   Defendant Chan is alleged to have participated.
24                 The eye level view is that Defendant Chan,
25   consistent with the evidence, that he was one of the
```

1    individuals trying to essentially create bribery opportunities

2    in order to further -- at this point he's outside of the City.

3    So Defendant Chan is trying to, in our view, now directly

4    benefit financially and professionally by being a consultant

5    who can get things done and by leveraging his relationship with

6    the City.

7                    So Businessperson A, who is a wealthy

8    cabinetmaker, was utilized by Defendant Chan to provide

9    benefits through other city officials.  For example, overt

10   act -- starting at overt act 221 --

11                    THE COURT:  221?

12                    MR. JENKINS:  Correct, Your Honor.  221.  This

13   one has the header "City commissioner's relative."  So the city

14   commissioner is someone who, according to Defendant Chan's own

15   chart, the chart that he had on his computer that was titled

16   "People to influence," on that people to influence there are

17   such individuals like Defendant Huizar who we obviously believe

18   was one of the main individuals that Defendant Chan --

19                    THE REPORTER:  Counsel, you froze up on me.

20                    MR. JENKINS:  No problem.  Thank you, madam court

21   reporter.

22                    That Defendant Chan sought to bribe or facilitate

23   bribes to.  In addition to Defendant Huizar, by

24   Defendant Chan's own admission or acknowledgment, another city

25   official that he sought to influence is City Commissioner 1

1    whose name is masked.  This individual's position was another

2    city position who could help facilitate entitlements or real

3    estate development projects.

4             The scheme that is alleged beginning at overt

5    act 221 in summary was that Defendant Chan was the architect of

6    a payment arrangement by which City Commissioner 1's wife would

7    be paid by Businessperson A for some form of vague employment

8    meaning it was not exactly clear what she would do.  The

9    point, at least as will be testified to by Businessperson A as

10   corroborated by the recorded interactions with Defendant Chan,

11   the point really was to curry favor with City Commissioner 1

12   through these payments.

13            So Businessperson A, in fact, did hire

14   City Commissioner 1's wife and ultimately paid her over a

15   period of four months $16,000.  Businessperson A will testify,

16   as corroborated by recorded conversations with Defendant Chan,

17   that the only reason he hired this person was at the direction

18   of Defendant Chan and to benefit the relationship with

19   City Commissioner 1 was a person Defendant Chan was seeking to

20   influence at the time.

21            THE COURT:  This was all after Mr. Chan left the

22   employment of the City?

23            MR. JENKINS:  Correct.

24            THE COURT:  These are all in April, May 2018?

25            MR. JENKINS:  Correct.  At this point he's

1    alleged to be the briber.  He was previously the bribee.  He
2    was previously before that a bribe facilitator.  He is alleged
3    to be a bribe facilitator, a bribe recipient, and a briber
4    throughout the years all for the goal of increasing development
5    projects and his financial interest as essentially being a
6    go-to person for development projects in Downtown L.A.
7              In addition, consistent with the -- our view of
8    the evidence that Defendant Chan would find surreptitious ways
9    to pay city officials, overt act 234 describes another secret
10   payment arrangement using a family member, this time a City
11   Staffer A-2, overt act 234 on page 61.
12             City Staffer A-2 was a significant senior
13   official on Defendant Huizar's staff, someone who had
14   significant influence over all of the planning projects, not
15   just CD-14 which the vast majority of the projects were going
16   through, but this individual also had oversight over all the
17   projects in the city because, in Defendant Huizar's capacity as
18   chair for the Planning & Land Use Management, Defendant Huizar
19   would oversee all the projects across the city.  So would this
20   City Staffer A-2.
21             THE COURT:  You closed a loop on that.  That is
22   covered in overt act No. 450 and overt act No. 451 with the
23   heading of Defendant Chan's attempt to witness tamper, and that
24   is in November of 2018 he, according to the Indictment, drafted
25   a document that he later provided to Businessperson A which

```
 1   appeared to serve as the script for Businessperson A's
 2   summarizing Defendant Chan's version of the facts regarding
 3   Chan's plan of Businessperson A paid City Staffer A-2 a
 4   finder's fee, and it goes on to describe the script.
 5              I take it that the Government has that script
 6   that was provided to Businessman A?
 7              MR. JENKINS:  We do, Your Honor.
 8              THE COURT:  And then, of course -- was this --
 9   were these meetings -- because by this time it appears that
10   Businessperson A -- and that's why my notes reflected November
11   of 2018 -- he was obviously working for the bureau prior to
12   that, but at least November 2018 as working for the FBI, were
13   these conversations recorded?
14              MR. JENKINS:  Yes, Your Honor.  All those
15   interactions are recorded including the ones you just
16   described.
17              THE COURT:  Okay.  So the -- when Mr. Chan,
18   according to the Government's theory, changes hats from a
19   bribee to a briber, this is one of what the Government would
20   characterize as the smoking gun transaction which has evidence
21   of the actual consulting fees that were paid and then
22   Mr. Chan's efforts to cover those up by providing this script
23   to Businessperson A?
24              MR. JENKINS:  We would certainly describe that as
25   very direct evidence of a corrupt intent of a bribery scheme
```

1    and consistent with all the other evidence that is alleged that

2    he participated in.

3              THE COURT:  So you disagree it was the smoking

4    gun?

5              MR. JENKINS:  I don't want to overstate anything

6    and describe it as a smoking gun, but we are certainly

7    confident that it informs our view of the defendant.

8              THE COURT:  Okay.  Let's move to the substantive

9    counts.  Count 28 -- let's first take count number -- Count 29

10   which is the false statement which is also covered by overt act

11   No. 452, and that's the -- on November 7, 2018, recorded

12   interview.

13             Who was present during the course of that

14   interview on November 7th?  You have alleged that he made

15   various false statements to the FBI, the first of which that he

16   was not involved and had no involvement in the settlement of

17   Defendant Huizar's 2013 sexual harassment lawsuit.  And we

18   talked about the evidence with respect to that.  And, B, the

19   false statement relates to Chairman Huang, H-u-a-n-g, doesn't

20   have anything in front of Jose Huizar's district but needs

21   Huizar's help or involvement.  And then the third is that Yuan

22   never asked Huizar for anything including help on the hotel.

23             I understand how the Government -- I think I

24   understand how the Government intends to prove those statements

25   are false.  But was anybody else -- who participated in this

1   November 7th interview?

2             MR. JENKINS:  Yes, Your Honor.  And it's now 39.

3   The interview was conducted by FBI Special Agents

4   Terri Tampubolon and Heath Smally who the interview was

5   recorded.  There is a transcript that has been provided --

6   excuse me -- a transcript that has been created and that will

7   be primary evidence, the witnesses in that report.

8             THE COURT:  Was he represented by counsel?

9             MR. JENKINS:  Not at that time, Your Honor.

10            THE COURT:  Okay.  The reason I ask is I remember

11  from your -- our discussion with respect to Mr. Huizar that

12  there were various interviews that were conducted that

13  Mr. Huizar was represented by counsel.  I guess my question is,

14  with respect to Mr. Chan, was there any proffer sessions or any

15  statements made by Mr. Chan during the time that he was -- that

16  counsel was present?

17            MR. JENKINS:  No, Your Honor.  He declined after

18  counsel was retained.

19            THE COURT:  Okay.  So the only -- the only

20  interview was the November 7, 2018, interview, and that was

21  prior to retaining counsel, and that forms the basis of the

22  false statement.  So there's no other statements that would be

23  involved in this case either -- other than during the course of

24  the conspiracy.  No post-arrest statements.

25            MR. JENKINS:  There is an additional -- he wasn't

```
 1    arrested, to be clear, at the time of November 7th.  Also, the

 2    next day, November 8th, 2018, Defendant Chan voluntarily

 3    reached back out to Special Agent Tampubolon to further discuss

 4    the topics that were discussed the prior day.

 5                THE COURT:  And did he continue to lie allegedly?

 6                MR. JENKINS:  We believe he provided incomplete

 7    and misleading information, but it is not presently the subject

 8    of any charges.  But we intend to admit evidence from it to

 9    show a further misleading intent at minimum.

10                In addition, there is an additional interview

11    conducted at Defendant Chan's -- the CCC business that he had

12    with co-defendant George Chiang.  There was an interview of him

13    by Special Agent Andy Civetti.  So this is when Defendant Chan

14    essentially was in private practice in his private capacity.

15    There's an interview done there.  But I do not believe any

16    charge would result from that interview.

17                The only significant evidence, at least now that

18    is alleged in the Indictment related to that interview, is

19    that, immediately after Special Agent Civetti and the other

20    special agent left the interview and Defendant Chan's personal

21    private business office, he immediately went to the chairs, as

22    alleged in the Indictment, appears to have looked for

23    surveillance equipment on the chairs which we thought would be

24    significant.  But that is essentially the only conduct from

25    that interview that is alleged in the Indictment.
```

1    THE COURT:  All right.  Are there any searches

2    that were conducted that resulted in the seizure of any

3    property from Mr. Chan?

4    MR. JENKINS:  Yes, Your Honor.  The Government

5    seized -- searched and seized evidence from the CCC business

6    that is George Chiang and Defendant Chan's business.  Most

7    significantly these searches were digital meaning

8    Defendant Chan's e-mails, his phone from which there was

9    significant evidence or at least a volume of evidence that was

10   seized and is available -- will be available in digital format.

11   The most significant pieces of evidence are

12   alleged in the Indictment meaning there are e-mail

13   communications, text communications, the Google drive which

14   contains the people to influence chart.  Those are the evidence

15   in terms of things that were seized where they were derived

16   from.

17   THE COURT:  Were any of Mr. Chan's calls

18   intercepted by the Government?

19   MR. JENKINS:  Yes, Your Honor.  Defendant Chan

20   was the subject of one of the wiretap affidavits in this case.

21   So he was intercepted for a period.  The estimate is that there

22   were -- I think the best way to describe it is how many line

23   sheets or pages of line sheets.  So that would be pertinent for

24   recordings intercepted.  There's approximately 1,600 pages of

25   line sheets which again are pretty -- they're not verbatim

1    transcripts, but the FBI did a pretty outstanding job -- so

2    there's pretty close to it, or summaries, or if it's a text

3    message, it's simply the text message.

4              In addition, as alluded to by my prior comment,

5    there was an audiovisual bug -- bugs installed in the CCC

6    office surreptitiously by the Government pursuant to court

7    order.  So there are recorded audio and recorded video from

8    those bugs.

9              THE COURT:  What office is that?

10             MR. JENKINS:  We call it the CCC office.  It was

11   formerly the Synergy office.  These are the consulting

12   companies first owned by George Chiang, and then when

13   Defendant Chan teamed with George Chiang, they used the same

14   office.  It's an office in Downtown L.A. for their consulting

15   firm.

16             THE COURT:  Okay.  The ultimate -- the LABXG,

17   which is alleged in paragraph 13 which was formed in August of

18   2017, is that -- is that -- you allege it as an Inc.  Who owns

19   that company?

20             MR. JENKINS:  Defendant Chan, Your Honor.

21             THE COURT:  And is Mr. Chiang part of that

22   company?

23             MR. JENKINS:  He is not as far as we know,

24   Your Honor.

25             THE COURT:  Okay.  So we talked about the

1    statements.  We talked about the searches.  We talked about the

2    wire intercept.

3                What is the status of producing the discovery to

4    Mr. Braun?  I realize this case has just -- PIA took place on

5    Monday.

6                MR. JENKINS:  That is correct, Your Honor.  On

7    Tuesday or December 2nd, whichever day of the week that is, we

8    sent an e-mail to Defendant Chan's counsel Mr. Braun outlining

9    plans for discovery.  So there is a stipulation for a

10   protective order.  There is a draft transcript agreement.  We

11   requested a hard drive from him.  A significant portion of

12   discovery is essentially ready, but it will take some time to

13   upload it to a hard drive once we receive it from Mr. Braun.

14   So we sent an e-mail, made a request to meet with him to see

15   the most efficient way forward.

16               So presumably Mr. Braun is here, so we can have

17   that conversation at some point soon to get that process

18   rolling.  But it is in large part substantially done or ready

19   to be done.

20               THE COURT:  Is the discovery as voluminous as the

21   discovery in Mr. Huizar's case, or is there more or less or

22   about the same?

23               MR. JENKINS:  I would say more so because it

24   includes all of the same evidence because ultimately the

25   racketeering charge is alleged against them both.  The conduct

1    therein is overlapping.  In addition, there is Defendant Chan's

2    specific recordings, for example, and other individual things

3    that weren't provided to Defendant Huizar at this point but

4    would be provided to Defendant Chan.

5                    And, in addition, there's a couple additional

6    items such as Defendant Chan's actual wiretaps that need to be

7    processed and provided.  But discovery will be voluminous.

8                    THE COURT:  And the Title III applications have

9    all been unsealed because my memory is they were produced to

10   counsel for Mr. Huizar.

11                   MR. JENKINS:  All the ones relevant to this

12   charged case, yes, Your Honor.

13                   THE COURT:  Okay.  So those are available for

14   Mr. Braun.

15                   MR. JENKINS:  Yes, Your Honor.  They will be.

16                   THE COURT:  Does the Government have any

17   intention of adding any additional -- filing a second

18   Superseding Indictment adding any defendants or any additional

19   charges?

20                   MR. JENKINS:  The investigation is ongoing,

21   Your Honor.  However, I would say at this point the most

22   significant foreseeable charges have been brought.  So if I

23   could -- if the Court would indulge my hedging on this

24   question, it is an ongoing investigation.  Whether that results

25   in a Superseding Indictment in this case or a new Indictment in

1    a separate case or none of the above, it's difficult to tell.

2    But at this point, Your Honor, a significant portion of the

3    evidence has been reviewed, and we believe the appropriate

4    charges on defendant have been brought.

5              THE COURT:  All right.  The last question I have

6    is on the forfeiture counts.  I know we -- we had a discussion

7    on forfeiture allegations in the original Indictment.  Is there

8    any specific property that the Government is seeking to forfeit

9    with respect to Mr. Chan?

10             MR. JENKINS:  There is no specific property

11   identified right now to Defendant Chan, no.

12             THE COURT:  Okay.  Mr. Braun, I didn't mean to

13   exclude you from any of our discussion this morning, but I

14   realize that you're -- you have -- there's a lot of material

15   to -- for you to look at.

16             My question for you is the dates that have been

17   set in this case -- and I will issue today a Criminal Trial

18   Order, today or Monday.  But we have a trial date that was

19   agreed to by Mr. Huizar's counsel and the Government of June

20   22nd of 2021, and there are various deadlines to file pretrial

21   motions, all of which are set forth in docket No. 63.  I don't

22   know if you have had time to look at those dates and, more

23   importantly, whether or not you believe that you can work

24   within those -- within those dates.  I realize you're at

25   somewhat of a disadvantage because you haven't had the benefit

1    of any discovery, but I wanted to get your thoughts on that.

2                    MR. BRAUN:  Yes, Your Honor.  I just received

3    notice over Thanksgiving, Sunday, that this case was being

4    indicted for my client to show up.  I guess they had a press

5    release they wanted to beat.  So I didn't have anything.  But I

6    actually have another case involving a Chinese student in

7    custody pending in front of Judge Fitzgerald that we're trying

8    to take a deposition of a material witness.  To be blunt, that

9    case has priority.

10                   But I have been doing some background work on

11   this case anyway over the last number of months.  Perhaps --

12   there's obviously no way we could be ready before that June

13   trial date.  Maybe we could schedule another status, say, in 60

14   to 90 days.  That way we will have a better idea of what the

15   discovery is.

16                   THE COURT:  I'm sorry.  Your other case is in

17   front of which judge?

18                   MR. BRAUN:  Judge Fitzgerald, Michael Fitzgerald.

19                   THE COURT:  Judge Fitzgerald.  Okay.  What I'm

20   going to suggest is -- obviously I don't expect you to be

21   committed to these dates today, but we have got two other

22   groups of defendants.  We have got Chairman Huang, and we have

23   got Mr. Lee.  So it seems to me what makes sense is to have

24   another hearing -- I don't know if I need another Trial Setting

25   Conference with respect to those defendants although it may be

1    helpful.  When is the PIA set for the other defendants?

2              MR. JENKINS:  Next Monday, December 7th, PIA for

3    Defendant Lee who is charged in a separate scheme that we did

4    not discuss.  To the point of whether an additional trial

5    setting will be necessary potentially for Defendant Lee and his

6    LLC, those are both December 7th.  Subsequently, December 14,

7    the following Monday, the PIA and initial appearance for

8    Shen Zen Company, that is, the Chairman Wei Huang's company, is

9    scheduled to make their appearance on December 14.  I would

10   also note that counsel for Defendant Huang has indicated that

11   his client does not intend to appear.  His client is currently

12   in China and has respectfully declined our invitation to appear

13   on this Indictment at this time.

14             THE COURT:  I take it we are going to have

15   some -- the initiation of some process in order to bring him to

16   Los Angeles to stand trial?

17             MR. JENKINS:  We are certainly exploring all our

18   options.  He is in China which makes it a little more

19   difficult, but we are certainly not done with that defendant,

20   Your Honor.  So we are exploring our options.  And we are

21   negotiating with his counsel, and we are hopeful, perhaps not

22   optimistic, that potentially we can reach some resolution.  I'm

23   not sure what resolution would be reached, but right now we

24   intend to let him know essentially he is a fugitive as of that

25   notice.

1          THE COURT:  And the LLC, the Shen, S-h-e-n,

2     second word for the reporter is Z-h-e-n, New World One -- my

3     memory was -- I could be wrong -- there was another LLC which

4     was Shen, S-h-e-n, Zen, Z-e-n, Corporation which was a

5     California LLC which was somehow involved in this Indictment,

6     but is my memory correct or my notes correct that that LLC is a

7     separate entity from the New World, LLC, but owned by

8     Chairman Huang?

9          MR. JENKINS:  I think you're right.  Essentially

10    there is a Shen Zen New World Chinese mega-development company

11    and Shen Zen the Provence.  There is also one of the domestic

12    subsidiaries, the formal name is Shen Zen One, LLC.  That is

13    the domestic LLC that has been indicted in this case.  And then

14    they do intend to appear through Richard Steingard on the 14th.

15          THE COURT:  Is the New World One, LLC -- that is

16    the California LLC or Chinese mega-company?

17          MR. JENKINS:  That is the domestic -- the LA LLC.

18          THE COURT:  Okay.  So -- all right.  So I was

19    confused as to why you hadn't charged the domestic LLC, but

20    apparently you have charged that entity.  So that entity is

21    going to appear, and that entity is represented by

22    Mr. Bruce Cohen?

23          MR. JENKINS:  He is now represented by

24    Richard Steingard, S-t-e-i-n-g-a-r-d.

25          THE COURT:  All right.  And Chairman Huang is

1  represented by Kenneth Klein?

2  MR. JENKINS:  Formerly Kenneth Klein, now

3  currently represented by Paul Meyer and Greg Wilke, W-i-l-k-e.

4  THE COURT:  Your voice cut out.

5  The PIA for Mr. Lee and his LLC 940 Hill is for

6  December 7th.  Did you indicate it would be worthwhile to have

7  a Trial Setting Conference, or you didn't think it was

8  necessary?

9  MR. JENKINS:  We do believe it would be

10  appropriate and helpful for all parties and would be distinct

11  information that was not discussed today.

12  THE COURT:  Okay.  Then what I will do is -- if

13  the PIA is on Monday, then I will tell the PIA clerk to set up

14  a Trial Setting Conference for next week for Mr. Lee and Hill.

15  Is there any day that the Government is not going to be

16  available?

17  MR. JENKINS:  We will make ourselves available.

18  We appreciate the offer.  We are pretty open next week,

19  Your Honor.

20  THE COURT:  All right.  Well, I will then get PIA

21  a date.  I will check my calendar for next week.

22  As I said, I think what makes sense is, once we

23  have all of the defendants making their -- let me ask you this.

24  The PIA for New World One, LLC, is there any reason to have a

25  Trial Setting Conference for the entity?

1          MR. JENKINS:  For that one we do not think so

2     until the individual defendant appears.

3          THE COURT:  Which the chances of that happening

4     are slim to none.

5          MR. JENKINS:  I'm not a betting person, but I

6     don't disagree with that assessment.

7          THE COURT:  Okay.  Well, to the extent you're

8     going to -- you're going to use the process of a court to

9     secure Chairman Huang's appearance, I suggest that you initiate

10    that effort promptly because, whatever trial date we do set, I

11    am not going to continue the trial waiting for Mr. -- for

12    Chairman Huang to show up, and I certainly don't want to try

13    this case twice.

14         MR. JENKINS:  Absolutely, Your Honor.  We will do

15    so.  Absolutely.

16         THE COURT:  And you will keep the Court advised

17    as to whether or not you made a decision whether or not to try

18    to secure his attendance?

19         MR. JENKINS:  Yes.  We will apprise the Court as

20    soon as we make a decision as to what that process is.

21         THE COURT:  So it seems to me, once we have

22    Mr. Lee on board, have conducted the Trial Setting Conference

23    next week, that maybe in early January counsel will get

24    together and meet and discuss the current dates that are set

25    forth in docket No. 63.  To the extent that those dates need to

1  be changed, come up with a stipulation as to the acceptable

2  dates for everybody's calendars, and then we can go from there.

3              Does that make sense, Mr. Braun?

4              MR. BRAUN:  Yes, Your Honor.

5              THE COURT:  Mr. Jenkins, are you on board with

6  that?

7              MR. JENKINS:  Yes, Your Honor.  Thank you.

8              THE COURT:  All right.  I don't have anything

9  else.  I appreciate --

10             MR. BRAUN:  This is Harland Braun.

11             The Government got an order that my client -- and

12  I talked to his son about this case.  I didn't pay much

13  attention to it at the time.  His son is a lawyer, licensed to

14  practice in California.  We intend to use him to help prepare

15  the case.  I just assumed the Government didn't realize that he

16  was a lawyer when they got that order.  But we intend to use

17  Jeremy Chan as an assistant to help prepare his father's case.

18  In that case, he will have to discuss the case with his father.

19             So I don't know if the Government is prepared to

20  concede that now or consider that problem.  But I think my

21  client has a right under *Lopez Guzman* to an attorney of his

22  choice even if it is his own son.  And I don't think there is

23  any evidence that the son was involved in any of these schemes.

24             THE COURT:  I will let you take that up with the

25  Government.  To the extent that it remains an issue, you can

 1  file something with the Court.

 2              MR. BRAUN:  Yes, Your Honor.

 3              MR. JENKINS:  And just for the record,

 4  Your Honor, the defendant's son is referenced in the First

 5  Superseding Indictment which would create potential conflict.

 6              THE COURT:  Okay.  Well, I will let you fine

 7  lawyers work out the issues, and to the extent that you can't

 8  work out the issues, I'm always here to make rulings.

 9              MR. JENKINS:  Understood.

10              MR. BRAUN:  Thank you.

11              MR. JENKINS:  Thank you very much.

12              THE COURT:  All right.  Everybody stay safe.  I

13  don't know what's going to go on this week, but this is getting

14  to be --

15              MR. BRAUN:  2,700 people died yesterday,

16  Your Honor.

17              THE COURT:  In any event, I just can't imagine

18  continuing this way until the spring of next year.  Maybe we

19  will all be vaccinated by then.

20              MR. JENKINS:  We hope.

21              MR. BRAUN:  Or maybe like China everyone will put

22  on their mask.

23              THE COURT:  Right.

24              MR. BRAUN:  People have a problem doing that.

25              THE COURT:  All right.  Well, in any event, stay

1    safe, and have a good weekend.

2                    MR. BRAUN:  Thank you.

3                    MR. JENKINS:  Thank you, Your Honor.  You as

4    well.

5                    THE DEFENDANT:  Thank you.

6                    THE COURT:  All right.  Unless there's anything

7    else, we will now close the record.  Anything else from the

8    Government?

9                    MR. JENKINS:  Nothing from the Government.  Thank

10   you, Your Honor.

11                   Thank you, madam court reporter.

12                   THE COURT:  Anything else from Mr. Braun?

13                   MR. BRAUN:  No, Your Honor.

14                   THE COURT:  All right.  Then the record will be

15   closed.

16                   (Proceedings concluded at 9:48 a.m.)

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                        DATED THIS  6TH  DAY OF DECEMBER, 2020.

16

17

18                        /S/ MIRANDA ALGORRI

19                        MIRANDA ALGORRI, CSR NO. 12743, CRR
                          FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

# EXHIBIT E

| | | | | | |
|---|---|---|---|---|---|
| **Interview with Harland** | | | | | |
| | **Tue Jan 10 2023** | **Wed Jan 11 2023** | **Thu Jan 12 2023** | **Fri Jan 13 2023** | |
| | 10:00 am Bob Stone (L.A. City) | | | 10:00 am (Portugal) Henry Wang (Development) | |
| | | 11:00 am Farrel Stevins (Development) | | 11:00 pm Van Ambatielos (L.A. City) | |
| | | 12:30 pm Kevin Cheng (Student) | | | |
| | 1:30 pm Larry Galstian (L.A. City) | | 1:30 pm Verej Janoyan (L.A. City) | 1:00 pm Johnny Yutronich (L.A. City) | |
| | 2:30 pm Bob Goodwin (Development) | 2:30 pm (Vermont) Rubidium Wu (Friend/Student) | 2:30 pm Lessing Gold (Development) | 2:00 pm Fred Balderrama (Development) | |
| | 3:30 pm Stephanie Mkhlian (L.A. City) | 3:30 pm Michael Hunt (Development) | 3:30 pm (Wisconsin) Al Hernandez (L.A. City) | | |