E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091/0363/3289/3819
     Facsimile: (213) 894-6436
     E-mail:   Mack.Jenkins@usdoj.gov
             Cassie.Palmer@usdoj.gov
             Susan.Har@usdoj.gov
             Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>RAYMOND SHE WAH CHAN,<br>  aka "She Wah Kwong,"<br><br>        Defendant. | No. CR 2:20-326(A)-JFW-2<br><br>GOVERNMENT'S TRIAL BRIEF;<br>EXHIBITS A-H<br><br>Trial Date: February 21, 2023<br>Trial Time: 8:30 A.M.<br>Location:  Courtroom of the Hon.<br>          John F. Walter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files the Government's Trial Brief.

The Government's Trial Brief is based upon the attached memorandum of points and authorities, the attached exhibits, the

files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 13, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney


                                  _____/s/_____
                                  BRIAN R. FAERSTEIN
                                  MACK E. JENKINS
                                  CASSIE D. PALMER
                                  SUSAN S. HAR
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................iii

TABLE OF EXHIBITS...............................................viii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    STATUS OF THE CASE..........................................1

      A.   Trial Status..........................................1

      B.   Length of Trial and Number of Witnesses...............1

II.   LEGAL AND EVIDENTIARY ISSUES................................3

      A.   Order of Proof at Trial...............................3

      B.   Jury Nullification and Improper Defenses..............5

           1.   Jury Nullification Generally.....................5

           2.   Improper References to Alleged Racial Bias.......6

           3.   Entrapment Defense...............................9

      C.   Hearsay Generally....................................11

      D.   Co-Conspirator and Co-Schemer Statements and Conduct.12

      E.   Audio/Video Recordings and Transcripts...............16

           1.   English-Language Audio/Video Recordings &
                Transcripts.....................................16

           2.   Standalone Laptop in the Jury Room..............17

           3.   Translations of Foreign Language Recordings.....18

      F.   Summary Exhibits & Witness...........................19

      G.   Prior Inconsistent Statements........................20

      H.   Marital Communications/Spousal Testimonial Privilege.21

      I.   Truthful Testimony Provisions of Plea Agreements.....22

      J.   Defense Witnesses....................................23

           1.   Scope of Defendant Cross-Examination............23

           2.   Content and Manner of Character Evidence........24

           3.   Number of Character Witnesses...................27

i

K.   Reciprocal Discovery....................................28

1.   Reciprocal Discovery..............................28

L.   Trial Indictment......................................29

M.   Trial Logistical Issues...............................29

1.   Jury Contacts and Witness Sequestration...........29

2.   Stand-By Interpreter Request......................32

III. CONCLUSION................................................32

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

Bourjaily v. United States,
483 U.S. 171 (1987) ............................................. 12

Crawford v. Washington,
541 U.S. 36 (2004) ............................................. 12

Economou v. Little,
850 F. Supp. 849 (N.D. Cal. 1994) ............................. 30

Flemister v. United States,
260 F.2d 513 (5th Cir. 1958) .................................. 20

In re Sealed Case,
352 F.3d 409 (D.C. Cir. 2003) ................................. 26

Mathews v. United States,
485 U.S. 58 (1988) ............................................. 9

Michelson v. United States,
335 U.S. 469 (1980) .................................. 24, 25, 26

Mitchell v. United States,
958 F.3d 775 (9th Cir. 2020) .................................. 30

Robinson v. United States,
33 F.2d 238 (9th Cir. 1929) ................................... 14

Rosales-Lopez v. United States,
451 U.S. 182 (1981) ........................................... 31

Sendejas v. United States,
428 F.2d 1040 (9th Cir. 1970) ................................. 13

Taylor v. Illinois,
484 U.S. 400 (1988) ........................................... 28

Trammel v. United States,
445 U.S. 40 (1980) ............................................ 21

United States v. Arteaga,
117 F.3d 388 (9th Cir. 1997) .................................. 12

United States v. Black,
767 F.2d 1334 (9th Cir. 1985) ................................. 24

United States v. Bonanno,
    852 F.2d 434 (9th Cir. 1988) ................................... 10

United States v. Bush,
    58 F.3d 482 (9th Cir. 1995) ................................... 26

United States v. Camejo,
    929 F.2d 610 (9th Cir. 1991) ................................. 24

United States v. Chadwell,
    798 F.3d 910 (9th Cir. 2015) ................................. 17

United States v. Chen,
    754 F.2d 817 (9th Cir. 1985) ................................. 17

United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996) .................................. 21

United States v. Cuozzo,
    962 F.2d 945 (9th Cir. 1992) ................................. 24

United States v. Dawkins,
    999 F.3d 767 (2d Cir. 2021) .................................. 25

United States v. Diaz,
    961 F.2d 1417 (9th Cir. 1992) ................................ 26

United States v. Dimora,
    750 F.3d 619 (6th Cir. 2014) ................................. 25

United States v. Dorsey,
    677 F.3d 944 (9th Cir. 2012) ................................. 23

United States v. Echeverry,
    759 F.2d 1451 (9th Cir. 1985) ................................ 12

United States v. Franco,
    136 F.3d 622 (9th Cir. 1998) ................................. 18

United States v. Freeman,
    498 F.3d 893 (9th Cir. 2007) ................................. 16

United States v. Gere,
    662 F.2d 1291 (9th Cir. 1981) ................................. 3

United States v. Gibson,
    690 F.2d 697 (9th Cir. 1982) ................................. 12

United States v. Griffin,
    440 F.3d 1138 (9th Cir. 2006) ................................ 21

United States v. Guyton,
  36 F.3d 655 (7th Cir. 1994) .................................... 13

United States v. Hale,
  422 U.S. 171 (1975) ........................................... 20

United States v. Hedgcorth,
  873 F.2d 1307 (9th Cir. 1989) ................................. 24

United States v. Henry,
  560 F.2d 963 (9th Cir. 1977) .................................. 27

United States v. King,
  587 F.2d 956 (9th Cir. 1978) .................................. 16

United States v. Kleinman,
  880 F.3d 1020 (9th Cir. 2017) .................................. 6

United States v. Larson,
  460 F.3d 1200 (9th Cir. 2006) ................................. 12

United States v. Lemire,
  720 F.2d 1327 (D.C. Cir. 1983) ................................ 20

United States v. Lloyd,
  807 F.3d 1128 (9th Cir. 2015) ................................. 13

United States v. Lothian,
  976 F.2d 1257 (9th Cir. 1992) ................................. 14

United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981) .................................. 3

United States v. Monroe,
  943 F.2d 1007 (9th Cir. 1991) ................................. 23

United States v. Montgomery,
  384 F.3d 1050 (9th Cir. 2004) ................................. 21

United States v. Moss,
  34 F.4th 1176 (11th Cir. 2022) ................................ 27

United States v. Moten,
  582 F.2d 654 (2nd Cir. 1978) .................................. 30

United States v. Nazemian,
  948 F.2d 522 (9th Cir. 1991) .................................. 13

United States v. Noushfar,
  78 F.3d 1442 (9th Cir. 1996) .................................. 17

v

United States v. Payne,
   437 F.3d 540 (6th Cir. 2006) ................................... 13

United States v. Rhodes,
   713 F.2d 463 (9th Cir. 1983) ................................... 10

United States v. Saget,
   991 F.2d 702 (11th Cir. 1993) .................................. 20

United States v. Salazar-Gaeta,
   447 F.2d 468 (9th Cir. 1971) ................................... 26

United States v. Schoneberg,
   396 F.3d 1036 (9th Cir. 2005) .................................. 23

United States v. Shaw,
   829 F.2d 714 (9th Cir. 1987) ................................... 23

United States v. Smith,
   591 F.3d 974 (8th Cir. 2010) ................................... 16

United States v. Spentz,
   653 F.3d 815 (9th Cir. 2011) ................................. 9, 10

United States v. Vo,
   413 F.3d 1010 (9th Cir. 2005) .................................. 21

United States v. Williams,
   547 F.3d 1187 (9th Cir. 2008) .................................. 10

United States v. Yarbrough,
   852 F.2d 1522 (9th Cir. 1988) .................................. 13

**Statutes**

18 U.S.C. § 371 ................................................. 15

18 U.S.C. § 666(a)(2) ........................................... 15

18 U.S.C. § 1001(a)(2) ........................................... 1

18 U.S.C. § 1962(d) ........................................... 1, 15

18 U.S.C. § 666(a)(1)(B) ......................................... 1

18 U.S.C. § 1343 ................................................. 1

**Rules**

Fed. R. Crim. P. 16 ............................................. 28

Fed. R. Crim. P. 24...................................................31

Fed. R. Crim. P. 43...................................................17

Fed. R. Evid. 104......................................................3

Fed. R. Evid. 403.....................................................11

Fed. R. Evid. 404.....................................................26

Fed. R. Evid. 405................................................24, 25

Fed. R. Evid. 611.....................................................26

Fed. R. Evid. 615................................................30, 31

Fed. R. Evid. 801.....................................................12

Fed. R. Evid. 901.....................................................16

Fed. R. Evid. 1006....................................................19

**TABLE OF EXHIBITS**

| Exhibit | Description | Cite |
|---------|-------------|------|
| A | 11-6-2022 Email from H. Braun to government counsel (highlights added) | P. 7, n.3<br>P. 8, n.5 |
| B | 12-5-2022 Email from H. Braun to government counsel (highlights added) | P. 8, n.5 |
| C | 9-30-2021 Letter from H. Braun to Acting U.S. Attorney (highlights added) | P. 8, n.5 |
| D | 12-23-2022 Email from H. Braun to government counsel (highlights added) | P. 8 |
| E | 2-8-2023 Email from H. Braun to government counsel (highlights added) | P. 8 |
| F | 1-12-21 Letter from government counsel to defense regarding discovery production (highlights added) | Pp. 9, 28 |
| G | 2-10-23 Email from H. Braun to government counsel (highlights in original) | P. 7, n. 4 |
| H | 2-11-23 Email from government counsel to H. Braun | P. 30 |

## MEMORANDUM OF POINTS AND AUTHORITIES

I. STATUS OF THE CASE

    A. Trial Status

The First Superseding Indictment ("FSI") charges defendant Raymond She Wah Chan ("defendant") with the following twelve counts:

- Count 1 – Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of 18 U.S.C. § 1962(d);

- Counts 2-4, 12-15 – Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2(b);

- Counts 22, 27-28 – Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2(a) (aiding/abetting is expressly alleged as to Counts 22 and 27); and

- Count 39 – False Statements to a Federal Government Agency, in violation of 18 U.S.C. § 1001(a)(2).

Jury trial against defendant is set for February 21, 2023 at 8:30 a.m.  Defendant currently is released on bond.

    B. Length of Trial and Number of Witnesses

As of the date of this filing, the government plans to call the following sixteen to seventeen witnesses in its case-in-chief in the following approximate order: (1) FBI Special Agent Andrew Civetti; (2) George Esparza, the former Special Assistant to former CD-14 Councilmember José Huizar; (3)  Morrie Goldman, a real estate consultant and fundraiser for Huizar; (4) Kevin Keller, the Deputy Mayor for Economic Development for the City of Los Angeles; (5) Bud Ovrom, the former Deputy Mayor for Economic Development for the City of Los Angeles and former General Manager of the Los Angeles Department of Building and Safety ("LADBS"); (6) Harris Chan, the former Managing Director of Shen Zhen New World Investment (USA),

1   Inc. ("SZNW"); (7) Yan Yan, a former employee of SZNW, LADBS, and

2   Synergy Alliance Advisors, Inc. and CCC Investments ("CCC");

3   (8) Peggy O'Donovan, an employee of East West Bank; (9) another

4   employee of East West Bank, or two employees from Chase Bank and

5   Wells Fargo Bank, respectively, knowledgeable about the manner and

6   location of bank wires to and from East West Bank, including from

7   Chase Bank and Wells Fargo Bank; (10) Ricky Zheng, agent and right-

8   hand man of Chairman Wei Huang of SZNW and business representative of

9   SZNW; (11) Richelle Rios, the wife of Huizar and former CD-14

10  successor; (12) George Chiang, the co-owner of Synergy Alliance

11  Advisors, Inc. and CCC, a real estate consultant/broker, and close

12  associate of defendant; (13) David Ambroz, the former President of

13  the Los Angeles City Planning Commission; (14) a Google LLC employee

14  knowledgeable about the manner and location of wire transmissions to

15  and from Google email accounts; (15) Shawn Kuk, the former Planning

16  Director for Huizar and the CD-14 Councilmember Office;

17  (16) Businessperson A, who operated businesses relating to major

18  development projects in Los Angeles and who covertly worked at the

19  direction of the FBI as part of the government's underlying

20  investigation starting in approximately August 2017; and (17) FBI

21  Special Agent Civetti, testifying as to matters not covered during

22  his initial testimony.[1]

23  _____

24       [1] The government will be calling employees from East West Bank,
     Chase Bank, and/or Wells Fargo Bank, as well as Google LLC, to
25   testify about the fact that the wire communications alleged in the
     honest services wire fraud counts against defendant traveled in
26   interstate commerce.  The government proposed fact stipulations on
     this and other issues, but the defense has indicated that it will not
27   enter any fact stipulations in this case.  In addition to potential
     rebuttal witnesses, the government also reserves the right to call an
28   FBI language analyst (Jason Wang) to the extent translation disputes

2

*(footnote cont'd on next page)*

On February 10, 2023, the government filed its witness list with a summary of the anticipated areas of testimony for each of its witnesses.  (Dkt. No. 938.)  Since that time, the government has revised its time estimate for the direct examination of one witness-- George Esparza--from 4.5 hours to 6.5 hours.  Accordingly, the estimated time for the government's case-in-chief (without allotment for cross-examination) is approximately 49.5 hours, or approximately nine court days.

## II.  LEGAL AND EVIDENTIARY ISSUES

### A.  Order of Proof at Trial

Pursuant to Federal Rule of Evidence 104, a "court may admit the proposed evidence on the condition that the proof be introduced later."  Fed. R. Evid. 104(b).  In other words, "[t]he trial judge may make a preliminary determination of admissibility or may admit the testimony conditionally, subject to 'connecting up' with the foundation to be eventually laid by the prosecution."  United States v. Gere, 662 F.2d 1291, 1294 (9th Cir. 1981) (citation omitted).  For example, with respect to co-conspirator statements: "The order of proof is within the sound discretion of the trial judge, who may conditionally admit coconspirator statements subject to a later motion to strike."  United States v. Miranda-Uriarte, 649 F.2d 1345, 1349 (9th Cir. 1981) (internal citations omitted).  The court can consider all the evidence, regardless of the order of proof, when assessing foundation for admissibility of evidence.  Id.

_____

arise before or during trial, notwithstanding the parties' ongoing efforts to resolve those issues before trial.  As of the time of this filing, there are no outstanding translation disputes.  The government filed an offer of proof with respect to the potential expert testimony of Jason Wang on February 7, 2023.  (Dkt. No. 929.)

At trial, similar to the two prior trials in this case, the government intends to admit a large portion of the evidence through its first witness and case agent, FBI Special Agent Andrew Civetti, who has personal knowledge from leading and overseeing the FBI's investigation for over five years and is competent to testify about the evidence obtained during the course of the investigation. Special Agent Civetti will testify about numerous types of evidence the FBI obtained, including public records from various state and local governmental offices and other public sources and entities; financial and business records obtained from banks and other entities; email, text message, and other digital and documentary evidence obtained through search warrants, grand jury subpoenas, and voluntary disclosures by third parties; audio recordings of intercepted phone calls and meetings obtained through court-authorized wiretaps; audio recordings of other phone calls and/or meetings obtained through consensual recordings (including covertly recorded calls and meetings at the FBI's direction); photographs and video recordings; and defendant's self-titled "Radar Screens" reflecting detailed lists and action items for defendant's work from 2013 through 2019.[2]

In addition, as discussed further below, Special Agent Civetti will testify about summary charts that were prepared by reviewing and

---

[2] The government's evidence, including the exhibits the government intends to introduce through Special Agent Civetti, is described in detail in the government's exhibit list set forth in the parties' Joint Statement and Second Joint Pretrial Exhibit Stipulation.  (Dkt. No. 937.)  With the exception of one objection to summary exhibits and objections to the completeness of certain excerpts of recordings and translations, defendant does not object to the authenticity and admissibility of all other materials on the government's exhibit list.

4

summarizing voluminous records that are otherwise admissible, including bank and other financial records, travel and hotel records, emails, text messages, telephone toll records, calendar entries, and casino records.  The Court has discretion to admit the summary charts with Special Agent Civetti at the start of the trial, even though the foundation for admissibility for certain records will be established by later witnesses.  Those witnesses, including Esparza, Chiang, Andy Wang, Goldman, and others, will testify about the scope and operation of the CD-14 Enterprise and bribery schemes that existed involving defendant, Huizar, and others, through which the participants conspired to engage and engaged in a pay-to-play scheme within the City of Los Angeles.

**B.   Jury Nullification and Improper Defenses**

1.   <u>Jury Nullification Generally</u>

Following Huizar's change of plea hearing, when asked by the Court whether defense counsel intended to pursue jury nullification, counsel stated that he did.  (1/20/23 Hr'g Tr. at 6:2-6.)  Defense counsel explained that he "tiptoed" toward the issue, and, while acknowledging that "you can't really tell the jury to disregard the evidence and the law," he stated his belief that the defense has a right to invite nullification.  (<u>Id.</u> at 6:6-20, 8:2-11.)  The Court informed defense counsel that it was "not going to permit the defendant to advocate for jury nullification," citing Ninth Circuit precedent that "courts have a duty to forestall and prevent nullification whether by firm instruction or admonition or dismissal of an offending juror because it is the duty of jurors in a criminal case to take the law from the Court and apply the law to the facts as they find them to be from the evidence." (<u>Id.</u> at 7:4-13 (quoting

1  <u>United States v. Kleinman</u>, 880 F.3d 1020, 1031 (9th Cir. 2017)

2  (citation omitted)).)   The Court instructed the defense to file a

3  brief by January 25, 2023 if it sought to pursue a nullification

4  theory at trial.   Defense counsel did not do so, and during the

5  January 25 status conference, stated that "[o]bviously we're not

6  going to argue jury nullification in a case where your client is

7  innocent."   (1/25/23 Hr'g Tr. at 21:2-10.)

8       Despite defense counsel's statements purporting to abandon this

9  impermissible strategy, the government maintains significant concerns

10 the defense will seek to invite nullification -- both in subtle and

11 direct ways -- at trial.   Defense counsel has repeatedly directed

12 false allegations at the government with respect to the motivations

13 for the charges against his client and alluded to a series of

14 impermissible and untenable defenses he may seek to advance at trial.

15 The government describes below several of the unfounded claims the

16 defense may seek to offer, directly or indirectly, in inviting the

17 jury to nullify at trial, including as early as opening statement.

18 The defense should be precluded from seeking to raise these and other

19 similarly irrelevant and prejudicial claims at trial.

20           2.   <u>Improper References to Alleged Racial Bias</u>

21      In its Motion <u>in</u> <u>Limine</u> No. 8 ("MIL No. 8"), the government

22 moved to exclude any improper reference, including through argument

23 or witness examination, attacking the government as racially

24 motivated or biased in investigating and prosecuting any of the

25 defendants in this case.   (See Dkt. No. 888, the substance of which

26

27

28

the government incorporates herein by reference.)  Huizar responded to MIL No. 8, but defendant Chan did not take a position.[3]

During the January 20 status conference, the Court stated its intention to "deny that motion as premature or moot but advise counsel that to the extent the position changes, that the Court will require an offer of proof to be filed 48 hours in advance of counsel's attempt to raise that issue."  (1/20/23 Hr'g Tr. at 4:6-10.)  Notwithstanding the Court's order for 48-hours' notice from the defense of its intent to raise any form of cultural defense, there still remains a substantial risk at trial of the defense injecting false accusations about the government's alleged racial bias in investigating and prosecuting this case.[4]

_____

[3] Prior to the government filing MIL No. 8, Chan's counsel stated in a November 6, 2022 email:  "We do not plan to put on a cultural defense nor do we think the government's motive is racist. The government is simply stupid.  Obviously some of the government agents are racist.  The cultural differences explain but do not excuse any conduct."  (Exhibit A hereto.)  However, as illustrated by the subsequent correspondence described herein, counsel's stated intentions last November are wholly at odds with his repeated and recent baseless claims about the government's alleged racial bias.

[4] The government's concern about the defense not providing the requisite notice ordered by the Court has been reinforced during this case by the defense's pattern of failing to comply with Court orders and deadlines.  As set forth in the government's recent briefing, defendant and defense counsel both have failed to comply with defendant's conditions of pretrial release since the inception of this case.  (Dkt. Nos. 920, 927-2.)  In addition, the defense has repeatedly shown little regard for working constructively with the government on exchanging positions in a timely manner to meet Court-ordered deadlines for joint filings, including the parties' joint statements on the pretrial exhibit stipulations, disputed jury instructions, disputed verdict forms, and the defense's rule of completeness objections.  Most recently, the defense disregarded the government's request for defendant's positions on the jury instructions and verdict form by Friday, February 10 (for purposes of meet-and-confer discussions after the government had disclosed its proposed versions on February 7), informing the government: "Get back to you Sunday."  (See, e.g., Exhibit G hereto.)  The defense did not get back to the government on Sunday (February 12) either.  As of the time of this filing on February 13 (the day the parties' joint

*(footnote cont'd on next page)*

7

Defense counsel's messaging has consistently pointed toward the defense's intent to put this unfounded, irrelevant, and highly prejudicial accusation in front of the jury in some capacity.  In its MIL #8, the government quoted and attached email correspondence from defense counsel (as of December 5, 2022) in which counsel repeatedly and wrongly accused the government of anti-Chinese racial bias.  (See Dkt. No. 888 at 14; see id. 888-2, 888-3; see also id. 259-1 ¶ 3, 259-10 (letter accusing U.S. Attorney's Office of being "rife with virulent anti-Chinese bias").[5])  Since that time and as recent as several days ago, defense counsel has continued with his barrage of false claims against the government.  For example:

- In a December 21, 2022 email regarding proposed juror questionnaires, defense counsel described one question proposed by Huizar's counsel as "clearly racist as is the entire prosecution" (Exhibit D);

- In the parties' February 3, 2023 Joint Pretrial Exhibit Stipulation, defense counsel included in his objections to the government's exhibits his complaint that the "government has ignored three letters from the defense asking why the Guan L[e]i case was dismissed" (Dkt. No. 925-1 at 3 (referring to a client counsel apparently represented in a wholly unrelated case and has repeatedly held up as a supposed example of the government's purported racist charging practices)); and

- In a February 8, 2023 email regarding proposed fact stipulations, defense counsel "speculate[d] that the Trumpian DOJ ordered the indictments as part of the Chinese initiative" and accused the government of "ingor[ing his] request for an explanation for the Guan L[e]i dismissal after he spent 9 months at MDC!!" (Exhibit E).

Defense counsel has not wavered in his false accusations about the purported racial animus that he claims motivated the government's charges in this case.  For the reasons set forth in the government's

---

positions on the jury instructions and verdict form are due), the government still has not received any positions from the defense.

[5] The government has reattached these email and letter exhibits as Exhibits A, B, and C hereto for the Court's ease of reference.

8

MIL #8, the defense should be precluded from making any improper references falsely attacking or insinuating that the government's investigation or prosecution was racially biased or motivated.

### 3. Entrapment Defense

In his Proposed Summary of the Case, defendant for the first time revealed that he apparently intends to argue that the government "exercised excessive entrapment on [Shawn] Kuk and Chan" but its "entrapment effort failed." (Dkt. No. 932 at 15; see also Dkt. No. 937 at 7 ("Andy and the FBI attempted to entrap Kuk with a $10,000 payment.").) There are numerous fundamental flaws with defendant's eleventh-hour disclosure of a purported entrapment defense, more than two years after the government's request for "notice of any intention of [defendant] to rely on an entrapment defense" in its first production of discovery to defense counsel. (See Exhibit F (January 21, 2021 discovery production letter to Harland Braun et al.).)

First, in order for defendant to be entitled to an instruction on entrapment, the defense must make a preliminary showing that "there exists evidence sufficient for a reasonable jury to find in his favor." United States v. Spentz, 653 F.3d 815, 818 (9th Cir. 2011) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). While such evidence may be "slight," "there still must be some evidence demonstrating the elements of the defense before an instruction must be given." Id. Defendant has proffered no evidence in support of an entrapment defense or instruction at trial.

Second, even if he were to try to make such a showing, he would not be able to demonstrate requisite evidence of either, much less both, prongs of the entrapment defense. The Ninth Circuit has "held that '[a] defendant is not entitled to have the issue of entrapment

9

submitted to the jury in the absence of evidence showing some inducement by a government agent <u>and</u> a lack of predisposition by the defendant.'"  <u>Spentz</u>, 653 F.3d at 818 (quoting <u>United States v. Rhodes</u>, 713 F.2d 463, 467 (9th Cir. 1983)) (emphasis in original). Defendant's theory here appears to be that another party (Kuk) was the target of the government's inducement of $10,000.  But derivative entrapment is not a cognizable defense, <u>United States v. Bonanno</u>, 852 F.2d 434, 439 (9th Cir. 1988), nor is mere financial motive sufficient to show inducement.  <u>Spentz</u>, 653 F.3d at 819.  In any event, the evidence at trial will prove that defendant, not anyone acting on behalf of the government, initiated and orchestrated the bribery scheme involving Kuk and Wang.

As for predisposition, the conduct defendant claims constituted entrapment could not have arisen until, at the earliest, June 2018 – at least more than five years after defendant's first involvement in the RICO conspiracy with his introduction of Huizar to Wei Huang and his integral participation in the pay-to-play scheme in the years thereafter.  Defendant could not show that the "government initially made the suggestion of criminal activity" nor that he "evidenced reluctance to commit the offense that was overcome by repeated government inducement or persuasion," among the other factors considered as part of the predisposition analysis.  <u>United States v. Williams</u>, 547 F.3d 1187, 1198 (9th Cir. 2008) (citation omitted).

Third, the 2018 bribery scheme involving Kuk is not charged in any substantive counts in the FSI in any event.  Besides having no support in the evidence, an entrapment defense to this narrow conduct at the tail-end of the years-long RICO conspiracy, without any specific count to which it could possibly apply, would only serve to

10

confuse the issues and mislead the jury.  Fed. R. Evid. 403.  Defense counsel's apparent intent to inject an untenable "entrapment" theory into trial appears to be yet another thinly-veiled attempt to distract the jury and invite it to nullify.  Nor should defense counsel be permitted to advance an "imperfect" entrapment theory--by suggesting some wrongdoing by the government in its use of an informant or that defendant was "set up" or "trapped."  Accordingly, defendant should be precluded from raising entrapment in any form, whether during witness examinations, opening statement, or closing argument.[6]

## C. Hearsay Generally

The government expects witnesses to testify at trial about discussions with other co-conspirators and co-schemers in furtherance of the charged conduct.  Thus, the government provides the following background on hearsay and the co-conspirator hearsay exclusion.[7]

---

[6] Defense counsel also has repeatedly made reference, both in court and in correspondence with the government, to other matters having nothing to do with this case.  Such issues include the government's "twice" not having met with defense counsel for a "reverse-proffer" prior to indictment (though counsel consistently neglects to mention the reverse-proffer he did take part in post-indictment), the fact that one of the previously-assigned AUSAs left the U.S. Attorney's Office to lead the anti-corruption office of an Eastern European country, and the number of AUSAs that have worked on all phases of this approximately seven-year investigation and prosecution.  All of these matters are completely irrelevant to the issues in this case, and defense counsel should be precluded from referring to any of them during trial.  Fed. R. Evid. 403.

[7] The government separately discusses the legal standards regarding hearsay and the admissibility of defendant's own statements in the parties' concurrently-filed Joint Statement Re: Disputed Transcripts Pursuant To Federal Rule Of Evidence 106.  In that filing, the government addresses the admissibility of defendant's statements as admissions of a party opponent, the prohibition on defendant seeking to offer his own self-serving hearsay, and the limits of the rule of completeness (Rule 106) as it applies to defendant offering his own hearsay statements.

As a general matter, Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Testimony that is not offered for the truth of the matter asserted, but for another purpose, is not hearsay. See e.g., United States v. Arteaga, 117 F.3d 388, 396 (9th Cir. 1997) (statements offered for "effect on hearer" are offered for a non-truth-related purpose); United States v. Echeverry, 759 F.2d 1451, 1456 (9th Cir. 1985) (statements offered not for truth but as necessary background information admissible as non-hearsay); United States v. Gibson, 690 F.2d 697, 700 (9th Cir. 1982) (statements admissible because offered to establish fact they were made and not for truth of matter asserted).

### D.   Co-Conspirator and Co-Schemer Statements and Conduct

Federal Rule of Evidence 801(d)(2)(E) provides that a statement offered against an opposing party is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a co-conspirator statement for the truth of its contents against a defendant, the government must show by a preponderance of evidence that: (1) a conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made in furtherance of the conspiracy. United States v. Larson, 460 F.3d 1200, 1211 (9th Cir. 2006); see Bourjaily v. United States, 483 U.S. 171, 175 (1987). Statements made in furtherance of a conspiracy also are not "testimonial" and, consequently, do not violate the Confrontation Clause. Crawford v. Washington, 541 U.S. 36, 56 (2004).

To be "in furtherance," the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988). Examples of admissible co-conspirator statements include, among other things: "statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities." United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991) (citations omitted). Likewise, "[s]tatements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)." See United States v. Payne, 437 F.3d 540, 546 (6th Cir. 2006). And though the statement must be in furtherance of a conspiracy, it need not be the exclusive, or even primary, purpose of the declaration. See United States v. Guyton, 36 F.3d 655, 659 (7th Cir. 1994).

A co-conspirator statement need not be made in the presence of the defendant, or even made to another co-conspirator, to be admissible. See Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970) ("It is well settled that a conversation between two co-conspirators which takes place out of the presence of a third co-conspirator is admissible into evidence against the third co-conspirator."); United States v. Lloyd, 807 F.3d 1128, 1160-61 (9th Cir. 2015) ("It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E).").

"Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants."  United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992); see Robinson v. United States, 33 F.2d 238, 240 (9th Cir. 1929) ("[I]f a conspiracy exists in fact [as when a scheme to defraud is shared by several], the rules of evidence are the same as where a conspiracy is charged.")  Thus, the rules of admissibility governing co-conspirator statements and conduct with respect to the charged overarching RICO conspiracy apply equally to co-schemer statements and conduct, including with respect to the L.A. Grand Hotel bribery scheme and the Luxe Hotel bribery scheme alleged in the FSI.

At trial, the government will present evidence of the existence of the RICO conspiracy beginning at least by February 2013, when defendant introduced Huizar to Wei Huang (Chairman of SZNW), and continuing through the co-conspirators' efforts to conceal the pay-to-play scheme even after execution of federal search warrants in November 2018 (after which defendant provided Wang a "script" to respond to law enforcement questions) and as late as March 2019 (when David Lee confronted and sought to align with Justin Kim about what he had told the FBI).

The parties have resolved the balance of defendant's objections to the government's exhibits (including documents and recordings) reflecting co-conspirator and co-schemer statements.  Nonetheless, witnesses, including Esparza, Chiang, Goldman, Wang, Kuk, and others, will testify about the documents and recordings and provide additional testimony about conversations with each other and with other individuals who were co-conspirators and/or co-schemers within

the scope of the charged conduct.  These conversations comprising

statements made during and in furtherance of the RICO conspiracy and

underlying bribery schemes constitute admissible co-conspirator

and/or co-schemer statements under Federal Rule of Evidence

801(d)(2)(E).[8]

Indeed, defense counsel acknowledged during the January 25, 2023

status conference that, in light of the RICO conspiracy charge on

which the government will be proceeding at trial, "RICO makes a lot

of things relevant that wouldn't be relevant without RICO.  It means

everyone that's involved with the enterprise, even if my client

didn't know it, and every statement they could make.  So we can

simplify the exhibits, but that's up to the[ government and its

decision on whether to proceed on the RICO charge]."  (See 1/25/23

Hr'g Tr. at 54:13-19 (emphasis added).)

Accordingly, the conduct of co-conspirators and co-schemers in

furtherance of advancing and concealing the objectives of the

overarching RICO conspiracy and underlying schemes also should be

admissible, as defendant acknowledges with respect to the relevance

---

[8] Huizar, Chiang, and Esparza have all pleaded guilty to the RICO conspiracy charge (18 U.S.C. § 1962(d)) on which defendant is proceeding to trial here.  (See Dkt. Nos. 910, 912 (Huizar guilty plea); Case No. CR 20-203-JFW, Dkt. Nos. 1, 7, 29 (Chiang guilty plea); Case No. CR 20-208-JFW, Dkt. Nos. 1, 9, 27 (Esparza guilty plea).)  In addition, Goldman pleaded guilty to engaging in a conspiracy (18 U.S.C. § 371) with Huizar and Cotter, among others, to engage in the Mateo Project bribery scheme (also one of the bribery schemes underlying the overarching RICO conspiracy), including through the use of a Political Action Committee created for the benefit of Richelle Rios's campaign to succeed Huizar as Councilmember for CD-14.  (See Dkt. No. 20-369-JFW, Dkt. Nos. 1, 9, 29.)  Similarly, Kim pleaded guilty to engaging in federal program bribery (18 U.S.C. § 666(a)(2)) in connection with the 940 Hill Project bribery scheme, describing in the factual basis to his plea agreement the nature of his contacts and communications with Huizar and Esparza, among others, in furtherance of the bribery scheme.

1  of conduct encompassed by the charged RICO conspiracy.  (1/25/23 Hr'g
2  Tr. at 54:13-19.)

3  **E.  Audio/Video Recordings and Transcripts**

4  **1.  English-Language Audio/Video Recordings & Transcripts**

5  A recording is admissible upon a showing that it is "accurate,
6  authentic, and generally trustworthy."  United States v. King, 587
7  F.2d 956, 961 (9th Cir. 1978).  For example, testimony that a
8  recording depicts evidence that the witness observed is sufficient to
9  authenticate the recording.  Fed. R. Evid. 901(b); United States v.
10  Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).

11  At trial, the government will introduce and play for the jury
12  excerpts of numerous English-language audio recordings, including
13  intercepted phone calls and meetings pursuant to court-authorized
14  wiretaps and consensually recorded calls and meetings at the
15  direction of the FBI.  The government also intends to introduce
16  excerpts from defendant's recorded interview with the FBI.  Special
17  Agent Civetti has knowledge of how the recordings were made and is
18  familiar with the individuals recorded in the clips and their voices.
19  He is therefore qualified to authenticate the recordings.  To the
20  extent the recordings contain any vague or ambiguous statements,
21  Special Agent Civetti, or a witness who participated in a recorded
22  conversation, may give lay opinion testimony about the meaning of
23  otherwise vague or ambiguous statements made in the recording.  See
24  United States v. Freeman, 498 F.3d 893, 902 (9th Cir. 2007) ("A lay
25  witness may provide opinion testimony regarding the meaning of vague
26  or ambiguous statements [in recorded conversations]").

27  While the recordings themselves are the evidence, the government
28  has also prepared written transcripts of the recordings as an aid to

16

1   the jury while listening to the recordings.  See United States v.
2   Chen, 754 F.2d 817, 824 (9th Cir. 1985).  Special Agent Civetti
3   reviewed the transcripts for accuracy and can authenticate them.  The
4   government provided the defense with its proposed transcripts and the
5   defense had no objections to accuracy.  (The parties' positions on
6   the defense's outstanding objections to the completeness of content
7   contained in excerpts of certain recordings will be set forth in the
8   parties' concurrently-filed Joint Statement Re: Disputed Transcripts
9   Pursuant To Federal Rule Of Evidence 106.)  The government intends to
10  display the scrolling transcripts on the screen while playing
11  corresponding audio recording exhibits at trial.

12      For the jury to consider the evidence on a recording, it must be
13  played in open court.  Allowing jurors to take into the jury room
14  recordings that were not played in open court is structural error
15  requiring automatic reversal if a defendant objects to allowing the
16  jurors to have the un-played recordings in the jury room.  United
17  States v. Noushfar, 78 F.3d 1442, 1445-46 (9th Cir. 1996).

18          2.   Standalone Laptop in the Jury Room

19      In order to aid jury review of evidence, minimize deliberation
20  disruptions, and avoid the extensive amount of time it takes to have
21  all jurors and parties re-assembled to hear a playback of a
22  recording, the jury should have access to and the ability to play
23  admitted audio and video recordings during their deliberations in the
24  jury room.  See, e.g., United States v. Chadwell, 798 F.3d 910, 914
25  (9th Cir. 2015) (holding no abuse of discretion in sending video
26  exhibit to jury room as "defendant's right to be present at all
27  stages of the trial under Federal Rule of Criminal Procedure 43(a)
28  does not extend to a jury's private review of evidence in the jury

17

room"). Accordingly, **the government requests that the Court make available a standalone laptop in the jury room for the jury to review admitted recordings.** After the parties conduct the customary exhibit review at the conclusion of trial, the government will furnish a thumb drive containing the admitted recordings so that the jurors can play them via the laptop.

### 3. Translations of Foreign Language Recordings

A number of recording exhibits that will be presented at trial consist of conversations in a foreign language, specifically, Mandarin Chinese, Korean, and Spanish. These foreign-language recordings include intercepted phone calls involving, among others, defendant, Huizar, Huizar's mother, and Lincoln Lee (a former City employee who also left the City to work with defendant as a consultant on the Luxe Hotel project), as well as covertly recorded calls and meetings involving defendant, Wang, Kuk, David Lee, and Justin Kim. For these recordings, the government has prepared translated transcripts that it provided to the defense for its review. To date, the parties have resolved all objections the defense has raised about the accuracy of certain translations. For this evidence, the translated transcript is the evidence, not the foreign language spoken in the recording. Ninth Circuit Manual of Model Criminal Jury Instructions No. 2.7 ("Transcript of Recording in Foreign Language"); see also United States v. Franco, 136 F.3d 622, 626 (9th Cir. 1998) ("We therefore have upheld a trial court's instruction that a jury is not free to disagree with a translated transcript of tape recordings."). Consistent with the Lee/940 Hill trial, the government intends to have the AUSAs read the roles of the

speakers in the translated transcripts to the jury while displaying
the translated transcript on the screen.

### F.   Summary Exhibits & Witness

Just as it did in the Lee/940 Hill and SZNW trials, the
government will seek to admit summary evidence of voluminous records
and have a witness testify concerning those summaries.  Fed. R. Evid.
1006.  Specifically, the government will seek to admit various
summary exhibits (Trial Exs. 900-942) synthesizing facts and events,
comprised in voluminous discovery, that are relevant to the RICO
conspiracy and the underlying bribery schemes.  As part of the
parties' meet-and-confer process, defendant has objected to one of
the government's proposed summary exhibits (Trial Exh. 905).  In
responding to that objection in the parties' Joint Statement and
Second Joint Pretrial Exhibit Stipulation, the government set forth
the legal principles underlying the admissibility of that exhibit and
its other summary exhibits under Rule 1006.  (Dkt. No. 937 at 7-8.)

However, shortly before the government was required to file and
submit a Chambers copy of the parties' joint statement on February
10, the defense indicated that it also may object to Trial Exhibit
900 (a diagram of participants in the CD-14 Enterprise) as "obviously
argumentative and not based on any evidence in the real world," as it
is "simply a diagram of the prosecution's theory of a RICO which
obviously does not exist."  (Dkt. No. 937-1.)  The government takes
the position that the defense waived that objection by not providing
it to the government in a timely manner to permit an informed
response prior to the parties' joint filing.  Nonetheless, the
objection is meritless.  The defense does not contest the accuracy of
the underlying exhibit but rather how the information is portrayed.

A summary exhibit "need not give effect to the contentions of the accused." See United States v. Lemire, 720 F.2d 1327, 1349 (D.C. Cir. 1983) (quoting Flemister v. United States, 260 F.2d 513, 517 (5th Cir. 1958)).  In any event, the government may instead seek to use Trial Exhibit 900 as a demonstrative at trial and not seek to admit it as substantive evidence.

   G.   **Prior Inconsistent Statements**

   The Supreme Court has held that to impeach the credibility of a witness with a "prior inconsistent statement," the court "must be persuaded that the statements are indeed inconsistent." United States v. Hale, 422 U.S. 171, 176 (1975).  Thus, if the witness does not testify to something that is inconsistent with a prior statement, there is no "prior inconsistent statement" with which to impeach the witness.  Id.  Likewise, "a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." United States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993).

   Consistent with the Court's practice in the Lee/940 Hill and SZNW trials, if defendant intends to impeach a witness with a prior inconsistent statement, defendant must first provide a copy of the alleged prior inconsistent statement to the government and the Court. Only after the Court determines the prior statement is indeed inconsistent may defendant impeach the witness before the jury.

   If defendant attempts to use a purportedly inconsistent prior statement with a testifying witness, the government may then on re-direct seek to admit the "entire conversation or document from which the impeachment statements were drawn if it has significant probative

force bearing on credibility apart from mere repetition by plac[ing] the inconsistencies in a broader context, demonstrating that the inconsistencies were a minor part of an otherwise consistent account." United States v. Collicott, 92 F.3d 973, 980 (9th Cir. 1996) (cleaned up).

## H.   Marital Communications/Spousal Testimonial Privilege

There are two privileges that arise from a marital relationship: the marital communications privilege and the spousal testimonial privilege.  The spousal testimonial privilege permits a witness to refuse to testify against his or her spouse while they are married and belongs only to the testifying spouse.  United States v. Montgomery, 384 F.3d 1050, 1056 (9th Cir. 2004) (citing Trammel v. United States, 445 U.S. 40, 53 (1980)).  The marital communications privilege extends to "confidential communications [between spouses], i.e., those not made in the presence of, or likely to be overheard by, third parties." United States v. Vo, 413 F.3d 1010, 1016 (9th Cir. 2005) (cleaned up).  This privilege covers (1) "only . . . words or acts intended as communication to the other spouse," (2) "only those communications made during a valid marriage," and (3) "only . . . those marital communications which are confidential." United States v. Griffin, 440 F.3d 1138, 1143 (9th Cir. 2006) (cleaned up).

Similar to the SZNW trial, the government plans to call Huizar's wife, Richelle Rios, as a witness.  Among other things, Ms. Rios will testify about Huizar's position as CD-14 Councilmember and Chair of the Planning and Land Use Management Committee; her introduction to Wei Huang (Chairman of SZNW) through Huizar and a meeting she attended involving defendant, Huizar, Huang, and others at which the group discussed a sexual harassment lawsuit involving Huizar; events

Rios attended involving Huizar and Huang as well as trips Rios and

Huizar took to Las Vegas involving Huang; Rios's access to cash she

received from Huizar; and Huang's and other developers' support for

Rios's bid to follow Huizar as CD-14 Councilmember.

Critically, Ms. Rios, who is still married to Huizar, will not

testify about any confidential marital communications between Ms.

Rios and Huizar.  Nor is Ms. Rios, the testifying spouse, invoking

the spousal testimonial privilege.  Thus, the government does not

anticipate that either the marital communications privilege or the

spousal testimonial privilege will come into play at trial.  In

addition, Ms. Rios is represented by appointed counsel Alyssa Bell,

who is hoping to be present during her client's testimony, depending

on her own trial schedule, and can raise any privilege issue with the

Court and/or her client should it become necessary.

### I.   Truthful Testimony Provisions of Plea Agreements

The government intends to call three witnesses (Esparza,

Goldman, and Chiang) who have entered into plea agreements in which

they agreed to cooperate with the government.  The plea agreements

each contain a provision that requires the witness to fully cooperate

with the government, including by testifying as a witness if called

upon to do so.  The plea agreements also include provisions requiring

the cooperating witnesses to be honest and forthcoming, and to render

truthful testimony.

"Eliciting testimony on direct examination that a witness

entered into a plea agreement that requires truthful testimony may

constitute vouching."[9]  United States v. Dorsey, 677 F.3d 944, 953 (9th Cir. 2012).  However, "referring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are 'made in response to an attack on the witness's credibility because of his plea bargain,' including an attack in defense counsel's opening statement."  Id. (quoting United States v. Monroe, 943 F.2d 1007, 1013–14 (9th Cir. 1991)); see also id. at 954 ("Defense counsel implied in his opening statement that Fomby was a liar and that he was biased because he got 'a deal from the government.'  The prosecutor permissibly responded to this attack by eliciting testimony that Fomby's plea agreement required him to tell the truth.  When the defense opens a door, it should not be surprised to see the prosecutor enter.").

Here, the government anticipates that defense counsel will attack one or more of the cooperating witnesses' credibility, perhaps as early as opening statement.  If the defense does so, the government should be permitted to elicit testimony regarding the truthful testimony provisions of the respective plea agreement during direct examination as appropriate.

### J.   Defense Witnesses

#### 1.   Scope of Defendant Cross-Examination

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination

---

[9] If such testimony is inadvertently elicited on direct examination before any attack on the cooperating witnesses' credibility in opening or otherwise, a curative instruction would be in order, see United States v. Shaw, 829 F.2d 714, 717–18 (9th Cir. 1987), and of course defense counsel must be permitted fulsome cross examination, see United States v. Schoneberg, 396 F.3d 1036, 1043 (9th Cir. 2005).

concerning all matters reasonably related to the subject matter of his testimony.  The scope of defendant's waiver is coextensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); see also United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.  Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.") (internal quotations and citation omitted).

　　　　　　2.　Content and Manner of Character Evidence

　　　　Federal Rule of Evidence 405(a) sets forth the sole methods by which character evidence may be introduced.  It states that where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and (2) by testimony as to opinion.  Fed. R. Evid. 405(a).  Thus, a defendant cannot introduce specific instances of his good conduct through the testimony of others.  See Michelson v. United States, 335 U.S. 469, 477 (1980) ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental or moral traits."); see also United States v. Camejo, 929 F.2d 610, 613 (9th Cir. 1991) (evidence of specific instances is not admissible to prove the defendant's good character); United States v. Hedgcorth, 873 F.2d 1307, 1313 (9th Cir. 1989) (defendant's testimony regarding his role as government intelligence operative, offered to show that he was "patriotic," "pro-government" individual, properly excluded).

Nor can defendant circumvent the prohibition of his offering so-called "good acts" evidence under any other theory of admissibility, including with respect to proof of his intent in this case.  While Rule 404(b) allows for limited uses of "other crimes, wrongs, or acts" in a criminal case, courts have consistently denied defendants' attempts to offer evidence of their own good deeds or noncorrupt acts in public corruption and white-collar cases.  See, e.g., United States v. Dawkins, 999 F.3d 767, 792-93 (2d Cir. 2021) (affirming exclusion of "good act" evidence in public corruption case where defendant could not establish innocence "through proof of the absence of criminal acts on specific occasions"); United States v. Dimora, 750 F.3d 619, 630 (6th Cir. 2014) (affirming exclusion of public official's "good acts" of helping constituents without anything in return, as "prior 'good acts' generally may not be used to show a predisposition not to commit crimes").  In addition, no trait of character is an "essential element of a charge, claim, or defense" in this case and thus specific instances of conduct are not admissible under this narrow exception.  Fed. R. Evid. 405(b); see also id. Adv. Comm. Notes ("[T]he rule confines the use of evidence of [specific instances of conduct] to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry.").

Unlike the defense, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait the defense has put at issue.  See Fed. R. Evid. 405(a).  A defendant's character witnesses may be cross-examined about their knowledge of the defendant's wrongful acts to prevent this advantage given to the defendant from "becoming an unfair and unreasonable one."  See Michelson, 335 U.S. at 479.  "A witness who

has endorsed the character of the defendant may be cross-examined about whether he's heard about prior bad acts of the defendant." United States v. Bush, 58 F.3d 482, 489 (9th Cir. 1995) (citing Fed. R. Evid. 405(a)). The only prerequisite is that there must be a good faith basis that the incidents inquired about are relevant to the character trait at issue. See United States v. Salazar-Gaeta, 447 F.2d 468, 469 (9th Cir. 1971). "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." Michelson, 335 U.S. at 479.

Here, in light of the RICO and bribery charges as well as the false statement charge, it would be proper for character witnesses to testify about defendant's alleged character traits for law-abidingness and truthfulness. See Fed. R. Evid. 404(a)(2)(A); United States v. Diaz, 961 F.2d 1417, 1419 (9th Cir. 1992); In re Sealed Case, 352 F.3d 409, 412 (D.C. Cir. 2003). If the defense opens the door in this way, the government may inquire regarding specific instances of prior bad acts by defendant.

To the extent the defense offers any such character evidence, it should do so during the defense's case and not on cross-examination during the government's case-in-chief. The scope of a cross-examination is within the discretion of the trial court. Fed. R. Evid. 611(b). Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Id. While the Court has discretion to permit inquiry into additional matters on cross-examination, id., the Court should bar the defense from seeking to elicit self-serving

character testimony from defendant's former colleagues while he worked for the City of Los Angeles (including Keller, Ovrom, Kuk, and Esparza) and other witnesses with whom defendant has worked closely (including Yan Yan and Chiang) on cross-examination during the government's case -- especially to the extent the defense has not already turned over any Jencks statements or reports of interviews relating to each witness.

### 3. Number of Character Witnesses

The Court maintains the "right to impose some limitation on the number of witnesses testifying about a particular fact," including defendant's character, as such "must be left to the sound discretion of the judge." United States v. Henry, 560 F.2d 963, 965 (9th Cir. 1977) (citation omitted) (no abuse of discretion limiting defendant to two character witnesses instead of four); see also United States v. Moss, 34 F.4th 1176, 1188 (11th Cir. 2022) (court properly limited defense to six character witnesses instead of 16, explaining "[i]t is well-established that district courts have considerable discretion to limit the number of character witnesses and that we should overturn these determinations rarely and only on a clear showing of prejudicial abuse of discretion.") (cleaned up).

Defendant has represented that he may seek to call upwards of 12 witnesses, claiming they "all are percipient witnesses plus character witnesses" but that he is "not going to put on any straight character witnesses." (1/25/23 Hr'g at 51:4-10.) Should the defense's witness list, which is due to be filed on February 13 and must provide a summary of the expected testimony, reveal potentially cumulative character witnesses, the government reserves the right to seek to limit the number of such witnesses.

K.   **Reciprocal Discovery**

1.   Reciprocal Discovery

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery obligations on the part of defendant to produce three categories of materials that he intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure.  Fed. R. Crim. P. 16(b)(1)(A)-(C).  Rule 16 imposes on defendants a continuing duty to disclose these categories of materials.  Where a party fails to produce discovery as required, the rule empowers this Court to "prohibit that party from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances."  Fed. R. Crim. P. 16(d)(2).

From the first production of discovery to the defense in this case, the government requested "all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure."  (See Exhibit F.)  The government has thus far received no reciprocal discovery from defendant.  Pursuant to the Court's pretrial scheduling order, defendant is required to produce Jencks statements, charts and summaries, an exhibit list and exhibits, and a witness list by February 13, 2023.  To the extent defendant attempts to introduce or use any evidence at trial that has not already been produced in discovery to the government, such evidence should be excluded.  See Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defense failure to comply with, or object to, government's discovery request before trial justified exclusion of unproduced evidence).

**L.   Trial Indictment**

Given the number and, in some cases, complexity of charges in the FSI, the government intends to file a trial indictment to go back with the jury during deliberations.  A trial indictment was provided to the jury in the SZNW trial, and will be helpful to the jury and guide them in their deliberations.  More specifically, along with the jury instructions and verdict form, a trial indictment outlines for the jury what they need to evaluate in determining whether defendant is guilty or not guilty of the charges contained therein.  The government's proposed trial indictment will delete all inapplicable allegations and counts and include a clear disclaimer on every page that the indictment is not evidence, which is also set forth in the jury instructions.  To the extent necessary, at the end of trial and prior to deliberations, the trial indictment will be further sanitized to omit any allegations that were not presented during the trial.

**M.   Trial Logistical Issues**

1.   <u>Jury Contacts and Witness Sequestration</u>

On February 11, 2023, the government sent defense counsel an email proposing that the parties agree on three trial logistical issues.  Specifically, the government proposed that:

> a)   Neither side (and no one acting in concert with either side, like a jury consultant) shall conduct online (<u>i.e.</u>, social media, etc.) research of prospective jurors, consistent with the Court's order in the 940 Hill/Lee trial and defense counsel's agreement in the SZNW trial;
>
> b)   Neither side will make unsolicited attempts to contact jurors after the trial has ended at their home, workplaces, or anywhere outside of the courthouse, though any jurors could voluntarily speak with defense or government counsel at or near the courthouse at the conclusion of trial, consistent with the Court's practice in the SZNW trial; and

1                c)    Each side will ensure their witnesses (including
Jeremy Chan, to the extent the defense intends to call him
to testify) are sequestered until they testify pursuant to
FRE 615 (with the exception for Special Agent Civetti,
whose presence is permitted under FRE 615(b) and (c)).

(See Exhibit H hereto.)   The government has yet to receive a response
from the defense.

With respect to the proposal on not conducting online research
of prospective jurors and limiting contacts with seated jurors
following trial, the government believes these measures are necessary
and appropriate to balance defendant's right to a fair trial with the
need to afford protections to the privacy of jurors.

The Ninth Circuit has "long imposed restrictions on lawyers
seeking access to jurors" in the post-trial context, in part to
"protect jurors from the annoyance and harassment" of post-verdict
contacts.   Mitchell v. United States, 958 F.3d 775, 787 (9th Cir.
2020); Economou v. Little, 850 F. Supp. 849, 852-853 (N.D. Cal. 1994)
(collecting cases; "The Court of Appeals for the Ninth Circuit
disfavors post-verdict interrogation of jurors, and allows such
interrogation in limited circumstances."); see also United States v.
Moten, 582 F.2d 654, 665 (2nd Cir. 1978) (recognizing power of trial
judge to order all post-verdict investigation of jurors to be
conducted under his supervision).   It is worth noting that defense
counsel previously joined in defendant Huizar's motion to vacate this
Court's order prohibiting counsel from contacting jurors from the
Lee/940 Hill trial (Dkt. No. 717), which the Court denied (Dkt. No.
838).   The government believes it is important to raise this issue
prior to trial to ensure appropriate safeguards are in place to
protect jurors' privacy interests at the trial's conclusion.

1        Similar principles underlying respect for the privacy and
2 integrity of the jury call for voir dire of prospective jurors to be
3 conducted in open court, under the supervision of this Court, and not
4 online.  Without restrictions on the manner and scope of voir dire,
5 there is a risk not only that prospective jurors could have their
6 social media and online presence dissected by counsel and jury
7 consultants, but also that they could be contacted improperly,
8 directly or indirectly, through their social media and online
9 accounts.  Federal Rule of Criminal Procedure 24, which governs the
10 examination and selection of trial jurors, affords trial courts broad
11 discretion in the conduct of voir dire.  As the Supreme Court has
12 long recognized, "[b]ecause the obligation to impanel an impartial
13 jury lies in the first instance with the trial judge, and because he
14 must rely largely on his immediate perceptions, federal judges have
15 been accorded ample discretion in determining how best to conduct the
16 voir dire."  <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 189 (1981)
17 (plurality opinion).  The parties have filed their respective
18 additional proposed voir dire questions for the Court's consideration
19 (Dkt. Nos. 933, 934), and thus have been provided the opportunity to
20 propose additional questions in the aid of selecting a fair and
21 impartial jury.  The Court's procedures will be sufficient to achieve
22 that objective, and additional online research of prospective jurors
23 should not be allowed.

24        Finally, with respect to sequestration of witnesses, the
25 government will request an order pursuant to Federal Rule of Evidence
26 615 that, with the exception of Special Agent Civetti, "witnesses
27 [be] excluded so that they cannot hear other witnesses' testimony,"
28 which the Court must order at a party's request.  Fed. R. Evid. 615.

2.   Stand-By Interpreter Request

At least two of the government's witnesses (Ricky Zheng and Andy Wang) speak English as a second language, and may require the assistance of an interpreter during their testimony.  The government will request that its Office provide a Mandarin and Cantonese Chinese interpreter or interpreters to be available for the day(s) these witnesses may testify during trial.

**III. CONCLUSION**

The government respectfully requests leave to file supplemental trial memoranda before or during trial, as may become appropriate.