1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,        )
                                      )
6              PLAINTIFF,             )      CASE NO.
                                      )
7              vs.                    )      CR 20-326(A)-JFW
                                      )
8    RAYMOND SHE WAH CHAN,            )
                                      )      PAGES 1 TO 35
9              DEFENDANT.             )
     _____)

10

11

12

13                   **REPORTER'S TRANSCRIPT OF**
                        **STATUS CONFERENCE**
14                 **FRIDAY, JANUARY 20, 2023**
                          **9:51 A.M.**
15                 **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22    _____

23          **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4455
                LOS ANGELES, CALIFORNIA 90012
25                 MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4          MARTIN ESTRADA
           UNITED STATES ATTORNEY
5          BY:  MACK JENKINS
           BY:  CASSIE PALMER
6          BY:  SUSAN HAR
           BY:  BRIAN FAERSTEIN
7          Assistant United States Attorneys
           United States Courthouse
8          312 North Spring Street
           Los Angeles, California 90012

9

10   **FOR DEFENDANT CHAN:**

11         BRAUN & BRAUN, LLP
           BY:  HARLAND W. BRAUN
12         10880 Wilshire Boulevard
           Suite 1020
13         Los Angeles, California 90024

14   Also Present:

15         Special Agent Andrew Civetti

16
           Jeremy Chan
17

18

19

20

21

22

23

24

25

**LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 20, 2023**

**9:51 A.M.**

**---**

09:51AM    THE CLERK:  Recalling CR 20-326(A)-JFW,

United States of America versus Raymond She Wah Chan.

Counsel, please state your appearances.

MR. JENKINS:  Mack Jenkins, Cassie Palmer,

Susan Har, and Brian Faerstein on behalf of the United States.

09:51AM    Also at counsel table is Special Agent Andy Civetti of the FBI.

MR. BRAUN:  Harland Braun, B-r-a-u-n, with my

client and Jeremy Chan, the co-counsel.

THE COURT:  All right.  A couple matters I wanted

to discuss with counsel.  Although I was prepared to hear

09:51AM    argument and rule on the motions in limine, in light of

Mr. Huizar's plea of guilty this morning, those motions are now

moot.  I did not see any joinder by Mr. Braun nor did Mr. Braun

sign any of these motions.

So I assume you're not a part of these motions?

09:52AM    MR. BRAUN:  I'm not a big fan of motions in

limine as you can tell.

THE COURT:  That's fine.  But I just wanted to

make sure that I didn't miss anything in terms of a joinder.

The docket obviously has a number of entries on it.

09:52AM    The only motion that it seems to me that is

1    directed at Mr. Braun and his client is the Government's Motion

2    in Limine No. 8, but it seemed to me, based upon the e-mail

3    exchange, that that motion was also moot based upon Mr. Braun's

4    response to an e-mail that Mr. Chan is not going to raise any

09:53AM    5    issues that the Government's prosecution was racially motivated

6    or biased.  My intention was to deny that motion as premature

7    or moot but advise counsel that to the extent the position

8    changes, that the Court will require an offer of proof to be

9    filed 48 hours in advance of counsel's attempt to raise that

09:54AM   10    issue.

11               So that seems to be the only motion that --

12    related to Mr. Chan.

13               MR. BRAUN:  I think, Your Honor, that I have

14    changed my view on that.  At first I thought it was racially

09:54AM   15    motivated.  Now I just think --

16               THE COURT:  Can you pull the microphone -- pull

17    the lectern up.  Push the button and raise it.  You're tall.

18    Get the microphone close to you.  There you go.  Don't hide

19    yourself behind it.

09:54AM   20               MR. BRAUN:  In the Rodney King case, these things

21    were activated, and I didn't know that.  So my co-counsel was

22    drinking water, and I commented that with a strong mind and a

23    weak bladder, he could be a federal judge.  I didn't realize it

24    was being transmitted to Judge Davies who has a sense of humor.

09:55AM   25               I think I changed my mind.  I think it's just

ignorance.  We basically as Americans know very little about
China and know little about that civilization, and we think we
do.  I think it might come in -- we will do it formally as --
the jury instructions in one of the cases said that
Mr. Wei Huang's going to China is somehow evidentiary.  If that
comes about, I think then we have to get into why a citizen of
the People's Republic of China would decide not to come to L.A.
But that's the only time that would come in.

THE COURT:  All right.  Well, to the extent you
intend to raise it, please abide by the Court's order that I'm
going to require an offer of proof certainly 48 hours in
advance.  I think you raised at the last hearing your position
with respect to the -- I think you concluded or you were of the
opinion the Court erred in providing that instruction.  In any
event, there are no issues then with respect to the motions in
limine.

Is the Government satisfied with that result?

MR. JENKINS:  We are at this point, Your Honor.
We would just flag there has been inconsistent messaging about
Mr. Braun's defenses.  So we understand the Court's ruling that
you're ordering him to provide us an offer of proof 48 hours if
his plan changes.  And we would just -- we will be mindful of
that because we are concerned that that order will not be
followed based off communications with him.  He's also
indicated to me as set forth in the declaration that he

```
 1   believes in jury nullification which --

 2              THE COURT:  Well, that's not going to happen with

 3   respect to the jury nullification.

 4              You don't intend to pursue that theory, do you,

 5   Mr. Braun?

 6              MR. BRAUN:  Yes, Your Honor, I do.  But I tiptoed

 7   towards that.  So you can't really tell the jury to disregard

 8   the evidence and the law.  However, I have had debates with the

 9   presiding judge of the L.A. Superior Court where I advocated

10   jury nullification because I do believe that James Madison knew

11   what he was doing when he wrote our Constitution.  And there's

12   two published arguments by me which advocates jury

13   nullification which I will provide to counsel.

14              But I think it's a difficult one because the

15   Constitution does allow the president to nullify a court

16   proceeding, and it does not allow -- there's no provision for

17   an appeal of a not guilty verdict.  So I understand why that is

18   a difficult issue because our history has basically been sudden

19   jurors acquitting clansmen for clearly killing people.  So all

20   of the history of the --

21              THE COURT:  Let me just give you my view.  If you

22   intend to pursue this, certainly I want notice.

23              As the 9th Circuit stated in *United States versus*

24   *Kleinman* at 880 F.3d 1020, the 9th Circuit case 2017 -- and I

25   quote -- "Jury nullification occurs when a jury acquits a
```

09:57AM (line 5)
09:57AM (line 10)
09:57AM (line 15)
09:58AM (line 20)
09:58AM (line 25)

defendant even though the Government proved guilty beyond a
reasonable doubt.  It's well established that jurors have the
power to nullify, and this power is protected by freedom from
incrimination or sanction after an acquittal.  However, jurors
09:58AM do not have the right to nullify and the courts have no
corresponding duty to ensure that juries are able to exercise
this power such as by giving jury instructions on the power to
nullify.  On the contrary, courts have a duty to forestall and
prevent nullification whether by firm instruction or admonition
09:58AM or dismissal of an offending juror because it is the duty of
jurors in a criminal case to take the law from the Court and
apply the law to the facts as they find them to be from the
evidence."  That's the end of the quote.

And as the 1st Circuit stated in the *Sepulveda*
09:59AM case at 15 F.3d 1161 -- and I quote -- "The applicable rule is
that although jurors possess raw power to set an accused free
for any reason or for no reason, their duty is to apply the law
as given to them by the Court.  Accordingly, while jurors may
choose to flex their muscles ignoring both the law and evidence
09:59AM in a rush to acquit a criminal defendant, neither the Court nor
counsel should encourage jurors to exercise this power."

So I can tell counsel that I'm not going to
permit the defendant to advocate for jury nullification.  If
you have a brief that you want to file with respect to this
09:59AM issue, you can file it by Tuesday of -- or Wednesday of next

1    week.

2              MR. BRAUN:  I have a chapter of -- I have a

3    client that wrote a book about his case in which one of the

4    chapters is a jury nullification argument.

5              Your Honor, I understand what the law is.  But I

6    also think that when James Madison wrote the Constitution,

7    there was a case where a jury acquitted a publisher despite the

8    law.  And I know the difficulty with that.

9              Also, for example, the -- I don't know where the

10   Constitution says the courts can overrule the congress, but

11   that's our tradition.

12             THE COURT:  All right.  The other issue I want to

13   discuss with counsel is the contours of the case.  It may be

14   premature because I realize that we just took Mr. Huizar's plea

15   this morning.  But I wanted to get an understanding from the

16   Government if the contours of the case and, more importantly,

17   the time it's going to take to try the case against Mr. Chan

18   has changed.

19             MR. JENKINS:  It has certainly changed,

20   Your Honor, meaningfully so in a reduced amount of witnesses

21   and time.  We are still evaluating it because, frankly, the

22   plea came together, I would say, very rapidly.  As you know,

23   it's a binding plea.  So we are still planning for all

24   contingencies.

25             But we have a meeting -- the trial team has a

1    meeting today after this hearing to discuss how to make those

2    contours narrower.  So I don't have a current estimate except

3    that it will be, I would say, significantly shorter and fewer

4    witnesses.

10:01AM   5          At the same time, Mr. Chan is charged in the same

6    racketeering count which means we have to prove up the elements

7    of the enterprise which focuses on Defendant Huizar.  But

8    there's certainly parts that we can cut out of both that and

9    the Huizar-specific charges, Your Honor.

10:02AM   10          THE COURT:  Maybe what I will do is set -- there

11   are a bunch of issues I wanted to discuss this morning, but

12   maybe what I will do is just defer all of those and let

13   everybody take a step back now that we have Mr. Huizar's guilty

14   plea and set a status conference for midweek of next week.  Let

10:02AM   15   me look at my list here.  There's a lot of deadlines that are

16   approaching.

17          Mr. Braun, it didn't seem to me that you -- I

18   could be wrong, but I don't know how much you participated in

19   some of these meet-and-confer proceedings, especially with

10:02AM   20   respect to the joint pretrial exhibit stipulation.  I issued a

21   minute order that requires an additional meet and confer and a

22   joint statement.  So I want to make sure that you're aware of

23   those orders and aware of those dates and aware of those

24   deadlines.

10:03AM   25          With respect to the final transcript and

translations deadline, that deadline, according to my notes, is today.  I take it that all those transcripts and translations are now included on the pretrial exhibit stipulation that was filed on January 17th; correct?

10:03AM  MR. JENKINS:  Yes, Your Honor.

THE COURT:  So now it's a matter of designating from those exhibits that which the Government intends to play.

MR. JENKINS:  That is correct, Your Honor.

THE COURT:  All right.  And those are due today.

10:04AM  Are you prepared to deliver them today, or do you want a couple days to take a look at what you're actually going to need?

MR. JENKINS:  My understanding from AUSA Palmer is that we actually have already satisfied that deadline, Your Honor.

10:04AM  THE COURT:  Okay.  So you have those, Mr. Braun?

MR. BRAUN:  I guess I do.  I have been busy interviewing my client.  This is a very complicated case.

THE COURT:  Well, it's not actually that complicated.  I have spent now a considerable amount of time.

10:04AM  Obviously I learned the Shen Zhen scheme and I learned the 940 Hill scheme from sitting through each of those trials.  So in preparation for this trial, I spent some time attempting to educate myself in terms of the Luxe Hotel scheme as well as the Mateo Project scheme.  With respect to the Shen Zhen --

10:05AM  obviously the RICO conspiracy is the RICO conspiracy.  That

1   is -- in terms of complexity, that's complex because it

2   involves many moving parts, but it really consists of the

3   Shen Zhen honest services which your client is charged in

4   Count 2 and in Count 3 and in Count 4.  Those all relate to --

10:06AM   5   at least Counts 2 and 3 relate to the transaction involving the

6   pledge of the collateral or the loan that Mr. Huizar received

7   in order to settle the sexual harassment suit.

8          The one that I had tried to come up to speed on

9   and I basically was relying on the statements, the 302s, and

10:06AM   10   the factual basis for the pleas with respect to Luxe Hotel, and

11   that apparently is a fairly simple set of transactions.  And

12   those are charged in counts -- Count 12 and Count 13.  Those

13   relate to the two checks that Mr. George Chiang issued to

14   Mr. Chan's company for -- and the first one was in October of

10:07AM   15   2017 for $36,432 and the second was December 27, 2017, which

16   is, again, from George Chiang's company Synergy to Mr. Chan's

17   company LABXG in the amount of $33,507.23.  And then Count 14

18   charges the e-mail sent to Mr. Huizar, and then the other is

19   Count 15.

10:08AM   20          What's the Government's theory -- well, first of

21   all, there is no dispute that Mr. Chan or his company, which

22   was created shortly after he retired from the City, received

23   each of these checks; correct?

24          MR. BRAUN:  Six months later, I think.

10:08AM   25          THE COURT:  Pardon me?

```
 1                    MR. BRAUN:  Six months later.

 2                    THE COURT:  In any event, the checks were

 3       received by your client's company.

 4                    MR. BRAUN:  Right.  Right.

 5                    THE COURT:  And those checks, if Mr. Chiang's

 6       testimony is to be believed, those checks were provided to your

 7       client, based upon his testimony, if my memory serves me, for

 8       work that Mr. Chan was doing on behalf of the Luxe Hotel during

 9       the period of time that he was employed as the -- as deputy

10       mayor.

11                    MR. BRAUN:  Your Honor, I think you're going to

12       find this trial very interesting because there will be a lot of

13       it that was not properly presented before --

14                    THE COURT:  That's what I'm trying to understand.

15                    That's Mr. Chiang's testimony, that your client

16       was working on the Luxe Hotel while he was deputy mayor.  He

17       and Mr. Chiang had an arrangement whereby, at that point in

18       time I think that Alliance, Mr. Chan's consulting company, was

19       receiving somewhere in the neighborhood of $35,000 in

20       consulting fees, and then there were three bonus payments if

21       they moved the project along according to those timetables on

22       those projects.  Mr. Chiang's theory is that -- counsel, if you

23       want to have a conversation go outside, and I will take a

24       recess.  But there's no conversations happening during the

25       course of --
```

1    MR. BRAUN:  I was trying to -- you know, you may

2    think it's simple, but I think it's a very complicated case.

3    THE COURT:  I'm just trying to understand it, and

4    that is that the checks were received, and I guess your

10:10AM  5    position is going to be that it was for work that was done

6    after Mr. Chan retired from the County although Mr. Chiang's

7    testimony is going to be different, and that is they had an

8    agreement that they would defer these payments until obviously

9    after Mr. Chan retired as deputy mayor.

10:11AM  10    What I'm missing from the equation here is the

11    official acts that the Government's theory is that Mr. Chan

12    performed in connection with the Luxe Hotel Project.

13    MR. BRAUN:  Let me help you just briefly if I

14    tell you some of the background.

10:11AM  15    I met with Mr. Chan before many times, and then I

16    had some question about, if he told people not to go to Vegas,

17    how could he be charged with aiding and abetting?  If he had

18    nothing to do with the loan, how could he be charged with a

19    loan?  And if you had nothing -- and if you sabotaged and made

10:11AM  20    sure that the PAC money was never paid because it would have

21    violated your ethics, how can you be charged with that?

22    So I said to one of the previous counsel who has

23    gone to Moldova, why don't we have a reverse proffer which I

24    have done a number of times --

10:12AM  25    THE COURT:  That's what I'm asking you for now.

1   Tell me what the reverse proffer is.  What's the theory with

2   respect to the Luxe Hotel?  What did your client do or what did

3   he not do?  You keep saying that the Government's prosecution

4   is not correct, they don't understand it and you want to make a

10:12AM   5   reverse proffer.  What I'm trying to do now is I'm trying to

6   understand what it is your defense is to -- the clearest ones

7   in my mind are the two checks from Synergy which is

8   Mr. Chiang's company to Mr. Chan.

9            MR. BRAUN:  The rules are basically that if you

10:13AM   10   work for the City and you have a discretionary function on a

11   particular project, you were banned for life from ever working

12   on the project, from ever trying to influence someone who has

13   discretion.  But if it's within your department and you're

14   retired, you can't lobby.  And lobby is specifically defined by

10:13AM   15   the municipal code which means you cannot approach someone who

16   has a discretionary as opposed to a ministerial function to

17   suggest that they take a particular action.  So anything that

18   he did within that year was totally lawful.  They should have

19   known this before they indicted my client.

10:13AM   20            THE COURT:  If he's receiving money for taking

21   official actions --

22            MR. BRAUN:  No.  He's taking money for assisting

23   someone else on a project, and it's perfectly okay to call

24   someone in the City and say what is the -- --

10:14AM   25            MR. JEREMY CHAN:  If I may, Your Honor.

1          THE COURT:  No.  You know, Mr. Braun is the lead

2     counsel.  He has always maintained his position with respect to

3     this.  So I just want to hear from him.

4          MR. BRAUN:  That is our position is that he at no

10:14AM   5     time violated any law or took a bribe.  And we have -- the

6     reason I wanted a reverse proffer is I don't think the

7     Government knows that he told Mr. Huizar and Wei Huang that

8     they shouldn't go to Vegas because it looked bad.  For that

9     he's indicted for aiding and abetting.

10:14AM   10          He had nothing to do with the loan because, if

11     you look at the timeline, the loan went at a time that he

12     wasn't even involved.  There's no involvement by him, and he's

13     charged with that.

14          And then he's charged with a PAC, which I don't

10:14AM   15     approve of PAC, where he is the one who basically didn't set it

16     up and he made sure there was never a payment.  So I'm trying

17     to figure what the Government's theory is.

18          If you're a prosecutor -- and I was once many,

19     many years ago -- you simplify a case.  He's a public official.

10:15AM   20     Did he get something in exchange for an official act?  And the

21     answer is no.

22          THE COURT:  All right.  Mr. Jenkins?  Well, let

23     me ask you one final question.  What is the defense to

24     the counts -- the 1001?

10:15AM   25          MR. BRAUN:  My experience with the 1001 is, when

1    they don't have a case, they send someone in to try to get you

2    to say something.  If you look at what he says --

3              MR. JEREMY CHAN:  Sir --

4              MR. BRAUN:  Wait a second.  If you look at what

5    he says and compare it with what the transcript shows, they

6    basically lied to the grand jury.  They removed words like "at

7    that time."  So that's our argument.  There's nothing that he

8    said that was incorrect.

9              THE COURT:  All right.  Mr. Jenkins.

10              MR. JENKINS:  Just briefly, Your Honor.

11              The things he said that were incorrect whereas

12    that he repeatedly said that he was not involved in the

13    orchestration of the loan that ultimately saved

14    Defendant Huizar's career through the $600,000 loan.  He says

15    it numerous times throughout that interview, and the evidence

16    is that he was very much involved and, in fact, he was one of

17    the originators to have Huang provide the loan.

18              And as to the question of Mr. Braun said the

19    answer is no as to what benefits that Mr. Chan got or agreed to

20    get while he was a public official, as the Court pointed out,

21    George Chiang's answer to that is yes.  As the Court pointed

22    out that there's specific checks to him shortly after when he

23    was barred from any contact for working with Hazens, he admits

24    he got paid for helping Hazens.  So he's admitting both to

25    various ethics violations.

1          In addition, as the Court pointed out, it's

2     undisputed that very soon after he leaves the City, he gets

3     paid by the very company that he was helping significantly.

4     And what official acts he -- one, pressuring, advocating to

10:17AM  5     Jose Huizar who took a number of official acts to benefit

6     Hazens and the Luxe Hotel which Chairman Huang, Defendant

7     Chan's associate, and another person that he introduced to

8     Huizar, Chairman Huang for Hazens and Luxe Hotel repeatedly

9     said the process was going too slowly.  He wanted it expedited.

10:17AM  10    And that's in recordings.

11          So David Ambrose, the president of the City

12    Planning Commission, will testify that Ray Chan came to his

13    house and advocated for speeding up the process.  The evidence

14    is that Jose Huizar sped up the process.  And the evidence is

10:18AM  15    that shortly after Defendant Chan left the city, he became

16    enriched from that company, and George Chiang will fill in

17    those gaps.  If the jury believes George Chiang, they will

18    return a guilty verdict.

19          We have additional circumstantial evidence to

10:18AM  20    support that including Defendant Chan lying to the FBI about

21    his role in another scheme related to another chairman.  That,

22    we think, combined both a consistent pattern of helping Chinese

23    developers and using his own relationships with city officials,

24    we are going to argue that he was doing it so -- exactly what

10:18AM  25    happened, so when he left the City, he would be compensated and

1  rewarded based off agreements he made while he was a public

2  official.  That's before we get to the aiding and abetting.

3  But we expect, again, George Chiang to fill in these gaps.

4          One other point, for the record, Mr. Jeremy Chan

10:19AM  5  is not counsel of record.  He's also on the Government witness

6  list.  He's also alleged to be a beneficiary of the scheme.

7          THE COURT:  Who is Jeremy Chan?

8          Oh, you are Jeremy Chan.  Are you an attorney?

9          MR. JEREMY CHAN:  Yes, I am, Your Honor.

10:19AM  10          THE COURT:  Are you representing -- I never

11  understood the relationship.  Counsel is correct.  The

12  Government is going to have evidence that there were payments.

13  I don't understand what the payments to you were for.  Perhaps

14  you can tell us what those payments were for.

10:19AM  15          MR. JEREMY CHAN:  Absolutely, Your Honor.  Should

16  I --

17          THE COURT:  No.  You can sit down.  Just get a

18  microphone.

19          MR. JEREMY CHAN:  So those payments, according to

10:19AM  20  George Chiang's 302s, were from Andy Wang's consulting contract

21  that we had with him for a year.  But this is not -- but while

22  that is his 302, what this was was just a show of gratitude

23  from George Chiang to myself for some of the work I have been

24  helping him with.  He has always shown and provided tokens of

10:20AM  25  appreciation to me throughout the times, and we have a very

 1  unique relationship that is multifaceted as kind of personal,

 2  martial arts related and also professionally.

 3          So I have been assisting him with various issues

 4  with compensation, and he took that upon himself to -- because

10:20AM  5  of the unique circumstances in my life that we can explain in

 6  greater detail later on, he chose to, you know, show his

 7  appreciation to me.

 8          MR. BRAUN:  You know, we tried to stay out of

 9  the -- there seems to be a -- there's something called a red

10:20AM 10  pocket in Chinese culture that it's customary to show your

11  appreciation.  This is a difficult thing for someone outside of

12  the Chinese culture to understand.  I'm not going to make a big

13  deal about it.  Obviously, Mr. Ray Chan knew nothing about

14  this, what his son was doing.

10:21AM 15          MR. JEREMY CHAN:  That is also true, Your Honor.

16          MR. BRAUN:  He is also a lawyer licensed, and

17  he's also an expert on building and real estate.  They're

18  trying to say that anything that was paid by anyone to any

19  relative is a payment for something.

10:21AM 20          Your Honor, my client worked with the City for

21  33 years.  They did not do a search warrant on his house.  They

22  had an undercover working with him who he worked with for a

23  year for nothing as a favor, Mr. Wang.  They wiretapped.

24          You would think that if he had gotten anything in

10:21AM 25  exchange for anything, that they would have something.  I think

1    they just threw this case on him figuring maybe he will lead us

2    to the mayor's office or something.  That's what I thought.

3    Maybe I was wrong.  But I thought, hey, you're going to be

4    charged because you're Chinese descent and you're the deputy

5    mayor and they're ambitious.  So that's why I asked for a

6    reverse proffer.

7              I've never had a reverse proffer that didn't

8    result in a disposition because, you know, clients do lie to

9    us.  That's what the reverse proffer is about.  It takes less

10   than an hour, and they tell you what their theory is.

11             THE COURT:  Mr. Jenkins, are you willing to have

12   a reverse proffer?

13             MR. BRAUN:  We had one, yes, Your Honor.

14             THE COURT:  Oh, you had one.

15             MR. BRAUN:  After the Indictment.  We had it last

16   week.  But that doesn't do you any good because they have

17   already leaked to the press his name even before they charged

18   him.  That was in the press that someone leaked the search

19   warrant.

20             You would think that given his 33 years with the

21   City, they would have something that he got.  This theory --

22   they have some theory that he with Huizar blocked a

23   consolidation of the Planning Department and the Building

24   Department in the City of Los Angeles.  I have interviewed a

25   number of people, and the industry was against it because his

        1    department was very efficient and the Planning Department was

        2    very slow.

        3                THE COURT:  Well, that's all irrelevant.  What

        4    difference does that make?

10:23AM   5                MR. BRAUN:  They said the purpose of that

        6    agreement was to save his job.  It wasn't.  The purpose of his

        7    agreement was they had a friend of the former mayor who wasn't

        8    qualified.

        9                THE COURT:  What about Daron Williams?

10:23AM  10                MR. BRAUN:  He fired Daron Williams.

       11                THE COURT:  Pardon me?

       12                MR. BRAUN:  He was fired.  He was related to

       13    somebody.  He was hired to do some work.  He didn't do the work

       14    properly, and they fired him.

10:23AM  15                THE COURT:  Wasn't he asked by your client to

       16    speak with Ms. Guerrero to put pressure on the

       17    Planning Commission to approve Luxe?

       18                MR. BRAUN:  No.

       19                THE COURT:  No?

10:23AM  20                MR. BRAUN:  No.

       21                THE COURT:  Mr. Chan and Mr. Williams's relative,

       22    didn't they meet to discuss a consulting agreement where

       23    Mr. Chiang on behalf of the CC Investment Company, which

       24    apparently is the company that was created between Chan and

10:24AM  25    Chiang, there was a consulting agreement for $1,000 a month for

1    four months?  That didn't happen?

2              MR. JEREMY CHAN:  Your Honor, you're correct.

3    That did happen.  But that was -- we will at trial show you and

4    provide as exhibits all the different work product that

10:24AM   5    Mr. Ron Williams, Jr., prepared.  So this was a legitimate work

6    arrangement where he was to provide a feasibility analysis for

7    real estate opportunities in Southern California and various

8    properties that would impact real estate value.

9              THE COURT:  So it's like the phony real estate

10:24AM  10    reports that were --

11              MR. JEREMY CHAN:  No, sir.  This was focused on

12    rent control ordinances.  This was not a phony business.  We

13    have evidence to show this was a legitimate arrangement where

14    staff members from my father's office was, you know, working

10:25AM  15    with this consultant --

16              THE COURT:  Is Mr. Chan your father?

17              MR. JEREMY CHAN:  Yes, sir.

18              THE COURT:  For all of what I read, I couldn't

19    understand what the relationship was.  Some new piece of

10:25AM  20    information then.

21              What about Jacinto, J-a-c-i-n-t-o, that

22    apparently Mr. Chan told Andy Wang --

23              MR. JEREMY CHAN:  No, Your Honor.

24              THE COURT:  -- to pay some money.  He oversaw the

10:25AM  25    Bureau of Engineering and he can help with issues for the

1    Luxe Hotel.  That didn't happen?

2                MR. JEREMY CHAN:  No, Your Honor.

3                Respectfully, I apologize for interrupting you

4    earlier.  It was Andy Wang who was asking for assistance and

10:26AM   5    recommendations for people who were qualified to help him

6    market his product.

7                THE COURT:  I understand that.  This is something

8    specific that apparently Jacinto was on the Bureau of

9    Engineering, and at least somebody is going to testify that

10:26AM  10    Mr. Chan had Andy Wang pay him some money so they would have

11    approvals from the Bureau of Engineering.

12                Then I didn't realize -- this one actually came

13    as a shock that, Shawn -- is it Kuk who worked in Huizar's

14    office?

10:26AM  15                MR. BRAUN:  That was the person they tried to

16    bribe three times, and he kept turning the money down.  Three

17    times they offered him $10,000.  They got money from the

18    Government.

19                THE COURT:  What are you talking about now,

10:27AM  20    Mr. Braun?

21                MR. BRAUN:  Shawn Kuk.  They tried to bribe him.

22                THE COURT:  Who tried to bribe him?

23                MR. BRAUN:  The agents, the Government.  He

24    turned it down even though he needed the money.  He was going

10:27AM  25    through a divorce.

1          MR. JENKINS:  To answer the Court's question --

2          THE COURT:  Sure.

3          MR. JENKINS:  -- Shawn Kuk at the time was the

4    planning director for Jose Huizar.

10:27AM   5          THE COURT:  I remember he testified.

6          MR. JENKINS:  Correct.  And he will testify again

7    that Ray Chan attempted to bribe him.

8          THE COURT:  In what way?

9          MR. JENKINS:  By trying to funnel a $10,000

10:27AM  10   payment.

11         THE COURT:  Through his mother?

12         MR. JENKINS:  First to his mother.  Actually, I

13   believe it was first to his brother and then second to his

14   mother and ultimately to Shawn Kuk who turned down the offer

10:27AM  15   from Ray Chan to pay through Andy Wang that money.

16         So, again, consistent with the Court's question,

17   there's the Joe DiSento, there's Shawn Kuk, there's

18   Deron Williams, all of them either public officials themselves

19   or related to public officials that's on top of the Hazens

10:28AM  20   payments he received.

21         MR. BRAUN:  That is 10,000 of the Government's

22   money that they got.  We have the --

23         MR. JENKINS:  That is correct.

24         MR. JEREMY CHAN:  Your Honor, very quickly --

10:28AM  25         THE COURT:  Hold on.  I have one final one.  This

```
 1    is Overt Act 450.  Mr. Chan in November of 2018 drafted a
 2    script for Andy Wang covering Mr. Chan's version of the facts
 3    with respect to having -- characterizing the money as a
 4    finder's fee to be paid to Shawn Kuk.
 5                    That never happened?
 6                    MR. JEREMY CHAN:  Your Honor, that did happen.
 7    What I would like to clarify is that this was never a script to
 8    give to Andy Wang.  This was a document prepared for Andy Wang
 9    to give to his attorney because Andy Wang approached my father
10    saying that he had received a subpoena and he was very nervous
11    and the script was -- the alleged script is just a recounting
12    of events for his attorney.
13                    THE COURT:  Here it is.  So Synergy paid you,
14    Jeremy Chan, $19,000 for work while your father was deputy
15    mayor; is that correct?  What is this $19,000 for?
16                    MR. JEREMY CHAN:  I cannot recall at this moment,
17    sir.
18                    THE COURT:  You can't recall what it's for?
19                    MR. JEREMY CHAN:  Not the specific amount,
20    Your Honor.
21                    THE COURT:  Okay.  Well, in general, in the
22    neighborhood of $20,000.  Synergy was Chiang's company;
23    correct?
24                    MR. JEREMY CHAN:  Correct, sir.
25                    THE COURT:  There's a -- my notes have a recap
```

        1    that -- first of all, Hazens, which is the owner and developer

        2    of the Luxe Hotel, paid $772,000 in consulting fees.  It seems

        3    like everybody was hitting up Hazens for fees to get this

        4    project approved.  But Synergy paid Mr. Chan's company --

10:30AM 5                    MR. BRAUN:  My client has an explanation --

        6                    THE COURT:  -- $93,939.  Is that accurate?

        7                    MR. BRAUN:  My client wants to address the Court.

        8    He's got to understand anything he says can be used against

        9    him.

10:30AM 10                   THE COURT:  No.  I don't want your client to --

        11   now he has two lawyers.

        12                   MR. BRAUN:  Your Honor, I should go back to the

        13   RICO because that's going to involve everything --

        14                   THE COURT:  The RICO, that to me -- I'm trying to

10:30AM 15   focus now on what I view to be not very complex transactions.

        16   It's limited to a very discrete number of witnesses.  You've

        17   got Chiang, George Chiang, who is primarily the witness against

        18   Mr. Chan as it relates to the honest services counts involving

        19   the Luxe Hotel.  Those transactions don't appear to be that

10:31AM 20   difficult to figure out.

        21                   The Government at least -- I was trying to piece

        22   all this together.  But it looks like there are -- so all of

        23   those bonuses were actually realized.  Chiang received the

        24   first bonus of $100,000 for reaching the Planning Department in

10:32AM 25   May of 2017, then the second bonus of 150,000 for the

          1   hearing -- CPC hearings in October of 2017.  Then the third

          2   bonus was in December of 2017, 185,000.

          3              MR. BRAUN:  He had that client long before my

          4   client ever left the City.

10:32AM   5              THE COURT:  Who had that client?

          6              MR. BRAUN:  George Chiang.  Not my client.

          7              THE COURT:  I thought the history of Mr. Chan and

          8   Mr. George Chiang, according to his 302s or the factual

          9   basis -- and, again, I apologize.  I can't remember the source

10:32AM  10   of all this material.  I was just trying to get a grasp of it.

         11   But it was Mr. Chan who actually had conversations with

         12   Mr. Chiang and asked him if he wanted to focus his consulting

         13   activities to Downtown Los Angeles development projects that --

         14   at that point in time, there were numerous Chinese developers

10:33AM  15   who wanted to get into L.A. and Mr. Chan was -- offered to

         16   Mr. Chiang to introduce him to various of those developers.

         17   There is certainly nothing wrong with that.  Is that how the

         18   relationship starts?

         19              MR. BRAUN:  It started, Your Honor -- my client

10:33AM  20   is what they call a sifu.  He basically is the head of a

         21   martial arts group which is more like a social group, a family.

         22   And that's how they got to know each other.  So, of course,

         23   they were trying to bring him in.  This case has cost the City

         24   of Los Angeles, in my opinion, at least $4 billion --

10:33AM  25              THE COURT:  You know, all of this stuff is really

1   irrelevant.  You have all of these theories about who did what

2   to who and what the city did and the cost to the city.  None of

3   that is going to come into evidence.

4          MR. BRAUN:  What's relevant is did my client do

5   something in an official capacity in exchange for money?

6          THE COURT:  Right.

7          MR. BRAUN:  It's a simple case.

8          THE COURT:  That's my point.  That's what I'm

9   trying to get through.

10         MR. JEREMY CHAN:  Very briefly, I understand --

11         THE COURT:  No, counsel.  We're not going to --

12   I'm going to conclude this because the court reporter has had a

13   long morning and we're not getting anywhere.

14         So what I'm going to do is I'm going to let

15   everybody take a couple steps backwards, and I want to make

16   sure that Mr. Braun is onboard -- not onboard but is aware of

17   these various dates.  I take it, since you're not a fan of

18   motions in limine, that you're also not a fan of making

19   frivolous objections to the Government's trial exhibits.

20         MR. BRAUN:  Well, I just joined all of the

21   exhibits that the public defender had.  I have to re-evaluate

22   our situation now because I only found out at 4:00 o'clock

23   yesterday that they were entering a plea.

24         THE COURT:  That's why I want to take a step

25   backwards because a lot of these exhibits to me it seems that

the objections were frivolous.  So I sent out the joint

statement -- order which required the joint statement to be

filed by February 1st.  But I want counsel to start focusing on

these exhibits and dealing as -- Mr. Braun, you've been doing

this a long time, and you're a very good lawyer, and you know

what's important and what's not important.  A lot of these

boilerplate objections to the joint pretrial exhibit

stipulation just seem to me to be boilerplate.  Once you

actually take a look at them, I think a lot of those will be

resolved.

          So I'm going to continue this -- I'm going to set

a status conference for next week on Wednesday, January 25th at

8:00 o'clock.

          How is that on counsel's calendars?

          MR. JENKINS:  We will make it work, Your Honor.

We will be there.

          THE COURT:  Mr. Braun?

          MR. BRAUN:  That's fine, Your Honor.

          THE COURT:  Okay.  What I hope to accomplish is

to find out and give the Government an opportunity to refocus

its -- the contours of this trial so hopefully get a better

idea of the trial estimate and get Mr. Braun onboard taking a

look at these exhibits.  And I'm going to be issuing today or

Monday some orders with respect to the defense exhibits.

          While I'm on that subject, how many defense

1   exhibits do you think you're going to have?

2            MR. BRAUN:  We think there's about 800, but

3   90 percent of them are Government exhibits.

4            THE COURT:  That's why this process is going to

10:37AM   5   be very important because, to the extent you're going to be

6   relying on Government's exhibits and the public defender had

7   objected to a Government exhibit but you want to use it, then

8   that objection seems to me will be resolved.

9            MR. BRAUN:  Yeah.

10:37AM   10            THE COURT:  Okay.  And how many witnesses are you

11   intending to call?

12            MR. BRAUN:  I actually interviewed 15 that are

13   noncharacter witnesses, and I've got four more that would be

14   straight character witnesses.

10:37AM   15            THE COURT:  All right.  And those -- have you

16   made a decision in terms of who you're going to call?

17            MR. BRAUN:  Not yet.

18            THE COURT:  Okay.  Because those are due on

19   February 13th.

10:37AM   20            So I encourage you folks to get together and talk

21   about the trial, the documents, and the witnesses, and where

22   we're going to go with this case.  And then on Wednesday we can

23   have an additional conversation.

24            MR. BRAUN:  I noticed on your order you said in

10:38AM   25   person.  I thought that was --

1        THE COURT:  I said what?

2        MR. BRAUN:  In person.  You didn't want us to

3   meet by phone.

4        THE COURT:  Right.  Everything is in person.

5        MR. BRAUN:  Okay.  I came to their office for the

6   reverse proffer.  They are invited to my office.

7        THE COURT:  No.  Because the Government has all

8   the exhibits.  So the meet and confer is in the Government's

9   office.

10       How many binders are there?  I know Shen Zhen had

11  I think six binders.  What are we talking about in terms of

12  binders?

13       MR. JENKINS:  It might have been six binders, but

14  now because we're going to cut a significant amount of --

15       THE COURT:  Just an estimate.

16       MR. JENKINS:  Right now it's in the range of six

17  to eight binders, and that's one of the things we're

18  evaluating.

19       THE COURT:  Okay.

20       MR. JENKINS:  Close to eight binders right now.

21       THE COURT:  Sometime next week I'm going to ask

22  you to deliver copies of the trial exhibits.  So when I'm

23  looking at this joint statement -- I can't make a determination

24  without looking at the exhibits.  I don't want to ask you to do

25  that now, but I want this process to work out.  And then at a

1    convenient time when things solidify, then I'm going to ask you

2    to deliver courtesy copies of the trial exhibits.

3         MR. JENKINS:  And we will do that, Your Honor.

4    One -- to make the process more smooth, there's going to be a

10:39AM  5    lot of exhibits we're taking out.  So the question is whether

6    we should renumber things or how do you want to do it.  We may

7    need more time to make sure we give you and Mr. Braun not eight

8    binders and we're only going to use two.  If we can have a

9    little more time to figure out to basically cut as much as

10:39AM  10   possible.

11        THE COURT:  Why don't you do this.  Between now

12   and next Wednesday, get an idea of the cuts and what you want

13   to do, and on Wednesday we can talk about it.  If it makes more

14   sense to have a new clean exhibit list renumbered, we can just

10:40AM  15   trash the first one and start anew, and that will be easier for

16   Mr. Braun and be easier for the Government and certainly be

17   easier for me.

18        MR. JENKINS:  I'm sorry to interrupt.  Yes.  That

19   makes sense.

10:40AM  20        THE COURT:  Mr. Braun, are you onboard with that?

21        MR. BRAUN:  Yes.  There's only one other thing.

22   If you are going to instruct the jury on that Wei Huang's not

23   being here is going to be evidence, that might involve a few

24   more witnesses.

10:40AM  25        MR. JENKINS:  Just to be clear, Your Honor, there

1    was no such instruction.  There was a ruling.  You never

2    instructed on the fugitive status.

3              THE COURT:  Right.  The jury instructions are

4    another item that comes later in the deadline list.  So let's

10:40AM    5    just take baby steps now and try to get the exhibits resolved

6    because to me that's the most important because that makes the

7    trial go a lot smoother, and then we can take up these other

8    issues.

9              Mr. Braun, I can tell you that a lot of what

10:41AM   10    you're articulating today may be interesting, but I don't see

11   how it will be admissible at trial.

12             MR. BRAUN:  The only thing is Count 1, the RICO,

13   basically involves everything.

14             THE COURT:  Right.

10:41AM   15             MR. BRAUN:  So that means that everything that

16   counsel talked about with Mr. Huizar is going to come in

17   because it's being used against my client.  He was indicted by

18   the grand jury, and they basically defined what the parameters

19   of the --

10:41AM   20             THE COURT:  Maybe the Government will decide that

21   they're just going to go after the honest services and the

22   federal program bribery counts and the false statement count

23   and not go after the RICO.

24             MR. BRAUN:  That would be reasonable, but I don't

10:41AM   25   think they will do that.

1            THE COURT:  Or maybe you can consider attempting

2    to resolve the case with the Government on a reasonable basis,

3    but that's not for me.  I can't involve myself in those

4    conversations.

10:42AM   5            In any event, it's been a long morning.  Have a

6    good weekend.  We will see you Wednesday at 8:00.

7            MR. JENKINS:  Thank you, Your Honor.

8            (Proceedings concluded at 10:42 a.m.)

1        CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5        I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15        DATED THIS  29TH  DAY OF JANUARY, 2023.

16

17

18        /S/ MIRANDA ALGORRI

19        _____
          MIRANDA ALGORRI, CSR NO. 12743, CRR
20        FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25