1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,        )
                                      )
6            PLAINTIFF,               )     CASE NO.
                                      )
7            vs.                      )     CR 20-326(A)-JFW
                                      )
8    RAYMOND SHE WAH CHAN,            )
                                      )     PAGES 1 TO 58
9            DEFENDANT.               )
     _____   )

10

11

12

13                 **REPORTER'S TRANSCRIPT OF**
                         **STATUS CONFERENCE**
14             **WEDNESDAY, JANUARY 25, 2023**
                         **8:01 A.M.**
15               **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22    _____

23          **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
               FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, SUITE 4455
               LOS ANGELES, CALIFORNIA 90012
25               MIRANDAALGORRI@GMAIL.COM

1 |                     **APPEARANCES OF COUNSEL:**

2

3 | **FOR THE PLAINTIFF:**

4 |       MARTIN ESTRADA
        UNITED STATES ATTORNEY
5 |       BY:  MACK JENKINS
        BY:  CASSIE PALMER
6 |       BY:  SUSAN HAR
        BY:  BRIAN FAERSTEIN
7 |       Assistant United States Attorneys
        United States Courthouse
8 |       312 North Spring Street
        Los Angeles, California 90012
9

10 | **FOR DEFENDANT CHAN:**

11 |       BRAUN & BRAUN, LLP
        BY:  HARLAND W. BRAUN
12 |       10880 Wilshire Boulevard
        Suite 1020
13 |       Los Angeles, California 90024

14 | Also Present:

15 |       Special Agent Andrew Civetti

16

17

18

19

20

21

22

23

24

25

**LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 25, 2023**

**8:01 A.M.**

**---**

08:01AM    THE CLERK:  Calling CR 20-326(A)-JFW,
United States of America versus Raymond She Wah Chan.

Counsel, please state your appearance.

MR. JENKINS:  Good morning, Your Honor.

Mack Jenkins, Cassie Palmer, Susan Har, and
08:01AM    Brian Faerstein on behalf of the United States.  Joining me at
counsel table is Andrew Civetti of the FBI to my right.

MR. BRAUN:  Good morning, Your Honor.

Harland Braun, B-r-a-u-n, at counsel table with
my client Ray Chan and my co-counsel Brendan Pratt.

08:02AM    THE COURT:  All right.  Has Mr. Pratt filed a
Notice of Appearance?

MR. PRATT:  Yes, Your Honor.

THE COURT:  When did you do that?

MR. PRATT:  I want to stay around a month and a
08:02AM    half ago, two months ago.

THE COURT:  All right.  Good morning to all.
This matter is on the Court's calendar for an additional status
conference.  At the status conference last Friday,
January 20th, we discussed several case management issues,
08:02AM    specifically, the trial exhibits that the Government will offer

1    and the number of witnesses that the Government will call now

2    that the case will proceed only as to Mr. Chan.

3              The current status of the trial exhibits, counsel

4    filed a joint pretrial exhibit stipulation on January 17th

08:03AM    5    which appears as Docket No. 907 which listed trial Exhibits 1

6    through 1071.  Because of the extraordinary number of

7    objections, I issued a minute order on January 18th which

8    appears as Docket No. 908 requiring the parties to meet and

9    confer and resolve the objections and, to the extent any

08:03AM   10    objections remain, to file a joint statement on or before

11    February 1st.

12              As a result of the -- Mr. Huizar's guilty plea,

13    the Government advised that it would be reviewing its trial

14    plan and perhaps make certain modifications as to the number of

08:04AM   15    trial exhibits it would offer and the number of witnesses that

16    it would call.

17              During our discussions on Friday, Mr. Jenkins

18    raised the issue whether the Government should simply file a

19    new exhibit list or modify the existing joint pretrial exhibit

08:04AM   20    stipulation, and I deferred that discussion until today based

21    upon the Government's review of its exhibits.  And I have been

22    provided now apparently with a list of -- a new -- I've never

23    had a witness list.  But with a list of witnesses that the

24    Government intends to call listing some 23 witnesses and four

08:05AM   25    additional witnesses that will be called in absence of a

1    stipulation.

2              That answers one question although I don't know

3    what the number of witnesses that the Government expected to

4    call in the joint trial, but it's really not relevant.

08:05AM  5              MR. JENKINS:  It's only relevant to show we had

6    significantly cut it.  It was at one time 75, and the most

7    recent provided to the defense a few weeks ago was 50

8    witnesses.  So this is less than half of that most recent

9    number in the joint trial.

08:06AM  10             THE COURT:  And we're continuing to move

11   downward.

12             MR. JENKINS:  Yes, Your Honor.  That is a

13   continuing downward trend, and this is still the outer bounds

14   of the witnesses.  But I think we're getting very close to the

08:06AM  15   final, final.

16             THE COURT:  What about the trial exhibits?

17             MR. JENKINS:  The trial exhibits similarly are

18   following a downward trajectory.  It's still a voluminous

19   process.  Originally the Court pointed out there was around a

08:06AM  20   thousand and something exhibit numbers.  There are actually

21   1,200 exhibit items meaning, for exhibits that have multiple

22   parts, there would be for a text chain would be given one

23   exhibit number but actually would be several different

24   exhibits, 1000A, 1000B.  So we're doing it to be most specific

08:06AM  25   by exhibit items.

```
  1              Most recently there were 1,210.  Now we're down
  2   to 768 exhibit items.  And just to reflect the significance
  3   there, originally the exhibit list was around 164 pages, and it
  4   is now approximately 75 pages.
  5              THE COURT:  All right.
  6              MR. JENKINS:  We provided that most recent list
  7   to Mr. Braun but late last night, I believe.
  8              MR. BRAUN:  I received it late last night.
  9              THE COURT:  If you will go to the lectern because
 10   I can't hear you with the microphone so far away.
 11              MR. BRAUN:  We got it late last night.  I haven't
 12   had a chance to look at it.  We plan to go through their
 13   exhibits and --
 14              THE COURT:  Pull the lectern up so the microphone
 15   is close to you so we can hear what you have to say.
 16              MR. BRAUN:  So we plan to look through their
 17   exhibit list and see what we need, and we will tell them what
 18   additional witnesses -- which exhibits we have.  But we just
 19   got that late last night as well.
 20              THE COURT:  I understand that.  I'm not trying
 21   to -- I'm just trying to get a sense of where we are.
 22              What I thought about -- what I decided over the
 23   weekend is I think that it would probably be better or make
 24   more sense for the Government to prepare an entirely new
 25   witness list then --
```

1              MR. JENKINS:  Do you mean exhibit list,

2     Your Honor?

3              THE COURT:  I'm sorry.  Exhibit list.  Because

4     then you can provide that list although it appears you have

08:08AM   5     already provided it to Mr. Braun.  But based upon what

6     Mr. Braun indicated on Friday, that -- with respect to his

7     exhibits, that he was going to be primarily relying on a lot of

8     the Government's exhibits.  And I made the suggestion that, in

9     light of that, I assume that Mr. Braun is not going to be

08:08AM  10     objecting to certain of the trial exhibits that the Government

11     intends to offer.

12              So it seems to me that with the new list and a

13     new review by Mr. Braun, that a lot of the previous objections,

14     which I think were primarily boilerplate objections that were

08:09AM  15     asserted by the public defender representing Mr. Huizar, can

16     and should be resolved.

17              So I think since you have provided that list,

18     Mr. Braun obviously needs an opportunity to go over that list.

19              Are the exhibit numbers different in this new

08:09AM  20     list?

21              MR. JENKINS:  Your Honor, the answer is both.  So

22     AUSA Palmer provided yesterday at 6:00 p.m. a list of newly

23     numbered exhibits.  So there is a new list consolidated,

24     minimized that have new exhibit numbers.  And she also included

08:09AM  25     the cross-references to the prior exhibit numbers so Mr. Braun

can track, to the extent that this one he interposes any
objections, but to compare to the prior list where the F.P.D.s
put their objections, he will be able to see those numbers and
then the new numbers.

08:10AM          THE COURT:  Okay.  So I think then what makes
sense is to start with the newly numbered exhibit list which
has now been provided to Mr. Braun, let Mr. Braun have an
opportunity to digest those exhibits and provide the Government
with any objections he may have to those exhibits.  I would
08:10AM  expect that could be accomplished by February 1st.  And then
counsel file a joint pretrial exhibit stipulation with respect
to only the new exhibits and the new exhibit numbers by
February 3rd and then meet and confer with respect to those
objections and file a joint statement as required by the
08:11AM  Court's January 18th minute order by February 10th.

          So I think that new timetable will give everybody
an opportunity to review the exhibits, the objections, and to
prepare a joint statement.

          MR. BRAUN:  Yes, Your Honor.

08:11AM          MR. JENKINS:  Yes, Your Honor.  We will make that
work.

          THE COURT:  Okay.  With respect to the format of
the joint pretrial exhibit stipulation that is now going to be
filed, one of the issues I was going to discuss on Friday but
08:12AM  didn't have an opportunity to do so was I didn't understand the

```
 1    format of the joint pretrial exhibit stipulation which was
 2    filed on January 17th.  There were six columns.  Obviously the
 3    first column was the number of the exhibit, and then there was
 4    a column for prior trial.
 5            I'm looking at Exhibit No. 1 which is the
 6    photographs of relevant persons, and there is a reference to
 7    the Lee trial.  I did not see any separate column for any
 8    objection that had been made to any of the exhibits in the
 9    prior trial or the Court's ruling on those exhibits.  And it
10    looks like -- I'm now looking at Exhibit 21A -- that counsel
11    intended to include that information in the column for the
12    Huizar objections which the one I'm looking at says, "The
13    940/Lee Motion in Limine No. 2, Esparza notes, hearsay, Court
14    denied."  And then the Government's response to -- I guess it's
15    the continued objection on hearsay grounds.  It's the
16    Government's opposition 940/Lee Motion in Limine No. 2.  That's
17    not very helpful.
18            The other problem I have with the format of the
19    pretrial exhibit stipulation is -- and I'm looking at, for
20    example, Exhibit No. 47 which is a May 18, 2015, e-mail and
21    spreadsheets.  The Huizar objection was hearsay and the
22    Government's response citing to Federal Rule of Evidence
23    801(d)(2)(E).
24            That is not very helpful in terms of trying to
25    determine what the specific hearsay objection is.  And in the
```

08:12AM (line 5)
08:13AM (line 10)
08:13AM (line 15)
08:14AM (line 20)
08:14AM (line 25)

1    next iteration of the joint pretrial exhibit stipulation, the

2    objection should be more specific, i.e., if it's hearsay, for

3    example, it's not in furtherance of the scheme or the parties

4    are not members of the conspiracy and then the Government's

08:15AM    5    response to that objection.  Just simply raising a hearsay

6    objection doesn't help me make a determination in terms of what

7    really is at issue with respect to the particular exhibit.

8              I realize that the joint statement will provide

9    some assistance to that, but I think initially there ought to

08:15AM   10    be more specificity in terms of what the basis of these hearsay

11    objections are and the Government's response.  And, of course,

12    I have a further discussion or argument in support of each

13    party's position in the joint statement.  So please keep that

14    in mind.

08:16AM   15              I think in terms of format that the -- there

16    should be a final column somewhat the same way we did in I

17    believe it was the Shen Zhen stipulation where that final

18    column has the information with respect to the prior trial, the

19    Court's ruling.  And it will be helpful to include, if it's in

08:16AM   20    the Lee trial, the Lee trial exhibit number, the objection, and

21    the ruling or, if it's Shen Zhen, the exhibit number and the

22    ruling, although adding the exhibit number probably isn't that

23    helpful.

24              MR. JENKINS:  Your Honor, my --

08:16AM   25              THE COURT:  Sure.

1          MR. JENKINS:  So I think just to clarify, the

2     reason those original -- so the first column question, when it

3     said "prior trial," that was really more internally between us

4     and the Federal Public Defender's Office to let them know, for

08:17AM    5     example, these exhibits were admitted previously to suggest to

6     them the likelihood they will be admitted again.  So it's

7     really internal reference points for them.

8          The other column you're mentioning is part of our

9     agreement is they wouldn't relitigate certain motions in limine

08:17AM   10     but they wanted to preserve those objections.  So those are

11     sort of record maintaining for the P.D.s to include that so

12     they weren't waiving any objections and to note their position

13     there.  And then we did include where the Court denied it so

14     the Court wouldn't have to relook at those ones.

08:17AM   15          So it's those -- if the Court wants -- what the

16     Court has asked for, we can do that, but just sort of put the

17     context in why those columns were there.  Obviously it may

18     change depending on Mr. Braun's or Mr. Chan's objections to the

19     extent they are relevant.  A lot of it was to try to help

08:18AM   20     facilitate the P.D.'s, focus their objections on things the

21     Court hasn't ruled on before.

22          THE COURT:  I don't have any problem with that

23     now that I understand it because, to the extent I need more

24     clarification as to a specific -- continued specific objection,

08:18AM   25     I can pick that up in the joint statement.  But as to those

```
 1    exhibits that don't -- that were not dealt with in prior trial
 2    or prior motions in limine, I do think it's important to have
 3    more specificity in terms of the defendant's objection, for
 4    example, foundation objection, what's missing from the
 5    foundation and, as I said, the hearsay with some definition or
 6    specificity in terms of why it is hearsay.
 7              So I will let you try to remember what we did in
 8    Shen Zhen -- I don't think I brought that.  Yes, I did.  The
 9    Government's trial exhibit list with party's position which is
10    Docket No. 765 --
11              MR. BRAUN:  Your Honor, I think this is going to
12    be a lot easier, this new trial, because we're not going to --
13    mostly we will be adding things that they can object to and we
14    might want to -- there may be some e-mails that are not
15    complete.  So I don't think it's going to be a huge issue.  We
16    were with the public defender, and we were basically just going
17    along with them.  So I think it will be simpler --
18              THE COURT:  I hope so.  I guess the proof of that
19    will be when I see the pretrial exhibit stipulation.
20              With respect to defense exhibits, I was going to
21    issue an order today similar to what I have done in the Lee
22    case and in the Shen Zhen case because your exhibits --
23    obviously, if you're in a position to provide your exhibits
24    earlier.  But according to the worksheet that I have, the
25    defense list is not due until February 15th.  But if you're
```

```
 1   prepared to provide that exhibit list -- and I think it should
 2   be a separate exhibit list -- to the Government because what
 3   I'm going to then order is, similar to what we have done with
 4   respect to the Government's exhibits, order the Government and
 5   Mr. Braun to meet and confer and prepare a joint statement or
 6   prepare a pretrial exhibit stipulation with respect to the
 7   defense exhibits.  Then depending upon the number of
 8   objections, I may order a meet and confer so I can have a
 9   better understanding of those exhibits.
10             But I don't want to include defense exhibits in
11   the Government's exhibit list.  I want the Government to have
12   its separate exhibit list with its separate numbering.
13             And, Mr. Braun, you should have your separate
14   defense exhibit list picking up with where the Government
15   ends -- I will let you pick the number.  Start with
16   Exhibit No. 1500.  That way it will be clear what the defense
17   exhibits are and what the Government's exhibits are.  As you
18   point out, I think there will be a lot less objections to these
19   exhibits.
20             So on the Government's exhibits, now that you're
21   using a new set of numbers, are you also -- had you also put
22   the labels on the exhibits, or do you have to relabel each of
23   those exhibits now?
24             MR. JENKINS:  Yes.  We have to relabel each
25   exhibit.
```

08:21AM (line 5)
08:21AM (line 10)
08:21AM (line 15)
08:22AM (line 20)
08:22AM (line 25)

THE COURT:  Okay.  So this schedule will give you time to do all that?  Because I'm going to ask at some point in time for courtesy copies to come to chambers.  I'm not going to set a date for that now because I really don't need them until I actually see what remaining disputes there are with respect to exhibits.

MR. JENKINS:  Understood, Your Honor.  We will be able to do that.

THE COURT:  All right.  So that takes care of the trial exhibits.  Hopefully we're -- the objections will come down -- will be a manageable number of objections.

I think in the -- actually, in the Lee case and the Shen Zhen case, most of the exhibits after all of the meet-and-confer process were basically agreed to.

MR. JENKINS:  That is accurate, Your Honor.

THE COURT:  All right.  With respect to the -- the next issue that I have is another case management issue with respect to the transcripts and the translations.  My notes from our status conference on Friday indicate that the Government had delivered the final transcripts and final translations to defense counsel by the deadline of January 20th which was Friday.  But we didn't have any discussion with respect to any objections that the defense may have had to the Government's designations.

And I don't know -- in the order which we're

```
 1   operating under which is Docket No. 441 which set up this
 2   schedule of various events, there was no -- the final
 3   transcripts and translations were -- the deadline to produce
 4   those was January 20th which the Government has complied with.
 5   But there was no follow-up with respect to any procedure
 6   regarding any objections that the defense may have to those
 7   translations or those designations.
 8               So I don't know if counsel had worked out an
 9   agreement with respect to that or if you're relying on the
10   Court's Criminal Trial Order which was issued at the outset of
11   the case which appears as Docket No. 51 which set up the
12   procedure for the exchange and the -- a timetable for
13   objections.
14               MR. JENKINS:  We do not have an agreement,
15   Your Honor.  I think a schedule makes sense.  Whether the Court
16   wants us to follow the standing order or set a separate one, we
17   did provide, in fact, in advance on the 16th we provided those
18   final transcripts.  We're ahead of schedule.  I don't know if
19   Mr. Braun and Mr. Pratt have had the time to review, but it
20   does make sense to set a schedule, or we will comply with the
21   standing order, Your Honor.
22               THE COURT:  Well, standing order -- the Criminal
23   Trial Order gave four calendar days after disclosure to provide
24   objections which it's over today.  So I'm not going to keep
25   that -- I will let you folks agree on a schedule, and maybe the
```

```
 1    schedule is consistent with the schedule that I have just

 2    established for the trial exhibits because all of these are

 3    part of the trial exhibits.  So I think that probably makes

 4    most sense.

 5              Mr. Braun, do you agree?

 6              MR. BRAUN:  Yes, Your Honor.

 7              THE COURT:  All right.  So why don't we just use

 8    that schedule for the objections to the transcripts and/or

 9    translations.

10              MR. JENKINS:  Understood, Your Honor.  That

11    schedule works for us.

12              THE COURT:  All right.  And one of the items that

13    I want to mention is that under the Criminal Trial Order I have

14    a provision in there for the in-camera filings.  As I did in

15    both the Lee case and the Shen Zhen case, I'm removing that

16    requirement.  There are no in-camera filings.  So I don't want

17    a whole box full of binders that have in-camera filings.

18              MR. JENKINS:  Understood, Your Honor.

19              THE COURT:  I understand that Mr. Jeremy Chan is

20    not going to appear in this case; is that correct?

21              MR. BRAUN:  Yes, Your Honor.  There's a *Wheat*

22    case that sits on all fours, I think.  In particularly, having

23    a son as counsel who is also going to be a witness in the case

24    would be a conflict under *Wheat*.  The Court would have an

25    independent obligation to not have him appear, but we're going
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | to voluntarily agree with that case and the strategy in that       |
|       | 2  | case.  So he is not going to appear.  He's here to confirm         |
|       | 3  | that, and my client would confirm it, but I don't think that's     |
|       | 4  | necessary.                                                         |
| 08:28AM | 5 | THE COURT:  All right.  Let me ask Mr. Chan.                      |
|       | 6  | Is that your understanding?                                        |
|       | 7  | THE DEFENDANT:  Yes, Your Honor.                                  |
|       | 8  | THE COURT:  All right.  Is he going to be called                  |
|       | 9  | as a defense witness?                                              |
| 08:28AM | 10 | MR. BRAUN:  I think he's a prosecution witness,                  |
|       | 11 | Your Honor.                                                       |
|       | 12 | THE COURT:  Pardon me?                                            |
|       | 13 | MR. BRAUN:  He's a prosecution witness.                          |
|       | 14 | THE COURT:  Is he also going to be called as a                   |
| 08:28AM | 15 | defense witness?                                                 |
|       | 16 | MR. BRAUN:  On cross, probably.  I would prefer                  |
|       | 17 | to do it on cross.  But he may be a defense witness, but I         |
|       | 18 | don't think so.  I think if they call him based on their          |
|       | 19 | Indictment, the cross-examination would be sufficient, but I       |
| 08:28AM | 20 | don't know.                                                      |
|       | 21 | THE COURT:  All right.                                           |
|       | 22 | MR. JENKINS:  May we just briefly be heard on                    |
|       | 23 | that, Your Honor?                                                |
|       | 24 | THE COURT:  Sure.                                                |
| 08:29AM | 25 | MR. JENKINS:  One, Mr. Jeremy Chan is on our                     |

witness list, but it sounds like to the extent, as we continue

to cull this witness list, if we don't call him, it seems like

I think I'm hearing Mr. Braun say he would likely call him.

We do think -- again, it sounds like the issue is

08:29AM   resolved.  But we also emphasize we do think it is a

non-waivable conflict based on Mr. Jeremy Chan's involvement

both in the Indictment and as a witness and having potential

criminal exposure himself and representing, even though it is

his father, represents, in our view, a non-waivable conflict.

08:29AM   The second part of that, Your Honor, is when we

did -- when Mr. Faerstein was researching this issue, we came

across something we also needed to raise with the Court.  That

is, in fact, that according to Mr. Raymond Chan's bond

conditions, he is barred from talking to Jeremy Chan about the

08:29AM   case, and that is explicitly in the order.  So at this point it

also seems he's violated that order, and that's at docket 100.

So we want to put that on the record because our

concern is, one, that's a violation of a court order.  We're

also concerned, the third point, is that Mr. Raymond Chan has

08:30AM   been contacting Government witnesses which is also in violation

of the court order, Docket 100.  And we wanted to put that on

the record now to cease both of those activities.

THE COURT:  All right.  Mr. Braun.

MR. BRAUN:  Yes, Your Honor.  In terms of my

08:30AM   client, we did -- what we did was I interviewed 15 witnesses on

Zoom, and Mr. Chan called the witnesses and arranged for the time.  I'm not aware of the bond condition.

As far as Mr. Jeremy Chan is concerned, you know, he's a lawyer.  He's very knowledgeable in the building area.  And he has prepared documentation and worked with me in terms of the ethics issues involved.

So I would ask he be allowed -- I agree with counsel in terms of it's a non-waivable conflict in terms of being counsel of record.  I think as a witness I should be able to talk to him and he should be able to continue to talk to me about the case as well as his father.

THE COURT:  If it's a bond condition he cannot speak with his father, I'm not familiar with Docket No. 100.  I'm not sure that I entered such an order.  But you should be aware of it, and Mr. Chan runs the risk that if he violates the terms of his bond, I'm going to revoke his bond.  So he needs to be careful in terms of complying with the terms and conditions of his bond.

With respect to your contact with Jeremy Chan with respect to the merits of the case, what's the Government's position on this?  I know there was a motion in limine that was raised, and I don't see any problem with counsel interviewing witnesses.

MR. JENKINS:  As to counsel interviewing witnesses, there isn't a problem.  As to the court order, the

two concerns -- and this order was entered by Judge Stevenson,
Magistrate Judge Stevenson, one, as the order stands today, he
is barred from talking to Jeremy Chan.  No discussion of
pending action.

08:32AM      So, again, if Mr. Braun wants to revisit that
bond condition, he must do so.  But in terms of setting up
interviews with witnesses, that's not a problem.  But the
additional problem is, if Mr. Raymond Chan is contacting
witnesses, that is also in violation of the bond condition set
08:32AM   by Judge Stevenson, and our understanding is that he is and has
been.

THE COURT:  Well, I suggest, Mr. Braun, in order
to be on the safe side, that you tell Mr. Chan to cease
arranging interviews with these witnesses and have someone from
08:33AM   your office call the witness to make arrangements.

MR. BRAUN:  Yes.

THE COURT:  Because that bond condition is there.
It potentially is going to cause you a problem.  Not you but
Mr. Chan a problem.  And if you want to seek relief from it,
08:33AM   then you should file something, and I will consider it
because -- I was not aware of it.  Obviously it's not my order.

MR. BRAUN:  I wasn't aware of it either,
Your Honor.  I wasn't at the arraignment.

THE COURT:  Well, Mr. Chan I'm sure was aware of
08:33AM   it.  It was his bond.

```
 1                    Well, those are the case --
 2               MR. BRAUN:  One other matter I should take up
 3      with Your Honor.  We had a discussion about jury nullification
 4      last time, and I'm not going to argue that because that is only
 5      appropriate if your client is guilty.  You're asking the jury,
 6      despite the evidence.  Our position is my client is innocent.
 7               I was thinking that in terms of more Huizar, and
 8      I hadn't thought it through.  Obviously we're not going to
 9      argue jury nullification in a case where your client is
10      innocent.
11               THE COURT:  All right.  As long as you're at the
12      lectern, why don't you -- I have a couple questions based upon
13      our discussions on Friday.
14               It seems to me, with respect to Mr. Chan's
15      defense, that your position is that based upon your comments on
16      Friday, which I went back and looked at several of the 302s and
17      the factual basis for the pleas and certain of the Government's
18      witnesses, that based upon your comments, it appears that --
19      you can correct me if I'm wrong -- that you contend that
20      Mr. Chan was a dedicated public servant for decades and that
21      all of the actions of Mr. Chan during the relevant time period
22      in the First Superseding Indictment were simply part of his
23      normal duties and responsibilities as the general manager of
24      the L.A. Department of Building and Safety which is a position
25      he held until May of 2016 when he was appointed deputy mayor
```

08:33AM (line 5)
08:34AM (line 10)
08:34AM (line 15)
08:34AM (line 20)
08:35AM (line 25)

for economic development which is the position he held until
I -- this date keeps alluding me, but it looks like until
June 30 of 2017 when he resigned and established his own
company which is LABXG.

08:36AM          That was my understanding of your general
position with respect to Mr. Chan and his involvement in these
events.  Am I accurate?

MR. BRAUN:  Yes, Your Honor.

THE COURT:  What I did was I went back and looked

08:36AM at -- and particularly, which is problematic for Mr. Chan, and
that is the factual basis for the plea of guilty for
Mr. George Chiang.  And there were a number of items in that
factual basis which I wanted to have the benefit of your
insight this morning.

08:37AM          It appears, according to Mr. George Chiang, that
he had a relationship with Mr. Chan since early 2014.  And in
September of 2014, Mr. Chan asked Mr. Chiang if he had any
interest of becoming a consultant to the various Chinese
companies that are apparently coming to Los Angeles for
08:37AM purposes of developing projects in Downtown Los Angeles.  And
Mr. George Chiang agreed, and Mr. Chan told Mr. George Chiang
to open a company which he did which was the Synergy Alliance
Advisors Company.

          Beginning in 2014, Mr. Chan began to introduce
08:38AM Mr. Chiang to various Chinese developers.  Mr. George Chiang

1   was a close political ally of Mr. Huizar who we all know is the

2   councilman for the District 14 and member of the PLUM Committee

3   and on the City Council.

4         Then what I'd like to focus on is what --

08:38AM   5   ultimately then it appears, based upon what I understand -- and

6   the Government can correct me if I'm wrong because obviously I

7   don't have the testimony of Mr. George Chiang.  But then

8   Mr. George Chiang and Mr. Chan embark upon an arrangement,

9   particularly with respect to the Luxe Hotel project which

08:39AM   10   Mr. George Chiang and his company ended up entering into a

11   consulting arrangement with.

12        It appears, based upon the factual basis for

13   Mr. George Chiang's plea of guilty, that he, Mr. George Chiang,

14   was aware of the -- was aware that Mr. Huizar was obtaining or

08:40AM   15   was being paid bribes, and specifically the factual basis of

16   the plea goes on and on about the phony real estate consulting

17   arrangement that was requested by Mr. Huizar and which was

18   agreed to by Mr. Fuer Yuan who owned the Luxe Hotel where

19   Mr. Huizar's associate -- I think his name is Mr. Camacho --

08:41AM   20   created and established a company.  And there was an

21   arrangement whereby the Luxe Hotel people were paying $11,000 a

22   month retainer for, in effect, phony real estate reports that

23   were provided to the Luxe Hotel.  I assume the $11,000 a month

24   that was paid to Mr. Camacho's company somehow found its way

08:41AM   25   into Mr. Huizar's pocket.

1          So it appears that not only was Mr. George Chiang

2    aware of the -- of that arrangement but also your client

3    Mr. Chan was aware of that arrangement.  He was advised in a

4    December 10th text message from Mr. George Chiang to Mr. Chan

08:42AM   5    that indicates that Mr. George Chiang was aware of this -- of

6    the bribe that was being -- $11,000 a month bribe that was

7    being paid to Mr. Huizar and in a text message advised Mr. Chan

8    not to talk to Mr. Huizar about the meeting that he had with

9    Mr. Huizar because Mr. Huizar had instructed Mr. Chan not to

08:42AM   10   refer to the financial arrangement that Mr. Huizar had with the

11   Luxe Hotel people and didn't want anyone to know about that

12   agreement.

13         So it seems to me, at least at this point in

14   time, Mr. Chan was aware that Mr. Huizar was receiving bribes

08:43AM   15   from the Luxe Hotel people in connection with his -- the

16   various votes that were in the PLUM Committee and his efforts

17   to see that the project was approved.

18         Is that inconsistent with what your understanding

19   is?

08:43AM   20         MR. BRAUN:  Yes.  Partially, Your Honor.  Let me

21   explain.  It's sort of a different culture.  One thing

22   Americans have to understand is that people do have a different

23   culture.  George Chiang and my client were a member of a

24   kung fu organization.  We will have pictures of it.  They met

08:43AM   25   twice a week at his house, and he was the sifu which is almost

1    the -- so what happened is -- I represented a number of con men

2    over the years.  Usually what happens in these groups, the

3    victims will say, well, how did he cheat me?  He accepted Jesus

4    like I did and he came to church.

08:44AM  5           So what happened is George Chiang should have

6    told Mr. Chan, when they set up this business, that he had this

7    arrangement where he was paying off Mr. Huizar.  However, the

8    thing that was set up is Mr. -- and we have the records and so

9    forth and the timelines.  My client did not know that

08:44AM 10   Mr. George Chiang was paying off Huizar indirectly through his

11   Canadian phony scheme.  He did not know about that.  And I

12   think Mr. George Chiang should have told my client that.  He

13   would have said, look, I can't go into business with you or

14   told him he didn't know about that.

08:44AM 15          What you're going to find out, Your Honor, in

16   this case -- it's interesting.  I'm learning too -- is that

17   there is this sort of ancient Chinese kung fu organization and

18   relationship where my client is the head.  And we have pictures

19   of their meetings which is interesting because there's one

08:45AM 20   where they all have their heads on the ground.  I ask my

21   client, what is that?  And he says, well, we're honoring our

22   ancestors before we do our exercises.

23          What happened is there's a lot of interrelations

24   here that are not understandable.  This is more like a family.

08:45AM 25   Mr. Jeremy Chan was a member of it.  George Chiang was a member

1   of it.  My client was the head of it.  It annoyed his wife

2   obviously.  He spent a lot of money himself paying for dinners

3   and so forth.

4           So my client had no idea that Mr. George Chiang

08:45AM   5   had this arrangement.  I assume that George Chiang is going to

6   hopefully tell the truth as their witness.  That's one of his

7   obligations.  I think Your Honor will find out that my client

8   had no knowledge of that.

9           THE COURT:  Let me just go back because it looks

08:45AM   10  like, with respect to the financial benefits that your client

11  received, there's no doubt -- we discussed that on Friday --

12  that he received financial benefits, the $36,000 that's charged

13  in Count 12 and the $33,000 that's charged in Count 13 and, in

14  addition, his son received $19,000.

08:46AM   15          But the background for that arrangement, it looks

16  like between January of 2017 and June of 2017 George Chiang and

17  Mr. Chan agreed that he, Mr. Chan, would assist

18  Mr. George Chiang in connection with the Luxe Hotel project in

19  exchange for future payments to Mr. Chan.  Mr. Chan agreed to

08:46AM   20  perform and did perform official acts while he was deputy mayor

21  to benefit the project.

22          In January of 2017, while he was still deputy

23  mayor, he prepared an action item list for project -- the Luxe

24  project on a weekly basis, led project meetings, assigned tasks

08:47AM   25  to Defendant George Chiang and others to move the project

forward.  And in exchange, George Chiang agreed to share the

consulting fee and bonus payments that he had negotiated with

the Luxe Hotel people.

In fact, in January of 2017, Mr. George Chiang

and Ray Chan and apparently his son Jeremy had a strategy

meeting where Mr. George Chiang's consulting firm was -- they

were trying to take over the entirety of the consulting

arrangement for the Luxe Hotel approval project, and

George Chiang was successful in negotiating a consulting

contract with Luxe that included a monthly retainer of 35,000.

A consulting contract was modified to include three very

significant bonus payments, 100,000, 150,000 and 185,000.

Mr. George Chiang agreed with Mr. Ray Chan to pay a portion of

those fees in connection with his assistance in moving the

Luxe Hotel project along and, in fact, as we know from our

discussion on Friday, there's -- it's undisputed that Mr. Chan

did receive a portion of those fees which are charged in

Count 12 and Count 13.

So I don't understand how, whatever this

arrangement is in terms of the karate relationship or whatever

it is, how Mr. Chan can be taking whatever action he took,

which under your theory is that he was just acting in

accordance with his duties and responsibilities.  But I think

it's -- I'm sure that your -- I don't know what your position

is, but I will ask you what your position is -- if he's getting

money from a developer for projects that are pending before the

City that takes those ordinary duties and responsibilities out

of that context.  And it seems to me they fall under the

category he's taking money for his official acts which in this

08:50AM    case are influencing various city officials to approve the

project.

MR. BRAUN:  Your Honor, that's --

THE COURT:  That's going to be sufficient

evidence for the jury to convict him.

08:50AM    MR. BRAUN:  Your Honor, the --

THE COURT:  Why don't you move your mask down so

I can understand you.

MR. BRAUN:  If you study the -- there's two types

of employees in in the City, and there's time periods.  If you

08:50AM    are -- if it's a project in which you have some discretion,

that's defined in the rules of the City -- some discretion, you

are barred from having any involvement with that particular

project.  If it's a project that is pending in in the City

while you're employed with the City, there's a one-year

08:51AM    revolving door prohibition in which you cannot contact anyone

in the City that has any discretion over the project.

THE COURT:  I'm focusing simply on the period of

time where Mr. Chan was still employed by the City during his

time as the general manager or deputy mayor.  If he made an

08:51AM    agreement, which apparently according to Mr. George Chiang was

entered into, to receive money from the Luxe Hotel people, it
seems to me during that period of time, even though he didn't
receive the money until after he left the employ of the City,
it's obvious that he didn't want to take that money while he
08:51AM   was employed because, if you look at the -- there's a provision
in the factual basis for Mr. Chiang's plea.  It says,
consistent with his agreement to share the bonus payment with
Mr. Chan, he asked -- George Chiang asked Mr. Ray Chan if he
wanted his share of the first bonus payment in check form.
08:52AM   Mr. Chan told Mr. Chiang to wait until later because he
preferred getting a bigger check at a later date.  This all
takes place while he with the City.

          Then there's another reference in the factual
basis for the plea that Mr. Chan calls Mr. George Chiang and
08:52AM   says something to the effect, you're going to get the cash for
me, the $20,000?  And Mr. George Chiang responds that he's got
the money.  It's in the car.  And Mr. Ray Chan then says
that -- just keep it there for now.

          So the evidence, it seems to me -- the Government
08:53AM   can correct me if I'm wrong.  The evidence seems pretty
substantial, based upon the testimony of Mr. George Chiang,
that this -- there was an arrangement or agreement between
Mr. George Chiang and Ray Chan for Mr. Ray Chan to share in the
monies that were being paid by Luxe Hotel, and those monies --
08:53AM   and for his activities or his acts while deputy mayor.  And we

1    know what some of those acts were in terms of, for example,

2    trying to influence Mr. Ambrose to vote or approve the

3    Luxe Hotel project.

4              MR. BRAUN:  I think you're right in your

08:53AM   5    interpretation, but I think the evidence will show it's to the

6    contrary.  In other words, my client could work on a project.

7    He can't be paid for any official act while he's working for

8    the City, but he can work on a project as long as he doesn't

9    lobby as defined by the statute.  So he didn't lobby.

08:54AM   10             So the idea that -- that particular -- I know the

11   Government has simply misunderstood that particular wiretap

12   because --

13             THE COURT:  So you think Mr. Chan can receive

14   thousands of dollars from a developer that has a project before

08:54AM   15   the City and there's nothing wrong with that?

16             MR. BRAUN:  No.  You can work on a project that

17   was in the City while you were an employee there as long as you

18   did not have any discretion over it.  You cannot lobby for one

19   year.  And lobbying is defined by the statute.

08:55AM   20             THE COURT:  But that's after you leave.  I'm

21   talking about during the period of time that he was employed by

22   the City where he is performing various official acts, and in

23   this case it looks to me like -- I don't think he has a vote on

24   anything, but the official acts are going to be influencing

08:55AM   25   various city officials in the planning department and other

1   officials to approve the Luxe project.

2               You're not saying that he can take 60-, $70,000

3   of a developer's money and continue to work on that project

4   whether it's discretionary or not discretionary.

08:55AM   5               MR. BRAUN:  I agree with Your Honor, but the

6   evidence will be to the contrary.  He did not lobby anyone

7   while he was within that one-year period.

8               THE COURT:  So what was he getting the 60- or

9   $70,000 for?

08:56AM   10               MR. BRAUN:  He was working with George Chiang.

11   We will show you all the work he did, all the projects he

12   worked on, all the other things he did, and he didn't get any

13   money until later that time.  Now, the 20,000, they just

14   misunderstood the 20,000.  He turned down 20,000 from Mr. Wang

08:56AM   15   in China.  Mr. George Chiang I believe will testimony honestly

16   about that.  He turned down any kind of a signing bonus.  And

17   the $20,000, we're talking about a -- that he turned down a

18   check that bounced.  Mr. George Chiang went to the bank and got

19   the cash.  That's the 20,000 we're talking about.

08:56AM   20               So, Your Honor, I understand what your position

21   is.  It's correct.

22               THE COURT:  It's not my position.  I'm trying to

23   understand your position in light of the comments on Friday.

24               MR. BRAUN:  I was here when Mr. -- for example,

08:56AM   25   Mr. Huizar, these people will say what they have to say to make

1    their deal.  What they say on the stand and what the jury will

2    determine the evidence will be will be quite contrary.  I will

3    give you an example.

4              I was here when Mr. Huizar agreed that the

08:57AM  5    consolidation of the Building and Safety Department and the

6    Planning Department was part of a plot to help Mr. Chan give --

7    keep his job.  That's what he swore under oath.  That's not

8    true because I completely investigated that.  That's complete

9    fabrication.

08:57AM  10             So what I'm simply saying is the jury is going to

11    have to listen to Mr. George Chiang, and they're going to have

12    to listen to Mr. Chan, and they will get the instructions from

13    Your Honor about what the rules are, and they will decide.  I

14    believe he never took any money for doing anything improper

08:57AM  15    while he was a member of the City.

16             What I was surprised at actually, when I read the

17    regulations, is you can work on a project that was in your

18    department, but you can't lobby.

19             THE COURT:  And be paid by a developer?

08:57AM  20             MR. BRAUN:  And be paid by a developer as long as

21    there wasn't a -- as long as there wasn't an agreement that you

22    did something while you were working for the City.

23             THE COURT:  And if he goes to -- I can't remember

24    the gentleman's name now.  But if he goes to another city

08:58AM  25    official and tells that city official, hey, this Luxe project,

1   I would hope that you would vote to approve whatever your

2   department -- involvement of your department to approve the

3   Luxe project?

4          MR. BRAUN:  Your Honor, when Mr. Ambrose

08:58AM   5   testifies, Your Honor is going to find out that my client was

6   already retiring, that Mr. Ambrose had one vote out of nine,

7   and the project wasn't even within -- it wasn't even before his

8   department.  So my client will say he did not do that.  That is

9   a person he did not get along with.  He set up a meeting

08:58AM   10   halfway between the city and the Disney Company in Hollywood,

11   and that was only for the purpose of trying to repair their

12   personal relationship.  So that was not an improper meeting.

13          THE COURT:  All right.

14          MR. BRAUN:  I can see that -- I think Your Honor

08:59AM   15   will recognize that when someone is charged with something like

16   Mr. Huizar or Mr. Chiang and trying to make a deal, that

17   they're told by -- I'm not blaming the prosecution.  It's

18   usually the defense lawyers who say, you'd better come up with

19   something on Chan.  Otherwise, you're not going to get a good

08:59AM   20   recommendation.

21          THE COURT:  I don't view Mr. Huizar to be a

22   witness in the case against Mr. Chan.

23          But the other issue that I have is, after he

24   leaves -- after Mr. Chan leaves the City as alleged I think in

08:59AM   25   these overt acts 216 through 240 -- and we started to discuss

34

1    this on Friday -- he's making various -- this is the heading of

2    Mr. Chan's indirect bribe payments to city officials through

3    relatives.  This is the payments for Williams's relative and

4    Jacinto, and there was a third, Shawn Kuk.

09:00AM  5              So none of that happened?

6              MR. BRAUN:  No.  It happened, Your Honor.

7              THE COURT:  So now that he left the city, he's

8    making -- according to -- I guess, according to the

9    Government's theory, he changes from his -- wearing the hat of

09:00AM 10   the bribee to become a briber.  So he's making payments to

11   these various people to influence the project?

12             MR. BRAUN:  He hires a student whose father is on

13   a commission, supposedly in a bribe.  And then he fires him

14   because he doesn't do the work.  I have never heard a bribe

09:01AM 15   where you fire -- Ms. Jacinto, she worked.  She got very little

16   money.  She was recommended through Mr. Kuk who is -- by

17   Mr. Wang who is a Government informant at the time.  And he

18   will testify that she worked many, many weeks and got probably

19   less pay than she deserved trying to promote that company.

09:01AM 20             So what Your Honor is simply saying is, when

21   someone comes to someone and says, well, who's a good person

22   for this, you can't even recommend them because otherwise

23   you're charged with bribing.

24             THE COURT:  Well, there are more specific

09:01AM 25   allegations.  There are payments to these various individuals

for official acts in approving the Luxe Hotel project.  That's

a -- just, in general, hiring somebody.  Money is being paid

for a specific purpose.  In any event --

MR. BRAUN:  If there is a payment for an

approval, that is a bribe.  If it is payment for actual work

that has nothing to do with it and the Government -- what --

the Government has stretched the theory.  If you look at the

count -- Count 2, for example, my client told Mr. Huizar and

Wei Huang they shouldn't go to Las Vegas together, yet he's

charged with aiding and abetting.

THE COURT:  Well, that raises a different

question because it seems to me these Chinese developers --

that Mr. Chan had the relationship with both Fuer Yuan and

Wei Huang of Shen Zhen New World.  That's really the linchpin

and the contact.  And Mr. Chan knew what was going on between

Mr. Wei Huang and Mr. Huizar because he cautioned them not to

continue to go on these Las Vegas trips.  So he knew something

was up.

He also knew that Shen Zhen had a project that

was pending in the city of Los Angeles.  And I assume, based

upon his position, that he also knew, or at least he could have

found out, how Mr. Huizar was voting on that project.  And he

was also aware of the benefits that Mr. Huizar was receiving

from Shen Zhen including the loan transaction.

MR. BRAUN:  I think Your Honor is incorrect.  I

1    think the evidence will show that Mr. Chan -- there's two

2    things.  One is his legal obligation, and one is his ethical

3    obligation.

4              What he didn't like about the trips to Vegas was

09:03AM   5    that a city councilman was going to Vegas where everything is

6    being paid by basically the taxpayers incorrectly, and it

7    didn't look good.  And there was nothing pending at that point

8    that Mr. Huizar was going to vote on, and Mr. Wei Huang was

9    just a guy that liked to gamble and glommed onto a group of

09:04AM  10    people that went with Mr. Wei Huang to Las Vegas.  He had been

11    going to Vegas -- this man could lose a couple million dollars

12    on a weekend.  So the amounts of money he gave his entourage

13    had nothing to do with anything that Mr. Huizar was going to

14    vote on.

09:04AM  15              Mr. Huizar should be a witness here, Your Honor.

16    I mean, he's made a deal to cooperate with the Government.  So

17    we should -- I assume we're going to hear from Mr. Huizar.

18              THE COURT:  What about the loan transaction?  If

19    Mr. Chan is so concerned about the appearance of Huizar trips

09:04AM  20    with Wei Huang to Las Vegas, I assume that he was concerned

21    about the $600,000 that was being provided by Wei Huang to

22    Mr. Huizar.

23              MR. BRAUN:  One thing I don't think the

24    Government has done is put together a timeline on this.  This

09:05AM  25    transaction -- he had a conversation with Mr. Huizar about this

1    lawsuit.  So he's a boss and he's a friend.  He said, yeah, you

2    better settle this lawsuit.  He asked him to check the value he

3    had in his home.  There wasn't enough value in the home.

4    Mr. Huizar decided to fight the lawsuit.

09:05AM  5            What happened later, six months later, a member

6    of the board of supervisors decides to run for Mr. Huizar's

7    seat, and then he decides to have the loan.  If you look at the

8    loan itself, it had nothing to do with my client.  He didn't

9    sign for the loan.  He didn't arrange for the lawyers who did

09:05AM  10   the loan.  He didn't get any benefit from the loan.  All he did

11   was express an opinion to Mr. Huizar six months earlier that he

12   should settle the loan which is good advice.  He should have

13   settled the loan.

14            So this idea that he had something to do with

09:06AM  15   Wei Huang's guaranteeing this loan is completely bogus.

16            THE COURT:  He didn't guarantee the loan, but he

17   was aware of the loan.  In fact, he was the -- as I understand

18   the Government's evidence, he was the individual that convinced

19   or suggested to Mr. Wei Huang that he make Mr. Huizar the loan

09:06AM  20   or at least advised Mr. Wei Huang that Mr. Huizar had this

21   lawsuit and the lawsuit needed to be settled.

22            MR. BRAUN:  You will be surprised in the

23   evidence.  He had nothing to do with it.

24            THE COURT:  But he knew about --

09:06AM  25            MR. BRAUN:  He knew there was going to be a loan,

```
 1    but --
 2                    THE COURT:  So that leads me then to the false
 3    statement count where the -- he -- and is this
 4    November 7th, 2018 interview, is it regarded?
 5                    MR. JENKINS:  It is, Your Honor.
 6                    THE COURT:  Can you provide me with a courtesy
 7    copy of the recording in the next couple days?
 8                    MR. JENKINS:  Yes.  We will provide you an audio
 9    and --
10                    THE COURT:  I don't need the audio.  I just need
11    the transcript.
12                    MR. JENKINS:  Transcript.  Yes, Your Honor.
13                    THE COURT:  This goes on to say that he didn't
14    know anything about the settlement of Mr. Huizar's 2011 sexual
15    harassment lawsuit and -- even during our discussions today, it
16    turns out that that's not true because he did know about the
17    lawsuit.  He did know about the settlement.  And he
18    apparently -- and I haven't read the transcript -- he told the
19    FBI something different.  He lied.
20                    MR. BRAUN:  No.  The FBI didn't know what they
21    were doing.  They sent someone to his home at 7:00 in the
22    morning who had cooperated with him in the past where they
23    found some corruption in the city, and he assisted the FBI.
24    They sent the FBI agent there, and he had nothing to do with
25    the actual loan.  He didn't say he didn't know about the loan.
```

1    He said he wasn't involved with the loan.

2              So I have always thought it was a good idea to

3    talk to the FBI.  But what they end up doing, when they don't

4    have a case, they send someone in, and try to get you to say

09:08AM   5    something, and then they want to quibble about what you say.

6              THE COURT:  Well, it's not a quibble because it's

7    recorded.

8              MR. BRAUN:  Right.  We can listen to it.  And the

9    jury is going to hear the whole recording, and they're going to

09:08AM   10   hear my client's testimony, and they're going to decide whether

11   or not this is just a Hail Mary by the Government that knows

12   they don't have a case.

13             THE COURT:  All right.  It's going to be a

14   difficult task, it seems to me, to convince a jury that he

09:08AM   15   didn't make false statements to the FBI.  I haven't seen this

16   recording, but based upon Count 1.  There's evidence throughout

17   this case that he, one, knew about the sexual harassment

18   lawsuit.  This morning you said that apparently Mr. Chan

19   advised Mr. Huizar to settle the suit.  He didn't have the

09:09AM   20   money to settle the suit.  So Mr. Chan, who has the contact

21   with Mr. Wei Huang -- that contact gave Mr. Wei Huang the

22   knowledge that Mr. Huizar needed the money in order to settle

23   the sexual harassment lawsuit, puts the two together, he drops

24   out, and the transaction is completed.

09:09AM   25             MR. BRAUN:  That's not how it happened,

1    Your Honor.  Your Honor will find out from the evidence there

2    was a six-month gap, that Mr. Huizar changed his mind because

3    Gloria Molina, I believe was a city councilman, decided to run

4    for his seat, and he then wanted to settle it.

09:09AM    5            THE COURT:  Well --

6            MR. BRAUN:  I think my client is getting the rap

7    because he's from China, speaks the language, all of a sudden

8    he's responsible for Wei Huang.

9            This is going to be an interesting bribe theory

09:10AM   10   that you basically bribe a city councilman because you

11   guarantee his loan.  He then makes payments against it which he

12   eventually defaults on.  Then you're going to have to show that

13   Mr. Wei Huang had something he expected from Mr. Huizar, and,

14   in fact, there is nothing he expected because we weren't even

09:10AM   15   close to --

16            THE COURT:  Well, that's not what the jury found.

17            MR. BRAUN:  Well, our jury is going to get the

18   whole truth.

19            THE COURT:  Well, that assumes that the jury in

09:10AM   20   the Shen Zhen case didn't get the whole truth.  I presided over

21   the trial, and it was pretty clear to me that Mr. -- in any

22   event, I don't want to take any more of your time.  I'm just

23   puzzled because there are -- the two hurdles that I see in this

24   case are the Luxe Hotel and the false statement.

09:11AM   25            MR. BRAUN:  I think we have the whole -- look,

1    they've got eight counts -- I should bring one thing up,

2    Your Honor.  The Government should inform me if they're going

3    to be going ahead on the RICO because the RICO makes almost

4    every statement admissible under their theory that you have an

09:11AM  5    enterprise.  I don't think they made up their mind yet, but if

6    they can tell me what they're going to do in terms of the

7    counts, we can maybe slim the case down a little.

8             Your Honor, let's look at the totality.  My

9    client worked for the City of Los Angeles for 33 years.  The

09:11AM  10   reason we're going to get the museum for Star Wars in

11   exposition is because of my client.  I interviewed 15 people

12   including the union, contractors, everyone.  They all say the

13   guy is innocent.

14            I have a picture -- I have one person that stuck

09:11AM  15   in his trunk of his car $8,000 cognac that was wrapped up, and

16   when had he found it, he returned it.  There's a number of

17   people that when they went to breakfast with him, they split

18   the checks.

19            So it should be a simple thing.  The Government

09:12AM  20   has a wiretap.  They have an undercover agent.  They have all

21   of this -- they had Mr. Wang who is an undercover who was doing

22   voluntary.  Yet they can't show that my client directly got

23   anything in exchange for some public act.

24            THE COURT:  That's simply not true.  He got over

09:12AM  25   $70,000.

1          MR. BRAUN:  He got $70,000 for almost six months

2     of work that he did for the company that he put together, and

3     we're going to show what he did.

4          THE COURT:  All right.

09:12AM   5          MR. BRAUN:  Thank you.

6          THE COURT:  Mr. Jenkins, do you want to -- I'm

7     operating at somewhat of a disadvantage because I don't have

8     all of the evidence.  Is there something that I misstated or is

9     there an elaboration that you can provide with respect to the

09:13AM  10     Government's theory with respect to this -- the Luxe Hotel?

11          MR. JENKINS:  I believe Your Honor correctly

12     outlined much of the evidence as we know it and expect it to be

13     presented.

14          Two clarifications including the Luxe Hotel, and

09:13AM  15     we expect the testimony to be from George Chiang that Mr. Chan

16     was knowledgeable about these things.  Your Honor is seeing the

17     detailed radar screens which will play a paramount role in this

18     case.  Mr. Chan, as Mr. Braun conceded, is a leader.  He's

19     someone people listened to.  He's also very detail oriented.

09:13AM  20     He's also someone who is very thoughtful as the Court pointed

21     out about concerns he had related to Vegas, the same reasons

22     that would support why the city official who has to report on

23     his Form 700s any gifts would not take checks while he's in the

24     city.

09:14AM  25          So the evidence as to the Luxe Hotel scheme will

1    be both that he was aware of it and participated in it and was

2    the person encouraging George Chiang to take certain actions

3    while Mr. Chan was helping the Luxe Hotel for the Hazens

4    chairman who he then shortly thereafter began to work directly

09:14AM   5    for.  Whether he was lobbying or working in the background,

6    either way they're ethical violations.  But bigger than that,

7    as the Court pointed out, if he agreed to take payments while

8    he's in the city to provide those services while he's in the

9    city, it's a violation of federal law.

09:14AM   10         THE COURT:  In terms of the official acts, are

11   there any -- Mr. Chan was not in a position to vote on

12   anything, was he?  Or is the official acts of the Government's

13   theory is that he was influencing other officials in the city

14   to approve the project?

09:14AM   15         MR. JENKINS:  Yes.  As outlined in Mr. Chiang's

16   factual basis that the Court read, that is accurate, and that

17   will be our official act presentation.

18         THE COURT:  So he didn't vote on anything?

19         MR. JENKINS:  Not to our knowledge, no.

09:15AM   20         THE COURT:  So the pressure he exerted on these

21   officials, which officials are we talking about?

22         MR. JENKINS:  So there will be one David Ambrose

23   who I believe the Court either referenced or intended to

24   reference related to the visit to David Ambrose's house.  He

09:15AM   25   was the chair of the Planning Commission.  There's also going

1    to be an official from the Board of Public Works who is

2    Joel Jacinto, an LADOT person and an L.A. Fire Department

3    person.

4              THE COURT:  That's H-a-n-i.  Last name is

09:15AM  5    M-a-l-k-i?

6              MR. JENKINS:  That is accurate, Your Honor.

7              THE COURT:  Okay.

8              MR. JENKINS:  There are letters from those

9    individuals that set forth their views on Hazens.  So we will

09:15AM  10   use that as evidence to -- not only did he make such, whether

11   it's pressure or supporting or encouraging or advocating,

12   actions were taken after he went and met with those people to

13   support the Luxe Hotel.

14             Just before I forget, two clarifications,

09:16AM  15   Mr. Braun is correct that the $20,000 cash is -- will be

16   presented in a little different way than is represented in the

17   Indictment.  That is, we do not believe that was related to the

18   Hazens scheme, as we call it, or the Luxe Hotel scheme, but it

19   was money from a different Chinese chairman that was owed or

09:16AM  20   provided to Raymond Chan while he was in the city.

21             And the emphasis we will put on there is a deputy

22   mayor telling a co-conspirator to hold on to $20,000 cash in

23   his car and that he would pick it up later because he wants to

24   only use cash we think is still probative evidence of someone

09:16AM  25   trying to conceal receiving cash from third parties while he's

1    in the city.  And the fact that he's using cash a lot, by his

2    own words, suggests he has alternate forms of income or

3    payment.  But it is not going to link directly to the Hazens

4    scheme.  It's more evidence of Mr. Chan's practice of

09:17AM    5    concealment and use of cash.

6              The second thing, which the Court will see when

7    we provide the recorded statements, Mr. Chan, to his credit, at

8    6:00 a.m. or 7:00 a.m. spoke with the FBI for a long time on

9    November 7th.  We use quotes in the Indictment for a reason

09:17AM    10   because Mr. Chan clearly and unequivocally denies involvement

11   in the loan many times, and he also says he wasn't aware of

12   certain things.

13             As the interview progresses that Special Agent

14   Terry Tampubolon confronts Mr. Chan repeatedly, "I know you

09:17AM    15   know more.  We're here because we know more.  Mr. Chan, I know

16   you," because they had prior interactions.  Mr. Raymond Chan,

17   as often in the case of a subject being interviewed by the FBI,

18   his story changes.  So as the Court will see, there is an

19   iterative process.  He never gets fully to the truth.  He never

09:17AM    20   fully comes clean.  But when Terry Tampubolon keeps asking him,

21   "This doesn't make sense.  How do you not know that the

22   chairman and your friend Jose Huizar about this loan?"  Then he

23   slowly starts to reveal a little more information.

24             I just want to flag that for the Court because it

09:18AM    25   goes from unequivocal to more an iterative truth-telling

```
 1   process, and the law on false statements still provides that
 2   the unequivocal denials, provided they are intentional, still
 3   are sufficient to prove a false statement case.
 4              THE COURT:  Are there other 302s of interviews
 5   with Mr. Chan?
 6              MR. JENKINS:  He calls back.  There's another
 7   transcript.
 8              THE COURT:  I want all of the transcripts of the
 9   302s with Mr. Chan so I can read the entirety.
10              MR. JENKINS:  Yes, Your Honor.  We will provide
11   that as soon as possible.
12              THE COURT:  Okay.
13              MR. JENKINS:  Those are just the two
14   clarifications.
15              THE COURT:  And why was Mr. Jeremy Chan, why was
16   he receiving $19,000 from Mr. Chan?  Was he -- it looks like he
17   was somehow involved -- and maybe Mr. Braun can help us out on
18   this.  He is a licensed attorney who was charged with the
19   modification of the drafting of this consulting agreement
20   between Mr. Chan's company and the Luxe Hotel people?
21              MR. JENKINS:  That is our understanding.  I think
22   there's a theme that, at least the Court has pointed out, that
23   one way the bribes have been paid in this case are indirectly
24   to family members.  Mr. Jeremy Chan is a licensed lawyer.  He
25   also had a law firm job where you cannot take outside money or
```

09:18AM (lines 5, 10, 15)
09:19AM (lines 20, 25)

1    outside contracts outside of your law firm position.

2    Mr. Jeremy Chan is no longer employed by a law firm, and I

3    think that is related.  So we think his involvement there is

4    another way of payments.

09:20AM    5              He did do some work, but while he was working on

6    that project we think is another way that the Chan family was

7    receiving benefits from a developer, from a lawyer who had a

8    different job and a different employer and is not allowed to be

9    earning that money.

09:20AM   10              And then going forward, one of the companies they

11   form is CCC.  That is one of the companies they form as part of

12   their developer consultant lobbying firm, however they describe

13   it.  The first "C" is Ray Chan.  Second "C" is George Chiang.

14   Third "C" is Jeremy Chan.  George Chiang is going to testify

09:20AM   15   how that was a vehicle for them to receive payments they all

16   negotiated including with Jeremy Chan and Ray Chan on how to

17   profit the relationships we think they corruptly developed

18   while Mr. Chan was in the city.

19              THE COURT:  What's Mr. Jeremy Chan's area of

09:21AM   20   practice?

21              MR. JENKINS:  I believe he did real estate law.

22   If the Court wants to ask him, he's here.  My understanding is

23   he did land use.

24              THE COURT:  Is that right, Mr. Braun?

09:21AM   25              MR. BRAUN:  Yes, Your Honor.

1          Your Honor, actually, I found out he knows more

2     about land use than his father.  He basically is a specialist

3     in land use and getting approvals and so forth.

4          And Mr. George -- you will have to hear the

09:21AM  5     evidence.  Mr. George Chiang is like a family member.  So it's

6     like if you ask a family member to do some work and he does a

7     lot of work and we will have to come up with that.  And then

8     there is a -- have you ever heard of a "red pocket"?  Red

9     pocket is a custom in the Chinese community to give gifts.

09:21AM 10     It's sort of similar to lalute in the Italian culture.  So

11     basically we're going to -- Mr. Jeremy Chan is going to show

12     you what work he's done and what he got and so forth.

13          THE COURT:  So what did he do for it?

14          MR. BRAUN:  He did a lot of work consulting on

09:22AM 15     various real estate projects that Mr. George Chiang was

16     operating in.

17          You know, that's the issue.  Obviously the

18     prosecutor is correct.  If he's getting money to -- as an

19     indirect recipient for his father's bribes, he's guilty; right?

09:22AM 20     But that's not the case.  I think the evidence is going to

21     surprise you.

22          Basically what happened is they basically had

23     Mr. Huizar clearly and they had Mr. Chiang clearly, and Mr. Lee

24     is a separate case.  They figured let's go after Mr. Chan, you

09:22AM 25     know.  They got a wiretap.  They got an informant.  They had

conversations that were -- they don't have anything.  So they

keep stretching it.  He must have known about the trip to

Las Vegas.  He knew about this.  He didn't do anything.  He's

going to testify.

09:22AM    THE COURT:  He did know about the trips to

Las Vegas.

MR. BRAUN:  I'm sorry.  He said not to go to

Las Vegas.

THE COURT:  So he knew what was going on.

09:23AM    MR. BRAUN:  He knew they were going to Vegas.

THE COURT:  All right.

MR. BRAUN:  After he left the city, Wei Huang

tried to hire him as a consultant.  He turned him down because

he didn't like his style, the way he was late at meetings, the

09:23AM    way he treated insubordinates and so forth.  So if he was so

greedy, why didn't he take the job with Mr. Wei Huang?

THE COURT:  In any event, I think I understand

the theory of your defense.

MR. BRAUN:  What does bother me, Your Honor, in

09:23AM    this case is there's two billionaires from China who are going

to build two hotels that we need in Los Angeles.  There is no

evidence they did anything wrong, and we have lost not only

those two hotels, which Your Honor may not know but L.A. is

short of hotel space because we can't accommodate a big

09:23AM    convention.

1          THE COURT:  We have enough people in Los Angeles.

2     I don't think we need any more hotels given the traffic.

3          MR. BRAUN:  No.  We don't have enough local -- if

4     you're going to have the COMDEX, you have to go to Vegas

09:24AM   5     because there's not enough hotel space.

6          THE COURT:  Mr. Wei Huang is very familiar with

7     Vegas.  In any event, I understand.

8          MR. BRAUN:  I heard the testimony about

9     Las Vegas, and I'm sure I was as appalled by it as Your Honor

09:24AM   10    was.  However, do you realize the taxpayers paid for everything

11    except the hookers because I'm sure those were tax deductible

12    dollars that these casinos deducted from their gross revenue.

13         THE COURT:  All of that is interesting but really

14    irrelevant.

09:24AM   15         MR. BRAUN:  I'm interested in things that are

16    irrelevant too.  That's what makes life interesting.

17         THE COURT:  All right.  Let me ask.  Now that we

18    have the witness list pared down, how long does the Government

19    anticipate for its case in chief?

09:25AM   20         MR. JENKINS:  We are still evaluating that in

21    part, as Mr. Braun noted and I think the Court raised, at this

22    point we plan to proceed on all counts as to Defendant Chan.

23    We are evaluating the racketeering count and whether it makes

24    sense to persist on that.  Assuming we do and the 23ish

09:25AM   25    witnesses, we have cut the estimate down from six weeks to

1    approximately three weeks.

2                    THE COURT:  Okay.  Mr. Braun, you're still at

3    your same --

4                    MR. BRAUN:  No.  I don't think so.  It's a

09:25AM    5    shorter trial because Mr. Huizar is not here.  I have

6    interviewed 15 witnesses.  Probably we will call 12 of them.

7    They all are percipient witnesses plus character witnesses.  So

8    I'm not going to put on any straight character witnesses.

9    Maybe one but not many.  And then my client will testify.  I

09:26AM    10    would say two weeks, Your Honor.

11                    THE COURT:  Okay.  We're getting it down to

12    manageable proportions.  I'm sure as we -- that's why I think

13    the exercise with respect to the exhibits is going to be

14    particularly important because I don't think, based upon what I

09:26AM    15    understand your defense, Mr. Braun, that any of these exhibits

16    are going to be really that important in terms of the defense

17    case.

18                    Your position is Mr. Chan is a good guy and

19    worked for the city for 33 years, did nothing wrong while he

09:26AM    20    was at the city and is entitled to or was able to receive money

21    while he was working for the city.  And you're going to present

22    evidence that the money was not paid in connection with any of

23    the projects that are subject to the First Superseding

24    Indictment but it was, I guess, for something else.

09:26AM    25                    It's going to be a tough road though based just

1    on the evidence that I have seen, and I spent Saturday and

2    Sunday reviewing all these 302s.  There's just a lot of

3    evidence to the contrary.

4              MR. BRAUN:  It's a very tricky thing when you're

09:27AM  5    trying to provide for the transition between Government -- like

6    these lawyers here are probably not going to stay with the

7    Government.  They're going to go to a private firm.  They would

8    be disbarred if they worked on any case that they prosecuted.

9    That's by state law.

09:27AM  10             But the codes really do provide for a transition

11   period, and they do allow you to work on a project that was in

12   the department as long as you don't -- you can't get money for

13   something you did while working on it.  I agree with Your Honor

14   there.  But you can get money for something you have done

09:27AM  15   afterwards as long as it was legal.

16             THE COURT:  I guess that's the question.  If

17   Mr. George Chiang is believed that he was getting these monies

18   for work that -- or the promise -- it was obviously Mr. Chan,

19   based upon the items I have read, he didn't want to be paid the

09:28AM  20   33- and $36,000 while he was employed with the city.  So he

21   conveniently deferred those payments until after he left the

22   city.  But if Chiang is believed that there was an agreement he

23   was going to be paid a portion of those fees for work on the

24   Luxe project that he did, then you've got a problem.

09:28AM  25             MR. BRAUN:  Problem, he's a convicted felon.  It

 1    will be the question whether the jury will believe him.

 2                    THE COURT:  Right.

 3                    MR. BRAUN:  As opposed to my client's life,

 4    33 years with the city of Los Angeles.

09:28AM   5          THE COURT:  Right.  In any event --

 6                    MR. JENKINS:  Your Honor, just on the issue of

 7    defense witnesses and court orders on deadlines, we would ask

 8    that the Court set a *Jencks* deadline for defense witnesses to

 9    provide statements.  I requested that from Mr. Braun yesterday,

09:28AM  10    and we said we were going to talk about it today.

11                    THE COURT:  That's already in the schedule.

12    According to my notes of order 441, the defense *Jencks* acts

13    statements are due on February 15th.

14                    MR. JENKINS:  If that is the case, then that

09:29AM  15    works for us, Your Honor.  We must have overlooked that.

16                    THE COURT:  I'm looking at the list.  We have a

17    pretrial conference set for February 10th.  Coming up in

18    February, we have the proposed joint statement of the case

19    February 1st.  Expert offer of proof, we're not going to have

09:29AM  20    any experts.

21                    Are you going to have any experts, Mr. Braun?

22                    MR. BRAUN:  My client is an expert I guess, and I

23    think Jeremy Chan may be an expert, but I'm not sure yet.

24                    THE COURT:  If they are, there is a requirement

09:29AM  25    for an expert offer of proof by February 7th.  Then we've got

1    the jury instructions, the joint statement of the case,

2    proposed voir dire all due before the 10th.  And then the

3    Government's trial brief is the 13th, verdict form the 13th,

4    instructions the 13th, and then the defense *Jencks* act

09:30AM  5    statements the 13th, charts and summaries, witness list, and

6    exhibit list on the 13th.

7              As I indicated, I'm going to issue orders with

8    respect to the defense witness and exhibits today so we can

9    work on any objections that the Government may have.

09:30AM  10             But that's the schedule that I have that I think

11   is still the existing schedule.

12             MR. JENKINS:  Thank you, Your Honor.

13             MR. BRAUN:  The only thing I would request of the

14   Government is they tell me if they're going to go on RICO.  As

09:30AM  15   Your Honor knows, RICO makes a lot of things relevant that

16   wouldn't be relevant without RICO.  It means everyone that's

17   involved with the enterprise, even if my client didn't know it,

18   and every statement they could make.  So we can simplify the

19   exhibits, but that's up to them.

09:30AM  20             MR. JENKINS:  At this point we intend to go

21   forward on Count 1 with the RICO count.

22             THE COURT:  I assumed that was the case.

23             All right.  Anything else?  So I guess the next

24   time we will have a chance to chat will be on February 10th

09:31AM  25   unless something comes up in the meantime.  But I encourage

1  counsel to continue their hard work on these exhibits so we can

2  at least eliminate any issues with respect to the trial

3  exhibits because it appears that the live testimony is going to

4  be the most important part of this trial.

09:31AM  5         MR. BRAUN:  We're waiting for Mr. Huizar,

6  Your Honor.  He agreed to testify honestly for the Government.

7  I don't see any reason why they're afraid to call him.

8         MR. JENKINS:  For the record, he has not agreed

9  to do anything except plead guilty which he has done.

09:31AM  10         THE COURT:  All right.  I didn't expect to see

11  him again.

12         MR. JENKINS:  We have no intentions of calling

13  Mr. Huizar at this time.

14         THE COURT:  All right.  And I take it that all of

09:31AM  15  your efforts to try to resolve this case have been

16  unsuccessful, or are you still trying?

17         MR. BRAUN:  My client is innocent, and he's not

18  going to be pleading.  If he gets convicted and he goes to

19  jail, that's life, you know.

09:32AM  20         THE COURT:  Well, that's an easy statement for

21  you to say.

22         MR. BRAUN:  He goes to jail, and I go home to

23  dinner.

24         THE COURT:  Right.  That's something that -- I

09:32AM  25  understand your position, but it's something that certainly

Mr. Chan needs to evaluate as to whether or not going to trial

is in his best interest in this case, obviously with your

advice.  I'm not involving myself in any plea negotiations, but

as we move forward, that ought to be an overriding

consideration for Mr. Chan.

MR. JENKINS:  Just for the record, Your Honor, we

have presented the reverse proffer as requested by Mr. Chan and

Mr. Braun.  We are open to resolving the case as we represented

to him and Mr. Chan, and we continue to be open to a fair

resolution of this case, Your Honor.

MR. BRAUN:  One slight correction.  I requested

twice a reverse proffer before Indictment, and I was turned

down because I didn't quite understand what the Government's

theory was.  I have attended a lot of reverse proffers.

90 percent of them resulted in a settlement.  We had a reverse

proffer a week or two ago, and obviously it's a lot different

after an Indictment.

THE COURT:  I don't know what the difference is.

The Government now has a better understanding of its case, its

theory, and its evidence, especially having gone through two

trials.

MR. BRAUN:  Because usually what they do is in

less than an hour they say, here's what we think you did,

here's what we think you did, here's what we think you did.

Now go talk to your client.  If he's lying to you, come back to

1    us, and we'll resolve the case.  I couldn't figure out what

2    their theory was on Las Vegas and the loan.  If we had been

3    able to figure that out, but they turned us down.

4              THE COURT:  So even as of the last reverse

09:33AM 5    proffer, you couldn't figure it out?

6              MR. BRAUN:  I figured it out, but I wasn't that

7    impressed with it.

8              THE COURT:  All right.  Well, at least you

9    understand it because I think it's -- I think it's pretty clear

09:34AM 10   which maybe not so much in terms of the honest services count

11   but certainly in terms of the false statement, but we will see.

12   That's what we have juries for.

13             MR. BRAUN:  Thank you.

14             THE COURT:  All right.

09:34AM 15             MR. JENKINS:  Thank you, Your Honor.

16             (Proceedings concluded at 9:34 a.m.)

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5           I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                    DATED THIS  26TH  DAY OF JANUARY, 2023.

16

17

18               /S/ MIRANDA ALGORRI

19               _____
                 MIRANDA ALGORRI, CSR NO. 12743, CRR
20               FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25