1      **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3     **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5 **UNITED STATES OF AMERICA,**   )
               )
6     **PLAINTIFF,**    )  **CASE NO.**
               )
7     **vs.**      )  **CR 20-326A-JFW**
               )
8 **RAYMOND SHE WAH CHAN,**   )  **VOLUME 2**
               )  **PAGES 64 TO 297**
9     **DEFENDANT.**   )
               )

10

11

12

13      **REPORTER'S TRANSCRIPT OF**
         **TRIAL DAY 2**
14     **WEDNESDAY, FEBRUARY 22, 2023**
         **8:11 A.M.**
15      **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23 _____

24    **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
     FEDERAL OFFICIAL COURT REPORTER
25     350 WEST 1ST STREET, SUITE 4455
     LOS ANGELES, CALIFORNIA 90012
     MIRANDAALGORRI@GMAIL.COM

1                  **APPEARANCES OF COUNSEL:**

2

3  **FOR THE PLAINTIFF:**

4       MARTIN ESTRADA
        UNITED STATES ATTORNEY

5       BY:  MACK JENKINS
        BY:  SUSAH HAR

6       BY:  CASSIE PALMER
        BY:  BRIAN FAERSTEIN

7       Assistant United States Attorneys
        United States Courthouse

8       312 North Spring Street
        Los Angeles, California 90012

9

10 **FOR THE DEFENDANT:**

11      BRAUN & BRAUN, LLP
        BY:  HARLAND W. BRAUN

12      BY:  BRENDAN PRATT
        10880 Wilshire Boulevard

13      Suite 1020
        Los Angeles, California 90024

14

15 Also Present:

16      Special Agent Andrew Civetti

17

18

19

20

21

22

23

24

25

1                          **INDEX OF WITNESSES**

2

3    **WITNESSES**                                                      **PAGE**

4    CIVETTI, Andrew

5            Direct examination by Ms. Palmer                    96

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 1 | Photographs | 103 | 103 |
| 2 | Resume | 112 | 112 |
| 3 | Map | 106 | 106 |
| 5 | Code of Ethics | 128 | 128 |
| 7 | "A Few Facts About Us" | 116 | 116 |
| 20 | Oath of Office | 124 | 124 |
| 21 | Salary | 123 | 123 |
| 22 | Oaths of Office | 124 | 124 |
| 23A | Form 700 (2013) | 131 | 131 |
| 23B | Form 700 (2014) | 131 | 131 |
| 23C | Form 700 (2015) | 131 | 131 |
| 23D | Form 700 (2016) | 131 | 131 |
| 24A | Form 60 (2013) | 131 | 131 |
| 24B | Form 60 (2014) | 131 | 131 |
| 24C | Form 60 (2015) | 131 | 131 |
| 25 | 2013 Calendar | 194 | 194 |
| 26 | 2014 Calendar | 194 | 194 |
| 27 | 2015 Calendar | 194 | 194 |
| 28 | 2016 Calendar | 194 | 194 |
| 29 | 2017 Calendar | 194 | 194 |
| 30 | 2018 Calendar | 194 | 194 |
| 41A | 2/22/2014 Radar Screen | 231 | 231 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 41B | 3/31/2014 Radar Screen | 231 | 231 |
| 42A | 5/3/2015 Radar Screen | 231 | 231 |
| 42B | 11/8/2015 Radar Screen | 231 | 231 |
| 42C | 11/22/2015 Radar Screen | 231 | 231 |
| 42D | 12/6/2015 Radar Screen | 231 | 231 |
| 43A | 3/26/2016 Radar Screen | 231 | 231 |
| 43B | 5/1/2016 Radar Screen | 231 | 231 |
| 43C | 7/24/2016 Radar Screen | 231 | 231 |
| 44A | /1/1/2017 Radar Screen | 231 | 231 |
| 44B | 6/11/2017 Radar Screen | 231 | 231 |
| 45A | 7/9/2018 Radar Screen | 231 | 231 |
| 45B | 10/7/2018 Radar Screen | 231 | 231 |
| 45C | 10/21/2018 Radar Screen | 231 | 231 |
| 45D | 10/28/2018 Radar Screen | 231 | 231 |
| 47 | Document metadata | 172 | 172 |
| 48 | 10/3/2015 to-do list | 172 | 172 |
| 49 | 3/8/2016 to-do list | 172 | 172 |
| 50 | 10/5/2016 to-do list | 172 | 172 |
| 54 | 2014 Synergy balance sheet | 164 | 164 |
| 54A | 2014 Synergy profit & loss | 164 | 164 |
| 55 | 2015 Synergy balance sheet | 164 | 164 |
| 55A | 2015 Synergy profit & loss | 164 | 164 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 56 | 2016 Synergy balance sheet | 164 | 164 |
| 56A | 2016 Synergy profit & loss | 164 | 164 |
| 57 | 2017 Synergy balance sheet | 164 | 164 |
| 57A | 2017 Synergy profit & loss | 164 | 164 |
| 58 | 2018 projected monthly budget | 164 | 164 |
| 71 | Text message | 170 | 170 |
| 71A | Text message | 170 | 170 |
| 72A | Text message | 172 | 172 |
| 72B | Text message | 172 | 172 |
| 72C | Text message | 172 | 172 |
| 72D | Text message | 172 | 172 |
| 72E | Text message | 172 | 172 |
| 112 | Executive meeting | 164 | 164 |
| 113 | E-mail | 164 | 164 |
| 113A | Photograph | 164 | 164 |
| 114 | E-mail | 159 | 159 |
| 114A | Metadata | 159 | 159 |
| 115 | Debt finance plan | 164 | 164 |
| 116 | E-mail | 164 | 164 |
| 117 | E-mail | 164 | 164 |
| 118 | Salesian gala program | 162 | 162 |
| 119 | Salesian tables | 162 | 162 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 120 | Fundraising document | 164 | 164 |
| 121 | Fundraising commitments | 164 | 164 |
| 122 | E-mail | 159 | 159 |
| 124 | E-mail | 162 | 162 |
| 125 | E-mail | 159 | 159 |
| 125A | Metadata | 159 | 159 |
| 126 | E-mail | 159 | 159 |
| 126A | Metadata | 159 | 159 |
| 127 | E-mail | 159 | 159 |
| 128 | Calendar entry | 170 | 170 |
| 129 | Kuk brief | 164 | 164 |
| 130 | E-mail | 159 | 159 |
| 131 | E-mail | 162 | 162 |
| 132 | Contribution | 162 | 162 |
| 133 | E-mail | 162 | 162 |
| 134 | Due diligence report | 162 | 162 |
| 135 | Spreadsheet | 162 | 162 |
| 136 | E-mail | 160 | 160 |
| 137 | E-mail | 160 | 160 |
| 140 | Text message | 170 | 170 |
| 141 | Text message | 162 | 162 |
| 142 | Text message | 162 | 162 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 143 | Text message | 162 | 162 |
| 144 | Text message | 162 | 162 |
| 145 | Text message | 162 | 162 |
| 146 | Text message | 162 | 162 |
| 147 | Text message | 162 | 162 |
| 148 | Text message | 162 | 162 |
| 149 | Text message | 162 | 162 |
| 150 | Text message | 162 | 162 |
| 151 | Text message | 162 | 162 |
| 152 | Text message | 162 | 162 |
| 153 | Text message | 162 | 162 |
| 154 | Text message | 162 | 162 |
| 155 | Text message | 162 | 162 |
| 156 | Text message | 162 | 162 |
| 157 | Text message | 170 | 170 |
| 158A | Text message | 172 | 172 |
| 158B | Text message | 172 | 172 |
| 158C | Text message | 172 | 172 |
| 158D | Text message | 172 | 172 |
| 163 | Video | 164 | 164 |
| 171 | E-mail | 160 | 160 |
| 172 | Note | 170 | 170 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 173 | Text message | 162 | 162 |
| 174 | Text message | 170 | 170 |
| 175 | Text message | 170 | 170 |
| 176 | Text message | 160 | 160 |
| 177 | Text message | 172 | 172 |
| 178 | Text message | 170 | 170 |
| 179 | Text message | 170 | 170 |
| 187 | Metadata | 170 | 170 |
| 187A | Recorded meeting excerpt | 170 | 170 |
| 187B | Recorded meeting excerpt | 170 | 170 |
| 200 | Photographs and metadata | 170 | 170 |
| 201 | Metadata | 170 | 170 |
| 202 | Video | 170 | 170 |
| 203 | Photographs and metadata | 170 | 170 |
| 204 | Metadata | 170 | 170 |
| 212 | Ring camera video | 164 | 164 |
| 212A | Screenshot | 164 | 164 |
| 213 | Photographs | 164 | 164 |
| 220 | Finances document | 172 | 172 |
| 221 | Chase Credit Card statement | 162 | 162 |
| 222 | Chase Credit Card statement | 162 | 162 |
| 223 | Bank records excerpts | 162 | 162 |

| | | | | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|---|---|

**INDEX OF EXHIBITS CON'T**

| # | NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|---|
| 4 | 224 | Bank records excerpts | 162 | 162 |
| 5 | 225 | Bank records excerpts | 162 | 162 |
| 6 | 226 | Receipts | 164 | 164 |
| 7 | 227 | Receipts | 164 | 164 |
| 8 | 228 | Records | 164 | 164 |
| 9 | 229 | Text message | 170 | 170 |
| 10 | 230 | Text message | 170 | 170 |
| 11 | 231 | Subpoena | 162 | 162 |
| 12 | 232 | Subpoena | 162 | 162 |
| 13 | 233 | Radar Screen | 164 | 164 |
| 14 | 300 | Business records | 143 | 143 |
| 15 | 301 | Business records | 143 | 143 |
| 16 | 302 | Homepage | 138 | 138 |
| 17 | 303 | Chairman Oration | 138 | 138 |
| 18 | 304 | News re: Sheraton | 138 | 138 |
| 19 | 305 | News re: 20th anniversary | 138 | 138 |
| 20 | 306 | L.A. Grand - Main | 149 | 149 |
| 21 | 307 | L.A. Grand - renderings | 149 | 149 |
| 22 | 308 | L.A. Grand - letter | 149 | 149 |
| 23 | 309 | L.A. Grand - TFAR application | 149 | 149 |
| 24 | 310 | Sheraton Universal - Main | 150 | 150 |
| 25 | 311 | Sheraton Universal - letter | 150 | 150 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 312 | Sheraton Universal Arch Plans | 150 | 150 |
| 320 | Consolidation Memo | 160 | 160 |
| 321 | E-mail | 160 | 160 |
| 322 | E-mail | 160 | 160 |
| 323 | E-mail | 160 | 160 |
| 324 | E-mail | 160 | 160 |
| 325 | E-mail | 160 | 160 |
| 326 | Analyst Report | 160 | 160 |
| 327 | E-mail | 160 | 160 |
| 328 | E-mail | 160 | 160 |
| 329 | E-mail | 160 | 160 |
| 330 | E-mail | 160 | 160 |
| 331 | E-mail | 160 | 160 |
| 332 | RFP Site Map | 160 | 160 |
| 333 | RFP Information | 160 | 160 |
| 334 | E-mail | 160 | 160 |
| 335 | E-mail | 160 | 160 |
| 336 | Proposed Strategies for Parking Agreement | 160 | 160 |
| 337 | E-mail | 160 | 160 |
| 338 | Consolidation Memo to PLUM | 160 | 160 |
| 339 | Letter | 160 | 160 |
| 340 | Chan Questions Re Union | 160 | 160 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 341 | Chan Questions Re Union | 160 | 160 |
| 342 | City of LA Resolution | 160 | 160 |
| 343 | China Trip Document | 164 | 164 |
| 344 | E-mail | 160 | 160 |
| 345 | E-mail | 162 | 162 |
| 346 | E-mail | 162 | 162 |
| 347 | E-mail | 160 | 160 |
| 348 | E-mail | 160 | 160 |
| 349 | E-mail Chain | 160 | 160 |
| 350 | E-mail | 163 | 163 |
| 351 | Huizar Calendar | 164 | 164 |
| 352 | Shawn Kuk Brief | 164 | 164 |
| 353 | Planning Report Excerpt | 164 | 164 |
| 354 | Letter | 163 | 163 |
| 355 | E-mail | 163 | 163 |
| 356 | E-mail | 160 | 160 |
| 357 | E-mail | 160 | 160 |
| 358 | E-mail | 160 | 160 |
| 359 | E-mail | 160 | 160 |
| 360 | HVS Market Study | 160 | 160 |
| 361 | Chan Google Drive | 160 | 160 |
| 362 | Chan Google Drive | 160 | 160 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 363A | Esparza Phone Notes | 170 | 170 |
| 363B | Esparza Phone Note | 170 | 170 |
| 363C | Esparza Phone Note | 170 | 170 |
| 363D | Esparza Phone Note | 170 | 170 |
| 363E | Esparza Phone Note | 170 | 170 |
| 363F | Esparza Phone Note | 170 | 170 |
| 363H | Esparza Phone Notes | 170 | 170 |
| 363I | Esparza Phone Note | 170 | 170 |
| 363J | Esparza Phone Note | 170 | 170 |
| 364A | Text Message | 172 | 172 |
| 364B | Text Message | 166 | 166 |
| 364C | Text Message | 172 | 172 |
| 364D | Text Message | 172 | 172 |
| 364E | Text Message | 172 | 172 |
| 364F | Text Message | 172 | 172 |
| 364G | Text Message | 172 | 172 |
| 364H | Text Message | 172 | 172 |
| 364I | Text Message | 172 | 172 |
| 364J | Text Message | 172 | 172 |
| 364K | Text Message | 172 | 172 |
| 364L | Text Message | 172 | 172 |
| 364M | Text Message | 172 | 172 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 364N | Text Message | 172 | 172 |
| 364O | Text Message | 172 | 172 |
| 364P | Text Message | 172 | 172 |
| 364Q | Text Message | 172 | 172 |
| 364R | Text Message | 172 | 172 |
| 364S | Text Message | 172 | 172 |
| 364T | Text Message | 172 | 172 |
| 364U | Text Message | 172 | 172 |
| 364V | Text Message | 172 | 172 |
| 364W | Text Message | 172 | 172 |
| 364X | Text Message | 172 | 172 |
| 365A | Text Message | 170 | 170 |
| 365B | Text Message | 170 | 170 |
| 365C | Text Message | 170 | 170 |
| 365D | Text Message | 170 | 170 |
| 365E | Text Message | 170 | 170 |
| 365F | Text Message | 170 | 170 |
| 365G | Text Message | 170 | 170 |
| 365H | Text Message | 170 | 170 |
| 365I | Text Message | 170 | 170 |
| 365J | Text Message | 170 | 170 |
| 365K | Text Message | 170 | 170 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|-------------------|
| 366A | Text Message | 172 | 172 |
| 366B | Text Message | 172 | 172 |
| 367 | Text Message | 170 | 170 |
| 367A | Text Message | 170 | 170 |
| 368 | Text Message | 172 | 172 |
| 369 | Text Message | 170 | 170 |
| 370 | Text Message | 170 | 170 |
| 371A | Text Message | 171 | 171 |
| 371B | Text Message | 171 | 171 |
| 371C | Text Message | 171 | 171 |
| 372A | Text Message | 171 | 171 |
| 372B | Text Message | 171 | 171 |
| 372C | Text Message | 171 | 171 |
| 372D | Text Message | 171 | 171 |
| 372E | Text Message | 171 | 171 |
| 372F | Text Message | 171 | 171 |
| 372G | Text Message | 171 | 171 |
| 372H | Text Message | 171 | 171 |
| 372I | Text Message | 171 | 171 |
| 372J | Text Message | 171 | 171 |
| 372K | Text Message | 171 | 171 |
| 372L | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 372M | Text Message | 171 | 171 |
| 372N | Text Message | 171 | 171 |
| 373A | Text Message | 171 | 171 |
| 373B | Text Message | 171 | 171 |
| 373C | Text Message | 171 | 171 |
| 374 | Text Message | 171 | 171 |
| 375 | Text Message | 171 | 171 |
| 376 | E-mail | 160 | 160 |
| 377 | E-mail | 160 | 160 |
| 378 | E-mail | 160 | 160 |
| 379 | E-mail | 160 | 160 |
| 380 | Voicemail | 171 | 171 |
| 390 | Google Maps | 141 | 141 |
| 391 | Google Maps | 141 | 141 |
| 392 | Photograph | 164 | 164 |
| 393 | Photographs | 286 | 286 |
| 394 | Photographs | 286 | 286 |
| 395 | Photographs | 286 | 286 |
| 396 | Photographs | 286 | 286 |
| 397 | Photograph | 284 | 284 |
| 398 | Photograph | 171 | 171 |
| 399 | Photograph | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 400 | Screenshot | 163 | 163 |
| 401 | Video | 163 | 163 |
| 402 | Video | 163 | 163 |
| 403 | Video | 163 | 163 |
| 404 | Video | 163 | 163 |
| 405 | Photograph | 164 | 164 |
| 406 | Photograph | 164 | 164 |
| 407 | Photograph | 164 | 164 |
| 408 | Screenshot | 163 | 163 |
| 409 | Photograph | 164 | 164 |
| 410 | Photograph | 171 | 171 |
| 411 | Photograph | 171 | 171 |
| 412 | Photograph | 171 | 171 |
| 413 | Video | 163 | 163 |
| 414 | Video | 163 | 163 |
| 415 | Video | 163 | 163 |
| 416 | Video | 163 | 163 |
| 417 | Video | 163 | 163 |
| 418 | Video | 163 | 163 |
| 420 | Cosmopolitan Records | 284 | 284 |
| 421 | Cosmopolitan Records | 284 | 284 |
| 422 | E-mail | 160 | 160 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 423 | E-mail | 160 | 160 |
| 424 | Flight Confirmation | 160 | 160 |
| 425 | Photograph | 171 | 171 |
| 426 | Photograph | 171 | 171 |
| 427 | Photograph | 171 | 171 |
| 428 | Photograph | 171 | 171 |
| 429 | Chrysler Aviation | 164 | 164 |
| 440 | Godoy Lawsuit | 157 | 157 |
| 441 | Letter | 172 | 172 |
| 442 | Grace Luck Resolution | 160 | 160 |
| 443 | Guodi Sun Fee Agreement | 160 | 160 |
| 444 | Promissory Note | 160 | 160 |
| 445 | Wire Authorization | 160 | 160 |
| 446 | CA Bar Search | 157 | 157 |
| 447 | E-mail | 160 | 160 |
| 448 | E-mail | 160 | 160 |
| 449 | E-mail | 160 | 160 |
| 450 | E-mail | 160 | 160 |
| 451 | E-mail | 160 | 160 |
| 452 | E-mail | 160 | 160 |
| 453 | E-mail | 160 | 160 |
| 454 | E-mail | 160 | 160 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|-------------------|
| 455 | E-mail | 160 | 160 |
| 456 | E-mail | 160 | 160 |
| 457 | E-mail | 160 | 160 |
| 458 | E-mail | 160 | 160 |
| 459 | E-mail | 160 | 160 |
| 460 | Chase Acct Statement | 164 | 164 |
| 461 | Check & Deposit Slip | 164 | 164 |
| 462 | East West Bank Documents | 163 | 163 |
| 463 | East West Bank Statement | 163 | 163 |
| 464 | East West Bank Document | 163 | 163 |
| 465 | Wells Fargo Statements | 163 | 163 |
| 466 | Wires & Offsets | 163 | 163 |
| 467 | Walsh & Associates Checks | 163 | 163 |
| 468 | PLUM Approval Motion | 157 | 157 |
| 469 | Motion Postpone Consolidation | 157 | 157 |
| 470 | PLUM Letter | 157 | 157 |
| 471 | City Council Approval | 157 | 157 |
| 472 | PLUM & City Council Approval | 157 | 157 |
| 473 | PLUM & City Council Approval | 157 | 157 |
| 474 | City Council Approval | 157 | 157 |
| 475 | PLUM Approval | 157 | 157 |
| 476 | City Council Approval | 157 | 157 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 500 | Hazens Articles of Incorp | 157 | 157 |
| 501 | Luxe Hotel Renderings | 157 | 157 |
| 502 | Case Information (Luxe) | 157 | 157 |
| 503 | Entitlement Application | 163 | 163 |
| 504 | Letter | 160 | 160 |
| 505 | Letter | 160 | 160 |
| 506 | Hazens TOT Motion | 157 | 157 |
| 507 | Hazens TOT Approval | 157 | 157 |
| 508 | Letter | 160 | 160 |
| 509 | Letter | 160 | 160 |
| 510 | Letter | 160 | 160 |
| 511 | Letter | 160 | 160 |
| 512 | Letter | 160 | 160 |
| 513 | Letter | 160 | 160 |
| 514 | Resolution | 157 | 157 |
| 515 | Hazens CPC Meeting Agenda | 157 | 157 |
| 516 | Hazens CPC Meeting Minutes | 157 | 157 |
| 517 | Hazens PLUM Approval | 157 | 157 |
| 518 | Hazens City Council Approval | 157 | 157 |
| 519 | PLUM Resolution | 157 | 157 |
| 520 | City Council Resolution | 157 | 157 |
| 521 | City Council | 157 | 157 |

| | | | FOR | FOR |
|---|---|---|---|---|
| | | | IDENTIFICATION | EVIDENCE |
| | NUMBER | DESCRIPTION | PG. | PG. |

<b>INDEX OF EXHIBITS CON'T</b>

| | NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|---|
| 4 | 522 | City Council Approval | 157 | 157 |
| 5 | 523 | Development Agreement | 157 | 157 |
| 6 | 530 | E-mail | 160 | 160 |
| 7 | 531 | E-mail | 160 | 160 |
| 8 | 532 | E-mail | 160 | 160 |
| 9 | 533 | E-mail | 160 | 160 |
| 10 | 534 | E-mail | 160 | 160 |
| 11 | 535 | E-mail | 160 | 160 |
| 12 | 536 | Calendar Invite Conf | 160 | 160 |
| 13 | 537 | E-mail | 160 | 160 |
| 14 | 538 | E-mail | 160 | 160 |
| 15 | 539 | E-mail | 160 | 160 |
| 16 | 540 | E-mail | 160 | 160 |
| 17 | 541 | E-mail | 160 | 160 |
| 18 | 542 | E-mail | 160 | 160 |
| 19 | 543 | E-mail | 160 | 160 |
| 20 | 544 | E-mail | 160 | 160 |
| 21 | 545 | E-mail | 160 | 160 |
| 22 | 546 | E-mail | 160 | 160 |
| 23 | 547 | E-mail | 160 | 160 |
| 24 | 548 | E-mail | 160 | 160 |
| 25 | 549 | E-mail | 160 | 160 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|:---:|:---:|
| 550 | E-mail | 160 | 160 |
| 551 | Consulting Agreement | 160 | 160 |
| 551A | Consulting Agreement | 160 | 160 |
| 552 | E-mail | 160 | 160 |
| 553 | E-mail | 160 | 160 |
| 554 | Hazens CPC Presentation | 160 | 160 |
| 555 | Post CPC Document | 160 | 160 |
| 556 | E-mail | 160 | 160 |
| 557 | E-mail | 160 | 160 |
| 560 | Flight Record | 160 | 160 |
| 561 | Consulting Agreement | 160 | 160 |
| 562 | E-mail | 160 | 160 |
| 563 | E-mail | 160 | 160 |
| 564 | Real Estate Report/Invoice | 160 | 160 |
| 565 | Real Estate Report/Invoice | 160 | 160 |
| 566 | Real Estate Report/Invoice | 160 | 160 |
| 567 | Real Estate Report/Invoice | 160 | 160 |
| 568 | Real Estate Report/Invoice | 160 | 160 |
| 569 | Real Estate Report/Invoice | 160 | 160 |
| 570 | E-mail | 160 | 160 |
| 571 | E-mail | 160 | 160 |
| 572 | Receipt | 163 | 163 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 573 | Receipt | 163 | 163 |
| 574 | Ticket Confirmation | 163 | 163 |
| 575 | Receipt | 163 | 163 |
| 576 | E-mail | 163 | 163 |
| 577 | Union Bank Statements | 163 | 163 |
| 578 | Calendar Entry | 171 | 171 |
| 579 | Calendar Entry | 171 | 171 |
| 580 | Calendar Entry | 171 | 171 |
| 581 | Calendar Entry | 171 | 171 |
| 582 | Lakers Tickets | 163 | 163 |
| 590A | Text Message | 172 | 172 |
| 590B | Text Message | 172 | 172 |
| 590C | Text Message | 172 | 172 |
| 591 | Text Message | 171 | 171 |
| 591A | Text Message | 171 | 171 |
| 591B | Text Message | 171 | 171 |
| 591C | Text Message | 171 | 171 |
| 591D | Text Message | 171 | 171 |
| 591E | Text Message | 171 | 171 |
| 591F | Text Message | 171 | 171 |
| 591G | Text Message | 171 | 171 |
| 592A | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 592B | Text Message | 171 | 171 |
| 592C | Text Message | 171 | 171 |
| 592D | Text Message | 171 | 171 |
| 592E | Text Message | 171 | 171 |
| 592F | Text Message | 171 | 171 |
| 592G | Text Message | 171 | 171 |
| 592H | Text Message | 171 | 171 |
| 592I | Text Message | 171 | 171 |
| 592J | Text Message | 171 | 171 |
| 592K | Text Message | 171 | 171 |
| 592L | Text Message | 171 | 171 |
| 592M | Text Message | 171 | 171 |
| 592N | Text Message | 171 | 171 |
| 592O | Text Message | 171 | 171 |
| 592P | Text Message | 171 | 171 |
| 592Q | Text Message | 171 | 171 |
| 592R | Text Message | 171 | 171 |
| 592S | Text Message | 171 | 171 |
| 592T | Text Message | 171 | 171 |
| 592U | Text Message | 171 | 171 |
| 592V | Text Message | 171 | 171 |
| 593A | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 593B | Text Message | 171 | 171 |
| 593C | Text Message | 171 | 171 |
| 593D | Text Message | 171 | 171 |
| 593E | Text Message | 171 | 171 |
| 593F | Text Message | 171 | 171 |
| 593G | Text Message | 171 | 171 |
| 593H | Text Message | 171 | 171 |
| 593I | Text Message | 171 | 171 |
| 593J | Text Message | 171 | 171 |
| 594A | Text Message | 171 | 171 |
| 594B | Text Message | 171 | 171 |
| 594C | Text Message | 171 | 171 |
| 594D | Text Message | 171 | 171 |
| 594E | Text Message | 171 | 171 |
| 595 | Text Message | 172 | 172 |
| 596A | Text Message | 171 | 171 |
| 596B | Text Message | 171 | 171 |
| 596C | Text Message | 171 | 171 |
| 596D | Text Message | 171 | 171 |
| 596E | Text Message | 171 | 171 |
| 596F | Text Message | 171 | 171 |
| 596G | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 596H | Text Message | 171 | 171 |
| 596I | Text Message | 171 | 171 |
| 596J | Text Message | 171 | 171 |
| 596K | Text Message | 171 | 171 |
| 596L | Text Message | 171 | 171 |
| 596M | Text Message | 171 | 171 |
| 596N | Text Message | 171 | 171 |
| 596O | Text Message | 171 | 171 |
| 596P | Text Message | 171 | 171 |
| 596Q | Text Message | 171 | 171 |
| 596R | Text Message | 171 | 171 |
| 596S | Text Message | 171 | 171 |
| 596T | Text Message | 171 | 171 |
| 596U | Text Message | 171 | 171 |
| 596V | Text Message | 171 | 171 |
| 596W | Text Message | 171 | 171 |
| 597A | Text Message | 171 | 171 |
| 597B | Text Message | 171 | 171 |
| 597C | Text Message | 171 | 171 |
| 597D | Text Message | 171 | 171 |
| 597E | Text Message | 171 | 171 |
| 597F | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 597G | Text Message | 171 | 171 |
| 597H | Text Message | 171 | 171 |
| 597I | Text Message | 171 | 171 |
| 597J | Text Message | 171 | 171 |
| 597K | Text Message | 171 | 171 |
| 597L | Text Message | 171 | 171 |
| 597M | Text Message | 171 | 171 |
| 597N | Text Message | 171 | 171 |
| 597O | Text Message | 171 | 171 |
| 597P | Text Message | 171 | 171 |
| 597Q | Text Message | 171 | 171 |
| 597R | Text Message | 171 | 171 |
| 598A | Text Message | 171 | 171 |
| 598B | Text Message | 171 | 171 |
| 598C | Text Message | 171 | 171 |
| 598D | Text Message | 171 | 171 |
| 598E | Text Message | 171 | 171 |
| 598F | Text Message | 171 | 171 |
| 598G | Text Message | 171 | 171 |
| 598H | Text Message | 171 | 171 |
| 598I | Text Message | 171 | 171 |
| 599 | Text Message | 163 | 163 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 601A | Text Message | 171 | 171 |
| 601B | Text Message | 171 | 171 |
| 601C | Text Message | 171 | 171 |
| 602 | Text Message | 171 | 171 |
| 603A | Text Message | 171 | 171 |
| 603B | Text Message | 171 | 171 |
| 603C | Text Message | 171 | 171 |
| 603D | Text Message | 171 | 171 |
| 630 | Hazens Checks | 163 | 163 |
| 631 | Synergy Checks | 163 | 163 |
| 632 | Synergy Checks | 163 | 163 |
| 633 | Synergy Checks | 163 | 163 |
| 700 | Calendar Entry | 171 | 171 |
| 702 | E-mails | 163 | 163 |
| 703 | E-mails & Reports | 163 | 163 |
| 704 | E-mails & Reports | 163 | 163 |
| 705 | E-mails & Reports | 163 | 163 |
| 706 | E-mails & Reports | 163 | 163 |
| 707 | Test Message | 171 | 171 |
| 708 | Text Message | 171 | 171 |
| 709 | Text Message | 171 | 171 |
| 714 | Check from CCC | 163 | 163 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 730 | E-mail | 160 | 160 |
| 731 | E-mail | 160 | 160 |
| 732 | E-mail | 160 | 160 |
| 733 | Andy Wang Checks | 165 | 165 |
| 740 | Text Message | 171 | 171 |
| 761 | Photograph | 157 | 157 |
| 800 | Kevin Chen PAK Contribution | 163 | 163 |
| 801 | Document | 165 | 165 |
| 802 | Dodgers Tickets | 163 | 163 |
| 810 | Text Message | 171 | 171 |
| 811 | Text Message | 171 | 171 |
| 812 | Text Message | 171 | 171 |
| 813 | Text Message | 171 | 171 |
| 814 | Text Message | 171 | 171 |
| 815 | Text Message | 171 | 171 |
| 816 | Text Message | 171 | 171 |
| 817 | Text Message | 171 | 171 |
| 818 | Text Message | 171 | 171 |
| 819 | Text Message | 171 | 171 |
| 820 | Text Message | 171 | 171 |
| 821 | Text Message | 171 | 171 |
| 822 | Text Message | 171 | 171 |

**INDEX OF EXHIBITS CON'T**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 823 | Text Message | 171 | 171 |
| 824 | Text Message | 171 | 171 |
| 825 | Text Message | 171 | 171 |
| 826 | Text Message | 171 | 171 |
| 827 | Text Message | 171 | 171 |
| 828 | Text Message | 171 | 171 |
| 829 | Text Message | 171 | 171 |
| 830 | Text Message | 171 | 171 |
| 831 | Text Message | 171 | 171 |
| 832 | Text Message | 171 | 171 |
| 833 | Text Message | 171 | 171 |
| 834 | Text Message | 171 | 171 |
| 835 | Text Message | 171 | 171 |
| 836 | Text Message | 171 | 171 |
| 837 | Text Message | 160 | 160 |
| 860 | Photograph | 165 | 165 |
| 861 | Photographs | 165 | 165 |
| 902 | LADBS Org. Chart | 115 | 115 |
| 907B | Summary Chart | 272 | 272 |
| 922 | SZNW Casino Trips | 289 | 289 |
| 924 | SZNW 2013-2014 Timeline | 177 | 177 |
| 927 | Godoy Settlement Money Flow | 267 | 267 |

**WEDNESDAY, FEBRUARY 22, 2023; 8:11 A.M.**

**LOS ANGELES, CALIFORNIA**

-oOo-


(The following proceedings were held in

open court outside the presence of the jury:)

THE COURT:  All right.  Good morning.  All

counsel and the defendant are present.  You may be seated.

We have an issue with respect to a juror, and

08:11AM  that is Alternate No. 1, Mr. Curtis Williams.  Shannon was

advised this morning that he didn't believe he could continue

because he has a disability and diabetes.  So Shannon asked

Mr. Williams to write a note, which he did, and I will provide

a copy of it to counsel.  But the note says, "Due to my

08:12AM  disability and diabetes, I determined that I would no longer be

able to attend jury duty."  It's signed by Mr. Williams.

Apparently, my memory was he was an elderly

gentleman who -- so I will hear from counsel.

MR. JENKINS:  Our recollection is he did raise a

08:12AM  potential -- or not potential but a disability that was

potentially interfering.  We would not object given that we

have at least for now five additional alternates.  We wouldn't

object to having a medical-cause excuse.

MR. BRAUN:  We will stipulate to his replacement,

08:13AM  Your Honor.

1          THE COURT:  You have to get to a microphone.

2          MR. BRAUN:  We will stipulate to his replacement,

3    Your Honor.

4          THE COURT:  Okay.  Well, there is no replacement.

08:13AM   5    We will excuse him, and then alternate seat No. 1 will be open,

6    or we will move everybody at some other point in time.

7          MR. BRAUN:  That's agreeable, Your Honor.

8          THE COURT:  All right.  Shannon, you can go ahead

9    and tell him that he is excused and line up the jurors and

08:13AM  10    bring them in.  So we will bring in the jurors in a couple

11    minutes.

12          (A recess was taken at 8:13 a.m.)

13          (The following proceedings were held in

14           open court in the presence of the jury:)

08:18AM  15          THE COURT:  All right.  Welcome, ladies and

16    gentlemen.

17          The Government may call its first witness.

18          MS. PALMER:  Your Honor, the Government calls FBI

19    Special Agent Andrew Civetti.

08:18AM  20          THE CLERK:  Do you solemnly swear that the

21    testimony you shall give in the cause now before this Court

22    shall be the truth, the whole truth, and nothing but the truth,

23    so help you God?

24          THE WITNESS:  I do.

08:18AM  25          THE CLERK:  Thank you.  Be seated.

```
 1                  Please state and spell your name for the record.
 2                  THE WITNESS:  Andrew Civetti, A-n-d-r-e-w
 3      C-i-v-e-t-t-i.
 4                  THE COURT:  All right.  You may proceed.
 5                  MS. PALMER:  Thank you, Your Honor.
 6                       ANDREW CIVETTI,
 7                  GOVERNMENT'S WITNESS, SWORN.
 8                     DIRECT EXAMINATION
 9      BY MS. PALMER:
10          Q      Special Agent Civetti, where do you work?
11          A      The FBI.
12          Q      And how long have you worked at the FBI?
13          A      Since September of 2015, approximately
14      seven-and-a-half years.
15          Q      What is your current assignment?
16          A      I'm assigned to the Los Angeles field office in
17      the public corruption squad.
18          Q      What types of crimes does the public corruption
19      squad investigate?
20          A      We investigate a variety of crimes, typically
21      focused on white collar crimes such as bribery, fraud,
22      obstruction of justice.
23          Q      Do you also investigate conspiracies to do those
24      same things?
25          A      That's correct.
```

1    Q      And how many investigations have you investigated

2  in your career?

3    A      Approximately five to ten.

4    Q      Can you describe briefly your training as an FBI

08:19AM  5  agent?

6    A      When we first get hired as agents, we have to

7  attend a field training course in Quantico, Virginia.  It's

8  approximately 20 weeks.  From there we get assigned to our

9  first field office.  Mine was the Los Angeles field office.  We

08:20AM 10  then start at our field office and are assigned to a squad

11  which we receive, then, field training.

12    Q      And so do you receive specialized training in

13  public corruption?

14    A      Yes.  When I joined the public corruption squad,

08:20AM 15  I was assigned a training agent.  That's an experienced agent

16  who basically takes me under their wing, and I work with them

17  extensively on actual public corruption specific

18  investigations.

19    Q      And do you have periodic continuing training?

08:20AM 20    A      Yes.

21    Q      And have you also been trained in things like

22  evidence collection and various topics relating to specific

23  crimes?

24    A      I have.

08:20AM 25    Q      And does that include training in digital device

1    extractions?

2         A       Yes.

3         Q       And have you also given trainings?

4         A       I have.

08:20AM   5         Q       Can you describe some of those trainings that you

6    have given for the jury?

7         A       I have given a number of trainings across the

8    nation in different field offices specific to public corruption

9    and how to run public corruption investigations.

08:21AM   10        Q       What is your educational background?

11        A       I have a Bachelor of Arts in criminology,

12   criminal justice as well as a law degree.

13        Q       Now, I want to take you to March 2016, please.

14   Were you involved in a federal criminal investigation into

08:21AM   15   corruption and bribery in the City of Los Angeles?

16        A       Yes.

17        Q       And what has your role been in that

18   investigation?

19        A       I have been the lead case agent.

08:21AM   20        Q       And in March 2016, what was the focus of that

21   investigation?

22        A       We were investigating allegations that public

23   officials had been soliciting or accepting benefits in exchange

24   for favorable treatment on a variety of issues.

08:21AM   25        Q       And are you familiar with the term "pay-to-play"?

1      A      I am.

2      Q      And what does that mean as far as this

3  investigation goes?

4      A      Pay-to-play would be looking at benefits in

5  exchange for trying to influence a public official to act or

6  influence a project.  Specifically we were looking at

7  development projects within the city of Los Angeles.

8      Q      And as far as the types of individuals and

9  entities you were investigating, can you describe what

10  categories you were focused on?

11      A      One category was the public officials themselves,

12  if it's elected officials, heads of departments, their staff.

13  And then another category on the other side of it would be the

14  developers or business owners.

15      Q      And were you also investigating lobbyists or

16  consultants who go between those two categories?

17      A      Yes.  We identified them as basically the middle

18  people, the ones that were coordinating between the officials

19  and then the developers.

20      Q      What types of actions by public officials does

21  this -- did your investigation focus on?

22      A      Because we're looking primarily at the

23  development projects, we're looking at the approvals or

24  permissions from the City to be able to have those development

25  projects not only get approved to be able to build but then

1    actually being built.  So the planning approval and the

2    construction approval.

3            Q       And what types of permissions were the developers

4    seeking?  What types of approvals?

08:23AM   5            A       At a high level, they were called "entitlements."

6    That would include different variances to code, different

7    subsidies from the City, the overall just permission to be able

8    to actually build that entity.  A lot of the pieces of land

9    were designated as one particular thing, yet you may want to

08:23AM  10    build something much bigger.  So you're going to need approvals

11    from the City to do that.

12            Q       And did your investigation also involve actions

13    relating to calendaring of hearings?

14            A       Yes.

08:23AM  15            Q       And how is calendaring of hearings relevant to

16    the investigation?

17            A       The City process can be pretty complicated, and

18    one of those steps of the process is to go before a committee

19    of the City Council.  And in order to get before that

08:24AM  20    committee, you would have to be put on to an agenda.  So you

21    would first need to get on that agenda to even have that

22    committee hear that project.

23            Q       In addition to actions that an individual -- a

24    public official might make, were you also investigating public

08:24AM  25    officials using their influence on other public officials?

1        A        That's correct.

2        Q        And were you also looking at persons who aided or

3    helped facilitate bribes?

4        A        Yes.

08:24AM 5        Q        Now, for that developmental process, what primary

6    city departments were involved?

7        A        The process involves a lot of different

8    departments.  But the two specific ones being the

9    Planning Department and the Department of Building and Safety.

08:24AM 10       Q        And as projects progress through development,

11    which City entities are they ultimately approved by?

12       A        The City Council.

13       Q        And are they also signed off ultimately by the

14    mayor?

08:25AM 15       A        Yes.

16       Q        Now, I want to talk about the sorts of processes

17    that you served and did in your investigation.  Can you briefly

18    describe at a high level the types of things that you did?

19       A        The FBI utilized a number of investigative

08:25AM 20    techniques from looking at bank accounts and phone records to

21    executing search warrants on people's residences or their

22    persons or their devices as well as e-mails, wiretaps,

23    recordings, interviews.

24       Q        And approximately how many witnesses did the FBI

08:25AM 25    interview as part of its investigation?

1      A      The number of witnesses, probably between 50 and

2  100, but then we have conducted hundreds of interviews because

3  we have interviewed witnesses multiple times.

4      Q      And is there a particular time period that the

08:26AM   5  investigation was focused on?

6      A      Predominantly 2013 through 2018.

7      Q      Now, you mentioned that the first category of

8  individuals you were focused on -- that the investigation was

9  focused on was local public officials.  Who were the main

08:26AM  10  public officials that you investigated?

11      A      Council Member Jose Huizar, General Manager

12  Raymond Chan who was also the deputy mayor, as well as

13  George Esparza.

14      Q      And what was George Esparza's job title at that

08:26AM  15  time?

16      A      He was the special assistant to Council Member

17  Jose Huizar.

18      Q      And are you familiar with Raymond Chan?  Have you

19  met him?

08:26AM  20      A      I have met him, yes.

21      Q      And can you identify for the jury where he is

22  seated and a piece of clothing?

23      A      He is sitting at the defense counsel table,

24  second one in from the left, white shirt.

08:27AM  25              MR. BRAUN:  I will stipulate that he has

         1    identified my client.

         2                    THE COURT:  All right.

         3                    MS. PALMER:  Your Honor, may I have one moment?

         4                    THE COURT:  Yes.

08:27AM  5         Q        BY MS. PALMER:  Have you reviewed Government's

         6    Exhibit No. 1?

         7         A        I have.

         8         Q        And what is Exhibit No. 1?

         9         A        It's a slide deck of a number of photographs of

08:27AM  10   relevant persons to the investigation.

         11                   MS. PALMER:  Your Honor, at this time the

         12   Government would move to admit previously stipulated Exhibit 1.

         13                   THE COURT:  It will be received without

         14   objection.

08:27AM  15              (Marked for identification and received

         16              into evidence Exhibit No. 1.)

         17                   MS. PALMER:  If we could please pull up page 1.

         18        Q        What is this, Special Agent Civetti?

         19        A        This is a photograph of Defendant Raymond Chan.

08:28AM  20        Q        And you said that the two relevant positions that

         21   Mr. Chan held -- what were the two relevant positions he held?

         22        A        He was the general manager of the Department of

         23   Building and Safety.  At one point it was an interim position

         24   and then became permanent.  And then he was also the deputy

08:28AM  25   mayor of economic development.

 1      Q       And is the general manager of a City department
 2  the head?
 3      A       Yes.  That would be the No. 1 of that department.
 4              MS. PALMER:  And then if we could go to page 2 of
 5  this exhibit, please.  Exhibit 1, page 2.
 6      Q       Is this a photograph of Jose Huizar?
 7      A       That's correct.
 8      Q       And you said that his role that was relevant to
 9  this investigation was council member; correct?
10      A       That's correct.
11      Q       Of which council district?
12      A       He was the council member for
13  Council District 14.
14      Q       And when did Jose Huizar first -- when was he
15  first elected to office?
16      A       2005.
17      Q       And typically how long is the term for a council
18  member?
19      A       Four years.
20      Q       And how many times was Jose Huizar re-elected?
21      A       A total of four times.  2005, 2007, 2011, and
22  2015.
23      Q       I think I misspoke.  Re-elected -- so he was
24  elected a total of four times?
25      A       He was elected four times, re-elected three.

1    Q     And how long did he hold his position as council

2  member?

3    A     15 years.

4    Q     And when did his term end?

5    A     2020.

6    Q     And in 2020, did he term out?

7    A     That's correct.

8    Q     What does that mean?

9    A     That he had -- the number of terms he could --

10  expired.  He could no longer run again.

11    Q     Now, can you briefly describe the structure of

12  the City Council?

13    A     The Los Angeles City Council is broken up

14  geographically into 15 different districts, and each of those

15  districts has an elected council member to represent that

16  district.  So the council itself is made up of 15 elected

17  officials.

18    Q     And in terms of CD-14, is council district

19  abbreviated to CD?

20    A     Correct.

21    Q     What areas -- geographical areas does it cover?

22    A     CD-14 predominantly covers downtown,

23  Boyle Heights, El Sereno, Lincoln Heights.

24    Q     Have you reviewed Government's Exhibit 3?

25    A     I have.

08:29AM (line 5)
08:30AM (line 10)
08:30AM (line 15)
08:30AM (line 20)
08:30AM (line 25)

1      Q      Is it a map of the council districts in

2  Los Angeles?

3      A      Yes.

4             MS. PALMER:  Your Honor, at this time the

08:31AM  5  Government moves to admit previously stipulated Exhibit 3.

6             THE COURT:  It will be admitted without

7  objection.

8             (Marked for identification and received

9             into evidence Exhibit No. 3.)

08:31AM  10            MS. PALMER:  If we could zoom in on the right to

11  Council District 14, please.

12     Q      Is Council District 14 -- do you see that on your

13  screen?

14     A      I do.

08:31AM  15     Q      Is that the area that Jose Huizar represented

16  during the relevant period?

17     A      That's correct.

18     Q      And in addition to being the council member for

19  CD-14, did Huizar have any positions within the City that were

08:31AM  20  relevant to the investigation?

21     A      Yes.

22     Q      What other position?

23     A      He sat on two different committees, the

24  Economic Development Committee and the Planning and Land Use

08:31AM  25  Management Committee.

1    Q      Let's start with the Planning and Land Use

2    Management Committee first.  Is the abbreviation for that PLUM?

3    A      That's correct.

4    Q      And what years was he the chair of that?

5    A      I believe it was from 2013 through 2018.

6    Q      And what is PLUM?

7    A      PLUM is the -- a committee of the City Council.

8    So it's a subset of the 15 council members.  It's typically

9    made up of three to five council members at any given time.  It

10   would be the committee that reviews projects and provides a

11   recommendation and a vote that is transferred to the main full

12   City Council.

13   Q      So the council members who make up PLUM vote on

14   recommendations?

15   A      Correct.  They would vote on the PLUM Committee,

16   and then they would vote again for full council.

17   Q      And you said that it typically has how many

18   members?

19   A      Three to five.

20   Q      Why is PLUM relevant to your investigation?

21   A      PLUM is relevant because it's the committee that,

22   regardless of the council district in which a project may be

23   physically located, the PLUM Committee would see all of those

24   projects that would need these various approvals, not just one

25   particular committee or one particular council district.

1        Q       Thank you.

2               And after PLUM votes on a particular item, does

3        it then go to the City Council for a full vote?

4        A       That's correct.

08:33AM  5        Q       And as far as the chairperson of PLUM, so the

6        role that Jose Huizar had, what types of powers does that give

7        Jose Huizar?

8        A       As the chairperson of a committee, the council

9        member would be responsible for running the particular

08:33AM  10       committee meeting.  In addition, creating the agenda for that

11       meeting.  So determining which projects would be on the agenda

12       or which projects would not be on the agenda.

13       Q       And why is agendizing or being able to put a

14       project on the agenda or off the agenda, why is that something

08:34AM  15       that was relevant to your investigation?

16       A       Well, for the agenda, if you're not on the

17       agenda, the project is not able to move through that city

18       process.  So this was basically a pit stop that needed to occur

19       for development projects and would be relevant to a project

08:34AM  20       actually being able to then be approved and constructed.  So

21       PLUM was that first or the first step before the actual

22       City Council approval.

23       Q       And so Jose Huizar had scheduling power, a vote

24       in PLUM, and a vote in City Council with respect to development

08:34AM  25       projects; is that correct?

1          A        That's correct.

2          Q        You mentioned his second position that was

3     relevant to the investigation was Economic Development

4     Committee.

08:34AM   5          A        Yes.  That's correct.

6          Q        And what is that?

7          A        The Economic Development Committee is another

8     committee of the City Council.  So it would also be made up of

9     a subset of those 15 council members.  And specific to this

08:35AM   10    investigation, the Economic Development Committee was one of

11    the committees that would approve subsidies or the start of

12    subsidies for different projects.

13         Q        And subsidies are a way for a developer to save

14    money on a project; is that right?

08:35AM   15         A        That's correct.

16         Q        Now, I want to return to previously admitted

17    Exhibit 1, page 1.  So back to speaking about the defendant

18    Raymond Chan, let's discuss the two roles he had, the two

19    public offices.

08:35AM   20                  So during what years did he hold the title of

21    general manager of Los Angeles -- the Department of Building

22    and Safety, LADBS?

23         A        2013 through 2016.

24         Q        And when did he become deputy mayor of economic

08:36AM   25    development?

| | | | |
|---|---|---|---|
| | 1 | A | Around July of 2016. |
| | 2 | Q | Are both of those roles appointed by the mayor? |
| | 3 | A | They are appointed positions. |
| | 4 | Q | Did Raymond Chan eventually leave the City? |
| 08:36AM | 5 | A | He did. |
| | 6 | Q | When? |
| | 7 | A | Around July of 2017. |
| | 8 | Q | When he left the City, what did he do for work? |
| | 9 | A | He was a part of a consulting and lobbyist firm. |
| 08:36AM | 10 | Q | Did that consulting and lobbyist firm work with |
| | 11 | | developers in the City? |
| | 12 | A | Yes. |
| | 13 | Q | If you could look -- are you familiar with the |
| | 14 | | Government's Exhibit No. 2? |
| 08:36AM | 15 | A | I am. |
| | 16 | Q | And what is it? |
| | 17 | A | Exhibit 2 is a resume of the defendant. |
| | 18 | Q | And how did you obtain this? |
| | 19 | A | Through a search warrant of his Google account. |
| 08:37AM | 20 | Q | And can you describe for the jury what a search |
| | 21 | | warrant is? |
| | 22 | A | A search warrant is a court order that's signed |
| | 23 | | off by a federal judge.  The search warrant -- we have to put |
| | 24 | | together a -- what they call an affidavit.  It's basically a |
| 08:37AM | 25 | | document that outlines the crimes that we're investigating, the |

facts that we have acquired in the investigation at that time

and a -- what we call a probable cause statement or a reason

for why this particular thing should be searched.  So in this

case, a Google search warrant, why the Google account should be

08:37AM   searched for evidence of the crimes that we have described.

Q      And then once you obtain a search warrant from

the judge, how do you sort through the messages?

A      When the judge signs off on the warrant, we then

serve the warrant on the provider.  So in this instance it

08:38AM   would be Google.  Google then provides us the content

responsive to that order.  That would be a time period in which

we're looking for records.  They would provide the whole set of

records during that relevant time period.

Then part of the warrant is an attachment B, and

08:38AM   attachment B is what outlines what the Government is authorized

to seize, what we have determined was relevant to this

investigation.  So we go through and review that whole

production of documents, so in this case e-mails and a

Google Drive, and look through to see what is responsive to

08:38AM   that warrant.

Q      And after that, do you stop looking at anything

else that was not relevant to the warrant?

A      We basically create two buckets, relevant or

responsive and the nonresponsive.  So once our review is

08:38AM   complete, we have a time period in which that needs to be done.

1    Once that's complete, the nonresponsive we no longer have

2    access to.  We only seize the stuff responsive to that warrant.

3          Q       And Exhibit 2 was a document that you seized from

4    Defendant Chan's Google Drive?

08:39AM    5          A       That's correct.  Responsive to that Google

6    warrant.

7          Q       What is a Google Drive?

8          A       Basically cloud storage.  So the Google Drive is

9    a platform to be able to save documents to, and it's linked to

08:39AM   10    your Google account.

11                MS. PALMER:  Your Honor, at this time the

12    Government moves to admit previously stipulated Exhibit 2.

13                THE COURT:  It will be admitted without

14    objection.

08:39AM   15          (Marked for identification and received

16          into evidence Exhibit No. 2.)

17          Q       BY MS. PALMER:  Bringing up page 1, is this a

18    resume for Raymond Chan?

19          A       That's correct.

08:39AM   20          Q       Aside from what appears to be a typo at the first

21    line of deputy mayor, does that appear to be -- looking at the

22    date range there, does that appear to be a typo as far as the

23    date range for when he served as deputy mayor?

24          A       Yes.  It's my understanding he was deputy mayor

08:40AM   25    from July 2016 through the end of June 2017.

1       Q      But aside from that, does the information on this

2   form appear consistent with other information that you have

3   received during the investigation?

4       A      That's correct.

08:40AM  5       Q      And looking at the first -- at the 2003 through

6   2016 entry on the resume, does that describe some of

7   defendant's duties as general mayor -- general manager and

8   executive officer of LADBS?

9       A      That's correct.

08:40AM  10      Q      And, in particular, looking at the first bullet

11   that the defendant led and directed 1,000 employees with a

12   $180 million budget, is that what that says there?

13       A      That's correct.

14       Q      And then going to the mayoral entry at the top,

08:41AM  15   and as deputy mayor, does it list a number of agencies and

16   operations that Raymond Chan oversaw when he was deputy mayor?

17       A      Yes.

18       Q      And among those are the Building and Public

19   Safety Department?

08:41AM  20      A      Yes.

21       Q      And the Planning Department?

22       A      Yes.

23       Q      Why are those two departments relevant to your

24   investigation?

08:41AM  25      A      Those are two of the departments that are

1    involved in the City approval process for the entitlements and

2    the construction.

3           Q       And then zooming back out, please, and going to

4    the bottom where it says "language," second to the bottom

08:41AM  5    entry, what language does Defendant Chan identify as the

6    languages that he speaks?

7           A       Chinese, the dialects Cantonese and Mandarin, as

8    well as English.

9           Q       Now, you mentioned earlier that LADBS has a role

08:42AM  10   in the development process.  As part of your investigation, did

11   you obtain an organizational chart for LADBS?

12          A       I did.

13          Q       And was that through an open source search?

14          A       Yes.

08:42AM  15          Q       And describe briefly for the jury what an open

16   source search is.

17          A       Open source would be a search of publicly

18   accessible documents.  In a simple sense, a Google search.

19   Whatever documents are publicly accessible, we use different

08:42AM  20   open source databases to be able to review.

21                  MS. PALMER:  Your Honor, at this time the

22   Government moves to admit previously stipulated

23   Exhibit No. 902.

24                  THE COURT:  902 will be received without

08:42AM  25   objection.

|   |   |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 08:43AM | 5 |

1          (Marked for identification and received

2          into evidence Exhibit No. 902.)

3               MS. PALMER:  Publishing 902.

4     Q     Is this document an LADBS organizational chart

5 and telephone directory?

6     A     Yes.

7     Q     Going to page 4 of this document, is the

8 defendant there at the top of this document as the general

9 manager?

10     A     Yes.  Raymond S. Chan, general manager.

11     Q     And then below that, are there different persons

12 and then bureaus that the defendant oversaw?

13     A     That's correct.

14     Q     And are there five bureaus?

15     A     Yes.

16               MS. PALMER:  Then if we could just scroll through

17 that to the next page, please.

18     Q     And does this represent just one of those

19 bureaus?

20     A     That's correct.

21     Q     And with all of the different managers and

22 personnel with positions in that bureau?

23     A     Yes.

24               MS. PALMER:  Okay.  And then go down again one

25 more, please.

1      Q      Same thing for this.  Another bureau, this one

2  the permit and engineering bureau; correct?

3      A      Correct.

4      Q      And does this document contain details of the

08:44AM  5  different bureaus that the defendant oversaw?

6      A      That's correct.

7      Q      Did you also obtain a document relating to LADBS

8  that the department puts out relating to kind of what they do?

9      A      That's correct.

08:44AM 10      Q      And is that Exhibit 7?

11      A      Yes.

12            MS. PALMER:  Your Honor, at this time the

13  Government moves to admit previously stipulated Exhibit No. 7.

14            THE COURT:  It will be received without

08:44AM 15  objection.

16            (Marked for identification and received

17            into evidence Exhibit No. 7.)

18      Q      BY MS. PALMER:  Does this document have both kind

19  of a mission statement for LADBS as well as some facts about

08:44AM 20  the Department of Public and Safety -- Building and Safety?

21      A      That's correct.

22      Q      In particular, looking at the issues, over 57,000

23  permits.  So LADBS, at least at that time, they said they issue

24  over 57,000 e-permits; is that correct?

08:45AM 25      A      Yes.  And I believe this is for fiscal year 2019

1    through 2020.

2         Q     Okay.  And zooming back out, and then below that,

3    can you just read that for the jury?

4         A     "Reviews and approves plans for over 74,000

08:45AM  5    projects annually, over 30 projects every working day."

6         Q     300.

7         A     300 projects.

8         Q     Yes.  Thank you.

9               So as deputy mayor, the defendant, you said,

08:45AM  10   oversaw both Planning and LADBS; is that correct?

11        A     That's correct.

12        Q     And when Ray Chan left the City, you said that he

13   then went to a private consulting firm and worked on behalf of

14   developers; is that correct?

08:46AM  15        A     That's correct.

16              MS. PALMER:  If we could go back to Exhibit 2,

17   page 1, please.  If we could zoom in on the top where it says

18   "Chief real estate development strategist."

19        Q     Next to it it says "Synergy Alliance Advisors."

08:46AM  20   What is Synergy Alliance Advisors?

21        A     It's my understanding it's the consulting

22   lobbyist firm that Ray Chan had.

23        Q     And did you receive documents from Synergy

24   Alliance Advisors as part of your investigation?

08:46AM  25        A     That's correct.

1    Q    And did those documents show that Defendant Chan

2    was paid by Synergy Alliance Advisors?

3    A    Yes.

4    Q    And can you please read the two bullet points as

08:46AM   5    far as what his resume said he did for Synergy Alliance

6    Advisors?

7    A    Bullet one, "Guide projects through development,

8    entitlement, permit, and construction phases."  And the second

9    bullet, "Set development timeline and monitor progress to

08:47AM   10   ensure results."

11   Q    And his title was chief real estate development

12   strategist?

13   A    That's correct.

14   Q    And was Synergy also a subject of your

08:47AM   15   investigation?

16   A    Yes.

17   Q    And did you serve subpoenas on Synergy?

18   A    That's correct.

19   Q    Did Defendant Chan have a business partner at

08:47AM   20   Synergy?

21   A    Yes.

22   Q    And what was that person's name?

23   A    George Chiang.

24        MS. PALMER:  If we could go to Exhibit 1 at

08:47AM   25   page 7.

1      Q      Is this a photograph of George Chiang?

2      A      That's correct.

3      Q      And what did you -- based upon your

4   investigation, what did you understand George Chiang's

08:48AM   5   relationship to be with Raymond Chan?

6      A      That they were business partners.

7      Q      And based upon your review of their -- did you

8   obtain communications, e-mails, text messages, and recordings,

9   that have both Raymond Chan and George Chiang?

08:48AM  10      A      Yes.

11      Q      And based upon your review of those

12   communications, did they work very closely together?

13      A      That's correct.

14      Q      And when Raymond Chan was in the City, was he

08:48AM  15   communicating closely with George Chiang?

16      A      Yes.

17      Q      Did you also obtain toll records between the two

18   of them?

19      A      Yes.  That's correct.

08:48AM  20      Q      And tell the jury what toll records mean.

21      A      Toll records are phone records.  So it would be

22   the numbers dialed in and out.  There's no content.  But it

23   would just be the actual phone records.

24      Q      And did you see frequent communications between

08:49AM  25   the defendant and George Chiang?

|   | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Now, did the FBI later determine that |
| 3 | George Chiang was a subject of their investigation? | |
| 4 | A | Yes. |
| 08:49AM 5 | Q | And did the FBI later interview George Chiang? |
| 6 | A | Correct. |
| 7 | Q | Now, after Defendant Chan left the City, did he |
| 8 | also open another company in addition to Synergy Alliance | |
| 9 | Advisors? | |
| 08:49AM 10 | A | Two other companies. |
| 11 | Q | What's the first one? |
| 12 | A | CCC. |
| 13 | Q | And based upon your investigation, do you know |
| 14 | what CCC stands for? | |
| 08:49AM 15 | A | Raymond Chan, Jeremy Chan, George Chiang. |
| 16 | Q | And who is Jeremy Chan? |
| 17 | A | The defendant's son. |
| 18 | | MS. PALMER:  And if we could pull up Exhibit 1 at |
| 19 | page 5. | |
| 08:49AM 20 | Q | Is this a photograph of Jeremy Chan? |
| 21 | A | Yes. |
| 22 | Q | And so Jeremy Chan worked with George Chiang and |
| 23 | the defendant at CCC? | |
| 24 | A | That's correct. |
| 08:50AM 25 | Q | And did you also, in reviewing the communications |

1    between George Chiang, the defendant, and Jeremy Chan, see that

2    Jeremy Chan provided assistance relating to Synergy as well?

3         A      That's correct.

4         Q      Now, what is Jeremy Chan's vocation?

08:50AM  5    A      He's a lawyer.

6         Q      You said there was a second company that the

7    defendant opened?

8         A      That's correct.

9         Q      What is that company?

08:50AM  10   A      LABXG, Inc.

11        Q      And during your investigation, did you see that

12   Synergy made payments to LABXG?

13        A      That's correct.

14        Q      Now, I want to talk about the third public

08:51AM  15   official you identified as relevant to your investigation,

16   Mr. George Esparza.

17               Can we please pull up previously admitted

18   Exhibit 1 at page 10, please.

19               Is this a picture of George Esparza?

08:51AM  20   A      That's correct.

21        Q      And when you joined the investigation in

22   March 2016, what was George Esparza's role in the City?

23        A      His title was special assistant to Council Member

24   Jose Huizar.

08:51AM  25   Q      What were his duties?

```
 1         A        He was the Councilman's right-hand man.

 2         Q        And what do you mean by that?

 3         A        He was the staff member that reported directly to

 4    the council member.  He would maintain the council member's

 5    calendar for him.  He would attend meetings with the council

 6    member.  He would drive the council member.  He would also

 7    attend meetings with developers.  In addition, he was the

 8    council member's fundraiser.

 9         Q        And did he also, based upon your investigation,

10    pass messages from Jose Huizar to others?

11         A        Yes.  George Esparza acted as a go-between.

12         Q        And did you see -- so did George Esparza become

13    the subject of the investigation in 2016?

14         A        That's correct.

15         Q        And did the FBI later interview George Esparza?

16         A        Yes.

17         Q        Now, I want to talk about the salaries of public

18    officials like Jose Huizar and Raymond Chan.  Are those

19    publicly disclosed?

20         A        Yes.

21         Q        Now, through the investigation, did you

22    determine -- were you able to look at open source data to

23    determine the amount that Jose Huizar was paid on average

24    during the years relevant to the investigation?

25         A        That's correct.
```

```
 1          Q       And approximately what was that?

 2          A       180- to $190,000 a year.

 3          Q       And did you also obtain information relating to

 4    the defendant's salary from 2013 through 2016?

 5          A       That's correct.

 6          Q       And is that information summarized in a chart

 7    that's marked as a Government exhibit?

 8          A       Yes.

 9          Q       And is that Government Exhibit 21?

10          A       Correct.

11                  MS. PALMER:  Your Honor, at this time the

12    Government moves to admit previously stipulated Exhibit No. 21.

13                  THE COURT:  All right.  21 will be received

14    without objection.

15                  (Marked for identification and received

16                  into evidence Exhibit No. 21.)

17                  MS. PALMER:  If we can publish Exhibit 21,

18    please.

19          Q       Special Agent Civetti, looking at this chart,

20    does this summarize the various types of pay and benefits that

21    Raymond Chan received during those relevant years?

22          A       That's correct.

23          Q       Looking at the total pay and benefits, those

24    range from around 238,000 a year to 261,000 a year; is that

25    correct?
```

08:53AM (line 5)
08:53AM (line 10)
08:53AM (line 15)
08:54AM (line 20)
08:54AM (line 25)

1          A       Yes.

2          Q       As part of your investigation, did you review

3    records from the City of Los Angeles relating to oaths of

4    office and the code of ethics?

08:54AM   5          A       Yes.

6          Q       And are those marked as Exhibits 20 and 21 -- I

7    mean, 20 and 22?

8          A       20 and 22.  That's correct.

9          MS. PALMER:  Your Honor, at this time the

08:54AM  10    Government moves to admit previously stipulated Exhibits 20 and

11    22.

12          THE COURT:  All right.  They will be received

13    without objection.

14          (Marked for identification and received

08:55AM  15          into evidence Exhibit Nos. 20 and 22.)

16          Q       BY MS. PALMER:  And turning to page 3 of

17    Exhibit 20, and zooming in on the top, what is the title of

18    this document?

19          A       "Oath of Office."

08:55AM  20          Q       And does this -- is this the oath of office that

21    relates to Raymond Chan?

22          A       That's correct.

23          Q       And if we could just zoom in on the middle, could

24    you please read for the jury what that says there?

08:55AM  25          A       "I do solemnly swear that I will support the

1    Constitution of the United States and the Constitution of the

2    State of California and the charter of the City of Los Angeles

3    and that I will faithfully discharge the duties of the Office

4    of General Manager Department of Building and Safety."

08:55AM    5         Q        And so what's below there written in handwriting

6    is the defendant's title; is that correct?

7         A        At that period in time.

8         Q        At that period in time.  Okay.

9                  Zooming back out, was it signed by the defendant

08:56AM   10    on April 30 of 2014?

11         A        That's correct.

12                 MS. PALMER:  If we could go to page 1 of Exhibit

13    20, please.  Zooming in on the top portion with the signature,

14    please.

08:56AM   15         Q        Is the title of this "Code of Ethics"?

16         A        Yes.

17         Q        Could you please read the text?

18         A        "I have received a copy of the City's code of

19    ethics as contained in the resolution adopted by the

08:56AM   20    City Council on July 21, 1959, and amended August 23rd, 1979,

21    by council resolution.  I have read and understand the intent

22    of this code, and I will apply it in my duties with the City."

23         Q        And it's signed by Raymond Chan?

24         A        That's correct.  That's his signature.

08:56AM   25         Q        On April 30, 2014?

|   |   |   |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Then if we could go to page 2 of Exhibit 20, |

3    please.

4              Is this an "Oath of Loyalty"?

08:57AM 5    A    That's correct.

6    Q    And is it also signed by the defendant?

7    A    Yes.

8    Q    Did you also obtain similar documents for

9    Jose Huizar?

08:57AM 10    A    That's correct.

11    Q    And if we could turn to Exhibit 22 at page 1, are

12    these the various oaths of office and oaths of loyalty for

13    Jose Huizar that you obtained during your investigation?

14    A    These are two of them, and the document contains

08:57AM 15    a number of them.

16    Q    Right.  So it's 11 pages long.  So it would

17    contain a number of them from the various years that

18    Jose Huizar was a council member?

19    A    That's correct.

08:58AM 20    Q    If we could go to page 10, please.  Zooming in on

21    the top of that, is this the similar code of ethics that we

22    just read but for Jose Huizar that we just read for

23    Raymond Chan?

24    A    That's correct.

08:58AM 25    Q    And the date that Jose Huizar signed that is

1    June 25th, 2015?

2         A     Yes.

3              MS. PALMER:  And then if we could go to page 5.

4    What is -- if we could zoom in on the middle portion.

08:58AM  5         Q     If you could just read that text, please, for the

6    jury.

7         A     "I will disclose any interest, direct or

8    indirect, in any business or transaction which is in

9    substantial conflict with the proper discharge of my official

08:59AM 10   duties in the public interest or which impairs my independence

11   of judgment in the discharge of such duties."

12        Q     And is that signed by Huizar?

13        A     That's correct.

14             MS. PALMER:  If we could zoom out, please.

08:59AM 15        Q     And the date of that is June 13, 2011?

16        A     That's correct.

17        Q     Now, both of the documents we have reviewed

18   mention the code of ethics.  Did you obtain a copy of the

19   Los Angeles -- of the code of ethics during your investigation?

08:59AM 20        A     Yes.

21             MS. PALMER:  Your Honor, at this time the

22   Government moves to admit previously stipulated Exhibit No. 5.

23             THE COURT:  It will be received without

24   objection.

08:59AM 25   ///

1          (Marked for identification and received

2          into evidence Exhibit No. 5.)

3     Q      BY MS. PALMER:  Zooming in on the top of this,

4 the title, what is the title of this?

09:00AM   5     A      "City of Los Angeles Code of Ethics."

6     Q      And is the code of ethics divided into various

7 subsections?

8     A      That's correct.

9     Q      And if we could look -- zoom in to the first

09:00AM  10 subsection, is this a general rule with respect to conflicts of

11 interest?

12     A      Yes.

13     Q      Can you please read the text of that for the

14 jury?

09:00AM  15     A      "Persons in the public service shall not engage

16 in nor shall they have any interest, direct or indirect, in any

17 business or transaction nor incur obligation which is in

18 substantial conflict with the proper discharge of their

19 official duties in the public interest or which impairs their

09:00AM  20 independence of judgment in the discharge of such duties."

21     Q      Thank you.

22          And can you go to -- can we zoom in on the second

23 subsection, please.

24          Is the title of this "Actions and Conduct

09:01AM  25 Designed to Build Public Confidence"?

1    A      That's correct.

2    Q      Does this generally require public servants to be

3  impartial and devote their best interests to serving the City?

4    A      Yes.

09:01AM   5         MS. PALMER:  If we could zoom in on the third

6  subsection, please.

7    Q      What is the title of this subsection?

8    A      "Acceptance of Favors and Gratuities."

9    Q      And can you please read that into the record?

09:01AM  10    A      "Persons in the public service shall not accept

11  money or other consideration or favors from anyone other than

12  the City for the performance of an act which they would be

13  required or expected to perform in the regular course of their

14  duties, nor shall such persons accept any gifts, gratuities, or

09:02AM  15  favors of any kind which might reasonably be interpreted as an

16  attempt to influence their actions with respect to City

17  business."

18         MS. PALMER:  Thank you.  Can we please zoom in on

19  subsection 5, please.

09:02AM  20    Q      Is the title of this "Use of City Employment and

21  Facilities for Private Gain"?

22    A      That's correct.

23    Q      Does this generally advise employees that they

24  cannot use for private gain the City's time and facilities or

09:02AM  25  their positions?

1      A      That's correct.

2             MS. PALMER:  And, finally, just one more, if we

3      could go to subsection 10, please.

4      Q      This subsection is entitled "Discussion of Future

09:02AM 5   Employment."  Can you please read it into the record?

6      A      "Persons in the public service shall not

7      negotiate for future employment outside the City service with

8      any person, firm, or organization known by such persons to be

9      dealing with the City concerning matters within such person's

09:03AM 10  area of responsibility or upon which they must act or make a

11     recommendation."

12     Q      Thank you, Special Agent Civetti.

13            Did you obtain disclosure forms of the State of

14     California?

09:03AM 15  A      That's correct.

16     Q      Generally, does the State of California require

17     certain disclosures of public officials?

18     A      Yes.

19     Q      And what two types of forms did you obtain in

09:03AM 20  your investigation relating to the defendant?

21     A      Form 700 forms which are the State of

22     California's disclosure of economic interests as well as the

23     City's version of that, their Form 60.

24     Q      And did you -- are those marked as -- are the

09:03AM 25  Form 700s marked as Exhibits 28A through 28D?

1        A        No.  23A through 23D.

2        Q        Yes.  Are the Form 60s marked as 24A through 24C?

3        A        That's correct.

4                 MS. PALMER:  Your Honor, at this time the

09:04AM  5   Government moves to admit previously stipulated Exhibits 23A

6   through 23D.

7                 THE COURT:  They will be received without

8   objection.

9                 (Marked for identification and received

09:04AM  10                into evidence Exhibit Nos. 23A through 23D.)

11                MS. PALMER:  And 24A through 24C.

12                THE COURT:  What about C?

13                MS. PALMER:  Yes, Your Honor.  A through C.

14                THE COURT:  You're including C?

09:04AM  15                MS. PALMER:  Yes.

16                THE COURT:  Those will be received without

17   objection.

18                MS. PALMER:  Thank you, Your Honor.

19                (Marked for identification and received

09:04AM  20                into evidence Exhibit Nos. 24A through 24C.)

21       Q        BY MS. PALMER:  Now, I want to speak with you

22   about the FBI's investigation of crimes by local and state

23   public officials.

24                When does the FBI have jurisdiction to

09:04AM  25   investigate those types of crimes?

1    A        The investigation -- we have jurisdiction when

2    the local entity receives at least $10,000 worth of federal

3    money.  So in this case, the City of Los Angeles receives in

4    excess of that amount from the Federal Government.

09:05AM  5    Q        During the investigation, did you learn that the

6    City of Los Angeles received funds from the Federal Government

7    for each of the calendar years from 2013 through 2018?

8    A        That's correct.

9    Q        And did they receive at least $10,000 in federal

09:05AM 10    funds for each of those calendar years?

11    A        Yes.

12    Q        Now, I want to discuss the second set of persons

13    who you said were the subjects of your investigation, real

14    estate developers.  So in addition to public officials, the

09:05AM 15    investigation focused on real estate developers.  What were you

16    investigating as it pertained to real estate developers?

17    A        The FBI was investigating whether developers were

18    providing any type of benefit to the public officials,

19    attempting to influence them or have them agree to provide that

09:06AM 20    developer with favorable treatment on the projects.

21    Q        Did you investigate a number of real estate

22    developers in this case?

23    A        That's correct.

24    Q        For the real estate developers that you were

09:06AM 25    focused on, were those with projects in downtown Los Angeles?

1        A        Either current projects or prospective projects.

2        Q        In particular, did you focus on developers with

3    projects in Jose Huizar's district?

4        A        That's correct.

09:06AM   5        Q        Let's talk about one of those developers.  Was

6    such a person named Wei Huang?

7        A        That's correct.

8        Q        And who is Wei Huang?

9        A        Wei Huang was the chairman of a development

09:06AM   10    company called Shen Zhen New World.  He was a Chinese national.

11        Q        And bringing up Exhibit 1 at page 13, looking at

12    the right there, is that a photograph of Wei Huang?

13        A        That's correct.

14        Q        And was Wei Huang the chairman of a company

09:07AM   15    called Shen Zhen New World?

16        A        Yes.

17        Q        And is he also the billionaire owner of that

18    company?

19        A        He's the sole owner of the company and its

09:07AM   20    subsidiaries.

21        Q        Is that company based in China?

22        A        Yes.

23        Q        Particularly, the name Shen Zhen, does that refer

24    to a particular region of China?

09:07AM   25        A        That's correct.

```
 1          Q       Which part of China?

 2          A       It's a province in China.

 3          Q       And where does Wei Huang live?

 4          A       In China in Shen Zhen.

 5          Q       But during the period between 2013 and '18, did

 6   he visit the United States regularly?

 7          A       That's correct.

 8          Q       How often?

 9          A       Anywhere from four to ten times a year.  He had a

10   residence in San Marino, California.

11          Q       And is your understanding that Chairman Huang is

12   a Chinese national?

13          A       That's correct.

14          Q       And did Chairman Huang have a relationship with

15   Raymond Chan in 2013?

16          A       That's my understanding.

17          Q       And did he have a relationship with Jose Huizar

18   in 2013?

19          A       Not initially.

20          Q       So did he have -- did he have a relationship with

21   Jose Huizar prior to 2013?

22          A       No.

23          Q       And based upon your investigation, including your

24   review of text messages, e-mails, and other communications, how

25   were Wei Huang and Jose Huizar introduced?
```

|   |   |
|---|---|
| 1 | A        Through Raymond Chan. |
| 2 | Q        Now, I want to talk to you about a few other |
| 3 | persons who were -- who worked for Shen Zhen New World or were |
| 4 | affiliated with Wei Huang. |
| 09:09AM 5 | If we could bring up Exhibit 1, page 8, please. |
| 6 | Looking at the top there, who is that? |
| 7 | A        Virginia Clark.  She was the general manager for |
| 8 | Shen Zhen New World here in Los Angeles. |
| 9 | Q        And did she manage -- did Shen Zhen New World |
| 09:09AM 10 | have two hotels that are relevant to the investigation? |
| 11 | A        That's correct. |
| 12 | Q        And what were the names of those hotels? |
| 13 | A        The L.A. Grand Hotel which was located in |
| 14 | downtown Los Angeles, and the Sheraton Universal which was by |
| 09:09AM 15 | Universal Studios. |
| 16 | Q        Did Ms. Clark manage at least one of those |
| 17 | hotels? |
| 18 | A        Yes.  She was the general manager. |
| 19 | Q        Of which one? |
| 09:09AM 20 | A        The L.A. Grand.  I believe she oversaw both of |
| 21 | them at points in time as well. |
| 22 | Q        And did she work directly with Wei Huang during |
| 23 | the period relevant to your investigation? |
| 24 | A        Yes. |
| 09:10AM 25 | Q        And was Virginia Clark a person of interest to |

1    the investigation?

2         A       That's correct.

3         Q       Now, did you also investigate someone named

4    Ricky Zheng?

5         A       Yes.

6         Q       And if we could bring up page 23 of previously

7    admitted Exhibit No. 1, is this a photo of Ricky Zheng?

8         A       That's correct.

9         Q       And as far as Ricky Zheng's relationship to

10   Wei Huang, how would you describe that relationship?

11        A       He had a multifaceted relationship.  At one point

12   he was the owner's representative.  So he represented Wei Huang

13   here in the United States.  I believe he had a title of

14   executive director.  He was Wei Huang's right-hand man.

15        Q       And when you say owner's representative, is that

16   for representing the owner on behalf of the hotels?

17        A       That's correct.

18        Q       And you said he was his right-hand -- what do you

19   mean by that as far as did he -- I think you used that term

20   with respect to Mr. Esparza.  What kinds of things did

21   Mr. Zheng do for Wei Huang?

22        A       Mr. Zheng would organize meetings.  He would

23   communicate messages from Wei Huang to George Esparza.  He

24   would do a variety of tasks on a daily basis.

25        Q       Now, I want to talk a little bit about

1    Chairman Huang and his company.  Did you conduct open source

2    research on Shen Zhen New World?

3         A       That's correct.

4         Q       And one of the things you reviewed was Shen Zhen

5    New World's website?

6         A       Yes.

7         Q       And is the URL of that website

8    www.sznewworld.com?

9         A       I believe that to be accurate.

10        Q       Okay.  And when you pulled up this website, was

11   it in Chinese or in English?

12        A       Initially in Chinese.

13        Q       And were you able to toggle on the website to

14   show English?

15        A       Yes.  The website had a built-in feature to be

16   able to toggle between the two languages.  So I could toggle to

17   English and read the web page.

18        Q       Basically, you can click a button on the website,

19   and it would switch over to English?

20        A       Correct.

21        Q       Did you preserve screen grabs or printouts of

22   that website?

23        A       Yes.  Various pages of that website.  Not just

24   the home page, but there were a number of tabs that I

25   preserved.

1    Q      So the English -- are those marked as exhibits in

2    this case?

3    A      That's correct.

4    Q      And are those in English?

09:13AM  5    A      Yes.  They're in English mostly.

6    Q      And the English that appears on those, is that

7    what the website provided?

8    A      Correct.

9    MS. PALMER:  Your Honor, at this time the

09:13AM 10    Government would move to admit previously stipulated

11    Exhibits 302 through 305.

12              THE COURT:  They will be received without

13    objection.

14              (Marked for identification and received

09:13AM 15              into evidence Exhibit No. 302 through 305.)

16              MS. PALMER:  If we could please publish

17    Exhibit 302.

18    Q      Zooming in on the top half of the page, what is

19    this?

09:13AM 20    A      This is the homepage for Shen Zhen New World.

21    Q      And the text that's in the sky sort of above that

22    skyline, can you read that for the jury?

23    A      "New World New Landmark."

24    Q      In the top left corner there, there's a logo.  Is

09:13AM 25    that the logo for Shen Zhen New World Group?

1   A       That's correct.

2   Q       And then zooming out, please, and zooming in on

3   the bottom left, looking at the bottom left, there's something

4   that says "Real Estate Development."

09:14AM  5           Do you see that?

6   A       That's correct.

7   Q       And based upon your investigation, was real

8   estate development a core industry of Shen Zhen New World

9   Group?

09:14AM 10  A       Yes.  It was my understanding they were a

11  development company.

12  Q       And by real estate developer -- we have been

13  using that word -- can you describe in very simple terms what

14  that means?

09:14AM 15  A       Development meaning taking a piece of property

16  and constructing it into something larger, multi-use.  Not just

17  owning a piece of property but actually developing it into

18  something else.

19  Q       And on the Shen Zhen website, is Chairman Huang

09:14AM 20  represented, reflected as the chairman and president of

21  Shen Zhen New World Group?

22  A       Yes.  On the website, that's correct.

23  Q       Did you review similar pages about Shen Zhen's

24  history of real estate development that contribute to your

09:15AM 25  understanding of Shen Zhen New World as a development company?

1          A        That's correct.

2          Q        And based upon your knowledge of the

3  investigation, what, if any, business properties did

4  Chairman Huang have in the United States?

09:15AM  5          A        Chairman Huang only had the two properties, the

6  L.A. Grand and the Sheraton Universal, both located in

7  Los Angeles.

8          Q        So you're not aware of any other properties in

9  the United States that Shen Zhen New World had?

09:15AM 10          A        No.  I'm not aware.

11          Q        So let's talk about those two hotels.  Starting

12  with the L.A. Grand Hotel, what year did Shen Zhen New World

13  acquire the L.A. Grand Hotel?

14          A        2010.

09:16AM 15          Q        For how much?

16          A        I don't recall the specific amount, but millions

17  of dollars.

18          Q        Was it many millions of dollars?

19          A        Many millions.

09:16AM 20          Q        Okay.  And was the defendant LLC the sole owner

21  of the L.A. Grand Hotel?

22          A        Do you mind repeating that?

23          Q        Was the -- was the LLC, Shen Zhen New World, the

24  sole owner of the L.A. Grand Hotel?

09:16AM 25          A        The sole owner of L.A. Grand Hotel was Shen Zhen

1    New World I.  That was a U.S. subsidiary of the parent company

2    Shen Zhen New World, all owned by Wei Huang.

3         Q       And where is it located?

4         A       The subsidiary?

5         Q       No.  The L.A. Grand Hotel.

6         A       In downtown Los Angeles in Jose Huizar's district

7    on Figueroa Street.

8         Q       And did you acquire maps of the areas in which

9    those two hotels are located?

10        A       Yes.  On the open source, I put the address of

11   the hotel, 333 South Figueroa, into a Google map and looked at

12   the street view of those maps.

13             MS. PALMER:  Your Honor, at this time the

14   Government moves to admit previously stipulated Exhibits 390

15   and 391.

16             THE COURT:  All right.  They will be received

17   into evidence without objection.

18             (Marked for identification and received

19             into evidence Exhibit Nos. 390 and 391.)

20        Q       BY MS. PALMER:  Publishing Exhibit 390, what is

21   this?

22        A       This is a -- the Google map, and there is -- it's

23   hard to see, but there is a red pin for 333 South Figueroa.

24   That's the location of the L.A. Grand in downtown Los Angeles.

25        Q       And the freeway going directly to the left of

1   that, is that the 110 Freeway?

2        A      That's correct.

3        Q      And if we could go to page 2 of Exhibit 390 and

4   if we could zoom in on the top of that, please, what does this

09:18AM  5   depict?

6        A      This is a street level view from Figueroa Street

7   looking at the L.A. hotel.  You can see the logo behind the

8   palm trees.  That would be the front, like, vestibule area, the

9   drive-up valet, and then the actual 13-story hotel is to the

09:18AM  10  left, the glass building.

11       Q      And during your investigation, did you hear the

12  L.A. Grand Hotel referred to by another name?

13       A      The L.A. Grand, the Downtown Hotel.

14       Q      The Downtown Hotel?

09:18AM  15       A      Correct.

16       Q      And did you obtain business records for the

17  L.A. Grand Hotel as part of your investigation?

18       A      Yes.

19       Q      Including California Secretary of State records?

09:18AM  20       A      That's correct.

21            MS. PALMER:  Your Honor, at this time, we move to

22  admit previously stipulated Exhibit 300.

23            THE COURT:  All right.  It will be received

24  without objection.

09:18AM  25  ///

```
 1                    (Marked for identification and received

 2                    into evidence Exhibit No. 300.)

 3                         MS. PALMER:  And 301, Your Honor.

 4                         THE COURT:  That will also be received without

 5         objection.

 6                    (Marked for identification and received

 7                    into evidence Exhibit No. 301.)

 8                         MS. PALMER:  Thank you.

 9              Q         Publishing Exhibit 301, what is this?

10              A         This is the Articles of Incorporation or Articles

11         of Organization for Shen Zhen New World II, LLC, for the State

12         of California.  This would be for the U.S. subsidiary of

13         Shen Zhen New World that owns the Sheraton Universal.

14              Q         And that's the other hotel?

15              A         That's the -- Wei Huang's second property that he

16         acquired.  That's correct.

17              Q         And if we could pull up Exhibit 301 -- sorry --

18         300, page 1.

19                         Is this the Secretary of State record for

20         Shen Zhen New World New Age I, LLC?

21              A         Yes.  I believe this is the first Articles of

22         Organization that was filed in 2010 when the property was

23         built, and I believe there were subsequent files that changed

24         the name to Shen Zhen New World I, LLC.

25              Q         And this is the corporation that held the
```

09:19AM (line 5)
09:19AM (line 10)
09:19AM (line 15)
09:19AM (line 20)
09:20AM (line 25)

1    L.A. Grand Hotel?

2         A     Correct.  Owned by Chairman Huang.

3         Q     And going to page 12 of Exhibit 300, looking at

4    the manager member -- the business address first, is the

5    business address 333 South Figueroa Street?

6         A     That's correct.

7         Q     And that's the address that you identified for

8    the L.A. Grand Hotel?

9         A     Yes.

10        Q     Going below that for managing members, it says,

11   "Qi Wei Huang."  Do you understand that to be another spelling

12   for Wei Huang's name?

13        A     No.  That's actually his daughter Tiffany Huang.

14        Q     Okay.  And going down to the Chief Executive

15   Officer for type of business, No. 7, is Wei Huang identified as

16   the Chief Executive Officer of the hotel?

17        A     That's correct.

18        Q     Now I'd like to talk to you about the Sheraton

19   Universal.  Where is the Sheraton Universal located?

20        A     In Council District 4 by Universal Studios.

21        Q     What year did Chairman Huang acquire the Sheraton

22   Universal?

23        A     2011.

24        Q     Was it acquired for approximately $90 million?

25        A     That's correct.

1    Q     And is the Sheraton Hotel in Jose Huizar's

2    council district?

3    A     No.

4    Q     Which council district is it in?

09:22AM   5    A     Council District 4.

6    Q     But as a council member, would Jose Huizar have

7    had a vote over that -- any development votes?

8    A     Yes.  He has a vote in City Council and also, if

9    this hotel were to be redeveloped in any capacity, through the

09:22AM   10   PLUM Committee.

11   Q     And he would also have that agendizing power in

12   the PLUM Committee for this project as well?

13   A     That's correct.

14         MS. PALMER:  If we could publish Exhibit 391,

09:22AM   15   please.

16   Q     Zooming in on the top, is that the location of

17   the Sheraton Universal Hotel?

18   A     Yes.  Located at 33 Universal Hollywood Drive.

19   Q     It's indicated by the red flag there?

09:23AM   20   A     Yes.  And I correct myself.  333 Universal

21   Hollywood.

22   Q     And it's -- just below it is the 101 Freeway; is

23   that right?

24   A     That's correct.

09:23AM   25   Q     Zooming back out and zooming in on just the photo

1   there, is that a photograph of the front of the

2   Sheraton Universal Hotel?

3          A       That's correct.

4          Q       And did Shen Zhen New World issue any press

09:23AM   5   releases when it purchased the two hotels?

6          A       Yes.  There's a press release advertised on their

7   website that I took a screenshot of.

8          Q       If we could publish previously admitted

9   Exhibit 304, please, is this the press release that you

09:23AM   10  obtained from Shen Zhen New World's website?

11         A       Yes.  This is the article dated January 12 of

12  2011.

13         Q       And this relates to Shen Zhen New World

14  purchasing a -- the hotel in Los Angeles; is that correct?

09:24AM   15         A       That's correct.  The second hotel.

16                MS. PALMER:  If we could pull up Exhibit 304

17  again, please.  If we could highlight looking at -- the last

18  sentence.  If we could zoom in on that text.  If we could

19  highlight the last sentence of the first paragraph.

09:24AM   20                THE WITNESS:  It's cut off a little.

21         Q       BY MS. PALMER:  Yeah.  Can you read the last

22  sentence of the first paragraph, please.

23         A       "We believe that Sheraton Universal with its

24  location near to the main entertainment industry area will

09:25AM   25  maintain its decisive position in service industry.  We plan to

1    have strategic cooperation with domestic business partners to

2    expand the guest source of Sheraton Universal."

3        Q       Sorry.  I actually meant -- I thought the one

4    above was the first paragraph.  Where it starts with "The

09:25AM  5  second successful purchase."

6        A       I apologize.  "This is the second successful

7    purchase of famous hotel in L.A. within nine months following

8    its purchase of Los Angeles Downtown Hotel last March."

9        Q       And then if we could read the highlighted portion

09:25AM  10  that starts with "Huang Wei, president of the group."

11       A       "Huang Wei, president of the group, said the

12   acquisition of Sheraton Universal strengthen our company's

13   investment strategy on U.S. real estate and perfect our

14   investment in Los Angeles.  We believe that Los Angeles real

09:26AM  15  estate market has great potential for development."

16       Q       Huang Wei, do you understand that to be Wei Huang

17   and sometimes his name is presented with the last name first?

18       A       That's correct.

19       Q       Based upon your knowledge of the investigation,

09:26AM  20  would any major development project in Los Angeles, including

21   the L.A. Grand Hotel or the Sheraton Universal, need to go

22   through L.A. City Council for approval process?

23       A       That's correct.  First through PLUM and then

24   through City Council.

09:26AM  25              MS. PALMER:  If we could publish previously

1   admitted 305, page 1, please.

2         Q       What is the title of this?

3         A       "New World, New Leads Shen Zhen New World

4   Celebrated its 20th Year Anniversary."

09:27AM  5         Q       If we could zoom in on the highlighted portion,

6   please, can you read that highlighted portion into the record,

7   please.

8         A       "Especially in year 2010 and 2011, the group

9   purchased Los Angeles Marriott Hotel and Sheraton Universal

09:27AM 10  Hotel in 63 million and 90 million respectively.  While these

11  purchases fulfilled the company's dream of transnational

12  development, they were the first successful cases in which five

13  star hotels in the U.S.A. purchased by Chinese enterprise."

14        Q       And in this sentence, Los Angeles Marriott Hotel,

09:27AM 15  does that refer to the property that you have been referring to

16  as L.A. Grand Hotel?

17        A       That's correct.  When the property was purchased,

18  it was designated as a Marriott brand hotel.

19        Q       Through the investigation, did you learn that

09:27AM 20  Chairman Huang took steps to develop both the L.A. Grand Hotel

21  and the Sheraton Universal?

22        A       That's correct.

23        Q       And did you obtain information that Shen Zhen

24  New World formally filed applications with the City of

09:28AM 25  Los Angeles to develop the two hotels?

```
 1            A       Yes.
 2            Q       And did you obtain copies of portions of those --
 3     did you obtain copies of those?
 4            A       Of the applications, that's correct.
 5            Q       And are portions of those applications marked as
 6     Government exhibits?
 7            A       Yes.
 8            Q       And with respect to the L.A. Grand Hotel, are
 9     those marked as Exhibits 306 through 309?
10            A       That's correct.
11                    MS. PALMER:  Your Honor, at this time, the
12     Government moves to admit exhibits -- previously stipulated
13     Exhibits 306 through 309.
14                    THE COURT:  They will be received without
15     objection.
16                    (Marked for identification and received
17                    into evidence Exhibit Nos. 306 through 309.)
18            Q       BY MS. PALMER:  And are portions of the
19     application to develop the Sheraton Universal contained in
20     Exhibits 310 through 312?
21            A       That's correct.
22                    MS. PALMER:  Your Honor, at this time the
23     Government moves to admit previously stipulated Exhibits 310
24     through 312.
25                    THE COURT:  They will be received without
```

09:28AM (line 5)
09:28AM (line 10)
09:28AM (line 15)
09:28AM (line 20)
09:29AM (line 25)

1    objection.

2              (Marked for identification and received

3              into evidence Exhibit Nos. 310 through 312.)

4         Q    BY MS. PALMER:  Special Agent Civetti, were these

09:29AM  5    two applications filed with the City on the same day?

6         A    They were.

7         Q    What day was that?

8         A    It was in June of 2018.  I believe the 7th or

9    8th.

09:29AM  10        Q    If we could display previously admitted

11   Exhibit 306, page 1, what is the header?  Can you please read

12   the header of this document?

13        A    "Applications, Department of City Planning

14   Application."

09:29AM  15        Q    And if you could read the project description.

16        A    The project name is the "L.A. Grand Hotel

17   Downtown Redevelopment" and the description being "The project

18   will consist of a conversion of an existing 13-story hotel to

19   to 224 apartment units with the addition of a 77-story tower

09:30AM  20   that will provide 599 new hotel rooms, 242 condominium units,

21   28,704 square feet of commercial, and 36,674 square feet of

22   hotel amenities."

23        Q    Zooming out, looking at the project location, is

24   that the location of the L.A. Grand Hotel?

09:30AM  25        A    Correct.

1      Q       And does this application reflect that the

2  redevelopment project would add a 77-story tower to the

3  existing hotel?

4      A       That's correct.

09:30AM  5      Q       Based upon your investigation, would a 77-story

6  tower have been the tallest building in Los Angeles?

7      A       Not only Los Angeles.  The tallest west of the

8  Mississippi.

9              MS. PALMER:  And looking at the project team

09:30AM  10  information, if we could zoom back out, going to page 2.  Page

11  4 for the record.  I apologize.

12      Q       Zooming in on the top there, who is the

13  applicant?

14      A       Huang Wei or Wei Huang.

09:31AM  15      Q       And the company?

16      A       Shen Zhen New World I, LLC.

17      Q       And the attention following it?

18      A       Virginia Clark.

19      Q       And that's the person you identified previously

09:31AM  20  for the jury?

21      A       That's correct.

22      Q       And looking at the e-mail address, is that the

23  e-mail address that you saw on e-mails associated with

24  Ms. Clark that you obtained during the investigation?

09:31AM  25      A       That's correct.

1          Q       Now, zooming back out, below that there's an

2    indication of agent representative names and other.  Could we

3    zoom in on those two categories?  What is the agent

4    representative?

09:32AM   5          A       The agent representative would be a firm or a

6    consultant lobbyist that is acting on behalf of the company.

7          Q       And for this particular project, Psomas was the

8    consultant?

9          A       That's correct.

09:32AM   10         Q       And then below it has "Other, specify architect"

11   and next to it it says, "The architects of record."  Who were

12   the architects of record for this project?

13         A       The DiMarzio Kato Architectural Firm,

14   specifically Jeff DiMarzio and Saturo Kato.

09:32AM   15         Q       If we could turn to page 9 of Exhibit 306, No. 3

16   there has "Actions requested."  How many actions are stated

17   there?

18         A       There's four different actions.

19         Q       Is your understanding of what -- what is your

09:33AM   20   understanding of what actions requested means in the context of

21   this application?

22         A       The actions requested are the permissions or

23   approvals that the project is requesting from the City.

24         Q       And so those are approvals that would need to go

09:33AM   25   through the City process?

1          A       Yes.  This is what we would call the

2    entitlements.

3          Q       And would PLUM review at least some of these

4    requests?

09:33AM   5          A       Yes.  Because there's multiple requests, these

6    would actually be all packaged together.  So PLUM would review

7    all of these requests.

8          Q       If we could display previously admitted

9    Exhibit 307, what is this, Special Agent Civetti?

09:34AM  10          A       This is a rendering of what the developer was

11   hoping to build.

12          Q       Is this something that was created by the

13   architecture firm that was employed on this project?

14          A       That is correct.  This would be the rendering

09:34AM  15   submitted with the application.

16          Q       If we could go to page 8 of this exhibit.  We're

17   scrolling through.  Are these various renderings that were

18   provided by the architecture firm and submitted with the

19   application?

09:34AM  20          A       That's correct.

21          Q       And on the screen right now, there are two

22   exhibit -- page 7 and page 8.  Are those aerial views of what

23   the architects anticipated the project would look like?

24          A       That's correct.  From two different angles.

09:35AM  25          Q       If we could zoom in on 7, please.  Orienting the

1  jury, the freeway that's going past that, is that, again, the

2  110 Freeway that we see there?

3       A       Yes.  The freeway above the building, that is the

4  110.

09:35AM  5       Q       Running basically left to right across.

6       A       Correct.

7       Q       And the existing hotel, is that reflected sort of

8  in the bottom in black?  Is that the existing hotel?

9       A       The existing hotel would be the left portion of

09:35AM  10  the building, the smaller one.  That would be the 13 stories

11  that currently exist.  And the right side would be the new

12  77-story tower.

13       Q       If we could go to page 11, please.  What is this,

14  Special Agent Civetti?

09:36AM  15       A       This would be the rendering from the street view.

16       Q       As part of your investigation, did you prepare

17  timelines of the evidence that you gathered?

18       A       That's correct.  A number of timelines.

19       Q       And did one of those timelines relate to the

09:36AM  20  development of the L.A. Grand Hotel?

21       A       Yes.  These were events that were on some of the

22  timelines.

23       Q       And can you describe your process for putting

24  together a timeline?

09:37AM  25       A       To create the timelines, I would take the various

1    pieces of evidence that I had obtained.  So if it's phone

2    calls, text messages, e-mails, different correspondence, I

3    would then plot them along a timeline to depict when they're

4    happening in relation to other events that I was aware of.

09:37AM    5    Q    Now, I want to go through some of the types of

6    documents that you obtained.  You talked about them at a very

7    high level with the jury, and now we will go through them in a

8    little more detail and go through the exhibits that they relate

9    to on the exhibit list.

09:37AM    10   So you had mentioned open source documents, and

11   you said it's sort of like a Google search.  In addition to the

12   open source documents we have already discussed, did you obtain

13   a number of additional open source documents?

14   A    That's correct.

09:38AM    15   Q    Have you reviewed the exhibit list that the

16   Government prepared in this case?

17   A    Yes.

18   Q    And did you identify on that exhibit list those

19   exhibits that came from open source documents that you received

09:38AM    20   in the investigation?

21   A    That's correct.

22   Q    And then did you review the exhibits themselves

23   to confirm that those were the open source documents you

24   actually received?

09:38AM    25   A    Yes.  That was my process.

          1          Q       So you substantially reviewed each of those

          2    exhibits?

          3          A       I compared each document to then what was listed

          4    on the exhibit list to ensure that the exhibit list was

09:38AM   5    actually reflecting the actual document I was reviewing and

          6    they matched.

          7                  MS. PALMER:  Your Honor, at this time the

          8    Government would move to admit a group of exhibits that

          9    Special Agent Civetti has identified as open source documents,

09:39AM  10    and I can read them into the record.  They are previously

         11    stipulated.

         12                  THE COURT:  What do they begin with?

         13                  MS. PALMER:  They are separate, so I would have

         14    to read each one.  But the first one starts at 400.  So I

09:39AM  15    can --

         16                  THE COURT:  400?

         17                  MS. PALMER:  Yes.  Do you want me to go one at a

         18    time or read them --

         19                  THE COURT:  If they're all stipulated to, you can

09:39AM  20    read the entire list, and then I will admit the entire list.

         21                  MS. PALMER:  Thank you, Your Honor.

         22                  THE COURT:  Go slowly for the court reporter.

         23                  MS. PALMER:  Thank you, Your Honor.

         24                  Exhibit 400, 446, 468, 469, 470 through 476, 500

09:39AM  25    through 502, 506, 507, 514 through 523, 761, and 902.

```
 1              THE COURT:  All right.  Those will be received
 2   into evidence without objection.
 3              (Marked for identification and received
 4              into evidence Exhibit Nos. 440, 446, 468,
 5              469, 470 through 476, 500 through 502,
 6              506, 507, 514 through 523, and 761.)
 7              MS. PALMER:  Your Honor, my co-counsel has
 8   brought to my attention I mistakenly said 400 instead of 440.
 9   It should be 440.
10              THE COURT:  All right.  That exhibit will be
11   received without objection.
12        Q     BY MS. PALMER:  Special Agent Civetti, you
13   mentioned a Google warrant be that you received for the
14   defendant's Google account.  Did you receive similar search
15   warrants for a variety of other service providers?
16        A     That's correct.
17        Q     At a high level, can you describe for the jury
18   what other service providers you obtained warrants from?
19        A     For the different subjects that we were looking
20   into, they used different service providers.  So Google was
21   used as well as Yahoo! and Microsoft, and we did search
22   warrants for each of those service providers and went through
23   that same process of drafting that affidavit, having it be
24   signed by the judge, and then receiving the whole production
25   and going through that based on what's responsive to that
```

1    attachment.

2          Q      And in terms of the types of evidence you

3    received from the service providers, did you receive e-mails?

4          A      Yes.  E-mails were included for a number of

09:41AM   5    subjects.

6          Q      And what other types of information did you

7    receive from the service providers?

8          A      They would be the e-mails and associated, like,

9    Google drives.

09:41AM   10          Q      And were there also things like calendars and

11    contacts?

12          A      At times, that's correct.

13          Q      And for which persons did you receive search

14    warrants for service providers that are relevant to this

09:42AM   15    investigation -- to this trial?

16          A      Defendant Chan, Jose Huizar, George Esparza,

17    Ricky Zheng, George Chiang.

18          Q      And did you also receive documents for Jenny Wu?

19          A      That's correct.

09:42AM   20          Q      And have you previously reviewed the exhibit list

21    and provided a list of the documents obtained via the search

22    warrants to service providers to the Government?

23          A      Yes.

24          Q      And did you substantively review those items and

09:42AM   25    confirm that the descriptions matched the actual exhibits?

1          A       Yes.  I conducted a similar process I did with

2    the open source documents, comparing the list with the actual

3    exhibit.

4                   MS. PALMER:  Your Honor, at this time I would

09:42AM  5    move to admit previously stipulated exhibits, and I will read

6    that list into the record.

7                   THE COURT:  All right.  Make sure you read it

8    slowly.

9                   MS. PALMER:  114, 114A, 116, 117, 122, 125, 125A,

09:43AM  10   126, 126A, 127, 130, 136, 137, 171, 176, 320 through 342 --

11                  THE COURT:  What was that?  320 through what?

12                  MS. PALMER:  342.

13                  THE COURT:  All right.

14                  MS. PALMER:  344, 347 through 349, 356 through

09:43AM  15   362, 376 through 379, 422 through 424, 442 through 459, 504 --

16                  THE COURT:  Wait a minute.  442 through 459?

17                  MS. PALMER:  Correct, Your Honor.

18                  THE COURT:  What was the next one?

19                  MS. PALMER:  504, 505, 508 through 513, 530

09:44AM  20   through 557, 560 through 571, 730 through 732, and 837.

21                  THE COURT:  All right.  Those will be received

22   into evidence without objection.

23                  (Marked for identification and received

24                   into evidence Exhibit Nos. 114, 114A, 116,

09:43AM  25                   117, 122, 125, 125A, 126, 126A, 127, 130,

```
 1              136, 137, 171, 176, 320 through 342, 344, 347
 2              through 349, 356 through 362, 376 through
 3              379, 422 through 424, 442 through 445,
 4              447 through 459, 504, 505, 508 through
09:44AM  5      513, 530 through 557, 560 through 571,
 6              730 through 732, and 837.)
 7      Q       BY MS. PALMER:  Special Agent Civetti, did you
 8  also obtain certain documents pursuant to subpoenas?
 9      A       That's correct.
09:45AM 10      Q       And a subpoena is an order from the Court to
11  provide documents?
12      A       That's correct.
13      Q       And typically -- and did you request
14  certifications with those subpoenas for those documents?
09:45AM 15      A       Yes.
16      Q       And what do those certifications entail?
17      A       The certifications are provided with the
18  documents that are responsive, and they indicate that these are
19  business records of that particular entity that I had
09:45AM 20  subpoenaed.
21      Q       And which entities relevant to this trial did you
22  subpoena?
23      A       The FBI subpoenaed a number of different entities
24  including banks for bank records as well as development
09:45AM 25  companies for their records relating to those development
```

1    projects.

2          Q       Did you also subpoena casinos in Las Vegas,

3    consultants, the City of Los Angeles?

4          A       Yes.  That's correct.

09:46AM  5          Q       And did you also subpoena the defendant's

6    companies and other third parties?

7          A       Yes.

8          Q       And what types of documents did you receive in

9    response to subpoenas?

09:46AM  10         A       The documents responsive to the subpoenas would

11   vary depending on the entity, but it would include bank

12   statements, banking account information for the developers, the

13   different e-mails or communications, as well as balance sheets,

14   accounting records, and the like.

09:46AM  15         Q       And from, for example, the casinos, did you also

16   receive information relating to expenditures and videos?

17         A       The subpoenas from the casinos would include

18   different invoices, expenditures, as well as surveillance

19   footage.

09:46AM  20         Q       And did you follow the same process that we

21   described for the jury regarding verifying the Government's

22   exhibit list and matching the exhibits?

23         A       That's correct.

24         Q       And did you provide a list of items that related

09:47AM  25   to the documents that the FBI subpoenaed in this case?

```
 1         A       That's correct.
 2                 MS. PALMER:  Your Honor, at this time I would
 3    like to admit the following previously stipulated exhibits.
 4                 THE COURT:  All right.
 5                 MS. PALMER:  818 -- I mean -- yeah.  Sorry.  118,
 6    119 --
 7                 THE COURT:  118?
 8                 MS. PALMER:  118.
 9                 THE COURT:  All right.
10                 MS. PALMER:  119, 124, 131 through 135, 141
11    through 156, 173, 121 through -- sorry -- 221 through 225.
12                 THE COURT:  121 through --
13                 MS. PALMER:  221 through 225, 231, 232, 306
14    through 312, 344, 345, 346, 350, 354, 355, 360, 400 through
15    404, 408, 413 through 418, 462 through 467 --
16                 THE COURT:  Slow down.
17                 MS. PALMER:  462 through 467, 503, 551, 551A,
18    572, 573 through 577, 582, 599, 630 through 633, 702 through
19    706, 714, and then 800 and 802.
20                 THE COURT:  All right.  Those exhibits will be
21    received without objection.
22                 (Marked for identification and received
23                  into evidence Exhibit No. 118, 119, 124,
24                  131 through 135, 141 through 156, 173,
25                  221 through 225, 231, 232, 345, 346,
```

09:47AM (line 5)
09:47AM (line 10)
09:48AM (line 15)
09:49AM (line 20)
09:48AM (line 25)

350, 354, 355, 400 through 404, 408,

413 through 418, 462 through 467, 503,

572, 573 through 577, 582, 599, 630

through 633, 702 through 706, 714,

09:49AM    800 and 802.)

Q       BY MS. PALMER:  Special Agent Civetti, did you

receive documents from third parties voluntarily through the

course of this investigation?

A       Yes.

09:50AM    Q       Can you explain to the jury what that means?

A       When the FBI would interview different witnesses,

at times the witnesses would provide documents or we would

request documents from them, and these would be voluntarily

provided.

09:50AM    Q       And as relevant to exhibits on the Government's

exhibit list, which individuals did you receive documents from?

A       George Esparza, Shawn Kuk, George Chiang,

Yan Yan.

Q       Did you also receive from Andy Wang?

09:50AM    A       That's correct.

Q       And did you follow the same process with the

Government in reviewing the exhibits on the list pertaining to

third parties and identifying those that you obtained from the

third parties?

09:50AM    A       That's correct.

1          MS. PALMER:  Your Honor, at this time the

2     Government would move to admit those exhibits obtained from

3     third parties, and I can read the list in.  They have been

4     previously stipulated.

09:51AM  5          THE COURT:  All right.  Are you going to read

6     them by party producing or just read them in general?

7          MS. PALMER:  I'm going to read them in general,

8     Your Honor.

9          THE COURT:  All right.  Then go slow.

09:51AM  10          MS. PALMER:  54, 54A, 55, 55A, 56, 56A, 57, 57A,

11     58, 112, 113, 113A, 115, 120, 121, 129, 163, 212, 212A, 213,

12     226 through 228, 233, 343, 351 through 353, 392, 405, 406 --

13          THE COURT:  486?

14          MS. PALMER:  406.

09:52AM  15          THE COURT:  All right.

16          MS. PALMER:  407, 409, 429, 453, 460, 461, 733,

17     801, 860, and 861.

18          THE COURT:  All right.  Those exhibits will be

19     received into evidence without objection.

09:53AM  20          (Marked for identification and received

21               into evidence Exhibit Nos. 54, 54A, 55,

22               55A, 56, 56A, 57, 57A, 58, 112, 113, 113A,

23               115, 120, 121, 129, 163, 212, 212A, 213,

24               226 through 228, 233, 343, 351 through 353,

09:52AM  25               392, 405, 406, 407, 409, 429, 460, 461,

1          733, 801, 860, and 861.)

2          Q     BY MS. PALMER:  Special Agent Civetti, did you

3     also receive text messages via search warrants?

4          A     That's correct.

09:53AM  5          Q     And can you explain to the jury what that means?

6          A     For search warrants for individuals for their

7     cellular telephones, it would be a similar process of drafting

8     that affidavit and then, once the Court authorizes that

9     seizure, the FBI would execute those search warrants, obtain

09:53AM  10    the physical devices, so the actual cell phone.  We would then

11    take those devices and put them on a software in which we were

12    able to download all of the contents of that device.  We then

13    book the physical device into our evidence so it is completely

14    preserved, and that extraction is what we then review for

09:54AM  15    what's responsive to that attachment.

16         Q     And from those extractions, did you then create

17    exhibits for this trial?

18         A     Yes.  When we create that extraction, we then

19    review that for what's responsive, and those extractions are

09:54AM  20    going to contain a number of things that are on the phone.  So

21    it could be calendar entries, text messages, phone logs, and

22    contacts and the like.  And then we have then taken those --

23    what's responsive and made them into a variety of exhibits.

24         Q     And which individuals relevant to this

09:54AM  25    investigation did you receive text messages -- extract text

1    messages from that appear on the Government's exhibit list?

2         A       Defendant Chan, George Esparza, Shawn Kuk,

3    George Chiang, Ricky Zheng.

4         Q       And in creating the exhibits, if you could turn

09:55AM  5    to Exhibit 364B, please?

6         A       "E" as in echo?

7         Q       "B" as in boy.

8         A       Okay.

9         Q       Is this one of the exhibits you created from

09:55AM  10   those extractions?

11        A       That's correct.

12               MS. PALMER:  Your Honor, at this time I'm just

13   going to publish one, Exhibit 364B.

14               THE COURT:  All right.  Are you going to move it

09:55AM  15   into evidence?

16               MS. PALMER:  Yes.

17               THE COURT:  364B will be received into evidence.

18               (Marked for identification and received

19                into evidence Exhibit No. 364B.)

09:55AM  20               MS. PALMER:  If we can bring it up, please.

21        Q       Now, looking at this, what does this show?  Can

22   you describe to the jury?

23        A       This is an extraction report from that program

24   Cellebrite.  That's the program that the FBI utilizes to

09:55AM  25   actually extract the data off the phone.  This particular

1    exhibit we're looking at is the extraction report of text

2    messages.  Specifically, this cover page, I have added photos

3    of who the participants of the particular messages are

4    involved.  In this case it's Defendant Chan and Jose Huizar.

09:56AM    5           And while preparing the exhibits, because we

6    seized a number of cellular telephones as well as iTunes

7    backups off of Jose Huizar's computer that contained messages

8    similar to cell phones, in the top right corner I included the

9    photograph of whose device this particular extraction report

09:56AM    10   came from.

11        Q    And so for each of the Government exhibits, they

12   will have an extraction report that references where the

13   content came from and then the parties who are participating in

14   the communications; is that correct?

09:56AM    15        A    That's correct.  And the parties participating we

16   included a -- I apologize -- a colored outline for who the

17   speaker of the particular messages are.

18        Q    And what are those particular outlines?

19        A    The messages that will appear on the left are

09:57AM    20   going to be outlined in blue, and those are all from

21   Defendant Chan.  And then on the right will be messages in the

22   color green, and those are Jose Huizar.

23        Q    And then zooming out and going to page 2, just as

24   an example, and so here the messages on the left would be from

09:57AM    25   Defendant Chan and the messages on the right would be from

1    Jose Huizar?

2         A      That's correct.

3         Q      And the -- and then looking at the bottom of the

4    bubble, there's a date there and a time.  Was that extracted

09:58AM   5    from that -- those reports as well?

6         A      That's correct.

7         Q      Okay.  And both of those at the top, they both

8    say "Raymond Chan."  Why is that the case?

9         A      Both the blue bubble and green bubble say

09:58AM   10   Raymond Chan.  At times the way the extraction report is,

11   depending on the phones involved, the program software,

12   et cetera, it sometimes will identify both bubbles as one of

13   the parties.  However, because this is from Jose Huizar's

14   device, the green messages are always Jose Huizar's even though

09:58AM   15   it -- the extraction report says Raymond Chan.  We don't alter

16   the way the extraction appears.

17        Q      And so is -- so the photos at the top will

18   correspond to the messages that follow them in terms of the

19   persons who are sending and receiving; is that correct?

09:58AM   20        A      That's correct.  And these exhibits were made as

21   excerpts of messages for periods of time.  So this isn't the

22   entire chain between those two, but this would be an excerpted

23   period of time and all the messages contained for that specific

24   period of time.

09:59AM   25        Q      So if you're grabbing a group of messages, you're

1   not eliminating any messages in the middle; is that correct?

2       A     That's correct.

3       Q     Did you follow a similar process as we previously

4   discussed with respect to text messages obtained during the

09:59AM  5   investigation?

6       A     That's correct.

7           MS. PALMER:  Your Honor, at this time I would

8   like to read into the record the Government's exhibits that are

9   text messages that are previously stipulated to.

09:59AM  10          THE COURT:  All right.

11          MS. PALMER:  71, 71A, 128, 140, 157, 172 --

12          THE COURT:  172?

13          MS. PALMER:  172, 174, 175, 178, 179, 187, 187A,

14   187B, 200 through 204.

10:00AM  15          THE COURT:  204?

16          MS. PALMER:  Correct, Your Honor.  229, 230, 363A

17   through 363F, 363H through 363J, 365A through 365K, 367, 368 --

18   367A.

19          THE COURT:  Wait a minute.  Go back.  367 and

10:01AM  20   then what?

21          MS. PALMER:  And then 367A, 369, 370, 371A

22   through C, 372A through N.

23          THE COURT:  "N" as in Nancy?

24          MS. PALMER:  Correct, Your Honor.  373A through

10:01AM  25   373C, 374, 375, 380, 398, 399, 410 through 412, 425 through

428, 378 through -- sorry.  578 through 581, 591 through 591G.

592A through 592V as in victory, 593A through 593J, 594A

through 594E as in echo, 596A through 596W, 597A through 597R,

598A through 598I, 601A through 601C, 602, 603A through 603D as

in dog, 700, 707 through 709, 740, 810 through 836.

Q    Special Agent Civetti, one more category.  Did

you also execute physical search warrants in certain locations

in this case?

A    That's correct.

MS. PALMER:  Your Honor, I think we need a ruling

on that last list.  I don't think that -- we were moving to

admit all of those, and I don't think I asked.

MR. BRAUN:  No objection, Your Honor.

THE COURT:  All right.  What exhibit are you

referring to?

MS. PALMER:  The whole last list.

THE COURT:  All right.  All of those exhibits

that were just referred to will be received into evidence

without objection.

(Marked for identification and received

into evidence Exhibit Nos. 71, 71A, 128,

140, 157, 172, 174, 175, 178, 179,

187, 187A, 187B, 200 through 204, 229,

230, 363A through 363F, 363H through 363J,

365A through 365K, 367, 367A, 369, 370,

| | |
|---|---|
| 1 | 371A through 371C, 372A through 372N, |
| 2 | 373A through 373C, 374, 375, 380, 398, |
| 3 | 399, 410 through 412, 425 through 428, |
| 4 | 578 through 581, 591 through 591G, 592A |
| 10:02AM 5 | through 592V, 593A through 593J, 594A |
| 6 | through 594E, 596A through 596W, 597A |
| 7 | through 597R, 598A through 598I, 601A |
| 8 | through 601C, 602, 603A through 603D, 700, |
| 9 | 707 through 709, 740, 810 through 836.) |

10:04AM 10    Q    BY MS. PALMER:  As relevant to this trial, did

11  you execute a search warrant at Jose Huizar's residence?

12    A    That's correct.

13    Q    And what types of items did you seize that are

14  relevant to this trial?

10:05AM 15    A    There's a number of items seized including his

16  computers.

17    Q    And did you also take photos of items that were

18  found during that -- the execution of that search warrant that

19  are exhibits in this case?

10:05AM 20    A    That's correct.

21    Q    And did you follow the previous process that we

22  discussed relating to the search warrant items and identified

23  on the Government's exhibit list?

24    A    That's correct.

10:05AM 25    MS. PALMER:  Your Honor, the Government moves to

1    admit previously stipulated exhibits, and I will read a list.

2                   THE COURT:  All right.  How many are there?

3                   MS. PALMER:  Not very many.

4                   THE COURT:  All right.

10:05AM   5         MS. PALMER:  47 through 50, 72A through 72E, 158A

6    through 158D, 177, 220, 364A through 364X, 366A, 366B, 368,

7    441, 590A through 590C, and 595.

8                   THE COURT:  All right.  Those exhibits will be

9    received into evidence without object.

10:06AM  10          (Marked for identification and received

11               into evidence Exhibit Nos. 47 through 50,

12               72A through 72E, 158A through 158D, 177,

13               220, 364A, 364C through 364X, 366A, 366B,

14               368, 441, 590A through 590C, and 595.)

10:06AM  15    Q       BY MS. PALMER:  Agent Civetti, we have been

16    talking about timelines that you created as part of this case.

17    I want to turn to the period of time between 2013 and 2014.

18                   THE COURT:  All right.  Before we get into that,

19    let's take our first morning break.  We will be in recess for

10:06AM  20    15 minutes.

21                   THE CLERK:  All rise for the jury.

22               (A recess was taken at 10:06 a.m.)

23               (The following proceedings were held in

24               open court in the presence of the jury:)

10:29AM  25                   THE COURT:  All right.  The jury is present.  All

 1    counsel and the defendant are present.

 2              You may resume your examination of Agent Civetti.

 3              MS. PALMER:  Thank you, Your Honor.

 4         Q    Special Agent Civetti, turning to the time period

10:29AM  5    of 2013 through 2014, did you create certain timelines relating

 6    to Shen Zhen New World?

 7         A    That's correct.

 8         Q    And did one of those timelines summarize the

 9    events during that period?

10:29AM 10         A    That's correct.

11         Q    And what types of entries do those timelines

12    include?

13         A    The timelines include calendar events as well as

14    e-mails and text messages as well as City files.

10:30AM 15         Q    And do they also include some phone data?

16         A    That's correct.

17         Q    Now, in 2013, having reviewed all of those

18    communications, were there several frequent topics in those

19    communications?

10:30AM 20         A    Yes.

21         Q    And specifically, with respect to Jose Huizar,

22    Raymond Chan, and Wei Huang, what were the specific topics?

23         A    There were topics related to issues involving the

24    L.A. Grand Hotel, a parking dispute, union issues.

10:30AM 25         Q    With respect to Raymond Chan, were there issues

1    relating to the consolidation of the department that he worked

2    for?

3        A       That's correct.

4        Q       And with respect to Jose Huizar, were there

10:30AM  5    communications about a sexual harassment lawsuit against

6    Jose Huizar?

7        A       Yes.

8        Q       With respect to that sexual harassment lawsuit,

9    has the FBI looked into the details of the settlement in open

10:31AM  10   source documents?

11       A       That's correct.

12       Q       And did you find anything?

13       A       Just that the case had been settled.

14       Q       And as far as you know, was the agreement

10:31AM  15   publicly available?

16       A       No, it was not.  It was a confidential

17   settlement.

18       Q       What about the dollar amount paid by Jose Huizar

19   to settle that lawsuit?

10:31AM  20       A       It was not publicly disclosed.

21       Q       But was the FBI able to learn of the dollar

22   amount of the agreement through its investigation?

23       A       That's correct.

24       Q       And where did the FBI obtain that information?

10:31AM  25       A       Based on e-mails and text message communications

```
 1    that we had received from the search warrants.

 2         Q     And does that include for Ricky Zheng,

 3    Jose Huizar, and George Esparza?

 4         A     E-mails between them.  That's correct.

 5         Q     And based upon your review of those e-mails, did

 6    Ricky Zheng appear to have some involvement in the settlement?

 7         A     Yes.

 8         Q     And then based upon your review of those

 9    communications as well as communications with Raymond Chan, via

10    e-mail and text message, did he appear to have some involvement

11    in that settlement?

12         A     That's correct.

13         Q     Did anyone else from Shen Zhen New World have

14    involvement in the settlement based upon your review of those

15    records?

16         A     Yes.

17         Q     Who?

18         A     Wei Huang, the chairman, and an employee Yan Yan.

19         Q     So Chairman Huang and an employee Yan Yan?

20         A     That's correct.

21         Q     And what was Yan Yan's position?

22         A     I believe she was an accountant or worked in the

23    accounting department.

24         Q     At one of the hotels?

25         A     That's correct.
```

1    Q        And does Yan Yan also have a relationship with

2  the defendant?

3    A        Yes.

4    Q        Did she later work for the defendant?

10:32AM  5    A        That's correct.

6    Q        And was she also the defendant's kung fu student?

7    A        Yes.

8    Q        Did you identify any other entities involved with

9  the investigation -- with the investigation -- sorry -- through

10:33AM 10  the investigation involved with the settlement?

11    A        That's correct.

12    Q        Including banks?

13    A        Banks and companies.

14    Q        Which banks did you identify?

10:33AM 15    A        East West Bank.

16    Q        And did you identify certain attorneys who were

17  used as part of that settlement?

18    A        That's correct.

19    Q        And did those include Henry Yong and Guodi Sun?

10:33AM 20    A        Sun Guodi.

21    Q        Henry Yong and Sun Guodi.

22             And did you obtain documents from sources

23  relating to those individuals as well?

24    A        Yes.

10:33AM 25    Q        And in the early period -- and this lawsuit, who

 1    filed this lawsuit?

 2         A        A former staffer of Council Member Jose Huizar.

 3         Q        And was her name Ms. Godoy?

 4         A        Francine Godoy.  That is correct.

10:33AM 5         Q        During the early period, did you review

 6    communications relating to the settlement that involved

 7    Defendant Chan?

 8         A        There were communications about the settlement,

 9    and Raymond Chan was on those communications.  That's correct.

10:34AM 10        Q        And was that relevant -- why was that relevant to

11    your investigation?

12        A        It was relevant because we had a -- we were

13    investigating a potential benefit being provided to the council

14    member, specifically the settlement of this lawsuit.  And it

10:34AM 15   was significant that there was not only Jose Huizar on these

16    communications relating to a developer but that also another

17    public official was involved.

18        Q        I want to turn -- Your Honor, at this time the

19    Government moves to admit Exhibit 924 which has been previously

10:34AM 20   stipulated.

21             THE COURT:  All right.  924 will be received into

22    evidence.

23             (Marked for identification and received

24             into evidence Exhibit No. 924.)

10:34AM 25             MS. PALMER:  Going to the first page, please.

1       Q       Agent Civetti, what is this?

2       A       This is the timeline that I created.

3       Q       And the bar in the middle, is that the -- does

4   that have the year and certain months?

10:35AM  5       A       Yes.  This is what I would call the time bar.

6       Q       Will certain events appear above the time bar and

7   certain events occur below the time bar?

8       A       That is correct.

9       Q       What does it signify, the ones above versus the

10:35AM 10   ones below?

11      A       The events that are above the time bar are those

12   events related to the L.A. Grand Hotel as well as the sexual

13   harassment lawsuit filed against Jose Huizar, and the events

14   below the chart are the events involving and communications

10:35AM 15   involving the defendant Raymond Chan.

16      Q       All right.  If we could scroll to the next page,

17   please, 924, page 2.

18              Looking at this, what are those two events that

19   are depicted on this timeline?

10:35AM 20      A       The yellow flag represents when Ms. Godoy first

21   filed an administrative complaint against Jose Huizar that

22   occurred in June of 2013, and then the second one represented

23   by the red quote bubble or call-out bubble represents a

24   communication.  This communication is between Jose Huizar and

10:36AM 25   Harris Chan who worked for Shen Zhen New World.

1      Q      And looking at the -- you said administrative

2   complaint.  So did Ms. Godoy file an administrative complaint

3   before filing the lawsuit?

4      A      That's correct.

10:36AM   5      Q      That is what this June 2013 flag represents?

6      A      Yes.

7      Q      You said Mr. Harris Chan is on this

8   communication.  Who is Mr. Chan?

9      A      Harris Chan was the general manager for Shen Zhen

10:36AM   10   New World here in the United States.  He worked for

11   Chairman Huang.

12          MS. PALMER:  If we could please pull up

13   Exhibit 366A, please.

14      Q      What is this, Special Agent Civetti?

10:37AM   15      A      This is one of the extraction reports from

16   Jose Huizar's device, his iTunes.  And this is involving

17   Harris Chan which will be the blue messages and Jose Huizar

18   which will be the green messages.

19          MS. PALMER:  And if we could go to the second

10:37AM   20   page, please.  Look at the third message down and zoom in on

21   those three messages, please.  You can start with that one.

22      Q      So this would be a message from Mr. Harris Chan

23   from Shen Zhen New World to Jose Huizar; is that correct?

24      A      That's correct.

10:37AM   25      Q      Can you please read this for the jury?

1    A        "Hi Jose.  Talked to the Chairman.  He is

2   positively supporting you.  Going through your wife's law firm

3   sounds fine.  Will confirm the arrangements later.  Good luck."

4            MS. PALMER:  And if we could zoom back out.  And

10:37AM  5   please include the next two messages.

6        Q        Mr. Huizar responds, "Thank you very much,

7   Harris, and please thank the Chairman."  Who do you understand

8   the Chairman to be in this text message based on your review of

9   the materials in this case?

10:38AM  10       A        Wei Huang.

11       Q        And Mr. Chan responds, "You are welcome."

12            Is that correct?

13       A        That's correct.

14            MS. PALMER:  If we could go to page 3, please,

10:38AM  15   and zoom in on the top three messages.

16       Q        The ones in green, those are from Mr. Huizar;

17   correct?

18       A        That's correct.

19       Q        Can you please just read those two?

10:38AM  20       A        "Okay.  Just checking to see if there is a

21   connection or they are friends of the Chairman."  And the

22   second message, "They rejected offer.  They want 1.2."

23       Q        And Mr. Harris Chan's response?

24       A        "Too bad.  Thanks for the info."

10:39AM  25       Q        And you included this text message exchange on

1    the timeline.  Why did you include this on the timeline?

2         A       These text messages, based on my understanding of

3    the investigation, was related to that Francine Godoy Complaint

4    that had been filed, and this was significant given my

5    understanding that Shen Zhen New World was a developer and

6    Jose Huizar was informing this developer the status of that

7    Complaint, in this case offer being rejected.

8         Q       Okay.  And then looking at the -- Mr. Huizar's

9    message where he says, "I was just wanting to see if there is a

10   connection or if they are friends of the Chairman," who did you

11   understand, based upon your review of the messages, what he

12   meant by "friends of the Chairman" there?

13        A       I believe he was referring to another developer

14   Greenland.

15        Q       And when he said, "They rejected the offer.  They

16   want 1.2," what did you understand "1.2 million" to be?

17        A       $1.2 million.

18        Q       I'm sorry.  "1.2" to mean?

19        A       $1.2 million.

20        Q       Okay.  If we can return to 924 --

21               THE COURT:  Excuse me, if you use the other

22   microphone, that one distorts your voice.  The microphone you

23   were using before is much clearer.  You can turn it and stand

24   in the same position.  Just take the mic and put it down.

25               MS. PALMER:  This is better, Your Honor?

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | THE COURT:  Yes.  That's a much better                                    |
|       | 2  | microphone.                                                              |
|       | 3  | MS. PALMER:  Okay.  Thank you.                                            |
|       | 4  | If we can return to the timeline, 924-3, please.                         |
| 10:40AM | 5  | Q     Looking at this, there are two new entries below                    |
|       | 6  | the line there.  What do these depict?                                    |
|       | 7  | A     These are two entries related to the                               |
|       | 8  | consolidation of the Planning Department with the Department of           |
|       | 9  | Building and Safety.  These particular entries are based on               |
| 10:41AM | 10 | City records.                                                            |
|       | 11 | Q     And at that time the defendant worked at the --                     |
|       | 12 | at LADBS; correct?                                                        |
|       | 13 | A     That's correct.                                                     |
|       | 14 | MS. PALMER:  And if you can -- if we can go to                            |
| 10:41AM | 15 | exhibit -- previously admitted Exhibit 320, please.                      |
|       | 16 | Q     Special Agent Civetti, what is this?                               |
|       | 17 | A     This is a City of Los Angeles interdepartmental                     |
|       | 18 | correspondence from a -- the director of City Planning and the           |
|       | 19 | general manager of Building and Safety to the council members            |
| 10:41AM | 20 | of PLUM.                                                                  |
|       | 21 | Q     And the date of this is April 5, 2013?                             |
|       | 22 | A     That's correct.                                                     |
|       | 23 | Q     And the subject is "Realignment of City                            |
|       | 24 | Departments"?                                                            |
| 10:41AM | 25 | A     Correct.                                                            |

1      Q      And, generally, the realignment of City

2  departments, is -- is that what we have been referring to as,

3  quote, "consolidation"?

4      A      That's correct.

10:42AM  5      Q      Again, so that means that LADBS would have merged

6  with the Planning Department?

7      A      That's correct.  To create a new single

8  department.

9      Q      And this memo at the time, the person signing it

10:42AM  10  from LADBS, it was from Bud Ovrom; is that correct?

11      A      That's correct.  The general manager at the time

12  of this memo.

13            MS. PALMER:  Now, looking at what was the next

14  entry on the timeline, if we can turn to 924-3.  It's

10:42AM  15  previously been admitted.

16      Q      The next entry is this PLUM approval.  You said

17  that that refers to a motion that was in PLUM; is that correct?

18      A      That's correct.

19            MS. PALMER:  And if we could pull up Exhibit 468,

10:43AM  20  please.  If we could go to page 4 of that document, please.  If

21  we could zoom in on the members there at the bottom.

22      Q      In this particular one, did Jose Huizar vote

23  "yes"?

24      A      He did.

10:43AM  25      Q      And what was the purpose of 468?

1          A          This motion was a motion to initiate studies for

2     the consolidation of those two departments.

3          Q          And looking at the summary there at the top, if

4     we can zoom in, and does this summarize that this is sort of

10:44AM  5     the initiation of what would be the consolidation?

6          A          That's correct.

7          Q          And Jose Huizar voted "yes" to consolidate -- to

8     take this step toward consolidation; is that correct?

9          A          That's correct.

10:44AM  10          MS. PALMER:  Now, if we could go to previously

11     admitted 376 at page 4, please.

12                One moment, Your Honor.

13                If we can go back to the timeline at 924 at

14     page 4, please.

10:45AM  15          Q          Looking at this, is this -- what does this

16     depict?

17          A          This is an event for August 31st of 2013.  This

18     is an e-mail communication from Defendant Chan to

19     George Esparza related to the consolidation.

10:45AM  20          MS. PALMER:  And if we can go to page --

21     Exhibit 376 at page 1, please.

22          Q          Starting with the last message first and zooming

23     in on that, is this a message from Raymond Chan to

24     George Esparza?

10:45AM  25          A          That's correct.

1    Q       And can you just read the first sentence, please?

2    A       "Attached is a draft motion that Jose and I

3    talked about before he left for Mexico."

4    Q       And the last sentence, please?

10:46AM   5    A       "Please tell Jose that I will brief him Tuesday

6    morning.  Thanks."

7    Q       And zooming back out, is this sent -- going to

8    where that is sent on August 30, 2013, is that sent from

9    Raymond Chan?

10:46AM   10    A       Yes.  That's from Raymond Chan's personal e-mail

11    address.

12    Q       So that is an e-mail address you know to be

13    associated with him that is his personal e-mail address?

14    A       That's correct.

10:46AM   15    Q       And he did have a City e-mail address at that

16    time; is that correct?

17    A       Yes.

18    Q       And if we could go to page 2 of that.  Is this a

19    draft motion?

10:46AM   20    A       That's correct.

21    Q       And Mr. Chan had attached this draft motion and

22    sent it to Jose Huizar; is that right?

23    A       That's correct.  Well, he sent it to

24    George Esparza and said, "Please provide to Jose Huizar."

10:46AM   25    Q       Thank you.

1          If you could read the portion that starts with,

2     "I further move that."

3          A     "I further move that the CAO/CLA and all

4     departments involved in the merger process be instructed to

10:47AM  5     cease any activity on merging, including but not limited to

6     drafting implementing ordinances, setting up new budgetary and

7     other accounts for the merged department until further

8     instruction from council."

9          Q     And this document that was attached, based upon

10:47AM 10    your review of it, what was it attempting to do?

11         A     To stop the consolidation.

12              MS. PALMER:  If we could go back up to the first

13    e-mail.  If we could zoom in on the middle e-mail, please.

14         Q     If we could read George Esparza -- the sentence

10:48AM 15    starting "I'll show him as soon as I see him."

16         A     "I'll show him as soon as I see him this

17    morning."

18         Q     Thank you.

19              If we could go to Exhibit 924, page 5, please.

10:48AM 20    Looking at the top there, this September 12 entry, what is

21    this?

22         A     This is another text message communication

23    between Council Member Jose Huizar and the Shen Zhen employee

24    Harris Chan.

10:48AM 25              MS. PALMER:  And if we could pull up that

1  exhibit, please, Exhibit 366A at page 3.  Sorry.  If we could

2  go to page 1 first.

3      Q     Again, for the record, the left is

4  Mr. Harris Chan and the person on the right would be

10:49AM  5  Jose Huizar.  So Jose Huizar's text messages would be in green,

6  and Harris Chan's text messages would be in blue; is that

7  correct?

8      A     That's correct.

9      MS. PALMER:  If we could go to page 3, please,

10:49AM  10  and go to the bottom four texts, two at a time.

11     Q     If you could read what Mr. Harris Chan sent to

12  Jose Huizar.

13     A     This is from September 12, 2013.  "Hi Jose.  I

14  just talked to the Chairman.  He fully endorses your plan.  He

10:49AM  15  is proud that your wife will support you in public if the other

16  side filed a lawsuit.  He also said he'll support you during

17  the upcoming campaign.  Please go ahead as you planned.

18  Thanks."

19     Q     Based upon your review of the records, did you

10:50AM  20  understand "if the other side filed a lawsuit" refers to the

21  lawsuit relating to Francine Godoy, her sexual harassment

22  lawsuit against Jose Huizar?

23     A     That's correct.

24     Q     Can you please read Huizar's response?

10:50AM  25  A     "Thanks.  I will ask attorneys to make offer

```
 1   tomorrow.  I would expect they will not accept and then get
 2   ready for plan B."
 3              MS. PALMER:  If you could zoom back out and go to
 4   the next two messages.
 5        Q    Mr. Harris Chan's response?
 6        A    "Yes.  Please proceed as planned.  We are all
 7   behind you."
 8        Q    And when you read, "We are all behind you," based
 9   upon your review of messages, did you understand that to mean
10   the Chairman?
11        A    That's correct.
12        Q    Looking at the last message there, it says, "Hi,
13   Jose.  Shahram Delijani will meet Greg Clark and I for a drink
14   at 4:30 p.m. on Wednesday.  Can you join us?  I will be at our
15   Downtown Hotel.  Please advise.  Harris."
16              Who is Mr. Delijani?
17        A    Mr. Delijani was a developer property owner
18   throughout the city of Los Angeles.  Specifically, the Delijani
19   family owned a parking structure or parking lot that was
20   adjacent to the L.A. Grand Hotel.
21        Q    Did you review a series of messages that relate
22   to this parking matter?
23        A    Yes.
24        Q    Were there dinners and meetings relating to those
25   that involved Mr. Jose Huizar?
```

1          A       That's correct.

2          Q       And did Mr. Raymond Chan also communicate

3    regarding this parking matter?

4          A       Yes.

10:51AM   5          Q       And why was that of significance to you?

6          A       This was significant given the timing of events.

7    In public corruption investigations, we're really looking for

8    events that are related to benefits as well as events related

9    to favors or favorable treatment.  So the communications

10:52AM   10   related to issues with the L.A. Grand Hotel such as a parking

11   dispute is significant given also communications with that same

12   developer related to a sexual harassment lawsuit.

13                MS. PALMER:  If we could go to previously

14   admitted Exhibit 327, please.  We can zoom in on the top, the

10:52AM   15   "to" and "from" and "subject," please.  Sorry.  The subject was

16   above that line.  Thank you.

17         Q       And what is the subject of this?

18         A       "Items to follow up."

19         Q       And who is it from?

10:52AM   20         A       Jose Huizar's personal e-mail address.

21         Q       And who is it sent to?

22         A       A Jose Huizar staff member.

23         Q       And the date is September 20, 2013?

24         A       That's correct.

10:53AM   25                MS. PALMER:  If we could zoom back out and zoom

1    in on items one and two, please.

2         Q       Can you please read item one?

3         A       "Item one.  I currently have a meeting with the

4    Delijanis on October 10.  Please see if they can accommodate a

10:53AM  5    lunch or dinner meeting sometime this coming week instead.

6    Richelle will be joining us.  Make sure Shahram and

7    Michael Delijani attend."

8         Q       And did you understand this to relate to the

9    parking dispute?

10:53AM  10        A       That is correct.

11        Q       That is the parking dispute related to

12   Wei Huang's property?

13        A       Yes.  The L.A. Grand Hotel.

14        Q       For the second one, can you please read that?

10:53AM  15        A       "Number two, call Tom Walsh from Unite HERE.  See

16   if he is would like to join me and Chairman Wei, the owner of

17   the L.A. Hotel on Figueroa for dinner on October 10.  The

18   Chairman is in town and would like to meet Tom Walsh."

19        Q       Who did you understand Tom Walsh to be?

10:54AM  20        A       Tom Walsh was the president of a labor

21   organization called Unite HERE.  Unite HERE represented hotel

22   and hospitality workers in the city of Los Angeles.

23        Q       You mentioned that Chairman Wei Huang was having

24   some union issues; is that correct?

10:54AM  25        A       That is correct.

1    Q    Do you understand that item 2 relates to that?

2    A    That is correct.

3    Q    Here Jose Huizar is helping arrange a dinner with

4    Wei Huang and the union rep; is that correct?

10:54AM   5    A    Arrange a dinner that Jose Huizar would also

6    attend.

7    Q    And then the other -- the one above is him

8    arranging a lunch or dinner relating to the parking dispute?

9    A    That is correct.

10:54AM   10    MS. PALMER:  And if we could go back to the

11    timeline, Exhibit 924, page 7, please.

12    Q    Looking here, what are the new items that we see

13    here?

14    A    The new items include the September 20th e-mail

10:55AM   15    that we just reviewed as well as a September 27th text message

16    communication between the defendant and Jose Huizar regarding a

17    Delijani meeting.  And then below the line was a City Council

18    event in which a new motion was presented related to

19    consolidation.

10:55AM   20    Q    And relating to that particular consolidation

21    motion, was that the City Council referring it to PLUM?

22    A    Yes.  I believe the motion was first waived out

23    of the committee and went straight to City Council and then

24    City Council referred it to go back to the PLUM Committee.

10:56AM   25    MS. PALMER:  If we could bring up on the left

1    Exhibit 372 at page 2 and on the right if we could bring up

2    469.

3              Q       The one on the left, 376, is that the draft that

4    Raymond Chan had sent to George Esparza to provide to

10:56AM  5    Jose Huizar?

6              A       That is correct.

7              Q       And what is on the right?

8              A       The right would be the motion that was introduced

9    by two other council members related to the consolidation.

10:56AM  10             Q       And looking at the content, do they -- are they

11   substantially similar based upon your review?

12             A       They're almost verbatim.

13             Q       So there are a few changes, but they're very,

14   very similar?

10:57AM  15             A       That's correct.

16                     MS. PALMER:  If we could go to -- back to the

17   timeline, Exhibit 924, page 8, please.

18                     MR. BRAUN:  I just want to object to the previous

19   answer if we could --

10:57AM  20                     THE COURT:  You have to get in the microphone so

21   I can understand what your objection is.

22                     MR. BRAUN:  Okay.  I have been noticing,

23   Your Honor, I noticed those are two different documents.  One

24   asks for a consultation and one is attempting to maybe -- if

10:57AM  25   counsel could correct that.

1          THE COURT:  You're talking about 924?

2          MR. BRAUN:  Yes, Your Honor.

3          THE COURT:  What's your --

4          MR. BRAUN:  My objection is one -- let me talk to

10:58AM  5   counsel.  Maybe she can correct it.

6          (Counsel confer.)

7          THE COURT:  Okay.  924 only has eight pages to

8   it.

9          MR. BRAUN:  We will take it up on cross,

10:58AM  10  Your Honor.

11     Q    BY MS. PALMER:  Looking at this, over the period

12  that continues, did you continue to see communications relating

13  to the three topics you identified before?

14     A    Yes.  The topics of the sexual harassment

10:58AM  15  lawsuit, the parking and labor disputes, as well as

16  consolidation.

17          MS. PALMER:  If we can go to the next page,

18  please.

19     Q    Looking at these, there's a purple triangle

10:59AM  20  there.  What does that represent?

21     A    The purple triangle indicates meetings that

22  occurred.  Specifically, this one is related to a calendar

23  entry from Jose Huizar's calendar.

24     Q    If we could pull up exhibit -- for the calendars,

10:59AM  25  how did you receive those calendars?

1    A       The FBI received those calendars via subpoena to

2    the City.

3    Q       And are those calendars marked -- are some of

4    those calendars the Government received marked as Government

10:59AM   5    exhibits?

6    A       That's correct.

7    Q       Do they appear at Exhibits 25 through 30?

8    A       That's correct.

9    MS. PALMER:  Your Honor, at this time the

10:59AM   10   Government moves to admit Exhibits 25 through 30 previously

11   stipulated.

12   THE COURT:  25 through 30 will be admitted

13   without objection.

14   MS. PALMER:  Thank you, Your Honor.

10:59AM   15   (Marked for identification and received

16   into evidence Exhibit Nos. 25 through 30.)

17   MS. PALMER:  If we could publish Exhibit 25 at

18   page 275.  If we could zoom in on the 3:00 o'clock.

19   Q       Is this something you would have referenced in

11:00AM   20   order to make that entry on your timeline?

21   A       Correct.  The entries on the timeline are

22   referring to various pieces of evidence that we received.

23   Q       And this particular one is for October 2nd, 2013,

24   at 3:00 p.m., and it references a meeting with two persons with

11:00AM   25   the last name Delijani.  Are those known as the Delijanis in

```
 1    other e-mails?
 2         A     Yes.  They're brothers.
 3              MS. PALMER:  If we could go to previously
 4    admitted 364B, please.
 5         Q     Is this a text message exchange between
 6    Raymond Chan and Jose Huizar?
 7         A     That's correct.  This is the cover page of that
 8    exchange.
 9              MS. PALMER:  Okay.  If we could go to page 2,
10    please, and zoom in on the first four messages.  Just the first
11    four.
12         Q     Mr. Chan said, "Good afternoon, sir.  Is there a
13    good time for Harris and I to do a call about your afternoon
14    meeting?"  And then can you read Mr. Huizar's response?
15         A     "You available to talk?"
16         Q     And then Mr. Chan says, "Please call us.
17    Chairman is waiting."  Who did you understand the Chairman to
18    be?
19         A     Wei Huang.
20         Q     And then Jose Huizar responds, "Call in ten
21    minutes.  I am in bad reception area."
22              Is that correct?
23         A     That's correct.
24              MS. PALMER:  If we can zoom back out.
25         Q     What was Raymond Chan's response?
```

11:01AM (line 5)
11:01AM (line 10)
11:01AM (line 15)
11:01AM (line 20)
11:02AM (line 25)

1        A        "Great."

2        Q        Based upon your review of that, did you

3   understand that Raymond Chan was either with the Chairman or

4   facilitating a call with the Chairman?

11:02AM   5        A        That's correct.

6        Q        Why was that of significance to your

7   investigation?

8        A        This was significant because the text message

9   referencing afternoon meeting, when reviewing the calendar, the

11:02AM   10  afternoon meeting was the meeting with the Delijanis for this

11  parking dispute.  So it was significant that Raymond Chan,

12  another public official, was involved as the go-between between

13  Jose Huizar and Chairman Huang, the developer.

14              MS. PALMER:  If we can go back to the timeline,

11:02AM   15  Exhibit 924, page 10, please.

16       Q        Here do we see a number of additional entries

17  relating to Delijani dinners and meetings?

18       A        That's correct.

19       Q        And do those include several messages with

11:03AM   20  Raymond Chan as well as a Huizar calendar entry?

21       A        Yes.

22              MS. PALMER:  And if we could go to one of those

23  text messages, please.  If we could go to 364C, displaying the

24  bottom half of this -- the last two messages, please.

11:03AM   25       Q        Can you read what Jose Huizar said?

1          A       "Delijanis confirmed dinner Wednesday at 7:00.

2     Can you let the Chairman know and also please confirm that

3     below is the address if restaurant.  And please send me name if

4     restaurant.  140 West Valley Boulevard San Gabriel 91776."

11:04AM   5          Q       And can you read Raymond Chan's response?

6          A       "Got it.  Will talk to the Chairman and provide

7     you with the address.  Have you had a chance to talk to Herb

8     and Gil?"

9          Q       And with respect to the second part of -- so,

11:04AM  10     again, the Chairman, you understood that to be Chairman Huang;

11     correct?

12          A       Correct.

13          Q       And then with respect to that second part of the

14     message, based upon your review of the messages in the

11:04AM  15     investigation, who did you understand Herb and Gil to be?

16          A       Herb to be Herb Wesson, the council president and

17     Gil to be Gil Cedillo, another member on the City Council.

18          Q       And did you have an understanding of what

19     Raymond Chan was asking Jose Huizar to talk to them about?

11:04AM  20          A       Yes.  Based on the review of these messages, he

21     was requesting Jose Huizar to talk to these two council members

22     regarding that consolidation.

23          Q       And regarding making the consolidation not

24     happen.

11:05AM  25          A       Correct.

1          MS. PALMER:  And if we could go to the second

2    page of this exhibit, please.  Go to the first two messages,

3    please.

4          Q    Jose Huizar responded, "Tracking down Herb

5    first."  Did you understand that that meant Jose Huizar was

6    going to be trying to talk to Herb Wesson?

7          A    Correct.

8          Q    And then he says, "Mitch called me."  Who did you

9    understand Mitch to be?

10          A    Mitch Englander, another council member and the

11    council member that put through the motion to initiate the

12    consolidation.

13          Q    And then the last sentence, "Staff tells me Mitch

14    will not be there tomorrow.  Perhaps he is asking me to

15    postpone."  You said that Mitch Englander put the motion

16    through for consolidation?

17          A    The initial motion was from Mitch Englander to

18    initiate those studies to consolidate the departments.

19          MS. PALMER:  If we can zoom back out.  Zoom in on

20    Raymond Chan's -- the next three messages, please.

21          Q    Looking at the one of two there, what does

22    Raymond Chan -- the first message there say?

23          A    "Just confirmed with the Chairman that Wednesday

24    at 7:00 p.m. is great.  The name and address of the restaurant:

25    New Capital Seafood, 140 West Valley Boulevard San Gabriel."

1    Q        Okay.  The next message is just relating, again,

2    to where that restaurant is; correct?

3    A        Correct.

4             MS. PALMER:  If we can go down farther.  Zooming

11:07AM  5   in on the last four.

6    Q        Can you read Raymond Chan's message there?

7    A        "Sir, is there a good time that I can talk to

8    you?  Also, the Chairman asked if you are available tomorrow

9    night for a fantastic French dinner at his Sheraton."

11:07AM  10  Q        And Jose Huizar responds "Half hour call you."

11   And what was Raymond Chan's response?

12   A        "Great.  I hope everything is okay on your side."

13   Q        Okay.  And what did you understand that to be?

14   Regarding -- in relation to your review of these text messages?

11:07AM  15  A        It was my understanding that this was related to

16   the sexual harassment lawsuit.

17   Q        And looking at the last message, can you please

18   read that?

19   A        "Good evening, sir.  Just e-mailed you the

11:07AM  20  talking points.  Thank you so much, sir."

21   Q        And what did you understand the talking points to

22   be?

23   A        These were talking points to be used during the

24   PLUM Committee meeting that was going to discuss the

11:08AM  25  consolidation.

1          MS. PALMER:  If we could go to Exhibit 924,

2    page 112 -- sorry -- page 11.

3          Q     And do we see some new entries there?

4          A     Yes.  For October 7th and 8th as well as -- for

11:08AM   5    October 7th and 8th.

6          Q     Below the line.

7          A     That's correct.

8          Q     So the October 7th and 8th, the talking points,

9    that's what you're referring to?

11:08AM  10          A     That's correct.

11          Q     And, also, there's a "PLUM approval postpone

12   consolidation."  What does that entry refer to?

13          A     That refers to a PLUM Committee meeting on

14   October 8th in which the motion to cease the initiation of the

11:09AM  15   consolidation was discussed and approved.

16          MS. PALMER:  And if we could go to Exhibit 329,

17   page 1, please.

18          Q     Looking at the bottom message first, who is this

19   from?

11:09AM  20          A     This is from Defendant Chan's personal e-mail

21   address to Council Member Jose Huizar's personal e-mail

22   address.

23          Q     And the subject?

24          A     "Talking points."

11:09AM  25          Q     And when was this sent?

1      A       October 7th of 2013.

2      Q       And if we could look at the text of what

3  defendant sent to Jose Huizar, what is he -- what does it say?

4      A       "Good evening, sir.  Attached are two files.

11:09AM  5  One, questions to ask the consultant and talking points.  Two,

6  why the motion should be adopted."

7      Q       And then can you read the line under that?

8      A       "Thank you very much for all your help.  You are

9  our savior."

11:10AM  10     Q       Okay.  And those talking points, based upon the

11  communications and the timing, did you understand that those

12  were the talking points that were referred to in the text

13  message?

14     A       That's correct.

11:10AM  15     Q       And those talking points relate to why the

16  consolidation should not happen; is that correct?

17     A       That's correct.

18     Q       And with respect to "The motion should be

19  adopted," that would be the motion to stop the consolidation?

11:10AM  20     A       That would be the motion to cease the studies to

21  be done to consolidate the departments.

22             MS. PALMER:  And then if we could zoom back out.

23     Q       Going to the second page, that's from

24  Raymond Chan; is that correct?

11:10AM  25     A       That's correct.

1      Q      And if we could go to the first page again, and

2  there's a little message right there in the middle between

3  Jose Huizar and sent back to Ray Chan on October 7th.  And can

4  you read what Jose Huizar said?

11:11AM  5      A      "Haven't spoken with Wesson.  Gil COS called Paul

6  and said he is with us."

7      Q      And "with us," based upon your review of the

8  communications, what did you understand that to mean?

9      A      To support the motion that was being proposed.

11:11AM  10      Q      And then if we could look at the top message, and

11  this one is from Raymond Chan's personal e-mail address to

12  Jose Huizar's personal e-mail address on October 8th.  Zooming

13  out, if we can do the first two paragraphs.  Can you read the

14  first paragraph, please?

11:11AM  15      A      "Great, great news.  Thank you so much, sir.

16  Will you please try to verify that with Gil during council?"

17      Q      And then zooming back out, if you could do the

18  last paragraph, please.  If you could just read it.

19      A      "There will be a lot of people from the industry

11:12AM  20  and union representatives to speak at PLUM today.  Please,

21  please make sure that the item will not be continued."

22      Q      And based upon what -- based upon Jose Huizar's

23  position as the chair of PLUM, did he have the ability to make

24  sure that an item would make the agenda on PLUM?

11:12AM  25      A      I don't recall if he was the chair of PLUM at

1    this point, but he was a committee member that would be

2    reviewing that.  It is possible that as chair he would agendize

3    or not agendize.

4         Q    And Raymond Chan was asking him to make sure that

5    this particular item did not get continued; correct?

6         A    That's correct.  And based upon my review of

7    this, I believe he was the chair of PLUM at that time.

8              MS. PALMER:  And then if we could go to

9    Exhibit 364C, please.

10        Q    Are these additional text messages between

11   Raymond Chan and Jose Huizar?

12        A    That's correct.

13        Q    If we could just look at the top few messages

14   there, are they arranging to talk that day?

15        A    That's correct.

16             MS. PALMER:  And if we could go to -- zoom back

17   out.  If we could go to page 3, please.  If we could zoom in on

18   the bottom -- the messages that are one and two.

19        Q    Can you read the first one, please?

20        A    One of two.  "You are such an eloquent speaker.

21   Unbelievable.  Please accept my deepest.  Most sincere

22   gratitude.  Believe me or not, I have years in my eyes.  I am

23   actually crying.  Thank you.  Thank you.  Thank you.  See you

24   later."

25        Q    And did you understand that Jose Huizar spoke on

```
 1   behalf of that motion in PLUM?
 2        A       That's correct.
 3        Q       And that's what this refers to?
 4        A       Yes.
 5                MS. PALMER:  If we could go back up to -- sorry.
 6   Can you zoom out?
 7        Q       If you could look at the messages that start
 8   with, "Hi, sir.  Is M.E. going to be there?" the two in the
 9   middle.  So is this before the hearing based on timing?
10        A       It appears so.
11        Q       And M.E., who do you understand that to refer to?
12        A       Council member Mitch Englander.
13        Q       And Huizar's response?
14        A       "No.  He is in Paris."
15        Q       And based upon your review of this text message
16   exchange, was Huizar following up and reaching out to other
17   council members to get support for the motion?
18        A       That's correct.
19        Q       And if we can zoom back out.  Zoom in on
20   Raymond Chan's response to, "No.  He is in Paris," message?
21        A       "Good for him and is."
22        Q       Now if we could go to Exhibit 470, please.  What
23   is this, Special Agent Civetti?
24        A       This is, I believe, a report from the clerk of
25   the PLUM Committee.
```

1    Q       And is this generally the motion that they were

2    referring to that postponed the consolidation?

3    A       I believe the motion ceases the -- or postpones

4    the implementation of the consolidation, and it basically

11:16AM   5    delays that consolidation from happening and instructing

6    additional studies to be done.

7    Q       And so as of this date, the consolidation is

8    postponed and additional studies would be conducted among other

9    things?

11:17AM   10   A       That's correct.

11           MS. PALMER:  If we can turn to the timeline 924

12   at page 12.

13   Q       And the additional items there to the right, do

14   those refer to an additional dinner with Raymond Chan and

11:17AM   15   Jose Huizar along with Chairman Huang?

16   A       Yes.  There's a communication discussing a dinner

17   to occur.

18   Q       That's on October 15th?

19   A       That's correct.

11:17AM   20   Q       And then there's a text message chain relating to

21   the lawsuit being filed; correct?

22   A       Yes.  Between the defendant and Council Member

23   Huizar.

24   Q       And that's on the date that the lawsuit was

11:17AM   25   actually filed; is that correct?

```
 1          A       Yes.

 2                  MS. PALMER:  Now, if we could go to 364E, please.

 3          Q       Is this also a text message chain between

 4   Raymond Chan and Jose Huizar?

 5          A       That's correct.

 6          Q       And if we could zoom in on the first three

 7   messages.  Can you read what Raymond Chan said?

 8          A       "Can you talk now, sir?"

 9          Q       And did Jose Huizar respond, "Let's talk later,

10   Ray.  The lawsuit was filed.  Speaking with my attorneys now."

11          A       Correct.

12          Q       And Raymond Chan's response?

13          A       "Got it."

14                  MS. PALMER:  And if we can zoom back out.  And

15   zooming in on the next three.

16          Q       And what was Ray's next response?

17          A       "The Chairman asks if there is anything that he

18   can help.  Please call me.  Thanks."

19          Q       And did you understand the Chairman in this to be

20   Chairman Huang?

21          A       Correct.

22          Q       So Raymond Chan is asking Jose Huizar if there is

23   anything the Chairman can do to help relating to the sexual

24   harassment lawsuit.

25          A       That's correct.
```

11:18AM (line 5)
11:18AM (line 10)
11:18AM (line 15)
11:19AM (line 20)
11:19AM (line 25)

1    Q      And looking at the next series of messages, are

2  they trying to figure out a time for Jose Huizar to talk to the

3  Chairman?

4    A      That's correct.

11:19AM  5        MS. PALMER:  And zooming back out, going to the

6  next page, and if we can zoom in on the first three messages,

7  please.  Sorry.  If we can just go -- sorry -- the third

8  message and down.  Yeah.  Three of three, perfect.

9    Q      Here Raymond Chan says, "I'll brief the

11:20AM  10  Chairman."

11        Is that correct?

12    A      That's correct.

13    Q      What did you understand him to be briefing the

14  Chairman about based upon your review of the text message?

11:20AM  15    A      That the sexual harassment lawsuit had actually

16  been filed against the council member.

17    Q      In fact, in the previous text chain, Raymond Chan

18  had said he was reviewing reports in the media relating to it;

19  correct?

11:20AM  20    A      That's correct.

21        MS. PALER:  If we can zoom back out, please.  And

22  zoom in on the next three messages.

23    Q      And, again, here are they trying to find a time

24  for Jose Huizar to talk with the Chairman?

11:20AM  25    A      That's correct.

1        MS. PALMER:  And then zooming back out.  And the

2    last three messages, please.

3        Q        Can you read what Raymond Chan wrote to

4    Jose Huizar?

11:20AM  5        A        "CM really wants to see you before he leaves.

6    Can you come to the hotel now?  Maybe you can bring the cigars.

7    Please call me."

8        Q        And CM there, who do you understand CM to be?

9        A        Chairman.  Chairman Wei Huang.

11:21AM  10       Q        So Ray Chan is saying the Chairman wants to see

11   Jose Huizar before the Chairman leaves?

12       A        That's correct.

13       Q        And he makes a recommendation that they meet at

14   the hotel.  What did you understand the hotel to be?

11:21AM  15       A        The L.A. Grand downtown.

16       Q        And he says, "Maybe you can bring cigars."  So

17   he's recommending that Jose Huizar bring cigars to the meeting

18   with the Chairman?

19       A        According to this message.

11:21AM  20       Q        What is Jose Huizar's response?

21       A        "On my way."

22       Q        And Raymond Chan's response?

23       A        "Great."

24       MS. PALMER:  If we can go back to the timeline,

11:22AM  25   924 at page 13.

1    Q        Following this and that meeting, did you see

2    additional entries relating to the Delijani parking dispute?

3    A        That's correct.  Calendar entries as well as

4    communications with the defendant related to this issue.

11:22AM  5    Q        And those are reflected by the calendar entry and

6    the text messages between Raymond Chan and Jose Huizar; is that

7    correct?

8    A        That's correct.

9             MS. PALMER:  If we could scroll to the next page,

11:22AM  10    please.

11    Q        Why were these -- the series of messages

12    significant to you or communications and events?

13    A        It was significant to the timeline as well as the

14    investigation given that the Defendant Chan, being another

11:23AM  15    public official, was the one as the go-between between

16    Jose Huizar, the council member, and the developer, Wei Huang.

17    Specifically, he seemed to be facilitating the help that

18    Chairman was willing to provide to Jose Huizar for the sexual

19    harassment lawsuit.

11:23AM  20             At the same time that this benefit was occurring,

21    there were also communications with the defendant regarding

22    issues that the hotel needed in which there was a request for

23    Jose Huizar to intervene in that matter.

24             MS. PALMER:  And if we could go to the next page

11:23AM  25    of the timeline.

1      Q       And did these communications between the

2  defendant, Huizar, and Shen Zhen New World including Wei Huang

3  continue throughout this period?

4      A       It did continue.

11:23AM  5            MS. PALMER:  If we can look at Exhibit 331,

6  please.  The message at the bottom, if we can zoom in on that.

7      Q       Is that from Defendant Chan's Gmail address?

8      A       Yes.  That's his personal account.

9      Q       And he's sending it to Jose Huizar's personal

11:24AM  10  account as well?

11      A       That's correct.

12      Q       And this is on November 5th, 2013?

13      A       Yes.

14      Q       Can you read what he wrote?

11:24AM  15      A       "Please see attachment.  Sorry for the delay."

16      Q       And looking at that attachment, page 2, what is

17  this, Special Agent Civetti?

18      A       This is a draft motion.

19      Q       And Raymond Chan is providing a draft motion

11:24AM  20  relating to the consolidation, and it's for Jose Huizar; is

21  that correct?

22      A       Yes.  It was my understanding that the motion was

23  to reinitiate funding for the current building department and

24  planning department.

11:25AM  25      Q       And going up to the first page, by this time, had

```
 1   Raymond Chan become the head of LADBS?

 2        A       Yes.  He was the interim general manager.

 3        Q       And so he's asking -- he's helping draft a

 4   motion -- or he's drafting a motion for Huizar that relates to

 5   restoring funding to, among other things, LADBS?

 6        A       That's correct.

 7        Q       And then looking at the message above, this is

 8   from Jose Huizar.  And who is that to?

 9        A       I believe it's a Jose Huizar staff member.

10        Q       And can you please read the text?

11        A       "Don't mention I got this from Ray.  Please print

12   and have ready for me to submit in council today on this item."

13             MS. PALMER:  Now, if we could turn to 364H,

14   please, and if we could go to the first -- one of two

15   exhibits -- sorry -- the one of two text messages.

16        Q       And can you read that what Raymond Chan sent to

17   Jose Huizar.

18        A       "Good morning, sir.  I heard that the item,

19   motion, may go consent this morning at counsel.  If it goes

20   consent, then I guess we do not need to do the amend."

21        Q       And if we could do the next message, please.

22        A       "Amendment.  If it is called special, then can

23   you please introduce the amendment?  Please advise.  I e-mailed

24   the amendment to you last Saturday.  Thanks."

25        Q       And when he says, "I e-mailed the amendment to
```

1    you last Saturday," do you understand that to be the document

2    that he sent to Jose Huizar?

3         A     That's correct.

4         Q     And that Jose Huizar told his staff member not to

11:27AM  5    tell others that it came from Defendant Raymond Chan?

6         A     That's correct.

7         Q     And if we could go to page 2 of this document,

8    please.  And if we could go to the last two text messages.

9              Can you please -- I will actually read.  Did

11:27AM  10   Jose Huizar say, "Wesson office suggested not to muddle up with

11   amendment now.  Let's get through today and bring back

12   amendment next round"?

13        A     That's correct.

14        Q     What was Raymond Chan's response?

11:27AM  15        A     "Sir, you are magical.  I think this is the

16   better cause.  Thank you, sir, very much.  May I call you

17   later?"

18        Q     Based upon your investigation and review of the

19   text messages, what was your understanding of "muddle up with

11:28AM  20   amendment"?  What does that mean?

21        A     Introducing the amendment if it is not needed.

22              MS. PALMER:  If we can go back to the timeline

23   and go to 924, page 16.

24        Q     The new events here, what are those new events?

11:28AM  25   What do they represent?

1    A    These represent communications between the

2  defendant and Council Member Huizar relating to those issues

3  with the L.A. Grand Hotel as well as the calendar entry of

4  Jose Huizar with that Delijani family that was involved in that

11:28AM    5  dispute.

6    Q    And is Defendant Chan also on two of those

7  communications?

8    A    He was.

9    Q    And if we could go to one of those

11:29AM    10  communications.  It's a text message 364I.  And if we could go

11  to the first few text messages, please.

12    And here is Raymond Chan, again, referring to a

13  conversation that he had with the Chairman.

14    A    That's correct.

11:29AM    15    Q    And if you could -- did he say that the Chairman

16  asked me to send his best regard to you and your family?

17    A    Yes.

18    Q    In response, can you read what Jose Huizar said?

19    A    "Hey, Ray.  Everything is okay.  Meeting with

11:29AM    20  Shahram today in evening.  He asked if we could meet just to

21  chat."

22    Q    Who is Shahram?

23    A    He is one of the Delijani brothers that owns the

24  parking lot.

11:30AM    25    MS. PALMER:  If we could zoom back out and go to

1    page 2.

2        Q      On this page, does -- do they discuss that they

3    were going to have a phone conversation with the Chairman?

4        A      That's correct.

11:30AM  5        Q      Looking at the bottom, again, who is the one that

6    is facilitating the call with the Chairman?

7        A      Defendant Chan.

8        MS. PALMER:  And then zooming back out, if we

9    could go to 924, page 17, please.

11:30AM  10        Q      Looking at the purple triangle at the top "Huizar

11   calendar meet with R.C.," is that another one of those calendar

12   entries that we talked about previously that Huizar had in his

13   official calendar?

14        A      That's correct.

11:31AM  15        Q      And then there's a message that same day between

16   Defendant Chan and Jose Huizar regarding commitment; is that

17   correct?

18        A      That's correct.

19        Q      And in Huizar's calendar, did he spell out the

11:31AM  20   name Raymond Chan?

21        A      In the calendar, no.

22        Q      And if we go to that text message 158A and zoom

23   in on the first two, please, and so here this is on

24   December 9, 2013.  Jose Huizar said, "One thing we didn't talk

11:32AM  25   about on Sunday is to make sure we get the commitment in before

1    end of the year as we previously discussed.  Thank you."

2              Can you read Raymond Chan's response?

3         A    "We did talk about that but not in detail because

4    that is supposed to be a done deal."

11:32AM  5         Q    And as far as the end of the year, what is your

6    understanding, based upon the investigation, what that means?

7         A    The end of the year would be the campaign finance

8    period.

9         Q    And the word "commitment" there, what did you

11:32AM  10   understand that to mean?

11        A    Campaign contributions.

12        Q    And Defendant Chan's response that it's supposed

13   to be a done deal -- sorry.  That's all I wanted to -- he said

14   it's supposed to be a done deal, meaning the commitment?

11:32AM  15        A    Correct.

16              MS. PALMER:  If we can zoom back out.  Then the

17   last two messages.

18        Q    Jose Huizar responded, "Thank you, sir.  I like

19   the confidence."

11:33AM  20              What did Raymond Chan respond?

21        A    "Thank you, sir."

22        Q    If we go back to Exhibit 924 at page 17, there

23   are a few items below the line, December 3rd and December 11th.

24   Can you explain what those are?

11:33AM  25        A    Those are two additional events in which

1    Jose Huizar voted.  This would be the PLUM Committee and the

2    City Council committee, and they were voting on motions or

3    movements related to restoring the authority of the

4    Planning Department and the Department of Building and Safety.

11:33AM  5         Q        So this is allowing sort of the Department of --

6    DBS to continue to restore the powers it used to have; is that

7    correct?

8         A        That's correct.

9         Q        At a very high level.

11:34AM  10         A        Very high level.

11         Q        And did Huizar vote "yes" on both of those?

12         A        He did.

13         Q        And going to page -- the next page, please, do we

14    see two additional entries relating to the Delijanis?

11:34AM  15         A        Yes.

16         Q        And the parking dispute?

17         A        That's correct.

18         Q        And, again, there's another calendar entry on the

19    right that says, "Huizar says dinner R.C."

11:34AM  20                   Is that correct?

21         A        That's correct.

22         Q        That's from Jose Huizar's calendar?

23         A        That's correct.

24         Q        And did he, again, use just the initials on that?

11:34AM  25         A        Yes.  R.C.

                    1          MS. PALMER:  And if we could look at

                    2   Exhibit 364K, please.  And if we could zoom in on the top few

                    3   messages.

                    4          Q     Here is Raymond Chan talking to Jose Huizar about

11:35AM             5   having dinner with the Chairman.

                    6          A     Yes.

                    7          Q     And specifically where?

                    8          A     At the Chairman's residence.

                    9          Q     And do they also talk about meeting beforehand to

11:35AM            10   discuss things before they go to the Chairman?

                   11          A     Yes.  That's correct.

                   12          Q     Okay.  And is -- what was Jose Huizar's response?

                   13          A     I can be at my house -- "I can be at my home at

                   14   6:45."

11:35AM            15          MS. PALMER:  And if we can zoom back out.  Then

                   16   zooming in on the next three messages.

                   17          Q     And are they rescheduling the dinner at that

                   18   point so they can have enough time to chat beforehand?

                   19          A     Yes.

11:36AM            20          MS. PALMER:  And then zooming back out.

                   21          Q     Are they actually meeting and Raymond Chan picks

                   22   up Defendant Huizar to take him to the Chairman's house?

                   23          A     That's correct.

                   24          Q     And going to the second page, in this message

11:36AM            25   Raymond Chan is saying, "Told the Chairman we will be there at

1    8:00."

2                    Is that correct?

3         A         That's correct.

4         Q         And why did you include this entry on your

11:36AM  5    timeline?

6         A         These entries related to the parking dispute.  It

7    seemed that the issue was a continual thing that the Chairman

8    was looking for Jose Huizar to assist and Raymond Chan was

9    facilitating as well it was at the same time period in which

11:37AM  10   City actions were occurring that were benefiting the defendant.

11                   MS. PALMER:  And if we can then return to the

12   timeline, 924 at page 21, please.

13        Q         And do these reflect additional events relating

14   to the timeline -- I mean, to the parking dispute?

11:37AM  15        A         Some of the events related to the parking

16   dispute, and then some of them related to fundraising for

17   Jose Huizar involving the defendant.

18        Q         And let's look at those.  So let's look at the

19   December 19th exchange between Defendant Chan and Wei Huang.

11:37AM  20   Can we go to exhibit -- previously admitted 333 -- 334, please.

21                   Zooming in on the top of that, what is the

22   subject of this e-mail?

23        A         It's a forward "Huizar re-election campaign

24   donation form."

11:38AM  25        Q         And who is it from?

```
          1          A        Ray Chan's personal e-mail address.

          2          Q        And who is he sending it to?

          3          A        Wei Huang at his Shen Zhen New World account.

          4          Q        And if we can go to page 2 of this document.

11:38AM   5    Zooming in on the text below the lined area, does this provide

          6    some of the rules relating to campaign contributions?

          7          A        Yes.  It sets the limit to $700 per individual or

          8    business as well as who cannot donate.

          9          Q        And who cannot donate?

11:38AM   10         A        Contributions from foreign nationals are

          11   prohibited.

          12         Q        And was Wei Huang a foreign national?

          13         A        That's correct.

          14                  MS. PALMER:  And going to Exhibit 335, please.

11:39AM   15   335.  Zooming in on the bottom message first with the "from"

          16   and "to."

          17         Q        Is this also on December 9th?

          18         A        Yes.  This is the same day as that donation form.

          19         Q        Sorry.  December 19th.

11:39AM   20         A        December 19th, 2013.

          21         Q        And this is from Jose Huizar?

          22         A        It's --

          23         Q        I mean to Jose Huizar?

          24         A        Correct.

11:39AM   25         Q        And who is it from?
```

1      A      Chairman Huang at Shen Zhen New World.

2      Q      And what is Chairman Huang attaching here?

3      A      He says, "Per our previous discussion, enclosed

4    is our proposal letter to Golden Hills."

11:40AM    5           MS. PALMER:  And zooming back out, going in on

6    the top message.

7      Q      And is this Jose Huizar forwarding that message

8    to his personal account?

9      A      That's correct.

11:40AM   10      Q      And so Wei Huang is directly reaching out to

11   Jose Huizar in this?

12      A      Yes.  With the attachment for the proposal letter

13   to Golden Hills.

14           MS. PALMER:  And if we could go to Exhibit 158B,

11:40AM   15   please.

16      Q      What is Golden Hills?

17      A      Golden Hills is the Delijani company that owns

18   the parking lot.

19           MS. PALMER:  If we can go to Exhibit 158B,

11:41AM   20   please.

21      Q      Are these additional text messages between

22   Raymond Chan and Jose Huizar?

23      A      That's correct.

24           MS. PALMER:  If we can go to page 2, please,

11:41AM   25   zooming in on the first four messages.

```
 1          Q       In the first message, does Jose Huizar mention
 2   that he's at Universal Studios with his family?
 3          A       That's correct.
 4          Q       And does he -- is Raymond Chan in this message
 5   trying to set up a meeting between Jose Huizar and himself and
 6   Wei Huang?
 7          A       That's correct.
 8          Q       And he's asking him to go to dinner with the
 9   Chairman; is that correct?
10          A       Yes.
11          Q       And does Raymond Chan indicate that he will relay
12   that message to the Chairman?
13          A       Yes.
14          MS. PALMER:  And then if we can zoom back out.
15   And then can you please do the next three messages or the next
16   two messages starting with "Thank you."
17          Q       What does Huizar respond?
18          A       "Thank you and Chairman again for tickets.  This
19   was spectacular."
20          MS. PALMER:  And if we can go to page 3, please,
21   and zoom in on those three messages.
22          Q       Can you please read what Defendant Chan wrote to
23   Jose Huizar there?
24          A       "Good news.  We have gathered all 45.  Just need
25   to verify that all the forms are filled out correctly."
```

1    Q       And Jose Huizar said, "That's very good news.

2    Thank you."

3            And what does Raymond Chan respond?

4    A       "You are welcome, sir.  Good luck."

11:43AM  5    Q       And what did you understand, based upon your

6    review of these documents and investigation, that 45 referred

7    to?

8    A       45 individual contributions.

9    Q       And based upon your investigation of this case,

11:43AM  10   what is the limit for contributions?

11   A       At this period of time, it was $700 per person

12   was the limit for Jose Huizar's fundraising.

13   Q       And typically during your investigation, did you

14   see that when particular elected official is asking for a

11:43AM  15   number of checks, they mean checks at the maximum amount?

16   A       That's correct.  $700 per check.

17   Q       So 45 times 700 would be around $31,500?

18   A       That is correct.

19   Q       Why did you include this text message exchange on

11:44AM  20   your timeline, Special Agent Civetti?

21   A       Part of the investigation of different benefits

22   that we were investigating were campaign contributions.  And in

23   this particular instance we were investigating a public

24   official, Defendant Chan, facilitating campaign contributions

11:44AM  25   for Jose Huizar at the same time that a number of other events

1  are occurring including issues with the hotel, the sexual

2  harassment, and the consolidation, all benefiting the three

3  individuals involved -- Chairman Huang, Jose Huizar, and

4  Defendant Chan.

11:44AM  5      Q      And during your investigation did you learn of

6  any prohibitions on general managers for participating in

7  campaign activities?

8      A      Yes.  I reviewed the Los Angeles campaign finance

9  laws, and part of that code directly prohibits general managers

11:44AM  10  from engaging in fundraising on behalf of an elected official

11  such as Jose Huizar.

12      Q      Returning to the timeline, Exhibit 924, page 22,

13  we now see on this timeline what appears to be a casino chip.

14  What does that signify?

11:45AM  15      A      That signifies a trip to Las Vegas that

16  Jose Huizar went on with Chairman Huang.

17      Q      Were there a number of trips to Las Vegas during

18  the period that you investigated?

19      A      Yes.  It was one of the benefits that we were

11:45AM  20  investigating.

21      MS. PALMER:  If we can look at the text message

22  right next to it that is Exhibit 364L.  If we can zoom in on

23  those three.

24      Q      This is a text message exchange, again, between

11:46AM  25  the defendant and Jose Huizar?

1     A      That's correct.

2     Q      Can you please read what Raymond Chan wrote to

3  Jose Huizar?

4     A      "Good morning, sir.  I hope things are going good

11:46AM  5  in Vegas and your family is enjoying the trip."

6     Q      Jose Huizar responds, "Good morning, Ray.

7  Everything is great."

8            And what was Raymond Chan's response?

9     A      "Fantastic."

11:46AM  10     Q      Based upon your investigation, did Jose Huizar

11  pay for his own trips to Las Vegas?

12     A      Not the ones that he was attending with

13  Chairman Huang.

14     Q      And for those trips, who paid for those?

11:46AM  15     A      Chairman Huang or the casino.

16     Q      And this is one message relating to Raymond Chan

17  discussing Vegas with Jose Huizar.  Are there additional

18  messages over this time period where Defendant Chan discusses

19  Vegas with Huizar?

11:47AM  20     A      Yes.  That's correct.

21     Q      And why was that of significance to you?

22     A      It's significant because in this investigation,

23  as I said, we're investigating benefits being provided by

24  developers seeking to influence public officials.  And for this

11:47AM  25  a casino trip being all inclusive paid by that developer would

1    be a red flag of the investigation as well that the other

2    individual involved is another public official who was involved

3    in having those trips occur.  So with that, when we're looking

4    at public corruption activities, we need to look at the

11:47AM  5    totality of what's going on at periods of time because a lot of

6    times innocuous activity such as a campaign contribution, a

7    trip to Vegas, an issue with the hotel independently may be

8    innocuous, but given the timing of all of it and the people

9    involved, that's a concern for our investigation.

11:48AM  10              MS. PALMER:  Looking at Exhibit 337, page 1,

11   please, and zooming in on the top.

12         Q      The subject of this is "Forward parking

13   negotiation summary."  And it is from Raymond Chan's personal

14   e-mail address to Jose Huizar's personal e-mail address.  And

11:48AM  15   it has an attachment called "Parking negotiation_JH."

16              Is that correct?

17         A      That's correct.

18         Q      If we can go to page 2 of the document that the

19   defendant attached, what is this, Special Agent Civetti?

11:48AM  20         A      This is the attachment to that e-mail, and it was

21   titled "Proposed strategies for parking agreement negotiation."

22         Q      And based upon your investigation, is this

23   strategy relating to the parking issue that Chairman Huang was

24   facing?

11:49AM  25         A      That's correct.

1          MS. PALMER:  And if we can go back to the

2    timeline, Exhibit 924, page 24, please -- sorry.  Can we go

3    back to Exhibit 337, page 2.

4          Q        Before Chairman Huang had sent over some points

11:49AM   5    that Raymond Chan received relating to Golden Hills, is that,

6    again, referenced here?

7          A        Yes.

8          Q        And can you read that, please?

9          A        "The Chairman recognizes that this offer may be

11:49AM   10   relatively unsatisfactory from Golden Hills' perspective.  He

11   would like to use this as an opportunity to identify what terms

12   Shahram feels is amicable --" I can't say that word.

13         Q        Amicable?

14         A        "-- amicable for."

11:50AM   15   Q        Okay.  Zooming back out, and then the last line

16   of that talking points or strategies.  Yes.

17         A        "Most importantly, Golden Hill will experience no

18   loss of profits."

19         Q        And this is Raymond Chan sending it to

11:50AM   20   Jose Huizar; correct?

21         A        That's correct.

22         Q        And going back to Exhibit 924, page 24, are there

23   a number of additional items relating to the parking dispute?

24         A        Yes.  It was a pattern I recognized on this

11:50AM   25   timeline.

1      Q       And below the line there, there's a January 28th

2   CLA memo.  What is that?

3      A       That's a memo related to the consolidation and

4   the different departments.

5              MS. PALMER:  And if we could look at the

6   February 22nd, 2014, call.  It's 364U.

7      Q       And looking at this and zooming -- so, again,

8   text message exchange between Raymond Chan and Jose Huizar; is

9   that right?

10     A       That's correct.

11             MS. PALMER:  And if we could zoom in on the first

12  three messages, please.

13     Q       Here is Defendant Chan apprising Jose Huizar of

14  when the Chairman is arriving.

15     A       Yes.

16     Q       And then can you read what he says in the last

17  message that's zoomed in on?

18     A       "I am in the Chairman's house.  Can we call you?"

19     Q       And based upon your review of that text message,

20  what is your understanding of what he means when he says, "I am

21  in the Chairman's house"?

22     A       That Defendant Chan was physically located at

23  Chairman Huang's residence.

24     Q       And calling Jose Huizar from there?

25     A       Correct.

1            MS. PALMER:  And zooming back out.  If we could

2    go to 924 at page 25, please.

3            Q      And looking at this, there's a new shape that's

4    green, green shape on the timeline.  What does this depict,

11:52AM  5    Special Agent Civetti?

6            A      The green hexagon --

7            Q      Hexagon.

8            A      -- is representing a radar screen from the

9    defendant.

11:53AM  10           Q      And what is a radar screen?

11           A      A radar screen is a document similar to a task

12   listing or to-do list documenting a variety of things that the

13   defendant is involved in.

14           Q      And that particular radar screen, the date on it

11:53AM  15   is the same day as the call with the Chairman that we just read

16   about; is that correct?

17           A      It's the same day that Defendant Chan was at the

18   Chairman's residence and they were calling Jose Huizar.

19           Q      And did you collect a number of these radar

11:53AM  20   screens during the course of your investigation?

21           A      Hundreds of pages.

22           Q      And did you review the metadata for those radar

23   screens?

24           A      I did.

11:53AM  25           Q      What did the metadata show regarding who created

1    those screens?

2        A        The metadata showed that those screens were

3    created by a user Raymond Chan.

4        Q        How detailed are the radar screens?

11:54AM  5    A        They're very detailed.

6        Q        And for what time period did you seize radar

7    screens?

8        A        For the time period of the -- relevant to the

9    investigation, 2013 through 2018.

11:54AM  10   Q        And in the course of this investigation, have you

11   become familiar with how the radar screens are organized?

12       A        Yes.

13       Q        And based upon your knowledge of this

14   investigation, do any of the radar screens appear to reflect

11:54AM  15   information relating to Chairman Huang?

16       A        They do.

17       Q        Do they appear to reflect information relating to

18   other developers?

19       A        Other developers, that's correct.

11:54AM  20   Q        And do they have information that appears to

21   relate to Chairman Huang's two hotels in Los Angeles?

22       A        Yes.

23       Q        And were the radar screens saved in a specific

24   folder?

11:55AM  25   A        Some of them were e-mail attachments, some of

1  them were on the Google Drive, and some were located on the

2  Google Drive within a folder labeled "Chairman."

3      Q      And some of the radar screens that the jury will

4  be seeing today relating to Shen Zhen, were those in a folder

5  called "Chairman"?

6      A      Not all of them but some.

7      Q      And in preparation for trial, did you review the

8  radar screens that the Government marked as exhibits?

9      A      I did.

10         MS. PALMER:  Your Honor, at this time the

11  Government would move to admit previously stipulated exhibits,

12  and I have a short list.

13         THE COURT:  How short?

14         MS. PALMER:  Five.

15         THE COURT:  Okay.

16         MS. PALMER:  With ranges.

17         THE COURT:  Because we're not going to take the

18  time for the jury.  The next time we have a long list, we're

19  going to take it up at a recess.

20         MS. PALMER:  Thank you, Your Honor.  41A and B,

21  42A through D, 43A through C, 44A and B, and 45A through D, as

22  in dog.

23         Are those received Your Honor?

24         THE COURT:  Yes.  Those will be received without

25  objection.

1              (Marked for identification and received

2              into evidence Exhibit Nos. 41A and B, 42A

3              through D, 43A through C, 44A and B, and

4              45A through D.)

11:56AM  5              MS. PALMER:  If we could go to previously

6       admitted Exhibit 41B, please.

7              Q       Special Agent Civetti, what is this?

8              A       This is an example of one of the radar screens or

9       progress reports.  This one specifically is all related to the

11:57AM 10      L.A. hotel and Sheraton Hotel of Shen Zhen New World.

11             Q       And did you also review -- and does this have

12      details relating to the different phases of the hotel?

13             A       Yes.  At the time there was a renovation

14      occurring at the two hotels, and these are different phases of

11:57AM 15      that -- of that renovation.

16             Q       And just to clarify, these are from the

17      defendant's files?

18             A       That's correct.  These are from the defendant's

19      files in a folder labeled "Chairman" on the Google Drive.

11:57AM 20             MS. PALMER:  And if we could go to -- if we could

21      go to 41A, please.

22             Q       And looking at the top portion with the date and

23      the title, what is the date of this?

24             A       This is February 22nd, 2014, the day that the

11:58AM 25      defendant was at the Chairman's house.

1    Q        And what is the title?

2    A        "CM tasks progress report."

3    Q        And it says, "Call J.H. to set meeting."  What is

4    your understanding from reviewing these screens that J.H.

11:58AM  5    refers to in these screens?

6    A        Council Member Jose Huizar.

7    Q        And CM tasks progress report, what did you

8    understand CM to refer to?

9    A        Chairman Wei Huang.

11:58AM  10        MS. PALMER:  And if we can zoom back out.

11    Q        Generally, how would you describe what we see on

12    this screen?

13    A        This document has a number of categories that are

14    separated by underlines with the subject matter.  So there's

11:59AM  15    four categories on this particular document -- Downtown Hotel,

16    Sheraton, property, and miscellaneous.

17    Q        Zooming in on the Downtown Hotel, is it your

18    understanding that that refers to the L.A. Grand Hotel?

19    A        Yes.

11:59AM  20    Q        And where it says, "Parking" there, again, is

21    J.H. referenced relating to the parking?

22    A        Yes.

23    Q        And is this a name that we've seen throughout

24    relating to the Delijanis?

11:59AM  25    A        Shahram.  He's one of the Delijani brothers.

|  |  |  |
|---|---|---|
|  | 1 | Q       And zooming back out, the Sheraton Hotel, that |
|  | 2 | category, do you understand that to refer to Chairman Huang's |
|  | 3 | Sheraton Hotel? |
|  | 4 | A       That's correct. |
| 12:00PM | 5 | Q       And was Defendant Chan ever employed by Shen Zhen |
|  | 6 | New World, as far as you know? |
|  | 7 | A       Not that I'm aware. |
|  | 8 | Q       And at that time, who was he employed by? |
|  | 9 | A       The City of Los Angeles. |
| 12:00PM | 10 | MS. PALMER:  Now, if we can go to Exhibit 924, |
|  | 11 | page 25.  And looking at 364 -- sorry.  Let's go to the next |
|  | 12 | page. |
|  | 13 | Q       And those items below the line, what do those |
|  | 14 | items represent on March 4th? |
| 12:00PM | 15 | A       They represent communications between the |
|  | 16 | defendant and Jose Huizar regarding a PLUM meeting as well as |
|  | 17 | the PLUM meeting occurring and in approval that Huizar voted |
|  | 18 | yes. |
|  | 19 | MS. PALMER:  Let's go to that text message, 364V. |
| 12:01PM | 20 | Q       Zooming in on the first two messages there, can |
|  | 21 | you read what Defendant Chan wrote to Jose Huizar? |
|  | 22 | A       "Is there a chance to talk before PLUM?  I heard |
|  | 23 | that M.L. is trying to convince you that this report is no |
|  | 24 | good.  This is total B.S.  This report has great |
| 12:01PM | 25 | recommendations.  Also, can you please talk to Gil for his |

```
  1   support for extending the contract for the consultant.
  2   Thanks."
  3        Q     Who did you understand M.L. to be?
  4        A     Michael LoGrande, the director of the
  5   Planning Department.
  6        Q     And was Michael LoGrande one of the people who
  7   initially supported consolidation?
  8        A     That's correct.
  9              MS. PALMER:  Zooming back out, if we can go to
 10   473 at page 1, please.  And if we can go to page 2.
 11        Q     What is this, Special Agent Civetti?
 12        A     This is the report from the PLUM Committee.
 13        Q     And is this the report that Defendant Chan was
 14   referring to in the last message?
 15        A     That's correct.
 16              MS. PALMER:  And going to page 3, please.  And
 17   zooming in on the "respectfully submitted" and the votes at the
 18   bottom.
 19        Q     Who submitted this?
 20        A     Council Member Jose Huizar.
 21        Q     And he was the chair of the Planning and Land Use
 22   Management Committee?
 23        A     That is correct.
 24        Q     And how did he vote?
 25        A     Yes.
```

12:02PM (line 5)
12:02PM (line 10)
12:02PM (line 15)
12:03PM (line 20)
12:03PM (line 25)

1    Q    And other members were absent?

2    A    They were not present.

3         MS. PALMER:  Now, if we could return to the

4    timeline, 924 at page 26.  If we could go to page 27, please.

12:03PM    5    Q    And these two events, April 2nd and April 30th,

6    what do those signify?

7    A    April 2nd would be the City Council approval

8    considering what the PLUM Committee had approved on March 4th.

9    And then April 30th would be the day in which Raymond Chan was

12:04PM   10    appointed as the permanent general manager for the Department

11    of Building and Safety.

12    Q    And why did you include these entries on your

13    timeline?

14    A    These entries were included because, as of

12:04PM   15    April 2nd, the actions that the City Council was taking was

16    basically stopping the consolidation altogether and realigning

17    the authority to the two departments, Planning and Building and

18    Safety, and then the appointment of Raymond Chan as the general

19    manager would then be a permanent over this department.

12:04PM   20    Q    So in this period Defendant Chan had been an

21    interim GM of LADBS, and this entry represents when he became

22    the official appointed.

23    A    That's correct.

24    Q    And the April 2nd entry represents the final

12:05PM   25    division of authority for the de-consolidation.

1      A       In a high sense, yes.

2      Q       On a high level.

3              Now, scrolling to the next page, the two entries

4      at the top, April 23rd and then May 13th, what do those

12:05PM  5   represent?

6      A       April 23rd is a council action in which a

7      resolution was presented by Jose Huizar on behalf of

8      Chairman Huang, and May 13th were communications between

9      Defendant Chan and Jose Huizar related to a fundraising list.

12:06PM  10             MS. PALMER:  And if we could pull up Exhibit 342.

11     Q       What is this, Special Agent Civetti?  Is this the

12     resolution you talked about?

13     A       Yes.  This is the official resolution that the

14     City Council approved for the Chairman.

12:06PM  15   Q       And are resolutions official actions that are

16     taken by council members?

17     A       That is correct.

18     Q       And zooming out.  And then does it have a series

19     of "whereas's" where it describes certain things relating to

12:06PM  20   Chairman Wei Huang?

21     A       That's correct.

22     Q       And does it refer to his development going to --

23     sorry.  It's so small.

24             The second to the last one, if we can zoom in on

12:07PM  25   that.

1      Does this note the Chairman's various roles that
2  he holds and that he's president of Shen Zhen among other
3  things?

4      A     Correct.

12:07PM  5      MS. PALMER:  And going to page 2, if we can zoom
6  in on just the top of the page and with the signatures.

7      Q     Can you just read that top paragraph?

8      A     "Now, therefore, be it resolved by the City of
9  Los Angeles that the Los Angeles City Council hereby recognizes
12:07PM  10  Chairman Huang Wei for his achievements and hardships over the
11  years in building a successful background for himself."

12      Q     And is that presented by Jose Huizar?

13      A     Yes.

14      Q     And can you read just the first part of the next
12:08PM  15  "Be it further resolved"?

16      A     "Be it further resolved that Council Member
17  Jose Huizar, on behalf of the people of the 14th Council
18  District, extends a special thank you Chairman Huang Wei for
19  the contributions he has and will continue to make to economy
12:08PM  20  of the 14th district."

21      Q     Thank you.

22      Now, the two other entries related to
23  fundraising, and I'd like to pull up on the left previously
24  admitted Exhibit 136 and on the right previously admitted
12:08PM  25  Exhibit 153C.  158C.  Looking on the left, if you can just zoom

```
 1    in on the top.

 2                    Can you describe what this is,

 3    Special Agent Civetti?

 4         A       This is an e-mail from Raymond Chan's personal

 5    e-mail address to Jose Huizar's personal e-mail address on

 6    May 13 of 2014 with subject "Forward e-mail list" and an

 7    attachment called "dummy.3 removed."  It appears to be an Excel

 8    sheet.

 9         Q       And this was sent on May 13, 2014?

10         A       That's correct.

11                    MS. PALMER:  Zooming back out, if we can go to

12    page 2 of the document on the left.

13         Q       And zooming in on the top of this, what is this?

14         A       It's labeled "LADBS Newsletter recipients as of

15    March 5, 2014."

16         Q       And so this appears to be Defendant Chan

17    e-mailing Jose Huizar a copy of the LADBS Newsletter recipients

18    with their contact information?

19         A       That's correct.

20         Q       And that includes their addresses or their

21    numbers and e-mail addresses; is that correct?

22         A       That's included among the different categories.

23         Q       And looking on the right, does Jose Huizar send a

24    message to Raymond Chan on May 12 saying, "You have time to

25    meet tonight to go over our list?  I want to send invite
```

1    tomorrow"?

2          A       That's correct.

3          Q       And based upon your review of these text messages

4    and other communications, what did you understand that to be

12:11PM   5    referring to?

6          A       A fundraising list and specifically the list

7    provided by the defendant.

8          Q       And in response, what does the defendant say to

9    Jose Huizar?

12:11PM   10         A       "I just realized that it may not be a good idea

11   for us to discuss the list in a restaurant.  Can I come to your

12   home around 7:15 to 7:30 tonight?"

13         Q       So the defendant there is saying that they don't

14   want to discuss the list.  Based upon your understanding, it

12:11PM   15   would be the LADBS list that he sent?

16         A       The LADBS list and/or a fundraising list.

17         Q       And he said it's not a good idea to discuss in a

18   restaurant; is that correct?

19         A       That's correct.

12:11PM   20         Q       So he offered to go to Jose Huizar's home

21   instead.

22         A       Yes.

23                 MS. PALMER:  And if we could zoom back out.

24         Q       Are they, in the text messages that follow,

12:11PM   25   arranging to meet in person to discuss that list?

1      A      That's correct.

2      Q      And then, in addition, is Raymond Chan

3    referencing that he needs to talk to the Chairman?

4      A      Yes.

5      Q      And what is Jose Huizar's response?

6      A      "Okay.  Tell the Chairman I said hello."

7      Q      And you earlier referenced that you reviewed the

8    municipal code with respect to prohibitions against general

9    managers engaging in certain kinds of fundraising on behalf of

10   elected officers.  Does that include using lists for -- sending

11   lists for those types of events?

12     A      Correct.

13            THE COURT:  All right.  We're going to take our

14   final break of the day.  We will be in recess for 15 minutes.

15            THE CLERK:  All rise for the jurors.

16            (A recess was taken at 12:12 p.m.)

17            (The following proceedings were held in

18            open court in the presence of the jury:)

19            THE COURT:  All right.  All counsel and the

20   defendant are present.  The jury is present.

21            You may resume your examination.

22            MS. PALMER:  Thank you, Your Honor.

23     Q      Special Agent Civetti, before the break we were

24   discussing contributions and involvement by a general manager

25   in fundraising for other City officials.  In particular, the

1    municipal code relating to that.  Does the municipal code

2    prohibit a general manager from supplying names to be used for

3    invitations to a fundraising event?

4         A    That is correct.

12:36PM   5         Q    Now, I wanted to bring up one of the radar

6    screens we were looking at earlier, previously admitted

7    Exhibit 41A.

8              And, again, these are the defendant's screens

9    that were found on his computer; is that correct?

12:36PM   10        A    His Google Drive.

11        Q    And this particular one, the date is

12   February 22nd, 2014?

13        A    That is correct.

14        Q    Looking at the category called "property," what

12:36PM   15   do you understand this category to be?

16        A    I understand this category to represent a third

17   property that the Chairman Wei Huang was potentially interested

18   in located in the city.  It was an undeveloped piece of

19   property.

12:36PM   20        Q    Again, this particular radar screen, this relates

21   to Chairman Huang; is that correct?

22        A    That is correct.

23        Q    Then with respect to the RFP, what does that

24   entry mean?

12:37PM   25        A    An RFP is an abbreviation for request for

1  proposal meaning a bid.  This was a -- it's my understanding,

2  based on review of other documents also located on the

3  Google Drive, that there was a piece of City property that the

4  City was looking to sell to a developer to be developed into

5  hotels and mega-mixed use properties.

6       Q    And one of the entries there says, "J.H. will

7  slow down."  Based upon your review of the documents, what did

8  you understand that to mean?

9       A    It's my understanding that the RFP, there is a

10  process involved with bidding and selecting.  There were a

11  number of developers interested in that property, and "J.H.

12  will slow down" will indicate Jose Huizar will slow down that

13  process given that Chairman Huang was interested.

14       Q    Again, this is the defendant keeping a record of

15  this?

16       A    That's correct.

17       Q    And the two categories that follow, "studied" and

18  "research," can you explain to the jury what your understanding

19  of each of those is?

20       A    The studied category, it's my understanding these

21  are items in which the defendant had actually looked into or

22  acquired documents related to.  So there are documents on his

23  Google Drive related to these entries -- hotel incentive

24  program, TFAR, TOT, and DTLA guidelines.  Each of these are

25  part of that City process to do development and require the

```
 1    PLUM and City Council approvals.
 2             Q       And what about the research category?
 3             A       Research would be those items the defendant is
 4    still looking into for the Chairman.
 5             Q       Under the second line there, it says, "Prevailing
 6    wage TT Chris and J.H."  What did you understand TT to mean in
 7    the radar screens?
 8             A       Talked to.
 9             Q       So for that particular one it means talked to
10    Chris and Jose Huizar; is that correct?
11             A       That's correct.
12             Q       And for those categories studied and research,
13    did you see other radar screens that used other terms to mean
14    the same thing?
15             A       That is correct.
16             Q       What were those terms?
17             A       "Collected" and "uncollected."
18             Q       And collected would be the studied items?
19             A       Yes.  And they had the same entries -- hotel
20    incentive program, TFAR, TOT, et cetera.
21             A       And the collected items, those there would all be
22    things that need to go through PLUM; is that correct?
23             A       That is my understanding, yes.  And ultimately
24    City Council.
25             Q       Thank you.
```

1          Now I'd like to return to the timeline if we can

2     go to Exhibit 924, page 30.

3          And we had been talking about fundraising before

4     the break.  Did certain fundraising activities continue going

12:40PM  5     into June?

6          A     That is correct.

7          Q     And, for example, the purple triangle that

8     represents on June 2nd an entry on Huizar's calendar for a

9     fundraiser?

12:40PM 10          A     Yes.  At the City Club, a location in

11    Los Angeles.

12          Q     And then there's a message from Defendant Chan

13    regarding fundraising as well that same day?

14          A     Yes.

12:40PM 15          MS. PALMER:  If we can go to that text message,

16    Exhibit 158D as in dog at 1.

17          Q     And looking at that -- can you zoom in on the

18    first message?  What does that refer to?

19          A     It says, "Joel Miller never received anything.

12:41PM 20    Can someone send it to him?  He will be there."

21          MS. PALMER:  And if we can go to page 2, please.

22    Looking at the bottom third of the screen and zooming in.

23          Q     In this message, is the defendant talking to

24    Jose Huizar and talking about meeting up?

12:41PM 25          A     The first message, that's correct.  "Running

1        late, sir.  Be there at 4:15."

2               Q       And Jose Huizar is checking in with him?

3               A       He says "K."

4               Q       And if we can go -- when he says in the next

12:42PM  5       message down from the defendant, "There should be ten more

6        based upon my calls.  We'll verify later," what did you

7        understand ten more to mean in the context of this

8        conversation?

9               A       Ten more contributions.

12:42PM  10              MS. PALMER:  And if we can go to Exhibit 364N,

11       please, N as in Nancy.  And if we can zoom in on the first four

12       messages.

13              Q       Now, here there is communications again between

14       Jose Huizar and the defendant regarding the Chairman's plans?

12:43PM  15              A       Yes.

16              Q       And, specifically, where the Chairman will be

17       while he's in L.A.; is that correct?

18              A       Can you repeat that?

19              Q       Specifically the Chairman's plans when he is

12:43PM  20       coming into town on the weekend; is that correct?

21              A       It's -- I'm confused with your question.

22              Q       Sorry.  The first text message, can you just --

23       what does that mean?  What are they talking about?

24              A       "Chairman change plans for this weekend or still

12:43PM  25       on?"

1      Q       And then what does the defendant respond?

2      A       "So far plan for you, George, and Richelle

3  remains the same.  Leave L.A. on Saturday afternoon and return

4  on Sunday night."

12:43PM  5      Q       And do you understand this to be Raymond Chan

6  conveying where the Chairman will be and the plans relating to

7  the Chairman?

8      A       Yes.  It conveys leaving Los Angeles on Saturday

9  and returning on Sunday with Jose Huizar, George, and his wife

12:44PM  10  Richelle.

11      Q       And there defendant Huizar says -- sorry --

12  Jose Huizar says, "Okay for Richelle to go?"

13      A       That is correct.

14      Q       Who is Richelle?

12:44PM  15      A       Jose Huizar's wife.

16      Q       And why is this text message included on the

17  timeline?

18      A       This text message is included because this

19  communication related to organizing a trip to Las Vegas for

12:44PM  20  Jose Huizar to attend with Chairman Huang and subsequently,

21  based on my review of casino records, there was a Las Vegas

22  trip that occurred on Saturday and Sunday in Las Vegas.  So

23  it's relevant given that Defendant Chan is coordinating for the

24  council member and his wife to leave on Saturday and return on

12:45PM  25  Sunday to Las Vegas.

1    MS. PALMER:  Going to Exhibit 364O, please,

2  zooming in on the first few messages there.

3    Q    Again, does this relate to Raymond Chan

4  communicating with Jose Huizar relating to the Chairman and

12:45PM    5  getting together with him?

6    A    Yes.  This is for another event.

7    Q    And this event is the Chairman's best friend's

8  daughter, a dinner?

9    A    That's correct.  The graduation of the friend.

12:45PM   10    Q    And there Jose Huizar says he can't make it; is

11  that right?

12    A    That's correct.

13    Q    And zooming back out.  Going to the bottom three

14  messages, there are they still discussing -- in the first

12:46PM   15  message, can you just read what Defendant Chan writes to

16  Jose Huizar?

17    A    "No problem.  Sir.  I'll tell the Chairman.  I'll

18  confirm the Vegas trip with him and report back to you.  Have a

19  great evening."

12:46PM   20    Q    Did you understand that to relate to the Vegas

21  trip we saw in the previous text message?

22    A    That is correct.

23    Q    That would be the defendant helping arrange a

24  trip with the Chairman and Jose Huizar?

12:46PM   25    A    Yes.  Facilitating that trip.

1    Q    And then Raymond Chan's last message there, can

2    you read that, please?

3    A    "I'll let him know who you will be meeting

4    tomorrow.  Goodnight."

12:46PM  5        MS. PALMER:  And going to Exhibit 924, page 31,

6    please.  924, page 31.

7    Q    In that middle message there, can we read the

8    sentence starting, "I would change anything for the Chairman"?

9    A    "I would change anything for Chairman, but this

12:47PM  10   one is tough to move.  Yes, please let me know about Vegas so

11   that I can make plans."

12   Q    And that's Jose Huizar communicating to the

13   defendant "I would change anything for the Chairman"?

14   A    It's Jose Huizar communicating for -- a message

12:47PM  15   to Chairman Huang.

16        MS. PALMER:  If we could go to exhibit -- back to

17   924 at page 31.

18   Q    Special Agent Civetti, what do we see on this

19   chart?

12:47PM  20   A    There were two Vegas trips that occurred with

21   Jose Huizar and Chairman Huang, one of them being that weekend

22   trip that the defendant had facilitated June 7th through 8th.

23   Q    And then what do we see below the line there?

24   A    Below the line is another action that occurred

12:48PM  25   within City Council or City Council committee related to

1       reestablishing the two separate departments.  Specifically,

2       this is related to transferring funds.

3              Q        And so this is, again, sort of the undoing of

4       that initial memo that the defendant was against?

12:48PM   5           A        Correct.

6              Q        Okay.  Now, if we could go to the next page, just

7       scrolling down, these two new entries are July 18th and then

8       July 23rd.  What do these refer to?

9              A        These are communications between the defendant

12:49PM  10      and Jose Huizar specifically about meeting with him and

11      Ricky Zheng as well as him checking in, "How are things coming

12      along?"

13                      MS. PALMER:  And if we could go to Exhibit 364P,

14      that first text message.

12:49PM  15           Q        In this text message, are they -- this is where

16      they are arranging to meet up along with Ricky Zheng and -- at

17      dim sum?

18             A        That's correct.

19             Q        And at this time, is the lawsuit against

12:49PM  20      Jose Huizar still pending?

21             A        The lawsuit is pending at this time.

22             Q        And zooming in on the middle exhibit -- I mean,

23      the middle messages, the three, here Raymond Chan said,

24      "Chairman called me last night, and we had a great

12:50PM  25      conversation.  Will there be a good time to talk this morning?"

1        And Raymond Chan asks, "Now?"  And then what

2   does -- sorry.  Jose Huizar asks, "Now?"

3        And then what does the defendant respond?

4        A      "Sir, Ricky and I called you at around 2:00.  You

12:50PM   5   didn't pick up.  Please call me at your convenience.  Thanks."

6        Q      And zooming back out.  And Ricky who?

7        A      Ricky Zheng who worked with Chairman Huang on

8   behalf of Shen Zhen New World.

9        Q      And then does Ray continue to try to coordinate

12:50PM  10   that throughout this text message exchange?

11        A      Yes.  I believe they arrange for a dinner to

12   occur.

13        Q      And Ricky Zheng at that time -- you described him

14   earlier as Chairman Huang's right-hand man.  Would you have

12:51PM  15   described him -- during that time period, is he working closely

16   with Chairman Huang?

17        A      That is correct.

18        Q      And here they're arranging to have dim sum, and

19   that's sent from the defendant.

12:51PM  20   A      That's correct.  This is a message from the

21   defendant.

22        MS. PALMER:  And if we could go to

23   Exhibit 364P -- sorry.  The next page.  And we're going to be

24   looking at the bottom five messages, but if we can take the

12:51PM  25   first three -- the top three of those five first.

1    Q      Can you please read Raymond Chan's message?

2    A      "How are things coming along?  I have a separate

3    subject that I need to talk to you.  Will there beer a good

4    time to talk?"

12:52PM    5    Q      And then go to the last message, please.  Sorry.

6    The last message.

7           Can we zoom in on the last message on the page?

8           Is Raymond Chan asking how it went yesterday

9    there?

12:52PM    10   A      That is correct.

11          MS. PALMER:  Now if we can return to Exhibit 924

12   at page 33.

13   Q      Looking at that new entry on August 20th, what

14   does that entry reflect?

12:52PM    15   A      This is a communication between the defendant and

16   Jose Huizar referencing Ricky Zheng.

17          MS. PALMER:  If we could go to that 364Q.

18   Q      Zooming in on the first three messages on that

19   page, what time was this sent?

12:53PM    20   A      The message from the defendant is sent at

21   7:21 a.m. on August 20 of 2014.

22   Q      Can you read it, please?

23   A      "Good morning, sir.  Did you have a chance to

24   talk to the Chairman last night?"

12:53PM    25   Q      Again, do you understand the Chairman to be

         1    Chairman Huang?

         2         A      That is correct.

         3         Q      What was Jose Huizar's response?

         4         A      "No.  Didn't hear anything."

12:53PM  5         Q      What is the defendant's response?

         6         A      "I think you should call Ricky to find out the

         7    latest.  Let's touch base in the late morning."

         8                MS. PALMER:  If we can go to the next three

         9    messages, please.  Just do the rest of the page.

12:54PM 10         Q      Raymond Chan's message sent a little bit later

        11    that day at 11:55.  Can you read the defendant's message?

        12         A      "Any further development?"

        13         Q      What does Jose Huizar say?

        14         A      "No.  Some confusion.  I asked Ricky to try and

12:54PM 15    get me meeting with Chairman tonight."

        16                Q      And then what does the defendant say in response?

        17         A      "Can you talk?"

        18                MS. PALMER:  And then if we can go to the next

        19    page.  Then go to the first four messages of that page.

12:54PM 20         Q      What does the defendant send to Jose Huizar?

        21         A      "Have you set up a meeting with the Chairman?

        22    Ricky told me that you may with the Chairman and things have

        23    been worked out.  Right?"

        24         Q      Jose Huizar responds, "Yes, I have been running

12:55PM 25    around today.  Can I call I in half hour."

1          And what does the defendant say?

2     A     "Yes, please."

3          MS. PALMER:  And then if we can return to the

4     timeline and go to -- so it's 924 at page 34.

12:55PM   5     Q     And what do we see here depicted?

6     A     These are two additional events that occurred,

7     one being on -- both being on August 21st, was an

8     L.A. City Council resolution for Ricky Zheng.  And then also on

9     that same day was a wire payment of $600,000 from a company in

12:56PM   10    Hong Kong to an attorney's trust account.

11    Q     And to be clear, that entry above, that's the one

12    we just looked at.  It was the day before when the defendant

13    was directing Jose Huizar to reach out to Ricky on the latest;

14    is that correct?

12:56PM   15    A     That's correct.  That's the day before these two

16    events occurred.

17    Q     And looking at Exhibit 449, zooming in on the top

18    third of the page, what is the subject of this?

19    A     "Forward wiring."

12:56PM   20    Q     And who is it from?

21    A     Henry Yong.

22    Q     And who is it to?

23    A     George Esparza's personal e-mail,

24    Jose Huizar's -- one of his personal e-mails, and Ricky Zheng

12:57PM   25    at his personal e-mail.

1    Q        And who do you understand Henry Yong to be?  Did

2    you learn that during your investigation?

3    A        Yes.  I learned that at a point in time he was an

4    attorney, and based on his e-mail address, he was an

12:57PM   5    immigration law attorney.

6    Q        And was he a practicing attorney?

7    A        At one period in time -- at one period in time.

8    Q        And at that period of time was he?

9    A        He was disbarred from California, from practicing

12:57PM  10    in the state of California.

11    Q        And his e-mail address is ESQ.  Do you know what

12    that stands for?

13    A        Esquire.

14    Q        Does that just mean lawyer?

12:57PM  15    A        Lawyer.

16    Q        And then immigration law; is that correct?

17    A        Correct.

18    Q        And based upon your review of public sources, did

19    you understand him to be an immigration law attorney generally?

12:58PM  20    A        Generally, that's correct.

21    Q        And going to page 2 of this document, what is

22    this?

23    A        This would be a bank statement for a Chase bank

24    account.  Specifically, it's for an IOLTA account being an

12:58PM  25    Interest on Lawyer Trust Account.  So this would be an account

1    for a lawyer.

2         Q       And were you able to identify -- that account,

3    who is the owner of that account?

4         A       Sun Guodi or Guodi Sun.

12:58PM  5         Q       And did you understand him to be involved in this

6    transaction?

7         A       Yes.

8         Q       And was he also a lawyer?

9         A       He was a lawyer.

12:58PM  10        Q       And is an IOLTA account basically an account that

11   lawyers can accept funds into?

12        A       Yes.

13        Q       And then zooming back out, and looking at the top

14   there, what is that?

12:59PM  15        A       There is an incoming wire transfer from a bank in

16   Hong Kong to a company called Grace Luck Holdings, Limited.

17   And that's going to this Sun Guodi Chase account in the amount

18   of $599,980.

19        Q       And that JPMorgan Chase account is located in

12:59PM  20   San Gabriel?

21        A       That's correct.

22        Q       So it's coming in from Hong Kong into San Gabriel

23   via wire transfer.

24        A       That's correct.

01:00PM  25        Q       And zooming back out.  We will go into this in a

```
 1   bit more detail.  Based upon your investigation, what did

 2   those -- what happened to those funds?

 3       A      These funds were ultimately used as a collateral

 4   to secure a loan for Jose Huizar that would settle the sexual

 5   harassment lawsuit in the amount of $600,000.

 6              MS. PALMER:  Now, the next item on the timeline,

 7   if we can go to 392, page 1.

 8       Q      Now, the same day as this transfer took place,

 9   was this -- sorry.  What does this depict?

10       A      This is a picture from Ricky Zheng's either

11   Facebook or WeChat.  It's a photograph of Jose Huizar and

12   Ricky Zheng holding a City Council resolution.

13       Q      And what are -- what is the City Council

14   resolution?

15       A      The City Council resolution is a resolution on

16   behalf of the City Council recognizing an individual or entity.

17       Q      And this particular one was recognizing

18   Ricky Zheng?

19       A      That is correct.

20              MS. PALMER:  If we can go to page 2, please.

21   Zooming in on the part that has his name and the text

22   underneath, or just the text underneath would probably be

23   easier.

24       Q      I know it's probably a little hard to read.  Can

25   you attempt to read it for the jury?
```

          1        A        "On behalf of the City of Los Angeles and the

          2   14th Council District, I would like to recognize Ricky Zheng

          3   for his outstanding achievements as special assistant to

          4   Chairman Huang Wei of Shen Zhen New World Group.  This

01:01PM   5   proclamation is hereby awarded to Ricky Zheng for his exemplary

          6   efforts and accomplishments which have been of great value to

          7   the community and to the city of Los Angeles and which will

          8   have helped to further the common good of making our city a

          9   better place in which to live."

01:02PM  10        Q        Okay.  And zooming back out, the signature right

         11   below it?

         12        A        Is Council Member Jose Huizar's.

         13        Q        So his is the top signature, and then there are

         14   the signatures of the other council members?

01:02PM  15        A        That is correct.

         16        Q        And this occurred on the same day that the

         17   transfer of funds occurred.

         18        A        That is correct.

         19        Q        Now, a resolution, does it require a council

01:02PM  20   member to take action?

         21        A        Yes.

         22        Q        And why did you include these entries on the

         23   timeline?

         24        A        These entries were included -- the City

01:03PM  25   certificate for Ricky Zheng is a benefit being provided to

01:03PM

Ricky Zheng on behalf of the council member.  This is
officially from the City.  At the same time, the wire transfer
is happening.  I also reviewed a number of e-mails around this
period of time from July, August time frame in which there's
communications with that disbarred attorney Henry Yong and
George Esparza and Ricky Zheng coordinating the wiring of that
money, specifically for the topic of settling the sexual
harassment lawsuit.  So this was a benefit being provided to
the council member on behalf of Ricky Zheng who represented

01:03PM

Chairman Huang.

Q      Now, returning to the timeline, 924, page 35.
Now, there are two new entries on the right.  There is a casino
chip again and a message.  So during this period, was
Jose Huizar continuing to go on trips with Wei Huang to

01:04PM

Las Vegas?

A      Yes.  He takes a trip the next day after that
money had been transferred and the resolution had been provided
to Ricky Zheng.

Q      And then on the right there is a message from the

01:04PM

defendant to Jose Huizar, and we will go ahead and pull it up.
It is 364Q.

And in this group of text messages, is the
defendant, again, talking about the Chairman at the beginning?

A      These messages are the August 20th messages we

01:04PM

reviewed, and then the August 25th messages I believe are later

```
  1   in the chain.

  2        Q    And going to that page, and the one that's in the

  3   middle, the two messages in the middle, can you read what the

  4   defendant sent to Jose Huizar?

  5        A    "Good morning, sir.  I hope you did well in LV.

  6   Do you have a good time to talk?"

  7        Q    And what do you understand LV to be?

  8        A    Las Vegas.

  9             MS. PALMER:  If we could return to the timeline,

 10   924 at page 36.

 11        Q    And here we have some additional items below.

 12   There's an August 11 message from the defendant to Jose Huizar

 13   and then two blue items that relate to PLUM and City Council.

 14   Can you describe at a high level what the two items on the

 15   right are?

 16        A    The two items on the right are two additional

 17   votes occurring before the City, one in PLUM and one in

 18   City Council, and it's related to the ending of that

 19   consolidation endeavor.

 20        Q    And going to Exhibit 364W, which is the

 21   August 11th, 2014, text message between Chan and Huizar, if you

 22   look at the bottom four messages, the defendant is asking

 23   Jose Huizar -- it says, "Hi, sir.  Two things."  And looking at

 24   the second one, he says, "Another is to ask if you can postpone

 25   one of the PLUM items from 8/19 to 8/26.  This item is related
```

1      to the update on development reform.  The reason for my request

2      is because the consultant matrix cannot be at PLUM on 8/19.

3      However, it is extremely essential for him to be there.  The

4      consultant can be there on 8/25.  Please help."

01:07PM   5                  What was Jose Huizar's response to the defendant?

6      A        "Got it.  Asked Tanner to change it."

7      Q        And who is Tanner?

8      A        Tanner was Jose Huizar's planning deputy at the

9      time.  He would be the one creating the PLUM agenda.

01:07PM   10     Q        And what is a planning deputy, generally?

11     A        A planning deputy, generally, reviews projects

12     that are before the council district, as well because the

13     council member was the Chairman of PLUM, they would also review

14     projects going before PLUM.

01:07PM   15     Q        And does that person work for Jose Huizar or for

16     the planning committee?

17     A        Jose Huizar.

18     Q        And why did you include this particular text

19     message on the timeline?

01:08PM   20     A        This text message was significant given that the

21     defendant was requesting Jose Huizar to take official actions

22     related to the development reform that was occurring while also

23     communicating with Jose Huizar about benefits that the

24     defendant was aware Jose Huizar was receiving from

01:08PM   25     Chairman Huang in Las Vegas.

1          MS. PALMER:  If we could go back to the timeline,

2    924, at page 38.

3          Q     And what do these depict?

4          A     These are two different communications that occur

01:08PM  5    on September 3rd, one with Jose Huizar and that attorney

6    Henry Yong and the other one with the defendant.

7          MS. PALMER:  And bringing up Exhibit 451, please.

8          Q     Looking at the top, can you tell us what the

9    subject is?

01:09PM 10          A     "American Plus Bank loan application docs."

11          Q     And, again, this is a message from Henry Yong to

12    one of Jose Huizar's personal accounts, Ricky Zheng, and

13    George Esparza?

14          A     That is correct.

01:09PM 15          MS. PALMER:  And if we can zoom out.

16          Q     And here on September 3rd Jose Huizar is writing

17    to Henry Yong.  Can you please read what he said?

18          A     "Henry, can you find out before we go if I can

19    simply state that the purpose of loan is for personal use?

01:09PM 20    Would that be sufficient?  I obviously do not want to state

21    that it is for settlement."

22          Q     And did you understand that there was a deadline

23    that was referenced relating to the settlement?

24          A     Yes.  I believe review of additional

01:10PM 25    correspondence in the e-mail.  Jose Huizar indicates there is a

1    settlement deadline of September 30th.

2              MS. PALMER:   If we could go to Exhibit 924 at

3    page 39.

4         Q    What are we seeing here as far as the new

5    messages?

6         A    These are additional communications with

7    Defendant Chan and Jose Huizar around the period in time which

8    I was also reviewing e-mails related to the settlement

9    proceeds.

10        Q    And during this period, is Jose Huizar -- is it a

11   re-election year for him?

12        A    He was expecting to be re-elected in 2015.  So,

13   yes, this would be a campaign year.

14        Q    And was he facing a challenger?

15        A    Yes.

16             MS. PALMER:   Now, if we could pull up 364R.  We

17   will just go through them three at a time.

18        Q    Looking on the right, is Jose Huizar asking the

19   defendant to speak with him that day?

20        A    Yes.

21             MS. PALMER:   And then scrolling down if we can do

22   the next three.

23        Q    Can you read what Jose Huizar says to the

24   defendant?

25        A    "Ray, hold off on asking Chairman.  George told

```
 1    me that Ricky was frustrated that we keep asking him.  Ricky

 2    said that Chairman will call China tonight.  Let's wait until

 3    tomorrow to see what happens."

 4         Q       And, again, Chairman, you understand that to be

 5    Chairman Huang; is that right?

 6         A       That's correct.

 7         Q       And George, who do you understand that to refer

 8    to?

 9         A       Jose Huizar's special assistant George Esparza.

10         Q       And Ricky refers to Ricky Zheng?

11         A       Yes.  Chairman Huang's assistant.

12         Q       And defendant's response?

13         A       "Will do, sir."

14         Q       And then after that does the defendant ask if

15    Jose Huizar can talk?

16         A       That's correct.

17              MS. PALMER:  And zooming back out and going to

18    page 2, please, and doing the first four messages.

19         Q       Can you read what the defendant wrote there?

20         A       "Good evening, sir.  The Chairman did not pick up

21    the call.  I'll try tomorrow again.  Sorry.  Ray."

22         Q       And so there you understand that the defendant is

23    trying to contact Chairman Huang?

24         A       On behalf of Jose Huizar, that's correct.

25         Q       And then they're trying to connect again.
```

1              If we could go to the bottom four messages.

2              The first message the defendant said, "Everything

3    good, sir?"

4              What does Jose Huizar say?

01:13PM  5    A         "Yes.  Thank you."

6         Q         And what is the defendant's response?

7         A         "Great."

8         Q         Now turning to -- so this was September 19th.  If

9    we could go back to the timeline, 924 at page 40, please.

01:13PM  10             So that was September 19th, that entry.  Then we

11   have on September 23rd a star and on September 26th a star.  So

12   what do those items show?

13        A         The September 23rd event labeled with the

14   $570,000 to Huizar's attorney represents the electronic wire

01:14PM  15   transfer from an account in Pasadena, the East West Bank

16   account for Grace Luck Holdings, to Jose Huizar's attorney's

17   account.  And then the September 26th event includes a

18   representation of records that show $600,000 being paid to

19   Francine Godoy's attorneys, Francine Godoy being the plaintiff

01:14PM  20   in that sexual harassment lawsuit.

21        Q         So that is the settlement we have been talking

22   about?

23        A         That is the settlement.  That is correct.

24             MS. PALMER:  And if we can pull up Exhibit 452,

01:14PM  25   please, and zooming in on the top of that, please.

1        Q        What is the date?

2        A        September 24th, 2014.

3        Q        And who is it from?

4        A        Verita Verita from East West Bank.

01:15PM  5        Q        And is that to Jose Huizar's personal account?

6        A        Yes.

7                 MS. PALMER:  And zooming out.  And zooming in on

8    the top of that message.

9        Q        Is this basically confirming the wire -- it is

01:15PM 10    attaching a wire confirmation?

11       A        That is correct.

12       Q        And then where is Verita Verita located?

13       A        She works out of the East West Bank office in

14    Pasadena, California.

01:16PM 15                MS. PALMER:  Okay.  And if we could go to page 2,

16    please.  Zooming in on the originator.

17       Q        Outgoing, what is the time there?

18       A        This is an outgoing wire on September 23rd, 2014,

19    at 2:49 p.m.

01:16PM 20       Q        And the amount?

21       A        $570,000.

22                MS. PALMER:  And zooming back out.  And zooming

23    in on the message text.

24       Q        And looking at the bottom left, who is the

01:16PM 25    originator?

|   |   |   |
|---|---|---|
| 1 | A | Jose Luis Huizar. |
| 2 | Q | And is that an address in Los Angeles? |
| 3 | A | Yes.  That is his residence. |
| 4 | Q | And the beneficiary? |
| 5 | A | Walsh & Associates Trust. |

01:16PM 5

6    Q    And did you have an understanding of

7 Walsh & Associates Trust, what that was?

8    A    Walsh & Associates Trust was the law firm that

9 was representing Council Member Huizar in the sexual harassment

01:17PM 10 matter.

11    Q    That went from an account at East West Bank to a

12 Wells Fargo Bank; correct?

13    A    Correct.  The Wells Fargo was the

14 Walsh & Associates account.

01:17PM 15    Q    Have you obtained documents relating to this

16 transaction via subpoena?

17    A    Yes.

18    Q    And did you use those documents along with others

19 to create a summary relating to the settlement transaction?

01:17PM 20    A    That's correct.

21    Q    And how did you create that summary chart?

22    A    I created the chart basically from reviewing the

23 various records and e-mails to determine specific dates that

24 events occurred and then created a chart showing the flow of

01:18PM 25 that money from the Hong Kong company to the various

```
 1    East West Bank and Wells Fargo accounts.

 2                 MS. PALMER:  Your Honor, at this time the

 3    Government moves to admit stipulated Exhibit 927.

 4                 THE COURT:  All right.  927 will be received

 5    without objection.

 6                 (Marked for identification and received

 7                 into evidence Exhibit No. 927.)

 8        Q       BY MS. PALMER:  Publishing 927, is this the chart

 9    that you created?

10        A       Yes.

11        Q       And can you describe on the left what does the

12    box in blue represent?

13        A       The first box on the left titled Grace Luck

14    Holding is the company that was located or at least the account

15    that was located in Hong Kong that initiated the $600,000 wire

16    transfer.

17        Q       And did you try to do research on that company?

18        A       I did.

19        Q       And what did you determine relating to that

20    company?

21        A       There didn't seem to be much information, if any

22    information at all, that the company existed or had any type of

23    business in Los Angeles.

24        Q       And so -- that company below, what does that

25    graphic represent that is below that company?
```

Timestamps in left margin: 01:18PM (lines 5, 10, 15), 01:19PM (lines 20, 25)

1    A       That is an outline of the country China.  This is

2  just showing the money coming from China to the United States.

3    Q       Okay.  And then looking at the box where the

4  600,000 ends up, is this Sun Guodi, the person that we talked

01:19PM   5  about earlier?

6    A       Yes.  That is one of the lawyers that was

7  involved in the transaction.

8    Q       And then the next transaction?

9    A       There was $600,000 transferred from Sun Guodi's

01:19PM  10  Chase IOLTA account to a Grace Luck Holding account in

11  East West Bank.

12    Q       And then what's the next transaction?

13    A       This, the line, it's not a transfer of funds.  It

14  would be a loan that was established off of that Grace Luck

01:20PM  15  Holding account which was a certificate of deposit.

16    Q       And what is a certificate of deposit?

17    A       It's a type of savings account.

18    Q       And as far as the collateral, was that the -- was

19  it cash, the money went into the CD?

01:20PM  20    A       There was $600,000 that was in that savings

21  account.

22    Q       And then there was also $30,000 coming from

23  Walsh & Associates?

24    A       That's correct.  On September 23rd there was a

01:20PM  25  wire transfer from -- associated with Jose Huizar's loan to his

1   lawyer as well the next day there was a cash deposit of $30,000

2   into Walsh & Associates' account.

3       Q    And then eventually what is the final

4   distribution?

01:21PM
5       A    On September 26, 2014, there was a payment of

6   $600,000 to Francine Godoy's -- the law firm representing her,

7   Eisenberg & Associates.

8       Q    Now, if we could -- why did you include entries

9   relating to this transaction on your timeline?

01:21PM
10      A    This transaction was the -- well, the timeline --

11  during this period of time, there were no more communications

12  relating to this transaction.  And then on the timeline, the

13  specific events of the money being transferred because this was

14  in this investigation a benefit that we were investigating that

01:22PM
15  Jose Huizar was receiving.  And part of that investigation was

16  to determine who was providing that, and this ended up being a

17  developer providing that $600,000 to Jose Huizar, the same

18  developer that had properties in Jose Huizar's district and, as

19  well, had issues before Jose Huizar that had been continually

01:22PM
20  communicated with the defendant.

21      MS. PALMER:  Now, if we can go back to

22  Exhibit 924 at page 43, please.  Sorry.  Go to 924 at 42.

23  No. 41.

24      Q    Looking there, the last entry there, October 1st,

01:22PM
25  was the lawsuit dismissed?

1    A        That's correct.

2    Q        And was Jose Huizar re-elected in 2015?

3    A        He was.

4             MS. PALMER:  Now, if we could scroll to the next

01:23PM  5   page, please, and the next page.

6    Q        Now, after his re-election, did Jose Huizar go to

7    Las Vegas again with Wei Huang?

8    A        He did.

9    Q        And is that reflected by the casino chip on --

01:23PM  10   A        Yes.

11            MS. PALMER:  Scrolling to the next page.

12   Q        Now, there are two items here.  One is Huizar and

13   Zheng communicating and then the next one is a radar screen.

14   So what do those relate to?

01:23PM  15   A        The March 17th communication is between

16   Jose Huizar and Ricky Zheng requesting a meeting with Tom Walsh

17   who was involved with the unions.  So this would be another

18   request being made on behalf of the developer of Jose Huizar

19   following a benefit that had just been provided to Jose Huizar.

01:24PM  20   And then specifically on May 3rd is a radar screen related to

21   the Chairman's L.A. Downtown Hotel.

22   Q        Now, looking at the radar screen, Exhibit 42A,

23   again, this is from the defendant's Google Drive; is that

24   correct?

01:24PM  25   A        His Google Drive or e-mail, one of the two.

1    Q       And looking at this, if we could go to page --

2    the date is May 3rd, 2015, on the top right.

3    A       That's correct.

4    Q       And scrolling to page 2, if we can go to projects

01:25PM  5    at the bottom, is there anything here under projects that you

6    found relevant to your investigation?

7    A       Yes.  The entry labeled "DT Hotel."

8    Q       And why did you find that relevant to the

9    investigation?

01:25PM  10    A       Because it was my understanding that was an entry

11    reflecting Chairman Huang's downtown hotel, the L.A. Grand.

12    Q       And does it have things including the net

13    buildable area and other details?

14    A       Yes.  The net buildable area was significant

01:25PM  15    because that calculation I would then later observe on other

16    City documents related to development of that hotel.

17    Q       And for this time period -- did you also see this

18    reflected in other radar screens?

19    A       Yes.

01:25PM  20    Q       Did it also match what was in the application for

21    the Downtown Hotel project?

22    A       That's correct.

23             MS. PALMER:  If we can take that down, please.

24    Q       During your investigation, did you look at phone

01:26PM  25    calls and analyze them between the defendant and Jose Huizar?

1      A      Yes.  I reviewed a number of toll records which

2  are those calls of numbers dialed in and out for individuals.

3      Q      And can you describe the process?  Did you put

4  them onto a chart after that?

01:26PM  5      A      Yes.  I reviewed the toll records which tend to

6  be hundreds, if not thousands, of pages of communications.  I

7  then went through there and categorized the callers involved

8  and specifically isolated it to communications between

9  Jose Huizar and Defendant Chan and then created a chart showing

01:26PM  10  those communications over a period of time.

11              MS. PALMER:  Your Honor, at this time --

12      Q      Is that Exhibit 907B?

13      A      "B" as in bravo.  That is correct.

14              MS. PALMER:  Your Honor, at this time the

01:27PM  15  Government moves to admit previously stipulated Exhibit 907B as

16  in bravo.

17              THE COURT:  All right.  That will be admitted

18  without objection.

19              (Marked for identification and received

01:27PM  20              into evidence Exhibit No. 907B.)

21      Q      BY MS. PALMER:  Special Agent Civetti, can you

22  explain to the jury what we are seeing here?

23      A      This is the chart I created based on my review of

24  all the phone records, specifically for the time period of

01:27PM  25  June 2012 through December 2014.

1    Q      Why did you select that time period?

2    A      These are the records I had available during that

3  time period.  Specifically, I chose this time period because it

4  involves all the actions that occurred on the timeline we had

01:27PM  5  just gone through.  So it was communications that would have

6  been occurring during the parking and labor disputes as well as

7  the sexual harassment settlement, the Vegas trips, and

8  Jose Huizar's involvement on the consolidation requested by the

9  defendant.

01:28PM  10    Q      And just generally, on the left, is that the

11  number of calls?

12    A      That's the -- correct.  That's the number of

13  communications.

14    Q      And then on the bottom, those are the dates by

01:28PM  15  month?

16    A      Yes.  Those are the month and year, the first one

17  being June 2012 and the last one being December 2014 with every

18  month in between.

19    Q      And prior to 2013, how would you describe the

01:28PM  20  amount of communication that you found between the defendant

21  and Jose Huizar?

22    A      Prior to May 2013, there was very little, if at

23  all, any communication between the two.

24    Q      And can you describe the trend, if any, that you

01:28PM  25  saw thereafter?

1       A       The trend then increased, specifically peaking at

2  the time in which the sexual harassment lawsuit was filed, and

3  then continuing in declining until all these matters had been

4  resolved.

01:29PM  5       Q       And why was this relevant to your investigation?

6       A       This was relevant because we're investigating

7  benefits being provided by developers to council members.  In

8  addition, what those benefits -- the purpose of those benefits

9  and the requests or -- the requests or favors that were being

01:29PM  10  asked of the council member.  Specifically, these

11  communications are relevant because we have a -- Jose Huizar

12  being the council member.  We have another public official, the

13  general manager of Building and Safety, Raymond Chan, actively

14  engaging in all of those matters.  So seeing the amount of

01:29PM  15  communication between these two parties was significant because

16  it indicated the defendant's facilitation of a lot of that

17  involvement.

18               MS. PALMER:  And if we could go to 924, page 45,

19  please.

01:30PM  20       Q       Looking at this, there's a trip on July 7th

21  through July 9th, 2015.  Was this trip of significance to the

22  investigation?

23       A       It was.

24       Q       And going to page -- the next page, please, what

01:30PM  25  does this entry depict?

1        A        This is an event from July 28th of 2015.

2    Specifically, it's a note that Esparza -- George Esparza had in

3    his phone.  So he utilized the Note application on his phone

4    and recorded a note that we then were able to seize when we

01:31PM  5    conducted the search warrants.

6        Q        And did you obtain other notes from

7    George Esparza's phone as part of the investigation?

8        A        Yes.  He was an avid note taker on his

9    activities.

01:31PM  10       Q        And did he -- are some of those notes marked as

11   exhibits on the Government's exhibit list?

12       A        That is correct.

13       Q        And the process that we discussed before, did you

14   do that for the phone note exhibits?

01:31PM  15       A        Yes.  His phones would have been seized, and the

16   extraction process occurred.  Those phones were reviewed, and

17   these notes were one of the things we were able to seize from

18   that extraction.

19       Q        And then did you review the Government's exhibit

01:31PM  20   list and make sure that the descriptions on the exhibit list

21   matched the notes and they were the same notes that you had

22   seized?

23       A        That is correct.

24               MS. PALMER:  Your Honor, at this time the

01:32PM  25   Government moves to admit previously stipulated Exhibits 172,

|    |    |
|----|----|
| 1  | 363A through F, and 363H through J. |
| 2  | THE COURT:  Say the last one again. |
| 3  | MS. PALMER:  363H through J. |
| 4  | THE COURT:  All right.  Those will be received |
| 5  | without objection. |
| 6  | MS. PALMER:  Move to publish -- can you please |
| 7  | bring up previously admitted Exhibit 363C? |
| 8  | Q     Zooming in on that, is this an extraction report |
| 9  | similar to what we've seen for text messages but this one |
| 10 | relates to the phone note for George Esparza? |
| 11 | A     That is correct. |
| 12 | Q     And the date on this is July 28, 2015? |
| 13 | A     Yes. |
| 14 | Q     And can you read the note, please, for the jury? |
| 15 | A     "China.  Had to postpone trip but would love to |
| 16 | go early next year.  He agrees with you.  Let's let Vegas cool |
| 17 | off.  Go in December and only go with Chairman." |
| 18 | Q     Now, when you saw the word Chairman there, did |
| 19 | you understand that to mean Chairman Huang? |
| 20 | A     Correct.  Wei Huang of Shen Zhen New World. |
| 21 | MS. PALMER:  So if we could go back to the |
| 22 | timeline, please, 924, page 46. |
| 23 | Q     So you said this July 7th through 9th trip was |
| 24 | significant.  Why was this trip significant? |
| 25 | A     This trip was significant because Jose Huizar was |

01:32PM — line 5
01:33PM — line 10
01:33PM — line 15
01:33PM — line 20
01:34PM — line 25

1    approached by the security of one of the casinos and he refused

2    to sign documentation, and they then notified the FBI.

3         Q       And was this the first time that Chairman Huang

4    came on to the FBI's radar?

5         A       That's correct.

6         Q       And the FBI -- was this the first time they

7    were -- became aware of Jose Huizar going to Las Vegas with

8    Chairman Huang?

9         A       Yes.

10        Q       When you were notified, what form were you

11   notified in?

12        A       By a tip from the Las Vegas casino, The Palazzo.

13        Q       When you said Jose Huizar, did you later obtain

14   documents and subpoena records from the Las Vegas casinos?

15        A       Yes.  We subpoenaed records for a variety of

16   information including player activity, surveillance footage,

17   comps that were provided, invoices, room charges, other

18   benefits.

19        Q       And did you receive video records as well?

20        A       Yes.  Surveillance footage.

21        Q       Okay.  And as far as the form that he failed to

22   fill out, what was that form?

23        A       It was called the -- it was a financial

24   disclosure.  So the casino referred to it as their politically

25   exposed person or PEP form, and it was a form to disclose

1    financials for that individual.  So, specifically,

2    Council Member Huizar was recognized as a council member.  So

3    it was a form to disclose how he was playing in the casino.  It

4    was the casino's way of determining whether elected officials

01:36PM   5    are using City funds or whose money they are playing with.

6         Q    And Jose Huizar refused to fill out that form?

7         A    On two occasions.

8         Q    That note that we read relating to George Esparza

9    saying, "Let's let Vegas cool off," was that following that

01:36PM   10   trip?

11        A    Correct.

12        Q    And the surveillance video that you received, was

13   this -- did this take place at The Palazzo or where?

14        A    Yes.  It was The Palazzo Venetian Hotel in

01:36PM   15   Las Vegas.

16        Q    What was the date that Jose Huizar refused to

17   sign the form?

18        A    I believe it was July 8, 2015.

19        Q    Based upon your review of the records, was

01:36PM   20   Jose Huizar there in Las Vegas gambling with Wei Huang?

21        A    That is correct.

22             MS. PALMER:  Your Honor, at this time the

23   Government moves to admit previously stipulated Government's

24   Exhibit 404.

01:37PM   25             THE COURT:  All right.  Exhibit 404 will be

1    received without objection.

2         Q      BY MS. PALMER:  And before we start,

3    Special Agent Civetti, is there any sound in this video?

4         A      No, there is not.

5         MS. PALMER:  If we can just start it and stop it

6    immediately.  Pause it.

7         Q      Now, can you orient the jury as to what they are

8    seeing on the screen right now?

9         A      This is a video surveillance from one of the

10   cameras at The Palazzo Hotel.  This is specifically looking at

11   the public gaming area.  And there is a number of gaming

12   tables, and specifically the left table in the middle of the

13   screen includes three individuals.

14        Q      And where the arrow is indicated, the table on

15   the left, the person all the way at the top of that table.

16        A      That is Council Member Jose Huizar.

17        Q      And who is sitting next to him?

18        A      George Esparza, his special assistant.

19        Q      And the person next to George Esparza?

20        A      Ricky Zheng, Chairman Huang's assistant.

21        Q      As far as the other people in -- okay.

22        Can we go ahead and -- is Chairman Wei Huang in

23   this video?

24        A      He is not in this video.

25        MS. PALMER:  Now if we can go ahead and play and

1       then pause at 18 seconds.

2                     (The video commenced playing before the jury.)

3                           MS. PALMER:  If you can pause now.

4           Q       And what are we seeing in this video?  Who are

01:39PM  5      the people in black?

6           A       From the left of the screen, three individuals

7       approach.  These are three people that work for The Palazzo in

8       their security and surveillance divisions.  One of them is

9       approaching Ricky Zheng, and the other two are approaching

01:39PM 10      behind George Esparza and Jose Huizar.

11                          MS. PALMER:  Okay.  If we can continue playing.

12                    (The video commenced playing before the jury.)

13                          MS. PALMER:  Then if we can pause.

14          Q       Does the person from the casino appear to be

01:39PM 15      holding something in her hand?

16          A       Yes.  It appears to be a clipboard or paper.

17                          MS. PALMER:  Okay.  If we can continue and just

18      play through the end.

19                    (The video commenced playing before the jury.)

01:42PM 20          Q       BY MS. PALMER:  Special Agent Civetti, in that

21      clip, what did you see Jose Huizar do?

22          A       He was approached by the casino staff.  Papers

23      were presented to him, and then he left.

24          Q       Did you ever see him sign the form?

01:43PM 25          A       No.

1       Q       And what was George Esparza doing while

2   Jose Huizar was talking to the security staff?

3       A       Looking over his shoulder.

4       Q       And what about Ricky Zheng?

01:43PM  5       A       It appeared at the time he was talking to another

6   staff member.  He also leans over at one point towards

7   Jose Huizar and George Esparza.

8       Q       And what happened at the end of the clip?

9       A       The three of them get up and walk away from the

01:43PM  10  gambling area.  They stop playing.

11      Q       And based upon this incident, did the

12  Palazzo Casino alert the FBI?

13      A       That is correct.

14      Q       And do you have an understanding of -- and then

01:43PM  15  based upon that, what happened with the FBI's investigation?

16      A       The FBI then subpoenaed records related to

17  Jose Huizar's finances.

18      Q       And did they also -- did the FBI also subpoena

19  records to various Las Vegas casino hotels involving Wei Huang,

01:44PM  20  Ricky Zheng, Jose Huizar, and George Esparza?

21      A       Yes.  Subpoenas were issued to a variety of

22  hotels including the Cosmopolitan, Caesar's Palace, Palazzo,

23  and Wynn casinos.

24      Q       Did the FBI also obtain records from airlines?

01:44PM  25      A       Yes.

```
 1         Q        Why did you obtain records from airlines?

 2         A        We wanted to determine how Jose Huizar was

 3    traveling to Las Vegas.  So we subpoenaed airlines for

 4    commercial flights as well as the subpoenas with the casinos

 5    that showed records of flight or travel.

 6         Q        Did Jose Huizar and George Esparza sometimes

 7    travel on Southwest Airlines to Las Vegas?

 8         A        Yes.

 9         Q        And on other occasions, how did they get to

10    Las Vegas?

11         A        On private jets provided by the casino.

12         Q        Now, you mentioned some of the types of records

13    that you got from casinos.  Did you get things like player

14    profiles?

15         A        Yes.  Player profiles, gaming activities, and

16    cash in and out records.

17         Q        Can you describe to the jury what a comp is as

18    it's used in Las Vegas?

19         A        A comp would be shorthand for compensation.

20    These would be provided by the hotel to high rollers.  So it

21    would basically be a credit for various amenities.  It could be

22    food, club, wine, the actual hotel rooms, the private jet.  But

23    these are given to the high rollers that are spending large

24    amounts of money in Las Vegas.

25         Q        And so does that mean that the high roller
```

01:44PM (line 5)
01:45PM (line 10)
01:45PM (line 15)
01:45PM (line 20)
01:46PM (line 25)

1   doesn't pay out of pocket for the items that are comped?

2        A       Not directly, but they are paying by gambling

3   high, high amounts, like millions of dollars' worth.

4        Q       And in the records you reviewed, who, if anyone,

01:46PM  5   was identified as a high roller?

6        A       Wei Huang was the high roller.

7        Q       Anyone else in their group?

8        A       No.

9        Q       Can you estimate the approximate number of pages

01:46PM  10   that you reviewed for records you received from these casinos?

11        A       Hundreds, if not thousands, as well as -- yeah.

12   Hundreds, if not thousands, related to the documents.

13        Q       And for what time period do these records

14   generally cover?

01:46PM  15        A       From 2013 through 2017.

16        Q       In preparation for this trial, did you compile

17   relevant excerpts of those records from various casinos?

18        A       Yes.

19        Q       And are two of those excerpts that you compiled

01:47PM  20   marked as Government's exhibits -- marked in the Government's

21   exhibits?

22        A       Yes.  That's correct.

23        Q       And are those Exhibits 420 and 421?

24        A       That is correct.

01:47PM  25             MS. PALMER:  Your Honor -- actually, one second.

1        Your Honor, at this time the Government moves to admit

2        previously stipulated Exhibits 420 and 421.

3                    THE COURT:  All right.  They will be admitted

4        without objection.

01:47PM  5                    (Marked for identification and received

6                     into evidence Exhibit Nos. 420 and 421.)

7            Q       BY MS. PALMER:  And you mentioned already that

8        you obtained surveillance videos.  In addition to looking at

9        surveillance videos, did you also personally travel to

01:48PM 10        Las Vegas and observe some of the surveillance rooms?

11           A       Yes.

12           Q       And is a photograph of a surveillance room that

13        you observed on the Government's exhibit list?

14           A       That is correct.  At the Wynn Casino.

01:48PM 15                    MS. PALMER:  Your Honor, at this time the

16        Government moves to admit previously stipulated Exhibit 397.

17                    THE COURT:  All right.  It will be received

18        without objection.

19                    (Marked for identification and received

01:48PM 20                     into evidence Exhibit No. 397.)

21                    MS. PALMER:  If we can bring that up on the

22        screen.

23           Q       Is this a photograph from one of the surveillance

24        rooms you observed?

01:48PM 25           A       Yes.  This is a photograph I took of the Wynn

 1    surveillance room.  Specifically, it's showing the number of

 2    monitors that represent the cameras that are around the casino.

 3         Q       And in addition to reviewing all of that, did you

 4    also prepare screenshots of the clips for the Government's

 5    exhibit list -- screenshots and certain clips for the

 6    Government's exhibit list?

 7         A       Yes.  That is correct.

 8              MS. PALMER:  Your Honor, at this time the

 9    Government moves to admit previously stipulated Exhibits 400

10    through 403.

11              THE COURT:  400 to what?  403?

12              MS. PALMER:  Uh-huh.

13              THE COURT:  All right.  Those will be received

14    without objection.

15              MS. PALMER:  408.

16              THE COURT:  It will be received.

17              MS. PALMER:  And then 413 through 418.

18              THE COURT:  Those will also be received without

19    objection.

20         Q       BY MS. PALMER:  While you were in Las Vegas, did

21    you observe and visit each of the hotels where Wei Huang

22    stayed?

23         A       Yes.  For the four hotels I had named,

24    Caesar's Palace, Wynn -- Venetian Palazzo, Wynn, and

25    Cosmopolitan.

1        Q       Why did you visit the villas?

2        A       The villas were where, I understood, the party --

3   Wei Huang, Jose Huizar, George Esparza, and Ricky Zheng -- to

4   stay.  So these would be the rooms that were being provided by

01:50PM  5   the hotels.

6        Q       Did you take photographs of some of those villas?

7        A       I did.

8                MS. PALMER:  Your Honor, the Government moves to

9   admit previously stipulated Exhibits 393 through 396.

01:50PM  10               THE COURT:  All right.  They will be received

11   without objection.

12               (Marked for identification and received

13                into evidence Exhibit Nos. 393 through 396.)

14               MS. PALMER:  Let's look at one example.  If we

01:50PM  15   can publish 393, please.

16        Q       What are we looking at here?

17        A       This is one of the villas at Caesar's Palace.  So

18   this specific picture is the entryway or foyer to the villa.

19        Q       Can you describe the features of this villa?

01:50PM  20        A       This villa would have multiple bedrooms,

21   sometimes between three and five.  It would have private dining

22   areas, sometimes movie theaters, its own pool and spa area, as

23   well as multiple bathrooms.  Very luxurious.

24        Q       If we can just scroll through this, is this

01:51PM  25   another photo of the villa?

1       A       Yes.  These are all photos from the Caesar's

2    villa.

3       Q       And then going to page 5, is this one of the

4    bedrooms?

01:51PM   5       A       That's correct.

6       Q       And then pages -- is this one of the bathrooms?

7       A       Yes.

8       Q       And 8 and 9, what does this show?

9       A       One of the private sitting rooms.

01:51PM   10       Q       And then, if we can go to 10, what is this?

11       A       This would be the private outside pool area

12    that's specific to this villa.  So it's not available to the

13    public.  It would only be for the party that's staying in that

14    villa.

01:51PM   15               MS. PALMER:  If we could just continue to scroll

16    through.

17       Q       Is this just different angles of that outdoor

18    area?

19       A       That's correct.

01:52PM   20       Q       And what is this?

21       A       I believe that's either another sitting room or

22    the general sitting room, just different angles.

23       Q       And were the suites at the Wynn, Cosmo, and

24    Palazzo similarly spacious with many rooms?

01:52PM   25       A       I would say the Caesar's was the nicest, but all

1    the villas at the four were very luxurious and spacious with

2    multiple bedrooms and other areas.

3        Q       Based upon your review of the records, have you

4    identified the number of trips that Jose Huizar took that were

01:52PM  5    paid for by Wei Huang?

6        A       Yes.  Paid directly or indirectly based on his

7    status at the casinos.

8        Q       And how many such trips did you identify?

9        A       20.

01:52PM 10        Q       And that's for the time period 2013 through '17?

11        A       That's correct.

12        Q       In reviewing these records, did you also identify

13    the value of the benefits charged by the casino under

14    Wei Huang's account for each of these trips?

01:53PM 15        A       Yes.  I reviewed hundreds of pages of records

16    that would show the benefits or charges being accrued by

17    Wei Huang and his party.

18        Q       And did you then compile a summary chart

19    reflecting the data from these records?

01:53PM 20        A       That's correct.

21            MS. PALMER:  Your Honor, the Government moves to

22    admit previously stipulated Exhibit 922.

23            THE COURT:  All right.  922 will be received into

24    evidence without objection.

01:53PM 25            MS. PALMER:  Thank you, Your Honor.

1          (Marked for identification and received

2          into evidence Exhibit No. 922.)

3          Q       BY MS. PALMER:  Looking at this summary chart, it

4    says, "Casino trips summary chart."  Does this reflect those

01:53PM  5    20 trips we just discussed?

6          A       That's correct.  The first column is the trip

7    number, and this would be the 20 different trips.

8          Q       And the second column, what is that?

9          A       That would be the date of the trips.

01:53PM 10         Q       And then the third column?

11         A       Are the hotels in which the party receives some

12   type of benefit.

13         Q       How did you determine the -- for the dates, how

14   did you determine the date ranges?

01:54PM 15         A       I compared the date ranges for the records

16   provided by the casino that showed Wei Huang was there or

17   visiting at that time as well cross-checking it with text

18   messages and Southwest flight records to determine when

19   Jose Huizar or George Esparza were also present.  And comparing

01:54PM 20   those records, I was able to determine which trips Jose Huizar

21   also attended because Wei Huang had been attending Vegas

22   frequently.  But I wanted to determine which specific trips

23   Jose Huizar was also on, and it was these 20.

24         Q       And looking at the last column, the group

01:54PM 25   benefit, what does that mean?  What does group benefit mean?

1     A       Group benefit would be the total calculation of

2   all the benefits that were attributed to Wei Huang.  So they

3   aren't specific to one individual, but they're specific to that

4   trip.

01:54PM    5     Q       And would those include expenses that are either

6   comped or paid directly by Wei Huang?

7     A       That is correct.

8     Q       For the group that would include when Jose Huizar

9   is there, if there are other people there, that includes the

01:55PM   10   whole number for everyone?

11     A       Correct.  There is no way to determine individual

12   expenses per individual.  So, for example, if there was a

13   dinner for $2,000 as a charge, there wasn't a way to determine

14   that Jose Huizar specifically had a -- one specific meal.  So

01:55PM   15   it includes the entire total.

16     Q       What are some of the examples of the benefits

17   that go into this calculation?

18     A       This would include meals, visits to the clubs as

19   well as the spas.  It would include anything from like the mini

01:55PM   20   bar inside the rooms as well as butler services.  It also

21   includes the airline travel if they travel on the private jet.

22     Q       And this summary chart, does this include chips?

23     A       This one does not, no.

24     Q       Okay.  At the very bottom of the chart, you have

01:56PM   25   totals; is that right?

1    A      That's correct.

2    Q      And across all of the 20 -- all of the 20 trips,

3    what was the total amount that you calculated?

4    A      $1,111,793 worth of group benefits provided to

01:56PM 5   Wei Huang and utilized by Jose Huizar.

6    Q      Now I'd like you to walk the jury through some of

7    the records that we mentioned relating to these trips.  I want

8    to focus your attention on trip 18 as an example.

9           If we can publish previously admitted

01:57PM 10  Exhibit 420, please.

11          Can you explain to the jury what this is?

12   A      This would be one of the invoices of records

13   received.  This one specifically is coming from Cosmopolitan,

14   and it shows all of the charges that are attributed to

01:57PM 15  Wei Huang's account.

16   Q      And if we could zoom on the top right part, does

17   that have the arrival date and the departure date?

18   A      Correct.  August 5th, 2016, to August 7 of 2016.

19   Q      All right.  And are these itemized charges for

01:57PM 20  Wei Huang's account?

21   A      That is correct.

22   Q      And zooming -- and so -- and are those charges

23   that would be separate from the benefits -- the villa and other

24   things, these were charges that were actually charged to the

01:58PM 25  room?

1      A      This would include all the various charges for

2  Wei Huang's account.  So this will be the spa services, the

3  meals, the butler, et cetera, that were used to calculate that

4  group benefit.

01:58PM  5      Q      And looking at that, the name there that's

6  repeated throughout says Huang Wei; correct?

7      A      That's correct.

8      Q      Zooming back out, there's a wing room number on

9  the right.  What does that represent?

01:58PM  10      A      That would be the room, the villa that they

11  stayed in at Cosmopolitan.

12      Q      And you said that some of the charges that are

13  included on this would be things like spa charges; is that

14  correct?

01:59PM  15      A      That's correct.

16      Q      And looking at this, for example, the bottom one,

17  the bottom entry there, there is a spa entry for $545 around

18  that; is that correct?

19      A      That's correct.

01:59PM  20      Q      And if we can go to page 8, here there is -- the

21  very first entry of August 5th is an entry for Milos.  How much

22  is that?

23      A      $3,493.69.

24      Q      Do you know what Milos is?

01:59PM  25      A      The seafood restaurant in the Cosmopolitan.

1        Q        So that reflects around a $3,500 bill for that

2    meal.

3        A        That is correct.

4        Q        And below that, there's room charge ES7089S.  Do

02:00PM   5    you see that?

6        A        Yes.  That's referring to the room number and the

7    amount $3,500.01.

8        Q        Is that the charge for the villa?

9        A        That's the charge for the villa for one night.

02:00PM  10        Q        So that's $3,500 a night for that villa?

11        A        That's correct.

12        Q        And here the records reflected that this was a

13    two-night stay?

14        A        Correct.

02:00PM  15        Q        And zooming in on the middle of page 8, do you

16    see a second night charge for $3,500?

17        A        Yes.

18        Q        And that's the same -- is that the same wing and

19    room?

02:00PM  20        A        Yes.  And the same trip.

21        Q        And what does the additional number signify?

22        A        Can you repeat your question?

23        Q        Sorry.

24                Does this -- so were these items that were comped

02:01PM  25    by the casino?

1        A        Yes.  When reviewing the document, there's a

2   column for credit or balance in addition to the charges that we

3   had been looking at.  So in this case, there was a credit or

4   comp provided in the amount of $21,333.35.

02:01PM   5        Q        Okay.  And then just -- and then going through

6   it, they would reflect the additional charges for the rest of

7   that weekend.

8        A        That's correct.

9        Q        And were there similar itemized charges and comps

02:01PM  10   provided for that weekend?

11        A        Yes.

12                 MS. PALMER:  Your Honor, may I have a moment?

13                 THE COURT:  Sure.  You can have more than a

14   moment because we're going to take our evening recess.

02:01PM  15                 Ladies and gentlemen, I want to remind you of the

16   instruction I have given you earlier.  Until this trial is

17   over, you're not to discuss this case with anyone including

18   your fellow jurors, members of your family, people involved in

19   the trial, or anyone else.  Nor are you allowed to permit

02:02PM  20   others to discuss the case with you.

21                 Please do not read or watch or listen to any news

22   reports of the trial and do not conduct any independent

23   research.

24                 And, finally, you're reminded to keep an open

02:02PM  25   mind until all the evidence has been received, you have heard

|  | 1 | the arguments of counsel, instructions of the Court, and the |

1    the arguments of counsel, instructions of the Court, and the

2    views of your fellow jurors.

3              So we will see you tomorrow at 8:00 o'clock.

4              THE CLERK:  All rise for the jurors.

02:02PM   5        (The following proceedings were held in

6              open court outside the presence of the jury:)

7              THE COURT:  All right.  The jury is not present.

8              I have a -- first of all, I'm going to provide

9    counsel with a copy of the note from Mr. Williams this morning,

02:03PM  10   and I'm going to ask the courtroom deputy to file it under

11   seal.

12             I have a question with respect to Exhibit 924.

13   How many pages does this 924 timeline have?

14             MS. PALMER:  The exhibit itself has eight pages.

02:03PM  15   We have it displayed differently so we can do event-by-event

16   for the jury because, when we put everything together, it can

17   be distracting.  So that's why the one on our computer here is

18   slightly different.  The one in the exhibit binder has all of

19   the timelines at once.

02:04PM  20             THE COURT:  All right.  Because I kept trying to

21   look at the -- I looked at the bench copy and then looked at

22   the original, and Exhibit 924 only has eight pages.  So I

23   couldn't follow along with respect to when you were talking

24   about 46 pages.

02:04PM  25             MS. PALMER:  I understand.  We can provide both

```
 1    the Court and the defense copies of the -- basically it's
 2    event-by-event or few events at a time.
 3                   THE COURT:  I would appreciate having a copy.
 4    I'm sure Mr. Braun -- it's been a long day.
 5                   You want a copy also?
 6                   MR. BRAUN:  The morning is fine.
 7                   THE COURT:  Yes.  The morning is fine.  Great.
 8                   We'll see you tomorrow.
 9                   MS. PALMER:  Thank you, Your Honor.
10                   (Proceedings concluded at 2:04 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5         I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15              DATED THIS  18TH  DAY OF MAY, 2023.

16

17

18              /S/ MIRANDA ALGORRI

19              _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
20              FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25