1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5  **UNITED STATES OF AMERICA,**          )
                                          )
6               **PLAINTIFF,**            )      **CASE NO.**
                                          )
7               **vs.**                   )      **CR 20-326A-JFW**
                                          )
8  **RAYMOND SHE WAH CHAN,**              )      **VOLUME 4**
                                          )      **PAGES 521 TO 677**
9               **DEFENDANT.**            )
   _____       )

10

11

12

13              **REPORTER'S TRANSCRIPT OF**
                     **TRIAL DAY 4**
14           **FRIDAY, FEBRUARY 24, 2023**
                     **8:02 A.M.**
15            **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23   _____

24         **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
            F E D E R A L   O F F I C I A L   C O U R T   R E P O R T E R
            3 5 0   W E S T   1 S T   S T R E E T ,   S U I T E   4 4 5 5
25          L O S   A N G E L E S ,   C A L I F O R N I A   9 0 0 1 2
                M I R A N D A A L G O R R I @ G M A I L . C O M

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         MARTIN ESTRADA
          UNITED STATES ATTORNEY
5         BY:  MACK JENKINS
          BY:  SUSAN HAR
6         BY:  CASSIE PALMER
          BY:  BRIAN FAERSTEIN
7         Assistant United States Attorneys
          United States Courthouse
8         312 North Spring Street
          Los Angeles, California 90012
9

10   **FOR THE DEFENDANT:**

11        BRAUN & BRAUN, LLP
          BY:  HARLAND W. BRAUN
12        BY:  BRENDAN PRATT
          10880 Wilshire Boulevard
13        Suite 1020
          Los Angeles, California 90024
14

15   Also Present:

16        Special Agent Andrew Civetti

17

18

19

20

21

22

23

24

25

1            **INDEX OF WITNESSES**

2

3    **WITNESSES**                                                    **PAGE**

4    CIVETTI, Andrew

5            Direct examination resumed by Ms. Palmer          526
            Cross-examination by Mr. Braun                    611

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

524

| | INDEX OF EXHIBITS | | |
|---|---|---|---|
| | | FOR IDENTIFICATION | FOR EVIDENCE |
| NUMBER | DESCRIPTION | PG. | PG. |
| 4 | Map of DTLA | 527 | 524 |
| 59A | Opening Documents | 551 | 551 |
| 59B | Bank Statements | 551 | 551 |
| 59C | Deposits and Offsets | 551 | 551 |
| 59D | Checks | 551 | 551 |
| 101 | Photographs | 605 | 605 |
| 102 | News Video Clip | 601 | 601 |
| 210 | Photographs | 597 | 597 |
| 211 | Photographs | 597 | 597 |
| 701 | Consulting Agreement | 605 | 605 |
| 715 | Check Receipts | 605 | 605 |
| 716 | Photographs | 605 | 605 |
| 903 | Mayor Org. Chart | 536 | 536 |
| 907A | Top 20 Contacts | 547 | 547 |
| 907C | David Ambroz Summary Chart | 538 | 538 |
| 907D | David Ambroz Records | 538 | 538 |
| 933 | Hazens Checks to Synergy | 540 | 540 |
| 940 | Jacinto Timeline | 587 | 587 |
| 940A | Jacinto Timeline (Chiang) | 587 | 587 |
| 940B | Jacinto Timeline (Wang) | 587 | 587 |
| 942 | Payment Timeline | 587 | 587 |
| 942A | Chan, Kuk Timeline | 587 | 587 |

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 942B | Chan, Wang Timeline | 587 | 587 |
| 943 | FBI Overt Timeline | 587 | 587 |

1          **FRIDAY, FEBRUARY 24, 2023; 8:02 A.M.**

2                 **LOS ANGELES, CALIFORNIA**

3                          -oOo-

4

5          (The following proceedings were held in

6          open court outside the presence of the jury:)

7                 THE COURT:  Good morning.  Shannon is bringing in

8     the jury.  The defendant is present.  All counsel are present.

9                 (The following proceedings were held in

08:03AM  10          open court in the presence of the jury:)

11                THE COURT:  All right.  The jury is present.

12                Good morning, ladies and gentlemen.  I'm happy to

13    see that you safely navigated the rainstorm, and I appreciate

14    your being on time this morning.

08:03AM  15                As soon as the jurors are seated, which they are,

16    you may resume your examination of Agent Civetti.

17                MS. PALMER:  Thank you, Your Honor.

18                     **ANDREW CIVETTI,**

19          **GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.**

08:03AM  20             **DIRECT EXAMINATION (RESUMED)**

21                MS. PALMER:  If we could please publish

22    Exhibit 100, please.  I mean 900.

23          Q     Special Agent Civetti, yesterday when we ended

24    the day, we were talking about Hazens and the Luxe Hotel

08:04AM  25    project.  And this is Exhibit 900.  Is that -- looking at this,

1    is that, depicted the second person from the right, Fuer Yuan?

2    That's the Chairman of Luxe; correct?

3         A    That's correct.  With the blue background and

4    blue outline for Hazens.

08:05AM    5         Q    And you also created a chart which was admitted

6    as Exhibit 901 which provides the table to your right which

7    summarizes those projects and the relevant persons; is that

8    correct?

9         A    That's correct.

08:05AM   10         Q    And in addition to that, did you create a map

11   that charts those particular projects onto a geographical area?

12        A    Yes.  That's correct.

13        Q    And is that Exhibit No. 4?

14        A    Yes.

08:05AM   15             MS. PALMER:  Your Honor, at this time the

16   Government would move to admit previously stipulated Exhibit 4.

17             THE COURT:  All right.  It will be received into

18   evidence without objection.

19             (Marked for identification and received

08:05AM   20             into evidence Exhibit No. 4.)

21             MS. PALMER:  If we can please publish.

22        Q    Special Agent Civetti, what is that?

23        A    This is a map showing downtown Los Angeles, and

24   specifically I have added on the logos of the various projects

08:06AM   25   for their particular areas within downtown those projects are

1    located.  The topmost icon LADBS, that would be the location of

2    the Department of Building and Safety.  And to the right of

3    that city hall where Huizar's office was.

4         Q     And to the left of that, is that the Shen Zhen

08:06AM   5    New World -- the L.A. Grand Hotel location?

6         A     That is correct.

7         Q     And if you can just keep going down and just

8    explain which of those logos refer to which projects.

9         A     So moving south is Greenland.  Right below

08:06AM  10    Greenland would be Oceanwide.  And next to Oceanwide's project

11    is the Luxe Hotel, Hazens's project.  And then the three

12    additional logos are all City Century projects.

13         Q     And looking at this geographical -- this map

14    that's on the page right now, are all of those within

08:06AM  15    Jose Huizar's council district?

16         A     That's correct.

17         Q     Yesterday when we were talking about Hazens, we

18    were focused on the time period for 2017, and we were going

19    over a timeline.  I would like to return there.

08:07AM  20              If we can please publish Exhibit 943, page 12,

21    please.  Sorry.  931, page 12.

22              Just to reorient the jury, what types of events

23    are above the line, and what types of events are below the

24    line?

08:07AM  25         A     The events above the line would be communications

1  related to the Hazens project that are not involving

2  Defendant Chan.  It would include benefits to Jose Huizar as

3  well.  And the events below the line would be communications,

4  meetings, et cetera, that involve Defendant Chan.

08:08AM  5          THE COURT:  This is Exhibit 931?

6          MS. PALMER:  931, Your Honor.  I apologize.

7          THE COURT:  All right.

8      Q      BY MS. PALMER:  And looking at this, for example,

9  this is the time period from March 2017 through May 2017.

08:08AM 10  There's a March 13th conversation -- a communication between

11  the defendant, George Chiang, Jeremy Chan, among others.  And

12  what's the subject of that?

13      A      "Talked to Hani."

14      Q      And who is Hani?

08:08AM 15      A      Hani Malki.  He was a City official within the

16  fire department.

17      Q      And then looking at the April 6th communication,

18  what is the subject matter of that, the communication that the

19  defendant is having with George Chiang and Jeremy Chan?

08:08AM 20      A      It related to Tract Map clearances related to the

21  Department of Water & Power, specifically the Water Division.

22      Q      And those had to do with the L.A. Luxe Hotel

23  project?

24      A      That is correct.

08:09AM 25          MS. PALMER:  Now, if we can publish previously

1     admitted Exhibit 547 at page 2, please.

2            Q       Looking at this, Special Agent Civetti, is this

3     "The people who influenced the project" table that we looked at

4     yesterday?

08:09AM  5     A       Yes.  This was the attachment on an e-mail that

6     Defendant Chan had sent to his son and George Chiang.

7            Q       I think that we went through the elected public

8     officials category, but I would like to also look at the public

9     officials category which we did not go through yesterday.  So

08:09AM  10    looking at the top, if we can zoom in on the first two rows,

11    "The people who influenced the project," and then the sign

12    TOT -- the first two rows of the table.  Then if we can zoom

13    in below that on the public officials.  Thank you.

14            And can you describe what we're seeing here?

08:10AM  15    A       The first two rows would be the first two rows of

16    this chart with the title being "People who influenced the

17    project."  The second row, those were all -- each column was

18    representing a part of the city development process in which a

19    subsidy or an entitlement would go through with the last column

08:10AM  20    union, union issues being a part of that development process

21    given that appeals can be filed against these projects.

22            Q       And so, for example, for signs, the planning --

23    the person from the Planning Department that is identified

24    there, the two persons are Kevin Keller and Lucy Ibarra; is

08:11AM  25    that correct?

1    A       That's correct.

2    Q       And for TFAR and VTTM and EIR, are those items

3    that would need to be -- that are part of the development

4    process for a project?

08:11AM  5    A       Yes.  They would go through the development

6    process as well as the PLUM Committee and City Council.

7    Q       And can you please identify the persons there who

8    are -- the defendant identified in this document as "The people

9    who influenced the project"?

08:11AM  10   A       From Planning, Kevin Keller and Lucy Ibarra.

11   From Public Works, Joel Jacinto.  From Transportation,

12   Verej Janoyan.  And from Water & Power, Marvin Moon.

13   Q       And then for the "development agreement" column,

14   what is the development agreement?

08:11AM  15   A       The development agreement would be the contract

16   between the developer and the City after the entitlements were

17   provided.  It basically outlines the agreement and it prolongs

18   how long the developer has to construct and do the development

19   basically.  It's a contract with the City.

08:12AM  20   Q       And looking at the table there, is Kevin Keller,

21   again, identified as one of the persons who influences the

22   project?

23   A       That's correct.

24   Q       As far as the persons that we have seen

08:12AM  25   communications with or meetings with on this timeline, are some

1    of those persons also on this chart?

2         A    Yes.  The communications we were reviewing

3    yesterday included Kevin Keller, Joel Jacinto, Verje Janoyan.

4              MS. PALMER:  If we can go back to the Hazens

08:12AM   5    timeline, Exhibit 931, page 12, please.  If we can now pull up

6    Exhibit 557, please.

7         Q    What is this, Special Agent Civetti?

8         A    This is an e-mail from Jeremy Chan to Lincoln Lee

9    and George Chiang on March 11, 2017, with the subject updated

08:13AM  10    documents for March 11th.

11        Q    And so yesterday I think we looked at the very

12    first day of this, but we did not go into the additional

13    documents.

14              If we can turn to 557, page 8, please.

08:13AM  15              Is this one of the documents attached to this

16    e-mail?

17        A    That's correct.

18        Q    And looking at the top, is the title of it

19    "Tract Clearances"?

08:13AM  20        A    Yes.

21        Q    What is your understanding of what tract

22    clearances are?

23        A    Part of the entitlement process, the Tract Map

24    needs to be reviewed, and there's a series of tract clearances

08:14AM  25    from different departments that must be approved or reviewed

1     before the project application is able to go through that first

2     milestone with the Planning hearing.

3          Q        And yesterday we reviewed correspondence relating

4     to the tract clearances for the Luxe Hotel?

08:14AM   5     A        That's correct.

6          Q        Do you see there are agencies looking at the

7     columns here that are identified as the agency that would be in

8     charge?

9          A        Yes.  The first column represents agency, and

08:14AM   10    these would be the agencies that are required to provide a

11    tract clearance.

12         Q        And then is there also a column that has contact

13    chief there?

14         A        That's correct.

08:14AM   15    Q        For each of the agencies?

16         A        Yes.

17                   MS. PALMER:  And if we can zoom back out, please.

18         Q        Looking at this, is there also a column that says

19    "responsible"?

08:14AM   20    A        Yes.  The very last column.

21         Q        And looking -- comparing this chart to the

22    previous chart that we saw, the defendant's "People who

23    influenced the project" chart, does it have many of the same

24    individuals or some of the same individuals?

08:15AM   25    A        Yes.  Some of the same individuals are listed

1    under contact chief including Verje, Joel Jacinto, Hani Malki.

2        Q    And then looking at the people who are

3    responsible for the project, are there two different persons

4    who are identified by their initials in that column?

08:15AM  5        A    Yes.  R.C. and G.C.

6        Q    And how many agencies are identified on this

7    chart?

8        A    There's eight agencies.

9        Q    And as far as the DOT, do you understand that

08:15AM  10    R.C., Raymond Chan, the defendant, was identified as the one

11    responsible for that project -- I mean, for that agency?

12        A    Based on our investigation, I understand R.C. to

13    be Raymond Chan and G.C. to be George Chiang.

14        Q    And for that particular row, the defendant is

08:16AM  15    identified in the responsible column?

16        A    Yes.  For Department of Transportation, the

17    person responsible is Raymond Chan.

18        Q    And for Department of Power?

19        A    Raymond Chan.

08:16AM  20        Q    Department of Water?

21        A    Defendant Chan.

22        Q    Street lighting?

23        A    Defendant Chan.

24        Q    Fire?

08:16AM  25        A    Defendant Chan.

1    Q       And for the other including BOE -- what does BOE

2    stand for?

3    A       Bureau of Engineering.

4    Q       And for that one, that is George Chiang who is

08:16AM    5    identified?

6    A       That is correct.

7    Q       And then for DBS, there are two different ones,

8    grading and zoning, those are also George Chiang; is that

9    correct?

08:16AM    10    A       Yes.  That's Department of Building and Safety,

11    and then the responsible person listed, according to this

12    chart, is George Chiang.

13    Q       So in terms of the number of -- that are assigned

14    to Raymond Chan versus George Chiang, are there -- is it five?

08:17AM    15    Am I doing it right?

16    A       Yes.  Five were associated with Raymond Chan

17    being responsible for the tract clearance, and three of them it

18    was George Chiang that was responsible.

19    Q       And at this time what was the defendant's

08:17AM    20    position when this was sent?

21    A       He was still a City official.  He was the deputy

22    mayor of Economic Development.

23    Q       Did you create a chart summarizing the primary

24    areas of responsibility that the defendant had as deputy mayor?

08:17AM    25    A       Yes.  The chart included the departments that he

536

```
 1    oversaw as deputy mayor.
 2         Q     And did that include the Department of Planning
 3    and the Department of Building and Safety?
 4         A     It did.
 5               MS. PALMER:  At this time, Your Honor, I would
 6    move to admit previously stipulated Exhibit 903.
 7               THE COURT:  All right.  That exhibit will be
 8    received without objection.
 9               (Marked for identification and received
10               into evidence Exhibit No. 903.)
11               MS. PALMER:  Now going back to the Hazens 2017,
12    2018 timeline at 931, page 14, please.
13         Q     Is this the time period we're looking at here,
14    May 2017 through July 2017?
15         A     The timeline starts May 2017.  Some of the events
16    may go past July 2017, but there's at least a marker that would
17    include July.
18         Q     And looking at this first entry here, what is
19    this?
20         A     This would be a meeting between Defendant Chan
21    and David Ambroz.
22               MS. PALMER:  And if we can pull up Exhibit 1.3 on
23    the right, please.
24         Q     Is that David Ambroz?
25         A     Yes.  That's a photograph of David Ambroz.
```

08:17AM (line 5)
08:17AM (line 10)
08:18AM (line 15)
08:18AM (line 20)
08:19AM (line 25)

1    Q      And what was his position at that time?

2    A      David Ambroz was appointed to the City Planning

3    Commission, and specifically he was City Planning Commission

4    president.

08:19AM  5    Q      And what is the City Planning Commission?  Can

6    you remind us?

7    A      The City Planning Commission would be the second

8    hearing or the second milestone for development project.

9    They're an independent body made up of citizens within

08:19AM  10   Los Angeles.  They're appointed by the mayor, and they serve on

11   the board to review development projects.

12   Q      During your investigation, did you review phone

13   records or calls between the defendant and David Ambroz?

14   A      That's correct.

08:19AM  15   Q      And after reviewing the Toll Records, did you

16   create two charts?

17   A      Yes.

18   Q      And what were those two charts?  What was

19   contained on those?

08:19AM  20   A      One of the charts was the specific call logs, so

21   the phone calls and text messages between the defendant and

22   Mr. Ambroz, and the second chart is a bar graph showing those

23   communications.

24   Q      And are those marked as Exhibits 907C and 907D?

08:20AM  25   A      That's correct.

```
 1              MS. PALMER:  Your Honor, at this time the
 2   Government moves to admit previously stipulated Exhibits 907C
 3   and 907D.
 4              THE COURT:  All right.  They will be admitted
 5   without objection.
 6              (Marked for identification and received
 7              into evidence Exhibit Nos. 907C and 907D.)
 8              MS. PALMER:  Publishing Exhibit 907D, please.
 9      Q      Can you explain to the jury what we are looking
10   at here?
11      A      This is a screenshot of an Excel sheet showing
12   call records.  Specifically, the first column would be
13   Defendant Chan's phone number followed by the date and time
14   that those communications occurred.  The column D representing
15   duration.  If it was a phone call, the duration.  Those are
16   duration in seconds.  If there was no duration, those would
17   have been text messages.  Direction indicating, if the data was
18   provided, whether it was an incoming or outgoing call.  And
19   then the last column being associate would be Mr. Ambroz's
20   phone number.
21      Q      And are there only -- so the one on the right,
22   the 310 number, is Mr. Ambroz's number?
23      A      That's correct.
24      Q      And the one on the left, the target, that would
25   be defendant's personal number, personal cell phone number?
```

08:20AM (line 5)
08:20AM (line 10)
08:20AM (line 15)
08:21AM (line 20)
08:21AM (line 25)

1    A      Yes.  Defendant Chan's personal cell phone

2  number.

3    Q      It looks like they were grouped into two

4  particular dates; is that right?

08:21AM  5    A      Yes.  There's a set of calls on July 26, 2016,

6  and then a set of text messages on May 11th and one on May 12th

7  of 2017.

8    Q      And the meeting that we were looking at on the

9  timeline, was that a meeting on May 12, 2017?

08:21AM  10    A      That's correct.

11    Q      And in May 2017, was the defendant still deputy

12  mayor of Los Angeles?

13    A      That's correct.

14    Q      And was it shortly after he became deputy mayor?

08:22AM  15    A      The July 2016 contacts would be shortly after he

16  was appointed deputy mayor, and the May 2017 contacts would be

17  shortly before he leaves the City.

18    Q      Thank you.

19          And if we can turn back to Exhibit 931, page 15,

08:22AM  20  please.

21          There's a blue box diamond above -- on May 18th,

22  and it says, "Check $100,000 to Synergy from Hazens."  What

23  does that represent?

24    A      This is representing my review of financial

08:22AM  25  records for Hazens and Synergy.  This specifically would be

1    based on a check that I reviewed from Hazens to Synergy in the

2    amount of $100,000 on May 18th.  And based on my investigation,

3    I understood that to be the first milestone payment or bonus

4    after or around the planning hearing.

08:23AM   5          Q      To the right of it, there's the Luxe Hotel public

6    hearing.  Do you see that?

7          A      Correct.

8          Q      And that occurred on May 24th of 2017?

9          A      Yes.  That would be the first major hearing in

08:23AM  10    that development process.

11          Q      You said that for the financial records -- for

12    the entry relating to the $100,000 payment, you reviewed

13    financial records.  Did you also make a summary chart that

14    summarizes all Hazens's payments to Synergy?

08:23AM  15          A      That's correct.

16          Q      And is that Government's Exhibit 933?

17          A      Yes.  That's correct.

18          MS. PALMER:  Your Honor, at this time, the

19    Government moves to admit previously stipulated Exhibit 933.

08:23AM  20          THE COURT:  All right.  It will be admitted

21    without objection.

22          (Marked for identification and received

23          into evidence Exhibit No. 933.)

24          Q      BY MS. PALMER:  So you said that the Luxe Hotel

08:24AM  25    public hearing is the first of the milestones.  It's the first

1    step in that process; is that correct?

2         A       The first major step; correct.

3              MS. PALMER:  Okay.  And if we can go to

4    Exhibit 931 at page 16, please.  The new marker is below the

08:24AM  5    line there on June 11th.  It's one of defendant's radar

6    screens.  If we can go ahead and look at that radar screen,

7    44B.  And the date there, again, is June 11th.  If we can go to

8    page 4, please.

9         Q       Right below the double lines in the middle of the

08:24AM 10    page, the second bullet, there's a bullet that says "Yuan."

11    Did you understand defendant's -- this defendant's radar screen

12    here to be referring to Chairman Yuan of Hazens?

13         A       That's my understanding.

14         Q       And focusing on that first entry, there's an

08:25AM 15    entry that says "compensation" with a series of numbers, 1, 2,

16    3, 4 and then 4 and a half.

17              Do you see that?

18         A       Yes.

19         Q       And the first number, the 1, appears to be

08:25AM 20    lighter than the others.

21         A       That's correct.

22         Q       And did you see in your review of the radar

23    screens that sometimes items would be grayed out?

24         A       Yes.  Based on my review, it appeared that grayed

08:25AM 25    out items were tasks that had been completed but still being

1    reflected on the radar screen.

2        Q    So sort of like accomplished but you don't want

3    to delete it.  So it will still be showing.  When something is

4    grayed out, in your review, it had already happened for the

5    most part?

6        A    Based on my review, the grayed out events, at

7    least most of them, based on my review of other documents,

8    communications, meetings, et cetera, would have been things

9    that had already occurred.  That's correct, the grayed out ones

10   having been completed.

11       Q    On defendant's radar screen here where it says

12   compensation and the date of this, did this entry -- did this

13   radar screen occur shortly after that first milestone payment

14   had been paid?

15       A    That's correct.

16       Q    And paid to Synergy; correct?

17       A    Correct.

18       Q    And based upon that, what was your understanding

19   of what these numbers represented?

20       A    It's my understanding that these compensation

21   numbers represent the four milestones of the development

22   process.  As well as additional financial records I had

23   reviewed, there was another bonus or large payment made after a

24   development agreement had been signed.  It is my understanding

25   that was the four and a half.  So there were four bonus

1    payments we had reviewed on the contract and then an additional

2    large bonus payment.

3         Q      And then looking at the other items here, are

4    there other items that reflect dates and other milestones in

08:27AM   5    the project, for example, CPC, PLUM, and council?

6         A      Yes.  That's correct.

7         Q      And at this time, was the defendant still working

8    at the City?

9         A      Yes.  He was still the deputy mayor of

08:27AM  10    Economic Development.

11              MS. PALMER:  If we can go to Exhibit 931 at

12    page 17, please.

13         Q      Below the line on June 22nd, it appears that

14    there is a call.  Does that represent a wire call that was

08:27AM  15    intercepted?

16         A      Yes.  That's correct.

17              MS. PALMER:  And, Your Honor, if you could read

18    the Instruction No. 3 for during trial relating to transcripts

19    of recordings in English.

08:27AM  20              THE COURT:  That's the one that I read yesterday;

21    correct?

22              MS. PALMER:  I think yesterday we did the one for

23    translations, but I failed to ask the Court to read the one

24    relating to recordings in English.

08:28AM  25              THE COURT:  Which instruction number is it?

1          MS. PALMER:  Proposed Instruction No. 3,

2     Your Honor.

3          THE COURT:  All right.  This is the transcript of

4     recording in English; correct?

08:28AM  5          MS. PALMER:  Yes, Your Honor.

6          THE COURT:  All right.  Ladies and gentlemen, let

7     me provide you with the following instruction:

8          You're about to hear a recording that has been

9     received into evidence.  Please listen to it very carefully.  A

08:28AM 10     transcript of the recording is being displayed on the screens

11     in front of you to help you identify the speakers and as a

12     guide to help you listen to the recording.  However, bear in

13     mind that the recording is the evidence, not the transcript.

14     If you hear something different from what appears in the

08:29AM 15     transcript, what you heard is controlling.  After the recording

16     is played, the transcript will be removed from the screen.

17          MS. PALMER:  If we could play 612B.

18          (The audio commenced playing before the jury.)

19     Q      BY MS. PALMER:  Special Agent Civetti, were you

08:30AM 20     able to determine what exactly the $20,000 in cash that the

21     defendant and George Chiang were referring to here?

22     A      Not specifically.

23     Q      And while there was some mention of

24     Chairman Huang or Huang, do you know someone in this

08:30AM 25     investigation -- did you come across someone with the last name

1    of Huang?

2         A       Yes.  Another developer chairman,

3    Chairman Edwin Wang.

4         Q       And did he have a finance business relationship

08:30AM  5    with Chan and Chiang?

6         A       That's correct.

7         Q       Notwithstanding that you don't know the source of

8    this cash or the purpose, was this relevant to your

9    investigation?

08:31AM  10        A       It was.

11        Q       Why?

12        A       Because this interception is reflecting a call

13   between a public official and a consultant in which cash is

14   being discussed as well as a reference that the defendant only

08:31AM  15   wanted to use cash for everything.  That was significant

16   because, when individuals are using cash, it makes it difficult

17   in the investigation to be able to track that money.

18        Q       I think you talked about that a little bit

19   yesterday with respect to Jose Huizar and his use of cash; is

08:31AM  20   that correct?

21        A       That's correct.  And looking at the cash he had

22   received in Vegas but then the absence of cash in his bank

23   accounts.

24        Q       During these excerpts, did you hear the defendant

08:31AM  25   indicate that he ever -- that he never wanted the money?

1      A      There is no indication that he did not want the

2   money.

3      Q      And did he also ask to have George Chiang hold on

4   to the cash?

08:32AM   5      A      Yes.  That's the phrase he used.

6      Q      And he said he uses cash on everything?

7      A      That's correct.  Trying to use cash on

8   everything.

9      Q      Trying to use cash on everything?

08:32AM   10      A      That's correct.

11             MS. PALMER:  Now if we can go back to the

12   timeline on Exhibit 931, page 18, please.

13      Q      Now, June 30th, 2017, is this when the defendant

14   retired from the City?

08:32AM   15      A      That would be the last day that he was in the

16   City.

17      Q      And after he retired, did he formally begin

18   working for Synergy?

19      A      That's correct.

08:32AM   20      Q      And did he also open two other companies?

21      A      Yes.

22      Q      Did those include CCC?

23      A      That was one of the companies he opened after

24   retiring.

08:32AM   25      Q      Was the other one LABXG?

1        A       That is correct.

2        Q       Now, in your investigation in this case, did you

3    review the defendant's top phone contacts or did you look at

4    all of his phone contacts in terms of communications with other

08:33AM  5    individuals?

6        A       Yes.  I reviewed the phone records for the

7    defendant from approximately August of 2014 through June 30 of

8    2017 because this was the time period in which the defendant

9    was still a City official.

08:33AM  10       Q       And did you summarize those in a chart?

11       A       I did.

12       Q       And is that chart Government's Exhibit 907A?

13       A       Yes.  907A will show the top 20 contacts from my

14   review.

08:33AM  15              MS. PALMER:  Your Honor, at this time the

16   Government moves to admit previously stipulated Exhibit 907A.

17              THE COURT:  All right.  It will be received

18   without objection.

19              (Marked for identification and received

08:33AM  20              into evidence Exhibit No. 907A.)

21              MS. PALMER:  If we can please publish.

22       Q       Can you explain to the jury what you're seeing on

23   the bottom, what each of the axes on this graph represent?

24       A       Along the left-hand side would be the number of

08:34AM  25   communications.  So from zero communications at the bottom up

1    to 3,000 communications at the top.  And then along the bottom

2    would be the individuals that were the top 20 contacts of the

3    defendant for this period August 15th, 2014, through

4    June 30th, 2017.

08:34AM 5         Q       And here there are two that are much higher than

6    the others.  Let's take the second highest one first.  Who does

7    that reference?

8         A       Jeremy Chan, the defendant's son.

9         Q       And the tallest one?

08:34AM 10        A       George Chiang, the consultant.

11        Q       And approximately how many contacts between that

12   time period when the defendant was in the City were there

13   between defendant and George Chiang?

14        A       Around 2,750 or so.

08:35AM 15        Q       And so aside from the defendant's son, what was

16   the next closest contact?

17        A       It appears to be Jerry Neuman, a land use

18   consultant or land use lawyer.

19        Q       And was Jerry Neuman one of the persons who also

08:35AM 20   worked on the Hazens Luxe Hotel project?

21        A       For a period of time, that's correct.

22        Q       Did you obtain Secretary of State documents for

23   CCC and LABXG?

24        A       Yes.

08:35AM 25               MS. PALMER:  If we can bring up previously

1    admitted Exhibit 53, please.

2         Q      Now, is this one of the Secretary of State

3    documents that you obtained for LABXG?

4         A      That's correct.  This would be the Articles of

5    Incorporation.

6                MS. PALMER:  And if we could go to 53, page 6,

7    please.

8         Q      So this is the Articles of Incorporation.  Who is

9    the registered individual here?

10         A      Raymond She Wah -- and I believe the last name is

11    further on the page.  Raymond Chan.

12         Q      And what is the date looking on the top right?

13         A      This was filed August 1st of 2017.

14                MS. PALMER:  Your Honor, may I have one moment?

15                THE COURT:  Yes.

16         Q      BY MS. PALMER:  And so that was about a month

17    after the defendant left the City?

18         A      That's correct.

19                MS. PALMER:  If we can go to Exhibit 59A, please,

20    page 6.

21         Q      What is this, Special Agent Civetti?

22         A      This is a Secretary of State Statement of

23    Information.  This was included when the defendant opened a

24    bank account at East West Bank for LABXG.  This would be a

25    document that was provided to the bank when he opened that

1    account.

2         Q      And if we could -- is defendant listed at box 4

3    as the officer?

4         A      Yes.  Officer, Chief Executive Officer

08:37AM   5    Raymond She Wah Chan.

6         Q      And looking at box 7, what is the type of

7    business listed?

8         A      Real estate broker.

9         Q      And the date on is this?

08:38AM   10        A      August 9, 2017.

11        Q      So this was a little over a month after the

12   defendant left the City?

13        A      That is correct.

14        Q      And these were documents submitted to open a bank

08:38AM   15   account relating to LABXG?

16        A      Yes.

17        Q      Now, did you obtain other financial records

18   relating to LABXG?

19        A      Yes.  From East West Bank.

08:38AM   20             MS. PALMER:  Your Honor, I believe they're

21   previously admitted, but if not, we would move to admit

22   Exhibits 59A through 59D.

23                  THE COURT:  I don't have those in.

24                  Shannon, do you have them in?

08:38AM   25                  MS. PALMER:  They're previously stipulated.  I

1    apologize.

2              THE COURT:  They're previously stipulated, but I

3    don't have them in evidence.  So 59, 59A and B will be received

4    into evidence.

08:38AM    5              MS. PALMER:  A through D as in dog.

6              THE COURT:  All right.  C and D will also be

7    admitted into evidence.

8              (Marked for identification and received

9              into evidence Exhibit Nos. 59A through D.)

08:39AM   10    Q       BY MS. PALMER:  During your review of documents

11    in this case and through the communications you reviewed, did

12    you see the name LABXG used in a different context than the

13    company the defendant opened?

14    A       Yes.  I have seen LABXG listed on radar screens

08:39AM   15    as well as e-mails and text message communications.

16    Q       How was it listed when it wasn't -- aside from a

17    company, how else was it listed?

18    A       I understood LABXG to be the defendant's martial

19    arts group or kung fu group.

08:39AM   20              MS. PALMER:  And going to Exhibit 931 at page 19,

21    please.

22    Q       Looking at this, on July 5th and July 19th, are

23    there communications between Huizar and George Chiang?

24    A       Yes.  Both intercepted wire communications as

08:39AM   25    well as text communications.

```
 1          Q       And did these communications relate to the

 2   L.A. Luxe -- the Hazens Luxe Hotel project?

 3          A       Yes.

 4                  MS. PALMER:  And if we could scroll to the next

 5   page, please.

 6          Q       Now, two items appeared below the line there, the

 7   August 8th -- on August 8th and August 24th.  And they both

 8   have the same name in them, Deron Williams, Jr.  Who is

 9   Deron Williams, Jr.?

10          A       Deron Williams, Jr., is the son of a public

11   official Deron Williams.

12                  MS. PALMER:  If we can pull up on the right side

13   of the screen Exhibit 1 at page 21.

14          Q       Is this a photograph of Deron Williams?

15          A       Yes.  This is a photograph of Deron Williams.

16          Q       And what was Deron Williams's position?  You said

17   he was a public official?

18          A       Yes.  He was the chief of staff for the council

19   president.

20          Q       And how does the council president -- how is the

21   council president relevant to the approval process?

22          A       The council president is a council member.  He's

23   one of the 15 council members.  So he would also have a vote at

24   City Council to approve development projects.

25          Q       Just to be clear, this person on the right is
```

08:40AM (line 5)
08:40AM (line 10)
08:40AM (line 15)
08:40AM (line 20)
08:41AM (line 25)

1    senior, not junior?

2        A      Correct.  This is Deron Williams, Sr., so the

3    father of the name listed on the timeline.

4        Q      And on the timeline, there's a meeting referenced

08:41AM  5    between the defendant and Deron Williams, Jr.  Did that meeting

6    occur based upon the calendar that you reviewed?

7        A      This was a calendar entry from Defendant Chan's

8    phone specifically stating a meeting between the defendant and

9    Deron Williams, Jr.  If it occurred, I wasn't able to determine

08:41AM  10   just based on the calendar entry.

11               MS. PALMER:  If we can display Exhibit 700, that

12   calendar entry, please.  If you can zoom in on that.

13       Q      Now, this appears to be an extracted item sort of

14   like some of the phone notes and other things that we have

08:42AM  15   seen; is that correct?

16       A      That's correct.  This would be an extraction of

17   the defendant's personal cell phone.

18       Q      And what is the subject of this meeting?

19       A      "Consulting Agreement review meeting Deron and

08:42AM  20   Ray."

21       Q      And who are the attendees listed for that

22   meeting?

23       A      Deron Williams and Raymond Chan, and it's my

24   understanding that that e-mail address was associated with

08:42AM  25   Deron Williams, Jr.

554

```
 1          Q      And is George Chiang listed as an attendee?

 2          A      Not on this calendar, no.

 3          Q      And the location?

 4          A      800 West 6th Street, Los Angeles.  And I'm

 5    familiar with that address based on the investigation that

 6    that's where Defendant Chan and George Chiang worked, their

 7    office.

 8          Q      The Synergy office?

 9          A      The Synergy CCC office.  That's correct.

10                 MS. PALMER:  Now if we can return to Exhibit 931,

11    page 21.

12          Q      And the details of -- sorry.  Looking back at

13    Exhibit 700, what are the details listed on that calendar

14    entry?

15          A      "Per an e-mail sent on August 21st to review and

16    sign the agreement."

17                 MS. PALMER:  Now if we can go to Exhibit 931,

18    page 21, please.

19          Q      And the new entry on -- there is August 21st --

20    August 24th there with the phone.  Is this an intercepted call?

21          A      Yes.  Between the defendant and George Chiang.

22          Q      And is it discussing the defendant and

23    George Chiang requesting a motion from Jose Huizar to benefit

24    the project?

25          A      Yes.
```

555

1    Q    And specifically does that motion relate to the

2  allocation of funds for TFAR?

3    A    Yes.  That's correct.

4    Q    And that type of motion, the allocation of funds

08:44AM  5  for TFAR, is that a necessary step for the Luxe Hotel project

6  to proceed to the next milestone in CPC?

7    A    Typically in the development process where the

8  public benefit or TFAR payment needs to be paid would be a part

9  of that process.  This specific motion or resolution was unique

08:44AM  10  to this specific project.

11         MS. PALMER:  And if we could go to the next page,

12  please.

13    Q    Here looking at this, what are we looking at here

14  on the screen?

08:45AM  15    A    This is the timeline September 2017 below the

16  line showing another intercepted phone call between the

17  defendant and George Chiang and then above that being the

18  motion or resolution that Council Member Huizar put through for

19  the Luxe Hotel project.

08:45AM  20         MS. PALMER:  If we can bring up Exhibit 597K,

21  please, and zoom in on the first two messages.

22    Q    Is this a communication between Jose Huizar and

23  George Chiang?

24    A    That's correct.  And George Chiang's messages are

08:45AM  25  in green.

1    Q      And can you just read the first sentence there in

2    the first message?

3    A      "Hi boss.  Wanted to give you a heads up.  Mason

4    spoke to Chairman and CPC needs to be 9/14/17.  Otherwise, the

08:45AM  5  loan commitment from lender will be lost for the project."

6    Q      And then going to the next -- the second message

7    there, if you could read the first two sentences.

8    A      "Hi boss.  We met with Planning yesterday and

9    went through the outstanding items for September 14, 2017, CPC.

08:46AM  10  We would need a motion from your office to direct the TFAR

11   allocation by next week before council recess to make the

12   September 14 CPC hearing."

13   Q      So in this message George Chiang is requesting

14   from Jose Huizar to make this motion?

08:46AM  15  A      That's correct.

16          MS. PALMER:  And could you please read the next

17   sentence relating to -- starting with "Have already."

18   A      "Have already informed Shawn about this and is

19   currently waiting for Shawn to call me."

08:46AM  20  Q      And then can you read the last sentence?

21   A      "Due to the urgency of the matter, would you have

22   time to meet with Mason and I?"

23          MS. PALMER:  Now if we can go back to

24   Exhibit 931, 21.  Sorry.  22.  23.  Yes.  931, 23.

08:47AM  25  Q      And looking at the September 1st entry there, is

1   that the TFAR motion that was referenced in these messages?

2       A    Yes.  I believe there was specifically a

3   resolution, but it's one and the same.  There was an official

4   act by the council member.

08:47AM  5       MS. PALMER:  If we can look at Exhibit 514,

6   please.  We can look at that resolution.  Zooming in on the

7   top, just the title and the stamp to the right of it.

8       Q    Does it say resolution?  And then what's the

9   stamp to the right of that?

08:47AM  10      A    Planning and Land Use Management.

11       MS. PALMER:  If you can zoom in on the last

12   paragraph and the signature.

13       Q    And can you please read that?

14       A    "Be it further resolved that by adoption of this

08:48AM  15  resolution the Council authorizes the Department of City

16   Planning to accept a Transfer of Floor Area application from

17   Jia Yuan U.S.A., Company, as described above for future

18   consideration from the City Council."  It's presented by

19   Jose Huizar, Council Member 14th district.

08:48AM  20      MS. PALMER:  If we could go to Exhibit 931,

21   page 23, please.

22       Q    And was there also an intercepted call between

23   the defendant and George Chiang on August 30th relating to the

24   TFAR motion?

08:48AM  25      A    That's correct.

1          MS. PALMER:  Now if we can go to the next page of

2     the timeline, please.

3          Q     And what do we see here?

4          A     This would be a marker representing a

08:49AM   5     September 1st, based on my review, of a contract that was

6     signed between CCC and Deron Williams, Jr.

7          MS. PALMER:  And if we could go to the next page,

8     please.

9          Q     And looking at the first entry there, 711, is

08:49AM   10    that an intercepted call?

11         A     Yes.  That is an intercepted call between Chiang

12    and Defendant Chan.

13         MS. PALMER:  If we can please play Exhibit 711.

14         (The audio commenced playing before the jury.)

08:51AM   15    Q     BY MS. PALMER:  Special Agent Civetti, there was

16    someone referenced both Deron and Ana in there.  Can you

17    explain who those people are again?

18         A     It's my understanding that the reference to Deron

19    was Deron Williams, Sr., the father of Deron Williams, Jr.  And

08:52AM   20    the reference to Ana was Ana Guerrero, the chief of staff of

21    the mayor and worked in the mayor's office.

22         Q     And this conversation relates to the upcoming

23    meeting at the CPC for the Luxe Hotel project?

24         A     That's my understanding.

08:52AM   25    Q     And why did you include this conversation on the

1    timeline?

2         A       This conversation was included because it was

3    relevant that we had information related to that contract that

4    was signed between CCC, the defendant's company, and

08:52AM  5    Deron Williams Jr., the son of Deron Williams who they're

6    discussing that they're requesting to provide talking points to

7    the mayor's office and those talking points being for the

8    mayor's office to provide information to support this project.

9         Q       And George Chiang asked the defendant if these

08:53AM 10    were talking points that they would tell the public, and the

11    defendant responded, no.  Did that have any significance to

12    your project -- to your investigation?

13        A       Yes.  It was significant given that there was

14    information being provided to a public official to articulate

08:53AM 15    to another public official, but that would not be a part of the

16    public record.

17        Q       And if we could go to exhibit -- and David Ambroz

18    they mentioned, and I think we have talked about him, but who

19    was he?  Can you remind us?

08:53AM 20        A       David Ambroz would be the CPC president who would

21    be overseeing the City Planning Commission hearing that was

22    upcoming.

23        Q       And one other item I wanted to talk about from

24    this call.  They mentioned that this project was not in Herb's

08:53AM 25    district.  What did that mean, "Herb's district"?

1      A       Herb would be a reference to Herb Wesson, the

2   council president.  This project was located in Jose Huizar's

3   district, not Herb Wesson's district.  Based on my

4   understanding of the call was that they were linking why this

08:54AM   5   project -- why Deron, the chief of staff of Herb Wesson, would

6   speak on behalf of this project to the mayor's office.

7               MS. PALMER:  And looking at Exhibit 708, please.

8      Q       Now, is this a text conversation between

9   Deron Williams and George Chiang?

08:54AM   10      A       Yes.  Deron Williams, the chief of staff for

11   Herb Wesson.

12               MS. PALMER:  And if we could zoom in on the first

13   three messages.

14      Q       George Chiang said, "Hey D, hope you're having a

08:54AM   15   good day.  Just wanted to make sure the talking points can be

16   conveyed to Ana before the hearing on 9/14/17.  Thanks bro."

17               Did you understand, again, Ana there to be

18   Ana Guerrero?

19      A       That's correct.

08:55AM   20      Q       And then the 9/14, that's the CPC hearing that we

21   were talking about?

22      A       Yes.  That would be the hearing that's to occur

23   in three days from this message.

24      Q       And what was Deron Williams's response?

08:55AM   25      A       "Will do."

1      Q      And George Chiang's response?

2      A      "Thank you, brother."

3      Q      And that hearing -- that CPC hearing,

4    David Ambroz was the president of CPC?

08:55AM   5      A      He was the president of CPC, and he leads the CPC

6    hearing meetings.

7             MS. PALMER:  If we could go to Exhibit 709,

8    please.  Zoom in on both of the top two messages.

9      Q      Is this a conversation, again, between

08:55AM  10    Deron Williams, Sr., the chief of staff, and George Chiang?

11      A      That is correct.

12      Q      And what is the date of this one?

13      A      September 12th, the next day.

14      Q      So two days before that hearing?

08:56AM  15      A      That is correct.

16      Q      And can you please read George Chiang's first

17    message?

18      A      "Hi, Deron.  Sorry to bug.  Just going over my

19    checklist for the CPC hearing on September 14th.  Thank you for

08:56AM  20    talking to Ana for us.  Let me know once the message is

21    delivered.  Thank you, brother."

22      Q      And then when he said, "Thank you for talking to

23    Ana," again, Ana Guerrero, the same Ana we have been talking

24    about is your understanding?

08:56AM  25      A      Yes.  The chief of staff of the mayor.

1    Q      And if we can read the next message, please?

2    A      "Hi, Deron.  Sorry to bug again.  When you get a

3  chance, can you give me a ring?  We just heard from Planning

4  that David Ambroz does not like the project's design.  I wait

08:56AM  5  for your call.  Thanks George."

6    Q      Was there a follow-up call that was intercepted

7  by the FBI relating to this?

8    A      Yes.  That's correct.

9         MS. PALMER:  If we can go to Exhibit 712, please,

08:56AM  10  and play that.

11         (The audio commenced playing before the jury.)

12         MS. PALMER:  If we can go back to Exhibit 931 at

13  page 25.

14    Q      And was there an additional call between Huizar

08:57AM  15  and Chiang relating to this same topic?

16    A      Yes.  This was an intercepted call relating to

17  the upcoming CPC hearing.

18         MS. PALMER:  Now if we can scroll to the next

19  page, please.

08:57AM  20    Q      We're looking at September 14th.  Is that the

21  date of the CPC hearing?

22    A      That's correct.

23         MS. PALMER:  And if we could go to -- there are

24  several, it looks like, calls -- there's a call and a text

08:58AM  25  message.  If we can go to the first one between Jose Huizar and

1    George Chiang, 620A.

2              (The audio commenced playing before the jury.)

3         Q      BY MS. PALMER:  Special Agent Civetti, when

4    Jose Huizar said, "Whatever it was, we'll fix it in PLUM," was

08:59AM  5    PLUM the next milestone for the project after it passed CPC?

6         A      Yes.  This would be the next step in the process.

7         Q      And was Jose Huizar the chair of the

8    PLUM Committee?

9         A      He was.

08:59AM  10             MS. PALMER:  Now, if we can go to Exhibit 931 at

11   page 26.

12        Q      Here are there additional communications relating

13   to the project?

14        A      Yes.  There was a text message communication

08:59AM  15   between Council Member Huizar and George Chiang.

16        Q      And in that is Huizar asking George Chiang to

17   convey to the Chairman that "We were helpful"?

18        A      That's correct.

19             MS. PALMER:  If we can go to the next page,

09:00AM  20   please.

21        Q      Now, these items are below the line.  So are

22   these communications that same day of the CPC hearing that

23   relate to the defendant?

24        A      Yes.  That's correct.

09:00AM  25             MS. PALMER:  And if we can go to Exhibit 620 --

1    Q    So there are two calls -- it looks like 621A and

2    B are two clips, and it says, "Chan and associate."  Were you

3    able to determine who this person was?

4    A    Based on the call, I believe it's an associate

09:00AM   5    named Jason, but I'm not familiar with who that specifically

6    is.

7         MS. PALMER:  If we can go to 621A first, please,

8    and play that.

9         (The audio commenced playing before the jury.)

09:02AM   10   Q    BY MS. PALMER:  Special Agent Civetti, why was

11   this of significance to your investigation?

12   A    This was significant for two reasons.  One, just

13   being the references to the political chains that were pulled,

14   specifically talking with the mayor's office and the fact that

09:02AM   15   the PLUM Committee, those are good brothers.  In addition, the

16   fact that Defendant Chan had mentioned working so hard the last

17   nine months.  It was my understanding that this call was

18   September of 2017.  So nine months would include from January

19   2017.  And for that period of six months, the -- from January

09:02AM   20   to June, the defendant was still working in the City.

21   Q    And when the defendant refers to someone who was

22   the, quote, "thick head," what did you understand that to be

23   based upon the context of the communications?

24   A    David Ambroz, the CPC president.

09:03AM   25        MS. PALMER:  And if we can go to 621B and play

1    that, please.

2             (The audio commenced playing before the jury.)

3        Q        BY MS. PALMER:  Based upon the context of this

4    call, Special Agent Civetti, did you understand Raymond Chan to

09:03AM  5    be soliciting additional business from the person he was

6    talking to?

7        A        That is correct.

8        Q        And he was talking about his work on the approval

9    for the Hazens hotel -- for the Luxe Hotel project from Hazens;

09:04AM  10   is that right?

11       A        Yes.  For at least the last nine months.

12               MS. PALMER:  Now, if we can go to the additional

13   call from the same day, 622B, please.

14       Q        And this is a call between the defendant and

09:04AM  15   George Chiang.

16       A        That's correct.

17               (The audio commenced playing before the jury.)

18       Q        BY MS. PALMER:  Special Agent Civetti, did you

19   understand the Chairman reference to be there Hazens

09:05AM  20   Chairman Yuan?

21       A        That's correct.

22       Q        Now, that same day, the defendant and his son

23   Jeremy Chan were also communicating about the passage of the

24   CPC hearing; is that correct?

09:05AM  25       A        Yes.  At this time we were intercepting both

1  calls and text messages on the defendant's phone, and some of

2  the text messages that were intercepted included the defendant

3  and his son Jeremy Chan.

4          MS. PALMER:  And if we could go to Exhibit 593G,

09:06AM  5  please.

6      Q     So you said that this was intercepted on a wire

7  instead of extracted from a device.

8      A     Correct.  These messages would have been received

9  live on that wire interception.

09:06AM  10     Q     Okay.  Is that why this exhibit appears slightly

11  different than some of the other text messages that we have

12  seen in this case?

13     A     Yes.  There is no header saying "extraction

14  report."  This was purely created by myself based on my review

09:06AM  15  of multiple text messages that were intercepted.

16          MS. PALMER:  Now, if we can zoom in on the first

17  four, please.

18     Q     Could you read the defendant's first message?

19     A     Yes.  And just for the record, the green messages

09:06AM  20  are Defendant Chan's, and the blue messages are his son

21  Jeremy Chan.  And the first message from September 14th, 2017,

22  "CPC Luxe.  Ambroz is fucking with Jose on signs and TFAR

23  distribution."

24     Q     And Jeremy responded, "Not really surprised based

09:07AM  25  on what we learned yesterday."

1           And the defendant's response?

2      A      "I mean, CPC approved Luxe.  We are moving on to

3  PLUM."

4      Q      And Jeremy responded, "Oh, now that's a

09:07AM  5  surprise."

6           Now if we can go to the last four messages or

7  just the rest of the messages.

8           And then what was Jeremy's response?

9      A      "Good news for milestones."

09:07AM  10      Q      And what did you understand milestones to mean in

11  that context?

12      A      The large bonus payments being paid from Hazens

13  to Synergy.

14      Q      And then there's a reference on the right.

09:07AM  15  Defendant says, "Billy and Nick talked to the commissioners."

16  Who are Billy and Nick, based upon your investigation?

17      A      It's my understanding that Billy is Billy Chun

18  who replaced the defendant as deputy mayor of

19  Economic Development and Nick is Nick Maricich of the mayor or

09:08AM  20  Planning Department -- the mayor's office or Planning

21  Department.

22      Q      So those are public officials who are talking to

23  the commissioners on behalf of the defendant?

24      A      Yes.  It's my understanding the commissioners

09:08AM  25  being the CPC commissioners.

1    Q    And then it says, "Deron asked Ana."  That's the

2    Deron Williams we have been talking about, the senior

3    Deron Williams, and Ana Guerrero from the mayor's office?

4    A    That's correct.

09:08AM  5    Q    And then, "You know who asked Deron."

6         Then Jeremy Chan says, "Congrats."

7         And then what does Raymond Chan respond?

8    A    "To all of us.  Still waiting for the second

9    payment."

09:08AM  10   Q    And what was your understanding of still waiting

11   on the second payment to mean?

12   A    The second large milestone payment being paid

13   from Hazens to Synergy.

14        MS. PALMER:  And if we could go to the timeline,

09:08AM  15   Exhibit 932, page 28.  931, page 28.

16   Q    Near the end of the month, so about 16 days after

17   the Luxe Hotel hearing, is there a payment from Jeremy Chan to

18   Synergy?

19   A    Yes.  In the amount of $8,450.

09:09AM  20   Q    And at a high level, did you review the check and

21   see that this was something that was sent from the Synergy bank

22   records and deposited in Jeremy Chan's account?

23   A    That is correct.

24        MS. PALMER:  If we can scroll to the next page,

09:09AM  25   please, and to the next page.

1      Q      Now, looking at this, do we see the CPC hearing

2  coming up on November 9th?

3      A      That's correct.

4      Q      Why is there an additional CPC hearing?

09:09AM  5      A      During the September 14th CPC hearing, there is

6  one item that was postponed to be reviewed later because that

7  element needed to go through another City entity before, and

8  then it would be reheard on November 9th.

9      Q      Looking at the November 19th entry, there is a

09:10AM  10  payment from Hazens to Synergy for $150,000.  What do you

11  understand that payment to be for?

12      A      It's my understanding that's the second payment,

13  the second bonus milestone payment from Hazens to Synergy.

14      Q      Which of the milestones did that relate to?

09:10AM  15      A      The second part of that development process, the

16  CPC hearing.

17      Q      And then there are entries for October 24th and

18  October 31st.  Are those just meetings that were reflected in

19  calendars between Jose Huizar and George Chiang?

09:10AM  20      A      These are meetings that are reflected through

21  discussions of text messages between Jose Huizar and

22  George Chiang.  So they were arranging meetings and confirming

23  those meetings happening.

24      Q      Thank you.

09:11AM  25            Now, if we can go to the next page.

1          And during the same period below the line, are

2     those the items relating to the defendant?

3          A     That's correct.

4          Q     And after that Synergy payment of $150,000, was

09:11AM  5     there a check to LABXG?

6          A     Yes.

7          Q     And how much was that?

8          A     $36,432.

9          Q     Did you see a check from Synergy -- was this

09:11AM  10    check directly to the defendant or was it written to LABXG?

11         A     It was not to the defendant.  It was to his

12    company LABXG.

13              MS. PALMER:  And if we can go to Exhibit 632 at

14    page 3, and if we can zoom in on the top check, please, and

09:12AM  15    both sides of it.

16         Q     Is this the check from Synergy Alliance Advisors

17    to LABXG?

18         A     That's correct.

19         Q     And the date is October 28th, 2017?

09:12AM  20    A     Yes.

21         Q     And the same amount that we saw reflected in the

22    table?

23         A     Yes.

24         Q     And looking at the back of that check, did the

09:12AM  25    defendant sign the back of that check?

1  A  Yes.  It was signed by the defendant and

2 deposited into an East West Bank account in Pasadena,

3 California.

4    MS. PALMER:  And if we can go to Exhibit 931 at

09:12AM 5 page 31, please.

6  Q  During this same time period a few days later,

7 was there another check to Jeremy Chan from Synergy?

8  A  Yes, there was in the amount of $6,550.

9    MS. PALMER:  If we can scroll to the next page in

09:12AM 10 the timeline, please.

11  Q  Are there new items that have appeared to the

12 right of that CPC hearing?

13  A  That's correct.

14  Q  And do two of those items relate to the PAC that

09:13AM 15 we were talking about on the first day of trial?

16  A  Yes.  These two items are Excel sheets related to

17 Jose Huizar tracking, i.e., or PAC commitments.  I'm not sure

18 if at this time the Families for L.A. PAC was officially

19 formed, but this would be the PAC to support Richelle, his

09:13AM 20 wife.

21  Q  Thank you.

22    And if we could go to Exhibit 125 and go to

23 page 2, please, and zoom in on the first half of the page.

24    Looking at this, did you find anything of

09:13AM 25 significance in -- what was significant to your investigation

1    relating to this exhibit?

2         A        This exhibit was tracking anticipated or

3    committed contributions to Richelle Huizar's campaign,

4    specifically, the names of the individuals or companies that

09:14AM  5    had been listed.  I had an understanding that these were a lot

6    of the developers with projects pending before the

7    PLUM Committee, and then specifically some of the same names

8    that we were already investigating were appearing on this list

9    such as City Century, Greenland, Carmel.

09:14AM 10              MS. PALMER:  And if we can highlight those.

11        Q        So City Century, Greenland, and Carmel.  And

12   there's an amount to the right with notes; correct?

13        A        That's correct.

14        Q        And then Carmel is the third from the bottom

09:14AM 15   there?

16        A        That's correct.

17        Q        And each of those is tracking potential

18   commitments of $25,000; is that right?

19        A        Yes.  From each of those developers.

09:15AM 20              MS. PALMER:  And if we can zoom in on the second

21   half of that screen, please.

22        Q        And on this screen do we see Hazens and

23   Oceanwide?

24        A        That's correct.

09:15AM 25        Q        And to the right of that, for Hazens is it

1    $100,000 reflected?

2         A    Yes.

3         Q    To the right of that, is there a name?

4         A    George Chiang.

09:15AM  5    Q    Now, on the previous screen, we had seen the word

6    "IE."  What does IE refer to?

7         A    Independent expenditure.

8              MS. PALMER:  And if we can go to Exhibit 931,

9    page 32.

09:15AM  10   Q    And independent expenditure, did you understand

11   that to also refer to the PAC?

12        A    Yes.  And I believe the name of the document or

13   at least a new document created titled "Initial Commitments to

14   PAC" had similar information from that initial IE strategy

09:16AM  15  Excel sheet.

16        Q    And there's also a November 17 communication

17   between defendant -- between Jose Huizar and George Chiang; is

18   that right?

19        A    Yes.  Related to the upcoming PLUM date.

09:16AM  20   Q    So the upcoming PLUM date, that's the next

21   milestone in the progression of this project; is that right?

22        A    Yes.  That would be the third milestone for the

23   Hazens project.

24              MS. PALMER:  And if we can scroll to the next

09:16AM  25  page.

1    Q      And what do we see here?

2    A      This would be the date December 5th of the PLUM

3  hearing in which the recommendation approval was voted on.

4          MS. PALMER:  And if we could go to page 517,

09:16AM  5  page 1, please.

6    Q      So this here, is this the recommendation in favor

7  of the Luxe Hotel project that was advanced through PLUM?

8    A      Yes.  This would be the PLUM Committee report.

9  So this would be the report that outlines the recommendation

09:17AM  10  for the Luxe Hotel project, and this report would be forwarded

11  to the City Council.

12          MS. PALMER:  And if we can go to page 3, please,

13  and zoom in on the summary and just the top half of the page,

14  please.

09:17AM  15    Q      So does this summarize that now at this point the

16  project can move forward to the next milestone?

17    A      That's correct.

18    Q      And who signed this?

19    A      Jose Huizar.

09:17AM  20          MS. PALMER:  And if we can zoom back out, please,

21  and zoom in on the persons who voted.

22    Q      And did Jose Huizar vote "yes"?

23    A      That's correct.

24          MS. PALMER:  Now, if we can go to Exhibit 931,

09:17AM  25  page 35, please.

1          Q        What does this signify?

2          A        December 13 is signifying the City Council

3     approval of the Luxe Hotel project and then December 14th being

4     another bonus payment check from Hazens to Synergy in the

09:18AM  5     amount of --

6          Q        Sorry.  Go ahead.

7          A        -- in the amount of $185,000.

8          Q        And for the December 13th City Council vote, did

9     Jose Huizar vote "yes"?

09:18AM 10          A        That's correct.

11          Q        And this $185,000 payment, what do you understand

12     that payment to relate to?

13          A        The next approval that had occurred.

14          Q        The third milestone?

09:18AM 15          A        That's correct.

16                   MS. PALMER:  Now, if we could go to -- scroll to

17     the next page.

18          Q        And there's some below the line items including a

19     check to the defendant in the amount of $33,507.

09:19AM 20                   Do you see that?

21          A        Yes.

22          Q        There's also a text message between the defendant

23     and George Chiang.

24                   Do you see that?

09:19AM 25          A        Yes.  This would be a text communication between

1    the defendant.

2            MS. PALMER:  And if we could go to 593I and look

3    at that, please.  And zooming in on those messages, please.

4        Q     So this is a text message exchange on

09:19AM   5    December 19th, 2017, with Raymond Chan on the left and

6    George Chiang on the right; is that correct?

7        A     Yes.

8        Q     And Raymond Chan is generally discussing certain

9    things relating to Hazens; is that correct?

09:19AM  10        A     I think there's a variety of subjects, but he

11    does mention Yuan, Chairman Yuan of Hazens.

12        Q     And does he say, "Last, please follow up with our

13    check"?

14        A     That's correct.

09:20AM  15            MS. PALMER:  And if we could go to Exhibit 633,

16    1, please.  And if we can zoom in on the check and the back of

17    the check.

18        Q     Is this, again, a copy of the check that the

19    defendant received through LABXG?

09:20AM  20        A     Yes.  This is a check from Synergy to LABXG on

21    December 27, 2017, in the amount of $33,507.

22        Q     And, again, it was deposited into the

23    East West Bank in Pasadena?

24        A     That's correct.

09:20AM  25            MS. PALMER:  If we can go to 931, page 38.

1    Q    And there's some additional entries here.  What

2    do they relate to?

3    A    These relate to e-mail communications,

4    specifically on January 10 and January 16th, with attachments

09:21AM   5    of those previous Excel sheets that we discussed related to the

6    PAC.

7    Q    And based upon your review of those attachments,

8    do they appear to show the same spreadsheet received as the one

9    we looked at back in November?

09:21AM   10    A    That's correct.

11    Q    And then on January 4th, was there an additional

12    payment from Hazens to Synergy?

13    A    Yes.  In the amount of $105,000.

14    Q    During this time period on January 11, are Huizar

09:21AM   15    and Chiang continuing to meet based upon the calendar entry?

16    A    That is correct.

17    MS. PALMER:  If we can zoom to the next page,

18    please.

19    Q    What is reflected here below the line?

09:22AM   20    A    These are meetings involving the defendant along

21    with the Chairman of Hazens, Jose Huizar, George Chiang, and

22    Jose Huizar's wife Richelle Rios, and then another meeting

23    between the defendant and Jose Huizar.

24    Q    And above the line there, is there also a

09:22AM   25    communication between George Chiang and Jose Huizar regarding

1    the PAC fundraising that we have been discussing?

2         A        Yes.  That communication is text communications

3    after those two meetings had just occurred.

4              MS. PALMER:  And if we could go to the next page

09:22AM  5    of the timeline, please.  Are these -- and then go to the next

6    page.

7         Q        What are we seeing here?

8         A        The March 9 PLUM approval.  That would be PLUM

9    approval for the Luxe Hotel project specifically related to the

09:22AM  10   development agreement, the contract between the developer and

11   the City.  And then there's subsequent meetings that were

12   occurring between Council Member Jose Huizar and George Chiang

13   at both city hall and Huizar's personal residence.

14             MS. PALMER:  And if we can go to the next page,

09:23AM  15   please.

16        Q        Then there's some below-the-line items relating

17   to the defendant.  Do those both relate to the PAC that we have

18   been discussing to benefit Richelle Rios?

19        A        That's correct.

09:23AM  20            MS. PALMER:  And if we could look at Exhibit 812,

21   please.

22        Q        Is this a text message chain between

23   Defendant Chan and George Chiang?

24        A        Yes.

09:24AM  25            MS. PALMER:  And if we can just zoom in on the

first three messages, please.

Q    The defendant said, "Good morning, *Seilo*.  In addition to the sign matter, please also, one, tell J that Yuan is coming in June.  We can talk about the PAC at that time."

Do you see that?

A    I do.

Q    And do you understand that to refer to the PAC to support Richelle Huizar?

A    That's correct.

Q    In the previous documents, we saw there was a $100,000 commitment that Jose Huizar was tracking from Hazens; is that correct?

A    Yes.

Q    And then to "Ask J whether he will support three more stories for ADC," do you see that?

A    I do.

Q    And then, finally, "And tell him that we help Richelle to secure the support from Thomas for tomorrow night's high school gala."  What do you understand that last item to refer to?

A    Richelle being a reference to Richelle Rios and Thomas from Thomas Feng of Oceanwide, high school gala being Salesian High School, the gala that we talked about yesterday that Richelle Rios was a fundraiser for and support a contribution to that gala.

1    Q        And as far as ADC -- I think it is something that

2  will be discussed later.  Just as a preview, what is ADC?

3    A        ADC is Arts District Center.  This will be

4  another development project that Defendant Chan was working on

09:25AM  5  with Jose Huizar to approve.

6    Q        And J, just to be clear for the record, do you

7  understand that to refer to Jose Huizar?

8    A        Yes.

9    Q        And then the defendant said, "Also, let's keep --

09:25AM 10  let's keep Monday lunch with S.K."  Who do you understand S.K.

11  to be?

12    A        Shawn Kuk, Jose Huizar's planning deputy.

13    Q        And then George Chiang responds in the

14  affirmative.

09:26AM 15           And if we can go through -- if we can go back now

16  to Exhibit 813.

17           This is a message from George Chiang to

18  Raymond Chan a few days later.  Does it appear that he is -- he

19  says, "Below are the items I'm talking to J about."  Do you

09:26AM 20  understand that to be Jose Huizar?

21    A        That's correct.

22    Q        And is he, again, doing a list of the items that

23  the defendant had told him to follow up on?

24    A        Yes.  It's my understanding these are the lists

09:26AM 25  that the defendant had just sent him in the previous chain.

1      Q      And it includes the item 1, "Tell Jose Huizar

2    that Yuan is coming in June and we can talk about the PAC at

3    that time."

4             Is that correct?

09:26AM   5    A      Yes.  This is including all the elements from

6    that chain, specifically elements related to projects and

7    things related to benefits.

8             MS. PALMER:  And if we can go to Exhibit 598F.

9    Sorry.  Can we go to 931 at page 46.

09:27AM   10   Q      What are we seeing here?

11     A      A meeting that occurred on May 18th between

12   Defendant Chan and Jose Huizar and George Chiang as well as an

13   update to a radar screen of the defendant's.

14            MS. PALMER:  And so can we look at defendant's

09:27AM   15   radar screen update from the same day, 45A at 3, please, and

16   zoom in on the top half.

17     Q      And looking at the arrangements, there's

18   something that says, "PAC (after announcement in September)."

19            What did you understand "after announcement" to

09:28AM   20   refer to?

21     A      At this time Richelle Rios hadn't announced her

22   candidacy yet.  There was a specific time in which candidates

23   will actually announce -- it's a period of time you can

24   officially start your fundraising, and her announcement was

09:28AM   25   scheduled to occur in September.

1      Q       And to be clear, this entry is under a larger

2   umbrella titled "Hazens Chairman Yuan weekly WeChat"?

3      A       That's correct.

4      Q       And to the right of that entry "PAC after

09:28AM  5   announcement in September," it appears to be a grayed-out

6   entry; is that correct?

7      A       Yes.  The grayed-out entry "Talked to Jose Huizar

8   May 18th."

9      Q       And you saw reflected in the records that he had

09:29AM 10   talked to him that day?

11      A       On the timeline, the triangle meeting is a

12   reflection of that event occurring.

13              MS. PALMER:  If we can go to Exhibit 921 at

14   page 48, please.  48.

09:29AM 15              THE WITNESS:  I believe it's 931, page 48.

16      Q       BY MS. PALMER:  And what do we see here,

17   Special Agent Civetti?

18      A       These are communications between Jose Huizar and

19   George Chiang on the day and then after the June 12

09:30AM 20   City Council approval of that development agreement for Hazens.

21      Q       And did Jose Huizar vote "yes" at that final

22   approval?

23      A       He did.

24      Q       And looking at the text message from the same day

09:30AM 25   between Huizar and George Chiang, 598G, and if we can zoom in

1    on the top three messages with Jose Huizar being the blue and

2    George Chiang being the green.  And can you please read

3    Jose Huizar's first and second messages.

4         A      "DA for Hazens just passed council today.  Does

09:30AM  5    that mean project has been fully entitled?  Is that our last

6    vote?"

7         A      And George Chiang responded, "Hi boss.  I think

8    so since Chairman doesn't want to do sign and TOT.  Let me

9    check."  Did you understand sign and TOT to be additional

09:31AM  10   elements or entitlements of the package that initially Hazens

11   was seeking?

12        A      That is correct.

13              MS. PALMER:  If we can go to the next page,

14   please, and zoom in on the first two messages.

09:31AM  15        Q      And then what did Jose Huizar say in response to

16   that?

17        A      "When is the Chairman coming into town?  We need

18   to finalize PAC stuff."  And I believe these messages were just

19   a few days after the previous messages.

09:31AM  20        Q      And what did George Chiang respond?

21        A      "Hi boss.  Sorry for the late reply.  Still out

22   with family on vacation.  I was told the Chairman should be in

23   late June or July.  Let me check in and let you know.  Thanks."

24              MS. PALMER:  And if we can go to 598H, please.

09:32AM  25        Q      Looking at the -- these are between the same two

1    people, Jose Huizar and George Chiang; correct?

2         A    Yes.

3              MS. PALMER:  If we can look at the first two

4    messages.

5         Q    Is Jose Huizar reaching out to ask about when is

6    the Chairman coming into town?

7         A    That's correct.

8         Q    And George Chiang responded, "It sure.  Let me

9    find out why."

10             And if we can go to the next two messages.

11             Can you read what Jose Huizar said?

12        A    "Any news on when he is coming into town?  Hoping

13   to catch dinner with him and talk about Richelle campaign."

14        Q    And George Chiang responds, "Hi boss.  Ray is

15   working on it.  I let you know after I see him in office

16   tomorrow."

17             By "Ray working on it," did you understand that

18   he meant the defendant Raymond Chan?

19        A    That's correct.

20        Q    And by "it," did you understand he meant the

21   communications with the Chairman that Raymond Chan was the one

22   communicating with him?

23        A    The "it" I understand to be Richelle's campaign.

24        Q    Okay.  Thank you.

25             Now if we can go to Exhibit 931, page 49.

1           There is an October 8th entry relating to a text

2    message "Re loose ends," and then there's a meeting between

3    Huizar and Chiang on October 16th; is that correct?

4           A       That is correct.

09:33AM  5           MS. PALMER:  If we can display Exhibit 598I,

6    please.

7           Q       Zooming in on the first two messages, can you

8    read what Jose Huizar wrote to George Chiang?

9           A       "Hey, George.  Have time to meet soon to tie up

09:34AM  10   some loose ends re the Hazens project?"

11          Q       And are there a series of messages in which they

12   talk about where to meet and then eventually in the messages

13   they actually meet?

14          A       That is correct.

09:34AM  15          MS. PALMER:  And now if we can go to Exhibit 921

16   at page 48 -- 931 at page 48.  And if we can go to 49, please.

17          Q       And is this the last entry on this timeline?

18          A       That's correct.

19          Q       And this was October 28th, 2018?

09:34AM  20          A       This is the October -- the end of the timeline is

21   October 2018.  That's correct.  The last entry was

22   October 16th.

23          Q       And did the FBI execute a series of search

24   warrants in this case on November 7th, 2018?

09:35AM  25          A       That's correct.

1      Q      And for the other timeline modules you prepared

2   in this case, for example, the Shen Zhen ones, did they end at

3   a similar period in the fall of 2018?

4      A      That's correct.

09:35AM   5      Q      Now, did you prepare other timelines in

6   conjunction with trial for this case?

7      A      Yes.

8      Q      And what were those timelines that you prepared?

9      A      Those timelines also related to another

09:35AM   10   development project, the Arts District Center that I had

11   mentioned, specifically the defendant's role along with

12   Shawn Kuk and an individual Andy Wang for events that were

13   occurring around that same time period.  I also prepared a

14   timeline related to Defendant Chan, Joel Jacinto, Andy Wang,

09:36AM   15   George Chiang for a period of time as well.

16      Q      And are those timelines reflected at

17   Exhibits 940, 940A, and 940B with respect to Joel Jacinto?

18      A      That's correct.

19      Q      And 942, 942A with respect to the defendant and

09:36AM   20   Shawn Kuk?

21      A      I believe 942B as well, but yes, that's correct.

22      Q      And then 942B would involve Chan and Wang?

23      A      That's correct.

24            MS. PALMER:  Your Honor, at this time the

09:36AM   25   Government would move to admit Exhibits 940, 940A, 940B.

```
 1                    THE COURT:  Those will be admitted without
 2   objection.
 3                       (Marked for identification and received
 4                   into evidence Exhibit Nos. 940, 940A, and 940B.)
 5                    MS. PALMER:  And then 942, 942A, and 942B.
 6                    THE COURT:  Those will be admitted without
 7   objection.
 8                       (Marked for identification and received
 9                   into evidence Exhibit Nos. 942, 942A and 942B.)
10        Q      BY MS. PALMER:  So we're not going to show those
11   in this portion of your testimony.  I'd like to move on to the
12   discussion of the overt aspect of your investigation.
13                    Did you also prepare a timeline relating to that?
14        A      Yes.
15        Q      Is that Exhibit 943?
16        A      That's correct.
17                    MS. PALMER:  Your Honor, at this time we move to
18   admit Exhibit 943.
19                    THE COURT:  All right.  943 will be admitted
20   without objection.
21                       (Marked for identification and received
22                   into evidence Exhibit No. 943.)
23                    MS. PALMER:  If we can publish page 1.
24        Q      When does this timeline begin?
25        A      September 2018.
```

1          MS. PALMER:  And if we can go to page 2.

2     Q     What is the first entry on this timeline?

3     A     September 5th, two events occurring on

4 September 5, the first one with the FBI seal being a recorded

09:37AM  5 call that I had with Defendant Chan requesting an interview.

6     Q     What was the purpose of that call?

7     A     The purpose of the call was to set up an

8 interview.  The FBI was looking to interview Defendant Chan to

9 kind of test his credibility given the information we had

09:38AM  10 received thus far.

11     Q     And were you requesting information specifically

12 about the investigation?

13     A     Not specific to this investigation, no.

14     Q     And during this time period, did you have a bug

09:38AM  15 in defendant's office that could intercept both audio and video

16 live?

17     A     That's correct.

18     Q     And during the phone call that you had with the

19 defendant, were you, therefore, able to watch him?

09:38AM  20 A     Yes.  I was watching the video as I placed that

21 phone call.

22     Q     And you were able to listen to it afterwards?

23     A     Well, I was on the phone, so I was listening to

24 it.

09:38AM  25 Q     But you could watch the video with audio

1  afterwards as well?

2      A      The video doesn't capture the audio, but there

3  was recording devices in the office as well.  But I recorded

4  through the phone line because we had a wiretap up on his phone

09:39AM  5  as well.

6      Q      Was there anyone in the room with the defendant

7  when you called?

8      A      Based on the angle of the video, I did not see

9  anyone else present except the defendant.

09:39AM  10     Q      And when you talked to the defendant, did you ask

11  that he not disclose that the FBI was investigating -- was

12  wanting to speak to him?

13     A      I did make that request.

14     Q      And did the defendant agree?

09:39AM  15     A      He did.

16     Q      And why did you make such a request?

17     A      I made the request because earlier in the

18  afternoon I made similar requests to subjects of the

19  investigation, and following their agreement, they then -- we

09:39AM  20  intercepted the phone calls in which they then did disclose.

21  So part of this was to test subjects' credibility and then

22  determine whether they were going to be truthful or not.  So

23  making this request was a common practice.

24     Q      And was one of those that you're referring to a

09:40AM  25  call that we heard where Justin Kim called George Esparza after

1    the FBI had spoken with him?

2         A      Yes.  That's correct.

3         Q      Why specifically were you not going to be asking

4    about the subject of this investigation?

09:40AM    5         A      As I mentioned, we wanted to see whether the

6    defendant would be truthful in testing their credibility on

7    subject matters not specifically related to them.

8    Specifically, we were determining at this point, if we had

9    revealed all of the investigation, it could potentially

09:40AM    10   jeopardize the integrity of the investigation.

11        Q      What do you mean by the integrity of the

12   investigation?

13        A      Well, as soon as we start interviewing people and

14   go overt and start revealing aspects of the investigation were

09:40AM    15   concerns that they will then talk with other subjects of the

16   investigation.  And the integrity -- we want to make sure that

17   the various witnesses we talked to haven't been talking with

18   other subjects in which their stories could be aligning or

19   changing.

09:41AM    20        Q      And is -- are you concerned also about

21   destruction of evidence?

22        A      Yes.  We are concerned about destruction of

23   evidence.

24        Q      And so when you talked to the defendant, did you

09:41AM    25   schedule a time to come back and actually visit him in his

1    office?

2        A        Yes.  I believe it was about a week later.

3        Q        And after you got off the phone with him, did you

4    intercept a call that's reflected there with the defendant and

09:41AM  5   George Chiang?

6        A        I continued to view the video, and then we

7    intercepted the communications between defendant and

8    George Chiang from the office and conference room audio bugs.

9        Q        And so did you view the defendant get up from his

09:41AM  10  office and go and speak with George Chiang after getting off

11   the phone with you?

12       A        Almost immediately after hanging up the phone,

13   the defendant, I could see, get up from his chair behind his

14   desk and exit the office.  I didn't view anyone else in that

09:42AM  15  room at the time.  And then, yes, the audio was picked up from

16   in the conference room or his office of a discussion.  I did

17   not see him though.

18            MS. PALMER:  If we could go to Exhibit 189 and

19   play that, please.

09:43AM  20           (The audio commenced playing before the jury.)

21       Q        BY MS. PALMER:  How, if at all, did the

22   defendant's behavior after this interview affect your

23   investigation?

24       A        I felt the behavior was concerning.

09:43AM  25       Q        Why?

1    A    Because I had just had a phone call in which I

2    requested that the -- my phone call was not disclosed and the

3    defendant had agreed not to disclose it and then, immediately

4    following that phone call, he then did, in fact, disclose the

09:44AM  5    fact that I had called.  Specifically, he was disclosing to

6    another subject of the investigation.

7              MS. PALMER:  And if we could go back to

8    Exhibit 943, page 2, please.  Sorry.

9        Q    On this where defendant said, "I hope it's not --

09:44AM  10   I hope it's not related to Jose," was that of any relevance to

11   your investigation?

12       A    Yes.  We had been investigating Jose Huizar, and

13   I understand this reference to be Jose Huizar and George Chiang

14   hoping it was not related to Jose, my interview.

09:44AM  15       Q    I'm sorry.  George Chiang said that, not the

16   defendant.

17       A    Right.  George Chiang said that.

18       Q    And then did you actually visit the defendant's

19   office to conduct an interview?

09:44AM  20       A    Yes.  On September 12, 2018.

21       Q    I'm just going to play a small portion of that

22   interview because you said the topic of that interview did not

23   get into the investigation of this case; is that correct?

24       A    Yes.  Given the concern I had, the FBI decided

09:45AM  25   that we would not disclose the larger investigation.

1    Q      And at this time you had not done the search

2  warrants and all of those other very public acts; is that

3  correct?

4    A      That's correct.

5            MS. PALMER:  And if we can go to 190,

6  Exhibit 190, please.  And if we can play that.

7            (The audio commenced playing before the jury.)

8    Q      BY MS. PALMER:  Special Agent Civetti, based upon

9  your review of the videos and the audio bugs, was defendant in

10  a meeting with staff members from Synergy when you called him?

11    A      Based on the camera angle that I could see, there

12  was no one else in the office.  And when the call was

13  immediately hung up, defendant left the office to speak with

14  George Chiang.

15    Q      And then did anything of note happen -- anything

16  of note to the investigation happen after you left the office?

17    A      Yes.  After I left the office, we had FBI

18  personnel monitoring the videos, and those videos then I

19  reviewed after the fact.  And in reviewing those videos shortly

20  after leaving, the defendant was examining the chairs that we

21  had sat in.

22            MS. PALMER:  And if we could go to Exhibit 209,

23  please.  And if we could play it.

24            (The video commenced playing before the jury.)

25    Q      BY MS. PALMER:  What are we looking at,

1    Special Agent Civetti?

2         A       This would be the angle -- this angle is from

3    defendant's desk looking toward the door on the left and the

4    wall.  There's two chairs behind that desk.  So the defendant

09:50AM  5    is to the left.  I was there that day.  So I recognized the

6    clothing he was wearing and that that was, in fact, the

7    defendant and that was, in fact, the defendant's office.

8                  And then there's two chairs, and I was sitting --

9    the arrows pointing to the defendant's chair and there are --

09:51AM  10   you can't see them clearly visible, but there's the top white

11   part of one of the chairs can be seen to the kind of middle

12   right.  I was sitting there.

13                 MS. PALMER:  Okay.  And if we can continue

14   playing it.

09:51AM  15                 (The video commenced playing before the jury.)

16                 MS. PALMER:  Okay.  If we can go ahead and stop

17   it.

18        Q       Special Agent Civetti, what did you observe in

19   that video?

09:52AM  20        A       I observed the defendant examining the chairs

21   that both myself and the another agent had sat in.

22   Specifically, the video you can see the chairs being turned

23   upside down as well.

24        Q       And how did the defendant's behavior after the

09:53AM  25   interview affect your investigation?

1    A    The initial concerns -- impression I had from the

2    beginning, it only continued.

3         MS. PALMER:  If we could go to Exhibit 943 at

4    page 4, please.

09:53AM  5    Q    Is the next item on the timeline the November 7th

6    search warrants, interviews, and subpoenas?

7         A    Yes.  That's correct.

8         Q    And can you describe briefly at a high level how

9    many search warrants and interviews and subpoenas were served

09:53AM  10   that day?

11        A    So on November 7th, 2018, the FBI executed 16

12   search warrants around the city including Council Member

13   Jose Huizar's house and two of his City offices.  We also

14   conducted search warrants with other subjects of the

09:53AM  15   investigation and a number of interviews.

16        Q    And why did you do all of these things at once?

17        A    We wanted to conduct this activity

18   simultaneously, and we already had concerns of subjects

19   disclosing aspects of the investigation or at least the fact

09:54AM  20   that the FBI was investigating.  So we were concerned that if

21   we had not simultaneously interviewed subjects, that they would

22   then talk amongst each other and either change or align their

23   stories.

24        Q    And among the locations searched, did you search

09:54AM  25   Jose Huizar's house as well as his council office?

1      A      Yes.  That's correct.

2      Q      And were you -- did you personally participate in

3   those searches?

4      A      I did.  I personally participated in the

09:54AM  5   execution at Jose Huizar's residence, and then I shortly

6   thereafter went to his city hall office.

7      Q      And what were you searching for?

8      A      We were searching for a variety of items

9   including documents, computers, digital devices, cash, any

09:54AM  10   evidence of benefits being provided.  We had been investigating

11   these development projects.  So any records related to the

12   development projects as well as the fundraising and documents

13   related to Richelle Rios's campaign.

14      Q      And you seized a number of digital items as well?

09:55AM  15      A      Yes.  We found a number of digital devices

16   throughout the residence.  We had an electronic sniffing dog

17   who was able to go through and help us locate different

18   devices.  There were multiple computers, thumb drives, old cell

19   phones, et cetera.

09:55AM  20      Q      Did you find cash at Jose Huizar's residence?

21      A      The FBI did locate cash.  That's correct.

22      Q      And how much cash did the FBI locate?

23      A      Approximately $129,000 in cash.

24      Q      Are photographs of the cash marked as exhibits in

09:55AM  25   this case?

```
 1         A      I believe it's -- yes.  That's correct.

 2         Q      And are they Exhibits 210 and 211?

 3         A      That's correct.

 4                THE COURT:  210 and 211 will be received into

 5     evidence without objection.

 6                (Marked for identification and received

 7                into evidence Exhibit Nos. 210 and 211.)

 8                MS. PALMER:  If we can bring up Exhibit 210,

 9     please.

10         Q      What are we seeing here, Special Agent Civetti?

11         A      This is a photograph that was captured the day of

12     the searches.  This is specifically the lower half of

13     Jose Huizar's closet in his bedroom.  On the floor is an

14     envelope and a T-shirt.  The envelope, you can see cash coming

15     out the top of it.

16         Q      Is that how it was found?

17         A      The cash was found in that envelope, and those

18     two envelopes were bundled up inside that T-shirt Our Town

19     El Soreno.

20         Q      And what is the item that the money was in?

21         A      Can you repeat your question?

22         Q      Was it in this manila folder, or was it in any

23     other item?

24         A      Yes.  It was in that envelope, bundled in that

25     envelope.
```

1          MS. PALMER:  And if we can scroll through and

2     look at the other photographs.

3          Q     And is that the cash laid out?

4          A     Yes.  The photo there is the cash that was all

09:57AM  5     bundled in that T-shirt.  There was cash also found other

6     places.

7          MS. PALMER:  And if we can zoom back out.

8          Q     And where was this cash found?

9          A     This cash was found in the suit jacket pocket of

09:57AM 10     one of the suit jackets that was hanging in the closet.

11     Specifically, it was in a money bag or a type of case that you

12     can see is unzipped, and that would be the cash that was in

13     that zipped money bag in the coat pocket of one of the hanging

14     coats.

09:57AM 15          Q     And all of the cash here is in hundred dollar

16     bills that you can see?

17          A     Yes.  I believe most, if not all, of the cash was

18     in hundred dollar bills in bundles.

19          MS. PALMER:  And if we can bring up Exhibit 211,

09:57AM 20     please.

21          Q     Was this also cash found in Jose Huizar's home?

22          A     Yes.  That's correct.

23          Q     And the -- there are red envelopes on the left

24     and cash laid out on the right.  Was that cash found in red

09:58AM 25     envelopes?

599

1       A       Yes.  Those -- that's the cash laid out.  It was

2   originally found within a row of cash.  That would be the

3   amount of cash that was in that red pocket.

4       Q       And what did the FBI do with the cash after it

09:58AM   5   was seized from Jose Huizar's house?

6       A       The cash was seized, counted a second time,

7   submitted to evidence.  And then from evidence the FBI engaged

8   in forfeiture procedures.

9       Q       And what does it mean when something is forfeited

09:58AM  10   by the FBI?

11       A       The term forfeiture, it's a process that we go

12   through for the Government to claim possession or ownership of

13   that specific property.

14       Q       Why did you forfeit the cash from Jose Huizar's

09:58AM  15   house?

16       A       The cash, we believed, was proceeds of crimes.

17   So when there is assets, specifically cash, sometimes it could

18   be cars, boats, products that illicit proceeds were utilized,

19   we have a forfeiture jurisdiction.

09:59AM  20       Q       And the illicit proceeds that you were

21   investigating here were the proceeds of bribery?

22       A       Yes.  These would be what we believed to be

23   proceeds of bribery, the cash found in the house.

24       Q       And what else is the FBI able to forfeit in a

09:59AM  25   bribery case?

1    A       As I mentioned, we could forfeit items.  So if we

2  believe that a luxury boat was purchased with cash from a crime

3  of bribery, then potentially a boat, a car, a home.  That

4  wasn't the aspect in this investigation, but it could also be

09:59AM   5  bank accounts, and that was another part of what we were

6  looking to forfeit.

7    Q       So when you say bank accounts, if someone were to

8  pay a bribe that then went into a bank account, would that

9  account potentially be subject to seizure regardless of what

09:59AM   10  type of account it was?

11    A       Yes.  That is correct.

12    Q       And these search warrants, were they -- was that

13  how you obtained some of the evidence that we have covered

14  during your direct testimony?

10:00AM   15    A       Yes.

16    Q       Now, are you aware whether the execution of

17  search warrants in this case was publicized in the media?

18    A       Yes.  It was my understanding it was widely

19  publicized.  Not only did I see news media after the search

10:00AM   20  warrant occurred, but during the search warrants, there were

21  helicopters and news vans around Jose Huizar's residence.

22    Q       And did you also review news media afterwards

23  that, at least one clip showing, that's been marked as a

24  Government exhibit?

10:00AM   25    A       Yes.  I reviewed the news media, and then the

1    Government exhibit specifically is just the video.  The audio

2    is not included.  It's only an excerpt.

3         Q       Is that Government's Exhibit 102?

4         A       That is correct.

5                 MS. PALMER:  Your Honor, at this time the

6    Government moves to admit Exhibit 102 and play it.

7                 THE COURT:  All right.  102 will be admitted

8    without objection.

9                 (Marked for identification and received

10                into evidence Exhibit No. 102.)

11                (The video commenced playing before the jury.)

12                MS. PALMER:  If we can pause it for a moment.

13        Q       Is this -- what we're looking at here, can you

14   orient the jury, please?

15        A       These are a number of FBI agents leaving the

16   residence of Jose Huizar's house with items in their hands.

17   That would be some of the items that we seized from the

18   residence.

19                MS. PALMER:  If we can continue now.

20                (The video commenced playing before the jury.)

21                MS. PALMER:  If we can pause.

22        Q       Is this the search of the -- of Jose Huizar's

23   office?

24        A       Yes.  This would be his office at city hall.

25                MS. PALMER:  If we can continue.

1           (The video commenced playing before the jury.)

2               MS. PALMER:  If we can go to Exhibit 943, page 5,

3     please.

4       Q       The next items on the timeline are November 7th,

10:02AM  5     November 8th interviews of the defendant; is that correct?

6       A       That's correct.

7       Q       And are the -- is the November 7th interview the

8     interview that is the subject of the false statements in this

9     case?

10:02AM 10      A       That is correct.

11      Q       We are going to listen to those at a later point

12    in this case.  So I will go ahead and move on to the next item

13    if we can scroll down.

14              A few days after that, was Chairman Huang

10:02AM 15    interviewed?

16      A       That's correct.  At Chairman Huang's residence.

17      Q       And was this a voluntary interview?

18      A       Yes.  It was a voluntary interview.  And when I

19    went to interview Chairman Huang, I introduced myself as an FBI

10:03AM 20    agent and told him that I was there to discuss his relationship

21    with Jose Huizar and basically the high level that we were

22    investigating.

23              MS. PALMER:  And if we can go to the next entry,

24    please.

10:03AM 25      Q       Does this reflect that on November 7th the FBI

```
 1   executed search warrants and served subpoenas on the
 2   defendant's office?
 3        A      This represents the searches at defendant's
 4   office, but it was on November 14th.  So a week after our
 5   searches on November 7th we had issued a number of subpoenas to
 6   developers on that day and specifically that day being
 7   November 7th.  And on November 14th we executed search warrants
 8   at the Synergy CCC office that the defendant worked, and I
 9   personally provided a subpoena for those companies to the
10   defendant.
11        Q      And just to remind the jury, a subpoena is an
12   order from the Court to produce certain documents; is that
13   correct?
14        A      That's correct.
15        Q      And are those marked as previously admitted
16   Exhibits 231 and 232?
17        A      Yes.  Those are the subpoenas.
18             MS. PALMER:  If we can just briefly look at the
19   subpoena 231, page 3.
20        Q      Is that the front of the subpoena?
21        A      Yes.  This would be the cover page of the
22   subpoena to Synergy Alliance.
23             MS. PALMER:  If we can go to the next page,
24   please.
25        Q      What is this, Special Agent Civetti?
```

10:03AM (line 5)
10:03AM (line 10)
10:04AM (line 15)
10:04AM (line 20)
10:04AM (line 25)

1          A        This would be the subpoena attachment, so

2     included with the cover page, that orders the production of

3     documents.  This would be the attachment outlining what

4     documents must be produced.

10:04AM   5          Q        And is there a specific time period for which you

6     requested documents?

7          A        Yes.  The FBI was requesting documents from

8     January 2013 to present which would be November of 2018.

9          Q        And specifically, then, are there topics that are

10:05AM   10    included below that?

11         A        Correct.  There's a number of categories.

12         Q        And those topics include, for example,

13    Jose Huizar, Richelle Rios Huizar, George Esparza, Shawn Kuk,

14    Los Angeles Council District 14, and the PLUM Committee?

10:05AM   15        A        The different categories would be, say,

16    communications benefits, et cetera, and then within each

17    category we were looking for records related to this group,

18    among others.

19         Q        Now, did you obtain documents relevant to the

10:05AM   20    investigation in response to that subpoena?

21         A        Yes.

22         Q        Are those documents relating to the contract of

23    Deron Williams, Jr.?

24         A        Yes.  I believe the contract was provided in the

10:05AM   25    document production, and the actual physical contract was

```
 1   seized during the execution at the CCC Synergy office.

 2        Q      And are those marked as Exhibits 701, 715, and

 3   716?

 4        A      Yes.  All of those would be among the documents

 5   produced or from the search warrant.

 6               MS. PALMER:  Your Honor, at this time the

 7   Government moves to admit Exhibits 701, 715, and 716 as

 8   previously stipulated.

 9               THE COURT:  All right.  They will be admitted

10   without objection.

11               (Marked for identification and received

12               into evidence Exhibit Nos. 701, 715 and 716.)

13        Q      BY MS. PALMER:  Did you also take photographs of

14   Synergy's office as part of your investigation?

15        A      That is correct.

16        Q      Are those marked as Exhibit 101?

17        A      Yes.

18               THE COURT:  All right.  101 will be received into

19   evidence without objection.

20               (Marked for identification and received

21               into evidence Exhibit No. 101.)

22               THE COURT:  How much longer do you have?

23               MS. PALMER:  One page.  Probably about five

24   minutes.

25               THE COURT:  Okay.  Go ahead.
```

1          MS. PALMER:  If we can pull up Exhibit 101

2     briefly.

3          Q     Is this -- are these photographs of Synergy's

4     office?

10:06AM  5          A     That is correct.

6          MS. PALMER:  And if we can please just scroll

7     through.

8          Q     Is this the conference room on page 2?

9          A     Yes.  This would be the conference room that we

10:07AM  10    had the audio and visual bugs.

11         MS. PALMER:  And scroll through to the next and

12    the next.

13         Q     And what is this going to page 4?

14         A     This is George Chiang's office.

10:07AM  15         Q     And going to page 5, what is this?

16         A     Raymond Chan's office.

17         Q     Now, if we can go to the timeline, 943 at page 8,

18    the next item is the Ricky Zheng search warrant and interview.

19    Did you personally execute the search warrant and interview?

10:07AM  20         A     There were a number of FBI agents present.  I

21    didn't do it alone, but yes.  A search warrant was executed,

22    and I interviewed Ricky Zheng.

23         Q     And, generally speaking, what were the topics of

24    the interview?

10:07AM  25         A     The topics of the interview with Ricky Zheng

1     related to Jose Huizar, George Esparza, the Vegas trips, the

2     settlement payment, and Defendant Chan.

3            Q       And without saying what Mr. Zheng told you, was

4     it your belief that Mr. Zheng was truthful or not entirely

10:08AM  5     truthful during that interview?

6            A       Not entirely.

7                    MS. PALMER:  Now if we can go to the next page of

8     the timeline, please.

9            Q       What is this?

10:08AM  10           A       This would be the next day, November 20th.  This

11    point on the timeline represents travel records that I had

12    reviewed related to Wei Huang, and those travel records

13    indicated that the day after my interview with Ricky Zheng,

14    Chairman Huang left the United States.

10:08AM  15           Q       And you previously had testified that you had

16    observed Chairman Huang's travel and that you had obtained

17    records to track that travel before this time; is that correct?

18           A       That is correct.  I reviewed his travel from 2013

19    to 2018.

10:09AM  20           Q       And how frequently during that period on average

21    was he visiting the United States?

22           A       Anywhere from four to ten times.

23           Q       And after he left his flight on November 20th,

24    did he return to the United States?

10:09AM  25           A       He has yet to return.

1    Q       Does the FBI consider Chairman Huang to be a

2    fugitive?

3    A       That is correct.

4            MS. PALMER:  Now going to the last item on the

10:09AM  5   timeline, Exhibit 943 at page 11 -- at page 10.

6    Q       And what is this, Special Agent Civetti?

7    A       This represents an event that occurred on

8    November 24th.  This is a meeting between the defendant and

9    Andy Wang.  I had provided Andy Wang a recording device and

10:09AM  10  instructed him to record a meeting with Defendant Chan.

11   Q       And so at that time Andy Wang was cooperating

12   with the Government's investigation?

13   A       Yes, he was.

14   Q       And is he still cooperating with the Government's

10:10AM  15  investigation?

16   A       Yes.

17   Q       And why did you provide -- why did you include

18   this on the timeline?

19   A       I included this on the timeline because, after

10:10AM  20  the November 14th search warrants at the defendant's office and

21   the subpoenas served, the defendant contacted Andy Wang and

22   requested a meeting with him.

23   Q       And did anything happen at that meeting that

24   affected your investigation?

10:10AM  25  A       Yes.  Defendant Chan provided Andy Wang a

1    document.

2         Q      And did you receive a copy of that document?

3         A      I did.

4         Q      Is that document marked as Government's

10:10AM 5    Exhibit 801?

6         A      Yes.

7         Q      In reviewing that document, without discussing it

8    in detail, was it your understanding that it was a full

9    accounting or less than a full accounting of the facts?

10:10AM 10        A      I believed it was a less accounting and that

11   there was material information that had been left out.  Given

12   that I had instructed Andy Wang to do multiple recordings with

13   Ray Chan throughout the investigation and, based on my review

14   of those recordings and the communications between them, I

10:11AM 15   understood that some of the information that was material to my

16   investigation was not included on that document.

17        Q      And was that a concern to you?

18        A      It was a concern.

19        Q      Why?

10:11AM 20        A      Because part of -- after the intercepted calls

21   with Justin Kim, George Esparza, and then the defendant's

22   behavior that I observed earlier in September, the

23   investigation was concerned with some of our witnesses being

24   affected by subjects and whether that -- they were trying to

10:11AM 25   change or alter stories and tamper with witnesses.  It would

1    affect the integrity of the investigation.

2         Q     Why is the integrity of the investigation

3    important, Special Agent Civetti?

4         A     The whole purpose of a federal investigation is

10:11AM   5    to find the truth and to find whether crimes had been

6    committed.  So during this truth-seeking mission, you can say,

7    we're looking to determine the facts that happened.  And if

8    witnesses are being presented with information that is not

9    consistent with the facts, that would affect the integrity of

10:12AM   10   the investigation.

11         Q     And did any other witness in the investigation

12   advise you that they had been provided a similar type of

13   document from the defendant?

14         A     Yes.  George Chiang.

10:12AM   15              MS. PALMER:  Your Honor, may I have a moment?

16              THE COURT:  Your moment is going to be the end of

17   your investigation.

18              MS. PALMER:  No furthers questions, Your Honor.

19              THE COURT:  All right.  We will take our first

10:12AM   20   morning break.

21              THE CLERK:  All rise for the jury.

22              (A recess was taken at 10:12 a.m.)

23              (The following proceedings were held in

24              open court in the presence of the jury:)

10:30AM   25              THE COURT:  All right.  The jury is present.  All

         1    counsel and the defendant are present.

         2                    Mr. Braun, cross-examination.

         3                    Mr. Braun, if you raise that podium up, the

         4    microphone will be closer to you.

10:31AM  5                    MR. BRAUN:  Thank you, Your Honor.

         6                         **CROSS-EXAMINATION**

         7    BY MR. BRAUN:

         8         Q    Agent Civetti, let's start at the end where we

         9    talked about this Andy Wang.  You set up a meeting with

10:31AM 10    Ray Chan.

        11         A    That's correct.

        12         Q    Now, Andy Wang is someone who had been working

        13    with you for months; isn't that correct?

        14         A    That's correct.

10:31AM 15         Q    Okay.  He had been caught bribing certain people;

        16    correct?

        17         A    We were investigating the benefits that Andy Wang

        18    had been providing to City officials.

        19         Q    So you had him under investigation for bribery;

10:31AM 20    correct?

        21         A    We were investigating him for bribery; correct.

        22         Q    You had a case on him.  It wasn't filed yet, but

        23    you caught him -- you had the evidence; right?

        24         A    He was part of this large investigation.  That's

10:32AM 25    correct.

1      Q      Okay.  So he basically is working for you;

2  correct?

3      A      He agreed to cooperate with the Government.

4      Q      You wired him up so that when he talked to my

10:32AM  5  client, you would have a recording; right?

6      A      Yes.  I instructed Andy Wang to record all of the

7  conversations he had with the defendant.

8      Q      And the defendant -- Mr. Chan worked for many

9  months with Mr. Wang; correct?

10:32AM  10      A      What do you mean by "worked"?

11      Q      Well, he had a company where he was going to

12  outfit kitchens and has electronics for new buildings; correct?

13      A      Yes.  Andy Wang had multiple companies.

14      Q      Yeah.  And so Ray Chan helped Andy Wang for

10:32AM  15  months setting up his company, hiring people; correct?

16      A      Yes.  Mr. Chan was assisting Andy Wang.

17      Q      You had hundreds of hours -- you must have had

18  hundreds of hours of Andy Wang talking to Mr. Chan; is that

19  correct?

10:33AM  20      A      I'm not sure if it was hundreds of hours, but we

21  did have a number of recordings between the two of them.

22      Q      Did Ray Chan ever get any money from Andy Wang

23  for all these months of work?

24      A      I'm not aware of Andy Wang paying Defendant Chan.

10:33AM  25      Q      So basically, as far as you know, Ray Chan was

1    working for nothing; correct?

2         A    You could characterize it that way.

3         Q    Well, if you're working and not getting paid,

4    you're working for nothing; correct?

5         A    There was no formal contract between the two.

6    There was no compensation agreed upon.  So working is a very

7    large term for the assistance Mr. Chan was providing to

8    Andy Wang.

9         Q    Well, he recommended employees for Mr. Wang;

10   correct?

11        A    He did recommend Andy Wang to hire someone.

12        Q    And that was Ave Jacinto?

13        A    Yes.  Ave Jacinto, the wife of the Public Works

14   Commissioner Joel Jacinto.

15        Q    When you're a wife in our system, you're not a

16   slave; correct?

17        A    A slave?

18        Q    Yeah.  You're allowed to hire someone who's

19   someone's wife; correct?

20             MS. PALMER:  Objection, Your Honor.

21   Argumentative.

22             THE COURT:  Overruled.

23             THE WITNESS:  Can you repeat your question?

24        Q    BY MR. BRAUN:  Well, your theory is that Ray Chan

25   basically got a job for Ave Jacinto in order to influence her

1    husband; correct?

2        A       Yes.  We were investigating whether benefits were

3    being provided to City officials and specifically to

4    Joel Jacinto, the Public Works Commissioner.

10:34AM  5        Q       And you've investigated how much work she did for

6    how much money she got; right?

7        A       Yes.  I'm aware of the money and work that

8    Ave Jacinto performed for Andy Wang.

9        Q       Let's go back to the meeting.

10:34AM  10              You tell Andy Wang to set up a meeting with

11   Ray Chan and -- because there's a subpoena to get advice from

12   Ray Chan; correct?

13       A       There -- you need to time qualify it.  After the

14   subpoenas were served to developers on November 7th, we did

10:35AM  15   instruct Andy Wang to inform the defendant that he had received

16   a subpoena himself and that that subpoena had been received.

17       Q       And the purpose was to have them meet, record my

18   client telling him to lie; correct?

19       A       The purpose was to see what the defendant would

10:35AM  20   do in response to Andy Wang receiving a subpoena.

21       Q       And he told him to tell the truth; correct?

22               MS. PALMER:  Objection.  Hearsay, Your Honor.

23               THE COURT:  Overruled.

24               THE WITNESS:  Based upon my review of the text

10:35AM  25   messages, he did tell him to tell the truth.

1        Q       BY MR. BRAUN: And that interview is -- the

2 discussion between your informant Andy Wang and Ray Chan while

3 he's being wired -- bugged by you is a tape-recording; correct?

4        A       Which one are you referring to?

10:35AM   5        Q       The meeting about the grand jury subpoena that

6 you told -- that they were supposed to meet; correct?

7        A       The timeline, as I recall it, is that Andy Wang

8 had sent Ray Chan a text message saying he had received a

9 subpoena. The defendant then told him he should meet with a

10:36AM 10 lawyer, tell the truth. From there there was no more

11 communication that I instructed Andy Wang to have with

12 Raymond Chan. And then after the search warrants were executed

13 at Raymond Chan's office, Raymond Chan then reached out to

14 Andy Wang and requested a meeting that I then instructed

10:36AM 15 Andy Wang to record.

16        Q       And it was recorded; correct?

17        A       It was recorded.

18        Q       And that was the -- that was a meeting where my

19 client told Andy Wang, "Tell the truth"; correct?

10:36AM 20        A       I don't --

21        MS. PALMER: Objection. Hearsay.

22        THE COURT: Overruled.

23        THE WITNESS: I believe that recording was about

24 an hour long. I don't recall the specific instruction of that.

10:36AM 25        Q       BY MR. BRAUN: Well, your report with the 302s

1    states, does it not, that Ray Chan told Andy Wang to tell the

2    truth.

3              MS. PALMER:  Objection.  Hearsay.

4              THE COURT:  Overruled.

10:36AM  5              THE WITNESS:  If you'd like me to review the

6    report.  I don't have any recollection sitting here today that

7    that specific phrase was used.

8        Q    BY MR. BRAUN:  So you've got a tape-recording,

9    you have a 302, and you can't remember whether my client told

10:37AM 10   your informant to tell the truth; is that right?

11       A    In a general sense, he was telling him to tell

12   the truth.

13       Q    Now, let's look at this case globally now rather

14   than just nitpick it together.

10:37AM 15             Now, my client -- let's see.  Councilman Huizar

16   went to Las Vegas with Mr. Wei Huang -- I get these names

17   confused.  I'm sorry -- with Wei Huang multiple times; correct?

18       A    Correct.

19       Q    Did Ray Chan ever go?

10:37AM 20       A    Not that I'm aware.

21       Q    So you flew to Las Vegas and looked at all the

22   records; correct?

23       A    I did.

24       Q    You have no evidence that he ever went; correct?

10:37AM 25       A    No.  I do not believe that Raymond Chan was on

1       the trips to Las Vegas.

2              Q       He told him not to go, didn't he?

3              A       I have no evidence that he told him not to go.

4       The messages and communications that I reviewed on multiple

10:38AM  5      occasions, he was actually coordinating or suggesting and

6       asking how the Councilman was doing in Vegas.

7              Q       With his family; right?  On that one message;

8       correct?

9              A       He did go to Las Vegas with his family.

10:38AM 10             Q       Right.  Okay.  And so my client said, how are you

11      doing with your family; correct?

12             A       I don't recall the specific, but it was, hope

13      Las Vegas is going well and your family enjoys, something like

14      that.

10:38AM 15             Q       You saw all these luxury huge accommodations --

16      correct? -- that Huizar stayed with Huang?

17                     Correct?

18             A       Are you referring to the Villas?

19             Q       All of them.  There are three or four different

10:38AM 20      casinos; correct?

21             A       Yes.  There's multiple casinos that they were

22      staying at.

23             Q       Now, did Mr. Wei Huang go to Las Vegas regularly

24      before Mr. -- Councilman Huizar joined him?

10:39AM 25             A       It's my understanding that Wei Huang frequented

1    Vegas often including before Huizar started joining the trips.

2           Q       And he had a -- he couldn't lose more than

3    $2 million a weekend; correct?

4           A       I don't recall the specific amount he was losing,

10:39AM  5    but he would lose sometimes upwards of 1 to $2 million.

6           Q       It had to be a lot for the casinos to be giving

7    him all of the accommodations and food for free; correct?

8           A       Yes.  Those comps were given due to his

9    high-roller status.

10:39AM  10           Q       And it's pretty expensive to fly from Van Nuys

11    Airport to Las Vegas on a private jet, is it not?

12           A       The private jets are expensive.  That's correct.

13           Q       Maybe 15-, $20,000?

14           A       I think they vary.

10:39AM  15           Q       And you investigated, in addition to

16    Councilman Huizar, who else went with Mr. Huang to Vegas,

17    putting aside the trips where he brought his wife and children;

18    correct?  Who else went with him?

19           A       George Esparza, his special assistant.

10:40AM  20           Q       Anyone else?

21           A       A number of associates of Chairman Huang and his

22    assistant Ricky Zheng.

23           Q       Now, as an FBI agent, you're familiar there are

24    rich people that like to have people around them; correct?

10:40AM  25           A       That occurs.  That's correct.

1    Q      So on these trips -- on these trips, he might

2    lose $2 million, but he would give 10,000 or 2,000 to his

3    friends of his to be with him; correct?

4    A      Yes.  Chairman Huang was providing chips to

10:40AM   5    everyone in the party, larger amounts to Council Member

6    Jose Huizar based on my review.

7    Q      And these other people would hang on, make some

8    money, get a free trip, and come back again; correct?

9    A      Correct.  They would all enjoy those group

10:40AM   10    benefits that I had described.

11    Q      Right.  So Wei Huang like -- let me ask you this.

12    Is there anything illegal about this other than if there was an

13    agreement to sell your vote?  In other words, there's nothing

14    illegal about taking a developer to go to Las Vegas with a

10:41AM   15    City Councilman, is there?

16    A      We were investigating allegations that benefits

17    were being provided to City officials, and specifically we were

18    looking at -- that this developer had property within

19    Los Angeles and specifically in the Council Member's district.

10:41AM   20    So based on the allegations we received and what we were

21    investigating, yes, that was the crime --

22    Q      I'm not questioning the investigation.  Of course

23    you have a right to investigate if public officials are going

24    to Vegas with developers.  I'm asking you is there anything

10:41AM   25    illegal about that?

1        A        If you want to narrow under a microscope just a

2    councilman in Vegas on an occasion is it illegal or not legal,

3    I'm not going to make that assessment.  But given the totality

4    of what was occurring and what the investigation was revealing,

5    then --

6        Q        Look, I'm not playing a trick.  I'm just asking

7    you whether or not, taking a law separated, if a developer

8    takes a City Councilman to Las Vegas, that itself is not

9    illegal, is it?

10               MS. PALMER:  Objection.  Asked and answered.

11               THE COURT:  Overruled.  He hasn't answered that

12   question yet.

13       Q        BY MR. BRAUN:  It's not illegal itself?

14       A        Independently it would not be illegal.

15       Q        Great.  It's only illegal if there's a

16   quid pro quo where the public official has agreed or is going

17   to vote in exchange for that trip; correct?

18       A        It's more than just agreed.  It's if they're

19   attempting to influence them.

20       Q        Wait a second.  Aren't politics influencing other

21   people?  In other words, I'm not trying to play a trick.  You

22   can't buy a vote or you can't exchange anything of value to a

23   public official, but you can influence them, can't you?

24       A        If you are providing benefits in an attempt to

25   influence that public official, yes, that is illegal.  That's

1    what we're investigating.

2          Q      Okay.  But just simply illegal, politicians try

3    to influence each other all the time; correct?

4          A      Politicians do talk amongst themselves -- I'm not

5    sure what your question is.

6          Q      What I'm saying is that just the intent to

7    influence someone isn't a crime, is it?

8          A      Intending to influence someone when you're

9    receiving benefits or future benefits, then, yes, that is a

10   crime.

11         Q      If I call my congressman up and say, you know

12   what, I'm one of your constituents.  I don't like this bill.

13   Will you vote against it?  That is not illegal, is it?

14         A      That is not illegal unless you are providing

15   benefits to that Councilman for voting no on that bill.

16         Q      I'm talking about the simple case of a citizen

17   calling up their elected representatives and expressing an

18   opinion and asking them to vote.  That is not illegal in and of

19   itself, is it?

20         A      That is not illegal in and of itself.  That is

21   correct.

22         Q      So your job in investigating corruption must be

23   difficult because you have to distinguish between -- let me put

24   it this way.

25                Our political system is based to a great extent

1    on money; correct?

2        A      Money is involved in the political system.  That

3    is correct.

4        Q      They say money is the mother's milk of politics;

5    correct?

6        A      I'm not aware of that phrase.

7        Q      So politicians are raising money all the time;

8    correct?

9        A      Yes.  There's campaigns involved with getting

10   elected officials elected.

11       Q      Right.  And these people that are giving the

12   money, some of them are just ideologues, and some of them have

13   some interest in the outcome of the votes; correct?

14       A      That's correct.

15       Q      And you have to distinguish as an investigator

16   between American political system that is based on money and

17   those things that are based on a quid pro quo for money;

18   correct?

19       A      Yes.  That's what we're investigating.

20       Q      Now, when you're investigating a public official

21   then, you also have to investigate what they're doing lawfully

22   as a public official and what they're doing unlawfully as a

23   public official; correct?

24       A      Yes.  That's all part of the investigation.

25       Q      Now, let's talk about the process of building in

1    Los Angeles.  You're aware of the idea that if I -- if I buy a

2    piece of property in Los Angeles, I can build on it as long as

3    I conform to the building codes; correct?

4         A     The building code and the city ordinances.

10:45AM  5    That's correct.

6         Q     Right.  And I don't have to ask -- I have to

7    check with the building department to make sure that my plans

8    are consistent with our building codes, and then they check on

9    us.  But other than that, I don't have to go and get any kind

10:45AM  10   of approval, do I?

11        A     It depends on what you're building and what

12   you're looking to construct.

13        Q     Of course.  If I'm trying to raise -- if the

14   plot -- the piece of property provides for a three-story

10:45AM  15   building and I want a seven-story building, I have to get that

16   cleared by the City; correct?

17        A     Potentially, yes.  It depends on the zone.

18        Q     If I'm within the zone, if that zone provides for

19   a three-story building with a certain setback constructed a

10:46AM  20   certain way, I don't have to ask anyone permission, but I have

21   to get cleared by the building department; correct?

22        A     Part of the construction, yes, there are building

23   codes that have to go through.  Are you saying the plot of land

24   is solely a three-story plot of land?

10:46AM  25        Q     I'm saying every plot of land in the city of

1    Los Angeles can be built on if you comply with the building

2    codes; correct?

3          A       It depends on what you're constructing.

4          Q       If you're constructing something that's not

10:46AM  5    provided for, you have to go to planning; correct?

6          A       That's correct.  If the zone does not allow you

7    to build what you're seeking to build, then, yes, there are

8    going to be City approvals that are required.

9          Q       If I'm not deviating from what's allowed, I just

10:47AM  10   to go to the building department and make sure it is consistent

11   with the law and they check on how it's being built; correct?

12         A       That's correct.

13         Q       There's two different processes.  One is for

14   entitlements where I'm trying to build a 77-story hotel in

10:47AM  15   downtown Los Angeles.  That I have to go to the planning;

16   correct?

17         A       Yes.  That would go through the planning

18   department as well as the PLUM Committee and City Council.

19         Q       Just so we jump ahead, the two office hotels that

10:47AM  20   we're talking about here by Wei Huang and Mr. Yuan, those have

21   never been built; correct?

22         A       The 77-story tower was never built.  That's

23   correct.  And I'm not familiar what the phase of the Luxe Hotel

24   is right now, whether they started construction, built, or not,

10:47AM  25   but they received their entitlements.

1    Q      They received their entitlements, but they

2    haven't built, have they?

3    A      Off the top of my head, I'm not sure.

4    Q      We're not worried about people coming from China,

10:48AM   5    investing in our city, and taking the buildings back, are we?

6    A      I don't think you'd be able to take a building

7    back.

8    Q      Right.  So if Chinese billionaires want to come

9    to Los Angeles and build buildings, great; correct?

10:48AM   10    A      From what perspective?  If they want to build,

11    then, yes, you go through that process, and you're able to

12    build in the city of Los Angeles.

13    Q      Yes.  You use American construction workers, you

14    make it consistent with our building codes, and you probably

10:48AM   15    employ hundreds of employees in those hotels, Americans;

16    correct?

17              MS. PALMER:  Objection, Your Honor.  Relevance.

18    403.

19              THE COURT:  Sustained.

10:48AM   20    Q      BY MR. BRAUN:  So there's nothing inherently

21    illegal about a billionaire from China coming here and wanting

22    to construct a building; correct?

23    A      No.

24    Q      Are you familiar with the hotel business at all?

10:48AM   25    A      I am generally familiar with how hotels work.

1    That's correct.

2         Q    And if you -- let's say, if I build a hotel,

3    which is unlikely, I then -- I don't run the hotel, do I?

4         A    There's usually a management company that runs

10:49AM   5    that hotel.

6         Q    It's Marriott, Hyatt, those big companies, they

7    run it; correct?

8         A    The Marriott, Hyatt would be the brand of the

9    hotel.  The actual who runs the hotel would be separate.  It's

10:49AM  10    an actual management company.  I'm familiar with that.  It's

11    not a Marriott.  Marriott is the brand, not the managing

12    company.

13         Q    So what you do is build a hotel as an investment.

14    You then find a company that puts their brand on it for

10:49AM  15    reservation purposes, and they're specialists, and you make

16    whatever deal you can; correct?

17         A    The building is an investment, and then branding

18    is a part of that that allows for the hotel then to get

19    clients, access to national networks, et cetera, loyalty

10:49AM  20    points.  So, yes, branding and investments are together.

21         Q    I'm just trying to -- maybe I didn't ask a good

22    question.

23              You build a building.  You're an investor, but

24    you're not in the hotel business.  You then contract out the

10:50AM  25    running of the building to some organization for reservations,

1    and they're basically -- that's their business.  They know how

2    to run a hotel; correct?

3         A      Yes.  A managing company is hired to run that

4    hotel.

10:50AM  5    Q      Now -- so -- let me see here.  What I'm trying to

6    do is see -- there was some criticism of a -- there was a

7    dispute between Wei Huang -- or controversy between Wei Huang

8    and some people over parking that you investigated; correct?

9         A      That's correct.

10:50AM  10   Q      Is there something criminal about, if you buy a

11   hotel and it's got an ongoing contract for parking with a

12   different company, is there something criminal about trying to

13   buy out that company, that parking?

14        A      That third-party conflict, no, that would not be

10:50AM  15   criminal.

16        Q      In fact, that's the type of thing that a public

17   official is supposed to do.  If you have two people in your

18   district that have a problem, you try to work it out between

19   them.  You don't force anything; correct?

10:51AM  20   A      I don't recall that's one of the official duties

21   of a Council Member, to get involved in third-party disputes.

22        Q      So who's supposed to do it if the City Councilman

23   doesn't do it?

24        A      The third parties amongst themselves.  They have

10:51AM  25   a contract together.

1      Q      So it's really a criminal act.  You call up a

2   Councilman and say, look, I own a hotel, but I got this other

3   company that's got the parking.  Do you know them?  Let's all

4   sit down and work it out and have the Councilman help you.  Is

10:51AM  5   there something wrong with that?

6      A      It's criminal when there's a stream of benefits

7   being provided to the Councilman for a number of favorable

8   treatment related to that hotel and specifically when there's a

9   development in that Council Member's district.

10:51AM  10      Q      It's always a criminal act if the public official

11   is getting some compensation for his conduct; correct?

12      A      I will take your words and say, yes, that is

13   always a criminal act.

14      Q      So I'm talking about one company wants to buy

10:52AM  15   another company's parking rights.  Both sides are free to

16   either come together on a price or not; correct?

17      A      Correct.  That's a third-party disagreement

18   between the two.  They can figure out how they want to do it.

19      Q      And you think it's something criminal for the

10:52AM  20   City Councilman to get involved and help out his own

21   constituents?

22              MS. PALMER:  Objection, Your Honor.  Misstates

23   prior testimony.

24              THE COURT:  Objection is overruled.

10:52AM  25              You can answer the question.

1          THE WITNESS:  The Council Member's involvement,

2     given the totality of our investigation, yes, that part of it

3     was part of this stream of benefits being provided to the

4     Council Member.

10:52AM  5          Q     BY MR. BRAUN:  Look, I'm not saying you shouldn't

6     investigate.  I'm just asking, if you find out that two people,

7     adults, businesspeople, one has a parking right and one has the

8     hotel and they want to try to work it out between them and the

9     City Councilman for both of them intervenes to try to solve the

10:53AM 10     problem, it's perfectly okay for you to investigate that;

11     correct?

12          A     If that is the only thing occurring.

13          Q     Okay.  If it's the only thing that's occurring,

14     that's exactly what a City Councilman is supposed to do;

10:53AM 15     correct?

16          A     If that's the only thing occurring.

17          Q     Okay.  Now, you mentioned that there was a sexual

18     harassment lawsuit that an employee brought against Mr. Huizar.

19     You investigated that too; correct?

10:53AM 20          A     That's correct.  I didn't investigate the sexual

21     harassment.  I investigated the way that sexual harassment was

22     settled.

23          Q     Okay.  I'm not criticizing that.  I'm just

24     saying, okay, that's the issue now.

10:53AM 25          It's certainly not wrong for the young lady to

1    sue the City Councilman; correct?

2         A        She has the right to do so.

3         Q        And he has a right to defend himself; correct?

4         A        Of course.

10:54AM   5    Q        And he has a right to settle the case; correct?

6         A        Of course.

7         Q        And he has the right to borrow the money to

8    settle the case; correct?

9         A        It depends on where that money is being borrowed

10:54AM  10   from.

11        Q        From a bank?

12        A        It depends how that loan is created.

13        Q        Let's put it this way.  If it creates a conflict,

14   he's got to not vote on anything involving that particular

10:54AM  15   party; correct?

16        A        Correct.  Any conflicts would need to be

17   disclosed on their financial disclosure forms.

18        Q        Right.

19                 And he would also have to decline to -- in the

10:54AM  20   city of Los Angeles, he would have to register that with the

21   City; right?

22        A        Yes.  He would have to disclose that.

23        Q        Right.  And he would be precluded from voting on

24   anything that there's a conflict of interest; correct?

10:54AM  25   A        The proper thing to do would be to recuse

1    yourself.  That's correct.

2        Q      So there's nothing inherently, taken in itself,

3    of settling a lawsuit.  It's just a question of whether you got

4    the money on a quid pro quo; correct?

10:54AM  5        A      That's correct.

6        Q      Is there something criminal about a friend of the

7    City Councilman saying to them, maybe you should settle this

8    because you're running for re-election?  Is that criminal?

9        A      Can you repeat that?

10:55AM  10       Q      Is there something criminal about a friend of the

11   City Councilman giving him the legal advice maybe you should

12   settle the case?

13       A      Friends can provide friends advice.  That is

14   correct.

10:55AM  15       Q      Now, when you investigated the settlement of this

16   lawsuit, it was in two phases; correct?

17       A      There was an initial complaint filed, and then

18   the lawsuit was subsequently filed.  That's correct.

19       Q      And then it drifted for months; correct?  It was

10:55AM  20   being fought for months; correct?

21       A      The lawsuit was pending from October of 2014

22   to -- '13 to October of '14.  So, yes, it was pending for about

23   a year.

24       Q      And then an opponent announced or at least there

10:55AM  25   was a rumor that an opponent was going to run against the

City Councilman; correct?

        A        Yes.   The City Councilman had an opponent in that 2016 election.

        Q        That was Gloria Molina; correct?

        A        Correct.

        Q        So the City Councilman decided he had better go ahead and settle the case; correct?

        A        I don't know the intention of why the Councilman thought he wanted to settle it, but this lawsuit was putting a political barrier, you could say, to the election.

        Q        So the issue really is whether there was a quid pro quo for the settlement; correct?

        A        We were investigating whether the settlement collateral provided by Chairman Huang was in exchange to influence the Council Member for the development projects.

        Q        Was there anything pending that -- let's put it this way.   If there was something directly pending in front of Councilman Huizar and the -- and Wei Huang gave him the collateral to settle the lawsuit, that's clearly wrong; correct?

        A        That's correct.

        Q        What if there's something not pending, there's nothing pending, he's just a friend?   And if you're a billionaire, you know, signing for 600- is not quite exactly -- if you're losing 2 million a year -- 2 million on a weekend,

```
 1   600- isn't a lot of money to you.  So if he just did it as a
 2   friend, that would not be a crime; correct?
 3              MS. PALMER:  Objection, Your Honor.  Vague as to
 4   "pending."
 5              THE COURT:  Sustained.
 6        Q     BY MR. BRAUN:  Pending.  So if there's something
 7   pending, pending, in other words, there's a motion or something
 8   to be approved in front of the committee where
 9   Councilman Huizar is, then there's a real problem if he
10   basically helps out Huizar; correct?
11        A     If there is a specific vote before the
12   Councilman, yes, that is definitely a problem.
13        Q     And he can't do that because that would be a
14   quid pro quo or a crime; right?
15        A     That's what we were investigating.
16        Q     And that's -- I'm not criticizing your
17   investigation.  I'm asking some questions about it.
18              If there's something not pending, then we have a
19   different issue, don't we?
20              MS. PALMER:  Your Honor, same objection.  Vague
21   as to "pending."
22              MR. BRAUN:  I will correct, Your Honor.
23        Q     There's a way, if there's something not pending
24   but you give so much to the public official that you, quote,
25   "own him," that's also a problem, is it not?
```

10:57AM (line 5)
10:57AM (line 10)
10:57AM (line 15)
10:58AM (line 20)
10:58AM (line 25)

1          A       Can you repeat the question?

2          Q       Yeah.  So, in other words, if there's something

3   not pending in front of this public official but you have given

4   him so much that he's really, you know, loyal to you and

10:58AM  5   basically you own him, then that is a crime, is it not?

6                  MS. PALMER:  Your Honor, objection.  Still vague

7   as to "pending."

8                  THE COURT:  That objection is overruled.

9                  THE WITNESS:  Correct.  If there's a corrupt

10:58AM  10   relationship between the two of them and benefits have been on

11   a continual basis and you're asking the Council Member to then

12   provide your project favorable treatment, that is a crime.

13   That's what we're investigating.

14          Q       BY MR. BRAUN:  That's called the *Silver* case --

10:58AM  15   right? -- from New York?

16          A       I'm not aware of what case --

17                  THE COURT:  Let's refrain from getting into legal

18   principles.  I will instruct the jury at the close of the case.

19                  MR. BRAUN:  All right.

10:59AM  20          Q       You had mentioned that in Los Angeles a public

21   official can't get involved in politics; correct?  Give money

22   and support candidates?

23                  MS. PALMER:  Objection.  Misstates testimony,

24   Your Honor.

10:59AM  25                  THE COURT:  That objection is overruled.  I just

1    think the question is ambiguous.  Can you rephrase it?

2         Q    BY MR. BRAUN:  Is your opinion that a public

3    official like Mr. Chan cannot raise money for a candidate, give

4    money for a candidate, or get involved in political campaigns?

10:59AM 5         Correct?

6         A    It's not my opinion.  It's based on my review of

7    the Los Angeles campaign ordinances that specifically prohibit

8    a general manager such as the defendant from engaging in those

9    fundraising activities of an elected official such as

10:59AM 10   Council Member Jose Huizar.

11        Q    Have you ever read the governmental ethics

12   ordinance for the City of Los Angeles?

13        A    I have reviewed the City ethics ordinance.

14        Q    So a public official like Mr. Chan cannot do it

11:00AM 15   on -- while he's being compensated by the City; correct?

16        A    I don't know if -- you'd have to show me that

17   specific section of it.  What I'm referring to is the campaign

18   code of Los Angeles.

19        Q    And I'm referring to the governmental ethics

11:00AM 20   ordinance under Section 49.5.5, misuse of City position or

21   resources.

22             Have you ever looked at that?

23        A    We are referring to two different documents, and

24   I'm not familiar with that specific code section of that

11:00AM 25   document.

1    Q    And this code section -- have you ever looked on

2    the Internet to see if there was a code section that would

3    apply?

4    A    Apply to -- I don't understand your question.

11:00AM    5    Q    Isn't it a fact that in the city of Los Angeles

6    there are a number of restrictions on the public officials or

7    appointees being engaged in political activities?

8         Correct?

9    A    Yes.  There's code of ethics as well as political

11:01AM    10   campaign laws.

11   Q    Okay.  You cannot do it while on duty for the

12   City of Los Angeles; correct?

13   A    You are not allowed to fundraise on City time.

14   That is correct.

11:01AM    15   Q    But you can do it on your own time; correct?

16   A    Can you repeat the question?

17   Q    Well, if you can't do it on -- if the rules say

18   you can't do it on City time, that means you can do it on your

19   own time; correct?

11:01AM    20   A    I believe you're referring to a more umbrella

21   definition of campaign and being a public official campaigning

22   on City time.  There is specific prohibitions based on campaign

23   finance laws for certain individuals, specifically general

24   managers.  So there's actually an elevated prohibition that's

11:01AM    25   different than that general prohibition that you're referring

1    to.

2          Q        So you're familiar with the one I'm referring to?

3          A        I am familiar that City officials are not allowed

4    to raise funds on City time.  That's correct.

11:02AM   5          Q        And they're also not allowed to wear a uniform

6    that says City of Los Angeles while they're working for a

7    candidate which would imply the City is endorsing them;

8    correct?

9          A        I believe that's part of the code.

11:02AM   10          Q        And they can't use a City title, can they,

11    because that would imply that the City is endorsing that

12    candidate; correct?

13          A        Correct.

14          Q        And they can't use their offices or any kind of a

11:02AM   15    facility that is paid for by the City of Los Angeles; correct?

16          A        That's correct.  You cannot campaign on City time

17    or with City facilities.

18          Q        But other than that, you can campaign; correct?

19          A        Certain individuals are allowed to campaign on

11:02AM   20    their own time, but certain individuals are not allowed to

21    campaign such as a general manager.

22          Q        And you're telling us that it specifically

23    says -- where it says City officials, agency employees,

24    appointees awaiting confirmation by the City Council shall not

11:02AM   25    misuse -- so that applies to Mr. Chan?

1    A       That is the general code, yes.  That is a code

2    that applies to Mr. Chan while he was in the City.

3    Q       Okay.  That will be up to the Court to decide;

4    correct?  Not you or me; correct?

11:03AM  5    A       To decide what?

6    Q       To decide what the law is; right?

7    A       It is my understanding the Court will advise the

8    jury of what the law is on the case.

9    Q       I realize you were a little critical of the

11:03AM  10   union.  The unions are an integral part of the building of

11   Los Angeles; correct?

12          MS. PALMER:  Objection, Your Honor.  Misstates

13   testimony as to "you were critical of union."

14          THE COURT:  That objection is sustained.

11:03AM  15   Q       BY MR. BRAUN:  We're talking about contacts with

16   Mr. Watson; correct?

17   A       I'm not familiar with a Mr. Watson.

18   Q       You're familiar that my client, in discussing

19   problems at the facilities, would contact the unions; correct?

11:04AM  20   A       I'm not sure at what point in time you're talking

21   about or who you're talking about or what you're talking about.

22   Q       Would you -- Mr. Chan's job, the head of

23   Building and Safety, was to promote building in Los Angeles;

24   correct?

11:04AM  25   A       His job was to oversee the Department of Building

```
 1    and Safety and the thousands of employees that worked there.

 2        Q    At least a thousand employees; correct?

 3        A    At least a thousand, yes.

 4        Q    And the Building and Safety had a multiple of

 5    different departments -- electrical, plumbing, and so forth --

 6    correct?

 7        A    They have a number of bureaus.  I believe there

 8    were five under Defendant Chan.

 9        Q    And those particular departments could not issue

10    entitlements, could they?  They could only see whether or not

11    you were complying with the law; correct?

12        A    That's correct.  Building and Safety regulated

13    the code enforcement where the Planning Department worked with

14    the entitlements.

15        Q    So basically, if you're going to build in

16    Los Angeles and you don't have an entitlement, you have to

17    comply with the law; correct?

18        A    It depends on what you're trying to build.

19        Q    Assuming you're building what's allowed on a

20    piece of property, you just have to comply with the law; right?

21        A    Yes.  You'd have to comply with the code.

22        Q    And the code is designed for safety --

23    correct? -- among other things?

24        A    That's correct.

25        Q    And it's designed to build buildings that will
```

1    hopefully withstand earthquakes; correct?

2         A     I believe the code is designed for the safety of

3    the citizens of Los Angeles.

4         Q     And that's exactly what Ray Chan did, isn't it?

11:05AM  5    A     He was the head of the Building and Safety.  I

6    don't know that he specifically was ensuring that codes were up

7    to code.

8         Q     And you're investigating -- you know he wrote a

9    book; right?

11:05AM 10    A     I am aware of that fact.

11        Q     You have read the book, haven't you?

12        A     I have reviewed drafts within his Google drive of

13   at least pages of that book.  I have not read that book

14   physically cover-to-cover.

11:06AM 15    Q     The book describes what radar screens are;

16   correct?

17        A     I believe part of it is a key or a code, and

18   that's how I was able to help decipher my understanding of what

19   the radar screens meant.

11:06AM 20    Q     It describes the whole process of building a

21   Building and Safety department that is helpful; correct?

22        A     I have not read that cover-to-cover.  So I'm not

23   aware if that is in that book.

24        Q     Okay.  You're aware in your background that he's

11:06AM 25   basically honored throughout the country for his improvements

1    of the Building and Safety; correct?

2         A    I'm not aware of his accolades across the

3    country.

4         Q    Okay.  You're aware that if you're a builder that

11:06AM  5    comes to Los Angeles and has to go through 16 different

6    departments, that it can really delay your construction;

7    correct?

8         A    Yes.  There can be many delays throughout the

9    development process.

11:06AM  10        Q    And some of it is just bureaucratic; correct?

11        A    I'm not sure if --

12        Q    Well --

13        A    There are delays that can occur through that

14   process.  The reasons for those delays I think are a

11:07AM  15   case-by-case basis.

16        Q    Okay.  And Mr. Chan developed a system where

17   there was an all-hands-on-deck, everyone cooperated; correct?

18        A    I don't know the specifics of the system, but I

19   understand that there was some efficiency changes that Mr. Chan

11:07AM  20   was a part of.

21        Q    Efficiency changes.  If you're building a

22   ten-story building and you're delayed by a year because of

23   bureaucracy, that's pretty expensive, isn't it?

24        A    That can be very expensive for delays.  That's

11:07AM  25   correct.

1        Q        And developers are aware of the type of delays in

2    a particular jurisdiction; correct?

3        A        Yes.  The developers know of delays.

4        Q        Because it costs them a lot of money; correct?

11:07AM   5        A        It can cost a lot of money for delays.

6        Q        Now, so -- let's do a global thing.  When you

7    work for the City of L.A., you're not prohibited from working

8    in the building industry when you leave, are you?

9        A        There are rules and regulations about what you

11:08AM  10    can and can't do when you leave the City.

11        Q        Right.  So the City actually -- if something is

12    under your jurisdiction like you have the discretion of whether

13    to approve the building or not, there is a lifetime ban --

14    correct? -- on lobbying people to change that?

11:08AM  15                Correct?

16        A        That's my understanding.

17        Q        If that's not the situation, there's a year-long

18    prohibition on contacting people over certain things; correct?

19        A        That's part of it.  That's correct.

11:08AM  20        Q        Now, you can't contact someone for that year.

21    You can't contact someone personally whose got the discretion

22    to approve or disapprove something; correct?

23        A        I think the code is you can't personally or

24    indirectly.  So directly or indirectly.  So you can't use a

11:08AM  25    proxy or an agent to do that on your behalf either.

1    Q       Because you had a position and you don't want

2  that position to be -- to imply that you're putting pressure on

3  that person; correct?

4    A       That's correct.

11:09AM  5    Q       There was a letter that the prosecution put in

6  that went to China that there was a draft of that that they put

7  in that had my client's name on it, Ray Chan; correct?

8    A       Yes.  I believe that is a letter dictated by

9  Chairman Huang and provided to Jose Huizar.

11:09AM  10    Q       And the one that was put in evidence here had

11  Ray Chan's name in it; correct?

12    A       What was put into evidence was the e-mail that

13  contains the draft from Chairman Huang in both Chinese and

14  English.  That's correct.

11:09AM  15    Q       But the letter that was sent to China, he removed

16  his name, did he not?

17    A       I believe the letter signed by Jose Huizar did

18  not have his name in it.  I will take your representation that

19  it was Raymond Chan that had his name be removed.

11:10AM  20    Q       That would be an important part of your

21  investigation to know whether or not he was using his position

22  in some improper way; correct?

23    A       Yes.  We're investigating exactly that.

24    Q       Okay.  And if you can check, you will find his

11:10AM  25  name was removed; correct?

644

```
 1        A        His name is removed from the letter that
 2   Jose Huizar signed.
 3        Q        Now, you basically know my client's background
 4   because you investigated him; correct?
 5        A        I know some of his background.  That's correct.
 6   I don't know every detail of his life.
 7        Q        So you basically -- I see you used a map of China
 8   in one of your exhibits.  I don't remember that.  I think
 9   they --
10        A        It was only used on that one exhibit to represent
11   that the money for the sexual harassment settlement was coming
12   from Hong Kong to the United States to settle that sexual
13   harassment lawsuit.
14        Q        Now, there's a little island that's south of
15   that.  Do you know what that island is?
16        A        I'm not aware.
17                 MS. PALMER:  Objection, Your Honor.  Relevance.
18                 THE COURT:  He said he wasn't aware.
19        Q        BY MR. BRAUN:  You don't know where he was born,
20   do you?
21        A        The specific province I'm not aware, no.
22        Q        You don't know he was born on an island, do you?
23        A        I'm not aware.
24        Q        You're aware he went to Canada; correct?  That's
25   part of his background; correct?
```

```
 1                    MS. PALMER:  Objection, Your Honor.  Relevance.

 2                    THE COURT:  Sustained.

 3                    MR. BRAUN:  Okay.

 4          Q       Is it important -- L.A. has a lot of people from

 5   overseas, doesn't it?

 6          A       Yes.  There's --

 7                    MS. PALMER:  Objection.  Relevance, Your Honor.

 8                    THE COURT:  The question has already been

 9   answered.

10                    MR. BRAUN:  Okay.

11          Q       In fact, so investigating Mr. Chan, you're aware

12   that he -- you know what sifu means; right?

13          A       I am familiar with the term sifu.

14          Q       What does it mean?

15          A       Master.

16          Q       And *Dailo*, what's *Dailo*?

17          A       Big brother.

18          Q       Okay.  And you're aware that he would have ten

19   people at his house twice a week as part of the kung fu

20   organization; correct?

21          A       I'm aware of a kung fu organization that he

22   referred to as LABXG.

23          Q       And you're familiar it has strong ties to

24   Mainland China.  It's traditional; correct?

25          A       I'm not aware of the ties to China.
```

| | |
|---|---|
| 1 | Q    Do you have any idea what these societies are? |
| 2 | A    What societies are you referring to? |
| 3 | Q    The kung fu societies. |
| 4 | MS. PALMER:  Objection, Your Honor.  Vague. |
| 11:12AM  5 | Relevance. |
| 6 | THE COURT:  It's also outside the scope of the |
| 7 | direct. |
| 8 | MR. BRAUN:  Let me bring it in. |
| 9 | Q    Do you know whether George Chiang was a member of |
| 11:12AM  10 | that particular kung fu organization? |
| 11 | A    It's my understanding he attended those events. |
| 12 | Q    And would that have any significance to you as an |
| 13 | investigator? |
| 14 | A    Yes.  It was significant to the relationship |
| 11:12AM  15 | between George Chiang and the City official Raymond Chan. |
| 16 | Q    And it would mean, would it not, as an |
| 17 | investigator that George Chiang was virtually a member of my |
| 18 | client's family; correct? |
| 19 | A    Can you rephrase that question? |
| 11:13AM  20 | Q    In other words, it's not just that you came to a |
| 21 | meeting, but George Chiang basically became a friend of my |
| 22 | client's family and attended family events; correct? |
| 23 | A    My understanding that there was a close |
| 24 | relationship between George Chiang and Defendant Chan. |
| 11:13AM  25 | Q    And between the wives; correct? |

```
 1          A       I believe their wives knew each other.

 2          Q       And the children; correct?

 3          A       I'm not sure if George Chiang's children knew of

 4   Jeremy Chan.

 5          Q       Okay.  And you're familiar with the occasions in

 6   which they would gather at my client's house; correct?

 7          A       Yes.  They gathered.

 8          Q       You know what a red pocket is; correct?

 9          A       I'm aware of a red pocket.

10          Q       What is a red pocket?

11          A       If you could pull up the exhibit, it's a pocket

12   of money.

13          Q       Okay.  It's a custom in the Chinese community to

14   give gifts; correct?

15          A       Gift-giving, yes.

16          Q       So you don't go to a person's house for dinner

17   without bringing a bottle of wine, do you?

18          A       I don't know if people do or not.  Culturally you

19   may bring gifts to friends' houses for dinner.

20          Q       Well, as an investigator it's important for

21   you -- I'm not saying you should know this.  But if you see

22   someone that's a member of a minority group, they're all

23   American citizens, but you do bring something with you from --

24   aren't you familiar -- isn't it important how they interact?

25          A       I believe all Americans have some type of
```

```
 1    culture, not just minority groups.  I'm sure it's a part of

 2    people's lives.

 3          Q       And we lose it after a few generations, don't we?

 4                  MS. PALMER:  Objection.  Relevance.

 5    Argumentative.  403.

 6                  THE COURT:  Sustained.

 7          Q       BY MR. BRAUN:  So, now, let's -- the relationship

 8    between Ray Chan and George Chiang is part of a cultural

 9    relationship; correct?

10          A       It is my understanding they had a business

11    relationship.

12          Q       They also had a personal relationship, did they

13    not?

14          A       Yes.  They had a close relationship.

15          Q       And part of the culture is that you help people

16    out; correct?

17          A       That may be a part of the culture.

18          Q       You don't give them favoritism if you're a public

19    official, but you can tell them what they can do; correct?

20                  MS. PALMER:  Objection.  Foundation.  Relevance.

21                  THE COURT:  Overruled.

22                  THE WITNESS:  Can you repeat the question?

23                  MR. BRAUN:  Yes.

24          Q       So one of the things you have learned about this

25    subculture is that there is a tradition of assisting each
```

```
 1    other; correct?
 2         A     I don't --
 3               MS. PALMER:  Objection.  Vague as to
 4    "subculture," Your Honor.
 5               THE COURT:  Sustained.
 6               MR. BRAUN:  Okay.
 7         Q     Now, there's -- my client is a member of a
 8    subculture of the Chinese community; correct?
 9         A     I'm not aware of subcultures.
10         Q     He's a Christian.  Most Chinese are not
11    Christians; right?
12               MS. PALMER:  Objection.  Relevance, Your Honor.
13    403.
14               THE COURT:  Sustained.
15         Q     BY MR. BRAUN:  Part of -- now, you heard the
16    intercept talking about $20.  Do you know what that's about?
17         A     I believe it was $20,000, but yes, I am familiar
18    with that recording.
19         Q     Okay.  Sorry.  20,000.  2,000.
20               When you listen to -- one of the problems about
21    hearing a wiretap is sometimes it's out of context because we
22    don't always talk about everything.  We talk in short terms;
23    correct?
24         A     The complete context is not always in one
25    particular recording.  That is correct.
```

11:15AM (lines 5)
11:15AM (line 10)
11:16AM (line 15)
11:16AM (line 20)
11:16AM (line 25)

1    Q      And you basically listened to, say, the five or

2    six earlier recordings prior to the one that we played in

3    court, did you?

4    A      We intercepted a number of recordings.

11:16AM    5    Q      Now, the $20 that they're talking about is a

6    student of Ray Chan who bounced a check; correct?

7           MS. PALMER:  Objection, Your Honor.  Misstates

8    facts.

9           THE COURT:  Sustained.

11:16AM    10    Q      BY MR. BRAUN:  Okay.  Do you know what they're

11    talking about?

12    A      Can you --

13    Q      Do you know what they were talking about on that

14    tape that you made?

11:17AM    15    A      I don't know the specifics of the recording, but

16    it's my understanding they were discussing money and the

17    defendant wanting to use everything in cash and specifically

18    telling George Chiang to hold on to it.

19    Q      Okay.  You don't know whether or not his wife

11:17AM    20    didn't like him spending a lot of money on the kung fu group,

21    do you?

22    A      I do not know the specifics.

23    Q      Basically you don't know about -- do you know

24    about the Paramount scam in China?

11:17AM    25           MS. PALMER:  Objection.  Relevance.  Beyond the

1    scope.  403.

2              THE COURT:  Sustained.

3         Q    BY MR. BRAUN:  Who is Irwin Wong?

4         A    Who?

11:17AM  5         Q    Irwin Wong?

6         A    I'm not familiar with an Irwin Wong.

7         Q    You're familiar or not that the executive at

8    Paramount Studios was defrauding people in China claiming they

9    were going to build a park there, aren't you?

11:17AM  10             MS. PALMER:  Objection, Your Honor.  Same

11   objections as to this topic.

12             THE COURT:  Sustained.

13        Q    BY MR. BRAUN:  You have reviewed which work --

14   what Jeremy did and George Chiang did with respect to a

11:18AM  15   Paramount investigation; isn't that correct?

16        A    I recall seeing on radar screens and other

17   communications references to Paramount.  I'm not aware of the

18   specifics of what any of that was.

19        Q    You didn't investigate why an executive at

11:18AM  20   Paramount committed suicide, did you?

21             MS. PALMER:  Objection, Your Honor.  Relevance.

22   403.  Outside the scope.

23             THE COURT:  Overruled.

24             THE WITNESS:  I'm not aware.

11:18AM  25        Q    BY MR. BRAUN:  Are you aware that the person in

```
  1    China was saved $8 million because of the work of Jeremy and

  2    Ray Chan?

  3                 MS. PALMER:  Objection, Your Honor.  Assumes

  4    facts not in evidence.

11:18AM  5             THE COURT:  Sustained.

  6        Q     BY MR. BRAUN:  Okay.  Are you aware that Mr. Chan

  7    turned down an offer of $20,000 as a gift?

  8                 MS. PALMER:  Objection, Your Honor.  Assumes

  9    facts not in evidence.

11:18AM 10            THE COURT:  Sustained.

 11        Q     BY MR. BRAUN:  You had an undercover working,

 12    Mr. Andy Wang, correct, wired up working with Ray Chan;

 13    correct?

 14        A     He was not an undercover.  He was a cooperating

11:19AM 15    witness that I instructed to make surreptitious recordings with

 16    the defendant.

 17        Q     So he wasn't employed by the FBI.  He was working

 18    off a case that he was guilty of and hoping to get a lower

 19    sentence; correct?

11:19AM 20        A     He agreed to cooperate with the Government.

 21    There were no promises, guarantees, or discussion of a case or

 22    what the outcome of the investigation into Andy Wang would

 23    result in.

 24        Q     There's no discussion, but anyone who practices

11:19AM 25    in this building knows that a recommendation from the
```

```
 1   Government is given great respect; right?

 2              MS. PALMER:  Objection.  Argumentative.

 3              THE COURT:  That objection is overruled.

 4              THE WITNESS:  I'm aware that the Government will

 5   provide recommendations to the Court related to cooperators.

 6        Q    BY MR. BRAUN:  Now, you got $10,000 of Government

 7   money to bribe someone, didn't you?

 8        A    The FBI authorized a $10,000 payment to a City

 9   official.

10        Q    Mr. Kuk; correct?

11        A    That is correct who the approval was for.

12        Q    And how many times did you try to bribe him?

13              MS. PALMER:  Objection, Your Honor.  Misstates

14   testimony.  Beyond the scope.

15              THE COURT:  Overruled.

16              THE WITNESS:  Can you repeat the question?

17        Q    BY MR. BRAUN:  How many times did your

18   undercover -- not undercover -- your cooperator try to bribe

19   him?

20        A    I believe Andy Wang presented the cash or a check

21   in the amount of $10,000 to Shawn Kuk multiple times.

22        Q    And multiple times he turned it down; correct?

23        A    He did not turn it down.  He asked not to take it

24   at that time.  And it was part -- based upon my review of those

25   recordings, that it was agreed-upon but, while he was in the
```

```
 1    City, he did not want to take possession of that.

 2         Q      You got it back, didn't you?

 3         A      Got it back?

 4         Q      The money, wasn't it returned to the FBI?

 5         A      That's correct.

 6         Q      So he never got the bribe that you told your

 7    person to give to this fellow; correct?

 8         A      He did not take possession of it, no.

 9         Q      And at that time, you knew he needed money;

10    correct?

11         A      Based on my review of the recordings from

12    Defendant Chan, that, yes, Shawn Kuk was going through a

13    divorce and needed money.

14         Q      And he had two children; correct?

15         A      I believe he has two children.

16         Q      And an air conditioner that didn't work?

17         A      I'm not aware of his air conditioner.

18         Q      And he still turned down $10,000; correct?

19         A      It was not turned down.

20         Q      But you got it back; right?

21         A      The -- correct.

22         Q      Now, the tape-recording between Andy Wang and my

23    client where my client said, "Tell the truth," you didn't like

24    the fact that my client, when he prepared a document, it didn't

25    include everything; correct?
```

11:21AM (line 5)
11:21AM (line 10)
11:21AM (line 15)
11:21AM (line 20)
11:22AM (line 25)

```
 1        A        It omitted information that was related to
 2   payments.  That's correct.
 3        Q        Okay.  So how -- so you've got an undercover guy
 4   that's working for you, and he's secretly talking to Ray Chan.
 5   And Ray Chan tells him, tell the truth, which is probably a
 6   disappointment for you guys; right?  You're probably looking
 7   for him to say lie, weren't you?
 8        A        We weren't looking for one thing or the other.
 9   We were looking for the facts of the case.  We weren't looking.
10   We were instructing the cooperator to record whatever that
11   conversation may be.
12        Q        And now you criticize my client that the document
13   that he prepared wasn't complete; right?
14        A        Based --
15             MS. PALMER:  Objection, Your Honor.  Misstates
16   testimony.  He was not criticizing.
17             THE COURT:  Overruled.
18             THE WITNESS:  Based on my review of the
19   recordings and the different discussions that Defendant Chan
20   had with Andy Wang, I believe that document that was being
21   provided did omit information that was relevant to the contents
22   of that document and that this was an attempt of influencing
23   the cooperator and what they may say to the FBI.
24        Q        BY MR. BRAUN:  So because you didn't like it was
25   incomplete, he didn't know that you were -- it was going to be
```

1    given to the FBI, did he?  No one told him, hey, we're

2    preparing this for the FBI; right?

3         A      This occurred after there were subpoenas and that

4    the cooperator understood that the FBI -- he was obviously

11:23AM   5    cooperating at that time.  But he had told Defendant Chan that

6    he had been interviewed by the FBI previously and then

7    specifically that he had gotten a subpoena.

8         Q      It's all -- I assume that this recording is

9    available to everyone; correct?

11:24AM   10        A      These were recorded, that's correct.  It's part

11   of the evidence.

12        Q      Is it audible?  Can we hear it?

13             MS. PALMER:  Objection, Your Honor.

14   Argumentative.

11:24AM   15             THE COURT:  Overruled.

16             THE WITNESS:  Yes.  You can hear portions of the

17   recording.  Some portions are unintelligible, and we have

18   marked those on various transcripts as "UI."

19        Q      BY MR. BRAUN:  But the transcript part that is

11:24AM   20   intelligible is where Ray Chan said, "Tell the truth"; right?

21             MS. PALMER:  Objection, Your Honor.  Calls for

22   hearsay.

23             THE COURT:  Overruled.

24             THE WITNESS:  Can you repeat the question?

11:24AM   25             MR. BRAUN:  If I can remember it.  We will move

1   on.

2       Q       Let's look at this case globally.  We've got two

3   city councilmen that have pled guilty that are guilty of taking

4   bribes; correct?

5       A       That's correct.

6       Q       Okay.  You've got George Esparza who basically

7   was the go-between who got bribes; correct?

8       A       That's correct.

9       Q       Okay.  You've got Mr. Lee who bribed someone

10  else; correct?

11      A       Mr. Lee was a developer that bribed, yes.

12      Q       Okay.  And you've got all of those, but you

13  didn't quite -- you had to stretch the case to try to get Chan;

14  correct?

15              MS. PALMER:  Objection, Your Honor.

16  Argumentative.  403.

17              MR. BRAUN:  I will withdraw.

18      Q       Look at the case globally.  So my client has like

19  400 projects going at one time; correct?

20      A       I believe, based on the exhibit "about us," there

21  were 300 projects on a daily basis that the Department of

22  Building and Safety was reviewing.

23      Q       Now, there's no allegation -- he was helping

24  projects from all over the world and all over the country;

25  correct?  It wasn't just Chinese projects; right?

```
 1      A      I'm not aware of all over the world and all over

 2   the country.  I don't know specifically what projects you are

 3   referencing.

 4      Q      How about George Lucas's museum that's being

 5   built right now?

 6      A      I'm not aware of that project.

 7      Q      Are you aware he's responsible for that coming

 8   here instead of San Francisco?

 9      A      I am not.

10      Q      Are you aware that he's responsible for

11   80 percent of the corrections after the Northridge earthquake?

12              MS. PALMER:  Objection.  Assumes facts not in

13   evidence.

14              THE COURT:  He's asking if he's aware.  That

15   objection is overruled.

16              THE WITNESS:  I'm not aware.

17      Q      BY MR. BRAUN:  So your position is that a man --

18   well, let me ask you this.

19              Why didn't you search his house?  You served

20   17 search warrants.  You didn't search his house.

21      A      We obtained search warrants for his digital

22   devices, specifically his cell phone.  We did not do search

23   warrants at his residence.  We were aware that the --

24   Defendant Chan was working out of CCC and Synergy, and the

25   evidence we had collected thus far and the information we had
```

1  was that the evidence part of this case would be contained at

2  that office and not his residence.  So we did not seek a search

3  warrant because we did not have a reason to believe there was

4  evidence at his house.

11:27AM  5       Q       Right.  But you could always say, hey, by the

6  way, do you mind if we search your house?  And if the person

7  says, yes, that's fine; right?

8       A       Yes.  At times we ask if they would consensually

9  allow us to search their house.

11:27AM 10       Q       And your agent that was sent that morning didn't

11  even ask him, did they?

12       A       I'm not aware if that agent asked or not asked.

13       Q       It's taped; correct?

14       A       He was interviewed, and that was recorded;

11:27AM 15  correct.

16       Q       Didn't you instruct your agent we don't have

17  probable cause, but you know what, let him -- ask him if we can

18  search.  You know, we've got nothing to lose.  You're going to

19  be there with another agent, two agents in the morning at

11:27AM 20  7:00 o'clock.

21               MS. PALMER:  Objection.  Relevance.

22  Argumentative.  403.

23               THE COURT:  Overruled.

24               THE WITNESS:  I did not ask the agent to do that.

11:28AM 25  I did not believe there would be evidence contained inside of

1    Mr. Chan's house.

2         Q      BY MR. BRAUN:  Well, you can always look,

3    correct, as an investigator?  Sometimes you don't know that

4    something is there, but you get lucky; right?

11:28AM   5         A      You cannot just look.  He would have to

6    voluntarily allow us.

7         Q      That's right.  So you ask them, and your agent --

8    neither of your agents went there that morning and asked him,

9    did they?

11:28AM   10         A      They didn't.  It's my understanding that they did

11   not ask him.

12         Q      But he gave them the phone; correct?

13         A      He did provide his cell phone pursuant to that

14   warrant.

11:28AM   15         Q      Without any kind of -- voluntarily; correct?

16         A      It was pursuant to the warrant, but he did

17   cooperate and provide the phone.

18         Q      And he talked to them; correct?

19         A      He did talk to them.

11:28AM   20         Q      And he knew one of the agents from a previous

21   case where he cooperated with the Bureau where there was some

22   inspectors that were suspicious; correct?

23         A      He had previously cooperated in that

24   investigation.

11:28AM   25         Q      Okay.  And that was the agent that you sent

```
 1  there; correct?

 2       A       That is the agent that interviewed him.  That is

 3  correct.

 4       Q       Was she part of this -- was she familiar with

 5  this case, or did she just do it that morning?

 6       A       She was familiar with different aspects of the

 7  investigation.

 8       Q       Why wasn't she more detailed when she asked about

 9  the loan, about the various phases of the loan?  Do you know?

10               MS. PALMER:  Objection.  Foundation.

11               THE COURT:  Sustained.

12       Q       BY MR. BRAUN:  Did you brief her on the evidence

13  that you had on the loan?

14       A       We did discuss portions of that prior to the

15  interview.

16       Q       Okay.  Did you tell her that there was no

17  evidence that when the loan went through, that Ray Chan signed

18  for it, interacted, had anything to do with the loan?

19               MS. PALMER:  Objection, Your Honor.  Assumes

20  facts not in evidence.  Calls for hearsay.

21               THE COURT:  Sustained.

22       Q       BY MR. BRAUN:  Now, Ray Chan then called her back

23  the next day; right?

24       A       The defendant did reach out to the agent the next

25  day.  That is correct.
```

11:29AM (lines 5, 10, 15, 20, 25)

1      Q      Called.  Okay.

2             That's because a woman by the name of Yan Yan

3      came to him and said, oh, I read in the paper.  I guess I was

4      part of that loan; correct?

5             MS. PALMER:  Objection, Your Honor.  Hearsay.

6      Assumes facts not in evidence.

7             THE COURT:  Sustained.

8      Q      BY MR. BRAUN:  You know he told her not to talk

9      anymore, just call the FBI; correct?

10            MS. PALMER:  Objection, Your Honor.  Hearsay.

11            THE COURT:  Sustained.

12     Q      BY MR. BRAUN:  Didn't he call the FBI the next

13     morning to tell him that Yan Yan had seen him?

14     A      He did call the FBI the next morning.

15     Q      But that's being uncooperative; right?  Is that

16     being uncooperative or cooperative?

17     A      Providing additional information.

18     Q      Cooperative; right?

19     A      He was seeking to provide additional information;

20     correct.

21     Q      Provide, not bribe.  Provide; right?

22     A      Provide information; correct.

23     Q      And there's a -- when you look at a statement,

24     isn't the time that the statement applies to relevant?  In

25     other words, if you're talking about yesterday, today, or in

1    the future, is that a relevant part of a statement?

2        A       Timing within a statement, yes, that's relevant.

3        Q       Yeah.  Well, why, when this statement was

4    presented to the grand jury, did they remove the words "at that

5    time"?

6                MS. PALMER:  Objection, Your Honor.  Speculation.

7    403.  Relevance.  Assumes facts not in evidence.

8                MR. BRAUN:  I will withdraw the question,

9    Your Honor.

10               THE COURT:  All right.

11       Q       BY MR. BRAUN:  Okay.  The question that we're

12   charged with they removed.  There's three dots that said "at

13   that time"; correct?

14               MS. PALMER:  Same objection, Your Honor.

15               THE COURT:  Sustained.

16       Q       BY MR. BRAUN:  So, at least as an investigator,

17   my client should be charged and go to trial on the statement

18   that he made, not the statement that -- another statement;

19   correct?

20               MS. PALMER:  Objection.  Relevance.  403.

21   Assumes facts not in evidence.

22               THE COURT:  Sustained.

23       Q       BY MR. BRAUN:  So let's go to the case as a

24   whole.  So we have the Las Vegas where my client never went to

25   Las Vegas.  You will agree with that; correct?

1    A      Correct.  That's my understanding.

2    Q      And basically he -- you're saying that he -- if

3  he knew about it, it's facilitating?

4    A      Based on my review of the text messages, he was

11:32AM  5  coordinating between Jose Huizar and Chairman Huang to

6  coordinate at least one of the trips.

7    Q      One out of 22; correct?  How many?

8    A      I only believe there were 20 trips that I'm aware

9  of, and they're -- based on my review of those text messages at

11:32AM  10  that time, they were related to coordination of at least one of

11  them.

12    Q      Okay.  So, you know -- if you know a friend is

13  going to Vegas and you tell him not to go but there's some

14  issue of coordination, all of a sudden you're responsible for

11:32AM  15  his trip; correct?

16        MS. PALMER:  Objection, Your Honor.  Assumes

17  facts not in evidence.

18        THE COURT:  It's argumentative.

19    Q      BY MR. BRAUN:  So he should have called the FBI

11:33AM  20  and said, oh, by the way, this developer and city councilman

21  are going to Las Vegas.  And wouldn't the FBI say, well, tell

22  us when there's a crime; correct?

23        MS. PALMER:  Objection.  Argumentative.

24        THE COURT:  It's really irrelevant.

11:33AM  25        MR. BRAUN:  Okay.

1    Q    So let's go.  Now, we've got the Vegas trips.  He

2  never got a chip; correct?

3    A    I'm not aware of Defendant Chan ever receiving

4  any casino chips.

11:33AM    5    Q    Never slept in a room there; correct?

6    A    I'm not aware of his -- if he's been to Vegas or

7  not.

8    Q    Well, let's talk about those trips.  Never ate

9  anything for free; correct?

11:33AM    10    A    I'm not aware of him being on any of those Vegas

11  trips.

12    Q    But he's still charged with aiding and abetting

13  these trips; correct?

14    A    Yes.  Aiding and abetting is relating to the

11:33AM    15  facilitation of the trips, not the actual presence at the

16  trips.

17    Q    The pilot that flies him there must also be a

18  criminal, right, if he knew they were going there?

19         MS. PALMER:  Objection.  403.  Argumentative.

11:34AM    20         THE COURT:  Sustained.

21    Q    BY MR. BRAUN:  Okay.  Now let's talk about the

22  loan.  We've got trips to Vegas that he's not on, but you say

23  he's facilitating, and there's one e-mail that says something,

24  whatever.  Now we have the loan, when the loan actually went

11:34AM    25  through, did he sign anything?

```
 1        A        His name was not on those documents, no.

 2        Q        Okay.  Is he legally liable for the loan?

 3        A        Not that I'm aware of.

 4        Q        There's actually multiple e-mails about the loan

 5  between the various people and nothing with reference to

 6  Mr. Chan; correct?

 7        A        Based on my review of those documents, Mr. Chan

 8  is not on them.

 9        Q        Okay.  And are you aware that Huizar asked Chan

10  to talk to Wei Huang about a loan and he turned him down?

11                 MS. PALMER:  Objection, Your Honor.  Hearsay.

12                 THE COURT:  Overruled.

13                 MS. PALMER:  Assumes facts not in evidence as

14  well.

15                 THE COURT:  Overruled.

16        Q        BY MR. BRAUN:  Are you aware of that as part of

17  your investigation?

18        A        Can you repeat the question?

19        Q        That Wei Huang asked Ray Chan to talk to

20  Wei Huang about the loan and he said no?

21        A        Based on my review of the communications --

22                 THE COURT:  I think you misstated that.  It's

23  Huizar.

24                 MR. BRAUN:  Yeah.  You're right.

25                 THE COURT:  Why don't you restate the question.
```

1    Q    BY MR. BRAUN:  Are you aware that Ray Chan talked

2    to -- that Huizar asked him to talk to Wei Huang about getting

3    a loan and he said no?

4    A    Based on my review of the communications, it was

11:35AM  5    that Jose Huizar used Chairman -- Raymond Chan as the

6    go-between between Chairman Huang and Jose Huizar and that he

7    was passing messages and coordinating Chairman Huang providing

8    that settlement money.  That is my understanding based on the

9    communications and the evidence.

11:35AM  10    Q    But you don't have an e-mail like that; correct?

11    A    There are multiple text messages around the

12    period of time in which there is coordination efforts for the

13    sexual harassment lawsuit money.

14    Q    Have you talked to Mr. Huizar about whether or

11:36AM  15    not he was told not to do it by my client?

16    A    I have talked to Mr. Huizar.  That is correct.

17    And he informed me that Raymond Chan was a part of those

18    discussions and Raymond Chan was the one that talked to

19    Chairman Huang.

11:36AM  20    Q    He will be testifying; right?

21         MS. PALMER:  Objection, Your Honor.  403.

22         THE COURT:  Sustained.

23    Q    BY MR. BRAUN:  Has he made a deal with the

24    Government to plead?

11:36AM  25    A    Jose Huizar did plead to the same RICO

```
 1    conspiracy.
 2         Q       Why isn't he testifying?  Do you know?
 3                 MS. PALMER:  Objection.  403, Your Honor.
 4                 THE COURT:  Sustained.
 5         Q       BY MR. BRAUN:  So now we have got the trips to
 6    Vegas in which you say he coordinated and then this loan he
 7    didn't sign on that you claim he relied on Huizar, but there's
 8    nothing -- there's no document where he signed or the bank
 9    said, hey, we want Ray Chan to sign, is there?
10         A       Raymond Chan is not on the documents for the bank
11    loan.
12         Q       So let's go to the PAC.  Do you know what a PAC
13    is?
14         A       Yes.  I'm aware.
15         Q       It's the way that politicians avoid the limits on
16    the contributions; correct?
17         A       Yes.  There are no limits to PACs.
18         Q       Right.  So I could take -- I could -- if my
19    associate here had a PAC, I could put $5 million in it; right?
20         A       You could.
21         Q       And I could put $10 million in it; correct?
22         A       Yes, you could.
23         Q       And this is legal?
24         A       PACs are legal.  That is correct.
25         Q       So we really don't have any limits on money in
```

1    this country, do we?

2                     MS. PALMER:  Objection.  Argumentative.  403.

3                     THE COURT:  Sustained.

4        Q       BY MR. BRAUN:  Okay.  So a PAC is something that

11:37AM  5    is not subject to the restrictions on giving to a candidate;

6    correct?

7        A       That's correct.

8        Q       But it's a thing in -- it's like a creation, a

9    PAC, that you can give any amount of money to and no one --

11:38AM 10    it's not illegal; right?

11       A       It is not illegal to contribute to a PAC.  That

12    is correct.  And there are no limits.

13       Q       Are you telling me that people just give to PACs

14    because they're not interested in legislation?

11:38AM 15                    MS. PALMER:  Objection, Your Honor.  Misstates

16    prior testimony.  Argumentative.

17                    THE COURT:  Sustained.

18       Q       BY MR. BRAUN:  Okay.  This is your area.  People

19    that give big money to PACs are interested in a particular

11:38AM 20    party, are they not?  Or a particular candidate; correct?

21                    MS. PALMER:  Objection.  Argumentative.

22                    THE COURT:  Overruled.

23                    THE WITNESS:  I am not aware of everyone's

24    intention of why they contribute or not contribute.  We were

11:38AM 25    investigating how the Families For a Better Los Angeles PAC was

1    being used as a vehicle of benefits to support Richelle Rios

2    being elected, and specifically the developers being asked for

3    those benefits were the same developers with projects pending

4    before Jose Huizar.

11:38AM    5        Q    BY MR. BRAUN:  There is nothing illegal about a

6    developer giving money to a PAC, is there?

7        A    There is when it's in exchange for --

8        Q    Taken alone, there is nothing illegal about a

9    developer giving money to a PAC.

11:39AM    10        A    Independently, no.  They're allowed to donate to

11    PAC.

12        Q    How about buying ten tables at a dinner?

13        A    Independently, no.  They're allowed to fundraise.

14        Q    Do you think developers do this because of public

11:39AM    15    spirit in this?  They're not interested in tax breaks?

16        MS. PALMER:  Objection.  Foundation.

17    Argumentative.

18        THE COURT:  Sustained.

19        MR. BRAUN:  Okay.

11:39AM    20        Q    So now we have a PAC.  So really there's a

21    tradition in this country, is there not, about a wife

22    succeeding her husband?  You've heard of Margaret J. Smith;

23    right?

24        A    I'm not aware.

11:39AM    25        Q    How about Deborah Dingell from Michigan?

1          MS. PALMER:  Objection.  Relevance.

2          THE COURT:  Sustained.

3          MS. PALMER:  403.

4      Q     BY MR. BRAUN:  So it's suspicious of you that

5  Jose Huizar would encourage his wife to run for his seat;

6  correct?

7      A     We were investigating whether public officials

8  were maintaining power or not and, specifically, that

9  Jose Huizar was going to be termed out, he would no longer be

10 able to take votes on development projects.  So we were

11 investigating that plan to then have his wife succeed him and

12 have a council vote.

13     Q     I'm not saying that's wrong to investigate.  I'm

14 just saying that a lot of wives, because they know all the

15 people, they spent their life with their husband or, now I

16 guess it's going to be the other way with husbands running for

17 wives' seats, this is a tradition in the country, is it not?

18         MS. PALMER:  Objection.  Foundation.

19 Speculation.

20         THE COURT:  Sustained.

21     Q     BY MR. BRAUN:  Okay.  So is there anything

22 inherently wrong with a wife deciding to run for her husband's

23 seat when he's termed out?

24     A     Independently, no.

25     Q     All right.  Is it also wrong for them to talk to

1   each other?

2       A       I believe husbands and wives typically talk to

3   each other.  There's nothing wrong with that.

4       Q       Except if they're on the Supreme Court.  All

5   right.

6               Then a husband and wife are going to have

7   generally the same -- maybe generally the same political

8   philosophy; correct?

9               MS. PALMER:  Objection.  Calls for speculation.

10  Foundation.

11              THE COURT:  That's highly speculative.

12              MR. BRAUN:  I think you're right.

13      Q       The last name helps, doesn't it?

14      A       Can you repeat that?

15      Q       The last name usually helps because, after

16  running for office a number of times under the name Huizar and

17  they see the name Huizar, that's probably going to give you a

18  certain percentage of the vote; correct?

19      A       It was my understanding that Richelle Rios had

20  planned to run under Richelle Rios, but then it was a strategic

21  reason to use the name Huizar given the brand, the Huizar

22  brand.

23      Q       That's because of the scandal that developed;

24  correct?

25              Let me ask you this.  Have you ever been involved

1    in electoral politics?

2                    MS. PALMER:  Objection.  Relevance.

3                    THE COURT:  Sustained.

4         Q    BY MR. BRAUN:  Now, you graduated -- you went to

11:42AM  5    school, and you became a lawyer; correct?

6         A    I graduated from law school.

7         Q    Did you ever pass the Bar?

8         A    No.  I joined the Bureau right after.

9         Q    How do you learn about politics?

11:42AM  10                   MS. PALMER:  Objection.  Relevance.

11                   THE COURT:  Sustained.

12        Q    BY MR. BRAUN:  Okay.  One of the things you have

13   to do, it's a pretty tricky thing in our system, isn't it, is

14   distinguishing between money that passes legally and money that

11:42AM  15   passes illegally; correct?

16                   MS. PALMER:  Objection.  Asked and answered.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  Yes.  Part of the difficult part of

19   investigating public corruption is determining which activities

11:42AM  20   are completely innocuous and which activities are criminal in

21   nature.

22        Q    BY MR. BRAUN:  Now, obviously you don't have

23   any -- and neither do I.  We don't have any information about

24   how they run things in China.

11:43AM  25                   MS. PALMER:  Objection.  Relevance.

1          THE COURT:  He hasn't asked a question yet.

2      Q      BY MR. BRAUN:  When someone comes from overseas,

3   they have to obey all of our rules; correct?

4      A      Yes.

11:43AM   5      Q      Can they -- as a foreigner, they can't give money

6   to a candidate, can they?

7      A      Foreign nationals are prohibited from

8   contributing to U.S. elections.

9      Q      If they have an American subsidiary, they can

11:43AM  10   give money, can't they?

11      A      Not necessarily.

12      Q      What do you mean not necessarily?

13      A      Because although a U.S. subsidiary could

14   contribute, if the contribution is being approved by a foreign

11:43AM  15   national or foreign principal, then it is still prohibited.  So

16   if the foreign national is the one approving that election,

17   regardless if it's a U.S. subsidiary or not, those are still

18   prohibited.

19      Q      So if they're not approved, the subsidiary just

11:43AM  20   does it on its own because they want to build a building or

21   something, that's okay; right?

22      A      If it was completely independent on its own.

23      Q      Now -- okay.  So now let's get back to the big

24   thing.

11:44AM  25          So to violate the federal law -- and you can

             1    correct me if I'm wrong -- the public official has to take

             2    something of value, get something of value, and then do

             3    something with the power that's been influenced by the person

             4    that's paying them; is that right?

11:44AM      5          A       That is incorrect.

             6                   MS. PALMER:  Objection, Your Honor.  Relevance.

             7    The Court will instruct on the law.

             8                   THE COURT:  He already answered the question.

             9          Q       BY MR. BRAUN:  So we've got the trips to Vegas

11:44AM     10    that my client didn't go on but you say facilitated, and we've

            11    got the loan that he's not on any of the paperwork.  So let's

            12    go to the PAC.

            13                   When you read these -- when you read these

            14    communications, you notice they were mostly George Chiang?

11:44AM     15          A       George Chiang typically interacted with

            16    Jose Huizar.  That's correct.

            17          Q       Okay.  So were you aware that it was Jose Huizar

            18    in the presence of George Chiang that got Chairman Huang to --

            19    someone tells me it's like U-n.  So you say Yuan -- Yuan to

11:45AM     20    pledge $100,000; right?

            21          A       I'm aware of communications in which

            22    Defendant Chan directed George Chiang to discuss the PAC with

            23    Jose Huizar.

            24          Q       So you're familiar that it was Ray Chan who

11:45AM     25    sabotaged that, who kept telling Chairman Huang, wait until

1    after -- or tells Huizar to wait until after Huang comes back

2    from China; correct?

3                THE PALMER:  Objection.  Calls for hearsay.

4    Assumes facts not in evidence.

5                THE COURT:  Sustained.

6                Mr. Braun, I hate to cut you off, but we're going

7    to have to have a change of court reporters.  We will take our

8    second break early so the court reporter can -- the new court

9    reporter can set up.

10                All right.  We will be in recess.

11                THE CLERK:  All rise for the jury.

12                (A recess was taken at 11:46 a.m.)

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                DATED THIS  24TH  DAY OF MAY, 2023.

16

17

18                /S/ MIRANDA ALGORRI

19                _____
                  MIRANDA ALGORRI, CSR NO. 12743, CRR
20                FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```