1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,          )
                                        )
6                      Plaintiff,       )
                                        )
7        v.                             )   Case No. CR 20-326 JFW
                                        )
8    RAYMOND SHE WAH CHAN,              )          Volume 5
                                        )     (Pages 678 - 802)
9                      Defendant.       )
     _____)

10

11           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                     JURY TRIAL:  DAY 4
12              FRIDAY, FEBRUARY 24, 2023
                        12:04 P.M.
13               LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23      MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                     (213) 894-2305


                     UNITED STATES DISTRICT COURT

1                 **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       E. MARTIN ESTRADA
      United States Attorney
5       BY:  SUSAN S. HAR
      BY:  CASSIE D. PALMER
6       BY:  MACK E. JENKINS
      BY:  BRIAN R. FAERSTEIN
7           Assistant United States Attorneys
      United States Courthouse
8       312 North Spring Street
      Los Angeles, California  90012
9

10   **FOR THE DEFENDANT:**

11       BRAUN & BRAUN, LLP
12       BY:  HARLAND W. BRAUN
      BY:  BRENDAN J. PRATT
13           Attorneys at Law
      10880 Wilshire Boulevard, Suite 1020
14       Los Angeles, California  90024

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1              **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                          PAGE

4    CIVETTI, Andrew

5        Cross-examination (Resumed) by Mr. Braun
         Redirect Examination by Ms. Palmer
6        Recross-examination by Mr. Braun
         Further Redirect Examination by Ms. Palmer
7        Further Recross-examination by Mr. Braun

8

9    ESPARZA, George

10       Direct Examination by Ms. Har

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXHIBITS

2                                        FOR              FOR
                                    IDENTIFICATION    EVIDENCE
3    NUMBER   DESCRIPTION               PG.              PG.

4      9  -  Los Angeles Municipal Code

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1                FRIDAY, FEBRUARY 24, 2023; 12:04 P.M.

 2                     LOS ANGELES, CALIFORNIA

 3                              -oOo-

 4           (In the presence of the jury:)

 5           THE COURT:  All right.  The jury is present, all

 6  counsel and the defendant are present.

 7                And welcome to our new court reporter.

 8                And we're ready to proceed.

 9                MR. BRAUN:  I'll try to keep the names straight for

10  the --

11                        ANDREW CIVETTI,

12     PLAINTIFF'S WITNESS, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

13                     CROSS-EXAMINATION (RESUMED)

14  BY MR. BRAUN:

15      Q.   Okay.  Let me just ask a different sort of question,

16  it just occurred to me.

17                Does the FBI have any program -- you know, we have

18  these -- like, these two billionaires in China come over here.

19  Do we have any kind of a program to say, hey, you can do this,

20  you can do that under our system?

21      A.   The FBI have a program letting developers know what

22  they can and can't do?

23      Q.   Right.

24      A.   I'm not aware of that.

25      Q.   Do you know if the Government even does that?  I
```

```
 1    mean, it's sort of confusing for -- I mean, if you come from a
 2    foreign country and you can give a million dollars to a PAC but
 3    you can't give someone a certain way but you can if you're a
 4    citizen but whatever.  We have nothing -- we have no education
 5    program like that, do we?
 6                MS. PALMER:  Objection, Your Honor.  Relevance.
 7                THE COURT:  Sustained.
 8        Q.    (BY MR. BRAUN:)  Okay.  Now, so let's go back to
 9    the -- so the case.  We got the trip to Vegas and we got the
10    loan and now we've got the PAC.  So the PAC -- are you aware
11    that, when you go through, that it was Ray Chan who kept
12    delaying the payment on the PAC?  Can you tell that from the
13    e-mail?
14                MS. PALMER:  Objection.  Assumes facts not in
15    evidence.  Calls for hearsay.
16                THE COURT:  I think you have to be more specific
17    with respect to the --
18        Q.    (BY MR. BRAUN:)  Okay.  There's e-mails where -- you
19    could see the e-mails that Huizar keeps pounding on Chiang,
20    Where's the money, where's the money; correct?
21        A.    I reviewed a number of text messages in which
22    Jose Huizar and George Chiang were discussing the PAC payment.
23        Q.    Yeah.  And there's really no problem -- I mean, this
24    idea that you have wait until Chairman Huang comes to the
25    United States.  He could pay it from China; correct?  But he'd
```

**UNITED STATES DISTRICT COURT**

1    probably have to direct his American subsidiary to pay it

2    because he can't, he's a foreign national; correct?

3         A.   He could have the ability to pay it while he's still

4    in China, that's correct.

5         Q.   So now we've got -- okay.  Now, the PAC was never

6    paid; is that right?

7         A.   The $100,000 was not received from the PAC.

8         Q.   And my client never went to Vegas; correct?

9         A.   He did not go to Vegas.

10        Q.   And he's not signed on any of the loan documents;

11   correct?

12        A.   His name is not on the loan documentation.

13        Q.   So now -- let's see.  Now, he -- let's see.  He is

14   charged, as I understand it, with hiring Deron Williams, Jr.,

15   to work with your undercover at the kitchen place in order to

16   influence his father; is that right?

17        A.   He's not charged specifically for hiring

18   Deron Williams, Jr., but it is a part of the RICO charge in

19   which his conduct of hiring that public official's son while

20   asking that public official for -- contacting the mayor on

21   behalf of the Hazens project.

22        Q.   So then -- and the fact that he fired him because he

23   didn't do the job, is that in the Indictment?  Do you know?

24             MS. PALMER:  Assumes facts not in evidence.  403,

25   Your Honor.

1          THE COURT:  Sustained.

2     Q.   (BY MR. BRAUN:)  Did he fire him, according to your

3  investigation?

4     A.   He did fire him.

5     Q.   Okay.  Now, he's also charged or part of the RICO

6  with hiring Ave, the wife of Jacinto; correct?

7     A.   He did not hire Ave Jacinto, no.

8     Q.   He recommended her; correct?

9     A.   He directed Andy Wang to hire Public Works

10 commissioner Joel Jacinto's wife, Ave Jacinto, that's correct.

11    Q.   She was hired twice; correct?

12    A.   He did direct Andy Wang to hire her twice.

13    Q.   He recommended the first time, and he paid her

14 $6,000; correct?

15    A.   I believe $6,000 was paid to Ave Jacinto by

16 Andy Wang.

17    Q.   Okay.  And Andy Wang is the guy working for you;

18 correct?  Working off his case with you; correct?

19         MS. PALMER:  Objection, Your Honor.  Assumes facts

20 not in evidence.

21         THE COURT:  Overruled.

22         THE WITNESS:  He was cooperating with the Government

23 at the time.

24    Q.   (BY MR. BRAUN:)  Okay.  And then, he then decided to

25 hire Ave Jacinto back; correct?

**UNITED STATES DISTRICT COURT**

1      A.    "He," Raymond Chan?  Who is the "he"?

2      Q.    The "he" is Cabwin (phonetic) Wang, Andy Wang?

3      A.    Andy Wang hired Ave Jacinto at the direction of

4  Defendant Chan on both occasions.

5      Q.    And he was working -- Andy Wang was working for you;

6  correct?

7      A.    Andy Wang was cooperating with the Government.

8      Q.    And who told you that?  Andy Wang?

9      A.    That he was cooperating with the Government?

10     Q.    No.  That -- that he decided to hire her back at my

11 client's direction.

12     A.    Based on my debriefs with Andy Wang after those

13 recordings, as well as the review of the recordings, it was

14 consistent that Defendant Chan had directed Andy Wang to do

15 those hirings.

16     Q.    Now, you're familiar with how much work Ave Jacinto

17 did; correct?

18     A.    I'm familiar that Ave Jacinto did complete work for

19 Andy Wang.

20     Q.    And attended at least 30 meetings; correct?

21     A.    There were a number of meetings that Ave

22 participated in.

23     Q.    And produced a number of documents; correct?

24     A.    Correct.

25     Q.    And had they -- and had a work -- she had to keep

1    track of what she did on a program; correct?

2        A.    I'm not sure of a program or what she was keeping

3    track of, but she did complete work.

4        Q.    And she did more than enough work for the amount

5    that she was paid; correct?

6        A.    I wouldn't be able to determine the amount of work

7    versus amount paid.  That --

8        Q.    Even though --

9        A.    I'm not aware.

10       Q.    Even though Andy Wang was working under your

11   direction; correct?

12       A.    Andy Wang was cooperating with the Government.

13       Q.    How long did -- what months did he cooperate with?

14       A.    He began cooperating in August of 2017, and he's

15   still continuing to cooperate to today.

16       Q.    Okay.  Has he ever been actually charged with a

17   crime?

18       A.    He has not been charged.

19       Q.    But you have the evidence to charge him if you want

20   to; correct?

21            MS. PALMER:  Objection, Your Honor.  Relevance.

22   403.

23            THE COURT:  Sustained.

24       Q.    (BY MR. BRAUN:)  So -- okay.  Now, so to have a

25   quid pro quo, you have to get something; right?

1       A.    Benefits being provided --

2       Q.    Benefits, right.

3       A.    -- correct.

4       Q.    So my client didn't get anything out of the trips to

5   Vegas, did he?  Did he ever go to Vegas, have a bottle of wine,

6   Coca-Cola, anything?

7       A.    Not aware of benefits that Defendant Chan received

8   from Vegas, no, on those trips.

9       Q.    And then on the loan, he got no benefits, did he?

10  He wasn't even involved with the loan; correct?

11      A.    It's not my understanding -- it's my understanding

12  he was involved with the loan.

13      Q.    And if he wasn't involved with the loan, would that

14  make any difference?

15      A.    If he was not involved?

16      Q.    Yeah.  He didn't -- he didn't sign any documents, he

17  didn't do anything; correct?

18      A.    He was not signing documents on the loan, that is

19  correct.  He was not on the loan.

20      Q.    Okay.  And there's no evidence that he ever got

21  anything from the loan; correct?

22      A.    From the loan proceeds, no.  He did not receive any

23  of those loan proceeds.  It was to settle the sexual harassment

24  lawsuit.

25      Q.    It wasn't against him, the sexual harassment

1    lawsuit, was it?

2        A.    No.  It was against Councilmember Jose Huizar.

3        Q.    Okay.  And then the PAC, the money never went

4    through; correct?

5        A.    The PAC money was not paid, no.  That's correct.

6        Q.    They were raising money for scholarships for a

7    Catholic high school or a Catholic school; correct?

8        A.    One of the benefits that we were investigating was

9    the indirect benefits to Salesian High School by the various

10   developers and coordinated with Raymond Chan and Jose Huizar.

11       Q.    So Raymond Chan couldn't suggest to some third

12   person, oh, by the way, would you give some money to a Catholic

13   high school without committing a crime?

14       A.    Independently?

15       Q.    Okay, right.

16       A.    Independently, that would be okay.

17       Q.    And you're -- and you're familiar that

18   Raymond Chan's entire family is here from China; correct?

19            MS. PALMER:  Objection.  Relevance, Your Honor.

20            THE COURT:  Sustained.

21       Q.    (BY MR. BRAUN:)  You're aware he's an American

22   citizen; right?

23       A.    Yes, I'm aware he's an American citizen.

24       Q.    So unlike -- he chose to be an American.  You and I

25   are probably born Americans; right?

```
1          MS. PALMER:  Objection, Your Honor.  Relevance.

2          THE COURT:  Sustained.

3     Q.    (BY MR. BRAUN:)  Okay.  So now I see there's some

4   kind of a theory -- and you correct me if I'm wrong -- that he

5   conspired with Huizar to block a consolidation to save his job.

6   Is that the theory that the Government's come up with?

7     A.    That was part of the investigation, was the request

8   being made by Defendant Chan to Jose Huizar involving that

9   consolidation.

10    Q.    Okay.  Have you studied the consolidation?

11    A.    I've reviewed the consolidation.

12    Q.    Do you understand the politics behind the

13  consolidation?

14    A.    I understand that Defendant Chan's involvement in

15  having and drafting motions for Jose Huizar to then stop that

16  consolidation.

17    Q.    Oh, yeah.  So public -- he can't participate in

18  recommending to the City that he works what would be a

19  reasonable consolidation; correct?

20    A.    Independently, that would be fine.

21    Q.    Okay.  And part of his job as a -- working for the

22  City is to give him the best advice; correct?

23    A.    Independently, that would be fine.

24    Q.    And the fact is that every City councilman voted

25  against the consolidation after it was recommended by an
```

1   independent consultant; correct?

2        A.    The final City Council vote on those motions, yes.

3   The entire City -- I don't know the -- rephrase.

4            City Council approved those motions.  I am not aware

5   if every 15 councilmember voted yes or no.  I would have to

6   review the specific documents.  I don't know how Huizar voted.

7        Q.    You're aware that the construction industry was

8   against it; correct?

9        A.    Not aware of every industry, if they were pro or

10   against consolidation.

11       Q.    You were aware that the labor unions were against

12   it; correct?

13            MS. PALMER:  Objection, Your Honor.  Relevance.

14            THE COURT:  Sustained.

15       Q.    (BY MR. BRAUN:)  From your -- the consolidation was

16   designed to protect the guy who didn't have the qualifications,

17   he was on a two-year waiver, Mr. Ovrom?

18            MS. PALMER:  Objection, Your Honor.  Assumes facts

19   not in evidence.  Relevance.

20            THE COURT:  Sustained.

21       Q.    (BY MR. BRAUN:)  Do you know -- do you know the

22   background behind the consolidation?  Do you know -- what

23   investigation did you do?

24       A.    I'm aware of the documents that were submitted on

25   the City file and the motions and then as well as the

1    communications between Defendant Chan and Jose Huizar related

2    to consolidation.

3         Q.   The motion that my client provided to Mr. Huizar

4    would have blocked the consolidation; correct?

5         A.   I believe the language in the motion was cease, so

6    end consolidation.

7         Q.   Okay.  And the one that was passed, that was never

8    used; correct?

9         A.   The one that was passed was very similar in language

10   but watered down.  It was not going to cease it; however, it

11   would postpone it.

12        Q.   Okay.  And to hire for a million dollars or whatever

13   it is a consultant; right?

14        A.   Correct.  It was directing a consultant to be hired.

15        Q.   Okay.  And a consultant made a study and came back

16   with a recommendation; correct?

17        A.   That is correct.

18        Q.   And they recommended against the consolidation;

19   correct?

20        A.   There were various recommendations.  But, overall,

21   the theme was to not consolidate those two departments.

22        Q.   Because it was bad for the City; correct?

23        A.   I don't know that I would characterize it as bad,

24   but there were recommendations on why that should not occur.

25        Q.   Okay.  It was -- it was recently a political thing,

```
 1   scam, that cost the taxpayers a million dollars; correct?
 2              MS. PALMER:  Objection, Your Honor.  Relevance.
 3   403.
 4              THE COURT:  Sustained.
 5       Q.    (BY MR. BRAUN:)  Now, so we -- my client got nothing
 6   out of the trips to Vegas; correct?
 7       A.    He was not on the trips.  He was not part of the
 8   group benefits.
 9       Q.    But he didn't sign -- got nothing from the loan;
10   correct?
11       A.    Did not receive any proceeds from that loan.
12       Q.    And the PAC didn't even go through; correct?
13       A.    That hundred thousand dollars that was agreed upon
14   was not paid.
15       Q.    Okay.  And so -- and he got -- let me ask you this.
16   So you're familiar with the City rules about people leaving the
17   City and restrictions; correct?
18       A.    I am generally familiar with those rules.
19       Q.    Okay.  And there's no restriction -- well, first
20   place, if he had -- is there a difference between a -- what we
21   would call an administrative where a decision has to be made,
22   like how far -- how far a fire hydrant has to be from a wall as
23   opposed to a discretionary.  There's a discretionary item,
24   correct?  That's where you have to approve a -- a change;
25   correct?
```

```
 1        A.    Correct.
 2        Q.    But if it's a -- not a discretionary item, then
 3   it's -- that's a different type of restriction; correct?
 4        A.    The restriction on nondiscretionary, such as just
 5   like setting up a meeting, admin-type tasks, um, you're
 6   correct, that's different than a discretionary approval.
 7        Q.    And there's no law that says that a person who's
 8   worked for 30-some years for the City of Los Angeles can't work
 9   for a consultant, is there?
10        A.    There is rules and regulations on what work can and
11   can't be completed and whether that work is being done directly
12   or indirectly through an agent or a proxy.
13        Q.    Okay.  So now, let's be clear.  If you had a
14   discretionary role in the City, you can't go out and work on
15   anything that involves that discretionary.  You've basically
16   got a lifetime ban; correct?
17        A.    Not recalling every specific but generally, yes, if
18   there was discretionary approvals and there was substantial
19   involvement, there are prohibitions against what you can and
20   cannot work on.
21        Q.    For life, you can't touch it; correct?
22        A.    I believe there is a lifetime ban on the elements of
23   that, that's correct.
24        Q.    That makes sense, because you -- now, as to other
25   items, you can do certain types of work, you can -- correct? --
```

1    for a year?

2          A.    There is some -- there's a cooling-off period that

3    you're prohibited from certain things for that year.

4          Q.    And what you can't do is you can't approach anyone

5    in the City who has a -- has discretion?

6          A.    You cannot, directly or indirectly, approach a City

7    official.

8          Q.    And so there's no prohibition in making -- in

9    working for a consultant.  There's only prohibition on what

10   specifically you can do; correct?

11         A.    There is a prohibition on directing that consultant,

12   then, he cannot do that -- or that is -- the prohibition is

13   direct or indirect.  So working with a consultant and directing

14   the consultant to do something would also be prohibited.

15         Q.    And so what can you do?  So you -- you could work on

16   a project, but you can't do anything; right?  Is that what this

17   says?

18         A.    The Code requires you to have a cooling-off period

19   so that you're not using your previous position to influence

20   when you leave the City.

21         Q.    Can you -- can you do anything during that year?

22         A.    Not related to lobbying of officials, directly or

23   indirectly.

24         Q.    Lobby -- you can't lobby officials who have any

25   discretion; correct?

1     A.    Directly or indirectly, that is correct.

2          MR. BRAUN:  No further questions, Your Honor.

3          THE COURT:  All right.  Any redirect?

4          MS. PALMER:  Yes, Your Honor.

5               **REDIRECT EXAMINATION**

6 BY MS. PALMER:

7     Q.    Special Agent Civetti, I want to start where defense

8 counsel ended.  He said that Raymond Chan got nothing out of

9 the Vegas trips.

10        Did Raymond Chan, based upon the evidence you

11 reviewed, get something out of the Vegas trips?

12     A.    Yes.

13     Q.    And what was that?

14     A.    The stopping or postponing of that consolidation and

15 ultimately the appointment as general manager.

16     Q.    And is the defendant charged by the Government with

17 receiving those benefits?

18     A.    He is charged with the aiding and abetting of the

19 Vegas benefits.

20     Q.    And did you recover evidence in your investigation

21 that the defendant aided and abetted, meaning, did he -- did

22 you see him helping facilitate the benefits that Jose Huizar

23 received?

24     A.    That's correct.

25     Q.    Now, defense counsel also said that the defendant

1    got nothing from the sexual harassment loan.

2            Is the defendant charged with receiving funds from

3    that sexual harassment loan?

4        A.    No.   The defendant is not charged for that.

5        Q.    And is he, instead, charged with aiding and abetting

6    that sexual harassment loan?

7        A.    That's correct.

8        Q.    And what evidence did you recover in the

9    investigation relating to the ways in which the defendant

10   assisted on that loan?

11       A.    Numerous communications between the defendant and

12   Jose Huizar.

13       Q.    And did he also assist by talking to the chairman?

14       A.    That's correct.

15       Q.    And with respect to the PAC, defense counsel asked

16   you about the fact that that PAC did not go through.

17            Did you see any evidence in the record where --

18            THE COURT:  You're starting out with a false

19   premise, the PAC didn't go through.  You mean the payment of

20   the PAC didn't go through.

21            MS. PALMER:  Yes, Your Honor, I apologize.

22            THE COURT:  You don't have to apologize.  Just make

23   the question more specific.

24       Q.    (BY MS. PALMER:)  That the hundred-thousand-dollar

25   payment from Hazens was never actually paid.

1          A.    Correct.  That payment was not paid or made.

2          Q.    And was there anything in the record that you saw

3     where the defendant told Jose Huizar that this is not going to

4     be coming through or indicated in any way that Hazens would not

5     pay that money?

6          A.    No.  There was no evidence of communicating that to

7     Jose Huizar.

8          Q.    And did you instead see communications relating to

9     advising Jose Huizar that that PAC payment would come through?

10         A.    That's correct.

11         Q.    And can you describe some of those?

12         A.    Not only the communications directing George Chiang

13    to have discussions with Jose Huizar regarding the PAC.  There

14    was also Radar Screens in which the defendant was categorizing

15    the arrangement and including the fact that they would talk to

16    Jose Huizar specifically on May 18th and, additionally, that

17    the Chairman would be coming in town.

18         Q.    And defense counsel mentioned one other thing that

19    didn't end up going through as far as Deron Williams being

20    fired -- Deron Williams, Jr., being fired.

21               Was Deron Williams, Jr., fired after the project had

22    already passed the milestone for which his father was helpful

23    to the project?

24         A.    That is correct.

25         Q.    And with respect to the PAC money that had been

```
 1   promised, was that not paid only after Jose Huizar had already

 2   voted yes and assisted the Luxe Hotel project in various ways?

 3        A.   That's correct.

 4        Q.   Now, I want to talk to you about a few topics that

 5   the defense brought up on cross.  I want to talk to you about

 6   Shawn Kuk.

 7             On cross, you were asked about whether you paid a

 8   bribe to Shawn Kuk.  Is Shawn Kuk Huizar's planning director?

 9        A.   That's correct.

10        Q.   And is the photo of him on the screen there,

11   Exhibit 1 at page 17?

12        A.   That's correct.  There's a photograph of Shawn Kuk.

13        Q.   And did the FBI pay a bribe to Shawn Kuk?

14        A.   The FBI provided a hundred thousand dollars of cash

15   to Andy Wang to provide to Shawn Kuk.

16        Q.   And that --

17             THE COURT:  Wait a minute.  Wait a minute.  You said

18   a hundred thousand?

19             THE WITNESS:  10,000.  I apologize.

20        Q.   (BY MS. PALMER:)  And did the FBI attempt to bribe

21   Shawn Kuk or was that bribe at someone else's direction?

22        A.   It was at the direction of Defendant Chan.

23        Q.   And can you describe that?

24        A.   The Defendant Chan during a conversation with

25   Andy Wang instructed Andy Wang that they should provide a
```

1    finder's fee to Shawn Kuk and that that finder's fee would be

2    to have Shawn Kuk introduce Andy Wang to various developers,

3    the developers that Shawn Kuk was aware of with projects in the

4    city.

5          And subsequently, the defendant directed Andy Wang

6    on different ways of paying Shawn Kuk and that, when Shawn Kuk

7    did not want to take possession of the money at the time,

8    Defendant Chan agreed to hold on to it and to track the

9    $10,000.

10   Q.   And do you have recordings corroborating what

11   Andy Wang, the source cooperating with the Government, told you

12   about that?

13   A.   That's correct.  Not only would I meet with

14   Andy Wang directly after those meetings in which he would

15   debrief me on what occurred during that meeting, there were,

16   then, also recordings that I reviewed to corroborate whether

17   what Andy Wang was saying was accurate or not accurate.

18   Q.   And you were asked about the fact that Shawn Kuk

19   never took actual possession of the money.  Again, did he agree

20   to take possession of it?

21   A.   Correct.

22   Q.   And who was the person who held on to it for

23   Shawn Kuk?

24   A.   Andy Wang ultimately held on to the money.

25   Q.   And did Raymond Chan document that he was going to

1    be holding on to it for Shawn Kuk?

2         A.    Yes.  On multiple Radar Screens, the defendant had

3    an entry related to SK and holding the $10,000 on behalf of

4    Andy Wang.

5         Q.    And if we could bring up Government's Exhibit 45C-4,

6    please.

7               And is this one of those entries that the defendant

8    was tracking with respect to the $10,000 -- $10,000 for

9    Shawn Kuk?

10        A.    Yes.  This is a Radar Screen with a category Andy,

11   including finder fee and commission.  And then specifically

12   reserve 10 for SK.  And it was my understanding that "10" was

13   the 10,000 that was discussed.

14        Q.    And did anything happen shortly after Shawn Kuk

15   agreed to the defendant's deal for $10,000 that affected

16   Shawn Kuk's ability to collect the money?

17        A.    Yes.  The FBI's investigation became over and the

18   search warrants had been executed.

19        Q.    And with respect to the PAC, did anything happen

20   around the time -- before Richelle Rios was able to announce

21   her candidacy?

22        A.    Can you repeat the question?

23        Q.    Did anything -- did Richelle Rios end up running for

24   that office seat?

25        A.    She announced her candidacy around September of

1    2018.  After the FBI executed search warrants, she withdrew her

2    candidacy.

3        Q.    And I want to talk to you briefly about Andy Wang.

4    We just mentioned him with respect to Shawn Kuk.

5        On cross, you were asked whether the defendant

6    helped Andy Wang for nothing.  In fact, did the defendant have

7    something to gain from hiring a commissioner's wife?

8        A.    Yes.

9        Q.    And what was that?

10        A.    The -- after the entitlements had been obtained in

11    the Luxe Hotel project, the defendant and George Chiang

12    obtained a contract that I've reviewed relating to the

13    construction of that project and part of that being B permits

14    that would be required.  And the commissioner, Joel Jacinto,

15    oversaw multiple departments that were involved with the

16    B permits.

17        Q.    And so, although Andy Wang was not getting paid, it

18    helped him to pay for Ave Jacinto to assist with this?

19        A.    Although the defendant was not being paid, he was

20    benefiting by having the B permits because he had a $70,000 a

21    month contract with Hazens to get that pushed through.

22        Q.    And looking at the screen here, on the left, is that

23    Ave Jacinto?

24        A.    That is.

25        Q.    And on the left, is that Joel Jacinto?

1      A.    Yes.  That's her husband, Joel.

2      Q.    The defense asked you about campaign finance laws

3   relating to municipal codes and different codes of ethics.  Do

4   you remember those questions?

5      A.    Yes.  I believe defense counsel was asking related

6   to the specifics of fundraising that are outlined in the Code

7   of Ethics.

8      Q.    And one of the things that you said in response is

9   that there are different codes that apply to different

10  individuals?

11     A.    That is correct.

12     Q.    And do certain public officials have heightened

13  duties that go beyond a regular employee?

14     A.    Yes.  There are heightened restrictions for some

15  City employees.

16     Q.    And with respect to those heightened requirements

17  for -- sorry -- for the heightened requirements, are those

18  contained in the campaign finance ordinance of the Los Angeles

19  Municipal Code?

20     A.    That's correct.

21          MS. PALMER:  And, Your Honor, at this time, I'd like

22  to publish that Code.

23          THE COURT:  What exhibit is it?

24          MS. PALMER:  It's one I just provided to the Court.

25  It will be Exhibit No. 9.

**UNITED STATES DISTRICT COURT**

```
 1                  (Exhibit 9 for identification.)

 2                  MS. PALMER:  And may I approach and give a copy to

 3      the witness?

 4                  THE COURT:  No.  Not until I look at it.

 5                  So Exhibit 9 was not on the original exhibit list.

 6                  MS. PALMER:  No.  This was one in response to

 7      defense counsel's arguments -- or statements relating to the --

 8      a different Code.

 9                  THE COURT:  It was in response to his

10      cross-examination this morning?

11                  MS. PALMER:  Yes, Your Honor.

12                  THE COURT:  All right.  Why don't you let me see a

13      copy of it.

14                  MS. PALMER:  I -- I put one over there, Your Honor.

15                  THE COURT:  Where?

16                  All right.  You may approach the witness.

17                  Mr. Braun, you have a copy of it; right?

18                  MR. BRAUN:  Yeah.  I just got it.  Yes, Your Honor.

19                  THE COURT:  All right.  Why don't you direct your

20      attention to what you're going to ask Agent Civetti about so we

21      don't have to read the whole document.

22           Q.    (BY MS. PALMER:)  Special Agent Civetti, is this --

23      when you were talking about the heightened requirements for

24      certain public officials, is this the provision of the

25      Los Angeles Municipal Code that you were referring to?
```

**UNITED STATES DISTRICT COURT**

1      A.    That is correct.

2      Q.    And when you were referring to the type of person

3  who was not permitted to do certain kinds of fundraising, is

4  that contained at subsection B1?  Oh, sorry.

5      A.    I believe it's C.

6      Q.    Yes.  Sorry.  C.

7            THE COURT:  Is there a question pending?

8            MS. PALMER:  Yes.

9      Q.    (BY MS. PALMER:)  And so based upon -- so this is

10  the code that you were referring to; is that correct?

11      A.    That's correct.

12      Q.    And this is a heightened code that applies beyond

13  normal employees who may not, for example, fundraise on City

14  time?

15      A.    Yes.  This is a more stringent code.

16      Q.    And what types of prohibited fundraising apply to

17  persons, including does this apply to general managers?

18      A.    It does.

19      Q.    And what types of prohibited fundraising would apply

20  that you were referring to that the defendant was not permitted

21  to do and that you observed he did do?

22      A.    Requesting donations, inviting individuals to

23  campaign events, as well as providing lists to elected

24  officials to invite people to events.

25            MS. PALMER:  Your Honor, at this time, the

1    Government would move to admit this into evidence.

2              THE COURT:  Any objection to Exhibit 9?

3              MR. BRAUN:  No objection, Your Honor.  We have our

4    own.

5              THE COURT:  All right.  Exhibit 9 will be received

6    into evidence.  It's a three-page document entitled "Campaign

7    Finance Ordinance."

8              (Exhibit 9 received into evidence.)

9              MS. PALMER:  And if I may just display A2.

10         Q.   (BY MS. PALMER:)  And looking at A2, are these the

11   types of prohibited fundraising here that you are talking

12   about?

13         A.   That is correct.

14         Q.   And those include things like inviting a person to a

15   fundraising event?

16         A.   Yes.  That's element B.

17         Q.   And does it also include things like delivering a

18   contribution other than one's own, either by mail or in person

19   to an elected City officer or candidate for elected City

20   office?

21         A.   Yes.  That's a prohibited fundraising, subsection I.

22         Q.   Now, we also talked about the one-year bar.  And one

23   of the things that you said is that officials are not permitted

24   to lobby either themselves or to use a proxy.

25              What did you mean by "proxy"?

1          A.      A proxy, meaning an individual that's acting at the

2    direction or on behalf of the former City official.

3          Q.      And did you see defendant using a proxy in this case

4    during the one-year period that he did not -- after he worked

5    at the City?

6          A.      That's correct.

7          Q.      And who was that proxy?

8          A.      George Chiang.

9          Q.      And what was the type of evidence that you saw

10   relating to his use of a proxy?

11         A.      E-mails, text messages, intercepted phone calls.

12         Q.      And in addition to him using a proxy after he was

13   working in the City to do work on development projects, did you

14   also see him do work on development projects while he was in

15   the City?

16         A.      That's correct.

17         Q.      And, for example, did you hear him say that he had

18   been working on the Hazens project for nine months?

19         A.      Yes.

20         Q.      And would that have included time while he was in

21   the City?

22         A.      Yes.

23         Q.      Now, defense counsel asked you many times to look at

24   certain situations in isolation.  Do you remember those

25   questions?

1        A.     Yes, I do.

2        Q.     And to look at certain things in and of itself.  Do

3    you remember that phrase being used?

4        A.     Correct.

5        Q.     And when you're investigating public corruption, do

6    you look at just one thing by itself?

7        A.     No.

8        Q.     What do you look at?

9        A.     We're looking at the totality of what's occurring,

10   not only the events in independent time but the events

11   surrounding that time.  So as the timelines are prepared,

12   was -- basically what I do throughout the investigation is

13   tracking when benefits are being provided, when City votes are

14   being provided, and the relationship between who is providing

15   and accepting or agreeing to accept those benefits.

16       Q.     And so is it fair to say that you're not looking

17   at -- just because of one thing, you don't ignore all the other

18   evidence?

19       A.     I do not look at the evidence in isolation.  I look

20   at it totalitary -- together.

21       Q.     And do you also look, when you're looking at corrupt

22   relationships, at things like grooming?

23       A.     Yes.  That is a phrase I would use to characterize

24   the corrupt relationship that we're looking into.

25       Q.     And the defense asked you about things being

1    pending.  Do you remember those questions?

2        A.    Yes.

3        Q.    And just for example, let's talk about Shen Zhen New

4    World.  The defense asked you whether they had anything pending

5    in Jose Huizar's district when they were providing benefits to

6    him.

7              Do you recall those questions?

8        A.    Yes, I recall the pending questions.

9        Q.    And in your view -- so did the evidence in this case

10   show that Shen Zhen had two hotels in Jose Huizar's district

11   during the relevant period?

12       A.    There was one hotel in Jose Huizar's district,

13   The L.A. Grand, and there was another hotel that he owned,

14   Sheraton Universal, but it was in the city of Los Angeles.

15       Q.    And that's a hotel that, if he had developments on,

16   that would come before the PLUM committee on which Huizar sat?

17       A.    Yes.  Both of these would go before PLUM, regardless

18   of the district.

19       Q.    And did those hotels have various renovations and

20   many other types of things during the relevant period?

21       A.    Yes.  There was renovations as well as a number of

22   disputes that Jose Huizar was involved with and as well as

23   Defendant Chan.

24       Q.    And the evidence that you had in your investigation,

25   did it show that, in fact, Huizar did assist Shen Zhen New

1    World in resolving those issues?

2         A.    Multiple times.

3         Q.    And that's while he was receiving a stream of

4    benefits?

5         A.    That's correct.

6         Q.    The defense asked you about whether a subsidiary

7    that is owned by a United States subsidiary can legally give

8    contributions to a candidate.

9               Do you remember those questions?

10        A.    I believe it was U.S. subsidiaries that are

11   ultimately parent owned by a foreign company.

12        Q.    And did you -- do you know whether -- you said

13   something about if it's approved by a foreign national, that's

14   not permitted?

15        A.    That's correct.

16        Q.    Can you explain what you meant by that?

17        A.    Regardless, if -- the company doing the donation, if

18   it's a U.S. subsidiary, if that donation is being made at the

19   direction of the foreign principal, meaning the owner of that

20   company, that would be prohibited.

21              So through the investigation, we were investigating

22   whether Chairman Yuan or Chairman Huang were agreeing to

23   donations.  And based on subpoenas I received from Shen Zhen

24   New World, it was evident that Chairman Huang would be the

25   approver on donations.

1      Q.    And did you also see evidence that Chairman Yuan was

2    approving things like the $100,000 PAC, which I know is not

3    under contributions but that he was involved in that as well?

4      A.    He would be involved in the approval of fundraisings

5    being hosted at The Luxe Hotel as well as that hundred thousand

6    dollars to the PAC.

7      Q.    And are donations to high schools related to

8    politics subject to contribution restrictions?

9      A.    No, I'm not aware of restrictions for such a

10   payment.

11     Q.    And are concert tickets related to politics in any

12   other way?

13     A.    They are related in the sense that, if they are

14   being provided to public officials, they are required to be

15   disclosed on their disclosure forms.

16     Q.    And what about gambling chips?

17     A.    Same thing.

18     Q.    And money to settle a lawsuit?

19     A.    Same thing.

20           MS. PALMER:  Your Honor, may I have one moment?

21           THE COURT:  Yes.

22           (Off-the-record discussion between counsel.)

23           MS. PALMER:  No further questions, Your Honor.

24           THE COURT:  All right.

25           MR. BRAUN:  Just briefly, Your Honor.

1           THE COURT:  All right.  Mr. Braun.

2                    **RECROSS-EXAMINATION**

3    BY MR. BRAUN:

4      Q.    So if I understand the theory and the -- the benefit

5    that Ray Chan got from the Vegas trips was the blocking of the

6    consolidation?  Is that the theory?

7      A.    I don't believe that's specifically what I said.

8      Q.    I thought that's what the -- the answer was, that

9    the -- that the benefit that he got from the Vegas trips was

10   that the consolidation was blocked, to his benefit.  Is that

11   right?

12     A.    I believe I said that he received no benefits from

13   those Vegas trips but at the same time the consolidation was

14   blocked.

15     Q.    So what -- so he got no benefit, but the

16   consolidation was blocked.  So the consolidation had nothing to

17   do with the Vegas trips; right?

18     A.    He wasn't charged on receiving benefits from that

19   Vegas trip.

20     Q.    Well, let's -- let's talk about the real world.

21   He -- the consolidation was blocked because it made no sense;

22   correct?

23           MS. PALMER:  Objection, Your Honor.  Argumentative.

24   Assumes facts not in evidence.

25           THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  Can you repeat the question?

2     Q.    (BY MR. BRAUN:)  The consolidation was blocked

3  because it made no sense.

4     A.    There could be legitimate reasons for why that

5  consolidation did not occur.

6     Q.    Right.

7          And one of the reasons was because it was -- it was

8  Villaraigosa's payoff to a buddy who wouldn't qualify for a

9  job; isn't that right?

10          MS. PALMER:  Objection, Your Honor.  Relevance.

11  403.

12          THE COURT:  Sustained.

13     Q.    (BY MR. BRAUN:)  Okay.  Now, so the other theory is

14  that with all this money that's being involved, that they hire

15  junior to do some computer scans to see which jurisdictions

16  have rent control; correct?

17     A.    I believe the contract outlines to do research on

18  rent control in Los Angeles.

19     Q.    And the total value of the contract was $4,000?

20     A.    I believe it was $1,000 per month.  I can't recall

21  the duration of how long that contract should be.

22     Q.    And that he got about -- there was complaints that

23  his work was unsatisfactory; correct?

24     A.    I've reviewed e-mails in which there was discussion

25  that the reports or the work was subpar at best.

1      Q.    And so then they fired him; right?

2      A.    He was fired.

3      Q.    And the difference -- he got about 1900.  So they

4  fired him over $2100; right?

5      A.    I believe he received $1900, and he did receive that

6  money and then he was fired after the approvals of the Luxe.

7      Q.    You mean because -- what you're doing is you're

8  putting together things that may have no connection; correct?

9      A.    I'm putting together things that are happening at

10  the same period of time.  I'm not looking at the events

11  independently.

12      Q.    You did that with the -- with your timelines, you

13  just took items that had nothing to do with each other, he's

14  got 300 program -- improvements going on, you put them all in

15  the same timeline.  Correct?

16      A.    I'm creating a timeline of the facts in evidence

17  that I had received and what is relevant and happening at that

18  time frame, that is correct.

19      Q.    You're saying that for $2100, they fired junior

20  whose father was on the board -- correct? -- even though they

21  were in the business of getting approvals; correct?

22      A.    I --

23            MS. PALMER:  Objection, Your Honor.  Misstates

24  testimony.  Misstates facts.

25            THE COURT:  I think the question is ambiguous.

1    You're going to have to rephrase.

2        Q.    (BY MR. BRAUN:)  Okay.  So under the contract, they

3    would have owed him $2100; correct?

4        A.    I believe the contract was $1,000 a month, and

5    ultimately what was paid was $1900.  I'm not sure what $2100

6    reference you're making.

7        Q.    The difference between 1900 and the gross --

8    whatever the amount is on the -- the contract -- that's why I

9    subtracted.  I assumed it was 4,000; but if it was more, there

10   would be a different figure.  Correct?

11       A.    I'm not understanding the question.

12       Q.    Doesn't make any sense, does it, in this business if

13   you're trying to influence some commissioner, you're going to

14   fire his son over a relatively small amount of money and you

15   have corroboration that his work was subpar?

16       A.    Based on my investigation and looking at the

17   evidence at the time, Deron Jr. had been hired shortly before

18   requests were being made to Deron Williams to talk to the

19   Mayor's office regarding The Luxe Hotel project.  So it was

20   relevant that a son of a public official was then talking with

21   the Mayor's -- being hired and then that public official is

22   acting on behalf of the company.

23       Q.    Did you notice in your evidence that my client

24   excluded his partner, George Chiang, from -- from a meeting

25   where Deron Sr. would be just to prevent any kind of a

```
 1   violation?  Correct?  Would you say that?
 2              MS. PALMER:  Objection, Your Honor.  Assumes facts
 3   not in evidence.
 4              THE COURT:  Sustained.
 5       Q.    (BY MR. BRAUN:)  Okay.  So what you're saying is
 6   that the jury can look at this evidence and there's e-mails in
 7   there where my client is coordinating the trips to Las Vegas;
 8   is that right?
 9       A.    We did review text messages in which he was
10   coordinating the trip.
11       Q.    And they're in there; right?
12       A.    That has been admitted as evidence, that's correct.
13              MR. BRAUN:  Okay.  No further questions, Your Honor.
14              THE COURT:  All right.  May this witness step down?
15              MS. PALMER:  Just one question, Your Honor.
16              THE COURT:  All right.
17                     FURTHER REDIRECT EXAMINATION
18   BY MS. PALMER:
19       Q.    Defense counsel asked you about Defendant Chan not
20   receiving anything.  Did he receive money from Hazens?
21       A.    Yes.
22              MS. PALMER:  No further questions.
23              THE COURT:  All right.  You may --
24              MR. BRAUN:  Just one question.
25              THE COURT:  Sure.
```

```
 1           MR. BRAUN:  A follow-up.
 2                 FURTHER RECROSS-EXAMINATION
 3  BY MR. BRAUN:
 4      Q.   He got money after he left the City; correct?
 5      A.   The payment of the money did occur after he left the
 6  City.
 7      Q.   And he worked for six months for no pay; right?
 8      A.   The --
 9      Q.   He didn't get any pay for the first six months that
10  he worked at the company, did he?
11      A.   I believe the first check was in October and he was
12  officially starting at the company in August.  So I believe
13  that's only two or three months, not six months.  So --
14      Q.   Okay.  His partner got 400,000 for that period,
15  didn't he?  Didn't he?
16           MS. PALMER:  Objection, Your Honor.  Facts not in
17  evidence.
18           THE COURT:  Overruled.
19           THE WITNESS:  I don't believe that's accurate.
20      Q.   (BY MR. BRAUN:)  How about 397-?
21      A.   I don't believe that's accurate.
22      Q.   Is it over 350-?
23      A.   Hazens made approximately $1.7 million of payments
24  to Synergy and that is what was paid to Synergy.  As far as
25  what George Chiang himself took or didn't take, I don't know
```

1   those figures.

2        Q.   My client got about 70-; correct?

3        A.   Those two specific checks related to the milestone

4   payments, yes, that was around $70,000.

5             MR. BRAUN:  No further questions.

6             THE COURT:  All right.  You may step down.

7             Call your next witness.

8             MS. HAR:  The Government calls George Esparza.

9             THE COURTROOM DEPUTY:  Please raise your right hand.

10            Do you solemnly swear that the testimony you shall

11   give in the cause now before this Court shall be the truth, the

12   whole truth, and nothing but the truth, so help you God?

13            THE WITNESS:  I do.

14            THE COURTROOM DEPUTY:  Thank you.  Be seated.

15            Please state and spell your name for the record.

16            THE WITNESS:  George Esparza, G-e-o-r-g-e,

17   E-s-p-a-r-z-a.

18            THE COURT:  You may proceed.

19            MS. HAR:  Thank you, Your Honor.

20                      **GEORGE ESPARZA,**

21       **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

22                      **DIRECT EXAMINATION**

23   BY MS. HAR:

24        Q.   Mr. Esparza, were you previously employed with the

25   City of Los Angeles?

```
 1        A.    Yes.

 2        Q.    For what years?

 3        A.    From 2009 to 2017.

 4        Q.    And were you an intern during some of those years?

 5        A.    Yes.

 6        Q.    What years were those?

 7        A.    I was an intern in the year 2005, 2006.

 8        Q.    And when did you go to work full-time?

 9        A.    I started working full-time at the age of 22.

10        Q.    And what year was that?

11        A.    2009.

12        Q.    Did you spend approximately a total of eight years

13   working for the City?

14        A.    Yes.

15        Q.    And during that time, did you work for a

16   councilmember's office?

17        A.    I did, yes.

18        Q.    Which councilmember?

19        A.    Councilmember Jose Huizar.

20        Q.    Publishing previously admitted Exhibit 1, page 2.

21              Is this Jose Huizar?

22        A.    Yes.

23        Q.    Which district did Councilmember Jose Huizar cover?

24        A.    Council District 14.

25        Q.    And what geographic areas does that cover?
```

1      A.    That covered Boyle Heights, Downtown Los Angeles,

2  El Sereno, Eagle Rock, and Highland Park.

3      Q.    Is the councilmember position an elected position?

4      A.    Yes.

5      Q.    And how long does one term last?

6      A.    I believe it's -- it was 12 years, eight to

7  12 years -- oh, one term?

8      Q.    Yeah, one term.

9      A.    Four years.  I'm sorry.  Four years.

10      Q.    In 2009, what was your job within Councilmember

11  Huizar's office?

12      A.    In 2009, I started off as a caseworker out of the

13  Boyle Heights office.

14      Q.    And how did you originally get this job with

15  Jose Huizar's office?

16      A.    Well, initially, I just was an intern.  I was --

17  came back from college and decided to get involved in my

18  community.  And then my mom and Jose Huizar actually went to

19  elementary school together, so he was also a family friend.

20      Q.    After you were a caseworker out of Boyle Heights,

21  did your job title ever change to special assistant?

22      A.    Yes.

23      Q.    And when did that happen?

24      A.    I want to say maybe 2012, 2013.

25      Q.    Focusing on the 2012 to 2017 time period, what were

1    your official job duties during that time?

2        A.    Mainly the first one was to -- I managed the

3    councilmember's daily operations.  So I picked him up every

4    morning and I took him to all his meetings, made sure that he

5    had all his briefs, made sure that just his day-to-day

6    activities ran smooth.

7            On top of that, I also managed and billed and

8    maintained relationships on his behalf.  I was responsible for

9    the fundraising in his office.  And, also, I managed -- helped

10   manage both of his campaigns, political campaigns throughout my

11   years there.

12       Q.    Would you be with the councilmember sometimes on an

13   hourly basis?

14       A.    Yes.

15       Q.    What time might you -- strike that.

16           How did you keep track of the many tasks or -- or

17   issues organized about the things that Jose Huizar told you to

18   do?

19       A.    I took a lot of notes on my phone.

20       Q.    Did you report directly to Jose Huizar?

21       A.    Yes, I did.

22       Q.    What was your annual salary with the City when you

23   started there?

24       A.    When I started there, it was $32,000.

25       Q.    How about when you left in the end of 2017?

1      A.    It was about 102,000.

2      Q.    As a City employee, what did you understand your

3  duties to be with -- with respect to the City of Los Angeles

4  and its citizens?

5      A.    My duty was to serve the constituents of CD-14 and

6  the City.

7      Q.    And by "CD-14," you mean Council District 14?

8      A.    Yes.

9      Q.    Did you understand that as a public official, you

10  were prohibited from engaging in a transaction that presented a

11  conflict of interest?

12     A.    Yes.

13     Q.    And that you were prohibited from accepting money

14  for favors or acts in the regular course of your duties?

15     A.    Yes.

16     Q.    Were you also aware that you had to make annual

17  disclosures regarding other financial income, benefits, or

18  gifts that you received while you were working for the City of

19  L.A.?

20     A.    Yes.

21     Q.    While you were employed by the City, how would you

22  describe your professional relationship with Jose Huizar?

23     A.    I was -- like I said, I was his closest confidante.

24  I -- you know, he was definitely like a mentor, a role model to

25  me at one point.  So we -- you know, we shared everything

1    together.

2         Q.    Did you also have a personal relationship?

3         A.    I did.

4         Q.    What did a typical day for Jose Huizar look like?

5         A.    Usually pick him up about 7:00, 8:00 o'clock in the

6    morning.  We usually have -- I drive him to morning meetings

7    either at a restaurant, have a coffee.  And then during the

8    City Council meetings, certain amount of time I was just there

9    to -- making sure, again, that his day ran smooth.  And then

10   after his council meetings, it would usually go into dinner

11   meetings or community meetings in the evenings.  So I would

12   drive him to all those events as well.

13        Q.    Would you also sometimes attend planning meetings

14   with the councilmember?

15        A.    Yes.

16        Q.    And would these be meetings that included meetings

17   with developers or business people in the City?

18        A.    Yes.

19        Q.    What would be the hours that a day might last,

20   starting at 7:00 a.m. and ending when?

21        A.    Probably -- typical, probably from 7:00 a.m. to

22   10:00 p.m. was pretty average.

23        Q.    Could it be later than that?

24        A.    Yes.

25        Q.    Is it fair to say that this was a busy person?

1      A.    Very busy person, yes.

2      Q.    Are you aware whether Jose Huizar maintained a daily

3    calendar with the City?

4      A.    Yes.

5      Q.    And how do you know that?

6      A.    I was responsible for his calendar.  I oversaw his

7    calendar and also just made sure that we -- yeah, we met our

8    timeline and kept -- kept on -- kept on schedule.

9      Q.    That was your job, to make sure he stayed on with

10   all his appointments?

11     A.    Stayed with all his appointments, made sure he had

12   all his notes, made sure all his staff was -- was prepared to

13   staff him, yes.

14     Q.    And did the calendar include both personal and

15   official City business matters?

16     A.    Yes.

17     Q.    Did you understand Jose Huizar to be the Chair of

18   PLUM?

19     A.    Yes.

20     Q.    Is that the Planning and Land Use Management

21   Committee?

22     A.    Yes.

23     Q.    And was that from about 2013 on?

24     A.    Yes.

25     Q.    What type of power or authority did Jose Huizar have

725

as the chair of PLUM?

    A.    Very powerful, yes.

    Q.    What kinds of things could he do in that position?

    A.    Well, as the Chairman of PLUM, he had the power to agendize any development project in the City of Los Angeles, so any sky -- skyscraper, any type of housing, any development in the City of L.A. had to go through his desk.

    So agendize items, could also draft motions to change the ordinances in different locations and -- I mentioned schedule meetings; right?  Oh, yeah, schedule meetings and changing ordinances was mainly his duty.

    Q.    And did he have voting power as the Chair of PLUM?

    A.    Yes.

    Q.    And you used the word "agendize."  What did you mean by that?

    A.    So it's putting a project on the -- putting the project on the calendar, on the Planning and Land Use calendar for it to be heard, so it can be publicly heard in that committee.

    Q.    And would that need to happen for that project to move on in the approval process?

    A.    Yes.

    Q.    What would happen if the project was not put on the agenda or not agendized?

    A.    It was stalled.

**UNITED STATES DISTRICT COURT**

1      Q.    It was stalled?

2      A.    Yes.

3      Q.    And as just a councilmember for CD-14, what power or

4  authority did Jose Huizar have in that position?

5      A.    As councilmember for the council district, full

6  power and authority.

7      Q.    What do you mean by that?

8      A.    That any decision within that district, he was --

9  he -- he made.

10      Q.    Did he have influence over other councilmembers in

11  other districts?

12      A.    Yes.

13      Q.    Was he able to negotiate with unions?

14      A.    Yes.

15      Q.    And he also had a vote as a councilmember?

16      A.    Yes.

17      Q.    As far as you know, does Jose Huizar speak Chinese?

18      A.    No.

19      Q.    Do you?

20      A.    No.

21      Q.    All right.  Do you know the defendant in this case,

22  Raymond Chan?

23      A.    Yes, I do.

24      Q.    Showing page 1 of this exhibit.

25           In 2013, what title or job did the defendant have?

1      A.   I believe general manager of Building and Safety.

2      Q.   And did you later know him to be the deputy mayor?

3      A.   Yes.

4      Q.   What year did you first meet the defendant?

5      A.   I believe sometime in 2013; 2012, 2013.

6      Q.   And during the time that you knew the defendant, did

7  he call you by any particular term?

8      A.   Uh, at times "little brother."

9      Q.   And at times what did you call the defendant?

10     A.   "Big brother."

11     Q.   Does the defendant speak Chinese?

12     A.   Yes.

13     Q.   And based on your observations, did the defendant

14  have access to Jose Huizar?

15     A.   Yes.

16     Q.   What kind of access?

17     A.   Full -- full access to the councilmember.

18     Q.   What does that mean?

19     A.   Um, meaning that he could get a meeting with the

20  councilmember immediately, you know, walk into the office

21  and -- and just walk into the councilmember's office without

22  any -- really without any notice.

23     Q.   Did he also have access to Jose Huizar's planning

24  staff?

25     A.   Yes.

1    Q.   As far as you knew, did any other official from
2  LADBS have this level of access to Jose Huizar?
3    A.   No.
4    Q.   Did any other official from any other City
5  department have that access to Jose Huizar?
6    A.   No.
7    Q.   And what was your relationship with the defendant,
8  Ray Chan?
9    A.   Just -- just as described, you know, big
10  brother/little brother relationship.  I -- you know, we had a
11  lot of personal talks and also career talks.
12    Q.   Would you pass messages from Councilmember Huizar to
13  the defendant and vice versa?
14    A.   Yes.
15    Q.   Now, Mr. Esparza, have you pled guilty pursuant to a
16  cooperation plea agreement in this case?
17    A.   I have, yes.
18    Q.   For what crime?
19    A.   For the racketeering.  For racketeering, yeah.
20    Q.   For RICO conspiracy?
21    A.   Yes.
22    Q.   Okay.  And is that Racketeer Influenced and Corrupt
23  Organizations?
24    A.   Yes.
25    Q.   Did you plead guilty to conspiring with Jose Huizar,

1       among other people?

2              A.    I did.

3              Q.    Did you plead guilty to being a member of the CD-14,

4       or Council District 14, enterprise?

5              A.    Yes.

6              Q.    And as part of the plea, did you admit to

7       participating in what's called a pay-to-play scheme in the City

8       of Los Angeles?

9              A.    I did.

10             Q.    Was Jose Huizar the leader of that scheme?

11             A.    Yes.

12             Q.    And at a high level, could you describe what the

13      pay-to-play scheme was?

14             A.    Um, mainly when, say, like a developer comes into

15      our office and schedules a meeting with the Councilmember,

16      initially we'll meet with that particular company and then that

17      company will have an ask -- right? -- introducing their company

18      to -- or what their plans are for that particular project.

19                   Once we kind of get a sense of the value of the

20      project or the asks of that certain project, then the

21      Councilmember would do an assessment of, again, the value and

22      kind of assessment of what we could ask this particular -- this

23      particular company.

24                   So to kind of get a -- kind of -- kind of get a

25      sense of -- of how they're willing to play, the Councilmember

1    would ask or make some request.  And they would start off with

2    small requests and -- whether it's, you know, tickets or --

3    just to see if they're willing to give to the Councilmember.

4    And if they're willing to give to the Councilmember or meet his

5    requests, then we give them full access -- or we give -- we

6    start giving them access to our office.

7           Q.    Okay.  And so by the asks or the requests, could

8    that be various types of benefits?

9           A.    Correct.

10          Q.    And under the pay-to-play scheme, if the developer

11   provided some benefits, then, in return, Jose Huizar would

12   provide official access to his office?

13          A.    Yes.

14          Q.    For the project?

15          A.    Yes.

16          Q.    Would he put it on a priority list?

17          A.    Yes.

18          Q.    And what sorts of things could Jose Huizar do if a

19   project was on the priority list?

20          A.    If the project was on a priority list, then they

21   would usually have full access to our office, meaning they have

22   access to the planning director at the time.  They have access

23   to, like, the Public Works deputy.  They also would have access

24   to scheduling meetings with other City departments.

25                And so, really, having support from our office, we

1    could definitely hand-hold the project throughout the --

2    throughout the process, throughout the planning process.

3         Q.    And did the hand-holding include influence on

4    other -- Jose Huizar's influence on other public officials to

5    treat that project favorably?

6         A.    Yes.

7         Q.    Would it include the things you described earlier

8    about agendizing the project for PLUM and voting on it?

9         A.    Yes.

10        Q.    And what sorts of things could Jose Huizar do if a

11   project was not on the priority list?

12        A.    If it was not on the priority list, definitely block

13   access to his staff, to his resources, definitely -- not answer

14   any of their calls -- right? -- direct staff not to take any of

15   their meetings until they meet whatever requests that he had.

16        Q.    And he could not place it on the PLUM agenda, for

17   example?

18        A.    Correct.

19        Q.    And he could vote against it?

20        A.    Yes.

21        Q.    What role did you have in this pay-to-play scheme?

22        A.    Um, my role was when -- I would always be with the

23   Councilmember every single meeting so especially during these

24   developer meetings.  My job or my responsibility was to

25   identify my counterpart so identify who the other George is in

1    that -- in that company and then mainly communicate whatever

2    asks that the Councilmember had, I would communicate that to

3    that George or to their assistant.

4         Q.   So is it fair to say that you were like a middleman

5    or a go-between for the Councilmember and the developer?

6         A.   Yes.

7         Q.   And you would sometimes be working with another such

8    middleman or the George of that developer?

9         A.   Correct.

10        Q.   And so how would you approach or negotiate with that

11   developer or the George of the developer?  Were you trained in

12   any particular way?

13        A.   Yeah.  I was trained to not directly ask for this,

14   for that.  Right?  It was always a no-no.  You can't say we'll

15   vote for your project if you give us this, you know, give us

16   this donation.  But I was trained to be very clear on what the

17   message was and very clear that if they don't meet the

18   Councilmember's requests, then that project would be stalled.

19        Q.   And who trained you to -- to be -- to use that kind

20   of language?

21        A.   Council -- the Councilmember, Huizar.

22        Q.   In terms of deciding what benefits or requests the

23   councilmember was going to make of the developer, is that

24   something you would discuss with Jose Huizar?

25        A.   Yes, we would.

1      Q.    And what would those conversations look like?

2      A.    You know, mainly he -- you know, he really, you

3   know, taught me, he really wanted us to figure out how we sized

4   the developers up.  Right?  So if the project was worth

5   $100 million, then maybe it's a $100,000 check or -- you know,

6   you could ask for higher prices depending on the project.  If

7   it's just a -- maybe a million dollar project or $2 million

8   project, then obviously the ask would be low.  But mainly just

9   to start out with small asks, small requests just to see if the

10  developer is willing to play.

11     Q.    Was there a particular term or language that he

12  would use when you would have these discussions about figuring

13  out whether a developer was going to be willing to pay?

14     A.    Yes.  It was -- it was mainly, you know, let's --

15  let's see if these cows are willing to give milk and also --

16  excuse my language -- but let's hit these fuckers up.

17     Q.    Those were the words that the Councilmember would

18  use to describe what benefits he could extract from developers?

19     A.    Yes.

20     Q.    And what sorts of categories of benefits might you

21  be asking for on behalf of Jose Huizar?

22     A.    Depends, depends on what his -- I guess his mood --

23  what his mood was that day.  But sometimes it was concert

24  tickets, sporting event tickets, ties, clothing ties, sorry,

25  golf clubs.  It could also just be T-shirts.  Right?

1    So just like these small little requests just to see

2    if they're willing to -- if they're able to just be resourceful

3    and meet the Councilmember's request no matter how -- how

4    close -- no matter what the timeline was, even if it was last

5    minute.

6    Q.    And what could some of the bigger benefits be?

7    A.    Some of the bigger benefits were donations to his

8    high school, also campaign donations, and then some cases cash.

9    Q.    And were the benefits that you asked for always ones

10   that went directly into Huizar's pocket?

11   A.    No.

12   Q.    Could there be an ask or a demand that a developer

13   hire, for example, Huizar's relatives or his associates?

14   A.    Yes.

15   Q.    And can you give an example of how Jose Huizar might

16   ask a developer to hire a friend or an advisor?

17   A.    Yeah.  Especially when you first meet a developer

18   and he sees how much help that they would need from him and

19   from our office, sometimes he would ask them to hire, for

20   example, one of his friends, close friends -- because they're

21   construction management companies.  Right?  And he would

22   recommend that they hire this company because they have good

23   community relationships and, also, that they were -- that they

24   were close, that they understood the process.

25   Q.    Would he ask a developer to hire a friend or an ally

1    that he had as a consultant for the project?

2         A.    Correct.

3         Q.    And what was the purpose of doing that, having his

4    friends working for the developer?

5         A.    The main -- the main purpose was that the

6    Councilmember knew that if he had a friend in that company,

7    then he could essentially ask for more things.  So it was -- it

8    was easier for him to ask a friend of his versus someone that

9    we didn't know.

10        Q.    And by "ask for more things," you mean for those

11   benefits you described -- concert tickets, sporting event

12   tickets, trips, cash, et cetera?

13        A.    Yes.

14        Q.    And when you would ask for a developer to pay a

15   benefit, would you ask for everything all at once or would you

16   go back more than once?

17        A.    Yeah.  I would just start off very slow.  And then

18   the more that they agreed to deliver these resources, then the

19   Councilmember would just keep asking and asking and asking.  So

20   it was just an ongoing -- ongoing asking of these developers,

21   yes.

22        Q.    And why was Jose Huizar able to just keep asking?

23   What kind of leverage did he have over the developer?

24        A.    Well, he had full leverage over the development.  He

25   was the Chairman of PLUM.  He represented Downtown Los Angeles,

so the real estate boom was high.  And so the developers knew
that -- they knew that they needed the Councilmember to get
their project through the process.

Q.    And by "the process," do you mean the entitlements
or the approval process for the project?

A.    Yes.

Q.    Are you familiar with the term "friend of the
office"?

A.    Correct.  Yes, I am.

Q.    What does that phrase mean to you in the context of
this pay-to-play scheme?

A.    It was a term that the Councilmember created just to
identify those developers or those stakeholders who contributed
in some way or form.  So if they were big donors, if they gave
them all those -- give him the tickets, then they were put on
that friends' list.

Q.    And in exchange, did they get the type of access,
official acts, agendizing, and votes that you described?

A.    Yes.

Q.    Did you and Jose Huizar maintain a list of the
friends of the office that had projects in the City?

A.    Yes, we did.

Q.    I want to cover a specific example of this
pay-to-play scheme.  And I'm going to fast-forward you to 2017,
which was -- that was your last year with Jose Huizar's office;

```
 1   correct?
 2        A.    Yes.
 3        Q.    Are you familiar with 940 Hill, LLC, and David Lee?
 4        A.    Yes.
 5        Q.    Publishing Exhibit 1, page 18.
 6              Is this David Lee?
 7        A.    Yes.
 8        Q.    And who is David Lee?
 9        A.    David Lee was the -- the owner of the 940 Hill
10   Project.
11        Q.    And is he a developer?
12        A.    Yes.
13        Q.    Did he have a project that he was seeking to get
14   approved through the City approval process?
15        A.    Yes.
16        Q.    And what project was that?
17        A.    That was Olympic and Hill Project.
18        Q.    Was it also referred to as the 940 Hill Project?
19        A.    Oh, yes.
20        Q.    Did something happen at some point to endanger the
21   approval of that Olympic and Hill or 940 Hill development
22   project?
23        A.    Yes.
24        Q.    What was that thing?
25        A.    A union organization appealed the -- filed an appeal
```

1    on the project.

2         Q.    And why does a union appeal endanger the approval

3    process of a development project?

4         A.    Because it forces the developer to negotiate with

5    the -- with the -- with the unions to, you know -- essentially,

6    it increases the cost of the project.

7         Q.    Can the approval process get -- be stalled while

8    that appeal is pending?

9         A.    Yes.

10        Q.    And did Jose Huizar ask this developer, David Lee,

11   to pay in exchange for Huizar using his official position to

12   resolve that union appeal?

13        A.    He did.

14        Q.    Did he communicate that message through you?

15        A.    Yes.

16        Q.    And what is it that Jose Huizar asked for in

17   exchange for him resolving the appeal?

18        A.    He asked for cash.

19        Q.    How much cash?

20        A.    Well, at first, it was about $1.2 million, and then

21   it was negotiated down to $500,000.

22        Q.    In cash?

23        A.    In cash, yes.

24        Q.    And were you the one that communicated this message?

25        A.    I did, yes.

```
 1        Q.   And who did you communicate that message to?

 2        A.   To Justin Kim.

 3        Q.   I'd like to go to page 16 of this exhibit.

 4             On the right side, is that Justin Kim?

 5        A.   Yes.

 6        Q.   And what was Justin Kim's role in relation to

 7   940 Hill?

 8        A.   He was -- he was the middle person for David Lee.

 9        Q.   Was he the George of that developer?

10        A.   Yes.

11        Q.   And was he also a consultant?

12        A.   Yes.

13        Q.   Was Justin Kim a friend of the office, as you

14   described that term?

15        A.   Yes.

16        Q.   Why was he a friend of the office?

17        A.   He was the Coun- -- one of the Councilmember's

18   biggest fundraisers.

19        Q.   And was there a term used for a developer who would

20   contribute a lot of money to Jose Huizar or who had a lot of

21   money?

22        A.   Yeah.  It was referred to as a fat cow.

23        Q.   They'd also be referred to as a big whale?

24        A.   And a big whale, yes.

25        Q.   And did Justin Kim, in fact, end up delivering to
```

1    you $200,000 in cash on behalf of David Lee as a bribe for

2    Jose Huizar?

3         A.    Yes.

4         Q.    Did he give it to you all at once or across multiple

5    drops?

6         A.    Multiple drops.

7         Q.    And was it two?

8         A.    Yes.

9         Q.    Two drops?  Okay.

10              I'd like to publish what's been previously admitted

11   as Exhibit 200.  Let's go to page 2.  Keep scrolling.

12              Does Exhibit 200 show the photograph of the cash

13   that you received from Justin Kim on the first drop?

14        A.    Yes.

15        Q.    Who took these photographs?

16        A.    I did.

17        Q.    Let's go to page -- sorry, on page 4, what's shown

18   here?

19        A.    Here?

20        Q.    Yes.

21        A.    Cash.

22        Q.    And where is it on?  What's it on?

23        A.    On my bed.

24        Q.    Is this in your room?

25        A.    Yes.

1      Q.    Let's go to page 5.

2            And what's shown here?

3      A.    I wrote a note on a napkin that says, "Giving cash

4    to CM Huizar, February 10th, 2017."

5      Q.    Does "CM" mean councilmember?

6      A.    Yes.

7      Q.    And why did you write this note?

8      A.    Because I wanted to document what the Councilmember

9    had me pick up.

10     Q.    And was this -- and did you write February 10th,

11   2017, because that's when you picked up the cash?

12     A.    Yes.

13     Q.    Let's go to page 7.

14           Is this another note that you wrote?

15     A.    Yes.

16     Q.    And can you read it, please?

17     A.    "Giving him cash from Justin Kim for Olympic and

18   Hill Project.  No unions.  2/10/17."

19     Q.    And what does this note mean?

20     A.    It meant where the -- where the money came from.

21     Q.    And that it was in exchange for Jose Huizar getting

22   rid of the union appeal?

23     A.    Correct.

24     Q.    Page 9, please.

25           And what did you do with that cash in this photo?

1        A.    In this photo, I put $100,000 in a -- in a Don Julio

2    box and then I took it to the Councilmember's house.

3        Q.    Why did you put it in a liquor box?

4        A.    I didn't want to put $100,000 in, like, a brown bag

5    or plastic bag.

6        Q.    And did you, in fact, then take the cash that's

7    pictured here on Exhibit 200 to Jose Huizar?

8        A.    I did, yes.

9        Q.    What did he instruct you to do with it?

10       A.    He told me to -- to keep it and hold on -- hold

11   on -- hold on to it for him.

12       Q.    And why did he want you to hold on to it for him?

13       A.    Well, at first, I thought he trusted me with his

14   money.  But I felt that just in case the FBI came into our

15   lives, that he wouldn't be caught with the money.

16       Q.    And did you hold on to that cash like he instructed

17   you to?

18       A.    I did, yes.

19       Q.    Where did you put it?

20       A.    It was in -- it was in a safe in my room.

21       Q.    And even though you were physically holding on to

22   that money in your room, what was your understanding of who

23   that money belonged to?

24       A.    It belonged to my boss -- the Councilmember.

25       Q.    Your boss, Jose Huizar?

1      A.     Yeah.

2      Q.     And what, if anything, did Jose Huizar instruct you

3  to do regarding the union appeal on David Lee's project?

4      A.     He told me to go talk to the brother of the

5  president of the -- of the union and ask -- and told me to talk

6  to him and to tell him that the Councilmember's going to have

7  to support this project.

8      Q.     Did you ask him to drop the appeal?

9      A.     Yes.  I asked if they could drop the appeal.

10      Q.     Are you aware whether Jose Huizar also met with the

11  brother of the union directly?

12      A.     He did.

13      Q.     And did you and Jose Huizar do these things, meaning

14  go and advocate to the union because of the bribe that

15  David Lee had paid?

16      A.     Yes, we did.

17      Q.     And did the union ultimately drop its appeal?

18      A.     They did.

19      Q.     Okay.  After the union dropped its appeal, what

20  happened in terms of the cash?

21      A.     Um, after the union was dropped -- after the appeal

22  was dropped, then it was -- we -- we received a second drop.

23      Q.     And how much was it the second time?

24      A.     A hundred thousand.

25      Q.     I'm going to publish previously admitted

```
 1    Exhibit 203.  If we could just scroll -- yeah.
 2              And did you, again, take pictures of the cash that
 3    you received the second time around?
 4         A.   I did, yes.
 5         Q.   And is that what's photographed in Exhibit 203?
 6         A.   Yes.
 7         Q.   In the middle there, what's shown?
 8         A.   A Johnnie Walker box with cash inside.
 9         Q.   And so did you put the cash in another liquor box?
10         A.   I did, yes.
11         Q.   For the same reason?
12         A.   Correct.
13         Q.   And what did you do with this box?
14         A.   I then took it to the Councilmember's house.
15              MS. HAR:  Zoom out.  Can you just scroll through the
16    rest of the pages so the jury can see.  Page 4, showing page 5,
17    page 6, 7, 8 --
18         Q.   (BY MS. HAR:)  And, actually, in this photo, where
19    is -- does this box contain the cash?
20         A.   Yes.
21         Q.   And where is it?  What is it sitting on?
22         A.   It's in my car on the passenger seat.
23         Q.   Was this on your way to drop it off at Jose Huizar's
24    house?
25         A.   Yes.
```

```
 1        Q.    Show page 9, please.
 2              Okay.  And so what happened when you presented this
 3   box to Jose Huizar?
 4        A.    Same thing, he just told me if I could keep the cash
 5   safe at my house.
 6        Q.    And did you take this money home as well, following
 7   the Councilmember's instruction?
 8        A.    Yes.
 9        Q.    And where did you store it?
10        A.    In my room.
11        Q.    So at that point -- at that point, how much cash
12   were you holding on to?
13        A.    $200,000.
14        Q.    And same question, even though you were holding on
15   to now $200,000, what was your understanding of who that money
16   belonged to?
17        A.    The Councilmember's.
18        Q.    At some point, did you ask someone else to hold on
19   to the cash for you?
20        A.    I did, yes.
21        Q.    Who did you ask?
22        A.    Ricky Zheng.
23        Q.    And we'll talk more about Ricky Zheng in a moment,
24   but I'll just briefly show you Exhibit 1, page 23.
25              Is that Ricky Zheng?
```

```
 1        A.    Yes.  That's him.

 2        Q.    Did you meet him through another developer?

 3        A.    I did, yes.

 4        Q.    Was that Shen Zhen New World?

 5        A.    Yes.

 6        Q.    Okay.  Can you remind the jury the month and year

 7   that you left Jose Huizar's office?

 8        A.    I left in December of 2017.

 9        Q.    By that point, were you aware -- were you and

10   Jose Huizar aware that the FBI was investigating you two?

11        A.    Yes.

12        Q.    Right before you left, did you have a meeting with

13   Jose Huizar to tell him that you were leaving?

14        A.    I did, yes.

15        Q.    Where was that meeting?

16        A.    In the Councilmember's -- in his private office.

17        Q.    Did you record -- did you record that meeting with

18   Jose Huizar?

19        A.    I did.

20        Q.    What did you use to record the meeting?

21        A.    My cell phone.

22        Q.    And why did you decide to record that meeting?

23        A.    I just knew that he was going to bring up the cash,

24   so I just wanted to, again, protect myself and record that

25   conversation.
```

1        Q.    And by "the cash," you mean the $200,000 that you

2   were holding on to for the Councilmember?

3        A.    Yes.

4        Q.    And where in Jose Huizar's private office did the

5   meeting take place?

6        A.    In his private bathroom.

7        Q.    So when you got there, were you first in his -- in

8   his office?

9        A.    Yes.

10        Q.    Okay.  And did you tell him at that point that you

11   were going to be leaving working for him?

12        A.    Correct.

13        Q.    Okay.  And then how did the switch to the bathroom

14   come up?

15        A.    Well, after I told the Councilmember that I was

16   leaving his office -- I mean, the first thing he was -- he told

17   me, well -- he looked at me and said, you know, let's talk --

18   let's talk in his office.  And that's when I already knew he

19   was going to bring up the cash.

20            And so we -- you know, we -- I put -- I had two

21   phones at the time so I put another phone down and then I

22   walked into his bathroom.  And he closed the door, turned on

23   the light, and then just started having the conversation about

24   the cash.

25        Q.    And this is like a private bathroom that's off of

```
 1    the office -- off of his private office?
 2         A.    Yeah.   It's a private bathroom, yeah, within the
 3    office, yes.
 4         Q.    Have you ever met -- have you ever met with
 5    Jose Huizar in his private bathroom before?
 6         A.    No.   That was the first -- that was the first time,
 7    yeah.
 8         Q.    Were you surprised that he asked you to go in the
 9    bathroom?
10         A.    Yeah.
11         Q.    And what was your understanding of why he was asking
12    you to talk in the bathroom?
13         A.    Because he didn't want to -- I mean, he didn't
14    want -- he wanted to make sure that no one was recording or
15    that there was no wires from the FBI in his office.
16         Q.    And he thought that the bathroom was a safe place?
17         A.    Yeah.
18         Q.    In preparation for trial, have you previously
19    listened to a clip from that recording you made in the bathroom
20    during this meeting with Jose Huizar?
21         A.    Yes, I did.
22               MS. HAR:  I'd like to play what's been previously
23    admitted as Exhibit 187A.
24               (Audiotape played, not reported.)
25               MS. HAR:  Pausing there.
```

1    Q.    (BY MS. HAR:)  So did you hear in that recording if

2  Huizar asked if you had heard anything?

3    A.    Yes.

4    Q.    And what -- what's he referring to?

5    A.    He asked me if I heard anything about the FBI.

6    Q.    And because at this point you and he had heard that

7  the FBI was asking questions; correct?

8    A.    That is correct.

9         MS. HAR:  Okay.  Let's keep playing.

10         (Audiotape played, not reported.)

11         MS. HAR:  Pause there.

12    Q.    (BY MS. HAR:)  All right.  Did you hear in that

13  recording Jose Huizar say, "I'm gonna need money.  That's

14  mine"?  Right?

15    A.    Yes.

16    Q.    And what did you understand him to mean when he

17  said, "That's mine"?

18    A.    That he -- that the $200,000 was his and he wanted

19  it back.

20    Q.    And did you confirm to him that that $200,000 was

21  his?

22    A.    I did.

23    Q.    And did you also hear him say that "this happened

24  over the summer, let's give it a couple more months"?

25    A.    Yes.

1    Q.    And what was the thing that happened over the

2  summer?

3    A.    That's when the FBI first approached me, and I had

4  two interviews with the FBI that summer.

5    Q.    And when he says, "Let's give it a couple more

6  months," did you understand him to mean he wanted to wait it

7  out?

8    A.    Yes.

9    Q.    Did you also hear Huizar make a reference to the

10  fact that Richelle's running and that Richelle's not -- not

11  being able to work anymore because she's campaigning?

12    A.    Yes.

13    Q.    And what did that mean?

14    A.    Well, his wife was going to start running for his

15  council -- for his council seat and she was going to stop

16  working.  So --

17    Q.    All right.  Let's keep playing this clip to the end.

18          (Audiotape played, not reported.)

19    Q.    (BY MS. HAR:)  And in that portion, did you tell

20  Jose Huizar this was scary, "This is scary"?

21    A.    I did, yes.

22    Q.    What was scary to you?

23    A.    The FBI, the FBI interviews were scary, yeah.

24    Q.    Near the end of that recording, did you hear

25  Jose Huizar say, "Let's give it three months, let some time

1    pass, April 1st"?

2         A.    Yes.

3         Q.    And what did you understand it to mean when he said

4    "let some time pass"?

5         A.    Yeah, just to let the -- let it cool off a little

6    bit from -- from the FBI interviews in the summer.

7         Q.    Before what happens?

8         A.    Before I meet with him and give him his -- give him

9    his cash.

10        Q.    And so is that what he was suggesting happen on

11   April 1st, that you give him that cash money that was the

12   bribe?

13        A.    Correct.  Yes.

14        Q.    Did you, in fact, give Jose Huizar the $200,000 cash

15   on April 1st?

16        A.    I did not.

17        Q.    Did you two decide to move the date back to

18   October 1st, 2018?

19        A.    Correct.

20        Q.    Now, these two cash drops that you picked up from

21   Justin Kim, that was in February and March of 2017; right?

22        A.    Yes.

23        Q.    And so now we're talking about October 2018, over a

24   year and a half later; correct?

25        A.    Correct.

```
 1        Q.    Even though it was over a year and a half later that
 2    you had been holding on to this cash, did you still understand
 3    that it was Jose Huizar's money?
 4        A.    Yes.
 5        Q.    Did that understanding change just because some time
 6    had passed?
 7        A.    No.
 8        Q.    Did you ever ultimately end up giving that money to
 9    Jose Huizar?
10        A.    No.
11        Q.    Did he try to get you to meet up to give him the
12    money?
13        A.    Yes, he did.
14        Q.    What sorts of things did he do to try to get his
15    money from you?
16        A.    I mean, sent me several text messages, you know,
17    called me several times, and then also showed up to -- showed
18    up to my grandparents' house.
19        Q.    I'd like to take a look at some of those messages.
20    Publishing Exhibit 175, which has been previously admitted.
21              Are these text messages between you and Jose Huizar?
22        A.    Yes.
23        Q.    And let's zoom in on the first two.
24              Okay.  That first message, you see that it's dated
25    September 30th, 2018, from Jose Huizar?
```

1    A.    Yes.

2    Q.    Does it say, "Hey, George.  Tomorrow is October 1st.

3  When we gonna meet?"

4    A.    Yes.

5    Q.    Did you respond to that message?

6    A.    No.

7    Q.    Okay.  The next message on October 4th, 2018.  Did

8  Jose Huizar text you, "Hey, George, so we gonna meet up like

9  you said we would after October?"  Is that what that says?

10   A.    Yes.

11   Q.    And did you respond to that message?

12   A.    I did not.

13   Q.    After this October 4th message, did he try to also

14  meet you in person on October 12th, 2018?

15   A.    Yes.

16   Q.    And what happened then?

17   A.    He showed up to -- showed up to my house and -- I

18  mean, I wasn't home at the time.  But he knocked -- he knocked

19  on my front door.

20   Q.    And who was home?

21   A.    It was my grandfather.

22   Q.    And did he speak with your grandfather?

23   A.    Yeah.  He told my grandfather -- asked if I was

24  there and that I owed him some money.  You know, he gave me a

25  loan and I owed him some money.

**UNITED STATES DISTRICT COURT**

1      Q.   And did your grandfather tell you about that?

2      A.   Yes, he did.

3      Q.   How did that make you feel, the fact that

4   Jose Huizar showed up at your grandparents' house trying to get

5   the money?

6      A.   Yeah.  I was really -- I was really pissed off

7   because he was trying to intimidate my grandfather.  And that

8   was actually the first time that he actually showed up to my

9   house for the eight -- you know, close to eight years I was

10  working for him.

11     Q.   Have you also seen a video of Jose Huizar coming to

12  your house?

13     A.   Yes.

14     Q.   How so?

15     A.   The Ring, the Ring -- the Ring -- the Ring video on

16  our front door.

17     Q.   And in preparation for this trial, have you

18  previously reviewed a screenshot of that video?

19     A.   I did, yes.

20     Q.   I'll publish what's been admitted as Exhibit 212A.

21          Is this that screenshot of Jose Huizar at your

22  grandparents' house trying to get his money?

23     A.   Yes.

24          THE COURT:  Whose house is this?  Your house or your

25  grandparents' house?

```
 1              THE WITNESS:  My grandparents' house.
 2      Q.   (BY MS. HAR:)  Did you live with your grandparents
 3  at that time?
 4      A.   Yes.
 5      Q.   Let's go back to Exhibit 175.  I'd like to look at
 6  the bottom two messages.
 7              After that incident, did he message you again on
 8  October 14th?
 9      A.   Yes.
10      Q.   Did he say, "I've been trying to connect with you.
11  We have a meeting that was supposed to occur on October 1st"?
12      A.   Correct.
13      Q.   And the following message on October 20th, did he
14  text you again?
15      A.   Yes.
16      Q.   Could you read that one, please?
17      A.   "George, I've been trying to reach you.  When are we
18  going to meet and square up?"
19      Q.   Did you respond to either of these messages?
20      A.   I did not.
21      Q.   Let's go to page 2, please.  Zoom in on the top one.
22              And did he also send you this message on
23  October 22nd?
24      A.   He did, yes.
25      Q.   Okay.  "Sounds like you don't ever want to meet and
```

face up to your commitment to meet on October 1st and you are

using other pretexts as to why you don't want to meet.  You are

using excuses as for the real reason you don't want to meet and

you know it.  You told me April, then October.  Now what?  Each

time comes up and you don't want to meet at all?  You want it

all and that's the real reason why you don't want to meet and

are using all kinds of excuses.  One more time, when are we

going to meet?"

        Did I read that correctly?

A.    Yes.

Q.    And did you ever respond to this message?

A.    I did not.

Q.    Are you aware whether the FBI ultimately seized that

cash?

A.    Yes.

Q.    And in this specific example of the pay-to-play

scheme involving the developer 940 Hill and David Lee, was the

bribe just straight cash?

A.    Yes.

Q.    But to be clear, under the pay-to-play scheme, was

the bribe or benefit paid usually just straight cash?

A.    No.

Q.    Okay.  From 2013 to the end of 2017, can you

approximate how many times a week or a month you would be

soliciting benefits on behalf of Huizar as part of the

1    pay-to-play scheme?

2         A.    Weekly.  Like, pretty regularly that we would

3    request, solicit some type of donation from people, yes.

4         Q.    Would you say it was multiple times a week?

5         A.    Yeah, depends on the week, yeah, multiple times a

6    week, yeah.

7         Q.    Multiple times a month?

8         A.    Yes.

9         Q.    Was it part of a continuing course of your conduct

10   to make those requests as part of the pay-to-play scheme?

11        A.    Yes.

12        Q.    And did some of the developers you solicited

13   benefits from include Chinese developers?

14        A.    Yes.

15        Q.    And was there someone in the City in particular that

16   introduced you and Jose Huizar to these Chinese developers?

17        A.    Yes.

18        Q.    Who was that?

19        A.    Mr. Ray Chan.

20        Q.    The defendant?

21        A.    Yes.

22        Q.    Did these developers have pending projects in the

23   City or plans to redevelop in the City?

24        A.    Yes.

25        Q.    And did you and Jose Huizar consider these

1    developers fat cows or big whales?

2         A.    Yes, we did.

3         Q.    And why was that?

4         A.    Um, majority of them were billionaires and had a lot

5    of resources.  And they were also willing to -- most of them

6    were willing to meet the Councilmember's requests.

7         Q.    When the defendant, Ray Chan, would introduce

8    Jose Huizar to a Chinese developer, would he -- was there a

9    typical speech or introduction that he would give?

10        A.    Yes.

11        Q.    And what was that?

12        A.    Just mainly introducing the role of the

13   Councilmember as a councilmember for the district and then also

14   his role and responsibilities as Chairman of the Planning and

15   Land Use committee.

16        Q.    Did he say anything about Jose Huizar's role or

17   authority over downtown?

18        A.    Yeah.  King of downtown, big boss of downtown.

19        Q.    Those would be the types of phrases the defendant

20   would use to describe Jose Huizar?

21        A.    Yes.

22        Q.    And did he ever -- did he tell the Chinese developer

23   what type of -- whether they needed Jose Huizar?

24        A.    Yes, he did.

25        Q.    During these same types of introductions, would the

1  defendant pitch himself as the general manager of LADBS?

2       A.    He did, yes.

3       Q.    What would he say about himself to the Chinese

4  developers with Jose Huizar?

5       A.    That he's the general manager of Building and Safety

6  and that he could help them streamline the project once it's --

7  during the construction process.

8       Q.    In front of the developers, would -- how would

9  Jose Huizar and the defendant refer to each other?

10      A.    You know, big -- you know, big brother or, you know,

11 refer to him as -- kind of like also big boss and also kind of

12 like the perfect combo.

13      Q.    And by "perfect combo," that means the perfect

14 combination between Jose Huizar and the defendant, Ray Chan?

15      A.    Yes.

16      Q.    And how would the defendant and Jose Huizar act with

17 one another in front of these developers?

18      A.    Very -- very friendly.

19      Q.    How so?

20      A.    Just a lot of -- a lot of touching, a lot of

21 laughing, a lot of just -- you know, kind of showing the

22 developer how close they were, how close their relationship

23 was.

24      Q.    And after these introductions, would Jose Huizar

25 ever ask about how it had gone, how the meeting had gone?

```
1        A.    Yes.

2        Q.    What would he say about that?

3        A.    Of how the meeting had gone?

4        Q.    Yeah.  How the introduction with that developer had

5   gone.

6        A.    I'm kind of -- say that again, please.

7        Q.    That's okay.

8              After these kinds of introductory meetings, would

9   the defendant stay involved with Jose Huizar and the developer?

10       A.    Yes, he would.

11       Q.    In what way?

12       A.    Just keeping in touch with, again, how the meeting

13  went, some of the -- kind of an update on where they're at in

14  the process, what kind of projects -- what kind of project

15  they'll be introducing.

16       Q.    And would the defendant sometimes be a translator?

17       A.    Yes.

18       Q.    Would the defendant relay messages or requests for

19  these developers to you for Jose Huizar?

20       A.    Yes, he would.

21       Q.    And as far as you knew, was it part of the

22  defendant's official job as the general manager of LADBS to do

23  those things?

24       A.    No.

25       Q.    Can you tell the jury the names of some of these
```

UNITED STATES DISTRICT COURT

1   Chinese development companies that the defendant introduced

2   Jose Huizar to or facilitated communications with?

3        A.    Yes.  I know first one -- it was Greenland, a

4   company called Greenland, Hazens, the Shen Zhen New World

5   Order, the Shen Zhen -- Oceanwide company.  And I believe there

6   was -- City Century, I believe, was another company and RNF, if

7   my memory is right.

8        Q.    And are some of the ones -- I don't know if you can

9   see, to your right, Exhibit 901A -- actually, it's on the

10   screen.  Publish Exhibit 901.

11            On that left column, corporations, are those some of

12   the names of the companies you just listed?

13       A.    Yes.

14       Q.    And is it fair to say that the defendant was the one

15   who set up access between Jose Huizar and the companies listed

16   on Exhibit 901?

17       A.    Yes.

18       Q.    Did you and Jose Huizar solicit benefits from each

19   of these Chinese developers that were introduced to you and

20   Huizar by the defendant?

21       A.    Yes.

22       Q.    More than once per developer?

23       A.    Yes.

24       Q.    And did the defendant play a role in helping to

25   obtain benefits from Chinese developers for Jose Huizar?

1    A.    He did.

2    Q.    In what way, at a high level?

3    A.    Helping secure donations and being the middle person

4  from specific asks that the Councilmember had of the -- of that

5  specific Chairman or developer.

6    Q.    Was the defendant, Ray Chan, considered a friend of

7  the office as you and Huizar use that term as part of the

8  pay-to-play scheme?

9    A.    Yes, he was.

10   Q.    Are you familiar with someone named George Chiang?

11   A.    Yes.

12   Q.    I'm going to publish Exhibit 1, page 7.

13         And is that a photo of George Chiang?

14   A.    Yes.

15   Q.    And who is George Chiang?

16   A.    George Chiang was a consultant for -- was a

17  consultant for, I believe, the -- yeah, had his own consulting

18  company and was on a few of the Chinese projects.

19   Q.    Was he a consultant for any particular company in --

20  yeah, for any specific company?

21   A.    I think it was called Synergy.  Consulted for --

22  for -- Hazens.  He was a consultant for the Hazens project and

23  also Oceanwide project.

24   Q.    Did you also know him to be Raymond Chan, the

25  defendant's business partner?

1    A.   Yes.

2    Q.   And after the defendant retired from the City, did

3    he and George Chiang officially start working together?

4    A.   Yes.

5    Q.   And how did you first meet George Chiang?

6    A.   I met George Chiang through Raymond Chan.

7    Q.   And what did the defendant say about George Chiang

8    when he introduced you?

9    A.   Good guy, like his -- also like his brother and also

10   to work with him whenever it came to certain requests for the

11   Hazens project.

12   Q.   Did he also -- around that time, did the defendant

13   also say that George Chiang was going to help with Huizar's

14   upcoming 2015 election campaign?

15   A.   Yes.

16   Q.   And after you first met George Chiang, did you

17   continue to interact with both George Chiang and the defendant

18   over the next several years?

19   A.   Yes.

20   Q.   Did those interactions also involve these Chinese

21   development companies?

22   A.   Yes.

23   Q.   Okay.  And can you describe that from your

24   perspective, how George Chiang -- your observations of

25   George Chiang, Raymond Chan, and their interactions with the

```
 1   Chinese development companies?
 2        A.    That, you know, they were -- they were that -- you
 3   know, that bridge with the Chinese companies.  They were the
 4   ones who had access to the big whales of -- especially with the
 5   foreign investment coming into Downtown L.A.  They were the --
 6   the go-to guys.
 7        Q.    Have you ever been in a meeting when the defendant,
 8   while he was working with -- for the City, encouraged the
 9   developer to work with George Chiang?
10        A.    Yes.
11        Q.    And which developer was that?
12        A.    RNF.
13        Q.    Is that another Chinese developer?
14        A.    Yes.
15        Q.    Okay.  So what happened during that meeting?
16        A.    Well, during the meeting, we went to have dinner in
17   a private room.  It was myself, Mr. Chan, and then
18   George Chiang and the developer.  And I believe my boss was
19   actually coming -- was coming late, but we wanted to meet
20   before the Councilmember showed up.
21              And just Ray was telling the developer how important
22   it was to have the -- not only the Councilmember support but
23   also to work with George Chiang because he was close to -- to
24   Ray.
25              And then, also, the relationship that I had with
```

1    George Chiang at the time and also with Ray, that, again, it

2    was just a good combination because by having me working with

3    George, then we could definitely help with the project -- like

4    having a guy in the inside of the Councilmember's office who

5    will be reporting on this project and making sure that the

6    Councilmember meets his commitments.

7        Q.    And this was with the company RNF; right?

8        A.    Correct.  Yes.

9        Q.    And was it true that George Chiang had a great

10   relationship with Jose Huizar?

11       A.    Yes.

12       Q.    And I should ask, during the time that the defendant

13   is encouraging RNF to work with George Chiang, was he -- what

14   was his position?

15       A.    I believe he was deputy mayor at the time.

16       Q.    Was George Chiang a friend of the office, as that

17   term was used in the pay-to-play scheme?

18       A.    Yes, he was.

19       Q.    Prior to meeting George Chiang through the

20   defendant, did you know about him, know about George Chiang?

21       A.    Before -- before the -- before the defendant

22   introduced us?

23       Q.    Yes.

24       A.    No.

25       Q.    Like, had you ever heard of his name or that he had

1    been a consultant on any projects for the City?

2        A.    No.

3        Q.    After you met George Chiang through the defendant's

4    introduction, did you interact with George Chiang as a

5    representative for developers?

6        A.    Yes.

7        Q.    I believe you referenced Oceanwide, Hazens; correct?

8        A.    Yes.

9        Q.    Did he also represent RNF?

10       A.    I'm not sure if he officially represented them, no.

11       Q.    Okay.  Did you and Jose Huizar ever discuss the

12   relationship between Huizar's office on one side, Chinese

13   developers on another side, and the defendant and

14   George Chiang?

15       A.    Yes.

16       Q.    What did you two say about that?

17       A.    That it was good to have a friend like Ray and

18   George as the consultant because in my -- in Councilmember's

19   terms, they get it.  So that meant that they understood that

20   they needed to -- that the Councilmember is going to have

21   certain requests, and Ray and George understood how to meet

22   those requests and understood how important they were to the

23   Councilmember to keep pushing their project forward.

24       Q.    When you said that they "get it" in terms of the

25   requests, you mean the requests from Jose Huizar for bribes?

1        A.    Correct.

2        Q.    Over time, did you form a personal relationship with

3    George Chiang?

4        A.    I did.

5        Q.    And at some point, did you hear that the defendant

6    might leave the City or retire from the City?

7        A.    Yes.

8        Q.    Did you have a conversation with George Chiang about

9    that?

10       A.    I did.

11       Q.    Okay.  What was that conversation?

12       A.    Well, my -- because I got close to George Chiang, I

13   was concerned that if Ray leaves, I was wondering, like, where

14   are you going to get all your business from now that Ray is no

15   longer working for the City.  And that's when George shared

16   with me that Ray will be coming to his company.

17       Q.    And did he say anything about when the plan for the

18   defendant to come to George Chiang's company had -- when they

19   had come up with that plan or idea?

20       A.    Yeah.  I'm not sure the exact, like, timeline for

21   that, no.

22       Q.    Was it something that was understood while the

23   defendant was still in the City?

24       A.    Yes.

25       Q.    And when you heard about that plan or idea, what was

```
 1    your reaction?
 2         A.    I thought -- at the time I thought it was genius
 3    because they were really able to monopolize the Chinese market
 4    for the developers.
 5         Q.    And up to that point, did you have the understanding
 6    that the defendant was the one that helped George Chiang get
 7    all of the business?
 8         A.    Yes.
 9         Q.    And that was why you were concerned about him, about
10    what might happen to him after the defendant left the City?
11         A.    Correct.
12         Q.    Based on your personal observations, can you
13    describe the relationship dynamic between the defendant and
14    George Chiang?
15         A.    Yeah.  Mr. Chan was George Chiang's boss.  I know
16    that George really talked to Ray before making any decision or
17    making any move when it comes to the developers or even to the
18    Councilmember.
19         Q.    Would George Chiang say that to you sometimes, that
20    he needed to go first check in with the defendant?
21         A.    Yeah, that he needed to talk to either Ray or he
22    needs to talk to the big bro.
23         Q.    And, again, this is while the defendant was working
24    for the City?
25         A.    Yes.
```

```
1          Q.    As part of the pay-to-play scheme and of the RICO
2    conspiracy, was one of the goals to get money and benefits for
3    Jose Huizar and other members of the racketeering enterprise?
4          A.    Yes.
5          Q.    In your plea agreement, did you admit that that was
6    one of the goals?
7          A.    I did.
8          Q.    Was it important and was it one of the goals of the
9    conspiracy for members to keep their official positions in the
10   City?
11         A.    Yes.
12         Q.    Was it important for Jose Huizar to keep political
13   control of his councilmember seat?
14         A.    Yes.
15         Q.    And why was that important for the RICO conspiracy?
16         A.    Because down -- he needed to maintain his power
17   within Downtown L.A. just because that's where all the
18   development projects were happening during that time.  So he
19   felt that if he was no longer in office or that a friend of his
20   was -- or if he didn't have an ally at the council district,
21   then he will lose his leverage and his value within the --
22   within the developers, specifically the Chinese developers.
23   Because they had built such a strong relationship that, if he
24   wasn't there anymore, then he -- he will lose -- you know, he
25   would lose access to them.  That was his power, was the
```

1    position.

2         Q.    Right.  He used his position as the leverage over

3    development projects to get the benefits?

4         A.    Correct.

5         Q.    Was it important that the defendant, Ray Chan,

6    maintain his role at the Department of Building and Safety?

7         A.    Yes.

8         Q.    Why was that important?

9         A.    It was important for the Councilmember because part

10   of his -- like, his arsenal of -- you know, of how to give --

11   or the resources he had within the office was to have direct

12   access to the general manager of Building and Safety.

13              So part of that -- part of the -- I guess, yeah,

14   part of that access was to put him in touch with the -- the

15   person who was responsible for their -- the construction of the

16   actual building, you know.

17        Q.    And was it also important for him to maintain that

18   role so that he could continue to have access to those

19   developers that we talked about?

20        A.    Correct.  Yes.

21        Q.    Was part of the pay-to-play scheme to have people

22   who were loyal to Jose Huizar placed in certain roles?

23        A.    Yes.

24        Q.    And so would the Councilmember ever ask developers

25   to hire friends or allies?

1      A.    Yes.

2      Q.    And is that so that you could have people like the

3  defendant who -- I think you said who gets it?

4      A.    Correct.

5      Q.    Would Jose Huizar ever check in with the defendant

6  to see if a developer had hired George Chiang?

7      A.    I believe so, yes.

8      Q.    And what would he say to the defendant?

9      A.    Just to see if -- yeah, if -- if the company

10  hired -- had hired George just so that he knows whether to

11  continue to meet with them or not or continue to build a

12  relationship with them.

13      Q.    And as far as keeping power as a goal of the RICO

14  conspiracy, did it later include getting Huizar's wife elected

15  to the CD-14 council seat?

16      A.    Yes.

17      Q.    And what's the name of Jose Huizar's wife?

18      A.    Richelle Rios.

19      Q.    And on the screen, Exhibit 1, page 20, is that

20  Richelle Rios?

21      A.    Yes.

22      Q.    Was it important for the -- and a goal of the

23  pay-to-play scheme and the RICO conspiracy to conceal the

24  financial benefits that you and Jose Huizar were receiving from

25  developers?

1      A.    Yes.

2      Q.    Why was that a goal?

3      A.    To conceal the -- the --

4      Q.    To conceal the financial benefits, why was that

5    important?

6      A.    Well, because we didn't want the FBI to find out

7    about the -- the bribes.

8      Q.    You were trying to avoid detection by the law

9    enforcement?

10     A.    Yes.

11     Q.    And in general, was it important to conceal the

12   pay-to-play scheme?

13     A.    Yes.

14     Q.    Was one of the ways that you concealed the scheme to

15   not disclose benefits on your annual financial disclosure?

16     A.    Correct.

17     Q.    Is that called a Form 700?

18     A.    Yes.

19     Q.    And is that the mandatory form that public officials

20   like yourself need to fill out every year to report

21   investments, income, loans, gifts, things like that?

22     A.    Yes.

23     Q.    And is the purpose of the form, in part, to ensure

24   that there aren't conflicts of interest?

25     A.    Correct.

```
 1        Q.   I'm going to focus in on a developer now.
 2             Are you familiar with someone named Wei Huang?
 3        A.   Yes.
 4        Q.   Was he considered a friend of the office?
 5        A.   Yes.
 6        Q.   And who is Wei Huang?
 7        A.   He is the Chairman of the Shen Zhen company.
 8        Q.   I'm going to publish Exhibit 1, page 13.
 9             Is that a photograph of Chairman Wei Huang?
10        A.   Yes.
11        Q.   And did you refer to him by his title, Chairman?
12        A.   Yes.
13        Q.   And what year did you first meet Chairman Huang?
14        A.   In 2013.
15        Q.   And where did he live?
16        A.   He lived in China.
17        Q.   Did he also have a residence in -- in L.A.?
18        A.   Yes, in San Marino.
19        Q.   And to your knowledge, how often did Chairman Huang
20   come to the United States when you were seeing him?
21        A.   About every other month.
22        Q.   And as far as you know, does Chairman Huang speak
23   English?
24        A.   No.
25        Q.   What business did Chairman Huang have in the City of
```

UNITED STATES DISTRICT COURT

```
 1   Los Angeles?
 2        A.    He had just purchased The L.A. Hotel in Downtown
 3   Los Angeles and also the Sheraton Universal by
 4   Universal Studios.
 5        Q.    Did you have an understanding of his level of
 6   wealth?
 7        A.    Yes.  That he was a billionaire.
 8        Q.    How did you know that?
 9        A.    Through -- through Ray and a quick Google search.
10        Q.    But the defendant told you that Wei Huang was a
11   billionaire?
12        A.    Yes.
13        Q.    Did Ricky Zheng also tell you that?
14        A.    Yes.
15        Q.    Was it relevant to the pay-to-play scheme that
16   Chairman Huang was a billionaire?
17        A.    Yes.
18        Q.    Why is that?
19        A.    That's a lot of -- that's a lot of resources that
20   the Councilmember could tap into, not only because he owned the
21   two hotels, just because of -- just, yeah, it was good to have
22   a billionaire as a -- as a friend, as a -- yeah.  It was good
23   to have a billionaire as a friend in the political office.
24        Q.    Did you understand Chairman Huang to be a real
25   estate developer?
```

1        A.    Yes.

2        Q.    And how did you know that?

3        A.    Just, again, based on -- based -- talking to

4   Mr. Ray Chan and also just research.

5        Q.    Research, like research on the Internet?

6        A.    Yes.

7        Q.    Did you have regular contact with Chairman Huang

8   after you met him?

9        A.    Yes.

10       Q.    And did that last through about 2018?

11       A.    It did.

12       Q.    Okay.  Let's talk about a name that's come up,

13   Ricky Zheng.  Exhibit 1, page 23.

14             Okay.  And who is Ricky Zheng?

15       A.    Ricky Zheng was the Chairman's assistant or

16   Chairman's George on that -- in that company, yes.

17       Q.    And when the Chairman would be in the

18   United States -- well, let me back up.

19             Where did Ricky Zheng reside?

20       A.    In the San Gabriel Valley.

21       Q.    And when the Chairman was in the States, what role

22   did Ricky Zheng have in terms of taking care of the chairman?

23       A.    Yeah, he was his -- his No. 1 guy to take care of

24   him while he was in the States, yes.

25       Q.    Did Mr. Zheng have an official role with Shen Zhen

1    New World?

2         A.    Yes.  At one point, yes.

3         Q.    And do you recall his title?

4         A.    He was the general manager for the -- for both

5    hotels at the time.

6         Q.    Okay.  Both The L.A. Grand Hotel and the Sheraton

7    Universal?

8         A.    Yes.

9         Q.    And what year did you first meet Mr. Zheng?

10        A.    In 2013.

11        Q.    Did you have regular contact with him after you met

12   him?

13        A.    Yes.

14        Q.    Was that through 2018?

15        A.    Yes.

16        Q.    And during the time period that you knew Mr. Zheng,

17   from 2013 to 2018, did Mr. Zheng assist with business matters

18   concerning the Chairman's hotels?

19        A.    Yes.

20        Q.    And was that true regardless of his formal title

21   with the company?

22        A.    That is correct.

23        Q.    Did the defendant first introduce you and

24   Jose Huizar to Chairman Wei Huang of Shen Zhen New World?

25        A.    Yes, he did.

1      Q.    Okay.  What did the defendant say about

2  Chairman Huang before you met him, before you met the Chairman?

3      A.    Well, that he bought two hotels and that he was a

4  billionaire.

5      Q.    Okay.  Did you and Jose Huizar go to a dinner to

6  meet Chairman Huang?

7      A.    We did.

8      Q.    Where was that dinner?

9      A.    I believe it was in Monterey Park or -- excuse me --

10  Alhambra.

11     Q.    Was this in about 2013?

12     A.    Yes.

13     Q.    And who was present at this first dinner, starting

14  with people on the Shen Zhen New World side?

15     A.    It was the Chairman -- it was Chairman Huang, I

16  believe his -- another staff member of his, Harris.  There was

17  his assistant, Chairman's assistant.  I think that was it from

18  the Chairman's side.

19     Q.    Okay.  Was the assistant named Nash?

20     A.    Nash, yes.

21     Q.    And who attended this introductory dinner from

22  Jose Huizar's office?

23     A.    It was the Councilmember, myself, and I believe his

24  chief of staff at the time and another downtown deputy.

25     Q.    Okay.  Did the defendant, Ray Chan, attend?

```
 1      A.    Yes, he did.

 2      Q.    Was this an elaborate dinner?

 3      A.    Yes.

 4      Q.    What can you -- can you describe that to the jury?

 5      A.    It was probably -- it was my first real elaborate, I

 6  guess, Chinese dinner.  It was just a lot of wine, a lot of

 7  expensive wine, different types of fish I've never seen before.

 8  It was just, you know, food that just kept coming on one of

 9  those round tables and a lot of just laughing and -- yeah, it

10  was just a lot of drinking.

11      Q.    Did Chairman Huang provide any gifts to Jose Huizar

12  during this introductory dinner?

13      A.    Yes.

14      Q.    What was it?

15      A.    Bottles of wine.

16      Q.    Did the defendant, Ray Chan, get that gift?

17      A.    He did, yes.

18      Q.    Did you get the wine?

19      A.    No.

20      Q.    During the dinner, what language was used?

21      A.    Chinese.

22      Q.    Was there translation?

23      A.    Yes.

24      Q.    Who was translating?

25      A.    Mr. Raymond Chan.
```

**UNITED STATES DISTRICT COURT**

1    Q.    During that first dinner, did the defendant describe

2    to Chairman Huang who Jose Huizar was?

3    A.    Yes, he did.

4    Q.    And what did he say about Jose Huizar?

5    A.    That he was the councilmember that represented

6    downtown, that he was the Chairman of the Planning and Land Use

7    committee, that he was the king of downtown, the big boss of

8    downtown.

9    Q.    So was this that typical pitch that the defendant

10   would make for Jose Huizar in front of Chinese developers?

11   A.    Yes.

12   Q.    And did the defendant describe what Jose Huizar

13   could do?

14   A.    Yes.

15   Q.    What did he say about that?

16   A.    He was just expressing to the developer how powerful

17   the Councilmember was, how to agendize the items -- right? --

18   file motions, and vote on projects.  It was just elaborating on

19   how important the Councilmember was for that particular

20   project.

21   Q.    And in response to the defendant's explanation that

22   Huizar was the big boss of downtown and this whole explanation,

23   how did Chairman Huang respond?

24   A.    In his -- a few words of English, like, very, very

25   good.  That was his thing, like, very, very good, big boss.  So

1    he did repeat those certain phrases that Ray was sharing with

2    him.

3         Q.    And did he make that thumbs-up gesture you just

4    made?

5         A.    Yeah, he did.

6         Q.    During the same introductory dinner with Shen Zhen

7    New World, did the defendant explain what he could do as the

8    general manager of Building and Safety?

9         A.    Yes, he did.

10        Q.    What did he say about that?

11        A.    Mainly how he could streamline their project,

12   especially with the construction -- construction aspects of the

13   project.

14        Q.    Did he talk about how it's important to save time

15   and money for the developer?

16        A.    Yes.

17        Q.    And during that dinner, did the defendant,

18   translating, making any suggestions to Jose Huizar about

19   Las Vegas?

20        A.    Yes.

21        Q.    What did he say?

22        A.    It was just -- throughout the conversation, it was

23   brought up that the -- that the Chairman liked to gamble and

24   that he would be going to Vegas sometime soon and the

25   conversation suggested that Huizar should go.

1    Q.    And that was being translated by the defendant?

2    A.    Correct.

3    Q.    During the time period of 2013 to 2017, did

4    Chairman Huang make requests of Jose Huizar relating to his two

5    hotels in Los Angeles?

6    A.    He did, yes.

7    Q.    Were those requests made -- ever made through you?

8    A.    Yes.

9    Q.    And would the defendant sometimes be the one to

10   relay or communicate those requests for -- on behalf of

11   Chairman Huang to you?

12   A.    Yes.

13   Q.    Did you or Jose Huizar ever tell Chairman Huang "no"

14   to a request that he made?

15   A.    Never.

16   Q.    That included requests for assistance for the

17   hotels?

18   A.    Correct.  Yeah, we never told him.  We never told

19   the Chairman no.

20   Q.    During your interactions with Ricky Zheng, did you

21   ever explain to him Jose Huizar's power within the City and in

22   downtown?

23   A.    I did, yes.

24   Q.    Did you do that more than once?

25   A.    Yes.

1       Q.    And what sorts of things did you tell Ricky Zheng

2  about what Jose Huizar could do?

3       A.    Basically, if -- you know, the Councilmember had the

4  power to kill the project, stall the project, and also just to

5  make sure that their project gets on top of the list of all the

6  different developments going on in downtown.

7       Q.    During the time that you knew Chairman Huang, did

8  you receive financial benefits from him?

9       A.    I did, yes.

10      Q.    Did Jose Huizar?

11      A.    Yes.

12      Q.    Did you admit to those facts in your plea agreement?

13      A.    I did.

14      Q.    And did the financial benefits include paid trips to

15  Las Vegas with Chairman Huang and Ricky Zheng?

16      A.    Yes.

17      Q.    Approximately how many trips like that did you go

18  on?

19      A.    A lot -- a lot of trips.  I don't -- over --

20  probably like over a dozen trips.

21      Q.    Was it over a dozen?

22      A.    Yes.

23      Q.    And did both you and Jose Huizar go on these trips?

24      A.    We did, yes.

25      Q.    Was that from early 2013 to 2017?

1      A.   Yes.

2      Q.   Did Jose Huizar prioritize going to Vegas with

3  Chairman Huang?

4      A.   Yes.

5      Q.   How so?

6      A.   Whenever the Chairman was in town, it could be a day

7  notice, it could be a few hours' notice and the Councilmember

8  would cancel all his plans, whether it was personal or work,

9  and we would -- we would fly out.

10      Q.   So he would cancel meetings or business relating to

11  his work as a Councilmember to go to Vegas with Chairman Huang?

12      A.   Yes.

13           THE COURT:  All right.  Let's save the Vegas trips

14  until Monday morning.

15           Ladies and gentlemen, I want to remind you the

16  instruction that I gave you earlier.  Until this trial is over,

17  you're not to discuss this case with anyone, including your

18  fellow jurors, members of your family, people involved in the

19  trial, or anyone else, nor are you allowed to permit others to

20  discuss the case with you.

21           Also, please do not read, watch, or listen to any

22  news reports, if any, of the trial.  And more important -- most

23  importantly, do not do any independent research.

24           And, finally, you're reminded to keep an open mind

25  until all the evidence has been received, you have heard the

1    arguments of counsel, instructions of the Court, and the views

2    of your fellow jurors.

3              As you know, we will be in session on Monday and

4    we'll again start at 8:00 o'clock.  So hopefully we'll have a

5    sunny day on Monday, but everybody have a good weekend and

6    drive safely.

7              THE COURTROOM DEPUTY:  All rise for the jury.

8              (Out of the presence of the jury:)

9              THE COURT:  All right.  The jury is not present.

10             There's a couple of issues that I wanted to discuss

11   with counsel and the first of which are the exhibits.

12             And it appears that Mr. -- Mr. Pratt is now in

13   charge of exhibits.  So, Mr. Braun, if you want to defer to

14   Mr. Pratt, I have no --

15             MR. BRAUN:  Defer, Your Honor.

16             THE COURT:  Pardon me?

17             MR. BRAUN:  Kindly, I defer.

18             THE COURT:  All right.  I have been provided with

19   the transcripts for the recordings.  And I just want to confirm

20   because I actually spent some time this morning with the --

21   with the trial exhibits, that these are the same exhibits.

22             The ones that were on the exhibit list or the -- not

23   the exhibit list but the document that was filed on

24   February 22nd, Docket No. 970, that was the defense list of --

25   of all recordings, that these are the exhibits that are

1    referred to on that list; is that correct, Mr. Pratt?

2                MR. PRATT:  That's correct, Your Honor.

3                THE COURT:  All right.  And they're all in English;

4    correct?

5                MR. PRATT:  Some are in Chinese, I believe,

6    Your Honor.

7                THE COURT:  Which ones did you -- which ones were in

8    Chinese?  The 2001 series are the interview, the FBI interview

9    with Mr. Chan.  Those are in English.

10               Is the -- is the 24 -- 2498 -- I'm sorry, 2458, this

11   is the line sheet of the conversation between Mr. Chan and

12   Mr. Chiang.  Is this the translation?

13               MR. PRATT:  Sorry.  Just a moment, Your Honor.

14               THE COURT:  Well, let me ask the Government.  You've

15   received a copy of the -- of the exhibits from the -- from the

16   list that was filed on February 22nd; correct?

17               MR. FAERSTEIN:  Yes, Your Honor.

18               THE COURT:  So you're comfortable that the

19   translations -- it appears that they've all been -- they've all

20   been translated; correct?

21               MR. FAERSTEIN:  I don't think that's our

22   understanding, Your Honor.

23               THE COURT:  Well, for example, take 2458.  That's an

24   English translation of the conversation that is referred to as

25   the 6/22/2017 call.  This is in English.  This is -- this is a

1    line sheet that's in English.  It looks like it's the

2    Government translation.

3              MR. FAERSTEIN:  If it's -- if it's a line sheet, it

4    would have been a line sheet from the ongoing wiretap.  It's

5    not a translated transcript of the recording itself.

6              THE COURT:  All right.  So it's the Government's

7    position with respect to the 2458 -- Exhibit 2458, which is the

8    line sheet transcript or the line sheet notes of that

9    conversation, that that's not a -- an official transcript.

10              MR. FAERSTEIN:  That's our position, Your Honor.

11              THE COURT:  All right.  So what's the defense's

12    position with respect to when you're going to provide the

13    Government with the -- and let me also confirm with the

14    Government, this conversation was in the foreign language, in

15    Chinese?

16              MR. FAERSTEIN:  That specific one -- I can't answer

17    that question for you right now, Your Honor, based on how it's

18    described in this -- in the defense exhibit list.

19              THE COURT:  Well, it's not described in the defense

20    exhibit list.  You have the actual document.  It was given to

21    you this morning.  And I have it, and I'm looking at it right

22    now.  It's Exhibit 2458.

23              MR. FAERSTEIN:  Okay.  That is among the 12

24    translations that we received last night and that Your Honor

25    received this morning?  I apologize.  I don't have that

1    specific exhibit number written down but --

2            THE COURT:  It's a conversation that took place on

3    June 22nd, 2017, between Mr. Chan and Mr. Chiang.  So you've

4    seen the -- you've seen the line sheet; correct?

5            MR. FAERSTEIN:  I -- I have not looked at what we

6    received last night yet, Your Honor.

7            THE COURT:  Well, you know, we're sitting here all

8    day and the Government is concerned about the translations and

9    the exhibits.  And if you're not even going to look at the

10   documents that the counsel provided to you -- I looked at them,

11   I looked at them this morning.  I looked at the exhibits and

12   then I confirmed that the exhibits are -- are conformed to what

13   counsel -- the hard copies that counsel provided this morning.

14           So I'm trying to work through these issues.  And if

15   you're not even going to look at the documents, then I'm going

16   to give up.

17           MR. FAERSTEIN:  Yes, Your Honor.  We understand

18   that.  And it's fully our intention to review the translations

19   that we were provided last night.

20           THE COURT:  But these aren't translations, according

21   to you.  According to you, these are the English notes

22   apparently prepared -- let me ask Agent Civetti.

23           Agent Civetti, we have a line sheet of this

24   conversation.  So is this something that the Bureau translates

25   roughly and writes down each of the participants what they are

```
 1   saying?
 2             SPECIAL AGENT CIVETTI:  That's correct.
 3             THE COURT:  Okay.  So this is not an official
 4   translation?
 5             SPECIAL AGENT CIVETTI:  No.  We wouldn't -- if it
 6   was in Chinese, we would have had a linguist available who did
 7   detailed summaries, sometimes a verbatim translation.  That is
 8   not the official translation.
 9             THE COURT:  Okay.  So where is the official
10   translation?
11             SPECIAL AGENT CIVETTI:  For that one, we would not
12   have done an official translation.  I don't believe that's our
13   exhibit.
14             THE COURT:  Okay.  So there are no -- so the defense
15   has not provided official translations.
16             MR. PRATT:  Apologies, Your Honor.  Exhibit 2458,
17   that conversation that occurred was in English.  And that is
18   just the excerpt of the English transcript.
19             THE COURT:  All right.  Is that the Government's
20   understanding?
21             MR. FAERSTEIN:  If that is the line sheet, then,
22   yes, that would be the English line sheet that we produced
23   during the investigation.
24             THE COURT:  No, but is that -- is that -- is that
25   counsel's statement correct, that that means that that
```

1    conversation was then in English and there is no -- it was in

2    English and this is the -- the English version of that

3    conversation?

4            MR. FAERSTEIN:  That's correct.

5            THE COURT:  Okay.  So anytime we have a line sheet

6    that's in English, the Government has, with the assistance of a

7    linguist, gone through and recorded what the participants of

8    those conversations have said?

9            SPECIAL AGENT CIVETTI:  That's correct.

10           THE COURT:  Okay.  So -- all right.  So that -- so

11   we have line sheets for 2458 and we have line sheets for 2665,

12   which consists of six pages.  And that's the conversation

13   that's on this document No. 970, is the September 12th, 2017,

14   call between Chan, Mr. Chan and Mr. Williams.

15           So there is no -- so everybody is comfortable that

16   that conversation that's reflected in 2665 was in English?

17           SPECIAL AGENT CIVETTI:  Correct.

18           THE COURT:  All right.  Then the next one is the

19   27 -- I don't see a hard copy of Exhibit 27 -- 2707.  That's

20   the recording between Mr. Wang and Mr. Chan on May 10th, 2017.

21   That is -- where's the hard copy of 2706?

22           MR. PRATT:  Your Honor, we have that as

23   Exhibit No. 2706.

24           THE COURT:  Right.  That's what I'm saying, 2706.

25   It's not in the package that you just gave me.

```
1            MR. PRATT:  Our apologies, Your Honor.  We -- we
2   have that.
3            THE COURT:  All right.  Why don't you hand it to me.
4            In what form is it?
5            MR. PRATT:  It's in hard copy form, Your Honor.
6            THE COURT:  I understand it's hard copy.  Is it
7   English or is it -- is it in Chinese?
8            MR. PRATT:  It's English, Your Honor.
9            THE COURT:  Okay.  So Government, 2706,
10  Agent Civetti, that's in English?
11           SPECIAL AGENT CIVETTI:  Do you mind giving the date
12  of that again?
13           THE COURT:  May 10th, 2017.
14           SPECIAL AGENT CIVETTI:  And that's between
15  Defendant Chan and Andy Wang?
16           THE COURT:  Correct.  Re:  Ave meeting.
17           SPECIAL AGENT CIVETTI:  I don't believe I recall any
18  recordings from May 2017 because Andy was not cooperating at
19  that time.
20           THE COURT:  All right.  Let me see exhibit -- it's
21  been provided to the Government.  Show the Government -- show
22  Agent Civetti a copy of this.
23           The exhibit list -- the exhibit list is incorrect.
24  It looks like it's a recording -- maybe it's a three-way
25  recording on October 5th, 2017, Raymond Chan, Andy Wang, and
```

1  Ave Jacinto.

2        SPECIAL AGENT CIVETTI:  Yes.  Portions of that would

3  be in English and portions would be in Chinese.

4        THE COURT:  Okay.  So the portion that the defense

5  is intending to play that you've given me, 2706, the three

6  pages, that's all in English?

7        MR. PRATT:  That's correct, Your Honor.

8        THE COURT:  Okay.  Then the next is the -- the

9  recording at 2934.  The document that you handed me consists of

10  three pages.  And this is -- it has "Translated" on it.  Who

11  translated it?

12        MR. PRATT:  Sorry, Your Honor.  Um, it was

13  originally a government translation, and then we provided an

14  alternative translation.  And then -- and then we reached an

15  agreement on that alternative translation.

16        THE COURT:  You have reached an agreement?

17        MR. PRATT:  That is my understanding, Your Honor.

18        THE COURT:  Who do you have the understanding with?

19        MR. PRATT:  With -- with the Government and --

20  apologies again, I'm just getting up to speed on this.  But

21  with -- yes, it was with the Government.

22        THE COURT:  Well, all right.  Then there's 2962,

23  which is a recorded call between Mr. Chan and Mr. Wang.  That's

24  2962.  Is this -- is this in English or in Chinese?  And is

25  this the transcript that you provided me, which consists of six

1    pages, is that -- is that in English or is this a translation?

2            MR. PRATT:  It's a translation, Your Honor.

3            THE COURT:  And has the Government -- have you and

4    the Government reached an agreement with respect to the

5    accuracy of this translation -- the translation?

6            MR. PRATT:  Yes, we have, Your Honor.

7            THE COURT:  Is that correct?

8            SPECIAL AGENT CIVETTI:  That's correct.

9            THE COURT:  All right.  And then 2974, 2975, 2976,

10   2977, 2978, that looks like it is a -- excerpts from the

11   October 5th, 2018, lunch between Andy and Shawn Kuk.  Is this

12   in English?  And if it's not in English, have counsel reached

13   an agreement with respect to the translations?

14           MR. PRATT:  These were all in English, Your Honor.

15           THE COURT:  Okay.  All right.  So those are the

16   only -- those are the exhibits that the Government now has, and

17   I encourage you to look at them over the weekend.

18           I have one other issue with respect to the -- the

19   defendant's exhibits.  I was noticing, as I was going through

20   them earlier this week -- and I did not mention it when I made

21   the order to provide the Court with a list of all recordings.

22           But what I don't understand is the Government's --

23   I'm sorry -- the defense exhibit list.  And I'm looking at the

24   one that was filed on February 19th, Docket No. 965, which

25   provided the Court with more meaningful descriptions of the

1 exhibits.  They have Government casino Bates numbers for many

2 of those exhibits.  Yet when I look at the exhibit binders that

3 you provided, those exhibits do not have the Bates numbers on

4 them.

5    How could you possibly use exhibits that didn't have

6 the Bates numbers on them or -- include them in the book?

7 You've got them on the exhibit list, and they're not included

8 in the nine volumes of exhibits that I have.

9    MR. PRATT:  Yes, Your Honor.  It's my understanding

10 that, when defense was preparing these exhibits, um, when

11 the -- we were converting them into PDFs, some of the Bates

12 numbers were lost in the conversion.

13    THE COURT:  All right.  Well, it becomes -- it

14 becomes very confusing to try to figure out, one, whether or

15 not any -- any -- which of these exhibits are going to be

16 offered by the -- by the Government or have been offered and

17 admitted by the Government without reference to a Bates number.

18    So I don't know how you intend to avoid -- we're not

19 going to have duplicate exhibits going in, so I don't know how

20 you're going to avoid that.  How do you intend to make sure

21 that there are no duplicate exhibits?

22    MR. PRATT:  The -- we had a meet and confer

23 yesterday afternoon, Your Honor, and the Government very

24 generously provided a list of exhibits that had already been

25 admitted on their side.  And we're going to use the Government

**UNITED STATES DISTRICT COURT**

1   exhibit numbers for these same exhibits.

2            THE COURT:  So you're going to be revising this

3   exhibit list and withdrawing those exhibits that the Government

4   has already admitted?

5            MR. PRATT:  We're going to cross-reference those

6   exhibit numbers.  So we're going to have a column that lists

7   the Government's exhibit number next to our exhibit on our

8   exhibit list.

9            THE COURT:  And whether or not that exhibit has been

10  admitted into evidence.

11           MR. PRATT:  That is my understanding, Your Honor.

12           THE COURT:  Well, you're going to be preparing it

13  so --

14           MR. PRATT:  Yes.

15           THE COURT:  That's the way it's going to be.

16           MR. PRATT:  Yes.  Yes, Your Honor.

17           THE COURT:  All right.  Well, that will solve --

18  that will solve one of the problems.  But then when -- you

19  know, Mr. Braun, I'm going to suggest to you -- and I think I

20  know you well enough -- that you are focusing on -- a very

21  specific focus in terms of the defense of this case.  And I

22  understand that when it comes time to putting together trial

23  exhibits, that both the Government and the defense err on the

24  side of including most every exhibit that they have in their

25  office because they don't want to be accused of leaving any

```
 1    exhibits out, which is not the purpose of this exercise.
 2              But what I'm going to suggest to you is you might
 3    want to go through -- because I've looked at a lot of these
 4    exhibits.  And in addition to being duplicative of what the
 5    Government has admitted and will be offering, it looks like
 6    this exhibit list could be really honed down to just those
 7    exhibits that you really have an interest in introducing at the
 8    time of trial because right now, the way this has been put
 9    together, the exhibit list has really become unmanageable.
10              MR. BRAUN:  I agree.  I hate exhibits, so we'll
11    narrow it down.
12              THE COURT:  Right.  And in this case, most of the
13    exhibits are coming from the Government.  And certainly, if
14    there are certain smoking gun exhibits that you want to refer
15    to --
16              MR. BRAUN:  We'll use them.
17              THE COURT:  -- you can use those.
18              So I'm going to ask you to spend some time in the
19    next couple of days going through this exhibit list and start
20    making some cuts and coming up and providing the Government by
21    noon on Sunday with a revised exhibit list that -- I'm not
22    trying to preclude you from offering any exhibit.  I'm just
23    trying to make it more manageable because this process is just
24    consuming an awful lot of time and effort.
25              MR. BRAUN:  I agree, Your Honor.  I just -- that's
```

1    why I hate civil cases, just too many exhibits.

2              THE COURT:  And then to those that are going to

3    remain on the exhibit list, I assume that the Government has

4    been provided with all of the exhibits on Docket No. 965, you

5    have nine -- I have nine volumes.  I assume you have the nine

6    volumes?

7              MR. FAERSTEIN:  We have been provided the exhibit

8    binders as well as electronic versions, Your Honor.  The issue

9    that Your Honor recognized already is that for a lot of the

10   exhibits that are identified with Bates numbers on the exhibit

11   list, we do not have the underlying copies or versions of those

12   exhibits that have the Bates numbers that we produced to the

13   defense.

14             THE COURT:  Well, what I'm going to suggest is after

15   Mr. Braun goes through and revises this exhibit list, that

16   those exhibits that remain on the exhibit list, that copies of

17   the -- those exhibits that remain on the exhibit list, that

18   you -- you either annotate the exhibits that have been provided

19   by the Government.  But I want you to put the Bates -- the

20   Government Bates numbers on those exhibits that are going to

21   remain so the process of reviewing those exhibits will

22   become -- become less cumbersome.

23             I know that's -- it shouldn't be that much problem

24   for the defense because you have the exhibits, you have the

25   underlying Bates numbers.  And it's just a matter of -- I mean,

1     you can actually, rather than -- I'm loathe to say this.  But

2     if you have an exhibit, for example, the -- I don't know

3     what -- I have a question mark by 206, Chiang Exhibit C, Casino

4     369003.

5               See, the problem is, even the list that was supposed

6     to be providing me with a more meaningful description, I still

7     have no idea what that is, nor do I have the number of pages on

8     it.

9               So, in any event, I'm just going to order the

10    defense not only to go through and cull out some of the

11    unnecessary exhibits and provide the Government with a revised

12    and file it by -- prepare a revised exhibit list and file that

13    exhibit list by noon on -- on Sunday.  That way, I'll have an

14    opportunity to also look at it but, also, to provide the

15    Government with the Bates numbers of the exhibits that are

16    going to remain on the exhibit list so the Government can

17    easily go through and figure out whether or not it's going to

18    have any objection.

19              I assume that if the Government satisfies itself

20    that it is a document that was produced in discovery, which has

21    the Bates numbers on it, that the Government isn't going to

22    object to the authenticity of that document.  You may have

23    other objections, but at least you'll know what the document is

24    and we can then deal with it on a more substantive basis.

25              MR. FAERSTEIN:  With respect to authenticity,

1    Your Honor, that's correct.  That will make it easier.

2                THE COURT:  All right.

3                MR. FAERSTEIN:  If I may, I'm sorry to interrupt.

4                THE COURT:  Go ahead.

5                MR. FAERSTEIN:  One other request I think is

6    consistent with what we've already discussed, with respect to

7    the exhibit list that the defense is going to produce by noon

8    on Sunday, it will be very helpful to have cross-references for

9    the remaining exhibits they have to the Government's exhibits

10   that are, that we've already, you know, provided to them and

11   that are -- many of which are in evidence.

12               We provided a partial list of those cross-references

13   yesterday to sort of get the ball rolling, but it would be

14   helpful if the defense was able to complete the picture with

15   respect to any and all crossover between their exhibits and the

16   Government's trial exhibits.

17               THE COURT:  Yes.  I think that's -- that's a fair --

18   a fair request.  So the defense exhibit list will -- I thought

19   that's what this column was going to be for.

20               MR. FAERSTEIN:  Yes.  We added that column to the --

21   the list we sent the defense yesterday and completed some of

22   those that we'd already done.  And the defense, I believe,

23   would be adding or completing the picture on that -- in that

24   separate file.

25               THE COURT:  Give me an example because I'm not sure

**UNITED STATES DISTRICT COURT**

```
 1    that the defense is going to be capable of doing that without

 2    having the Government's input.

 3              I mean, this all should have been done in a meet and

 4    confer where you sit down and you sit in a room and you go

 5    through these exhibits and you go through these exhibit lists.

 6    And this e-mail back and forth is just -- in my view, is

 7    just -- is just make-work and it's a waste of time.

 8              So what are you suggesting?  What does this

 9    column -- this column going to include?

10              MR. FAERSTEIN:  The column, Your Honor, will have --

11    it will say Government exhibit number.  And so for --

12              THE COURT:  So, for example, we've got

13    Exhibit No. 2000, which is the First Superseding Indictment.

14    So there's no objection to the Government, defendant's

15    response.  So what is this column going to say?

16              MR. FAERSTEIN:  I can give you a specific example,

17    Your Honor.

18              THE COURT:  All right.

19              MR. FAERSTEIN:  The list we sent the defense

20    yesterday, for Exhibit -- Defense Exhibit 2011.

21              THE COURT:  2011 is the City Ethics Revolving Door

22    Brochure.

23              MR. FAERSTEIN:  That's correct.

24              THE COURT:  Okay.

25              MR. FAERSTEIN:  So we have put in a column -- to the
```

1    left of their exhibit numbers a separate column that says

2    "Government Exhibit number" and that is also Government

3    Exhibit No. 6.  We have cross-referenced our Government No. 6

4    with their defense Exhibit 2011.

5              THE COURT:  Okay.  But why can't you do that after

6    you -- I mean, you can do that now based upon the defendant's

7    exhibit list.  You can just continue to provide the

8    cross-reference numbers.  And then when they prepare the list

9    that's going to be filed on noon on Sunday, they can include

10   those numbers.  And why can't you continue to do it that way?

11             MR. FAERSTEIN:  Yes, Your Honor.  The parties will

12   discuss who does it.  It's just a question of who actually does

13   that review or that analysis.

14             THE COURT:  Okay.  I don't care who does it, I just

15   want it to get done.  And hopefully many of these exhibits are

16   going to turn out to be unnecessary.

17             MR. BRAUN:  I hope the jury is just as confused as

18   we are because that would be helpful.

19             THE COURT:  All right.  Well, I don't think it's

20   confusing.  I just think it's -- it's confusing before you --

21   before you display them to the jury and we haven't had any

22   issues, which I'm thankful for, because of the generous

23   stipulations with respect to the admissibility of these

24   exhibits.

25             But I anticipate that some of those stipulations --

1   I hope they continue.  But next week with some of these live

2   witnesses, there may be other objections.  And certainly the

3   foundation and the authenticity objections, I don't expect to

4   have any -- any objections on those, but some of the

5   substantive objections may -- may come out.

6              In any event, I'll leave it up to you good folks.

7   Everybody have a good weekend and try to stay dry.  And we'll

8   see you Monday morning.

9              (Proceedings adjourned at 2:29 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 2ND DAY OF JUNE, 2023.

18

19

20              /S/ MYRA L. PONCE
     _____
21        MYRA L. PONCE, CSR NO. 11544, CRR, RDR
             FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**