1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**          )

                                            )

6            **PLAINTIFF,**                 )        **CASE NO.**

                                            )

7            **vs.**                        )        **CR 20-326A-JFW**

                                            )

8    **RAYMOND SHE WAH CHAN,**              )        **VOLUME 7**

                                            )        **PAGES 1072 TO 1341**

9            **DEFENDANT.**                 )

     _____ )

10

11

12

13                      **REPORTER'S TRANSCRIPT OF**

                             **TRIAL DAY 6**

14                  **TUESDAY, FEBRUARY 28, 2023**

                             **8:10 A.M.**

15                   **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

     _____

23

24              **MIRANDA ALGORRI, CSR 12743, RPR, CRR**

                 FEDERAL OFFICIAL COURT REPORTER

                 350 WEST 1ST STREET, SUITE 4455

25               LOS ANGELES, CALIFORNIA 90012

                   MIRANDAALGORRI@GMAIL.COM

1   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        MARTIN ESTRADA
         UNITED STATES ATTORNEY
5        BY:  MACK JENKINS
         BY:  SUSAN HAR
6        BY:  CASSIE PALMER
         BY:  BRIAN FAERSTEIN
7        Assistant United States Attorneys
         United States Courthouse
8        312 North Spring Street
         Los Angeles, California 90012
9

10  **FOR THE DEFENDANT:**

11       BRAUN & BRAUN, LLP
         BY:  HARLAND W. BRAUN
12       BY:  BRENDAN PRATT
         10880 Wilshire Boulevard
13       Suite 1020
         Los Angeles, California 90024
14

15  Also Present:

16       Special Agent Andrew Civetti

17

18

19

20

21

22

23

24

25

1

**INDEX OF WITNESSES**

2

3 | **WITNESSES** | **PAGE** |

4  ESPARZA, George

5          Direct examination resumed by Ms. Har          1076
           Cross-examination by Mr. Braun                  1081
6          Redirect examination by Ms. Har                 1156
           Recross-examination by Mr. Braun                1176

7

8  MORRIS, Luke

9          Direct examination by Mr. Faerstein             1183

10

GOLDMAN, Morris
11
           Direct examination by Mr. Jenkins               1193
12         Cross-examination by Mr. Braun                  1271

13
KELLER, Kevin
14
           Direct examination by Ms. Har                   1272

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

2

3

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|

4

5
(None)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **TUESDAY, FEBRUARY 28, 2023; 8:10 A.M.** |
| 2 | **LOS ANGELES, CALIFORNIA** |
| 3 | -oOo- |
| 4 | |
| 5 | (The following proceedings were held in |
| 6 | open court in the presence of the jury:) |
| 7 | THE COURT:  All right.  Good morning to everyone. |
| 8 | Jury is present.  All counsel and the defendant are present. |
| 9 | You may resume your examination of this witness. |
| 08:10AM 10 | MS. HAR:  Thank you, Your Honor. |
| 11 | **GEORGE ESPARZA,** |
| 12 | **GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.** |
| 13 | **DIRECT EXAMINATION (RESUMED)** |
| 14 | BY MS. HAR: |
| 08:10AM 15 | Q    Mr. Esparza, when we left off yesterday, we were |
| 16 | looking at your phone note that's Exhibit 363J. |
| 17 | If we could please publish that. |
| 18 | And you were testifying about the fact that you |
| 19 | had heard that the defendant was going around asking people |
| 08:10AM 20 | whether they knew about Chairman Huang's settlement money for |
| 21 | Jose Huizar; right? |
| 22 | A    Yes. |
| 23 | Q    And did you find that -- when you heard that, did |
| 24 | you find that odd? |
| 08:11AM 25 | A    I did. |

1    Q       I believe you were testifying that the reason you

2  thought that was odd was that the defendant was asking people

3  about a settlement that he had helped structure; right?

4    A       Yes.

08:11AM  5    Q       And when you spoke to Jose Huizar about that, did

6  he have a similar reaction?

7    A       Yes.

8    Q       Did it appear to you that one of the reasons the

9  defendant was asking around about this was because he wanted to

08:11AM  10  find out who else knew about his role in the settlement?

11    A       Yes.

12    Q       At some point later, did you decide to cooperate

13  with the FBI?

14    A       I did.

08:11AM  15    Q       Was that after your house had been searched by

16  the FBI?

17    A       Yes.

18    Q       Was that in November of 2018?

19    A       Yes.

08:11AM  20    Q       How long after your first two interviews was

21  that?

22    A       Probably a year and a half.

23    Q       And in those first two interviews, you had been

24  untruthful; right?

08:12AM  25    A       Correct.

```
 1        Q        After you came back to the FBI in November --

 2   about November of 2018, did you sit down with FBI agents?

 3        A        I did.

 4        Q        Did you also sit down with prosecutors?

 5        A        I did.

 6        Q        That time around, did you have an attorney?

 7        A        This time I did.

 8        Q        Not the last two times?

 9        A        The last time times I did not have an attorney.

10        Q        During that meeting, did you tell the FBI and the

11   prosecutors about the trips to Las Vegas with Chairman Huang,

12   Jose Huizar, and Ricky Zheng?

13        A        I did.

14        Q        Did you also admit to them about your involvement

15   in the settlement of the sexual harassment lawsuit?

16        A        I did, yes.

17        Q        During that meeting in November of 2018 after you

18   chose to cooperate, did you tell the Federal Government about

19   the defendant's involvement in the settlement of that lawsuit?

20        A        Yes.

21        Q        At some point later, did you sign what is called

22   a cooperation plea agreement?

23        A        I did.

24        Q        Did you sign that around May 21st of 2020?

25        A        Yes.
```

1    Q       Mr. Esparza, have you pled guilty to RICO

2    conspiracy?

3    A       I did.

4    Q       And RICO stands for Racketeer Influenced and

08:13AM   5    Corrupt Organizations?

6    A       Yes.

7    Q       What is the maximum penalty you face for pleading

8    guilty to RICO conspiracy?

9    A       20 years.

08:13AM   10   Q       As part of your plea agreement, did you admit to

11   participating in the pay-to-play scheme in Council District 14

12   with Jose Huizar and others?

13   A       Yes, I did.

14   Q       Do you hope to receive a recommendation from the

08:13AM   15   Government for a lower sentence in exchange for your

16   cooperation?

17   A       I do.

18   Q       And even though you have that hope, has the

19   Government made any promises to you about what specific

08:13AM   20   sentence the Government will recommend?

21   A       No.

22   Q       Sitting here today, you don't know whether you

23   will get a lower recommendation from the Government.

24           True?

08:13AM   25   A       I do not.

1       Q       Who ultimately is going to decide your sentence?

2       A       Judge Walter.

3       Q       The judge in this case?

4       A       Yes.

08:14AM   5   Q       In order to get the benefit of your cooperation

6  plea agreement, what must you do?

7       A       Tell the truth.

8       Q       You also have to cooperate fully?

9       A       Yes.

08:14AM  10   Q       Is that written, those conditions, telling the

11  truth, cooperating fully, written into your plea agreement?

12       A       Yes.

13       Q       And as part of your guilty plea, did you admit

14  to, among other things, facts about being part of the bribery

08:14AM  15  scheme with Chairman Wei Huang and Jose Huizar involving the

16  L.A. Grand Hotel project which you testified about?

17       A       Yes.

18       Q       Did that L.A. Hotel bribery scheme include

19  receiving various financial benefits from Chairman Wei Huang

08:14AM  20  and Ricky Zheng during these trips to Vegas and Australia?

21       A       Yes.

22       Q       In your plea, did you admit that you understood

23  that, in providing those benefits, Chairman Huang intended to

24  get help from the City on his L.A. Grand Hotel development

08:14AM  25  whenever such needs arose?

1        A        Yes.

2        Q        Did you also admit to concealing certain of your

3    crimes in various ways including by lying to the FBI?

4        A        Yes.

08:15AM    5        Q        And by not reporting those bribes on your

6    financial disclosures on the Form 700s?

7        A        Yes.

8        Q        Did that concealment include trying to hide your

9    illegal activities as part of the RICO conspiracy?

08:15AM    10        A        Yes.

11                MS. HAR:  May I have a moment, Your Honor?  One

12    moment, Your Honor.

13                THE COURT:  Yes.

14                MS. HAR:  No further questions.

08:15AM    15                THE COURT:  All right.  Cross-examination.

16                          **CROSS-EXAMINATION**

17    BY MR. BRAUN:

18        Q        So why didn't you tell us you lied to the FBI

19    before we had two days of testimony?

08:15AM    20        A        Excuse me?

21        Q        Why didn't you tell us that you had lied to the

22    FBI before you testified for two days under oath?

23        A        That I lied to the FBI?

24        Q        Yeah.  Didn't you lie to the Government about

08:16AM    25    your involvement?

1082

```
 1        A       In the first two meetings, yes.

 2        Q       So you had two meetings with Mr. Jenkins here.

 3   Was he there?

 4        A       My first two meetings, no, Mr. Jenkins was not

 5   there.

 6        Q       You had a lawyer there, did you not?

 7        A       The first -- are you talking about the meetings

 8   in June of 2017?

 9        Q       Let's talk about the two meetings where you lied

10   to the Government.

11        A       Well, June 2017 is when I lied to the Government.

12        Q       Okay.  And you had a lawyer there?

13        A       I did not.

14        Q       Did you later have a lawyer?

15        A       After, yes.

16        Q       And you lied to him too?

17        A       No.

18        Q       You told him you lied to the Government?

19        A       Yes.

20        Q       Okay.  And so you told him you lied to the

21   Government, and he still attended a meeting with you?

22        A       Yes.

23        Q       Okay.  Now, let's -- so you first went to see the

24   Government when?

25        A       When they called -- June 2017 is the first time I
```

```
 1    went to see the Government.

 2            Q       And who did you talk to at the Government?

 3            A       FBI Agent Andy Civetti.

 4            Q       And you lied to him?

 5            A       I did.

 6            Q       And you knew it was a federal crime to lie to the

 7    FBI?

 8            A       I did.

 9            Q       Okay.  And how did you lie to him?  What did you

10    tell him that was false?

11            A       I didn't tell him the truth.

12            Q       Okay.  But you told him something that was

13    untrue; right?

14            A       Correct.

15            Q       Okay.  What did you tell him that was untrue?

16            A       That I was unaware of anyone taking bribes.

17            Q       And that's -- and did you tell him about the

18    trips to Las Vegas?

19            A       I did not.

20            Q       Did you tell him about the settlement?

21            A       No.

22            Q       Okay.  How long did this meeting with Mr. Civetti

23    last?

24            A       Not sure.  Seemed like forever.

25            Q       Where did it occur?
```

08:17AM (line 5)
08:17AM (line 10)
08:17AM (line 15)
08:17AM (line 20)
08:18AM (line 25)

1    A    It occurred in the FBI headquarters near UCLA.

2    Q    Okay.  Right at Wilshire and Sepulveda; correct?

3    A    There you go.  Wilshire.

4    Q    So you went down there.  What was the purpose of

08:18AM  5  you going down there?  Did he subpoena you there?

6    A    No.  I received a phone call from them.

7    Q    And you just voluntarily went down and said I'm

8    going to -- and you determined that you were going to lie;

9    right?

08:18AM  10   A    No.  I didn't determine that I was going to lie,

11   but I did determine to go meet with him.

12   Q    Okay.  And when you got there, you said -- you

13   lied to him; right?

14   A    Yes.  I did lie, yes.

08:18AM  15   Q    And he told you ahead of time that it was a crime

16   to lie to the FBI; correct?

17   A    He did, yes.

18   Q    So why didn't you just tell him the truth?

19   A    I was scared.

08:18AM  20   Q    You were worried about going to jail; right?

21   A    Yes.

22   Q    And now you have made a deal with the Government

23   that if you perform for them, you will get a -- they will at

24   least make a recommendation; correct?

08:19AM  25   A    To tell the truth.  Yes.

1    Q    Is this the third time you have testified?

2    A    Yes.

3    Q    Okay.  And so you basically understand that

4  they're only going to help you if you help convict Ray Chan;

08:19AM  5  right?

6         A    I just -- my responsibility is just to tell the

7  truth.

8         Q    That's what now you're saying, but you didn't

9  believe that when you went to talk to the FBI; correct?

08:19AM  10        A    Correct.  The first time, yes.

11        Q    What about the second time?  When was that?

12        A    I think a couple weeks after the first interview.

13        Q    That was Mr. Civetti again?

14        A    Yes.

08:19AM  15        Q    Was anyone else there that you see in the

16  courtroom today?

17        A    No.  Just Mr. Civetti.

18        Q    Was Mr. Jenkins there?

19        A    No.

08:19AM  20        Q    And you lied again; correct?

21        A    Yes.  I did lie.

22        Q    He warned you again that you could go to jail for

23  lying; correct?

24        A    Correct.

08:19AM  25        Q    Now -- so let's -- explain to the jury what

```
 1    happened.  So you lied twice to the FBI even though you had
 2    been warned that it's a federal crime to lie, and then at some
 3    point you changed your mind and decided to cooperate with the
 4    Government; correct?
 5         A      Correct.
 6         Q      Was there any money exchanged between those --
 7    didn't you have some money that you had held?
 8         A      I don't understand your question.
 9         Q      Okay.  After your second interview with the FBI
10    that you lied, did you then bring money to Mr. Huizar?
11         A      No.  I did not bring money to Mr. Huizar.
12         Q      When did you take money to Mr. Huizar?
13         A      I took money to Mr. Huizar before the FBI came --
14    before the FBI interviews.
15         Q      So you basically -- so at the time you went to
16    the FBI, you didn't tell him that you had taken money to
17    Mr. Huizar, did you?
18         A      Correct.
19         Q      So that was a lie; correct?
20         A      Yes.
21         Q      And they told you that omitting facts is the same
22    as a lie; correct?
23         A      Correct.
24         Q      Yet you still decided; right?
25         A      Yes.
```

08:20AM (line 5)
08:20AM (line 10)
08:20AM (line 15)
08:21AM (line 20)
08:21AM (line 25)

1     Q     Because you were basically trying to save

2    yourself from your own conduct; correct?

3     A     Correct.

4     Q     You could have just gone in and told them the

5    truth; correct?

6     A     Correct.

7     Q     You also didn't have to go in there.  They told

8    you you were free to leave; correct?

9     A     Correct.

10     Q     But you decided to lie to the FBI to avoid

11    responsibility; correct?

12     A     Yes.

13     Q     Now, at some point you claimed that you were

14    under the mind control of Mr. Huizar; is that right?

15     A     Yes.

16           MS. HAR:  Objection.  Misstates testimony.

17    Argumentative.

18           THE COURT:  He's already answered the question.

19     Q     BY MR. BRAUN:  Didn't you tell the Government

20    that actually what happened was Huizar controlled you; correct?

21     A     Yes.

22     Q     And you used the word "mind control"; correct?

23     A     I did.

24     Q     That wasn't true either; correct?  You had a free

25    will to do whatever you wanted to; correct?

1          A       Not exactly, no.

2          Q       Well, you were taught the difference between

3   right and wrong; correct?

4          A       From my grandfather, yes.

08:22AM  5          Q       Right.  And you knew that it was wrong to lie to

6   the FBI; correct?

7          A       I did.

8          Q       And you knew it was wrong to lie to the FBI the

9   second time; correct?

08:22AM  10         A       Yes.

11         Q       And you knew it was wrong to shake down

12  developers for money; correct?

13         A       Not exactly.  Yes.

14         Q       You didn't think it was wrong to say to a

08:22AM  15  developer, hey, you've got to pay off my boss?

16         A       In that case, yes.  Yes.

17         Q       Of course.

18                 So basically you were the guy that shook down the

19  developers for Huizar; correct?

08:22AM  20         A       Yes and no.

21         Q       And you knew it was wrong; correct?

22         A       Yes.

23         Q       And you did it anyway; correct?

24         A       Yes.

08:23AM  25         Q       And you knew it was a -- and you thought at least

```
 1    it was a federal crime; correct?
 2         A       Correct.
 3         Q       So basically -- correct me if I'm wrong -- you
 4    will do anything -- you will say anything to avoid
 5    responsibility for your conduct; correct?
 6               MS. HAR:  Objection.  Argumentative.
 7               THE COURT:  Sustained.
 8         Q       BY MR. BRAUN:  So you will lie for the Government
 9    to get a lower sentence; correct?
10         A       I will tell the truth for the Government.
11         Q       That's what you're saying now; right?
12         A       I am saying, yes, I will tell the truth.  Yes.
13         Q       How do we believe you now?  You have lied many
14    times to the FBI; correct?
15               MS. HAR:  Objection.  Argumentative.
16               THE COURT:  Sustained.
17         Q       BY MR. BRAUN:  Is there something about your
18    character that has changed since you lied to the FBI?
19               MS. HAR:  Same objection, Your Honor.
20               THE COURT:  Overruled.
21               THE WITNESS:  Can you repeat the question,
22    please?
23         Q       BY MR. BRAUN:  Is there something about your
24    moral character that has changed since you lied to the FBI
25    twice?
```

1090

1       A       Absolutely.

2       Q       You're afraid of going to jail; right?

3       A       Yes.

4       Q       Okay.  And you're relying on the people over here

08:24AM  5  at this table to make a recommendation; correct?

6       A       Yes.

7       Q       And you believe that you will get a better

8  recommendation if you get Ray Chan convicted; correct?

9       A       No.

08:24AM 10      Q       You think they will be happy to run back to their

11  boss or report to Washington --

12              MS. HAR:  Objection.  Speculation.

13  Argumentative.

14              THE COURT:  Finish the question.

08:24AM 15      Q       BY MR. BRAUN:  You think they will be happy to

16  report to the boss that Ray Chan was acquitted?

17              MS. HAR:  Objection.  Calls for speculation.

18  Argumentative.

19              THE COURT:  Sustained.

08:24AM 20      Q       BY MR. BRAUN:  So let's look at -- you understand

21  that you get a better recommendation from the people at this

22  table if you convict Ray Chan; correct?

23      A       No.  I'm just here to tell the truth.

24      Q       That's what you thought -- that was your

08:25AM 25  responsibility to the FBI; correct?

1   A      Excuse me?

2   Q      When you lied to the FBI twice, you had the

3   responsibility to tell them the truth; correct?

4   A      I did, yes.

08:25AM   5   Q      And you lied to them anyway; right?

6   A      Correct.

7   Q      Now, let's talk about this gigantic RICO

8   conspiracy other than questions from counsel.

9          Is Mr. Huizar's wife part of this?

08:25AM   10   A      I'm not sure.

11   Q      Well, it wouldn't work, would it, if she decided

12   to vote honestly; correct?

13          MS. HAR:  Objection.  Vague.

14          THE COURT:  Overruled.

08:25AM   15          THE WITNESS:  Can you please repeat your

16   question?

17   Q      BY MR. BRAUN:  In other words, the conspiracy

18   that you claim you're part of required a dishonest city council

19   person; right?

08:25AM   20   A      Correct.

21   Q      And that helps you to shake down developers;

22   correct?

23   A      Yes.

24   Q      Okay.  And did you have an agreement with her

08:26AM   25   that she was going to be dishonest also?

| | | | |
|---|---|---|---|
| | 1 | A | With the council member's wife? |
| | 2 | Q | Yes. |
| | 3 | A | No. |
| | 4 | Q | Did you ever discuss with her that her husband |
| 08:26AM | 5 | | was shaking down developers? |
| | 6 | A | No.  Not in the -- not in the bribe aspect, no. |
| | 7 | Q | Did you ever tell her that you went to Vegas, how |
| | 8 | | many, more than a dozen times? |
| | 9 | A | Yes. |
| 08:26AM | 10 | Q | Okay.  And what did she say? |
| | 11 | A | She didn't -- |
| | 12 | | MS. HAR:  Objection.  Calls for hearsay. |
| | 13 | | THE COURT:  Overruled. |
| | 14 | Q | BY MR. BRAUN:  Did she say anything? |
| 08:26AM | 15 | A | She didn't like her husband going to Las Vegas |
| | 16 | | every other month. |
| | 17 | Q | Now, you had mentioned that -- have you ever |
| | 18 | | heard of Westfield Company? |
| | 19 | A | It sounds familiar. |
| 08:26AM | 20 | Q | It's an Australian company; correct? |
| | 21 | A | I don't know. |
| | 22 | Q | Have you ever seen the Westfield malls across |
| | 23 | | this country? |
| | 24 | A | Yes. |
| 08:27AM | 25 | Q | They're foreign owned, aren't they? |

1          MS. HAR:  Objection.  Lacks foundation.

2          THE COURT:  Overruled.

3          You can answer the question if you know.

4          THE WITNESS:  I don't know.

08:27AM  5     Q     BY MR. BRAUN:  Do you know whether Ray Chan was

6   working with them to help remodel the malls?

7     A     I don't know.

8     Q     Have you ever heard of George Lucas?

9          MS. HAR:  Objection.  Relevance.  403.

08:27AM  10         THE COURT:  Overruled.

11         THE WITNESS:  George Lucas?

12    Q     BY MR. BRAUN:  Yeah.

13    A     Is that like a director?

14    Q     Yes.  There's a museum -- he's building a museum

08:27AM  15  in Exposition Park, is he not?

16    A     Is that the Star Wars guy?  I don't know who that

17  is.

18    Q     You don't know whether or not Ray Chan brought

19  that museum here, do you?

08:27AM  20    A     No.

21    Q     So when they listed developers, you just limit it

22  to Chinese developers; correct?

23    A     Yes.

24    Q     So did the prosecution tell you to leave out any

08:28AM  25  development that wasn't Chinese?

1094

```
 1              MS. HAR:  Objection.  Calls for speculation.
 2   Argumentative.
 3              THE COURT:  Sustained.
 4         Q    BY MR. BRAUN:  How about the Wilshire Grand
 5   Hotel?  That's Korean, is it not?
 6         A    Yes.
 7         Q    Do you know whether or not Ray Chan worked with
 8   them?
 9         A    I do.
10         Q    And he did, did he not?
11         A    Yes.
12         Q    And he helped bring that Korean money to L.A.;
13   correct?
14         A    I don't know about bringing Korean money, no.  I
15   just know he worked on the project.
16         Q    Let's talk about Chairman -- I have a tough time
17   pronouncing it, but it's Yuan.  Chairman Yuan, he was going to
18   bring, what, at least $750 million to L.A.; correct?
19         A    I believe so.
20         Q    And Wei Huang was going to bring about
21   $750 million to L.A.; right?
22         A    Correct.
23         Q    To build two skyscrapers in Downtown L.A.;
24   correct?
25         A    Yes.
```

08:28AM (line 5)
08:28AM (line 10)
08:28AM (line 15)
08:28AM (line 20)
08:29AM (line 25)

1    Q       They were never built; correct?

2    A       Not that I'm aware of, no.

3    Q       Do you realize that you and Huizar drove those

4    two developers from Los Angeles back to China?

08:29AM  5           MS. HAR:  Objection.  Argumentative.

6           THE COURT:  Sustained.

7    Q       BY MR. BRAUN:  So were you and Huizar interested

8    in bringing money and jobs to L.A.?

9           MS. HAR:  Objection.  Argumentative.  403.

08:29AM  10          THE COURT:  The 403 objection is sustained.

11          MR. BRAUN:  Okay.

12   Q       Do you know anything about the political system

13   of Mainland China?

14   A       The political system?

08:29AM  15   Q       Yeah.

16   A       In China, no.

17   Q       So you have no idea how -- you know it's run by

18   the communist party; correct?

19   A       I'm not sure.

08:29AM  20   Q       Well, it's called People's Republic of China.

21   You know it's communist; correct?

22          MS. HAR:  Objection.  Lacks foundation.  Asked

23   and answered.

24          THE COURT:  Sustained.

08:30AM  25   Q       BY MR. BRAUN:  Wei Huang, was he a communist?  Do

1    you know?

2         A       I have no idea, no.

3         Q       A billionaire communist from China?  Do you think

4    he's a communist?

08:30AM   5              MS. HAR:  Objection.  Calls for speculation.

6    Lacks foundation.  403.

7              THE COURT:  Sustained.

8              MR. BRAUN:  Okay.

9         Q       How about Yuan?  Was he a communist?

08:30AM   10             MS. HAR:  Same objections, Your Honor.

11             THE COURT:  Sustained.

12        Q       BY MR. BRAUN:  So you don't really know how

13   someone from Mainland China that comes to the United States

14   knows the difference between a political contribution that is

08:30AM   15   legal under our system and a bribe which is illegal, do you?

16        A       I'm not sure, no.

17        Q       Now, did the FBI or the Government ever give you

18   any literature to explain to these people that you can give as

19   much money as you want as long as you call it a political

08:31AM   20   contribution but you can't bribe them?

21        A       Do I know that the FBI gave the developers a

22   pamphlet?

23        Q       Or anything.

24        A       Not that I'm aware of, no.

08:31AM   25        Q       Do you know of any program that the

```
 1    U.S. Government had to make sure that people coming from

 2    overseas understood our political system which is based on

 3    money?

 4         A       Can you say that again, please?

 5         Q       Our political system depends on money, does it

 6    not?

 7                 MS. HAR:  Objection.  Vague.  Argumentative.

 8                 THE COURT:  Overruled.

 9                 THE WITNESS:  Does our political --

10         Q       BY MR. BRAUN:  Depends on money?

11         A       Depend on money, yes.

12         Q       The people that have the money control the

13    political system by contributions; correct?

14         A       Correct.

15         Q       And you were part of that system.  Ray is getting

16    money for politics; correct?

17         A       That is correct.

18         Q       And that's legal; correct?

19         A       Yes.

20         Q       So now it's not legal then for a politician to

21    say, give me money for my vote.  That's illegal; correct?

22         A       Correct.

23         Q       Is it legal for a developer to give money to

24    politicians without any agreement?

25         A       Without any agreement?  I would assume that it's
```

```
 1  legal.
 2          Q       Legal.  Right.
 3                  So someone coming in -- if you were part of a
 4  transaction where someone came in from China and just started
 5  giving money to politicians, that would be illegal because
 6  they're not Americans; right?
 7          A       I'm not sure.
 8          Q       Well, you know that a foreigner cannot give money
 9  to -- in a political campaign; correct?
10          A       Correct.  The foreign national cannot give money
11  to a political campaign.
12          Q       But you know what a bundler is, do you not?
13          A       I do.
14          Q       So a foreign national can come in and promise you
15  politically a certain amount of money, but he can't give it
16  himself.  He has to go to his friend and say, please give an X
17  amount of money, and then they can go to a bunch of people and
18  give the money; correct?
19          A       I'm not sure if that's legal too.
20          Q       But you've heard of the word bundler; correct?
21          A       I have heard of the word bundler.
22          Q       And a bundler is someone who gets other people to
23  give contributions; correct?
24          A       Correct.
25          Q       That's legal, is it not, as long as it's that
```

08:32AM (line 5)
08:32AM (line 10)
08:32AM (line 15)
08:33AM (line 20)
08:33AM (line 25)

1    person's money, as long as there's been no reimbursement;

2    correct?

3         A     Correct.

4         Q     Okay.  So a foreign national can come in to the

08:33AM 5    United States and bundle a bunch of money for a politician as

6    long as the money actually comes from Americans; correct?

7              MS. HAR:  Objection.  Incomplete hypothetical.

8              THE COURT:  Overruled.

9              THE WITNESS:  Sorry.  Can you say that again?

08:33AM 10        Q     BY MR. BRAUN:  A developer from China, say, can

11   come in and say to Huizar, I'm going to bundle $10,000 for you,

12   but he's got to go to his friends and get the money; correct?

13        A     If someone wants to bundle, yes, they would go to

14   their friends.

08:33AM 15        Q     Okay.  Now how about PACs?  You know what a PAC

16   is; right?

17        A     Yes.

18        Q     So a PAC, there is no limit; correct?

19        A     From my understanding, you're right.  There is no

08:34AM 20   limit.

21        Q     So someone can give $100 million to a PAC;

22   correct?

23        A     I guess hypothetically, yes.

24        Q     Or $50 million; correct?

08:34AM 25        A     Sure.

1       Q       Now, so under our system, there is no limit on

2  money; correct?  As long as there's not a quid pro quo;

3  correct?

4       A       I'm not sure.

08:34AM  5       Q       Well, if there's no limit on PAC -- a PAC the

6  money has to go to a candidate or at least two candidates;

7  right?

8       A       Correct.

9       Q       So it's sort of a scam, is it not, because it's a

08:34AM 10  way around -- there's no limits in our system; correct?

11       A       There's no limits on PACs.  That's correct.

12       Q       Okay.  And PAC money goes to candidates; correct?

13       A       That is correct.

14       Q       And candidates set that up; correct?

08:34AM 15       A       Yes.

16       Q       To avoid limits on money; right?

17       A       Yes.

18       Q       So our system unfortunately depends on money;

19  right?

08:35AM 20       A       Yes.

21       Q       And you were part of that system; correct?

22       A       Yes, I was.

23       Q       And that was the legal part; correct?

24               MS. HAR:  Objection.  Calls for a legal

08:35AM 25  conclusion.  Vague.

1          THE COURT:  Overruled.

2          THE WITNESS:  Sorry.  Can you repeat your

3  question?

4      Q      BY MR. BRAUN:  That was legal?  In other words,

08:35AM  5  you could go to a developer and say, give $15,000 to this PAC

6  for so and so, and that's legal; correct?

7      A      I mean, at the time I thought it was legal, but

8  obviously I'm hearing now.  I pled guilty to those crimes.  So

9  I guess they weren't legal.

08:35AM  10     Q      So now you think that soliciting contributions to

11  PAC is illegal?  Who told you that?

12     A      My Indictment told me that.

13     Q      Well, you don't -- you were indicted because of

14  bribes; correct?

08:36AM  15     A      Correct.

16     Q      A bribe is a quid pro quo where a politician

17  says, if you give me 15,000 I will vote this way; correct?

18     A      Correct.

19     Q      So that's different from just a political

08:36AM  20  contribution; correct?

21     A      Correct.

22     Q      Now, the people that give money to politicians

23  without any agreement, they're trying to buy access to the

24  politician; correct?

08:36AM  25     A      Correct.

1    Q     Is that legal?

2              MS. HAR:  Objection.  Calls for a legal

3    conclusion.

4              MR. BRAUN:  I will withdraw the question.

08:36AM  5              MS. HAR:  403.

6              THE COURT:  Sustained.

7    Q     BY MR. BRAUN:  All these people that give money

8    to politicians, is that just because they believe, or are

9    looking for future decisions?

08:36AM  10              MS. HAR:  Objection.  Calls for speculation.

11    Argumentative.

12              THE COURT:  I'm going to sustain the objection.

13    I think you can rephrase the question.

14              MR. BRAUN:  Okay.

08:36AM  15    Q     So the people that contribute -- if you went to

16    someone that got money for Huizar and there was no

17    quid pro quo, they're just doing it because they love Huizar;

18    correct?

19              MS. HAR:  Objection.  Calls for speculation.

08:37AM  20    Vague as to people.

21              THE COURT:  Overruled.

22              THE WITNESS:  I mean, when people gave to Huizar,

23    there's always an interest of why they gave.

24    Q     BY MR. BRAUN:  There was an interest.  There was

08:37AM  25    a question of why they gave; correct?

1      A      Correct.

2      Q      Now, if they said to Huizar we're giving it to

3  you because we want a stop sign or something like that, that

4  would be illegal; correct?

08:37AM  5      A      If they said exactly what they wanted, yes.

6      Q      Okay.  But if they didn't say what they wanted

7  when they gave the money and came later and asked Huizar for

8  some consideration, that would not be illegal as far as you

9  knew; correct?

08:37AM  10              MS. HAR:  Objection.  Calls for legal conclusion.

11              THE COURT:  Sustained.

12      Q      BY MR. BRAUN:  So now, this conspiracy that

13  counsel has described, let's look at some evidence rather than

14  the statements.  This was designed to get something of value to

08:38AM  15  the members of this supposed RICO conspiracy; correct?

16      A      Correct.

17      Q      What did you get out of it?

18      A      Well, I received cash and chips and a lot of

19  benefits being the council member's assistant.

08:38AM  20      Q      And plus you assisted Huizar, your boss, in

21  getting bribes; correct?

22      A      Correct.

23      Q      So he got bribes; correct?

24      A      Correct.

08:38AM  25      Q      He got trips to Vegas; correct?

1104

```
 1        A       Yes.

 2        Q       Okay.  Now, did you ever give any money to

 3   Ray Chan?

 4        A       Did I ever give any money to Ray Chan?

 5        Q       Yes.

 6        A       No.

 7        Q       He worked for Andy Wang for free for 18 months,

 8   did he not?

 9                MS. HAR:  Objection.  Lacks foundation.

10                THE COURT:  Sustained.

11        Q       BY MR. BRAUN:  Is one of the benefits of a RICO

12   conspiracy is you get to work for nothing?

13                MS. HAR:  Objection.  Argumentative.

14                THE COURT:  Sustained.

15        Q       BY MR. BRAUN:  Now, this charity, what's the high

16   school charity's name?

17        A       Salesian High School.

18        Q       Do you know whether Ray Chan is Catholic?

19                MS. HAR:  Objection.  Argumentative.  403.  Lacks

20   foundation.

21                THE COURT:  Sustained.

22        Q       BY MR. BRAUN:  So he basically solicited

23   contributions to a Catholic high school; correct?

24        A       Yes.

25        Q       And was this for scholarships for poor kids?  Do
```

08:38AM (line 5)
08:38AM (line 10)
08:39AM (line 15)
08:39AM (line 20)
08:39AM (line 25)

1    you know?

2         A      They were scholarships, yes.

3         Q      Okay.  And they didn't give scholarships to rich

4    kids hopefully; correct?

08:39AM   5         A      I don't know.

6         Q      Do you know the demographics of that school?

7                MS. HAR:  Objection.  403.

8                THE COURT:  Sustained.

9         Q      BY MR. BRAUN:  So Ray Chan, a Catholic, is

08:39AM  10    soliciting money for Catholic scholarships.  Is that a crime?

11                MS. HAR:  Objection.  Improper legal conclusion.

12    Assumes facts not in evidence.

13                THE COURT:  Sustained.

14         Q      BY MR. BRAUN:  Okay.  Do you think that's a

08:40AM  15    crime?

16                MS. HAR:  Objection.  Calls for legal conclusion.

17                THE COURT:  Sustained.

18         Q      BY MR. BRAUN:  Did you plead guilty because of

19    Ray Chan, a Catholic, asking for schools -- money for Catholic

08:40AM  20    scholarships?

21                MS. HAR:  Same objection, Your Honor.

22                THE COURT:  Overruled.

23                THE WITNESS:  Did I plead guilty because Ray

24    solicited funds for Salesian High School?

08:40AM  25         Q      BY MR. BRAUN:  Yes.

1    A      No.

2    Q      Because, as far as you're concerned, that's

3  legal; correct?  At least your own mind?

4           MS. HAR:  Objection.  Misstates testimony.

08:40AM   5           THE COURT:  Sustained.

6    Q      BY MR. BRAUN:  So now -- so you went to

7  Las Vegas, what, at least a dozen times; correct?

8    A      That is correct.

9    Q      And you -- as far as you know, you were comped by

08:40AM  10  the casinos; correct?

11    A      Correct.

12    Q      That's because Chairman Wei Huang was rich enough

13  that he could lose $2 million on a weekend; correct?

14    A      That is correct.

08:41AM  15    Q      Okay.  Now, so as far as you knew, he didn't pay

16  for these.  The casinos gave him all the -- took care of the

17  whole group because they knew that he was going to lose money;

18  correct?

19    A      Correct.

08:41AM  20    Q      You understand that Vegas wasn't built on people

21  winning money; correct?

22    A      That is correct.

23    Q      That's why, when you got chips from the Chairman,

24  you basically didn't use them all because you wanted to make

08:41AM  25  sure you had something to take home; correct?

```
 1          A       That is correct.

 2          Q       And each casino you went to with your boss

 3   Huizar, they were comped; correct?

 4          A       Correct.

 5          Q       And he had $2 million credit to multiple casinos

 6   there; correct?

 7          A       Yes.

 8          Q       Okay.  So who pays for these rooms and meals and

 9   wine and towels and everything that you guys took?

10          A       Who pays for it?

11          Q       Who pays for it?

12          A       Chairman's losings I guess pay for it.

13          Q       Okay.  And the casinos deduct it as a business

14   expense; correct?

15                  MS. HAR:  Objection.  Calls for speculation.

16   Lacks foundation.

17                  THE COURT:  Sustained.

18          Q       BY MR. BRAUN:  Do you know anything about our tax

19   structure?

20          A       Just the basics.

21          Q       And you know that businesses can deduct things,

22   expenses; correct?

23                  MS. HAR:  Objection.  Relevance.

24                  THE COURT:  Sustained.

25          Q       BY MR. BRAUN:  So did it ever bother you morally
```

08:41AM (line 5)
08:42AM (line 10)
08:42AM (line 15)
08:42AM (line 20)
08:42AM (line 25)

1    when you took all of these freebies?  You knew that the

2    taxpayers were paying for it; correct?  Did that bother you?

3         A        Did it bother me with -- did the Vegas trips

4    bother me?

08:43AM   5         Q        No.  The fact that you knew all of those comps

6    were being paid for by taxpayers.

7                  MS. HAR:  Objection.  Assumes facts not in

8    evidence.

9                  THE COURT:  Sustained.

08:43AM   10        Q        BY MR. BRAUN:  Did you ever think about whether

11   or not the casinos were able to deduct these?

12                 MS. HAR:  Objection.  Asked and answered.  403.

13                 THE COURT:  Sustained.

14        Q        BY MR. BRAUN:  Now, the scam that you and Huizar

08:43AM   15   used to shake down developers was to withhold the processing of

16   the requests for entitlements; correct?

17        A        Correct.

18        Q        So that you understood how the building and trade

19   system worked in Los Angeles; correct?

08:43AM   20        A        The building and trades?

21        Q        Well, when you build a skyscraper, you have a

22   process to go there; correct?

23        A        Correct.

24        Q        Okay.  So if I bought a piece of property in

08:44AM   25   Los Angeles, there are certain requirements that are a matter

```
 1   of law in terms of what I build; correct?

 2        A     Correct.

 3        Q     And as long as I stay inside those laws, I don't

 4   have to have an entitlement, do I?

 5        A     I'm not too sure of the weeds of that process,

 6   no.

 7        Q     Well, you knew that the Building and Safety

 8   Department that Ray was head of had no authority to give

 9   entitlements; correct?

10        A     I was unsure.  I'm not sure, no.

11        Q     Well, that's really the central part of this

12   case, is it not, that he was supposed to be giving something in

13   exchange for something?

14             MS. HAR:  Objection.  Argumentative.

15             THE COURT:  Sustained.

16             MR. BRAUN:  Okay.

17        Q     So your boss and you -- basically your boss said

18   to the developers, if you don't give me money, meaning give it

19   to my friend Esparza and me, your project is not going to get

20   entitled; correct?

21        A     That is correct.

22        Q     And part of the consideration wasn't the fact

23   that a wealthy developer may not bring his money to

24   Los Angeles; correct?

25             MS. HAR:  Objection.  Relevance.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you please repeat your

3   question?

4      Q    BY MR. BRAUN:  When you and Huizar were shaking

08:45AM  5   down developers, didn't you think, if they won't pay us off,

6   the development is not going to come here and L.A. is going to

7   suffer?

8          MS. HAR:  Objection.  Argumentative.  403.

9          THE COURT:  Overruled.

08:45AM 10          THE WITNESS:  I don't think we ever thought that

11   way, no.

12      Q    BY MR. BRAUN:  But Huizar's job was to take care

13   of the city; correct?

14      A    I mean, that was on paper he was supposed to take

08:45AM 15   care of the city.

16      Q    On paper, but he didn't really do it, did he?

17      A    No.

18      Q    And you helped him with his scam; right?

19      A    I did, yes.

08:45AM 20      Q    So did you ever discuss with Huizar, look, if

21   Wei Huang doesn't come here, the city doesn't get this 77-story

22   hotel; correct?  Did you ever discuss that with him?

23      A    No.

24      Q    Did you ever discuss with him that this 77-story

08:46AM 25   hotel cannot go back to China; correct?

1       MS. HAR:  Objection.  Argumentative.  403.

2       THE COURT:  Overruled.

3    Q    BY MR. BRAUN:  Did you ever discuss that with

4  him?

08:46AM    5    A    No.

6    Q    Did you ever discuss how many jobs were lost in

7  construction?

8    A    No.

9    Q    Did you ever discuss with him how many jobs were

08:46AM   10  lost to the city because there wasn't a hotel for people to

11  work in?

12    A    No.

13    Q    So you and Huizar really didn't care about the

14  city of Los Angeles, did you?

08:46AM   15    A    I don't know if the council member cared about

16  the city of L.A., no.

17    Q    Well, you knew what you were doing.  You knew it

18  was illegal; correct?

19    A    Correct.

08:46AM   20    Q    Didn't you ever say to him, hey, boss, we keep

21  shaking down these developers.  They're just not going to

22  invest; correct?

23    A    I mean, him and I did have some conversations

24  about that, yes.

08:47AM   25    Q    But you didn't care, did you?

1       A       The council member did not care, no.

2       Q       Well, but you didn't quit then, did you?

3       A       No, I did not quit.  I mean, I did eventually

4  leave the office when I got the opportunity to leave to another

08:47AM  5  political office.  I took the first chance I got to.

6       Q       But you claimed there was mind control, that

7  Huizar had mind control over you; correct?

8       A       I did, yes.

9       Q       And you told the Government, I want to be on your

08:47AM 10  team; correct?

11      A       I did, yes.

12      Q       And you wanted to say -- you wanted to lie and

13  then escape responsibility for your crimes; correct?

14              MS. HAR:  Objection.  Argumentative.

08:47AM 15              THE COURT:  Sustained.

16      Q       BY MR. BRAUN:  Maybe you can clarify.  I'm trying

17  to read reports.  You had a couple meetings with the Government

18  and then got rid of some cash, or what were the facts about

19  that?

08:48AM 20      A       Yeah.  The $200,000 bribe that I had for

21  Council Member Huizar, after my initial interviews, I was

22  really scared that the FBI would raid my house.  So I decided

23  to give the money to Ricky Zheng to hold.

24      Q       Okay.  So you went to the FBI and lied, and then

08:48AM 25  you thought, uh-oh, they might search my house; correct?

1    A    Correct.

2    Q    And then you took the money, the 200,000 -- this

3    was bribe money?

4    A    Yes.

08:48AM    5    Q    That you were holding for Huizar?

6    A    Yes.

7    Q    And you took it to Ricky Zheng?

8    A    I did, yes.

9    Q    And you had an agreement with him to hold it for

08:48AM    10    you or what?

11    A    I asked him if he could hold it for me, yes.

12    Q    Did you tell him it was bribe money?

13    A    I did.

14    Q    He said, no problem, I will hold it for you?

08:48AM    15    A    No.  After a lecture and calling me stupid, he

16    decided to hold it for me, yes.

17    Q    So that was after the first interview.  And then

18    what motivated you to go to the second interview and lie to the

19    Government?

08:49AM    20    A    I gave the cash after the second interview, not

21    after the first.

22    Q    So you lied in the first interview, you lied in

23    the second interview, and then you gave the cash to

24    Ricky Zheng; correct?

08:49AM    25    A    That is correct.

1   Q      So you never told the agent here about the money

2   during the interviews; correct?

3   A      That is correct.

4   Q      Now, how long did you know Ray Chan?

08:49AM   5   A      I knew him for a little bit over four or five

6   years.

7   Q      You would admit you have a very poor character

8   for truth and veracity; correct?

9   A      No.

08:50AM   10   Q      You tell the truth; correct?

11   A      I do, yes.

12   Q      Unless you're looking for something to protect

13   yourself; correct?

14   A      No.

08:50AM   15   Q      We have -- I mean, you say no, but you have

16   already admitted to lying twice to the FBI.

17   A      Correct.  You're correct.

18   Q      You basically admit to shaking down developers;

19   correct?

08:50AM   20   A      Correct.

21   Q      And you admit to ignoring the responsibilities

22   that the city councilman has to the city of Los Angeles;

23   correct?

24   A      Say that again.

08:50AM   25   Q      Did you ever tell Huizar, stop taking bribes.

1    This is the wrong thing to do?

2         A      I was in no position to tell the council member

3    you can't take bribes.

4         Q      This is a free country.  You can say whatever you

08:50AM   5    want; correct?

6                MS. HAR:  Objection.  Argumentative.

7                THE COURT:  Overruled.

8                THE WITNESS:  I mean, it's a lot more deep than

9    that.  I have known the man since I was 19 years old, really

08:51AM  10    looked up to him.  And it was something that -- he was a role

11    model, a mentor of mine, someone at some point I thought was a

12    father figure.  So it was a lot deeper than him being my

13    supervisor.  So I rarely told him no when he asked me to do

14    things.

08:51AM  15         Q      BY MR. BRAUN:  So you violated your obligation to

16    the people of this city and this country when you lied twice to

17    the FBI; correct?

18         A      Yes.  I did lie to the FBI.  Yes.  Yes, I did.

19         Q      Then you turned on Huizar to save yourself;

08:51AM  20    correct?

21         A      That's not true, no.

22         Q      Didn't you tell the FBI eventually that you were

23    getting bribes for Huizar?

24         A      Yes.

08:51AM  25         Q      So you -- I'm not saying that you did the wrong

1    thing, but you did turn on an old friend; correct?

2         A       Well, the council member and I really had a

3    falling out way before the FBI raided my house, yes.

4         Q       What was the falling out over?

08:52AM  5         A       Excuse me?

6         Q       What was the falling out over?

7         A       Well, when I told Council Member Huizar that the

8    FBI were interviewing me, he told me that it looks like I have

9    a problem, and he kind of left me on -- left me on my own.  So

08:52AM  10   that's when I had to really talk to my attorney.  I'm very

11   grateful for him.  And I got out of the council member's office

12   and just tried to do the right thing.

13        Q       So, now, Ray Chan never went to Las Vegas, did

14   he?

08:52AM  15        A       He did not, no.

16        Q       On any of the trips he never went to Las Vegas;

17   correct?

18        A       That is correct.

19        Q       He never got on a private jet to go to Las Vegas,

08:52AM  20   did he?

21        A       Correct.

22        Q       Do you know what a private jet to Las Vegas

23   roundtrip costs?

24        A       I have no idea.

08:53AM  25        Q       Haven't you seen the bills to the Government?

1      A      They have not shown me any bills.

2      Q      $20,000.

3      A      I don't know how much the trip was, the roundtrip

4 for a private jet.  I don't know.

08:53AM   5      Q      Now -- so the Government -- has the Government

6 told you that now they're prosecuting Ray Chan for trips to

7 Las Vegas which he never got?

8              MS. HAR:  Objection.  Misleading.  403.

9              THE COURT:  Sustained.

08:53AM  10      Q      BY MR. BRAUN:  Okay.  So has the Government told

11 you why they're prosecuting Ray Chan for those trips to

12 Las Vegas?

13              MS. HAR:  Same objection, Your Honor.

14              THE COURT:  Sustained.

08:53AM  15      Q      BY MR. BRAUN:  He didn't participate in any of

16 those trips to Las Vegas, did he?

17      A      Ray never went with us to Las Vegas, no.

18      Q      Okay.  You know he's still being prosecuted for

19 trips he didn't go on; correct?

08:53AM  20              MS. HAR:  Objection.  Argumentative.  Misleading.

21              THE COURT:  Sustained.

22      Q      BY MR. BRAUN:  Did the Government tell you why

23 they're prosecuting him for those trips?

24              MS. HAR:  Objection.  Misleading.  Calls for

08:54AM  25 hearsay.  403.

```
 1                    THE COURT:  Sustained.

 2          Q      BY MR. BRAUN:  Now, let's talk about this

 3   settlement.  You told the Government that Ray Chan structured

 4   this entire settlement; correct?

 5          A      That is correct.

 6          Q      Were you there?

 7          A      I mean, the council member, my boss, and also

 8   Ricky Zheng who were there told me that Ray helped structure

 9   the --

10          Q      So you don't know personally, do you?

11          A      I mean, I wasn't physically in the room, but I

12   was told by my boss and I was told by Ricky Zheng.

13          Q      So Ricky Zheng, the guy that held the bribe money

14   for you, correct, he told you?

15          A      Correct.

16          Q      And Huizar who is shaking down developers told

17   you; correct?

18          A      Correct.

19          Q      Now, what if Ray Chan told you he didn't

20   participate?  Wouldn't you believe him?

21                    MS. HAR:  Objection.  Improper hypothetical.

22   Assumes facts not in evidence.

23                    THE COURT:  Sustained.

24          Q      BY MR. BRAUN:  So your entire testimony is based

25   on what two felons told you; correct?
```

08:54AM (line 5)
08:54AM (line 10)
08:54AM (line 15)
08:55AM (line 20)
08:55AM (line 25)

1          MS. HAR:  Objection.  Assumes facts not in

2   evidence.

3          THE COURT:  Overruled.

4          THE WITNESS:  Can you please repeat your

08:55AM  5   question?

6     Q     BY MR. BRAUN:  Yeah.  Your testimony about

7   Ray Chan structuring this settlement loan is based on what two

8   felons told you; correct?

9          MS. HAR:  Objection.  Misstates -- excuse me.

08:55AM  10  Assumes facts in not in evidence with respect to Ricky Zheng's

11  status.

12         MR. BRAUN:  I'll straighten it out.

13         THE COURT:  Use the names.

14         MR. BRAUN:  Okay.

08:55AM  15    Q     Now, Ricky Zheng was the guy that held the bribe

16  money; correct?

17    A     Yes.  He held it for me, yes.

18    Q     So he's one of the honest people that you're

19  relying on; correct?

08:56AM  20    A     Well, he told me way before he held the bribe

21  money for me.  So this wasn't recent.  It was way before.  It

22  was back in 2013 or '14, and Ricky held the money for me in

23  2017.

24    Q     Now, are you familiar with -- have you ever seen

08:56AM  25  a timeline of when your boss decided to fight this case?  He

1    was fighting the lawsuit, was he not?

2         A    For the sexual harassment?

3         Q    Yes.

4         A    Yes.  He was fighting the lawsuit, yes.

08:56AM  5    Q    So at first he decided not to pay $1.8 million

6    demand; correct?

7         A    Correct.

8         Q    That is, your boss decided not to pay it;

9    correct?

08:56AM  10   A    That is correct.

11        Q    And so he fought the lawsuit, what, for six or

12   seven months?

13        A    I'm not too sure exactly when, but there was a

14   time when he was trying to fight it, yes.

08:56AM  15   Q    And then when Supervisor Molina was rumored to

16   run against him, he decided to settle it; correct?

17        A    That is correct.

18        Q    And he went to Wei Huang and asked him for help;

19   correct?

08:57AM  20   A    Right.  He said he was going to ask Ray to talk

21   to -- Ray Chan to talk to Wei Huang.  Yes.

22        Q    And did he tell you that Ray Chan said, no, he

23   won't?  Did he tell you that?

24        A    No.  He told me that Ray Chan will help him get

08:57AM  25   the --

1    Q      Will.  But did he tell you that Ray Chan said,

2    no, I will not participate?

3              MS. HAR:  Objection.  Assumes facts not in

4    evidence.  Asked and answered.

08:57AM   5              THE COURT:  Overruled.

6              THE WITNESS:  Can you please repeat your

7    question?

8        Q      BY MR. BRAUN:  Did your boss, the convicted

9    felon, tell you that Ray Chan refused to go to Wei Huang for

08:57AM  10   the settlement?  Did he tell you that?

11       A      He did not tell me that Ray Chan refused to go to

12   the Chairman.  No.  He did not tell me that.

13       Q      Now, you have seen the paperwork on the loan,

14   have you not?

08:58AM  15       A      Yes.

16       Q      You don't see Ray Chan's name anywhere, do you?

17       A      Not that I recall, no.

18       Q      And you have seen the e-mails on the loan;

19   correct?

08:58AM  20       A      Yes.

21       Q      And Ray Chan's name -- he was never e-mailed on

22   it; correct?

23       A      I'm not sure.  I don't think so, no.

24       Q      Now, people -- Ray Chan wanted Huizar to be

08:58AM  25   re-elected; correct?

1    A      That is correct, yes.

2    Q      Because, as far as he knew, your client -- your

3 boss Huizar was pro-development; correct?

4    A      That is correct.

08:58AM    5    Q      And Molina publicly announced that Downtown L.A.

6 should be a parking lot; correct?

7    A      Yes, she did.

8    Q      So the issue was whether or not you were for

9 developing L.A. or keeping it a parking lot; correct?

08:58AM   10    A      That is correct.

11    Q      And the public decided by 70 percent that we

12 should develop L.A.; correct?

13             MS. HAR:  Objection, Your Honor.  Relevance.

14 403.

08:59AM   15             THE COURT:  Overruled.

16             THE WITNESS:  Can you please repeat your

17 question?

18    Q      BY MR. BRAUN:  Yeah.  Your boss Huizar won by

19 70 percent; correct?

08:59AM   20    A      He did, yes.

21    Q      So he swamped Molina; correct?

22    A      Yes.

23    Q      And Molina took a public stance against any

24 development; correct?

08:59AM   25    A      That is correct.

1    Q    And your boss took a stance on pro-development;

2    correct?

3    A    Correct.

4    Q    So that's what the issue of the election was

08:59AM    5    about; correct?

6    A    One of the issues, yes.

7    Q    And you understood that Ray Chan was

8    pro-development; correct?

9    A    That is correct.

08:59AM    10    Q    Now, there was a point that Ray Chan retired as

11    head of Building and Safety; correct?

12    A    Yes, he did.

13    Q    And then he became what?

14    A    Then he became deputy mayor.

08:59AM    15    Q    Right.  And that is a contract with the City;

16    correct?

17    A    I'm not sure if it was -- I'm not sure.

18    Q    You don't know whether he remained an employee or

19    was under contract; correct?

09:00AM    20    A    Yeah.  I don't know that information.

21    Q    And the way you stay with the City is if the

22    mayor asks you to stay; correct?

23         MS. HAR:  Objection.  Lacks foundation.

24         THE COURT:  Overruled.

09:00AM    25         If you know.

1        THE WITNESS:  I'm not sure how that process works

2   with being a deputy mayor.  I don't know.

3        Q        BY MR. BRAUN:  You don't know whether the mayor

4   decides who the deputy mayors are going to be; correct?

09:00AM    5        A        Correct.  I don't know that process.

6        Q        When he was deputy mayor, Mr. Garcetti was mayor;

7   correct?

8        A        Yes.

9        Q        Now, do you know how many years Ray Chan worked

09:00AM   10   for the City in Building and Safety?

11        A        I have no idea.

12        Q        Now, as bad as your boss was, as crooked as he

13   was, he never compromised safety, did he?

14        A        Did the council member ever compromise safety?

09:00AM   15        Q        Did he ever allow -- tell a builder you could

16   build with substandard cement?  He didn't, did he?

17        A        Not that I'm aware of.

18        Q        He just shook people down for entitlements;

19   correct?

09:01AM   20        A        He shook people down for cash and bribes, yes.

21        Q        Because he would withhold the entitlement as the

22   head of the PLUM Committee; correct?

23        A        Correct.

24        Q        You understood that developers who wanted to

09:01AM   25   build something more than maybe a house that was allowed and

1    wanted to build a skyscraper had to come and get an

2    entitlement; correct?

3         A       Yes.  They had to come to the council member's

4    office and get his approval.

09:01AM   5    Q       But he didn't have the right to approve it

6    legally, did he?  They lobbied him; correct?

7         A       Yes and no.

8         Q       Well, there was a committee that he was head of,

9    the PLUM Committee, that basically -- where he had a vote;

09:01AM  10  correct?

11        A       That is correct.

12        Q       That's the legal authority he had; correct?

13        A       Yes.

14        Q       And there were other members of that committee;

09:01AM  15  correct?

16        A       Correct.

17        Q       And then it had to be approved by the entire city

18   council; correct?

19        A       Yes.

09:02AM  20  Q       So he did not have authority to give an

21   entitlement himself, did he?

22        A       Again, yes and no.

23        Q       Well, he had influence; correct?

24        A       Strong influence.

09:02AM  25  Q       Called politics; correct?

1    A       Sure.  Yes.

2    Q       Is there something wrong with influence?  That's

3  how we run the country; correct?

4            MS. HAR:  Objection.  Argumentative.  403.

09:02AM  5        THE COURT:  Overruled.

6            THE WITNESS:  Yes.  Influence is important, yes.

7    Q       BY MR. BRAUN:  Now, Ray Chan never had the

8  authority to grant an entitlement, did he?

9    A       I'm not sure, no.

09:02AM 10   Q       The head of the Building and Safety doesn't give

11 entitlements, does he?

12   A       Again, I'm not sure if it's entitlements.  I know

13 they help with the actual building of the actual project, so

14 the actual construction.  So the Planning is -- the Planning is

09:02AM 15 responsible for the permits, and I believe Building and Safety

16 is the actual construction.  So if you ever want to get the

17 building off the ground, then it needs to go through Ray or the

18 Building and Safety.

19   Q       Correct me if I'm wrong.  If I want to build a

09:03AM 20 77-story building in Downtown L.A. and it's not zoned for that,

21 which it usually is not, I have to get an entitlement from the

22 City to do that; correct?

23   A       Correct.

24   Q       And that's exactly where your boss became so

09:03AM 25 critical because he was in charge of the PLUM Committee;

1    correct?

2         A      Correct.

3         Q      And the city councilman in whose district the

4    building is going to be built in has tremendous influence;

09:03AM  5    correct?

6         A      That's correct.

7         Q      So once you get the entitlement, then Building

8    and Safety takes that over; correct?

9         A      From my understanding, yes.

09:03AM  10        Q      So the Building and Safety have to follow every

11   rule of the building code; correct?

12        A      Again, I'm not too sure on all the technicalities

13   of that process.  I just understood the general -- just the

14   general idea of how that works.  The legalities or

09:04AM  15   technicalities of that.

16        Q      Okay.  So -- but the way you understood it -- you

17   worked for the City.  Once you get an entitlement, it's

18   Building and Safety that enforces the law; correct?

19        A      Correct.

09:04AM  20        Q      They then look at your plans and make sure they

21   comply with all the various codes; correct?

22        A      Correct.

23        Q      And if it doesn't, they bring it to your

24   attention; correct?

09:04AM  25        A      Bring it to the developer's attention or -- no

1    one ever brought up to my attention that they were violating --

2        Q        They can kibosh the whole thing.  You know you're

3    not going to use that substandard cement.  They can say that;

4    right?  They enforce the law; correct?

09:04AM 5        A        The Building and Safety?

6        Q        Yes.

7        A        Yes.

8        Q        And, then, once they have approved the plans,

9    they actually supervise it being built; correct?

09:04AM 10       A        From my understanding, yes.  Again, I wasn't too

11   involved in the weeds of that whole process.

12       Q        From your understanding, then, there's various

13   departments.  Electrical, cement, the reinforcement.  There's

14   myriads of departments; correct?

09:05AM 15       A        That is correct, yes.

16       Q        And what they do is they look at what the law is

17   and what you're going to do, and if you don't do what the law

18   says, you don't build; correct?

19                MS. HAR:  Objection.  Lacks foundation.  Calls

09:05AM 20   for speculation.

21                THE COURT:  Overruled.

22                THE WITNESS:  Sorry.  Can you repeat yourself?

23       Q        BY MR. BRAUN:  So what Building and Safety does,

24   says this is what the law is and you're not going to do the

09:05AM 25   law.  So they say no; correct?

1     A     Correct.

2     Q     Right.  So they're an enforcement mechanism;

3  correct?

4     A     From my understanding, yes.

09:05AM   5     Q     So there's a separation of powers, is there not?

6  One group can approve the plan and the other one are the

7  policemen that enforce our rules; correct?

8     A     Well, actually, I think that's why it's important

9  for them to work together in those Planning meetings, for

09:06AM  10  example, so that it's streamlined so there wouldn't be a

11  conflict.  So it's kind of Building and Safety works with

12  Planning, and that's the route, so when it gets to that

13  process, then there's really no hiccups.  It's not the Planning

14  takes care of it and then all of a sudden Building and Safety

09:06AM  15  takes care of it.  For example, especially with the weekly

16  meetings we had at Council Member Huizar's office, we're trying

17  to avoid so that everyone is on the same page.

18     Q     But the fact is that Building and Safety cannot

19  approve an entitlement; correct?

09:06AM  20     A     Correct.

21     Q     So the fact that Building and Safety may assist

22  builders and developers prior to entitlement doesn't give them

23  the power, do they?  They don't have the power.  You had the

24  power.  You and your boss had the power; right?

09:06AM  25     A     Yes and no.  Not totally true.  Yes and no.

1     Q     You can shake people down and say you're not

2  going to get approval unless you give us money; correct?

3     A     That is correct.

4     Q     Building and Safety can't do that, can they?

09:06AM  5     A     I'm not sure.

6     Q     Ray Chan worked with the FBI because there was

7  some inspectors that were suspicious; correct?

8     MS. HAR:  Objection.  Lacks foundation.

9     THE COURT:  Sustained.

09:07AM  10     MS. HAR:  Assumes facts not in evidence.

11     Q     BY MR. BRAUN:  Now, Ray Chan wanted your boss

12  re-elected; correct?

13     A     Yes, he did.

14     Q     And it was common knowledge that there was a

09:07AM  15  sexual claim.  It was in the *L.A. Times*; correct?

16     A     You are right, yes.

17     Q     So asking about if -- what I don't get is he's

18  asking about it but you say he's part of it.  So why would you

19  be asking about something that you're part of?

09:07AM  20     A     That's exactly what I thought when I heard him

21  asking.  I knew he was part of the structure of the settlement.

22  So I was really shocked to hear that he was asking who did it.

23     Q     Right.

24     A     I mean, who gave the settlement money.

09:08AM  25     Q     Maybe Huizar was lying to you; right?

1       A       No.  I mean, I had all the e-mail documentation

2   from Chairman Huang, from Ricky Zheng.  During our

3   conversations, it was talked about the loan.  So the council

4   member wasn't lying to me that the money wasn't coming from

09:08AM   5   Chairman Huang, no.  I wouldn't have worked with Ricky Zheng if

6   the money was coming from Chairman Huang.

7       Q       So it did occur to you why would Ray Chan be

8   asking about it when he was part of it; right?

9       A       That is correct.

09:08AM   10       Q       Because, actually, Ricky Zheng and Huizar led me

11   to believe that he was part of it; correct?  That's why you

12   were scratching your head; correct?

13       A       Well, that's why I was scratching my head when I

14   heard that Ray was asking who gave the money to the council

09:08AM   15   member because I knew that Ray did know that Chairman Huang did

16   give Council Member Huizar the money.  That's why I was

17   confused.

18       Q       You knew from what Huizar and Zheng told you;

19   correct?

09:09AM   20       A       Correct.

21       Q       So they could have lied to you; correct?

22       A       No.  I don't think they would have lied to me.

23       Q       Oh, no.  Huizar wouldn't lie to you.  He just

24   collects bribes; right?

09:09AM   25       A       About this specific settlement money, again, I

1    was working with Ricky to get the money from Chairman Huang.

2    And then when Ricky wasn't -- when Ricky didn't want to respond

3    anymore, then Council Member Huizar told me, well, let me talk

4    to Ray so that he knows what's going on with -- if he can check

09:09AM  5    in with Chairman Huang.  So when I wasn't getting any responses

6    from Ricky to talk to the Chairman, then Jose Huizar said, let

7    me talk to Ray and figure out what's the deal.

8         Q    Did Jose Huizar ever tell you that Ray Chan said

9    he would not talk to Wei Huang about the loan?  Did he tell you

09:09AM  10   that?

11             MS. HAR:  Objection.  Asked and answered.

12   Assumes facts not in evidence.

13             THE COURT:  It has been asked and answered.

14             MR. BRAUN:  Okay.

09:10AM  15        Q    Now, this scheme that the prosecutor keeps

16   talking about, I see a crooked city councilman shaking down

17   developers using you; right?

18        A    Correct.

19        Q    And getting things.  This is a gigantic

09:10AM  20   conspiracy?  It's the two of you; correct?

21        A    No.

22        Q    Someone else?  Who?

23        A    Who was part of our conspiracy or who was part of

24   shaking down developers?  George Chiang, Ray Chan, myself.

09:10AM  25        Q    Who did Ray Chan shake down?

1     A        Chairman Huang, the Hazens.

2     Q        What did he get?  What did he get?  Did he get

3  anything?

4     A        I mean, you're asking part of the conspiracy, and

09:10AM  5  part of the Huizar conspiracy is that we're asking developers

6  for money.  I know we asked Ray Chan if he could ask certain

7  developers for money, and they did deliver.

8     Q        So that's called politics or charity; correct?

9              MS. HAR:  Objection.  Argumentative.  Misstates

09:11AM  10  testimony.

11             THE COURT:  Overruled.

12             THE WITNESS:  Can you please repeat your

13  question?

14     Q        BY MR. BRAUN:  Okay.  If you ask for the Catholic

09:11AM  15  high school, it's charity; correct?

16             MS. HAR:  Objection.  Incomplete hypothetical.

17             THE COURT:  Overruled.

18             THE WITNESS:  Salesian High School was a

19  nonprofit, yes.

09:11AM  20     Q        BY MR. BRAUN:  And if you ask someone for a

21  political campaign, that's politics; correct?

22     A        Yes and no.  Yes.

23     Q        Now, can you name anything that -- before he

24  retired from the City that he got?  Nothing; right?

09:11AM  25     A        Yeah.  Nothing that I'm aware of, no.

1       Q       And the FBI has spent years investigating;

2   correct?

3       A       Yes.

4       Q       Wiretaps; correct?

09:11AM   5       A       Yes.

6       Q       They had an informant.  Andy Wang was working

7   with him; correct?

8       A       Correct.

9       Q       They have been able to give people deals to get

09:12AM  10   them to testify like you; correct?

11       A       I'm not sure what other conversations they had

12   with other people, no.

13       Q       Okay.  But you cannot name a dime that my client

14   got while he was with the City; correct?

09:12AM  15       A       I don't know.

16       Q       You're part of this -- you have worked with the

17   Government now for years; correct?

18       A       Yes.

19       Q       You have testified in two prior trials; correct?

09:12AM  20       A       Yes.

21       Q       They have shown you paperwork; correct?

22       A       Just paperwork that had to do with me, yes.

23       Q       And you know that they have had wiretaps;

24   correct?

09:12AM  25       A       That is correct.

1        Q       And you know that they have subpoenaed records;

2    correct?

3        A       Yes.

4        Q       You know that they can check Ray Chan's entire

09:12AM  5    financial background; correct?

6        A       Correct.

7        Q       And the truth is that there's -- he never got

8    anything; correct?

9        A       I don't know.

09:13AM  10       Q       They came up with this crazy theory, did they

11   not, that by blocking a consolidation, he was saving his job;

12   correct?

13               MS. HAR:  Objection.  Argumentative as to crazy

14   theory.

09:13AM  15               THE COURT:  Sustained.

16       Q       BY MR. BRAUN:  Okay.  They came up with this

17   theory that Ray Chan blocked a consolidation, and that was his

18   benefit; correct?

19       A       I don't know.  I don't know.

09:13AM  20       Q       Right.  You know about the consolidation, do you

21   not?

22       A       Yes.

23       Q       And you know that every -- the developers were

24   against it; correct?

09:13AM  25       A       At that time in 2014, 2013, I was not -- again,

 1   not privy to all those private conversations.  Again, mainly

 2   from knowing the council member and also seeing Ray Chan e-mail

 3   me the notes for -- the talking points to go against the

 4   consolidation.

09:14AM  5        Q       Of course.  Of course he was against the

 6   consolidation; correct?

 7        A       Correct.

 8        Q       Because it made no sense to anyone, did it?

 9        A       At the time I wasn't really privy to those

09:14AM 10   conversations.  I just knew that the council member's staff was

11   against it but the council member voted -- I mean was for the

12   consolidation, and then once the council member saw the talking

13   points from Ray, then he voted against the consolidation.

14        Q       And you saw the resolution that you gave to your

09:14AM 15   boss Huizar; correct?

16        A       Whatever Ray e-mailed me or whatever anyone

17   e-mailed me, I always showed it to the council member.

18        Q       And the resolution that passed basically said the

19   same thing, let's study it; correct?

09:14AM 20        A       If I remember correctly, yes.

21        Q       Right.  So they were identical; correct?  One

22   said study it, the other one said study it; correct?

23        A       I don't remember exactly, but I believe so.

24        Q       So what the City Council did was say, well, we're

09:14AM 25   not sure about this consolidation but let's have an independent

```
 1   matrix -- I think it's called matrix -- study it and make a
 2   recommendation; correct?
 3        A      Once again, I'm not too familiar with the actual
 4   process of the consolidation.  I just knew that Council Member
 5   Huizar wasn't going to support it because of his relationship
 6   with Ray.
 7        Q      The fact is that the City of Los Angeles had a
 8   reputation of having a very good Building and Safety
 9   Department; correct?
10              MS. HAR:  Objection.  Lacks foundation.
11              THE COURT:  Overruled.
12              Do you know?
13              THE WITNESS:  Can you please repeat your
14   question?
15        Q      BY MR. BRAUN:  The City of Los Angeles had a
16   national reputation for a very efficient Building and Safety
17   Department; correct?
18        A      I don't know.
19        Q      Have you ever looked at the book that my client
20   wrote about the Building and Safety and recommendations?
21              MS. HAR:  Objection.  Lacks foundation.
22   Relevance.  403.
23              THE COURT:  He's just asking if he looked at the
24   book.
25              Did you look at a book?
```

                        1                    THE WITNESS:  I did not look at a book.

                        2          Q       BY MR. BRAUN:  You didn't know he wrote a book,

                        3    did you?

                        4          A       No.

09:16AM       5          Q       Did the FBI ever show you his book?

                        6          A       No.

                        7          Q       Okay.  So you knew that Ray Chan developed a

                        8    system of coordination of all the departments; correct?

                        9          A       That's correct, yes.

09:16AM      10          Q       That's because, when you have 16 departments to

                       11    check on your building -- and they're all bureaucrats.  It may

                       12    take a while.  It may take you forever to get through it;

                       13    correct?

                       14          A       Yes.

09:16AM      15          Q       Okay.  And you understood that Ray Chan developed

                       16    a system where everyone worked together; correct?

                       17          A       That is correct.

                       18          Q       And he had meetings called all-hands-on-deck

                       19    meetings where everyone from all of the departments got

09:16AM      20    together with the developer to see if there were any problems;

                       21    correct?

                       22          A       Correct.

                       23          Q       And if you had a problem, you would call

                       24    Ray Chan, and he would direct you to electrical, plumbing,

09:16AM      25    reinforcement department, and you would get something done;

```
 1   correct?
 2        A       You're right.  Yes.
 3        Q       And so L.A. -- we had a number one department;
 4   correct?
 5        A       I'm not sure if it was number one.
 6        Q       It was one of the best.  Let's put it that way.
 7        A       I believe that's what I was told, yes.
 8        Q       Now, if you're a developer and you try to go into
 9   a city and the bureaucracy of Building and Safety holds you up
10   for a year or two, that's a lot of money, is it not?
11        A       Yes.
12        Q       So we're talking about millions of dollars;
13   correct?
14        A       That is correct.
15        Q       But Ray Chan structured it in such a way that
16   there was coordination so, if you got by Planning into Building
17   and Safety, they weren't just holding you up for no reason;
18   correct?
19        A       Yes.
20        Q       And they were problem solvers, were they not?
21        A       Yes.
22        Q       And you have attended some of the meetings, have
23   you not, where Ray or someone else would have all the people
24   together and introduce to each other and know who to call in
25   case there was a problem; correct?
```

1    A    Yes.  Those meetings with the council member's

2  office, yes.

3    Q    Now, the council members also had

4  responsibilities, did they not?  To make sure things were going

09:18AM  5  ahead in their council district; correct?

6    A    Yes.

7    Q    So, for example, parking, Wei Huang wanted to buy

8  the parking.  Are you familiar with that issue?

9    A    Yes.

09:18AM  10    Q    Right.  So someone else owned the parking to the

11  lot that he was going to build a hotel; correct?

12    A    Correct.

13    Q    And so Wei Huang wanted to purchase from the

14  Delijanis the right to park; correct?

09:18AM  15    A    Yes.

16    Q    And they were going to pay the money for it;

17  correct?

18    A    Yes.

19    Q    And these are two private companies; correct?

09:18AM  20    A    Correct.

21    Q    It didn't require the City Council to approve a

22  deal, did it?

23    A    No.

24    Q    But it certainly was the responsibility of a city

09:18AM  25  councilman to assist both parties to get together; correct?

1       A       Again, yes and no.

2       Q       Well, if one guy is not going to build the

3   building because of the parking, don't you want to straighten

4   it out?

09:19AM   5       A       Again, it was the council member knew -- because

6   of the Chairman Huang and who he was, that was the main reason

7   why he would even coordinate a meeting between two developers.

8   If someone else -- a random person asked a council member to

9   set up these two meetings, most likely, again, it wouldn't have

09:19AM   10  happened.

11      Q       You're just talking about money again; right?  If

12  you're a big contributor and you have a lot of money, you get

13  special treatment in our system; correct?

14      A       I was talking specifically about Wei Huang, the

09:19AM   15  one you mentioned about working out with the parking situation.

16      Q       They actually never got together, did they?  They

17  never came together on a deal; correct?

18      A       Yeah.  You're right.  They never came up on a

19  deal, no.

09:19AM   20      Q       Right.  Wei Huang evaluated the value of the

21  parking, and the Delijanis had a different valuation, and they

22  never got together; correct?

23      A       From my understanding, you are correct.

24      Q       And that's actually -- the fact that Huizar is on

09:20AM   25  the take and taking money from developers doesn't mean that he

```
 1    can't be a good councilman in other respects, can he?
 2         A     Yes and no.
 3         Q     Well, look, if a good city councilman is going to
 4    solve a problem in the district, that's going to aid the
 5    building in the district, the fact that he's being bribed by
 6    someone else doesn't take away his responsibility to his
 7    constituents, does it?
 8         A     You would think so, but again, that was not
 9    always the case.
10         Q     Not always the case, but sometimes he actually
11    was a good city councilman, was he not?
12         A     He did do a lot of great work for the community
13    here.  100 percent right on that.  But to say that he just
14    always did favors for people, that's not true either.
15         Q     In the real world of politics, if I gave $5 and
16    another guy gave 5,000, guess who gets the appointment?  The
17    guy that gives 5,000; right?
18              MS. HAR:  Objection.  Incomplete hypothetical.
19    Argumentative.
20              THE COURT:  Overruled.
21              THE WITNESS:  Correct.
22         Q     BY MR. BRAUN:  Listen, let's be candid.  Our
23    whole system sucks, does it not?
24              MS. HAR:  Objection.  Argumentative.  403.
25              THE COURT:  Sustained.
```

09:20AM (line 5)
09:20AM (line 10)
09:20AM (line 15)
09:21AM (line 20)
09:21AM (line 25)

1    Q        BY MR. BRAUN:  Do you approve of a system that

2  depends on money?

3              MS. HAR:  Objection.  Argumentative.

4              THE COURT:  Sustained.

09:21AM  5   Q        BY MR. BRAUN:  Now, you basically were sent a

6  letter that was drafted in China that you were supposed to do a

7  letter on Huizar's stationery; correct?

8    A        Yes.

9    Q        And you know the draft that came from China;

09:21AM 10 correct?

11   A        Yes.

12   Q        And you know the draft that you produced that was

13 sent to China from Jose Huizar; correct?

14   A        Correct.

09:22AM 15  Q        There's a difference because one the draft has

16 Ray Chan's name in it and the one that finally went to China

17 does not have Wei Huang -- Ray Chan's name in it; correct?

18   A        Correct.

19   Q        That's because Huizar told you to take the name

09:22AM 20 out; correct?

21   A        Well, he made the edits to it, yes.

22   Q        Because he told you that Ray Chan saw the draft

23 and didn't like it because it made it look like he was

24 endorsing the project; correct?

09:22AM 25  A        I didn't -- I wasn't sure -- I don't know if

1  the -- the council member never told me that he showed it to

2  Ray.  I don't think I heard that before.

3       Q       But you know one thing, that the letter that went

4  out to China dropped the name of Ray Chan; correct?

09:22AM  5       A       Correct.

6       Q       And you got that instruction from Huizar;

7  correct?

8       A       Yes.

9       Q       He didn't tell you whether Ray Chan objected to

09:23AM  10  that, did he?  He just didn't discuss it with you.  You just

11  took the order; correct?

12       A       You are correct.

13       Q       Now -- so -- now, when Wei Huang took you to

14  Vegas, was there anything pending in the city of L.A. that

09:23AM  15  required --

16              MS. HAR:  Objection.  Vague as to pending.

17              THE COURT:  Sustained.

18              MR. BRAUN:  Okay.

19       Q       You understand that going to Vegas itself, even

09:23AM  20  though it stinks multiple times, you would admit it stinks, the

21  whole thing stinks; right?

22       A       Do I admit that Las Vegas stinks?

23       Q       Yeah.  Free room, free board, prostitutes,

24  everything?

09:24AM  25       A       I thought you meant the word smell.

1        Q        And working for a city councilman, it stinks;

2    right?

3        A        Yes.

4        Q        Okay.  And Ray Chan never went, did he?

09:24AM  5        A        Yes.  You're correct.

6        Q        Okay.  But it's only a crime if there's

7    something -- a quid pro quo; correct?  Under our law.  I'm not

8    saying it's the way it should be.  I'm just saying it's just

9    the way it is.

09:24AM 10                MS. HAR:  Objection.  Calls for legal conclusion.

11        Q        BY MR. BRAUN:  Do you know of anything that was

12    pending during that period by Wei Huang asking for Huizar to

13    vote for him?  Do you know of anything?

14                MS. HAR:  Objection.  Vague as to pending.

09:24AM 15                THE COURT:  I will overrule the objection.

16                You can answer.

17        Q        BY MR. BRAUN:  You know what I mean by pending?

18        A        Yes.

19        Q        Of course.  Pending means there's some kind of a

09:24AM 20    motion or approval that requires Huizar to vote on it; correct?

21        A        Correct.

22        Q        Do you know of anything that was pending at that

23    time?

24        A        Well, when we were going to Vegas, we did go to

09:25AM 25    Vegas once we did see the renderings of the new hotel or what

he wanted to build.  So it was well known that he did have --

that Chairman Huang did want to develop the L.A. Hotel.  So

that was very -- we talked about it every single time we hung

out.

09:25AM    Q    Right.  That was a preview meeting where all the

people from the various departments came and looked at it and

you saw this picture of a hotel; correct?

    A    Right.

    Q    It wasn't -- it wasn't -- the Planning Department

09:25AM  hadn't worked on it yet, had they?

    A    No.

    Q    Staff.

    A    But the Planning Department, we were also working

on the international school that we were building too at the

09:25AM  hotel.  So way before we saw the development for the tallest

building west of the Mississippi, the council member -- we were

helping him with the actual school, the international school

that was being built on his hotel.  So that was also pending

construction.

09:25AM    Q    Okay.  Wei Huang spent $25 million refurbishing

the hotel; correct?

    A    I'm not sure the amount.

    Q    But it was huge; right?

    A    Correct.

09:26AM    Q    It did not require any kind of entitlement, did

1    it?

2             A       At that point -- I don't know.  I don't know.

3             Q       That can be -- that kind of redoing can be done

4    with the Building and Safety Department without the

09:26AM  5    PLUM Committee; correct?

6                     MS. HAR:  Objection.  Lacks foundation.

7                     THE COURT:  Overruled.

8                     THE WITNESS:  But -- well, I'm not too sure,

9    again, on that process.  But I know that the Chairman was also

09:26AM  10   asking us to help with the promotion of the school as well with

11   the -- asking us to call media to bring attention to the

12   international school.  So although it wasn't really being

13   built -- it was in the process of being built and renovated, as

14   you said, it was also to see how our office could help promote

09:26AM  15   it -- promote using the CD-14 resources to also promote it.  So

16   not necessarily just with planning, but also using our media

17   team on the City side to promote the press conference.

18            Q       BY MR. BRAUN:  Okay.  There's a lot that they --

19   the City Council -- he can do for his people in his district

09:27AM  20   that does not require an entitlement; correct?

21            A       Correct.

22            Q       Like you can redo an entire hotel and refurbish

23   it without having to go to PLUM; correct?

24            A       Again, I don't know the full details of all of

09:27AM  25   that.  I don't know if they need to get approvals from Planning

```
 1    or Building and Safety during the renovations.  I'm not too
 2    sure.
 3          Q      So they never got approval for the renovation,
 4    did they?  Because they didn't need it, did they?
 5                 MS. HAR:  Objection.  Asked and answered.  Lacks
 6    foundation.
 7                 THE COURT:  Sustained.
 8          Q      BY MR. BRAUN:  Do you understand that in the city
 9    of Los Angeles that there's a whole variety of projects that
10    can be built and renovated without entitlements; correct?
11          A      You're correct.
12          Q      And those do, however, require Building and
13    Safety to make sure that you're using carpeting that is
14    fireproof, the right lights, and so forth; correct?
15          A      Correct.
16          Q      So that there's a whole process.  There's a --
17    there's a separation of powers.  The Planning Department and
18    PLUM gives you an entitlement or denies you an entitlement;
19    right?
20          A      Well, again, it's yes or no because it's not the
21    division of power at times because you still need to go through
22    the council office, Huizar's office, to then have them set up
23    the different meetings with the different departments.  So, you
24    know, usually the Department of Building and Safety was what
25    does the council office think, and then it goes back to the
```

1   council member.  And if he gives the okay to the department or

2   to the staff, then the process moves forward.

3        Q        If I own a piece of property in Huizar's district

4   and I don't need an entitlement, he cannot stop me from

09:28AM  5   redecorating, can he?

6        A        No.  But there's always other ways.  For example,

7   in Wei Huang's hotel, they were looking to renew, for example,

8   the liquor licenses; right?  And the liquor licenses within the

9   hotel go through Planning.  They go through -- they go through

09:29AM  10   the council member's office.  So, again, it's not always just

11   entitlements when it comes to Planning Department.  It's

12   different -- again, different topics or different themes.

13       Q        So if I have a small restaurant and want to

14   redecorate it and don't want to serve liquor in it, I can get

09:29AM  15   some plans from a contractor and take it to Building and

16   Safety; correct?  I don't have to go to a city councilman;

17   correct?

18       A        Yes and no.  Yes and no.

19       Q        In fact, I don't have to.  Isn't it true?

09:29AM  20       A        I don't think you technically have to.  But for

21   the most part, people have checked in with our office, just

22   look aesthetically, is this what the council member supports?

23   Do we want this type of signage on the front of the building --

24       Q        Signage is different; right?  Signage may require

09:29AM  25   an entitlement; right?  Come on.  You worked there.  You know

 1    that a lot of building went on in the district without any

 2    necessity of going through the PLUM Committee; correct?

 3              MS. HAR:  Objection.  Asked and answered and

 4    argumentative tone.

09:30AM  5              THE COURT:  Sustained.

 6         Q    BY MR. BRAUN:  You know that at any time that

 7    Ray Chan had 300 projects going on?

 8         A    I did not know that.

 9         Q    Okay.  And very few of these would require

09:30AM 10    entitlements; correct?

11         A    Again, I don't know that.

12         Q    Did you know that his responsibility was for over

13    hundreds of projects that didn't require entitlements?

14              MS. HAR:  Objection.  Asked and answered.

09:30AM 15    Assumes facts --

16              THE COURT:  Sustained.

17         Q    BY MR. BRAUN:  Now, after the Northridge

18    earthquake are you familiar who -- do you want to object before

19    I -- okay.

09:30AM 20              After the Northridge earthquake, are you aware

21    that he was responsible for hundreds of upgrades?

22              MS. HAR:  Objection.  Argumentative.  403.

23              THE COURT:  Sustained.

24         Q    BY MR. BRAUN:  So when you took the name of

09:31AM 25    Ray Chan off of the letter that was going -- that Huizar was

1      going to China -- sending to China, you knew at that point that

2      he didn't publicly support the L.A. Grand project, did you not?

3           A       I did not know that, no.

4           Q       Isn't that the reason you took the name off?

09:31AM   5           A       The council member took the name off.  I just

6      literally put it on a Word document.  So I don't know why the

7      council member took Ray's name off.  I don't know.

8           Q       Now, there was one point that you said that my

9      client brought an envelope full of checks to -- let me see --

09:32AM   10      to give to Huizar?

11           A       Yes.

12           Q       Didn't you once testify that either Ricky Zheng

13      or Chan did that?

14           A       I testified that Ray gave me an envelope of

09:32AM   15      checks.

16           Q       Wasn't that Ricky Zheng?  Are you sure?

17           A       I'm 100 percent confident it was Ray Chan.

18           Q       Did you testify earlier -- June 15, 2020, didn't

19      you tell the Government that you recalled that it was Chan or

09:32AM   20      Ricky Zheng?

21           A       I know that it was Ray Chan who gave me the

22      envelope.

23           Q       So you're more sure than you would have been in

24      2020 three years ago when you talked to the Government?

09:32AM   25                   MS. HAR:  Objection.  Improper impeachment.

1          THE COURT:  Sustained.

2      Q      BY MR. BRAUN:  Now, a letter -- you have seen the

3  motion by Mr. Price suggesting that the matrix study the

4  consolidation; correct?

5      A      Yes.

6      Q      And you have seen the one that was provided to

7  Mr. Huizar by Ray Chan that suggested study; correct?

8      A      Correct.

9      Q      They were almost identical; correct?

10      A      Yes.

11      Q      Yeah, because what happened is the whole

12  consolidation was designed to save one person's job; correct?

13      A      Yes.

14      Q      And that's because the person didn't have the

15  proper licensing.  He was on a two-year waiver.  He didn't have

16  the proper licensing; correct?

17          MS. HAR:  Objection.  Vague as to he.

18          THE COURT:  Overruled.

19          You can answer if you understand the question.

20          THE WITNESS:  I'm sorry.  I don't think I

21  understood the first question.

22      Q      BY MR. BRAUN:  You know the background of the

23  consolidation; correct?

24      A      Yeah.  Again, at that time I did not know the

25  background.  All I knew, from my understanding, was that Ray

1  would lose his job if the consolidation happened.  Then I know

2  it was important for the council member to support -- or to not

3  support the consolidation so that Ray Chan can keep his job.

4  That was all I --

09:34AM  5      Q     Ray Chan was not going to lose his job if there

6  was consolidation; is that correct?

7      A     From what my understanding was at the time was he

8  was going to lose his job.

9      Q     Huizar told you that?

09:34AM  10      A     Based on the consensus of all of us talking

11  together about the consolidation.

12      Q     Have you checked that?  Ray Chan wouldn't have

13  even taken a reduction in pay; correct?

14      A     I mean --

09:34AM  15      Q     You don't know, do you?

16           MS. HAR:  Objection.  Assumes facts not in

17  evidence.

18           THE COURT:  Overruled.

19           THE WITNESS:  I mean, like I said, I heard, when

09:35AM  20  Ray told the chairs at that dinner, he said he told both the

21  council member and Herb Wesson thank you because, if it wasn't

22  for you, I wouldn't be here.  If it wasn't for you, I wouldn't

23  have my job.  So I heard it directly from Ray Chan himself.

24      Q     BY MR. BRAUN:  The head of the new department

09:35AM  25  would have been appointed by Gil Garcetti; correct?

1          A        I don't know.

2          Q        Gil Garcetti appointed Ray Chan head of Building

3     and Safety; correct?

4                   MS. HAR:  Objection.  Assumes facts not in

09:35AM  5     evidence.

6                   THE COURT:  Overruled.

7                   You can answer if you know.

8                   THE WITNESS:  I don't know.

9          Q        BY MR. BRAUN:  Do you know who Gil Garcetti

09:35AM  10    fired?

11         A        You mean Eric Garcetti or his dad?  I don't know

12    anything about Gil Garcetti.

13         Q        I'm sorry.  Eric Garcetti.

14         A        I don't know who

09:35AM  15    Eric Garcetti fired.  I wasn't -- I don't know.

16         Q        So basically you don't know whether or not the

17    consolidation -- the consolidation was opposed by the unions;

18    correct?

19         A        I don't know the -- again, the process of the

09:36AM  20    consolidation or the details of the consolidation.  I just know

21    that it was important for Ray to keep that job, and the council

22    member was going to support --

23         Q        You're wrong.  Do you admit you could be wrong,

24    that you're just hearing that by hearsay?

09:36AM  25                  MS. HAR:  Objection.  Argumentative.  Counsel

```
 1   testifying.

 2              THE COURT:  The objection is sustained.

 3              MR. BRAUN:  Okay.

 4              THE COURT:  I think you have exhausted his

 5   knowledge with respect to the consolidation.

 6              MR. BRAUN:  I'm still probing.  Maybe he knows

 7   more.

 8        Q    Every single city councilman voted against the

 9   consolidation; isn't that correct?

10        A    Again, I don't know.

11        Q    Eric Garcetti was against the consolidation;

12   correct?

13              MS. HAR:  Objection.  Lacks foundation.  403.

14   Cumulative.

15              THE COURT:  He's just asking if he knows.

16        Q    BY MR. BRAUN:  Do you know?

17        A    I don't know.

18        Q    Do you know what the independent consultant

19   recommended about the consolidation?

20        A    No.

21        Q    Do you know exactly how much Ray Chan would have

22   made or lost under the consolidation?

23        A    I don't know.

24        Q    You do know, however, that the Building and

25   Safety Department was first class under Ray Chan; correct?
```

09:36AM (line 5)
09:36AM (line 10)
09:36AM (line 15)
09:37AM (line 20)
09:37AM (line 25)

1        A      Yes.

2        Q      And the Planning Department was plagued by you

3 and Huizar and other people shaking people down; correct?

4        A      Yes and no.

09:37AM  5        Q      Okay.  So consolidating them was something that

6 the industry feared; correct?

7        A      I don't know.

8        Q      Well, it could have cost the building industry a

9 lot of money; correct?

09:37AM 10         MS. HAR:  Objection.  Lacks foundation.  Calls

11 for speculation.

12         THE COURT:  Sustained.

13         MR. BRAUN:  No further questions, Your Honor.

14         THE COURT:  All right.  Any redirect?

09:38AM 15         MS. HAR:  Yes, Your Honor.

16                  **REDIRECT EXAMINATION**

17 BY MS. HAR:

18        Q      Mr. Esparza, I want to start with your plea

19 agreement which defense counsel questioned you about.  Do you

09:38AM 20 recall that line of questioning?

21        A      Yes.

22        Q      When you pled guilty to a RICO conspiracy, were

23 you taking accountability for your conduct?

24         THE COURT:  Will you use the microphone that's in

09:39AM 25 front of you?

1       MS. HAR:  Yes, Your Honor.

2    Q    BY MS. HAR:  When you pled guilty to a RICO

3  conspiracy, did you do that because you wanted to take

4  accountability for your conduct?

09:39AM  5    A    Yes, I did.

6    Q    Did you accept the fact of your criminal conduct?

7    A    I did.

8    Q    In fact, did you also accept the fact that part

9  of that criminal conduct was lying to the FBI?

09:39AM  10    A    Yes.

11    Q    And was lying to the FBI part of the pay-to-play

12  scheme?

13    A    Yes.

14    Q    Why was lying to the FBI important to that

09:39AM  15  scheme?

16    A    It would protect the scheme.  It would -- yeah.

17  Protect it.

18    Q    And it was a goal of that scheme to conceal?

19    A    Yes.

09:39AM  20    Q    And as far as the conditions of your plea

21  agreement, is there any part of that in which your -- any

22  recommendation about your sentence, does it depend on whether

23  there's a conviction in this case?

24    A    Not at all, no.

09:40AM  25    Q    Does it depend at all on any outcome of this

1    case?

2         A       No.

3         Q       And does your plea agreement, in fact, say that

4    the determination of whether you provided substantial

09:40AM   5    assistance will not depend in any way on whether the Government

6    prevails at trial or any court hearing in which you testify?

7         A       That is correct.

8         Q       Does it specifically say that whether any person

9    is found guilty or not guilty will have no effect on the

09:40AM   10   Government's sentencing recommendation?

11        A       That is correct.

12        Q       What are you required to do under the plea

13   agreement?

14        A       Tell the truth.

09:40AM   15   Q       And what would be the thing that would undo your

16   plea or blow up any, quote/unquote, "deal"?

17        A       If I lied.

18        Q       And is that written specifically into your plea

19   agreement?

09:40AM   20   A       Yes.

21        Q       In 2017 when you had your initial FBI interviews,

22   how old were you?

23        A       I think I just turned 29, 30.

24        Q       So during the time period of 2013 to 2018 or so,

09:41AM   25   were you in your mid 20s?

1159

1      A      Early and mid 20s, yes.

2      Q      And you were asked about the lies that you had

3  made in those interviews.  That's true; right?

4      A      That is true.

09:41AM    5      Q      And those were the two interviews in the summer

6  of 2017?

7      A      Yes.

8      Q      After that and after you chose to cooperate, did

9  you sit with the FBI and the Government again?

09:41AM   10      A      I did, yes.

11      Q      Did you sit for multiple interviews?

12      A      I did.

13      Q      Did you -- how long would those sessions last?

14      A      Sometimes all day.

09:41AM   15      Q      And over the course of those many, many

16  interviews and hours, did you tell the truth?

17      A      I did.

18      Q      Did you admit to all of the conduct and the

19  reasons for why you pled guilty?

09:41AM   20      A      Yes.

21      Q      Is that because you were no longer trying to

22  protect the RICO conspiracy?

23      A      That is correct.

24      Q      Okay.  All right.  Let's talk about some of these

09:42AM   25  projects.  On cross-examination you were asked about these very

```
 1   expensive development projects; right?

 2        A     Correct.

 3        Q     And in your experience, were there always

 4   consultants that were part of those expensive development

 5   projects?

 6        A     Yes.

 7        Q     What was the role of the consultants?

 8        A     To be the middle person between the council

 9   member, myself, and the developer.

10        Q     And why did you need a consultant to go through

11   that entitlements process if you had a very expensive project?

12        A     You need a consultant so that the council office

13   could ask for certain requests from those specific consultants.

14        Q     And are you aware whether those consultants

15   received fees for their work?

16        A     They did, yes.

17        Q     Did they receive a lot of fees?

18        A     Yes.

19        Q     That's because those projects were so expensive;

20   right?

21        A     That is correct.

22        Q     In fact, was there a part of the scheme where

23   Jose Huizar would seek to have his people, his allies,

24   installed as consultants?

25        A     Yes.
```

1    Q      And, in turn, would those people, if they were

2    installed, would they be paid those expensive fees?

3    A      Yes.

4    Q      You were asked some questions about -- some

09:43AM   5    incomplete hypotheticals about the political system in this

6    country.

7           Do you recall those questions?

8    A      Yes.

9    Q      In your testimony in describing the various

09:43AM   10   political contributions you solicited, were those just

11   soliciting political contributions?

12   A      No.

13   Q      Were those just constituents who were paying

14   under the American political system?

09:43AM   15   A      No.

16   Q      Why not?

17   A      Because they were just not donations.  They were

18   also just different, you know, alcohol for family parties,

19   T-shirts, golf clubs, stuff that had no -- that weren't

09:44AM   20   political donations.  Event tickets.

21   Q      And even if you didn't say -- and was it part of

22   your training to not say exactly that this was for that?

23   A      Yes.

24   Q      And why was that important to the RICO scheme?

09:44AM   25   A      Just that the council member always told me that,

1  if I were to say, you give us this -- give us this donation,

2  then we will vote for your project or that we would support

3  your project, that he felt that that was crossing the line.  So

4  I had to be very clear not to say this for that but still make

09:44AM  5  it clear that, hey, I understand your project is coming up in

6  two weeks.  This nonprofit or this is very important for the

7  council member.  Would you be willing to support?  And

8  depending if they said yes or no or their commitment, then we

9  would continue in those two weeks.  If those two weeks came and

09:45AM  10  we still hadn't heard anything from those people, then the

11  project was stalled.

12       Q       Even if you didn't use those explicit words, did

13  that at all change your understanding of what, in fact, those

14  contributions were for?

09:45AM  15       A       Say that again.

16       Q       Even though you didn't use those explicit words

17  that the political contributions were for the project, was it

18  your understanding that's what it was?

19       A       Yes.

09:45AM  20       Q       And did you still communicate that to what the

21  contributor was?

22       A       Yes.

23       Q       And was that something -- in your prior testimony

24  you testified the fact that the defendant got it.  Was it --

09:45AM  25  right?

1          A       Yes.

2          Q       Was it your understanding that the defendant also

3    understood that message?

4          A       Correct.

09:45AM  5          Q       There was a line of questioning about the fact

6    that there were hotels lost as a result of this scheme.

7                  Do you recall that?

8          A       Yes.

9          Q       You understood Jose Huizar to be pro-development;

09:46AM  10   correct?

11         A       Yes.

12         Q       And did you understand that Jose Huizar was going

13   to approve the L.A. Grand Hotel redevelopment?

14         A       Yes.

09:46AM  15         Q       Did he ever take any action that would suggest

16   that he wasn't going to approve the L.A. Grand Hotel?

17         A       No.

18         Q       And as far as the Luxe Hotel, which developer

19   owns that property?

09:46AM  20         A       It was the Hazens Chairman.

21         Q       Did you understand that Jose Huizar was going to

22   approve the Luxe Hotel project?

23         A       Yes.

24         Q       And, in fact, did Jose Huizar pass motions to

09:46AM  25   help facilitate entitlements for the Luxe Hotel?

```
 1          A       He did, yes.

 2          Q       Are you aware whether he voted to approve the

 3   Luxe Hotel?

 4          A       Yes.

 5          Q       So, in fact, Jose Huizar was supporting these two

 6   projects; correct?

 7          A       That is correct.

 8          Q       And these were two projects for which the

 9   developers paid bribes.

10          A       Yes.

11          Q       And who helped facilitate those bribes from

12   Shen Zhen New World and Hazens to Jose Huizar?

13          A       Ray Chan.

14          Q       You were asked about the fact that the defendant

15   helped -- and one of those benefits from Shen Zhen New World

16   was the settlement; correct?

17          A       That is correct.

18          Q       And defense counsel questioned you about how you

19   knew that the defendant helped structure that loan -- excuse

20   me -- that settlement.

21                  Do you recall that?

22          A       Yes.

23          Q       And can you just describe how you know that the

24   defendant helped structure that settlement?

25          A       Well, the first one was Council Member Huizar
```

1  told me that he would talk to Ray Chan to help talk to

2  Chairman Huang about the settlement.  So he said, let me check

3  in with Ray to see if the Chairman would want to talk.  Once

4  that conversation happened, Council Member Huizar told me it's

09:47AM  5  going to be a go, that he talked to Ray and I would be working

6  with Ricky Zheng to collect the settlement.  Ricky Zheng also

7  told me that Ray Chan structured the settlement money for the

8  loan.

9          In addition, when I also talked to George Chiang,

09:48AM  10  as I mentioned earlier, George Chiang knew about the loan.  And

11  that's when I was surprised because he -- he told me that Ray

12  told him about the loan too.  So I heard from three different

13  people that Ray was responsible for getting the settlement --

14  for the loan.

09:48AM  15      Q     And as far as the timing of when Jose Huizar and

16  Ricky Zheng told you that the defendant was structuring this,

17  was that happening while these plans were still ongoing?

18      A     Yes.

19      Q     And would Jose Huizar come back to you with an

09:48AM  20  update and then you would then move forward with the next step

21  of making that settlement happen?

22      A     Yes.

23      Q     After the settlement was completed, did

24  Jose Huizar, through his conduct and through the access he

09:48AM  25  provided to defendant, also tell you that the defendant helped

1166

1   with the settlement?

2        A      Yes.

3        Q      What kind of conduct did Jose Huizar show, what

4   sort of treatment would he give to the defendant that would

5   confirm to you that the defendant was the one, in fact, who

6   made the settlement possible?

7        A      He started to give Ray Chan 100 percent access to

8   him.  Any meetings that he needed, text messages, dinners, Ray

9   had full access to the council member, full access to the CD-14

10  office, and also full access to me.

11       Q      Would Jose Huizar ever give full access to

12  somebody who hadn't helped him get a benefit?

13       A      Never.

14       Q      And did he, in fact, say to you at some point

15  that, had he not -- had Ray Chan not helped with the

16  settlement, he would have cut him off a long time ago?

17       A      That is true.

18       Q      And in 2014, were you Jose Huizar's most trusted

19  advisor?

20       A      In 2014, yes, I was.

21       Q      During that time period, were you and Ricky Zheng

22  close?

23       A      Yes.

24       Q      Were you good friends?

25       A      Yes.

1    Q      Can you think of any reason why Ricky Zheng and

2    Jose Huizar would in 2014 tell you things that weren't true?

3    A      No.

4    Q      And is Ricky Zheng the same person that the

09:50AM  5   defendant wanted Shanghai Construction to hire as a consultant

6    for that project?

7    A      Yes.

8    Q      And did you understand Ray Chan and Ricky Zheng

9    to have their own personal relationship?

09:50AM  10  A      Yes.

11   Q      Did you understand them to be close?

12   A      Yes.

13   Q      And what interest did the defendant have in

14   having his close friend Ricky Zheng hired as a consultant on

09:50AM  15  the Shanghai Construction project?

16   A      What was his --

17   Q      What was the defendant's interest in that?

18   A      Again, just keeping the project within the

19   family -- I mean, within the family -- within the same group of

09:50AM  20  trusted people.

21   Q      Was it the same type of interest that Jose Huizar

22   would have when he wanted to get his friends as consultants

23   hired?

24   A      Yes.

09:50AM  25  Q      You were asked -- it's true Ray Chan wasn't on

1        any of the bank paperwork; right?

2               A       That is correct.

3               Q       Was it his role to be on the bank paperwork that

4        would provide a loan to Jose Huizar secured by Wei Huang's

09:51AM  5        collateral?

6               A       No.

7               Q       It's true that Ray Chan -- he's not on any of

8        these e-mails; correct?

9               A       No.

09:51AM 10               Q       Was it his role to be on the e-mails working out

11        the logistics of that settlement arrangement?

12               A       No.

13               Q       What was his role with respect to the settlement

14        arrangement?

09:51AM 15               A       To keep everything discreet and -- yeah.  Keep

16        everything discrete.

17               Q       Did he have a role in persuading Chairman Huang

18        to give Jose Huizar the money?

19               A       Yes.

09:51AM 20               Q       And as far as the full access that the defendant

21        got after the settlement, is it fair to say that the

22        defendant -- he needed to have access to Jose Huizar for

23        entitlements?

24               A       Yes.  He needed to have access.

09:52AM 25               Q       As far as you know -- and defense counsel asked

1    you about this -- defendant did not have authority on his own

2    to grant entitlements; correct?

3         A       That's correct.

4         Q       Who had that authority?

09:52AM  5         A       Council Member Huizar.

6         Q       And did the defendant know that?

7         A       Yes, he did.

8         Q       How do you know that he knew about Jose Huizar's

9    power to get entitlements?

09:52AM  10        A       Because every time we met with the Chinese

11   developers, Ray would bring that power up to the developer.

12        Q       You were asked about what the defendant got out

13   of helping with the settlement; right?

14        A       Correct.

09:52AM  15        Q       You were asked about what the defendant got

16   for -- strike that.

17                You were basically asked questions about what the

18   defendant got with respect to helping Jose Huizar get these

19   benefits; right?

09:52AM  20        A       Correct.

21        Q       And it's fair to say -- are you aware of any

22   money, direct money that the defendant got for that conduct?

23        A       No.

24        Q       Did you have an understanding of what he did get

09:53AM  25   out of it?

1    A    As far as money --

2    Q    No.  Not as far as money but something else.

3    A    Oh, he received full access to Council Member

4    Huizar.

09:53AM    5    Q    And you're aware that the defendant worked with

6    George Chiang to be a consultant for the City of L.A.; right?

7    A    That is correct, yes.

8    Q    Are you aware that he had as his client some of

9    the same developers that he had been helping get benefits from

09:53AM    10    for Jose Huizar?

11    A    Yes.

12    Q    Can a council member's help on projects go beyond

13    just voting on entitlements?

14    A    Yes.

09:53AM    15    Q    I believe you talked about there was sort of a

16    practice in the city for that.

17    A    Say that again, please.

18    Q    I think you testified that there's -- it was

19    known or that it was a practice that these developers were

09:54AM    20    going to come and get Council Member Huizar's support and

21    buy-in for things besides entitlements; correct?

22    A    Yes.

23    Q    Was there any major entitlement within

24    Jose Huizar's district that he didn't at least have some

09:54AM    25    knowledge of or input over?

1    A        No.  He was -- he always had knowledge in what

2    was being approved in his district, yes.

3    Q        And even for projects that didn't need

4    entitlements, would those developers still want the council

09:54AM  5    member's support?

6    A        Yes.

7    Q        You were asked some questions about this parking

8    dispute between Wei Huang and the Delijanis.

9             Do you recall that?

09:54AM  10    A        Yes.

11    Q        Did you understand that the defendant was part of

12    helping to facilitate that dispute?

13    A        Yes.

14    Q        And did he do that with Jose Huizar?

09:55AM  15    A        He did, yes.

16    Q        Was this during the 2013 and 2014 time period?

17    A        Yes.

18    Q        Did you see Jose Huizar's assistance to Shen Zhen

19    New World on that parking dispute as just him acting as a good

09:55AM  20    City Council member?

21    A        No.

22    Q        Was it just him helping an ordinary constituent?

23    A        No.

24    Q        Why was he working with the defendant to help

09:55AM  25    Chairman Wei Huang on his L.A. Grand Hotel parking dispute in

1    2013 and 2014?

2         A       Mainly because we just finished going to

3    Las Vegas with Chairman Huang.

4         Q       Because of the benefits?

09:55AM   5    A       Yes.

6         Q       That was true for a variety of matters that were

7    affecting the L.A. Grand Hotel; right?

8         A       That is correct.

9         Q       Including like the AUP media that you talked

09:55AM  10    about.

11        A       Correct.  Yes.

12        Q       And other issues affecting Wei Huang's hotel?

13        A       Yes.

14        Q       That was true throughout that renovation period

09:56AM  15    too; correct?

16        A       Correct.

17        Q       And when did you learn of the plans to redevelop

18    the L.A. Grand Hotel?

19        A       I mean, I don't remember the exact year, but it

09:56AM  20    was just -- it was brought up during our conversations at

21    dinners and then officially when the Chairman -- when we had

22    that meeting with our city hall office when he showed us the

23    renderings of the project.  So it was official at that point.

24        Q       Right.  And you had had -- you had wondered about

09:56AM  25    why Chairman Huang was providing all of these benefits; right?

1    A       That is correct.

2    Q       Is that why you asked Ricky Zheng about that?

3    A       I did, yes.

4    Q       And what was Ricky Zheng's response?

09:56AM  5    A       He said the Chairman's philosophy is that you

6    give, give, give and then you make the big ask.  So you give,

7    give, give and then you -- sorry.  You give, give, give and

8    then you have the big ask.

9    Q       So when you personally found out or saw the plans

09:57AM  10   for the L.A. Grand Hotel redevelopment, did you understand at

11   that point that all this is what Chairman Huang has been giving

12   and giving and giving for?

13   A       Yes.  That's when I learned that the hotel was

14   the big ask.

09:57AM  15   Q       You were asked questions about this letter in

16   which Ray Chan's name was removed; right?

17   A       Yes.

18   Q       I think there was some suggestion by defense

19   counsel that the defendant didn't support the redevelopment of

09:57AM  20   the L.A. Grand Hotel.

21           Do you recall that line of questioning?

22   A       Yes, I do.

23   Q       Did you understand that the defendant supported

24   the redevelopment of the L.A. Grand Hotel?

09:57AM  25   A       Yes.

1    Q    How do you know that?

2    A    Based on all our dinners with Ray and the

3    Chairman that he would verbally support the project.

4    Q    Did the defendant verbally state that he was

09:58AM  5    going to support this project in your presence during your

6    dinners?

7    A    Yes, he did.

8    Q    Did that include the meeting at the Sheraton in

9    the back of the Sheraton during that cigarette break when a

09:58AM  10   comment was made about how the redevelopment would be like the

11   Chairman's "big dick over the city"?

12   A    That is correct.

13   Q    During that August 4th meeting with all the city

14   officials, did the defendant indicate his support for the

09:58AM  15   project then?

16   A    Yes.

17   Q    Can you think of anything that the defendant has

18   done or said that would suggest he didn't support the

19   redevelopment of the L.A. Grand Hotel?

09:58AM  20   A    No.

21         MS. HAR:  May I have a moment, Your Honor?

22         THE COURT:  Yes.

23   Q    BY MS. HAR:  Mr. Esparza, going back to the role

24   of the consultants or the lobbyists with respect to development

09:59AM  25   projects, if a lobbyist or a consultant has full access to

1    Jose Huizar the way the defendant did, is that going to help

2    that consultant or lobbyist in their job?

3             A        100 percent.

4             Q        How so?

09:59AM   5    A        When you're a consultant or lobbyist and you have

6    full access to the council member, you have full access to his

7    staff, you can get any question asked at any time.  You can

8    meet with the council member, get his approvals or give him

9    briefs at any time of the whole process.  So being able to

09:59AM  10    say -- go back to the developer and say, I have

11    Council Member Huizar who is supporting the project and have a

12    direct relationship with the council member, right, then that's

13    the golden ticket for any developer and any consultant or

14    lobbyist.

10:00AM  15    Q        Does it help that consultant perform his job?

16             A        100 percent.

17             Q        Does it help that consultant get extra fees if

18    they wanted?

19             A        Yes.

10:00AM  20    Q        Would it help that consultant get more business

21    with other developers?

22             A        Yes.

23             Q        To promote the fact they have full access to

24    Jose Huizar's office?

10:00AM  25    A        Yes.

1176

```
 1          Q       And when the defendant became officially a
 2    consultant, did he have that relationship with Jose Huizar?
 3          A       He did, yes.
 4                  MS. HAR:  No further questions, Your Honor.
 5                  THE COURT:  All right.  Any additional questions?
 6                  MR. BRAUN:  Just a few, Your Honor.
 7                       RECROSS-EXAMINATION
 8    BY MR. BRAUN:
 9          Q       So why did Ray Chan reject Wei Huang's offer to
10    make him be his consultant after he left the City?  Do you know
11    why?
12                  MS. HAR:  Objection.  Assumes facts not in
13    evidence.  Lacks foundation.
14                  THE COURT:  Sustained.
15          Q       BY MR. BRAUN:  Do you know that my client
16    rejected Wei Huang's offer?  Did you know that?
17                  MS. HAR:  Objection.  Asked and answered.  Lacks
18    foundation.  Assumes facts not in evidence.
19                  THE COURT:  The objection is overruled.
20                  THE WITNESS:  I don't know.
21          Q       BY MR. BRAUN:  Did you know that when Ray Chan
22    left the City of Los Angeles, that he had receptions for six
23    city councilmen at his office where they had coffee and they
24    would bring donations?  Did you know that?
25                  MS. HAR:  Objection.  Beyond the scope.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  I didn't know that.

3      Q      BY MR. BRAUN:  Did you know that he did not do

4  one for Councilman Huizar?

5      A      I don't know.  I don't know.

6      Q      That's inconsistent with their theory of some

7  kind of a RICO conspiracy, is it not?

8          MS. HAR:  Objection.  Argumentative.

9          THE COURT:  It also assumes facts not in

10  evidence.

11          MR. BRAUN:  Okay.

12      Q      Now, you were at that meeting where Wei Huang

13  presented the concept of the new hotel; correct?

14      A      Correct.

15      Q      He was 45 minutes late, wasn't he?

16      A      Yes.

17      Q      And Ray Chan berated him in front of the whole

18  group; isn't that correct?

19      A      I don't know if he berated him.  I mean, Ray

20  was -- Ray was upset that he was late, but he didn't berate

21  the -- he didn't embarrass the Chairman.

22      Q      He did embarrass him; correct?

23      A      He did not embarrass him.

24      Q      He made it clear to the Chairman in front of a

25  half a dozen or more people that the Chairman -- it was

 1    outrageous that he be 45 minutes late keeping all these people

 2    waiting; correct?

 3         A     It was known that the -- the Chairman was

 4    45 minutes late.  Yeah.  We were all waiting for him.

10:02AM  5         Q     When he came in, Ray said something to him in

 6    front of everyone else, didn't he?  Like, where the hell have

 7    you been; right?

 8         A     I don't know if where the hell have you been, but

 9    he did address that he was 45 minutes late.  I don't remember

10:03AM  10   the exact words he used.

11         Q     So he had no hesitancy in taking on this Chairman

12    right in front of a whole bunch of staffers in the City;

13    correct?

14              MS. HAR:  Objection.  Misstates prior testimony.

10:03AM  15   403.

16              THE COURT:  Overruled.

17              THE WITNESS:  Say that again, please.

18         Q     BY MR. BRAUN:  He didn't have any problem showing

19    his displeasure in front of a bunch of people from the City;

10:03AM  20   correct?

21         A     Correct.

22         Q     You don't speak Chinese, but the Chairman

23    certainly looked like he was embarrassed; right?

24         A     Yeah.  He apologized for being late.  He did

10:03AM  25   apologize for being late.

1    Q     And he apologized because Ray Chan said something

2  to him; isn't that correct?

3    A     I don't know if that was the reason, but the

4  Chairman did -- as soon as he walked in before anyone said

10:03AM  5  anything, the Chairman was, sorry, sorry in his broken English.

6  So it wasn't -- it was as soon as he entered the room.  It

7  wasn't after the conversation with Ray, no.

8    Q     And you didn't know that Ray Chan rejected an

9  offer by the Chairman to be a consultant, did you?

10:04AM  10    MS. HAR:  Objection.  Asked and answered.

11  Assumes facts --

12    THE COURT:  Sustained.

13    Q     BY MR. BRAUN:  Now, we're talking about access.

14  You have watched television.  You have seen lawyers go on and

10:04AM  15  say, I'm a former United States assistant attorney; correct?

16    MS. HAR:  Objection.  Relevance.

17    THE COURT:  Sustained.

18    Q     BY MR. BRAUN:  Okay.  Do you think people hire

19  people for that reason?

10:04AM  20    MS. HAR:  Objection.  Vague.

21    Q     BY MR. BRAUN:  Is something wrong with having a

22  job that gives you access to public officials?

23    MS. HAR:  Objection.  Argumentative.

24    THE COURT:  Sustained.

10:04AM  25    Q     BY MR. BRAUN:  Now, this document you signed,

```
 1   your lawyer told you -- I'm not -- I don't know Judge Walter --

 2                THE COURT:  Do you have the plea agreement?

 3        Q    BY MR. BRAUN:  But your lawyer told you that

 4   judges generally follow the recommendations from the

 5   Government; correct?

 6                MS. HAR:  Objection.  Calls for hearsay.

 7   Privilege.

 8                THE COURT:  Sustained.

 9        Q    BY MR. BRAUN:  So this lawyer you took to see the

10   FBI, you told him you were going to lie to the FBI?

11                MS. HAR:  Objection.  Calls for privileged

12   information.  Misstates facts.

13                THE COURT:  Sustained.

14        Q    BY MR. BRAUN:  So what benefit did my client get

15   out of this supposed scheme?  Could you name one dime that he

16   got?

17        A    As far as dollars, I don't know.  But he received

18   full access to Council Member Huizar's office, full access to

19   the CD-14 team, full access to myself at any time he wanted.

20        Q    He's head of Building and Safety; correct?

21        A    That is correct.

22        Q    He's the deputy mayor; correct?

23        A    That is correct.

24        Q    He's appointed by the mayor; correct?

25        A    That is correct.
```

1       Q       Are you saying the other offices wouldn't open

2   their door to him?

3       A       Council Member Huizar did not meet with any other

4   deputy mayor or department general manager at any time they

10:05AM  5   wanted.  They had to follow the regular process and go through

6   a scheduling request.  Ray was the only one who could literally

7   come to the door, knock, and say, is the council member there?

8   Is Jose there, on a first name basis, and get to the back of

9   the room without questions asked.

10:06AM 10       Q       But the other city councilmen, wouldn't they open

11   up the door to the head of Building and Safety?

12       A       I don't know how the other council members run

13   the office, but I know with Council Member Huizar he didn't

14   allow really anyone to go meet him last minute.

10:06AM 15       Q       Your boss was a crook; right?  He took bribes;

16   right?

17       A       Yes.

18       Q       And you're trying to use him as an example?

19       A       Well, you're asking me how it was in our office.

10:06AM 20       Q       All I'm saying is did he get a dime?  He got a

21   salary from the City.  He never got a dime, and you know it.

22   Isn't that right?

23               MS. HAR:  Objection.  Asked and answered.

24   Argumentative.

10:06AM 25               THE COURT:  Sustained.

```
 1                  MR. BRAUN:  Thank you.  No further questions.
 2                  THE COURT:  All right.  May this witness be
 3       excused?
 4                  MS. HAR:  Yes, Your Honor.
 5                  THE COURT:  All right.  We will take our morning
 6       recess.  We will be in recess for 15 minutes.
 7                  (A recess was taken at 10:07 a.m.)
 8                  (The following proceedings were held in
 9                  open court in the presence of the jury:)
10                  THE COURT:  All right.  All counsel and the
11       defendant are present.  The jury is present.
12                  The Government may call its next witness.
13                  MR. FAERSTEIN:  The Government calls Luke Morris.
14                  THE CLERK:  Please raise your right hand.
15              Do you solemnly swear that the testimony you
16       shall give in the cause now before this Court shall be the
17       truth, the whole truth, and nothing but the truth, so help you
18       God?
19                  THE WITNESS:  I do.
20                  THE CLERK:  Thank you.  Be seated.
21                  Remove your mask if you'd like, and please state
22       and spell your name for the record.
23                  THE WITNESS:  My name is Luke Morris, L-u-k-e
24       M-o-r-r-i-s.
25                  THE COURT:  You may proceed.
```

```
 1          MR. FAERSTEIN:  Thank you, Your Honor.

 2                     LUKE MORRIS,

 3             GOVERNMENT'S WITNESS, SWORN.

 4                  DIRECT EXAMINATION

 5  BY MR. FAERSTEIN:

 6     Q      Mr. Morris, are you currently employed?

 7     A      Yes.  I work at Google.

 8     Q      What do you do at Google?

 9     A      At Google I'm a member of their legal

10  investigations team.

11     Q      And do you have a position on the legal

12  investigations team?

13     A      Yes.  I'm a policy specialist and also serve as a

14  custodian of records.

15     Q      How long have you served as a policy specialist

16  at Google?

17     A      I have been in this role for about

18  three-and-a-half years now.

19     Q      And can you please describe your primary

20  responsibilities as a policy specialist?

21     A      Of course.  My main duty is to respond to data

22  requests by law enforcement for user data that comes in the

23  forms of subpoenas, court orders, and search warrants.

24     Q      Would those be search warrants from the

25  Government?
```

1    A    Yes.

2    Q    Do you also testify in court?

3    A    Yes, I do.

4    Q    Does Google offer Internet-based services to the

10:27AM  5  public?

6    A    Yes, we do through our -- through our Gmail

7  service.

8    Q    In your capacity as a policy specialist as well

9  as a custodian of records for Google, do you generally have

10:27AM  10  knowledge about the Internet-based services that Google offers

11  to the public?

12    A    Yes.

13    Q    And do you generally have knowledge about the

14  infrastructure Google employs to offer those services to the

10:27AM  15  public?

16    A    Yes, I do.

17    Q    I believe you mentioned Gmail.  What is Gmail?

18    A    Gmail is Google's free e-mail service that allows

19  a user to send and receive e-mails.

10:28AM  20    Q    Can anyone sign up for a Gmail account?

21    A    Yes.

22    Q    Does a user's Gmail account typically have a

23  specific domain?

24    A    Yes, it does.  When a user signs up for a Gmail

10:28AM  25  account, their domain will end in @gmail.com.

1      Q       Is @gmail.com an e-mail domain that indicates an

2    e-mail is hosted by Google's e-mail service?

3      A       Yes, it does.

4      Q       Can a user with a Gmail account send e-mails to

5    and receive e-mails from other users with e-mail accounts?

6      A       Yes.

7      Q       And do those other users have to also be using a

8    Gmail account?

9      A       No, they do not.

10      Q       So can the other users be using an e-mail account

11    supported by another e-mail -- excuse me -- another e-mail

12    service provider or company?

13      A       Yes, they can.

14      Q       So, for example, can a user with a Gmail account

15    exchange e-mails with an e-mail account supported by an e-mail

16    provider such as sbcglobal.net?

17      A       Yes.

18      Q       Generally speaking, are e-mails transmitted

19    through electronic signals?

20      A       Yes, they are through the Internet.

21      Q       So as a policy specialist and custodian of

22    records for Google do you generally have knowledge about how

23    Google stores its digital data?

24      A       Yes.

25      Q       Do you generally have knowledge about how Google

1  maintains that digital data in the regular course of its

2  business?

3       A    Yes.

4       Q    Do you generally have knowledge about Google's

10:29AM 5  maintenance of Gmail data, in particular?

6       A    Yes.

7       Q    Do you generally have knowledge about how e-mails

8  over Gmail are transmitted electronically from one account to

9  another?

10:29AM 10      A    Generally, yes, I do.

11      Q    Does Google maintain Gmail computer services to

12 facilitate the transmission of e-mails that Gmail users send

13 and receive?

14      A    Yes, we do.

10:29AM 15      Q    Do all e-mails that a Gmail user sends at some

16 point travel through a Gmail computer server?

17      A    Yes.

18      Q    Do all e-mails that a Gmail user receives at some

19 point travel through a Gmail computer server?

10:30AM 20      A    Yes.

21      Q    With respect to the computer servers that Google

22 uses to transmit e-mails to or from a Gmail account between

23 February 1st, 2013, and April 11, 2022, were any of those

24 servers located within the state of California?

10:30AM 25      A    No.  There weren't.  We did not have any servers

1    in California for that date range.

2         Q       Does Google presently maintain any Gmail servers

3    within the state of California?

4         A       No, we do not.

10:30AM  5         Q       So if a Gmail user physically located in

6    Los Angeles uses a digital device to send an e-mail through his

7    Gmail account, does the act of sending that e-mail initiate the

8    transmission of electronic signals from the digital device to a

9    Gmail server?

10:30AM 10         A       Yes.

11         Q       Must those electronic signals travel from a

12    digital device in Los Angeles to a Gmail server outside of

13    California?

14         A       Yes.  That's correct.

10:31AM 15         Q       Similarly, if a Gmail user physically located in

16    Los Angeles uses a digital device to retrieve an e-mail through

17    his Gmail account, does the act of retrieving that e-mail from

18    Gmail involve sending electronic signals to a Gmail server?

19         A       Yes.

10:31AM 20         Q       Must those electronic signals travel from the

21    digital device in Los Angeles to a Gmail server outside of

22    California?

23         A       Yes.

24         Q       Is the transmission of those electronic signals

10:31AM 25    to the Gmail server necessary for the Gmail user to ultimately

```
 1   retrieve the e-mail off his digital device?
 2        A       Yes.  It would have to pass through the Gmail
 3   server.
 4        Q       Did Google receive a search warrant for an e-mail
 5   account in the name of George Esparza?
 6        A       Yes, we did.
 7        Q       In or around 2017?
 8        A       Yes.
 9        Q       And also in or around 2018?
10        A       Yes.
11        Q       Did it produce e-mails to the Government in
12   response to that search warrant?
13        A       Yes, we did.
14        Q       Did Google receive a search warrant for an e-mail
15   account in the name of Ricky Zheng in or around 2017?
16        A       Yes.
17        Q       As well as 2018?
18        A       Yes.
19        Q       Did Google produce e-mails to the Government in
20   response to that search warrant?
21        A       Yes, we did.
22        Q       In response to those search warrants?
23        A       Yes.
24        Q       All right.  So I'm now -- if we can please
25   publish previously admitted Exhibit No. 125.
```

1          Do you see a document on the screen in front of

2    you?

3          A     Yes, I do.

4          Q     All right.  Does the sender of this e-mail from

10:32AM  5    an account with the name George Esparza have an e-mail account

6    ending with domain @gmail.com?

7          A     Yes.

8          Q     Is that an e-mail account hosted by Gmail?

9          A     Yes.

10:32AM  10         Q     What's the date of this e-mail?

11         A     It's January 10, 2018.

12         Q     If this e-mail was sent from a digital device in

13    California would the sending of this e-mail have initiated an

14    electronic signal from California to a Gmail server outside of

10:33AM  15    California?

16         A     Yes.

17         Q     By the same token, if the recipient of this

18    e-mail was using a digital device in California at that time,

19    would the receipt of the e-mail also entail a signal traveling

10:33AM  20    from a Gmail server outside of California to a device in

21    California?

22         A     Yes.

23              MR. FAERSTEIN:  We can take that down.  We can

24    publish now previously admitted Exhibit 126.

10:33AM  25         Q     Does the recipient of this e-mail using an

account with the name Christina Kegeyan have an e-mail account

ending with domain @gmail.com?

A    Yes.

Q    Is that also an e-mail account hosted by Gmail?

10:34AM    A    Yes, it is.

Q    What is the date of this e-mail?

A    January 16, 2018.

Q    If this e-mail was sent from a digital device in

California, would the sending of this e-mail have initiated an

10:34AM   electronic signal from California to a Gmail server outside of

California?

A    Yes.

Q    And if the recipient of this e-mail was using a

digital device in California at that time, would the receipt of

10:34AM   that e-mail also entail a signal traveling from a Gmail server

outside of California to the device in California?

A    Yes.

MR. FAERSTEIN:  Okay.  We can take that down.

Thank you.  If we can now publish previously admitted

10:34AM   Exhibit No. 356.  Thank you.

Q    Okay.  Does the sender of this e-mail from an

account with the name Ricky Zheng have an e-mail account ending

with domain @gmail.com?

A    Yes.

10:35AM   Q    Is that an e-mail account also hosted by Gmail?

1    A      Yes, it is.

2    Q      When was this e-mail sent?

3    A      This was sent on October 19, 2016.

4    Q      So if this e-mail was sent from a digital device

10:35AM  5  in California, would the sending of this e-mail have initiated

6    an electronic signal from California to a Gmail server outside

7    of California?

8    A      Yes.

9    Q      And if the recipient of this e-mail was using a

10:35AM  10  digital device in California at that time, would the receipt of

11   the e-mail also entail a signal traveling from a Gmail server

12   outside of California to a device in California?

13   A      Yes.

14           MR. FAERSTEIN:  All right.  We can take that

10:35AM  15  down.  Finally, I'm going to publish previously admitted

16   Exhibit No. 359.

17   Q      Focusing, if we could, on the bottom or the

18   middle, the originating e-mail, is one of the accounts in the

19   e-mail chain bearing the e-mail identifier zhengr11,

10:36AM  20  z-h-e-n-g-r 11, an e-mail account ending with

21   domain @gmail.com?

22   A      Yes.

23   Q      And is that also an e-mail account hosted by

24   Gmail?

10:36AM  25  A      Yes.

1    Q       And what is the date of this e-mail if you can

2    see?

3    A       I believe it's December 19, 2016.

4    Q       All right.  If this e-mail was sent to a digital

10:36AM   5    device in California, would the sending of this e-mail have

6    initiated an electronic signal from California to a Gmail

7    server outside of California?

8    A       Yes.

9    Q       And if the recipient of this e-mail was using a

10:36AM   10    digital device in California at that time, would the receipt of

11    the e-mail similarly entail a signal traveling from a Gmail

12    server outside of California to a device in California?

13    A       Yes.

14           MR. FAERSTEIN:  Your Honor, may I have a moment?

10:36AM   15           THE COURT:  Yes, you may.

16           MR. FAERSTEIN:  Nothing further, Your Honor.

17           THE COURT:  Any cross-examination?

18           MR. BRAUN:  No, Your Honor.

19           THE COURT:  All right.  May this witness be

10:37AM   20    excused?

21           MR. BRAUN:  Yes, Your Honor.

22           MR. FAERSTEIN:  Yes, Your Honor.

23           THE COURT:  All right.  Thank you very much.

24    Call your next witness.

10:37AM   25           MR. JENKINS:  The United States calls

1    Morrie Goldman to the stand, Your Honor.

2                    THE CLERK:  Please raise your right hand.

3                    Do you solemnly swear that the testimony you

4    shall give in the cause now before this Court shall be the

10:38AM    5    truth, the whole truth, and nothing but the truth, so help you

6    God?

7                    THE WITNESS:  Yes.

8                    THE CLERK:  Thank you.  Be seated.  Please state

9    and spell your name for the record.

10:38AM    10                    THE WITNESS:  Morris Goldman, M-o-r-r-i-s

11    G-o-l-d-m-a-n.

12                    THE COURT:  All right.  You may proceed.

13                    MR. JENKINS:  Thank you, Your Honor.

14                               **MORRIS GOLDMAN,**

10:38AM    15                 **GOVERNMENT'S WITNESS, SWORN.**

16                         **DIRECT EXAMINATION**

17    BY MR. JENKINS:

18         Q    Mr. Goldman, what are your current occupations?

19         A    I now work in the wine industry.  I work at a

10:38AM    20    wine store during the week as a sommelier and wine buyer, and

21    on the weekend I work in a tasting room at a winery in

22    Paso Robles.

23         Q    That's in Central Coast, California?

24         A    Yeah.  San Luis Obispo County.

10:38AM    25         Q    What's your academic background starting in

1194

```
 1    college?
 2         A        I have a Bachelor's degree from
 3    Pepperdine University in political science and journalism, and
 4    I have a Master's degree from Cal State Northridge in public
 5    administration.
 6         Q        At some point did you work for city government,
 7    specifically in Los Angeles?
 8         A        Yes.  From 1991 through the end of 1997, I worked
 9    for City Councilman Mike Hernandez.
10         Q        And at some point did you start your own
11    business?
12         A        Yes.  In 2004 I started my own boutique lobbying
13    government relations firm called Urban Solutions.
14         Q        And does that government lobbying firm
15    Urban Solutions still exist to this day, Mr. Goldman?
16         A        No.  I closed it in 2020.
17         Q        And why did you elect to close Urban Solutions in
18    2020, Mr. Goldman?
19         A        In June after being advised of the situation with
20    the Government and after working on my plea deal, I felt I
21    needed to move on and get a fresh start someplace else.
22         Q        And by situation with the Government, do you mean
23    you were part of a city hall corruption investigation?
24         A        Regrettably, yes, I was.
25         Q        In the plea deal you're referring to, did you
```

 1   plead guilty for your role in that city hall corruption

 2   investigation?

 3        A       Yes, I did.

 4        Q       Did that effectively damage your government

 5   consulting business as a result?

 6        A       Yes.

 7        Q       So then you fled L.A. to go where?

 8        A       The Central Coast.

 9        Q       And by flee, I mean you just moved to a different

10   place to start fresh; right?

11        A       Yes.  Correct.

12        Q       You didn't actually flee.  That was a poor choice

13   of words in fact.

14        A       No.  Drove.

15             MR. JENKINS:  Let's put up Exhibit 1-12

16   previously admitted.

17        Q       Okay.  Is this city hall Morrie Goldman?

18        A       Yes, it is.

19        Q       It is your city government haircut?

20        A       Yes.  That was my city hall haircut.

21        Q       This is your sommelier haircut that we're seeing

22   today?

23        A       Yes.  Correct.

24        Q       What does a lobbyist do?  Let's go back to when

25   you were a lobbyist.  What does a lobbyist do?

         1       A       Lobbyists basically utilizes relationships.  Over

         2   the course of your time working in and around city hall, you

         3   develop relationships with elected officials, with deputies,

         4   with land use attorneys.  You basically monetize those

10:41AM  5   relationships.

         6               Someone would hire me, for example, to open doors

         7   to political offices, get meetings, track down information,

         8   those types of things.

         9       Q       And where did you operate as a lobbyist for

10:41AM 10   Urban Solutions?

        11       A       I had an office in Little Tokyo a couple blocks

        12   away from city hall.

        13       Q       In Downtown L.A.?

        14       A       In Downtown L.A., yes.

10:41AM 15       Q       Was your lobbying focused on the city of

        16   Los Angeles?

        17       A       Yes.

        18       Q       Are there generally -- we're not going to go

        19   through them.  Generally are there rules about who can lobby

10:41AM 20   and what lobbyists can do?

        21       A       Yes.  As an example, I would register with the

        22   City Ethics Commission and file quarterly reports.

        23       Q       And who were some of your clients when you were a

        24   City of L.A. lobbyist?

10:42AM 25       A       Clear Channel Outdoor, Related, Holland Partner

1    Group, Carmel Partners, Lightstone Group.

2        Q      That's good.  We will go a little slower for the

3    court reporter in front of you who is trying valiantly to write

4    everything down.

10:42AM  5           What types of industries did you lobby on behalf

6    of?

7        A      Primarily land use.  A little bit of technology.

8        Q      By land use are we talking major development?

9        A      Major development projects in the city of

10:42AM  10   Los Angeles.

11       Q      You mentioned Related.  What is Related?

12       A      Related is the Related Group, Related -- Related

13   companies.  They were -- they're the developer that did the

14   Equinox Hotel and the Grand Avenue project.

10:42AM  15      Q      And you also mentioned Carmel Partners.  What is

16   Carmel Partners?

17       A      Carmel Partners was a development group.  I

18   worked on several of their projects.  Most notably their

19   project -- I'm blanking now.  Mateo was obviously their project

10:43AM  20   in Downtown L.A.  They did the Whole Foods project.

21       Q      Did they have a project called Cumulous?

22       A      Yes.  I'm sorry, the Cumulus project in

23   Herb Wesson's district.

24       Q      Focusing on your work with the City of L.A.

10:43AM  25   specifically, how does a lobbyist provide value to a real

1  estate development client?

2       A    Well, L.A. can be extremely bureaucratic.  The

3  projects can sometimes sit on people's desks.

4  Council District 14, for example, Mr. Huizar's district, had

10:43AM  5  hundreds of projects going at any given time during the real

6  estate boom, and projects would sit.  The developer would hire

7  someone like myself to move those projects from the bottom of

8  the stack to the top of the stack to get meetings, to get phone

9  calls returned, those types of things.

10:44AM  10       Q    What time frame -- to give the jury context, what

11  time frame are we talking about here?  What time did you have

12  Urban Solutions focused in Downtown L.A.?

13       A    I had Urban Solutions from 2004 through 2020.

14       Q    Okay.  We will focus on that time period.

10:44AM  15       A    Okay.

16       Q    During that time period, it sounds like you

17  mentioned focusing on the area of Downtown L.A. known as

18  Council District 14; right?  CD-14 is Downtown L.A.?

19       A    Yes.

10:44AM  20       Q    That is Jose Huizar's district during most of

21  that time if not all of it?

22       A    Uh-huh.

23       Q    You mentioned there were hundreds of projects

24  flowing through just Jose Huizar's district.  Is that accurate?

10:44AM  25       A    Yes.

1    Q    I think you described there is a queue or line of

2    projects?

3    A    Yes.

4    Q    Not all projects can be built at the same speed.

5    Is that true?

6    A    That's correct.

7    Q    I believe you testified part of that role is to

8    get people, if they were on the bottom of that queue, higher

9    up; correct?

10    A    Correct.

11    Q    In the real estate development process, have you

12    heard the term time is money?

13    A    Time is money very much so.

14    Q    What does that mean in terms of real estate

15    development and that queue process of projects going through

16    the City approval process?

17    A    Well, a project could have holding costs.  You

18    may buy a project and sit on it for years before you even start

19    the entitlement process.  And then once you start the

20    entitlement process, you have to go through that process as

21    well such as if you need a general plan amendment or a zone

22    change or change in height or anything like that.  And those

23    approvals take time as well.  So in the meantime, you have the

24    holding costs that are associated with that project.

25    Q    Now, focusing on your time both at -- when you

1  worked at city hall, you worked for city councilmen; right?

2          A       Correct.

3          Q       Then as a lobbyist you worked with city

4  councilmen; right?

10:46AM  5          A       Correct.

6          Q       How would you describe the level of power,

7  focusing on the city of L.A., that a city council member has

8  over real estate development in the L.A.?

9          A       A city council member has virtually absolute

10:46AM  10  power over a project in the city of Los Angeles.

11          Q       What makes you say that, absolute power for a

12  city council member over real estate development projects?

13          A       Because the City of L.A. has a weak mayor, strong

14  council form of government.  So basically the council runs the

10:46AM  15  city.  There's sort of an unwritten rule that council members

16  defer to -- the other 14 members of the council will defer to

17  the council member of the district.  They will look to see if

18  that person takes a position on a project.  Departments,

19  commissions will always look to see whether or not a council

10:46AM  20  member is supporting a project.

21          Q       Okay.  So just to break it up a little bit,

22  sounds like you talked about a couple different ways about how

23  a city council member can affect how a real estate development

24  project proceeds.  If it's in its district, there are still 14

10:47AM  25  other council members; correct?

1     A     Correct.

2     Q     How do those 14 other council members treat the

3 council member whose home the district is in, the project is

4 in?

10:47AM  5     A     As the king or queen of that district.

6     Q     Then you also mentioned something at the end of

7 your answer about other commissions.  There's the City Council,

8 right?

9     A     Yes.

10:47AM  10     Q     Sort of up here.  And there are different city

11 planning, building, a bunch of other acronyms, other committees

12 beneath that; right?

13     A     Correct.

14     Q     What's the relationship between the city council

10:47AM  15 member who has the project in his district and these lower

16 committees, in your experience?

17     A     Well, the commissions will obviously review a

18 project.  They will make recommendations.  But in the case, for

19 example, of, let's say, projects going through a zone change or

10:47AM  20 a general plan amendment, those are actions that are going to

21 change the value of the project, potentially make it more

22 marketable for a developer.  And those actions are reviewed and

23 can be changed by the City Council.

24     Q     So once the commission makes a recommendation or

10:48AM  25 a plan, City Council can undo it, add to it; correct?

1        A        Correct.

2        Q        Okay.  In the city of L.A., would you say, for

3    real estate development projects, there's a lot of

4    discretionary approvals?  Very few discretionary approvals?

10:48AM  5    Somewhere in the middle?  How would you describe the rate of

6    discretionary approvals?

7        A        I would say it's probably -- I would say it's

8    probably 50/50.  But even in the -- even a project that has

9    very minimal oversight for like a hundred-unit apartment

10:48AM 10    building, that project may not be going through a zone change

11    or a height change or a general plan amendment.  It can be

12    something as simple as a Site Plan Review which is sort of

13    looking at how the project is designed, where the driveways

14    are, those types of things.

10:49AM 15                Even in that particular situation, you're still

16    going to want the council office to send a representative to

17    meet, you know, the zoning administrator or the Area Planning

18    Commission to say we support this project, we do not support

19    this project.

10:49AM 20        Q        Just to make sure I understand it, even where

21    there's no discretionary approval, meaning the council member

22    may not even vote on an entitlement, for example, does that

23    mean a developer no longer needs a council member's support or

24    interest?

10:49AM 25        A        No.  I would always say a developer wants the

1  council office to be supportive and wants to send a

2  representative to the zoning administrator or the Area Planning

3  Commission, for example, to say council member X, Y, and Z

4  wholeheartedly supports this project.

10:49AM  5      Q    And then this touches on a prior question.  How

6  does a city council member or a city council person seek to

7  influence or advise other city committees if they want to say,

8  hey, we support this project?  Do they communicate that message

9  to the committees?  If so, how?

10:50AM  10      A    They typically would send a staff person to that

11  commission or zoning -- you know -- they would send a deputy to

12  go and communicate or read a letter.

13      Q    And now let's focus back on you.  When you were a

14  lobbyist, which relationships, would you say, you had the

10:50AM  15  closest with city council members or their districts?

16      A    I would say probably Council District 1 which was

17  Gil Cedillo, Council District 10 which is Herb Wesson, and

18  Council District 14 which was Jose Huizar.

19      MR. JENKINS:  We will put up 1.

10:50AM  20      Q    Do you recognize Jose Huizar on the right of city

21  government Morrie Goldman?

22      A    Yes.

23      Q    When did you meet -- let me talk about it a

24  different way.

10:51AM  25      When you say -- how would you describe your role

to clients?  When you say, I have a good relationship with

Jose Huizar, how would you explain what you could get them out

of that relationship?

        A       I would describe myself as a friend of the

office.  I would describe myself as someone who had a close

relationship with Jose and a close relationship with, you know,

his chief of staff, his chief planning deputy, and someone who

could basically get a meeting, get calls returned, those types

of things.

        Q       And what was the ultimate goal, again, focusing

on real estate development projects, for your developer

clients, what was their ultimate goal in hiring you?  What did

they want you to do in the end?

        A       To basically get a project approved and over the

finish line.

        Q       Okay.  In your time as a lobbyist, who would you

say would be the number one political official in the city of

L.A. who could help get a project across the finish line?

        A       One more time.

        Q       Sure.  So you said the ultimate goal for your

clients is to get their real estate development project over

the finish line; correct?

        A       Correct.

        Q       Looking at the city of L.A. during your time,

what public official would you say had the most power to do

1    that, to achieve that goal?

2        A    I would say -- well, if it was a project -- if it

3    was a project in CD-14, it was certainly going to be

4    Councilman Huizar.  But he also chaired the Planning and Land

10:52AM  5    Use Management Committee.  So he was in a position to -- even

6    if you had a project that was not in downtown, you would still

7    want to have a relationship with Councilman Huizar because he

8    chaired the committee.

9        Q    And it sounds like you also said, for projects in

10:52AM  10   his district, you would describe him how in terms of ranking of

11   influence?

12       A    The single most important person with absolute

13   authority over whether that project was going to move or not.

14       Q    And in the time you were a city lobbyist, where

10:52AM  15   were most of the projects in the city of L.A.?

16       A    In or around downtown Los Angeles.

17       Q    In Jose Huizar's district?

18       A    Yes.

19       Q    Focusing still on Jose Huizar -- let's back up a

10:53AM  20   little bit.

21            When did you first meet him?

22       A    I met him when he was on the -- I first met him

23   when he was on the L.A. Unified School District School Board,

24   but we really didn't develop a relationship until he was a

10:53AM  25   council member.

1206

1   Q   At some point did you become closer to him when

2   he was a council member and your lobbying business progressed?

3   A   Yes.

4   Q   And you mentioned he was on the PLUM Committee,

10:53AM   5   the Planning and Land Use Management Committee?

6   A   Yes.

7   Q   And you mentioned his position on that was what?

8   A   He was the Chairman.

9   Q   Are you also aware of him being on other relevant

10:53AM   10   committees to your lobbying business?

11   A   He was also on the Economic Development

12   Committee.

13   Q   Also known as EDC?

14   A   Yes.

10:53AM   15   Q   As the chair of PLUM, what was your understanding

16   of what value he could provide your clients as the chair of

17   PLUM, Jose Huizar?

18   A   Well, he set the agenda for the committee.  He

19   basically would be the one who would calendar the item.  He

10:54AM   20   would be the one who would potentially make changes to the item

21   and make any amendments or corrections to an item that may have

22   been changed, for example, at the commission level.  He would

23   be the one who would make the changes at PLUM, and then those

24   items would go on to council.

10:54AM   25   Q   Is that the scenario you described or maybe a

1  lower level commission does something your developer client

2  doesn't want and he wants it fixed in PLUM, that's something

3  Jose Huizar could do?

4      A      Yes.

10:54AM  5      Q      Okay.  And would you advise your clients to, in

6  effect, get on Jose Huizar's good side?

7      A      Very much so.

8      Q      And how would you advise your clients to get on

9  Jose Huizar's good side?

10:54AM  10      A      Wine and dine him and support him and his causes.

11      Q      By support his causes, do you mean financially?

12      A      Yes.

13      Q      And by causes, can you give us some examples of

14  causes you're aware that Jose Huizar wanted your clients to

10:55AM  15  donate to?

16      A      On the nonprofit level, it could be Salesian High

17  School, it could be La Puente Learning Center.  For him

18  personally, it would be his re-election committee.  It would be

19  his officeholder committee.

10:55AM  20      Q      And would -- you mentioned Salesian High School.

21      A      Yes.

22      Q      Were you aware that Jose Huizar's wife was a paid

23  employee for Salesian High School during this time?

24      A      I knew she was -- I knew she was there.  I did

10:55AM  25  not know she was a paid employee.

1    Q    Was it a concern of you or your clients about --

2  we talked about how to get on Jose Huizar's good side, as you

3  just described.  Was it a concern for you or your clients about

4  getting on Jose Huizar's bad side?

10:55AM   5    A    Yes.

6    Q    And why?

7    A    Because, just as he could be your friend, he

8  could be your enemy.  And Jose's perspective, and my experience

9  with him knowing him through the years, is either you were with

10:56AM  10  him or you were against him.

11    Q    How would you describe, during this time period,

12  your level of access that you had to Jose Huizar in

13  Council District 14?

14    A    Very good.

10:56AM  15    Q    What does that very good access look like in

16  terms of practicalities?

17    A    The ability to get meetings right away.  The

18  ability to get calls returned.  The ability to text him, to get

19  responses back.  The ability to, if I couldn't get in to see

10:56AM  20  him, the ability to get a meeting with Paul Habib, his chief of

21  staff, or Shawn Kuk, his chief planning director.  Those types

22  of things.

23    Q    And was that very good access you had to

24  Jose Huizar something that was financially valuable to you as a

10:56AM  25  lobbyist?

1       A       Yes.  Very much so.

2       Q       Was that something that could help you increase

3   your fees?

4       A       Yes.

10:56AM  5       Q       Would that help you increase your branding and

6   what types of clients you could recruit?

7       A       Yes.

8       Q       How dependent, would you say, your lobbyist

9   business in CD-14 was on having access to CD-14 and

10:57AM 10   Jose Huizar?

11       A       Very much so because I was identified as a friend

12   of the office, as a friend of Jose's.  If I was no longer in a

13   position to get meetings, get calls returned, if I ever went on

14   the outs, word gets around quickly that this person no longer

10:57AM 15   has access.

16               MR. JENKINS:  Let's put up Exhibit 1-2, please.

17   Sorry.  1-1.

18       Q       Do you recognize the person on the screen?

19       A       Yes.

10:57AM 20       Q       Who is that?

21       A       Ray Chan.

22       Q       How do you know Ray Chan?

23       A       Through his work at Building and Safety.

24       Q       And you're aware that Ray Chan is the defendant

10:57AM 25   in this case?

1    A       Yes.

2    Q       Did you work with the defendant at some point

3    when he was at Building and Safety?

4    A       To a certain degree.  He was always very helpful

10:57AM  5    with meeting with developers, wanting to kind of provide a

6    resource.  You know, he was always offering to bring in

7    different departments that were involved or -- that were

8    involved in the development project.  He always tried to make

9    himself and his staff accessible.

10:58AM  10    Q       You mentioned -- I think you said he was the

11    general manager?

12    A       He was the general manager of Building and

13    Safety.

14    Q       Was there a time that you came to learn that the

10:58AM  15    defendant's position as general manager at Building and Safety

16    became in jeopardy?

17    A       There was a proposal that was percolating around

18    city hall for quite a while about -- to potentially merge

19    Planning and Building and Safety into sort of a super economic

10:58AM  20    development department.

21    Q       And in that super economic development

22    department, did you have an understanding of what effect it

23    would have on Ray's leadership over LADBS?

24    A       Well, it was -- as I understood it, the proposal

10:58AM  25    would have put Michael LoGrande who was the Planning director

1    in the general manager position and Ray as Building and Safety

2    in the No. 2 position.

3         Q       So essentially he would have been demoted?

4         A       Yes.

10:59AM   5         Q       Based off your experience in the City, was going

6    from a head of a department to no longer the head of a

7    department a good career trajectory?

8         A       Probably not.

9         Q       Based off your observations of the defendant

10:59AM   10   around this time, did he appear to be concerned about that

11   possible downward trajectory of his career?

12        A       I would -- I never discussed it with him

13   personally, but it would be my assumption that he was.

14        Q       Let me ask this question.

10:59AM   15        Did you around that time begin to see

16   Defendant Chan reaching out to other people to try to curry

17   support to keep his position?

18        A       Yes.  During this time on a parallel track, I

19   guess you could say, Councilman Wesson was setting up meetings

10:59AM   20   with prospective council candidates --

21        Q       Let me interrupt.  Who was Council Member

22   Wesson's chief of staff at that time?

23        A       Deron Williams.

24        MR. JENKINS:  Put up 1-21.

11:00AM   25        Q       Was Deron Williams part of some of these meetings

```
 1    you're going to describe?

 2         A      Yes.

 3         Q      All right.  Please continue.

 4         A      So I had a relationship with Deron and

 5    Michael Bai who was also working for Councilman Wesson at the

 6    time --

 7                THE COURT:  I think we need a question.  I think

 8    you were taken off track here.

 9                THE WITNESS:  I'm sorry.

10         Q      BY MR. JENKINS:  So my question is at some point

11    did you come to observe that Defendant Chan was trying to curry

12    political support to save his job?

13         A      Yes.

14         Q      Can you describe that?

15         A      At this time Deron and Michael, who worked for

16    Councilman Wesson, were setting up these sort of informal

17    mixers with prospective council candidates that their office

18    was going to support.  There were a small group of us who were

19    invited, and Ray was at some of those meetings.

20         Q      And based off your observations, did it appear to

21    you that Chan wanted to keep his job at LADBS?

22         A      Again, we never discussed it, but that would have

23    been my assumption.

24         Q      Okay.  Let's switch topics and talk about

25    Richelle Rios.
```

1          So if we can put up previously admitted 1-20.

2          Do you know when Jose Huizar was scheduled to

3     term out or when he could no longer run for the CD-12 {sic}

4     council member spot?

11:01AM    5          A     2020.

6          Q     December 2020?

7          A     Yes.

8          Q     Did Huizar, based off your conversations with

9     him, have a plan of who he wanted to succeed him?

11:01AM   10          A     He wanted his wife to succeed him on the council.

11          Q     How do you know that?

12          A     He told me.

13          Q     Was it a frequent topic of discussion or

14     infrequent topic of discussion?

11:01AM   15          A     It was just something that popped into his head.

16     I mean, I can't speak to when it happened.  It was just

17     something that he just got the idea.  He started talking about

18     it.  I had conversations as well with Art Gastelum who was a

19     good friend of his.  Art started talking about the merits of

11:02AM   20     having Richelle run, and it just sort of became the plan.

21          Q     Based off your discussions with Jose Huizar, what

22     level of importance would you describe Jose Huizar ascribe to

23     having his wife succeed him in CD-14?

24          A     Single most important to him.

11:02AM   25          Q     The single most important thing to him?

1       A       Yes.

2       Q       What value are you basing that on or what is your

3    basis to provide that value that Huizar ascribed to it?

4       A       Just in conversations the way he described it.

11:02AM    5       Q       Now let's talk about you.  Did you also want to

6    support Richelle Rios's candidacy to succeed Jose Huizar's seat

7    in CD-14?

8       A       Yes.

9       Q       Why?

11:02AM   10       A       A couple reasons.  One, I had several clients

11   in -- with projects in that district, and I knew that Jose was

12   going to be soliciting those clients.  So it was definitely --

13   we certainly were not -- we certainly weren't going to be in a

14   position to support someone who ran against her.  So there was

11:03AM   15   definite motivation on our part to sort of support the home

16   team.

17              Secondly, the obvious advantage of being on the

18   ground floor with a new council member who would be there

19   potentially for 12 years was something that would be incredibly

11:03AM   20   marketable.

21       Q       To your lobbying?

22       A       Yes.

23       Q       And is it fair to say you were interested in

24   maintaining that very good access you had to Jose Huizar

11:03AM   25   through his wife?

1        A        Exactly, yes.

2        Q        And you mentioned being on the ground floor.  Is

3   it fair to say you sort of already had an apartment there

4   because you were invested in Jose Huizar?

11:03AM   5        A        Yes.  But the thought being that he would no

6   longer be there, I wanted to be on the ground floor with his

7   heir apparent.

8        Q        And being on the ground floor with his heir

9   apparent, how do you believe that would enhance your lobbying

11:04AM   10  business?

11        A        Because I would be able to say I had access to

12  the new council member for downtown.

13        Q        Do you know whether or not Richelle Rios knew

14  anything about real estate development at that time?

11:04AM   15        A        I don't know.

16        Q        Did she ever talk to you about her thoughts and

17  views on real estate development?

18        A        No, not at all.

19        Q        When you did hear Richelle Rios talk about city

11:04AM   20  issues, did she appear to have a strong grasp on real estate

21  development?

22        A        Not particularly.

23        Q        All right.  Let's switch topics again and go to

24  fundraising.

11:04AM   25                 Was there a time where you were active in

```
 1   political fundraising?

 2         A      Yes.

 3         Q      Approximately what years?

 4         A      From 2004 through 2020.

 5         Q      And have you -- in what capacities have you

 6   participated in fundraising?

 7         A      Hosted countless events for candidates and

 8   council members at my office, was constantly getting solicited

 9   by council members almost day and night, sometimes on Jewish

10   High Holy Days.  It was sort of a 24/7 activity.  You sort of

11   knew which days not to answer your telephone.

12         Q      And having participated, it seems, in depth in

13   that fundraising process, are you aware there is a line between

14   legal fundraising and illegal bribery?

15         A      Yes.

16         Q      And are you aware that trading in an otherwise

17   legal political contribution in exchange for a political act

18   crosses into the illegal zone?

19         A      Yes.

20         Q      Because why?  What is that?

21         A      It's bribery if you're -- if you're paying for an

22   action, for a legislative action, that's bribery.

23         Q      Even though that it's an -- otherwise a political

24   contribution; right?

25         A      Yes.
```

```
 1          Q       At some point did you help in the creation of a
 2   Political Action Committee or PAC?
 3          A       Yes.
 4          Q       Just very high level, not too much, what is a
 5   PAC?
 6          A       A PAC is an independent committee separate from
 7   the elected official that can accept contributions to support
 8   issues or candidates.
 9          Q       And as far as you understand it, do some PACs
10   have a different contribution limit, the maximum someone can
11   donate?
12          A       Yes.
13          Q       What is a general purpose PAC?
14          A       A general purpose PAC is a PAC that is
15   independent from a candidate.  It is designed to support
16   multiple candidates, multiple issues, and it does not have any
17   contribution limits.
18          Q       So an individual or an entity can donate as much
19   as they want to this general purpose PAC?
20          A       Correct.
21          Q       But there's certain rules according to California
22   law about how that PAC can operate?
23          A       Yes.
24          Q       And who can operate it?
25          A       Yes.
```

1218

1        Q       And how the money can be spent?

2        A       Yes.

3        Q       And are there certain rules about firewalls and

4    things like that about who can be on one side and control

11:07AM  5    certain --

6        A       Yes.

7        Q       Okay.  And what PAC did you help create?

8        A       A PAC called Families for Better Los Angeles.

9        Q       Did you name that PAC?

11:07AM  10       A       Yes, I did.

11       Q       At whose direction did you create the PAC?

12       A       Jose Huizar.

13       Q       Was anyone else involved in the creation for --

14   can we just call it the Families PAC.  If we call it Families,

11:07AM  15   we are talking about the same one?

16       A       Yes.

17       Q       Who else was involved in the creation of the

18   Families PAC?

19       A       Art Gastelum as a friend/fundraiser of Jose and

11:07AM  20   George Esparza.

21       Q       Do you see in the bottom left quadrant --

22   Special Agent Civetti has put up page 11 of Exhibit 1.  Do you

23   recognize that person as Art Gastelum?

24       A       Yes.

11:08AM  25       Q       And you see George Esparza in the bottom right?

1        A        Yes.

2        Q        At a high level, what was this group's goal --

3        what were the goals in developing a PAC?  What was the point of

4        the Families PAC?

5        A        The point of the Families PAC was to raise large

6        contributions into the committee to build up a sizable war

7        chest, for lack of a better term, that would primarily benefit

8        Richelle's candidacy.

9        Q        Whose ultimate design was that?

10       A        That was Jose's.

11       Q        Did you have discussions with Jose Huizar about

12       the value of -- if his wife runs to succeed him and she comes

13       out with a large war chest through this PAC, how that could

14       affect her chances in an election?

15       A        It would potentially scare off -- he wanted to

16       have a large war chest.  His goal was to potentially scare off

17       challengers.

18       Q        From his wife?

19       A        Yes.

20       Q        And how was the PAC -- the Families PAC to be

21       structured?  Who was going to be -- who was going to do what?

22       Who was in charge of it?  When you had these conversations, how

23       was it supposed to be created?

24       A        Well, I explained to Jose that he could not -- he

25       could not be involved with it because it was going to be

1    supporting his wife.  What George and I discussed was that Jose

2    needed to find someone who could be the face of the committee,

3    find a treasurer and that George and I would essentially run

4    it.  We would raise money.  We would, you know, go out and pick

11:09AM    5    up checks, those types of things.  We just needed someone who

6    was going to be able to be the treasurer, someone who would

7    control it.

8         Q       In the first part of your answer you said that

9    Jose Huizar shouldn't be in control of it because effectively

11:09AM   10    it's a PAC to help his wife?

11         A       Right.  Yes.

12         Q       So your understanding of the PAC laws is that

13    would create some conflict?

14         A       Yes.  It would be illegal.

11:10AM   15         Q       And it would be illegal because -- again, just

16    focusing on it, a general purpose PAC versus a candidate

17    specific PAC, what's the difference?

18         A       Like I explained to Jose at the time, if he

19    opened a committee that was going to specifically support

11:10AM   20    Richelle, it was going to be bound by the contribution limits

21    associated with an L.A. City Council campaign.  What he wanted

22    to do was have the ability to raise, you know, 25,000, 50,000

23    at a pop.  And the only way you could get those types of

24    contributions would be through a general purpose committee.

11:10AM   25         Q       So if it was a candidate run PAC, those limits

1   are $700, $800, something like that?

2          A        Something like that.

3          Q        Okay.  Do you recall having a telephone

4   conversation with Jose Huizar where Richelle Rios is on the

11:10AM   5   line about this PAC around June 2nd, 2017?

6          A        Yes.

7          Q        Okay.  And at that time did you know the FBI was

8   wiretapping Jose Huizar's phone?

9          A        I did not know that.

11:11AM  10          Q        In preparation for your testimony, have you

11   reviewed an audio and transcript corresponding with that call?

12   An audio recording and a transcript corresponding to that call?

13          A        I'm sorry.  I don't understand.

14          Q        We will play it, and I will answer my own

11:11AM  15   question.

16                  Let's look at Exhibit 161-B.

17                  THE COURT:  That was previously admitted?

18                  MR. JENKINS:  Yes, Your Honor.  Previously

19   admitted 161-B.

11:11AM  20                  Just play it real quickly and pause,

21   Special Agent Civetti.

22                  (The audio commenced playing before the jury.)

23          Q        BY MR. JENKINS:  Do you recognize what we're

24   looking at now?

11:11AM  25          A        Yes.

1          MR. JENKINS:  We will continue playing this.

2    This is a phone call on June 2nd, 2017, between Jose Huizar and

3    Morrie Goldman.

4          (The audio commenced playing before the jury.)

11:12AM   5    Q      BY MR. JENKINS:  Mr. Goldman, we hear you

6    reference here a couple times, "We need someone who can sort of

7    be the face of it, like an extended family member or a really

8    good friend of the family."

9          Did you hear you discuss that?

11:13AM   10   A      Yes.

11   Q      And this is the Families PAC which is a general

12   purpose PAC?

13   A      Yes.

14   Q      What were you describing to Jose Huizar about how

11:13AM   15   this PAC should at least appear on paper?

16   A      It needed to have someone who could be a

17   treasurer.  It was someone who was going to basically sign the

18   campaign report, someone who was going to approve check

19   requests, someone who was going to cut checks, those sorts of

11:13AM   20   things.

21   Q      And were you describing for Jose Huizar how a

22   general purpose PAC should operate legally?

23   A      Yes.

24   Q      And based on your conversations with Jose Huizar

11:13AM   25   about the specific PAC, is that how he wanted this PAC to

1     operate?

2          A     No.

3          Q     And how did he want this PAC to operate?

4          A     He wanted someone who was going to be in charge

11:13AM  5     of the committee that was basically going to make sure that it

6     supported Richelle.

7                MR. JENKINS:  And we're going to play previously

8     admitted Exhibit 162.  I don't know if the Court's audio can

9     hear it up there.  It's a little quieter back here.  I have it

11:14AM  10    on maximum volume up here.  But I wanted to make sure the Court

11    can hear or Ms. Reilly can confirm the audio is good up there.

12                THE COURT:  I can hear it.

13                MR. JENKINS:  Okay.  162 previously admitted.

14                (The audio commenced playing before the jury.)

11:15AM  15    Q     BY MR. JENKINS:  Do you hear reference to -- in

16    that conversation that Jose Huizar makes to Justin?

17         A     Yes.

18         Q     And do you have an understanding of who that

19    person is?

11:15AM  20    A     Justin Kim.

21         Q     And what is the discussion about what the

22    potential problem is if Justin Kim is part of this PAC?

23         A     Well, that gets to the heart of the matter is

24    that whoever is going to be treasurer of that committee is

11:16AM  25    going to have control over how those funds are spent which is

1    why I was saying to him, you need to have somebody who you're

2    going to trust because, you know, you could have someone who is

3    treasurer of that committee, there's a falling out, and then

4    that person could potentially earmark those monies for a

11:16AM  5    candidate who wasn't Richelle.

6        Q       And did you also hear Jose Huizar in that clip

7    say something to the effect of "There's a million dollars

8    standing in committee.  I'm supposed to have not anything to do

9    with it.  I'm supposed to not have anything to do with it."

11:16AM  10   Did you hear him reference that a couple times?

11       A       Yes, I did.

12       Q       Was it your understanding that Jose Huizar wanted

13   nothing to do with how this money was spent?

14       A       No.  I think quite the opposite.  He would often

11:17AM  15   ask me how much money is in the committee, what are you

16   spending money on?  We once had a meeting in his office, and he

17   started the -- he started a conversation about, hey, let's talk

18   about campaign consultants.  Let's talk about posters.  I just

19   sort of looked at him, and I said, why are we discussing this?

11:17AM  20   There is no money in the committee.

21       Q       What was your concern with Jose Huizar asking you

22   about how the PAC was going to spend its money?

23       A       Because he was going to want to micromanage it

24   when that was not the way it was supposed to run.  I mean, the

11:17AM  25   ideal situation, we had hoped, was that there was going to be a

1    firewall around him.  The fact he wanted to start micromanaging

2    how those monies were spent was really concerning.  Several

3    months down the road -- this is probably in 2018 -- he on more

4    than one occasion, at least two or three times, said, hey, we

11:18AM  5    need to talk about merging his PAC -- this PAC, the Families

6    PAC with Michael Trujillo's community support PAC.

7        Q      Let me break that up a little bit.  You mentioned

8    micromanaging a couple times.  You're not just talking about

9    Jose Huizar being a sort of hands-on boss; right?  Was it the

11:18AM  10   micromanagement part, or could Jose Huizar have any control or

11   influence over how that money was spent?

12       A      He was not supposed to have any.

13       Q      And then as a result, based off your

14   conversations with him, he expresses a desire to have some

11:18AM  15   influence --

16       A      Yes.

17       Q      -- micromanaging influence of how that money was

18   spent?

19       A      Yes.

11:18AM  20       Q      Is that inconsistent or consistent with the laws

21   on general purpose PACs?

22       A      Inconsistent.

23       Q      Then when there's some conversation about how he

24   couldn't do that, what was his response about what he wanted to

11:18AM  25   do in response to you telling him that the Families L.A. PAC

1    couldn't be under his control?

2        A    He started bringing up the notion of merging the

3    Families PAC with Michael Trujillo's Community Support PAC.

4        Q    Who is Michael Trujillo, and what is that

5    Community Support PAC?

6        A    Michael Trujillo is a political consultant who

7    has a close work -- I don't know the nature of their -- he has

8    a close relationship with Jose.  They have done a lot of work

9    together.

10       Q    Let me ask more directly.

11            What was your understanding of what difference

12   there would be if there was the Families for L.A. PAC run by

13   somebody else or the Community PAC that was run by

14   Mike Trujillo?  Why would Jose Huizar care where the monies

15   went based on your communications with him?

16       A    I think Jose felt he was going to have greater

17   control over how those monies were spent with Trujillo's

18   Community Support PAC.

19            MR. JENKINS:  Let's just finish playing for the

20   record the rest of 162.

21            (The audio commenced playing before the jury.)

22       Q    BY MR. JENKINS:  Two questions on this last part.

23            First, you make a reference to seed money.  Can

24   you explain to the jury what you are interested in about having

25   seed money in the Families PAC?

1    A    Seed money is just money to get the committee

2  started, money that will show up on a campaign report that

3  shows Families has 50,000, Families has 100,000 just so that it

4  becomes a viable entity.

11:21AM  5    Q    Is this part of the plan to try to scare off

6  other potential Richelle Rios opponents?

7    A    Yes.

8    Q    Toward the end of that call, you referenced, "We

9  have an end game."  Who has an end game, and what is it?

11:21AM  10    A    The end game was getting Richelle elected to

11  City Council.

12    Q    And who was in that mission, according to you?

13  In that phone call who are you talking about?

14    A    I'm sorry.  I'm talking to Jose in this.

11:21AM  15    Q    So you and Jose, the goal of the PAC is to get

16  Richelle Rios elected?

17    A    Yes.

18    MR. JENKINS:  You can take that down.

19    Q    Still focusing on the Families PAC, did Jose

11:22AM  20  describe for you who you or who he was going to hit up for

21  these contributions?

22    A    We discussed -- we would meet somewhat regularly.

23  We would discuss projects that I had coming down the pike.  He

24  would identify lobbyists.  He would identify land use

11:22AM  25  attorneys.  He would identify projects.  He was getting a list

1    of regular projects that were coming in -- that were coming

2    down the pike for PLUM and that were coming into CD-14 from

3    Shawn Kuk, his planning director.

4         Q     And sort of at a high level, would Jose Huizar

11:22AM  5    identify people who needed his help to hit up?

6         A     Yes.

7         Q     Who would make these asks?  Would he make some of

8    them?

9         A     He would make a lot of them.  I would make the

11:22AM  10   asks of my clients.

11        Q     Sorry to interrupt.

12              When you would make the asks of your clients, how

13   would you describe the Families for L.A. PAC and why they

14   should donate to it?

11:23AM  15        A     I would describe the PAC as this is a PAC that is

16   going to support Richelle and other pro-development candidates

17   in downtown or with an interest in development in downtown.

18        Q     And when you made that PAC pitch, would you

19   always mention Richelle Rios?

11:23AM  20        A     Always.

21        Q     Was there ever a time when you didn't mention

22   Richelle Rios?

23        A     I don't think so.

24        Q     Why would you always mention Richelle Rios when

11:23AM  25   making this PAC pitch?

1    A    Two reasons.  One is because Richelle was going

2  to be a major recipient of the funding, and also, I wanted to

3  reiterate this was something that was important to Jose.

4    Q    It is fair to say this should have been a general

11:23AM  5  purpose PAC for a host of potentially pro-development

6  candidates; right?

7    A    Yes.

8    Q    But the only one you ever mentioned was

9  Richelle Rios; is that correct?

11:23AM  10    A    Yes.

11    Q    Was that by design between you and Jose Huizar?

12    A    I don't know that it was so much by design as

13  much as there was no other candidate he ever identified.

14    Q    Okay.  Now, when Jose Huizar would either ask you

11:24AM  15  to hit up developers who needed his help, did you have an

16  understanding of why he wanted those specific developers hit up

17  for contributions?

18    A    I'm sorry.  One more time.

19    Q    Did you ever see Jose Huizar leverage his

11:24AM  20  official position and people's need to get contributions?

21    A    Yes.  There were instances where he would hold

22  items hostage in PLUM until those -- or until those clients --

23  excuse me, not clients -- until those developers contributed.

24  There were instances when I would reach out to him for help on

11:24AM  25  behalf of certain clients, and the first thing he would say to

```
 1   me is, well, have they been helpful?

 2        Q     And what would you interpret that when you have a

 3   client that's a developer, has some need, some ask from

 4   Jose Huizar's office, some routine request; right?

 5        A     Yes.

 6        Q     And you go to Jose Huizar and his first response

 7   to your request on behalf of your client is have they been

 8   helpful?  What did you understand Jose Huizar to be asking you

 9   in those conversations?

10        A     He wanted to know if they had made political

11   contributions to him.

12        Q     If you answered yes or no, would that affect the

13   level of assistance or not that they got?

14        A     Most likely I would think so.

15        Q     Now would you describe Jose Huizar's City Council

16   assistance providing as transactional?  Non-transactional?  How

17   would you describe it?

18        A     Transactional.

19        Q     What do you mean by that?

20        A     He was very much interested in what was in it for

21   him.

22        Q     And when -- when he wanted to know what was in it

23   for him, excuse me, what do you mean?  What was the "it" that

24   he was looking for?

25        A     He wanted to know if they -- if they had made
```

1231

political contributions, if they were going to make political

contributions, if they had been supportive.

Q       In some of these conversations, did Jose Huizar

ever convey to you that he wanted you to convey to your

11:26AM  developer clients how helpful he had been or could be?

A       Yes.  Yes.  Multiple times he would ask me, hey,

do they know how much I have done for them?  Do they appreciate

what I'm doing for them?

Q       And what was your understanding, based off you

11:26AM  going -- being sort of the go-between, right, between your

clients and Jose Huizar, when he's asking you, hey, do your

clients know how helpful I have been, what message do you

understand he was trying to convey to your clients?

A       Are they being appreciative?  Are they showing

11:26AM  their appreciation by supporting him.

Q       Was Jose Huizar interested in expressing how

valuable he could be to your clients?

A       Yes.

Q       All right.  Let's focus more -- let's go back to

11:27AM  Ms. Rios, 1-20.  Did you get a sense of -- did you have

conversations with Richelle Rios about her candidacy?

A       No.

Q       Did you observe her when she was sort of

transitioning from thinking about being a candidate to then

11:27AM  when she announced?

1    A      No.

2    Q      You hosted a fundraiser though for her?

3    A      I did host a fundraiser for her.  But at that

4    point she was already -- she was an announced candidate.

11:27AM    5    Q      So either when she was considering her candidacy

6    or when she became a candidate, did you have an opportunity to

7    observe her in her --

8    A      Yes.

9    Q      Okay.  And did you ever get a sense of whether or

11:27AM   10    not Richelle Rios was enthusiastic about being a CD-14

11    candidate?

12    A      I never had that discussion with her.  I did

13    not -- in the instances I had seen her, I did not note

14    particular enthusiasm.  The event that I hosted at my office

11:28AM   15    for her is always an opportunity for new candidates to sort of

16    work on their stump speech and explain, hey, this is why I want

17    to be the council member, this is what I want to do.  And she

18    really -- I'm trying to think how I want to express it.  She

19    really was not impressive.  It really did not strike me as

11:28AM   20    someone who really had the fire in their belly for it.

21    Q      So your, say, subpar review of her stump speech,

22    did that inform you of whether or not you thought she was

23    enthusiastic of running?

24    A      Yes.  If I was going to base it on her stump

11:28AM   25    speech, I would say, yeah, it didn't really look like she was

```
 1   very enthusiastic about running.

 2        Q     Do you have an understanding about whether anyone

 3   was pushing her to succeed her husband in CD-14?

 4        A     I don't think I understand your question.

 5        Q     Do you know who, if anyone, was pushing

 6   Richelle to run to succeed Jose Huizar?

 7        A     I would think Jose, and I would think probably

 8   Art.

 9        Q     Okay.  Let's switch topics again.  We're going to

10   still focus on the Families PAC, but we will bring it back to

11   Defendant Chan.

12              Was there a time in 2018 where Jose Huizar asked

13   you to solicit political contributions from Defendant Chan on

14   behalf of Richelle Rios?

15        A     Yes.

16        Q     And did Huizar tell you whether or not he had

17   already had a conversation with Defendant Chan about that

18   concept, donating to Richelle Rios's campaign?

19        A     As I recall the conversation, we were going over

20   a bunch of people, and Ray was one of them.  And he said, hey,

21   I talked to Ray.  Follow up with him.

22        Q     And was it your understanding when Jose says,

23   hey, I talked to Ray, follow up with him, that Chan had agreed

24   to donate to Richelle Rios?

25        A     That was my assumption.
```

1    Q       Okay.  And did you follow that direction from

2    Jose Huizar and talk to Ray Chan about donating to

3    Richelle Rios?

4    A       Yes.  I think I saw Ray at an event and said,

11:30AM   5    hey, Jose wants me to meet up with you to talk about the PAC.

6    He said, yes, absolutely.  I think we might have swapped

7    numbers and something -- something along those lines, and we

8    scheduled a time to meet for lunch.

9    Q       In your conversation with Jose Huizar, did he

11:30AM   10   tell you where he wanted Defendant Chan to provide those

11   contributions, to what entity?

12   A       To the Families PAC.

13   Q       The one we have been talking about?

14   A       Yes.

11:30AM   15   Q       And when you had that conversation -- at some

16   point you had a conversation with Defendant Chan about

17   contributing to the Families for -- the Families PAC?

18   A       Yes.

19   Q       And what was his response?

11:31AM   20   A       Okay.  Yes.

21   Q       And at some point after he said yes to donate to

22   the Families PAC, did you have an understanding of where

23   Defendant Chan was going to get the money?

24   A       I didn't at the time of the lunch.  After the

11:31AM   25   lunch, I think we exchanged e-mails.  He asked me a question

```
 1    about the committee.  I sent him a remit.  I answered a
 2    question and sent him the remit.  A short time after that, I
 3    got a phone call from Kevin Chen.
 4                 MR. JENKINS:  So let's put up on the right
 5    Exhibit 1-6.
 6         Q    Do you recognize the person on the right with the
 7    name Kevin Chen as the person we're talking about?
 8         A    I met him once.  So it's not really fresh in my
 9    memory.
10         Q    That's fine.  Was his name Kevin Chen?
11         A    Yes.
12         Q    Do you understand whether -- who is Kevin Chen
13    that you know?
14         A    Well, I met -- I had a conversation with him on
15    the phone, and that was about it.
16         Q    Sorry.  Let me interrupt and ask a better
17    question.
18              Are you aware of Kevin Chen having any projects
19    in Jose Huizar's district?
20         A    I was not at the time he and I spoke on the
21    phone.  I discovered that later.
22         Q    What did you discover?
23         A    Well, I ran into Ray at an event, and he
24    introduced me to Kevin.
25         Q    And at some point did Kevin or Ray tell you that
```

1    Kevin Chen had the Art District Center in CD-14 that he was

2    trying to get through the city approval process?

3        A       Not that specifically.  I think Ray said

4    something to the effect of this is Kevin Chen.  He's got a

11:32AM  5    project in the Arts District.

6        Q       All right.  So you understand that Kevin Chen has

7    a project in the Arts District.

8        A       Yes.

9        Q       And then ultimately did you understand that the

11:33AM  10   donation that Defendant Chan solicited to the Families PAC came

11   from Kevin Chen?

12       A       Yes.

13       Q       Okay.  We will get back to the details of that.

14   Keep it moving.

11:33AM  15           Let's go to 2017/2018 back to you and your work

16   for Carmel Partners.  We talked about Carmel Partners at the

17   beginning.  It's a major national real estate development

18   company.

19       A       Yes.

11:33AM  20       Q       They had this Cumulus, like the cloud, project.

21       A       Yes.

22       Q       You also mentioned a Mateo project; right?

23       A       Yes.

24       Q       M-a-t-e-o?

11:33AM  25       A       Yes.

1    Q    Where was the Mateo project located?

2    A    In the Arts District.

3    Q    All right.  And Arts District, again,

4    Downtown L.A. --

11:33AM   5    A    CD-14.

6    Q    Huizar's district.

7    A    Yes.

8    Q    Just high level, what did that project consist

9    of?  What were they trying to build?

11:33AM   10    A    They wanted to build a major mixed-use project,

11    multi-family residential, commercial retail.  It was a very

12    complicated project.  It needed general plan amendment.  It

13    needed a height district change to allow it to go much taller.

14    Q    You said very complicated.  Needed a general plan

11:34AM   15    amendment or GPA?

16    A    Yes.

17    Q    Needed to go taller.  There are no towers in the

18    Arts District; right?  No big towers.  Bunker Hill in L.A. has

19    big towers.  Arts District no towers?

11:34AM   20    A    Yes.  This was going to be a big change for the

21    Arts District.

22    Q    As a result of that complexity, would it need a

23    lot of City approvals throughout it?

24    A    Yes.

11:34AM   25    Q    Who is your main point of contact at Carmel for

1      this project?

2           A       Neils Cotter.

3                   MR. JENKINS:  We will put up previously admitted

4      1-9.

11:34AM   5           Q       Is that Mr. Cotter on the screen?

6           A       Yes.

7           Q       And who is Neils Cotter related to

8      Carmel Partners?

9           A       He was the senior vice president in charge of

11:34AM  10     development in the Los Angeles area.

11          Q       Who did Mr. Cotter report to, as far as you

12     understood the hierarchy, at Carmel?

13          A       Ron Zeff.

14          Q       Is Ron Zeff the CEO or the owner maybe?

11:35AM  15          A       Yes.

16          Q       What was your role on the Mateo project?  What

17     were you supposed to be doing with Neils Cotter?

18          A       Basically helping to usher the project through

19     the entitlement process.  He had consultants that were doing

11:35AM  20     sort of the technical day-to-day work with the

21     Planning Department.  I was working on the political end with

22     the council office.

23          Q       And on the council office, who was your point of

24     contact at CD-14?

11:35AM  25          A       Shawn Kuk.

1          MR. JENKINS:  Put up 1-17 on the right, please,

2   Special Agent Civetti.  Previously admitted.

3          Q      Do you see a picture of Mr. Kuk on the right now?

4          A      Yes.

11:35AM  5          Q      Fair to describe -- what was Mr. Kuk's role at

6   CD-14, as you understood it?

7          A      He was the planning director.

8          Q      Based off your experience as a lobbyist, fair to

9   describe Mr. Kuk as one of the gatekeepers of CD-14?

11:36AM  10         A      Yes.  On planning issues.

11         Q      He is an important person on planning issues?

12         A      Yes.

13         Q      One of the most important?

14         A      Yes.

11:36AM  15         Q      Focusing on the Carmel project still, did

16  Jose Huizar ever link his help in his official capacity to

17  whether or not a developer had benefited him financially

18  related to the Carmel project?

19         A      I'm sorry.  Can you elaborate?

11:36AM  20         Q      Yes.  Let's look at first -- leave that there for

21  a second.  Do you recall a specific text message where you are

22  discussing with Jose Huizar something that Neils Cotter wants

23  on behalf of the Mateo project and Mr. Huizar responds, "Have

24  they contributed?"

11:36AM  25         A      Yes.  I do recall.

1    Q        Let's look at previously admitted Exhibit 141- --

2    just the one page first.  See at the top there it says text

3    message thread between you and Jose Huizar?

4    A        Yes.

11:37AM  5    Q        And then we will zoom in on the four messages

6    starting at the top.  The date is January 8, 2018.

7            Just for context, at this time are you working as

8    a consultant for the Mateo project on behalf of Carmel and

9    Neils Cotter?

11:37AM 10    A        Yes.

11    Q        And this is the complex project that needs a lot

12    of City approvals?

13    A        Yes.

14    Q        And it is in Jose Huizar's district?

11:37AM 15    A        Yes.

16    Q        I will -- you are the green here.  I will read

17    the blue on behalf of Jose Huizar.  "Let's do the PAC stuff

18    later this week.  See you there at 6:00.  What's the purpose of

19    tonight's meeting?  Are they gonna help with the PAC?"

11:37AM 20            Read your part.

21    A        "Neils wants to talk about their Mateo project

22    and see if you're comfortable with the height and affordability

23    levels."

24    Q        "Are they going to help with the PAC?"

11:37AM 25    A        "I'm sure they will.  However, as your friend,

1    let's discuss this in a different text thread."

2        Q      So when Jose Huizar asks you -- when you respond

3    to Jose Huizar -- Neils is Neils Cotter?

4        A      Yes.

11:38AM   5        Q      "Wants to talk about their Mateo project and see

6    if you're comfortable with the height and affordability

7    levels."  Focusing on the height and affordability levels, are

8    these two entitlements that Jose Huizar is going to need to

9    vote on?

11:38AM  10        A      Yes.

11        Q      And when Jose Huizar is asking you what is the

12    purpose of tonight's meeting, is your response, that

13    Neils Cotter is going to talk about these entitlements?

14        A      Yes.

11:38AM  15        Q      When he responds for the second time "Are they

16    going to help with the PAC?" -- do you see that there?

17        A      Yes.

18        Q      Your response implies that you're a little

19    concerned by his response?

11:38AM  20        A      More than a little.

21        Q      And why?

22        A      Because he was -- what he was talking about was

23    illegal, inappropriate, unethical.  He was tying the discussion

24    about the merits of a project specifically to whether or not

11:38AM  25    they were going to support a Political Action Committee.

1242

1    Q    And was this type of, I think you said,

2    inappropriate, unlawful linkage something that was rare to your

3    conversations with Jose Huizar, or was this one of the most

4    brazen?

11:39AM    5    A    No.  It happened on occasion, but this was the

6    most brazen or flagrant.

7              MR. JENKINS:  We can take that down.

8    Q    We're going to jump ahead.  That was January of

9    2018.  Now we're in August, about seven months later, 2018.

11:39AM    10              Do you recall that an issue came up related to

11   the Mateo project that threatened its continued viability?

12   A    Yes.

13   Q    And what issue came up in August 2018 that

14   threatened the Mateo project?

11:39AM    15   A    The Building Trades Union wanted the Mateo

16   project to be 100 percent union.  Neils did not want that.  He

17   did not want a project labor agreement because he felt it was

18   going to cost the project too much money, it was going to

19   potentially damage the project's viability and potentially kill

11:40AM    20   it.  And then he was afraid he was going to lose his job.

21   Q    And how can Jose Huizar help when a union appeals

22   a project?  What kind of things can Jose Huizar do to help with

23   that union opposition?

24   A    As it relates -- can you elaborate?

11:40AM    25   Q    Yeah.  Can Jose Huizar vote against it?

1    A     Yes.  Yes.  If a union or someone was appealing a

2    project, that appeal would ultimately go to PLUM Committee.

3         Q     And did this threat of a union appeal -- it

4    sounds like you said from Mr. Cotter's perspective it seemed to

11:40AM  5    be a significant deal.

6         A     He was freaking out about it, yes.

7         Q     Did he consider it maybe a death knell for the

8    project?

9         A     Yes.

11:40AM  10        Q     Maybe a death knell for Mr. Cotter's career at

11   Carmel?

12        A     Yes.

13             MR. JENKINS:  Let's look at previously admitted

14   Exhibit 142.

11:40AM  15        Q     This is a previously admitted text exchange

16   between -- first you see Mr. Cotter and yourself at the top.

17             Do you see that there, Mr. Goldman?

18        A     Yes.

19             MR. JENKINS:  And we will just zoom in on the

11:41AM  20   top.  That's good.

21        Q     So here we're in May of 2018, so around this time

22   period.  And do you see that Neils is in the blue telling

23   you -- Neils Cotter is telling you "Very important that

24   Shawn Kuk calls Kevin letting him know that he supports the

11:41AM  25   height, et cetera.  Please, please make sure this happens

```
 1    prior."
 2                    You say, "Yes, I have a call into Shawn."
 3                    Mr. Cotter responds, "Critical.  Would be a huge
 4    issue otherwise with those people attending."
 5                    First, a couple context questions.  Who is the
 6    Shawn that Mr. Cotter is please, please requesting you to
 7    contact?
 8         A        Shawn Kuk.
 9         Q        Jose Huizar's planning director?
10         A        Yes.
11         Q        Who is the Kevin, as you understand it, that
12    Neils Cotter is asking you to contact Shawn, to contact Kevin.
13    Who is the Kevin?
14         A        Kevin Keller.
15         Q        What is Kevin's role at this time?
16         A        He was a senior official in the
17    Planning Department.  I don't recall his exact title, but he
18    was pretty high up the food chain.
19         Q        And we talked about this sort of in broad
20    concepts earlier.  Is this an example of where a City Council
21    member's staff can try to influence another committee person?
22         A        Yes.
23         Q        And how is that happening here, at least as to
24    how Mr. Cotter wants it to happen?
25         A        Because the -- the ask here was to have Shawn
```

1  call Kevin and let him know that the council office supported

2  the project that Neils was proposing, that the council office

3  was comfortable with the height specifically.

4       Q    Okay.  You see Mr. Cotter says, "Critical.  Would

5  be a huge issue otherwise with those people attending"?  Do you

6  have a sense of sort of explaining what he means when he says

7  "with those people attending."  Do you know what he means?

8       A    Other people from the Planning Department.  I

9  think Vince Bertoni, the planning director, was going to be at

10 that meeting.

11      Q    And Mr. Cotter is concerned about Planning going

12 against the project?

13      A    Yes.

14           MR. JENKINS:  Let's zoom out and zoom into the

15 rest of them.

16      Q    And you see Mr. Cotter continues his own thread

17 of sending you text messages.  He responds, "Maybe Jose would

18 be willing to call Kevin."  That's Jose Huizar calling

19 Kevin Keller; right?

20      A    Yes.

21      Q    You respond, "Jose is traveling.  Not around this

22 week."

23           Mr. Cotter persists, "Can he put in a call?  I'm

24 just really concerned."

25           Let's zoom out.  Go to the next page and do the

1    first half.

2              Mr. Cotter continues, "Can you hound Shawn?  And

3    why can't Huizar put in a call?  Takes 5 minutes."

4              You respond, "He's in the Caribbean on a family

11:44AM    5    vacation."

6              Mr. Cotter responds, "Can he come to a meeting?"

7    referring to Shawn Kuk.

8              And you respond, "He's not going to a meeting in

9    Planning Department.  Shawn will let them know their position

11:44AM    10   and make the changes in PLUM."

11             When you're talking about Shawn is not going to

12   go to a meeting in Planning Department, he will let them know

13   their position and then make the changes in PLUM, can you

14   describe, again, what that second part means and make the

11:44AM    15   changes in PLUM?

16        A    What that means is that if the

17   Planning Department recommended a project that was not what

18   Carmel wanted, if the Planning Commission took an action on the

19   project which was not what Carmel wanted, the project as a

11:44AM    20   whole was going to go to the PLUM Committee and changes could

21   be made at the committee level before it went to council.

22        Q    Is this another example of the power of CD-14 to

23   give your clients what they want?

24        A    Yes.

11:45AM    25             MR. JENKINS:  Let's zoom out.  Let's do the last

```
 1    three blues or four blues.
 2         Q    Do you see Mr. Cotter persists, "We need to speak
 3    before noon or please pick up around noon.  This would be a
 4    disaster if they took a position to deny.  This meeting seems
 5    to be a really bad idea now.  When does Jose get back?"
 6              Did I read all those generally correctly?
 7         A    Yes.
 8         Q    Is this the freaking out that Mr. Cotter was
 9    doing as you're describing?
10         A    Yes.
11         Q    In response to the freaking out, who did
12    Mr. Cotter want to help him and his project?
13         A    Jose Huizar.
14              MR. JENKINS:  Okay.  Zoom out.
15         Q    Notwithstanding Mr. Cotter's freak out, is it
16    also true that Mateo project had some community support for its
17    project?
18         A    Yes.
19              MR. JENKINS:  Now let's look at exhibit
20    previously admitted 144.  First we will go to the top.
21         Q    We mentioned Ron Zeff.  That's the CEO/owner and
22    Neils Cotter's boss; correct?
23         A    Correct.
24         Q    We see Max Zeff.  This is a text message with
25    Max Zeff and yourself.  Who is Max Zeff?
```

1248

1       A       Max Zeff is Ron Zeff's son.

2       Q       So Neils Cotter, as he's freaking out, is also

3   working with the boss's son on this project?

4       A       Yes.

11:46AM  5       Q       Let's read the first four.  I will just read them

6   quickly here.

7               Essentially Max is asking you for an update on

8   project options in the blue.  There's, again, a reference to

9   "Also, did Shawn mention the PLUM for map on the 21st?  Just

11:46AM  10  needs to understand why."

11              And you respond -- why don't you read your

12  response.

13      A       "No projects yet, but I did speak to Huizar last

14  night.  I do think we will need one more meeting with him."

11:46AM  15              THE COURT:  Mr. Goldman, slow down a little.  The

16  court reporter has to take this down.  Start over again, but go

17  slow.

18              THE WITNESS:  I'm sorry.

19              "No projects yet, but I did speak to Huizar last

11:47AM  20  night.  I do think we will need one more meeting with him.  I

21  think he will get there.  Just think it will be a bit more

22  painful than we hope.  Regarding PLUM.  Shawn just laughed it

23  off as Planning getting overeager.  It isn't a big deal, and he

24  wasn't overly concerned by it."

11:47AM  25      Q       BY MR. JENKINS:  Mr. Zeff responds, "More painful

1     meaning more money."

2                We will go to the next group of messages.  Go all

3     the way to the bottom.

4                Then go ahead and read your response to when

11:47AM  5     Mr. Max Zeff says, "More painful equals more money?"

6                And what is your response?

7     A      "Yes.  He stressed that it is a heavy --" well,

8     heavy life -- it's actually, "He stressed that it is a heavy

9     lift."

11:48AM  10     Q      Focusing on that part, this text message,

11     according to the top, is August 14, 2018.  You previously

12     testified how around this time there was union opposition that

13     had developed to the project; right?

14     A      Correct.

11:48AM  15     Q      What is the heavy lift that you're talking about

16     that CD-14 is going to have to do in response potentially?

17     A      Potentially to go against organized labor who

18     were -- Jose's considered the building trades, most unions as

19     his political allies.

11:48AM  20     Q      So if Jose Huizar is going to do something in

21     opposition to unions, could that be potentially politically

22     risky to Jose Huizar?

23     A      Not so much to Jose Huizar -- not so much to

24     Jose Huizar because Jose was termed out in 2020.  Potentially

11:48AM  25     devastating to Richelle Huizar because they couldn't do

1    anything to Jose but they could definitely oppose Richelle and

2    support a candidate against her.

3      Q      And is that specific concern something that

4    Jose Huizar had expressed to you regarding Richelle Rios and

11:49AM   5    opposing the union?

6      A      Yes.

7      Q      Do you see here Mr. Zeff says, "Even with

8    community support and HCNC and LARABA explicit support for the

9    reduced affordable?" Are those two community groups who were

11:49AM   10    supporting the Mateo project?

11      A      Yes.

12      Q      And in response to Max Zeff telling you,

13    basically, hey, these groups support the project.

14          And what is your response to Max Zeff?

11:49AM   15      A      "Yes. Even with."

16      Q      And what are you telling him there? That even

17    though the Mateo project has these two -- community support of

18    these two neighborhood associations, what are you telling him

19    about whether or not this is going to be a heavy lift?

11:49AM   20      A      That irrespective of whatever community support

21    they had, that was not the support that was going to be as

22    important to Jose as the support of the building trades and/or

23    the potential reaction that the building trades would have on

24    Richelle.

11:50AM   25      Q      So in addition to Jose Huizar's concern about

1251

```
 1    basically the unions not supporting Richelle; right?

 2         A       Yes.

 3         Q       Or actively opposing her and supporting another

 4    candidate; right?  That was another concern?

 5         A       One more time.

 6         Q       So there's two concerns?

 7         A       Yes.

 8         Q       Jose Huizar wants union support for Richelle;

 9    right?

10         A       Correct.

11         Q       In addition, so that means the unions could

12    donate to her; correct?

13         A       Correct.

14         Q       Or the unions could not donate to anyone at all;

15    correct?

16         A       Correct.

17         Q       The third option is the union could support a

18    different candidate opposing Richelle?

19         A       Correct.  That was his real concern.

20         Q       Okay.  And then, in addition, your last text

21    message here you say, "It is the hit he will take with housing

22    advocates in *L.A. Times*."  So this seems to be a different

23    concern that Jose Huizar -- that you are expressing that

24    Jose Huizar had; right?  An additional one?

25         A       Yes.  This related -- as I recall, this piece
```

11:50AM (line 5)
11:50AM (line 10)
11:50AM (line 15)
11:50AM (line 20)
11:51AM (line 25)

1       related to the potential reduction in affordable housing.  The

2       Planning Department and Jose was asking for 11 percent.  Carmel

3       wanted to provide 6 percent.  And he was concerned he was going

4       to get criticized by the affordable housing advocates as well

11:51AM  5      as the *L.A. Times* for being too friendly with developers at the

6       expense of those who needed affordable housing.

7            Q       Too friendly with developers and hurting low

8       income access in Downtown L.A. when homelessness is a

9       significant media issue.

11:51AM 10            A       Yes.

11                 MR. JENKINS:  Okay.  We can take that down.

12            Q       Was Jose Huizar sensitive to how he was portrayed

13       in the media and social media?

14            A       Very much so.

11:52AM 15            Q       Was this something you talked about on more than

16       one occasion?

17            A       Occasionally.

18            Q       Now, around this time did you have a conversation

19       with Jose Huizar about helping the Carmel Mateo project

11:52AM 20       notwithstanding the union opposition?

21            A       Yes.

22            Q       Okay.  Did that happen on or around

23       September 4, 2018 -- September 2018 are you having that

24       discussion with him?

11:52AM 25            A       Yes.

1   Q       And just high level, what is your discussion with

2   Jose Huizar?  How does it go when you tell him obviously your

3   client wants to move this project forward.  They don't want the

4   unions on the project.  What is Jose Huizar's response?

11:52AM   5   A       His response is something to the effect that

6   Carmel was going to have to make it worth his while because of

7   the potential consequences to Richelle if he were to go against

8   labor.

9   Q       When Jose Huizar tells you Carmel is going to

11:52AM  10   have to make it worth his while to go against union in order

11   for him to protect Richelle, what do you understand Jose Huizar

12   to be telling you?

13   A       He was looking for some sort of financial

14   consideration.

11:53AM  15   Q       And after that communication, do you take back

16   that message to Neils Cotter?

17   A       Yes.

18   Q       And what do you convey to Neils Cotter about your

19   conversation with Jose Huizar where he mentions "They're going

11:53AM  20   to have to make it worth my while"?

21   A       Just -- I'm sorry.  Can you --

22   Q       Sure.  We did the Jose Huizar part of the

23   conversation.

24   A       Yes.

11:53AM  25   Q       Is that just you and Jose Huizar?

1          A          Yes.

2          Q          No Neils Cotter, no Carmel?

3          A          Right.

4          Q          Now, do you take that message back about it needs

11:53AM  5     to be worth Jose Huizar's while, do you take that message back

6     to Neils Cotter?

7          A          Okay.  Gotcha.

8          Q          You do?

9          A          Yes.  So I explained to him that it was going to

11:53AM  10    be a heavy lift, that Jose was really concerned about going

11    against organized labor and how organized labor was going to

12    take it out against Richelle and that he was really -- it was a

13    very huge lift.  Neils was extremely upset saying this is going

14    to kill the project and that he was going to lose his job.

11:54AM  15         Q          And so when Neils continues to express his

16    concern about the project and the job, do you offer a solution

17    about how to keep the project moving forward?

18         A          I suggested to him, look, if Jose is really

19    concerned about the consequences against Richelle and her

11:54AM  20    campaign, why don't you make a contribution or another

21    contribution to the Families PAC that was going to be

22    supporting Richelle?

23         Q          And what was your understanding when you're

24    offering or you're suggesting that Neils Cotter add an

11:54AM  25    additional contribution to the Families PAC, what would it be

1      in exchange for Jose Huizar doing?

2            A       To vote against labor.  To vote against the

3      building trades.

4            Q       What was Mr. Cotter's response to that?

11:55AM   5            A       He thought it was a great idea.

6            Q       Did you and Mr. Cotter discuss an amount that

7      would be added to the Families PAC contribution from Carmel to

8      make the union issue go away?

9            A       $50,000.

11:55AM  10            Q       You understand, Mr. Goldman, that offering that

11      amount to the Families PAC of $50,000 in exchange for

12      Jose Huizar making the union issue go away was a bribe?

13            A       Yes.  It was a bribe, and I deeply regret it.

14            Q       And at that point, had there -- why did you pick

11:55AM  15      the Families PAC?

16            A       Because that one was going to support Richelle's

17      candidacy.

18            Q       And had Carmel -- had you solicited Carmel

19      donations to that PAC previously?

11:55AM  20            A       Yes.

21            Q       At whose direction was that?

22            A       Jose.

23            Q       So was that the PAC that Jose wanted money to go

24      to?

11:55AM  25            A       Yes.

1                    MR. JENKINS:  Zooming out a little bit, during

2      the time that the Mateo project was pending, how much in

3      contributions did you solicit on behalf of Carmel Partners to

4      the Families PAC?

11:56AM   5         A       Over the entirety of the project, $100,000.

6          Q       And did you think that $100,000 would resonate

7      with Jose Huizar?

8          A       Yes.

9          Q       And after that conversation with Neils Cotter

11:56AM   10     where he says, I think you said, it was a great idea to do an

11     additional 50- to make the union issue go away, do you then

12     take that message back to Jose Huizar?

13         A       Yes, I did.

14         Q       Okay.  And, just generally, what was

11:56AM   15     Jose Huizar's response?

16         A       He said, okay.  And then he said he wanted to

17     have a private one-on-one meeting with Neils.

18         Q       And so after -- at that point, did you think

19     there was an agreement in terms of this additional -- or this

11:57AM   20     bribe?

21         A       Yes.

22         Q       But Jose Huizar had an additional ask to meet

23     with Neils Cotter one-on-one?

24         A       Yes.

11:57AM   25     Q       Did that strike you as odd or unusual?

1257

```
 1        A      Yes.

 2        Q      Normally do your clients have one-on-one meetings

 3   with your councilman?

 4        A      Not typically.

 5        Q      What was your concern here when Jose was asking

 6   to meet one-on-one -- and by one-on-one that means without you?

 7        A      Yes.

 8        Q      Did Jose Huizar make it clear you were disinvited

 9   to this --

10        A      Yes.

11        Q      I will try to finish my question first before you

12   answer, for the court reporter.

13               What was your concern when Jose Huizar didn't

14   invite you to this follow-up one-on-one with Mr. Cotter?

15        A      I was concerned that there would be topics

16   discussed and commitments made and no one there to actually

17   document it.

18        Q      Did this one-on-one dinner happen between

19   Jose Huizar and Neils Cotter as far as you know?

20        A      Yes.

21        Q      And you did not go; right?

22        A      No.

23        Q      Did you hear -- let's look at exhibit previously

24   admitted 153.  This is a text message between you and

25   Mr. Goldman on September 28, 2018.  Jose Huizar and
```

1    Morrie Goldman.  This is around the time following the

2    conversations you have just verbally told us about?  Do you

3    recall, for context, this happens later?

4        A    Yes.

11:58AM  5        Q    I will just read the Jose Huizar part.  "Good

6    meeting with Neils.  He is willing to help Richelle committee.

7    He will collect from consultant/contractors.  We didn't discuss

8    amount.  Please enlist him for your event and ask him to

9    collect 15- to 20K for your event."

11:58AM  10             At this point when you get this message from

11   Jose Huizar, is it your understanding still that that dinner

12   that the $50,000 to Families L.A. PAC bribe was agreed upon?

13       A    Yes.

14       Q    Was there also additional asks that Jose Huizar

11:59AM  15   apparently made with Neils Cotter at that dinner?

16       A    Yes.

17       Q    And what, do you understand, the additional ask

18   to be made on top of the $50,000 bribe payment?

19       A    15- to $20,000 for Richelle's council committee.

11:59AM  20       Q    Okay.  And there's also a "Please enlist him for

21   your event."  What event is Jose Huizar talking about?

22       A    That was the event that I previously testified

23   about that I held at my office for Richelle's campaign.

24            MR. JENKINS:  Okay.  We will take that down.

11:59AM  25       Q    Let's go there.  Did you host a fundraiser in

| | | | |
|---|---|---|---|
| | 1 | | early October for Richelle Rios? |
| | 2 | A | Yes. |
| | 3 | Q | And her re-election campaign? |
| | 4 | A | Yes. |
| 11:59AM | 5 | Q | And did Neils Cotter show up? |
| | 6 | A | Yes.  Along with -- along with Max Zeff. |
| | 7 | Q | The individual who is the son of the CEO? |
| | 8 | A | Yes. |
| | 9 | Q | And whose text message we read earlier? |
| 12:00PM | 10 | A | Yes. |
| | 11 | Q | Did you observe anything there -- let me back up. |
| | 12 | | Was Jose Huizar at this fundraiser? |
| | 13 | A | Yes. |
| | 14 | Q | Was it an intimate one?  A big one?  A medium |
| 12:00PM | 15 | | one? |
| | 16 | A | Intimate. |
| | 17 | Q | Where was it? |
| | 18 | A | At my office. |
| | 19 | Q | Did you have a rooftop? |
| 12:00PM | 20 | A | Roof deck, uh-huh. |
| | 21 | Q | How many people? |
| | 22 | A | Maybe 15.  No more than 20. |
| | 23 | Q | Okay.  During that fundraiser, did you observe |
| | 24 | | Mr. Cotter do anything that caught your attention? |
| 12:00PM | 25 | A | Yes.  He arrived with a white envelope. |

1    Q      And what was he going to do with that white

2   envelope as far as you understood it?

3    A      I asked him what it was, and he said it was for

4   Jose.

12:00PM   5    Q      And did he tell you what was in it?

6    A      No.  I asked him what was in the envelope, and he

7   responded -- he wouldn't tell me.  He said, if Jose wants you

8   to know, then he will tell you.

9    Q      And was this after the one-on-one dinner that you

12:01PM   10  were not invited to?

11    A      Yes.

12    Q      And after the bribe payment that they had agreed

13  to?

14    A      Yes.

12:01PM   15    Q      And what was your -- and was Max Zeff there at

16  that point?

17    A      Yes.

18    Q      And after the fundraiser, do you have an

19  understanding of what happened to the envelope?

12:01PM   20    A      No.  Other than what I read in the --

21    Q      I will stop you there.

22           So Mr. Cotter never told you later what was in

23  the envelope?

24    A      No.

12:01PM   25    Q      Was it your understanding that he gave that

1    envelope to Jose Huizar?

2         A    Yes.

3         Q    Okay.  Just for timing, was this also the speech

4    that Richelle Rios gave that you were, I think, diplomatically

12:01PM  5    unimpressed by?

6         A    Yes.

7         Q    Now, about a week after your fundraiser and this

8    mysterious envelope from Neils Cotter, about a week after that,

9    did Jose Huizar vote on the labor union appeal affecting the

12:02PM  10   Mateo project?

11        A    Yes.

12        Q    And how did he vote?

13        A    He voted to deny it.

14        Q    In other words, he voted in the way that Carmel

12:02PM  15   wanted?

16        A    Yes.

17        Q    Did that vote also affect the affordable housing

18   requirements that we talked about?

19        A    Yes.

12:02PM  20        Q    And the height requirements?

21        A    Yes.

22        Q    And was that vote in favor of what Carmel wanted?

23        A    Yes.

24        Q    In speaking about the affordable housing -- you

12:02PM  25   got into the numbers a little bit.  We don't need to go back

1   there.  Is it fair to say that city planning had recommended a

2   package where the affordable housing would be more robust?

3   There would be more affordable housing?

4        A     Yes.

5        Q     What about the Carmel version of that affordable

6   housing?  What was the difference?

7        A     It would be less robust.

8        Q     Which version did Jose Huizar approve?

9        A     Carmel's.

10        Q     And what was the effect then on affordable

11   housing at that project for that project?

12        A     Less affordable housing.

13        Q     Between the rejection of the union appeal and the

14   less affordable housing, what was the effect to Carmel's

15   profitability on that project?

16        A     They were very happy.

17        Q     Because it financially benefited them?

18        A     Yes.

19        Q     Okay.

20              THE COURT:  Do you know by how much?

21              THE WITNESS:  No, sir.

22        Q     BY MR. JENKINS:  Okay.  Just a few more topics

23   here, Mr. Goldman.

24              Let's look at Exhibit 135.  Let's go -- we have

25   a couple more topics.  Let's look at Exhibit 135 previously

1    admitted.

2              Mr. Goldman, can you describe what we are looking

3    at in Exhibit 135?

4         A    This is a spreadsheet that I was keeping on my

12:04PM  5    computer to keep track of commitments and contributions for the

6    Families PAC.

7         Q    The Families PAC is effectively the Richelle Rios

8    PAC.

9         A    Yes.

12:04PM  10        Q    Let's look at -- let's do the columns first.

11             Can you explain -- there's contributor,

12   self-explanatory.  What is the target -- target, committed --

13   that's fine.

14             Target, committed and paid, can you describe for

12:04PM  15   the jury what those are?  What are you tracking?

16        A    The target was the ask from Jose.  Committed is

17   what the individual ultimately agreed to do.  And paid is the

18   contribution that was made.

19        Q    Okay.  So we see one, two, three from the top is

12:05PM  20   Carmel Partners.

21        A    Yes.

22        Q    Do you see the target is $50,000?

23        A    Correct.  That was the -- that was the initial

24   ask.

12:05PM  25        Q    And then here it's one of the rare ones where the

```
 1    target is lower than the committed, and why is that?
 2         A       I'm sorry.  Can you --
 3         Q       So target is typically we're going to ask these
 4    people to donate -- let's use Avalon Bay, for example?
 5         A       I'm sorry.  I got you.  So the initial ask was
 6    50,000.  They did make a $25,000 contribution which is noted,
 7    but there was an additional 50,000 that they committed to.  And
 8    then under comments, the 25- from the original commitment plus
 9    the 50- that they agreed to later totaled 75,000.  And Jose
10    wanted it by December.
11         Q       And why did he want it by December?
12         A       Because he wanted it -- he just wanted it in the
13    bank, and that was the end of the reporting period.
14         Q       So did this amount include the additional bribe
15    amount?
16         A       Yes.
17         Q       Okay.  Now let's look right below
18    Carmel Partners.  Who is that?
19         A       Ray Chan.
20         Q       And Mr. Chan's target was 50,000, same as Carmel.
21         A       Uh-huh.
22         Q       His committed is 50,000.  So just stopping there,
23    is it your understanding, then, that that means that Ray Chan
24    agreed to contribute $50,000 to the Richelle PAC?
25         A       Yes.
```

1265

1    Q    Okay.  Then to the next column is 12,500 paid.

2    That amount was paid; right?

3    A    Yes.

4    Q    And then going to the comments, it looks like you

12:06PM  5    broke down, based off my math, hopefully that's 12,500 between

6    Kevin Chen and Minny Chen; correct?

7    A    Yes.

8    Q    Is this the same Kevin Chen who you described had

9    a project in the Arts District in Jose Huizar's district?

12:07PM  10   A    Yes.

11   Q    Do you recall at some point talking to either

12   Kevin Chen or Minny Chen about this contribution?

13   A    Yes.  I believe it was Kevin that I spoke with.

14   Q    I'm not sure if you know the details.  You

12:07PM  15   understand Kevin Chen and Minny Chen to be part of the same

16   contribution?

17   A    I believe so.

18   Q    Okay.  And just so I understand it, this is to

19   the Richelle Rios -- it's a general purpose PAC.

12:07PM  20   A    Yes.

21   Q    So there's no individual limit.

22   A    Correct.

23   Q    So Kevin Chen could have just donated 12,500 on

24   his own; right?

12:07PM  25   A    Yes, he could have.

1    Q    Do you know if there's any benefit to a donor or

2  to a recipient politician who has a big contribution broken up

3  into smaller contributions from different sources?  Is there

4  any benefit to doing it that way?

12:07PM  5    A    Well, smaller amounts are less likely to jump off

6  the page if someone is reviewing a campaign report.

7    Q    And if someone is reviewing a campaign report,

8  for example, might they look at the relationship between the

9  donor and the politician?

12:08PM  10    A    Probably, yes.

11    Q    Do you recall that actually happening, for

12  example, with Onni related to Jose Huizar?

13    A    Yes.

14    Q    And Onni is O-n-n-i?

12:08PM  15    A    Yes.

16    Q    Just very briefly, what happened there when a

17  contribution --

18    A    They made a $50,000 contribution to the Families

19  PAC.  At the same time, they were developing their *L.A. Times*

12:08PM  20  residential project.  And it was a $50,000 contribution, and

21  the *L.A. Times* wrote an article about it.

22    Q    And was Jose Huizar sensitive to that type of

23  media attention?

24    A    Yes.

12:08PM  25    Q    And had you had -- had Jose Huizar asked clients

1      of yours to, instead of giving him a big check, splitting that

2      big check into smaller checks from different sources?

3              A       Yes.  He made that request with Carmel.

4              Q       The same Carmel that bribed him; correct?

12:09PM    5              A       Yes.

6              Q       In addition to the inquiries that may result, are

7      you aware of certain election requirements where top donors

8      have to be reported?

9              A       Yes.  Expenditures made by PACs have to identify

12:09PM   10      their major donors.  I believe it's the top two donors are

11      identified as, you know, major funding by such and such.

12              Q       So if a large contribution is split up into

13      smaller contributions from different sources, that's also a way

14      to not be reported as a top donor; correct?

12:09PM   15              A       Yes.

16              Q       And just one more math question.

17                      According to my quick view, on this list $100,000

18      is a top contribution; right?

19              A       Yes.

12:10PM   20              Q       And $50,000 would be the second highest amount;

21      right?

22              A       Yes.

23              Q       Okay.

24                      THE COURT:  How much longer do you have?

12:10PM   25                      MR. JENKINS:  Eight minutes.

|  | 1 | THE COURT:  How many? |
|---|---|---|
|  | 2 | MR. JENKINS:  Eight minutes. |
|  | 3 | THE COURT:  Okay. |
|  | 4 | Q      BY MR. JENKINS:  Last topic, did you plead |
| 12:10PM | 5 | guilty, Mr. Goldman, for your role in the Mateo project bribery |
|  | 6 | scheme? |
|  | 7 | A      Yes, I did. |
|  | 8 | Q      And, specifically, do you recall what you pled |
|  | 9 | guilty to? |
| 12:10PM | 10 | A      Yes. |
|  | 11 | Q      What is that? |
|  | 12 | A      Conspiracy to commit bribery and honest services |
|  | 13 | fraud. |
|  | 14 | Q      And did you do so in court and under oath? |
| 12:10PM | 15 | A      Yes. |
|  | 16 | Q      And did you do so before Judge Walter who is |
|  | 17 | presiding to your left? |
|  | 18 | A      Yes. |
|  | 19 | Q      Specifically, with whom did you admit to |
| 12:10PM | 20 | conspiring to commit bribery? |
|  | 21 | A      Jose Huizar. |
|  | 22 | Q      And anyone else? |
|  | 23 | A      Neils Cotter. |
|  | 24 | Q      And do you recall you signed your plea agreement |
| 12:11PM | 25 | on or around August 14, 2020? |

1       A       Yes.

2       Q       And that was pursuant to what's called a

3   cooperation plea agreement?

4       A       Yes.

12:11PM   5       Q       And just at a high level, what does that

6   cooperation plea agreement require you to do?

7       A       To make myself available to the Government

8   whenever needed and always tell the truth.

9       Q       And in exchange for those things, are you

12:11PM   10   promised any specific benefit from the Government?

11       A       No.

12       Q       Are you promised any specific sentence from the

13   Government?

14       A       No.

12:11PM   15       Q       Sitting here today, do you know what, if any,

16   recommendation the Government is going to give to you when it

17   is your turn to be sentenced?

18       A       No.

19       Q       Ultimately, at the end of that day when it comes,

12:11PM   20   who is the sole person that is in charge of sentencing you?

21       A       Judge Walter.

22               MR. JENKINS:  Can I have one moment, Your Honor?

23               THE COURT:  Yes.

24               MR. JENKINS:  Fewer than eight minutes.  No

12:11PM   25   further questions at this time, Your Honor.

```
 1                    THE COURT:  All right.  We will take our second

 2        break of the day.  We will be in recess for 15 minutes.

 3                    THE CLERK:  All rise for the jury.

 4                    (A recess was taken at 12:12 p.m.)

 5                    (The following proceedings were held in

 6                     open court outside the presence of the jury:)

 7                    THE COURT:  All counsel are present.  The

 8        defendant is present.  The witness is present.  Shannon is

 9        bringing the jury in.

10                    Mr. Braun, how long do you expect?

11                    MR. BRAUN:  Three minutes.

12                    THE COURT:  That is a pretty long estimate.  Can

13        you cut it down?

14                    MR. PRATT:  Your Honor, I'm sorry.  Mr. Chan is

15        in the restroom.  He will be returning shortly.

16                    THE COURT:  There he comes.

17                    All right.  Mr. Chan, while you were out, I asked

18        Mr. Braun how long he was going to cross-examine.

19                    (The following proceedings were held in

20                     open court in the presence of the jury:)

21                    THE COURT:  All right.  The jury is present.  All

22        counsel and the defendant are present.

23                    Mr. Braun, you may cross-examine.

24        ///

25        ///
```

12:12PM (line 5)
12:31PM (line 10)
12:31PM (line 15)
12:32PM (line 20)
12:32PM (line 25)

1 **CROSS-EXAMINATION**

2 BY MR. BRAUN:

3 Q    Looking at this list again, there was an earlier

4 list that had Hazens on it for 100,000; is that correct?  If

12:32PM 5 you recall.

6 A    I don't recall.

7 Q    You got these numbers from Mr. Huizar?

8 A    Pardon me?

9 Q    Where did you get the numbers here?  From

12:32PM 10 Mr. Huizar?

11 A    Yes.

12 MR. BRAUN:  Thank you.  No further questions,

13 Your Honor.

14 THE COURT:  All right.  May this witness be

12:32PM 15 excused?

16 MR. JENKINS:  He may, Your Honor.  Thank you.

17 THE COURT:  All right.  Thank you very much.

18 Call your next witness.

19 MS. HAR:  The Government calls Kevin Keller.

12:33PM 20 THE CLERK:  Please raise your right hand.

21 Do you solemnly swear that the testimony you

22 shall give in the cause now before this Court shall be the

23 truth, the whole truth, and nothing but the truth, so help you

24 God?

12:33PM 25 THE WITNESS:  Yes, I do.

```
 1              THE CLERK:  Thank you.  You can remove the mask
 2   if you'd like and please state and spell your name for the
 3   record.
 4              THE WITNESS:  Hello.  Kevin Keller, K-e-l-l --
 5   K-e-v-i-n K-e-l-l-e-r.
 6              THE COURT:  You may proceed.
 7              MS. HAR:  Thank you, Your Honor.
 8                         KEVIN KELLER,
 9                 GOVERNMENT'S WITNESS, SWORN.
10                      DIRECT EXAMINATION
11   BY MS. HAR:
12        Q     Mr. Keller, do you work for the City of
13   Los Angeles?
14        A     I'm just going to make sure I turn off my phone.
15   I'm really sorry.  I don't want to have it go off.
16              Yes.
17        Q     You work for the City of Los Angeles?
18        A     Yes.
19        Q     And what is your current job title?
20        A     My current job title is senior advisor for
21   Mayor Karen Bass.
22        Q     And how long have you had that position?
23        A     I have had this position just for the last week.
24        Q     And prior to last week, what was your title?
25        A     My title was economic -- deputy mayor of economic
```

 1    development.

 2              THE COURT:  Can I ask you to pull the microphone

 3    a little closer to you?  Your sound is being distorted.  If you

 4    speak into the microphone, we will get a better quality.

 5              THE WITNESS:  Will do.

 6         Q     BY MS. HAR:  During the time you were the deputy

 7    mayor for economic development, were you officially with the

 8    Planning Department?

 9         A     Yes.  I'm a city planner on loan to the mayor's

10    office.

11         Q     And how long were you in the deputy mayor role

12    prior to your most recent promotion?

13         A     I began in August 2021.  So for about 18 months.

14         Q     And prior to the time that you were loaned out to

15    the mayor's office, were you formerly employed with the

16    Department of City Planning?

17         A     Yes.

18         Q     Is that also referred to as the

19    Planning Department?

20         A     Yes.

21         Q     So how long have you been with the

22    Planning Department?

23         A     I was hired in December 1999.  So about 23 years.

24         Q     Could you quickly list the titles that you have

25    held within the Planning Department over the course of those

23 years?

     A     Yes.  I was hired as a planning assistant.  I was promoted in 2003 to a city planning associate.  I worked as a planning deputy for an elected office for Councilwoman Cindy Miscikowski on the Westside of Los Angeles from 2003 to 2005, promoted to a city planner which is a managing planner in 2005, promoted to a senior planner for Central Los Angeles in 2008 including downtown.  Joined Mayor Garcetti's office in 2013 to 2016 as a director of planning policy.  And then I was the deputy director of planning from 2016 to 2017 and executive officer which is the No. 2 position in the City Planning Department from 2017 to 2021.

     Q     Is there any title within the Planning Department that you have not held?

     A     I have not been a zoning administrator which is another position.

     Q     And at a high level, what does the Planning Department do?

     A     The Planning Department reviews development proposals against the zoning code and issues recommendations and approvals for new buildings.

     Q     Is that so that those new developments can get entitlements?

     A     Yes.  An entitlement is an approval to build a building.

1  Q       And outside of the Planning Department, have you

2  also held other positions in other departments or offices

3  besides what you have already described?

4  A       The only other quick post I did was in 2003 I

12:37PM  5  worked for a summer for then Council Member Eric Garcetti as a

6  planning deputy.  I have been with the City the whole time.

7  Q       And in these various roles that you have held,

8  have you become familiar with the development approval process

9  for the City of Los Angeles?

12:37PM  10  A       Yes.

11  Q       And with the process for obtaining land use

12  entitlements?

13  A       Yes.

14  Q       How familiar would you say you are with those

12:37PM  15  processes?

16  A       I would say extremely familiar.

17  Q       And can you approximate how many development

18  projects that you have had some degree of involvement with

19  during your 23-year career with the City?

12:37PM  20  A       Over 23 years I would say multiple thousand

21  developments.

22  Q       And what is your educational background?

23  A       I received a Master's degree in urban planning

24  from Harvard University and have an undergraduate degree from

12:38PM  25  UCLA in geography and environmental studies.

1276

1    Q        Based on your experience in the City including

2    with the mayor's office, do you have a familiarity with the

3    federal assistance that the City of Los Angeles receives

4    annually?

12:38PM    5    A        Yes.

6    Q        And does the City of Los Angeles receive at least

7    $10,000 per year under a federal grant, contract, subsidy,

8    loan, or some type of federal assistance?

9    A        Yes.  I can't speak to the total, but the

12:38PM   10    consolidated plan, which is the housing and urban development

11    grant the City receives alone is close to $50 million a year

12    that I work with.

13    Q        That is just one example of the type of federal

14    assistance that the City obtains per year?

12:38PM   15    A        Yes.  Other assistance would be with the police

16    department, transportation grants, et cetera.  But the one I

17    can speak to is the consolidated plans from the Housing and

18    Urban Development Federal Department.

19    Q        As to that particular plan, has the City received

12:39PM   20    at least 10,000 in federal assistance since at least 2013?

21    A        Yes.

22    Q        Annually?

23    A        Yes.

24    Q        Okay.  I want to talk about some development

12:39PM   25    basics for the City.  And prior to coming to court today, did

1    you meet with the Government to prepare for your testimony?

2         A       Yes.

3         Q       And during the course of that preparation, did

4    you review a diagram that sketches out at a high level the city

12:39PM  5    approval process for project development applications?

6         A       Yes.

7                 MS. HAR:  Publishing previously admitted Exhibit

8    904, page 1.  Can we look at page 3, please?  Okay.  Page 1,

9    please.

12:39PM  10        Q       Is this the diagram that you reviewed?

11        A       Yes, it is.

12        Q       So my first question is, as a general matter,

13   does a developer need to obtain some sort of city approval to

14   build on their property?

12:39PM  15        A       Yes.

16        Q       Is it generally true that the more complicated or

17   bigger the project is, the more approvals that are required?

18        A       Everything is specific, but generally speaking,

19   yes.

12:40PM  20        Q       And you started to describe an entitlement.

21   Could you explain to the jury what that is?

22        A       Yes.  An entitlement is an approval from the city

23   to build a specific type of building on a particular piece of

24   property.

12:40PM  25        Q       Can you give an example of an entitlement?

1   A   An entitlement could be an approval for a new

2   40-unit apartment building on a vacant lot or an approval to

3   build a new hotel on an existing parcel next to a transit

4   station.

12:40PM   5   Q   And how, if at all, do entitlements affect the

6   value of that property or parcel?

7   A   Entitlements allow a new building to be built, so

8   they are valuable.

9   Q   Does it increase the value of the parcel?

12:40PM   10   A   Yes.  It would increase the value of the parcel.

11   Q   And are entitlements valuable to developers?

12   A   Yes.  Very much so.  A piece of land without

13   entitlements may not be able to be built on.  But with

14   entitlements, it's basically ready to go in terms of building a

12:41PM   15   new project on it.

16   Q   Once a developer has secured its entitlements to

17   build, is there a city oversight process for construction?

18   A   Yes.

19   Q   And what process is that?

12:41PM   20   A   Once the Planning Department has approved an

21   entitlement and the construction commences, the Department of

22   Building and Safety will oversee the issuance of development

23   permits, plan check, and inspection.

24   Q   And is that Department of Building and Safety

12:41PM   25   overseen by a general manager?

1     A     Yes.

2     Q     Is that the highest position at the -- at LADBS?

3     A     Yes.

4     Q     So now looking at page 1 of this exhibit -- could

12:41PM    5   you just generally describe what this shows?

6     A     Yes.  Looking at the exhibit, it shows the public

7   review process for consideration of entitlements starting with

8   a Planning Department public hearing.  Then that department

9   makes a recommendation to the City Planning Commission which

12:42PM   10   holds its own hearing.  The Planning Commission then provides

11   its determination to the City Council which is comprised of the

12   Planning and Land Use Management Committee of City Council and

13   the full City Council for a final vote.

14     Q     We will cover some specifics in a moment.  Are

12:42PM   15   these four boxes to the left displayed on page 1 of 904 the

16   levels of sort of departments and hearings that the project

17   application needs to be -- go through and be cleared for?

18     A     Yes.  Not every project has to go to full

19   City Council, but for those that require council action, this

12:42PM   20   is normally the process it would take.

21     Q     And the start of that process is with the

22   Planning Department?

23     A     Yes.

24     Q     And then it goes through City Planning

12:42PM   25   Commission, through PLUM, and then ultimately to a City Council

```
 1   vote; correct?

 2        A       Yes.

 3        Q       I'm going to start from the bottom up actually

 4   and ask you some questions about City Council.  How many city

 5   council members are there for Los Angeles?

 6        A       There are 15 council members in Los Angeles.

 7        Q       And how many votes do each of these council

 8   members have on a development project application that's before

 9   them?

10        A       Each council member has one vote.

11        Q       And how many votes are needed to approve a

12   development project?

13        A       Generally speaking, a majority vote is required

14   which would be 8 votes out of 14.

15        Q       As far as the council member in whose district

16   the pending project sits, does that person also get one vote?

17        A       Yes.

18        Q       Based on your experience in city planning, does

19   the district council member, however, have influence or sway

20   over the other 14 council members and their offices?

21        A       Based on my experience, yes.

22        Q       And in what ways does that council member have

23   influence or sway?

24        A       Most projects are project site specific.  So

25   although there are 15 districts in Los Angeles, the district in
```

1   which the project is located normally will have the most sway

2   or influence on the overall hearing.

3        Q       Do the other council members of other districts,

4   would they look to the district counsel office for their

12:44PM   5   position?

6        A       In my experience, yes.  Not all the time, but

7   there is a lot of deference to the council member who has the

8   project in their district.

9        Q       And is that because there is the understanding

12:44PM   10  that that council district {sic} knows what's good for their

11  district, what's going on with their district?

12        A       Yes.  Generally speaking, the elected

13  representative of that district has that community in mind when

14  they're reviewing the project in their district.

12:44PM   15       Q       In your experience, is it common for the district

16  council member's office to, in fact, provide its input and

17  guidance to the other council offices?

18        A       I can speak to the process I play a part in.

19  But, yes, at the hearings we have, they are open to any

12:44PM   20  stakeholder to make comments, and oftentimes the council

21  district will send a representative of their office to weigh in

22  and provide the council member's viewpoint on the project at

23  those hearings.

24        Q       And what is your understanding of why the council

12:45PM   25  district would want to be engaged in that way before the time

1    of the City Council vote and provide their input?

2          A       Oftentimes there are projects that may be

3    controversial, that may have particular elements that could be

4    addressed to build consensus.  So oftentimes input will be

5    shared up front about opportunities, things to look into for

6    these various decision makers to address community issues.

7          Q       Is it fair to say that many of the major

8    development projects in L.A. are in downtown?

9          A       Yes.

10         Q       Which district is that?

11         A       Downtown is District 14.

12         Q       And in your experience, have you seen a

13   development project be rejected by other members of the council

14   when the district council member, the one where the project is

15   located, supports it?

16         A       In my experience, I have not seen a project

17   denied where a -- overall denied when a council member supports

18   the project.

19         Q       Sitting here today, you can't think of an

20   instance when that happened where the council district office

21   supported the project but it got outvoted?

22         A       Not generally in my mind at the moment.

23         Q       And in your experience, have you ever seen a

24   development project get approved over the opposition of the

25   district council office where the project is located?

1    A    Generally speaking, I would say that would be

2  extremely rare.  I can't immediately recall an example of that.

3    Q    Between about 2013 and 2018, did you understand

4  Jose Huizar to be the council member for CD-14?

12:46PM  5    A    Yes.

6    Q    Did you also understand him to be the chair of

7  PLUM?

8    A    Yes.

9         MS. HAR:  Go to page 2 of this exhibit.

12:47PM  10    Q    Is that Jose Huizar?

11    A    That's Council Member Jose Huizar, yes.

12    Q    So staying on this page and looking at the -- so

13  we just talked about the City Council vote, the furthest box on

14  the bottom.  Moving up to PLUM Committee, what does PLUM stand

12:47PM  15  for?

16    A    PLUM Committee is a council committee.  It's the

17  Planning and Land Use Management Committee.

18    Q    Is it part of City Council?

19    A    Yes.  It's comprised of members of City Council.

12:47PM  20    Q    And what does the PLUM Committee do?

21    A    The PLUM Committee reviews land use items that

22  are pending for City Council consideration.  They will hold --

23  normally hold the hearing, take staff presentations, take

24  community input, and make a recommendation on the matter to the

12:47PM  25  full council.

1     Q       Is it fair to say, then, that the PLUM -- the

2 PLUM Committee is like a working group for development projects

3 for the full 15-member City Council?

4     A       Correct.

12:48PM 5     Q       And does PLUM review or oversee the most

6 significant commercial and residential development projects in

7 the city?

8     A       Yes.  Any large scale project that requires

9 council approval will go to PLUM.

12:48PM 10     Q       Under just normal circumstances, how many members

11 are on PLUM?

12     A       Five members.

13     Q       And is one of those five members the chair?

14     A       Yes.

12:48PM 15     Q       So for the time period we're discussing, that

16 would have been Jose Huizar?

17     A       Correct.  Excuse me.

18     Q       What are the responsibilities of the PLUM chair?

19     A       The PLUM chair sets the agendas for the

12:48PM 20 PLUM Committee meeting, convenes the meeting, runs the hearing,

21 and moves the agenda along.  Oftentimes, the PLUM chair also

22 makes the motion at the end of each item on the recommendation

23 moving forward.

24     Q       And do they generally lead the PLUM hearings?

12:48PM 25     A       Yes.

1     Q     And what is the significance of the PLUM agenda?

2     I believe you referenced the fact that the chair sets the

3     agenda.

4     A     Yes.  The Planning Commission will transmit cases

12:49PM  5     that require council action to the council.  They essentially

6     sit in a holding pattern until they are scheduled for the

7     PLUM Committee.  The PLUM chair sets those agendas.

8     Q     And is that when it would be subject to that PLUM

9     hearing?

12:49PM  10     A     Correct.

11     Q     If a project has not been reviewed and heard in

12     PLUM, can it move forward to the full City Council vote?

13     A     Generally speaking, it will wait for a

14     PLUM Committee hearing.  There is a procedure in which the

12:49PM  15     PLUM Committee can waive the matter to the full City Council.

16     Q     And in that -- is that a relatively rare

17     procedure?

18     A     That is fairly rare, yes.

19     Q     Even under that rare procedure where the matter

12:49PM  20     is waived through to City Council, must it be waived by the

21     PLUM chair?

22     A     Normally, yes.  The PLUM chair waives the item.

23     Q     As the chair of PLUM, did Jose Huizar have the

24     discretion to add a project to the agenda?

12:50PM  25     A     Yes.

1    Q       And did he also have the discretion to remove it?

2    A       Yes.

3    Q       Now, looking back at our chart here, are the next

4    two above that Planning Department and City Planning

5    Commission, are those two separate departments?

6    A       Yes.  The Planning Department is a city

7    department.  The City Planning Commission is a board of

8    neighborhood residents that serve in a volunteer capacity.

9    Q       And the Planning Department, the first box in

10   this diagram, is that where you have spent most of your career?

11   A       Correct.

12   Q       And it does sort of what you described earlier?

13   A       Yes.  They will review proposed projects against

14   the existing codes, make recommendations, conduct analysis, and

15   present the project to the City Planning Commission.

16   Q       And during the planning department's review of an

17   application, does it receive input from the district council

18   office?

19   A       The Planning Department normally will hold a

20   hearing, and at that time any stakeholder, including a council,

21   can participate in that hearing.

22   Q       Would that be a way in which the council office

23   can formally give its input?

24   A       Yes.

25   Q       How about informal ways?  Are there informal ways

1  for the district council office to provide input to the

2  Planning Department?

3      A      Yes.  Occasionally from time to time there will

4  be a meeting or a discussion of the proposed item, providing

5  background or providing some input on coordinating priorities.

6  So there are conversations that occur between elected officials

7  and their offices and the Planning Department.

8      Q      And can that dialogue occur even before a formal

9  application is filed?

10     A      Yes.  Oftentimes both the department and an

11  elected office may be involved in a project concept before it

12  actually is publicly filed.

13     Q      So now focusing on your prior role as the deputy

14  mayor of economic development, does the deputy mayor have

15  professional oversight with the Planning Department?

16     A      Yes.  The mayor of the city appoints the general

17  managers of the departments including the Building and Safety

18  Department and Planning Department.  The deputy mayor is the

19  day-to-day liaison on behalf of the mayor with those leaders.

20     Q      Okay.  And so would there be, for example,

21  regular check-ins with the deputy mayor and the

22  Planning Department head?

23     A      Yes.  I have held -- when I was in that role very

24  recently, I held monthly department check-ins with the general

25  managers of all the departments I was liaisoning with including

1    Building and Safety and City Planning.

2         Q    And in that role, is the deputy mayor of Economic

3    Development essentially overseeing Planning and LADBS and other

4    departments on behalf of the mayor?

12:52PM  5         A    Yes.  The mayor acts as essentially the city

6    manager in Los Angeles.  So the deputy mayors are someone that

7    can assist the city managers.  The general managers still

8    manage the departments, but in terms of their input, their

9    guidance from a city management mayoral point of view, they

12:53PM  10   would receive that through the deputy mayor assigned to them.

11        Q    And as the deputy mayor, would your professional

12   responsibilities include communicating the mayor's position to

13   the Planning Department on projects or issues as needed?

14        A    Yes.

12:53PM  15        Q    And who did you understand to be the deputy mayor

16   of Economic Development from 2016 to 2017?

17        A    Ray Chan.

18        Q    That's the defendant in this case?

19        A    Yes.

12:53PM  20        Q    So now looking at the City Planning Commission,

21   could you describe what that body is?

22        A    Yeah.  The City Planning Commission is a

23   nine-member panel including a president and vice president of

24   that commission.  They are serving in a volunteer capacity, and

12:54PM  25   they convene and review development proposals that are

presented by the Planning Department.  They take a vote on
those proposals, and that vote is either final for some types
of projects that are smaller.  Larger projects may also require
moving on to the City Council as shown in this diagram.

12:54PM  Q       And so is it consisting of just regular members
of the community?

A       Yeah.  The City Planning Commission is appointed
by the mayor.  So they can be any member of the community
that's a resident of the city of Los Angeles.

12:54PM  Q       And so on this flow chart here, does the City
Planning Commission receive the report and recommendations from
the Planning Department and then they will turn around their
own review and report?

A       Yeah.  The Planning Department essentially is
12:54PM  their work force.  The Planning Department prepares the
materials, presents them in a public meeting, and the City
Planning Commission does its work in a public setting with a
public hearing and then deliberation and then decision.

Q       And the same question as with the
12:55PM  Planning Department.  Can the City Planning Commission or CPC
receive input on a given project application from the district
council office?

A       Yes.

Q       In what ways?

12:55PM  A       Normally it would be at the public hearing

1    itself.

2         Q       Would you say that it is common or uncommon for

3    council offices to participate and share input to the CPC

4    during that second hearing?

12:55PM   5         A       It would be common.

6         Q       And now turning again to your prior role, can the

7    deputy mayor of Economic Developmental liaise with the CPC on

8    behalf of the mayor's office?

9         A       Yes.

12:55PM   10        Q       To be clear, in the deputy mayor role, does it

11   have the same type of oversight over CPC like it does with

12   Planning and LADBS?

13        A       Yes.  The deputy mayor, in my experience when I

14   was deputy mayor as well, maintains a close conversational

12:56PM   15   relationship with the chairs of the commissions.  The chairs

16   do -- are appointed by the mayor.  They serve at the pleasure

17   of the mayor.  So there is regular communication with those

18   commissions on behalf of the mayor's office.

19        Q       Is the CPC meant to be sort of an independent

12:56PM   20   body, not like the professional staff of the

21   Planning Department?

22        A       Yeah.  The commission model, you have a

23   professional staff at the Planning Department, and you have a

24   public resident board which provides that level of oversight

12:56PM   25   and recommendation.  Then you have an elected office level at

1    the council which can provide the final approval.

2        Q    And it's not on this -- actually, I guess we can

3    go to page 3 of this exhibit.

4             With respect to the Los Angeles Department of

5    Building and Safety, what is the relationship between the

6    deputy mayor of Economic Development with that department?

7        A    Currently and when I was in the position and in

8    the prior I would say nine years, both the Planning Department

9    and the Department of Building and Safety have been under the

10   same deputy mayor.  So the deputy mayor would provide that

11   oversight of the general manager in both City Planning and

12   Building and Safety.

13       Q    And did you, when you were in that role, have

14   regular coordination meetings with the general manager of

15   LADBS?

16       A    Yes.

17       Q    And what was the purpose of having those meetings

18   with the general manager of LADBS?

19       A    In my experience, I would have a monthly meeting

20   where we would go over the department's workload, department

21   priorities, issues of the day, high priority policy issues that

22   may be moving to council, large projects, staffing budgets,

23   operations, all the things that keep the city moving.

24       Q    And would you provide, from time to time,

25   feedback to the general manager of LADBS during these meetings?

1        A       Yes.

2        Q       And would it be understood that any feedback you

3   were providing as the deputy mayor is basically on behalf of

4   the mayor's office?

12:58PM    5        A       Correct.

6                MS. HAR:  Let's go back to page 1 of this

7   exhibit.

8        Q       We talked about the fact that when

9   Planning Department -- the Planning Department will send its

12:58PM   10   report and recommendation to CPC; right?

11        A       Correct.

12        Q       And when that happens, does the CPC then have to

13   follow the report and recommendation of the

14   Planning Department?

12:58PM   15        A       No.  The Planning Department makes a

16   recommendation, but the City Planning Commission is free to

17   approve, modify, or reject that recommendation.

18        Q       And then, as far as what CPC sends down or up to

19   the PLUM Committee, would the PLUM Committee be receiving both

12:59PM   20   the Planning Department's original report and recommendations

21   and CPC's report whether it was modified or changed or

22   rejected?

23        A       They would certainly receive all those materials.

24   The Planning Department staff would present the item to the

12:59PM   25   council on behalf of the Planning Commission.  So their

```
 1   presentation would be as the Planning Commission had

 2   recommended it.  But there would be all the material in the

 3   file if there was a change or other versions of recommendations

 4   in the file.

 5        Q       Would the PLUM Committee ultimately be making a

 6   decision on whatever recommendations the planning commission

 7   had sent?

 8        A       Correct.  They can approve, modify, or reject the

 9   recommendation or decision.

10        Q       And that would include, if PLUM did not like the

11   City Planning Commission's recommendations, would PLUM be free

12   to, for example, change it back to what the Planning Department

13   originally had?

14        A       Correct.

15        Q       Could they change it to something entirely

16   different from both what Planning Department or CPC

17   recommended?

18        A       Correct.

19        Q       Okay.  And on this diagram, there is -- it

20   indicates there is a first hearing, a second hearing, and a

21   third hearing.

22               Do you see that?

23        A       Yes.

24        Q       And are each of these public hearings?

25        A       Yes.  Those are public hearings.
```

12:59PM (line 5)
12:59PM (line 10)
12:59PM (line 15)
01:00PM (line 20)
01:00PM (line 25)

1    Q    Who can participate in each of these public

2  hearings?

3    A    The hearings are open to the public.  So any

4  member of the public is welcome to participate in these

01:00PM  5  hearings.

6    Q    In your experience, what sorts of stakeholders

7  participate in these public hearings?

8    A    In my experience, we tend to get obviously

9  neighbors, resident associations, business associations,

01:00PM  10  advocates, housing advocates, environmental advocates,

11  preservation advocates, other elected officials, or anyone who

12  has a stake or viewpoint on a proposal.

13    Q    When you say that these stakeholders can

14  participate in the hearings, what kinds of things can they do

01:00PM  15  as part of that process?

16    A    Yes.  There is a public comment period for each

17  item where each -- each participant has a period of time to

18  share anything they would like about the project,

19  recommendations, things to include, conditions that should be

01:01PM  20  considered, anything the public stakeholder would like to add

21  to the record.

22    Q    Can a stakeholder, for example, say, a labor

23  union, file an appeal?

24    A    Yes.  For items that are appealable, an appeal

01:01PM  25  can be filed normally by any party that would like to appeal.

1   Q      What does that mean if a party files an appeal?

2   A      In this example here, the item continues all the

3   way through to City Council.  Many times certain approvals stop

4   at a certain level unless they're appealed further.  So for

01:01PM  5   more simple approvals, potentially the Planning Department can

6   make them themselves, but they're appealable to the Planning

7   Commission if somebody appeals it.  Otherwise, it would stop at

8   the Planning Department.  Many, many different varieties of

9   different project approvals, but oftentimes there are appeals

01:02PM  10   that are available.

11   Q      And if an appeal is made, does that appeal carry

12   on to the next committee or body for that body's consideration?

13   A      Correct.  Normally it would be appealed up one

14   level from the department of the commission or from the

01:02PM  15   commission to the City Council.

16   Q      And if there is such an appeal by a

17   stakeholder -- let's stick with the labor union example -- and

18   it's on a project that the district council office supports,

19   could that council office then negotiate or discuss with the

01:02PM  20   labor union to see if they will discuss or withdraw the appeal?

21   A      Yeah.  Oftentimes if there is an appeal on a

22   matter that is being heard at a committee or at the council,

23   there is an effort to see if there are consensus points to

24   resolve the issue favorably although that certainly doesn't

01:02PM  25   have to happen.

1   Q    Are you aware of any requirement that a

2   developer/owner personally attend any of these public hearings

3   in the City approval process?

4   A    No.

01:03PM  5   Q    Are you aware of any city meetings that requires

6   the developer/owner to personally attend; otherwise, the city

7   will terminate or jeopardize their application?

8   A    No.  I'm not aware of any rules to that effect.

9   Q    Now, I want to ask you about real estate

01:03PM  10   development in Downtown L.A. particularly after 2012 and 2013.

11   Was there any kind of a shift or trend that you noticed in the

12   volume of development projects?

13   A    Yes.  2012 and '13 downtown was coming out of the

14   recession, and we saw an uptick in applications and also in

01:03PM  15   foreign investment in downtown.

16   Q    And did that include investors from China?

17   A    Yes.

18   Q    And did that in turn lead to an increase in

19   development applications for review for the City?

01:03PM  20   A    Yes.

21   Q    And those would be development applications for

22   major projects -- that included major projects that would go

23   through that city process we looked at on Exhibit 904?

24   A    Correct.

01:04PM  25   Q    All right.  I'd like to talk about a specific

1       project.  Are you familiar with the L.A. Grand Hotel located at

2       333 South Figueroa Street?

3            A       Yes.

4            Q       And in preparation for trial, have you reviewed

01:04PM  5      parts of the submitted application for the redevelopment of

6       that property?

7            A       Yes, I have.

8                    MS. HAR:  I'd like to publish previously admitted

9       Exhibit 306, page 1.

01:04PM 10            Q       Do you recognize this as the application cover

11      for that project?

12            A       Yes.  That's correct.

13                    MS. HAR:  And if we can zoom in on the first two.

14            Q       Do you see there the project location is for the

01:04PM 15      L.A. Grand Hotel that you described?

16            A       Yes.  It says, "Street address 321 to 351 South

17      Figueroa Street."

18            Q       And under project description, do you see the

19      project name?

01:05PM 20            A       "Project name, the L.A. Grand Hotel downtown

21      redevelopment."

22            Q       And what is your understanding of what this

23      developer was seeking to have approved and built?

24            A       Yes.  That's outlined here in the project

01:05PM 25      description.  So it was a proposal to convert an existing

1  13-story hotel to a 77-story residential and hotel development

2  that would include 599 hotel rooms, 242 condominium units,

3  28,704 square feet of commercial space, and 33,674 square feet

4  of hotel amenities spaces plus parking.

01:05PM  5      Q      Is this considered a mixed-use property?

6      A      This would be a mixed-use development.

7      Q      And why is it referred to as a mixed-use?

8      A      Mixed-use because it includes more than one use,

9  in this case, a residential component and a hotel component.

01:06PM  10      Q      And this application references about

11  28,000 square feet of commercial space.  Could you give the

12  jury a sense of how big that is?

13      A      Yeah.  Looking at that, that likely is a ground

14  floor level of commercial, restaurant, maybe some retail at the

01:06PM  15  ground level of a hotel.  Generally speaking, a supermarket or

16  grocery store would be around 40- or 50,000 square feet.  So

17  this seems about right for a ground level type of amenities in

18  a large mixed-use project.

19      Q      A little more than half of the size of a large

01:06PM  20  supermarket?

21      A      Yeah.

22      Q      And did a project like this require parking?

23      A      Yes.

24      Q      Is that required by code?

01:06PM  25      A      Yes.  The code would require parking.

1        Q        Is this considered a major development project?

2        A        Yes.

3        Q        And, actually, going back to the reference to the

4    77-story tower, are you aware of any building in Los Angeles

01:07PM  5    that is taller than that?

6        A        This doesn't show the exact height of the

7    building.  I always like to point out height and stories can be

8    different.  But that certainly is one of the tallest if not the

9    tallest, and my understanding of this project was that it was

01:07PM  10   intended to be the tallest.

11               MS. HAR:  Zooming out, and if we can go to

12   page 4.  If we can zoom in at the top part.  Thank you.

13       Q        Here do you see that the application provides

14   that the applicant fills out their team information?

01:07PM  15   A        Yes.

16       Q        Could you read the applicant name, please?

17       A        Applicant name, Huang Wei.

18       Q        And could you read the company?

19       A        Company is Shen Zhen New World I, LLC, attention

01:08PM  20   Virginia Clark.

21       Q        Did you understand this to be the developer for

22   this 77-story tower?

23       A        Correct.

24               MS. HAR:  Zooming out, and if we could go to

01:08PM  25   page 9.  Zooming in.  Yes.

```
 1        Q       Here, at this part of the application, does it
 2   describe the actions requested?
 3        A       Yes.  These are the specific entitlements or
 4   approvals that would be required for a project of this scope.
 5        Q       And how many entitlements did this project seek?
 6        A       This project was seeking four entitlements.
 7        Q       What were those four?
 8        A       I can read them here.  There was a vesting
 9   tentative tract map required.  There was specific plan project
10   permit compliance required.  There was a Transfer of Floor Area
11   required, and a master conditional use permit for the onsite
12   sale and consumption of alcohol.
13        Q       So let's actually start with the second one, the
14   specific plan project permit compliance.  What does it mean
15   when a developer is seeking an entitlement for a specific plan
16   project permit?
17        A       Yeah.  This location is located within the
18   Bunker Hill specific plan.  That is the master plan or the
19   blueprint for development in that area.  So projects within
20   that specific plan area require a special permit to show
21   they're consistent with the regulations in that area.  That
22   would be the specific plan project permit compliance.
23        Q       Is that something the project would need in order
24   to move forward with all the other entitlements?
25        A       Correct.
```

1    Q    So now let's look at the first one listed here,

2  the vesting tentative tract map.  What is that entitlement?

3    A    A vesting tentative tract map is a subdivision.

4  We can think of subdivisions as single-family homes on a former

01:09PM  5  farm.  Subdivisions can also be an airspace or with multiple

6  buildings on a lot.  So anything requiring a condominium will

7  include a subdivision in this proposed condominium.

8         You also, I see here, have seven airspace lots.

9  So that would be taking portions of the development, maybe the

01:10PM  10  hotel, maybe the residential, carving them into separate

11  ownership opportunities.  So it's an aerial subdivision

12  essentially.

13    Q    Why did this application specifically need this

14  vesting tentative tract map?

01:10PM  15    A    Subdivision or tentative tract is required

16  approvals for condominiums.  So that would be required to sell

17  condominiums and also to potentially sell the residential and

18  hotel components separately.

19    Q    Okay.  And so here, because this project seeks to

01:10PM  20  have a couple different uses including condos versus, say,

21  hotels or apartments, this is at a high level -- the thing that

22  would allow the project to be divided up in that way?

23    A    Yeah.  Divided up for sale.

24         MS. HAR:  And if we could go back to Exhibit 904,

01:11PM  25  page 1.  It's on the right there.

1     Q     For these two entitlements we just talked about,

2     the vesting tentative tract map and the plan project permit,

3     how would these go through the city approval flow?

4     A     Yes.  Happy to explain that.  Normally these

01:11PM     5     would both be approvals at the Planning Department level.  So

6     the Planning Department can issue a tract map approval and a

7     specific plan project approval at a department level.  When

8     they are -- when they're part of a bundle of other

9     entitlements, which I'm happy to talk about, they will be

01:11PM     10     bundled together and move whichever pathway the other

11     entitlements require.  In this case, some of the other

12     entitlements do require City Council action.  So everything

13     will move along as a package.  But standing by themselves.  A

14     tract map or project permit for a specific plan or

01:11PM     15     Planning Department approvals.

16     Q     So given the fact that these two entitlements are

17     a part of this entire application package, is it fair to say

18     that it would have had to have gone through essentially this

19     flow that's shown on Exhibit 904?

01:12PM     20     A     Yes.  Correct.  They would all go through to

21     City Council.

22     Q     Okay.  So then looking at the next entitlement on

23     Exhibit 306, do you see the reference to transfer of floor

24     area?

01:12PM     25     A     Correct.  Yes.  Transfer of floor area of greater

1   than 50,000 square feet.

2        Q       Is that sometimes called Transfer of Floor Area

3   Rights or TFAR?

4        A       Yes.  We will call that TFAR, Transfer of Floor

01:12PM   5   Area Rights.  That's an entitlement.

6        Q       What is a request for a TFAR entitlement?

7        A       So this is a request to build a project that is

8   larger than otherwise would be allowed on a project parcel to

9   exceed the floor area limit on that parcel by transferring

01:12PM   10   excess floor area from another parcel downtown to this parcel.

11        Q       Why does this specific application for the

12   L.A. Grand Hotel have a TFAR request?

13        A       The overall scale and size of the proposed

14   project exceeded the base level of floor area that would be

01:13PM   15   permitted on this location.  So in order to accommodate that,

16   there would have to be a requested transfer from other parcels

17   downtown onto this parcel to allow a project larger than

18   otherwise would have been approved.

19        Q       In essence, is the developer essentially sort of

01:13PM   20   buying or getting extra square footage rights to build onto

21   this property?

22        A       Yes.

23        Q       And in order to do that, does the developer need

24   to make some sort of a payment to get TFAR?

01:13PM   25        A       Yes.  The TFAR ordinance requires two payments, a

1 floor area payment and a public benefit payment.

2      Q      And is that dependent on the -- in part on the

3 appraisal value of the property?

4      A      There is a formula under which the payments are

01:13PM  5 calculated, and they are based on an appraisal of the land --

6 of the property value.

7      Q      Is a TFAR entitlement considered a major request?

8      A      Definitely so.  It is a major request.

9      Q      Why is that?

01:14PM 10      A      This request requires action by the full council.

11 It also allows larger projects on a certain site which can

12 create landmarks and desirable development.  But it is a

13 significant request that occurs frequently but is a big request

14 requiring approval of the City Council.

01:14PM 15      Q      So looking at Exhibit 904 on the right, is the

16 TFAR something that would necessarily flow through each of

17 these stages in the process?

18      A      Yes.  Any TFAR application would be required to

19 go through the entire process.

01:14PM 20      Q      And in your experience, how involved or

21 uninvolved is the PLUM Committee in evaluating a TFAR request

22 on a major development project?

23      A      In my experience, very involved.

24      Q      Why is that?

01:14PM 25      A      I would -- in my experience, for two reasons.

1  One, the projects go to the PLUM Committee for vetting.  And,

2  number two, the transfer of floor area ordinance is limited to

3  downtown which is also within District 14 solely which is also

4  at the time in question was -- that councilman was the chair of

5  the committee.

6       Q      And like the other entitlements that you have

7  discussed, is the TFAR request subject to the same sort of

8  opinion, feedback, and potential appeals by stakeholders in the

9  community?

10       A      Yes.  There would be hearings at every level.

11  There would be no appeal of this particular action because it

12  already requires -- it's already required to go to every step.

13  So just technically there's no need to appeal anything because

14  it goes through the whole system anyway on the transfers of

15  floor area.

16       Q      Okay.  And in your experience, can there be

17  stakeholders who would raise critiques for something like this,

18  a property going from 13 stories to 77 stories?

19       A      Yes.  From a planning perspective, concentrating

20  development in a certain location can have positive and

21  negative impacts.  Obviously putting additional development

22  downtown next to transit in a walkable location can be very

23  positive.  At the same time, it can generate more circulation,

24  traffic impacts, utility and infrastructure impacts, and also

25  height and shade, shadow impacts on adjacent properties.

1    Q       Turning now back to Exhibit 306, the final

2  entitlement, what is the master conditional use permit for

3  alcohol?

4    A       Any service of alcohol does require a local

01:16PM  5  permit, and in this case, there was a requirement for a master

6  conditional use permit to allow likely here five

7  establishments, likely restaurants, perhaps, in the hotel to

8  serve alcohol.  Also sometimes in-room bars or other uses in

9  the hotel complex.

01:17PM  10    Q       And what would be the review process for this

11  alcohol permit in the context of this application altogether?

12    A       Yes.  In this context it would also move through

13  the system as a package.  So it would be heard by the

14  department, the Planning Commission, and the City Council.

01:17PM  15    Q       Okay.  So in summary, is it fair to say that all

16  four of these entitlements for the L.A. Grand Hotel had the

17  potential, if not the requirement, that it go through -- up

18  through the PLUM Committee and to a full City Council vote?

19    A       Yes.  That's correct.

01:17PM  20    Q       All right.

21             I want to switch gears and talk about the

22  transient occupancy tax.  Are you familiar with what that is?

23    A       Yes.

24    Q       And what is that?

01:17PM  25    A       The transient occupancy tax is a city tax on

1    hotel night stays.

2         Q      Okay.  And what does that mean?

3         A      For any hotel in the city that charges a nightly

4    rate, there is a percentage tax that is added to that rate that

5    is collected by the City.

6         Q      Is that something that a guest who stays at a

7    hotel might see on their invoice as a line item?

8         A      Yes.  Normally you will see your rate.  You will

9    see all your other fees that aren't part of the City.  And then

10   you will see a tax that is collected.  The patron of the hotel

11   will pay that, and it is remitted to the City.

12        Q      Does the City have a subsidy or incentive option

13   for this transient occupancy tax?

14        A      Yes.  The City can enter into hotel incentive

15   agreements to provide a rebate of this tax to facilitate the

16   construction of a new hotel.

17        Q      Who would that rebate go to?

18        A      The rebate -- the tax is still collected by the

19   City, and it's then rebated or a portion of the tax is rebated

20   to the developer to help offset some of the expenses of

21   building the hotel.

22        Q      What is the purpose of the TOT incentive or

23   subsidy?

24        A      Hotels do provide a lot of revenue to the city.

25   So in many instances the hotel may not be feasible, and the

1   rebated revenue can help a hotel be feasible and generate

2   revenue for the city.

3        Q        Can you give a sort of general sense of what this

4   TOT incentive total amount might be for a major hotel in recent

01:19PM  5   years in downtown?

6        A        Yes.  There are a number of approved hotel

7   incentive agreements downtown.  In terms of value, it's

8   typically tied to the scale of the hotel and the market

9   dynamics.  But an approved hotel incentive agreement can

01:19PM  10  provide a value between $30 million up to $100 million or more

11  over the life of the agreement.  I can speak more about hotel

12  sizes if that's helpful.

13       Q        I think that's okay.

14                To be clear, the 30 million up to 100 million of

01:20PM  15  the TOT incentive would be money that's refunded to the

16  developer, the hotel operator?

17       A        That would be the value that is returned to the

18  hotel operator; correct.

19       Q        And if there is a request for a TOT incentive,

01:20PM  20  how does that get reviewed and approved?

21       A        The TOT incentive is reviewed on a parallel

22  track.  It's not reviewed by the Planning Department.  It would

23  require a motion by the City Council to have the chief

24  legislative analyst analyze the proposal, prepare the materials

01:20PM  25  and present it back to the council for consideration.

1    Q        Can that motion arise in PLUM?

2    A        That motion can be introduced by a council

3    member.

4    Q        Are you aware of whether the TOT incentive ever

01:20PM  5   goes through the Economic Development Committee?

6    A        In my experience, yes.  The TOT incentives have

7    not gone to the PLUM Committee although they certainly could.

8    They have gone to the Economic Development Committee which is a

9    separate committee of City Council for consideration.

01:21PM  10  Q        All right.  So staying on the topic of the

11   L.A. Grand Hotel by Shen Zhen New World, did you attend a

12   meeting on August 4th, 2016, about the redevelopment of that

13   property?

14   A        Yes, I did.

01:21PM  15  Q        And how was this meeting first brought to your

16   attention?

17   A        The meeting invite went to my boss, the director

18   of planning, on behalf of the council district.  And he was not

19   able to attend, so I attended in his stead.

01:21PM  20  Q        Who provided that invitation?

21   A        I believe Paul Habib, the chief of staff of

22   Council District 14, reached out to our office and the

23   Planning Department at that time.

24   Q        Prior to going to the meeting, did you recall

01:22PM  25  having much background on the purpose of the meeting?

1    A    I didn't have much background.  I knew from the

2    e-mail that it was a major development.  But, otherwise, I did

3    not have a lot of background on the project.

4    Q    And where did this meeting take place?

01:22PM 5    A    The meeting took place in the offices of

6    Council Member Jose Huizar's office.

7    Q    Was that at city hall?

8    A    At city hall, yes.

9    Q    And who attended that meeting besides you?

01:22PM 10   A    I attended from the Planning Department.

11   Paul Habib, the chief of staff for Council Member Huizar, was

12   present.  Shawn Kuk, Council Member Huizar's planning deputy,

13   was present.  Council Member Huizar was present as well.

14   Ray Chan was present along with two of his associates from the

01:22PM 15   mayor's office.  And members of the applicant team from the

16   developer were also present.

17   Q    So at the time of this meeting, was the defendant

18   Ray Chan the deputy mayor of economic development?

19   A    This is August 2016.  Yes.

01:23PM 20   Q    And as far as the attendees from the project

21   team, did you recognize any of them?

22   A    No, I did not recognize any of them.

23   Q    And what was your reaction when you saw that you

24   didn't really know anyone on the project team?

01:23PM 25   A    Certainly at the Planning Department we don't

1    pick who is on any project team.  Having worked in downtown, I

2    do remember in this instance going back to my desk and being

3    surprised that for a project of this scale I didn't recognize

4    anyone on the team.  With my experience having worked on many

01:23PM    5    of the downtown landmarks I -- nothing is wrong with that.  I

6    just remember being -- I remember thinking I didn't recognize

7    anyone in the room on a project of this scale at that time.

8         Q       What do you recall about the discussion -- the

9    substantive discussion of that meeting?

01:24PM    10        A       Yes.  It was more of a concept or presentation

11   overview.  My memory is that council member briefly introduced

12   the concept.  There were some project details shared.

13   Introductions were made.  And overall the project was, I think,

14   a very exciting project for a portion of downtown that was in

01:24PM    15   need of redevelopment.

16        Q       Was part of the excitement of the project the

17   fact that they were presenting a building that would be this

18   very tall skyscraper?

19        A       Yes.  I remember one of the project goals was to

01:24PM    20   be one of the tallest, if not the tallest, building in the

21   city.

22        Q       Of Los Angeles?

23        A       Of the city of Los Angeles, yes.

24        Q       And during that same meeting, was there

01:24PM    25   discussion of some of the benefits or incentives that might be

1    on the table for the project and for the developer?

2         A     I remember we discussed that the project is in

3    the Bunker Hill specific plan which does accommodate larger

4    developments.  There is also the Transfer of Floor Area Rights

01:25PM  5    process to allow larger developments in that area.

6         Q     Was there someone who led the meeting?

7         A     The meeting occurred a while ago.  So obviously

8    it was in the councilman's office or conference room, I would

9    say.  So I believe their office opened up the meeting, but it

01:25PM  10   was an open discussion and introduction beyond that.

11        Q     Was it your impression that the council office,

12   Jose Huizar's office supported this project?

13        A     You know, the project was not officially in front

14   of everyone at that time for an action.  But, yes, in general,

01:25PM  15   it was a concept that I think made a lot of sense for that area

16   and that the council member's office was also in support as a

17   concept.

18        Q     Do you recall hearing any opposition to this

19   project during that meeting?

01:26PM  20        A     No.  The only thing I think I pointed out, which

21   is more of a planner thing, is that there were two one-way

22   streets on this location on that corner.  So it's a very

23   difficult project to get car and truck access in and out of,

24   but that's just something that can be resolved through the

01:26PM  25   planning process.

1       Q       And as far as the type of people who attended,

2   you had the council member himself for CD-14; right?

3       A       Yes.   The Council Member Jose Huizar was present.

4       Q       And you were there although I understand

01:26PM    5   originally the invitation was for the director of planning

6   Vince Bertoni; correct?

7       A       Correct.

8       Q       And did you also have high up from the mayor's

9   office?

01:26PM   10       A       Yes.

11       Q       And that was the defendant Ray Chan?

12       A       Yes.   Ray Chan was present.

13       Q       Was this type of meeting for the project team

14   that's hosted, invited by the council member himself and

01:27PM   15   attended by heads of the Planning Department and the deputy

16   mayor, in your experience, is that normal or not normal?

17       A       Orientation meetings would not be abnormal.   I

18   don't believe I had gone to a meeting at that level before with

19   both the council member, deputy mayor, and the

01:27PM   20   Planning Department present.   But a meeting to kick off a

21   development like this would not be out of the ordinary.

22       Q       The thing that made it not ordinary were the

23   actual attendees of the meeting being the council member

24   himself; right?

01:27PM   25       A       Correct.

1    Q    And the deputy mayor?

2    A    Correct.

3    Q    And the second in Planning?

4    A    Correct.

01:27PM   5    Q    Can you think of any other meeting like that

6    where both the council member himself and the deputy mayor were

7    present for a project meeting?

8    A    I can't recall a meeting I attended with both the

9    council member and the deputy mayor present.

01:27PM   10    Q    So of the thousands of projects you have been

11    involved with during your career, this is the only one you can

12    think of sitting here today?

13    A    I can think of other meetings with the mayor's

14    staff and council staff, but that's the only one I can think

01:28PM   15    about with those particular level people.

16    Q    With those particular level people?

17    A    Correct.

18    Q    After the meeting, did you have -- did you

19    attempt to get some follow-up from the meeting?

01:28PM   20    A    Yes.  I recall, when I went back to my desk, I

21    sent an e-mail to Ray Chan and to his team offering to follow

22    up with the next steps to have the Planning Department sit down

23    with the applicant team to begin the professional review

24    process.

01:28PM   25    MS. HAR:  Let's publish previously admitted

1315

```
 1    Exhibit 379.  If we can go to page 2.
 2            Q      Is this the e-mail you sent?
 3            A      Yes.
 4                   MS. HAR:  So let's zoom in on the first half,
 5    please.  Top half.  Thank you.
 6            Q      Do you see that's an e-mail from you?
 7            A      Correct.  That's from me later that evening.
 8            Q      On August 4th?
 9            A      On August 4th.
10            Q      That's your City e-mail; correct?
11            A      That's my City e-mail; correct.
12            Q      Did you send an e-mail to Raymond Chan at his
13    City e-mail along with a couple cc's?
14            A      Yes.
15            Q      What was the purpose of you e-mailing Ray Chan?
16            A      I was following up on the next steps of the
17    meeting which was to have the Planning Department sit down with
18    the applicant team to go over the requirements of the specific
19    plan and the entitlements.
20            Q      And what was it -- why was it that you were
21    e-mailing Raymond Chan as opposed to, say, Jose Huizar's
22    office?
23            A      I don't immediately recall, but I know I was
24    updating Ray on this.  I normally probably would not e-mail the
25    council office directly as a department, but I know I was
```

1    asking for other contacts that should be included.

2         Q    At this time the defendant was the deputy mayor

3    of Economic Development which had oversight with the

4    Planning Department; right?

01:30PM  5    A    Correct.

6         Q    By this time, did you already have a professional

7    relationship with the defendant?

8         A    Yes, I did.

9              MS. HAR:  If we can zoom out.  If we could look

01:30PM  10   at the bottom message.

11        Q    There do you see that the defendant responded to

12   you and others?

13        A    Yes.

14        Q    Can you read his response?

01:30PM  15   A    Yes.  The response says, "Hi guys.  Let's sit

16   tight and wait for them to approach us.  CD-14 may want to take

17   the lead on this one.  Thank you for your enthusiasm, though."

18        Q    This essentially was Ray Chan telling

19   Planning Department to stand down and follow the lead of

01:31PM  20   Jose Huizar's office?

21        A    Yes.  I took this as essentially just wait.  No

22   need to set up any meetings as follow-up at this time.

23        Q    Was this an unusual response to you?

24        A    I do recall -- normally we want to get going as

01:31PM  25   soon as possible.  The planning process can take quite some

1  time.  I remember this e-mail.  It's unusual.  I mean, it's not

2  what I -- normally we would be urged to meet right away as soon

3  as possible.

4       Q     So it was not -- it didn't track with what you

5  would normally expect and what you would normally do?

6       A     Correct.  At the same time, we had gone to the

7  meeting with the council office and, perhaps, they wanted to

8  take the lead on it.

9       Q     And did you ever follow up with the defendant on

10  his response?

11       A     I don't believe so.

12       Q     I'm going to move on to a different developer and

13  a different project.

14            Are you familiar with a company called Hazens?

15       A     Yes.

16       Q     And do you know Hazens to be the developer of the

17  Luxe Hotel project?

18       A     Yes.

19       Q     Did you have some personal involvement in your

20  official role with that project starting in about 2015?

21       A     Yes, I did.

22       Q     And did your involvement with that project, the

23  Luxe Hotel project, continue through the end of 2017?

24       A     Yes, it did.

25       Q     I'm going to get into more details in a moment.

I'm going to talk generally, as a general matter, are you aware whether the defendant, while he was at the City, was substantively involved with the Hazens Luxe Hotel project?

A    Yes, he was involved.

Q    Did you have substantive meetings with the defendant about the Hazens project?

A    Yes, I did.

Q    Did you also have substantive calls or other communications with the defendant about the Hazens project?

A    Yes, I did.

Q    How often would you say that you met or discussed the Hazens Luxe Hotel project with the defendant during this time period 2015 through 2017?

A    I was probably meeting with Ray Chan on a weekly basis about things in general.  I don't think we talked about this project every week, but we definitely regularly updated each other on this project.

Q    So you were regularly discussing this project with Ray Chan; right?

A    Yes.

Q    And sometimes, if there was some activity happening with the application, would those communications increase?

A    Yes.

Q    And based on those interactions and discussions

you had, how involved or interested, would you say, that the defendant was with the Hazens project?

A       Based on my experience, I would say that Ray Chan was very interested in the project.

Q       Why do you say that he was very interested in the project?

A       We had a number of conversations about the project.  We met a few times on project details and had a few opportunities to meet with the leadership of the Hazens team.

Q       And as part of the defendant being very interested in this project, did it seem, also, that he was in the loop and was sort of keeping up to speed with the project?

A       I would say so, yes.

Q       Now, prior to 2015, had you worked professionally with the defendant for a number of years?

A       Yes.  I met Ray Chan -- I may have known of him earlier, but basically we met each other in 2013 when I joined the mayor's office as a staff member.

Q       Throughout the time period that you knew the defendant professionally since about 2013, had you discussed with him other development projects that were pending in the City?

A       Yes.  We discussed other projects as well.

Q       And how did the defendant's involvement or interest with the Hazens Luxe Hotel project compare with his

1320

| | |
|---|---|
| 1 | interest and involvement in those other projects? |
| 2 | A     I think there was interest in large scale |
| 3 | projects across the board.  I think the interest in the Hazens |
| 4 | project was in the highest category. |
| 01:35PM  5 | Q     Was in the highest category? |
| 6 | A     Yes. |
| 7 | Q     Do you recall him being this interested with any |
| 8 | other project to this degree? |
| 9 | A     I can't recall that. |
| 01:35PM 10 | Q     In the course of your work on the Hazens |
| 11 | Luxe Hotel project, did you meet someone named George Chiang? |
| 12 | A     Yes, I did. |
| 13 | Q     I will display a photograph of George Chiang.  Is |
| 14 | that him? |
| 01:35PM 15 | A     Yes.  That's George Chiang. |
| 16 | Q     And did you meet George Chiang through the |
| 17 | defendant's introduction? |
| 18 | A     Yes.  I believe I met George initially with |
| 19 | Ray Chan. |
| 01:35PM 20 | Q     And was that introduction in a professional or a |
| 21 | personal capacity? |
| 22 | A     All of my interactions with -- can you repeat |
| 23 | that in terms of personal capacity? |
| 24 | Q     Sure.  When the defendant was introducing you to |
| 01:36PM 25 | George Chiang, was that an introduction to you in a |

1    professional capacity or just to say this is a personal social

2    friend?

3         A       It was a professional capacity.

4         Q       And what did he indicate to you was

01:36PM  5    George Chiang's role in relation to the Luxe Hotel project?

6         A       I don't recall what Ray Chan would have said was

7    his relationship, but my impression of George was that he was a

8    proponent or consultant or contractor working with the Hazens

9    team to advance the project.

01:36PM  10        Q       And why was that your impression that

11   George Chiang was a proponent of the Hazens project?

12        A       You know, he seemed to be part of the project

13   team, and he did a lot of follow-up with myself and the

14   departments in terms of keeping the project moving.

01:37PM  15        Q       Is that something along the lines of what a

16   lobbyist or consultant might do?

17        A       Yes.  I would consider him a lobbyist or

18   consultant.

19        Q       Okay.  So a few moments ago when you testified

01:37PM  20   that you and the defendant would regularly substantively

21   discuss the Hazens Luxe Hotel project, did any of those

22   conversations also include George Chiang?

23        A       Yes, they did.

24        Q       Did most of them include the three of you?

01:37PM  25        A       I met with Ray Chan quite a bit on multiple

1    topics over that time, but I would say that the three of us in

2    some capacity met numerous times to discuss the Hazens project.

3         Q        And based on your observations in those meetings,

4    did George Chiang and the defendant seem close?

01:37PM 5    A        They seemed -- they seemed to be in the loop with

6    each other and close.

7         Q        And to be clear, when the defendant introduced

8    you, was that while the defendant was the general manager of

9    LADBS?

01:38PM 10   A        I can't immediately recall the date.  I met

11   George Chiang the first time.  I know Ray Chan's role shifted

12   in maybe late spring 2016.  So I believe I would have met

13   George after -- after Ray Chan became the deputy mayor.  That's

14   my general understanding looking at the history here.

01:38PM 15        Q        Okay.  We will take a look at some messages in a

16   sec about --

17        A        Okay.

18        Q        As far as you knew or observed, did the defendant

19   seem to be in close contact or close to any other lobbyist or

01:38PM 20   consultant type for a pending project in the same way that you

21   observed the defendant and George Chiang?

22        A        I know Ray Chan had a number of colleagues and

23   lobbyists he had worked with just like all of us at city hall

24   that he was close to and we were all close to.  The level of

01:39PM 25   involvement on this project -- I don't recall another project

```
 1   being at that same level.
 2        Q     And can you recall that from your observations
 3   the defendant having that same level of a relationship with
 4   anyone else from some other developer team?
 5        A     Clarifying with Ray Chan and George Chiang
 6   together?
 7        Q     Yeah.  Compared to that relationship.
 8        A     It's hard for me to say.  I would say they had a
 9   close relationship based on my experience.
10        Q     Did you ever observe George Chiang interacting
11   with any other city official in the same manner or to the same
12   degree that you observed -- excuse me -- that you observed
13   George Chiang interact with the defendant?
14        A     Yes.  I did not see George Chiang interact with
15   any other city official at the same level.
16        Q     During the time of this project, is it fair to
17   say you also interacted with George Chiang one-on-one?
18        A     Yes.
19        Q     What was the general nature of those
20   interactions?
21        A     George would contact me regularly checking in on
22   project status, checking in in general, and I would respond,
23   and we would I believe -- we had a couple coffees.  So
24   basically regular checking in on the project.
25        Q     And some of those might have been over coffee or
```

01:39PM (line 5)
01:39PM (line 10)
01:40PM (line 15)
01:40PM (line 20)
01:40PM (line 25)

1   something like that?

2       A       I recall having coffee with George Chiang.

3       Q       And when you would engage in those one-on-one

4   interactions with George Chiang, were you doing that in your

01:40PM  5   professional capacity with the City?

6       A       Yes.  It was in my professional capacity with the

7   City.

8       Q       Did you have any sort of personal or social

9   relationship with George Chiang?

01:41PM 10       A       No.  He was incredibly friendly.  I'm a friendly

11  person as well.  But it was work-related and professional.

12       Q       And you had been introduced to George Chiang

13  through the defendant; right?

14       A       Correct.

01:41PM 15       Q       And did the fact that the defendant was the one

16  who introduced you to George Chiang sort of put you at ease in

17  terms of texting with him and providing him updates on the

18  project?

19       A       Yes.

01:41PM 20       Q       Now, in preparation for trial, have you reviewed

21  parts of the development application for the Hazens Luxe Hotel

22  project?

23       A       Yes, I have.

24               MS. HAR:  I'd like to publish previously admitted

01:41PM 25  Exhibit 503.

1   Q        Is this part of that application?

2   A        Yes.  That's the application.

3   Q        So looking at just the upper right, do you see

4   that the date -- the date that this is filled in is

01:42PM  5   March 26, 2015?

6   A        Correct.

7   Q        Okay.  And under No. 1, project location and

8   size, do you see that the street address is 1020 South

9   Figueroa Street?

01:42PM  10   A        Correct.

11   Q        Is that the address of the Luxe Hotel?

12   A        Yes, it is.

13   Q        And then looking at project description under

14   No. 2, could you describe what this application sought to do?

01:42PM  15   A        Yes.  This was a proposal to build a hotel, a

16   250-room hotel, and 650 residential condominiums on an existing

17   hotel parcel including approximately 80,000 square feet of

18   retail and restaurant uses.

19   Q        Is this another mixed-use project?

01:42PM  20   A        This would be a similar -- I don't believe it was

21   the same scale as the one we discussed earlier but the same

22   approach, a residential hotel mixed-use project.

23   Q        And if we look at -- actually, if we zoom out,

24   please.  If we can look at No. 3, actions requested.

01:43PM  25            Does this identify some of the entitlements that

this project, the Hazens Luxe Hotel project, was seeking?

A      Yes.  This is the list of entitlements requested.

Q      And do you see that it has a request for a Site Plan Review, the master conditional use permit for alcohol, and then TFAR?

A      Correct.  In this location there is no specific plan, so it requires a Site Plan Review.  There is a conditional use permit for alcohol including in this location live entertainment.  And then there's a Transfer of Floor Area Rights request to build a property larger than otherwise would be allowed on that site.

Q      And are these three entitlements the same type of entitlements that would have gone through that city approval process that you walked us through with the Shen Zhen New World L.A. Grand Hotel?

A      Yes.  It would be the same process.

MS. HAR:  If we can zoom in on the top line where it says "Application type" right above the project location and size.

Q      Do you see a reference there to development agreement?

A      Yes.

Q      What is a development agreement?

A      A development agreement is an additional entitlement.  It is a contract between the developer and the

1  city that provides a longer approval period in exchange for

2  additional public benefits.  So, for example, a normal

3  entitlement may have a three-, five-, or seven-year timeline

4  which you can use it.  A development agreement will extend that

01:44PM  5  to 15 or 20 years.

6          Q       Why might a developer want a development

7  agreement?

8          A       Development agreements are useful where there is

9  a multiphase project where, perhaps, the first tower will be

01:45PM  10  built in the near term but there is a desire to lock in that

11  ability to build the second tower at some point down the

12  timeline.

13          Q       And who would have to approve the development

14  agreement?

01:45PM  15          A       Developments are prepared by the

16  Planning Department, reviewed by the Planning Commission, and

17  approved by the City Council.

18          Q       Are you aware whether this Luxe Hotel project

19  also sought a TOT or transit occupancy tax incentive?

01:45PM  20          A       I believe it did.

21          Q       And as discussed previously, that is something

22  that would ultimately go to a City Council vote?

23          A       Correct.

24          Q       Are you aware whether the Hazens Luxe Hotel

01:45PM  25  project required a tract map?

1    A       Yes.  It required a tract map as well.

2    Q       Can you briefly remind the jury what a tract map

3  is?

4    A       A tract map is a subdivision map in which

5  condominiums are created or potential airspace lots are created

6  to allow the sale of the hotel tower and the residential tower

7  separately or condominiums for sale in the residential tower.

8    Q       And is a tract map something that the

9  Planning Department would have reviewed as the initial step and

10 issued a decision for?

11   A       Yes.  In this instance the Planning Department

12 reviewed the tract map and issued the approval of the map.

13   Q       It didn't go on to the other bodies?

14   A       My understanding was it was not appealed, so it

15 stayed where it was and did not move.  Tract maps are

16 controlled by state law.  So unlike the rest of the

17 entitlements, the tract is a separate case and can -- if it's

18 not appealed, can stay where it's approved.

19   Q       Now, as part of its process in considering the

20 tract map request, does the Planning Department solicit input

21 from other departments?

22   A       Yes.

23   Q       And how does it do that?

24   A       The Planning Department is the lead reviewer of

25 tract maps.  When an application is received, it is sent out to

1  a number of development service departments including Building

2  and Safety, Department of Transportation, Bureau of

3  Engineering, Department of Water & Power, sanitation, street

4  services, street lighting, things like that.

01:47PM  5      Q      Okay.  And what does the -- those departments do

6  once they -- the Planning Department sends them a memo?

7      A      Yes.  Those departments then submit their

8  comments or requests back to the Planning Department.  The

9  Planning Department prepares the final approval which will

01:47PM  10  normally incorporate those requests.  So, for example, a new

11  sewer will be built here.  Three streetlights and street trees

12  are installed here, here, and here.  That's all folded into the

13  final map.

14          MS. HAR:  I'd like to publish previously admitted

01:47PM  15  Exhibit 557, page 8.  I want to focus your attention on the far

16  left column.

17      Q      Do you see those?

18      A      Yes.

19      Q      And as far as you know, are each of these types

01:48PM  20  of agencies or departments that the Planning Department would

21  solicit input for on the tract map?

22      A      Yes.  This appears to be a list of departments

23  that the tract would be circulated to for comments.

24      Q      If we run through the acronyms real quick, what

01:48PM  25  is DOT?

1    A    Department of Transportation.

2    Q    What is DWP?

3    A    Department of Water -- Department of Water &

4  Power.

01:48PM   5    Q    BOE?

6    A    Bureau of Engineering.

7    Q    Street lighting and fire, and what is the last

8  two?

9    A    Department of Building and Safety grading and

01:48PM   10  Department of Building and Safety zoning.

11    Q    And so these are the agencies from which the

12  Planning Department would solicit input for the tract map, and

13  then they would give back comments to the Planning Department;

14  correct?

01:49PM   15    A    Correct.

16    Q    What does the Planning Department do once it

17  receives comments back from the agencies?

18    A    The Planning Department has the authority to

19  incorporate, modify, or reject conditions.  Normally they will

01:49PM   20  include the other departments' conditions.  Where they

21  conflict, the department will have to kind of iron those out.

22  But normally those reports are folded into the final approval,

23  and then it's issued.

24    Q    Is there usually a time period by which these

01:49PM   25  types of departments are supposed to send back their input to

the Planning Department on a tract map?

         A      Yes.  Normally it's transmitted with a cover

letter, and there's a request for information back by a certain

date.

01:49PM    Q      As a general practice, does the

Planning Department wait to hear back from the departments

before they proceed to the hearing and the next steps?

         A      Normally that's the practice of the department is

to wait for the departments to submit their materials.  If a

01:50PM  department is way late, they may proceed without that

department, but the Planning Department tends to wait for those

departments.

         Q      When you were the deputy mayor of

Economic Development, did you ever personally go to specific

01:50PM  departments to inquire about the status of their comments for a

specific tract map on a project?

         A      No, I did not.

         Q      You never did that?

         A      No, I did not do that.

01:50PM    Q      So staying on the topic of entitlements, are you

aware whether the Luxe Hotel project had originally or at some

point requested an entitlement related to signage?

         A      Yes.

         Q      What is that, a signage or sign entitlement?

01:50PM    A      That is a major entitlement.  The city of

1    Los Angeles prohibits billboards but allows billboards

2    otherwise known as offsite signage in certain locations through

3    approval of a sign district.  So a sign district can allow

4    billboards to be placed on a project.

01:51PM   5        Q        Are these like those large billboards off of the

6    side of the building?

7        A        Correct.  An older billboard would be on a pole.

8    A modern signage normally is incorporated into the facade of a

9    building, and there's many examples of that on Figueroa next to

01:51PM   10   the convention center.

11        Q        And what's the purpose of the billboards or the

12   signs?

13        A        From the Planning Department point of view,

14   signage can activate a space, can create a lively pedestrian

01:51PM   15   environment.  Signage can also generate significant revenue for

16   the development.

17        Q        How can it generate revenue for the development?

18        A        If a project has the approval of a sign district,

19   the signage can be leased to a company which then provides

01:51PM   20   advertising on the signs, and that revenue can go to the

21   property owner of the development.

22        Q        And that revenue would be in the millions of

23   dollars?

24        A        Yeah.  The Planning Department does not maintain

01:52PM   25   records, but signage is very, very lucrative and over the life

1    of a project can certainly exceed multimillion dollar amounts.

2        Q       What is the approval process to get this type of

3    sign district entitlement?

4        A       A sign district is similar to the floor area

01:52PM    5    rights transfer.  It requires review by the

6    Planning Department, review by the Planning Commission, and

7    final review by the PLUM Committee and City Council.

8        Q       And as it goes through that process, can

9    conditions be imposed before the entitlement for signage is

01:52PM   10    granted?

11        A       Yes.  At any point along the way, conditions can

12    be imposed that modify or are required on the project.

13        Q       And what kind of conditions might be imposed on a

14    sign entitlement in particular?

01:52PM   15        A       Oftentimes the Planning Department will require

16    take down or removal of existing billboards to reduce visual

17    light.  Also, there are also illumination standards, design

18    standards of the sign, operating hours, orientation to make

19    sure the signs fit into the neighborhood as best as possible.

01:53PM   20        Q       And I believe you testified earlier this is

21    considered a major entitlement; right?

22        A       Definitely so.

23        Q       Are you familiar with someone named David Ambroz?

24        A       Yes.

01:53PM   25        Q       And who was -- is that David Ambroz displayed on

1    Exhibit 1, page 3?

2         A       That is David Ambroz; correct.

3         Q       And who is David Ambroz, and specifically what

4    was his role in 2017?

01:53PM  5    A       At the time David Ambroz was the chair of the

6    Planning Commission.

7         Q       By the Planning Commission, we're talking about

8    the City Planning Commission that is the second level down from

9    the Planning Department on Exhibit 904; correct?

01:54PM  10   A       Correct.

11        Q       What role does the chair of CPC or the City

12   Planning Commission have like David Ambroz?

13        A       The chair of the Planning Commission will convene

14   the commission hearings, run the hearing, take testimony, and

01:54PM  15   then also assess the viewpoints of the other commissioners and

16   move them into a position on a case and move that forward.

17        Q       In 2016 and 2017, did David Ambroz have a

18   reputation when it came to his views on signage?

19        A       Yes, he did.

01:54PM  20   Q       And what's your understanding of what that

21   reputation was?

22        A       David Ambroz was very concerned about the

23   proliferation of offsite signs and billboards and was very

24   outspoken in opposition to the inclusion of new sign districts

01:54PM  25   in the city.

1   Q        He was concerned about there being more signs?

2   A        Correct.

3   Q        And had you known him to at hearings or other

4   places on the record come out opposing requests for signage?

01:55PM   5   A        Yes.

6   Q        Had you and the defendant Ray Chan ever discussed

7   this reputation that David Ambroz had with respect to his

8   general opposition to signs?

9   A        Yes, we did.

01:55PM   10   Q        When you had those -- was it more than one

11   discussion?

12   A        I recall one discussion immediately.  Perhaps it

13   was more, but I recall one.

14   Q        And for the one that you have in mind, what was

01:55PM   15   the defendant's role at the time?

16   A        Ray Chan was the deputy mayor at the time.

17   Q        And did you ever talk to the defendant

18   specifically about the sign entitlement request in relation to

19   the Hazens Luxe Hotel project?

01:56PM   20   A        Yes.  In regards to the Hazens and other sign

21   districts, I shared that sign requests tend to be very

22   controversial and have -- there's a number of members of the

23   Planning Commission that are outspoken critics of sign

24   districts so that would be something to be aware of as this

01:56PM   25   project went forward.

1      Q      As far as the Luxe Hotel project, did you have an

2  understanding of how -- how much this project would cost?

3      A      The total development of the project?

4      Q      Yes.

01:56PM  5      A      I can provide a general estimate, but I don't

6  have the exact numbers.

7      Q      What's the general estimate?

8      A      The general estimate, I think from the City's

9  perspective, would be something approaching 300-, 400-,

01:56PM  10  $500 million and up.  Something in that scale.

11      Q      I forgot to ask that for the Shen Zhen New World

12  L.A. Grand Hotel.  What's the general estimate of what a

13  development project like that would --

14      A      I think these are probably undercount estimates,

01:57PM  15  but that scale would be approaching a billion dollars probably.

16      Q      Billion with a B?

17      A      Yes.  Billion with a B.  I'm not financing these

18  myself, but these are general statements of the magnitude of

19  these projects.

01:57PM  20      Q      Got it.

21              I want to circle back now to the TFAR, the

22  Transfer of Floor Area Rights request for the Hazens Luxe Hotel

23  project.  I believe you testified earlier that your

24  professional involvement with the Luxe Hotel project began in

01:57PM  25  about 2015.

1          Is that accurate?

2     A     Correct.

3     Q     And did that initial involvement that you had

4    relate to the request for TFAR?

01:57PM  5     A     Yes, it did.

6     Q     Okay.  What was that issue?

7     A     When this project was filing, there was an issue

8    in calculating the TFAR payment due to the appraisal.  Most

9    projects downtown up until that point had been built on vacant

01:58PM  10   land, and the appraisal was on a vacant site.  This project had

11   an existing hotel, and the appraisal -- it was very unclear how

12   to do an appraisal on the land value without incorporating the

13   existing value of the hotel.  That would have changed the

14   number or value of the TFAR calculation quite significantly.

01:58PM  15   Since the existing hotel had quite a lot of value, it would

16   have unnecessarily boosted the overall payment in that

17   location.

18   Q     What was the sort of delta in how much the TFAR

19   payment would be required of the developer depending on how the

01:58PM  20   property was appraised?

21   A     The appraisal value difference was something in

22   the tens of millions of dollars which would have equated to

23   something in the million dollar range of a different of

24   payments.  So the impact would have been around -- in the

01:59PM  25   million dollars of payments.

1    Q        And what role did you play in trying to figure

2    out what to do with this appraisal question?

3    A        I was brought in with my experience as being the

4    senior planner for downtown, and the solution we recommended

01:59PM    5    was to have the Planning Department do an independent

6    third-party appraisal to validate the applicant's materials,

7    and that was done at their expense but independently of the

8    applicant.  Ultimately in this case, the appraisal values

9    aligned with where the applicant had put them.  We were able to

01:59PM    10    proceed, and there were no more issues or concerns about this

11    particular component of the project.

12    Q        And was that something that took some time to

13    resolve?

14    A        Yes.  We brought in the Planning Department to

01:59PM    15    use one of their consultants to perform a third-party

16    appraisal, and that took a number of months to be completed.  I

17    would say I think it took maybe six months or maybe a little

18    longer.

19    THE COURT:  All right.  We will take up the rest

02:00PM    20    of it tomorrow morning.  We're going to take our evening break.

21    I want to remind the jury of the instruction I

22    have given you earlier.  Until this trial is over, you're not

23    to discuss this case with anyone including your fellow jurors,

24    members of your family, people involved in trial, or anyone

02:00PM    25    else.  Nor are you allowed to permit others to discuss the case

1  with you.  Also, please do not read, watch, or listen to any

2  news reports of the trial, and do not conduct any independent

3  research.

4            And, finally, you're reminded to keep an open

5  mind until all the evidence has been received, you have heard

6  the arguments of counsel, all the instructions of the Court,

7  and the views of your fellow jurors.

8            We will see you tomorrow, and we will start

9  promptly at 8:00.

10            THE CLERK:  All rise for the jury.

11            (The following proceedings were held in

12            open court outside the presence of the jury:)

13            THE COURT:  The jury is not present.

14            How much longer do you have of this witness?

15            MS. HAR:  No more than 20 to 30 minutes,

16  Your Honor.

17            THE COURT:  How many?

18            MS. HAR:  20 minutes.

19            THE COURT:  Cut it down.  You're going over

20  stuff, in my view, that is totally irrelevant.  So -- you're

21  losing the jury, and certainly you're losing me.  So please

22  keep that in mind with future witnesses.

23            I'm going to ask counsel to move out of the

24  courtroom quickly because I have a sentencing that I have to do

25  at 2:00 o'clock.  So if you will pack up and move out, I would

1   appreciate it.

2           (Proceedings concluded at 2:02 p.m.)

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5            I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15            DATED THIS  29TH  DAY OF MAY, 2023.

16

17

18            /S/ MIRANDA ALGORRI

19            _____
              MIRANDA ALGORRI, CSR NO. 12743, CRR
20            FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```