1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4                      - - -

5       HONORABLE JOHN F. WALTER, DISTRICT JUDGE PRESIDING

6

7    UNITED STATES OF AMERICA,        )
                                      )
8            Plaintiffs,              )
                                      )
9                                     )
                                      )
10          vs.                       ) No. CR 20-326(A)-JFW
                                      )
11                                    )
                                      )
12   RAYMOND SHE WAH CHAN,            )
                                      )
13          Defendant.                )
     ─────────────────────────────    )

14

15

     REPORTER'S TRANSCRIPT OF PARTIAL JURY TRIAL PROCEEDINGS
16
                 *TRIAL DAY 8, VOLUME I OF II*
17
                   LOS ANGELES, CALIFORNIA
18
                   THURSDAY, MARCH 2, 2023
19
     ─────────────────────────────────────────────────────

20               MARIA R. BUSTILLOS
                OFFICIAL COURT REPORTER
21                 C.S.R. 12254
              UNITED STATES COURTHOUSE
22              350 WEST 1ST STREET
                   SUITE 4455
23         LOS ANGELES, CALIFORNIA 90012
                 (213) 894-2739
24               MADAMREPORTER.COM

25

1          <u>A P P E A R A N C E S</u>

2

3

4    **ON BEHALF OF THE PLAINTIFFS,**
     **UNITED STATES OF AMERICA:**      OFFICE OF THE UNITED STATES
5                                        ATTORNEY
                                         BY:  MACK E. JENKINS, ESQ.
6                                        312 NORTH SPRING STREET
                                         SUITE 1500
7                                        LOS ANGELES, CA 90012
                                         (213)894-2091
8

9                                        OFFICE OF THE UNITED SATES
                                         ATTORNEY
10                                       BY:  SUSAN S. HAR, ESQ.
                                         312 NORTH SPRING STREET
11                                       SUITE 1200
                                         LOS ANGELES, CA 90012
12                                       (213)894-3289

13

14                                       OFFICE OF THE UNITED STATES
                                         ATTORNEY
15                                       BY BRIAN R. FAERSTEIN
                                         312 NORTH SPRING STREET
16                                       SUITE 1500
                                         LOS ANGELES, CA 90012
17                                       (213)894-3819

18

19   **ON BEHALF OF THE DEFENDANTS,**
     **RAYMOND SHE WAH CHAN:**           BRAUN and BRAUN, LLP
                                         BY:  HARLAND W. BRAUN, ESQ.
20                                       10880 WILSHIRE BOULEVARD
                                         SUITE 1020
21                                       LOS ANGELES, CA 90024
                                         (310)277-4777
22

23

24

25

I N D E X

|                                | PAGE |
|--------------------------------|------|
| GOVERNMENT'S CASE........................ | 6 |

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|--------------------------|--------|-------|----------|---------|
| **O'DONOVAN, PEGGY**      | --     | --    | --       | --      |
| BY BRIAN FAERSTEIN       | 1617   | --    | --       | --      |
| BY HARLAND BRAUN         | --     | 1645  | --       | --      |
| **DAVID AMBROZ**          | --     | --    | --       | --      |
| BY BRIAN FAERSTEIN       | 1647   | --    | 1755     | --      |
| BY HARLAND BRAUN         | --     | 1726  | --       | 1759    |
| **RICHELLE HUIZAR**       | --     | --    | --       | --      |
| BY MACK JENKINS          | 1760   | --    | --       | --      |

- -

E X H I B I T S

(None)

```
 1          LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 2, 2023
 2                              -o0o-
 3              (COURT IN SESSION AT 9:10 A.M.)
 4              (Whereupon, the following was held
 5               outside the presence of the jury:)
 6          THE COURT:  I am pleased to report that we have
 7    no juror issues this morning.
 8              (Whereupon, the following was held before
 9               the jury:)
10          THE COURT:  All right.  Good morning, ladies
11    and gentlemen.  We're ready to proceed.  The Government
12    may call its next witness.
13          MR. FAERSTEIN:  Yes, Your Honor, the Government
14    calls Peggy O'Donovan.
15    GOVERNMENT'S WITNESS, PEGGY O'DONOVAN, SWORN.
16          THE COURTROOM DEPUTY:  Please state and spell
17    your name for the record.
18    A      Peggy O'Donovan.  It's P-E-G-G-Y, capital
19    O', capital D-O-N-O-V-A-N.
20          THE COURT:  All right.  You may proceed.
21          MR. FAERSTEIN:  Thank you, Your Honor.
22                      DIRECT EXAMINATION
23    BY MR. FAERSTEIN:
24    Q      Ms. O'Donovan, are you currently employed?
25    A      Yes, I am.
```

1    Q        Where do you work?

2    A        At East West Bank.

3    Q        How long have you are worked at East West Bank?

4    A        17 years.

5    Q        What is your current position?

6    A        My current position is loan servicing manager

7    over default and modifications.

8    Q        Prior to East West Bank, did you have any other

9    jobs in the banking industry?

10   A        Yes, I worked for Home Savings of America for

11   19 years; and prior to that, I worked for a small bank,

12   headquartered in Northern California called Bay View

13   Bank.  They don't exist any longer for seven years.  And

14   prior to that, I worked for Bank of America for seven

15   years.

16   Q        In total, how long have you worked in the

17   banking industry?

18   A        50 years.

19   Q        Is there a particular area that you've

20   specialized in your career in the banking industry?

21   A        I -- I've specialized mostly in consumer loans.

22   Q        What about loan servicing?

23   A        Well, loan servicing on consumer loans.

24   Q        And based on your 48 years in the industry,

25   would it be fair to say you've worked on all aspects of

1    consumer loans?

2    A       Yes, it would be fair to say that, yes.

3    Q       With respect to your current position at

4    East West Bank as a loan servicing manager, how long

5    have you held that position?

6    A       Oh, the current position I have right now?

7    About seven years.

8    Q       Did you hold that position going back to 2014?

9    A       No, when I actually started with the bank, we

10   were much smaller, and I actually managed the whole loan

11   servicing for the consumer loans.

12   Q       And just in your current role, can you just

13   please briefly describe your primary responsibilities?

14   A       Um, in my current role, my responsibilities are

15   to collect on past due loans and then also to help

16   borrowers that are in financial hardship and modify

17   their loans.

18   Q       Is East West Bank a member of the Federal

19   Deposit Insurance Corporation or the FDIC?

20   A       Yes.

21   Q       And as a member of the FDIC, is East West Bank

22   a federally insured financial institution?

23   A       Yes.

24   Q       And has East West Bank always been a federally

25   insured financial institution?

```
 1   A        As far as I know, yes.  As long as I've worked
 2   for them, yes.
 3   Q        Thank you.
 4            While at East West Bank, have you worked on the
 5   origination of loans?
 6   A        I have worked on parts of the origination,
 7   mainly just the system site of it, setting loans up.
 8   Q        And just first, what does it mean for a loan to
 9   be originated?
10   A        It's when a loan -- a borrower actually applies
11   for a loan, and then it's actually underwritten to make
12   the determination if it's going to be approved or
13   declined.
14   Q        With respect to the system side of it, what do
15   you mean by "setting the loan up"?
16   A        Well, so that the borrowers are actually --
17   receive their billing statements and the loans tracked,
18   it's actually put onto a loan system that can actually
19   calculate the interest and monitor the payments and the
20   balance.
21   Q        Do you monitor or keep track of whether a
22   borrower's payments on a loan are timely or late?
23   A        Yes, in the fact that what I receive everyday
24   is a report that tells me the loans that are past due.
25   Q        You see that everyday?
```

```
 1    A         Every single day.
 2    Q         In your current role, do you also deal with
 3    loan defaults?
 4    A         That is exactly what I deal with, loan
 5    defaults.
 6    Q         And what is a loan default?
 7    A         A loan default is when the borrowers haven't
 8    made their payment.  And so we normally consider a loan
 9    in default when it's missed its first payment or when it
10    hits 30 days, which is, let's say the payment is due on
11    the 1st of the month, at the last day of that month, we
12    would consider that loan 30 days.
13    Q         Are you familiar with what's called a "secured
14    loan"?
15    A         Yes.
16    Q         What is a "secured loan"?
17    A         A "secured loan" is a loan that actually has
18    collateral that is the security piece of the loan, so
19    that if something -- if a borrower decides not to pay,
20    then depending on what that security is, we would then
21    take next steps at a certain time.
22    Q         What type of next steps?
23    A         If it's a mortgage loan, we might foreclose on
24    your house.  If it's an auto loan, we might repossess
25    the auto.  If it's a savings account loan, we might
```

```
 1   exercise to actually close the loan and pay it off.
 2   Q        When you say a "savings account loan," you mean
 3   just a bank account?
 4   A        Yes.
 5   Q        The bank account would be the collateral?
 6   A        Yes, the bank account is the collateral.
 7   Q        And when a borrower defaults on their loan
 8   payments, what are the bank's options with respect to
 9   the collateral?
10   A        That -- as far as -- certain collateral has,
11   you know, different things like I said.  If it's a
12   mortgage loan and you default, it -- we could end up
13   actually foreclosing on the house which means taking the
14   house back.  If it -- again, an auto loan, we could
15   actually repossess the auto.  And if it's a bank loan
16   that's secured by a savings account or a bank account,
17   we can actually close the loan and take the funds to pay
18   it off.
19   Q        Pay it off.  And I'm going to be very specific.
20   We're dealing with a bank account as collateral going
21   forward.
22   A        Okay.
23   Q        Thank you.
24            Is it fair to say that the collateral just
25   serves as protection for the bank?
```

```
 1    A        Yes.

 2    Q        Even though collateral may protect the bank, in

 3    your vast experience with consumer loan servicing, have

 4    you encountered instances where collateral becomes

 5    subject to either civil or criminal forfeiture?

 6    A        Yes.

 7    Q        You're not a lawyer; is that right?

 8    A        Correct, I'm not.

 9    Q        And you're not in the legal department at

10    East West Bank?

11    A        I'm not in the legal department.

12    Q        When the collateral becomes subject to civil or

13    criminal forfeiture, does East West Bank's in-house

14    attorneys or even retained outside attorneys, to your

15    knowledge, assist in dealing with the forfeiture

16    litigation?

17    A        Yes, if I'm notified of a forfeiture, I receive

18    the documents.  It is actually sent to our legal

19    department, and then they handle it from there as far as

20    filing a claim or whatever needs to be done.  If they're

21    going to outsource it to another outside attorney, I

22    might help in the fact that if they need information on

23    the loan, then I would provide that.

24    Q        And when you say that, you are providing

25    assistance to the lawyers?
```

1    A        Yes.

2    Q        In order to seek to exercise the right to the

3    collateral on a loan that's in default or that -- excuse

4    me -- that's in a forfeiture proceeding, does the bank's

5    lawyers to your knowledge have to take any particular

6    action?

7    A        Well, my understanding is a claim is filed.

8    And I also -- I would say freeze the loan, meaning I

9    have to document that I cannot go further with whatever

10   my next steps would be.

11   Q        And to your knowledge, do the lawyers sometimes

12   have to litigate the forfeiture claim?

13   A        Yes.

14   Q        So regardless of whether the bank uses its own

15   attorneys or outside retained attorneys, do forfeiture

16   actions take time, effort, and resources that would

17   otherwise be spent on your normal day-to-day ranking

18   operations?

19   A        Yes.

20   Q        Are forfeiture proceedings involving collateral

21   supposed to be a normal part of the day-to-day banking

22   operations?

23   A        Well, as far as a normal part, it happens.

24   Not -- not as much as other things, but it does happen.

25   So I guess the answer would be yes.

```
 1   Q        With respect to freezing -- I believe you said,
 2   freezing the account, can the bank exercise its rights
 3   to a collateral when a forfeiture proceeding is pending?
 4   A        No.
 5   Q        And so during that time, can the bank pay off a
 6   defaulted loan by using the collateral?
 7   A        No.
 8   Q        And can -- in forfeiture proceedings, delay the
 9   bank's ability to exercise its right on the collateral?
10   A        Yes.
11   Q        Is it possible that the collateral may end up
12   getting forfeited or seized by the Government?
13   A        Yes.
14   Q        At some point in 2014, did you come to work on
15   an East West Bank loan involving Jose Huizar?
16   A        Yes.
17   Q        What was your first involvement in working on
18   the loan involving Jose Huizar?
19   A        My first involvement on that loan was actually
20   to make sure the loan was set up correctly on the loan
21   system so that he would receive monthly billing
22   statements.
23   Q        Was that your involvement with the origination
24   of the loan?
25   A        That was my -- yes -- involvement with the
```

1    origination.

2    Q        Did you come to learn where the loan -- where

3    the loan was originated?

4    A        Did I come to learn?  Yes.

5    Q        Where?

6    A        It was originated in our branch in Pasadena --

7    our retail branch.

8    Q        To your knowledge, was Mr. Huizar initially

9    referred to the loan department through a board member

10   at East West Bank?

11   A        Yes.

12   Q        Who is that board member?

13   A        I just lost his name.

14   Q        Was it -- I'm sorry.  Go ahead.

15   A        Oh, I just lost his name.  I don't --

16   Q        Would the name, Rudy Estrada ring a bell?

17   A        Yes.

18   Q        Did you come to receive documentation regarding

19   this loan?

20   A        Yes, I did receive the note security agreement.

21   And I guess -- yeah, I received that when I was working

22   on the loan.

23   Q        Did you receive that from the Pasadena branch

24   where the loan was originated?

25   A        Yes.

1    Q        So I'm going to publish now previously admitted

2    Exhibit 462.  And if we can pull up page one of that

3    exhibit, please....

4            You mentioned a note security agreement and

5    disclosure statement.  Is this the note security

6    agreement and disclosure statement that you --

7    A        Yes, it is.

8    Q        Okay.  And this is what you would have received

9    to set up the loan on the system?

10   A        Correct.

11   Q        Just briefly, what is the purpose of this

12   document?

13   A        The document is -- well, for the security

14   piece, it actually states that the account deposit which

15   is a certificate of deposit is the collateral.  It tells

16   me there's going to be 60 payments and what the dollar

17   amount was that we dispersed.

18   Q        You mentioned a certificate of deposit, what is

19   that?

20   A        A certificate of deposit is really a savings

21   account, but not like a regular savings account because

22   it's put into the account for a specified time, and you

23   actually don't have access to it, unless you want to

24   give up your interest that is paid on that certificate

25   of deposit account.

1628

1    Q        A certificate of deposit savings account can

2    serve as collateral on a loan?

3    A        Yes.

4    Q        Did a security of deposit savings account serve

5    as the collateral on this loan?

6    A        Yes.

7    Q        All right.  And if we look at the top left, do

8    you see where it says -- there's a -- what appears to be

9    a stamp.  It says East West Bank Pasadena Commercial

10   Banking Center?

11   A        Yes.

12   Q        Do you recognize that -- the name of that

13   banking center?

14   A        Yes, that's the -- in the branch in Pasadena --

15   our Pasadena branch.

16   Q        Where this loan document would have been filled

17   out?

18   A        Correct.

19   Q        All right.  And if we go -- if we could zoom

20   out and zoom in on the bottom, please....

21            Well, actually I'm sorry, could we go back --

22   thank you.

23            Actually, if you look to the top right, do you

24   see the name "Jose Luis Huizar"?

25   A        Yes.

1    Q        And that was the borrower on this loan?

2    A        Yes.

3    Q        Now, at the time you worked on setting up this

4    loan for repayment, did you know who Jose Huizar was

5    beyond just seeing his name on this document?

6    A        No, I did not know who he was.

7    Q        All right.  And looking below, do you see where

8    it says, "$570,000"?

9    A        Yes.

10   Q        What does that represent?

11   A        That's the amount that we actually lent.

12   Q        Okay.  Was this an interest-only loan?

13   A        He -- the monthly payments were interest-only.

14   That principal amount of 570,000 was to be paid back

15   when the loan matured.

16   Q        And the amount right next to it, the 86,687 and

17   $0.47, would that be the interest that would be due over

18   the life of the loan?

19   A        Yes.

20   Q        And how long was this --

21   A        It was a five-year loan, 60 months.

22   Q        Okay.  Is -- is an interest-only loan sometimes

23   referred to as a balloon loan?

24   A        Yes.

25   Q        What does that mean?

1   A       That the principal amount is due when it

2   matures.  It could be the whole amount or it could be a

3   portion of the amount financed.

4   Q       The $570,000, was that amount wired to fund

5   this loan -- or was there a wire transfer to fund this

6   loan?

7   A       Yes.

8   Q       Okay.  For this loan to have been executed or

9   this loan agreement to be have been executed, would the

10  bank have needed the colat -- to be holding the

11  collateral at that time?

12  A       Yes.

13  Q       And so if we just look further down or if we

14  can zoom it -- oh, yeah, I'm sorry -- middle portion.

15  Thank you.

16          Do you see where it says "security"?

17  A       Yes.

18  Q       And it says, the loan to borrower secured by

19  East West Bank's deposit account number, and it lists

20  "0178550407," do you see that?

21  A       Yes.

22  Q       What does that reflect?

23  A       That is the account number for the certificate

24  of deposit.

25  Q       All right.  And if we could just then go to the

```
1    bottom -- or signatures, please.

2            Do you see there's a borrower signature?

3    A      Yes.

4    Q      And do you also see that there's a grantor

5    signature?

6    A      Yes.

7    Q      Are those different signatures to your

8    knowledge?

9    A      Yes.

10   Q      Did the borrower, Jose Huizar, was he the

11   grantor or the holder of the collateral?

12   A      The grantor, no, he was not.  That's who the

13   grantor is.

14   Q      All right.  Did both, the borrower and grantor

15   sign this document on September 23rd, 2014?

16   A      To the best of my knowledge, I was not there.

17   Q      All right.  If we could just turn briefly to

18   page four of this exhibit.  Zoom in on the top portion

19   or the little bit further -- where "view profile" is

20   captured too.  Thank you.

21           See where it says "certificate of deposit"?

22   A      Yes.

23   Q      It has an account number next to it?

24   A      Yes.

25   Q      Is this the certificate of deposit that served
```

1    as the collateral for the loan?

2    A       Yes.

3    Q       Do you see it says, "Grace Luck Holdings, Ltd.?

4    A       Yes.

5    Q       Did you know what that was --

6    A       No.

7    Q       -- at the time you received this loan document?

8    A       No, I did not know.

9    Q       Okay.  Did you receive this?  This is a

10   separate document.

11   A       This is actually a printout from the -- from

12   the banking system.  I don't recall receiving this at

13   the time I booked the loan.

14   Q       Okay.  At some point, did you -- would you have

15   seen that the certificate of deposit was held in an

16   account in the name of Grace Luck Holdings, Ltd.?

17   A       Yes, I did.

18   Q       And at the time you began working on this loan,

19   would you have had any insight into the source of the

20   collateral that secured the loan beyond whatever the

21   loan documents or bank printouts reflected?

22   A       No.

23   Q       We can take this document down now.  Thank you.

24           After you oversaw this loan being set up in

25   East West Bank's payment system, did you have continuing

```
 1    oversight of interest payments on this loan?
 2    A        I did.  As I said, every single day I receive a
 3    delinquency report for any loans that we have, and this
 4    loan actually was on the report several times.
 5    Q        When you say it's on the report, does that mean
 6    the borrower, Jose Huizar, was late on his payments?
 7    A        Yes.
 8    Q        How frequently would you say?
 9    A        Quite a bit.  I don't remember off the top of
10    my head, but he was on it constantly.
11    Q        And did East West Bank take any action with
12    respect to those late payments?
13    A        At one -- at point in time, yes, we did.  When
14    he did not contact us back and the loan had missed three
15    payments.
16    Q        Prior to that, when he would be late, would
17    East West Bank contact him and seek to obtain payments?
18    A        Yes.  So what we do is, we would contact him
19    when he would hit that 30-day mark, meaning he was
20    one-month past due.  We would call him.  Sometimes he'd
21    call us back.  It might go to 60 days, sometimes even
22    90 days; but we would get a call back, and then the
23    payment would be made within that day or the next day?
24    Q        Did you ever speak with him personally?
25    A        I never spoke with him personally, just my
```

1  staff.

2  Q       Okay.  At some point, did you realize the

3  significance of who Jose Huizar was with respect to this

4  loan?

5  A       Well, at one point in time, yes, I knew who he

6  was.

7  Q       Let me ask you a different question.  So when

8  he showed up on these frequent delinquency reports, did

9  you come to recognize the name?

10  A       Yes.

11  Q       And at some point, did you ever see that name

12  reported in the news?

13  A       Yes.

14  Q       And what do you recall hearing in the news?

15  A       That -- what I recall hearing is that I think

16  his house was raided or -- by the FBI.

17  Q       Okay.  At that time, was Mr. Huizar's loan

18  still active with East West Bank?

19  A       The loan was still active and very delinquent,

20  and he had not responded to us.

21  Q       So did there come a time when East West Bank

22  took action to seek to exercise its rights to the

23  collateral on the loan?

24  A       Yes.

25  Q       What action did East West Bank take?

```
 1    A         We closed the loan, and we actually debited --
 2    I guess, what I would say took the money from the
 3    savings account and paid the loan off.
 4    Q         Now, publishing previously admitted
 5    Exhibit 464.  If we could pull up page 20, please.
 6              Thank you.  And if we could zoom in on the
 7    bottom e-mail.  If you look at the bottom e-mail in this
 8    chain, was this an e-mail that you sent on
 9    December 12th, 2018, at about 9:36 a.m.?
10    A         Yes.
11    Q         Who were you sending this e-mail to?
12    A         I was sending it to the department that would
13    pay the loan off.  And what I was requesting was what we
14    call "a demand statement" that gives the amount that's
15    due on the loan.
16    Q         And that "to" line, it says "COMML, demand
17    payoff," is that a department at East West Bank?
18    A         Yes.
19    Q         And what is the -- what is the subject of this
20    e-mail?
21    A         The subject is the savings loan for
22    Jose Luis Huizar.
23    Q         Okay.  And if we look at the body of the
24    e-mail -- well, just for a moment -- Francesca, who is
25    that?
```

```
 1    A        She's the lead -- our call lead processor in
 2    the department.
 3    Q        Okay.  And that's Francesca Espinoza?
 4    A        Yes.
 5    Q        All right.  And if we look at the body of the
 6    e-mail, do you see where you inform Ms. Espinoza, "This
 7    is not like a regular savings loan that the branch does
 8    and this is the only one we have like it"?
 9    A        Uh-huh, yes, I do.
10    Q        Okay.  And do you also see where it says, "This
11    was a special request that was done a few years ago"?
12    A        Yes.
13    Q        Can you explain what you meant by that?
14    A        What I meant by that was that most of -- not
15    most -- but the regular savings loans normally are not
16    set up to have monthly interest payments.  And so what I
17    was explaining to her is that I -- the -- I wanted them
18    to do the demand, and I didn't want her to come back and
19    say, but wait, we don't do those demand statements.  And
20    so I was trying to explain to her that it was actually
21    really a loan secured by a savings account, which we do
22    all the time.  It was just set up just a little bit
23    differently.
24    Q        All right.  If we look at the next paragraph,
25    it states -- the second sentence states, do you see
```

```
 1   this:  "Currently it is past due, and we will be

 2   exercising our right to take the funds from the CD"?

 3   A       Yes.

 4   Q       What is the "CD"?

 5   A       The Certificate of Deposit savings account.

 6   Q       And that's the collateral that you mentioned

 7   earlier?

 8   A       Yes.

 9   Q       And then if we look further down, do you see

10   where it says, "I appreciate if you could expedite the

11   demand so that we can accomplish this today"?

12   A       Yes.

13   Q       All right.  So is it fair to say, you were

14   moving forward with some urgency here?

15   A       I was moving forward, yes.  Urgency?  I didn't

16   want -- their normal turnaround time can be three to

17   five days.  And so I really didn't want to wait any

18   longer.

19   Q       Okay.  You were asking here for it to be done

20   that day?

21   A       Correct.

22   Q       All right.  So on the top, if we could zoom out

23   and then zoom in on the top e-mail, please.  Thank you.

24           Do you see -- receive an e-mail from Francis?

25   A       Yes.
```

1638

```
1    Q        Who is Francis?

2    A        Francesca is Francis.

3    Q        All right.  And so she e-mailed you back that

4    same morning at 11:06 a.m.; is that right?

5    A        Yes.

6    Q        And in her e-mail, she states, "Please see

7    attached," do you see that?

8    A        Yes.

9    Q        What did she attach to this e-mail?

10   A        The demand statement which is the payoff

11   amount.

12   Q        Okay.  If we could turn to the next page,

13   please -- page 21 of Exhibit 464.  Is this that

14   demand --

15   A        Yes.

16   Q        -- payment?

17   A        The demand statement.  So it -- yes, it's the

18   demand statement.

19   Q        Okay.  And this is dated -- if you look to the

20   right, December 12th, 2018?

21   A        Yes.

22   Q        That's the same day you had requested this?

23   A        Yes.

24   Q        Um, for the collateral, if you look a little

25   further down, it states -- well, thank you -- if it
```

1  states "TCD," what does "TCD" mean?

2  A       It's a time certificate deposit is what the --

3  what the -- the initials stand for.  So that's where the

4  CD has a time frame that it's actually set up for.

5  Q       Is this in reference to the same certificate of

6  deposit account held by Grace Luck Holdings, Ltd.?

7  A       Yes.

8  Q       And then if we look a little further down, it

9  states, "amount to pay loan in full," and it states,

10  "$50,75,269.61," do you see that?

11  A       Yes.

12  Q       And what did that amount represent?

13  A       Well, that represented the principal which was

14  the 570,000, and then the interest that was due on the

15  loan was 5,269.61.  The interest that was due was from

16  August of 2018 to December of 2018.  So he had not been

17  making his monthly payment.  So we just -- we track it

18  to collect it -- the time.

19  Q       And would that be the amount that you were

20  going to be taking from the collateral which was the

21  certificate of deposit?

22  A       Yes.

23  Q       All right.  Did you also notify Jose Huizar of

24  the bank's decision to exercise its rights on this

25  collateral?

1640

1  A        Yes, we actually sent him a letter the day that

2  we actually did this, but we had sent him several

3  letters and made several phone calls to him prior to

4  that, trying to get him to contact us back.

5  Q        All right.  And if you just briefly look at

6  that letter -- if we can turn to page 23 of Exhibit 464.

7  If you look at the top of this e-mail, it has that date,

8  December 12th, 2018.  That, again, is the same date you

9  asked to exercise the rights on the collateral?

10 A        Yes.

11 Q        Was this letter sent to anyone else besides

12 Jose Luis Huizar?

13 A        We sent it to Grace Luck Holdings, Ltd., the

14 address that we had.

15 Q        And it says above that "Yan Yan"?

16 A        "Yan Yan," that was the signature or the

17 grantor on the CD.

18 Q        Did you have any knowledge who Yan Yan was?

19 A        I had no knowledge at all.

20 Q        And then just further in the -- in the

21 collateral, it lists the certificate of deposit number.

22 Is that the same account number that we saw earlier?

23 A        Yes.

24 Q        All right.  And then finally just at the bottom

25 of this letter, please, if we could blow up the bottom

1    paragraph.

2              This -- does this notify Mr. Huizar and Yan Yan

3    that the bank elected to declare the entire unpaid

4    principal and interest owed that day?

5    A        Yes.

6    Q        All right.  So based on your 17 years of

7    experience at East West Bank, if the bank knew that the

8    collateral securing the loan to Jose Huizar was derived

9    from any criminal activity, would the bank have approved

10   the loan?

11   A        No, we would not have approved it.

12   Q        And based on your experience at East West Bank,

13   if the bank knew that the collateral securing the loan

14   could be subject to criminal or civil forfeiture as a

15   result of criminal activity, would the bank have

16   approved the loan under those circumstances?

17   A        No, we would not have approved it.

18   Q        And does East West Bank have to rely in part on

19   the information provided by the prospective borrower,

20   applying for a loan?

21   A        Yes.

22   Q        I want to turn to one final matter, and I'm

23   going to discuss now the use of checks to transfer money

24   from one bank account to another.

25              Based on your experience in the banking

```
 1    industry, are you generally familiar with that process?
 2    A       Yes.
 3    Q       And --
 4    A       Yes, I moved, sorry.
 5    Q       What happens when a check is deposited into a
 6    bank account?
 7    A       When a check is deposited into a bank account,
 8    the bank account that it's deposited into gets --
 9    receives the funds.
10    Q       And so in terms of a deposited check, does
11    that -- does that create a credit of one -- from one
12    bank account to another?
13    A       Yes.
14    Q       Um, does the deposit of the checks start a
15    process by which the money is transferred from one bank
16    account to another?
17    A       Yes, it does.
18    Q       And does that process happen electronically as
19    opposed to physical cash being transferred between the
20    banks?
21    A       Yes, and it does happen electronically.
22    Q       So when an East West Bank customer deposits a
23    check drawn from an account held by another bank, do the
24    two banks communicate, in essence, through those
25    electronic communications?
```

1    A        Yes.

2    Q        In preparation for trial, did you look at two

3    checks that were deposited into an East West Bank

4    account?

5    A        Yes.

6    Q        All right.  If we could publish previously

7    admitted Exhibit 632 at page three on the left side of

8    the screen, please.  And then please publish previously

9    admitted Exhibit 633, at page one on the right side of

10   the screen.

11            I'm blowing up the front and back of the check

12   at the top of page 3 of Exhibit 632.  And then if we

13   could blow up the front and back of the check, page 1 of

14   633, second to the bottom.  Thank you.

15            Are these the checks that you previously

16   reviewed?

17   A        Yes.

18   Q        Looking at the back of these checks, were both

19   checks deposited into an East West Bank account?

20   A        Yes.

21   Q        Did the checks -- excuse me -- did the deposit

22   of these checks initiate an electronic process for the

23   processing of the checks?

24   A        Yes.

25   Q        Can you tell where they were deposited?

1    A        The top check is endorsed.  Both checks have

2    East West Bank's endorsement on them, which means it

3    went through our endorsement item processing area that

4    actually electronically captures them to send out into

5    the electronic world.  The bottom check actually also

6    has the branch depo- -- teller stamp also.

7    Q        Based on your time working at East West Bank,

8    where is the processing center located?  Where would the

9    processing center be located where these checks' images

10   would have to be processed?

11   A        The -- it's -- sorry -- it's located in

12   El Monte.

13   Q        El Monte, California?

14   A        El Monte, California.

15   Q        And then once it's transmitted to or through

16   El Monte, California, does it then go to the bank that

17   the check -- the bank whose account the check was

18   written or drawn on?

19   A        Electronically, it does get to the bank account

20   where it was drawn on.

21   Q        And here, would that be Chase?

22   A        Yes, it would be Chase.

23            MR. FAERSTEIN:  Your Honor, may I have a

24   moment?

25            THE COURT:  Yes.

1   MR. FAERSTEIN:  Nothing further, Your Honor.

2   THE COURT:  All right.  Any cross-examination?

3   MR. BRAUN:  Yes, Your Honor.

4   THE COURT:  All right.

5   **CROSS-EXAMINATION**

6   BY MR. BRAUN:

7   Q       So what was the monthly payment that Huizar

8   owed the bank?

9   A       It's -- it was approximately 1400 I think.  I

10  don't -- I don't have it in front of me.  It was a

11  calculation each month.

12  Q       And how many payments did he make, if you know?

13  A       He made -- I think there was -- I don't --

14  there was about 15 or 16 payments left or 14.  So he

15  made quite a few.

16  Q       So you deduct that amount from 60; correct?  It

17  would be -- he made about 45 payments?

18  A       Probably about that, yes.

19  Q       Okay.  And one other question.  Does -- if

20  some -- if someone borrowed money to settle a lawsuit,

21  is that a criminal activity from the bank's point of

22  view?

23  A       That's something I couldn't answer.

24  Q       Counsel said that the bank would not --

25  A       Well, we wouldn't do -- we wouldn't do what he

1    said if we knew that there was something wrong with the

2    funds that they were securing it with.

3    Q       There was no real risk to the bank, because it

4    was almost fully collateralized; correct?

5    A       Well, there's always a risk which he brought up

6    if the collateral is actually seized by the Government.

7    Q       Did the Government seize this money?

8    A       No.

9    Q       Okay.  So at least putting the action -- the

10   Government aside here, you had the security for the --

11   almost the entire loan; correct?

12   A       Yes.

13   Q       And Mr. Huizar made a majority of the payments

14   themselves during the period; correct?

15          MR. FAERSTEIN:  Objection.  Calls for

16   speculation.

17          THE COURT:  Sustained.

18   BY MR. BRAUN:

19   Q       Okay.  You got payments for about 45 of the 60;

20   correct?

21   A       Yes.

22   Q       Okay.  Now, just a -- my curiosity, you're

23   holding the money in -- and did you pay interest on the

24   money that was put up for the collateral?

25   A       Yes.

1  Q        Okay.

2            MR. BRAUN:  No further questions, Your Honor.

3            THE COURT:  All right.  Any additional

4  questions?

5            MR. FAERSTEIN:  No, Your Honor.  The witness

6  can be excused.

7            THE COURT:  All right.  Mr. Braun, may this

8  witness be excused?

9            MR. BRAUN:  Yes, Your Honor, certainly.

10            THE COURT:  All right.  You may be excused.

11  Thank you very much.  Call your next witness.

12            MR. FAERSTEIN:  The Government calls

13  David Ambrose.

14  **GOVERNMENT'S WITNESS, DAVID AMBROZ, SWORN.**

15            THE COURTROOM DEPUTY:  Please state and spell

16  your name for the record.

17            THE WITNESS:  Good morning.  David Hugh John

18  Ambroz, D-A-V-I-D H-U-G-H, John, J-O-H-N, Ambroz,

19  A-M-B-R-O-Z.

20            THE COURT:  All right.  You may proceed.

21            MR. FAERSTEIN:  Thank you, Your Honor.

22                      **DIRECT EXAMINATION**

23  BY MR. FAERSTEIN:

24  Q        Mr. Ambroz, have you served on any appointed

25  positions for the city of Los Angeles?

```
 1   A        Yes, I have.
 2   Q        What position or positions?
 3   A        I served on the citywide planning commission.
 4   Q        When you say "the citywide planning
 5   commission," is that also sometimes referred to as the
 6   CPC?
 7   A        Yes.
 8   Q        Is it also sometimes referred to as the
 9   commission?
10   A        Yes.
11   Q        When were you appointed to the CPC?
12   A        In 2013.
13   Q        How long did you serve on the CPC?
14   A        Just short of seven and a half years.
15   Q        At some point when you were serving on the CPC,
16   did you meet Raymond Chan?
17   A        Yes, I did.
18   Q        Who was Raymond Chan?
19   A        At the time, he was the general manager of
20   Building and Safety.
21   Q        When you say Building and Safety, is that the
22   Los Angeles Department of Building and Safety?
23   A        Yes, that's correct.
24   Q        Did he, to your knowledge, also serve as deputy
25   mayor for a period of time when you served on the CPC?
```

```
 1    A        Yes, that's correct.

 2    Q        And so I'm publishing previously admitted

 3    Exhibit 1 at page one, do you recognize the person

 4    depicted on the screen in front of you?

 5    A        Yes, I do.

 6    Q        Okay.  Who is it?

 7    A        Mr. Chan.

 8    Q        And do you understand that Raymond Chan is the

 9    defendant in this case?

10    A        Yes, I do.

11    Q        Okay.  Who appointed you to the CPC?

12    A        I was appointed by Mayor Eric Garcetti.

13    Q        Was that appointment approved by city council?

14    A        Yes, it was.

15    Q        Did you know Mayor Garcetti prior to your

16    appointment?

17    A        Yes, I did.

18    Q        How did you know him?

19    A        I -- I grew up homeless, and I became an

20    advocate for homelessness in Hollywood when I first

21    moved there.  And there was a lot of homeless children,

22    and I began to work with local charitable organizations

23    and volunteer and advocate.  I also worked with some

24    civic groups in Hollywood where I became a leader at the

25    business improvement district, and I got very active on
```

1    the neighborhood council's, a lot around promoting

2    inclusive development for people like my family when I

3    was growing up.  And in that time, I got to know his

4    staff and him through that advocacy before I went on to

5    work at L.A. City College.  At LACCI became the

6    foundation director and really worked hard on some local

7    Hollywood workforce development projects that included

8    trying to address the homelessness and hospitality and

9    other job prospects for homeless people.

10   Q        And let me just cut you off there for a moment.

11   A        Sure.

12   Q        Did you work with Mayor Garcetti or in sort of

13   conjunction with him in any of those -- in any of those

14   positions you held?

15   A        No, I never worked for the mayor --

16   Q        Okay.

17   A        -- or the council member.

18   Q        But you interacted and worked with him?

19   A        Yes, that's correct.

20   Q        Did you share any common policy interests with

21   Mayor Garcetti?

22   A        Yes, as I got to know him and his team and him

23   in particular, I grew up in foster care after

24   homelessness and shared, as he became a foster parent.

25   I got to know him and his wife better and more

1    intimately as they went through the process to become

2    and then became -- and I got to know some of their

3    foster children -- and toward them and spoke with them

4    and tried to provide -- I would say tried to be a role

5    model for some of the youth that they were fostering.

6    Q        Just to clarify in terms of timing, the

7    interactions that you've just testified about with

8    respect to Mayor Garcetti, was he then a council member?

9    A        Yes, that's correct.

10   Q        Okay.  And when you were appointed to the CPC,

11   he had become mayor?

12   A        Yes, that's correct.

13   Q        How many commissioners serve on the CPC?

14   A        Nine.

15   Q        And was that the same number when you served on

16   the CPC?

17   A        Yes, that's correct.

18   Q        Are all of the commissioners appointed by the

19   mayor?

20   A        Yes.

21   Q        And are those appointments approved by the city

22   council?

23   A        Yes.

24   Q        When you received your appointment to the CPC,

25   did you have to sign any documentation regarding your

1    potential resignation?

2    A       Yes.

3    Q       And can you describe that?

4    A       I was -- I was appointed twice, and both -- at

5    the first appointment, I had to sign an undated letter

6    of resignation that had no reason for resignation, just

7    simply stated I was resigning my position from the

8    citywide planning commission.

9    Q       Do you know whether other commissioners had to

10   sign a similar undated letter of resignation?

11   A       It is my understanding that all of us did.

12           THE COURT:  Is this a paid position?

13           THE WITNESS:  I'm sorry, sir?

14           THE COURT:  Is this a paid position?

15           THE WITNESS:  No, sir, it's a volunteer

16   appointment.

17   BY MR. FAERSTEIN:

18   Q       Could the letter of resignation be accepted at

19   any time?

20   A       Yes, it could.

21   Q       And who would have had the authority to accept

22   that letter of resignation?

23   A       The person I worked most often with was in the

24   position of deputy mayor for economic development.

25   Q       When you were appointed to the CPC in 2013, did

1653

1    you become president at some point?

2    A       I was not -- I'm sorry, could you repeat the

3    question.

4    Q       Sure.  Did you serve as president of the CPC at

5    some point in time?

6    A       Yes.

7    Q       And when you were appointed to the CPC in 2013,

8    did you become president right away or at some point

9    after your appointment?

10   A       After an initial period of time.

11   Q       Roughly when?

12   A       A few months after my appointment.

13   Q       How was it decided that you would become

14   president?

15   A       I was elected by my peers on the commission --

16   my fellow commissioners.

17   Q       Was there a specific term that you served as

18   president?

19   A       We hold -- we -- the commission holds elections

20   every year to elect officers.

21   Q       Were you re-elected to that position?

22   A       I was.

23   Q       How many times?

24   A       Four times.

25   Q       And so did you serve four years as president of

1    the CPC?

2    A        Roughly, yes.

3    Q        You mentioned that it was not a paid position.

4    Was the CPC your full-time job for the time you served

5    on the commission?

6    A        It felt like it, but no, I had a full-time job

7    with the Walt Disney company, and the City Planning

8    Commission quickly became pretty darn close to the

9    number of hours I was spending at work.

10   Q        And just briefly, what did you do with the

11   Walt Disney company while you served on the CPC?

12   A        Sure.  I worked in philanthropy.  I led

13   charitable giving for the media group at Disney, which

14   is our -- a Disney channel and ABC and Radio Disney and

15   our media properties.  So I got to do that for about

16   12 years.

17   Q        So given the work that you were doing with your

18   day job and the CPC and your not being paid by the CPC,

19   why did you do it?

20   A        I -- my family spent 12 years living on the

21   streets.  And I strongly believe in public service.  I

22   think that a lot of the reason we have the issues we do

23   is because good people don't volunteer.  And so I've

24   always been very active in my community so kids don't

25   grow up the way that I do from the neighborhood councils

```
 1    to federal commissions.  And being a foster dad myself,
 2    I think we have to do these things that sometimes are
 3    hard and time-consuming, and I did it for the number of
 4    years that I did because things take a long time to get
 5    done in the city of Los Angeles.  And there's some
 6    policies I really wanted to see in effect that I was
 7    able to putting homeless people at the center of our
 8    thinking and poor people and people that clean things.
 9    And I was able to center them in our policy-making, and
10    it's good to have an opinion.  It was better to be on
11    the Commission and trying to shape that policy.
12    Q       Were the other commissioners on the commission
13    also citizens who volunteered their time?
14    A       Yes, from all walks of life.
15    Q       What were the primary functions of the City
16    Planning Commission?
17    A       Twofold really.  We were a body that is charged
18    by the charter -- city charter to review and be the
19    original body that looks at any law or policy related to
20    the general plan or any policy like cannabis or
21    home-sharing and first started with the CPC, City
22    Planning Commission.  We were the body that heard
23    appeals for certain projects, and then we also heard
24    more complex projects came to the -- directly to the
25    City Planning Commission.
```

1    Q        You mentioned the general plan.  What is the

2    "general plan"?

3    A        I always thought of it -- you know, I'm not a

4    planner, but I always thought of the city -- the general

5    plan as our -- kind of our Constitution for what we can

6    do in a specific physical geography.  And the general

7    plan is what governs all of that.  And there are

8    elements of it in addition to describing what you can

9    build or not build.  There's also elements that the

10   state and different jurisdictions require, like a health

11   plan or a mobility element.  So the general plan is, you

12   could think of it as almost the constitution for what we

13   can do in our borders and what we're required to do to

14   make it a liveable city.

15   Q        Do the commissions serve legislative roles?

16   A        Yes, sir.

17   Q        Can you just briefly describe the legislative

18   role that it served?

19   A        Yeah.  So I'm not an expert.  I was appointed

20   as a citizen volunteer.  So with that caveat, we were

21   the body that first drafted the laws related to land

22   use, and then we would send them on to the city -- city

23   council, PLUM and then the full city council.  I always

24   thought of it as a factory line, and we were down at the

25   first part of the factory line.  And our job was X.  So

1    we would get a draft policy, like let's say cannabis,

2    which came to City Planning first -- City Planning

3    Commission.  We would review it.  There would be

4    hearings.  And then we would ultimately pass it at a

5    commission, and it would go out to council.  And so we

6    had first draft of these policies, things like the

7    mobility element, cannabis, home sharing and a whole

8    host of policies.  We also could initiate legislation on

9    our own as a body, and we did.

10   Q        With respect to PLUM, is that the Planning and

11   Land Use Management Committee?

12   A        Yes, that's correct on the council.

13   Q        It's a committee of city council?

14   A        Yes, sir.

15   Q        Did the CPC serve any adjudicative roles?

16   A        Yes, with respect to His Honor, we had a

17   quasi-judicial function where we would hear appeals --

18   different types of appeals from people that did not want

19   a project or felt aggrieved or a process violation.  We

20   would hear those appeals at the full City Planning

21   Commission meetings.

22   Q        Would those appeals sometimes relate to large

23   complex projects --

24   A        Yes.

25   Q        -- development projects?

```
 1              And then with respect to those large or complex

 2    projects you mentioned, what was the City Planning

 3    Commission's role regarding those types of projects?

 4    A       I'm sorry.  Can you repeat the question?

 5    Q       Sure.  Putting aside the appeals that you would

 6    hear, would you also consider proposed large development

 7    projects?

 8    A       Yes, sir.  So for complicated large scale

 9    projects, the City Planning Commission would be the

10    first body to hear those.  We would be the formal

11    hearing for those projects.  There might be a prehearing

12    done by staff, but we would be the first city body to

13    review those projects, and we -- those were the larger

14    ones -- the complicated ones with different issues that

15    might intersect and/or ones that might have a citywide

16    impact.

17    Q       When you say "staff," are you referring to the

18    staff of the Department of City Planning?

19    A       Yes, sir.

20    Q       Is that also sometimes referred to as

21    "Planning"?

22    A       Yes, sir.

23    Q       Did the Planning staff assist the City Planning

24    Commission?

25    A       Yes, sir.
```

```
1    Q       Okay.  And then are you familiar with the term
2    "entitlements"?
3    A       I am, sir.
4    Q       What are "entitlements"?
5    A       How I thought of entitlements, I don't know the
6    legal definition -- "entitlements" are the permissions
7    with which you can do what you want with the land.  So
8    if you want to build something, you need permissions.
9    And entitlements describe the individual permissions you
10   need or a usage.  So if you want to have, let's say,
11   dancing, you need an entitlement, like it's called a
12   "cabaret" license.  So you need to specifically ask for,
13   if you want to sell alcohol, you have to ask for
14   permissions.  So entitlements allow you to change or to
15   use a land in certain ways and/or build things that may
16   deviate from what is currently allowed on the land.  So
17   it's kind of a unique word, but that's how I always
18   thought of it.
19   Q       So with respect to alcohol, would that be a
20   conditional use permit.  Would that be an entitlement?
21   A       Yes, sir.
22   Q       What about signage, does that require
23   entitlement approval --
24   A       It does.
25   Q       -- often?
```

```
 1    A          And a legislative act.

 2    Q          And a legislative act?

 3               And then what about Transfer of Floor Area

 4    Rights or TFAR, is that an entitlement?

 5    A          That is, yes.

 6    Q          All right.  So you mentioned that the CPC is

 7    the first body to review a proposed project.  If we

 8    could look at previously admitted Exhibit number 904,

 9    please.  Thank you.

10               In preparation for your testimony today, did

11    you review this diagram?

12    A          Yes.

13    Q          Does this diagram accurately reflect the flow

14    of approvals for seeking -- for a project that's seeking

15    entitlements?

16    A          As I understand it, yes.

17    Q          So the first -- the top box says, "planning

18    department."  Is that the -- that's the Department of

19    City Planning?

20    A          Yes, sir.

21    Q          And to your understanding, would they have a --

22    a process by which they would review proposed

23    entitlements --

24    A          Yes, that's correct.

25    Q          -- before it gets to CPC?
```

```
 1    A        Yes, sir.
 2    Q        Would they sometimes have a hearing to consider
 3    those entitlements?
 4    A        Yes, they would, a public hearing.
 5    Q        Did the CPC hold public hearings to consider
 6    proposed projects with entitlements?
 7    A        Almost weekly, sir, yes.
 8    Q        Is the CPC supposed to exercise its own
 9    judgment about the entitlements that's proposed in a
10    particular project?
11    A        We are required to by the city charter,
12    absolutely.  We are supposed to be independent and act
13    independently, based on the information we gather
14    through the -- the processes and channels laid out by
15    law.  So yes.
16    Q        And did the CPC ultimately report to any person
17    or entity?
18    A        No.
19    Q        In your experience serving on the CPC, did it
20    operate as an independent body?
21    A        Yes, absolutely.
22    Q        When a development project was presented to the
23    CPC, did each commissioner have a vote as to proposed
24    entitlements?
25    A        Yes, we did.
```

1    Q        And with respect to those entitlements, did the
2    CPC operate by way of majority vote?
3    A        Yes.  Yes, sir.
4    Q        So would that be 5 to 4 carries the day?
5    A        That is correct.  There are some matters that
6    might require more, but -- of a majority, but that
7    generally is true, yes.
8    Q        And just briefly, what were your primary
9    responsibilities as the president of the CPC?
10   A        So I was appointed as a volunteer.  I mean, I
11   had never done something like this before which is the
12   point of these commission-ships.  And so I always
13   thought of my role as a layperson.  I'm not supposed to
14   be an expert.  I'm supposed to rely on expertise and use
15   my independent judgment to come to conclusions.  As CPC
16   president, there's an additional layer of
17   responsibility.  And responsibility is both formal and
18   informal.  Formally, we had to -- I had to administer
19   the meetings.  I had to work with staff to shape and
20   arrange the agenda so that our commission could operate
21   smoothly; that our commissioners could hear a full day
22   of testimony or hearings and not be exhausted by it.  I
23   also had to -- in administering the hearing, we had to
24   call up speakers.  We had to field staff.  We had to
25   deal with sometimes a rambunctious public that would

1  cause disruption.  We also had to -- informally, I felt

2  be an ambassador of the city to be perceived of and to

3  show up at important events and to be respectful and

4  show a certain comportment in the city of L.A.  So

5  formally administer the meetings, master the material so

6  you can administer the meetings and shape and arrange

7  the agenda that the CPC would hear.

8  Q       In shaping and arranging the agenda, did you

9  have influence over the setting of the agenda?

10  A       Yes.

11  Q       Are you familiar with the term "advanced

12  agenda"?

13  A       Yes.

14  Q       What was an "advanced agenda"?

15  A       So in order to perform my function and in order

16  to advise Commission or other commissioners on perhaps

17  the duration of a meeting might be, we would receive

18  advanced agendas, update it at every meeting.  So it

19  would constantly be updated toward the next meeting.

20  And on that, we would look at a few meetings and see

21  what would be on the agenda, be it, policy or projects

22  or appeals or legislative acts.  And that would

23  constantly be updated on an almost weekly or biweekly

24  basis.

25  Q       Would the advanced agenda include large complex

1   projects, development projects that were seeking

2   entitlements?

3   A       Yes.

4   Q       And that would be a few meetings ahead?

5   A       Yes.

6   Q       Was keeping track of those types of projects in

7   the meetings and months ahead important to you and your

8   role as president?

9   A       Yes, I quickly understood that we are a group

10  of citizen volunteers, and when you have 12 or 13-hour

11  days or eight-hour days for things that are just very

12  contentious, as human beings and volunteers it was

13  really taxing on my colleagues, as well as staff.  And

14  so we tried to shape the advanced agendas with a right

15  mix of projects appeals policy that would allow us to

16  contribute and not overwhelm the staff or volunteers.

17  And if we needed to, we can push something out further

18  or advance something quicker.

19  Q       Okay.  During your time serving on the CPC, did

20  you become aware of a proposed development project

21  involving the Luxe Hotel in downtown Los Angeles?

22  A       Yes.

23  Q       Was this a project proposed by the Hazens Real

24  Estate Group?

25  A       Yes.

```
 1   Q        How did you become aware of this project?
 2   A        The Luxe -- I call it the Luxe project appeared
 3   on our advanced agenda from staff.
 4   Q        And when -- do you recall when you first saw it
 5   on your advanced agenda?
 6            THE COURT:  Can I ask a question.  When you
 7   talk about "staff," what are you referring to?
 8            THE WITNESS:  Oh, I apologize.
 9            THE COURT:  Just staff dedicated to your
10   commission or is it staff from the planning department?
11            THE WITNESS:  The staff for the planning
12   department, sir.
13            THE COURT:  Okay.  I'm sorry.  Go ahead.
14            MR. FAERSTEIN:  Thank you, Your Honor.
15   BY MR. FAERSTEIN:
16   Q        Did the CPC have its own independent staff?
17   A        We had a staff secretary that had multiple
18   duties.  We had no independent staff.
19   Q        So you were largely relying on the planning
20   department staff to arrange the agenda and provide
21   information?
22   A        Yes, sir.
23   Q        So in terms of the advanced agenda, when --
24   when do you recall the Luxe project first appearing on
25   your advanced agenda?
```

```
 1   A         I believe it appeared in 2016.
 2   Q         And so when the project first came on your
 3   radar in 2016, what did you understand this proposed
 4   Luxe project to be?
 5   A         A Mixed Use project with different elements of
 6   hotel and commercial retail.
 7   Q         Does "Mixed Use" mean it's going to have both,
 8   a hotel component and a commercial component or does it
 9   mean something else?
10   A         Yes, and it can also sometimes be used to
11   describe a building that might include residential, like
12   apartments or condos, as well.
13   Q         Did you understand that this project would
14   involve both, hotel component and a residential
15   component?
16   A         Yes.
17   Q         Did any aspects of this proposed project give
18   you any concerns when you first learned about it?
19   A         Yes, sir.
20   Q         And what aspects were those?
21   A         Um, so a couple of different aspects.  First,
22   the City has a policy of what's called "vision zero,"
23   trying to make pedestrians and bicyclists more safe.
24   And if you think about areas of the city that are
25   touristy, like Sunset Boulevard or by the Staple
```

```
 1    Center -- or I forget what it's called now -- you put up
 2    giant signs that are designed to distract drivers, and
 3    then you put tourists in the mix -- and I don't
 4    understand how that's increasing pedestrian or vehicle
 5    safety.  I've never understood that.  And so if you
 6    think about that particular intersection, in particular,
 7    I don't remember the number of roads, but there's
 8    something like 24 lanes of traffic all coming together
 9    next to the Staple Center.  And as I understood it, the
10    entire corner was going to be a giant moving billboard,
11    brighter than the night sky.  And I don't understand how
12    that increased the general welfare of citizens, and that
13    has been a concern of mine down there for quite a while.
14    The other aspect was I had a lot of concerns about the
15    council member that represented CD14.
16    Q       Who was that?
17    A       At the time, it was council member Huizar,
18    council PLUM chair, as well.
19    Q       What were your concerns about council member
20    Huizar?
21    A       In my experience on the planning commission,
22    when I would review projects or consider things, it
23    always felt like the projects were not always advancing
24    the public good; that the member who was supposed to
25    represent not the businesses but the citizens that
```

```
 1    elected him were not first and foremost in his mind, and
 2    that might manifest in things like when you do a
 3    project, you're often asked to mitigate any impacts.
 4    And I had citywide review of different projects, and I
 5    would look at the comparison of some -- some impact
 6    mitigation efforts in different districts, and see that
 7    the ones in CD14 were not up to snuff.  They weren't
 8    doing as hard work as others had been doing.  I also was
 9    concerned about the progress and rapidity, the speed
10    with which some projects were being advanced, it seemed
11    to me.  I also was concerned about not only the poor --
12    small or -- or lesser than might be required nature of
13    the public benefits, but also, how they were being
14    allocated.  That was deeply concerning to me.
15    Q       When you say the "public benefits," what
16    specifically are you referring to?
17    A       Um, much to my unhappiness or chagrin, the City
18    allows a bucket or a list of -- it could be payments.
19    It could be project design changes or it could be the
20    way we hire for each project that gets built.  So it's
21    almost like a wish list the City puts forward to
22    developers to say if you're going to build this, this is
23    the stuff you have to do.  And for projects in downtown
24    and in Mr. Huizar's district, it might be -- it might be
25    related to TFAR.  It might be local hiring.  It might be
```

```
 1    environmental.  It might be park space.  And I felt like
 2    every time I would look at a major project downtown, it
 3    would be -- it would be not strong enough.  It would
 4    be -- I want to use the word "cheap."  It felt like
 5    these were -- this was not a strong advocacy for the
 6    citizens of downtown nor L.A., because downtown really
 7    impacts the entire city.
 8    Q       Was there a mechanism for the public benefits
 9    being controlled and spent in what you viewed as a more
10    sensible fashion?
11    A       Yes.
12    Q       What was that?
13    A       So, again, I'm a volunteer.  I'm not a
14    professional planner, but when I came onboard, I began
15    to understand something called TFAR, which is the
16    Transfer of Floor Area Rights.  So you can think of it
17    as you buy air rights.  So if you're limited in height,
18    you can buy air rights elsewhere and then transfer them
19    to your property.  The only place where you can do that
20    really is downtown, Los Angeles.  And it felt like the
21    Wild West.  TFAR, you'd make the payment to buy the land
22    rights and half the money would go to the council
23    offices, unrestricted essentially, and be directed to
24    direct benefits.  So they'd identify charities, but it
25    would go through the council office sometimes.  And then
```

```
 1    the other 50 percent would go to something called the

 2    TFAR committee or Commission, I can't remember.  And

 3    that would be a public process.  And so I always tried

 4    to steer a hundred percent of the money to go to the

 5    public process, and not go necessarily directly through

 6    the council office.

 7    Q        Would you have more visibility when it was with

 8    this -- in this public fund?

 9    A        Um, in my initiation, I sought to require the

10    staff to report back to the Commission on any TFAR

11    payments back to the CPC.  And we would pass that as a

12    condition on the projects, so yes.

13    Q        To your knowledge, were the concerns that you

14    laid out just now in terms of the signage and the -- the

15    public allocation of benefits and the issues with CD14,

16    were those well-known?

17    A        My concerns, sir?

18    Q        Yes.

19    A        Yes, very well known.

20    Q        And how do you know?

21    A        There would be kind of jokes about it, and

22    staff would joke about it.  The City -- when I would go

23    to public events would kind of -- the knowledge of my

24    opposition to signage or concerns about vision zero or

25    street trees, these were things that were well-known in
```

```
 1    the development community, as well amongst City planning
 2    staff to the point where it almost became a punch line.
 3    Q        Were you outspoken about those issues?
 4    A        Yes, sir.
 5    Q        Okay.  And just to clarify, the signage, there
 6    is digital signs and static signs; is that right?
 7    A        That's correct, sir.
 8    Q        You were more concerned about digital signs?
 9    A        I was concerned about signage overall.  In the
10    city of Los Angeles, the City Planning Commission passed
11    an updated sign policy under Mayor Villaraigosa that it
12    languished at the planning committee of council.  When I
13    became council president -- or excuse me -- Commission
14    president, I reasserted jurisdiction because of my deep
15    concern over the citywide signage and why was it
16    languishing at council for more than -- almost a decade.
17    What was holding things up?  And when we reasserted
18    jurisdiction, it was very loud and very public and very
19    unwelcome in some quarters of the city.
20    Q        Did you reassert jurisdiction before 2016?
21    A        I believe so, yes.
22    Q        Okay.  Were -- were digital signs lucrative for
23    developers?
24    A        Yes, as I understood it -- and it makes sense
25    kind of intuitively, a static sign or a sign where you
```

1  have to send out a truck to put up a vinyl thing, how

2  often do they get changed?  The digital signs are

3  changed as we've all seen all the time.  And so they're

4  much more lucrative, not only is it the nature of

5  digital signs, it's also the location.  So right now in

6  Los Angeles as I understood it when we reviewed the sign

7  policy, signs are disproportionately impacting

8  communities of poverty and color.  They're kind of

9  low-yield crappy signs in communities that are poor.

10  And so what the sign companies have done is kind of

11  said, hey, we're going to remove those, but we're going

12  to put up these giant ones that are digital.  And so I

13  tried to make sure that when we did that, we got as much

14  public benefit as possible.  We didn't just give away

15  everything.

16  Q        After the Luxe project came on your radar in

17  2016, did you -- was there anything about the pace of

18  the proposed project that struck you as out of the

19  ordinary?

20  A        Yes.

21  Q        Can you describe that, please.

22  A        Um, after managing the City Planning Commission

23  for a few years, you get a sense of how projects move

24  through committees and process and public hearings and,

25  you know, council members.  And this project just felt

```
 1    like it was a fast track project; that it was -- it
 2    needed to be moved quickly.  It was a sense I got from
 3    staff.  It's how it appeared on my agenda.  And it -- it
 4    just seemed out of the ordinary to me, the rapidity with
 5    which it was advancing.
 6    Q       Would you say there was a sense of urgency, the
 7    project?
 8    A       Yes.
 9    Q       Did it appear to have more urgency than other
10    large development projects during your time on the CPC?
11    A       Yes.
12    Q       Where did you feel that urgency coming from?
13    A       Formally through the staff processes that were
14    put before the Commission.  So the Department of City
15    Planning staff and then also Deputy Mayor Chan.
16    Q       Did that -- and is that the defendant?
17    A       Yes, that's correct.
18    Q       Did that urgency give you any concerns?
19    A       Yes.
20    Q       Why?
21    A       I was deeply troubled by CD14, Mr. Huizar's
22    management of that district.  I felt like there was
23    ongoing corruption in that district that I did not --
24    and was not able to do anything about in my role and on
25    top of that, to have a project advancing in a way that
```

```
1   it felt wrong in my gut.  That also seemed to buck the

2   trend in terms of projects takes a long time in a way to

3   get built.  It's just the process.  This one seemed to

4   be moving very quickly to me.  And it went from moving

5   along to moving very fast -- very quickly.  And I didn't

6   understand the need for that or why.

7   Q        Do you recall when the defendant became the

8   deputy mayor that over -- that you would deal with on

9   CPC?

10  A        I -- are you referring to the defendant, sir?

11  Q        I'm sorry, yes.  Do you recall when the

12  defendant became deputy mayor?

13  A        Yes, 2016.

14  Q        Had you ever spoken with the defendant before

15  he became deputy mayor?

16  A        Yes.

17  Q        And I think you previously testified that he

18  held the general manager of Building and Safety prior to

19  deputy mayor?

20  A        Yes, that's correct.

21  Q        Did you have any interactions with him when he

22  was general manager of Building and Safety?

23  A        Yes, I did.

24  Q        Can you just please briefly describe those

25  interactions?
```

```
 1   A         I was -- you know, I always thought of the
 2   Department of City Planning and Building and Safety as
 3   a -- spouses that are divorced and maybe trying to get
 4   back together.  And we had competing and sometimes
 5   overlapping authority.  And so when we were trying to
 6   pass things, a lot of the time, you can't pass things,
 7   unless Building and Safety signs off on them.  So -- or
 8   that they can enforce them or is that even in our power
 9   to do so.  So there's been different efforts over the
10   decades to merge the departments, because that's how
11   almost like siamese twins they are.  So what I wanted to
12   do at City Planning Commission was pass excellent
13   policy.  And in order to do that, I needed to understand
14   Building and Safety better than I did as a volunteer.
15   And so over the years we'd have different members of the
16   Building and Safety Department testify or in prepatory
17   materials, they would provide input or we would hear
18   from them directly in testimony.  Some of the officials
19   from Building and Safety would come to our hearings.  So
20   we had a lot of important interaction.  No negativity,
21   but it definitely was a -- I always thought of it again
22   as, you know, separated on the process of divorce, but
23   we still love each other.  It was challenging.
24   Q         Specific to the defendant, what were the nature
25   of your interactions with the defendant when he was
```

```
 1    general manager at Building and Safety?
 2    A        Mostly social.  So I would see him at City
 3    functions, you know, holiday party perhaps or something
 4    like the Chambers or Central City Association.  The
 5    citywide functions where I would appear in as kind of a
 6    commissioner, I would see him at those.
 7    Q        Did you ever have a personal relationship with
 8    him?
 9    A        No, I did not.
10    Q        So these were citywide functions?
11    A        Correct.
12    Q        Okay.  And did he attend CPC hearings as a
13    Building and Safety general manager --
14    A        Not --
15    Q        -- to your recollection?
16    A        No, not to my recollection.
17    Q        Okay.  When he was deputy mayor, did he attend
18    any CPC public hearings?
19    A        I believe at least once.
20    Q        Do you recall specifically what that hearing
21    was about?
22    A        I do not.
23    Q        When he was deputy mayor, did you continue to
24    see the defendant at city functions?
25    A        I did, yes.
```

```
 1   Q        Let me just take a step back real quick.  In
 2   terms of the CPC hearings, are there pre-meetings?  Do
 3   you have pre-meetings?
 4   A        I do, yes -- or we did, yes.
 5   Q        Please just briefly describe what is a
 6   "pre-meeting" with respect to a hearing?
 7   A        So, again, we were nine volunteers.  And what
 8   was coming before the commissioner, very complicated
 9   matters.  And so in order for me and my vice president
10   to administer the meeting, we'd have to make sure that
11   we understood the material the day before -- before we
12   went into the hearing, but because of constrictions
13   around the Brown Act, we would never be able to have a
14   pre-closed meeting.  And so what had occurred and been
15   set up before me was a -- at least the day before, three
16   members of the Commission would get together with staff,
17   and we would review what was on the agenda the next day.
18   And that review was very much about technical matters.
19   It was not deliberative, very, very much so.  And we had
20   a city attorney present.  The Department of City
21   Planning staff was always there.  And it would be me,
22   the vice president and a rotating member of the
23   Commission.  And we would be able to ask technical
24   matters or questions or review things.  And what that
25   allowed me to do in my vice chair -- vice president,
```

```
 1    would be when we went into the meeting, it's hard to
 2    both, administer the meeting and then absorb everything
 3    at the same time.  So this allowed us to make sure that
 4    we understood and had a firm grasp.  We'd also get a
 5    copy of the advanced agenda, as well.
 6    Q       Would a deputy mayor typically attend a
 7    pre-meeting?
 8    A       No.
 9    Q       Did the defendant when he was deputy mayor
10    attend a pre-meeting?
11    A       Yes.
12    Q       How many times?
13    A       One to my recollection.
14    Q       What do you recall about his attendance at that
15    pre-meeting?
16    A       One, I felt it was below him.  Not that I
17    thought low of us, but it -- you know, L.A. is a -- a
18    big messy city.  And I always thought that folks like
19    the deputy mayors would be out.  You know, they had more
20    important things to do than come to a pre-meeting.  And
21    then two, it had never happened before.  So it felt very
22    odd to me.  And then the other thing that I remember
23    about that pre-meeting is there is a conference table.
24    It's in city hall in this beautiful -- one of those
25    beautiful rooms in city hall.  There's a conference
```

```
 1    table, and there's chairs around the circumference of
 2    the room.  And I remember the defendant sat against the
 3    wall, instead of at the table.  And I always thought
 4    that was odd, and he sat somewhere kind of behind me to
 5    my left or right, I don't quite recall.  And I just
 6    thought it was odd, because I -- deputy mayors are very
 7    senior position the City.  And there was room at the
 8    table, and we would have made room at the table, if
 9    there weren't.  So it was odd for that, as well.
10    Q        Do you recall what -- what was on the agenda
11    for that pre-meeting?
12    A        I do not.
13    Q        So in your interactions with the defendant, did
14    he ever bring up the Luxe Hotel redevelopment project?
15    A        Yes.
16    Q        Did you ever proactively bring it up with him?
17    A        No.
18    Q        Would you have any reason to proactively bring
19    up the Luxe project with the defendant as deputy mayor?
20    A        No, we would work with a person underneath the
21    deputy mayor normally.
22    Q        When do you recall him first bringing it up?
23    A        I don't remember the date.  It was at a -- some
24    sort of social function that I was participating in
25    downtown.  I don't remember.
```

```
 1   Q        It was a city event?
 2   A        I believe so, yes.
 3   Q        What do you recall about that?  Was that an
 4   in-person conversation?
 5   A        Yeah, it was an in-person conversation.  It was
 6   a social event.  It might have been a holiday party.  We
 7   had retirement parties.  There's quite often social
 8   functions that we would go to.
 9   Q        What do you recall about that conversation?
10   A        I recall after some brief pleasantries, the
11   topic came up, and I don't -- it just felt odd.  I have
12   never -- in the few years that I'd served by that point,
13   I had never really had someone approach me about a
14   specific project like that in a public environment.  It
15   felt incongruous.  It was just memorable for that
16   reason.
17   Q        When you say you have not had someone approach
18   you about a specific project, are you referring to
19   deputy mayor or just anyone?
20   A        Um, that's a good question.  Really, the deputy
21   mayor, but very rarely anyone.  But the deputy mayor.
22   In particular, usually it was -- I don't remember the
23   name of position, but they had a functionary underneath
24   them.  And that would be the person who would speak to
25   me about all planning matters or -- to express whatever
```

1    was going on in the mayor's mind.

2    Q       Was the Luxe project already on your radar at

3    the time of that conversation?

4    A       I believe so, yes.

5    Q       What do you recall the defendant saying about

6    the Luxe project?

7    A       Um, that it was important that we should talk

8    about it.

9    Q       Do you recall anything else?

10   A       Not at that initial meeting.

11   Q       You had -- you mentioned earlier that the

12   defendant was one of the sources of the sense of

13   urgency.  Did you get the sense of urgency from him at

14   this type of meeting?

15   A       I did.  A., because even bringing it up, again,

16   it hadn't happened before.  And when someone brings

17   something up, it usually is important is the impression

18   that I got as a human being.  And so yes, I did.

19   Q       And what was your reaction at that event when

20   he brought it up?

21   A       You know, I deeply respect the office.  And so

22   I -- I assented, I said yes, look yes, sure.  We can

23   absolutely talk.  So I -- I agreed and non-committally

24   to get together and talk about it.

25   Q       Did you understand that to be a one-on-one

1    get-together to discuss the project?

2    A        Yeah, that was my impression.

3    Q        Did the defendant bring up the Luxe project

4    with you on any other occasions after that City event?

5    A        Well, ultimately we got together, yes.

6    Q        All right.  And that's the one-on-one, you

7    mentioned?

8    A        It is.

9    Q        How did he -- how did you sort of set up the

10   logistics of that meeting?

11   A        Um, I believe by text exchange.

12   Q        And --

13   A        Pardon me, could I have some water.  I forgot

14   to bring mine.

15   Q        If we could please publish previously admitted

16   Exhibit 907D.

17            In preparation for your testimony today, have

18   you seen this document?

19   A        Yes, I have.

20   Q        What do you understand it to be?

21   A        A communication between myself and Mr. Chan the

22   defendant.

23   Q        Do you see on the right, there is a -- a phone

24   number where you can only see the last four digits?

25   A        Yes.

1    Q        And those last four digits are five one four

2    six?

3    A        Yes.

4    Q        Do you understand that to be -- whose number is

5    that?

6    A        That is my cell phone number.

7    Q        Have you seen this document without the black

8    redaction box previously?

9    A        Yes, I have.

10   Q        And so have you been able to identify the full

11   phone number?

12   A        Yes I have.

13   Q        As yours?

14   A        Yes.

15   Q        And then on the left, as you see there is a

16   number that starts with area code 626 and ends with 4643

17   who do you understand that phone number to belong to?

18   A        Mr. Chan the defendant.

19   Q        All right.  So if we look -- if we can just

20   briefly blow up the lines that say (0) 726-2016.

21            So I'm focusing on the series of contacts that

22   are on July 26, 2016, do you understand what those

23   contacts reflect?

24   A        Yes.

25   Q        What are those?

1  A        Those are called -- those are calls between

2  myself and Mr. Chan.

3  Q        Do you recall having a -- are there -- is there

4  one call or are there multiple calls?

5  A        It looks like it was all near each other.  So

6  it looks like multiple calls but within a short period

7  of time.

8  Q        And you see the duration column that says the

9  first column says -- or it says it doesn't have a time

10 for the first column and 22.  Do you understand that to

11 be seconds?

12 A        I do, yes.

13 Q        Do you recall having just a series of calls

14 with the defendant on July 26, 2016?

15 A        I believe this was just an introductory

16 conversation or attempt at it.

17 Q        Okay.  And was that to your knowledge was that

18 at some point after -- shortly after the defendant was

19 appointed deputy mayor?

20 A        Yes.

21 Q        And would that be something that you would do

22 with respect to a new deputy mayor to, you know, would

23 they contact you or you contact them to introduce your

24 receives?

25 A        Yes.

```
 1    Q        Do you remember any particular top project
 2    being discussed at that time?
 3    A        No.
 4    Q        Any other project with the defendant other than
 5    the Luxe Hotel?
 6    A        I don't recall.
 7    Q        If we can zoom out an then just focusing on the
 8    series of context that have the date its of 110517 and
 9    at the bottom 12517 do you understand what these
10    contacts reflect?
11    A        I do, yes.
12    Q        What are they?
13    A        These are text exchanges on that date, I
14    believe to -- around logistics for our in-person
15    one-on-one meeting.
16    Q        Do you recall that that -- that one-on-one
17    meeting was on or about May 11th or May 12th, 2017?
18    A        Yes.
19    Q        Did you contact the defendant that day to your
20    knowledge to set up this meeting?
21    A        I don't recall who -- who pushed -- who called
22    first.
23    Q        Did you ask for this meeting?
24    A        No, I did not.
25    Q        Did you want do have this meeting?
```

```
 1    A        No, I did not.

 2    Q        To your knowledge, did the -- did the defendant

 3    have an office at city hall in Los Angeles?

 4    A        Yes.

 5    Q        Did he -- did he propose to meet at his office?

 6    A        No.

 7    Q        Did he specifically propose not meeting at his

 8    office?

 9    A        Yes.

10    Q        Where did he propose meeting?

11    A        Um, off-site and in a bar restaurant, not --

12    not in a formal space.

13    Q        Okay.  Do you recall specifically who chose the

14    particular bar or restaurant?

15    A        I do not, no.

16    Q        Did you choose it though?

17    A        I did not.

18    Q        During your time on the CPC, did you have

19    interactions with other deputy mayors of economic

20    development?

21    A        Yes, I did.

22    Q        Just generally, what were the nature of those

23    interactions?

24    A        Well, usually I'd get a call or a communication

25    from their City-provided phone which always started with
```

1  (213), and I would know it was the City.  It's -- I

2  think it's (213)978- and usually if there was a meeting

3  about anything concrete or specific, like a project, I

4  would go to the offices of that individual in city hall

5  or they would come to City Planning Commission.  We'd

6  meet in one of the formal meeting rooms behind city

7  council chamber.

8  Q      Was that -- were those frequent meetings or

9  sporadic or somewhere in between?

10  A      I would say they were sporadic.

11  Q      Okay.  And just generally speaking, what types

12  of things would you typically discuss with the deputy

13  mayor?

14  A      I rarely met with the deputy mayor, but when we

15  did, it would be very, very much a -- this is what we

16  think, but do what you will.  It was very much a:  This

17  is the opinion of administration.  It was very rarely

18  about you a specific project.  It was usually about --

19  but not never, but it was rarely about one.  And it was

20  really about citywide impactful things, like cannabis --

21  regulating cannabis or home sharing or updating the

22  general plan.  It would be impactful things,

23  occasionally about a project, but usually very

24  high-level and generic-like:  This is overall our

25  thoughts.

1    Q        The (626) number that we just looked at that

2    belonged to the defendant, was that a City number to

3    your knowledge -- City of Los Angeles official number?

4    A        Not to my knowledge, no.

5    Q        Was that -- did that strike you as odd

6    communicating with a non-city number with a deputy

7    mayor?

8    A        Yeah, very much so.  We were -- gone through

9    multiple ethics training as just volunteer

10   commissioners, and it was browbeat into us about

11   communication and California Public Records Act.  It was

12   said so many times about how and what and where and when

13   one can communicate and records and -- so seeing a

14   non-(213) -- or excuse me -- a non-city hall number was

15   very -- was surprising when it turned out to be the

16   deputy mayor.

17   Q        So turning to this meeting on May -- or

18   May 11th or May 12th, 2017, do you recall which date it

19   was, specifically?

20   A        No, I do not.

21   Q        Did you know the defendant well at that point

22   in time?

23   A        No.

24   Q        Did his position as deputy mayor carry any

25   weight in your mind?

```
1    A        Very much so, yes.

2    Q        In what way?

3    A        A couple things:  One, I -- you know, it was a

4    lot of -- it was a lot of work on the Commission.  It

5    was a lot of pressure.  And while we were independent,

6    we relied on the Department of City Planning which

7    reports up to the mayor.  And so that department reports

8    to the deputy mayor.  And so it felt -- it felt

9    important to me that the person that my department that

10   I was volunteering at was requesting a conversation, and

11   it felt odd to me because it was off-site and specific

12   to something.  And -- sorry --

13   Q        Oh, no go ahead.  Finish your answer, please.

14   A        You know, we're an independent Commission, and

15   we have a term of office, but it felt concerning to me

16   that someone who is not my boss but had authority and

17   power over my appointment was requesting a meeting.

18   That did not seem well.

19   Q        Did you ever think about the undated

20   resignation letter that you had signed when you first

21   were appointed to the CPC?

22   A        Yes.  Yes, I did.

23   Q        In what way?

24   A        You know, if someone was going to cash that

25   letter, it would be the deputy mayor, and it would be --
```

```
 1   I would be informed of that.  It wouldn't be me
 2   submitting it years later.  It would be that letter I
 3   signed in 2013ish.  So this would be -- the person in
 4   that position would most likely be the person to inform
 5   me that it had been accepted later.
 6   Q       Where did you ultimately meet off-site with the
 7   defendant?
 8   A       At Mama Shelter in Hollywood on Selma.
 9   Q       Is that M-A-M-A and then shelter?
10   A       Yes.
11   Q       What is Mama Shelter?
12   A       It is a -- with respect, somewhat of a crappy
13   bar/hotel.  It is a bar/restaurant on the first floor a
14   hotel and has a rooftop.  It was -- it's not exactly a
15   sports bar, but there's screens everywhere.  Surfaces
16   are sticky, and it's at Wilcox and Selma in kind of a
17   budding party district.
18   Q       Was this meeting during the week or on a
19   weekend?
20   A       A weekday.
21   Q       Was this a business day?
22   A       Yes, it was.
23   Q       And were you at work that day?
24   A       I was yes, at Disney.
25   Q       When I say "work," I mean your other job?
```

1    A          My pay job I like to call it.

2    Q          And did you meet the defendant at Mama Shelter?

3    Did you come from work?

4    A          I came from my office in Burbank to

5    Mama Shelter.

6    Q          Do you recall what time of day it was?

7    A          Late afternoon.

8    Q          Was this -- was this lunch or was it sometime

9    after lunch?

10   A          After lunch.

11   Q          When you were going to this meeting with the

12   defendant at Mama Shelter, did you expect to be

13   discussing the Luxe Hotel project?

14   A          Yes.

15   Q          Did this particular location of Mama Shelter

16   seem to you to be an appropriate place to discuss the

17   Luxe project?

18   A          Um, it did not, no.

19   Q          Just to clarify one point, with respect to the

20   resignation letter, did you feel like you could be

21   fired?

22   A          Yes.

23   Q          Why did the -- why did Mama Shelter not appear

24   to be an appropriate place to discuss the Luxe Hotel

25   project?

1   A        First, it's a place that I would not go to

2   myself.  It was just not my kind of establishment that I

3   like to go to.  And when I did have meetings of any

4   nature like this, I would want a place that had quiet

5   and privacy.  And this, you know, it's not a sports bar,

6   but it's a sports bar in some respects.  And it's loud.

7   It can be loud.  And it's certainly not private.  So I

8   thought it was an odd selection.

9   Q        Would have -- would meeting at the defendant's

10  office to discuss the Luxe Hotel project --

11  specifically, would that have seemed even appropriate to

12  you?

13  A        More appropriate certainly than Mama Shelter.

14  And at the time, I would say yeah, it would have been

15  more appropriate at the office.  I did not have an

16  experience like this before or after.  So --

17  Q        Yeah.  Now, did you ever discuss a specific

18  project like this with another deputy mayor?

19  A        Not to my recollection.

20  Q        Did the defendant give any reason why you would

21  not be meeting at city hall at his office?

22  A        No.

23  Q        At the -- at this point in time in May 2, 2017,

24  were you aware that the Luxe Hotel project would be

25  seeking entitlements?

```
 1   A        Yes.
 2   Q        And were you aware that the planning department
 3   was considering that -- those entitlements for the
 4   Luxe Hotel project at that time?
 5   A        Yes.
 6   Q        And did you understand that the Luxe Hotel
 7   project would be heard by the CPC for its
 8   recommendations on the entitlement request?
 9   A        Yes, I did.
10   Q        Did you understand at that time that the
11   project would potentially be on the CPC's agenda that
12   summer?
13   A        Yes.
14   Q        Did the fact that the project would be heard by
15   the CPC that summer give you any particular concerns
16   about having this meeting with the defendant?
17   A        Yes.
18   Q        What concerns were those?
19   A        So it was really adding up, because I -- I was
20   very concerned about City 14 and the real estate
21   development going on in that area, especially around the
22   Staple Center.  There were a lot of projects.  There's a
23   lot of money flowing through that area, and a lot of odd
24   things in my mind were being requested of Planning.  And
25   on top of that, to have a conversation about a project
```

```
1    in that area in this nature, it felt odd.  It felt like
2    this was just yet another thing that should -- that just
3    wasn't right, and I -- as a volunteer, you know, I did
4    my best to follow all the rules, processes and
5    protocols.  And a deputy mayor is certainly able to ask
6    me for a meeting and have that conversation, but it
7    would be like seeing your doctor at Mc Donald's, like
8    no.  Like, no.
9    Q        Did you have any concerns about your
10   independence as a CPC commissioner?
11   A        Going into the meeting, some.  Coming out of
12   the meeting, much.
13   Q        Well, let's just briefly going into the
14   meeting, what were your concerns about your
15   independence?
16   A        I had never really been leaned on to support a
17   project this way.  And I -- going into the meeting, my
18   sense was this -- that's what was going to happen, that
19   there -- this was a conversation about the importance of
20   the project, not why the project is bad.  So I had
21   never -- no one had ever -- no one in the City position
22   like this had asked me for a meeting off-site to have a
23   conversation about a project.  So it felt like, you
24   know -- it felt like, you know, like when you go to
25   school and dad like I want to talk to you after school.
```

1    Like, it just did not feel like a good sensation or
2    feeling that the mayor wanted to talk to me about a
3    mayor off-site.  It felt strange and incongruous, and it
4    hadn't really happened before.
5    Q       Did you feel like you had a choice?
6    A       No.
7    Q       To be clear, was this a social meeting in any
8    way?
9    A       No.
10   Q       Was it a meeting with the deputy mayor about
11   City business?
12   A       About the project which is City business, yes.
13   Q       Okay.  Did you arrive there first?  Did the
14   defendant arrive there first; do you recall one way or
15   the other?
16   A       I don't recall.  I think more or less the same
17   time.
18   Q       Okay.  And where did you sit?  Set the scene a
19   little bit.
20   A       Sure.  I came from Burbank.  We worked in
21   Burbank.  My offices are at the Disney headquarters.  I
22   drove across.  And I parked -- if you're familiar,
23   there's a beautiful post office on Wilcox.  I parked
24   behind the post office.  I think it's Schrader.  I
25   walked over.  And it has outdoor seating along Selma.

1   And I went inside, and there were people in there.  And

2   the screens were loud.  And I went in and -- and I sat

3   down.

4   Q        How long was this meeting?

5   A        Less than an hour.

6   Q        Did you eat?

7   A        I did not eat.  I -- Mr. Chan, the defendant,

8   ordered food.  I'm a little picky about what I eat.  I'm

9   also vegetarian.  And they're known for their chicken

10  wings.  So this was not my place.  And so quite often in

11  social settings, I find any myself as a vegetarian

12  politely having food in front of me.  And so we

13  ordered -- or he ordered or one of us ordered his

14  encouragement, because I would not have ordered there

15  and food was placed, but we did not eat.

16  Q        Did you initiate discussion during this meeting

17  or did the defendant?

18  A        Mr. Chan, the defendant did.

19  Q        And what did he -- what did he sort of start

20  discussing with you?

21  A        I believe there was pleasantries.  I don't

22  remember the specifics of that, and then we discussed

23  the Luxe project.

24  Q        Was the Luxe project the primary focus of this

25  meeting?

```
 1    A         It seemed to be, yes.

 2    Q         Did the defendant discuss any other projects

 3    during the meeting?

 4    A         I don't recall any others.

 5    Q         Did he discuss any other policy areas other

 6    than the Luxe project during this meeting?

 7    A         Signage but as it relates to the project.

 8    Q         As it was related to -- as an entitlement that

 9    was proposed for this project?

10    A         Yeah, because the overall City sign policy was

11    influx, and, you know, it was obviously a concern of

12    mine.  And it strongly related to this project.  So

13    there was a discussion of the sign policy as it related

14    to this project?

15    Q         What did the defendant specifically say about

16    the Luxe Hotel project when he sort of initiated that

17    part of the conversation?

18    A         I don't recall specific language.  I remember

19    that it was emphasized that this is an important project

20    to the City from an economic development perspective,

21    from a job's perspective, from a tourist -- tourism.

22    And that it was -- it was important to the -- that the

23    mayor's office supported the project.

24    Q         Did the -- did it appear the defendant was

25    prepared for this conversation?
```

1    A        Yes.

2    Q        Can you describe that, please.

3    A        So these projects are terribly complicated, you

4    know.  And I -- it took me years to understand a lot.

5    And I recall being impressed with a depth of knowledge.

6    There are, for example, for signage there's very

7    specific things in order to put up signs.  You have to

8    have a certain geography, a certain amount of land, and

9    all these things.  It's very technical.  And the

10   specifics of the project, the number of rooms, things of

11   that nature, seem to be right on the tip of the tongue,

12   of Mr. Chan, the defendant.  And I found that

13   surprising.  Usually deputy mayors have a lot going on,

14   you know, for the City of L.A.  It's a big city.  We're

15   just one small part of their portfolio.  So it was very

16   impressive that someone would know details of a specific

17   project.

18   Q        Did the defendant seem to anticipate concerns

19   that you may have had about the project?

20   A        Yes.

21   Q        In what way?

22   A        I had been very clear that I think no one in

23   Los Angeles, no human has ever raised their hand and

24   said, please put up more digital signs in front of me.

25   And yet, the City of L.A., that's what our elected

1    people are doing.  And so I've always -- it's always

2    confused me.  And I've always thought of it as a source

3    of corruption.  And so I've been well-known on the

4    record for that.  They -- they're just not good for

5    municipal local Government.  So going into that

6    conversation, I think Mr. Chan, the deputy mayor at the

7    time, well knew my concerns around signage, both from

8    his tenure as general manager of the Building and Safety

9    Department.  Part of my concern was, you know, in ten

10   years, we had issued zero signage enforcement against

11   all the signs.  There's thousands of illegal signs.  And

12   in ten years, Building and Safety had issued zero

13   enforcement actions against any of them.  We knew that

14   because we had a hearing about it.  So I think he was

15   well-aware and knew my concerns around signage.  And

16   this project was essentially, in my bind, a giant

17   billboard stand.

18   Q       Did you state your concerns about signage to

19   the defendant during the meeting?

20   A       I did, yes.

21   Q       Okay.  And what was his response, if any?

22   A       I don't recall specifically.  I recall just the

23   restatement of the earlier importance of the project to

24   the City of Los Angeles.

25   Q       Did you state any other concerns you had about

1    the project during the meeting?

2    A        Yeah, you know, there were a number of concerns

3    I had.  The development agreement -- or the list of

4    things that the project would provide seemed anemic,

5    seemed low.  I had all sorts of things that I usually

6    wanted to be included, local hiring, partnership with

7    Trade Tech -- you know, things in the project that I

8    wanted that we could include.  So the project always

9    stood out to me as being insufficiently in the public

10   interest, and this was yet another characteristic of

11   that.

12   Q        Did the defendant have a response to those

13   concerns that you voiced?

14   A        I think just generally that it -- restating the

15   importance to the City.  I -- I would send over -- or

16   you'd talk about specifics, and you get back

17   generalities, and I got the message quickly, that the

18   specifics weren't important; that the general nature of

19   the project was -- it was important, and the City needed

20   it.  And it was important to the City.  So my specific

21   concerns weren't on balance according to the

22   deputy mayor -- the most important consideration.

23   Q        When you say you got the message, you mean that

24   was something -- he was pushing back to your concerns

25   during the meeting?

1  A        Yes, that's correct.

2  Q        With respect to how much he knew about this

3  project, did that strike you as odd in terms of your

4  prior interactions with deputy mayors?

5  A        Yes.

6  Q        How so?

7  A        You know, with respect to his -- his other

8  colleagues that had the role, they often got things

9  incorrect or wrong, or they would not know the specifics

10  of a project or the entitlements may not be accurately

11  stated what they were seeking, because a deputy mayor

12  often has -- of special economic development, this is

13  the largest development cycle for real estate since the

14  1920s.  There's a lot going on for the City of L.A., if

15  you all remember.  And so it was surprising -- and I

16  hadn't experienced before the level of detail.  It might

17  occur with someone in the mayor's office around a

18  policy, like home-sharing or Airbnb or a cannabis, but

19  it wouldn't have been something -- it wouldn't have been

20  quite so specific as it relates to a project like this.

21  Q        Did the defendant say anything about other City

22  officials that were supporting the project?

23  A        Um, not to my recollection.

24  Q        Did he say anything about your position as

25  president of the CPC?

```
 1    A          I'm sorry, I apologize.

 2    Q          Oh, yes, go ahead.

 3    A          That's not exactly correct.  Can you ask the

 4    question again.  I thought you meant the mayor's office.

 5    Q          Sure.  Did the defendant say anything about

 6    other City officials that were in support of the

 7    project?

 8    A          I -- I believe we -- I don't recall the

 9    specifics, but I believe we discussed at CD14,

10    Mr. Huizar -- council member Huizar was supportive of

11    the project.

12    Q          Did you -- what was the tenure of this

13    discussion?

14    A          I would say superficially pleasant but with

15    a -- a thin venire which was a power dynamic of which I

16    was less powerful.

17    Q          Why were you less powerful?

18    A          Um, you know, the deputy mayor is a very

19    important position.  The City has a lot of influence.  I

20    also had -- I always thought was kind of a sword hanging

21    over me with my resignation letter, which I was glad if

22    they wanted to cash in, but it definitely was something

23    that was always on my mind when I took positions that

24    were ardent or in contravention of what I thought the

25    consensus might be.  So if the deputy mayor is saying to
```

```
 1   me that this is important in the mayor's office and they
 2   have my letter of resignation undated, it's on your
 3   mind.  You know, I've worked very hard in this role.  I
 4   did not want to be forced out yet.  I wanted to do the
 5   good work I thought I could do, and yet, protect my
 6   independence.
 7   Q        What was your perception as to the defendant's
 8   objective in having this discussion with you?
 9   A        I think, you know, it was an iron fist than a
10   soft glove.  It was very -- Mr. Chan was always very
11   personable and would always smile and was very pleasant,
12   but there's definitely a power dynamic.  My -- the
13   objective seemed to be, this is what we, collectively,
14   the role, "we," the mayor's office thinks -- and you are
15   an appointee, and we think you should think this too.
16   It felt like it was -- knowing all of my concerns, what
17   was more important was the approval of the project and
18   that that's where I should be.
19   Q        Did he ask you to vote in support of the
20   project?
21   A        He did ask me to support the project.
22   Q        Did he ask you to support the entitlements that
23   were being presented?
24   A        I believe -- I don't remember specifics.  I
25   remember being -- I remember being -- or we discussed
```

```
 1    supporting the project which would include the
 2    entitlement, sir.
 3    Q        And when you say he asked you to support the
 4    project, would that include your voting for the project?
 5    A        Necessarily, yes.
 6    Q        And would it include your using your influence
 7    over the agenda to get the project on the agenda?
 8    A        In my mind, it included everything I could do
 9    to support the project, including bylaws -- but by
10    policy, the chair of the Planning Commission manages the
11    agenda with staff, so yes.
12    Q        Did your position as president of the CPC carry
13    anymore sway with other commissioners?
14    A        Yes, I would say the chair of the Commission or
15    the president of the Commission is the first among
16    equals.  You know, while none of us have three votes per
17    person, the chair very much is a voice that we respect
18    on the Commission, because we also recognize that
19    they've done additional work to master projects.  So
20    yes.  And I also think I gained the respect of my
21    colleagues after service about my ethics, my
22    intelligence, my hard work.  That's why they reelected
23    me.  And I think they respected my voice.  And so when I
24    raised a concern, I know they took it very seriously.
25    If they didn't agree with me, they knew that -- they
```

```
 1    knew me.  So I think my voice was very persuasive.
 2    Q        Did you feel any pressure during this
 3    conversation?
 4    A        Yes.
 5    Q        How so?
 6    A        Um, well, on surface, it felt very polite, you
 7    know.  It felt as if I was being told in no uncertain
 8    terms that this was a project that was important to the
 9    City and needed to see across the finish line.  And
10    while I have been advised previously of the mayor's
11    office's position on things through the lower level or
12    the Planning staff, I don't -- I don't recall a project
13    like this or a conversation with the deputy mayor
14    position.  So those things combined made me feel like
15    there was a clear mandate that I was being asked to
16    comply with.
17    Q        And I think you testified that the meeting was
18    a little less than an hour?
19    A        Right.
20    Q        Would you say a half an hour, 45 minutes?  What
21    would you estimate?
22    A        I want to say somewhere between 30 and
23    45 minutes.
24    Q        This mandate that you felt during the
25    conversation, was that just at one point or did you feel
```

1     as if this was a consistent thread during the

2     conversation?

3     A        It felt like it was the reason for the

4     conversation.  So the latter.

5     Q        Okay.  And did you have a sense as to whether

6     the defendant was advocating for this project in his

7     capacity as deputy mayor?

8     A        Before the mayor disallowed the Commission, we

9     used to be able to talk to developers and their

10    lobbyists, and then the mayor outlawed that.  By mayoral

11    proclamation, commissioners can no longer talk to

12    anybody outside of hearings.  What it felt like to me

13    was I was having a conversation with a lobbyist.

14    Q        And can you describe that feeling a little bit

15    further.

16    A        You know, we -- in that time before, we used to

17    be able to meet with projects and sit down and have

18    conversations about our concerns, citywide concerns,

19    what have you, project-specific concerns, and they would

20    pay lobbyists, and the developers would do what they

21    would do, which is try and convince you otherwise.  And

22    in the couple of years that I've been serving in the

23    role, I had spent time with developers and lobbyists,

24    and it felt like I was having a conversation with

25    somebody who was advocating for a project, and that was

```
 1   new.
 2   Q        Did you know whether or not the mayor had sent
 3   the defendant to meet with you?
 4   A        I do not know for a fact.  My assumption was
 5   yes.
 6   Q        Your assumption is that the mayor had sent him?
 7   A        Well, when the deputy mayor talks to you, I
 8   always assume it has the authority of the office behind
 9   it.
10   Q        Okay.  Did you know one way or another whether
11   the mayor had specifically sent him?
12   A        Not in this instance, no.
13   Q        But in terms of your speaking with the deputy
14   mayor, did you feel as if you were communicating with
15   the mayor's office?
16   A        Yes.
17   Q        Okay.  And you were appointed by the mayor's
18   office?
19   A        Yes, that's correct.
20   Q        How did the meeting end?
21   A        I tried to be polite and non-committal.  And I
22   walked back to my car.  And I -- very specifically
23   remember getting in my car and being with a deep sense
24   of unease.  Downtown and City 14 has caused -- had
25   caused me a lot of anxiety and concern.  And it was the
```

1  epicenter of the exact reason why I got on to these

2  public bodies, which is homelessness.  And the one thing

3  we never really talked about in any of this was the very

4  issue that downtown was grappling with.  And I walked

5  out of there, and I sat in my car and I thought, what

6  the heck is going on here.  And I just felt uneasy.

7  Q        Did the defendant say anything to you when you

8  were leaving in terms of trying to discern whether there

9  was a mutual understanding?

10  A        I don't recall a specific language, but there

11  was a restatement of his position in some language, like

12  this is an important project to the City.  This is

13  supported by the area representative.  Um, I don't

14  remember specific language.

15  Q        Okay.  Was it your understanding that the

16  defendant was seeking to have your commitment coming out

17  of that meeting in support of this project?

18  A        Yes.

19  Q        Was it your perception that the defendant

20  would -- was seeking to influence your vote on the

21  project?

22  A        Yes.

23  Q        And was it your sense that the defendant was

24  seeking to influence your -- carrying your position as

25  president to influence the other members of the CPC?

```
 1    A        Yes.
 2    Q        Was it your perception that the defendant was
 3    seeking to influence your moving this project quickly?
 4    A        Yes.
 5    Q        And getting it on the agenda for the CPC
 6    quickly?
 7    A        It was already on the agenda at this time.
 8    Q        Okay.  As of May 2017, had you ever had a
 9    meeting like this with the deputy mayor while you served
10    on the CPC?
11    A        Not to my recollection.
12    Q        After May 2017, did you ever have another
13    meeting like this with any other deputy mayors while you
14    were on the CPC?
15    A        Not to my recollection.
16    Q        Did you ever have a meeting like this with any
17    other City officials while you served on the CPC?
18    A        No.
19    Q        In terms of the feeling you left this meeting
20    with, did you feel like you had any recourse you could
21    take to discuss your concerns about the meeting?
22    A        No.
23    Q        Why not?
24    A        Um, I don't -- I don't know.  I'm a volunteer.
25    And I remember walking out, being like, who do you call?
```

```
 1    Do I call the mayor?  Do I call a hotline and say what?
 2    I think the deputy mayor is -- sort of maybe is leaning
 3    on me.  I have no idea.  It felt like pressure had come
 4    to bear, and I had to do what I had to do to be an
 5    independent commissioner, and I knew that I had that in
 6    me to do whatever I thought was right.  This as a
 7    volunteer position.  This was not my job, but I took it
 8    very seriously, and I also knew that my time would come,
 9    and I would step off the Commission.  So I ultimately
10    felt like A., I didn't really understand who to call.  I
11    thought, you know -- and what am I going to say?  So it
12    is so hard to describe.  This is very different.  There
13    has been a lot of conversation and research here, but it
14    was a different time, and things were marching; and I
15    felt a little bit adrift, and I didn't know what to do,
16    and I had a full-time job.  And I did not feel like I
17    was going to do anything I thought was wrong.  So I
18    thought okay, I can do this.  I can be independent and
19    do what I think is right here.
20    Q       Just briefly, what did you mean by "things were
21    marching"?
22    A       It felt -- downtown in that time felt -- felt
23    so corrupt.  It felt like things were happening down
24    there that made no sense, not just in City 14.  And I
25    did not understand what was going on, but I knew that
```

UNITED STATES DISTRICT COURT

```
 1    every time I voted, I would vote as I thought was right;
 2    that I wasn't soliciting re-election.  I was a
 3    volunteer.  And if things were marching and they marched
 4    over me, so be it.  I felt like a huge sense of momentum
 5    around these bigger projects that didn't always pan out
 6    and/or in my mind operate in the public interest, which
 7    was our charter -- our charge.
 8    Q        Did you carry your feeling from this meeting
 9    going forward into 2017 or in 2017?
10    A        Yes, I did.
11    Q        In what ways?
12    A        Um, you know, I'm a -- I'm not a professional
13    judge or a legislator, and it felt like the
14    administration wanted me to act a certain way.  And I
15    felt like I didn't necessarily want to go exactly where
16    the administration was telling me they wanted us to go
17    as a Commission.  And I remember throughout my
18    deliberations or reviewing things, the mayor's office
19    had a very strong position through Mr. Chan, the
20    defendant, deputy mayor, that I might be deviating from.
21    And that was a -- definitely something I thought about.
22    Q        Did you discuss this meeting with the mayor
23    with anyone?
24    A        I discussed it with no one.
25    Q        Did the CPC ultimately consider the Luxe Hotel
```

```
1    project?

2    A        Yes, we did.

3    Q        Was it later that summer?

4    A        Yes.

5    Q        Prior to that meeting or that hearing, did you

6    have any further discussions with the defendant

7    regarding the project?

8    A        Not to my recollection.

9    Q        And for development projects that were seeking

10   entitlements, what did you typically review prior to a

11   CPC hearing?

12   A        Oh, my goodness, we would get -- it felt like a

13   photocopy paper box delivered to our homes.  Eventually,

14   we became digital, and you'd get all of these materials,

15   depending on the entitlements.  Sometimes there was a

16   lot of environmental documents.  Sometimes it was public

17   testimony.  If there was a hearing, there would be

18   information.  There would be a staff recommendation.

19   There would be exhibits from the developer.  They would

20   submit plans and such.  All the opposition, if it was

21   organized, would submit things, as well.  And then at

22   times, you know, if it was specific, if you're trying to

23   decide something that's based on something, you might

24   get whatever that other thing you're supposed to decide

25   based on something, you might -- you might get whatever
```

1   that other thing you're supposed to decide, based on if

2   there's a law or precedent, it might be included, as

3   well.  So in this instance, it was quite a robust

4   package, because of the nature of the entitlements in

5   the project itself.

6   Q        Did you review those materials?

7   A        Yes, I did.

8   Q        Okay.  Did you feel -- did you feel like you

9   had an obligation to do so as president of the CPC?

10  A        Yes.

11  Q        To your knowledge, had the Planning department

12  already considered the proposed project that you were

13  going to be hearing in the CPC?

14  A        Yes.

15  Q        And typically, does the CPC consider Planning

16  department's initial set of recommendations?

17  A        Yes.

18  Q        Okay.  If we could now publish previously

19  exhibit -- excuse me -- previously admitted

20  Exhibit 515....  And if we could just blow up the top of

21  the document.

22           Do you recognize what's -- what's reflected

23  here?

24  A        Yes.

25  Q        What is it?

1    A         This is the top of our agenda of the City

2    Planning Commission.

3    Q         And this is a meeting from

4    September 14th, 2017?

5    A         Correct.

6    Q         If we could just turn to page three and blow up

7    that top portion -- or actually -- well, yeah, do you

8    recognize what we've blown up on the screen here for

9    1020 south Figueroa Street?

10   A         Yes.

11   Q         And it says, "Luxe C Center Hotel" under

12   "proposed project"?

13   A         Yes.

14   Q         All right.  And was this the Luxe project that

15   the defendant had met with you about at Mama Shelter?

16   A         Yes.

17   Q         If we could now just blow up the list there

18   briefly.

19             Just looking at this, what types of

20   entitlements were -- were being considered at this

21   hearing?

22   A         So first, just to go through the list, we were

23   being asked to say that this -- this comported with the

24   California environmental impact review analysis, and we

25   had to make that finding, which is a separate document.

1    This was also requesting a legislative act, the creation

2    of a supplemental use district to allow a sign -- a sign

3    district, which had all sorts of specific requirements

4    in order to create one.  You can't just put it anywhere.

5    TFAR, which is the Transfer of Air Rights, essentially,

6    so that the project could be bigger, more dense than it

7    otherwise would be entitled to on that land, which

8    included the provision of benefits through the two

9    mechanisms we talked about and then a whole lot of

10   alcohol.  So you need permits to sell alcohol in all

11   sorts of different ways, and this was a very robust

12   package of alcohol request.

13   Q       Okay.  And if we could just briefly turn to

14   page four and look at item eight....  Is this still the

15   Luxe Hotel project?

16   A       Yes, that's correct.

17   Q       And do you see where it says "Proposed project

18   consideration of a development agreement"?

19   A       Yes.

20   Q       What is a "development agreement"?

21   A       Oh, my goodness, well, I always thought of them

22   as legalized corruption.

23                    (Laughter.)

24           THE WITNESS:  But basically a development

25   agreement is a side agreement by which a developer

```
1    agrees to do all sorts of things that are not in the law

2    or required by law, in order to get their project

3    approved, and council offices usually negotiate them.

4    And so we were asked to ratify them as part of our

5    approval process.  And what I would often do is reject

6    elements of a development agreement, which had nothing

7    to do with land use.  So this was us considering the

8    side deal that was negotiated to get the project

9    approved.

10   Q        Generally speaking, this package of

11   entitlements and benefits, was this the topic of

12   discussion that you had with the defendant during the

13   Mama Shelter meeting?

14   A        Yes.

15   Q        Okay.  Was this meeting held on

16   September 14, 2017, to your recollection?

17   A        Was the --

18   Q        Did the meeting -- was the hearing held?

19   A        Oh yes, yes.

20   Q        Would there typically be minutes prepared after

21   a meeting?

22   A        Always, yes.

23   Q        All right.  So if we could now -- if we could

24   actually keep Exhibit 515 on the left, page three.

25            THE COURT:  All right.  Before we get into
```

```
 1   these minutes, I think we'll take our first break of the
 2   morning.  We'll be in recess for 15 minutes.
 3                     (Recess.)
 4          THE COURT:  All counsel and the defendant are
 5   present.  Shannon is bringing in the jury.
 6          (Whereupon, the following was held before
 7          the jury)
 8          THE COURT:  All right.  The jury is present.
 9   You may resume your direct examination.
10          MR. FAERSTEIN:  Thank you, Your Honor.
11               DIRECT EXAMINATION (RESUMED)
12   BY MR. FAERSTEIN:
13   Q       Mr. Ambrose, when we left off, we were
14   discussing -- we were beginning to discuss the minutes
15   from the September 14th, 2017, CPC hearing.  And I've --
16   we've pulled that up.  It is previously admitted
17   Exhibit 516, and it we're looking at page 1.  Do you
18   recognize this document?
19   A       Yes.
20   Q       Are these the minutes from that meeting?
21   A       Yes.
22   Q       If we could please turn to page 9 of
23   Exhibit 516.
24          And we can just have it actually in the middle
25   of the page, please.
```

```
 1              Thank you.  If you look under "motion," it
 2      says, "Commissioner Ambroz put forth the actions below
 3      in conjunction with the approval of the following
 4      project," and then it references below that, the Luxe
 5      City Center Hotel project.  This is the Luxe project
 6      that you had previously spoken with the defendant about?
 7      A         Yes.
 8      Q         Okay.  And just can you just describe briefly,
 9      how does a particular project proceed in a CPC hearing?
10      How do you consider it?
11      A         Certainly.  For a project of this type, we
12      would have a staff presentation, and then we would
13      invite the developer or proponent to present.  And then
14      we would have any type of opposition and then public
15      comment.  After public comment, we would have:  Staff
16      will be able to respond to anything they heard before to
17      us, and then we would have commission deliberations
18      where we would discuss amongst each other, raise
19      questions, argue with each other, and ultimately, call a
20      vote.
21      Q         When you refer to "staff," again, are you
22      referring to the Planning department staff?
23      A         Yes, that's correct.
24      Q         And are they presenting this proposed project
25      to the CPC?
```

```
 1    A        Yes, that's correct.

 2    Q        And when you say "deliberations," is this in

 3    public?

 4    A        Yes.

 5    Q        Public hearing?

 6    A        Yes.

 7    Q        And at some point, do you end up taking a vote?

 8    A        Yes, I would be the person to call for the

 9    vote.

10    Q        And are you -- you're proceeding over the

11    meeting as the president?

12    A        I am presiding, yes.

13    Q        Were you president in September of -- on

14    September 14th, 2017?

15    A        Yes.

16    Q        All right.  If we just look at -- if we can

17    blow up a list of paragraphs below -- the main

18    paragraph -- and if we could extend it, so that we can

19    see the numbers on the left, please....

20             Thank you.

21             So do you see that for item number two, it

22    refers to a sign district?

23    A        Yes.

24    Q        And the Olympic south sign district -- Figueroa

25    and Olympic south sign district?
```

```
 1   A        Yes.

 2   Q        And it says that they're following

 3   modifications?

 4   A        Correct.

 5   Q        Can you just describe what is reflected here?

 6   A        Certainly.  So a couple -- a couple of things

 7   are coming into force here, in A, B, C, D and E.  First,

 8   is the brightness of the signs.  So there is an

 9   understanding that signs that are too bright, distract

10   drivers and also are unhealthy for a number of reasons,

11   for wildlife in the environment.  And so candelas is a

12   level of luminosity, how bright it is, and then you see

13   during the day, they're brighter, because it's daylight

14   out.  And then at night, they're supposed to dim.  So

15   that's what's there.  This comports with the CPC draft

16   sign ordinance that had not yet been passed by council.

17   We -- we put the provisions here.  Then there are the

18   hours.  So most signs come in, they request 24 hours/7

19   days a week, which I always thought was unreasonable.

20   So we should be able to see the stars, not just on the

21   walk is what my old phrase was.  So can we turn them off

22   at some time?  And that's what the hours were.

23   The in-lieu fee -- um, in-lieu fee is something that I

24   really did not like.  I think it encouraged bad behavior

25   by folks in positions of power.  It is basically, you
```

```
 1    can pay your way out of a condition.  So here we have

 2    these lists of conditions that are required, but we'll

 3    let you pay your way out of them, and I always thought

 4    that was not good.  So I always tried to remove that.

 5    Not always -- in this case, I tried to remove that --

 6    and then the takedown ratio for digital signs and for

 7    static.  So for every square foot you can think of it of

 8    digital, we wanted you to take down 10-square feet of

 9    static.  And the idea is, we would reduce signed light

10    is what it's called in our community.  It was higher,

11    because digital signs are more valuable.  So we wanted

12    more takedown than static.  Static are just the vinyl

13    signs you see.  Um....

14    Q       Let me -- let me actually just jump in real

15    quick.

16    A       Okay.

17    Q       When -- when you said that -- you said I tried

18    to take -- to do this.  Are you referring to you or to

19    CPC more broadly?

20    A       I -- I believe I included these, but it was the

21    CPC's action that would make them effective.

22    Q       In your experience on the CPC, were other

23    commissioners like-minded with respect to sign issues?

24    A       Yes.

25    Q       And when you were -- when the CPC was going to
```

```
 1    make a modification to a proposal, could you do that
 2    unilaterally?
 3    A        Absolutely not.
 4    Q        Would that have be voted on?
 5    A        Yes.
 6    Q        Okay.  And so these modifications that you were
 7    just describing, are those modifications that the CPC
 8    would be recommending?
 9    A        Correct.
10    Q        And in this -- in this meeting, did you
11    deliberate with the other CPC members these proposed
12    modifications?
13    A        Yes, we did.
14    Q        And did you reach agreement on these proposed
15    modifications?
16    A        Yes.
17    Q        If we could also now just flip to page 11 of
18    Exhibit 516.
19             Actually, if we could show pages 10 and 11 --
20    10 on the left and 11 on the right, please....
21             So this -- this shows pages 10 and 11 of the
22    minutes, Exhibit 516.  Do you understand this to be also
23    about the Luxe City Center, if you look in the middle of
24    page 10?
25    A        Yes.
```

```
 1   Q        And then if we look at page 11, item number

 2   three, do you see where it says, "Modify the TFAR

 3   payment to include a hundred percent funding to the

 4   public benefit trust fund"?

 5   A        Yes.

 6   Q        Was that another modification that was

 7   deliberated on during this hearing?

 8   A        By the entire Commission, yes.

 9   Q        All right.  And can you just briefly describe

10   what you were modifying here?

11   A        Certainly.  TFAR is the kind of Vegas-style

12   "buy the air rights, put 'em elsewhere," and then some

13   of the money goes into what I always thought of as a

14   black hole, and it goes to nonprofits and other groups

15   in the community that the council member usually

16   identifies.  The other 50 percent goes to the public

17   committee that has different members appointed by

18   different city officials that has a public process and

19   minutes and is -- and is much more transparent.  So what

20   I was requesting here, along with my colleagues on the

21   Commission unanimously was that a hundred percent go

22   directly to that other committee that's more transparent

23   because of our shared concerns.

24   Q        Just to clarify, when this project was proposed

25   to you by the Planning staff, did it initially propose a
```

1    50/50 split of the public benefit --

2    A        Yes.

3    Q        -- public benefits from the TFAR?

4    A        Yes, that's correct.

5    Q        And you were proposing -- you were modifying it

6    to recommend at a hundred percent to the public benefit

7    trust fund?

8    A        Correct.

9    Q        Okay.  Other than these two modifications, do

10   you recall the CPC making other modifications to the

11   proposal?

12   A        I don't recall.

13   Q        Did you ultimately vote to approve this project

14   or recommendations to approve this project?

15   A        Yes, I did.

16   Q        What are you specifically voting to approve?

17   A        Well, there's two separate motions here.

18   First, you vote and you verify that the environmental

19   analysis has been done correctly, and we did.  And then

20   there was a number of legislative actions we had to take

21   to create the sign district which allowed them to put

22   the signs up in the first place, and then we also

23   approved the entitlements that are requested.

24   Q        So you vote on each of those things separately?

25   A        Two of them separately, yes.

1   Q        Okay.  And during the deliberations, are you --

2   are you speaking with your fellow commissioners and

3   advocating in a certain way?

4   A        Yes, so it is open conversation with the

5   commission in order to -- some commissioners are more

6   shy than others, and so we would go left to right

7   sometimes around the horseshoe, so that commissioners

8   who were a little more introverted and wouldn't

9   necessarily speak up, everyone spoke; and if you didn't,

10  it's fine, we just keep going, and sometimes I would

11  speak last.

12  Q        So when you were sitting in this CPC hearing,

13  considering the Luxe Hotel project, did you have the

14  feeling that you described earlier from your meeting

15  with the defendant at Mama's Shelter in your mind?

16  A        Yes.

17  Q        Okay.  Did you have the undated letter of

18  resignation that you had signed in your mind when you

19  were sitting in this meeting?

20  A        Yes.

21  Q        And just briefly, what was in your mind when

22  you were sitting in this meeting?

23  A        I was pushing very much to alter the project,

24  to make it in my mind, serve the public interest better.

25  And my colleagues unanimously agreed, but I knew that we

```
 1    were pushing back against -- in the requested project

 2    that had existed when it was submitted and advocated for

 3    by the deputy mayor and by the developer and by the

 4    council member.  So we were basically pushing against a

 5    machine to do what we thought was right, and it felt

 6    risky.

 7    Q       Did the pressure that you felt during that

 8    meeting, was that in your mind?

 9    A       Yes.

10            MR. FAERSTEIN:  Nothing further, Your Honor.

11            THE COURT:  All right.  Cross-examination.

12                       CROSS-EXAMINATION

13    BY MR. BRAUN:

14    Q       Now, Mr. Ambroz, your advocacy for homeless

15    people and other people who put you at odds with some of

16    the members that were more interested in development; is

17    that correct?

18    A       I'm sorry, sir, other members of what?

19    Q       Of the Commission.

20    A       Would put me at odds with them, sir?

21    Q       Yeah.

22    A       No.

23    Q       Okay.  How about with developers?  Developers

24    found you sort of difficult?

25    A       I don't think they would say that to my face.
```

```
1    Q        No, I'm not saying what they would say to your

2    face, but what would you say in testimony?  They thought

3    that you were a pain in the you know what; correct?

4    A        I think they thought I had a backbone.

5    Q        Okay, all right.

6             Now, so this luncheon you had with Ray Chan was

7    on May 12th, 2017; is that correct?

8    A        Yes, sir.

9    Q        Okay.  And has the Government showed you the

10   Planning Commission agenda for the day earlier,

11   May 11th?

12   A        Yes, sir.

13   Q        And Mr. Chan was trying to -- as your records

14   show here, was trying to text you 12 times to try to get

15   in touch with you; correct?

16   A        Yes.

17            MR. FAERSTEIN:  Objection.  Misstates

18   testimony; assumes facts.

19            THE COURT:  Overruled.  You can answer.

20   BY MR. BRAUN:

21   Q        And did you -- did the Government show you

22   item 13 on the agenda?

23   A        I'm sorry, I don't recall what you're referring

24   to.

25   Q        Okay.  The agenda for the day that would match
```

1    with these telephones -- whatever these are -- there's

2    the 12 times that my client tried to get to you over and

3    over and over and over again, and that's on

4    May 11th, 2017; correct?

5    A        I don't understand the question, I'm sorry.

6    Q        Okay, because the Government, they showed you

7    this phone record; correct?

8    A        I can't -- I apologize.  I can't see that.

9    Q        Okay.  Do you remember testifying about the --

10   the number of calls?

11   A        I want to be truthful, I can't see that far,

12   sir.

13   Q        Can I approach him, Your Honor?

14            THE COURT:  Show it on the screen.

15            MR. FAERSTEIN:  Just objection as to the

16   vagueness as to what counsel is pointing to, Your Honor.

17            MR. BRAUN:  Let me just -- you were -- you were

18   -- there was an item 13 on May 11, 2017, item 13, that

19   the Government pointed out to you; correct?

20            THE COURT:  Mr. Braun, it's on the screen now.

21            MR. BRAUN:  Oh, it is?  Yeah.  Let's --

22            THE WITNESS:  Oh, yes, sir.

23   BY MR. BRAUN:

24   Q        You see all these calls there?

25   A        I do, sir.

```
 1    Q        Okay.  You didn't take -- what are they?  Are
 2    those phone calls or texts or what?  Can you tell?
 3    A        I believe they're a mix of both, sir.
 4    Q        Okay.  And from what I can see, Mr. Chan never
 5    got through to you that morning, did he?
 6    A        I don't recall, sir.
 7    Q        Now, do you recall that you were at a meeting
 8    of the CPC that morning?
 9    A        I don't recall, sir.
10    Q        Okay.  Did the Government ever show you the
11    official agenda for your committee on May 11th, 2017?
12    A        I don't recall if it -- it would be helpful to
13    see it.
14    Q        Do you recall there was an issue about -- about
15    changing the zoning in West Los Angeles; correct?
16    A        I'm sorry, sir.  I don't understand the
17    question.
18    Q        Well, has the Government ever showed you the
19    agenda for May 11th?
20    A        I don't recall.
21    Q        They never showed you the agenda that
22    corresponds with their -- this phone record?
23             MR. FAERSTEIN:  Objection.  Asked and answered.
24             THE COURT:  Sustained.
25    BY MR. BRAUN:
```

1    Q        Okay.  Now, entitlement, can the Building and

2    Safety department give entitlements?

3    A        No, sir.

4    Q        Can the deputy mayor give entitlements?

5    A        No, sir.

6    Q        So the only one that can give entitlements is

7    the Planning section of the City; correct?

8    A        Yes, sir.

9    Q        So when -- when Ray Chan approached you for

10   lunch, didn't he say, "I'm retiring in six weeks.  I'm

11   just trying to make peace with you"?

12   A        I don't recall that, sir.

13   Q        When you got back to the office, did you ever

14   say to someone there, "Who picked that restaurant"?

15            MR. FAERSTEIN:  Objection, hearsay.

16            THE COURT:  Overruled.

17            THE WITNESS:  I'm sorry.  I don't understand

18   the question.

19   BY MR. BRAUN:

20   Q        Well, it was a dive as you described it;

21   correct?

22   A        Yes.

23   Q        Okay.  And it was halfway between your office

24   and Ray's office; correct?

25   A        Yes.

1    Q       So he didn't force you to drive all the way

2    downtown to meet with him, did he?

3    A       It would have been easier.

4    Q       Well, if you look at a map, Hollywood is

5    halfway between.  It may have -- correct?

6    A       Not by traffic.

7    Q       Well, how about by how the bird flies?

8    A       That won't get you anywhere in L.A.

9                       (Laughter.)

10   BY MR. BRAUN:

11   Q       Okay.  So you don't even know who picked that

12   restaurant, do you?

13   A       I do not, sir.

14   Q       Okay.  Do you know whether it was picked,

15   because at least, they thought it was halfway between

16   your office and Ray's office?

17           MR. FAERSTEIN:  Objection.  Calls for

18   speculation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Will you repeat the question,

21   sir.

22   BY MR. BRAUN:

23   Q       Okay.  Do you know why it was picked?

24   A       I don't, sir.

25   Q       Now, do you remember telling the Government

```
1    that "The Hazens Residential project triggers a little

2    vomit in the back of my float"?

3    A       Yes.

4    Q       Is that because it was such a -- it was going

5    to be a 70-story skyscraper in Los Angeles?

6            MR. FAERSTEIN:  Objection, misstates testimony.

7            THE COURT:  Overruled.

8            THE WITNESS:  Repeat the question, please.

9            MR. BRAUN:  Yeah.  Was it because it was a

10   70-story skyscraper in Los Angeles?

11           THE WITNESS:  No.

12   BY MR. BRAUN:

13   Q       Why did it -- why did it give you vomit in the

14   back of your throat?

15   A       From any experience on the Commission, we were

16   seeing a level of corruption in City 14 that caused me

17   great concern.  And every time a project came up, it

18   seemed to reinforce that narrative and give you

19   examples; but when the development package came forward

20   and when the entitlements came forward, it seemed to not

21   operate as we're required to the general welfare of the

22   public.  In fact, it actually seemed to go against that

23   in many instances --

24   Q       You disliked the amount of retail space;

25   correct?
```

```
1    A        No.

2    Q        Did you tell the Government that you disliked

3    the amount of retail space?

4             MR. FAERSTEIN:  Objection, hearsay.

5             THE COURT:  Overruled.

6             THE WITNESS:  My concern was that retail would

7    not be utilized, not the amount.

8    BY MR. BRAUN:

9    Q        So you were concerned that whoever was going to

10   run this, would not be able to rent the retail space; is

11   that right?

12   A        I did not know their plans for occupying it

13   themselves or renting it, but I did know that there is a

14   high vacancy rate and ground for retail in this

15   neighborhood and that we were adding a great deal more,

16   and I didn't know that the market could command it, and

17   therefore, you could create a public blight with empty

18   retail which would diminish the walkability.

19   Q        You were also concerned because they had a

20   swimming pool that was private; correct?

21   A        No, that's not correct.

22   Q        Didn't you tell the Government that you were

23   concerned when the developers said that the open space

24   was for a private pool?

25   A        So the definition of "public space" and "open
```

```
 1   space" to me had been perverted on this project.  To
 2   call a rooftop pool "open space" is absurd.  "Open
 3   space" is a park on the ground, not up on a roof.
 4   Q       So you would rather have had this space been
 5   made into a park; correct?
 6   A       No.
 7   Q       Now, do you know Ray Chan's technical
 8   background?
 9   A       No, I do not.
10   Q       You don't know whether he has a degree in
11   Engineering?
12   A       I do not.
13   Q       You know that he speaks Chinese languages;
14   correct?
15           MR. FAERSTEIN:  Objection, assumes facts,
16   foundation.
17           THE COURT:  Overruled.
18           THE WITNESS:  Sorry, do I know that he
19   speaks --
20           MR. BRAUN:  Yeah, Mandarin or Cantonese?
21           THE WITNESS:  I did not, no.
22   BY MR. BRAUN:
23   Q       So did you -- you knew that the -- that the
24   developer of this, Mr. Huang --
25           THE COURT:  You walked away, I couldn't hear
```

```
 1    you.
 2             MR. BRAUN:  Oh, sorry.
 3             Mr. Huang was the man who was going to come up
 4    with the $750 million, correct?
 5             MR. FAERSTEIN:  Objection.  Foundation, assumes
 6    facts.
 7             THE COURT:  Why don't you rephrase the
 8    question.
 9             MR. BRAUN:  Okay.  Do you know who Mr. Huang
10    is?
11             THE WITNESS:  I do not.
12    BY MR. BRAUN:
13    Q       You didn't know this was a Chinese development?
14    A       I did.
15    Q       Okay.  And you knew that Ray Chan was a --
16    background was Chinese, correct?
17    A       No.
18    Q       You didn't think that by looking at him and
19    seeing his name, Chan, you didn't think he was of
20    Chinese descent, at least?
21             MR. FAERSTEIN:  Objection, argumentative.
22             THE COURT:  Sustained.
23    BY MR. BRAUN:
24    Q       Didn't he speak with an -- English with an
25    accent?
```

```
 1                 MR. FAERSTEIN:  Objection, argumentative.

 2                 THE COURT:  Overruled.

 3                 THE WITNESS:  I'm sorry.  There's a lot there.

 4       Would you, please, ask it again.

 5       BY MR. BRAUN:

 6       Q       Yeah, you saw -- you looked at him and you

 7       heard him speak.  And he spoke with an accent; correct?

 8       A       I did not judge him looking at him.

 9       Q       It's not a judgment.  I mean, it's -- I'm not

10       saying it's good or bad.  I'm just saying, you look at

11       people and you hear them speak, you can sort of guess

12       their origins; correct?

13       A       No.

14                 MR. FAERSTEIN:  Objection, argumentative.

15                 THE COURT:  Overruled.

16       BY MR. BRAUN:

17       Q       Okay.  The -- did you have an objection to

18       Chinese developers coming into Los Angeles?

19       A       No.

20       Q       You didn't -- this -- now, this building --

21       this building would have been right adjacent to

22       Staples Center; correct?

23       A       Yes.

24       Q       Okay.  And that would create some retail

25       space -- retail trade; correct?
```

```
 1    A         I'm sorry, sir.  I don't know understand
 2    what --
 3    Q         Let me ask you:  Have you ever been in the
 4    retail business?
 5    A         Myself, I have not, no.
 6    Q         Okay.  But you made a judgment that this
 7    building had too much retail space; correct?
 8    A         That's not correct, sir.
 9    Q         You hated the project you told the Government;
10    is that right?
11              MR. FAERSTEIN:  Objection, argumentative,
12    assumes facts, hearsay.
13              THE COURT:  Overruled.
14              MR. BRAUN:  You told the Government you hated
15    it; right?
16              THE WITNESS:  I hated the corruption.
17    BY MR. BRAUN:
18    Q         Well, we all hate corruption.  Do you think
19    you're unique about that?
20    A         I do not, sir.
21    Q         Okay.  Now, the system that you are fighting
22    against, for good reason, is dominated by money; isn't
23    that correct?
24    A         I'm sorry, sir, the system -- the Planning
25    system?
```

```
 1    Q          No, the political system.
 2    A          Is dominated by money?  I'm not going to argue
 3    against that, sir.
 4    Q          Right.  So basically our American system that
 5    ultimately makes these decisions is dominated by the
 6    people with money; correct?
 7    A          Hmm, such a big question....
 8    Q          You know how much millions is paid for
 9    political campaigns?
10               MR. FAERSTEIN:  Objection, beyond the scope,
11    relevance.
12               THE COURT:  Sustained.
13    BY MR. BRAUN:
14    Q          Now, so are you saying something that a deputy
15    mayor in the City of Los Angeles, who is responsible for
16    bringing building, whether you like it or not and money
17    into the city, should not talk to -- should not talk to
18    you at lunch?
19               MR. FAERSTEIN:  Objection, misstates testimony.
20               THE COURT:  Overruled.
21               THE WITNESS:  Sorry.  It's phrased in a way
22    that I don't know whether to say yes or no.  Could --
23    could you rephrase it for me, please.
24    BY MR. BRAUN:
25    Q          Yes, the deputy mayor of Los Angeles, in charge
```

```
 1    with economic development, is it improper for him to
 2    approach you?
 3    A       No, sir.
 4    Q       And you're one of 9 people; correct?
 5    A       Yes.
 6    Q       Okay.  And so the deputy mayor cannot give an
 7    entitlement; correct?
 8    A       Correct.
 9    Q       Okay.  Only an entitlement can be given by you
10    in -- and with -- in conjunction with some other people;
11    correct?
12    A       The council, yes, sir.
13    Q       Right.  We have a separation of powers;
14    correct?
15    A       Yes, sir.
16    Q       And the Building and Safety department enforces
17    the building codes; correct?
18    A       Yes.
19    Q       And you don't -- no one comes in front of your
20    committee and says, let's waive the building codes and
21    use second rate cement, do they?
22            MR. FAERSTEIN:  Objection, relevance,
23    Your Honor.
24            THE COURT:  Overruled.  You can answer the
25    question.
```

```
1            THE WITNESS:  I don't understand the question.
2    I'm sorry.
3            MR. BRAUN:  Okay.  Let me just do it a
4    different way.  There's one part of the City that does
5    planning; correct?  That's the part that you're with;
6    correct?  A Planning department; right?
7            THE WITNESS:  That's not exactly correct, sir.
8    BY MR. BRAUN:
9    Q       Correct me then.  Well, what --
10   A       All of us are supposed to follow Los Angeles
11   law, and the Planning code, and the Building and Safety
12   code are intermingled in terms of their ultimate goal.
13   So there's not separate bodies of law that we're
14   supposed to follow.  And we're all supposed to follow
15   the City's ethics rules.  So to say that one of us does
16   X and one of does Y is not exactly correct, but it's not
17   exactly wrong.  So it's hard for me to say yes or no.
18   Q       Well, at least, theoretically, the Planning
19   department, its entitlements, when they make variations
20   from the general rules; correct?
21   A       Sorry, sir.  Will you ask that again?  I'm
22   trying to --
23   Q       Let me put it this way:  I buy a piece of land
24   in Los Angeles, and I don't have any entitlements, I can
25   still build on it, can't I?
```

1 | A        You may build on it, based on what the
2 | underlying entitlements already are.
3 | Q        Right.  So every piece of property in
4 | Los Angeles has a basic entitlement; correct?
5 | A        Yes, sir.
6 | Q        And they need the Planning department and that
7 | organization when you try to build something that is in
8 | addition to the standard entitlements; correct?
9 | A        Yes.
10 | Q        And then the -- in theory, once you've got an
11 | entitlement, the Building department makes sure that you
12 | follow the building laws, the laws about construction,
13 | and they supervise you; correct?
14 | A        I'm not an expert in the Building and Safety
15 | department, sir.  I don't know the answer to that.
16 | Q        Do you know what the Building and Safety
17 | department does?
18 | A        At a high level, sir, yes.
19 | Q        And you know that they cannot give
20 | entitlements; correct?
21 | A        Yes.
22 | Q        Now, and also, even the mayor can't give an
23 | entitlement, can he?
24 | A        That's not exactly correct, sir.
25 | Q        Can the deputy mayor give an entitlement?

```
 1    A        No.

 2    Q        Okay.  So that at no time did Ray Chan either

 3    as head of the Building department or as deputy mayor

 4    have the right to give an entitlement; correct?

 5    A        Yes.

 6    Q        Now, is part of his job to be concerned with --

 7    with investment in Los Angeles?

 8             MR. FAERSTEIN:  Objection, Your Honor.

 9    Foundation.

10             THE COURT:  Sustained.

11    BY MR. BRAUN:

12    Q        Okay.  Now, when you make a decision -- when

13    you're making a decision about whether a building is

14    built, is one of the considerations whether or not

15    millions of dollars of foreign money is coming to

16    Los Angeles?

17             MR. FAERSTEIN:  Objection.  Calls for

18    speculation, foundation.

19             THE COURT:  Overruled.

20             THE WITNESS:  Will you please repeat.

21             MR. BRAUN:  Yeah, well, let me -- so if you're

22    making a decision about building -- a building, and it

23    is going to be very expensive, does -- is one of the

24    considerations that Los Angeles could use foreign money

25    coming in?
```

```
 1                 THE WITNESS:  Is one -- are you asking me is if
 2   it is one of my concerns, sir?
 3   BY MR. BRAUN:
 4   Q        Yes.  Are you concerned about that?
 5   A        In City 14 sometimes.
 6   Q        Okay.  And you're also concerned that a big
 7   building like that will create a lot of employment for
 8   Americans; correct?
 9                 MR. FAERSTEIN:  Objection, misstates testimony.
10   Calls --
11                 THE COURT:  The objection is overruled.
12                 THE WITNESS:  I'm sorry, sir.  Is one of -- is
13   one of my hopes that it will employ Americans?
14                 MR. BRAUN:  Yes.
15                 THE WITNESS:  Yes.
16   BY MR. BRAUN:
17   Q        The project as finally approved, did not have
18   signs, did it?
19   A        I'm sorry, sir, I can't hear you.  I apologize.
20                 MR. BRAUN:  I'm sorry.  Mr. Twan, the man
21   putting up the money, withdrew the request for signs;
22   correct?  Do you know?
23                 THE WITNESS:  I don't know.
24   BY MR. BRAUN:
25   Q        You don't know that he agrees with you that the
```

```
1    building would look bad with signs?

2    A        I respected our place in the process which was

3    at the start of the factory line.  And what happened at

4    council, I often had to turn away because of the

5    corruption I felt was going on there.

6    Q        Okay.  But you don't know whether or not the

7    person going to put up the money for this agrees with

8    you that there shouldn't be a sign there, do you?

9    A        I did not follow the project, sir.

10   Q        Now, the project was never built; correct?

11   A        I believe that's true, sir.

12   Q        Now, you're talking about corruption.  Is that

13   because -- is that just because the developers are going

14   to make money?  Is that the corruption you're talking

15   about?

16   A        No, sir.

17   Q        No.  You're talking about public officials

18   taking money for their actions; correct?

19   A        Um, I'm sorry, I don't understand.

20   Q        Okay.  If I'm a congressman and I say to you,

21   give me a thousand dollars and I'll vote for this bill,

22   that's corruption; right?

23   A        That's one type, yes.

24   Q        Now, if I say will you come to my dinner and

25   buy a couple of tables and then I ask you a year later
```

1    to vote a certain way, that's not corruption, is it?

2    A       It can be if your motivations are because they

3    bought you a table according to the City ethics rules.

4    Q       You think that buying all of these tables are

5    doing it because -- for some charitable reason?

6    A       There's a whole section of law called "behested

7    gifts."  And we are reported -- required to report

8    those.  In fact, that is considered corruption.

9    Q       Now, you know that people that work for

10   Los Angeles are allowed to go into consulting work;

11   correct?

12   A       I do, yes.

13   Q       And that's carefully regulated by -- by the

14   City -- that transition; correct?

15   A       Not carefully enough, sir.

16   Q       Okay.  So it -- it's the City's fault.  It's

17   not regulated enough?

18           MR. FAERSTEIN:  Objection, Your Honor.  Beyond

19   the scope.

20           THE COURT:  Sustained.

21           MR. BRAUN:  Okay.  So -- so isn't it a fact --

22   do you know a difference between a discretionary and

23   a -- and I'm trying to think of the word -- well, if I'm

24   in the City, and I had the discretion over an item -- in

25   other words, I have to maybe have a public hearing and

```
1    we're going to change something about it, I'm forbidden
2    never to work on that project for the rest of my life;
3    correct?
4            MR. FAERSTEIN:  Objection.  Same objection,
5    Your Honor.
6            THE COURT:  Sustained.
7    BY MR. BRAUN:
8    Q       Now, do you know whether under the ethics
9    rules, you're allowed to work on projects that you
10   didn't have that type of authority?
11           MR. FAERSTEIN:  Same objection, Your Honor.
12           THE COURT:  Sustained.
13           MR. BRAUN:  Okay.  Do you know anything about
14   the one-year revolving door rule?
15           MR. FAERSTEIN:  Same objection, Your Honor.
16           THE COURT:  Sustained.
17   BY MR. BRAUN:
18   Q       Now, did Ray Chan offer you anything to vote
19   for this project?  He didn't, did he?
20   A       I'm sorry.  Did he offer me....
21   Q       In your mind, you were worried about losing
22   this job that you weren't getting paid for and spending
23   all this time; is that right?
24   A       It was an offer I couldn't refuse.  It felt
25   like pressure.
```

1    Q        He never said anything like that, did he?

2    A        He didn't have to.

3    Q        You just thought in your own mind -- thought,

4    oh, I've got pressure; correct?

5    A        I would say based on experience.

6    Q        So he should go to jail because you imagined

7    something in your mind, is that what you're saying?

8             MR. FAERSTEIN:  Objection, Your Honor,

9    argumentative.

10            THE COURT:  Sustained.

11   BY MR. BRAUN:

12   Q        Now, let's go back to the -- this -- this

13   luncheon.  Wouldn't you admit that at least it looks on

14   a map like it's halfway between your office in Burbank

15   and downtown, Los Angeles?

16   A        Sir, in L.A., there's geography.  Then there's

17   traffic, and there's time of day.  And so coming over

18   from Burbank on Barham down Highland could be twice as

19   long as the 134 to the 5 to the 110.  So yes and no.

20   It's not a "yes" or "no" question.  Timing-wise, it can

21   be either.

22   Q        You will admit that whoever booked this

23   restaurant was trying to put it between -- halfway

24   between you and Ray Chan; correct?

25            MR. FAERSTEIN:  Objection, asked and answered.

```
 1              THE COURT:  Sustained.
 2      BY MR. BRAUN:
 3      Q       Do you know who picked this restaurant?
 4              MR. FAERSTEIN:  Objection, asked and answered.
 5              THE COURT:  Sustained.
 6      BY MR. BRAUN:
 7      Q       Okay.  Now, Ray Chan retired June 30th, 2017;
 8      correct?
 9      A       I don't know the exact date, but that seems
10      right, sir.
11      Q       And he told you he was going to retire;
12      correct?
13              MR. FAERSTEIN:  Objection.  Hearsay,
14      Your Honor.
15              THE COURT:  Overruled.
16              THE WITNESS:  I don't recall that, sir.
17      BY MR. BRAUN:
18      Q       Didn't he say I want to patch -- you know,
19      we've never gotten along, but I want to have lunch to
20      sort of patch up our relationship, because I'm retiring
21      in 6 weeks?
22              MR. FAERSTEIN:  Objection.  Hearsay,
23      Your Honor.
24              THE COURT:  Overruled.
25              THE WITNESS:  No.
```

BY MR. BRAUN:

Q       But you knew he was retiring; correct?

A       I don't recall.

Q       Well, can you think back now to that
May 2017....  You knew he was retiring?  He was on a
one-year contract; right?

        MR. FAERSTEIN:  Objection, Your Honor,
argumentative, foundation.

        THE COURT:  Overruled.

        THE WITNESS:  Sorry, sir.  Will you state the
question again.

BY MR. BRAUN:

Q       You knew he retiring -- you knew he was on a
contract; right?

A       I did not, no.

Q       You knew he wasn't an employee of the City;
correct?

A       No, I did not.

Q       Okay.  Did you know what his status was?

A       No, I did not.

Q       Did you know what ethics rules applied to him,
sir?

A       I assumed the same ones, sir.

Q       But you didn't know -- you didn't know whether
he was a contract or not, did you?

```
 1    A         That he was a contract or contractor?

 2    Q         A contractor, right.

 3    A         No, I did not know.

 4    Q         So at the time you had this luncheon, the --

 5    the Planning Commission took 3 months before they

 6    recommended approval of the Luxe project; right?

 7    A         That sounds right, sir.

 8    Q         So at the time this -- at the time this

 9    luncheon occurred, you really had nothing in front of

10    you; correct?

11    A         No.

12    Q         Involving the Luxe project; correct?

13    A         No.

14    Q         You just -- no, you didn't -- I can't -- it's a

15    bad question.

16    A         Would you mind asking the question in a

17    different way, sir, and I'll answer it.

18    Q         So you basically -- the -- the program -- you

19    had a public hearing on May 24th about the environmental

20    impacts report; correct?

21    A         I don't know the exact dates, sir, but that

22    seems correct.

23    Q         Okay.  And that was certified on

24    August 18th, 2017, does that sound about right?

25    A         I believe so, but I don't know the specific
```

```
 1    dates, sir.

 2    Q        Okay.  And you voted for the project on

 3    September 14th, 2017; correct?

 4    A        Yes, sir.

 5    Q        So the luncheon was in May, and the vote was in

 6    September; correct?

 7    A        Yes, sir.

 8    Q        By September, he was not a deputy mayor, was

 9    he?

10    A        No.

11    Q        He was a private citizen; correct?

12    A        I didn't know his status.

13    Q        And I think the CPC has a second hearing; is

14    that true to approve the Luxe; correct?  Is there a

15    second hearing too?

16             MR. FAERSTEIN:  Objection, vague as to time.

17             THE COURT:  Overruled.

18             THE WITNESS:  Sorry.

19    BY MR. BRAUN:

20    Q        Oh, no, I'm just looking at these notes here.

21    It says that there's a second hearing for approval of

22    Luxe for to the CPC, sounds about right?

23    A        Yes.

24    Q        So after the Planning commission approves it in

25    September 14th, around November 9th, the CPC approved
```

1752

1    it; correct?

2    A        Yes.

3    Q        Do you know now -- do you recall when the

4    signage was removed or -- do you know that?

5    A        I do not, sir.

6    Q        Okay.  You certainly would have approved that;

7    right?  You shouldn't -- you don't like signage; right?

8    A        I often felt like Jenga.  So when you remove

9    one piece, it would tumble the whole thing.  So I want

10   to say yes.  But I also was cautious that if something

11   is taken out, do they put something in?

12   Q        All right.  So what you're concerned about

13   is -- to put it in -- is that the signage is worth

14   something to the developers.  So if you take that piece

15   out, maybe the whole thing doesn't develop and doesn't

16   occur; is that right?

17   A        Or they traded it for something nefarious.

18   Q        Okay.  Now, is that development somewhere near

19   the convention center?

20   A        It is, sir.

21   Q        Okay.  And is it true -- and you can correct me

22   if I'm wrong -- that Los Angeles doesn't have enough

23   hotel rooms to host a full-blown convention, say like

24   the com decks that Las Vegas has?

25            MR. FAERSTEIN:  Objection, foundation,

1    relevance, 403.

2           THE COURT:  Sustained.

3           MR. BRAUN:  Is one of the considerations when

4    you approve or disapprove a new hotel, is whether or not

5    the City needs these rooms; correct?

6           MR. FAERSTEIN:  Objection.  Same objections,

7    Your Honor.

8           THE COURT:  Overruled.

9           THE WITNESS:  Will you please repeat that?

10          MR. BRAUN:  Yeah, let me just put it in simpler

11   words.

12          L.A. is short of hotel rooms downtown if we

13   have a big convention; is that right?

14          MR. FAERSTEIN:  Objection, relevance, 403.

15          THE COURT:  You're -- the question before that

16   was a better question or -- you're asking him about his

17   considerations of hotel space when he's making a

18   decision?

19          MR. BRAUN:  Yeah.

20          THE COURT:  That's what your point --

21          MR. BRAUN:  Right.  Will you answer the judge's

22   question.

23          THE WITNESS:  Certainly.  I would -- I often

24   heard both sides of that argument at Commission.  And it

25   depended on whose point of view and often what they were

```
 1    saying.  You may say "convention."  Someone else might

 2    say the "Olympics."  Everyone had different perspectives

 3    on that matter, and the facts and dates would affect my

 4    answer to your question.

 5    BY MR. BRAUN:

 6    Q        Okay.  So -- so some people had said if we have

 7    the Olympics here, we don't have enough rooms; right?

 8    A        I have heard that, sir.

 9    Q        Okay.  And then some people would say, we need

10    the rooms for regular conventions; correct?

11    A        I believe I've heard that too, sir.

12    Q        And the convention center is owned by the City

13    of Los Angeles; is that correct?

14    A        I don't know, honestly.

15    Q        Now --

16    A        I'm sorry.  I think it is, but I don't know

17    that.

18    Q        Okay.  Well, at least, they get some revenue

19    from it, whether they own it or not; correct?

20    A        I believe they do.  I think there's an

21    independent body that maybe runs it that I'm thinking

22    of, but I'm not exactly sure of the structure of the

23    convention center.

24             MR. BRAUN:  May I have a moment, Your Honor?

25             THE COURT:  Yes.
```

```
 1              MR. BRAUN:  Why don't you -- you're going to
 2    ask the Government to show you the agenda from May 11th.
 3              MR. FAERSTEIN:  Objection, Your Honor.
 4    Argumentative, relevance.
 5              MR. BRAUN:  I'll withdraw the question,
 6    Your Honor.
 7              THE COURT:  Is that it?
 8              MR. BRAUN:  Nothing further from us.
 9              THE COURT:  All right.  Does the Government
10    have any additional questions?
11              MR. FAERSTEIN:  Yes, Your Honor.
12                    REDIRECT EXAMINATION
13    BY MR. FAERSTEIN:
14    Q        Mr. Ambroz, do you recall the questions
15    regarding the purpose of the meeting between you and the
16    defendant at Mama's Shelter with respect to patching up
17    your relationship?
18    A        Yes, sir.
19    Q        Was there anything to patch up in your
20    relationship?
21    A        No.
22    Q        Did you have any type of relationship with the
23    defendant at that time?
24    A        Not to my knowledge, no.
25    Q        Did you have any type of relationship with the
```

1    defendant at any time?

2    A       No.

3    Q       Do you recall the questions regarding the

4    timing of the CPC meeting, the hearing being in

5    September 2017 and your meeting with the defendant at

6    Mama's Shelter being in May?

7    A       It was a little bit muddled.  So it's hard to

8    say.

9    Q       Okay.  So as of May 2017, was the Luxe Hotel

10   project going to be heard by the CPC that summer?

11   A       Yes.

12   Q       Was it, in fact, heard that summer?

13   A       Yes.

14   Q       And will there be any benefit in your mind to

15   the defendant speaking with you or pressuring you in

16   May with respect to the Luxe project when you would be

17   hearing the -- the project later that summer?

18   A       It didn't benefit me, but it certainly

19   benefitted the project.

20   Q       Would there be any benefit to the defendant if

21   he was in support of the project?

22   A       Um, I don't think in his role as deputy mayor.

23   Q       Sure.  Recall the questions regarding whether

24   or not the project was ultimately approved by city

25   council?

```
 1   A        Yes, sir.

 2   Q        Do you know one way or another whether the

 3   entitlements that were proposed for the project were, in

 4   fact, approved by city council?

 5   A        I do not, sir.

 6   Q        Do you recall the questions regarding whether

 7   the defendant offered you anything during that meeting

 8   in -- in connection with your -- your vote or your

 9   support of the project?

10   A        I recall those, yes.

11   Q        And I -- I think the Defense attorney asked you

12   whether you felt pressure whether it was just in your

13   head; do you recall that?

14   A        I do.

15   Q        You mentioned that in your experience, you felt

16   pressure.  Did you feel pressure from the defendant's

17   words during that meeting?

18   A        I did, yes.

19   Q        In what way?

20   A        Um, I don't know how else pressure would

21   manifest but in my head, and I felt like the deputy

22   mayor was essentially instructing me how to vote and

23   what he wanted to see have happen, and he was as deputy

24   mayor quite high in the City and as an independent

25   commissioner, I was supposed to operate independently;
```

```
 1    and those two things did not mix.  And so I felt a

 2    pressure to comply with his direction as opposed to my

 3    as-of-yet still hadn't reviewed independent analysis of

 4    the case and the project.

 5    Q        Okay.  Do you recall the questions he asked you

 6    regarding whether the deputy mayor can approve

 7    entitlements?

 8    A        I do, sir.

 9    Q        Okay.  And can the deputy mayor approve

10    entitlements?

11    A        No.

12    Q        Does the deputy mayor need the City Planning

13    Commission to approve entitlements?

14    A        Yes.

15    Q        Does he need you as the president of the City

16    Planning Commission to approve those entitlements?

17    A        Um, I don't -- I could -- no, the commission

18    could over-vote me.

19    Q        Okay.  Did you hold sway as the president of

20    the CPC?

21    A        Yes.

22    Q        And would you be able to through your

23    communications with other commissioners influence how

24    they're going to vote?

25    A        I absolutely can.  We respect each other, and
```

1    we listen to each other, and I think I had earned their

2    trust.

3              MR. FAERSTEIN:  Nothing further, Your Honor.

4                    **RECROSS EXAMINATION**

5    BY MR. BRAUN:

6    Q        Does it shock you that in our political system

7    people put pressure on each other?  It's the way it

8    operates; right?

9    A        Not the deputy mayor of Los Angeles pressuring

10   an independent commissioner.  That's not how we operate,

11   sir.

12   Q        But he can't even talk to you?

13   A        Talking and pressure are different.

14   Q        Okay.  He just talked -- he was leaving the

15   City, wasn't he, in a few weeks?

16   A        I did not know that, sir.

17             MR. BRAUN:  No further questions.

18             THE COURT:  All right.  May this witness be

19   excused?

20             MR. FAERSTEIN:  Yes, Your Honor.

21             THE COURT:  Mr. Braun, may he be excused?

22             MR. BRAUN:  Yes, Your Honor.

23             THE COURT:  All right.  Thank you very much.

24   Call your next witness, please.

25             MR. FAERSTEIN:  The Government calls

```
 1    Michelle Rios to the stand, Your Honor.
 2    GOVERNMENT'S WITNESS, RICHELLE RIOS, SWORN.
 3           THE COURTROOM DEPUTY:  Thank you.  Be seated.
 4           Please state and spell your name for the
 5    record.
 6           THE WITNESS:  Yes, my name is Richelle Huizar.
 7    First name spelled, R-I-C-H-E-L-L-E.  Last name spelled
 8    H-U-I-Z-A-R.
 9           THE COURT:  All right.  You may proceed.
10                    DIRECT EXAMINATION
11    BY MR. JENKINS:
12    Q      Are you currently married to Jose Huizar?
13    A      Yes.
14    Q      When did you and Jose Huizar get married?
15    A      We married in May of 1999.
16    Q      Are you and Mr. Huizar currently estranged?
17    A      Yes.
18    Q      How many children do you and Mr. Huizar have
19    together?
20    A      We have four children.
21    Q      I'm not going to ask the birth dates but just
22    the ranges of your four kids?  Age ranges.
23    A      Um, my oldest is 21.  And my youngest is 13.
24    Q      Do you have a law degree, Ms. Huizar?
25    A      Yes, I do.
```

1    Q        From where?

2    A        From UCLA. School of Law.

3    Q        After graduating from the UCLA, School of Law,

4    where did you begin employment?

5    A        Almost immediately after, I was hired by the

6    L.A. City Commission for children youth and their

7    families as a policy analyst.

8    Q        And so that's an L.A. City job?

9    A        Yes.

10   Q        How long did you work for L.A. City in that

11   capacity with the -- with the children?

12   A        Approximately 11 years.

13   Q        And did you leave that job with the City around

14   2006?  Does that sound about right?

15   A        Yes.

16   Q        Now, let's talk about the time period from 2006

17   to 2018.  What jobs did you do for employment?

18   A        I was employed as a consultant with a mid-size

19   law firm in Pasadena.  I was not practicing law at the

20   time, but helped to build their client base, and I also

21   worked as a development director for an all-boys

22   Catholic high school.

23   Q        We'll take both of those just quickly one at a

24   time.  The law firm -- the mid-size law firm you

25   mentioned, is that Vanderford and Ruiz?

```
 1    A        Yes.

 2    Q        And does -- is the Ruiz, Rudy Ruiz?

 3    A        Yes.

 4    Q        Does Rudy Ruiz have a relationship with your

 5    husband, Jose Huizar?

 6    A        Yes.

 7    Q        Are they friends?

 8    A        Yes.

 9    Q        And the type of legal work that Vanderford and

10    Ruiz did, was that labor employment?  Was that one of

11    the things they did?

12    A        Yes.

13    Q        And you mentioned you didn't work there as a

14    lawyer but as a consultant; right?

15    A        Yes.

16    Q        Was one of your jobs as a consultant to help

17    the law firm get business?

18    A        Yes.

19    Q        Get clients?

20    A        Correct.

21    Q        Okay.  And you also mentioned you worked as a

22    development director for a high school?

23    A        Yes.

24    Q        What's the name of that high school,

25    Ms. Huizar?
```

```
1    A         Bishop Morris Salesian High School.

2    Q         And can we just call it Salesian going forward?

3    A         Yes.

4    Q         And is one of the jobs as Development director

5    for Salesian's -- Salesian high school to do

6    fundraising?

7    A         Yes.

8    Q         Help the school get money; right?

9    A         Yes.

10   Q         And then just at a high level currently, what

11   do you work do for work?

12   A         I'm a program manager for a nonprofit

13   organization.

14   Q         Okay.  Let's focus on some more questions about

15   your estranged husband, Mr. Huizar.  Couple of quick

16   things:  Before we begin, I'm going to ask you questions

17   as we've talked about in preparations.  I don't want you

18   to reveal any private conversations that you and

19   Mr. Huizar had; do you understand that?

20   A         Yes.

21   Q         Okay.  So all my questions will be about

22   conversations where either there were third parties

23   present or just not conversations where you and

24   Mr. Huizar have one-on-one confidential communications.

25   Do you understand that?
```

1   A       Yes.

2   Q       Okay.  At some point, did Jose Huizar, your

3   husband, begin serving on city council?

4   A       Yes.

5   Q       And just the year when that began

6   approximately?

7   A       It would have been early 2006, like January.

8   Q       And then at some point, he stopped serving on

9   city council.  And approximately what year did that

10  terminate?

11  A       Approximately June of 2020.

12  Q       And during his term on city council, are you

13  aware that he was on certain committees in addition to

14  being on city council?

15  A       Yes.

16  Q       And that included the Planning and Land Use

17  Management or PLUM; right?

18  A       Yes.

19  Q       And you understood he was also the chair of

20  PLUM?

21  A       Yes.

22  Q       He was also on something called the Economic

23  Development Committee; is that right -- does it sound

24  right?

25  A       I don't recall that.

```
 1    Q        Okay.  You recall he was on PLUM, and he was a

 2    chair of PLUM and maybe some other committees?

 3    A        Correct.

 4    Q        Okay.  And let's bring up Exhibit 1-1, please.

 5    Do you recognize the individual depicted on the screen,

 6    Mrs. Huizar?

 7    A        Yes.

 8    Q        And who is that person?

 9    A        Ray Chan.

10    Q        And do you understand the person Ray Chan is

11    the defendant in this case?

12    A        Yes.

13    Q        Around 2013, did you become -- did you begin to

14    have more interactions with the defendant?

15    A        Yes.

16    Q        And sort of, can you just briefly describe when

17    would you see defendant Chan around this time period?

18    A        I would see him sometimes at -- at dinners --

19    Q        Was he --

20    A        -- with friends.

21    Q        Sorry.

22    A        Dinners or events.

23    Q        Okay.  Was defendant Chan friends with

24    Mr. Huizar?

25    A        Yes.
```

```
 1    Q        Would you see them together a lot?

 2    A        Yes, I see them off and on whenever I was privy

 3    to that.

 4    Q        Okay.  When you would see defendant Chan, would

 5    it be also with Jose Huizar?

 6    A        Yes.

 7    Q        And around that 2013 time period, do you have

 8    an understanding of what defendant Chan did for the

 9    City?

10    A        He was the general manager of the City's

11    Building and Safety Department.

12    Q        Okay.  Also known as LADBS?

13    A        Yes.

14    Q        All right.  Let's switch to a different

15    individual.  Now showing you on the screen 1-13, do you

16    recognize the individual now depicted on the screen, in

17    front of you, Mrs, Huizar?

18    A        Yes.

19    Q        Who is that?

20    A        Chairman Huang -- Wei Huang.

21    Q        Do you recall when -- just roughly what year

22    you remember meeting Chairman Huang?

23    A        It was sometime in 2013.

24    Q        Around the same time you also started seeing

25    defendant Chan around your husband more?
```

```
 1    A       Yes.

 2    Q       And who introduced you to Chairman Wei Huang?

 3    A       Jose.

 4    Q       And do you have an understanding of who

 5    introduced your husband to Wei Huang?

 6    A       Yes.

 7    Q       Who was that?

 8    A       My understanding is that Ray introduced them.

 9    Q       Ray Chan?

10    A       Yes.

11    Q       Okay.  Do you have an understanding also of

12    what Wei Huang does for a living?

13    A       He is a business person, a real estate

14    developer from China.

15    Q       Do you have an understanding of Mr. Chairman

16    Huang's level of wealth as a real estate developer?

17    A       I understood him to be a billionaire.

18    Q       And as a real estate developer, do you know

19    what properties Chairman Huang owned in the city of

20    Los Angeles?

21    A       The ones that I'm aware of are -- it's a hotel

22    near Universal Studios and a hotel on Figueroa.  And

23    then I believe he had a home in San Marino.

24    Q       And is the hotel in Figueroa, we're talking

25    about downtown, L.A.?
```

```
 1    A        Yes.

 2    Q        Okay.  Based off your observations, does

 3    Chairman Huang speak English.

 4    A        Not that I'm aware of, no.

 5    Q        When Chairman Huang would speak with

 6    Jose Huizar, how would they communicate as you observed

 7    it?

 8    A        Through a translator.

 9    Q        And how often would you say you would see

10    Jose Huizar and Wei Huang together?

11    A        I can't recall.

12    Q        And you mentioned a home in San Marino for the

13    chairman, you testified about that?

14    A        Yes.

15    Q        Where did Chairman Huang generally live as you

16    understood it?

17    A        In China.

18    Q        At some point, would you come to learn that

19    Chairman Huang had traveled from China to Los Angeles?

20    A        Yes.

21    Q        And during those times, would he hang out with

22    your husband?

23    A        Yes.

24    Q        Was that an off -- was that a regular

25    occurrence, Chairman Huang comes from China to L.A. and
```

1    ends up hanging out with Jose Huizar?

2    A        When he did come into town, my understanding

3    was yes, they would get together.  I just don't recall

4    how often that was.

5    Q        Do you recall on November 7th, 2018, the FBI

6    executed multiple search warrants, including at your

7    home?

8    A        Yes.

9    Q        And after that date, have you seen Wei Huang in

10   Los Angeles?

11   A        I have not.

12   Q        After that November 7th, 2018 date, do you know

13   if Jose Huizar and Wei Huang hung out anymore after

14   that?

15   A        I'm not aware if -- that they did.

16   Q        Okay.  Switch topics now to -- we're still in

17   this 2013 time period when you first spent more time

18   with defendant Chan and meet Wei Huang.  Did you also

19   become aware of significant and difficult information

20   related to your husband, Jose Huizar, in around

21   August of 2013?

22   A        Yes.

23   Q        And just at a high level, what information did

24   you learn that was difficult about your husband at that

25   time period?

```
 1   A         That he was having -- or had a consensual

 2   affair with a staff person.

 3   Q         Did you also learn as a result of that

 4   consensual affair with a staff person, that that staff

 5   person was interested in suing your husband?

 6   A         Yes.

 7   Q         And around this time period, was Jose Huizar

 8   going to be up for re-election?

 9   A         Yes.

10   Q         And specifically, that would happen in around

11   2015 is when that process would sort of kick into gear?

12   A         Right, correct.

13   Q         Okay.  And that re-election term, would that

14   have been for his final term in office at least as a

15   council member?

16   A         Yes.

17   Q         So this is his last shot, so to speak?

18   A         Yes.

19   Q         And in your view, did a sexual harassment

20   lawsuit by a City staffer against your husband threaten

21   his potential candidacy?

22   A         Yes.

23   Q         And did it threaten his public image?

24   A         Yes.

25   Q         And do you know for this -- we'll say the 2015
```

```
 1   election cycle, did Jose Huizar have a challenger?
 2   A        Yes, he did.
 3   Q        And who was that?
 4   A        Gloria Molina.
 5   Q        And based off your time in the City and being
 6   the spouse of a council member, was Gloria Molina a
 7   significant challenger?
 8   A        Absolutely.
 9   Q        And why do you say "absolutely"?
10   A        Well, she was a political icon in the Latino
11   community, and just a formidable challenger.  She had
12   served in elected office for many years, both at the
13   state and local level, and she was well-respected.
14   Q        And based off your observations with your
15   husband, did he also see her as a formidable Challenger?
16   A        Yes.
17   Q        Okay.  After learning about Jose Huizar's
18   affair and the likely subsequent lawsuit against him,
19   did you have any memorable lunch meetings about that
20   topic?
21   A        Yes.
22   Q        Just approximately when did -- what year did
23   that lunch meeting take place?
24   A        It had to have taken place in 20 -- late 2013.
25   Q        Do you recall where that meeting took place?
```

```
 1    A         Not the exact location, but it was a restaurant
 2    in San Gabriel.
 3    Q         A restaurant in San Gabriel Valley?
 4    A         Yes.
 5    Q         Who do you recall being at this memorable
 6    lunch?
 7    A         The chairman, Wei Huang was present.
 8    Q         We'll put up 1-13.  Who?
 9    A         Jose, Ray Chan.
10    Q         Putting up Chairman Huang, putting up Ray Chan,
11    putting up Jose Huizar.  Do you recall if anyone else
12    associated with Shen Zheng was at this lunch meeting?
13    A         I recall there was one or two other
14    individuals.
15    Q         Okay.  Just in sort of your memory banks, was
16    one of those individuals you're at least thinking might
17    have been there, Ricky Zheng?
18    A         Yes.
19    Q         1-23.  And do you see in the lower right-hand
20    corner of this four-some, a person identified as
21    Ricky Zheng?
22    A         Yes.
23    Q         Okay.  Do you recognize that person as
24    Ricky Zheng?
25    A         Yes.
```

1  Q       And did you understand Ricky Zheng to have a

2  business relationship with Chairman Huang?

3  A       Yes.

4  Q       Okay.  And I believe you mentioned there might

5  have been another individual at this meeting and putting

6  aside that person's name, did you also understand that

7  individual to be associated with Chairman Huang?

8  A       That was my understanding or maybe assumption.

9  Q       Okay.  So just based off this, there's three

10 individuals associated with Chairman Huang, along with

11 you and your husband and then the defendant at this

12 meeting; right?

13 A       Yes.

14 Q       Okay.  Was there any women at this meeting?

15 A       Not that I can recall.

16 Q       Okay.  During this meeting, was the topic of a

17 potential lawsuit against your husband during his

18 re-election campaign against Gloria Molina, was that a

19 topic of conversation for this lunch?

20 A       Yes.

21 Q       As far as your memory, was that the main topic

22 of this conversation -- of this lunch?

23 A       For the most part, yes.

24 Q       Okay.  Now, do you know why this group was

25 talking to you about what an understandably very private

1  and personal and painful matter?

2  A       The sense I got -- I don't know if it was out

3  of -- you know, it being explicitly said or -- or

4  just -- you know, what I kind of pieced-together was

5  that they wanted to -- you know, well, they were all

6  concerned about the lawsuit and how it was going to

7  affect Jose's re-election bid, and they wanted to get a

8  sense of I think from me about whether or not, I was

9  going to remain in the marriage.

10 Q       And is one of the persons who was concerned

11 about how this lawsuit would threaten your husband's

12 re-election bid, was one of the persons concerned, the

13 defendant?

14 A       Yes.

15 Q       And did -- was there a discussion about what to

16 do as a result of a likely lawsuit?

17 A       Yes.

18 Q       And what did this group, including defendant

19 Chan talk about as a potential response to a likely

20 lawsuit against your husband?

21 A       I don't recall the specific conversation around

22 it, but there was some discussion about how to resolve

23 the settlement or to deal with the settlement.

24 Q       And by resolving or dealing with the

25 settlement, the lawsuit, did you understand that to mean

1    possibly settling the lawsuit?

2    A        Yes.

3    Q        And by settlement, meaning money; right?

4    A        Yes.

5    Q        As far as you know, defendant Chan, Chairman

6    Huang, Ricky Zheng, none of them are lawyers, right, as

7    far as you know?

8    A        As far as I know.

9    Q        So this wasn't a conversation about legal

10   tactics.  This was a conversation about settling the

11   lawsuit, is that fair?

12   A        Yes.

13   Q        Okay.  And you also mentioned part of a topic

14   of this conversation with defendant and others was

15   whether you, as his wife, were going to stay in the

16   marriage, was that one of the topics you mentioned?

17   A        Yes.

18   Q        And did that seem a topic that these

19   individuals were interested in -- in hearing your answer

20   and your response?

21   A        Yes.

22   Q        And do you have an understanding of why the

23   defendant and others wanted to know whether you were

24   going to stand by Jose Huizar's side during this time?

25   A        Yes.

```
 1   Q        What's your understanding of why defendant and

 2   others wanted to see if you were going to stand by your

 3   husband, notwithstanding his affair, notwithstanding the

 4   lawsuit?

 5   A        Because I think it would certainly help his

 6   chances for re-election.

 7   Q        And did helping your husband's chances for

 8   re-election seem like something this group was very

 9   interested in doing?

10   A        Yes.

11   Q        How did that make you feel during this lunch?

12   A        Well, I just had a lot going on at the time;

13   and it was just an uncomfortable subject to talk about

14   with other people because it was a very personal matter,

15   although public, but personal for me.

16   Q        Did you like being put in that position by this

17   group?

18   A        No.

19   Q        And was it your understanding that this

20   potential litigant or plaintiff was asking for money as

21   a result of the lawsuit?

22   A        Yes.

23   Q        And do you recall just generally how much money

24   she was asking for?

25   A        I've heard figures anywhere from like 600,000
```

```
 1    to over a million.
 2    Q        Did you and Jose Huizar at that time have in
 3    the bank 600,000 to a million to pay off a lawsuit like
 4    this?
 5    A        No.
 6    Q        Now, during this conversation where defendant
 7    and others are seeking your opinion, seeking your view
 8    of what you are going to do, what your position in the
 9    marriage is going to be, did you convey to them what
10    that position was?
11    A        Yes.
12    Q        And generally, what did you convey to the
13    defendant and others about your position in staying in
14    the marriage?
15    A        Again, I don't recall, you know, exactly what I
16    said; but pretty much reassured them I was going to stay
17    in the marriage.
18    Q        And when you were reassuring the defendant and
19    others that you were going to stay in the marriage,
20    notwithstanding the affair and the lawsuit, did that
21    seem to -- what was their response?  Satisfied?
22    Dissatisfied?
23    A        I believe they were satisfied.
24    Q        Do you believe that to be one of the reasons
25    you were at this lunch?
```

```
1    A       Yes.

2    Q       Okay.  Then a few days later after this lunch,

3    did you have another encounter -- just leave it up at

4    the top to 11 and 113 -- a few days after this lunch

5    where you conveyed what you just described to the

6    defendant and others, did defendant Chan and you have

7    another conversation about settling this lawsuit?

8    A       Yes.

9    Q       And where did that conversation take place?

10   A       In my home.

11   Q       Was anyone else there?

12   A       At the time I -- I believe that Ray was there

13   to meet with Jose, but Jose wasn't -- hadn't arrived at

14   home yet.  And so we had a -- a brief moment to chat.

15   Q       And during this brief moment of chat between

16   the defendant and you, did the defendant again bring up

17   the topic of the lawsuit against your husband?

18   A       Yes.

19   Q       And what, if anything, did the defendant tell

20   you about what Wei Huang was going to be do in response

21   to the lawsuit against your husband?

22   A       I don't remember the exact exchange, but Ray

23   was really supportive and concerned -- he expressed his

24   concern, and he wanted to reassure me that he was there

25   for -- for Jose and myself and that the chairman would
```

 1    also, you know, be supportive and do what he could to

 2    help resolve the settlement.

 3    Q       And did you understand that the help to resolve

 4    the lawsuit for you meant money; right?

 5    A       Yes.

 6    Q       And did you understand that the defendant was

 7    telling you that Chairman Huang was going to be able to

 8    provide your husband money to help settle this lawsuit?

 9    A       I don't recall knowing that specifically, but

10    there was just someway that it was going to be resolved

11    and settled and he would be helping.

12    Q       And that he would be helping is Chairman Huang?

13    A       Yes.

14    Q       Okay.  And in addition to Chairman Huang

15    helping with this potentially 600,000 to a million

16    dollar lawsuit, did defendant Chan also signal that he

17    wanted to help your husband with -- settle this lawsuit?

18    A       Well, again, he expressed his concern and his

19    support.  And he -- and his willingness to be of

20    assistance.  I don't know in what way.  I mean,

21    personally giving money, I don't know.

22    Q       He didn't tell you specifically how he was

23    going to help, but he conveyed to you that he wanted to

24    help; is that fair?

25    A       Yes, yes.

```
 1    Q        And again at this point, did you understand
 2    that you were agreeing to stand by Jose during this
 3    re-election campaign against Gloria Molina -- that you
 4    standing by him would help him politically; did you
 5    understand that?
 6    A        Yes.
 7    Q        And ultimately, was this lawsuit against
 8    Jose Huizar ultimately settled?
 9    A        Yes.
10    Q        And as a result of that settlement, did -- did
11    you pay any money?
12    A        No.
13    Q        Did any family -- any money come out of your
14    family bank accounts as far as you know about it?
15    A        No.
16    Q        Do you -- putting aside anything you may have
17    read, do you know at firsthand where the money came from
18    to settle this lawsuit?
19    A        No.
20    Q        And just to understand, you don't know who paid
21    it or how much they paid; is that fair?
22    A        Yes.
23    Q        And that's because at the time it happened, it
24    was confidential; right?  There's no public reporting
25    about who paid it or how much they paid?
```

```
 1   A        Yes.

 2   Q        And ultimately, Jose Huizar beat Gloria Molina

 3   for his final term?

 4   A        Yes.

 5   Q        Okay.  We're going to switch topics again and

 6   put just Chairman Huang back up on the screen.  Now

 7   we're going to talk about some Las Vegas trips that your

 8   husband went on with Chairman Huang from 2014 to 2017,

 9   okay?

10   A        Yes.

11   Q        And fair to say that was a reoccurring event,

12   your husband going to Las Vegas with Chairman Huang?

13   A        Yes.

14   Q        Okay.  And maybe not a term of numbers, but how

15   often would that happen, Chairman Huang would come to

16   town and your husband would go to Vegas, how often would

17   that happen?

18   A        Regularly, but I -- I don't know exactly how

19   many times.

20   Q        Let me ask it this way:  Was it a regular

21   occurrence for when Chairman Huang you would learn comes

22   to town, that then during that trip, he and your husband

23   would go to Vegas, was that a reoccurring pattern?

24   A        Yes.

25   Q        And did you often have a lot of forewarning
```

```
 1    about Chairman Huang coming to town and your husband

 2    jetting off to Vegas with him?

 3    A         No.

 4    Q         Sometimes it -- you would just learn about it

 5    before it happened?

 6    A         Yes.

 7    Q         And when were these trips just in terms of

 8    during the week or weekend?  When were these trips

 9    usually?

10    A         Usually on the weekends.

11    Q         Would you look forward to the times when

12    Chairman Huang would come to L.A.?

13    A         No, not really.

14    Q         Why not?

15    A         Because it would mean a Vegas trip.

16    Q         And you then -- leaving you with your four

17    kids?

18    A         Yes.

19    Q         Sometimes would there be events that

20    Jose Huizar was supposed to attend with you and the kids

21    during these weekends when instead he would jet off to

22    Vegas?

23    A         Yes.

24    Q         And I want to focus specifically still in 2013

25    about a Las Vegas trip that your husband took with
```

```
 1   Wei Huang and then after his return you observed
 2   something that stuck out to you.  Do you know what
 3   incident or event I'm describing?
 4   A       Around what time?
 5   Q       Say early 2013 -- in or around 2013.
 6   A       Yes.
 7   Q       Okay.  After Jose Huizar and Chairman Huang go
 8   to Vegas, come back, do you observe something in your
 9   house that stands out to you?
10   A       Yes.
11   Q       I'm sorry -- or that stood out to you?  And
12   what was that?
13   A       Cash.
14   Q       And where did you see this cash?
15   A       Um, the first time, I -- Jose had it.
16   Q       And prior to going to Las Vegas, did you
17   observe your husband with a stack of cash or was it not
18   until he came back?
19   A       When he returned.
20   Q       And if you just estimate sort of the size of --
21   was it a stack of cash?  Was it one bill or what did it
22   look like?
23   A       It was a stack.
24   Q       And approximately an inch, a half an inch, two
25   inches?
```

```
 1   A        About an inch.

 2   Q        And can you see any denominations or what kind

 3   of bills they were?

 4   A        Hundred-dollar bills.

 5   Q        So when you see Jose Huizar with this inch

 6   thick of hundred-dollar bills, does that prompt a

 7   conversation between you two?  And again, I don't want

 8   to know what that conversation was, just "yes" or "no"

 9   to that prompted conversation?

10   A        Yes, it did.

11   Q        Okay.  And then, again, without any details,

12   was that a pleasant or unpleasant conversation?

13   A        Um, initially, it wasn't, but then it just

14   became strange.  Unpleasant.

15   Q        Initially it wasn't what?

16   A        Initially, it wasn't, but then it did become a

17   little unpleasant.

18   Q        Okay.  And let me ask a better follow-up.

19   After having that conversation with your husband about

20   this stack of cash that you observed on him, after you

21   had that conversation, did you feel comfortable raising

22   with Jose Huizar the idea of him getting cash in

23   Las Vegas after that conversation?

24   A        No.

25   Q        Did you decide not to bring up that topic of
```

```
 1   conversation after that initial one?

 2   A       Yes.

 3   Q       Okay.  Did you ever go on trips to Las Vegas

 4   with Jose Huizar where Wei Huang was also present?

 5   A       Yes.

 6   Q       Was one of those around New Year's of 2014?

 7   A       Yes.

 8   Q       So a little bit after some of these

 9   conversations we've just talked about; right?

10   A       Yes.

11   Q       Okay.  How did you get to Las Vegas on

12   New Year's in 2014?

13   A       On a private jet.

14   Q       And do you know whose private jet it was or who

15   it was provided on behalf of?

16   A       I understood it to be Chairman Wei Huang's jet.

17   I don't know if he owned it or rented it.

18   Q       And then where did you stay once you took the

19   private jet to Las Vegas?  Where did you guys stay?

20   A       I don't recall the hotel that we stayed in.

21   Q       Was it like a Motel 6 or a --

22   A       No, definitely not.

23   Q       Okay.  More like a villa with like a fancy --

24   A       Yes, a nice suite, yes.

25   Q       And for the -- for the private jet and the nice
```

1  suite, did you or Jose Huizar pay for any of that, as

2  far as you know?

3  A       As far as I know, no.

4  Q       And did you also go on a second trip to

5  Las Vegas where Chairman Huang was present in around

6  2016 or maybe 2017?

7  A       Yes, I think it was 2016.

8  Q       Okay, 2016.  And this trip was a little

9  different; right?

10  A       Yes.

11  Q       What was this trip supposed to be like -- this

12  trip to Vegas with Jose Huizar in 2016?

13  A       Well, we planned it as a -- a getaway.  I just

14  had a lot of things going on personally at the time.

15  And it was just the time for us to get away and spend

16  time together.

17  Q       And to be clear, the time together was you and

18  Jose Huizar, not you and Jose Huizar and Chairman Huang?

19  A       Well, that was my hope, yeah.

20  Q       And on this trip, you traveled just you and

21  Jose, not on a private jet, not with Chairman Huang on

22  the way there; correct?

23  A       Right.  Correct.

24  Q       Okay.  Did this end up being this sort of

25  one-on-one getaway with your husband that you had

```
 1    planned?  Did it end up being that way?
 2    A        No.
 3    Q        Why not?
 4    A        Um, Jose spent time gambling.
 5    Q        Did it turn out that Wei Huang was also there
 6    in Vegas during --
 7    A        Yes, uh-huh.
 8    Q        And when you say Jose Huizar spent time
 9    gambling, who did he spend time gambling with?
10    A        With Chairman Huang.
11    Q        And what did you end up doing?
12    A        Passed the time just sightseeing and shopping
13    and spent time in the room.
14    Q        And a lot of that time, you spent by yourself;
15    is that fair?
16    A        Yes.
17    Q        Okay.  How did you get back to L.A. from this
18    supposed -- supposed-to-be getaway trip with Jose Huizar
19    in 2016?  How did you get back to L.A.?
20    A        We flew back in the jet with the chairman.
21    Q        And was that originally -- was that originally
22    the plan that you would return with Chairman Huang on
23    this getaway trip?
24    A        No.
25    Q        And -- in fact, that weekend, did you have
```

```
 1   plans to be back in L.A. by a certain time?

 2   A       I was trying to get back in the afternoon on

 3   Sunday, because I had promised to take my two kids to an

 4   event.

 5   Q       And did you make it time -- make it in time on

 6   Sunday to take your kids to that event?

 7   A       No.

 8   Q       Why not?

 9   A       We stayed longer than we had planned.

10   Q       And when you say you guys stayed longer than

11   you had planned, why?

12   A       Jose was with the chairman, gambling.

13   Q       And did you ultimately miss the flight you had

14   planned to take back?

15   A       Yes.

16   Q       Because Jose Huizar was gambling with the

17   chairman?

18   A       Yes.

19   Q       Okay.  Do you recall -- we talked about Vegas

20   trips.  Do you recall other trips -- or trips to other

21   locations that Jose Huizar went on one in 2016 that was

22   not to Las Vegas, but to somewhere else with the

23   chairman?

24   A       I recall a trip to Australia.

25   Q       And that -- do you recall that being around
```

1    2016?

2    A       I believe so.

3    Q       And did you go on that trip?

4    A       No.

5    Q       Okay.  And then you recall another trip, not to

6    Vegas, not to Australia, but somewhere in

7    Northern California, in 2018?

8    A       Yes, around August.

9    Q       And that was with Chairman Huang?

10   A       Yes.

11   Q       And did you go on that trip?

12   A       No.

13   Q       Okay.  Okay.  Switching topics again....  but

14   focusing on cash in 2016.  During that 2016 time period,

15   did you and Jose Huizar share a closet?

16   A       Yes.

17   Q       Okay.  In around 2016, do you recall -- and

18   this is different from the 2013 time when you see Jose

19   with the stack of hundred-dollar bills.  Now we're in

20   2016.  Do you observe something in your closet that

21   catches your attention?

22   A       The -- there was a jacket.

23   Q       And what about the jacket or what about what

24   was in the jacket that caught your attention in 2016?

25   A       Um, there was a stack of cash in a coat pocket

1    in a jacket --

2    Q        And --

3    A        -- in the closet.

4    Q        And did you -- whose jacket was that?

5    A        It was Jose's jacket.

6    Q        And what was the cash located in?

7    A        Like a travel belt.  It zippers up.

8    Q        And were you able to see what types of

9    denominations that roll of cash had?

10   A        Yeah, I only saw one hundred dollar bills.

11   Q        And does Jose Huizar keep that jacket in that

12   same spot in that closet?

13   A        From what I can recall, yes.

14   Q        And would it be -- was it -- did you see

15   that that money bag of hundred-dollar bills more than

16   once in that location?

17   A        Yes.

18   Q        Did that jacket often have cash in it?

19   A        As far as I'm aware, yes.

20   Q        Okay.  Okay.  Between August 2016 and

21   February 2017, did you regularly deposit cash into your

22   bank account?

23   A        Yes.

24   Q        And from 2016, say August, February 2017, what

25   were the amounts -- just a rough amount what would be a

```
 1    range of cash you would deposit into your bank account?
 2    A        I think the lowest might have been $200, and I
 3    think the most was a thousand.
 4    Q        And what kind of -- what were the denominations
 5    of that cash you were depositing, whether a hundred or a
 6    thousand?
 7    A        It was usually a hundred-dollar bill.
 8    Q        And where would you get those hundred-dollar
 9    bills to deposit that cash?
10    A        Usually directly from Jose.
11    Q        And you worked for the City of L.A. about
12    11-ish years; right?
13    A        Yes.
14    Q        Jose Huizar worked for the City at that time?
15    A        Yes.
16    Q        Does the City pay its employees in cash?
17    A        No.
18    Q        At that time period, do you know -- did you
19    know whether Jose Huizar had any side jobs at that time
20    period?
21    A        Not that I'm aware of.
22    Q        Okay.  Okay.  Switching topics again.
23             Now we're at time frame, late 2015 -- like,
24    December 2015.  Do you have that time frame generally in
25    mind?
```

```
1    A        Um --

2    Q        Just generally keep in your mind.

3    A        Okay.

4    Q        Around that time frame, did Jose Huizar come to

5    you with an idea where about you would provide real

6    estate reports to an individual as a way to generate

7    income?

8    A        Yes.

9    Q        And at a high level, what did Jose Huizar was

10   tell -- what did Jose Huizar tell you about this idea as

11   a way for you to make money related to these real estate

12   reports?

13   A        I feel like I'm not understanding your question

14   or I'm not sure how to answer it without --

15   Q        Sure.  What do you understand -- what did

16   Jose Huizar tell you about this plan that had to do with

17   real estate reports; what do you remember?

18   A        Um, I understand -- I can't really say what he

19   said because I'm --

20   Q        Yeah, let me ask you a different question.  At

21   this -- at this time frame, after this idea is brought

22   to you about a way to make money for yourself that had

23   something to do with real estate reports, did you have a

24   conversation with someone named George Chiang?

25   A        Yes.
```

```
 1    Q        Okay.  Let's put up George Chiang which is 1 --
 2    1-7.  So again just zoom out for a second.  In 2015,
 3    would you say you knew a lot about real estate
 4    development?
 5    A        Definitely not.
 6    Q        In 2015 would it be fair to say you knew close
 7    to nothing about real estate development?
 8    A        Pretty much.
 9    Q        Okay.  And notwithstanding that, did you have
10    an understanding that there was this opportunity that
11    involved George Chiang and you providing real estate
12    reports to someone else?
13    A        Yes.
14    Q        Okay.  And just generally without any specific
15    conversations, what did you understand you were supposed
16    to do related to these real estate reports?
17    A        Send them to a woman in Canada.
18    Q        And do you remember that woman's -- that
19    Canadian woman's name?
20    A        Jenny Wu, I believe.
21    Q        And do you know why this arrangement was
22    brought to you?
23    A        My understanding was that it was an opportunity
24    to bring in extra income, but I was a bit uncomfortable
25    about the -- I felt uncomfortable about the arrangement,
```

 1   because I -- like I've stated, I didn't know anything

 2   about real estate, and the idea that somebody else would

 3   be producing reports, was -- seemed a little strange for

 4   me.

 5   Q        And at this time, had you met this Jenny Wu

 6   person or have any idea of who she was or what she did?

 7   A        Not at the time it was proposed to me.

 8   Q        Okay.  When you felt uncomfortable about

 9   participating in this arrangement, including because you

10   knew nothing about real estate development, did you talk

11   to George Chiang about those feelings?

12   A        Yes.

13   Q        And did you talk to George Chiang -- before I

14   get to that question, when you first met George Chiang,

15   did you believe he was the employee of a company?

16   A        Yes.

17   Q        And what company did you understand

18   George Chiang to be working for when you first met him?

19   A        I thought he was an employee of the chairman

20   for Hazen.

21   Q        So at the time you met George Chiang, you

22   thought he worked for Hazen or the chairman of Hazens?

23   A        Correct.

24   Q        Okay.  Back to this arrangement, do you have a

25   phone conversation with George Chiang about the fact

1    that you feel uncomfortable about being asked to

2    participate in this arrangement?  Do you have that

3    conversation with him on the phone?

4    A        Yes.

5    Q        Okay.  What does he say to you in this

6    telephone conversation when you're trying to have that

7    conversation?

8    A        I don't recall exactly what was said, but he --

9    I do know that he said he wanted -- he preferred to

10   speak in person about the arrangement.

11   Q        Instead of on the phone?

12   A        Correct.

13   Q        So when George Chiang tells you about this

14   arrangement that's already having you feel

15   uncomfortable, that he doesn't want to talk about it on

16   the phone; he wants to talk to you in person, did that

17   affect your level of concern with the arrangement?

18   A        A little.  It just felt -- it felt odd.  It was

19   strange.

20   Q        Prior to that request, had George Chiang ever

21   told you hey, I don't want to talk on the phone about

22   this.  Let's meet in person?

23   A        Not that I recall.

24   Q        After you had that conversation where he

25   conveys that, do you recall George Chiang ever saying

```
 1    something like that to you again?

 2    A       Not that I can recall.

 3    Q       That was the only time as you can recall?

 4    A       That I can remember, yeah.

 5    Q       Do you then subsequently have an in-person

 6    conversation with George Chiang about this arrangement?

 7    A       Yes.

 8    Q       And what does he tell you about who is going to

 9    produce these reports?

10    A       Well, he told me -- well, I had expressed my

11    concern, because again, I told him I did not have the

12    capacity to develop these real estate reports.  And he

13    just reassured me and said it would be okay and that he

14    would be drafting the actual reports for me to submit to

15    Jenny Wu.

16    Q       So based off that conversation, you're

17    understanding the person who was actually getting those

18    reports was George Chiang?

19    A       That he would be pulling them together,

20    drafting them and --

21    Q       And then what were you supposed to do with

22    them?

23    A       Submit them to Jenny Wu.

24    Q       Okay.  And after George Chiang explained that

25    he would be getting the reports, providing them to you
```

1    and you would provide them to Jenny Wu, did you become

2    at ease with the arrangement at that point?

3    A      No.

4    Q      Okay.  Why not?

5    A      It just seemed like an odd arrangement.

6    Q      And without getting into specific

7    conversations, was Jose Huizar aware of this odd

8    arrangement?

9    A      He was aware, but he -- he didn't seem to know

10   much.

11   Q      And who was your understanding of who did --

12   who should know much -- who did you understand who knew

13   about this arrangement?

14   A      I just assumed George Chiang.

15   Q      George Chiang?

16   A      Uh-huh.

17   Q      Ultimately, do you meet with this Canadian,

18   Jenny Wu?

19   A      Yes.

20   Q      And how does that meeting go?

21   A      Well, I was really nervous about meeting with

22   her, because again, I thought this was an actual

23   interview even though I was reassured that it really

24   wasn't.  I still was nervous because I didn't know how I

25   would hold a conversation with her about real estate

```
 1    development; but it ended up being quite pleasant, and
 2    it didn't even focus really on real estate development.
 3    We talked a lot about family and things that we like to
 4    do and just general issues occurring in downtown L.A.
 5    that would affect real estate development, a little bit
 6    about my own background.  So it wasn't as stressful when
 7    I actually met with her.
 8    Q       And I think you said as one of reasons it
 9    wasn't stressful is because it didn't really focus on
10    real estate development?
11    A       Right.
12    Q       Okay.  Do you have a second meeting with
13    Canadian Jenny Wu?
14    A       Yes.
15    Q       And what happened -- just high-level, what
16    happens at this second meeting with -- well, let me ask
17    a more specific question:  At the second meeting with
18    Jenny Wu, is there a now third party who is brought into
19    this arrangement?
20    A       Yes.
21    Q       And who is that?
22    A       Ernie Camacho.
23    Q       I'm going to publish previously admitted
24    Exhibit 1-4.
25            Do you recognize that person on the screen?
```

1    A        Yes.

2    Q        Is that Ernie Camacho?

3    A        Yes.

4    Q        Is Ernie Camacho a friend of Jose Huizar's?

5    A        Yes, he's been a long time friend of ours.

6    Q        Okay.  Ernie Camacho and your family go on

7    family trips together and stuff like that?

8    A        We have been, yes.

9    Q        Okay.  For years?

10   A        Yes.

11   Q        And do you know why Ernie Camacho was brought

12   into this arrangement?

13   A        I don't recall why exactly that decision was

14   made.

15   Q        And was that -- was it your understanding --

16   what's your understanding as to who made the decision to

17   insert Ernie Camacho into this arrangement?

18   A        I would assume that it would be Jose since he's

19   the one that had the relationship with Ernie, but I

20   don't -- I don't know who made the decision just to ask

21   Ernie specific -- or why.  I don't recall.

22   Q        Okay.  It wasn't your idea; right?

23   A        No.

24   Q        It wasn't Jenny Wu's idea as far as you

25   know?

```
 1    A        As far as I know, no.

 2    Q        But your husband is close with Ernie Camacho?

 3    A        Yes.

 4    Q        When Ernie Camacho gets brought into this

 5    arrangement, does Ernie Camacho seem to know what's

 6    happening?

 7    A        No, he's lost.  He asked me a lot of questions

 8    at that luncheon.

 9    Q        And does Ernie Camacho know what you're

10    supposed to do as far as this arrangement?

11    A        No, I mean, I generally told him what I

12    understood.  And like I said, he had questions, and I

13    directed him to talk to Jose about it.

14    Q        Okay.  And -- and in that conversation, did

15    Ernie Camacho seem confused about what Ernie Camacho was

16    supposed to do as part of this arrangement?

17    A        Yes.

18    Q        And then you asked him to talk to Jose Huizar.

19             Do you know if they had that conversation?

20    A        I'm sure they did, yes.

21    Q        So after the second meeting with Jenny Wu,

22    Ernie Camacho gets brought in, you point him to talk to

23    Jose Huizar.  What happens next related to this

24    arrangement as far as you know?

25    A        Well, at the lunch, the three of us agreed that
```

```
 1    Jenny Wu would draft up a contract and send it to Ernie
 2    to review and sign.  And I recall Ernie sending it to
 3    me.  He e-mailed it to me, and I took a look at it, and
 4    I just didn't feel comfortable -- I communicated that
 5    much too.
 6    Q       And once -- and once you get this contract,
 7    it's from Jenny Wu to Ernie Camacho to you; right?
 8    A       Yeah.
 9    Q       And did you read it?  Do you have a sense of
10    what it said?
11    A       I recall kind of perusing it.  I didn't like
12    read it read it.  And I just -- I was done.
13    Q       And was the reason you were done, I think you
14    mentioned, because you still felt uncomfortable?
15    A       Yeah.
16    Q       Did this arrangement feel off to you or right?
17    A       It felt off.
18    Q       Okay.  And because it felt off, did you
19    withdraw?
20    A       Yes.
21    Q       Okay.  Do you know what, if anything, happened
22    with that arrangement after you pulled out?
23    A       I -- I don't know what happened after that.
24    Q       Okay.  Do you know what, if anything,
25    George Chiang did after you pulled out?
```

```
 1    A        I don't know.

 2    Q        Okay.  So wouldn't that surprise you to learn

 3    that Ernie Camacho was paid $66,000 to provide those

 4    reports to Jenny Wu?

 5    A        Yes.

 6    Q        Would that surprise you?

 7    A        Yes.

 8    Q        And why would that surprise you?

 9    A        Because I thought it was over.

10    Q        And did you ever talk any aspect of this

11    arrangement with the defendant?

12    A        No, not that I can -- I don't recall.

13    Q        If you never talked to the defendant about it,

14    do you have any idea why the defendant would have

15    documented in his personal files a contract involving

16    you in it?

17    A        No.

18    Q        No idea?  Would that surprise you to learn --

19    A        It would surprise me, yes.

20    Q        Okay.  Let's talk about the high school

21    Salesian just for a bit.

22             In 2015, you were working as the development

23    director for Salesian High School?

24    A        Yes.

25    Q        And you were paid a salary for that job?
```

```
 1    A        Yes.

 2    Q        Okay.  And as one of the responsibilities for

 3    that Salesian High School, you were in charge of helping

 4    with a gala and fundraising and things like that?

 5    A        Yes.

 6    Q        Okay.  It wasn't your only job; right?  You did

 7    other things, like grant writing and stuff like that?

 8    A        Right.  There were a whole host of duties that

 9    I had.

10    Q        But one of them involved this gala; right?

11    A        Yes.

12    Q        For the gala, do you recall having people help

13    you solicit contributions to the gala?

14    A        Yes.

15             MR. JENKINS:  And can you put up 1-10.

16    BY MR. JENKINS:

17    Q        Do you recognize 1-10?

18    A        Yes.

19    Q        Who is that?

20    A        George Esparza.

21    Q        And just the high level, how would you

22    describe, at least around the 2015 time period, the

23    relationship between you, your husband, and

24    George Esparza?  How would you describe that dynamic?

25    A        It was a good relationship.
```

1     Q        Did George Esparza work closely with your

2     husband?

3     A        Yes, he was his special assistant.  He

4     accompanied him to almost every event, meeting,

5     fundraiser, you name it.

6     Q        And as a result, would you see George Esparza

7     around a lot?

8     A        Whenever I spent time with Jose and I'd

9     accompany him, then yes, George would be with us.

10    Q        Okay.  Let's -- was George Esparza one of the

11    persons that was helping you out on fundraising for

12    Salesian for the gala?

13    A        Yes.

14    Q        Okay.  Let's look at previously admitted

15    Exhibit 117.  First, we'll just go to the top.

16             Do you recognize -- we'll just make it

17    easier -- do you see that this is an e-mail from

18    George Esparza at his Gmail account to an ESQ for kids

19    at Yahoo account?  First, did I accurately describe the

20    from and to?

21    A        Yes.

22    Q        And that is your e-mail address, that Yahoo

23    address?

24    A        Yes, it is.

25    Q        And then we'll just -- it's July 2015.  And the

1   attachment is Salesian 2015 plan.  Do you see that

2   there?

3   A       Yes.

4   Q       And I'll just read it, "Hi, Richelle.  Here is

5   the list.  I will be getting a few updates by the end of

6   the week before our meeting.  All these folks have

7   already committed.  It's just a matter of collecting

8   now."  Signed off "George."  And then we'll go to page

9   two.  And I'll just zoom in on that Excel excerpt.  Just

10  based off that text we just read, does that -- is that

11  consistent with your memory of George Esparza helping

12  you collect -- identify donors for this gala?

13  A       Yes.

14  Q       Okay.  And we'll just look here by

15  organization.  On the top, one, you see there's an

16  organization called "Oceanwide."  If we could

17  highlight....  And they had committed 10,000.  And next

18  one, Hazens being highlighted -- another 10,000.

19  Greenland below that, there is 30,000.  There's a

20  Dr. Lee, 5,000.  And we'll -- there's three more people

21  with 10,000, 1,000 and 15,000.  Do you see all those

22  there?

23  A       Yes.

24  Q       Okay.  Sitting here today, do you have any

25  specific recollection of you talking to any of those

```
 1    people related to those organizations to get money for

 2    this event?

 3    A         I don't recall.

 4    Q         Based off your recollection in the e-mail we

 5    read, is it fair to say that George Esparza was the one

 6    making these asks?

 7    A         More than likely, yes.

 8    Q         Okay.  Let's see how these asks turned out.

 9    And if we can put 117 on the -- page 2 on the left.

10    118-1 on the right, please....  118-1 on the right,

11    please.  So just for the record, this is 118-1 on the

12    right.  This is the program from the gala in 2015,

13    September 18th, which is a few days after that e-mail we

14    just looked at.  Now, if we can scroll to page 2, and

15    let's just zoom in on the top three -- yep.  And we'll

16    just do a quick matching.  We'll highlight "Oceanwide"

17    on the left.  Do you see "Oceanwide" on the right; do

18    you see that, Ms. Huizar?

19    A         Yes.

20    Q         Then Hazens on the left of the commitments, and

21    then Hazen on the gala sponsorship, Greenland under the

22    25,000 -- looking at also, there's a Dr. David Lee.

23    Dr. David Lee.  There's Isaac Schomoff and Isaac -- and

24    there's a Schomoff under Salesian black and blue

25    sponsor, 10,000.  There's -- we'll skip "Broadway Trade
```

```
 1     Center" for now.
 2              And you see "Joseph Lin."  Does that name sound
 3     familiar?
 4     A       Yes.
 5     Q       And you understood him to be -- represented a
 6     company called "Body Glove"?
 7     A       Yes.
 8     Q       And are you familiar with a development company
 9     he had called "City Century"?
10     A       No.
11     Q       Okay.  And generally, we'll go through all the
12     numbers, but the numbers associated with the ultimate
13     gala donations, pretty closely track what George Esparza
14     had sent to you, right?
15     A       Yes.
16     Q       Meaning, that he said, they're going to pay X
17     amount, and it turns out X amount is what they paid;
18     right?
19     A       Yes.
20     Q       And I'm also going to not ask you to do the
21     math, because I did it already before we did this; but
22     fair to say that this category of all the donations is
23     upwards of over $200,000; right?
24     A       Looks like it.
25     Q       Okay.  Okay.  We can bring that down.
```

```
 1              All right.  Now let's talk about you.  And,
 2     again, not specific conversations or the content of
 3     those conversations, but at some point, did you and
 4     Jose Huizar begin to discuss the possibility of you
 5     running to succeed him as the council person for CD14?
 6     A       Yes.
 7     Q       And that would happen -- his last term would be
 8     2020; right?
 9     A       Correct.
10     Q       And so at some point prior to 2020, you would
11     have to announce your run and run; right?
12     A       Correct.
13     Q       Okay.  And without again any specific
14     conversations, did you get the -- did you get the idea
15     that Jose Huizar wanted you to run before you had
16     decided whether or not you wanted to run?
17     A       Yes.
18     Q       Okay.  And did you and Jose Huizar have
19     conversations -- now I'm going to focus on times where
20     there is third parties.  So you can now talk in more
21     detail.  Did you and Jose Huizar have conversations in
22     the presence of third parties where he would discuss his
23     desire for you to run to succeed him?
24     A       Yes.
25     Q       Okay.  And did he often in those conversations
```

1    say that you were planning to run or indicate that you

2    were planning to run in front of these other people?

3    A       Yes.

4    Q       Okay.  And did you feel as a result, pressure

5    from Jose Huizar to run to succeed him?

6    A       Yes, there was pressure.  It wasn't an easy

7    decision to make.  I understood the incredible

8    responsibility it is to be an elected office.  And I

9    understood the demand on time.  I wasn't sure how it was

10   going to pivot from being, you know, mom to four kids

11   and having to, you know, change things up so

12   drastically.  So yes, there was pressure.

13   Q       And at that time, is it fair to say there was a

14   period of time where you were still going back and forth

15   about whether you wanted to run?

16   A       Yes.

17   Q       During that time period, was Jose Huizar and

18   others setting up meetings and dinners though as if you

19   were going to run?

20   A       Yes, but remember, well, a lot of that

21   back-and-forth was very private, it was just, you know,

22   me struggling with the decision and just really trying

23   to figure out if it was the right move for me, and it

24   wasn't up -- it wasn't a public conversation I ever had

25   with anybody.  So most, if not all folks, thought I was

1    onboard and this was something that I was planning to

2    do.

3    Q       And before you formally announced, right, there

4    was also other steps you were taking that made it appear

5    as though you were going to announce before you formally

6    did; is that fair?

7    A       Yes, I was beginning to meet with a lot of

8    different people.

9    Q       Okay.  And your -- your other name is Rios;

10   right?  Richelle Rios?

11   A       That's my maiden name, yes.

12   Q       And today you announced yourself as

13   Richelle Huizar?

14   A       Yes, because it still is legally my name;

15   however, I do go by my maiden name now.

16   Q       So would you like me to switch back to Rios?

17   A       Whichever you'd like.

18   Q       Okay.  I will use Ms. Rios, because -- but I

19   want to go back to these conversations that you're

20   having with other people or in the presence of other

21   people about your thoughts on running.  Did you get the

22   sense that defendant Chan wanted you to succeed your

23   husband in CD14?

24   A       Yes.

25   Q       Okay.  And was that based off conversations

1   with him and your husband?

2   A        You mean me with them, yes.

3   Q        And as a result of first just contemplating

4   running, did you have an understanding that you would

5   have to fundraise?

6   A        Absolutely.

7   Q        Fair to say that fundraising is a big part of

8   campaigning?

9   A        Definitely.

10  Q        And is that particularly more true for someone

11  who is sort of a first-time candidate like you would

12  have been?

13  A        Yes.

14  Q        Okay.  Because for example, other candidates

15  often have things called "war chess" or contributions

16  from other elections, and you would be starting from

17  scratch?

18  A        To some degree, I'd be starting from scratch.

19  Q        And we talked about the name, Ms. Rios.  Huizar

20  is your legal name, but you also go by your maiden name.

21  Was there a discussion for your candidacy to go by

22  Mrs. Huizar?

23  A        Yes.

24  Q        And generally what was the idea behind using

25  Richelle Huizar versus Richelle Rios?

1    A        Well, the name recognition.  Jose had run with

2    his last name for a number of times, including his

3    school board elections.  And so people have to raise

4    quite a bit of money to generate that name recognition.

5    Q        And when you and your husband and Ray Chan

6    would talk about your potential candidacy, did you also

7    have conversations about who would help provide some of

8    that financial support that you needed?

9    A        On a couple of occasions, yes.

10   Q        For example, was there conversations about the

11   fact that Chairman Huang from Shen Zheng could be

12   someone who could potentially help with fundraising?

13   A        Yes.

14   Q        And was there also conversations about

15   potentially the Hazens chairman also being someone who

16   could potentially help with fundraising?

17   A        Yes.

18   Q        And we'll put up 122.  On your right, Ms. Rios,

19   do you see that individual on the right next to Chairman

20   Huang?

21   A        Yes.

22   Q        Who is the individual -- who do you understand

23   the individual on right to be next to Chairman Huang?

24   A        The chairman from Hazens.

25   Q        Okay.  Just a couple more topics, all right....

1       January 24th, 2018, at this point, you had not

2  officially announced that you were going to run for

3  Jose Huizar's seat; right?

4  A       Yes.

5  Q       But that was a -- fair to say topic of

6  conversation between you and your husband and others;

7  right?

8  A       Yes.

9  Q       Okay.  Do you recall a dinner in San Gabriel

10  Valley where -- just put -- just up put up --

11  George Chiang -- where George Chiang is present, the

12  Hazens chairman is present, your husband is present, and

13  your kids are present for a dinner in San Gabriel

14  Valley?

15  A       Yes.

16  Q       And this dinner, the topic of you potentially

17  running for Jose Huizar's seat comes up?

18  A       Yes.

19  Q       And was the defendant there?

20  A       Yes.

21  Q       Okay.  1-2, yeah, putting up a picture of the

22  defendant....

23       Where was this dinner just generally?  Where

24  did it take place?

25  A       Somewhere in San Gabriel Valley.  It was at a

```
 1    hotel that -- that the Hazens' chairman owned at a

 2    steakhouse there.

 3    Q        At this point, January 2008 -- 2018, had you

 4    for yourself decided that you wanted to run or not?

 5    A        No, I had not made that decision.

 6    Q        Okay.

 7    A        However, no one knew that, except Jose.

 8    Q        And internally, you're still struggling with

 9    the decision; right?

10    A        Yes.

11    Q        But sort of externally, you are signaling and

12    people are signaling on your behalf that you're going to

13    run; right?

14    A        Yes.

15    Q        Okay.  At that point, was it clear to you that

16    Jose Huizar wanted you to run?

17    A        Yes.

18    Q        At that point, was it clear to you that

19    defendant Chan supported you running?

20    A        Yes, he supported me.

21    Q        Okay.  At this dinner, was the topic of whether

22    or not the Hazen chairman would financially support your

23    campaign, did that topic generally come up?

24    A        Generally, yes.

25    Q        And what was your understanding of whether he
```

```
 1    was or was not -- was or was not going to financially
 2    support your campaign?
 3    A        He seemed supportive.
 4    Q        Okay.  And what do you base that on, just
 5    high-level?
 6    A        I mean, just the general conversation was about
 7    how I would make a -- a good councilwoman, just the
 8    excitement about getting started with the campaign.
 9    There was just general conversation around it, and
10    everyone seemed to be supportive of my candidacy, which
11    of course, I welcomed --
12    Q        Sure.
13    A        -- you know.
14    Q        A few years prior -- at some point prior, had
15    you been to China to visit the Hazens' chairman?
16    A        Yes.
17    Q        And during that trip, did you pay for any of
18    the accommodations as far as you know?
19    A        I don't know.
20    Q        Okay.  Back to the U.S., San Gabriel Valley
21    Hazens Hotel dinner, where did Jose Huizar sit,
22    Ms. Rios, at this dinner?
23    A        We were seated at a long rectangular table, and
24    he was seated at -- on my left side.
25    Q        And where in relation to Chairman Yuan,
```

```
 1    Chairman Huang -- Chairman Y-U-A-N, where in relation to
 2    Chairman Huang did he sit?
 3    A        Right next to him.
 4    Q        Jose Huizar did?
 5    A        Yes, uh-huh.
 6    Q        Okay.  And where were George Chiang and the
 7    defendant, Raymond Chan sitting in relation to
 8    Jose Huizar and the Hazens chairman?
 9    A        From what I can recall, they sat directly
10    across from -- from me -- from us.  We were on one side
11    of the table, and George and Ray were on the other side.
12    Q        And at this dinner, your kids were with you;
13    right?
14    A        Yes, three of my kids.
15    Q        Were you often talking to your kids at the
16    dinner?
17    A        Yeah.
18    Q        Okay.
19    A        Yes.
20    Q        Is it fair to say that chairman -- that Hazens
21    chairman, Chairman Yuan, and Jose Huizar had
22    conversations that you weren't a part of?
23    A        Yes.
24    Q        And same question for defendant Chan and
25    Jose Huizar and Hazen chairman, were they having
```

```
 1    conversations that you either weren't a part of or you
 2    were talking to your kids?
 3    A        They may have.  I don't -- I don't recall
 4    specifically.
 5    Q        Do you recall the Hazen chairman, also his
 6    first language is a Chinese dialect; right?
 7    A        Yes.
 8    Q        Okay.  And fair -- let me ask you, do you speak
 9    any Chinese dialects, Ms. Rios?
10    A        No, I do not.
11    Q        Okay.  Now, we're -- I think this is the last
12    topic, but we're going to focus on the topic still of --
13    of dinners.
14            So this -- that was a January 2018 dinner,
15    Hazens chairman communicates to you that he's going to
16    financially support your campaign; right?
17    A        Yeah.
18    Q        That's your understanding?
19    A        Right, yeah, that was my understanding.  That's
20    what I came away from that dinner with.
21    Q        Okay.  Thank you for that clarification.
22    Q        You came away with that idea that he's going to
23    support it.
24            Now let's talk about a dinner April 2018 at the
25    Duck House; do you recall that dinner?
```

```
 1   A       Yes, I do.

 2   Q       Again, just a couple of context questions:  In

 3   April of 2018, have you internally decided that you, in

 4   fact, are going to run for this seat or are you still

 5   struggling?

 6   A       I'm still struggling.

 7   Q       Okay.  In April 2018, Jose Huizar still want

 8   you to run?

 9   A       Yes.

10   Q       April of 2018, defendant Chan still supporting

11   you running?

12   A       Yes.

13   Q       Who set up this Duck House dinner in

14   April of 2018?

15   A       My understanding is that Ray Chan set it up.

16   Q       And who was at this Duck House dinner that

17   defendant Chan set up?

18   A       I don't recall all of the parties that were

19   present.

20   Q       Approximately how many people would you say

21   were at this dinner?

22   A       At least 30.

23   Q       Okay.  And just a sense of who were these

24   people -- and not maybe like names but industries or

25   businesspeople?  What do you know about the people in
```

```
 1    attendance?

 2    A         Generally, they were real estate developers,

 3    maybe some attorneys.

 4    Q         And do you understand -- or what's your

 5    understanding of who -- defendant Chan set it up.  Who

 6    was in charge of the guest list as far as you were

 7    aware?

 8    A         I don't know.

 9    Q         Okay.  But your understanding is that defendant

10    Chan set up the --

11    A         Yes.

12    Q         -- the dinner?

13              Okay.  And for this dinner, what was the topic

14    high level of conversation for this dinner?

15    A         Well, it was an opportunity for me to introduce

16    myself.  And in some cases, reintroduce myself as a

17    candidate because people have always known me as Jose's

18    wife; but, you know, did not have a good sense of, you

19    know, who I was as an individual.

20    Q         And for dinners like this, would you have a

21    hand in setting these up or are these things you would

22    just show up to?

23    A         Um, I didn't typically set a lot of these

24    dinners up.

25    Q         And, for example, for this dinner, did you have
```

1  a lot of time to prepare these remarks that you were

2  going to talk to these 30 people at?

3  A       No, I did not.  In fact, I -- when I heard that

4  I had a dinner with Ray, I literally thought it was just

5  like Jose, Ray, maybe his son -- or because we got

6  together once in a while -- so I thought it was a

7  private dinner until I found out it was otherwise.  I

8  think maybe the day before, and then I kind of frantically

9  called or communicated with Ray.  I can't remember how I

10  did it through text or call, but, you know, asking him

11  like who's going to be there.  You know, who's on the

12  invite list or what am I supposed to do or what are the

13  expectations.  So I think I found out maybe the night

14  before or two days before.

15  Q       And is that because other people were setting

16  up these dinners for you?

17  A       Yeah, it just wasn't made clear when it was

18  communicated to me that there was a dinner, but yes.

19  Q       Okay.  And of these 30 people, you said most of

20  them you think were real estate developers and maybe

21  some attorneys?

22  A       Correct.

23  Q       Okay.  And did you understand at this dinner

24  of -- including the real estate developers, whether or

25  not, those real estate developers at that time all had

```
 1    pending projects before Jose Huizar at that time?  Were
 2    you aware of that?
 3    A       No, I was not aware of that.
 4    Q       Okay.  Did you talk to the defendant about who
 5    some of these real estate developers were?
 6    A       I don't recall having a conversation like that
 7    with him.
 8    Q       Okay.  Did -- do you recall the defendant
 9    telling you whether or not, in fact, he represented as a
10    lobbyist certain of these developers who were at this
11    dinner?
12    A       I didn't know his relationship with them.
13    Q       With the attendees?
14    A       With the attendees, yes.
15    Q       Okay.  Can we put up -- actually -- put it down
16    real quick.
17            Who did you sit next to, if you recall, at the
18    dinner?
19    A       I don't recall his name, but I know he was a --
20    I believe it was a developer -- even an artist in
21    downtown in the Arts District.
22    Q       Okay.  Put up 11 --
23    A       I just remember us having a pleasant
24    conversation.  He was very nice.
25    Q       Let me show you a picture that you looked at
```

```
 1    previously.  11 and 16....  Do you recognize the person

 2    on the right as the person who sat next to you at this

 3    dinner?

 4    A       Yes.

 5    Q       Okay.  And so you're not aware of whether or

 6    not at that time, Raymond Chan was lobbying on behalf of

 7    Kevin Chen?

 8    A       No.

 9    Q       Okay.

10    A       I don't recall that.

11    Q       Okay.  And did you have an understanding though

12    that one of the points of this dinner was to introduce

13    you to real estate developers that Jose Huizar knew and

14    Ray Chan knew, was that one of the points of this

15    dinner?

16    A       I would imagine so, yes, definitely.  I mean,

17    this is one of the number of dinners that I was having

18    as I was, you know, gearing up to announce my candidacy.

19    So I was meeting with all different kinds of people.

20    So....

21    Q       At the time of this dinner in April of 2018, in

22    terms of size, where would you rank this dinner as

23    opposed to other dinners you described you were having?

24    A       It was probably the largest one.

25    Q       Okay.  The largest?
```

```
 1    A         Yes, gathering.

 2    Q         Okay.  Can I have one moment, Your Honor?

 3              THE COURT:  Yes.

 4              MR. JENKINS:  Just....

 5              Can we just put up 1-13.  Just a few more

 6    questions, Ms. Rios.

 7    BY MR. JENKINS:

 8    Q         Do you recall at some point in the Fall of

 9    2018, you did formally announce your candidacy to

10    succeed your husband as council person for CD14?

11    A         Yes.

12    Q         Around either before that or after that, do you

13    recall that Chairman Huang had agreed to host a

14    fundraiser for you at one of his hotels in L.A.?

15    A         Yes.

16    Q         Did you have the understanding then that that

17    was part of him following up on his commitment to

18    support you, Chairman Huang and your campaign?

19    A         Yes.

20    Q         Did that fundraiser ever happen?

21    A         No, it did not.

22    Q         Did something cause you to end your candidacy

23    shortly after you announced it?

24    A         Yes.

25    Q         And what was that?
```

1  A         The FBI searching my home.

2  Q         And as a result of the publication surrounding

3  those events, did you withdraw your -- or end your

4  campaign?

5  A         Yes, I just didn't see a path forward after

6  that.

7           MR. JENKINS:  Okay.  No further questions at

8  this point, Your Honor.

9           THE COURT:  All right.  We'll take our final

10  break of the day.  We'll be in recess for 15 minutes.

11                    (Recess.)

12    (Whereupon, Volume II reported by Miranda Algorri.)

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

25

1        **C E R T I F I C A T E**

2

3

4

5     UNITED STATES OF AMERICA          :

6              vs.                      :   No. CR 20-326(A)-JFW

7     RAYMOND SHE WAH CHAN              :

8

9

10    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22    /S/_____          07/18/2023_

23    MARIA R. BUSTILLOS                    DATE
      OFFICIAL REPORTER

24

25

## $

$0.47 [1] - 1629:17

$200 [1] - 1791:2

$200,000 [1] - 1807:23

$50,75,269.61 [1] - 1639:10

$570,000 [2] - 1629:8, 1630:4

$66,000 [1] - 1802:3

$750 [1] - 1735:4

## '

'em [1] - 1723:12

## /

/S [1] - 1825:22

## 0

0 [1] - 1683:20

0178550407 [1] - 1630:20

07/18/2023 [1] - 1825:22

**1**

**1** [4] - 1643:13, 1649:3, 1717:17, 1793:1
**1,000** [1] - 1805:21
**1-1** [1] - 1765:4
**1-10** [2] - 1803:15, 1803:17
**1-13** [3] - 1766:15, 1772:8, 1823:5
**1-2** [1] - 1813:21
**1-23** [1] - 1772:19
**1-4** [1] - 1798:24
**1-7** [1] - 1793:2
**10** [4] - 1722:19, 1722:20, 1722:21, 1722:24
**10,000** [4] - 1805:17, 1805:18, 1805:21, 1806:25
**10-square** [1] - 1721:8
**1020** [2] - 1614:20, 1714:9
**10880** [1] - 1614:20
**11** [10] - 1722:17, 1722:19, 1722:20, 1722:21, 1723:1, 1728:18, 1761:12, 1778:4, 1821:22, 1822:1
**11-ish** [1] - 1791:12
**110** [1] - 1747:19
**110517** [1] - 1685:8
**113** [1] - 1778:4
**117** [2] - 1804:15, 1806:9
**118-1** [3] - 1806:10, 1806:11
**11:06** [1] - 1638:4
**11th** [7] - 1685:17, 1688:18, 1727:11, 1728:4, 1729:11, 1729:19, 1755:2
**12** [5] - 1654:16, 1654:20, 1664:10, 1727:14, 1728:2
**1200** [1] - 1614:11
**122** [1] - 1812:18
**12254** [1] - 1613:21
**12517** [1] - 1685:9
**12th** [6] - 1635:9, 1638:20, 1640:8, 1685:17, 1688:18, 1727:7
**13** [4] - 1727:22, 1728:18, 1760:23
**13-hour** [1] - 1664:10
**134** [1] - 1747:19
**14** [7] - 1645:14, 1693:20, 1707:24, 1710:24, 1716:16, 1732:16, 1743:5
**1400** [1] - 1645:9
**14th** [5] - 1714:4,

1717:15, 1719:14, 1751:3, 1751:25
**15** [3] - 1645:14, 1717:2, 1824:10
**15,000** [1] - 1805:21
**1500** [2] - 1614:6, 1614:15
**16** [1] - 1645:14
**16...** [1] - 1822:1
**1617** [1] - 1615:6
**1645** [1] - 1615:6
**1647** [1] - 1615:7
**17** [2] - 1618:4, 1641:6
**1726** [1] - 1615:8
**1755** [1] - 1615:7
**1759** [1] - 1615:8
**1760** [1] - 1615:9
**18th** [2] - 1750:24, 1806:13
**19** [1] - 1618:17
**1920s** [1] - 1701:14
**1999** [1] - 1760:15
**1st** [1] - 1621:11
**1ST** [1] - 1613:22

**2**

**2** [5] - 1613:18, 1617:1, 1692:23, 1806:9, 1806:14
**20** [2] - 1635:5, 1771:24
**20-326(A)-JFW** [2] - 1613:10, 1825:6
**2006** [3] - 1761:14, 1761:16, 1764:7
**2008** [1] - 1814:3
**2013** [13] - 1648:12, 1652:25, 1653:7, 1765:13, 1766:7, 1766:23, 1769:17, 1769:21, 1771:24, 1782:24, 1783:5, 1789:18
**2013ish** [1] - 1690:3
**2014** [6] - 1619:8, 1625:14, 1631:15, 1781:8, 1785:6, 1785:12
**2015** [1] - 1770:11, 1770:25, 1791:23, 1791:24, 1793:2, 1793:6, 1802:22, 1803:22, 1804:25, 1805:1, 1806:12
**2016** [21] - 1666:1, 1666:3, 1671:20, 1672:17, 1674:13, 1683:22, 1684:14, 1786:6, 1786:7, 1786:8, 1786:12, 1787:19, 1788:21, 1789:1, 1789:14, 1789:17, 1789:20, 1789:24, 1790:20,

1790:24
**2017** [24] - 1685:17, 1688:18, 1692:23, 1709:8, 1709:12, 1711:9, 1714:4, 1716:16, 1717:15, 1719:14, 1727:7, 1728:4, 1728:18, 1729:11, 1748:7, 1750:24, 1751:3, 1756:5, 1756:9, 1781:8, 1786:6, 1790:21, 1790:24
**2017...** [1] - 1749:5
**2018** [19] - 1635:9, 1638:20, 1639:16, 1640:8, 1761:17, 1769:5, 1789:7, 1813:1, 1814:3, 1817:14, 1817:24, 1818:3, 1818:7, 1818:10, 1818:14, 1822:21, 1823:9
**2020** [3] - 1764:11, 1808:8, 1808:10
**2023** [2] - 1613:18, 1617:1
**21** [2] - 1638:13, 1760:23
**213** [2] - 1613:23, 1687:1
**213)894-2091** [1] - 1614:7
**213)894-3289** [1] - 1614:12
**213)894-3819** [1] - 1614:16
**213)978** [1] - 1687:2
**22** [1] - 1684:10
**23** [1] - 1640:6
**23rd** [1] - 1631:15
**24** [2] - 1667:8, 1720:18
**24th** [2] - 1750:19, 1813:1
**25,000** [1] - 1806:22
**26** [2] - 1683:22, 1684:14
**28** [1] - 1825:13

**3**

**3** [2] - 1643:12, 1750:5
**30** [6] - 1621:10, 1621:12, 1705:22, 1818:22, 1820:2, 1820:19
**30,000** [1] - 1805:19
**30-day** [1] - 1633:19
**30th** [1] - 1748:7
**310)277-4777** [1] - 1614:21
**312** [3] - 1614:6, 1614:10, 1614:15

**350** [1] - 1613:22

**4**

**4** [1] - 1662:4
**403** [2] - 1753:1, 1753:14
**4455** [1] - 1613:22
**45** [4] - 1645:17, 1646:19, 1705:20, 1705:23
**462** [1] - 1627:2
**464** [3] - 1635:5, 1638:13, 1640:6
**4643** [1] - 1683:16
**48** [1] - 1618:24

**5**

**5** [2] - 1662:4, 1747:19
**5,000** [1] - 1805:20
**5,269.61** [1] - 1639:15
**50** [3] - 1618:18, 1670:1, 1723:16
**50/50** [1] - 1724:1
**515** [1] - 1716:24
**515...** [1] - 1713:20
**516** [4] - 1717:17, 1717:23, 1722:18, 1722:22
**570,000** [2] - 1629:14, 1639:14

**6**

**6** [3] - 1615:3, 1748:21, 1785:21
**60** [5] - 1627:16, 1629:21, 1633:21, 1645:16, 1646:19
**600,000** [3] - 1776:25, 1777:3, 1779:15
**626** [2] - 1683:16, 1688:1
**632** [2] - 1643:7, 1643:12
**633** [2] - 1643:9, 1643:14

**7**

**70-story** [2] - 1732:5, 1732:10
**726-2016** [1] - 1683:20
**753** [1] - 1825:12
**7th** [2] - 1769:5, 1769:12

**8**

**8** [1] - 1613:16
**86,687** [1] - 1629:16

**894-2739** [1] - 1613:23
*1825 - 1850*

**9**

**9** [2] - 1717:22, 1739:4
**90** [1] - 1633:22
**90012** [4] - 1613:23, 1614:7, 1614:11, 1614:16
**90024** [1] - 1614:21
**904** [1] - 1660:8
**907D** [1] - 1682:16
**9:10** [1] - 1617:3
**9:36** [1] - 1635:9
**9th** [1] - 1751:25

**A**

**A-M-B-R-O-Z** [1] - 1647:19
**A.M** [1] - 1617:3
**a.m** [2] - 1635:9, 1638:4
**ABC** [1] - 1654:14
**ability** [1] - 1625:9
**able** [15] - 1655:7, 1655:9, 1673:24, 1677:13, 1677:23, 1683:10, 1694:5, 1706:9, 1706:17, 1718:16, 1720:20, 1733:10, 1758:22, 1779:7, 1790:8
**ABOVE** [1] - 1825:15
**ABOVE-ENTITLED** [1] - 1825:15
**absolutely** [8] - 1661:12, 1661:21, 1681:23, 1722:3, 1758:25, 1771:8, 1771:9, 1811:6
**absorb** [1] - 1678:2
**absurd** [1] - 1734:2
**accent** [2] - 1735:25, 1736:7
**accept** [1] - 1652:21
**accepted** [2] - 1652:18, 1690:5
**access** [1] - 1627:23
**accommodations** [1] - 1815:18
**accompanied** [1] - 1804:4
**accompany** [1] - 1804:9
**accomplish** [1] - 1637:11
**according** [2] - 1700:21, 1745:3
**account** [40] - 1621:25, 1622:2, 1622:3, 1622:5, 1622:6, 1622:16, 1622:20, 1625:2,

1627:14, 1627:21, 1627:22, 1627:25, 1628:1, 1628:4, 1630:19, 1630:23, 1631:23, 1632:16, 1635:3, 1636:21, 1637:5, 1639:6, 1640:22, 1641:24, 1642:6, 1642:7, 1642:8, 1642:12, 1642:16, 1642:23, 1643:4, 1643:19, 1644:17, 1644:19, 1790:22, 1791:1, 1804:18, 1804:19

**accounts** [1] - 1780:14

**accurately** [3] - 1660:13, 1701:10, 1804:19

**Act** [2] - 1677:13, 1688:11

**act** [5] - 1660:1, 1660:2, 1661:12, 1711:14, 1715:1

**action** [6] - 1624:6, 1633:11, 1634:22, 1634:25, 1646:9, 1721:21

**actions** [5] - 1624:16, 1699:13, 1718:2, 1724:20, 1744:18

**active** [4] - 1634:18, 1634:19, 1649:25, 1654:24

**activity** [3] - 1641:9, 1641:15, 1645:21

**acts** [1] - 1663:22

**actual** [2] - 1796:14, 1797:22

**adding** [2] - 1693:19, 1733:15

**addition** [4] - 1656:8, 1741:8, 1764:13, 1779:14

**additional** [4] - 1647:3, 1662:16, 1704:19, 1755:10

**address** [4] - 1640:14, 1650:8, 1804:22, 1804:23

**adjacent** [1] - 1736:21

**adjudicative** [1] - 1657:15

**administer** [5] - 1662:18, 1663:5, 1663:6, 1677:10, 1678:2

**administering** [1] - 1662:23

**administration** [3] - 1687:17, 1711:14, 1711:16

**admit** [2] - 1747:13, 1747:22

**admitted** [11] - 1627:1,

1635:4, 1643:7, 1643:9, 1649:2, 1660:8, 1682:15, 1713:19, 1717:16, 1798:23, 1804:14

**adrift** [1] - 1710:15

**advance** [1] - 1664:18

**advanced** [11] - 1663:11, 1663:14, 1663:18, 1663:25, 1664:14, 1665:3, 1665:5, 1665:23, 1665:25, 1668:10, 1678:5

**advancing** [3] - 1667:23, 1673:5, 1673:25

**advise** [1] - 1663:16

**advised** [1] - 1705:10

**advocacy** [3] - 1650:4, 1669:5, 1726:14

**advocate** [2] - 1649:20, 1649:23

**advocated** [1] - 1726:2

**advocating** [3] - 1706:6, 1706:25, 1725:3

**affair** [5] - 1770:2, 1770:4, 1771:18, 1776:3, 1777:20

**affect** [4] - 1754:3, 1774:7, 1795:17, 1798:5

**afternoon** [2] - 1691:7, 1788:2

**again...** [1] - 1789:13

**age** [1] - 1760:22

**agenda** [31] - 1662:20, 1663:7, 1663:8, 1663:9, 1663:12, 1663:14, 1663:21, 1663:25, 1665:3, 1665:5, 1665:20, 1665:23, 1665:25, 1673:3, 1677:17, 1678:5, 1679:10, 1693:11, 1704:7, 1704:11, 1709:5, 1709:7, 1714:1, 1727:10, 1727:22, 1727:25, 1729:11, 1729:19, 1729:21, 1755:2

**agendas** [2] - 1663:18, 1664:14

**aggrieved** [1] - 1657:19

**ago** [1] - 1636:11

**agree** [1] - 1704:25

**agreed** [4] - 1681:23, 1725:25, 1800:25, 1823:13

**agreeing** [1] - 1780:2

**agreement** [11] - 1626:20, 1627:4,

1627:6, 1630:9, 1700:3, 1715:18, 1715:20, 1715:25, 1716:6, 1722:14

**agrees** [3] - 1716:1, 1743:25, 1744:7

**ahead** [6] - 1626:14, 1664:4, 1664:7, 1665:13, 1689:13, 1702:2

**air** [3] - 1669:17, 1669:18, 1723:12

**Air** [1] - 1715:5

**Airbnb** [1] - 1701:18

**alcohol** [5] - 1659:13, 1659:19, 1715:10, 1715:12

**Algorri** [1] - 1824:12

**all-boys** [1] - 1761:21

**allocated** [1] - 1668:14

**allocation** [1] - 1670:15

**allow** [3] - 1659:14, 1664:15, 1715:2

**allowed** [6] - 1659:16, 1677:25, 1678:3, 1724:21, 1745:10, 1746:9

**allows** [1] - 1668:18

**almost** [11] - 1646:4, 1646:11, 1656:12, 1661:7, 1663:23, 1668:21, 1671:2, 1671:16, 1675:11, 1761:5, 1804:4

**alter** [1] - 1725:23

**ambassador** [1] - 1663:2

**Ambrose** [2] - 1647:13, 1717:13

**AMBROZ** [2] - 1615:7, 1647:14

**Ambroz** [6] - 1647:18, 1647:24, 1718:2, 1726:14, 1755:14

**AMERICA** [3] - 1613:7, 1614:4, 1825:5

**America** [2] - 1618:10, 1618:14

**American** [1] - 1738:4

**Americans** [2] - 1743:8, 1743:13

**amount** [21] - 1627:17, 1629:11, 1629:14, 1629:16, 1630:1, 1630:2, 1630:3, 1630:4, 1635:14, 1638:11, 1639:9, 1639:12, 1639:19, 1645:16, 1698:8, 1732:24, 1733:3, 1733:7, 1790:25, 1807:17

**amounts** [1] - 1790:25

**analysis** [3] - 1714:24, 1724:19, 1758:3

**analyst** [1] - 1761:7

**AND** [3] - 1825:10, 1825:13, 1825:15

**AND/OR** [1] - 1825:19

**anemic** [1] - 1700:4

**Angeles** [31] - 1647:25, 1648:22, 1655:5, 1664:21, 1669:20, 1671:10, 1672:6, 1686:3, 1688:3, 1698:23, 1699:24, 1729:15, 1732:5, 1732:10, 1736:18, 1738:15, 1738:25, 1740:10, 1740:24, 1741:4, 1742:7, 1742:16, 1742:24, 1745:10, 1747:15, 1752:22, 1754:13, 1759:9, 1767:20, 1768:19, 1769:10

**ANGELES** [7] - 1613:17, 1613:23, 1614:7, 1614:11, 1614:16, 1614:21, 1617:1

**announce** [4] - 1808:11, 1810:5, 1822:18, 1823:9

**announced** [4] - 1810:3, 1810:12, 1813:2, 1823:23

**answer** [11] - 1624:25, 1645:23, 1689:13, 1727:19, 1739:24, 1741:15, 1750:17, 1753:21, 1754:4, 1775:19, 1792:14

**answered** [3] - 1729:23, 1747:25, 1748:4

**anticipate** [1] - 1698:18

**anxiety** [1] - 1707:25

**ANY** [1] - 1825:18

**apartments** [1] - 1666:12

**apologize** [4] - 1665:8, 1702:1, 1728:8, 1743:19

**appeals** [8] - 1655:23, 1657:17, 1657:18, 1657:20, 1657:22, 1658:5, 1663:22, 1664:15

**appear** [5] - 1673:9, 1676:5, 1691:23, 1697:24, 1810:4

**appeared** [2] - 1665:2, 1666:1, 1673:3

**appearing** [1] - 1665:24

**applied** [1] - 1749:21

**applies** [1] - 1620:10

**applying** [1] - 1641:20

**appointed** [15] - 1647:24, 1648:11, 1649:11, 1649:12, 1651:10, 1651:18, 1652:4, 1652:25, 1653:7, 1656:19, 1662:10, 1684:19, 1689:21, 1707:17, 1723:17

**appointee** [1] - 1703:15

**appointment** [8] - 1649:13, 1649:16, 1651:24, 1652:5, 1652:16, 1653:9, 1653:12, 1689:17

**appointments** [1] - 1651:21

**appreciate** [1] - 1637:10

**approach** [4] - 1680:13, 1680:17, 1728:13, 1739:2

**approached** [1] - 1730:9

**appropriate** [5] - 1691:16, 1691:24, 1692:11, 1692:13, 1692:15

**approval** [6] - 1659:23, 1703:17, 1716:5, 1718:3, 1750:6, 1751:21

**approvals** [1] - 1660:14

**approve** [9] - 1724:13, 1724:14, 1724:16, 1751:14, 1753:4, 1758:6, 1758:9, 1758:13, 1758:16

**approved** [15] - 1620:12, 1641:9, 1641:11, 1641:16, 1641:17, 1649:13, 1651:21, 1716:3, 1716:9, 1724:23, 1743:17, 1751:25, 1752:6, 1756:24, 1757:4

**approves** [1] - 1751:24

**April** [6] - 1817:24, 1818:3, 1818:7, 1818:10, 1818:14, 1822:21

**ardent** [1] - 1702:24

**ARE** [1] - 1825:19

**area** [7] - 1618:19, 1644:3, 1683:16, 1693:21, 1693:23, 1694:1, 1708:13

**Area** [2] - 1660:3, 1669:16

**areas** [2] - 1666:24,

1697:5

**argue** [2] - 1718:19, 1738:2

**argument** [1] - 1753:24

**argumentative** [7] - 1735:21, 1736:1, 1736:14, 1737:11, 1747:9, 1749:8, 1755:4

**arrange** [3] - 1662:20, 1663:6, 1665:20

**arrangement** [23] - 1793:21, 1793:25, 1794:9, 1794:24, 1795:2, 1795:10, 1795:14, 1795:17, 1796:6, 1797:2, 1797:5, 1797:8, 1797:13, 1798:19, 1799:12, 1799:17, 1800:5, 1800:10, 1800:16, 1800:24, 1801:16, 1801:22, 1802:11

**arranging** [1] - 1663:8

**arrive** [2] - 1695:13, 1695:14

**arrived** [1] - 1778:13

**artist** [1] - 1821:20

**Arts** [1] - 1821:21

**as-of-yet** [1] - 1758:3

**aside** [4] - 1646:10, 1658:5, 1773:6, 1780:16

**aspect** [2] - 1667:14, 1802:10

**aspects** [4] - 1618:25, 1666:17, 1666:20, 1666:21

**assented** [1] - 1681:22

**assist** [2] - 1623:15, 1658:23

**assistance** [2] - 1623:25, 1779:20

**assistant** [1] - 1804:3

**associated** [4] - 1772:12, 1773:7, 1773:10, 1807:12

**Association** [1] - 1676:4

**assume** [2] - 1707:8, 1799:18

**assumed** [2] - 1749:23, 1797:14

**assumes** [4] - 1727:18, 1734:15, 1735:5, 1737:12

**assumption** [3] - 1707:4, 1707:6, 1773:8

**AT** [1] - 1617:3

**attach** [1] - 1638:9

**attached** [1] - 1638:7

**attachment** [1] - 1805:1

**attempt** [1] - 1684:16

**attend** [5] - 1676:12, 1676:17, 1676:6, 1678:10, 1782:20

**attendance** [2] - 1678:14, 1819:1

**attendees** [2] - 1821:13, 1821:14

**attention** [2] - 1789:21, 1789:24

**ATTORNEY** [3] - 1614:5, 1614:9, 1614:14

**attorney** [3] - 1623:21, 1677:20, 1757:11

**attorneys** [6] - 1623:14, 1624:15, 1819:3, 1820:21

**August** [6] - 1639:16, 1750:24, 1769:21, 1789:8, 1790:20, 1790:24

**Australia** [2] - 1788:24, 1789:6

**authority** [5] - 1652:21, 1675:5, 1689:16, 1707:8, 1746:10

**auto** [4] - 1621:24, 1621:25, 1622:14, 1622:15

**aware** [18] - 1644:20, 1665:1, 1692:24, 1693:2, 1699:15, 1764:13, 1767:21, 1768:4, 1769:15, 1769:19, 1790:19, 1791:21, 1797:7, 1797:9, 1819:7, 1821:2, 1821:3, 1822:5

---

# B

**back-and-forth** [1] - 1809:21

**backbone** [1] - 1727:4

**background** [3] - 1734:8, 1735:16, 1798:6

**bad** [5] - 1694:20, 1720:24, 1736:10, 1744:1, 1750:15

**bag** [1] - 1790:15

**balance** [2] - 1620:20, 1700:21

**balloon** [1] - 1629:23

**Bank** [27] - 1618:2, 1618:3, 1618:8, 1618:13, 1618:14, 1619:4, 1619:18, 1619:21, 1619:24, 1620:4, 1623:10, 1625:15, 1626:10, 1628:9, 1633:11,

1633:17, 1634:18, 1634:21, 1634:25, 1635:17, 1641:12, 1641:18, 1642:22, 1643:3, 1643:19, 1644:7

**bank** [37] - 1618:11, 1619:9, 1622:3, 1622:5, 1622:6, 1622:15, 1622:16, 1622:20, 1622:25, 1623:2, 1624:14, 1625:2, 1625:5, 1630:10, 1632:21, 1641:3, 1641:7, 1641:9, 1641:13, 1641:15, 1641:24, 1642:6, 1642:7, 1642:8, 1642:12, 1642:15, 1642:23, 1644:16, 1644:17, 1644:19, 1645:8, 1645:24, 1646:3, 1777:3, 1780:14, 1790:22, 1791:1

**bank's** [5] - 1622:8, 1624:4, 1625:9, 1639:24, 1645:21

**Bank's** [4] - 1623:13, 1630:19, 1632:25, 1644:2

**Banking** [1] - 1628:10

**banking** [7] - 1618:9, 1618:10, 1618:20, 1624:21, 1628:13, 1632:12, 1641:25

**banks** [3] - 1642:20, 1642:24, 1772:15

**bar** [5] - 1686:11, 1686:14, 1690:15, 1692:5, 1692:6

**bar/hotel** [1] - 1690:13

**bar/restaurant** [1] - 1690:13

**Barham** [1] - 1747:18

**base** [2] - 1761:20, 1815:4

**based** [19] - 1618:24, 1641:6, 1641:12, 1641:25, 1644:7, 1661:13, 1712:23, 1712:25, 1713:1, 1741:1, 1747:5, 1768:2, 1771:5, 1771:14, 1773:9, 1796:16, 1805:10, 1806:4, 1810:25

**basic** [1] - 1741:4

**basis** [1] - 1663:24

**Bay** [1] - 1618:12

**bear** [1] - 1710:4

**beat** [1] - 1781:2

**beautiful** [3] - 1678:24, 1678:25, 1695:23

**became** [13] -

1649:19, 1649:24, 1650:5, 1650:24, 1651:2, 1654:8, 1671:2, 1671:13, 1674:7, 1674:12, 1674:15, 1712:14, 1784:14

**become** [11] - 1651:1, 1651:11, 1653:1, 1653:8, 1653:13, 1664:20, 1665:1, 1765:13, 1769:19, 1784:16, 1797:1

**becomes** [2] - 1623:4, 1623:12

**began** [4] - 1632:18, 1649:22, 1669:14, 1764:5

**begin** [2] - 1761:4, 1763:16, 1764:3, 1765:13, 1808:4

**beginning** [2] - 1717:14, 1810:7

**behalf** [3] - 1785:15, 1814:12, 1822:6

**BEHALF** [1] - 1614:4, 1614:18

**behavior** [1] - 1720:24

**behested** [1] - 1745:6

**behind** [5] - 1679:4, 1687:6, 1695:24, 1707:8, 1811:24

**beings** [1] - 1664:12

**bell** [1] - 1626:16

**belong** [1] - 1683:17

**belonged** [1] - 1688:2

**below** [6] - 1629:7, 1678:16, 1718:2, 1718:4, 1719:17, 1805:19

**belt** [1] - 1790:7

**benefit** [7] - 1672:14, 1723:4, 1724:1, 1724:6, 1756:14, 1756:18, 1756:20

**benefits** [8] - 1668:13, 1668:15, 1669:8, 1669:24, 1670:15, 1715:8, 1716:11, 1724:3

**benefitted** [1] - 1756:19

**best** [2] - 1631:16, 1694:4

**better** [6] - 1650:25, 1655:10, 1675:14, 1725:24, 1753:16, 1784:18

**between** [18] - 1642:19, 1682:21, 1684:1, 1687:9, 1705:22, 1730:23, 1731:5, 1731:15, 1745:22, 1747:14, 1747:23, 1747:24, 1755:15, 1778:15,

1784:7, 1790:20, 1803:25, 1813:1

**beyond** [4] - 1629:5, 1632:20, 1738:10, 1745:18

**bicyclists** [1] - 1666:23

**bid** [2] - 1774:7, 1774:12

**big** [6] - 1678:18, 1698:14, 1738:7, 1743:6, 1753:13, 1811:7

**bigger** [2] - 1711:5, 1715:6

**bill** [2] - 1744:21, 1783:21, 1791:7

**billboard** [1] - 1667:10, 1699:17

**billing** [2] - 1620:17, 1625:21

**billionaire** [1] - 1767:17

**bills** [7] - 1784:3, 1784:4, 1784:6, 1789:19, 1790:10, 1790:15, 1791:9

**bind** [1] - 1699:16

**bird** [1] - 1731:7

**birth** [1] - 1760:21

**Bishop** [1] - 1763:1

**bit** [12] - 1631:19, 1633:9, 1636:22, 1695:19, 1706:14, 1710:15, 1756:7, 1785:8, 1793:24, 1798:5, 1802:21, 1812:4

**biweekly** [1] - 1663:23

**black** [3] - 1683:7, 1723:14, 1806:24

**blight** [1] - 1733:17

**blow** [2] - 1640:25, 1643:13, 1683:20, 1713:20, 1714:6, 1714:17, 1719:6

**blowing** [1] - 1643:11

**blown** [2] - 1714:8, 1752:23

**blue** [1] - 1806:24

**board** [3] - 1626:9, 1626:12, 1812:3

**bodies** [2] - 1708:2, 1740:13

**body** [12] - 1635:23, 1636:5, 1655:17, 1655:19, 1655:22, 1656:21, 1657:9, 1658:10, 1658:12, 1660:7, 1661:20, 1754:21

**Body** [1] - 1807:6

**booked** [2] - 1632:13, 1747:22

**borders** [1] - 1656:13

**borrowed** [1] -

1645:20
**borrower** [10] - 1620:10, 1621:19, 1622:7, 1629:1, 1630:18, 1631:2, 1631:10, 1631:14, 1633:6, 1641:19
**borrower's** [1] - 1620:22
**borrowers** [3] - 1619:16, 1620:16, 1621:7
**boss** [1] - 1689:16
**bottom** [9] - 1628:20, 1631:1, 1635:7, 1640:24, 1640:25, 1643:14, 1644:5, 1685:9
**bought** [1] - 1745:3
**BOULEVARD** [1] - 1614:20
**Boulevard** [1] - 1666:25
**box** [3] - 1660:17, 1683:8, 1712:13
**boys** [1] - 1761:21
**branch** [7] - 1626:6, 1626:7, 1626:23, 1628:14, 1628:15, 1636:7, 1644:6
**Braun** [3] - 1647:7, 1728:20, 1759:21
**BRAUN** [66] - 1614:19, 1614:19, 1615:6, 1615:8, 1645:3, 1645:6, 1646:18, 1647:2, 1647:9, 1726:13, 1727:20, 1728:17, 1728:21, 1728:23, 1729:25, 1730:19, 1731:10, 1731:22, 1732:9, 1732:12, 1733:8, 1734:20, 1734:22, 1735:2, 1735:9, 1735:12, 1735:23, 1736:5, 1736:16, 1737:14, 1737:17, 1738:13, 1738:24, 1740:3, 1740:8, 1742:11, 1742:21, 1743:3, 1743:14, 1743:16, 1743:20, 1743:24, 1745:21, 1746:7, 1746:13, 1746:17, 1747:11, 1748:2, 1748:6, 1748:17, 1749:1, 1749:12, 1751:19, 1753:3, 1753:10, 1753:19, 1753:21, 1754:5, 1754:24, 1755:1, 1755:5, 1755:8, 1759:5, 1759:17, 1759:22
**break** [2] - 1717:1,

1824:10
**BRIAN** [3] - 1614:14, 1615:6, 1615:7
**brief** [3] - 1680:10, 1778:14, 1778:15
**briefly** [18] - 1619:13, 1627:11, 1631:17, 1640:5, 1654:10, 1656:17, 1662:8, 1674:24, 1677:5, 1683:20, 1694:13, 1710:20, 1714:18, 1715:13, 1718:8, 1723:9, 1725:21, 1765:16
**bright** [2] - 1720:9, 1720:12
**brighter** [2] - 1667:11, 1720:13
**brightness** [1] - 1720:8
**bring** [10] - 1679:14, 1679:16, 1679:18, 1682:3, 1682:14, 1765:4, 1778:16, 1784:25, 1793:24, 1807:25
**bringing** [4] - 1679:22, 1681:15, 1717:5, 1738:16
**brings** [1] - 1681:16
**broadly** [1] - 1721:19
**Broadway** [1] - 1806:25
**brought** [8] - 1646:5, 1681:20, 1792:21, 1793:22, 1798:18, 1799:11, 1800:4, 1800:22
**browbeat** [1] - 1688:10
**Brown** [1] - 1677:13
**buck** [1] - 1674:1
**bucket** [1] - 1668:18
**budding** [1] - 1690:17
**build** [9] - 1656:9, 1659:8, 1659:15, 1668:22, 1740:25, 1741:1, 1741:7, 1761:20
**building** [13] - 1666:11, 1736:20, 1736:21, 1737:7, 1738:16, 1739:17, 1739:20, 1741:12, 1742:13, 1742:22, 1743:7, 1744:1
**Building** [22] - 1648:20, 1648:21, 1648:22, 1674:18, 1674:22, 1675:2, 1675:7, 1675:14, 1675:16, 1675:19, 1676:1, 1676:13, 1699:8, 1699:12, 1730:1, 1739:16,

1740:11, 1741:11, 1741:14, 1741:16, 1742:3, 1766:11
**built** [4] - 1668:20, 1674:3, 1742:14, 1744:10
**Burbank** [5] - 1691:4, 1695:20, 1695:21, 1747:14, 1747:18
**business** [8] - 1649:25, 1690:21, 1695:11, 1695:12, 1737:4, 1762:17, 1767:13, 1773:2
**businesses** [1] - 1667:25
**businesspeople** [1] - 1818:25
**BUSTILLOS** [3] - 1613:20, 1825:10, 1825:23
**buy** [6] - 1669:17, 1669:18, 1669:21, 1723:12, 1740:23, 1744:25
**buying** [1] - 1745:4
**BY** [53] - 1614:5, 1614:10, 1614:14, 1614:19, 1615:6, 1615:6, 1615:7, 1615:8, 1615:9, 1617:23, 1645:6, 1646:18, 1647:23, 1652:17, 1665:15, 1717:12, 1726:13, 1727:20, 1728:23, 1729:25, 1730:19, 1731:10, 1731:22, 1732:12, 1733:8, 1734:22, 1735:12, 1735:23, 1736:5, 1736:16, 1737:17, 1738:13, 1738:24, 1740:8, 1742:11, 1743:3, 1743:16, 1743:24, 1746:7, 1746:17, 1747:11, 1748:2, 1748:6, 1748:17, 1749:1, 1749:12, 1751:19, 1754:5, 1755:13, 1759:5, 1760:11, 1803:16, 1823:7
**bylaws** [1] - 1704:9

---

## C

**C.S.R** [1] - 1613:21
**CA** [4] - 1614:7, 1614:11, 1614:16, 1614:21
**cabaret** [1] - 1659:12
**calculate** [1] - 1620:19
**calculation** [1] - 1645:11

**California** [7] - 1618:12, 1644:13, 1644:14, 1644:16, 1688:11, 1714:24, 1789:7
**CALIFORNIA** [5] - 1613:2, 1613:17, 1613:23, 1617:1, 1825:12
**Camacho** [15] - 1798:22, 1799:2, 1799:4, 1799:6, 1799:11, 1799:17, 1800:2, 1800:4, 1800:5, 1800:9, 1800:15, 1800:22, 1801:7, 1802:3
**campaign** [4] - 1773:18, 1780:3, 1814:23, 1815:2, 1815:8, 1817:16, 1823:18, 1824:4
**campaigning** [1] - 1811:3
**campaigns** [1] - 1738:9
**Canada** [1] - 1793:17
**Canadian** [3] - 1793:19, 1797:17, 1798:13
**candelas** [1] - 1720:11
**candidacy** [7] - 1770:21, 1811:21, 1812:6, 1815:10, 1822:18, 1823:9, 1823:22
**candidate** [2] - 1811:11, 1819:17
**candidates** [1] - 1811:14
**cannabis** [6] - 1655:20, 1657:1, 1657:7, 1687:20, 1687:21, 1701:18
**cannot** [3] - 1624:9, 1739:6, 1741:19
**Cantonese** [1] - 1734:20
**capacity** [3] - 1706:7, 1761:11, 1796:12
**capital** [2] - 1617:18, 1617:19
**captured** [1] - 1631:20
**captures** [1] - 1644:4
**car** [3] - 1707:22, 1707:23, 1708:5
**care** [1] - 1650:23
**career** [1] - 1618:20
**carefully** [2] - 1745:13, 1745:15
**carries** [1] - 1662:4
**carry** [3] - 1688:24, 1704:12, 1711:8
**carrying** [1] - 1708:24
**case** [4] - 1649:9, 1721:5, 1758:4,

1765:11
**CASE** [1] - 1615:3
**cases** [1] - 1819:16
**cash** [19] - 1642:19, 1689:24, 1702:22, 1783:13, 1783:14, 1783:17, 1783:21, 1784:20, 1784:22, 1789:14, 1789:25, 1790:6, 1790:9, 1790:18, 1790:21, 1791:1, 1791:5, 1791:9, 1791:16
**catches** [1] - 1789:21
**category** [1] - 1807:22
**Catholic** [1] - 1761:22
**caught** [1] - 1789:24
**caused** [3] - 1707:24, 1707:25, 1732:16
**cautious** [1] - 1752:10
**caveat** [1] - 1656:20
**CD** [4] - 1637:2, 1637:4, 1639:4, 1640:17
**CD14** [1] - 1667:15, 1668:7, 1670:15, 1673:21, 1702:9, 1808:5, 1810:23, 1823:10
**cell** [1] - 1683:6
**cement** [1] - 1739:21
**Center** [9] - 1628:10, 1667:1, 1667:9, 1693:22, 1714:11, 1718:5, 1722:23, 1736:22, 1807:1
**center** [8] - 1628:13, 1644:8, 1644:9, 1655:7, 1655:9, 1752:19, 1754:12, 1754:23
**Central** [1] - 1676:4
**CENTRAL** [2] - 1613:2, 1825:11
**Century** [1] - 1807:9
**certain** [13] - 1621:21, 1622:10, 1655:23, 1659:15, 1663:4, 1698:8, 1711:14, 1725:3, 1745:1, 1764:13, 1788:1, 1821:10
**certainly** [11] - 1647:9, 1692:7, 1692:13, 1694:5, 1718:11, 1720:6, 1723:11, 1752:6, 1753:23, 1756:18, 1776:5
**Certificate** [1] - 1637:5
**certificate** [13] - 1627:15, 1627:18, 1627:20, 1627:24, 1628:1, 1630:23, 1631:21, 1631:25, 1632:15, 1639:2,

1639:5, 1639:21, 1640:21
**certified** [1] - 1750:23
**CERTIFY** [1] - 1825:12
**chagrin** [1] - 1668:17
**chain** [1] - 1635:8
**chair** [7] - 1667:18, 1677:25, 1704:10, 1704:14, 1704:17, 1764:19, 1765:2
**Chairman** [42] - 1766:20, 1766:22, 1767:2, 1767:19, 1768:3, 1768:5, 1768:15, 1768:19, 1768:25, 1772:10, 1773:2, 1773:7, 1773:10, 1775:5, 1779:7, 1779:12, 1779:14, 1781:6, 1781:8, 1781:12, 1781:15, 1781:21, 1782:1, 1782:12, 1783:7, 1785:16, 1786:5, 1786:18, 1786:21, 1787:10, 1787:22, 1789:9, 1812:11, 1812:19, 1812:23, 1815:25, 1816:1, 1816:2, 1816:21, 1823:13, 1823:18
**chairman** [22] - 1767:15, 1768:13, 1772:7, 1778:25, 1787:20, 1788:12, 1788:17, 1788:23, 1794:19, 1794:22, 1812:15, 1812:24, 1813:12, 1814:1, 1814:22, 1815:15, 1816:8, 1816:20, 1816:21, 1816:25, 1817:5, 1817:15
**chairs** [1] - 1679:1
**challenger** [3] - 1771:1, 1771:7, 1771:11
**Challenger** [1] - 1771:15
**challenging** [1] - 1675:23
**chamber** [1] - 1687:7
**Chambers** [1] - 1676:4
**Chan** [51] - 1648:16, 1648:18, 1649:7, 1649:8, 1673:15, 1682:21, 1683:18, 1684:2, 1696:7, 1696:18, 1698:12, 1699:6, 1703:10, 1711:19, 1727:6, 1727:13, 1729:4, 1730:9, 1735:15, 1735:19, 1742:2, 1746:18, 1747:24,

1748:7, 1765:9, 1765:10, 1765:17, 1765:23, 1766:4, 1766:8, 1766:25, 1767:9, 1769:18, 1772:9, 1772:10, 1774:19, 1775:5, 1778:6, 1779:16, 1810:22, 1812:5, 1814:19, 1816:7, 1816:24, 1818:10, 1818:15, 1818:17, 1819:5, 1819:10, 1822:6, 1822:14
**CHAN** [3] - 1613:12, 1614:19, 1825:7
**Chan's** [1] - 1734:7
**chances** [2] - 1776:6, 1776:7
**change** [3] - 1659:14, 1746:1, 1809:11
**changed** [2] - 1672:2, 1672:3
**changes** [1] - 1668:19
**changing** [1] - 1729:15
**channel** [1] - 1654:14
**channels** [1] - 1661:14
**characteristic** [1] - 1700:10
**charge** [4] - 1711:7, 1738:25, 1803:3, 1819:6
**CHARGED** [1] - 1825:18
**charged** [1] - 1655:17
**charitable** [3] - 1649:22, 1654:13, 1745:5
**charities** [1] - 1669:24
**charter** [4] - 1655:18, 1661:11, 1711:7
**Chase** [2] - 1644:21, 1644:22
**chat** [2] - 1778:14, 1778:15
**cheap** [1] - 1669:4
**check** [10] - 1642:5, 1642:7, 1642:10, 1642:23, 1643:11, 1643:13, 1644:1, 1644:5, 1644:17
**checks** [10] - 1641:23, 1642:14, 1643:3, 1643:15, 1643:18, 1643:19, 1643:21, 1643:22, 1643:23, 1644:1
**checks'** [1] - 1644:9
**Chen** [1] - 1822:7
**chess** [1] - 1811:15
**Chiang** [21] - 1792:24, 1793:1, 1793:11, 1794:11, 1794:13, 1794:14, 1794:14,

1794:21, 1794:25, 1795:13, 1795:20, 1795:25, 1796:6, 1796:18, 1796:24, 1797:14, 1797:15, 1801:25, 1813:11, 1816:6
**chicken** [1] - 1696:9
**children** [6] - 1649:21, 1651:3, 1760:18, 1760:20, 1761:6, 1761:11
**China** [5] - 1767:14, 1768:17, 1768:19, 1768:25, 1815:15
**Chinese** [7] - 1734:13, 1735:13, 1735:16, 1735:20, 1736:18, 1817:6, 1817:9
**choice** [1] - 1695:5
**choose** [1] - 1686:16
**chose** [1] - 1686:13
**CIRCUIT** [1] - 1825:18
**circumference** [1] - 1679:1
**circumstances** [1] - 1641:16
**citizen** [3] - 1656:20, 1664:10, 1751:11
**citizens** [3] - 1655:13, 1667:12, 1667:25, 1669:6
**city** [41] - 1647:25, 1649:13, 1651:21, 1655:5, 1655:18, 1656:4, 1656:14, 1656:22, 1656:23, 1657:13, 1658:12, 1661:11, 1663:2, 1663:4, 1666:24, 1669:7, 1671:10, 1671:19, 1676:24, 1677:20, 1678:18, 1678:24, 1678:25, 1680:1, 1686:3, 1687:4, 1687:6, 1688:6, 1688:14, 1692:21, 1698:14, 1723:18, 1738:17, 1756:24, 1757:4, 1764:3, 1764:9, 1764:12, 1764:14, 1767:19
**City** [84] - 1650:5, 1654:7, 1655:15, 1655:21, 1655:25, 1657:2, 1657:20, 1658:2, 1658:9, 1658:18, 1658:23, 1660:19, 1666:22, 1668:17, 1668:21, 1670:22, 1671:1, 1671:10, 1672:22, 1673:14, 1675:2, 1675:12, 1676:2, 1676:4, 1677:20,

1679:7, 1682:4, 1686:25, 1687:1, 1687:5, 1688:2, 1688:3, 1689:6, 1693:20, 1694:21, 1695:11, 1695:12, 1697:10, 1697:20, 1698:14, 1698:25, 1699:24, 1700:15, 1700:19, 1700:20, 1701:14, 1701:21, 1702:6, 1702:19, 1705:9, 1707:24, 1708:12, 1709:17, 1710:24, 1714:1, 1718:5, 1722:23, 1730:7, 1732:16, 1738:15, 1740:4, 1743:5, 1745:3, 1745:14, 1745:24, 1749:16, 1753:5, 1754:12, 1757:24, 1758:12, 1758:15, 1759:15, 1761:6, 1761:8, 1761:10, 1761:13, 1766:9, 1770:20, 1771:5, 1791:11, 1791:14, 1791:16, 1807:9
**City's** [3] - 1740:15, 1745:16, 1766:10
**City-provided** [1] - 1686:25
**citywide** [10] - 1648:3, 1648:4, 1652:8, 1658:15, 1668:4, 1671:15, 1676:5, 1676:10, 1687:20, 1706:18
**civic** [1] - 1649:24
**civil** [3] - 1623:5, 1623:12, 1641:14
**claim** [3] - 1623:20, 1624:7, 1624:12
**clarification** [1] - 1817:21
**clarify** [4] - 1651:6, 1671:5, 1691:19, 1723:24
**clean** [1] - 1655:8
**clear** [7] - 1695:7, 1698:22, 1705:15, 1786:17, 1814:15, 1814:18, 1820:17
**client** [2] - 1728:2, 1761:20
**clients** [1] - 1762:19
**close** [5] - 1622:1, 1622:17, 1654:8, 1793:6, 1800:2
**closed** [2] - 1635:1, 1677:14
**closely** [2] - 1804:1, 1807:13
**closet** [4] - 1789:15, 1789:20, 1790:3,

1790:12
**coat** [2] - 1789:25, 1850
**code** [3] - 1683:16, 1740:11, 1740:12
**CODE** [1] - 1825:13
**codes** [2] - 1739:17, 1739:20
**colat** [1] - 1630:10
**collateral** [34] - 1621:18, 1622:5, 1622:6, 1622:9, 1622:10, 1622:20, 1622:24, 1623:2, 1623:4, 1623:12, 1624:3, 1624:20, 1625:3, 1625:6, 1625:9, 1625:11, 1627:15, 1628:2, 1628:5, 1630:11, 1631:11, 1632:1, 1632:20, 1634:23, 1637:6, 1638:24, 1639:20, 1639:25, 1640:9, 1640:21, 1641:8, 1641:13, 1646:6, 1646:24
**collateralized** [1] - 1646:4
**colleagues** [5] - 1664:13, 1701:8, 1704:21, 1723:20, 1725:25
**collect** [3] - 1619:15, 1639:18, 1805:12
**collecting** [1] - 1805:7
**collectively** [1] - 1703:13
**College** [1] - 1650:5
**color** [1] - 1672:8
**column** [3] - 1684:8, 1684:9, 1684:10
**com** [1] - 1752:24
**combined** [1] - 1705:14
**comfortable** [2] - 1784:21, 1801:4
**coming** [11] - 1667:8, 1673:12, 1677:8, 1694:11, 1708:16, 1720:7, 1736:18, 1742:15, 1742:25, 1747:17, 1782:1
**command** [1] - 1733:16
**comment** [2] - 1718:15
**commercial** [2] - 1666:6, 1666:8
**Commercial** [1] - 1628:9
**commission** [17] - 1648:3, 1648:5, 1648:9, 1652:8, 1653:15, 1653:19, 1654:5, 1655:12, 1657:5, 1662:12,

1662:20, 1665:10, 1667:21, 1718:17, 1725:5, 1751:24, 1758:17

**Commission** [40] - 1654:8, 1655:11, 1655:16, 1655:22, 1655:25, 1657:3, 1657:21, 1658:9, 1658:24, 1663:16, 1670:2, 1670:10, 1671:10, 1671:13, 1672:22, 1673:14, 1675:12, 1677:16, 1677:23, 1687:5, 1689:4, 1689:14, 1704:10, 1704:14, 1704:15, 1704:18, 1706:8, 1710:9, 1711:17, 1714:2, 1723:8, 1723:21, 1726:19, 1727:10, 1732:15, 1750:5, 1753:24, 1758:13, 1758:16, 1761:6

**Commission's** [1] - 1658:3

**commission-ships** [1] - 1662:12

**Commissioner** [1] - 1718:2

**commissioner** [7] - 1661:23, 1676:6, 1677:8, 1694:10, 1710:5, 1757:25, 1759:10

**commissioners** [15] - 1651:13, 1651:18, 1652:9, 1653:16, 1655:12, 1662:21, 1663:16, 1688:10, 1704:13, 1706:11, 1721:23, 1725:2, 1725:5, 1725:7, 1758:23

**commissions** [2] - 1655:1, 1656:15

**commitment** [2] - 1708:16, 1823:17

**commitments** [1] - 1806:20

**committal** [1] - 1707:21

**committally** [1] - 1681:23

**committed** [2] - 1805:7, 1805:17

**Committee** [2] - 1657:11, 1764:23

**committee** [7] - 1657:13, 1670:2, 1671:12, 1723:17, 1723:22, 1729:11, 1739:20

**committees** [3] - 1672:24, 1764:13,

1765:2

**COMML** [1] - 1635:16

**common** [1] - 1650:20

**communicate** [3] - 1642:24, 1688:13, 1768:6

**communicated** [3] - 1801:4, 1820:9, 1820:18

**communicates** [1] - 1817:15

**communicating** [2] - 1688:6, 1707:14

**communication** [3] - 1682:21, 1686:24, 1688:11

**communications** [3] - 1642:25, 1758:23, 1763:24

**communities** [2] - 1672:8, 1672:9

**community** [5] - 1654:24, 1671:1, 1721:10, 1723:15, 1771:11

**companies** [1] - 1672:10

**company** [6] - 1654:7, 1654:11, 1794:15, 1794:17, 1807:6, 1807:8

**comparison** [1] - 1668:5

**competing** [1] - 1675:4

**complex** [4] - 1655:24, 1657:23, 1658:1, 1663:25

**complicated** [4] - 1658:8, 1658:14, 1677:8, 1698:3

**comply** [2] - 1705:16, 1758:2

**component** [4] - 1666:8, 1666:14, 1666:15

**comported** [1] - 1714:23

**comportment** [1] - 1663:4

**comports** [1] - 1720:15

**concern** [12] - 1667:13, 1671:15, 1697:11, 1699:9, 1704:24, 1707:25, 1732:17, 1733:6, 1778:24, 1779:18, 1795:17, 1796:11

**concerned** [16] - 1668:9, 1668:11, 1671:8, 1671:9, 1693:20, 1733:9, 1733:19, 1733:23, 1742:6, 1743:4, 1743:6, 1752:12,

1774:6, 1774:10, 1774:12, 1778:23

**concerning** [2] - 1668:14, 1689:15

**concerns** [27] - 1666:18, 1667:14, 1667:19, 1670:13, 1670:17, 1670:24, 1673:18, 1693:15, 1693:18, 1694:9, 1694:14, 1698:18, 1699:7, 1699:15, 1699:18, 1699:25, 1700:2, 1700:13, 1700:21, 1700:24, 1703:16, 1706:18, 1706:19, 1709:21, 1723:23, 1743:2

**conclusions** [1] - 1662:15

**concrete** [1] - 1687:3

**condition** [2] - 1670:12, 1721:1

**conditional** [1] - 1659:20

**conditions** [1] - 1721:2

**condos** [1] - 1666:12

**conference** [2] - 1678:23, 1678:25

**CONFERENCE** [2] - 1825:17, 1825:20

**confidential** [2] - 1763:24, 1780:24

**CONFORMANCE** [2] - 1825:16, 1825:19

**confused** [2] - 1699:2, 1800:15

**congressman** [1] - 1744:20

**conjunction** [3] - 1650:13, 1718:3, 1739:10

**connection** [1] - 1757:8

**consensual** [2] - 1770:1, 1770:4

**consensus** [1] - 1702:25

**consider** [9] - 1621:8, 1621:12, 1658:6, 1661:2, 1661:5, 1667:22, 1711:25, 1713:15, 1718:10

**consideration** [2] - 1700:22, 1715:18

**considerations** [4] - 1742:14, 1742:24, 1753:3, 1753:17

**considered** [2] - 1713:12, 1714:20, 1745:8

**considering** [3] - 1693:3, 1716:7, 1725:13

**consistent** [2] -

1706:1, 1805:11

**constantly** [3] - 1633:10, 1663:19, 1663:23

**Constitution** [1] - 1656:5

**constitution** [1] - 1656:12

**constrictions** [1] - 1677:12

**construction** [1] - 1741:12

**consultant** [3] - 1761:18, 1762:14, 1762:16

**consulting** [1] - 1745:10

**consumer** [5] - 1618:21, 1618:23, 1619:1, 1619:11, 1623:3

**consuming** [1] - 1655:3

**contact** [7] - 1633:14, 1633:17, 1633:18, 1640:4, 1684:23, 1685:19

**contacts** [3] - 1683:21, 1683:23, 1685:10

**contemplating** [1] - 1811:3

**content** [1] - 1808:2

**contentious** [1] - 1664:12

**context** [2] - 1685:8, 1818:2

**continue** [1] - 1676:23

**continuing** [1] - 1632:25

**contract** [7] - 1749:6, 1749:14, 1749:25, 1750:1, 1801:1, 1801:6, 1802:15

**contractor** [2] - 1750:1, 1750:2

**contravention** [1] - 1702:24

**contribute** [1] - 1664:16

**contributions** [2] - 1803:13, 1811:15

**controlled** [1] - 1669:9

**convention** [6] - 1752:19, 1752:23, 1753:13, 1754:1, 1754:12, 1754:23

**conventions** [1] - 1754:10

**conversation** [57] - 1680:4, 1680:5, 1680:9, 1681:3, 1684:16, 1689:10, 1693:25, 1694:6, 1694:19, 1694:23, 1697:17, 1697:25,

1699:6, 1705:3, 1705:23, 1705:25, 1706:2, 1706:4, 1706:13, 1706:24, 1710:13, 1725:4, 1773:19, 1773:22, 1774:21, 1775:9, 1775:10, 1775:14, 1777:6, 1778:7, 1778:9, 1784:7, 1784:8, 1784:9, 1784:12, 1784:19, 1784:21, 1784:23, 1785:1, 1792:24, 1794:25, 1795:3, 1795:6, 1795:7, 1795:24, 1796:6, 1796:16, 1797:25, 1800:14, 1800:19, 1809:24, 1813:6, 1815:6, 1815:9, 1819:14, 1821:6, 1821:24

**conversations** [20] - 1706:18, 1763:18, 1763:22, 1763:23, 1785:9, 1793:15, 1797:7, 1808:2, 1808:3, 1808:14, 1808:19, 1808:21, 1808:25, 1810:19, 1810:25, 1812:7, 1812:10, 1812:14, 1816:22, 1817:1

**convey** [2] - 1777:9, 1777:12

**conveyed** [2] - 1778:5, 1779:23

**conveys** [1] - 1795:25

**convince** [1] - 1706:21

**copy** [1] - 1678:5

**corner** [2] - 1667:10, 1772:20

**Corporation** [1] - 1619:19

**correct** [115] - 1623:8, 1627:10, 1628:18, 1637:21, 1645:16, 1646:4, 1646:11, 1646:14, 1646:20, 1648:23, 1649:1, 1650:9, 1651:9, 1651:12, 1651:17, 1657:12, 1660:24, 1662:5, 1671:7, 1673:17, 1674:20, 1676:11, 1701:1, 1702:3, 1707:19, 1714:5, 1715:16, 1718:23, 1719:1, 1720:4, 1722:9, 1724:4, 1724:8, 1726:17, 1727:3, 1727:7, 1727:15, 1728:4, 1728:7, 1728:19, 1729:15,

192,571,14,850

1730:7, 1730:21, 1730:24, 1731:5, 1732:25, 1733:20, 1733:21, 1734:5, 1734:14, 1735:4, 1735:16, 1736:7, 1736:12, 1736:22, 1736:25, 1737:7, 1737:8, 1737:23, 1738:6, 1739:4, 1739:7, 1739:8, 1739:11, 1739:14, 1739:17, 1740:5, 1740:6, 1740:7, 1740:9, 1740:16, 1740:20, 1741:4, 1741:8, 1741:13, 1741:20, 1741:24, 1742:4, 1743:8, 1743:22, 1744:10, 1744:18, 1745:11, 1745:14, 1746:3, 1747:4, 1747:24, 1748:8, 1748:12, 1749:2, 1749:17, 1750:10, 1750:12, 1750:20, 1750:22, 1751:3, 1751:6, 1751:11, 1751:14, 1752:1, 1752:21, 1753:5, 1754:10, 1754:13, 1754:19, 1762:20, 1765:3, 1770:12, 1786:22, 1786:23, 1794:23, 1795:12, 1808:9, 1808:12, 1820:22

**CORRECT** [1] - 1825:14
**correctly** [2] - 1625:20, 1724:19
**corresponds** [1] - 1729:22
**corrupt** [1] - 1710:23
**corruption** [12] - 1673:23, 1699:3, 1715:22, 1732:16, 1737:16, 1737:18, 1744:5, 1744:12, 1744:14, 1744:22, 1745:1, 1745:8
**council** [38] - 1649:13, 1650:17, 1651:8, 1651:22, 1656:23, 1657:5, 1657:12, 1657:13, 1667:15, 1667:17, 1667:18, 1667:19, 1669:22, 1669:25, 1670:6, 1671:12, 1671:13, 1671:16, 1672:25, 1687:7, 1702:10, 1716:3, 1720:16, 1723:15, 1726:4, 1739:12, 1744:4, 1756:25, 1757:4,

1764:3, 1764:9, 1764:12, 1764:14, 1770:15, 1771:6, 1808:5, 1823:10
**council's** [1] - 1650:1
**councils** [1] - 1654:25
**councilwoman** [1] - 1815:7
**counsel** [3] - 1645:24, 1717:4, 1728:16
**couple** [10] - 1666:21, 1689:3, 1706:22, 1720:6, 1744:25, 1763:15, 1812:9, 1812:25, 1818:2
**course** [1] - 1815:11
**COURT** [70] - 1613:1, 1613:20, 1617:3, 1617:6, 1617:10, 1617:20, 1644:25, 1645:2, 1645:4, 1646:17, 1647:3, 1647:7, 1647:10, 1647:20, 1652:12, 1652:14, 1665:6, 1665:9, 1665:13, 1716:25, 1717:4, 1717:8, 1726:11, 1727:19, 1728:14, 1728:20, 1729:24, 1730:16, 1731:19, 1732:7, 1733:5, 1734:17, 1734:25, 1735:7, 1735:22, 1736:2, 1736:15, 1737:13, 1738:12, 1738:20, 1739:24, 1742:10, 1742:19, 1743:11, 1745:20, 1746:6, 1746:12, 1746:16, 1747:10, 1748:1, 1748:5, 1748:15, 1748:24, 1749:9, 1751:17, 1753:2, 1753:8, 1753:15, 1753:20, 1754:25, 1755:7, 1755:9, 1759:18, 1759:21, 1759:23, 1760:9, 1823:3, 1824:9, 1825:10, 1825:11
**COURTHOUSE** [1] - 1613:21
**COURTROOM** [3] - 1617:16, 1647:15, 1760:3
**CPC** [74] - 1648:6, 1648:11, 1648:13, 1648:15, 1648:25, 1649:11, 1651:10, 1651:13, 1651:16, 1651:24, 1652:25, 1653:4, 1653:7, 1654:1, 1654:4, 1654:11, 1654:18,

1655:21, 1657:15, 1660:6, 1660:25, 1661:5, 1661:8, 1661:16, 1661:19, 1661:23, 1662:2, 1662:9, 1662:15, 1663:7, 1664:19, 1665:16, 1670:11, 1673:10, 1674:9, 1676:12, 1676:18, 1677:2, 1686:18, 1689:21, 1693:7, 1693:15, 1694:10, 1701:25, 1704:12, 1708:25, 1709:5, 1709:10, 1709:14, 1709:17, 1711:25, 1712:11, 1713:9, 1713:13, 1713:15, 1717:15, 1718:9, 1718:25, 1720:15, 1721:19, 1721:22, 1721:25, 1722:7, 1722:11, 1724:10, 1725:12, 1729:8, 1751:13, 1751:22, 1751:25, 1756:4, 1756:10, 1758:20
**CPC's** [2] - 1693:11, 1721:21
**CR** [2] - 1613:10, 1825:6
**crappy** [2] - 1672:9, 1690:12
**create** [6] - 1642:11, 1715:4, 1724:21, 1733:17, 1736:24, 1743:7
**creation** [1] - 1715:1
**credit** [1] - 1642:11
**criminal** [6] - 1623:5, 1623:13, 1641:9, 1641:14, 1641:15, 1645:21
**CROSS** [3] - 1615:4, 1645:5, 1726:12
**cross** [2] - 1645:2, 1726:11
**cross-examination** [2] - 1645:2, 1726:11
**CROSS-EXAMINATION** [2] - 1645:5, 1726:12
**curiosity** [1] - 1646:22
**current** [7] - 1618:5, 1618:6, 1619:3, 1619:6, 1619:12, 1619:14, 1621:2
**customer** [1] - 1642:22
**cut** [1] - 1650:10
**cycle** [2] - 1701:13, 1771:1

**D**

**D-O-N-O-V-A-N** [1] - 1617:19
**dad** [2] - 1655:1, 1694:25
**dancing** [1] - 1659:11
**darn** [1] - 1654:8
**date** [9] - 1640:7, 1640:8, 1679:23, 1685:8, 1685:13, 1688:18, 1748:9, 1769:9, 1769:12
**DATE** [1] - 1825:23
**dated** [1] - 1638:19
**dates** [4] - 1750:21, 1751:1, 1754:3, 1760:21
**David** [4] - 1647:13, 1647:17, 1806:22, 1806:23
**DAVID** [3] - 1615:7, 1647:14, 1647:18
**DAY** [1] - 1613:16
**day-to-day** [2] - 1624:17, 1624:21
**daylight** [1] - 1720:13
**days** [12] - 1621:10, 1621:12, 1633:21, 1633:22, 1637:17, 1664:11, 1720:19, 1778:2, 1778:4, 1806:13, 1820:14
**deal** [7] - 1621:2, 1621:4, 1662:25, 1674:8, 1716:8, 1733:15, 1774:23
**dealing** [3] - 1622:20, 1623:15, 1774:24
**debited** [1] - 1635:1
**decade** [1] - 1671:16
**decades** [1] - 1675:10
**December** [5] - 1635:9, 1638:20, 1639:16, 1640:8, 1791:24
**decide** [4] - 1712:23, 1712:24, 1713:1, 1784:25
**decided** [4] - 1653:13, 1808:16, 1814:4, 1818:3
**decides** [1] - 1621:19
**decision** [12] - 1639:24, 1742:12, 1742:13, 1742:22, 1753:18, 1799:13, 1799:16, 1799:20, 1809:7, 1809:22, 1814:5, 1814:9
**decisions** [1] - 1738:5
**decks** [1] - 1752:24
**declare** [1] - 1641:3
**declined** [1] - 1620:13
**dedicated** [1] - 1665:9

**D**

**deduct** [1] - 1645:16
**deep** [2] - 1671:14, 1707:23
**deeply** [3] - 1668:14, 1673:21, 1681:21
**default** [6] - 1618:7, 1621:6, 1621:7, 1621:9, 1622:12, 1624:3
**defaulted** [1] - 1625:6
**defaults** [3] - 1621:3, 1621:5, 1622:7
**defendant** [103] - 1649:9, 1673:16, 1674:7, 1674:10, 1674:12, 1674:14, 1675:24, 1675:25, 1676:24, 1678:9, 1679:2, 1679:13, 1679:19, 1681:5, 1681:12, 1682:3, 1682:22, 1683:18, 1684:14, 1684:18, 1685:4, 1685:19, 1686:2, 1688:2, 1688:21, 1690:7, 1691:2, 1691:12, 1692:20, 1693:16, 1695:14, 1696:7, 1696:17, 1696:18, 1697:2, 1697:15, 1697:24, 1698:12, 1698:18, 1699:19, 1700:12, 1701:21, 1702:5, 1706:6, 1707:3, 1708:7, 1708:16, 1708:19, 1708:23, 1709:2, 1711:20, 1712:6, 1714:15, 1716:12, 1717:4, 1718:6, 1725:15, 1755:16, 1755:23, 1756:1, 1756:5, 1756:15, 1756:20, 1757:7, 1765:11, 1765:14, 1765:17, 1765:23, 1766:4, 1766:8, 1766:25, 1769:18, 1773:11, 1774:13, 1774:18, 1775:5, 1775:14, 1775:23, 1776:1, 1777:6, 1777:13, 1777:18, 1778:6, 1778:16, 1778:19, 1779:6, 1779:16, 1802:11, 1802:13, 1802:14, 1810:22, 1813:19, 1814:19, 1816:7, 1816:24, 1818:10, 1818:17, 1819:5, 1819:9, 1821:4, 1821:8
**Defendant** [1] - 1613:13

**defendant's** [3] - 1692:9, 1703:7, 1757:16

**defendant...** [1] - 1813:22

**DEFENDANTS** [1] - 1614:18

**Defense** [1] - 1757:11

**definitely** [8] - 1675:21, 1702:22, 1703:12, 1711:21, 1785:22, 1793:5, 1811:9, 1822:16

**definition** [2] - 1659:6, 1733:25

**degree** [3] - 1734:10, 1760:24, 1811:18

**delay** [1] - 1625:8

**deliberate** [1] - 1722:11

**deliberated** [1] - 1723:7

**deliberations** [4] - 1711:18, 1718:17, 1719:2, 1725:1

**deliberative** [1] - 1677:19

**delinquency** [2] - 1633:3, 1634:8

**delinquent** [1] - 1634:19

**delivered** [1] - 1712:13

**demand** [10] - 1635:14, 1635:16, 1636:18, 1636:19, 1637:11, 1638:10, 1638:14, 1638:17, 1638:18, 1809:9

**denominations** [3] - 1784:2, 1790:9, 1791:4

**dense** [1] - 1715:6

**department** [25] - 1623:9, 1623:11, 1623:19, 1626:9, 1635:12, 1635:17, 1636:2, 1660:18, 1665:10, 1665:12, 1665:20, 1689:7, 1689:9, 1693:2, 1713:11, 1718:22, 1730:2, 1739:16, 1740:6, 1740:19, 1741:6, 1741:11, 1741:15, 1741:17, 1742:3

**Department** [10] - 1648:22, 1658:18, 1660:18, 1673:14, 1675:2, 1675:16, 1677:20, 1689:6, 1699:9, 1766:11

**department's** [1] - 1713:16

**departments** [1] -

**defendant's** [3] - 1675:10

**depended** [1] - 1753:25

**depicted** [3] - 1649:4, 1765:5, 1766:16

**depo** [1] - 1644:6

**Deposit** [2] - 1619:19, 1637:5

**DEPOSIT** [1] - 1825:19

**deposit** [21] - 1627:14, 1627:15, 1627:18, 1627:20, 1627:25, 1628:1, 1628:4, 1630:19, 1630:24, 1631:21, 1631:25, 1632:15, 1639:2, 1639:6, 1639:21, 1640:21, 1642:14, 1643:21, 1790:21, 1791:1, 1791:9

**deposited** [7] - 1642:5, 1642:7, 1642:8, 1642:10, 1643:3, 1643:19, 1643:25

**depositing** [1] - 1791:5

**deposits** [1] - 1642:22

**depth** [1] - 1698:5

**deputy** [60] - 1648:24, 1652:24, 1674:8, 1674:12, 1674:15, 1674:19, 1676:17, 1676:23, 1678:6, 1678:9, 1678:19, 1679:6, 1679:19, 1679:21, 1680:19, 1680:20, 1680:21, 1684:19, 1684:22, 1686:19, 1687:12, 1687:14, 1688:6, 1688:16, 1688:24, 1689:8, 1689:25, 1692:18, 1694:5, 1695:10, 1698:13, 1699:6, 1700:22, 1701:4, 1701:11, 1702:18, 1702:25, 1705:13, 1706:7, 1707:7, 1707:13, 1709:9, 1709:13, 1710:2, 1711:20, 1726:3, 1730:4, 1738:14, 1738:25, 1739:6, 1741:25, 1742:3, 1751:8, 1756:22, 1757:21, 1757:23, 1758:6, 1758:9, 1758:12, 1759:9

**DEPUTY** [3] - 1617:16, 1647:15, 1760:3

**Deputy** [1] - 1673:15

**derived** [1] - 1641:8

**descent** [1] - 1735:20

**describe** [18] - 1619:13, 1652:3, 1656:17, 1659:9, 1666:11, 1672:21, 1674:24, 1677:5, 1698:2, 1706:14, 1710:12, 1718:8, 1720:5, 1723:9, 1765:16, 1803:22, 1803:24, 1804:19

**described** [4] - 1725:14, 1730:20, 1778:5, 1822:23

**describing** [3] - 1656:8, 1722:7, 1783:3

**design** [1] - 1668:19

**designed** [1] - 1667:2

**desire** [1] - 1808:23

**detail** [2] - 1701:16, 1808:21

**details** [2] - 1698:16, 1784:11

**determination** [1] - 1620:12

**develop** [2] - 1752:15, 1796:12

**developer** [9] - 1712:19, 1715:25, 1718:13, 1726:3, 1734:24, 1767:14, 1767:16, 1767:18, 1821:20

**developers** [18] - 1668:22, 1671:23, 1706:9, 1706:20, 1706:23, 1726:23, 1733:23, 1736:18, 1744:13, 1752:14, 1819:2, 1820:20, 1820:24, 1820:25, 1821:5, 1821:10, 1822:13

**Development** [2] - 1763:4, 1764:23

**development** [37] - 1650:2, 1650:7, 1652:24, 1657:25, 1658:6, 1661:22, 1664:1, 1664:20, 1671:1, 1673:10, 1686:20, 1693:21, 1697:20, 1700:3, 1701:12, 1701:13, 1712:9, 1715:18, 1715:20, 1715:24, 1716:6, 1726:16, 1732:19, 1735:13, 1739:1, 1752:18, 1761:21, 1762:22, 1793:4, 1793:7, 1794:10, 1798:1, 1798:2, 1798:5, 1798:10, 1802:22, 1807:8

**deviate** [1] - 1659:16

**deviating** [1] - 1711:20

**diagram** [2] - 1660:11, 1660:13

**dialect** [1] - 1817:6

**dialects** [1] - 1817:9

**difference** [1] - 1745:22

**different** [27] - 1622:11, 1631:7, 1634:7, 1656:10, 1657:18, 1658:14, 1666:5, 1666:21, 1668:4, 1668:6, 1675:9, 1675:15, 1710:12, 1710:14, 1715:11, 1723:17, 1723:18, 1740:4, 1750:17, 1754:2, 1759:13, 1766:14, 1786:9, 1789:18, 1792:20, 1810:8, 1822:19

**differently** [1] - 1636:23

**difficult** [3] - 1726:24, 1769:19, 1769:24

**digital** [11] - 1671:6, 1671:8, 1671:22, 1672:2, 1672:5, 1672:12, 1698:24, 1712:14, 1721:6, 1721:8, 1721:11

**digits** [2] - 1682:24, 1683:1

**dim** [1] - 1720:14

**diminish** [1] - 1733:18

**dinner** [32] - 1744:24, 1813:9, 1813:13, 1813:16, 1813:23, 1814:21, 1815:21, 1815:22, 1816:12, 1816:16, 1817:14, 1817:20, 1817:24, 1817:25, 1818:13, 1818:16, 1818:21, 1819:12, 1819:13, 1819:14, 1819:25, 1820:4, 1820:7, 1820:18, 1820:23, 1821:11, 1821:18, 1822:3, 1822:12, 1822:15, 1822:21, 1822:22

**dinners** [8] - 1765:18, 1809:18, 1817:13, 1819:20, 1819:24, 1820:16, 1822:17, 1822:23

**Dinners** [1] - 1765:22

**DIRECT** [5] - 1615:4, 1617:22, 1647:22, 1717:11, 1760:10

**direct** [2] - 1669:24, 1717:9

**directed** [2] - 1669:23,

**deviating** 1800:13

**direction** [1] - 1758:25, 1250

**directly** [6] - 1655:24, 1670:5, 1675:18, 1723:22, 1791:10, 1816:9

**director** [5] - 1650:6, 1761:21, 1762:22, 1763:4, 1802:23

**disallowed** [1] - 1706:8

**disapprove** [1] - 1753:4

**discern** [1] - 1708:8

**disclosure** [2] - 1627:5, 1627:6

**discretion** [1] - 1745:24

**discretionary** [1] - 1745:22

**discuss** [15] - 1641:23, 1682:1, 1687:12, 1691:16, 1691:24, 1692:10, 1692:17, 1697:2, 1697:5, 1709:21, 1711:22, 1717:14, 1718:18, 1808:4, 1808:22

**discussed** [5] - 1685:2, 1696:22, 1702:9, 1703:25, 1711:24

**discussing** [3] - 1691:13, 1696:20, 1717:14

**discussion** [8] - 1696:16, 1697:13, 1702:13, 1703:8, 1716:12, 1774:15, 1774:22, 1811:21

**discussions** [1] - 1712:6

**disliked** [2] - 1732:24, 1733:2

**Disney** [7] - 1654:7, 1654:11, 1654:13, 1654:14, 1690:24, 1695:21

**dispersed** [1] - 1627:17

**disproportionately** [1] - 1672:7

**disruption** [1] - 1663:1

**dissatisfied** [1] - 1777:22

**distract** [2] - 1667:2, 1720:9

**district** [11] - 1649:25, 1668:24, 1673:22, 1673:23, 1690:17, 1715:2, 1715:3, 1719:22, 1719:24, 1719:25, 1724:21

**DISTRICT** [5] - 1613:1,

1613:2, 1613:5, 1825:11

**District** [1] - 1821:21
**districts** [1] - 1668:6
**dive** [1] - 1730:20
**DIVISION** [1] - 1613:3
**divorce** [1] - 1675:22
**divorced** [1] - 1675:3
**DO** [1] - 1825:12
**doctor** [1] - 1694:7
**document** [14] - 1624:9, 1627:12, 1627:13, 1628:16, 1629:5, 1631:15, 1632:7, 1632:10, 1632:23, 1682:18, 1683:7, 1713:21, 1714:25, 1717:18
**documentation** [2] - 1626:18, 1651:25
**documented** [1] - 1802:15
**documents** [3] - 1623:18, 1632:21, 1712:16
**dollar** [9] - 1627:16, 1779:16, 1784:4, 1784:6, 1789:19, 1790:10, 1790:15, 1791:7, 1791:8
**dollars** [2] - 1742:15, 1744:21
**dominated** [3] - 1737:22, 1738:2, 1738:5
**Donald's** [1] - 1694:7
**donations** [2] - 1807:13, 1807:22
**done** [11] - 1623:20, 1636:11, 1637:19, 1655:5, 1658:12, 1662:11, 1672:10, 1704:19, 1724:19, 1801:12, 1801:13
**donors** [1] - 1805:12
**door** [1] - 1746:14
**down** [14] - 1630:13, 1632:23, 1637:9, 1638:25, 1639:8, 1656:24, 1667:13, 1696:3, 1706:17, 1710:23, 1721:8, 1747:18, 1807:25, 1821:15
**downtown** [16] - 1664:21, 1668:23, 1669:2, 1669:6, 1669:20, 1679:25, 1707:24, 1708:4, 1710:22, 1731:2, 1747:15, 1753:12, 1767:25, 1798:4, 1821:21
**Dr** [3] - 1805:20, 1806:22, 1806:23
**draft** [4] - 1657:1,

1657:6, 1720:15, 1801:1
**drafted** [1] - 1656:21
**drafting** [2] - 1796:14, 1796:20
**drastically** [1] - 1809:12
**drawn** [3] - 1642:23, 1644:18, 1644:20
**drive** [1] - 1731:1
**drivers** [2] - 1667:2, 1720:10
**drove** [1] - 1695:22
**Duck** [3] - 1817:25, 1818:13, 1818:16
**due** [10] - 1619:15, 1620:24, 1621:10, 1629:17, 1630:1, 1633:20, 1635:15, 1637:1, 1639:14, 1639:15
**duration** [2] - 1663:17, 1684:8
**during** [38] - 1625:5, 1646:14, 1664:19, 1673:10, 1686:18, 1690:18, 1696:16, 1697:3, 1697:6, 1699:19, 1700:1, 1700:25, 1705:2, 1705:24, 1706:1, 1716:12, 1720:13, 1723:7, 1725:1, 1726:7, 1757:7, 1757:17, 1764:12, 1768:21, 1773:16, 1773:17, 1775:24, 1776:11, 1777:6, 1778:15, 1780:2, 1781:22, 1782:8, 1782:21, 1787:6, 1789:14, 1809:17, 1815:17
**duties** [2] - 1665:18, 1803:8
**dynamic** [3] - 1702:15, 1703:12, 1803:24

---

## E

**e-mail** [16] - 1635:7, 1635:8, 1635:11, 1635:20, 1635:24, 1636:6, 1637:23, 1637:24, 1638:6, 1638:9, 1640:7, 1804:17, 1804:22, 1806:4, 1806:13
**e-mailed** [2] - 1638:3, 1801:3
**early** [2] - 1764:7, 1783:5
**earned** [1] - 1759:1
**ease** [1] - 1797:2
**easier** [1] - 1731:3,

1804:17
**East** [29] - 1618:2, 1618:3, 1618:8, 1619:4, 1619:18, 1619:21, 1619:24, 1620:4, 1623:10, 1623:13, 1625:15, 1626:10, 1628:9, 1630:19, 1632:25, 1633:11, 1633:17, 1634:18, 1634:21, 1634:25, 1635:17, 1641:7, 1641:12, 1641:18, 1642:22, 1643:3, 1643:19, 1644:2, 1644:7
**easy** [1] - 1809:6
**eat** [4] - 1696:6, 1696:7, 1696:8, 1696:15
**economic** [5] - 1652:24, 1686:19, 1697:20, 1701:12, 1739:1
**Economic** [1] - 1764:22
**effect** [1] - 1655:6
**effective** [1] - 1721:21
**effort** [1] - 1624:16
**efforts** [2] - 1668:6, 1675:9
**eight** [1] - 1664:11
**eight-hour** [1] - 1664:11
**eight...** [1] - 1715:14
**either** [6] - 1623:5, 1742:2, 1747:21, 1763:22, 1817:1, 1823:12
**El** [4] - 1644:12, 1644:13, 1644:14, 1644:16
**elect** [1] - 1653:20
**elected** [7] - 1641:3, 1653:15, 1653:21, 1668:1, 1698:25, 1771:12, 1809:8
**election** [10] - 1711:2, 1770:8, 1770:13, 1771:1, 1773:18, 1774:7, 1774:12, 1776:6, 1776:8, 1780:3
**elections** [3] - 1653:19, 1811:16, 1812:3
**electronic** [3] - 1642:25, 1643:22, 1644:5
**electronically** [4] - 1642:18, 1642:21, 1644:4, 1644:19
**element** [2] - 1656:11, 1657:7
**elements** [4] - 1656:8, 1656:9, 1666:5,

1716:6
**elsewhere** [2] - 1669:18, 1723:12
**emphasized** [1] - 1697:19
**employ** [1] - 1743:13
**employed** [2] - 1617:24, 1761:18
**employee** [3] - 1749:16, 1794:15, 1794:19
**employees** [1] - 1791:16
**employment** [4] - 1743:7, 1761:4, 1761:17, 1762:10
**empty** [1] - 1733:17
**encounter** [1] - 1778:3
**encountered** [1] - 1623:4
**encouraged** [1] - 1720:24
**encouragement** [1] - 1696:14
**end** [10] - 1622:12, 1625:11, 1707:20, 1719:7, 1786:24, 1787:1, 1787:11, 1805:5, 1823:22, 1824:3
**ended** [1] - 1798:1
**endorsed** [1] - 1641:1
**endorsement** [2] - 1644:2, 1644:3
**ends** [2] - 1683:16, 1769:1
**enforce** [1] - 1675:8
**enforcement** [2] - 1699:10, 1699:13
**enforces** [1] - 1739:16
**Engineering** [1] - 1734:11
**English** [2] - 1735:24, 1768:3
**entire** [5] - 1641:3, 1646:11, 1667:10, 1669:7, 1723:8
**ENTITLED** [1] - 1825:15
**entitled** [1] - 1715:7
**entitlement** [15] - 1659:11, 1659:20, 1659:23, 1660:4, 1693:8, 1697:8, 1704:2, 1730:1, 1739:7, 1739:9, 1741:4, 1741:11, 1741:23, 1741:25, 1742:4
**entitlements** [38] - 1659:2, 1659:4, 1659:5, 1659:6, 1659:9, 1659:14, 1660:15, 1660:23, 1661:3, 1661:6, 1661:9, 1661:24,

1662:1, 1664:2, 1692:25, 1693:1, 1701:10, 1703:22, 1712:10, 1712:15, 1713:4, 1714:20, 1716:11, 1724:23, 1730:2, 1730:4, 1730:6, 1732:20, 1740:19, 1740:24, 1741:2, 1741:8, 1741:20, 1757:3, 1758:7, 1758:10, 1758:13, 1758:16
**entity** [1] - 1661:17
**environment** [2] - 1680:14, 1720:11
**environmental** [5] - 1696:1, 1712:16, 1714:24, 1724:18, 1750:19
**epicenter** [1] - 1708:1
**equals** [1] - 1704:16
**Eric** [1] - 1649:12
**Ernie** [19] - 1798:22, 1799:2, 1799:4, 1799:6, 1799:11, 1799:17, 1799:19, 1799:21, 1800:2, 1800:4, 1800:5, 1800:9, 1800:15, 1800:22, 1801:1, 1801:2, 1801:7, 1802:3
**Esparza** [9] - 1803:20, 1803:24, 1804:1, 1804:6, 1804:10, 1804:18, 1805:11, 1806:5, 1807:13
**especially** [1] - 1693:21
**Espinoza** [2] - 1636:3, 1636:6
**ESQ** [4] - 1614:5, 1614:10, 1614:19, 1804:18
**essence** [1] - 1642:24
**essentially** [4] - 1669:23, 1699:16, 1715:5, 1757:22
**establishment** [1] - 1692:2
**Estate** [1] - 1664:24
**estate** [26] - 1693:20, 1701:13, 1767:13, 1767:16, 1767:18, 1792:6, 1792:11, 1792:17, 1792:23, 1793:3, 1793:7, 1793:11, 1793:16, 1794:2, 1794:10, 1796:12, 1797:25, 1798:2, 1798:5, 1798:10, 1819:2, 1820:20, 1820:24, 1820:25, 1821:5, 1822:13

1,825:17-1776:25,1850

**estimate** [2] - 1705:21, 1783:20
**Estrada** [1] - 1626:16
**estranged** [2] - 1760:16, 1763:15
**ethics** [6] - 1688:9, 1704:21, 1740:15, 1745:3, 1746:8, 1749:21
**event** [10] - 1680:1, 1680:6, 1681:19, 1682:4, 1781:11, 1783:3, 1788:4, 1788:6, 1804:4, 1806:2
**events** [5] - 1663:3, 1670:23, 1765:22, 1782:19, 1824:3
**eventually** [1] - 1712:13
**everyday** [2] - 1620:23, 1620:25
**everywhere** [1] - 1690:15
**exact** [5] - 1708:1, 1748:9, 1750:21, 1772:1, 1778:22
**exactly** [13] - 1621:4, 1690:14, 1702:3, 1711:15, 1740:7, 1740:16, 1740:17, 1741:24, 1754:22, 1777:15, 1781:18, 1795:8, 1799:13
**EXAMINATION** [8] - 1617:22, 1645:5, 1647:22, 1717:11, 1726:12, 1755:12, 1759:4, 1760:10
**examination** [3] - 1645:2, 1717:9, 1726:11
**example** [4] - 1698:6, 1811:14, 1812:10, 1819:25
**examples** [1] - 1732:19
**Excel** [1] - 1805:9
**excellent** [1] - 1675:12
**except** [1] - 1814:7
**excerpt** [1] - 1805:9
**exchange** [2] - 1682:11, 1778:22
**exchanges** [1] - 1685:13
**excitement** [1] - 1815:8
**excuse** [5] - 1624:3, 1643:21, 1671:13, 1688:14, 1713:19
**excused** [5] - 1647:6, 1647:8, 1647:10, 1759:19, 1759:21
**executed** [3] - 1630:8, 1630:9, 1769:6
**exercise** [8] - 1622:1,

1624:2, 1625:2, 1625:9, 1634:22, 1639:24, 1640:9, 1661:8
**exercising** [1] - 1637:2
**exhausted** [1] - 1662:22
**Exhibit** [19] - 1627:2, 1635:5, 1638:13, 1640:6, 1643:7, 1643:9, 1643:12, 1649:3, 1660:8, 1682:16, 1713:20, 1716:24, 1717:17, 1717:23, 1722:18, 1722:22, 1765:4, 1798:24, 1804:15
**exhibit** [3] - 1627:3, 1631:18, 1713:19
**exhibits** [1] - 1712:19
**exist** [1] - 1618:13
**existed** [1] - 1726:2
**expect** [1] - 1691:12
**expectations** [1] - 1820:13
**expedite** [1] - 1637:10
**expensive** [1] - 1742:23
**experience** [11] - 1623:3, 1641:7, 1641:12, 1641:25, 1661:19, 1667:21, 1692:16, 1721:22, 1732:15, 1747:5, 1757:15
**experienced** [1] - 1701:16
**expert** [3] - 1656:19, 1662:14, 1741:14
**expertise** [1] - 1662:14
**explain** [2] - 1636:13, 1636:20
**explained** [1] - 1796:24
**explaining** [1] - 1636:17
**explicitly** [1] - 1774:3
**express** [1] - 1680:25
**expressed** [3] - 1778:23, 1779:18, 1796:10
**extend** [1] - 1719:18
**externally** [1] - 1814:11
**extra** [1] - 1793:24

## F

**face** [2] - 1726:25, 1727:2
**fact** [15] - 1620:23, 1623:22, 1693:14, 1707:4, 1732:22,

1745:8, 1745:21, 1756:12, 1757:4, 1787:25, 1794:25, 1812:11, 1818:4, 1820:3, 1821:9
**factory** [3] - 1656:24, 1656:25, 1744:3
**facts** [5] - 1727:18, 1734:15, 1735:6, 1737:12, 1754:3
**FAERSTEIN** [58] - 1614:14, 1615:6, 1615:7, 1617:13, 1617:21, 1617:23, 1644:23, 1645:1, 1646:15, 1647:5, 1647:12, 1647:21, 1647:23, 1652:17, 1665:14, 1665:15, 1717:10, 1717:12, 1726:10, 1727:17, 1728:15, 1729:23, 1730:15, 1731:17, 1732:6, 1733:4, 1734:15, 1735:5, 1735:21, 1736:1, 1736:14, 1737:11, 1738:10, 1738:19, 1739:22, 1742:8, 1742:17, 1743:9, 1745:18, 1746:4, 1746:11, 1746:15, 1747:8, 1747:25, 1748:4, 1748:13, 1748:22, 1749:7, 1751:16, 1752:25, 1753:6, 1753:14, 1755:3, 1755:11, 1755:13, 1759:2, 1759:20, 1759:25
**fair** [18] - 1618:25, 1619:2, 1622:24, 1637:13, 1775:11, 1779:24, 1780:21, 1781:11, 1787:15, 1793:6, 1806:5, 1807:22, 1809:13, 1810:6, 1811:7, 1813:5, 1816:20, 1817:8
**Fall** [1] - 1823:8
**familiar** [7] - 1621:13, 1642:1, 1659:1, 1663:11, 1695:22, 1807:3, 1807:8
**families** [1] - 1761:7
**family** [7] - 1650:2, 1654:20, 1780:13, 1780:14, 1798:3, 1799:6, 1799:7
**fancy** [1] - 1785:23
**far** [5] - 1620:1, 1622:10, 1623:19, 1624:23, 1728:11, 1773:21, 1775:5, 1775:7, 1775:8,

1780:14, 1786:2, 1786:3, 1790:19, 1799:24, 1800:1, 1800:10, 1800:24, 1815:18, 1819:6
**fashion** [1] - 1669:10
**fast** [2] - 1673:1, 1674:5
**fault** [1] - 1745:16
**FBI** [3] - 1634:16, 1769:5, 1824:1
**FDIC** [2] - 1619:19, 1619:21
**February** [2] - 1790:21, 1790:24
**Federal** [1] - 1619:18
**federal** [1] - 1655:1
**federally** [2] - 1619:22, 1619:24
**fee** [2] - 1720:23
**FEE** [1] - 1825:18
**feelings** [1] - 1794:11
**FEES** [1] - 1825:18
**feet** [1] - 1721:8
**fellow** [2] - 1653:16, 1725:2
**felt** [58] - 1654:6, 1657:19, 1663:1, 1667:23, 1669:1, 1669:4, 1669:20, 1672:25, 1673:22, 1674:1, 1678:16, 1678:21, 1680:11, 1680:15, 1689:8, 1689:11, 1689:15, 1694:1, 1694:23, 1694:24, 1695:3, 1703:16, 1705:6, 1705:7, 1705:24, 1706:3, 1706:12, 1706:24, 1708:6, 1710:3, 1710:10, 1710:15, 1710:22, 1710:23, 1711:4, 1711:13, 1711:15, 1712:12, 1726:5, 1726:7, 1744:5, 1746:24, 1752:8, 1757:12, 1757:15, 1757:21, 1758:1, 1793:25, 1794:8, 1795:18, 1801:14, 1801:17, 1801:18
**few** [14] - 1636:11, 1645:15, 1653:12, 1663:20, 1664:4, 1672:23, 1680:12, 1759:15, 1778:2, 1778:4, 1805:5, 1806:13, 1815:14, 1823:5
**field** [1] - 1662:24
**fighting** [1] - 1737:21
**Figueroa** [4] - 1714:9, 1719:24, 1767:22, 1767:24

**figure** [1] - 1809:23
**figures** [1] - 1776:25
**filed** [1] - 1624:7
**files** [1] - 1802:15
**filing** [1] - 1623:20
**filled** [1] - 1628:16
**final** [4] - 1641:22, 1770:14, 1781:3, 1824:9
**finally** [2] - 1640:24, 1743:17
**financed** [1] - 1630:3
**financial** [4] - 1619:16, 1619:22, 1619:25, 1812:8
**financially** [3] - 1814:22, 1815:1, 1817:16
**fine** [1] - 1725:10
**finish** [2] - 1689:13, 1705:9
**fired** [1] - 1691:21
**firm** [5] - 1678:4, 1761:19, 1761:24, 1762:17
**first** [46] - 1620:8, 1621:9, 1625:17, 1625:19, 1649:20, 1652:5, 1655:21, 1656:21, 1656:25, 1657:2, 1657:6, 1658:10, 1658:12, 1660:7, 1660:17, 1665:4, 1665:24, 1666:2, 1666:18, 1666:21, 1668:1, 1679:22, 1684:9, 1684:10, 1685:22, 1689:20, 1690:13, 1692:1, 1695:13, 1695:14, 1704:15, 1714:22, 1717:1, 1720:7, 1724:18, 1724:22, 1760:7, 1769:17, 1783:15, 1794:14, 1794:18, 1804:15, 1804:19, 1811:3, 1811:11, 1817:6
**first-time** [1] - 1811:11
**firsthand** [1] - 1780:17
**fist** [1] - 1703:9
**five** [3] - 1629:21, 1637:17, 1683:1
**five-year** [1] - 1629:21
**flew** [1] - 1787:20
**flies** [1] - 1731:7
**flight** [1] - 1788:13
**flip** [1] - 1722:17
**float** [1] - 1732:2
**Floor** [2] - 1660:3, 1669:16
**floor** [1] - 1690:13
**flow** [1] - 1660:13
**flowing** [1] - 1693:23
**focus** [7] - 1696:24,

1763:14, 1782:24, 1798:2, 1798:9, 1808:19, 1817:12

**focusing** [3] - 1683:21, 1685:7, 1789:14

**folks** [4] - 1678:18, 1720:25, 1805:6, 1809:25

**follow** [7] - 1694:4, 1740:10, 1740:14, 1741:12, 1744:9, 1784:18

**follow-up** [1] - 1784:18

**following** [6] - 1617:4, 1617:8, 1717:6, 1718:3, 1720:2, 1823:17

**food** [3] - 1696:8, 1696:12, 1696:15

**foot** [1] - 1721:7

**FOR** [3] - 1825:10, 1825:11, 1825:18

**forbidden** [1] - 1746:1

**force** [2] - 1720:7, 1731:1

**forced** [1] - 1703:4

**foreclose** [1] - 1621:23

**foreclosing** [1] - 1622:13

**FOREGOING** [1] - 1825:13

**foreign** [2] - 1742:15, 1742:24

**foremost** [1] - 1668:1

**forewarning** [1] - 1781:25

**forfeited** [1] - 1625:12

**forfeiture** [11] - 1623:5, 1623:13, 1623:15, 1623:17, 1624:4, 1624:12, 1624:15, 1624:20, 1625:3, 1625:8, 1641:14

**forget** [1] - 1667:1

**forgot** [1] - 1682:13

**formal** [4] - 1658:10, 1662:17, 1686:12, 1687:6

**formally** [6] - 1662:18, 1663:5, 1673:13, 1810:3, 1810:5, 1823:9

**FORMAT** [1] - 1825:16

**formidable** [2] - 1771:11, 1771:15

**forth** [3] - 1718:2, 1809:14, 1809:21

**forward** [10] - 1622:21, 1637:14, 1637:15, 1668:21, 1711:9, 1732:19, 1732:20, 1763:2,

1782:11, 1824:5

**foster** [4] - 1650:23, 1650:24, 1651:3, 1655:1

**fostering** [1] - 1651:5

**foundation** [7] - 1650:6, 1734:16, 1735:5, 1742:9, 1742:18, 1749:8, 1752:25

**four** [12] - 1631:18, 1653:24, 1653:25, 1682:24, 1683:1, 1715:14, 1760:20, 1760:22, 1772:20, 1782:16, 1809:10

**four-some** [1] - 1772:20

**frame** [5] - 1639:4, 1791:23, 1791:24, 1792:4, 1792:21

**Francesca** [3] - 1635:24, 1636:3, 1638:2

**Francis** [3] - 1637:24, 1638:1, 1638:2

**franticly** [1] - 1820:8

**freeze** [1] - 1624:8

**freezing** [2] - 1625:1, 1625:2

**frequent** [2] - 1634:8, 1687:8

**frequently** [1] - 1633:8

**friend** [2] - 1799:4, 1799:5

**friends** [3] - 1762:7, 1765:20, 1765:23

**front** [10] - 1643:11, 1643:13, 1645:10, 1649:4, 1696:12, 1698:24, 1739:19, 1750:9, 1766:17, 1809:2

**full** [9] - 1639:9, 1654:4, 1654:6, 1656:23, 1657:20, 1662:21, 1683:10, 1710:16, 1752:23

**full-blown** [1] - 1752:23

**full-time** [3] - 1654:4, 1654:6, 1710:16

**fully** [1] - 1646:4

**function** [3] - 1657:17, 1663:15, 1679:24

**functionary** [1] - 1680:23

**functions** [6] - 1655:15, 1676:3, 1676:5, 1676:10, 1676:24, 1680:8

**fund** [5] - 1630:4, 1630:5, 1670:8, 1723:4, 1724:7

**funding** [1] - 1723:3

**fundraise** [1] - 1811:5

**fundraiser** [3] - 1804:5, 1823:14, 1823:20

**fundraising** [6] - 1763:6, 1803:4, 1804:11, 1811:7, 1812:12, 1812:16

**funds** [4] - 1622:17, 1637:2, 1642:9, 1646:2

---

**G**

---

**Gabriel** [6] - 1772:2, 1772:3, 1813:9, 1813:13, 1813:25, 1815:20

**gained** [1] - 1704:20

**gala** [9] - 1803:4, 1803:10, 1803:12, 1803:13, 1804:12, 1805:12, 1806:12, 1806:21, 1807:13

**gambling** [5] - 1787:4, 1787:9, 1788:12, 1788:16

**Garcetti** [5] - 1649:12, 1649:15, 1650:12, 1650:21, 1651:8

**gather** [1] - 1661:13

**gathering** [1] - 1823:1

**gear** [1] - 1770:11

**gearing** [1] - 1822:18

**general** [21] - 1648:19, 1655:20, 1656:1, 1656:2, 1656:4, 1656:6, 1656:11, 1667:12, 1674:18, 1674:22, 1676:1, 1676:13, 1687:22, 1699:8, 1700:18, 1732:21, 1740:20, 1766:10, 1798:4, 1815:6, 1815:9

**generalities** [1] - 1700:17

**generally** [19] - 1642:1, 1662:7, 1686:22, 1687:11, 1700:14, 1716:10, 1768:15, 1776:23, 1777:12, 1791:24, 1792:2, 1793:14, 1800:11, 1807:11, 1811:24, 1813:23, 1814:23, 1814:24, 1819:2

**generate** [2] - 1792:6, 1812:4

**generic** [1] - 1687:24

**generic-like** [1] - 1687:24

**gentlemen** [1] - 1617:11

**geography** [3] -

1656:6, 1698:8, 1747:16

**George** [33] - 1792:24, 1793:1, 1793:11, 1794:11, 1794:13, 1794:14, 1794:18, 1794:21, 1794:25, 1795:13, 1795:20, 1795:25, 1796:6, 1796:18, 1796:24, 1797:14, 1797:15, 1801:25, 1803:20, 1803:24, 1804:1, 1804:6, 1804:9, 1804:10, 1804:18, 1805:8, 1805:11, 1806:5, 1807:13, 1813:11, 1816:6, 1816:11

**get-together** [1] - 1682:1

**getaway** [4] - 1786:13, 1786:25, 1787:18, 1787:23

**giant** [4] - 1667:2, 1667:10, 1672:12, 1699:16

**gifts** [1] - 1745:7

**given** [2] - 1654:17, 1739:9

**glad** [1] - 1702:21

**Gloria** [5] - 1771:4, 1771:6, 1773:18, 1780:3, 1781:2

**Glove** [1] - 1807:6

**glove** [1] - 1703:10

**Gmail** [1] - 1804:18

**goal** [1] - 1740:12

**goodness** [2] - 1712:12, 1715:21

**Government** [22] - 1617:11, 1617:13, 1625:12, 1646:6, 1646:7, 1646:10, 1647:12, 1699:5, 1727:9, 1727:21, 1728:6, 1728:19, 1729:10, 1729:18, 1731:25, 1733:2, 1733:22, 1737:9, 1737:14, 1755:2, 1755:9, 1759:25

**GOVERNMENT'S** [5] - 1615:3, 1615:4, 1617:15, 1647:14, 1760:2

**governs** [1] - 1656:7

**Grace** [4] - 1632:3, 1632:16, 1639:6, 1640:13

**graduating** [1] - 1761:3

**grant** [1] - 1803:7

**grantor** [6] - 1631:4, 1631:11, 1631:12, 1631:13, 1631:14,

1640:17

**grappling** [1] - 1708:5

**grasp** [1] - 1678:4

**great** [2] - 1732:17, 1733:15

**Greenland** [2] - 1805:19, 1806:21

**grew** [2] - 1649:19, 1650:23

**ground** [2] - 1733:14, 1734:3

**Group** [1] - 1664:24

**group** [6] - 1654:13, 1664:9, 1773:24, 1774:18, 1776:8, 1776:17

**groups** [2] - 1649:24, 1723:14

**grow** [1] - 1654:25

**growing** [1] - 1650:3

**guess** [4] - 1624:25, 1626:21, 1635:2, 1736:11

**guest** [1] - 1819:6

**gut** [1] - 1674:1

**guys** [2] - 1785:19, 1788:10

---

**H**

---

**H-U-I-Z-A-R** [1] - 1760:8

**half** [4] - 1648:14, 1669:22, 1705:20, 1783:24

**halfway** [5] - 1730:23, 1731:5, 1731:15, 1747:14, 1747:23

**hall** [6] - 1678:24, 1678:25, 1686:3, 1687:4, 1688:14, 1692:21

**hand** [3] - 1698:23, 1772:19, 1819:21

**handle** [1] - 1623:19

**hang** [1] - 1768:21

**hanging** [2] - 1702:20, 1769:1

**HAR** [1] - 1614:10

**harassment** [1] - 1770:19

**hard** [9] - 1650:6, 1655:3, 1668:8, 1678:1, 1703:3, 1704:22, 1710:12, 1740:17, 1756:7

**hardship** [1] - 1619:16

**HARLAND** [3] - 1614:19, 1615:6, 1615:8

**hate** [1] - 1737:18

**hated** [3] - 1737:9, 1737:14, 1737:16

**Hazen** [6] - 1794:20, 1794:22, 1806:21,

1814:22, 1816:25, 1817:5

**Hazens** [12] - 1664:23, 1732:1, 1794:22, 1805:18, 1806:20, 1812:15, 1812:24, 1813:12, 1815:21, 1816:8, 1816:20, 1817:15

**Hazens'** [2] - 1814:1, 1815:15

**head** [4] - 1633:10, 1742:3, 1757:13, 1757:21

**headquartered** [1] - 1618:12

**headquarters** [1] - 1695:21

**health** [1] - 1656:10

**hear** [10] - 1657:17, 1657:20, 1658:6, 1658:10, 1662:21, 1663:7, 1675:17, 1734:25, 1736:11, 1743:19

**heard** [13] - 1655:22, 1655:23, 1693:7, 1693:14, 1718:16, 1736:7, 1753:24, 1754:8, 1754:11, 1756:10, 1756:12, 1776:25, 1820:3

**hearing** [29] - 1634:14, 1634:15, 1658:11, 1661:2, 1661:4, 1662:23, 1676:20, 1677:6, 1677:12, 1699:14, 1712:5, 1712:11, 1712:17, 1713:13, 1714:21, 1716:18, 1717:15, 1718:9, 1719:5, 1723:7, 1725:12, 1745:25, 1750:19, 1751:13, 1751:15, 1751:21, 1756:4, 1756:17, 1775:19

**hearings** [9] - 1657:4, 1661:5, 1662:22, 1672:24, 1675:19, 1676:12, 1676:18, 1677:2, 1706:12

**hearsay** [5] - 1730:15, 1733:4, 1737:12, 1748:13, 1748:22

**heck** [1] - 1708:6

**height** [1] - 1669:17

**HELD** [1] - 1825:17

**held** [11] - 1617:4, 1617:8, 1619:5, 1632:15, 1639:6, 1642:23, 1650:14, 1674:18, 1716:15, 1716:18, 1717:6

**help** [16] - 1619:15, 1623:22, 1762:16,

1763:8, 1776:5, 1779:2, 1779:3, 1779:8, 1779:17, 1779:23, 1779:24, 1780:4, 1803:12, 1812:7, 1812:12, 1812:16

**helped** [1] - 1761:20

**helpful** [1] - 1729:12

**helping** [7] - 1776:7, 1779:11, 1779:12, 1779:15, 1803:3, 1804:11, 1805:11

**HEREBY** [1] - 1825:12

**Hi** [1] - 1805:4

**high** [16] - 1687:24, 1733:14, 1741:18, 1757:24, 1761:22, 1762:22, 1762:24, 1763:5, 1763:10, 1769:23, 1792:9, 1798:15, 1802:20, 1803:21, 1815:5, 1819:14

**High** [3] - 1763:1, 1802:23, 1803:3

**high-level** [3] - 1687:24, 1798:15, 1815:5

**higher** [1] - 1721:10

**Highland** [1] - 1747:18

**highlight** [1] - 1806:16

**highlight...** [1] - 1805:17

**highlighted** [1] - 1805:18

**hire** [1] - 1668:20

**hired** [1] - 1761:5

**hiring** [2] - 1668:25, 1700:6

**hit** [1] - 1633:19

**hits** [1] - 1621:10

**hmm** [1] - 1738:7

**hold** [5] - 1619:8, 1653:19, 1661:5, 1758:19, 1797:25

**holder** [1] - 1631:11

**holding** [3] - 1630:10, 1646:23, 1671:17

**Holdings** [4] - 1632:3, 1632:16, 1639:6, 1640:13

**holds** [1] - 1653:19

**hole** [1] - 1723:14

**holiday** [2] - 1676:3, 1680:6

**Hollywood** [5] - 1649:20, 1649:24, 1650:7, 1690:8, 1731:4

**home** [10] - 1655:21, 1657:7, 1687:21, 1701:18, 1767:23, 1768:12, 1769:7, 1778:10, 1778:14, 1824:1

**Home** [1] - 1618:10

**home-sharing** [2] - 1655:21, 1701:18

**homeless** [5] - 1649:19, 1649:21, 1650:9, 1655:7, 1726:14

**homelessness** [4] - 1649:20, 1650:8, 1650:24, 1708:2

**homes** [1] - 1712:13

**honestly** [1] - 1754:14

**Honor** [36] - 1617:13, 1617:21, 1644:23, 1645:1, 1645:3, 1647:2, 1647:5, 1647:9, 1647:21, 1657:16, 1665:14, 1717:10, 1726:10, 1728:13, 1728:16, 1739:23, 1742:8, 1745:18, 1746:5, 1746:11, 1746:15, 1747:8, 1748:14, 1748:23, 1749:7, 1753:7, 1754:24, 1755:3, 1755:6, 1755:11, 1759:3, 1759:20, 1759:22, 1760:1, 1823:2, 1824:8

**HONORABLE** [1] - 1613:5

**hope** [1] - 1786:19

**hopes** [1] - 1743:13

**horseshoe** [1] - 1725:7

**hospitality** [1] - 1650:8

**host** [4] - 1657:8, 1752:23, 1803:8, 1823:13

**Hotel** [17] - 1664:21, 1679:14, 1685:5, 1691:13, 1691:24, 1692:10, 1692:24, 1693:4, 1693:6, 1697:16, 1711:25, 1714:11, 1715:15, 1718:5, 1725:13, 1756:9, 1815:21

**hotel** [13] - 1666:6, 1666:8, 1666:14, 1690:14, 1752:23, 1753:4, 1753:12, 1753:17, 1767:21, 1767:22, 1767:24, 1785:20, 1814:1

**hotels** [1] - 1823:14

**hotline** [1] - 1710:1

**hour** [4] - 1664:11, 1696:5, 1705:18, 1705:20

**hours** [3] - 1654:9, 1720:18, 1720:22

**hours/7** [1] - 1720:18

**house** [6] - 1621:24, 1622:13, 1622:14, 1623:13, 1634:16, 1783:9

**House** [3] - 1817:25, 1818:13, 1818:16

**Huang** [53] - 1734:24, 1735:3, 1735:9, 1766:20, 1766:22, 1767:2, 1767:5, 1767:12, 1767:19, 1768:3, 1768:5, 1768:10, 1768:15, 1768:19, 1768:25, 1769:9, 1769:13, 1769:18, 1772:7, 1772:10, 1773:2, 1773:7, 1773:10, 1775:6, 1778:20, 1779:7, 1779:12, 1779:14, 1781:6, 1781:8, 1781:12, 1781:15, 1781:21, 1782:1, 1782:12, 1783:1, 1783:7, 1785:4, 1786:5, 1786:18, 1786:21, 1787:5, 1787:10, 1787:22, 1789:9, 1812:11, 1812:20, 1812:23, 1816:1, 1816:2, 1823:13, 1823:18

**Huang's** [2] - 1767:16, 1785:16

**huge** [1] - 1711:4

**Hugh** [1] - 1647:17

**HUGH** [1] - 1647:18

**Huizar** [90] - 1625:15, 1625:18, 1626:8, 1628:24, 1629:4, 1631:10, 1633:6, 1634:3, 1635:22, 1639:23, 1640:12, 1641:2, 1641:8, 1645:7, 1646:13, 1667:17, 1667:20, 1702:10, 1760:6, 1760:12, 1760:14, 1760:16, 1760:18, 1760:24, 1762:5, 1762:25, 1763:15, 1763:19, 1763:24, 1764:2, 1765:6, 1765:24, 1766:5, 1766:17, 1768:6, 1768:10, 1769:1, 1769:13, 1769:20, 1770:7, 1771:1, 1772:11, 1777:2, 1780:8, 1781:2, 1782:20, 1783:7, 1784:5, 1784:22, 1785:4, 1786:1, 1786:12, 1786:18, 1787:8, 1787:18,

1788:16, 1788:21, 1789:25, 1790:11, 1791:14, 1791:19, 1792:4, 1792:9, 1792:10, 1792:16, 1797:7, 1800:18, 1800:23, 1806:18, 1808:4, 1808:15, 1808:18, 1808:21, 1809:5, 1809:17, 1810:13, 1811:19, 1811:22, 1811:25, 1814:16, 1815:21, 1816:4, 1816:8, 1816:21, 1816:25, 1818:7, 1821:1, 1822:13

**HUIZAR** [1] - 1615:8

**Huizar's** [8] - 1634:17, 1668:24, 1673:21, 1771:17, 1775:24, 1799:4, 1813:3, 1813:17

**human** [3] - 1664:12, 1681:18, 1698:23

**hundred** [12] - 1670:4, 1723:3, 1723:21, 1724:6, 1784:4, 1784:6, 1789:19, 1790:10, 1790:15, 1791:5, 1791:7, 1791:8

**hundred-dollar** [6] - 1784:4, 1784:6, 1789:19, 1790:15, 1791:7, 1791:8

**hung** [1] - 1769:13

**husband** [37] - 1762:5, 1763:15, 1764:3, 1766:25, 1767:5, 1768:22, 1769:20, 1769:24, 1770:5, 1770:20, 1771:15, 1773:11, 1773:17, 1774:20, 1776:3, 1778:17, 1778:21, 1779:8, 1779:17, 1781:8, 1781:12, 1781:16, 1781:22, 1782:1, 1782:25, 1783:17, 1784:19, 1786:25, 1800:2, 1803:23, 1804:2, 1810:23, 1811:1, 1812:5, 1813:6, 1813:12, 1823:10

**husband's** [2] - 1774:11, 1776:7

---

**I**

**icon** [1] - 1771:10

**idea** [15] - 1710:3, 1721:9, 1784:22, 1792:5, 1792:10, 1792:21, 1794:2,

1826 - 1850

1794:6, 1799:22, 1799:24, 1802:14, 1802:18, 1808:14, 1811:24, 1817:22
**identified** [1] - 1772:20
**identifies** [1] - 1723:16
**identify** [3] - 1669:24, 1683:10, 1805:12
**II** [2] - 1613:16, 1824:12
**illegal** [1] - 1699:11
**image** [1] - 1770:23
**images** [1] - 1644:9
**imagine** [1] - 1822:16
**imagined** [1] - 1747:6
**immediately** [1] - 1761:5
**impact** [3] - 1658:16, 1668:5, 1714:24
**impactful** [2] - 1687:20, 1687:22
**impacting** [1] - 1672:7
**impacts** [3] - 1668:3, 1669:7, 1750:20
**importance** [3] - 1694:19, 1699:23, 1700:15
**important** [18] - 1663:3, 1664:7, 1675:20, 1678:20, 1681:7, 1681:17, 1689:9, 1697:19, 1697:22, 1700:18, 1700:19, 1700:20, 1700:22, 1702:19, 1703:1, 1703:17, 1705:8, 1708:12
**impressed** [1] - 1698:5
**impression** [2] - 1681:17, 1682:2
**impressive** [1] - 1698:16
**improper** [1] - 1739:1
**improvement** [1] - 1649:25
**IN** [5] - 1617:3, 1825:10, 1825:15, 1825:16, 1825:19
**in-house** [1] - 1623:13
**in-lieu** [2] - 1720:23
**in-person** [4] - 1680:4, 1680:5, 1685:14, 1796:5
**inch** [4] - 1783:24, 1784:1, 1784:5
**inches** [1] - 1783:25
**incident** [1] - 1783:3
**include** [7] - 1663:25, 1666:11, 1700:8, 1704:1, 1704:4, 1704:6, 1723:3
**included** [7] - 1650:7, 1700:6, 1704:8,

1713:2, 1715:8, 1721:20, 1764:16
**including** [6] - 1704:9, 1769:6, 1774:18, 1794:9, 1812:2, 1820:24
**inclusive** [1] - 1650:2
**income** [2] - 1792:7, 1793:24
**incongruous** [2] - 1680:15, 1695:3
**incorrect** [1] - 1701:9
**increased** [1] - 1667:12
**increasing** [1] - 1667:4
**incredible** [1] - 1809:7
**independence** [3] - 1694:10, 1694:15, 1703:6
**independent** [13] - 1661:12, 1661:20, 1662:15, 1665:16, 1665:18, 1689:5, 1689:14, 1710:5, 1710:18, 1754:21, 1757:24, 1758:3, 1759:10
**independently** [2] - 1661:13, 1757:25
**indicate** [1] - 1809:1
**individual** [12] - 1659:9, 1687:4, 1765:5, 1766:15, 1766:16, 1773:5, 1773:7, 1792:6, 1812:19, 1812:22, 1812:23, 1819:19
**individuals** [4] - 1772:14, 1772:16, 1773:10, 1775:19
**industries** [1] - 1818:24
**industry** [5] - 1618:9, 1618:17, 1618:20, 1618:24, 1642:1
**influence** [8] - 1663:9, 1702:19, 1704:6, 1708:20, 1708:24, 1708:25, 1709:3, 1758:23
**influx** [1] - 1697:11
**inform** [2] - 1636:6, 1690:4
**informal** [1] - 1662:18
**informally** [1] - 1663:1
**information** [7] - 1623:22, 1641:19, 1661:13, 1665:21, 1712:18, 1769:19, 1769:23
**informed** [1] - 1690:1
**initial** [4] - 1653:10, 1681:10, 1713:16, 1785:1
**initials** [1] - 1639:3

**initiate** [3] - 1643:22, 1657:8, 1696:16
**initiated** [1] - 1697:16
**initiation** [1] - 1670:9
**input** [1] - 1675:17
**insert** [1] - 1799:17
**inside** [1] - 1696:1
**insight** [1] - 1632:19
**instance** [2] - 1707:12, 1713:3
**instances** [2] - 1623:4, 1732:23
**instead** [3] - 1679:3, 1782:21, 1795:11
**institution** [2] - 1619:22, 1619:25
**instructing** [1] - 1757:22
**insufficiently** [1] - 1700:9
**Insurance** [1] - 1619:19
**insured** [2] - 1619:22, 1619:25
**intelligence** [1] - 1704:22
**interacted** [1] - 1650:18
**interaction** [1] - 1675:20
**interactions** [9] - 1651:7, 1674:21, 1674:25, 1675:25, 1679:13, 1686:19, 1686:23, 1701:4, 1765:14
**interest** [15] - 1620:19, 1627:24, 1629:12, 1629:13, 1629:17, 1629:22, 1633:1, 1636:16, 1639:14, 1639:15, 1641:4, 1646:23, 1700:10, 1711:6, 1725:24
**interest-only** [3] - 1629:12, 1629:13, 1629:22
**interested** [4] - 1726:16, 1770:5, 1775:19, 1776:9
**interests** [1] - 1650:20
**intermingled** [1] - 1740:12
**internally** [2] - 1814:8, 1818:3
**intersect** [1] - 1658:15
**intersection** [1] - 1667:6
**interview** [1] - 1797:23
**intimately** [1] - 1651:1
**introduce** [3] - 1684:23, 1819:15, 1822:12
**introduced** [3] - 1767:2, 1767:5, 1767:8

**introductory** [1] - 1684:15
**introverted** [1] - 1725:8
**intuitively** [1] - 1671:25
**investment** [1] - 1742:7
**invite** [1] - 1718:13, 1820:12
**involve** [1] - 1666:14
**involved** [2] - 1793:11, 1803:10
**involvement** [4] - 1625:17, 1625:19, 1625:23, 1625:25
**involving** [6] - 1624:20, 1625:15, 1625:18, 1664:21, 1750:12, 1802:15
**iron** [1] - 1703:9
**IS** [2] - 1825:13, 1825:16
**Isaac** [1] - 1806:23
**issue** [2] - 1708:4, 1729:14
**issued** [2] - 1699:10, 1699:12
**issues** [7] - 1617:7, 1654:22, 1658:14, 1670:15, 1671:3, 1721:23, 1798:4
**item** [8] - 1644:3, 1715:14, 1719:21, 1723:1, 1727:22, 1728:18, 1745:24
**itself** [1] - 1713:5

**J**

**jacket** [8] - 1789:22, 1789:23, 1789:24, 1790:1, 1790:4, 1790:5, 1790:11, 1790:18
**jail** [1] - 1747:6
**January** [4] - 1764:7, 1813:1, 1814:3, 1817:14
**Jenga** [1] - 1752:8
**JENKINS** [8] - 1614:5, 1615:9, 1760:11, 1803:15, 1803:16, 1823:4, 1823:7, 1824:7
**Jenny** [13] - 1793:20, 1794:5, 1796:15, 1796:23, 1797:1, 1797:18, 1798:13, 1798:18, 1799:24, 1800:21, 1801:1, 1801:7, 1802:4
**jet** [8] - 1782:21, 1785:13, 1785:14, 1785:16, 1785:19,

1785:25, 1786:21, 1787:2
**jetting** [1] - 1782:2
**job** [15] - 1650:9, 1654:4, 1654:6, 1654:18, 1656:25, 1690:25, 1691:1, 1710:7, 1710:16, 1742:6, 1746:22, 1761:8, 1761:13, 1802:25, 1803:6
**job's** [1] - 1697:21
**jobs** [5] - 1618:9, 1761:17, 1762:16, 1763:4, 1791:19
**JOHN** [2] - 1613:5, 1647:18
**John** [2] - 1647:17, 1647:18
**joke** [1] - 1670:22
**jokes** [1] - 1670:21
**Jose** [89] - 1625:15, 1625:18, 1628:24, 1629:4, 1631:10, 1633:6, 1634:3, 1635:22, 1639:23, 1640:12, 1641:8, 1760:12, 1760:14, 1762:5, 1764:2, 1766:5, 1767:3, 1768:6, 1768:10, 1769:1, 1769:13, 1769:20, 1770:7, 1771:1, 1771:17, 1772:9, 1772:11, 1775:24, 1777:2, 1778:13, 1778:25, 1780:2, 1780:8, 1781:2, 1782:20, 1783:7, 1783:15, 1784:5, 1784:22, 1785:4, 1786:1, 1786:12, 1786:18, 1786:21, 1787:4, 1787:8, 1787:18, 1788:12, 1788:16, 1788:21, 1789:15, 1789:18, 1790:11, 1791:10, 1791:14, 1791:19, 1792:4, 1792:9, 1792:10, 1792:16, 1797:7, 1799:4, 1799:18, 1800:13, 1800:18, 1800:23, 1804:8, 1808:4, 1808:15, 1808:18, 1808:21, 1809:5, 1809:17, 1812:1, 1813:3, 1813:17, 1814:7, 1814:16, 1815:21, 1816:4, 1816:8, 1816:21, 1816:25, 1818:7, 1820:5, 1821:1, 1822:13
**Jose's** [3] - 1774:7,

1790:5, 1819:17
**Joseph** [1] - 1807:2
**JUDGE** [1] - 1613:5
**judge** [2] - 1711:13, 1736:8
**judge's** [1] - 1753:21
**judgment** [4] - 1661:9, 1662:15, 1736:9, 1737:6
**JUDICIAL** [2] - 1825:17, 1825:20
**judicial** [1] - 1657:17
**July** [3] - 1683:22, 1684:14, 1804:25
**jump** [1] - 1721:14
**June** [2] - 1748:7, 1764:11
**jurisdiction** [3] - 1671:14, 1671:18, 1671:20
**jurisdictions** [1] - 1656:10
**juror** [1] - 1617:7
**JURY** [1] - 1613:15
**jury** [5] - 1617:5, 1617:9, 1717:5, 1717:7, 1717:8
**just...** [1] - 1823:4

## K

**keep** [5] - 1620:21, 1716:24, 1725:10, 1790:11, 1792:2
**keeping** [1] - 1664:6
**Kevin** [1] - 1822:7
**kick** [1] - 1770:11
**kids** [13] - 1654:24, 1760:22, 1782:17, 1782:20, 1788:3, 1788:6, 1804:18, 1809:10, 1813:13, 1816:12, 1816:14, 1816:15, 1817:2
**kind** [18] - 1656:5, 1659:17, 1670:21, 1670:23, 1671:25, 1672:8, 1672:10, 1676:5, 1679:4, 1690:16, 1692:2, 1702:20, 1723:11, 1774:4, 1784:2, 1791:4, 1801:11, 1820:8
**kinds** [1] - 1822:19
**knowing** [2] - 1703:16, 1779:9
**knowledge** [19] - 1623:15, 1624:5, 1624:11, 1626:8, 1631:8, 1631:16, 1640:18, 1640:19, 1648:24, 1670:13, 1670:23, 1684:17, 1685:20, 1686:2,

1688:3, 1688:4, 1698:5, 1713:11, 1755:24
**known** [7] - 1670:16, 1670:19, 1670:25, 1696:9, 1699:3, 1766:12, 1819:17

## L

**L.A** [22] - 1650:5, 1663:4, 1669:6, 1678:17, 1698:14, 1698:25, 1701:14, 1731:8, 1747:16, 1753:12, 1761:6, 1761:8, 1761:10, 1767:25, 1768:25, 1782:12, 1787:17, 1787:19, 1788:1, 1791:11, 1798:4, 1823:14
**labor** [1] - 1762:10
**LACCI** [1] - 1650:5
**LADBS** [1] - 1766:12
**ladies** [1] - 1617:10
**laid** [2] - 1661:14, 1670:14
**land** [9] - 1656:21, 1659:7, 1659:15, 1659:16, 1669:21, 1698:8, 1715:7, 1716:7, 1740:23
**Land** [2] - 1657:11, 1764:16
**lanes** [1] - 1667:8
**language** [5] - 1697:18, 1708:10, 1708:11, 1708:14, 1817:6
**languages** [1] - 1734:13
**languished** [1] - 1671:12
**languishing** [1] - 1671:16
**large** [6] - 1657:22, 1658:1, 1658:6, 1658:8, 1663:25, 1673:10
**largely** [1] - 1665:19
**larger** [1] - 1658:13
**largest** [3] - 1701:13, 1822:24, 1822:25
**Las** [11] - 1752:24, 1781:7, 1781:12, 1782:25, 1783:16, 1784:23, 1785:3, 1785:11, 1785:19, 1786:5, 1788:22
**last** [9] - 1621:11, 1682:24, 1683:1, 1725:11, 1760:7, 1770:17, 1808:7, 1812:2, 1817:11

**late** [7] - 1620:22, 1633:6, 1633:12, 1633:16, 1691:7, 1771:24, 1791:23
**Latino** [1] - 1771:10
**latter** [1] - 1706:4
**Laughter** [2] - 1715:23, 1737:17
**Law** [2] - 1761:2, 1761:3
**law** [14] - 1655:19, 1661:15, 1713:2, 1716:1, 1716:2, 1740:11, 1740:13, 1745:6, 1760:24, 1761:19, 1761:24, 1762:17
**laws** [3] - 1656:21, 1741:12
**lawsuit** [24] - 1645:20, 1770:20, 1771:18, 1773:17, 1774:6, 1774:11, 1774:16, 1774:20, 1774:25, 1775:1, 1775:11, 1776:4, 1776:21, 1777:3, 1777:20, 1778:7, 1778:17, 1778:21, 1779:4, 1779:8, 1779:16, 1779:17, 1780:7, 1780:18
**lawyer** [2] - 1623:7, 1762:14
**lawyers** [4] - 1623:25, 1624:5, 1624:11, 1775:6
**layer** [1] - 1662:16
**layperson** [1] - 1662:13
**lead** [2] - 1636:1
**leader** [1] - 1649:24
**leaned** [1] - 1694:16
**leaning** [1] - 1710:2
**learn** [9] - 1626:2, 1626:4, 1768:18, 1769:24, 1770:3, 1781:21, 1782:4, 1802:2, 1802:18
**learned** [1] - 1666:18
**learning** [1] - 1771:17
**least** [12] - 1646:9, 1676:19, 1677:15, 1731:15, 1735:20, 1740:18, 1747:13, 1754:18, 1770:14, 1772:16, 1803:22, 1818:22
**leave** [2] - 1761:13, 1778:3
**leaving** [3] - 1708:8, 1759:14, 1782:16
**led** [1] - 1654:12
**Lee** [3] - 1805:20, 1806:22, 1806:23
**left** [15] - 1628:7,

1643:7, 1645:14, 1679:5, 1683:15, 1709:19, 1716:24, 1717:13, 1719:19, 1722:20, 1725:6, 1806:9, 1806:17, 1806:20, 1815:24
**legal** [7] - 1623:9, 1623:11, 1623:18, 1659:6, 1762:9, 1775:9, 1811:20
**legalized** [1] - 1715:22
**legally** [1] - 1810:14
**legislation** [1] - 1657:8
**legislative** [7] - 1656:15, 1656:17, 1660:1, 1660:2, 1663:22, 1715:1, 1724:20
**legislator** [1] - 1711:13
**lent** [1] - 1629:11
**less** [5] - 1695:16, 1696:5, 1702:16, 1702:17, 1705:18
**LESS** [1] - 1825:18
**lesser** [1] - 1668:12
**letter** [15] - 1640:1, 1640:6, 1640:11, 1640:25, 1652:5, 1652:10, 1652:18, 1652:22, 1689:20, 1689:25, 1690:2, 1691:20, 1702:21, 1703:2, 1725:17
**letters** [1] - 1640:3
**level** [16] - 1687:24, 1701:16, 1705:11, 1720:12, 1732:16, 1741:18, 1763:10, 1767:16, 1769:23, 1771:13, 1792:9, 1795:17, 1798:15, 1803:21, 1815:5, 1819:14
**license** [1] - 1659:12
**lieu** [2] - 1720:23
**life** [3] - 1629:18, 1655:14, 1746:2
**light** [1] - 1721:9
**like-minded** [1] - 1721:23
**likely** [5] - 1690:4, 1771:18, 1774:16, 1774:19, 1806:7
**limited** [1] - 1669:17
**Lin** [1] - 1807:2
**line** [6] - 1635:16, 1656:24, 1656:25, 1671:2, 1705:9, 1744:3
**lines** [1] - 1683:20
**list** [9] - 1668:18, 1668:21, 1700:3, 1714:17, 1714:22,

1719:17, 1805:5, 1819:4, 1826:12
**listed** [3] - 1826:1, 1826:4, 1850
**listen** [1] - 1759:1
**lists** [3] - 1630:19, 1640:21, 1721:2
**literally** [1] - 1820:4
**litigant** [1] - 1776:20
**litigate** [1] - 1624:12
**litigation** [1] - 1623:16
**live** [1] - 1768:15
**liveable** [1] - 1656:14
**living** [2] - 1654:20, 1767:12
**LLP** [1] - 1614:19
**loan** [95] - 1618:6, 1618:22, 1618:23, 1619:4, 1619:10, 1620:8, 1620:10, 1620:11, 1620:15, 1620:18, 1620:22, 1621:3, 1621:4, 1621:6, 1621:7, 1621:8, 1621:12, 1621:14, 1621:16, 1621:17, 1621:18, 1621:23, 1621:24, 1621:25, 1622:1, 1622:2, 1622:7, 1622:12, 1622:14, 1622:15, 1622:17, 1623:3, 1623:23, 1624:3, 1624:8, 1625:6, 1625:15, 1625:18, 1625:19, 1625:20, 1625:24, 1626:2, 1626:3, 1626:9, 1626:19, 1626:22, 1626:24, 1627:9, 1628:2, 1628:5, 1628:16, 1629:1, 1629:4, 1629:12, 1629:15, 1629:18, 1629:21, 1629:22, 1629:23, 1630:5, 1630:6, 1630:8, 1630:9, 1630:18, 1632:1, 1632:7, 1632:13, 1632:18, 1632:20, 1632:21, 1632:24, 1633:1, 1633:4, 1633:14, 1634:4, 1634:17, 1634:19, 1634:23, 1635:1, 1635:3, 1635:13, 1635:15, 1635:21, 1636:7, 1636:21, 1639:9, 1639:15, 1641:8, 1641:10, 1641:13, 1641:16, 1641:20, 1646:11
**loans** [12] - 1618:21, 1618:23, 1619:1, 1619:11, 1619:15, 1619:17, 1620:5, 1620:7, 1620:17,

1620:24, 1633:3, 1636:15

**lobbying** [1] - 1822:6
**lobbyist** [2] - 1706:13, 1821:10
**lobbyists** [3] - 1706:10, 1706:20, 1706:23
**local** [6] - 1649:22, 1650:6, 1668:25, 1699:5, 1700:6, 1771:13
**located** [4] - 1644:8, 1644:9, 1644:11, 1790:6
**location** [4] - 1672:5, 1691:15, 1772:1, 1790:16
**locations** [1] - 1788:21
**logistics** [2] - 1682:10, 1685:14
**look** [33] - 1628:7, 1628:23, 1630:13, 1635:7, 1635:23, 1636:5, 1636:24, 1637:9, 1638:19, 1638:24, 1639:8, 1640:5, 1640:7, 1643:2, 1660:8, 1663:20, 1668:5, 1669:2, 1681:22, 1683:19, 1715:14, 1718:1, 1719:16, 1722:23, 1723:1, 1731:4, 1736:10, 1744:1, 1782:11, 1783:22, 1801:3, 1804:14, 1805:14
**looked** [4] - 1688:1, 1736:6, 1806:14, 1821:25
**looking** [8] - 1629:7, 1643:18, 1714:19, 1717:17, 1735:18, 1736:8, 1751:20, 1806:22
**looks** [5] - 1655:19, 1684:5, 1684:6, 1747:13, 1807:24
**LOS** [7] - 1613:17, 1613:23, 1614:7, 1614:11, 1614:16, 1614:21, 1617:1
**Los** [31] - 1647:25, 1648:22, 1655:5, 1664:21, 1669:20, 1671:10, 1672:6, 1686:3, 1688:3, 1698:23, 1699:24, 1729:15, 1732:5, 1732:10, 1736:18, 1738:15, 1738:25, 1740:10, 1740:24, 1741:4, 1742:7, 1742:16, 1742:24,

1745:10, 1747:15, 1752:22, 1754:13, 1759:9, 1767:20, 1768:19, 1769:10
**losing** [1] - 1746:21
**lost** [3] - 1626:13, 1626:15, 1800:7
**loud** [4] - 1671:18, 1692:6, 1692:7, 1696:2
**love** [1] - 1675:23
**low** [3] - 1672:9, 1678:17, 1700:5
**low-yield** [1] - 1672:9
**lower** [2] - 1705:11, 1772:19
**lowest** [1] - 1791:2
**Ltd** [4] - 1632:3, 1632:16, 1639:6, 1640:13
**Luck** [4] - 1632:3, 1632:16, 1639:6, 1640:13
**lucrative** [2] - 1671:22, 1672:4
**Luis** [3] - 1628:24, 1635:22, 1640:12
**luminosity** [1] - 1720:12
**lunch** [17] - 1691:8, 1691:9, 1691:10, 1730:10, 1738:18, 1748:19, 1771:19, 1771:23, 1772:6, 1772:12, 1773:19, 1773:22, 1776:11, 1777:25, 1778:2, 1778:4, 1800:25
**luncheon** [6] - 1727:6, 1747:13, 1750:4, 1750:9, 1751:5, 1800:8
**Luxe** [37] - 1664:21, 1665:2, 1665:24, 1666:4, 1672:16, 1679:14, 1679:19, 1681:2, 1681:6, 1682:3, 1685:5, 1691:13, 1691:17, 1691:24, 1692:10, 1692:24, 1693:4, 1693:6, 1696:23, 1696:24, 1697:6, 1697:16, 1711:25, 1714:11, 1714:14, 1715:15, 1718:4, 1718:5, 1722:23, 1725:13, 1750:6, 1750:12, 1751:14, 1751:22, 1756:9, 1756:16

---

# M

**machine** [1] - 1726:5

**MACK** [2] - 1614:5, 1615:9
**MADAMREPORTER. COM** [1] - 1613:24
**maiden** [3] - 1810:11, 1810:15, 1811:20
**mail** [16] - 1635:7, 1635:8, 1635:11, 1635:20, 1635:24, 1636:6, 1637:23, 1637:24, 1638:6, 1638:9, 1640:7, 1804:17, 1804:22, 1806:4, 1806:13
**mailed** [2] - 1638:3, 1801:3
**main** [2] - 1719:17, 1773:21
**major** [1] - 1669:2
**majority** [3] - 1646:13, 1662:2, 1662:6
**Mama** [10] - 1690:8, 1690:11, 1691:2, 1691:5, 1691:12, 1691:15, 1691:23, 1692:13, 1714:15, 1716:13
**MAMA** [1] - 1690:9
**Mama's** [3] - 1725:15, 1755:16, 1756:6
**man** [2] - 1735:3, 1743:20
**managed** [1] - 1619:10
**Management** [2] - 1657:11, 1764:17
**management** [1] - 1673:22
**manager** [10] - 1618:6, 1619:4, 1648:19, 1674:18, 1674:22, 1676:1, 1676:13, 1699:8, 1763:12, 1766:10
**manages** [1] - 1704:10
**managing** [1] - 1672:22
**Mandarin** [1] - 1734:20
**mandate** [2] - 1705:15, 1705:24
**manifest** [2] - 1668:2, 1757:21
**map** [2] - 1731:4, 1747:14
**MARCH** [2] - 1613:18, 1617:1
**marched** [1] - 1711:3
**marching** [3] - 1710:14, 1710:21, 1711:3
**MARIA** [3] - 1613:20, 1825:10, 1825:23
**Marino** [2] - 1767:23, 1768:12
**mark** [1] - 1633:19

**market** [1] - 1733:16
**marriage** [6] - 1774:9, 1775:16, 1777:9, 1777:14, 1777:17, 1777:19
**married** [3] - 1760:12, 1760:14, 1760:15
**master** [2] - 1663:5, 1704:19
**match** [1] - 1727:25
**matching** [1] - 1806:16
**material** [2] - 1663:5, 1677:11
**materials** [3] - 1675:17, 1712:14, 1713:6
**math** [1] - 1807:21
**matter** [5] - 1641:22, 1754:3, 1774:1, 1776:14, 1805:7
**MATTER** [1] - 1825:15
**matters** [5] - 1662:5, 1677:9, 1677:18, 1677:24, 1680:25
**matured** [1] - 1629:15
**matures** [1] - 1630:2
**mayor** [68] - 1648:25, 1650:15, 1651:11, 1651:19, 1652:24, 1674:8, 1674:12, 1674:15, 1674:19, 1676:17, 1676:23, 1678:6, 1678:9, 1679:19, 1679:21, 1680:19, 1680:21, 1684:19, 1684:22, 1687:13, 1687:14, 1688:7, 1688:16, 1688:24, 1689:7, 1689:8, 1689:25, 1692:18, 1694:5, 1695:2, 1695:3, 1695:10, 1699:6, 1700:22, 1701:11, 1702:18, 1702:25, 1705:13, 1706:7, 1706:8, 1706:10, 1707:2, 1707:6, 1707:7, 1707:11, 1707:14, 1709:9, 1710:1, 1710:2, 1711:20, 1711:22, 1726:3, 1730:4, 1738:15, 1738:25, 1739:6, 1741:22, 1741:25, 1742:3, 1751:8, 1756:22, 1757:22, 1757:24, 1758:6, 1758:9, 1758:12, 1759:9
**Mayor** [7] - 1649:12, 1649:15, 1650:12, 1650:21, 1651:8, 1671:11, 1673:15
**mayor's** [10] - 1681:1,

1697:23, 1701:17, 1702:5, 1703:1, 1703:14, 1705:10, 1707:15, 1707:17, 1711:18
**mayoral** [1] - 1706:10
**mayors** [6] - 1678:19, 1679:6, 1686:19, 1698:13, 1701:4, 1709:13
**Mc** [1] - 1694:7
**me...** [1] - 1746:20
**mean** [20] - 1620:8, 1620:15, 1622:2, 1629:25, 1633:5, 1639:1, 1662:10, 1666:7, 1666:9, 1690:25, 1700:23, 1710:20, 1736:9, 1774:25, 1779:20, 1782:15, 1800:11, 1811:2, 1815:6, 1822:16
**meaning** [4] - 1624:8, 1639:18, 1775:3, 1807:16
**means** [2] - 1622:13, 1644:2
**meant** [4] - 1636:13, 1636:14, 1702:4, 1779:4
**mechanism** [1] - 1669:8
**mechanisms** [1] - 1715:9
**media** [2] - 1654:13, 1654:15
**meet** [13] - 1648:16, 1686:5, 1687:6, 1690:6, 1691:2, 1706:17, 1707:3, 1731:2, 1769:18, 1778:13, 1795:22, 1797:17, 1810:7
**meeting** [95] - 1663:17, 1663:18, 1663:19, 1677:6, 1677:10, 1677:14, 1678:1, 1678:2, 1678:7, 1678:10, 1678:15, 1678:20, 1678:23, 1679:11, 1681:10, 1681:14, 1682:10, 1685:15, 1685:17, 1685:20, 1685:23, 1685:25, 1686:7, 1686:10, 1687:2, 1687:6, 1688:17, 1689:17, 1690:18, 1691:11, 1692:9, 1692:21, 1693:16, 1694:6, 1694:11, 1694:12, 1694:14, 1694:17, 1694:22, 1695:7, 1695:10, 1696:4,

1696:16, 1696:25, 1697:3, 1697:6, 1699:19, 1700:1, 1700:25, 1705:17, 1707:20, 1708:17, 1709:9, 1709:13, 1709:16, 1709:19, 1709:21, 1711:8, 1711:22, 1712:5, 1714:3, 1716:13, 1716:15, 1716:18, 1716:21, 1717:20, 1719:11, 1722:10, 1725:14, 1725:19, 1725:22, 1726:8, 1729:7, 1755:15, 1756:4, 1756:5, 1757:7, 1757:17, 1766:22, 1771:23, 1771:25, 1772:12, 1773:5, 1773:12, 1773:14, 1773:16, 1797:20, 1797:21, 1798:12, 1798:16, 1798:17, 1800:21, 1804:4, 1805:6, 1822:19

**meetings** [13] - 1657:21, 1662:19, 1663:5, 1663:6, 1663:20, 1664:4, 1664:7, 1677:2, 1677:3, 1687:8, 1692:3, 1771:19, 1809:18

**member** [16] - 1619:18, 1619:21, 1626:9, 1626:12, 1650:17, 1651:8, 1667:15, 1667:17, 1667:19, 1667:24, 1677:22, 1702:10, 1723:15, 1726:4, 1770:15, 1771:6

**members** [8] - 1672:25, 1675:15, 1677:16, 1708:25, 1722:11, 1723:17, 1726:16, 1726:18

**memorable** [3] - 1680:15, 1771:19, 1772:5

**memory** [3] - 1772:15, 1773:21, 1805:11

**mentioned** [18] - 1627:4, 1627:18, 1637:6, 1654:3, 1656:1, 1658:2, 1660:6, 1681:11, 1682:7, 1757:15, 1761:25, 1762:13, 1762:21, 1768:12, 1773:4, 1775:13, 1775:16, 1801:14

**merge** [1] - 1675:10

**message** [2] -

**messy** [1] - 1678:18

**met** [7] - 1687:14, 1714:15, 1794:5, 1794:14, 1794:18, 1794:21, 1798:7

**Michelle** [1] - 1760:1

**mid** [2] - 1761:18, 1761:24

**mid-size** [2] - 1761:18, 1761:24

**middle** [3] - 1630:14, 1717:24, 1722:23

**might** [30] - 1621:23, 1621:24, 1621:25, 1623:22, 1633:21, 1658:11, 1658:15, 1662:6, 1663:17, 1666:11, 1668:2, 1668:12, 1668:24, 1668:25, 1669:1, 1680:6, 1701:16, 1702:25, 1711:20, 1712:23, 1712:25, 1713:2, 1754:1, 1772:16, 1773:4, 1791:2

**million** [4] - 1735:4, 1777:1, 1777:3, 1779:15

**millions** [2] - 1738:8, 1742:15

**mind** [20] - 1668:1, 1681:1, 1688:25, 1693:24, 1702:23, 1703:3, 1704:8, 1711:6, 1725:15, 1725:18, 1725:21, 1725:24, 1726:8, 1746:21, 1747:3, 1747:7, 1750:16, 1756:14, 1791:25, 1792:2

**minded** [1] - 1721:23

**mine** [3] - 1667:13, 1682:14, 1697:12

**minutes** [10] - 1705:20, 1705:23, 1716:20, 1717:1, 1717:2, 1717:14, 1717:20, 1722:22, 1723:19, 1824:10

**Miranda** [1] - 1824:12

**miss** [1] - 1788:13

**missed** [2] - 1621:9, 1633:14

**misstates** [4] - 1727:17, 1732:6, 1738:19, 1743:9

**mitigate** [1] - 1668:3

**mitigation** [1] - 1668:6

**mix** [4] - 1664:15, 1667:3, 1729:3, 1758:1

**Mixed** [2] - 1666:5, 1666:7

**mobility** [2] - 1656:11, 1657:7

**model** [1] - 1651:5

**modification** [2] - 1722:1, 1723:6

**modifications** [8] - 1618:7, 1720:3, 1722:6, 1722:7, 1722:12, 1722:15, 1724:9, 1724:10

**Modify** [1] - 1723:2

**modify** [1] - 1619:16

**modifying** [2] - 1723:10, 1724:5

**Molina** [4] - 1771:4, 1771:6, 1773:18, 1780:3, 1781:2

**mom** [1] - 1809:10

**moment** [7] - 1635:24, 1644:24, 1650:10, 1754:24, 1778:14, 1778:15, 1823:2

**momentum** [1] - 1711:4

**money** [36] - 1635:2, 1641:23, 1642:15, 1645:20, 1646:7, 1646:23, 1646:24, 1669:22, 1670:4, 1693:23, 1723:13, 1737:22, 1738:2, 1738:6, 1738:16, 1742:15, 1742:24, 1743:21, 1744:7, 1744:14, 1744:18, 1763:8, 1775:3, 1776:20, 1776:23, 1779:4, 1779:8, 1779:21, 1780:11, 1780:13, 1780:17, 1790:15, 1792:11, 1792:22, 1806:1, 1812:4

**monitor** [2] - 1620:19, 1620:21

**Monte** [4] - 1644:12, 1644:13, 1644:14, 1644:16

**month** [4] - 1621:11, 1633:20, 1645:11

**monthly** [5] - 1625:21, 1629:13, 1636:16, 1639:17, 1645:7

**months** [4] - 1629:21, 1653:12, 1664:7, 1750:5

**morning** [7] - 1617:7, 1617:10, 1638:4, 1647:17, 1717:2, 1729:5, 1729:8

**Morris** [1] - 1763:1

**mortgage** [2] - 1621:23, 1622:12

**most** [10] - 1636:14, 1636:15, 1652:23, 1690:4, 1700:22,

1720:18, 1773:23, 1791:3, 1809:25, 1820:19

**mostly** [2] - 1618:21, 1676:2

**Motel** [1] - 1785:21

**motion** [1] - 1718:1

**motions** [1] - 1724:17

**motivations** [1] - 1745:2

**move** [1] - 1672:23, 1809:23

**moved** [3] - 1642:4, 1649:21, 1673:2

**moving** [7] - 1637:14, 1637:15, 1667:10, 1674:4, 1674:5, 1709:3

**MR** [122] - 1617:13, 1617:21, 1617:23, 1644:23, 1645:1, 1645:3, 1645:6, 1646:15, 1646:18, 1647:2, 1647:5, 1647:9, 1647:12, 1647:21, 1647:23, 1652:17, 1665:14, 1665:15, 1717:10, 1717:12, 1726:10, 1726:13, 1727:17, 1727:20, 1728:15, 1728:17, 1728:21, 1728:23, 1729:23, 1729:25, 1730:15, 1730:19, 1731:10, 1731:17, 1731:22, 1732:6, 1732:9, 1732:12, 1733:4, 1733:8, 1734:15, 1734:20, 1734:22, 1735:2, 1735:5, 1735:9, 1735:12, 1735:21, 1735:23, 1736:1, 1736:5, 1736:14, 1736:16, 1737:11, 1737:14, 1737:17, 1738:10, 1738:13, 1738:19, 1738:24, 1739:22, 1740:3, 1740:8, 1742:8, 1742:11, 1742:17, 1742:21, 1743:3, 1743:9, 1743:14, 1743:16, 1743:20, 1743:24, 1745:18, 1745:21, 1746:4, 1746:7, 1746:11, 1746:13, 1746:15, 1746:17, 1747:8, 1747:11, 1747:25, 1748:2, 1748:4, 1748:6, 1748:13, 1748:17, 1748:22, 1749:1, 1749:7, 1749:12, 1751:16, 1751:19,

1752:25, 1753:3, 1753:5, 1753:10, 1753:14, 1753:19, 1753:21, 1754:5, 1754:24, 1755:1, 1755:3, 1755:5, 1755:8, 1755:11, 1755:13, 1759:3, 1759:5, 1759:17, 1759:20, 1759:22, 1759:25, 1760:11, 1803:15, 1803:16, 1823:4, 1823:7, 1824:7

**muddled** [1] - 1756:7

**multiple** [5] - 1665:17, 1684:4, 1684:6, 1688:9, 1769:6

**municipal** [1] - 1699:5

**mutual** [1] - 1708:9

## N

**name** [33] - 1617:17, 1626:13, 1626:15, 1626:16, 1628:12, 1628:24, 1629:5, 1632:16, 1634:9, 1634:11, 1647:16, 1680:23, 1735:19, 1760:4, 1760:6, 1760:7, 1762:24, 1773:6, 1793:19, 1804:5, 1807:2, 1810:9, 1810:11, 1810:14, 1810:15, 1811:19, 1811:20, 1812:1, 1812:2, 1812:4, 1821:19

**named** [1] - 1792:24

**names** [1] - 1818:24

**narrative** [1] - 1732:18

**nature** [9] - 1668:12, 1672:4, 1675:24, 1686:22, 1692:4, 1694:1, 1698:11, 1700:18, 1713:4

**near** [3] - 1684:5, 1752:18, 1767:22

**necessarily** [4] - 1670:5, 1704:5, 1711:15, 1725:9

**need** [11] - 1623:22, 1659:8, 1659:10, 1659:11, 1659:12, 1674:6, 1715:10, 1741:6, 1754:9, 1758:12, 1758:15

**needed** [7] - 1630:10, 1664:17, 1673:2, 1675:13, 1700:19, 1705:9, 1812:8

**needs** [2] - 1623:20, 1753:5

**nefarious** [1] -

1752:17
**negativity** [1] -
1675:20
**negotiate** [1] - 1716:3
**negotiated** [1] -
1716:8
**neighborhood** [3] -
1650:1, 1654:25,
1733:15
**nervous** [2] - 1797:21,
1797:24
**never** [19] - 1633:25,
1650:15, 1662:11,
1667:5, 1677:13,
1678:21, 1680:12,
1680:13, 1687:19,
1694:16, 1694:21,
1708:3, 1729:4,
1729:21, 1744:10,
1746:2, 1747:1,
1748:19, 1802:13
**new** [3] - 1684:22,
1707:1, 1753:4
**New** [1] - 1785:6,
1785:12
**news** [2] - 1634:12,
1634:14
**next** [21] - 1617:12,
1621:21, 1621:22,
1624:10, 1629:16,
1631:23, 1633:23,
1636:24, 1638:12,
1647:11, 1663:19,
1667:9, 1677:17,
1759:24, 1800:23,
1805:17, 1812:19,
1812:23, 1816:3,
1821:17, 1822:2
**nice** [3] - 1785:24,
1785:25, 1821:24
**night** [3] - 1667:11,
1720:14, 1820:13
**nine** [2] - 1651:14,
1677:7
**non** [4] - 1681:23,
1688:6, 1688:14,
1707:21
**non-(213** [1] - 1688:14
**non-city** [2] - 1688:6,
1688:14
**non-committal** [1] -
1707:21
**non-committally** [1] -
1681:23
**none** [2] - 1704:16,
1775:6
**None** [1] - 1616:2
**nonprofit** [1] -
1763:12
**nonprofits** [1] -
1723:14
**normal** [4] - 1624:17,
1624:21, 1624:23,
1637:16
**normally** [3] - 1621:8,
1636:15, 1679:21

**NORTH** [3] - 1614:6,
1614:10, 1614:15
**Northern** [2] -
1618:12, 1789:7
**note** [3] - 1626:20,
1627:4, 1627:5
**notes** [1] - 1751:20
**nothing** [8] - 1645:1,
1716:6, 1726:10,
1750:9, 1755:8,
1759:3, 1793:7,
1794:10
**notified** [1] - 1623:17
**notify** [2] - 1639:23,
1641:2
**notwithstanding** [4] -
1776:3, 1777:20,
1793:9
**November** [3] -
1751:25, 1769:5,
1769:12
**number** [30] -
1630:19, 1630:23,
1631:23, 1640:21,
1640:22, 1651:15,
1654:9, 1655:3,
1660:8, 1667:7,
1682:24, 1683:4,
1683:6, 1683:11,
1683:16, 1683:17,
1688:1, 1688:2,
1688:3, 1688:6,
1688:14, 1698:10,
1700:2, 1719:21,
1720:10, 1723:1,
1724:20, 1728:10,
1812:2, 1822:17
**numbers** [4] -
1719:19, 1781:14,
1807:12

# O

**O'** [1] - 1617:19
**O'DONOVAN** [2] -
1615:5, 1617:15
**O'Donovan** [3] -
1617:14, 1617:18,
1617:24
**objection** [38] -
1646:15, 1727:17,
1728:15, 1729:23,
1730:15, 1731:17,
1732:6, 1733:4,
1734:15, 1735:5,
1735:21, 1736:1,
1736:14, 1736:17,
1737:11, 1738:10,
1738:19, 1739:22,
1742:8, 1742:17,
1743:9, 1743:11,
1745:18, 1746:4,
1746:11, 1746:15,
1747:8, 1747:25,
1748:4, 1748:13,

1748:22, 1749:7,
1751:16, 1752:25,
1753:6, 1753:14,
1755:3
**objections** [1] -
1753:6
**objective** [2] - 1703:8,
1703:13
**obligation** [1] - 1713:9
**observations** [2] -
1768:2, 1771:14
**observe** [3] - 1783:8,
1783:17, 1789:20
**observed** [2] - 1768:6,
1783:1, 1784:20
**obtain** [1] - 1633:17
**obviously** [1] -
1697:11
**occasionally** [1] -
1687:23
**occasions** [2] -
1682:4, 1812:9
**occupying** [1] -
1733:12
**occur** [2] - 1701:17,
1752:16
**occurred** [2] -
1677:14, 1750:9
**occurrence** [2] -
1768:25, 1781:21
**occurring** [1] - 1798:4
**Oceanwide** [3] -
1805:16, 1806:16,
1806:17
**odd** [14] - 1678:22,
1679:4, 1679:6,
1679:9, 1680:11,
1688:5, 1689:11,
1692:8, 1693:23,
1694:1, 1701:3,
1795:18, 1797:5,
1797:7
**odds** [2] - 1726:15,
1726:20
**OF** [17] - 1613:2,
1613:7, 1613:15,
1613:16, 1614:4,
1614:4, 1614:9,
1614:13, 1614:18,
1825:5, 1825:11,
1825:14, 1825:17,
1825:20
**off-site** [5] - 1686:11,
1689:11, 1690:6,
1694:22, 1695:3
**offer** [2] - 1746:18,
1746:20, 1746:24
**offered** [1] - 1757:7
**office** [31] - 1669:25,
1670:6, 1681:21,
1686:3, 1686:5,
1686:8, 1689:15,
1691:4, 1692:10,
1692:15, 1692:21,
1695:23, 1695:24,
1697:23, 1701:17,

1702:4, 1703:1,
1703:14, 1707:8,
1707:15, 1707:18,
1711:18, 1730:13,
1730:23, 1730:24,
1731:16, 1747:14,
1770:14, 1771:12,
1809:8
**OFFICE** [3] - 1614:4,
1614:9, 1614:13
**office's** [1] - 1705:11
**officers** [1] - 1653:20
**offices** [4] - 1669:23,
1687:4, 1695:21,
1716:3
**official** [2] - 1688:3,
1729:11
**OFFICIAL** [3] -
1613:20, 1825:10,
1825:23
**officially** [1] - 1813:2
**officials** [6] - 1675:18,
1701:22, 1702:6,
1709:17, 1723:18,
1744:17
**often** [22] - 1652:23,
1659:25, 1668:3,
1672:2, 1680:7,
1696:10, 1701:8,
1701:12, 1716:5,
1744:4, 1752:8,
1753:23, 1753:25,
1768:9, 1769:4,
1781:15, 1781:16,
1781:25, 1790:18,
1808:25, 1811:15,
1816:15
**old** [1] - 1720:21
**oldest** [1] - 1760:23
**Olympic** [2] - 1719:24,
1719:25
**Olympics** [2] - 1754:2,
1754:7
**ON** [2] - 1614:4,
1614:18
**onboard** [2] - 1669:14,
1810:1
**once** [8] - 1644:15,
1676:19, 1741:10,
1785:18, 1790:16,
1801:6, 1820:6
**one** [97] - 1627:2,
1633:13, 1633:20,
1634:5, 1636:8,
1641:22, 1641:24,
1642:11, 1642:15,
1643:9, 1645:19,
1649:3, 1674:3,
1678:13, 1678:16,
1678:24, 1681:12,
1681:25, 1682:6,
1683:1, 1684:4,
1685:15, 1685:16,
1687:6, 1687:19,
1688:13, 1689:3,
1691:19, 1694:21,

1695:14, 1696:13,
1698:25, 1698:22,
1705:25, 1707:10,
1708:2, 1711:24,
1715:4, 1730:6,
1739:4, 1739:19,
1740:4, 1740:15,
1740:16, 1742:14,
1742:23, 1743:1,
1743:2, 1743:12,
1743:13, 1744:23,
1746:14, 1749:6,
1752:9, 1753:3,
1757:2, 1761:23,
1762:10, 1762:16,
1763:4, 1763:24,
1772:13, 1772:16,
1774:10, 1774:12,
1775:16, 1777:24,
1783:21, 1785:1,
1785:6, 1786:25,
1788:21, 1790:10,
1798:8, 1799:19,
1803:2, 1803:10,
1804:10, 1805:15,
1805:18, 1806:5,
1814:7, 1816:10,
1822:12, 1822:14,
1822:17, 1822:24,
1823:2, 1823:14
**one-month** [1] -
1633:20
**one-on-one** [6] -
1681:25, 1682:6,
1685:15, 1685:16,
1763:24, 1786:25
**one-year** [2] -
1746:14, 1749:6
**ones** [7] - 1658:14,
1658:15, 1668:7,
1672:12, 1749:23,
1767:21
**ongoing** [1] - 1673:23
**open** [5] - 1725:4,
1733:23, 1733:25,
1734:2
**operate** [7] - 1661:20,
1662:2, 1662:20,
1711:6, 1732:21,
1757:25, 1759:10
**operates** [1] - 1759:8
**operations** [2] -
1624:18, 1624:22
**opinion** [3] - 1655:10,
1687:17, 1777:7
**opportunity** [3] -
1793:10, 1793:23,
1819:15
**opposed** [3] -
1642:19, 1758:2,
1822:23
**opposition** [3] -
1670:24, 1712:20,
1718:14
**options** [1] - 1622:8
**order** [9] - 1624:2,

1663:15, 1675:13, 1677:9, 1698:7, 1715:4, 1716:2, 1725:5

ordered [2] - 1696:8, 1696:13, 1696:14

ordinance [1] - 1720:16

ordinary [2] - 1672:19, 1673:4

organization [4] - 1741:7, 1763:13, 1805:15, 1805:16

organizations [2] - 1649:22, 1806:1

organized [1] - 1712:21

original [1] - 1655:19

originally [2] - 1787:21

originated [4] - 1620:9, 1626:3, 1626:6, 1626:24

origination [4] - 1620:5, 1620:6, 1625:23, 1626:1

origins [1] - 1736:12

otherwise [4] - 1624:17, 1706:21, 1715:7, 1820:7

outdoor [1] - 1695:25

outlawed [1] - 1706:10

outside [5] - 1617:5, 1623:14, 1623:21, 1624:15, 1706:12

outsource [1] - 1623:21

outspoken [1] - 1671:3

over-vote [1] - 1758:18

overall [3] - 1671:9, 1687:24, 1697:10

overlapping [1] - 1675:5

overruled [18] - 1727:19, 1730:16, 1731:19, 1732:7, 1733:5, 1734:17, 1736:2, 1736:15, 1737:13, 1738:20, 1739:24, 1742:19, 1743:11, 1748:15, 1748:24, 1749:9, 1751:17, 1753:8

oversaw [1] - 1632:24

oversight [1] - 1633:1

overwhelm [1] - 1664:16

owed [2] - 1641:4, 1645:8

own [7] - 1624:14, 1657:9, 1661:8, 1665:16, 1747:3, 1754:19, 1798:6

owned [4] - 1754:12, 1767:19, 1785:17, 1814:1

## P

pace [1] - 1672:17

package [4] - 1713:4, 1715:12, 1716:10, 1732:19

PAGE [2] - 1615:2, 1825:16

page [23] - 1627:2, 1631:18, 1635:5, 1638:12, 1638:13, 1640:6, 1643:7, 1643:9, 1643:12, 1643:13, 1649:3, 1714:6, 1715:14, 1716:24, 1717:17, 1717:22, 1717:25, 1722:17, 1722:24, 1723:1, 1805:8, 1806:9, 1806:14

pages [2] - 1722:19, 1722:21

paid [16] - 1627:24, 1629:14, 1635:3, 1652:12, 1652:14, 1654:3, 1654:18, 1738:8, 1746:22, 1780:20, 1780:21, 1780:25, 1802:3, 1802:25, 1807:17

pain [1] - 1727:3

painful [1] - 1774:1

pan [1] - 1711:5

paper [1] - 1712:13

paragraph [3] - 1636:24, 1641:1, 1719:18

paragraphs [1] - 1719:17

pardon [1] - 1682:13

parent [1] - 1650:24

park [3] - 1669:1, 1734:3, 1734:5

parked [2] - 1695:22, 1695:23

part [18] - 1624:21, 1624:23, 1641:18, 1656:25, 1697:17, 1698:15, 1699:9, 1716:4, 1740:4, 1740:5, 1742:6, 1773:23, 1775:13, 1800:16, 1811:7, 1816:22, 1817:1, 1823:17

PARTIAL [1] - 1613:15

participate [1] - 1795:2

participating [2] - 1679:24, 1794:9

particular [12] -

1618:19, 1624:5, 1650:23, 1661:10, 1667:6, 1680:22, 1685:1, 1686:14, 1691:15, 1693:15, 1718:9

particularly [1] - 1811:10

parties [5] - 1680:7, 1763:22, 1808:20, 1808:22, 1818:18

partnership [1] - 1700:6

parts [1] - 1620:6

party [4] - 1676:3, 1680:6, 1690:17, 1798:18

Pasadena [6] - 1626:6, 1626:23, 1628:9, 1628:14, 1628:15, 1761:19

pass [5] - 1657:4, 1670:11, 1675:6, 1675:12

passed [3] - 1671:10, 1720:16, 1787:12

past [4] - 1619:15, 1620:24, 1633:20, 1637:1

patch [3] - 1748:18, 1748:20, 1755:19

patching [1] - 1755:16

path [1] - 1824:5

pattern [1] - 1781:23

pay [18] - 1621:19, 1622:1, 1622:17, 1622:19, 1625:5, 1635:13, 1639:9, 1646:23, 1691:1, 1706:20, 1721:1, 1721:3, 1777:3, 1780:11, 1786:1, 1791:16, 1807:16, 1815:17

payment [10] - 1621:8, 1621:9, 1621:10, 1632:25, 1633:23, 1638:16, 1639:17, 1645:7, 1669:21, 1723:3

payments [18] - 1620:19, 1620:20, 1622:8, 1627:16, 1629:13, 1633:1, 1633:6, 1633:12, 1633:15, 1633:17, 1636:16, 1645:12, 1645:14, 1645:17, 1646:13, 1646:19, 1668:18, 1670:11

payoff [2] - 1635:17, 1638:10

peace [1] - 1730:11

pedestrian [1] - 1667:4

pedestrians [1] -

1666:23

peers [1] - 1653:15

Peggy [2] - 1617:14, 1617:18

PEGGY [3] - 1615:5, 1617:15, 1617:18

pending [2] - 1625:3, 1821:1

people [37] - 1650:2, 1650:9, 1654:23, 1655:7, 1655:8, 1657:18, 1696:1, 1699:1, 1726:15, 1736:11, 1738:6, 1739:4, 1739:10, 1745:9, 1754:6, 1754:9, 1759:7, 1776:14, 1803:12, 1805:20, 1806:1, 1809:2, 1810:8, 1810:20, 1810:21, 1812:3, 1814:12, 1818:20, 1818:24, 1818:25, 1819:17, 1820:2, 1820:15, 1820:19, 1822:19

per [1] - 1704:16

perceived [1] - 1663:2

percent [6] - 1670:1, 1670:4, 1723:3, 1723:16, 1723:21, 1724:6

perception [3] - 1703:7, 1708:19, 1709:2

perform [1] - 1663:15

perhaps [3] - 1663:16, 1676:3

period [16] - 1646:14, 1648:25, 1653:10, 1684:6, 1761:16, 1765:17, 1766:7, 1769:17, 1769:25, 1770:7, 1789:14, 1791:18, 1791:20, 1803:22, 1809:14, 1809:17

permissions [4] - 1659:6, 1659:8, 1659:9, 1659:14

permit [1] - 1659:20

permits [1] - 1715:10

person [33] - 1649:3, 1652:23, 1661:16, 1679:20, 1680:4, 1680:5, 1680:24, 1685:14, 1689:9, 1690:3, 1690:4, 1704:17, 1719:8, 1744:7, 1765:8, 1765:10, 1767:13, 1770:2, 1770:4, 1770:5, 1772:20, 1772:23, 1794:6, 1795:10, 1795:16, 1795:22, 1796:5,

1796:17, 1798:25, 1808:5, 1822:1, 1850

1822:2, 1823:10

person's [1] - 1773:6

personable [1] - 1703:11

personal [5] - 1676:7, 1774:1, 1776:14, 1776:15, 1802:15

personally [4] - 1633:24, 1633:25, 1779:21, 1786:14

persons [3] - 1774:10, 1774:12, 1804:11

perspective [2] - 1697:20, 1697:21

perspectives [1] - 1754:2

persuasive [1] - 1705:1

perusing [1] - 1801:11

perverted [1] - 1734:1

philanthropy [1] - 1654:12

phone [14] - 1640:3, 1682:23, 1683:6, 1683:11, 1683:17, 1686:25, 1728:7, 1729:2, 1729:22, 1794:25, 1795:3, 1795:11, 1795:16, 1795:21

photocopy [1] - 1712:13

phrase [1] - 1720:21

phrased [1] - 1738:21

physical [2] - 1642:19, 1656:6

picked [5] - 1730:14, 1731:11, 1731:14, 1731:23, 1748:3

picky [1] - 1696:8

picture [2] - 1813:21, 1821:25

piece [6] - 1621:18, 1627:14, 1740:23, 1741:3, 1752:9, 1752:14

pieced [1] - 1774:4

pieced-together [1] - 1774:4

pivot [1] - 1809:10

place [13] - 1669:19, 1691:16, 1691:24, 1692:1, 1692:4, 1696:10, 1724:22, 1744:2, 1771:23, 1771:24, 1771:25, 1778:9, 1813:24

placed [1] - 1696:15

plaintiff [1] - 1776:20

Plaintiffs [1] - 1613:8

PLAINTIFFS [1] - 1614:4

plan [11] - 1655:20, 1656:1, 1656:2,

1656:5, 1656:7, 1656:11, 1687:22, 1787:22, 1792:16, 1805:1

**planned** - 1786:13, 1787:1, 1788:9, 1788:11, 1788:14

**planner** [2] - 1656:4, 1669:14

**Planning** [43] - 1654:7, 1655:16, 1655:22, 1655:25, 1657:2, 1657:10, 1657:20, 1658:2, 1658:9, 1658:18, 1658:21, 1658:23, 1660:19, 1671:10, 1672:22, 1673:15, 1675:2, 1675:12, 1677:21, 1687:5, 1689:6, 1693:24, 1704:10, 1705:12, 1713:11, 1713:15, 1714:2, 1718:22, 1723:25, 1727:10, 1730:7, 1737:24, 1740:6, 1740:11, 1740:18, 1741:6, 1750:5, 1751:24, 1758:12, 1758:16, 1764:16

**planning** [16] - 1648:3, 1648:4, 1652:8, 1660:17, 1665:10, 1665:11, 1665:19, 1667:21, 1671:1, 1671:12, 1680:25, 1693:2, 1740:5, 1809:1, 1809:2, 1810:1

**plans** [3] - 1712:20, 1733:12, 1788:17

**pleasant** [5] - 1702:14, 1703:11, 1784:12, 1798:1, 1821:23

**pleasantries** [2] - 1680:10, 1696:21

**please...** [5] - 1627:3, 1628:20, 1719:19, 1722:20, 1806:10

**pleased** [1] - 1617:6

**PLUM** [7] - 1656:23, 1657:10, 1667:18, 1764:17, 1764:20, 1765:1, 1765:2

**pocket** [1] - 1789:25

**point** [37] - 1625:14, 1632:14, 1633:13, 1634:2, 1634:5, 1634:11, 1645:21, 1648:15, 1653:1, 1653:5, 1653:8, 1662:12, 1671:2, 1680:12, 1684:18, 1688:21, 1691:19,

1692:23, 1705:25, 1719:7, 1753:20, 1753:25, 1764:2, 1764:8, 1768:18, 1780:1, 1797:2, 1800:22, 1808:3, 1808:10, 1813:1, 1814:3, 1814:15, 1814:18, 1815:14, 1823:8, 1824:8

**pointed** [1] - 1728:19

**pointing** [1] - 1728:16

**points** [2] - 1822:12, 1822:14

**policies** [3] - 1655:6, 1657:6, 1657:8

**policy** [18] - 1650:20, 1655:9, 1655:11, 1655:19, 1655:20, 1657:1, 1663:21, 1664:15, 1666:22, 1671:11, 1672:7, 1675:13, 1697:5, 1697:10, 1697:13, 1701:18, 1704:10, 1761:7

**policy-making** [1] - 1655:9

**polite** [2] - 1705:6, 1707:21

**politely** [1] - 1696:12

**political** [4] - 1738:1, 1738:9, 1759:6, 1771:10

**politically** [1] - 1780:4

**pool** [3] - 1733:20, 1733:24, 1734:2

**poor** [2] - 1655:8, 1668:11, 1672:9

**portfolio** [1] - 1698:15

**portion** [4] - 1630:3, 1630:14, 1631:18, 1714:7

**position** [31] - 1618:5, 1618:6, 1619:3, 1619:5, 1619:6, 1619:8, 1648:2, 1652:7, 1652:12, 1652:14, 1652:24, 1653:21, 1654:3, 1679:7, 1680:23, 1688:24, 1690:4, 1694:21, 1701:24, 1702:19, 1704:12, 1705:11, 1705:14, 1708:11, 1708:24, 1710:7, 1711:19, 1776:16, 1777:8, 1777:10, 1777:13

**positions** [5] - 1647:25, 1648:2, 1650:14, 1702:23, 1720:25

**possibility** [1] - 1808:4

**possible** [2] -

1653:11, 1672:14

**possibly** [1] - 1775:1

**post** [2] - 1695:23, 1695:24

**potential** [6] - 1652:1, 1770:21, 1773:17, 1774:19, 1776:20, 1812:6

**potentially** [6] - 1693:11, 1779:11, 1812:12, 1812:15, 1812:16, 1813:16

**poverty** [1] - 1672:8

**power** [5] - 1675:8, 1689:17, 1702:15, 1703:12, 1720:25

**powerful** [2] - 1702:16, 1702:17

**powers** [1] - 1739:13

**practicing** [1] - 1761:19

**pre** [10] - 1677:2, 1677:3, 1677:6, 1677:14, 1678:7, 1678:10, 1678:15, 1678:20, 1678:23, 1679:11

**pre-closed** [1] - 1677:14

**pre-meeting** [7] - 1677:6, 1678:7, 1678:10, 1678:15, 1678:20, 1678:23, 1679:11

**pre-meetings** [2] - 1677:2, 1677:3

**precedent** [1] - 1713:2

**preferred** [1] - 1795:9

**prehearing** [1] - 1658:11

**preparation** [3] - 1643:2, 1660:10, 1682:17

**preparations** [1] - 1763:17

**prepare** [1] - 1820:1

**prepared** [2] - 1697:25, 1716:20

**prepatory** [1] - 1675:16

**presence** [3] - 1617:5, 1808:22, 1810:20

**present** [13] - 1677:20, 1717:5, 1717:8, 1718:13, 1763:23, 1772:7, 1785:4, 1786:5, 1813:11, 1813:12, 1813:13, 1818:19

**presentation** [1] - 1718:12

**presented** [2] - 1661:22, 1703:23

**presenting** [1] - 1718:24

**president** [23] -

1653:1, 1653:4, 1653:8, 1653:14, 1653:18, 1653:25, 1662:9, 1662:16, 1664:8, 1671:13, 1671:14, 1677:9, 1677:22, 1677:25, 1701:25, 1704:12, 1704:15, 1708:25, 1713:9, 1719:11, 1719:13, 1758:15, 1758:19

**PRESIDING** [1] - 1613:5

**presiding** [1] - 1719:12

**pressure** [16] - 1689:5, 1705:2, 1710:3, 1726:7, 1746:25, 1747:4, 1757:12, 1757:16, 1757:20, 1758:2, 1759:7, 1759:13, 1809:4, 1809:6, 1809:12

**pressuring** [2] - 1756:15, 1759:9

**pretty** [4] - 1654:8, 1777:16, 1793:8, 1807:13

**previously** [18] - 1627:1, 1635:4, 1643:6, 1643:8, 1643:15, 1649:2, 1660:8, 1674:17, 1682:15, 1683:8, 1705:10, 1713:18, 1713:19, 1717:16, 1718:6, 1798:23, 1804:14, 1822:1

**primary** [4] - 1619:13, 1655:15, 1662:8, 1696:24

**principal** [4] - 1629:14, 1630:1, 1639:13, 1641:4

**printout** [1] - 1632:11

**printouts** [1] - 1632:21

**privacy** [1] - 1692:5

**private** [13] - 1692:7, 1733:20, 1733:24, 1751:11, 1763:18, 1773:25, 1785:13, 1785:14, 1785:19, 1785:25, 1786:21, 1809:21, 1820:7

**privy** [1] - 1766:2

**proactively** [2] - 1679:16, 1679:18

**proceed** [5] - 1617:11, 1617:20, 1647:20, 1718:9, 1760:9

**proceeding** [3] - 1624:4, 1625:3, 1719:10

**PROCEEDINGS** [2] - 1613:25, 1825:15

**proceedings** [2] - 1624:20, 1625:8

**process** [16] - 1642:1, 1642:15, 1642:18, 1643:22, 1651:1, 1657:19, 1660:22, 1670:3, 1670:5, 1672:24, 1674:3, 1675:22, 1716:5, 1723:18, 1744:2, 1770:11

**processed** [1] - 1644:10

**processes** [3] - 1661:14, 1673:13, 1694:4

**processing** [4] - 1643:23, 1644:3, 1644:8, 1644:9

**processor** [1] - 1636:1

**proclamation** [1] - 1706:11

**produce** [1] - 1796:9

**producing** [1] - 1794:3

**professional** [2] - 1669:14, 1711:12

**profile** [1] - 1631:19

**program** [3] - 1750:18, 1763:12, 1806:12

**progress** [1] - 1668:9

**project** [141] - 1657:19, 1660:7, 1660:14, 1661:10, 1661:22, 1664:20, 1664:23, 1665:1, 1665:2, 1665:24, 1666:2, 1666:4, 1666:5, 1666:13, 1666:17, 1668:3, 1668:19, 1668:20, 1669:2, 1672:16, 1672:18, 1672:25, 1673:1, 1673:7, 1673:25, 1679:14, 1679:19, 1680:14, 1680:18, 1681:2, 1681:6, 1682:1, 1682:3, 1685:1, 1685:4, 1687:3, 1687:18, 1687:23, 1691:13, 1691:17, 1691:25, 1692:10, 1692:18, 1692:24, 1693:4, 1693:7, 1693:11, 1693:14, 1693:25, 1694:17, 1694:20, 1694:23, 1695:12, 1696:23, 1696:24, 1697:6, 1697:7, 1697:9, 1697:12, 1697:14, 1697:16, 1697:19, 1697:23, 1698:10,

1850

1698:17, 1698:19, 1699:16, 1699:23, 1700:1, 1700:4, 1700:7, 1700:8, 1700:19, 1701:3, 1701:10, 1701:20, 1701:22, 1702:7, 1702:11, 1703:17, 1703:20, 1703:21, 1704:1, 1704:4, 1704:7, 1704:9, 1705:8, 1705:12, 1706:6, 1706:19, 1706:25, 1708:12, 1708:17, 1708:21, 1709:3, 1712:1, 1712:7, 1713:5, 1713:12, 1714:12, 1714:14, 1715:6, 1715:15, 1715:17, 1716:2, 1716:8, 1718:4, 1718:5, 1718:9, 1718:11, 1718:24, 1723:24, 1724:13, 1724:14, 1725:13, 1725:23, 1726:1, 1732:1, 1732:17, 1734:1, 1737:9, 1743:17, 1744:9, 1744:10, 1746:2, 1746:19, 1750:6, 1750:12, 1751:2, 1756:10, 1756:16, 1756:17, 1756:19, 1756:21, 1756:24, 1757:3, 1757:9, 1758:4

**project-specific** [1] - 1706:19

**projects** [35] - 1650:7, 1655:23, 1655:24, 1657:23, 1657:25, 1658:2, 1658:3, 1658:7, 1658:9, 1658:11, 1658:13, 1661:6, 1663:21, 1664:1, 1664:6, 1664:15, 1667:22, 1667:23, 1668:4, 1668:10, 1668:23, 1670:12, 1672:23, 1673:10, 1674:2, 1693:22, 1697:2, 1698:3, 1704:19, 1706:17, 1711:5, 1712:9, 1746:9, 1821:1

**promised** [1] - 1788:3

**promoting** [1] - 1650:1

**prompt** [1] - 1784:6

**prompted** [1] - 1784:9

**properties** [2] - 1654:15, 1767:19

**property** [2] - 1669:19, 1741:3

**proponent** [1] - 1718:13

**proposal** [2] - 1722:1, 1724:11

**propose** [4] - 1686:5, 1686:7, 1686:10, 1723:25

**proposed** [20] - 1658:6, 1660:7, 1660:22, 1661:6, 1661:9, 1661:23, 1664:20, 1664:23, 1666:3, 1666:17, 1672:18, 1697:9, 1713:12, 1714:12, 1718:24, 1722:11, 1722:14, 1723:24, 1757:3, 1794:7

**Proposed** [1] - 1715:17

**proposing** [1] - 1724:5

**prospective** [1] - 1641:19

**prospects** [1] - 1650:9

**protect** [2] - 1623:2, 1703:5

**protection** [1] - 1622:25

**protocols** [1] - 1694:5

**provide** [10] - 1623:23, 1651:4, 1665:20, 1675:17, 1700:4, 1779:8, 1792:5, 1797:1, 1802:3, 1812:7

**provided** [3] - 1641:19, 1686:25, 1785:15

**providing** [3] - 1623:24, 1793:11, 1796:25

**provision** [1] - 1715:8

**provisions** [1] - 1720:17

**public** [43] - 1654:21, 1661:4, 1661:5, 1662:25, 1667:24, 1668:13, 1668:15, 1669:8, 1670:3, 1670:5, 1670:8, 1670:15, 1670:23, 1671:18, 1672:14, 1672:24, 1676:18, 1680:14, 1700:9, 1708:2, 1711:6, 1712:16, 1718:14, 1718:15, 1719:3, 1719:5, 1723:4, 1723:16, 1723:18, 1724:1, 1724:3, 1724:6, 1725:24, 1732:22, 1733:17, 1733:25, 1744:17, 1745:25, 1750:19, 1770:23, 1776:15,

1780:24, 1809:24

**Public** [1] - 1688:11

**publication** [1] - 1824:2

**publish** [6] - 1627:1, 1643:6, 1643:8, 1682:15, 1713:18, 1798:23

**publishing** [2] - 1635:4, 1649:2

**pull** [2] - 1627:2, 1635:5

**pulled** [3] - 1717:16, 1801:22, 1801:25

**pulling** [1] - 1796:19

**punch** [1] - 1671:2

**purpose** [2] - 1627:11, 1755:15

**PURSUANT** [1] - 1825:12

**push** [1] - 1664:17

**pushed** [1] - 1685:21

**pushing** [4] - 1700:24, 1725:23, 1726:1, 1726:4

**put** [37] - 1620:18, 1627:22, 1646:24, 1667:1, 1667:3, 1672:1, 1672:12, 1673:14, 1698:7, 1698:24, 1715:4, 1718:2, 1720:17, 1723:12, 1724:21, 1726:15, 1726:20, 1740:23, 1744:7, 1747:23, 1752:11, 1752:13, 1753:10, 1759:7, 1772:8, 1776:16, 1781:6, 1793:1, 1803:15, 1806:9, 1812:18, 1813:10, 1821:15, 1821:22, 1823:5

**puts** [1] - 1668:21

**putting** [9] - 1646:9, 1655:7, 1658:5, 1743:21, 1772:10, 1772:11, 1773:5, 1780:16, 1813:21

**Putting** [1] - 1772:10

## Q

**quarters** [1] - 1671:19

**quasi** [1] - 1657:17

**quasi-judicial** [1] - 1657:17

**question...** [1] - 1738:7

**questions** [19] - 1647:2, 1647:4, 1677:24, 1718:19, 1755:10, 1755:14, 1756:3, 1756:23, 1757:6, 1758:5,

1759:17, 1763:14, 1763:16, 1763:21, 1800:7, 1800:12, 1818:2, 1823:6, 1824:7

**quick** [5] - 1677:1, 1721:15, 1763:15, 1806:16, 1821:16

**quicker** [1] - 1664:18

**quickly** [9] - 1654:8, 1664:9, 1673:2, 1674:4, 1674:5, 1700:17, 1709:3, 1709:6, 1761:23

**quiet** [1] - 1692:4

**quite** [11] - 1633:9, 1645:15, 1667:13, 1679:5, 1680:7, 1696:10, 1701:20, 1713:3, 1757:24, 1798:1, 1812:4

## R

**R-I-C-H-E-L-L-E** [1] - 1760:7

**radar** [3] - 1666:3, 1672:16, 1681:2

**Radio** [1] - 1654:14

**raided** [1] - 1634:16

**raise** [2] - 1718:18, 1812:3

**raised** [2] - 1698:23, 1704:24

**raising** [1] - 1784:21

**rambunctious** [1] - 1662:25

**range** [1] - 1791:1

**ranges** [2] - 1760:22

**rank** [1] - 1822:22

**ranking** [1] - 1624:17

**rapidity** [2] - 1668:9, 1673:4

**rarely** [4] - 1680:21, 1687:14, 1687:17, 1687:19

**rate** [2] - 1733:14, 1739:21

**rather** [1] - 1734:4

**ratify** [1] - 1716:4

**ratio** [1] - 1721:6

**Ray** [23] - 1727:6, 1730:9, 1734:7, 1735:15, 1742:2, 1746:18, 1747:24, 1748:7, 1765:9, 1765:10, 1767:8, 1767:9, 1772:9, 1772:10, 1778:12, 1778:22, 1812:5, 1816:11, 1818:15, 1820:4, 1820:5, 1820:9, 1822:14

**Ray's** [2] - 1730:24, 1731:16

**Raymond** [5] - 1648:16, 1648:18, 1649:8, 1816:7, 1822:6

**RAYMOND** [3] - 1613:12, 1614:19, 1825:7

**re** [10] - 1653:21, 1711:2, 1770:8, 1770:13, 1773:18, 1774:7, 1774:12, 1776:6, 1776:8, 1780:3

**re-elected** [1] - 1653:21

**re-election** [9] - 1711:2, 1770:8, 1770:13, 1773:18, 1774:7, 1774:12, 1776:6, 1776:8, 1780:3

**reach** [1] - 1722:14

**reaction** [1] - 1681:19

**read** [7] - 1780:17, 1801:9, 1801:12, 1805:4, 1805:10, 1806:5

**ready** [1] - 1617:11

**real** [30] - 1646:3, 1677:1, 1693:20, 1701:13, 1721:14, 1767:13, 1767:16, 1767:18, 1792:5, 1792:11, 1792:17, 1792:23, 1793:3, 1793:7, 1793:11, 1793:16, 1794:2, 1794:10, 1796:12, 1797:25, 1798:2, 1798:5, 1798:10, 1819:2, 1820:20, 1820:24, 1820:25, 1821:5, 1821:16, 1822:13

**Real** [1] - 1664:23

**realize** [1] - 1634:2

**really** [27] - 1627:20, 1636:21, 1637:17, 1650:6, 1655:6, 1655:17, 1664:13, 1669:6, 1669:20, 1680:13, 1680:20, 1687:20, 1693:19, 1694:16, 1695:4, 1708:3, 1710:10, 1720:24, 1750:9, 1778:23, 1782:13, 1792:18, 1797:21, 1797:23, 1798:2, 1798:9, 1809:22

**reason** [10] - 1652:6, 1654:22, 1679:18, 1680:16, 1692:20, 1706:3, 1708:1, 1737:22, 1745:5, 1801:13

**reasons** [3] - 1720:10, 1777:24, 1798:8
**reassert** [1] - 1671:20
**reasserted** [2] - 1671:14, 1671:17
**reassure** [1] - 1778:24
**reassured** [3] - 1777:16, 1796:13, 1797:23
**reassuring** [1] - 1777:18
**receive** [11] - 1620:17, 1620:23, 1623:17, 1625:21, 1626:18, 1626:20, 1626:23, 1632:9, 1633:2, 1637:24, 1663:17
**received** [4] - 1626:21, 1627:8, 1632:7, 1651:24
**receives** [2] - 1642:9, 1684:24
**receiving** [1] - 1632:12
**recess** [2] - 1717:2, 1824:10
**Recess** [2] - 1717:3, 1824:11
**recognition** [2] - 1812:1, 1812:4
**recognize** [14] - 1628:12, 1634:9, 1649:3, 1704:18, 1713:22, 1714:8, 1717:18, 1765:5, 1766:16, 1772:23, 1798:25, 1803:17, 1804:16, 1822:1
**recollection** [11] - 1676:15, 1676:16, 1678:13, 1692:19, 1701:23, 1709:11, 1709:15, 1712:8, 1716:16, 1805:25, 1806:4
**recommend** [1] - 1724:6
**recommendation** [1] - 1712:18
**recommendations** [3] - 1693:8, 1713:16, 1724:14
**recommended** [1] - 1750:6
**recommending** [1] - 1722:8
**record** [7] - 1617:17, 1647:16, 1699:4, 1728:7, 1729:22, 1760:5, 1806:11
**Records** [1] - 1688:11
**records** [2] - 1688:13, 1727:13
**recourse** [1] - 1709:20
**RECROSS** [2] - 1615:4, 1759:4

**rectangular** [1] - 1815:23
**redaction** [1] - 1683:8
**redevelopment** [1] - 1679:14
**REDIRECT** [2] - 1615:4, 1755:12
**reduce** [1] - 1721:9
**REDUCTION** [1] - 1825:19
**reelected** [1] - 1704:22
**refer** [1] - 1718:21
**reference** [1] - 1639:5
**references** [1] - 1718:4
**referred** [5] - 1626:9, 1629:23, 1648:5, 1648:8, 1658:20
**referring** [8] - 1658:17, 1665:7, 1668:16, 1674:10, 1680:18, 1718:22, 1721:18, 1727:23
**refers** [1] - 1719:22
**reflect** [4] - 1630:22, 1660:13, 1683:23, 1685:10
**reflected** [3] - 1632:21, 1713:22, 1720:5
**refuse** [1] - 1746:24
**regarding** [9] - 1626:18, 1651:25, 1658:3, 1712:7, 1755:15, 1756:3, 1756:23, 1757:6, 1758:6
**regardless** [1] - 1624:14
**regular** [6] - 1627:21, 1636:7, 1636:15, 1754:10, 1768:24, 1781:20
**regularly** [2] - 1781:18, 1790:21
**regulated** [2] - 1745:13, 1745:17
**regulating** [1] - 1687:21
**REGULATIONS** [2] - 1825:16, 1825:20
**reinforce** [1] - 1732:18
**reintroduce** [1] - 1819:16
**reject** [1] - 1716:5
**relate** [1] - 1657:22
**related** [11] - 1655:19, 1656:21, 1668:25, 1697:8, 1697:12, 1697:13, 1769:20, 1792:11, 1793:16, 1800:23, 1806:1
**relates** [2] - 1697:7, 1701:20
**relation** [3] - 1815:25,

1816:1, 1816:7
**relationship** [12] - 1676:7, 1748:20, 1755:17, 1755:20, 1755:22, 1755:25, 1762:4, 1773:2, 1799:19, 1803:23, 1803:25, 1821:12
**relevance** [5] - 1738:11, 1739:22, 1753:1, 1753:14, 1755:4
**relied** [1] - 1689:6
**rely** [2] - 1641:18, 1662:14
**relying** [1] - 1665:19
**remain** [1] - 1774:9
**remarks** [1] - 1820:1
**remember** [29] - 1633:9, 1667:7, 1670:2, 1678:22, 1679:2, 1679:23, 1679:25, 1680:22, 1685:1, 1696:22, 1697:18, 1701:15, 1703:24, 1703:25, 1707:23, 1708:14, 1709:25, 1711:17, 1728:9, 1731:25, 1766:22, 1778:22, 1792:17, 1793:18, 1796:4, 1809:20, 1820:9, 1821:23
**remove** [4] - 1672:11, 1721:4, 1721:5, 1752:8
**removed** [1] - 1752:4
**rent** [1] - 1733:10
**rented** [1] - 1785:17
**renting** [1] - 1733:13
**reoccurring** [2] - 1781:11, 1781:23
**repayment** [1] - 1629:4
**repeat** [6] - 1653:2, 1658:4, 1731:20, 1732:8, 1742:20, 1753:9
**rephrase** [2] - 1735:7, 1738:23
**report** [9] - 1617:6, 1620:24, 1633:3, 1633:4, 1633:5, 1661:16, 1670:10, 1745:7, 1750:20
**reported** [3] - 1634:12, 1745:7, 1824:12
**REPORTED** [1] - 1825:14
**REPORTER** [3] - 1613:20, 1825:10, 1825:23
**REPORTER'S** [1] - 1613:15
**reporting** [1] - 1780:24

**reports** [16] - 1634:8, 1689:7, 1792:6, 1792:12, 1792:17, 1792:23, 1793:12, 1793:16, 1794:3, 1796:9, 1796:12, 1796:14, 1796:18, 1796:25, 1802:4
**repossess** [2] - 1621:24, 1622:15
**represent** [3] - 1629:10, 1639:12, 1667:25
**representative** [1] - 1708:13
**represented** [4] - 1639:13, 1667:15, 1807:5, 1821:9
**request** [6] - 1636:11, 1693:8, 1715:12, 1720:18, 1743:21, 1795:20
**requested** [4] - 1638:22, 1693:24, 1724:23, 1726:1
**requesting** [5] - 1635:13, 1689:10, 1689:17, 1715:1, 1723:20
**require** [4] - 1656:10, 1659:22, 1662:6, 1670:9
**required** [7] - 1656:13, 1661:11, 1668:12, 1716:2, 1721:2, 1732:21, 1745:7
**requirements** [1] - 1715:3
**research** [1] - 1710:13
**Residential** [1] - 1732:1
**residential** [2] - 1666:11, 1666:14
**resignation** [11] - 1652:1, 1652:6, 1652:10, 1652:18, 1652:22, 1689:20, 1691:20, 1702:21, 1703:2, 1725:18
**resigning** [1] - 1652:7
**resolve** [3] - 1774:22, 1779:2, 1779:3
**resolved** [1] - 1779:10
**resolving** [1] - 1774:24
**resources** [1] - 1624:16
**respect** [25] - 1619:3, 1620:14, 1622:8, 1625:1, 1633:12, 1634:3, 1651:8, 1657:10, 1657:16, 1658:1, 1659:19, 1662:1, 1677:6, 1681:21, 1684:22, 1690:12, 1691:19,

1701:2, 1701:7, 1703:25, 1704:20, 1721:23, 1755:16, 1756:16, 1758:25
**respected** [3] - 1704:23, 1744:2, 1771:13
**respectful** [1] - 1663:3
**respects** [1] - 1692:6
**respond** [1] - 1718:16
**responded** [1] - 1634:20
**response** [6] - 1699:21, 1700:12, 1774:19, 1775:20, 1777:21, 1778:20
**responsibilities** [4] - 1619:13, 1619:14, 1662:9, 1803:2
**responsibility** [3] - 1662:17, 1809:8
**responsible** [1] - 1738:15
**rest** [1] - 1746:2
**restatement** [2] - 1699:23, 1708:11
**restating** [1] - 1700:14
**restaurant** [8] - 1686:11, 1686:14, 1730:14, 1731:12, 1747:23, 1748:3, 1772:1, 1772:3
**result** [9] - 1641:15, 1770:3, 1774:16, 1776:21, 1780:10, 1804:6, 1809:4, 1811:3, 1824:2
**resume** [1] - 1717:9
**RESUMED** [1] - 1717:11
**retail** [12] - 1626:7, 1666:6, 1732:24, 1733:3, 1733:6, 1733:10, 1733:14, 1733:18, 1736:24, 1736:25, 1737:4, 1737:7
**retained** [2] - 1623:14, 1624:15
**retire** [1] - 1748:11
**retired** [1] - 1748:7
**retirement** [1] - 1680:7
**retiring** [5] - 1730:10, 1748:20, 1749:2, 1749:5, 1749:13
**return** [2] - 1783:1, 1787:22
**returned** [1] - 1783:19
**reveal** [1] - 1763:18
**revenue** [1] - 1754:18
**review** [15] - 1655:18, 1657:3, 1658:13, 1660:7, 1660:11, 1660:22, 1667:22, 1668:4, 1677:17, 1677:18, 1677:24,

1712:10, 1713:6, 1714:24, 1801:2
**reviewed** [3] - 1643:16, 1672:6, 1758:3
**reviewing** [1] - 1711:18
**revolving** [1] - 1746:14
**RICHELLE** [2] - 1615:8, 1760:2
**Richelle** [6] - 1760:6, 1805:4, 1810:10, 1810:13, 1811:25
**Ricky** [5] - 1772:17, 1772:21, 1772:24, 1773:1, 1775:6
**right-hand** [1] - 1772:19
**right...** [1] - 1812:25
**rights** [8] - 1625:2, 1634:22, 1639:24, 1640:9, 1669:17, 1669:18, 1669:22, 1723:12
**Rights** [3] - 1660:4, 1669:16, 1715:5
**ring** [1] - 1626:16
**Rios** [11] - 1760:1, 1810:9, 1810:10, 1810:16, 1810:18, 1811:19, 1811:25, 1812:18, 1815:22, 1817:9, 1823:6
**RIOS** [1] - 1760:2
**risk** [2] - 1646:3, 1646:5
**risky** [1] - 1726:6
**roads** [1] - 1667:2
**robust** [2] - 1713:3, 1715:11
**role** [14] - 1619:12, 1619:14, 1621:2, 1651:4, 1656:18, 1658:3, 1662:13, 1664:8, 1673:24, 1701:8, 1703:3, 1703:14, 1706:23, 1756:22
**roles** [2] - 1656:15, 1657:15
**roll** [1] - 1790:9
**roof** [1] - 1734:3
**rooftop** [2] - 1690:14, 1734:2
**room** [4] - 1679:2, 1679:7, 1679:8, 1787:13
**rooms** [8] - 1678:25, 1687:6, 1698:10, 1752:23, 1753:5, 1753:12, 1754:7, 1754:10
**rotating** [1] - 1677:22
**rough** [1] - 1790:25
**roughly** [1] - 1653:11,

1654:2, 1766:21
**Rudy** [3] - 1626:16, 1762:2, 1762:4
**Ruiz** [5] - 1761:25, 1762:2, 1762:4, 1762:10
**rule** [1] - 1746:14
**rules** [6] - 1694:4, 1740:15, 1740:20, 1745:3, 1746:9, 1749:21
**run** [18] - 1733:10, 1808:11, 1808:15, 1808:16, 1808:23, 1809:1, 1809:2, 1809:5, 1809:15, 1809:19, 1812:1, 1813:2, 1814:4, 1814:13, 1814:16, 1818:4, 1818:8
**running** [1] - 1808:5, 1810:21, 1811:4, 1813:17, 1814:19, 1818:11
**runs** [1] - 1754:21

## S

**safe** [1] - 1666:23
**Safety** [20] - 1648:20, 1648:21, 1648:22, 1674:18, 1674:22, 1675:2, 1675:7, 1675:14, 1675:16, 1675:19, 1676:1, 1676:13, 1699:8, 1699:12, 1730:2, 1739:16, 1740:11, 1741:14, 1741:16, 1766:11
**safety** [1] - 1667:5
**salary** [1] - 1802:25
**Salesian** [9] - 1763:1, 1763:2, 1763:5, 1802:21, 1802:23, 1803:3, 1804:12, 1805:1, 1806:24
**Salesian's** [1] - 1763:5
**San** [8] - 1767:23, 1768:12, 1772:2, 1772:3, 1813:9, 1813:13, 1813:25, 1815:20
**sat** [6] - 1679:2, 1679:4, 1696:2, 1708:5, 1816:9, 1822:2
**SATES** [1] - 1614:9
**satisfied** [2] - 1777:21, 1777:23
**Savings** [1] - 1618:10
**savings** [13] - 1621:25, 1622:2, 1622:16, 1627:20, 1627:21, 1628:1,

1628:4, 1635:3, 1635:21, 1636:7, 1636:15, 1636:21, 1637:5
**saw** [4] - 1640:22, 1665:4, 1736:6, 1790:10
**scale** [1] - 1658:8
**scene** [1] - 1695:18
**Schomoff** [2] - 1806:23, 1806:24
**School** [4] - 1761:3, 1763:1, 1802:23, 1803:3
**school** [10] - 1694:25, 1761:2, 1761:22, 1762:22, 1762:24, 1763:5, 1763:8, 1802:20, 1812:3
**Schrader** [1] - 1695:24
**scope** [2] - 1738:10, 1745:19
**scratch** [2] - 1811:17, 1811:18
**screen** [11] - 1643:8, 1643:10, 1649:4, 1714:8, 1728:14, 1728:20, 1765:5, 1766:15, 1766:16, 1781:6, 1798:25
**screens** [2] - 1690:15, 1696:2
**scroll** [1] - 1806:14
**search** [1] - 1769:6
**searching** [1] - 1824:1
**seat** [3] - 1813:3, 1813:17, 1818:4
**seated** [3] - 1760:3, 1815:23, 1815:24
**seating** [1] - 1695:25
**second** [12] - 1636:25, 1643:14, 1739:21, 1751:13, 1751:15, 1751:21, 1786:4, 1793:2, 1798:12, 1798:16, 1798:17, 1800:21
**seconds** [1] - 1684:11
**secretary** [1] - 1665:17
**section** [2] - 1730:7, 1745:6
**SECTION** [1] - 1825:12
**secured** [7] - 1621:13, 1621:16, 1621:17, 1622:16, 1630:18, 1632:20, 1636:21
**securing** [3] - 1641:8, 1641:13, 1646:2
**security** [9] - 1621:18, 1621:20, 1626:20, 1627:4, 1627:5, 1627:13, 1628:4, 1630:16, 1646:10
**see** [69] - 1620:25,

1628:8, 1628:24, 1629:7, 1630:16, 1630:20, 1631:2, 1631:4, 1631:21, 1632:3, 1634:11, 1636:6, 1636:10, 1636:25, 1637:9, 1637:24, 1638:6, 1638:7, 1639:10, 1655:6, 1663:20, 1668:6, 1676:2, 1676:6, 1676:24, 1682:23, 1682:24, 1683:15, 1684:8, 1705:9, 1715:17, 1719:19, 1719:21, 1720:12, 1720:20, 1721:13, 1723:2, 1728:8, 1728:11, 1728:24, 1729:4, 1729:13, 1757:23, 1765:17, 1765:18, 1766:1, 1766:2, 1766:4, 1768:9, 1771:15, 1772:19, 1776:2, 1783:14, 1784:2, 1784:5, 1789:18, 1790:8, 1790:14, 1804:6, 1804:17, 1805:1, 1805:15, 1805:21, 1806:8, 1806:17, 1806:18, 1807:2, 1812:19, 1824:5
**seeing** [6] - 1629:5, 1688:13, 1694:7, 1732:16, 1735:19, 1766:24
**seek** [3] - 1624:2, 1633:17, 1634:22
**seeking** [12] - 1660:14, 1664:1, 1692:25, 1701:11, 1708:16, 1708:20, 1708:24, 1709:3, 1712:9, 1777:7
**seem** [10] - 1689:18, 1691:16, 1698:11, 1698:18, 1775:18, 1776:8, 1777:21, 1797:9, 1800:5, 1800:15
**seize** [1] - 1646:7
**seized** [2] - 1625:12, 1646:6
**selection** [1] - 1692:8
**sell** [2] - 1659:13, 1715:10
**Selma** [3] - 1690:8, 1690:16, 1695:25
**send** [6] - 1644:4, 1656:22, 1672:1, 1700:15, 1793:17, 1801:1
**sending** [3] - 1635:11, 1635:12, 1801:2

**senior** [1] - 1679:7
**sensation** [1] - 1695:3
**sense** [18] - 1671:24, 1672:23, 1673:2, 1673:6, 1681:12, 1681:13, 1694:18, 1706:5, 1707:23, 1708:23, 1710:24, 1711:4, 1774:2, 1774:8, 1801:9, 1810:22, 1818:23, 1819:18
**sensible** [1] - 1669:10
**sent** [10] - 1623:18, 1635:8, 1640:1, 1640:2, 1640:11, 1640:13, 1707:2, 1707:6, 1707:11, 1807:14
**sentence** [1] - 1636:25
**separate** [4] - 1632:10, 1714:25, 1724:17, 1740:13
**separated** [1] - 1675:22
**separately** [2] - 1724:24, 1724:25
**separation** [1] - 1739:13
**September** [12] - 1631:15, 1714:14, 1716:16, 1717:15, 1719:13, 1719:14, 1751:3, 1751:6, 1751:8, 1751:25, 1756:5, 1806:13
**series** [3] - 1683:21, 1684:13, 1685:8
**seriously** [2] - 1704:24, 1710:8
**serve** [10] - 1628:2, 1628:4, 1648:13, 1648:24, 1651:13, 1653:4, 1653:25, 1656:15, 1657:15, 1725:24
**served** [13] - 1631:25, 1647:24, 1648:3, 1648:25, 1651:15, 1653:17, 1654:4, 1654:11, 1656:18, 1680:12, 1709:9, 1709:17, 1771:12
**serves** [1] - 1622:25
**service** [2] - 1654:21, 1704:21
**servicing** [6] - 1618:6, 1618:22, 1618:23, 1619:4, 1619:11, 1623:3
**serving** [6] - 1648:15, 1661:19, 1664:19, 1706:22, 1764:3, 1764:8
**SESSION** [1] - 1617:3
**set** [17] - 1625:20,

1627:9, 1632:24, 1636:16, 1636:22, 1639:4, 1677:15, 1682:9, 1685:20, 1695:18, 1713:16, 1818:13, 1818:15, 1818:17, 1819:5, 1819:10, 1819:23
**setting** [7] - 1620:7, 1620:15, 1629:3, 1663:9, 1809:18, 1819:21, 1820:15
**settings** [1] - 1696:11
**settle** [4] - 1645:20, 1779:8, 1779:17, 1780:18
**settled** [2] - 1779:11, 1780:8
**settlement** [6] - 1774:23, 1774:25, 1775:3, 1779:2, 1780:10
**settling** [3] - 1775:1, 1775:10, 1778:7
**seven** [4] - 1618:13, 1618:14, 1619:7, 1648:14
**several** [3] - 1633:4, 1640:2, 1640:3
**sexual** [1] - 1770:19
**Shannon** [1] - 1717:5
**shape** [4] - 1655:11, 1662:19, 1663:6, 1664:14
**shaping** [1] - 1663:8
**share** [2] - 1650:20, 1789:15
**shared** [2] - 1650:24, 1723:23
**sharing** [4] - 1655:21, 1657:7, 1687:21, 1701:18
**SHE** [3] - 1613:12, 1614:19, 1825:7
**Shelter** [13] - 1690:8, 1690:11, 1691:2, 1691:5, 1691:12, 1691:15, 1691:23, 1692:13, 1714:15, 1716:13, 1725:15, 1755:16, 1756:6
**shelter** [1] - 1690:9
**Shen** [2] - 1772:12, 1812:11
**ships** [1] - 1662:12
**shock** [1] - 1759:6
**shopping** [1] - 1787:12
**short** [3] - 1648:14, 1684:6, 1753:12
**shortly** [2] - 1684:18, 1823:23
**shot** [1] - 1770:17
**show** [10] - 1663:3, 1663:4, 1722:19, 1727:14, 1727:21,

1728:14, 1729:10, 1755:2, 1819:22, 1821:25
**showed** [5] - 1634:8, 1727:9, 1728:6, 1729:18, 1729:21
**showing** [1] - 1766:15
**shows** [1] - 1722:21
**shy** [1] - 1725:6
**siamese** [1] - 1675:11
**side** [10] - 1620:14, 1643:7, 1643:9, 1715:25, 1716:8, 1775:24, 1791:19, 1815:24, 1816:10, 1816:11
**sides** [1] - 1753:24
**sightseeing** [1] - 1787:12
**sign** [21] - 1631:15, 1651:25, 1652:5, 1652:10, 1671:11, 1671:25, 1672:6, 1672:10, 1697:10, 1697:13, 1715:2, 1719:22, 1719:24, 1719:25, 1720:16, 1721:23, 1724:21, 1744:8, 1801:2
**signage** [15] - 1659:22, 1670:14, 1670:24, 1671:5, 1671:9, 1671:15, 1697:7, 1698:6, 1699:7, 1699:10, 1699:15, 1699:18, 1752:4, 1752:7, 1752:13
**signal** [1] - 1779:16
**signaling** [2] - 1814:11, 1814:12
**signature** [3] - 1631:2, 1631:5, 1640:16
**signatures** [2] - 1631:1, 1631:7
**signed** [5] - 1689:20, 1690:3, 1721:9, 1725:18, 1805:8
**significance** [1] - 1634:3
**significant** [2] - 1769:19, 1771:7
**signs** [24] - 1667:2, 1671:6, 1671:8, 1671:22, 1672:2, 1672:5, 1672:7, 1672:9, 1675:7, 1698:7, 1698:24, 1699:11, 1720:8, 1720:9, 1720:18, 1721:6, 1721:11, 1721:13, 1724:22, 1743:18, 1743:21, 1744:1
**similar** [1] - 1652:10
**simpler** [1] - 1753:10

**simply** [1] - 1652:7
**single** [2] - 1621:1, 1633:2
**sit** [5] - 1695:18, 1706:17, 1815:21, 1816:2, 1821:17
**site** [6] - 1620:7, 1686:11, 1689:11, 1690:6, 1694:22, 1695:3
**sitting** [5] - 1725:12, 1725:19, 1725:22, 1805:24, 1816:7
**six** [2] - 1683:2, 1730:10
**size** [4] - 1761:18, 1761:24, 1783:20, 1822:22
**skip** [1] - 1806:25
**sky** [1] - 1667:11
**skyscraper** [2] - 1732:5, 1732:10
**small** [3] - 1618:11, 1668:12, 1698:15
**smaller** [1] - 1619:10
**smile** [1] - 1703:11
**smoothly** [1] - 1662:21
**snuff** [1] - 1668:7
**so...** [1] - 1822:20
**social** [6] - 1676:2, 1679:24, 1680:6, 1680:7, 1695:7, 1696:11
**soft** [1] - 1703:10
**solicit** [1] - 1803:13
**soliciting** [1] - 1711:2
**someone** [15] - 1645:20, 1680:13, 1680:17, 1681:16, 1689:16, 1689:24, 1698:16, 1701:17, 1730:14, 1754:1, 1792:24, 1793:12, 1811:10, 1812:12, 1812:15
**sometime** [2] - 1691:8, 1766:23
**sometimes** [22] - 1624:11, 1629:22, 1633:20, 1633:21, 1648:5, 1648:8, 1655:2, 1657:22, 1658:20, 1661:2, 1662:25, 1666:10, 1669:25, 1675:4, 1712:15, 1712:16, 1725:7, 1725:10, 1743:5, 1765:18, 1782:4, 1782:19
**someway** [1] - 1779:10
**somewhat** [1] - 1690:12
**somewhere** [7] - 1679:4, 1687:9,

1705:22, 1752:18, 1788:22, 1789:6, 1813:25
**son** [1] - 1820:5
**Sorry** [1] - 1765:21
**sorry** [34] - 1626:14, 1628:21, 1630:14, 1642:4, 1644:11, 1652:13, 1653:2, 1658:4, 1665:13, 1674:11, 1689:12, 1702:1, 1726:18, 1727:23, 1728:5, 1729:16, 1730:17, 1734:18, 1735:2, 1736:3, 1737:1, 1737:24, 1738:21, 1740:2, 1740:21, 1743:12, 1743:19, 1743:20, 1744:19, 1746:20, 1749:10, 1751:18, 1754:16, 1783:11
**sort** [16] - 1650:12, 1679:24, 1682:9, 1696:19, 1697:16, 1710:2, 1726:24, 1736:11, 1748:20, 1765:16, 1770:11, 1772:15, 1783:20, 1786:24, 1811:11, 1814:11
**sorts** [4] - 1700:5, 1715:3, 1715:11, 1716:1
**sought** [1] - 1670:9
**sound** [4] - 1750:24, 1761:14, 1764:23, 1807:2
**sounds** [2] - 1750:7, 1751:22
**source** [3] - 1632:19, 1699:2
**sources** [1] - 1681:12
**south** [3] - 1714:9, 1719:24, 1719:25
**space** [14] - 1669:1, 1686:12, 1732:24, 1733:3, 1733:10, 1733:23, 1733:25, 1734:1, 1734:2, 1734:3, 1734:4, 1736:25, 1737:7, 1753:17
**speakers** [1] - 1662:24
**speaking** [5] - 1687:11, 1707:13, 1716:10, 1725:2, 1756:15
**speaks** [2] - 1734:13, 1734:19
**special** [3] - 1636:11, 1701:12, 1804:3
**specialized** [2] - 1618:20, 1618:21
**specific** [29] -

1622:19, 1653:17, 1658:2, 1675:24, 1850, 1680:14, 1680:18, 1687:3, 1687:18, 1689:11, 1692:17, 1697:18, 1698:7, 1698:16, 1700:20, 1701:20, 1706:19, 1708:10, 1708:14, 1712:22, 1715:3, 1750:25, 1774:21, 1793:14, 1797:6, 1798:17, 1799:21, 1805:25, 1808:2, 1808:13
**specifically** [17] - 1659:12, 1668:16, 1676:20, 1686:7, 1686:13, 1688:19, 1692:11, 1697:15, 1699:22, 1707:11, 1707:22, 1724:16, 1770:10, 1779:9, 1779:22, 1782:24, 1817:4
**specifics** [7] - 1696:22, 1698:10, 1700:16, 1700:18, 1701:9, 1702:9, 1703:24
**specified** [1] - 1627:22
**speculation** [3] - 1646:16, 1731:18, 1742:18
**speed** [1] - 1668:9
**spell** [3] - 1617:16, 1647:15, 1760:4
**spelled** [2] - 1760:7
**spend** [2] - 1786:15, 1787:9
**spending** [2] - 1654:9, 1746:22
**spent** [10] - 1624:17, 1654:20, 1669:9, 1706:23, 1769:17, 1787:4, 1787:8, 1787:13, 1787:14, 1804:8
**split** [1] - 1724:1
**spoken** [2] - 1674:14, 1718:6
**sponsor** [1] - 1806:25
**sponsorship** [1] - 1806:21
**sporadic** [2] - 1687:9, 1687:10
**sports** [3] - 1690:15, 1692:5, 1692:6
**spot** [1] - 1790:12
**spouse** [1] - 1771:6
**spouses** [1] - 1675:3
**SPRING** [3] - 1614:6, 1614:10, 1614:15
**square** [1] - 1721:7
**stack** [6] - 1783:17,

1783:21, 1783:23,
1784:20, 1789:19,
1789:25

**staff** [38] - 1634:1,
1650:4, 1658:12,
1658:17, 1658:18,
1658:23, 1662:19,
1662:24, 1664:13,
1664:16, 1665:3,
1665:7, 1665:9,
1665:10, 1665:11,
1665:16, 1665:17,
1665:18, 1665:20,
1670:10, 1670:22,
1671:2, 1673:3,
1673:13, 1673:15,
1677:16, 1677:21,
1704:11, 1705:12,
1712:18, 1718:12,
1718:15, 1718:21,
1718:22, 1723:25,
1770:2, 1770:4

**staffer** [1] - 1770:20

**stamp** [1] - 1628:9,
1644:6

**stand** [6] - 1639:3,
1699:17, 1760:1,
1775:24, 1776:2,
1780:2

**standard** [1] - 1741:8

**standing** [1] - 1780:4

**stands** [1] - 1783:9

**Staple** [3] - 1666:25,
1667:9, 1693:22

**Staples** [1] - 1736:22

**stars** [1] - 1720:20

**start** [3] - 1642:14,
1696:19, 1744:3

**started** [5] - 1619:9,
1655:21, 1686:25,
1766:24, 1815:8

**starting** [2] - 1811:16,
1811:18

**starts** [1] - 1683:16

**state** [8] - 1617:16,
1647:15, 1656:10,
1699:18, 1699:25,
1749:10, 1760:4,
1771:13

**statement** [6] -
1627:5, 1627:6,
1635:14, 1638:10,
1638:17, 1638:18

**statements** [3] -
1620:17, 1625:22,
1636:19

**STATES** [11] - 1613:1,
1613:7, 1613:21,
1614:4, 1614:13,
1825:5, 1825:11,
1825:13, 1825:17,
1825:20

**states** [8] - 1627:14,
1636:25, 1638:6,
1638:25, 1639:1,
1639:9

**static** [6] - 1671:6,
1671:25, 1721:7,
1721:9, 1721:12

**status** [2] - 1749:19,
1751:12

**stay** [5] - 1775:15,
1777:16, 1777:19,
1785:18, 1785:19

**stayed** [3] - 1785:20,
1788:9, 1788:10

**staying** [1] - 1777:13

**steakhouse** [1] -
1814:2

**steer** [1] - 1670:4

**STENOGRAPHICAL
LY** [1] - 1825:14

**step** [2] - 1677:1,
1710:9

**steps** [4] - 1621:21,
1621:22, 1624:10,
1810:4

**sticky** [1] - 1690:16

**still** [18] - 1634:18,
1634:19, 1675:23,
1715:14, 1740:25,
1758:3, 1769:16,
1782:24, 1797:24,
1801:14, 1809:14,
1810:14, 1814:8,
1817:12, 1818:4,
1818:6, 1818:7,
1818:10

**stood** [2] - 1700:9,
1783:11

**stopped** [1] - 1764:8

**strange** [4] - 1695:3,
1784:14, 1794:3,
1795:19

**Street** [1] - 1714:9

**STREET** [4] - 1613:22,
1614:6, 1614:10,
1614:15

**street** [1] - 1670:25

**streets** [1] - 1654:21

**stressful** [2] - 1798:6,
1798:9

**strike** [2] - 1688:5,
1701:3

**strong** [3] - 1669:3,
1669:5, 1711:19

**strongly** [2] - 1654:21,
1697:12

**struck** [1] - 1672:18

**structure** [1] - 1754:22

**struggling** [4] -
1809:22, 1814:8,
1818:5, 1818:6

**stuck** [1] - 1783:2

**Studios** [1] - 1767:22

**stuff** [3] - 1668:23,
1799:7, 1803:7

**style** [1] - 1723:11

**subject** [6] - 1623:5,
1623:12, 1635:19,
1635:21, 1641:14,
1776:13

**submit** [4] - 1712:20,
1712:21, 1796:14,
1796:23

**submitted** [1] - 1726:2

**submitting** [1] -
1690:2

**subsequent** [1] -
1771:18

**subsequently** [1] -
1796:5

**succeed** [5] - 1808:5,
1808:23, 1809:5,
1810:22, 1823:10

**suing** [1] - 1770:5

**SUITE** [5] - 1613:22,
1614:6, 1614:11,
1614:15, 1614:20

**suite** [2] - 1785:24,
1786:1

**summer** [6] - 1693:12,
1693:15, 1712:3,
1756:10, 1756:12,
1756:17

**Sunday** [2] - 1788:3,
1788:6

**Sunset** [1] - 1666:25

**superficially** [1] -
1702:14

**supervise** [1] -
1741:13

**supplemental** [1] -
1715:2

**support** [17] -
1694:16, 1702:6,
1703:19, 1703:21,
1703:22, 1704:3,
1704:9, 1708:17,
1756:21, 1757:9,
1779:19, 1812:8,
1814:22, 1815:2,
1817:16, 1817:23,
1823:18

**supported** [4] -
1697:23, 1708:13,
1814:19, 1814:20

**supporting** [3] -
1701:22, 1704:1,
1818:10

**supportive** [5] -
1702:10, 1778:23,
1779:1, 1815:3,
1815:10

**supposed** [22] -
1624:21, 1661:8,
1661:12, 1662:13,
1662:14, 1667:24,
1712:24, 1713:1,
1720:14, 1740:10,
1740:14, 1757:25,
1782:20, 1786:11,
1787:18, 1793:15,
1796:21, 1800:10,
1800:16, 1820:12

**supposed-to-be** [1] -
1787:18

**surface** [1] - 1705:6

**surfaces** [1] - 1690:15

**surprise** [5] - 1802:2,
1802:6, 1802:8,
1802:18, 1802:19

**surprising** [3] -
1688:15, 1698:13,
1701:15

**surrounding** [1] -
1824:2

**SUSAN** [1] - 1614:10

**sustained** [13] -
1646:17, 1729:24,
1735:22, 1738:12,
1742:10, 1745:20,
1746:6, 1746:12,
1746:16, 1747:10,
1748:1, 1748:5,
1753:2

**sway** [1] - 1704:13,
1758:19

**swimming** [1] -
1733:20

**switch** [4] - 1766:14,
1769:16, 1781:5,
1810:16

**switching** [2] -
1789:13, 1791:22

**sword** [1] - 1702:20

**SWORN** [3] - 1617:15,
1647:14, 1760:2

**system** [13] - 1620:7,
1620:14, 1620:18,
1625:21, 1627:9,
1632:12, 1632:25,
1737:21, 1737:24,
1737:25, 1738:1,
1738:4, 1759:6

---

# T

**table** [8] - 1678:23,
1679:1, 1679:3,
1679:8, 1745:3,
1815:23, 1816:11

**tables** [2] - 1744:25,
1745:4

**tactics** [1] - 1775:10

**takedown** [2] -
1721:6, 1721:12

**talks** [1] - 1707:7

**taxing** [1] - 1664:13

**TCD** [2] - 1639:1

**team** [1] - 1650:22

**Tech** [1] - 1700:7

**technical** [4] -
1677:18, 1677:23,
1698:9, 1734:7

**telephone** [1] - 1795:6

**telephones** [1] -
1728:1

**teller** [1] - 1644:6

**ten** [2] - 1699:9,
1699:12

**tenure** [2] - 1699:8,
1702:12

**term** [10] - 1653:17,
1659:2, 1663:11,
1689:15, 1764:12,
1770:13, 1770:14,
1781:3, 1781:14,
1808:7

**terminate** [1] -
1764:10

**terms** [14] - 1642:10,
1651:6, 1665:23,
1670:14, 1674:2,
1677:2, 1701:3,
1705:8, 1707:13,
1708:8, 1709:19,
1740:12, 1782:7,
1822:22

**terribly** [1] - 1698:3

**testified** [4] - 1651:7,
1674:17, 1705:17,
1768:13

**testify** [1] - 1675:16

**testifying** [1] - 1728:9

**testimony** [10] -
1660:10, 1662:22,
1675:18, 1682:17,
1712:17, 1727:2,
1727:18, 1732:6,
1738:19, 1743:9

**text** [5] - 1682:11,
1685:13, 1727:14,
1805:10, 1820:10

**texts** [1] - 1729:2

**TFAR** [10] - 1660:4,
1668:25, 1669:15,
1669:21, 1670:2,
1670:10, 1715:5,
1723:2, 1723:11,
1724:3

**THAT** [2] - 1825:12,
1825:15

**THE** [117] - 1614:4,
1614:4, 1614:9,
1614:13, 1614:18,
1617:6, 1617:10,
1617:16, 1617:20,
1644:25, 1645:2,
1645:4, 1646:17,
1647:3, 1647:7,
1647:10, 1647:15,
1647:17, 1647:20,
1652:12, 1652:13,
1652:14, 1652:15,
1665:6, 1665:8,
1665:9, 1665:11,
1665:13, 1715:24,
1716:25, 1717:4,
1717:8, 1726:11,
1727:19, 1728:14,
1728:20, 1728:22,
1729:24, 1730:16,
1730:17, 1731:19,
1731:20, 1732:7,
1732:8, 1732:11,
1733:5, 1733:6,
1734:17, 1734:18,
1734:21, 1734:25,

1735:7, 1735:11, 1735:22, 1736:2, 1736:3, 1736:15, 1737:13, 1737:16, 1738:12, 1738:20, 1738:21, 1739:24, 1740:1, 1740:7, 1742:10, 1742:19, 1742:20, 1743:1, 1743:11, 1743:12, 1743:15, 1743:23, 1745:20, 1746:6, 1746:12, 1746:16, 1747:10, 1748:1, 1748:5, 1748:15, 1748:16, 1748:24, 1748:25, 1749:9, 1749:10, 1751:17, 1751:18, 1753:2, 1753:8, 1753:9, 1753:15, 1753:20, 1753:23, 1754:25, 1755:7, 1755:9, 1759:18, 1759:21, 1759:23, 1760:3, 1760:6, 1760:9, 1823:3, 1824:9, 1825:10, 1825:11, 1825:13, 1825:14, 1825:15, 1825:16, 1825:17, 1825:19, 1825:20

**themselves** [2] - 1646:14, 1733:13

**theoretically** [1] - 1740:18

**theory** [1] - 1741:10

**therefore** [1] - 1733:17

**they've** [1] - 1704:19

**thick** [1] - 1784:6

**thin** [1] - 1702:15

**thinking** [3] - 1655:8, 1754:21, 1772:16

**thinks** [1] - 1703:14

**third** [4] - 1763:22, 1798:18, 1808:20, 1808:22

**THIS** [1] - 1825:18

**thoughts** [2] - 1687:25, 1810:21

**thousand** [3] - 1744:21, 1791:3, 1791:6

**thousands** [1] - 1699:11

**thread** [1] - 1706:1

**threaten** [3] - 1770:20, 1770:23, 1774:11

**three** [13] - 1633:14, 1637:16, 1643:7, 1677:15, 1704:16, 1714:6, 1716:24, 1723:2, 1773:9, 1800:25, 1805:20, 1806:15, 1816:14

**throat** [1] - 1732:14

**throughout** [1] - 1711:17

**THURSDAY** [2] - 1613:18, 1617:1

**time-consuming** [1] - 1655:3

**timely** [1] - 1620:22

**timing** [3] - 1651:6, 1747:20, 1756:4

**timing-wise** [1] - 1747:20

**tip** [1] - 1698:11

**TITLE** [1] - 1825:13

**TO** [1] - 1825:12

**today** [5] - 1637:11, 1660:10, 1682:17, 1805:24, 1810:12

**together** [16] - 1667:8, 1675:4, 1677:16, 1681:24, 1682:1, 1682:5, 1760:19, 1766:1, 1768:10, 1769:3, 1774:4, 1786:16, 1786:17, 1796:19, 1799:7, 1820:6

**tongue** [1] - 1698:11

**took** [11] - 1634:22, 1635:2, 1698:4, 1702:23, 1704:24, 1710:7, 1750:5, 1771:25, 1782:25, 1785:18, 1801:3

**top** [20] - 1628:7, 1628:23, 1631:18, 1633:9, 1637:22, 1637:23, 1640:7, 1643:12, 1644:1, 1660:17, 1673:25, 1685:1, 1693:25, 1713:20, 1714:1, 1714:7, 1778:4, 1804:15, 1805:15, 1806:15

**topic** [17] - 1680:11, 1716:11, 1771:20, 1773:16, 1773:19, 1773:21, 1775:13, 1775:18, 1778:17, 1784:25, 1813:5, 1813:16, 1814:21, 1814:23, 1817:12, 1819:13

**topics** [6] - 1769:16, 1775:16, 1781:5, 1789:13, 1791:22, 1812:25

**total** [1] - 1618:16

**touch** [1] - 1727:15

**tourism** [1] - 1697:21

**tourist** [1] - 1697:21

**tourists** [1] - 1667:3

**touristy** [1] - 1666:25

**toward** [2] - 1651:3, 1663:19

**town** [4] - 1769:2,

1781:16, 1781:22, 1782:1

**track** [5] - 1620:21, 1639:17, 1664:6, 1673:1, 1807:13

**tracked** [1] - 1620:17

**trade** [1] - 1736:25

**Trade** [2] - 1700:7, 1806:25

**traded** [1] - 1752:17

**traffic** [3] - 1667:8, 1731:6, 1747:17

**training** [1] - 1688:9

**TRANSCRIPT** [4] - 1613:15, 1825:14, 1825:16, 1825:18

**Transfer** [3] - 1660:3, 1669:16, 1715:5

**transfer** [3] - 1630:5, 1641:23, 1669:18

**transferred** [2] - 1642:15, 1642:19

**transition** [1] - 1745:14

**translator** [1] - 1768:8

**transmitted** [1] - 1644:15

**transparent** [2] - 1723:19, 1723:22

**travel** [1] - 1790:7

**traveled** [2] - 1768:19, 1786:20

**trees** [1] - 1670:25

**trend** [1] - 1674:2

**trial** [1] - 1643:2

**TRIAL** [2] - 1613:15, 1613:16

**tried** [10] - 1651:4, 1664:14, 1670:3, 1672:13, 1707:21, 1721:4, 1721:5, 1721:17, 1728:2

**triggers** [1] - 1732:1

**trip** [15] - 1781:22, 1782:15, 1782:25, 1786:4, 1786:8, 1786:11, 1786:12, 1786:20, 1787:18, 1787:23, 1788:24, 1789:3, 1789:5, 1789:11, 1815:17

**trips** [8] - 1781:7, 1782:7, 1782:8, 1785:3, 1788:20, 1799:7

**troubled** [1] - 1673:21

**truck** [1] - 1672:1

**true** [5] - 1662:7, 1744:11, 1751:14, 1752:21, 1811:10

**TRUE** [1] - 1825:13

**trust** [3] - 1723:4, 1724:7, 1759:2

**truthful** [1] - 1728:11

**try** [3] - 1706:21, 1727:14, 1741:7

**trying** [18] - 1636:20, 1640:4, 1650:8, 1655:11, 1666:23, 1675:3, 1675:5, 1708:8, 1712:22, 1727:13, 1727:14, 1730:11, 1740:22, 1745:23, 1747:23, 1788:2, 1795:6, 1809:22

**tumble** [1] - 1752:9

**turn** [10] - 1631:17, 1638:12, 1640:6, 1641:22, 1714:6, 1715:13, 1717:22, 1720:21, 1744:4, 1787:5

**turnaround** [1] - 1637:16

**turned** [2] - 1688:15, 1806:8

**turning** [1] - 1688:17

**turns** [1] - 1807:17

**Twan** [1] - 1743:20

**twice** [2] - 1652:4, 1747:18

**twins** [1] - 1675:11

**two** [15] - 1642:24, 1643:2, 1678:21, 1715:8, 1719:21, 1724:9, 1724:17, 1724:25, 1758:1, 1772:13, 1783:24, 1784:7, 1788:3, 1805:9, 1820:14

**twofold** [1] - 1655:17

**type** [9] - 1621:22, 1681:14, 1718:11, 1718:14, 1744:23, 1746:10, 1755:22, 1755:25, 1762:9

**types** [6] - 1657:18, 1658:3, 1664:6, 1687:11, 1714:19, 1790:8

**typically** [6] - 1678:6, 1687:12, 1712:10, 1713:15, 1716:20, 1819:23

**U**

**U.S** [1] - 1815:20

**UCLA** [2] - 1761:2, 1761:3

**ultimate** [2] - 1740:12, 1807:12

**ultimately** [15] - 1657:4, 1661:16, 1682:5, 1690:6, 1710:9, 1711:25, 1718:19, 1724:13, 1738:5, 1756:24, 1780:7, 1780:8, 1781:2, 1788:13,

1797:17

**um** [2] - 1721:11, 1850

**unanimously** [2] - 1723:21, 1725:25

**uncertain** [1] - 1705:7

**uncomfortable** [7] - 1776:13, 1793:24, 1793:25, 1794:8, 1795:1, 1795:15, 1801:14

**undated** [5] - 1652:5, 1652:10, 1689:19, 1703:2, 1725:17

**under** [7] - 1641:16, 1671:11, 1714:11, 1718:1, 1746:8, 1806:21, 1806:24

**underlying** [1] - 1741:2

**underneath** [2] - 1679:20, 1680:23

**understandably** [1] - 1773:25

**understood** [15] - 1664:9, 1667:5, 1667:9, 1671:24, 1672:6, 1677:11, 1678:4, 1764:19, 1767:17, 1768:16, 1785:16, 1800:12, 1807:5, 1809:7, 1809:9

**underwritten** [1] - 1620:11

**unease** [1] - 1707:24

**uneasy** [1] - 1708:6

**unhappiness** [1] - 1668:17

**unhealthy** [1] - 1720:10

**unilaterally** [1] - 1722:2

**unique** [2] - 1659:17, 1737:19

**UNITED** [12] - 1613:1, 1613:7, 1613:21, 1614:4, 1614:9, 1614:13, 1825:5, 1825:11, 1825:13, 1825:17, 1825:20

**Universal** [1] - 1767:22

**unless** [2] - 1627:23, 1675:7

**unpaid** [1] - 1641:3

**unpleasant** [3] - 1784:12, 1784:14, 1784:17

**unreasonable** [1] - 1720:19

**unrestricted** [1] - 1669:23

**unwelcome** [1] - 1671:19

**up** [108] - 1620:7, 1620:15, 1622:12,

1625:11, 1625:20,
1627:2, 1627:9,
1627:24, 1629:3,
1632:24, 1634:8,
1635:5, 1636:16,
1636:22, 1639:4,
1640:25, 1643:11,
1643:13, 1646:5,
1646:24, 1649:19,
1650:3, 1650:23,
1654:25, 1662:24,
1663:3, 1667:1,
1668:7, 1671:17,
1672:1, 1672:12,
1677:15, 1679:14,
1679:16, 1679:19,
1679:22, 1680:11,
1681:15, 1681:17,
1681:20, 1682:3,
1682:9, 1683:20,
1685:20, 1689:7,
1693:19, 1698:7,
1698:24, 1713:20,
1714:6, 1714:8,
1714:17, 1717:16,
1719:7, 1719:17,
1724:22, 1725:9,
1732:17, 1734:3,
1735:3, 1743:21,
1744:7, 1748:20,
1755:16, 1755:19,
1765:4, 1769:1,
1770:8, 1772:8,
1772:10, 1772:11,
1778:3, 1778:16,
1781:6, 1784:18,
1784:25, 1786:24,
1787:1, 1787:11,
1790:7, 1793:1,
1798:1, 1801:1,
1803:15, 1809:11,
1809:18, 1809:24,
1812:18, 1813:10,
1813:17, 1813:21,
1814:23, 1818:13,
1818:15, 1818:17,
1819:5, 1819:10,
1819:21, 1819:22,
1819:24, 1820:16,
1821:15, 1821:22,
1822:18, 1823:5,
1823:17
**update** [1] - 1663:18
**updated** [3] - 1663:19,
1663:23, 1671:11
**updates** [1] - 1805:5
**updating** [1] - 1687:21
**upwards** [1] - 1807:23
**urgency** [8] - 1637:14,
1637:15, 1673:6,
1673:9, 1673:12,
1673:18, 1681:13
**usage** [1] - 1659:10
**uses** [1] - 1624:14
**utilized** [1] - 1733:7

## V

**vacancy** [1] - 1733:14
**vague** [1] - 1751:16
**vagueness** [1] -
1728:16
**Valley** [5] - 1772:3,
1813:10, 1813:14,
1813:25, 1815:20
**valuable** [1] - 1721:11
**Vanderford** [2] -
1761:25, 1762:9
**variations** [1] -
1740:19
**vast** [1] - 1623:3
**Vegas** [22] - 1723:11,
1752:24, 1781:7,
1781:12, 1781:16,
1781:23, 1782:2,
1782:15, 1782:22,
1782:25, 1783:8,
1783:16, 1784:23,
1785:3, 1785:11,
1785:19, 1786:5,
1786:12, 1787:6,
1788:19, 1788:22,
1789:6
**Vegas-style** [1] -
1723:11
**vegetarian** [2] -
1696:9, 1696:11
**vehicle** [1] - 1667:4
**venire** [1] - 1702:15
**verify** [1] - 1724:18
**versus** [1] - 1811:25
**vice** [4] - 1677:9,
1677:22, 1677:25
**view** [5] - 1631:19,
1645:22, 1753:25,
1770:19, 1777:7
**View** [1] - 1618:12
**viewed** [1] - 1669:9
**villa** [1] - 1785:23
**Villaraigosa** [1] -
1671:11
**vinyl** [2] - 1672:1,
1721:12
**violation** [1] - 1657:19
**visibility** [1] - 1670:7
**vision** [2] - 1666:22,
1670:24
**visit** [1] - 1815:15
**voice** [3] - 1704:17,
1704:23, 1705:1
**voiced** [1] - 1700:13
**Volume** [1] - 1824:12
**VOLUME** [1] - 1613:16
**volunteer** [12] -
1649:23, 1652:15,
1654:23, 1656:20,
1662:10, 1669:13,
1675:14, 1688:9,
1694:3, 1709:24,
1710:7, 1711:3
**volunteered** [1] -

1655:13
**volunteering** [1] -
1689:10
**volunteers** [4] -
1664:10, 1664:12,
1664:16, 1677:7
**vomit** [2] - 1732:2,
1732:13
**vote** [19] - 1661:23,
1662:2, 1703:19,
1708:20, 1711:1,
1718:20, 1719:7,
1719:9, 1724:13,
1724:18, 1724:24,
1744:21, 1745:1,
1746:18, 1751:5,
1757:8, 1757:22,
1758:18, 1758:24
**voted** [3] - 1711:1,
1722:4, 1751:2
**votes** [1] - 1704:16
**voting** [2] - 1704:4,
1724:16
**vs** [2] - 1613:10,
1825:6

## W

**WAH** [3] - 1613:12,
1614:19, 1825:7
**wait** [2] - 1636:19,
1637:17
**waive** [1] - 1739:20
**walk** [1] - 1720:21
**walkability** [1] -
1733:18
**walked** [4] - 1695:25,
1707:22, 1708:4,
1734:25
**walking** [1] - 1709:25
**walks** [1] - 1655:14
**wall** [1] - 1679:3
**Walt** [2] - 1654:7,
1654:11
**WALTER** [1] - 1613:5
**wants** [1] - 1795:16
**war** [1] - 1811:15
**warrants** [1] - 1769:6
**water** [1] - 1682:13
**ways** [3] - 1659:15,
1711:11, 1715:11
**wealth** [1] - 1767:16
**week** [4] - 1690:18,
1720:19, 1782:8,
1805:6
**weekday** [1] - 1690:20
**weekend** [3] -
1690:19, 1782:8,
1787:25
**weekends** [2] -
1782:10, 1782:21
**weekly** [2] - 1661:7,
1663:23
**weeks** [3] - 1730:10,
1748:21, 1759:15

**Wei** [14] - 1766:20,
1767:2, 1767:5,
1767:12, 1768:10,
1769:9, 1769:13,
1769:18, 1772:7,
1778:20, 1783:1,
1785:4, 1785:16,
1787:5
**weight** [1] - 1688:25
**welcomed** [1] -
1815:11
**welfare** [2] - 1667:12,
1732:21
**well-aware** [1] -
1699:15
**well-known** [3] -
1670:16, 1670:25,
1699:3
**well-respected** [1] -
1771:13
**WEST** [1] - 1613:22
**West** [31] - 1618:2,
1618:3, 1618:8,
1619:4, 1619:18,
1619:21, 1619:24,
1620:4, 1623:10,
1623:13, 1625:15,
1626:10, 1628:9,
1630:19, 1632:25,
1633:11, 1633:17,
1634:18, 1634:21,
1634:25, 1635:17,
1641:7, 1641:12,
1641:18, 1642:22,
1643:3, 1643:19,
1644:2, 1644:7,
1669:21, 1729:15
**WESTERN** [1] -
1613:3
**whichever** [1] -
1810:17
**whole** [8] - 1619:10,
1630:2, 1657:7,
1715:9, 1745:6,
1752:9, 1752:15,
1803:8
**wife** [3] - 1650:25,
1775:15, 1819:18
**Wilcox** [2] - 1690:16,
1695:23
**Wild** [1] - 1669:21
**wildlife** [1] - 1720:11
**willingness** [1] -
1779:19
**WILSHIRE** [1] -
1614:20
**wings** [1] - 1696:10
**wire** [1] - 1630:5
**wired** [1] - 1630:4
**wise** [1] - 1747:20
**wish** [1] - 1668:21
**WITH** [2] - 1825:16,
1825:19
**withdraw** [3] - 1755:5,
1801:19, 1824:3
**withdrew** [1] -

1743:21
**witness** [5] - 1617:12,
1647:5, 1647:8,
1647:11, 1759:18,
1759:24
**WITNESS** [35] -
1617:15, 1647:14,
1647:17, 1652:13,
1652:15, 1665:8,
1665:11, 1715:24,
1728:22, 1730:17,
1731:20, 1732:8,
1732:11, 1733:6,
1734:18, 1734:21,
1735:11, 1736:3,
1737:16, 1738:21,
1740:1, 1740:7,
1742:20, 1743:1,
1743:12, 1743:15,
1743:23, 1748:16,
1748:25, 1749:10,
1751:18, 1753:9,
1753:23, 1760:2,
1760:6
**WITNESSES** [1] -
1615:4
**woman** [1] - 1793:17
**woman's** [2] -
1793:18, 1793:19
**women** [1] - 1773:14
**word** [3] - 1659:17,
1669:4, 1745:23
**words** [3] - 1745:25,
1753:11, 1757:17
**workforce** [1] - 1650:7
**world** [1] - 1644:5
**worried** [1] - 1746:21
**worth** [1] - 1752:13
**writing** [1] - 1803:7
**written** [1] - 1644:18
**Wu** [12] - 1793:20,
1794:5, 1796:15,
1796:23, 1797:1,
1797:18, 1798:13,
1798:18, 1800:21,
1801:1, 1801:7,
1802:4
**Wu's** [1] - 1799:24

## Y

**Yahoo** [2] - 1804:19,
1804:22
**Yan** [8] - 1640:15,
1640:16, 1640:18,
1641:2
**year** [9] - 1629:21,
1653:20, 1744:25,
1746:14, 1749:6,
1764:5, 1764:9,
1766:21, 1771:22
**Year's** [2] - 1785:6,
1785:12
**years** [27] - 1618:4,
1618:11, 1618:13,

1825 - 1850

1618:15, 1618:18, 1618:24, 1619:7, 1636:11, 1641:6, 1648:14, 1653:25, 1654:16, 1654:20, 1655:4, 1672:23, 1675:15, 1680:12, 1690:2, 1698:4, 1699:10, 1699:12, 1706:22, 1761:12, 1771:12, 1791:12, 1799:9, 1815:14

**yield** [1] - 1672:9
**youngest** [1] - 1760:23
**yourself** [4] - 1787:14, 1792:22, 1810:12, 1814:4
**youth** [2] - 1651:5, 1761:6
**Yuan** [2] - 1815:25, 1816:21
**YUAN** [1] - 1816:1

## Z

**zero** [4] - 1666:22, 1670:24, 1699:10, 1699:12
**Zheng** [7] - 1772:12, 1772:17, 1772:21, 1772:24, 1773:1, 1775:6, 1812:11
**zippers** [1] - 1790:7
**zoning** [1] - 1729:15
**zoom** [11] - 1628:19, 1628:20, 1630:14, 1631:18, 1635:6, 1637:22, 1637:23, 1685:7, 1793:2, 1805:9, 1806:15