1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS (Cal. Bar No. 242101)
   Assistant United States Attorney
3  Chief, Criminal Division
   CASSIE D. PALMER (Cal. Bar No. 268383)
4  SUSAN S. HAR (Cal. Bar No. 301924)
   BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
5  Assistant United States Attorneys
   Public Corruption & Civil Rights Section
6       1500 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-2091/0363/3289/3819
8       Facsimile: (213) 894-6436
        E-mail:   Mack.Jenkins@usdoj.gov
9                 Cassie.Palmer@usdoj.gov
                  Susan.Har@usdoj.gov
10                Brian.Faerstein@usdoj.gov

11 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
12
13                 UNITED STATES DISTRICT COURT

14            FOR THE CENTRAL DISTRICT OF CALIFORNIA

15 UNITED STATES OF AMERICA,            No. CR 20-326(A)-JFW-2

16            Plaintiff,                JOINT STATEMENT REGARDING FIRST
                                        REVISED PRETRIAL GOVERNMENT
17            v.                        AMENDED EXHIBIT STIPULATION;
                                        APPENDICES 1 AND 2; EXHIBITS A-D
18 RAYMOND SHE WAH CHAN,
     aka "She Wah Kwong,"              Trial Date: March 12, 2024
19                                      Trial Time: 8:30 A.M.
              Defendant.                Location:   Courtroom of the Hon.
20                                                  John F. Walter

21

22

23      Plaintiff United States of America, by and through its counsel

24 of record, the United States Attorney for the Central District of

25 California and Assistant United States Attorneys Mack E. Jenkins,

26 Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, and defendant

27 Raymond She Wah Chan, by and through his counsel of record, John

28 Hanusz and Michael G. Freedman, hereby submit the parties' Joint

1   Statement Regarding First Revised Pretrial Government Amended Exhibit

2   Stipulation.

3        In support of this Joint Statement, the parties are filing the

4   accompanying First Revised Pretrial Government Amended Exhibit

5   Stipulation (Appendix 1).  Pursuant to the Court's order, the parties

6   also are providing, as Appendix 2, a "Disputed Exhibits Only" version

7   of the First Revised Pretrial Government Amended Exhibit Stipulation.

8   As set forth herein, the First Revised Pretrial Government Amended

9   Exhibit Stipulation reflects numerous revisions since the filing of

10   the Pretrial Government Amended Exhibit Stipulation.  (Dkt. No.

11   1289.)  The government will not list all of the revisions here but

12   will note several that affect a number of exhibits.

13        Specifically, the government has revised its exhibit list to

14   mark as "Identification Only" all transcripts of English-language

15   recordings (i.e., exhibits with "-T" in the title), because the

16   government does not intend to admit the standalone transcripts

17   themselves as evidence.  This revision resolved defendant's

18   objections to those exhibits.  Although the defense has withdrawn its

19   objections to those transcript exhibits, the government is including

20   copies of them in the courtesy copy binders of the disputed exhibits

21   to be provided to the Court in order to aid the Court's evaluation of

22   the admissibility of the disputed recordings.

23        In addition, the government and defense have agreed that, with

24   the Court's approval, the transcript-synched versions of English-

25   language audio/video recordings (which contain scrolling text of the

26   transcripts) will be admitted into evidence and provided to the jury,

27   in lieu of the audio-only versions of the recordings.  In light of

28   this agreement, the government deleted from its exhibit list the

2

redundant line-items for the synched versions of those recordings (i.e., exhibits with "-S" in the title) and the related objections to those exhibits, which now are marked as "Intentionally Omitted."

The government has saved onto a thumb drive all disputed audio/video recording exhibits as well as several voluminous exhibits and will deliver the thumb drive with the courtesy copies of the disputed exhibits.  The binders will contain a coversheet only for these exhibits.

On February 8, 2024, counsel for defendant informed the government that they had "identified a number of issues with the translations," specifically with respect to Exhibits 387C, 387D, 848B, 848C, 848D, and 848E.  The government is reviewing defendant's extensive feedback regarding those exhibits and, if necessary, the parties will provide briefing regarding any translation disputes.  In the accompanying Exhibit Stipulation, the government has designated those exhibits as "Pending Translation Review."

In this Joint Statement, in an effort to streamline the Court's review of the disputed exhibits, the parties have grouped the pertinent exhibits (and addressed the relevant law) based on the five categories of evidentiary objections lodged by the defense: (1) MIL 1; (2) MIL 2; (3) 402/403; (4) Hearsay; and (5) Federal Rule of Evidence 1006.  With respect to each evidentiary category, the defense first sets forth its complete position with the relevant exhibits to which the position applies, which is then followed by the government's response to each defense position addressing all of the defense's objections within that evidentiary category.

This filing is based upon the positions of the parties and authorities set forth below; the Appendices and Exhibits attached

3

1   hereto, including Appendix 1 (First Revised Pretrial Government

2   Amended Exhibit Stipulation), Appendix 2 (First Revised Pretrial

3   Government Amended Exhibit Stipulation – Disputed Exhibits Only), and

4   Exhibits A-D as reflected in the Table of Exhibits (these exhibits

5   provide foundation for pertinent facts relating to certain aspects of

6   the government's response to defendant's hearsay objections); the

7   files and records in this case; and such further evidence and

8   argument as the Court may permit.

9        The parties respectfully request leave of the Court to submit a

10  further revised Joint Pretrial Government Amended Exhibit

11  Stipulation, including to reflect any additionally resolved

12  objections, as may be appropriate.

13  Dated: February 12, 2024        Respectfully submitted,

14                                  E. MARTIN ESTRADA
                                    United States Attorney
15

16                                      /s/
17                                  CASSIE D. PALMER
                                    MACK E. JENKINS
18                                  SUSAN S. HAR
                                    BRIAN R. FAERSTEIN
19                                  Assistant United States Attorneys

20                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA
21

22

23

24  Dated: February 12, 2024        /s/ per email authorization
                                    JOHN HANUSZ
25                                  MICHAEL G. FREEDMAN
                                    Attorneys for Defendant
26                                  RAYMOND SHE WAH CHAN

27

28

                                    4

1                          **TABLE OF CONTENTS**

2    DESCRIPTION                                                    PAGE

3    TABLE OF AUTHORITIES...............................................i

4    TABLE OF EXHIBITS................................................vi

5    I.    DEFENSE OBJECTIONS TO EXHIBITS RE DEFENSE MOTION IN LIMINE
6          NO. 1 TO EXCLUDE EVIDENCE CONCERNING THE DETAILS OF LAS
           VEGAS TRIPS................................................1

7          A.    Defense Position......................................1

8          B.    Government Response...................................1

9                1.    Response to Exhibit Objections Falling Within
                       Defense MIL No. 1...............................1
10
                 2.    Response to Exhibit Objections Outside the Scope
11                     of Defense MIL No. 1............................2

12   II.   DEFENSE OBJECTIONS RE DEFENSE MOTION IN LIMINE NO. 2 TO
           EXCLUDE TESTIMONY CONCERNING UNRELATED SCHEMES.............3
13
           A.    Defense Position......................................3
14
           B.    Government Response...................................4
15
                 1.    Response to Exhibit Objections Falling Within
16                     Defense MIL No. 2...............................4

17               2.    Response to Exhibit Objections Outside the Scope
                       of Defense MIL No. 2............................6
18
                       a.    Mechanics of Pay-to-Play Scheme.........7
19
                       b.    Financial Commitments Obtained from
20                           Developers under the Pay-to-Play Scheme....7

21                     c.    Financial Commitments to Rios Succession
                             Plan....................................8
22
                       d.    Methods of Concealment of CD-14 Enterprise.....9
23
                       e.    Businessperson A Bribery Scheme...........10
24
                       f.    LA Grand Hotel Bribery Scheme and SZNW/Huang
25                           Financial Benefits for Huizar Assistance....11

26                     g.    Luxe Hotel Bribery Scheme and Hazens
                             Financial Benefits for Huizar and
27                           Defendant's Assistance....................12

28   III. DEFENSE 402/403 OBJECTIONS...................................14

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

    A.   Defense Position........................................14

    B.   Government Response.....................................16

          1.   Response to Overall Rule 402/403 Argument..........17

          2.   Response to Individual Objections..................21

                a.   Mechanics of Pay-to-Play Scheme...............21

                b.   Financial Commitments to Rios Succession Plan.......................................23

                c.   LA Grand Hotel Bribery Scheme and SZNW/Huang Financial Benefits for Huizar Assistance.......24

                d.   Luxe Hotel Bribery Scheme and Hazens Financial Benefits for Huizar and Defendant's Assistance........................28

                e.   Defendant's Cultivation of Huizar's Corrupt Relationships with Chinese Developers.........32

                f.   Defendant's Schemes to Bribe Other Public Officials....................................34

IV.  DEFENSE HEARSAY OBJECTIONS.................................35

    A.   Defense Position........................................36

    B.   Government's Response...................................38

          1.   Overview..........................................38

          2.   Legal Standard....................................39

          3.   The Declarants Are Participants of the Same RICO Conspiracy/Scheme as Defendant.....................41

                a.   SZNW Trial: Huizar, Esparza, Zheng, SZNW......42

                b.   Defendant's First Trial: Chiang, Hazens, Goldman, Kim.................................44

           4.   The Statements Are in Furtherance of the Conspiracy........................................50

                a.   CD-14 Enterprise..............................51

                b.   SZNW Bribery Scheme...........................54

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                          PAGE

          c.   Hazens Bribery Scheme..........................57

          d.   Other Pay-to-Play Conduct......................58

     5.   Other Exhibits Are Admissible as Nonhearsay.........60

     6.   The Exhibits Are Relevant and Not Unduly
         Prejudicial.........................................61

V.   DEFENSE 1006/611(A) OBJECTIONS................................61

  A.   Defense Position.........................................61

  B.   Government's Response....................................63

     1.   Overview............................................63

     2.   Legal Standard......................................64

     3.   General Admissibility of the Government's Summary
         Exhibits............................................65

          a.   Voluminous Records............................65

          b.   Admissibility of Underlying Records...........66

          c.   Presentation of Select, Objective Data........69

          d.   Admissibility Under Rule 611(a)...............69

     4.   Specific Arguments Relating to the Timelines.......71

     5.   Specific Arguments Relating to the Calculations
         Summaries...........................................74

     6.   Specific Arguments Relating to Visual Depictions
         of Voluminous Data..................................76

     7.   The Summary Exhibits Are Relevant and Not
         Unfairly Prejudicial................................78

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

3

**Federal Cases**

4

<u>Amarel v. Connell</u>,
5
   102 F.3d 1494 (9th Cir. 1996) ............................... 65

6
<u>Bourjaily v. United States</u>,
   483 U.S. 171 (1987) ........................................ 40

7
<u>United States v. Nordby</u>
8
   225 F.3d 1053 (9th Cir. 2000) .......................... 61, 69

9
<u>Salinas v. United States</u>,
   522 U.S. 52 (1997) ......................................... 17

10
<u>Sendejas v. United States</u>,
11
   428 F.2d 1040 (9th Cir. 1970) .............................. 39

12
<u>United States  v. Leon-Reyes</u>,
   177 F.3d 816 (9th Cir. 1999) ............................... 65

13
<u>United States v. Ammar</u>,
14
   714 F.2d 238 (3d Cir. 1983) ................................ 39

15
<u>United States v. Anekwu</u>,
   695 F.3d 967-82 (9th Cir. 2012) ........................ 66, 67

16
<u>United States v. Appolon</u>,
17
   695 F.3d 44 (1st Cir. 2012) ................................ 64

18
<u>United States v. Aron</u>,
   463 F.2d 779 (9th Cir. 1972) ........................... 15, 17

19

20
<u>United States v. Baker</u>,
   10 F.3d 1374 (9th Cir. 1993) ......................... 61, 68-69

21
<u>United States v. Bertoli</u>,
22
   854 F. Supp. 975-1050, (D.N.J. 1994) ....................... 70

23
<u>United States v. Bishop</u>,
   264 F.3d 535 (5th Cir. 2001) ....................... 67, 68, 70

24
<u>United States v. Boesen</u>,
25
   541 F.3d 838 (8th Cir. 2008) ............................... 63

26
<u>United States v. Borders</u>,
   829 F.3d 558 (8th Cir. 2016) ............................... 70

27
<u>United States v. Brooklier</u>,
28
   685 F.2d 1208 (9th Cir. 1982) .............................. 17

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Carpenter,
   923 F.3d 1172 (9th Cir. 2019) ................................. 15

United States v. Casamento,
   887 F.2d 1141 (2d Cir. 1989) ......................... 63-64, 67

United States v. Castaneda,
   16 F.3d 1504 (9th Cir. 1994) ................................. 35

United States v. Castillo,
   615 F.2d 878 (9th Cir. 1980) ................................. 35

United States v. Eubanks,
   591 F.2d 513 (9th Cir. 1979) ................................. 36

United States v. Evans,
   910 F.2d 790 (11th Cir. 1990) ............................ 65, 70

United States v. Fielding,
   645 F.2d 719 (9th Cir. 1981) ................................. 35

United States v. Foster,
   711 F.2d 871 (9th Cir. 1983) ................................. 52

United States v. Gardner,
   611 F.2d 770 (9th Cir. 1980) ................................. 68

United States v. Goldberg,
   401 F.2d 644 (2d Cir. 1968) ................................. 71

United States v. Guyton,
   36 F.3d 655 (7th Cir. 1994) ................................. 39

United States v. Ho,
   984 F.3d 191-10 (2d Cir. 2020) ........................... passim

United States v. Holmes,
   Case No. 5:18-cr-00258-EJD-1, 2021 WL 2044470 (N.D. Cal. May 22,
   2021) ....................................................... 18

United States v. Irvin,
   682 F.3d 1254 (10th Cir. 2012) .............................. 61

United States v. Jennings,
   724 F.2d 436-442, (5th Cir. 1984) ........................... 74

United States v. Kazeem,
   No. 1:15-cr-00172-HZ-1:22-cv-00106-HZ, 2023 WL 5337200 (D. Or. Aug.
   18, 2023) ................................................... 18

1

**TABLE OF AUTHORITIES (CONTINUED)**

2 <u>DESCRIPTION</u>                                                                      <u>PAGE</u>

3 <u>United States v. Larson</u>,
      460 F.3d 1200 (9th Cir. 2006) ......................... 35, 38, 49
4
5 <u>United States v. Lemire</u>,
      720 F.2d 1327 (D.C. Cir. 1983) ............................... 66
6
7 <u>United States v. Lloyd</u>,
      807 F.3d 1128 (9th Cir. 2015) ........................... 17, 39

8 <u>United States v. Lothian</u>,
      976 F.2d 1257 (9th Cir. 1992) ................................ 38
9
10 <u>United States v. Mayans</u>,
      17 F.3d 1174 (9th Cir. 1994) ................................. 15
11
   <u>United States v. Milkiewicz</u>,
12      470 F.3d 390 (1st Cir. 2006)(a) .............................. 69

13 <u>United States v. Miranda-Uriarte</u>,
      649 F.2d 1345 (9th Cir. 1981) ....................... 18, 40, 41
14
15 <u>United States v. Montgomery</u>,
      384 F.3d 1050 (9th Cir. 2004) ................................ 77
16
   <u>United States v. Nazemian</u>,
17      948 F.2d 522 (9th Cir. 1991) ........................ 38, 39, 49

18 <u>United States v. Nelson</u>, No. 17CR-533-EMC-1,
      2023 WL 411355 (N.D. Cal. Jan. 25, 2023) .................... 15
19
20 <u>United States v. Newton</u>,
      326 F.3d 253 (1st Cir. 2003) ................................ 48
21
   <u>United States v. Osum</u>,
22      943 F.2d 1394 (5th Cir. 1991) ............................... 66

23 <u>United States v. Pallais</u>,
      921 F.2d 684 (7th Cir. 1990) ................................ 50
24
25 <u>United States v. Pinto</u>,
      850 F.2d 927 (2d Cir. 1988) ................................. 71

26 <u>United States v. Possick</u>,
      849 F.2d 332 (8th Cir. 1988) ........................ 64, 65, 70
27
28 <u>United States v. Rivera Calderon</u>,
      578 F.3d 78 (1st Cir. 2009) ................................. 15

   <u>United States v. Rizk</u>,
      660 F.3d 1125 (9th Cir. 2011) ........................... <u>passim</u>

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                      PAGE

United States v. Robinson,
    774 F.2d 261 (8th Cir. 1985) ................................. 77

United States v. Scales,
    594 F.2d 558-64 (6th Cir. 1979) ...................... 69, 75-76

United States v. Schmit,
    881 F.2d 608 (9th Cir. 1989) ................................. 49

United States v. Sheeran,
    699 F.2d 112 (3d Cir. 1983) .................................. 17

United States v. Spires,
    628 F.3d 1049 (8th Cir. 2011) ................................ 68

United States v. Stephens,
    779 F.2d 232 (5th Cir. 1985) ................................. 75

United States v. Thiam,
    934 F.3d 89-97 (2d Cir. 2019) ................................ 77

United States v. Tille,
    729 F.2d 615 (9th Cir. 1984) ............................. 39, 51

United States v. Williams,
    952 F.2d 1504 (6th Cir. 1991) ................................ 70

United States v. Wood,
    943 F.2d 1048 (9th Cir. 1991) ............................. 60-61

United States v. Yarbrough,
    852 F.2d 1522 (9th Cir. 1988) ............................ 35, 37

United States v. Zemek,
    634 F.2d 1159 (9th Cir. 1980) ................................ 37

**Federal Rules**

Fed. R. Crim. P. 801 ............................................ 35

Fed. R. Evid. 104 .............................................. 40

Fed. R. Evid. 401 .......................................... passim

Fed. R. Evid. 402 .......................................... passim

Fed. R. Evid. 403 .......................................... passim

Fed. R. Evid. 611 .......................................... passim

Fed. R. Evid. 801(d)(2)(E) ................................. passim

Fed. R. Evid. 803(6) ....................................... passim

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Fed. R. Evid. 902(11) ........................................... 52

Fed. R. Evid. 1006 ........................................... passim

**Secondary Sources**

United States Sentencing Commission, Guidelines Manual § 2B1.1 ... 18

31 Charles A. Wright & Victor J. Gold, Fed. Prac. & Proc. Evid.
§ 8044 (2d ed.) .................................................. 65

**TABLE OF EXHIBITS**

| Exhibit | Description | Page |
|---------|-------------|------|
| A | FBI 302 Report Re: Interview of George Chiang on March 24, 2020 | 59 |
| B | FBI 1023 Report Re: CHS Reporting on November 30, 2017 (with highlights) | 59 |
| C | Trial Ex. 593G: September 14, 2017 Text Message with Defendant and Jeremy Chan (with redactions) | 59 |
| D | Trial Ex. 755C-T: Transcript of Recorded Call with Defendant, Chiang, and Lincoln Lee on April 17, 2018 | 59 |

**I.   DEFENSE OBJECTIONS TO EXHIBITS RE DEFENSE MOTION <u>IN LIMINE</u> NO. 1 TO EXCLUDE EVIDENCE CONCERNING THE DETAILS OF LAS VEGAS TRIPS**

**A.   Defense Position**

**[Government Exhibits 84C; 186C-Z; 186E-Z; 186F-Z; 186H-Z-186K-Z; 200-204; 210; 228; 363C; 365H-365K; 370; 372A; 372B; 372D; 372E; 372H; 372I; 372M; 372N; 393-418; 420-423; 425-429; 921-923]**

The defense position relating to these Exhibits is contained in Motion <u>in Limine</u> No. 1 and the Reply.

**B.   Government Response**

Defendant's objections above are premised or purportedly premised on the grounds raised in his Motion <u>in Limine</u> No. 1 to Exclude Evidence Concerning the Details of Las Vegas Trips ("MIL No. 1").  MIL No. 1 raises relevance and Rule 403 challenges to evidence bearing on the <u>details</u> of Jose Huizar's trips to Las Vegas with Wei Huang ("Huang") and others.  (<u>See</u> Dkt. No. 1292.)

The government responds below to defendant's MIL No. 1 objections that pertain to (1) exhibits falling within the scope of MIL No. 1 (identified in the government's response column as "Opp'n to MIL No. 1" in the accompanying updated government exhibit list), and (2) exhibits falling outside the scope of MIL No. 1 (identified in the government's response column as "Outside scope of MIL No. 1").

**1.   Response to Exhibit Objections Falling Within Defense <u>MIL No. 1</u>**

The defense objects based on its arguments in MIL No. 1 to the following exhibits that pertain to details of the Las Vegas trips:

**Exhibits 186C-Z; 186E-Z; 186F-Z; 186H-Z; 186I-Z; 186J-Z; 186K-Z; 210; 363C; 365H; 365I; 365J; 365K; 370; 372A; 372B; 372D; 372E; 372H; 372I; 372M; 372N; 393-418; 420; 421; 921; 922; 923**

Besides the relevance/403 arguments raised in MIL No. 1, defendant provides no other specific bases for his objections to these exhibits.

In its opposition to MIL No. 1, the government explains the relevance of the Las Vegas trips evidence to defendant and the broader RICO conspiracy and how none of the dangers under Rule 403 substantially outweigh the high probative value of this evidence. (See Dkt. No. 1292 at 5-9.)  The analysis in the government's opposition, which the government incorporates herein by reference, applies directly to the exhibits listed above.

Accordingly, the government respectfully submits that the Court's ruling on MIL No. 1 should determine the admissibility with respect to relevance and Rule 403 for the exhibits described above.

> 2.  Response to Exhibit Objections Outside the Scope of Defense MIL No. 1

The defense also objects based on MIL No. 1 to the following exhibits that do not pertain to the details of the Las Vegas trips: **Exhibits 84C; 200; 201; 202; 203; 204; 228; 422; 423; 425; 426; 427; 428; 429.**  Only one of these exhibits (**Ex. 84C**) has anything to do with Las Vegas, but still does not pertain to the details of the Las Vegas trips.  Rather, **Exhibit 84C** is an excerpt from a covertly recorded meeting during which Businessperson A informed Huizar that defendant had been inquiring whether Businessperson A knew about Huizar and George Esparza's ("Esparza") trips to Las Vegas with Huang, apparently gauging the breadth of outsiders' knowledge of the corrupt relationship between Huizar and Huang.  Because MIL No. 1 does not seek to exclude any and all mention of Las Vegas -- to the contrary, defendant concedes that the trips themselves are relevant -

2

- defendant's MIL No. 1 objection to Exhibit 84C is misplaced and without merit.

The other exhibits listed above do not pertain to Las Vegas in any way. Rather, they relate to the other financial benefits Huizar and Esparza obtained as part of the RICO conspiracy. These exhibits include photos and videos (and corresponding metadata) of the cash bribes that Esparza obtained from Justin Kim ("Kim") on behalf of 940 Hill and thereafter held for Huizar (**Exs. 200, 201, 202, 203, 204**); evidence relating to Huizar's and Esparza's flights to Australia paid for by Huang, the Australian dollar cash bribes they obtained while there, and their conversion of the cash to U.S. dollars (**Exs. 422, 423, 425, 426, 427, 428**); the private jet manifest for Huizar's luxury trip to Northern California paid for by Huang (**Ex. 429**); and receipts and records relating to Businessperson A's financial benefits to Huizar for access to developers (**Ex. 228**). The defense provides no specific basis as to how this limited evidence is unfairly prejudicial or otherwise runs afoul of Rule 403.

Accordingly, the Court should overrule defendant's objections premised upon MIL No. 1 to the exhibits described above and overrule defendant's 402/403 objections to these exhibits as well.

**II.  DEFENSE OBJECTIONS RE DEFENSE MOTION IN LIMINE NO. 2 TO EXCLUDE TESTIMONY CONCERNING UNRELATED SCHEMES**

**A.  Defense Position**

[**Government Exhibits 1; 80C-81, 88-89D-Z; 112-113A; 115; 117-122; 124; 126-127; 130-133; 140-156; 160-162; 171-175; 180Z-185; 187-187B; 200-204; 210-213; 220-228; 327; 335; 381-383; 425-428; 560-571; 574; 576-577; 582; 613A-613B; 906; 908-912; 922-926**]

3

1    The defense position relating to these Exhibits is contained in

2    Motion in Limine No. 2 and the Reply.

3        **B.    Government Response**

4        Defendant's objections above are premised or purportedly

5    premised on the grounds raised in his Motion in Limine No. 2 to

6    Exclude Testimony Concerning Unrelated Schemes ("MIL No. 2").  MIL

7    No. 2 raises relevance and Rule 403 challenges to evidence regarding

8    the Mateo and 940 Hill/Lee bribery schemes.

9        The government responds below to defendant's MIL No. 2

10   objections that pertain to (1) exhibits falling within the scope of

11   MIL No. 2 (identified in the government's response column as "Opp'n

12   to MIL No. 2"), and (2) exhibits falling outside the scope of MIL No.

13   2 (identified in the government's response column as "Outside scope

14   of MIL No. 2").

15        1.    Response to Exhibit Objections Falling Within Defense
                MIL No. 2

16

17   The defense objects based on MIL No. 2 to the following exhibits

     that pertain, in whole or in part, to either the Mateo scheme or the

18   940 Hill/Lee scheme:

19
         **Exhibits 1; 88-Z; 89A-Z; 89B-Z; 89C-Z; 89D-Z; 124; 130;**
20
         **131; 132; 133; 141; 142; 143; 144; 145; 146; 147; 149; 150;**
21
         **151; 152; 153; 154; 155; 156; 160; 185; 187; 187A; 200;**
22
         **201; 202; 203; 204; 212; 212A; 213; 906; 908**[1]
23

24   Besides the relevance/403 arguments raised in MIL No. 2, the defense

     provides no other specific bases for its objections to these
25
     exhibits.
26

27   _____

28        [1] As explained below, **Exhibits 1**, **130**, and **906** have broader
     relevance than the Mateo and 940 Hill/Lee bribery schemes.

4

In its opposition to MIL No. 2, the government explains the import of defendant's integral role in the RICO conspiracy, the broader admissibility of CD-14-Enterprise-related evidence relating to that conspiracy, the relevance of the Mateo and 940 Hill/Lee bribery schemes to the objectives and means defendant employed in the conspiracy, and the lack of unfair prejudice.  (See Dkt. No. 1293 at 5-9.)  The analysis in the government's opposition, which the government also incorporates herein by reference, applies directly to the exhibits listed above.

Accordingly, with the limited exception of **Exhibits 1, 130,** and **906** (discussed immediately below), the government respectfully submits that the Court's ruling on MIL No. 2 should determine the admissibility with respect to relevance and Rule 403 for the balance of exhibits the government lists above.

With respect to **Exhibit 1** (compilation of photographs of relevant persons), the defense raises a partial relevance objection only to the photographs of Neils Cotter, Justin Kim, David Lee, and Chris Modrzjeweski.  With respect to **Exhibit 906** (summary chart reflecting "Huizar All Benefits Solicited or Received"), the defense raises a partial relevance objection only to the benefits pertaining to the Mateo and 940 Hill/Lee bribery schemes.  Should the Court grant MIL No. 2, both exhibits can be revised to remove information pertaining to the Mateo and 940 Hill/Lee schemes.

**Exhibit 130** is an email and attached spreadsheet from Huizar to Morris Goldman ("Goldman") regarding fundraising for the Political Action Committee ("PAC") established for Richelle Rios's ("Rios") campaign for Huizar's City Council seat (the "Rios PAC").  The spreadsheet reflects a commitment from Carmel Partners relating to

the Mateo project, but it also reflects commitments from other developers, including Greenland that defendant introduced to Huizar as another Chinese company from whom Huizar could solicit financial benefits.  Thus, this exhibit has broader relevance beyond the Mateo project and should be admitted as evidence of Greenland as a target of PAC contributions for the Rios campaign.

   2.   Response to Exhibit Objections Outside the Scope of Defense MIL No. 2

      The defense also objects based on MIL No. 2 to the following exhibits that do not pertain to either the Mateo or 940 Hill/Lee schemes:

   **Exhibits 80C; 81; 112; 113; 113A; 115; 117; 118; 119; 120; 121; 122; 126; 126A; 127; 140; 148; 161A; 161B; 161C; 162; 171; 172; 173; 174; 175; 180Z; 181; 182; 183Z; 184Z; 187B; 210; 211; 220; 221; 222; 223; 224; 225; 226; 227; 228; 327; 335; 381; 382; 383; 425; 426; 427; 428; 560-571; 574; 576; 577; 582; 613A; 613B; 909; 910; 911; 912; 922; 923; 924; 925; 926**

MIL No. 2 raised relevance/403 objections solely to evidence relating to the Mateo and 940 Hill/Lee bribery schemes.  The exhibits listed above have nothing to do with either scheme.  Because MIL No. 2 does not support defendant's objections to these exhibits, the Court should overrule defendant's "MIL No. 2" objections to these exhibits.

      Moreover, defendant fails to specify any other grounds to support his boilerplate "402; 403" objections, other than his vague contention that certain of these exhibits pertain to "schemes and machinations of other charged defendants (or uncharged individuals) that have nothing to do with Mr. Chan."  As explained below,

6

defendant is incorrect, as all of these exhibits are relevant to and probative of other aspects of the charged RICO conspiracy, and defendant's Rule 402/403 objections to these exhibits should be overruled as well.

            a.    *Mechanics of Pay-to-Play Scheme*
    **[Exhibits 81, 613A, 613B]**

    These excerpts of recorded calls involving co-conspirators to the RICO conspiracy reflect the mechanics of the pay-to-play scheme that was at the heart of the conspiracy in which defendant played an integral part.  Specifically, in **Exhibit 81,** Esparza and Ricky Zheng ("Zheng") discuss not helping a foreign developer (Shanghai Construction) that has not "come through with any other commitments to us."  In **Exhibits 613A** and **613B,** George Chiang ("Chiang") and Kim discuss showing Huizar and Esparza and "the other Chinese Developer[s], assuming Councilman Huizar is there, how much motivation he's going to have to push everything around for my project" (**Ex. 613A**) and emphasizing the need to not discuss "on the phone" various requests Huizar had been making of Chiang, who was then representing Hazens (with defendant as his shadow partner) in connection with the Luxe Hotel project (**Ex. 613B**).  These exhibits are all relevant and probative of the pay-to-play scheme underlying the charged RICO conspiracy.

            b.    *Financial Commitments Obtained from Developers*
                  *under the Pay-to-Play Scheme*
    **[Exhibits 113, 113A, 115, 117, 119, 120, 121, 122]**

    These exhibits consist of spreadsheets, notes, correspondence, a brochure, and other documents primarily maintained by Huizar and Esparza to track financial contributions and commitments from

developers that Huizar targeted as part of the pay-to-play scheme, including Hazens, SZNW, and other Chinese companies (Greenland, Oceanwide, City Century) with projects in CD-14 and whom defendant introduced to Huizar.  The exhibits reflect the tracking of commitments to (1) the "Huizar Debt Finance Plan" and officeholder account for replenishing Huizar's funds used for campaigning for his 2015 reelection (**Exs. 113, 113A, 115**); (2) Salesian High School where Rios worked as a fundraiser (**Exs. 115, 117, 118, 119, 121, 122**); and (3) homelessness initiatives (HHH and Measure H) and a related PAC (Community Support PAC) for which Huizar fundraised (**Exs. 120, 121**). Defendant was directly involved in these fundraising efforts targeting developers for Huizar, including to collect contributions after Huizar's reelection; in fact, several of the exhibits reflect "Ray" or "Ray Chan" as the point person for obtaining certain contributions (**Exs. 113, 115, 119**).  These exhibits are relevant to and probative of the financial benefits the conspirators sought to extract from developers and defendant's involvement in this core aspect of the pay-to-play scheme.

> *c.   Financial Commitments to Rios Succession Plan*
> **[Exhibits 126, 126A, 127, 140, 148, 161A, 161B, 161C, 162]**

Similar to the exhibits above, these exhibits consist of tracking spreadsheets and correspondence primarily maintained by Huizar and Esparza specifically related to obtaining financial commitments from developers with projects in CD-14 for the Rios PAC. The exhibits directly relate to the Rios succession plan to maintain the CD-14 Enterprise's power after Huizar termed out.  Specifically, the exhibits reflect the tracking of contributions to the Rios PAC, including targeting commitments from Greenland, Oceanwide, City

8

Century, Chiang (as representative for Hazens), and Carmel Partners, among others (**Exs. 126,[2] 126A, 127**).  The exhibits include text messages coordinating efforts to target developers and others for Rios PAC contributions (**Exs. 140, 148**) and excerpts of recorded calls between Huizar and Goldman (who helped set up the Rios PAC) regarding the establishment of the Rios PAC (**Exs. 161A, 161B, 161C, 162**). These exhibits are all relevant to and probative of the efforts to extract benefits from developers to maintain the power of the CD-14 Enterprise, a core objective of the conspiracy.

> d.   *Methods of Concealment of CD-14 Enterprise*
>
> **[Exhibits 80C, 171, 172, 173, 174, 175, 180-Z, 181, 182, 183-Z, 184-Z, 187B, 210, 211, 221, 222, 223, 224, 225, 382, 909, 910]**

These exhibits reflect the importance of and methods for concealing the CD-14 Enterprise's illicit activities -- another core objective of the RICO conspiracy.  The exhibits include conspirators' recorded calls and other communications regarding the FBI's investigation and the need to maintain secrecy and use discretion in their illicit activities, including:

- Esparza/Chiang call regarding "trying to save the ship" (**Ex. 80C**);

- Huizar/Esparza communications about limiting illicit conversations over the phone, concealing the fact of Huizar's knowledge about the FBI investigation, and protecting each other (**Exs. 171, 172, 187B**);

- Goldman's guidance to Huizar to use the "Confide app" on his phone because the "message disappears" (**Ex. 173**);

---

[2] **Exhibit 126** is the charged wire communication in Count Fifteen of the FSI.

- Esparza/Kim recorded calls about the FBI's investigative activities into "political corruption" (**Exs. 181, 182**); and

- Esparza's recorded call with a CD-14 associate about Esparza's need for a high-level official title to enhance his ability to evade detection from the FBI and "handl[e] all [Huizar's] other little 'tranzas' [crooked]" (**Ex. 382**).

The exhibits also include communications between Huizar and Esparza about the 940 Hill/Lee bribe money and Huizar's efforts through coded communications to obtain the cash from Esparza (**Exs. 174, 175**).  The exhibits further include evidence of Huizar's money laundering through his mother, brother, and wife as part of his efforts to conceal the sources of this cash (like Huang and Businessperson A), including recorded calls with his mother (**Exs. 180-Z, 183-Z, 184-Z**); bank records for his mother, brother, and wife reflecting the deposits and checks utilized to launder Huizar's cash bribes (**Exs. 221, 222, 223, 224, 225**); and summary charts reflecting summaries of the money laundering financial transactions (**Exs. 909, 910**).  The exhibits also include photographs of the over $100,000 in cash the FBI found concealed in a t-shirt at Huizar's home (**Ex. 210**) as well as red gift envelopes of cash that defendant provided Huizar, which the FBI found in a drawer in Huizar's bedroom (**Ex. 211**).  This evidence is all relevant to and probative of the importance of concealing the objectives, activities, and financial benefits of the CD-14 Enterprise and the methods for doing so.

> *e.   Businessperson A Bribery Scheme*
>
> **[Exhibits 226, 227, 228, 911, 912)]**

These exhibits pertain to the Businessperson A bribery scheme that is alleged as part of the overt acts of the RICO conspiracy,

10

including receipts and records relating to Businessperson A's financial benefits to Huizar (**Exs. 226, 227, 228**) and summary charts of those financial benefits (**Exs. 911, 912**).  These exhibits are relevant to the financial benefits Huizar extracted as part of the larger RICO conspiracy; namely, for referrals to developers over whom Huizar had leverage through his powerful public position as potential clients for Businessperson A.  The evidence is also relevant (and, at a minimum, inextricably intertwined with the charged conduct) because of defendant's own use of Businessperson A to funnel financial benefits to family members of public officials (Deron Williams, Joel Jacinto, Shawn Kuk) from whom defendant needed assistance with development projects after he left City employment.

> f.   *LA Grand Hotel Bribery Scheme and SZNW/Huang Financial Benefits for Huizar Assistance*

**[Exhibits 220, 327, 335, 381, 383, 425, 426, 427, 428, 922, 923, 924, 925, 926]**

Defendant's MIL No. 2 objections to these exhibits -- all of which appear in the "Shen Zhen New World (LA Grand Hotel Project)" section of the government's exhibit list and/or are described as relevant to the SZNW bribery scheme -- border on the frivolous.  The exhibits do not relate to Mateo or 940 Hill/Lee (or any possible "other scheme" for that matter), and all are relevant to and probative of the corrupt relationship between Huizar and Huang/SZNW facilitated by defendant and the stream of financial benefits Huang provided.

Several of the exhibits relate to Huizar's and CD-14's assistance to SZNW with a hotel union issue (**Ex. 327**) and a parking lot dispute relating to the LA Grand Hotel (**Ex. 335**).  These requests

11

for and acts of assistance were not only in consideration of Huang's financial benefits but also a means for Huang to test his early corrupt investment in Huizar for his ultimate ask for the redevelopment of the LA Grand Hotel.  Similarly, another exhibit the defense challenges pertains to Huizar's referral of a consultant to SZNW for the LA Grand Hotel redevelopment project (**Ex. 381**).  In addition, the exhibits include a recorded call between Esparza and Zheng where they discuss the "600,000" collateral-as-bribe that Huang provided Huizar to quietly settle the sexual harassment lawsuit that threatened Huizar's City Council seat (**Ex. 383**), as well as Huizar's financial records documenting his $570,000 loan enabled by Huang's collateral (**Ex. 220**).  The exhibits relate to the Australia trip and Australian dollar bribes Huang provided Huizar and Esparza as part of the LA Grand Hotel scheme (**Exs. 425, 426, 427, 428**).  Finally, the exhibits include timelines and other summary charts relevant to the corrupt relationship between Huizar/Esparza and Huang/SZNW and the financial benefits that Huang corruptly provided (**Exs. 922, 923, 924, 925, 926**).  These exhibits are all relevant to and probative of central issues relating to the LA Grand Hotel bribery scheme and the corrupt relationship with Huang/SZNW, which defendant facilitated as a core part of the RICO conspiracy.

> g.   *Luxe Hotel Bribery Scheme and Hazens Financial Benefits for Huizar and Defendant's Assistance*

**[Exhibits 112, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 574, 576, 577, 582]**

Similarly, defendant's MIL No. 2/relevance/403 objections to exhibits directly pertaining to the Luxe Hotel project and

12

defendant's corrupt relationship with Hazens and Huizar are frivolous.

These exhibits include documentation and correspondence relating to a sham real estate consulting services agreement through which Hazens funneled $66,000 to Ernie Camacho (a close associate of Huizar), purportedly for real estate reports actually prepared by Chiang behind the scenes (**Exs. 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 577**). The exhibits also include flight information for Huizar's family trip to China where Hazens Chairman Fuer Yuan ("Yuan") provided financial benefits to Huizar and his family (**Ex. 571**). The exhibits also include benefits from Hazens to Huizar in the form of concert tickets, as facilitated by Chiang and defendant as Chiang's secret business partner (**Exs. 574, 576**). The exhibits similarly include Lakers tickets that Chiang purchased for CD-14 Planning Director Shawn Kuk ("Kuk") at Esparza's direction in consideration of Kuk's assistance with planning matters relating to the Luxe Hotel project. (**Ex. 582**). And the exhibits include handwritten notes on a Huizar Executive Committee agenda stating, among other things, "Follow up w/ Hazen & Ray Chan" (**Ex. 112**).[3] This evidence is all relevant to and probative of the financial benefits provided by Hazens to Huizar and his family and associates as part of

---

[3] **Exhibit 112** also reflects a note to "Call Ifie [the Chairperson of Greenland] – meeting with her tomorrow," which is relevant to Huizar's relationship with Greenland that defendant facilitated, ultimately leading to Greenland providing financial benefits to Huizar. The notes further reflect a message regarding an email sent to an East West employee "for CM [Huizar] on 9/9/14," less than two weeks before Huizar obtained the $570,000 loan from East West Bank, using Huang's $600,000 collateral, to settle the sexual harassment lawsuit. In this way, these notes reflect multiple relevant aspects of Huizar's corrupt relationships facilitated by defendant within the same exhibit.

the Luxe Hotel bribery scheme and the corrupt relationship between Huizar and Hazens, facilitated by defendant, which all go to the core of the charged RICO conspiracy.  Moreover, Hazens' bribes to Huizar dovetail with the developer's bribes to defendant for his official acts on the Luxe Hotel project.

In sum, all of the exhibits outside the scope of MIL No. 2 are nonetheless relevant to and probative of various aspects of the RICO conspiracy in which defendant played an integral role.  Defendant provides no meaningful basis to exclude any of this evidence.  The Court should overrule all of defendant's MIL No. 2 and 402/403 objections to the exhibits described above.

## III. DEFENSE 402/403 OBJECTIONS

### A.   Defense Position

**[Government Exhibits 1; 22; 80A; 80B; 80C; 81; 84A; 84B; 84C; 86; 88-Z; 89A-Z; 89B-Z; 89C-Z; 89D-Z; 102; 112; 113; 113A; 115; 117-122; 124; 126; 126A; 127; 129-133; 140-156; 160-163; 171-175; 178; 180Z-182; 183Z; 184Z-185; 187-187B; 200-204; 210-213; 220-228; 322; 324; 325; 327; 332; 335; 343-346; 350; 351; 354-359; 363A-363F; 363H-363J; 365A-K; 366B; 367-371C; 372A-N; 373A-375; 380-383; 386; 387A-Z-387D-Z; 393-418; 420-423; 425-429; 440-467; 532-536; 538; 539; 543; 556; 557; 560-571; 574; 576; 577; 582; 595; 596A-596W; 597A-597R; 598A-598F; 598H; 599; 601A-601C; 602; 603A-603D; 610; 611A-611B; 613A-614; 616; 619; 620A; 620B; 708-709; 712; 731; 740; 752; 756-758; 906; 908-912; 921-927; 931-932A; 940-942B]**

The defense objects to the above-referenced exhibits on the grounds that they are inadmissible under Federal Rules of Evidence 402 and/or 403.  Raymond Chan is the sole defendant in this trial. Regardless, the government seeks to introduce a host of irrelevant

14

evidence regarding defendants not on trial.  This irrelevant evidence includes the schemes and machinations of other charged defendants (or uncharged individuals) that have nothing to do with Mr. Chan (see, e.g., Govt. Exs. 1, 173-175, 180-184, 200-204; 210-213; 220-228; 372A-N; 393-418; 420-423; 425-429), as well as other city development projects of which Mr. Chan had zero involvement or knowledge, such as the 940 Hill project and the Mateo project (see, e.g., Govt. Exs. 1, 129-133; 140-156).  The government seeks to introduce this evidence to convince the jury to convict Defendant on account of the conduct of other individuals.  This evidence is irrelevant and should be excluded as a result.  Although the law allows one co-conspirator to be held liable for the acts of other co-conspirators, it does so only where the government can show that the co-conspirator knowingly took part in the conspiracy.  United States v. Aron, 463 F.2d 779, 780 (9th Cir. 1972) ("The government must prove knowledge of the conspiracy," even if it doesn't need to prove that a conspirator knew all of the details of the conspiracy).  Moreover, even if the government could prove that Defendant did have knowledge of the actions of his purported co-conspirators – and it cannot – "knowledge of a conspiracy's overall objectives does not make [a] defendant accountable for all of the coconspirators' acts furthering those objectives."  United States v. Lloyd, 807, F.3d 1128, 1143 (9th Cir. 2015).

Moreover, the probative value of that evidence would be substantially outweighed by the danger of unfair prejudice.  The law is clear: the Court must engage in the required balancing of the probative nature of the proffered evidence and any unfair prejudice resulting from its admission, even where broad conspiracies are

charged.  <u>United States v. Carpenter</u>, 923 F.3d 1172, 1182 (9th Cir. 2019) (Rule 403 analysis required in conspiracy case); <u>United States v. Mayans</u>, 17 F.3d 1174, 1183 (9th Cir. 1994) (same); <u>United States v. Rivera Calderon</u>, 578 F.3d 78, 94 (1st Cir. 2009) (same); <u>United States v. Nelson</u>, No. 17CR-533-EMC-1, 2023 WL 411355, at *3 (N.D. Cal. Jan. 25, 2023) (evidence concerning unrelated overt act excluded under Rule 403).  In other words, there is a significant danger that after hearing about unrelated acts committed by other individuals, the jury will convict Mr. Chan on this basis.

**B.  Government Response**

Defendant's Rule 402 and 403 objections significantly overlap with his objections premised (or purportedly premised) on MIL Nos. 1 and 2, which themselves are solely based upon Rule 402/403.  In Sections I(B) and II(B) <u>supra</u>, the government has addressed the relevance and probative value of any exhibits to which defendant objected on <u>both</u> Rules 402/403 grounds <u>and</u> MIL No. 1 and/or MIL No. 2 grounds.  It will not repeat those arguments here.  Instead, the government's following responses relate to exhibits with Rule 402/403 objections <u>only</u>, as follows:  **Exhibits 22; 80A; 80B; 84A; 84B; 86; 102; 129, 163; 178; 322; 324; 325; 332; 343; 344; 345; 346; 350; 351; 354; 355; 356; 357; 358; 359; 363A; 363B; 363D; 363E; 363F; 363H;363I; 363J; 365A; 365B; 365C; 365D; 365E; 365F; 365G; 366B; 367; 368; 369; 371A; 371B; 371C; 372C; 372F; 372G; 372J; 372K; 372L; 373A; 373B; 373C; 374; 375; 380; 386; 387A-Z; 387B-Z; 387C-Z; 387D-Z; 440-467; 532; 533; 534; 535; 536; 538; 539; 543; 556; 557; 595; 596A-596W; 597A-597R; 598A; 598B; 598C; 598D; 598E; 598F; 598H; 599; 601A; 601B; 601C; 602; 603A; 603B; 603C; 603D; 610; 611A; 611B; 614; 616;**

1   **619; 620A; 620B; 708; 709; 712; 731; 740; 752; 756; 757; 758; 927;**

2   **930; 931; 932; 932A; 940; 940A; 940B; 941; 942; 942A; 942B; 943.**

3      Given that these remaining exhibits with Rule 402/403 objections

4   fall into similar general categories of relevance, the government

5   again responds substantively to the objections by describing the

6   relevance and probative value of the challenged exhibits in topical

7   groupings, which account for all of defendant's objections listed

8   above.

9              1.    Response to Overall Rule 402/403 Argument

10      The overarching principle that appears to guide virtually all of

11   defendant's exhibit objections is that if he was not a participant on

12   an email, text chain, surreptitious recording, or other document, the

13   exhibit is not relevant to him, perhaps most incredibly, even when

14   the exhibits specifically reference him.  Indeed, defendant contends

15   that because "Chan is the sole defendant in this trial" and certain

16   evidence relates to "defendants not on trial," such evidence is

17   irrelevant.  This contention is legally and factually without merit.

18      Defendant was an integral participant in the hub of the charged

19   RICO conspiracy.  Evidence relating to the objectives of the

20   conspiracy and the pattern of racketeering activity underlying the

21   conspiratorial agreement that defendant joined is necessarily

22   relevant to the government's proof on the RICO count.  It is black-

23   letter conspiracy law that "[t]he partners in the criminal plan must

24   agree to pursue the same criminal objective and may divide up the

25   work, yet each is responsible for the acts of each other."  <u>Salinas</u>

26   <u>v. United States</u>, 522 U.S. 52, 63-64 (1997); <u>see also</u> <u>United States</u>

27   <u>v. Brooklier</u>, 685 F.2d 1208, 1222 (9th Cir. 1982) ("The purpose of

28   the RICO statute is to allow a single prosecution of persons who

                                        17

1    engage in a series of criminal acts for an enterprise, even if

2    different defendants perform different tasks or participate in

3    separate acts of racketeering.").

4         Defendant concedes as much, recognizing that "the law allows one

5    co-conspirator to be held liable for the acts of other co-

6    conspirators" where "the co-conspirator knowingly took part in the

7    conspiracy."  (Def. 402/403 Objections (citing United States v. Aron,

8    463 F.2d 779, 780 (9th Cir. 1972)).)  Consistent with these core

9    principles of conspiracy law, "[i]t is well established that acts in

10   furtherance of a conspiracy, committed by co-conspirators not on

11   trial, are admissible against a defendant even though that defendant

12   did not participate in those particular acts."  United States v.

13   Sheeran, 699 F.2d 112, 118 (3d Cir. 1983).

14        Defendant cites United States v. Lloyd, 807 F.3d 1128, 1143 (9th

15   Cir. 2015), for the proposition that "knowledge of a conspiracy's

16   overall objectives does not make [a] defendant accountable for all of

17   the coconspirators' acts furthering those objectives."  However, this

18   proposition from Lloyd (and the line of authority on which it relies)

19   arose in the context of calculating a defendant's intended losses at

20   sentencing under the standard in Section 2B1.1 of the Guidelines, not

21   the admissibility of evidence relating to a conspiracy, much less a

22   RICO conspiracy.[4]  The determination of relevancy for purposes of

23   admission of evidence at trial is a wholly separate analysis, and

24   "the Federal Rules of Evidence set a low bar for relevance."  United

25   States v. Holmes, Case No. 5:18-cr-00258-EJD-1, 2021 WL 2044470, at

26

27        [4] Only one other court appears to have relied on Lloyd for this
     proposition, also in the context of calculating the Guidelines range
28   at sentencing.  See United States v. Kazeem, No. 1:15-cr-00172-HZ-1,
     1:22-cv-00106-HZ, 2023 WL 5337200, at *9 (D. Or. Aug. 18, 2023).

1  *7 (N.D. Cal. May 22, 2021); <u>see also</u> <u>United States v. Miranda-</u>
2  <u>Uriarte</u>, 649 F.2d 1345, 1353 (9th Cir. 1981) ("The standard of
3  relevancy [under Rule 401] is not strict."). So long as evidence
4  "has any tendency to make a fact more or less probable than it would
5  be without the evidence" and "the fact is of consequence in
6  determining the action," the evidence is presumptively admissible.
7  Fed. R. Evid. 401, 402.

8      Moreover, what defendant also ignores is that his name often did
9  not appear in the documents he challenges <u>by his own design</u>. Early
10 on in the RICO conspiracy, defendant established himself as the
11 indispensable go-between for Huizar and Huang/SZNW, Yuan/Hazens, and
12 other foreign developers, but he purposefully limited or disguised
13 his involvement in certain activities or communications to conceal
14 his corrupt role while he was a public official. Defendant similarly
15 established himself as a shadow consultant behind Chiang's management
16 of Synergy, so that defendant could pull the strings on Chiang's --
17 and Huizar's -- corrupt relationships with developers from behind the
18 scenes.

19     Defendant's rote objections to the relevance of two emails that
20 do not expressly bear his name but are nevertheless highly relevant
21 to his role aptly illustrates this point. Defendant does not object
22 to **Exhibit 537**, in which he edited a draft email regarding a Luxe
23 Hotel TFAR appraisal issue that Chiang prepared to send to Huizar
24 (for Huizar to send to the Director of the Department of City
25 Planning (the "DCP")). At the time, defendant was the General
26 Manager of the Los Angeles Department of Building and Safety
27 ("LADBS") and had no reason to be revising an email regarding a TFAR
28 appraisal issue on behalf of Hazens, except as the shadow consultant

for Chiang/Synergy.  By contrast, defendant <u>does</u> object to the relevance of **Exhibit 538**, in which Chiang sends <u>defendant's edited version</u> of the draft email to Huizar without copying defendant to conceal defendant's involvement in consulting for Hazens, and defendant <u>does</u> object to **Exhibit 539**, in which Huizar ultimately sends the email to the DCP Director.  **Exhibits 538** and **539** pertain to the precise issue as **Exhibit 537**, yet defendant objects to the relevance of two but not the other simply because his name does not appear in the former.  But the fact that defendant's name does not appear on these exhibits does not make them irrelevant to him (they show what happened to the document he edited) and the concealment of his involvement is highly probative of his and Chiang's efforts to hide defendant's corrupt role in the scheme while he was a public official.  The bulk of defendant's Rule 402/403 objections proceed on the same indiscriminate, misguided basis and disregard the numerous grounds for relevance of the government's exhibits.

As for defendant's blanket assertion of Rule 403 to hundreds of exhibits he challenges, the government does not dispute that Rule 403 can be raised "even where broad conspiracies are charged."  However, defendant contends without any specificity that there is a "significant danger" the jury will convict defendant "after hearing about unrelated acts committed by other individuals."  Other than his MIL No. 2 to exclude evidence of the Mateo and 940 Hill schemes (which also asserts unfounded 402/403 objections to the government's evidence), defendant points to no specific exhibits whose supposed danger of unfair prejudice substantially outweighs their probative

1   value.[5]  As previously explained, these exhibits do not concern

2   "unrelated acts" to defendant but rather are probative of the pattern

3   of racketeering activity underlying the charged RICO conspiracy of

4   which defendant was a pivotal participant.  In any event, the

5   government expects that the Court's instructions on the law, both

6   during trial and at the close of evidence, will ensure the jury does

7   not convict defendant on any improper bases.

8          2.   Response to Individual Objections

9       Defendant's remaining 402/403 objections (i.e., those not

10  overlapping with MIL No. 1 or MIL No. 2 objections) should be

11  overruled because the proffered exhibits are relevant and probative

12  of numerous facts of consequence in determining this case for the

13  following reasons.

14          a.   Mechanics of Pay-to-Play Scheme

15      **[Exhibits 22, 80A, 80B, 84B, 86, 363H, 611B]**

16      These exhibits largely consist of recorded calls or meetings

17  involving participants in the RICO conspiracy revealing, from an

18  inside perspective, the mechanics of the pay-to-play scheme.

19      Specifically, **Exhibit 80A** is a recorded call between Esparza and

20  Chiang in which Esparza explains to Chiang, "you bank off also on

21  Ray, and Jose's office . . . for your Chinese clients, right?  For

22  example, Entitlements, PLUM, so we gotta use that use that [sic]

23  right?  And then we gotta keep making his motherfucking, him [Huizar]

24  happy . . . ."  **Exhibit 80B** is another excerpt from the same call in

25  which Esparza explains, "The chairman is like all I gotta do is

26  dangle this little piece of fruit in front of [Huizar] and he'll

27  _____

28          [5] Notably, defendant does not assert any other potential ground
    for objection under Rule 403 besides the danger of unfair prejudice.

                                    21

1    come." In a separate recorded call between Esparza and Chiang

2    (**Exhibit 611B**), Esparza explains that Huizar's "approach is that he's

3    going to um strong arm everyone. So for example, we're open up a

4    committee, a PAC right? . . . So his thing is Joseph [Lin of City

5    Century], okay you want help? You know, whatever help, we're not

6    even giving help, I want 50 grand to this committee . . . To the PAC.

7    Hazens, Oceanwide, this is what I want right now . . . So his idea in

8    his mind is that okay, people are going to support because they don't

9    want people to fuck with his projects you know." On a related point,

10   **Exhibit 363H** reflects an Esparza phone note in which he outlines

11   reasons why he needs a high-level official title from Huizar,

12   including "I'm becoming the face to establish the relationship."

13       The mechanics exhibits also include excerpts from two recorded

14   meetings between Huizar and Businessperson A in which they discuss

15   various aspects of the pay-to-play scheme, their corrupt

16   relationship, and Huizar's goal to maintain power through Rios. In

17   **Exhibit 84B,** Huizar explains that defendant was "tak[ing] all the

18   credit" for the Hazens Luxe Hotel project and other Chinese company

19   projects "[b]ecause I didn't know the Chinese so he introduced and

20   take all the credit for, like I would help and he goes back to them

21   and tells them he did right?"[6] And in **Exhibit 86,** Huizar discusses

22   Chiang's introduction of Kevin Chen to Huizar (in coordination with

23   defendant) in connection with the Arts District Center project (on

24   which defendant consulted and sought to steer bribes to Huizar's

25

26       [6] **Exhibit 84B** also is relevant to and probative of the
     importance of concealment and avoiding law enforcement detection, as
27   Huizar advises Businessperson A that "at least we know that we have
     to be careful with our communication. Just like you have been doing
28   for us." Defendant's 402/403 objections to this exhibit should be
     overruled for this reason as well.

Planning Director), Businessperson A's cabinet business and how
Huizar could steer referrals to him, and Businessperson A's support
for Rios's City Council campaign.

Finally, the exhibits include Huizar's oaths of office as City
Councilmember for CD-14, the position on which the success of the
entire RICO conspiracy hinged and for which defendant aided and
abetted Huizar in abusing his official duties and depriving the
public of the intangible right to Huizar's honest services (**Ex. 22**).[7]

All of these exhibits are relevant to and probative of the inner
workings of the pay-to-play scheme at the heart of the RICO
conspiracy of which defendant was an integral participant.

       *b.    Financial Commitments to Rios Succession Plan*

**[Exhibits 84A, 129, 163]**

These exhibits pertain to the Rios succession plan to maintain
the power of the CD-14 Enterprise after Huizar termed out of his City
Council seat as well as to steer developer financial commitments to
Rios's campaign.  **Exhibit 84A** is an excerpt of a recorded meeting
between Huizar and Businessperson A, in which Huizar explains, "my
plan is to get Richelle elected and then go for Mayor."  **Exhibit 129**
is a Councilmember brief prepared by CD-14 Planning Director Kuk for
the April 9, 2018 "Dinner w/ Ray Chan and Associates Re: Richelle
Meet & Greet with Chinese Development Groups," which "Ray Chan has
organized . . . as a meet & greet opportunity for Richelle" with the
Chinese development companies that defendant introduced to Huizar and

---

[7] Consistent with his approach to the other Rule 402/403
objections, defendant does not object to the relevance of his own
oaths of office but does so with respect to his key co-conspirator
for whom he is charged in the same RICO conspiracy and numerous
counts of honest services wire fraud.

in some cases (Hazen, Oceanwide, Kevin Chen) represented with Chiang. **Exhibit 163** is a video recording from the actual dinner. These exhibits are relevant to the conspiracy maintaining political power: in addition to Huizar's revelation of his plans for increasing his power (*i.e.*, running for Mayor while installing Rios as his City Council successor), defendant arranged the dinner for Chinese developers to meet Rios and thereby facilitate their financial support to her campaign. This evidence is relevant to and probative of defendant's critical role in helping Huizar obtain financial benefits from developers and maintaining the power of the CD-14 Enterprise.[8]

> ### c.   *LA Grand Hotel Bribery Scheme and SZNW/Huang Financial Benefits for Huizar Assistance*

**[Exhibits 322, 324, 325, 332, 344, 345, 346, 350, 351, 354, 355, 356, 357, 358, 359, 363A, 363D, 363E, 363F, 363I, 363J, 365A, 365B, 365C, 365D, 365E, 365F, 365G, 366B, 367, 367A, 368, 369, 371A, 371B, 3717C, 372C, 372F, 372G, 372J, 372K, 372L, 373A, 373B, 373C, 374, 375, 386, 387A, 387B, 387C, 387D, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 927]**

Defendant objects on Rule 402/403 grounds to at least 80 exhibits pertaining to the LA Grand Hotel bribery scheme (not including the 14 other SZNW-related exhibits analyzed above to which he also lodged objections under MIL Nos. 1 and 2). The exhibits are

---

[8] **Exhibits 129** and **163** also are key evidence of defendant's integral role in serving as the go-between for Chinese development companies and Huizar, who solicited and obtained financial benefits and commitments from these companies with projects in CD-14. Defendant's relevance/403 objections to these exhibits should be overruled for this reason as well.

relevant to numerous aspects of Huizar's corrupt relationship with
Huang and SZNW that defendant facilitated and fostered for many
years; the financial benefits Huizar obtained from Huang/SZNW
including through defendant's aiding and abetting; and the tasks and
activities that Huizar, Esparza, and CD-14 undertook for Huang/SZNW's
benefit relating to the LA Grand Hotel redevelopment project.
Huang's requests for the latter tasks and activities were made not
only in consideration of the financial benefits Huang provided Huizar
and Esparza but also in furtherance of Huang testing his corrupt
investment in Huizar for the ultimate goal of obtaining entitlements
for the redevelopment of the LA Grand Hotel.

With respect to the financial benefits provided by Huang/SZNW to
Huizar and Esparza, the exhibits include Esparza phone notes
regarding the transfer of the $600,000 in collateral from Huang to
facilitate Huizar's settlement of the Godoy lawsuit (**Ex. 363A[9]**),  the
"first" China trip to be planned for Huizar's family with "Shenzhen
government to pay for it" (also noting a "Second trip – everyone –
all companies") (**Ex. 363D**), and defendant asking various officials,
developers, and consultants about whether "they knew about CM
[Huizar] settlement," consistent with defendant trying to find out
how widespread knowledge was about Huang's involvement with Huizar's
settlement (**Ex. 363J**); an excerpt from a recorded call between Chiang
and Kuk, in which Chiang explains that "Jose still have to give Ray
the respect, because . . . Ray really, really helped out Jose on the

---

[9] **Exhibit 363A** also includes a note regarding "Hazen – ticket
agency that can get good tickets for kate perry concert tomorrow 4
tickets."  Thus, this exhibit also is relevant to and probative of
the financial benefits that Huizar obtained from Hazens as
facilitated through defendant (on the inside) and Chiang (on the
outside) working with Esparza.

Francine shit" and "without Ray" Huizar "would have just resigned"
(**Ex. 386**); translated excerpts from a recorded meeting between
Businessperson A and Zheng, in which Zheng explains various inside
aspects of defendant devising the collateral/Godoy settlement money
arrangement, as it was defendant "who figured out how it should be
handled, at Huang Wei's house" (**Exs. 387A, 387B, 387C, 387D**);
documentation, correspondence, financial and loan records, and other
materials relating to the funding of the Godoy settlement through use
of the $600,000 collateral bribe provide by Huang (**Exs. 440, 441,
442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452[10], 453, 454,
455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467**); and
a summary chart reflecting the complex flow of funds for the Godoy
settlement (**Ex. 927**).

With respect to the tasks and activities that Huizar and CD-14
undertook for Huang/SZNW's benefit, the exhibits include emails
between Esparza and SZNW employee Harris Chan regarding Huizar's
assistance with a visa application for a China-based SZNW executive
(**Exs. 322, 324**); correspondence involving Harris Chan, Huizar,
Esparza, Zheng, and SZNW employee Virginia Clark ("Clark") regarding,
at various times, Huizar's assistance with labor issues at SZNW's
hotels (**Exs. 325, 369, 373A, 373C**); Esparza phone notes regarding
assistance needed from Huizar regarding Huang's son's girlfriend (**Ex.
363E**) and assistance needed from Huizar and CD-14 relating to a labor
issue at one of SZNW's hotels (**Ex. 363I**); and correspondence
involving Huizar, Harris Chan and others regarding a parking lot

---

[10] **Exhibit 452** is the charged wire communication in Count Two of
the First Superseding Indictment (FSI).

dispute that Huizar and CD-14 assisted Huang in seeking to resolve regarding the LA Grand Hotel (**Exs. 366B, 368**).

Numerous other exhibits to which defendant objects pertain directly to the redevelopment of the LA Grand Hotel, including correspondence and documentation involving consultants to SZNW regarding design planning for the redevelopment of the LA Grand Hotel (**Exs. 344, 345, 346, 350, 354, 355, 374, 375**), including two emails in which a development consultant specifically indicated he was meeting with defendant on development related issues for the LA Grand Hotel (**Exs. 345, 350**) and a text message reflecting Huang wanted to speak with defendant and a design consultant regarding the project (**Ex. 375**); emails involving Huang, Zheng, Huizar, and Esparza regarding a "Municipality Letter" that Huang drafted for Huizar's signature to obtain funding for the redevelopment project, which Huizar revised and signed only after removing a reference to "Raymond Chan" that Huang had included in the draft letter (**Exs. 356[11], 357**); Huizar's calendar entry for an August 4, 2016 meeting at CD-14, attended by Huang and defendant among others, regarding the redevelopment project (**Ex. 351**); emails and correspondence regarding Huang's request for a list of potential land use consultants that Huizar and CD-14 provided to Huang for the redevelopment project (**Exs. 358, 359[12], 380**); and texts involving Huizar, Esparza, and Clark reflecting Huang wanting to meet with Huizar regarding the redevelopment project, and texts between Huang and Clark regarding the LA Grand Hotel and redevelopment project (**Exs. 367, 367A, 371A,**

---

[11] **Exhibit 356** is the charged wire communication in Count Three of the FSI.

[12] **Exhibit 359** is the charged wire communication in Count Four of the FSI.

**371B, 371C, 373B**).  In addition, the exhibits include a Request for Proposal ("RFP") site map that agents found in defendant's Google Drive relating to a property Huang was exploring purchasing as a third real estate asset (in addition to the LA Grand Hotel and Sheraton) in Los Angeles, reflecting defendant's close involvement with Huang and his interests in Los Angeles (**Ex. 332**).

The exhibits also include numerous text message chains that bear on multiple issues described above in any given chain, including Huizar/Esparza text chains regarding various aspects of the Godoy settlement, trips to Las Vegas with Huang, dinner with Huang and defendant, structuring of the currency exchange of Australian dollars, evading identification checks in Las Vegas, and being careful about what they say on the phone (**Exs. 365A, 365B, 365C, 365D, 365E, 365F**); and Esparza/Zheng text chains regarding various aspects of the relationship between Huizar and Huang, including coordinating meetings or other communications between Huang and Huizar and the signing of the "Municipality Letter" from Huizar to SZNW to get money for the LA Grand Project (**Exs. 372C, 372F, 372G, 372J, 372K, 372L**).

All of these exhibits are relevant to and probative of central issues relating to the LA Grand Hotel bribery scheme and Huizar's corrupt relationship with Huang/SZNW, which defendant facilitated as a core part of the RICO conspiracy.

> d. *Luxe Hotel Bribery Scheme and Hazens Financial Benefits for Huizar and Defendant's Assistance*

**[Exhibits 363A, 532, 533, 534, 535, 536, 538, 539, 543, 556, 557, 595, 596A, 596B, 596C, 596D, 596E, 596F, 596G, 596H, 596I, 596J, 596K, 596L, 596M, 596N, 596O, 596P, 596Q, 596R, 596S, 596T, 596U,**

28

**596V, 596W, 597A, 597B, 597C, 597D, 597E, 597F, 597G, 597H, 597I, 597J, 597K, 597L, 597M, 597N, 597O, 597P, 597Q, 597R, 598A, 598B, 598C, 598D, 598E, 598F, 598H, 599, 601A, 601B, 601C, 602, 603A, 603B, 603C, 603D, 610, 611A, 614, 616, 619, 620A, 620B, 930, 931, 932, 932A]**

Defendant similarly objects to at least 80 exhibits pertaining to the Luxe Hotel bribery scheme (not including the 17 other Hazens-related exhibits analyzed above to which he also lodged objections under MIL Nos. 1 and 2). The exhibits are relevant to numerous aspects of Huizar's corrupt relationship with Yuan and Hazens that defendant cultivated over several years; the financial benefits Huizar obtained from Hazens for himself as well as his family and associates, including through defendant's aiding and abetting; and official acts Huizar took and/or assistance Huizar and CD-14 provided to Hazens principally in connection with the Luxe Hotel.

With respect to the financial benefits Hazens provided to Huizar and his family and associates, the exhibits include correspondence regarding Katy Perry tickets Hazens provided to Huizar and his family (**Exs. 363A, 534**); correspondence regarding a Huizar dinner with Yuan where Hazens would be "pledging their support" for Huizar (**Exs. 535, 536**); correspondence between Huizar and his associate to whom the $66,000 in sham real estate consulting fee bribes were funneled regarding the status of the corrupt arrangement, as facilitated by defendant and Chiang (**Ex. 595**); correspondence between Chiang and Rios coordinating a meeting between Rios and a Hazens representative to discuss the sham consulting fee bribe arrangement (**Ex. 602**); and an excerpt of a recorded call between Huizar and Chiang where they discuss Huizar's family's trip to China at Yuan/Hazens's invitation

and the need to not let Huang/SZNW know Huizar had visited Hazens and not SZNW (**Ex. 610**).[13]

With respect to assistance and/or official acts Huizar provided for Hazens and the Luxe Hotel redevelopment project, the exhibits include emails involving Chiang and Huizar (and defendant behind the scenes) coordinating a message Huizar sent to the DCP Director regarding a Luxe Hotel TFAR appraisal issue (**Exs. 538, 539**); emails involving Chiang, Esparza, and others regarding moving the Luxe Hotel project "full speed ahead" "[n]ow with a common consensus in place" regarding the financial benefits Hazens would be providing Huizar (**Ex. 543**); Huizar's text to Yuan congratulating Yuan for City Council's approval of the Luxe Hotel development agreement, for which Huizar voted in support (**Ex. 599**); and excerpts of recorded calls involving Huizar, Esparza, and Chiang regarding various aspects of Huizar's assistance to the Luxe Hotel redevelopment project, including that whatever happens with the City Planning Commission's ("CPC") approval of the project "can be fixed later in PLUM," and ensuring Hazens's knowledge that Huizar had been helpful (**Exs. 611A, 614, 619, 620A, 620B**).  Huizar and CD-14 also provided other assistance to Hazens regarding its hotels in Los Angeles, including assisting through official channels with an ADA issue Hazens encountered in connection with renovations to one of its hotels (**Exs. 532, 533**).  The exhibits also include timelines reflecting the timing of various events relating to Huizar's assistance and official acts and defendant's shadow consulting on the Luxe Hotel redevelopment

_____

[13] Defendant also objected to a flow chart reflecting the flow of funds in the sham real estate consulting fee bribe arrangement (**Ex. 932**), but the government has agreed to use this exhibit as a demonstrative only.

1  project and Huizar's corrupt relationship with Yuan/Hazens

2  facilitated by defendant (**Exs. 930, 931, 932A**).

3      The exhibits further include other evidence of the inner

4  workings of Synergy's role in consulting on the Luxe Hotel project

5  while defendant served as a shadow consultant.  These exhibits

6  include correspondence regarding the status of Chiang's work streams

7  with defendant's son and another Synergy employee on obtaining

8  various approvals for the Luxe Hotel redevelopment project as of

9  March 2017, when defendant was still deputy mayor but was acting as a

10  shadow consultant and meeting with Chiang, his son, and the other

11  employee behind the scenes to assist on the project (**Exs. 556, 557**);

12  and an excerpt of a recorded call between Chiang and the same Synergy

13  employee in which they discuss defendant's direction on how to

14  approach a particular public official to obtain a quick response to a

15  project approval issue (**Ex. 616**).

16      The exhibits further include numerous text message chains that

17  bear on multiple issues described above in any given chain.  Such

18  relevant correspondence includes numerous Huizar/Chiang text chains

19  regarding various aspects of the Hazens relationship; the Luxe Hotel

20  redevelopment project and Huizar's assistance with it, coordination

21  with Yuan; coordination of the sham real estate consulting fee bribe

22  arrangement; coordination of Huizar's family trip to visit

23  Yuan/Hazens in China; entitlement approvals and City hearings for the

24  Luxe Hotel project; and coordination of Hazens's commitment and

25  contribution to the Rios PAC (**Exs. 596A, 596B, 596C, 596D, 596E,**

26  **596F, 596G, 596H, 596I, 596J, 596K, 596L, 596M, 596N, 596O, 596P,**

27  **596Q, 596R, 596S, 596T, 596U, 596V, 596W, 597A, 597B, 597C, 597D,**

28  **597E, 597F, 597G, 597H, 597I, 597J, 597K, 597L, 597M, 597N, 597O,**

**597P, 597Q, 597R, 598A, 598B, 598C, 598D, 598E, 598F, 598H**).  The relevant correspondence also includes Esparza/Chiang text chains regarding various aspects of the Hazens relationship; the CPC's approval of the Luxe Hotel redevelopment project; and bribes Huizar solicited from Hazens including The Weeknd concert tickets and alcohol from Costco for Huizar's mother's birthday party (**Exs. 601A, 601B, 601C**).  The relevant correspondence further includes Chiang's text chains with a Hazens executive coordinating Huizar meeting with Yuan about the consulting fee bribe arrangement, defendant's involvement in meeting with Hazens, Hazens's contribution to Huizar's high school alma mater (Salesian), and Huizar's support for the Luxe Hotel project (**Ex. 603A, 603B, 603C, 603D**).

Similar to the infirmity of defendant's relevance/403 objections to core evidence of the SZNW/LA Grand Hotel bribery scheme above, these exhibits all are relevant to and probative of central issues relating to the Luxe Hotel bribery scheme, defendant's corrupt shadow consulting on the project, and Huizar's corrupt relationship with Yuan/Hazens, which defendant facilitated as a principal component of the RICO conspiracy.

> e.  *Defendant's Cultivation of Huizar's Corrupt Relationships with Chinese Developers*

**[Exhibits 178, 343, 363B, 363D, 363F, 596B]**

These exhibits are relevant to the indispensable role that defendant played in the RICO conspiracy in connecting Huizar to Chinese companies with projects in CD-14 that were willing to provide financial benefits and commitments to Huizar.  Given defendant's connections and language abilities, he was uniquely situated to play this role of middleman and facilitator for building Huizar's corrupt

relationships with these companies.  At the same time, defendant took his own bribes from one of those companies (Hazens) and solicited business from others (e.g., Oceanwide) as a shadow consultant for Synergy during his time in public office.

The exhibits demonstrating Huizar's relationships with these Chinese companies and defendant's integral role in facilitating those relationships include Esparza phone notes regarding setting up meetings with Hazens, Greenland, Oceanwide, and City Century for Huizar's trip to China and defendant's role in that process (e.g., "Please work with George/Ray to confirm Oceanwide") (**Exs. 363B, 363D, 363F**); a photo of Huizar's itinerary for the China trip reflecting meetings with Hazens, Greenland, Oceanwide, and City Century/Sheng-Lo (**Ex. 343**); correspondence involving Esparza and Chiang (as defendant's secret business partner) in which Esparza asks Chiang to steer, as a referral, the Chairman of City Century to a law firm at which Rios worked (**Ex. 178**); and a text exchange in which Chiang asks Huizar to introduce him to "the guys from Oceanwide" because "Ray does not want them to know that him and I are close," consistent with defendant's intentional distancing of himself from Chiang as a shadow consultant (**Ex. 596B**).  These exhibits thus are relevant and highly probative of defendant's critical role in the RICO conspiracy of steering developers to Huizar and facilitating their corrupt relationship while also serving as a shadow consultant to build his own post-City consulting business as he abused his position as a public official.

> ### f. Defendant's Schemes to Bribe Other Public Officials

**[Exhibits 102, 708, 709, 731, 740, 752, 756, 757, 758, 940, 940A, 940B, 941, 942, 942A, 942B, 943]**

Defendant also objects to the relevance of a number of exhibits that are relevant to bribery schemes that he orchestrated after he left City employment and was <u>officially</u> working with Chiang, as alleged as part of the charged RICO conspiracy. Similar to defendant's other relevance/403 objections, defendant appears to object to these exhibits simply because his name does not expressly appear on the documents or he is not a participant in a recorded conversation. But the exhibits are part and parcel of bribery schemes that defendant devised, with Chiang's assistance, to benefit Hazens (who was then defendant's <u>formal</u> client) by steering financial benefits to family members of public officials who were in positions to influence the Luxe Hotel redevelopment project.

These exhibits include correspondence and a recorded call involving Chiang and Deron Williams (Chief of Staff to then City Council Chairperson Herb Wesson) requesting Williams's assistance in influencing the Mayor's Office to push the CPC's approval of the Luxe Hotel project (**Exs. 708, 709, 712**), while at the same time devising a scheme to pay money to Williams's son through a consulting arrangement; and correspondence and excerpts of recorded calls involving Chiang and Public Works Commissioner Joel Jacinto ("Jacinto") where Chiang (in coordination with defendant) requested Jacinto's assistance in facilitating consultations with the Bureau of Engineering, which the Public Works Commission oversaw, on various aspects of the Luxe Hotel project approval process (**Exs. 731, 740,**

34

752, 756, 757, 758), while at the same time devising a scheme to pay money to Jacinto's wife through a consulting agreement.  The exhibits also include timelines and summary charts of benefits paid relating to the Jacinto bribery scheme (**Exs. 940, 940A, 940B, 941**).  The exhibits similarly include timelines regarding a separate bribery scheme that defendant devised (also alleged as part of the RICO conspiracy) involving the provision of financial benefits to CD-14 Planning Director Kuk (directly or indirectly through his family members) in connection with Kuk's assistance on the then-pending Arts District Center ("ADC") project on behalf of defendant and Chiang's client, Kevin Chen (**Exs. 942, 942A, 942B**).  And the exhibits include a video (without sound) of a news report regarding the search warrant executions on November 7, 2018 (**Ex. 102**) and a timeline of the FBI's overt activities during the investigation, both of which help to frame the temporal context of defendant's efforts to tamper and influence Businessperson A's story about the true facts surrounding defendant's orchestration of the ADC/Kuk bribery scheme (**Ex. 943**).[14]

These exhibits all are relevant to and probative of defendant's post-City-employment schemes to bribe public officials, including through their family members, that dovetailed with his and the CD-14 Enterprise's methods of facilitating and obtaining bribes while defendant was a public official.

**IV.   DEFENSE HEARSAY OBJECTIONS**

[**Government Exhibits 80A-80C; 81; 84A-84C; 86; 88-Z; 89A-Z-89D-Z; 112; 113, 113A; 115; 117-122; 126; 127; 131; 132; 140; 160; 161A-**

---

[14] **Exhibit 943** is similarly relevant to and probative of defendant's and other co-conspirators' other efforts to conceal the activities of the CD-14 Enterprise and obstruct the government's investigation at other stages of the investigation.

161C; 162; 163; 171-175; 178; 180-Z; 181; 182; 183-Z; 184-Z; 185; 187A-187B; 220; 322; 324; 325; 327; 332; 335; 343-344; 356-359; 363A-363F; 363H-363J; 365A-365K; 366B; 367; 367A; 368-370; 371A-371C; 372A-372N; 373A-373C; 374-375; 380-383; 386; 387A-Z-387D-Z; 422; 423; 426-428; 447-459; 532-535; 538; 539; 543; 556; 557; 571; 595; 596A-596W; 597A-597R; 598A-598H; 599; 601A-601C; 602; 603A-603D; 610; 611A-611B; 613A-613B; 614; 616; 619; 620A-620B; 708-709; 712; 740; 752; 756-758]

### A.   Defense Position

The defense objects to the above-referenced exhibits on hearsay grounds. With respect to out-of-court statements made by purported co-conspirators that the government is offering for the truth of the matter asserted, it is hearsay. Although the government argues that it is it admissible under Federal Rule of Criminal Procedure 801(d)(2)(E), the prosecution must show, and the Court must determine by a preponderance of the evidence, that (1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made "in furtherance" of the conspiracy. *United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006), *adopted in relevant part on reh'g en banc*, 495 F.3d 1094, 1096 n.4 (9th Cir. 2007); *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994) (requiring that the prosecution establish and prove to the court by a preponderance of the evidence the defendant's "knowledge of and participation in an alleged conspiracy with the putative coconspirator."). The Ninth Circuit has narrowly interpreted the "in furtherance" language of Rule 801(d)(2)(E). The Rule does not apply to "[m]ere conversations between co-conspirators, or merely narrative

36

declarations among them." *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988). Nor does it apply to "casual admission[s] of culpability to someone [the declarant has] individually decided to trust." *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981) (citation omitted); *United States v. Castillo*, 615 F.2d 878, 883 (9th Cir. 1980). Rather, to be "in furtherance," the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979). In short, the statements must assist the conspirators in achieving their objectives. *Id.* It is the government's burden to show that the statements qualify as co-conspirator statements. Until the government has done so, the Court should exclude the statements.

In addition, the statements sought to be admitted by the government under the co-conspirator exception should be excluded based on Federal Rules of Evidence 402 (relevance) and 403 (unfair prejudice). To be clear, none of the objected to statements involve Defendant, nor do the vast majority of them refer to Defendant. Rather, these messages pertain to the various schemes of the purported members of the "CD-14 Enterprise," which the government claims are relevant by virtue of the fact that it has charged a racketeering conspiracy. Regardless of how the government has charged the case, its proffered evidence must be relevant, and any probative value cannot be substantially outweighed by a danger of unfair prejudice. Here, the proffered statements are not relevant as to Defendant, and their introduction encourages the jury to convict Defendant based on the unrelated actions of others.

The defense understands that the Court previously rejected hearsay objections to Govt. Exhs. 172, 363A, 363B, 363C, 363D, 363E, 363F, 363H, 363I, and 363J (notes from George Esparza's phone) in the course of the 940 Hill litigation. The defense is cognizant of the Court's ruling, but makes the objection again here in order to preserve its objection for the record. Separately, the defense maintains an objection to these exhibits under Federal Rules of Evidence 402 and 403.

**B.   Government's Response**

1.   Overview

Defendant objects on hearsay grounds to approximately **222** of the government's exhibits.  In support of his objections, defendant offers only a general recitation of case law regarding the foundational requirements to admit coconspirator statements under Rule 801(d)(2)(E).  Aside from this boilerplate statement of the law, he offers no specific explanation or analysis as to any of the objected-to exhibits.

The government is well aware of the rules governing the admissibility of coconspirator statements.  Indeed, based on its extensive presentation of evidence in the prior proceedings—which the government again intends to admit in defendant's retrial—this Court can and should find that the requisite pretrial foundation satisfying the requirements for admissibility under Rule 801(d)(2)(E) has been met.  See United States v. Zemek, 634 F.2d 1159, 1169 (9th Cir. 1980) (court has discretion to conditionally admit coconspirator's statements).  The exhibits at issue contain statements made by other coconspirators of the same RICO conspiracy of which defendant was a knowing participant in its hub, and the statements furthered the

38

common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy.  United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988).

Separately, 13 of the exhibits are also admissible as records of regularly conducted activity under Rule 803(6), and three of the exhibits are admissible because they do not contain hearsay or are being introduced for non-hearsay purposes.

Accordingly, the Court should overrule each of defendant's hearsay objections.

### 2.  Legal Standard

Federal Rule of Evidence 801(d)(2)(E) provides that a statement offered against an opposing party is not hearsay if it "was made by the party's co-conspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  To admit a coconspirator statement for the truth of its contents against a defendant, the government must show by a preponderance of evidence that: (1) a conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made in furtherance of the conspiracy.  United States v. Larson, 460 F.3d 1200, 1211 (9th Cir. 2006).  The same is true for the admissibility of "statements and acts of co-participants in a scheme to defraud . . . ."  United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992).

Courts take a broad view as to when a statement is made "in furtherance" of a conspiracy.  See United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991) (describing different types of admissible coconspirator statements).  Examples of admissible coconspirator statements include "statements made to induce

enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities." Id. (citations omitted). Likewise, statements designed to conceal the conspiracy's activities are admissible. See United States v. Tille, 729 F.2d 615, 620 (9th Cir. 1984) (RICO coconspirator's conversations with government informant about who might be cooperating with the government investigation and the story to give authorities if questioned were in furtherance of the RICO conspiracy; "When a purpose of the conspiracy is to formulate future strategies of concealment, narrations of past events may be in furtherance of the continuing conspiracy."); United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983) ("Statements between the conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met."). And though the statement must be in furtherance of a conspiracy, it need not be the exclusive, or even primary, purpose of the declaration. See United States v. Guyton, 36 F.3d 655, 659 (7th Cir. 1994).

A coconspirator statement need not be made in the presence of the defendant, or even made to another coconspirator, to be admissible. See Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970) ("It is well settled that a conversation between two co-conspirators which takes place out of the presence of a third co-

conspirator is admissible into evidence against the third co-conspirator."); United States v. Lloyd, 807 F.3d 1128, 1160-61 (9th Cir. 2015) ("It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E).").

Finally, it is well established that "[t]he order of proof is within the sound discretion of the trial judge, who may conditionally admit coconspirator statements subject to a later motion to strike." Miranda-Uriarte, 649 F.2d at 1349 (citations omitted); see also Fed. R. Evid. 104(b) ("[C]ourt may admit the proposed evidence on the condition that the proof be introduced later."). In making a preliminary factual determination under Rule 801(d)(2)(E), courts "may examine the hearsay statements sought to be admitted." Bourjaily v. United States, 483 U.S. 171, 181 (1987).

### 3. The Declarants Are Participants of the Same RICO Conspiracy/Scheme as Defendant

Each of the exhibits that the government seeks to admit under the coconspirator exemption involve statements by one or more of the following eight participants of the broader RICO conspiracy: Jose Huizar, George Esparza, Ricky Zheng, George Chiang, Morris Goldman, Justin Kim, SZNW (via its agents), and Hazens (via its agents).[15]

As a participant at the hub of the larger RICO conspiracy, defendant was a knowing participant of the same conspiracy as these eight individuals and shared in the RICO conspiracy's same goals. As set forth in the FSI, the "common objectives of the conspiracy" and the CD-14 Enterprise were to: (1) enrich the members and associates

---

[15] Defendant does not raise any hearsay objection to communications in which he was a direct participant.

41

of the enterprise through the pay-to-play scheme by obtaining direct and indirect benefits from developers in the City of Los Angeles; (2) maintain political control and advance the political goals of the enterprise through the pay-to-play scheme, including by obtaining funds for Huizar's re-election campaigns and officeholder accounts and for Richelle Rios' election campaign; and (3) protect the enterprise from detection, including through concealment and obstruction of justice.  (FSI ¶¶ 39, 42 pp. 10-15.)  Each of the above declarants—along with defendant—were part of the CD-14 Enterprise and shared in these three goals.

Significant evidence of the conspiracy, its common goals, and the declarants and defendant's knowing membership in the conspiracy was presented in the prior proceedings of this case over which the Court presided.  Based on that evidence, as well as the statements contained within the disputed exhibits themselves, there is ample foundation for the Court to conclude there is a "prima facie case that the conspiracy existed and that the defendant was part of it." Miranda-Uriarte, 649 F.2d at 1349.

   a.   SZNW Trial: Huizar, Esparza, Zheng, SZNW

Prior to trial against defendant SZNW, the Court concluded that there was a "sufficient pretrial prima facie showing that Shen Zhen, Huang, Huizar, Raymond Chan, George Esparza, and Ricky Zheng . . . engaged in a scheme to deprive the City of Los Angeles and its citizens of the right to honest services through bribery."  (Dkt. No. 699 (9/23/2022 Tr.) at 35:18-22; see also Dkt. No. 693 (denying SZNW's motion in limine to exclude coconspirator statements).)

The Court provided a detailed summary of some of the government's evidence, explaining defendant's shared participation

42

1    (along with Huizar, Esparza, Zheng, and SZNW) in this bribery scheme.

2    The Court's explanation illuminated how these individuals

3    participated in the same conspiracy aimed at furthering the common

4    goals of the CD-14 Enterprise.  For instance, the Court explained how

5    defendant aided to enrich Huizar through benefits from SZNW vis-à-vis

6    the pay-to-play scheme by (1) introducing Huang to Huizar and

7    Esparza; (2) "plant[ing] the seed" that resulted in numerous Vegas

8    trips with Huang, Huizar, Esparza, and Zheng; and (3) "advertis[ing]

9    the importance of Huizar . . . to Chinese developers," touting

10   Huizar's "power to put things on the agenda, overturn rules, and

11   change ordinances" and explaining to developers that "if you don't

12   have a relationship with Jose Huizar, your project could be at the

13   end of the list."  (Id. at 36-37.)  Defendant aligned himself with

14   Huizar's power by telling Huang that "[he] and Huizar could do

15   whatever Mr. Huang needed" (id. at 37:19-22) and agreeing to assist

16   Huang with his properties, including by working with Huizar (id. at

17   39:16-40:9).

18         Critically, defendant was instrumental in enabling Huizar to

19   maintain his political power and artfully concealing a significant

20   bribe from SZNW (in furtherance of all three goals of the RICO

21   conspiracy) when defendant, Huizar, and Huang secretly arranged for

22   Huang to provide $600,000 as collateral to save Huizar's Council seat

23   in the 2015 re-election.  (Id. at 37:23-38:18.)  The Court explained

24   that based on Huang's benefits to Huizar, Huang expected assistance

25   from Huizar, and that Huang sought to expand the LA Grand Hotel into

26   the tallest tower west of the Mississippi.  (Id. at 39:9-19, 40:10-

27   41:4.)

28

                                    43

Based on the foregoing, the Court concluded pre-trial as follows:

> There is more than sufficient evidence to find
> that the scheme began as early as 2013 based upon
> Raymond Chan's introduction of Mr. Huang and Mr.
> Huizar in February of 2013, their immediate
> travel to Las Vegas, the benefits that Mr. Huang
> provided to Mr. Huizar and Esparza on that trip,
> Huang's request of Huizar and Chan to support the
> Shen Zheng and its renovation project, which
> Huizar agreed to do.
> There is also sufficient evidence demonstrating
> that the scheme continued until sometime in 2018
> when the Government -- which is when the
> Government served its search warrants. Indeed,
> Mr. Huang and Zheng continued to provide Huizar
> with extravagant financial benefits during the
> same time frame that Mr. Huang and Shen Zhen,
> aided by Raymond Chan, began exploring the
> expansion of the L.A. Grand Hotel and Sheraton
> Universal Hotel.

(Id. at 41:5-25.)

During the government's nine-day presentation of evidence at trial, the government's evidence came in as proffered, including (as explained below) a significant number of the same exhibits to which defendant now objects.  The jury convicted SZNW on all counts.  That evidence more than sufficiently establishes a prima facie case that the conspiracy existed, that defendant was a willful part of it, and that SZNW, Huizar, Esparza, and Zheng were also participants of that same conspiracy sharing in its objectives.[16]

    b.   Defendant's First Trial: Chiang, Hazens, Goldman, Kim

The Court can also rely on the significant evidence that was admitted during the eight days of defendant's first trial before a

---

[16] Zheng's involvement in the RICO conspiracy extended beyond just SZNW.  For instance, he directed Huizar/Esparza to block access to another developer, Shanghai Construction, who was not fulfilling the coconspirators' demands for benefits.  (Trial Ex. 81.)

mistrial was declared.  That evidence further establishes a prima facie case that defendant's conspiracy—seeking to obtain benefits from developers through the pay-to-play scheme, maintaining and advancing political control, and avoiding law enforcement detection—also included George Chiang, Hazens, Goldman, and Kim.

During the first trial, Chiang testified that defendant brought him into the RICO conspiracy and trained him in all the ways of the conspiracy, including how to obtain benefits for themselves and Huizar through the pay-to-play scheme, maintain and advance political control, and avoid law enforcement detection.[17]  Among other things, Chiang testified that:

- While defendant was a City official, he propositioned Chiang to take on a "career change" and work in the "development side of the real estate cycle" with the aid of defendant's mentorship and "very deep connections within the City."  (3/3/23 Trial Tr. at 1867-70.)  Chiang soon agreed to defendant's proposal, which he believed would be financially lucrative.  (Id. at 1871:2-14.)  As early as fall 2014, Chiang and defendant agreed to be 50/50 business partners, with Chiang as the person "outside of the City" and defendant working secretly from "inside the City." (Id. at 1876:13-1878:20.)

---

[17] Chiang pled guilty to RICO conspiracy.  (See United States v. George Chiang, Case No. 20-CR-203-JFW, Dkt. No. 7.)  During the first trial, consistent with his factual basis, Chiang testified that he pled guilty to RICO conspiracy and admitted to participating in a pay-to-play scheme in Los Angeles led by Huizar; that Chiang and defendant were members of that conspiracy; and that the goals of the enterprise included enriching members and associates, advancing political goals and maintaining the enterprise's control and authority, and protecting the enterprise from detection.  (3/2/23 Trial Tr. at 1895-1896.)

45

- Defendant explained to Chiang the importance of knowing elected officials, especially Huizar, and fundraising for them.  (Id. at 1874:8- 1875:23.)  Defendant directed Chiang to fundraise for Huizar, through which Chiang first met Esparza (Id. at 1884:10-1885:8.)

- Defendant kept tabs on various developers who needed entitlements as potential clients.  (Id. at 1886.)  Defendant trained Chiang on "how to convey Jose Huizar's power to these developers" and make a "sales pitch."  (Id. at 1887:1-4; 1888:18-1889:1.)  At the same time, defendant instructed Chiang to keep concealed defendant's role in their business because defendant was still a City official.  (Id. at 1887:5-1888:9.)

- Chiang and defendant solicited benefits from Hazens in exchange for official acts from defendant and Huizar.  (Id. at 1898:17-1899:2.)  Among other things, Hazens supplied retainer payments to Chiang and defendant starting in 2015.  (Id. at 1899:3-19).  Hazens' main project was the Luxe Hotel.  (Id. at 1893:17-24.)

- Hazens was aware that defendant was working with Chiang as a "good brother[]" while defendant was still a City official.  (See id. at 1903:5-23.)

Consistent with Chiang's testimony, Esparza[18] testified that Hazens, like SZNW, was a developer and Friend of the Office that paid bribes to Huizar under the pay-to-play scheme, and that defendant and

---

[18] Esparza also pled guilty to the same RICO conspiracy.  (See United States v. George Esparza, 20-CR-208-JFW, Dkt. No. 9.)

46

Chiang facilitated those bribes.  Among other things, Esparza
testified that:

- Defendant facilitated introductions/communications with
  developers like Hazens, who provided benefits to Huizar
  (2/24/23 Trial Tr. at 760:25-762:5);

- Defendant introduced Esparza to Chiang as someone working
  with Hazens.  (Id. at 763:5-14.)

- Huizar said that defendant and Chiang "[got] it," meaning
  they knew how to facilitate bribes from developers.  (Id.
  at 766:11-767:1.)

- After defendant introduced Huizar to Hazens, which had a
  pending project in the City (2/27/23 Trial Tr. at 967-969),
  Huizar obtained various benefits from Hazens, including
  sporting event and concert tickets, other benefits, and
  campaign contributions (id. at 974-978).  Chiang, with
  defendant's assistance, facilitated these benefits.  (Id.
  at 978:8-979:3.)

- Defendant, Chiang, and Hazens contributed financially to
  Huizar's 2015 re-election campaign.  (Id. at 982:25-
  984:16.)  As part of the pay-to-play scheme, defendant was
  instrumental in strategizing a fundraising plan to collect
  contributions from developers to help Huizar pay off his
  campaign debt—a plan that was carried out by Esparza and
  Chiang.  (Id. at 987:14-989:22; see also 2/24/23 Trial Tr.
  at 763:5-14.)  The same was true with respect to gathering
  contributions to Salesian High School where Rios worked,
  including from Hazens.  (2/27/23 Trial Tr. at 993:3-
  994:24.)

47

- Hazens also routed concealed benefits to Huizar by
ostensibly paying Ernie Camacho $10,000 per month for real
estate reports but that the reports were actually sham
reports prepared by Chiang. (2/27/23 Trial Tr. at 1011:23-
1012:24.) Huizar later planned to ask Hazens directly for
more money because, after taxes, Huizar received less than
the full $10,000 monthly payment. (Id. at 1047.)

The above-described testimonies from defendant's first trial, as
well as the testimonies of Agent Civetti, David Ambroz, and Kevin
Keller, easily show that Chiang and Hazens were part of the same RICO
conspiracy as defendant.

Likewise, Kim and Goldman were also members of the same
conspiracy as defendant and shared in the same three goals of the CD-
14 Enterprise.[19] Much like Zheng with SZNW and Chiang with Hazens,
Kim and Goldman facilitated pay-to-play bribery schemes for
developers 940 Hill/David Lee and Carmel Partners, respectively.
(See 2/24/23 Trial Tr. (Esparza) at 737-756 (explaining Kim's role as
the "middle person for David Lee" who facilitated two cash drops of
$200,000 for Huizar to get rid of a union appeal against the 940 Hill
project); 2/28/23 Trial Tr. (Goldman) at 1254:23-1255:25
(facilitating contributions to Rios' PAC from Carmel Partners in
exchange for Huizar voting against labor/building trades for the
Mateo Project).) Consistent with the goals of the RICO conspiracy,
Kim and Goldman were also big fundraisers for Huizar. (See 2/27/23

---

[19] Goldman pled guilty to conspiracy to commit federal program
bribery and honest services mail fraud. (United States v. Morris
Goldman, Case No. 20-CR-369-JFW, Dkt. No. 9.) Kim pled guilty to
federal program bribery. (United States v. Justin Kim, Case No. 20-
CR-154, Dkt. No. 7.)

1  Trial Tr. at 997:21-998:4 (Kim as "one of the council member's

2  biggest fundraisers in the office); id. at 1038:2-7 (Goldman was a

3  "friend of the office" and "delivered on all of Council Member

4  Huizar's requests").)

5      During defendant's first trial, Esparza testified about another

6  important aspect of the RICO conspiracy: to get Richelle Rios elected

7  to succeed Huizar through whom he could "maintain his access to the

8  developers" and keep the pay-to-play scheme running.  (2/27/23 Trial

9  Tr. at 1031:25-1032:16.)  As part of that plan, Huizar sought to

10  extract contributions from developers for a Political Action

11  Committee (PAC) to funnel money towards Rios' campaign.  (Id. at

12  1034-1038.)  To keep concealed both the fact that Huizar was

13  controlling the PAC and that the PAC was actually for Rios, Goldman

14  and Kim were tapped to create the PAC.  (Id.)  Goldman

15      That Kim and Goldman may have been spokes in the broader RICO

16  conspiracy wheel does not render their statements inadmissible

17  against defendant because they shared in the broader goals of the

18  RICO conspiracy of which defendant was a party, by (1) enriching

19  themselves and their coconspirators in obtaining benefits from

20  developers; (2) maintaining political control and advancing the

21  political goals of the enterprise by fundraising for Huizar and Rios;

22  and (3) protecting the enterprise from detection.  See United States

23  v. Newton, 326 F.3d 253, 258 (1st Cir. 2003) (affirming admission of

24  statements of coconspirators who served as "spokes" of the

25  conspiracy, even though defendant did not know of the objective of

26  the spoke (to commit murders) because the murders furthered the

27  objectives of the broader RICO conspiracy to earn money through

28

1  illegal drug trafficking, of which the defendant plainly was a

2  party).

3      Based on the foregoing, the Court should conclude there is a

4  prima facie showing that (1) as early as 2013, the RICO conspiracy

5  led by Huizar existed and that it used a pay-to-play scheme to obtain

6  benefits, maintain and advance political control, and avoid

7  detection, and (2) defendant had knowledge of, and participated in,

8  that same conspiracy with the same objectives, along with Huizar,

9  Esparza, Zheng, SZNW, Chiang, Hazens, Goldman, and Kim.  See Larson,

10  460 F.3d at 1211.

11          4.  The Statements Are in Furtherance of the Conspiracy

12      The objected-to exhibits contain coconspirator statements made

13  in furtherance of the conspiracy.

14      Courts take a broad view as to when a statement is made "in

15  furtherance" of a conspiracy.  See Nazemian, 948 F.2d at 529

16  (describing different types of admissible coconspirator statements).

17  Even statements "containing information relevant to the conspiracy

18  may be admissible against coconspirators as statements in furtherance

19  of the conspiracy without evidence they were in fact consulted or

20  otherwise communicated."  United States v. Schmit, 881 F.2d 608, 613

21  (9th Cir. 1989).  As this Court pointed out previously:

22          It could be argued that any statement by a
           conspirator, made while he is a member of the
23          conspiracy, that concerns the conspiracy and has
           some informational content is in furtherance of
24          it.  The exchange of information is the lifeblood
           of a conspiracy, as it is of any cooperative
25          activity, legal or illegal.  Even commenting on a
           failed operation is in furtherance of the
26          conspiracy, because people learn from their
           mistakes.  Even identification of a coconspirator
27          by an informative nickname such as "Big Guy" is
           in furtherance of the conspiracy, because it
28

50

> helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible. Conspiracy is a serious business, and talk about it among or by the conspirators should not be presumed to be unrelated to the accomplishment of the conspiracy's goals.

(5/13/22 Tr. (940 Hill/Lee MIL Hr'g) at 18:10-19:16 (quoting United States v. Pallais, 921 F.2d 684, 688 (7th Cir. 1990).)

### a. CD-14 Enterprise

The following 47 exhibits are admissible coconspirator statements that directly relate to the CD-14 Enterprise and its common objectives: **Exs. 80A; 80B; 80C; 81; 84A; 84B; 84C; 86; 88-Z; 89A-Z; 89B-Z; 89C-Z; 89D-Z; 112; 113; 113A; 115; 117; 118; 119; 120; 121; 122; 126; 127; 131; 132; 140; 160; 161A; 161B; 161C; 162; 163; 171; 172; 174; 175; 178; 180-Z; 181; 182; 183-Z; 184-Z; 185; 187A; 187B.**

As indicated by the subheadings within the government's exhibit list, these exhibits involve one or more coconspirators and pertain to at least one of the common goals and activities of the CD-14 Enterprise.

Specifically, the exhibits within the **Exs. 80A-89D-Z range** are statements that:

- Instruct how the pay-to-play scheme works and the need to keep Huizar happy;

- Discuss various coconspirators' roles within the conspiracy;

- Execute the pay-to-play scheme, including by planning to block access for a developer who did not provide the requested benefits;

51

- Share information about the status of projects from developers paying benefits;

- Discuss risks to the conspiracy, including risk of detection by law enforcement based on who knows what about the conspiracy's activities;

- Strategize what to say if confronted by law enforcement

- Solicit participation in the succession plan to get Rios elected and ask about the status of PAC contributions; and/or

- Advise caution and the need for concealment.

See Tille, 729 F.2d at 620 (RICO coconspirator's conversations with government informant about who might be cooperating with the government investigation and the story to give authorities if questioned were in furtherance of the RICO conspiracy).

Exhibits within the **Exs. 112-162** range all involve at least one coconspirator and pertain to the RICO conspiracy's fundraising activities to extract contributions from developers and their proxies under the pay-to-play scheme for Huizar's accounts, the succession plan to elect Rios, and Salesian High School (an indirect benefit to Huizar through Rios).  Namely, they are coconspirator statements that:

- Contain detailed plans identifying developers to solicit and expected contribution amounts;

- Divide up coconspirators' respective roles and responsibilities for securing the contributions;

- Execute the plan by soliciting or confirming the contribution(s); and/or

- Track the status of the fundraising/contribution-collection efforts

Separately, the following exhibits <u>also</u> are admissible under Rule 803(6) as the records of regularly conducted activity: **Exs. 112; 113; 113A; 115; 117; 118; 119; 120; 121; 122; 127; 131; 132.** "[R]unning accounts of illicit enterprises are 'business records,' subject to the ordinary requirements regarding the admissibility of writings. <u>United States v. Foster</u>, 711 F.2d 871, 882 (9th Cir. 1983) (citing <u>United States v. Baxter</u>, 492 F.2d 150, 165 (9th Cir. 1973), and <u>Arena v. United States</u>, 226 F.2d 227, 234-35 (9th Cir. 1955)). So long as the record was "made pursuant to established procedures for the routine and timely making and preserving of business records, and is relied upon by the business in the performance of its function," it is admissible under Rule 803(6).  <u>Foster</u>, 711 F.2d at 882 (drug ledger satisfied Rule 803(6) where witness testified that she kept a record of most of her large drug transactions, "that it was her regular practice to enter into the ledger the number of balloons that went out on a particular day and how much money she took in").  The government anticipates that Esparza will testify that he was primarily responsible for planning, collecting, and tracking contributions from developers for Huizar's accounts, for Salesian High School, and for Rios' PAC and that he maintained these records contemporaneously and relied on them.  This is sufficient to satisfy Rule 803(6).  With respect to **Exs. 131 and 132**, which are emails relating to, and copies of, two checks Carmel Partners issued to Rios' PAC, the government expects to obtain a Rule 902(11) declaration from Carmel Partners or to call a custodian from Carmel Partners to establish these are business records under Rule 803(6).

Exhibits within the **Exs. 171-187B** range all involve one or more coconspirators and primarily pertain to the RICO conspiracy's need

for concealment and to avoid law enforcement detection.  The statements largely occur after the coconspirators became aware that the FBI was investigating their activities in early 2017.  These are coconspirator statements that:

- Advise caution and the need for concealment;
- Note instructions about not disclosing Huizar's knowledge of the FBI investigation;
- Make plans to meet to discuss the FBI;
- Demand in coded language the delivery of Huizar's bribes;
- Advise not to disclose a coconspirator's role in the conspiracy;
- Execute plans to procure indirect benefits for Huizar;
- Set in motion Huizar's money laundering activity necessary to conceal the conspiracy; and/or
- Discuss coconspirators' respective knowledge of the FBI investigation.

Because these statements were made in furtherance of the conspiracy, defendant's hearsay objections should be overruled.

*b.   SZNW Bribery Scheme*

Next, the following 86 exhibits are admissible coconspirator statements that directly pertain to the RICO conspiracy's execution and concealment of the SZNW bribery scheme: **Exs. 220; 322; 324; 325; 327; 335; 343; 344; 356; 357; 358; 359; 363A; 363B; 363C; 363D; 363E; 363F; 363H; 363I; 363J; 365A; 365B; 365C; 365D; 365E; 365F; 365G; 365H; 365I; 365J; 365K; 366B; 367; 367A; 368; 369; 370; 371A; 371B; 371C; 372A; 372B; 372C; 372D; 372E; 372F; 372G; 372H; 372I; 372J; 372K; 372L; 372M; 372N; 373A; 373B; 373C; 374; 375; 380; 381; 382; 383; 386; 387A-Z; 387B-Z; 367C-Z; 387D-Z; 422; 423; 427; 428; 447; 448; 449; 450; 451; 452; 453; 454; 455; 456; 457; 458; 459.**

A significant number of these exhibits were admitted during the trial against SZNW.  Each of these are coconspirator statements that:

- Seek Huizar's assistance with SZNW, including on the redevelopment of the LA Grand Hotel;

- Execute assistance from, or on behalf of, Huizar in response to SZNW's requests;

- Discuss or execute SZNW's plans to redevelop the LA Grand Hotel;

- Facilitate benefits from SZNW to Huizar/Esparza, including Vegas and other trips, fundraising for Huizar and Rios, and other benefits;

- Contain instructions to conceal relationship between Huizar, SZNW, and bribes;

- Track instructions or plans to facilitate benefits for Huizar;

- Track outstanding requests from SZNW for Huizar;

- Plan talking points to advance Esparza's title for the benefit of the conspiracy;

- Set in motion the facilitation of the $600,000 benefit from SZNW to settle Huizar's sexual harassment lawsuit;

- Track Huizar's $570,000 loan;

- Track plans for Huizar's trip to China, including meeting with other Chinese developers;

- Discuss plans to conceal SZNW's benefits, including using fake names and checking other attendees of trips;

- Track defendant's activities to learn who knows what about the SZNW settlement (a core activity of the conspiracy);

- Discuss defendant's role in facilitating the $600,000 settlement as part of the conspiracy;

- Discuss, execute, and track strategies to exchange foreign currency from SZNW (structuring) while concealing identity; and/or

- Warn about the FBI investigation.

In the 940 Hill/Lee trial, the Court denied defendants 940 Hill/Lee's motion in limine to exclude as hearsay Esparza's notes on his phone tracking the bribe payment from 940 Hill/Lee via Justin Kim. (See Dkt. No. 455.)  Among other things, the Court observed that "the Government expects to show that Esparza made his notes to document with his coconspirators relating to their activities and then relay their discussions to other members of the conspiracy" and that Esparza used phone notes "to document his daily business activities as a staffer working on behalf of Mr. Huizar, illegal or otherwise." (5/13/22 (940 Hill/Lee MIL Hr'g) at 13:18-14:3.)  This, the Court noted, was consistent with Esparza's role in the conspiracy to "ma[ke] a record of the information relation to the activities of his co-conspirators in carrying out the bribery scheme." (Id. at 14:23-15:4.)  The government then made this showing at trial, and the Court admitted the notes.

In defendant's trial, the government seeks to admit Esparza's phone notes (**Exs. 363A; 363B; 363C; 363D; 363E; 363F; 363H; 363I; 363J**), which served a similar purpose.[20]  Each of these phone notes advanced the common purposes of the RICO conspiracy by tracking plans and actions needed to facilitate bribes, like the $600,000 sexual harassment settlement and the trip to China to meet with developers; noting instructions to conceal activities; tracking requests from

---

[20] While serving a similar purpose, these exhibits are different exhibits than those admitted in the 940 Hill/Lee trial.

developers and friends of the office; planning talking points to obtain an enhanced title to better execute the ongoing pay-to-play scheme; and tracking outsiders' knowledge of the pay-to-play scheme.

Because these statements were made in furtherance of the conspiracy, defendant's hearsay objections should be overruled.

c.   *Hazens Bribery Scheme*

The following 78 exhibits are admissible coconspirator statements that directly pertain to the RICO conspiracy's execution and concealment of the Hazens bribery scheme: **Exs. 532; 533; 534; 535; 538; 539; 543; 556; 557; 571; 595; 596A; 596B; 596C; 596D; 596E; 596F; 596G; 596H; 596I; 596J; 596K; 596L; 596M; 596N; 596O; 596P; 596Q; 596R; 596S; 596T; 596U; 596V; 596W; 597A; 597B; 597C; 597D; 597E; 597F; 597G; 597H; 597I; 597J; 597K; 597L; 597M; 597N; 597O; 597P; 597Q; 597R; 598A; 598B; 598C; 598D; 598E; 598F; 598H; 599; 601A; 601B; 601C; 602; 603A; 603B; 603C; 603D; 610; 611A; 611B; 613A; 613B; 614; 616; 619; 620A; 620B.**

Each of these are coconspirator statements that:

- Seek Huizar's assistance with Hazens, including on the redevelopment of the Luxe Hotel;

- Execute assistance from, or on behalf of, Huizar in response to Hazens' requests;

- Discuss the status of Huizar's assistance to Hazens due to benefits;

- Discuss or execute Hazens' plans to redevelop the Luxe Hotel, including key milestones in the approval process;

- Facilitate benefits from Hazens to Huizar, including concert tickets, campaign contributions, trip to China, contributions to

Salesian, indirect benefits through real estate reports; and alcohol for Huizar's family member;

- Facilitate meetings with Huizar and Hazens or its proxies;
- Discuss the status of indirect benefits from Hazens;
- Update coconspirators on the status of developer projects;
- Discuss the succession plan;
- Discuss how the pay-to-play scheme works and various coconspirators' roles within the conspiracy;
- Instruct not to discuss matters over the phone; and/or
- Reassure Huizar that Hazens was advised he was helpful on the approval process.

Because these statements were made in furtherance of the conspiracy, defendant's hearsay objections should be overruled.

### d.   Other Pay-to-Play Conduct

Finally, the following 8 exhibits are admissible coconspirator statements that directly pertain to the ongoing activities of the RICO conspiracy in the form of defendant's schemes to route and conceal benefits to other public officials through their family members in exchange for favorable acts on development projects: **Exs. 708; 709; 712; 740; 752; 756; 757; 758.**

These exhibits, which all involve Chiang as a participant, relate to the execution of the same RICO conspiracy with the same common goals: (1) to enrich its members (namely, defendant and Chiang via Synergy/CCC Investment) by funneling benefits to public officials—namely, Deron Williams and Joel Jacinto—who can take favorable action on development projects, and (2) to conceal those benefits by directing them to family members of the public official.

1    The government expects Chiang will testify that, around August

2    3, 2017, defendant asked Deron Williams, a staffer for Councilmember

3    Herb Wesson, to provide favorable action on Hazens' Luxe Hotel

4    project, by asking Ana Guerrero, the Mayor's Chief of Staff, to put

5    pressure on CPC to approve the project.  (Exhibit A (03/24/2020

6    Chiang FBI 302).)  The government further expects Chiang will testify

7    that near the end of August, defendant directed CCC Investment to

8    execute an agreement with Deron Williams' son to provide consulting

9    services for compensation of $1,000 per month, effective September 1,

10   2017.  After the CPC approved the Luxe Hotel project in September

11   2017, defendant sent a text message to his son writing: "CPC approved

12   LUXE! We are moving on to PLUM . . . .  **Deron [WILLIAMS] asked Ana**

13   **[Guerrero].  You know who asked Deron [WILLIAMS] . . . . "**  (Exhibit

14   C (Trial Ex. 593G) (emphasis added).)  Defendant's son responded,

15   "Congrats!" to which defendant answered: "To all of us! Still waiting

16   for the 2nd payment," referring to the bonus payment defendant

17   expected to receive from Hazens for passing CPC.  (Id.)

18   The government also expects Businessperson A to testify that

19   defendant directed him to hire the wife of public official Joel

20   Jacinto, who oversaw the Bureau of Engineering, because Joel Jacinto

21   could take favorable action for the Luxe Hotel project.  (See Exhibit

22   B (11/30/2017 Businessperson A 1023).)  On April 17, 2018, defendant

23   told Chiang "We need [Jacinto] . . . make sure that [Jacinto] will

24   personally give them a call [to] explain the situation."  (Exhibit D

25   (Trial Ex. 755C-T).)  The government expects to further present

26   undisputed bank records (Trial Ex. 733) that Businessperson A hired

27   and paid Ave Jacinto approximately $16,110 in consulting fees.

28

1  Because these statements were made in furtherance of the
2  conspiracy, defendant's hearsay objections should be overruled.

3       5.   <u>Other Exhibits Are Admissible as Nonhearsay</u>

4      The following three exhibits are admissible as non-hearsay: **Exs.**
5  **163, 332, and 426**.  These exhibits are not hearsay because they do
6  not contain out-of-court statements offered for their truth.
7  Specifically:

8    • **Ex. 163** is video taken on April 9, 2018 the dinner hosted by
9      defendant to tout Rios' forthcoming campaign to run for the CD-
10     14 seat.  While there is some background chatter, there are no
11     discernible statements made in the video, and certainly no
12     statements that the government offers for their truth.

13   • **Ex. 332** is an RFP Site map.  The government anticipates that
14     Agent Civetti will testify that this exhibit, dated November 19,
15     2013, came from defendant's Google Drive in a folder called
16     "Collected."  The government is not offering Exhibit 332 for the
17     truth of what the site entails (e.g., that "an additional 9' of
18     sidewalk easement are required").  Rather, the government will
19     offer it to: (1) show defendant's close involvement with Wei
20     Huang and his exploration of acquiring a potential third
21     property in Los Angeles in 2013, and (2) in support of Agent
22     Civetti's understanding of a reference to "RFP" in defendant's
23     Radar Screen (<u>see</u> Ex. 40 at 26).

24   • **Ex. 426** is a form from Foreign Currency Express.  There are no
25     assertions contained in the exhibit and is therefore not offered
26     for its truth; it merely corroborates that Esparza went to this
27     location to exchange the money Huizar received from Wei Huang in
28     Australia.

6.   The Exhibits Are Relevant and Not Unduly Prejudicial

As is clear from the foregoing, each of these exhibits are directly relevant to and highly probative of the same RICO conspiracy that defendant joined, encouraged, and furthered.  As the government explained above in connection with defendant's other 402/403 objections and in its oppositions to MIL Nos. 1 and 2, the high probative value of these exhibits is not outweighed by any undue prejudice.

**V.   DEFENSE 1006/611(A) OBJECTIONS**

**[Government Exhibits 906; 907C; 908; 909; 910; 911; 912; 921; 922; 923 924; 925; 926; 927; 930; 931; 932; 932A; 940; 940A; 940B; 941; 942; 942A; 942B; 943]**

**A.   Defense Position**

The defense objects to the admission of these exhibits under Federal Rule of Evidence 1006. Putting aside its objections to some of these exhibits under Federal Rules of Evidence 402 and 403 and the issues identified in Mr. Chan's motions *in limine*, Defendant has no objection to the government's use of many of these exhibits as demonstratives. Defendant does object, however, to the introduction of these exhibits into evidence, as they are argumentative and simply designed to advance the government's case. They do not summarize voluminous records, as the government also seeks to introduce the vast majority of the underlying records as well, most of which are not voluminous. They are akin to the PowerPoint slides that the government will use in its closing (which are not evidence), but which the government nevertheless seeks to provide to the jury as it deliberates.

Rule 1006 allows a party to introduce a summary or a chart "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The government's argumentative summaries and charts do not comport with the letter or spirit of the Rule. *See*, *e.g.*, *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991) ("[C]harts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves. … [S]uch pedagogical devices should be used only as a testimonial aid, and should not be admitted into evidence otherwise be used by the jury during deliberations."). The summaries and charts proffered by the government are inadmissible demonstratives and should not be admitted into evidence.

The defense also objects to the government's argument that the objectionable and argumentative summaries are admissible under Federal Rule of 611(a). As the government notes, the Court has discretion as to whether it will admit the summaries under the Rule, but that does not mean that the Court *should* exercise that discretion and admit the summaries here. As the Ninth Circuit has noted, summaries should only be admitted pursuant to Rule 611(a) in "exceptional cases," and remain subject to Rule 403 analysis. *United States v. Baker*, 10 F.3d 1374, 1412 (9th Cir. 1993), *as amended* (Dec. 13, 1993), *and overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). Moreover, summaries containing inadmissible evidence – such as hearsay – are not admissible under Rule 611(a). *United States v. Irvin*, 682 F.3d 1254, 1263 (10th Cir. 2012) (admission of summary charts containing inadmissible hearsay constituted error).

1    There is nothing so exceptional about this case that the Court
2    should permit summaries that essentially constitute the government's
3    closing argument to be admitted as evidence and thus submitted to the
4    jury during its deliberations. Moreover, the slides themselves are
5    pure argument, filled with events and schemes in which Mr. Chan was
6    wholly uninvolved, such as (1) Jose Huizar's money laundering, *see,*
7    *e.g.*, Govt. Exhs. 909-910; (2) trips to Las Vegas (complete with
8    images of casino chips) and other locales, *see e.g.*, Govt. Exhs. 921-
9    926; (3) benefits Mr. Huizar received from others, *see, e.g.*, Govt.
10   Exh. 906, 911-912; and (4) other acts of corruption on Mr. Huizar's
11   part (such as the Mateo project), *see, e.g.*, Govt. Exh. 908. A number
12   reference hearsay evidence as well. *See, e.g.*, Govt. Exh. 925-926,
13   930-931.

14   The Court should decline to admit the government's summaries
15   under either rationale set forth by the government. The summaries are
16   argumentative and are inadmissible as a result.

17   **B.    Government's Response**

18        1.    Overview

19   The government's summary exhibits that defendant objects to fall
20   into three categories, all of which are admissible:

21   • **(1) Summary Timelines of Events ("Timelines"): Ex. 908**
22     (Carmel-Mateo Timeline); **Ex. 910** (Money Laundering Timeline –
23     Huizar Family); **Exs. 924, 925 & 926** (SZNW Timelines); **Exs.**
24     **930, 931 & 932A** (Hazens Timelines); **Exs. 940, 940A & 940B**
25     (Jacinto Timelines); **Exs. 941, 942A & 942B** (ADC Timelines);
26     and **Ex. 943** (FBI Overt Timeline);

27   • **(2) Calculations of Financial Benefits ("Calculations**
28     **Summaries"): Ex. 906** (All Benefits – Huizar); **Ex. 909** (Money

1     Laundering Table – Huizar Family); **Ex. 911** (Benefits from

2     Wang to Huizar - Details); **Ex. 912** (Benefits Wang to Huizar -

3     Totals); **Exs. 921 & 922** (Casino Trips – Chips & Group

4     Benefits; Group Benefits Only); **Ex. 923** (Casino Trips - Excel

5     Example); **Ex. 941** (Chan-Jacinto Payments); and

6  • **(3) Visual Depictions of Voluminous Data: Ex. 927** (Godoy Flow

7     Chart) and **Ex. 907C** (Chan Tolls Bar Graph).

8         Defendant broadly attacks the admissibility of these summary

9  exhibits with boilerplate arguments untailored to any of the specific

10 summary exhibits the government seeks to admit.  To be clear: the

11 government has adopted a measured approach to its summary exhibits

12 and, to that end, has agreed to use several summary exhibits for

13 demonstrative purposes only.  But the remaining summary exhibits the

14 government seeks to admit involve data that is both objective and

15 voluminous and will be useful to the jury; accordingly, they satisfy

16 the admissibility requirements of the Federal Rules of Evidence.

17 Thus, the Court should overrule each of defendant's objections.

18         2.   Legal Standard

19         The government's summary exhibits are admissible under Federal

20 Rule of Evidence 1006, which provides that the proponent of evidence

21 "may use a summary, chart, or calculation to prove the content of

22 voluminous writings, recordings, or photographs that cannot be

23 conveniently examined in court."  Fed. R. Evid. 1006.  "The purpose

24 of [Rule 1006] is to allow the use of summaries when the documents

25 are unmanageable or when the summaries would be useful to the judge

26 and jury."  United States v. Rizk, 660 F.3d 1125, 1130 (9th Cir.

27 2011) (cleaned up and emphasis added).  Thus, the Court must consider

28 whether the summary evidence "assist[s] the jury in understanding the

1    testimony already introduced" and "fairly summarizes" trial evidence.

2    United States v. Boesen, 541 F.3d 838, 848 (8th Cir. 2008).

3         Courts long have "approved the use of charts in complex trials,

4    and ha[ve] allowed the jury to have the charts in the jury room

5    during its deliberations," so long as the judge properly instructs

6    the jury how to treat such summaries.  United States v. Casamento,

7    887 F.2d 1141, 1151 (2d Cir. 1989) (emphasis added) (rejecting

8    argument that "despite the judge's instructions, the vast amount of

9    evidence presented to the jury made it inevitable that the jury would

10   rely uncritically on the government's summary charts," and noting

11   that courts generally "presume that juries follow the instructions

12   given them by the trial judge"); United States v. Ho, 984 F.3d 191,

13   209–10 (2d Cir. 2020) (no abuse of discretion in admitting charts

14   summarizing hundreds of pages in complex fraud trial, where jury was

15   properly advised of their duty to determine the accuracy of the

16   underlying evidence).

17        3.   General Admissibility of the Government's Summary

18             Exhibits

19             a.   Voluminous Records

20        The evidence underlying each of the government's summary

21   exhibits is sufficiently voluminous to satisfy Rule 1006.  "Rule 1006

22   does not provide a precise test for determining when source materials

23   may be considered voluminous."  31 Charles A. Wright & Victor J.

24   Gold, Fed. Prac. & Proc. Evid. § 8044 (2d ed.).  "Instead, district

25   courts are advised to carefully weigh the volume and complexity of

26   the materials.  These two factors have an inversely proportionate

27   relationship: as either the volume or complexity increases,

28   relatively less is required of the other factor."  United States v.

65

1  Appolon, 695 F.3d 44, 61 (1st Cir. 2012) (citing id.); United States

2  v. Possick, 849 F.2d 332, 339 (8th Cir. 1988) (Rule 1006 does not

3  require "that it be literally impossible to examine all the

4  underlying records [before a summary chart may be utilized], but only

5  that in-court examination would be an inconvenience.").

6      The disputed summary exhibits are offered to help the jury

7  understand this complicated, multi-scheme RICO conspiracy, and

8  information underlying them is sufficiently complex and voluminous to

9  justify its presentation in the form of summary exhibits.  See Ho,

10 984 F.3d at 209-10 (affirming Rule 1006 admission of timelines of

11 hundreds of pages of certain text messages, emails, and other

12 documents in complex trial); United States v. Evans, 910 F.2d 790,

13 792 (11th Cir. 1990) (same for summary chart depicting sixty $100

14 monthly payments over a five-year period); Possick, 849 F.2d at 339

15 (records used as basis for preparation of charts in narcotics

16 prosecution, which included telephone toll records of approximately

17 250 calls, and summaries of 20 drug transactions memorialized by

18 hotel receipts and phone bills, were sufficiently voluminous so as to

19 permit admission under Rule 1006); United States  v. Leon-Reyes, 177

20 F.3d 816, 820 (9th Cir. 1999) (in perjury prosecution, trial court

21 did not abuse its discretion in admitting summary of transcript of

22 defendant's allegedly perjured testimony to prove materiality where

23 admission of summary avoided need to admit voluminous transcripts).

24         b.  *Admissibility of Underlying Records*

25     Each of the summary exhibits the government seeks to admit are

26 based on admissible evidence that was produced to defendant well in

27 advance of trial.  See Amarel v. Connell, 102 F.3d 1494, 1516 (9th

28 Cir.  1996) (proponent of summary evidence must establish that the

underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection); Rizk, 660 F.3d at 1130 (materials underlying summary charts "must be admissible, but need not themselves be admitted into evidence") (citation omitted). While defendant claims that some summary exhibits are based on "inadmissible hearsay" or irrelevant "other schemes" evidence, these arguments rest on the same meritless hearsay and 402/403/MIL objections that have been previously briefed at length above and in the MIL filings. The Court's ruling on those objections would resolve defendant's objections here, i.e., if the Court: (1) overrules defendant's objection to a particular exhibit, then defendant's admissibility objection to the inclusion of that same exhibit in the summary charts would be overruled; and (2) sustains defendant's objection to a particular exhibit, the government would revise its summary charts to remove any references that exhibit, which would resolve the objection, too.

In fact, defendant effectively concedes the underlying records are admissible when he argues the summary exhibits are inadmissible because "the vast majority of the underlying records" will also be admitted into evidence. But the fact that the jury will receive some or all of the underlying evidence does not render the exhibits inadmissible where the materials cannot be conveniently examined by the jury. See United States v. Anekwu, 695 F.3d 967, 981-82 (9th Cir. 2012) (no abuse of discretion in admitting both a chart summarizing bank records and the underlying bank records, reasoning they served different purposes); United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991) (that reports regarding three bus

accidents were already in evidence did not mean that in-court examination of that evidence would have been convenient under Rule 1006, so as to preclude admission of summary testimony synthesizing documentary information).  Nor does "[t]he fact that the underlying documents are already in evidence . . . mean that they can[not] be 'conveniently examined in court.'"  United States v. Lemire, 720 F.2d 1327, 1347 (D.C. Cir. 1983).

"Summary charts in particular are admissible when (1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is available for cross-examination, and (4) the jury is properly instructed concerning use of the charts."  United States v. Bishop, 264 F.3d 535, 546 (5th Cir. 2001) (emphasis added).

Indeed, that the vast majority of the underlying evidence will actually be admitted satisfies (not undermines) the threshold requirement that the summary be based on admissible evidence made available in advance to the defense.  Fairness is further ensured here because the charts' preparer, FBI Supervisory Special Agent Andrew Civetti, will be available for cross-examination, including about the methods he used in compiling the charts.  See Anekwu, 695 F.3d 982 (ability to cross examine summary chart's preparer is positive factor in affirming admission of summaries); Bishop, 264 F.3d at 546.  Finally, the jury will be instructed concerning the proper use of these charts because the Court instructs in accordance with Ninth Circuit precedent, which instructions the jury is presumed to follow.  See Ninth Cir. Model Criminal Jury Instructions, No. 3.17

68

1  (2022 ed.) (cautioning that charts and summaries admitted into
2  evidence are "only as good as the underlying supporting material" and
3  the jury "should, therefore, give them only such weight as you think
4  the underlying material deserves"); Casamento, 887 F.2d at 1151.

5              *c.  Presentation of Select, Objective Data*

6       Without pointing to any specifics, defendant broadly claims that
7  the summary exhibits are "argumentative" because they are "simply
8  designed to advance the government's case."[21]  Defendant does not
9  otherwise claim that the summary exhibits are inaccurate or misstate
10 the objective evidence they reflect.

11      Contrary to defendant's assertion, however, that the government
12 has selected certain evidence and events to present in the summary
13 exhibits does not render them inherently argumentative or
14 inadmissible.  "[S]ummaries may include assumptions and conclusions
15 so long as they are based upon evidence in the record."  United
16 States v. Spires, 628 F.3d 1049, 1053 (8th Cir. 2011) (cleaned up).
17 That is plainly the case here because (as defendant points out) the
18 "vast majority" of the underlying evidence will be admitted.
19 Moreover, "[a] summary may include only evidence favoring one party,
20 so long as the witness does not represent to the jury that he is
21 summarizing all the evidence in the case."  Bishop, 264 F.3d at 547.

22              *d.  Admissibility Under Rule 611(a)*

23      Alternatively, these exhibits are admissible under Federal Rule
24 of Evidence 611(a), which permits trial courts to "exercise
25 reasonable control over the mode . . . of . . . presenting evidence
26 so as to (1) make those procedures effective for determining the

27

28      [21] At the same time, defendant states he does not object to these
   exhibits as demonstratives.

truth, [and] (2) avoid wasting time." Fed. R. Evid. 611(a). Relying on Rule 611(a), courts have admitted summaries where they "contribute[] to the clarity of the presentation to the jury, avoid[] needless consumption of time and [are] a reasonable method of presenting the evidence." United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (summary chart admissible in tax evasion case under Rule 611(a)); United States v. Baker, 10 F.3d 1374, 1412 (9th Cir. 1993), as amended (Dec. 13, 1993), and overruled on other ground by United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000) (in large drug conspiracy case, holding admission of summary testimony and charts detailing valuation of drug transactions "was a valid exercise of the district court's discretion under Fed. R. Evid. 611(a)," where the court properly instructed jury on the limitations of such evidence and the chart preparer was extensively cross-examined); United States v. Scales, 594 F.2d 558, 563-64 (6th Cir. 1979) (summaries of testimonial evidence designed "to aid the jury in its examination of the evidence already admitted" are authorized by Rule 611(a)); United States v. Milkiewicz, 470 F.3d 390, 396-98 (1st Cir. 2006) (noting that summaries are admissible under Rule 611(a) where they are "sufficiently accurate and reliable" and finding no abuse of discretion in admitting summary charts depicting the allegedly fraudulent sales transactions and showing discrepancies in defendant's income tax reporting under Rule 611(a), where defendant had ample opportunity for cross-examination and court properly instructed jury how to treat the summaries.). Consistent with these cases, the disputed summary exhibits are accurate and reliable, and, of particular relevance in this complicated case, would clarify the presentation of complex scheme evidence and help avoid the needless

consumption of time.  Thus, to the extent the Court declines to admit the summary exhibits under Rule 1006, it should exercise its discretion to admit the summary exhibits under Rule 611(a).

### 4.   Specific Arguments Relating to the Timelines

**[Ex. 908 (Carmel-Mateo Timeline); Ex. 910 (Money Laundering Timeline – Huizar Family); Exs. 924, 925, 926 (SZNW Timelines); Exs. 930, 931 & 932A (Hazens Timelines); Exs. 940, 940A & 940B (Jacinto Timelines); Exs. 941, 942A & 942B (ADC Timelines); and Ex. 943 (FBI Overt Timeline)]**

Timelines and event summaries are commonly admitted as proper summaries helpful to the jury, particularly *in complex cases* like this, because they make the trial more efficient and help clarify evidence that otherwise would be cumbersome.  See, e.g., United States v. Williams, 952 F.2d 1504, 1519 (6th Cir. 1991) (affirming Rule 1006 admission of chart summarizing a "chronology of the significant events" that occurred on three days of significance in government-corruption prosecution, including telephone, limousine, and surveillance records and excerpts from recorded telephone conversations); Bishop, 264 F.3d at 546 (no abuse of discretion in admitting government's timeline of events where underlying "evidence was already before the jury" and jury was properly instructed on summary evidence); United States v. Borders, 829 F.3d 558, 567 (8th Cir. 2016) (holding no error in admitting government's  summary timeline of the conspiracy under Rule 1006, holding "[s]ummary evidence is proper 'when it assists the jury in understanding the testimony already introduced and fairly summarizes trial evidence.'") (citation omitted).

Here, the government's timelines are based on objective records that are sufficiently voluminous—oftentimes hundreds or even thousands of pages of documents—including toll records, calendars, phone records, text messages, City documents, emails, bank and other financial records. As one example, the Hazens Timeline for the 2017-2018 period **(Ex. 931)** has 84 unique events, each of which relates to at least one but up to three underlying documents that themselves span from a few pages to hundreds of pages each. In other words, the materials underlying this timeline easily encompass many hundreds, if not thousands, of pages, and the sequencing of these underlying events provides information that would not otherwise be apparent from the documents themselves. See Ho, 984 F.3d at 209-10 (hundreds of pages sufficient); Evans, 910 F.2d at 792; Possick, 849 F.2d at 339. As Rule 1006 recognizes, "it often takes a great deal of court time to introduce a legion of documents to establish a single point." United States v. Bertoli, 854 F. Supp. 975, 1049-1050, (D.N.J. 1994), vacated in part on other grounds, 40 F.3d 1384 (3d Cir. 1994). To avoid a "grueling waste of time to examine all of the underlying evidence in court," which the government would be forced to do absent the Timelines, the Court can properly admit (and indeed should admit) the timelines as summaries under Rule 1006. Id.; see also United States v. Pinto, 850 F.2d 927, 935 (2d Cir. 1988) (no abuse of discretion in admitting summary charts identifying phone participants, conspirators' numbers and addresses, and the locations from which calls were placed or received); United States v. Goldberg, 401 F.2d 644, 647-48 (2d Cir. 1968) (affirming trial court's admission of charts that were constructed "from the testimony of the government's witnesses and from ... voluminous business records");

<u>Ho</u>, 984 F.3d at 209–10 (affirming Rule 1006 admission of timelines of hundreds of pages of certain text messages, emails, and other documents in complex trial).

To put a finer point on it: the government intends to use the Timelines just as it did during the first trial against defendant, namely, to present its case more efficiently by obviating the need to display all or most of the exhibits underlying the entries on Timelines.  Previously, the government displayed only selected documents when reviewing the Timelines with the appropriate witnesses, opting not to display routine but cumbersome documents like calendars and records of public hearings.  If the Courts limits the government's use of the Timelines to demonstrative purposes only, the government will need to go over the entries more thoroughly and display all or nearly all of the documents underlying the Timelines during witness examination and then again in closing argument, which would be inconvenient to the jury and result in an unnecessary expenditure of time.

The analysis in <u>Ho</u> is particularly helpful here.  984 F.3d at 209–10.  There, the defendant challenged the admission of summary charts that "provided timelines of certain text messages, emails, and other documents admitted into evidence," arguing that while "the charts accurately quote[d] the underlying emails and text messages and could be used as demonstratives," they were inadmissible under Rule 1006 because they were "created for the purpose of generating a narrative supporting the prosecution's theory of the case," and the underlying materials "easily . . . been examined by the jury."  <u>Id.</u> at 210 (ellipses in original).  The Second Circuit rejected this argument and affirmed the admission of these summary timeline

exhibits under Rule 1006, noting it had "long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury" about how to treat summary charts.  Id. (cleaned up).  The Second Circuit found the district court properly instructed the jury "to first determine that [the summary charts] accurately reflected the evidence on which they were based."  Id. Further, the Second Circuit held that "while it is true that summary charts are sometimes used to synthesize even larger volumes of documentary evidence . . . it was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts in a complex fraud trial."  Id. The Court should adopt similar reasoning here and admit the Timelines.

Alternatively, as explained above in Section V(B)(3)(d) supra, the Timelines are admissible under Rule 611(a) because they are accurate and reliable and would clarify the presentation of evidence to the jury and help avoid needless consumption of time in this particularly complex case.  For these reasons, the Court should admit the Timelines under Rule 1006, or alternatively, under Rule 611(a).

     5.   Specific Arguments Relating to the Calculations Summaries

**[Ex. 906 (All Benefits - Huizar); Ex. 909 (Money Laundering Table – Huizar Family); Ex. 911 (Benefits from Wang to Huizar - Details); Ex. 912 (Benefits Wang to Huizar - Totals); Exs. 921, 922 (Casino Trips – Chips & Group Benefits; Group Benefits Only); 923 (Casino Trips - Excel Example); Ex. 941 (Chan-Jacinto Payments)]**

74

1    Rule 1006 authorizes the use of "calculations" to prove the
2    content of underlying evidence.  Fed. R. Evid. 1006.  The
3    Calculations Summaries are admissible under Rule 1006 because they
4    are accurate and reliable, summarize voluminous records (hundreds or
5    thousands of pages of underlying documents), and help avoid needless
6    consumption of time.
7        The Casino summary charts marked as **Exhibits 921-923** illustrate
8    this point well.  **Exhibits 921** and **922** summarizes the value of
9    benefits provided to Huizar across 20 different Vegas trips from 2013
10   to 2017, including the group benefits that SZNW conferred.  E**xhibit
11   923** is an Excel spreadsheet that calculates all the line items for
12   the group benefits for just <u>one</u> of the 20 Vegas trips (the trip from
13   August 5-7, 2016), and is its own summary chart.  (See **Ex. 923.**)
14   **Exhibit 923** has over 150 entries with mathematical computations, and
15   each entry is based on underlying casino records and bank records,
16   which themselves are multiple pages for each such record.  Again,
17   this reflects just the group benefits for one of the 20 Vegas trips
18   detailed in **Exhibits 921** and **922**, and **Exhibits 921** and **922** are
19   additionally based on other admissible evidence, like flight records.
20   In other words, the underlying records are plainly voluminous.
21       As detailed above, the case law is replete with examples where
22   summaries are admitted under Rule 1006 to distill business records,
23   phone records, and bank records.  This makes good sense because this
24   type of concrete, objective information is capable of accurate
25   presentation in chart or summary form.  These Calculations Summaries
26   will help the jury to understand the scope of financial benefits
27   relating to the RICO conspiracy and its various sub-schemes.
28   Certainly, the alternative is untenable: expecting the jury to comb

75

through thousands of pages of bank records, watch videos depicting gambling chip exchanges, and review lengthy text message exchanges as presented by disparate witnesses in order to extract the relevant figures and then engage in mathematical computations to add up those figures.  Instead, the Calculations Summaries, which prove the content of voluminous records through mathematical calculations, will be helpful to the jury and avoid great inconvenience to them.  See Rizk, 660 F.3d at 1130;  United States v. Jennings, 724 F.2d 436, 441–442, (5th Cir. 1984) (no abuse of discretion in permitting use of summary charts where underlying evidence was almost two hundred pages of material and preparation of the charts involved substantial amounts of mathematical calculations).  The Court should admit them under Rule 1006, or alternatively, as discussed in Section V(B)(3)(d) supra, under Rule 611(a).

6.    Specific Arguments Relating to Visual Depictions of Voluminous Data

**[Ex. 927 (Godoy Funds Flow Chart) and Ex. 907C (Chan Tolls Bar Graph)]**

The Godoy Funds Flow Chart and Chan Tolls Bar Graph are admissible under Rule 1006 or, in the alternative, Rule 611(a).  The Godoy Funds Flow Chart (**Ex. 927**) is based upon voluminous emails, bank records, and business records.  This type of tracing analysis is complex, particularly where, as here, defendant and Huang designed the transaction to evade detection.  Providing a visual depiction that traces the flow of funds through the various entities and accounts will be helpful for the jury to understand this complex information in a manner that is not readily discernable from the voluminous records themselves.  See United States v. Stephens, 779

76

F.2d 232 (5th Cir. 1985) (no abuse of discretion in admitting charts, including simple flow charts tracing use of the loan proceeds because evidence was indisputably complex, and examination of the underlying materials would have been inconvenient without the charts).

For the same reasons, the Chan Tolls Bar Graph (**Ex. 907C**), which depicts defendant's calls and text contacts with Ambroz, is admissible.  To create this chart, SSA Civetti searched defendant's entire toll records for the relevant time period (September 2013 to August 2018), consisting of thousands of pages, in order to determine the days that defendant had telephonic contact with Ambroz and, importantly, the days defendant did *not* have contact with Ambroz. Courts have understandably admitted such evidence under Rule 1006, reasoning that "the absence of records may be summarized" in a chart. See Scales, 594 F.2d at 562 (affirming admission of chart stating that records *did not* contain certain information, reasoning that "[i]f the records themselves could have been admitted to show what their contents did not include, there appears to be no reason why Rule 1006 would not apply to a summary of their contents"; "that in such an instance the content of the records is negative . . . does not render the fact of omission any less an accurate summary of the content of the records").  This makes good sense because to hold otherwise would require the jury to inspect defendant's entire toll records over a five-year period to conclude that he did not have any other telephonic contacts with Ambroz except as illustrated in the chart.  This is precisely why such summary charts are permitted.

For these reasons, the Court should admit these exhibits under Rule 1006, or in the alternative, under Rule 611(a).

7.    The Summary Exhibits Are Relevant and Not Unfairly
      Prejudicial

        Finally, the government's summary exhibits are highly probative
and not unduly prejudicial.  Defendant objects to some of the summary
exhibits under Rules 402 and 403 and as "other schemes" evidence.
The arguments regarding other schemes as well as defendant's 402 and
403 objections are discussed at length above (supra Sections I(B),
II(B), III(B)), and the government will not repeat them here.  The
government will note, however, that the fact that the summaries
detail schemes within the scope of the broader RICO conspiracy does
not render them improper under Rule 403.  "The rule is well
established that the government in a conspiracy case may submit proof
on the full scope of the conspiracy; it is not limited in its proof
to the overt acts alleged in the indictment."  Rizk, 660 F.3d at 1131
(collecting cases within and outside of Ninth Circuit).  In Rizk, the
defendant argued that summary charts reflecting 96 real estate
transactions were "overbroad" where the "overt acts and substantive
counts of the indictment identified only nine specific properties."
Id. at 1129, 1129 n.1.  The Ninth Circuit rejected this argument,
holding that the "real estate transactions shown on the charts were
'inextricably intertwined' with the conspiracy charge" and the
"government offered the summary charts to show the full scope of that
conspiracy and as proof that the non-specified transactions were not
'other acts' at all."  Id. at 1132; see also United States v. Thiam,
934 F.3d 89, 96-97 (2d Cir. 2019) (rejecting defendant's relevance
and Rule 403 arguments and affirming admission of summary chart
depicting defendant's luxury purchases and text message exchanges
because the "evidence was useful to the jury in understanding

78

1    [defendant]'s motivation for accepting bribes and his consciousness

2    of guilt respectively"); United States v. Montgomery, 384 F.3d 1050,

3    1062 (9th Cir. 2004) (summary exhibit admissible where all entries

4    were "'inextricably intertwined' with the conspiracy, and therefore

5    not subject to Rule 404(b), because each occurred within the temporal

6    scope of the conspiracy and comprised the conspiracy"); United States

7    v. Robinson, 774 F.2d 261, 276 (8th Cir. 1985) ("The summary properly

8    included all 105 applicants [rather than the 15 named in the

9    indictment], because information regarding all of these individuals

10   was relevant in delineating the enormous scope of the [loan fraud]

11   scheme.").  The summary exhibits present evidence that is useful to

12   aid the jury in understanding the scope of the complex conspiracy,

13   including its goals and objectives and defendant's role in it.  For

14   these reasons and those articulated above, the Court should admit the

15   government's summary exhibits.

16

17

18

19

20

21

22

23

24

25

26

27

28