E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2091/0363/3289/3819
        Facsimile: (213) 894-6436
        E-mail:    Mack.Jenkins@usdoj.gov
                   Cassie.Palmer@usdoj.gov
                   Susan.Har@usdoj.gov
                   Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>RAYMOND SHE WAH CHAN,<br>  aka "She Wah Kwong,"<br><br>          Defendant. | No. CR 2:20-326(A)-JFW-2<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR MISTRIAL DUE TO JURY MISCONDUCT OR, IN THE ALTERNATIVE, AN EVIDENTIARY HEARING<br><br>Date:     May 3, 2024<br>Time:     8:00 a.m.<br>Location: Ctrm of the Hon. John F. Walter |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Mack E. Jenkins,
Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files
the Government's Opposition to Defendant's Motion for Mistrial Due to

1  Jury Misconduct or, in the Alternative, an Evidentiary Hearing.

2  (Dkt. No. 1405).

3       The government's Opposition is based upon the attached

4  memorandum of points and authorities, the files and records in this

5  case, and such further evidence and argument as the Court may permit.

6   Dated: April 15, 2024              Respectfully submitted,

7                                      E. MARTIN ESTRADA
                                       United States Attorney
8

9                                            /s/
                                       _____
                                       SUSAN S. HAR
10                                     CASSIE D. PALMER
                                       BRIAN R. FAERSTEIN
11                                     Assistant United States Attorneys

12                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   RELEVANT FACTS.................................................2

      A.    The Trial and Evidence Against Defendant.................2

      B.    Report by a CRD and the Jury's Verdicts.................6

III.  LEGAL STANDARD.................................................7

IV.   ARGUMENT.......................................................8

      A.    There Is No Evidence of Juror Misconduct.................8

      B.    The Juror's Comment Did Not Prejudice Defendant.........14

      C.    The Court Should Deny Defendant's Request for an
            Evidentiary Hearing.....................................17

V.    CONCLUSION....................................................20

1

**TABLE OF AUTHORITIES**

2

Cases

3

Dyer v. Calderon,
    151 F.3d 970 (9th Cir. 1998) .................................. 18
4
Pena-Rodriguez v. Colorado,
    580 U.S. 206 (2017) ...................................... 13, 18
5
Tanner v. United States,
    483 U.S. 107 (1987) ...................................... 19, 20
6
United States v. Anderson,
    561 F.2d 1301 (9th Cir. 1977) ............................ 11, 12
7
United States v. Angulo,
    4 F.3d 843 (9th Cir. 1993) ............................... 13, 19
8
United States v. Armstrong,
    909 F.2d 1238 (9th Cir. 1990) ................................. 1
9
United States v. Bagnariol,
    665 F.2d 877, 885 (9th Cir. 1981) .................. 14, 15, 17
10
United States v. Banks,
    514 F.3d 959 (9th Cir. 2008) .................................. 7
11
United States v. Caldwell,
    83 F.3d 954 (8th Cir. 1996) .................................. 9
12
United States v. Cox,
    324 F.3d 77 (2d Cir. 2003) ................................... 7
13
United States v. Dolan,
    120 F.3d 856 (8th Cir. 1997) ................................ 11
14
United States v. Fails,
    51 F. App'x 211 (9th Cir. 2002) ............................. 9
15
United States v. Gianakos,
    415 F.3d 912 (8th Cir. 2005) .............................. 9, 10
16
United States v. Halbert,
    712 F.2d 388 (9th Cir. 1983) ................................ 19
17
United States v. Haynes,
    729 F.3d 178 (2d Cir. 2013) ................................. 10
18
United States v. Hernandez-Escarsega,
    886 F.2d 1560 (9th Cir. 1989) ............................... 19
19
United States v. Hooker,
    198 F. App'x 545 (7th Cir. 2006) ........................... 12
20
United States v. Humphrey,
    208 F.3d 1190 (10th Cir. 2000) .............................. 13
21
United States v. Klee,
    494 F.2d 394 (9th Cir. 1974) .............................. 14, 15
22
United States v. Langford,
    802 F.2d 1176 (9th Cir. 1986) ............................... 19
23
United States v. Madrid,
    842 F.2d 1090 (9th Cir. 1988) ................................ 7
24
United States v. Milles,
    363 F. App'x 506 (9th Cir. 2010) ........................... 12

25

26

27

28

//

United States v. Montes,
  628 F.3d 1183 (9th Cir. 2011) ................................ 17, 18
United States v. Moten,
  582 F.2d 654 (2d Cir. 1978) ...................................... 13
United States v. Muhammad,
  819 F.3d 1056 (8th Cir. 2016) .................................... 12
United States v. Peterson,
  385 F.3d 127 (2d Cir. 2004) ....................................... 8
United States v. Reed,
  762 F. App'x 173 (5th Cir. 2019) .................................. 7
United States v. Resko,
  3 F.3d 684 (3d Cir. 1993) ........................................ 10
United States v. Rigsby,
  45 F.3d 120 (6th Cir. 1995) ...................................... 11
United States v. Rodriquez,
  116 F.3d 1225 (8th Cir. 1997) .................................... 13
United States v. Straach,
  987 F.2d 232 (5th Cir. 1993) ................................. 12, 16
United States v. Wintermute,
  443 F.3d 993 (8th Cir. 2006) ................................... 1, 18
United States v. Young,
  301 F.2d 298 (6th Cir. 1962) ..................................... 12
Welch v. United States,
  371 F.2d 287 (10th Cir. 1966) .................................... 12

Rules

Fed. R. Evid. 606(b)......................................... passim

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

On March 27, 2024, after a 10-day presentation of evidence by the government, the jury returned guilty verdicts on all 12 charged counts against defendant Raymond Chan ("defendant").  This was the second trial against defendant; his first trial started on February 21, 2023 but was declared a mistrial after prior defense counsel fell ill on the eighth day of trial.  (<u>See</u> Dkt. No. 1034.)

Defendant now seeks another mistrial.  (Dkt. No. 1405 ["Mot."].) The motion is based on a comment made by one juror to two other jurors that he/she hoped the jury would arrive at a quick verdict. Nothing about this innocuous and outcome-neutral remark--made after the jury sat attentively through 10 days of the government's evidence, over five hours of closing arguments, and over one hour of jury instructions--was improper.  There is also nothing to suggest that this comment "prejudiced the defendant to the extent that he has not received a fair trial," particularly in light of the overwhelming evidence of defendant's guilt.  <u>United States v. Armstrong</u>, 909 F.2d 1238, 1244 (9th Cir. 1990).  Defendant's baseless motion for a mistrial should be denied.

The Court also should reject defendant's request for an evidentiary hearing.  Under Federal Rule of Evidence 606(b), as part of an inquiry into the validity of a verdict, the Court may seek limited testimony of a juror only when there is a "colorable claim" that extraneous prejudicial information or outside influence was improperly before the jury.  <u>United States v. Wintermute</u>, 443 F.3d 993, 1002-03 (8th Cir. 2006).  Because nothing suggests that extraneous information or outside influences affected the jury, a

1

hearing questioning the jurors is prohibited.  A hearing with the courtroom deputy (the "CRD") who overheard the juror's remark also is unwarranted.  The Court already conducted a fulsome interview of the CRD regarding what she overheard and observed during the brief period she was near the three jurors.  A further hearing with the CRD would serve only as a needless fishing expedition.

## II.   RELEVANT FACTS

### A.   The Trial and Evidence Against Defendant

The trial in this matter began on March 12, 2024.  (Dkt. No. 1351.)  Over the following 10 court days, the government put on twelve witnesses and walked the jury through hundreds of exhibits.  (Dkt. No. 1400.)  The government concluded its case-in-chief on Monday, March 25.  (Dkt. No. 1393.)

The evidence against defendant was overwhelming.  Two separate cooperators, George Esparza and George Chiang, testified that defendant was part of the same RICO conspiracy to which they each pled guilty and provided extensive details about their interactions, communications, and close working relationships with defendant as part of that conspiracy.  Their testimonies covered all aspects of defendant's integral role in the Council District 14 ("CD-14") Enterprise and pay-to-play scheme at the heart of the RICO conspiracy.  This included defendant's critical involvement in advancing the L.A. Grand Hotel and Luxe Hotel bribery schemes; his facilitation of corrupt relationships between Councilmember Jose Huizar and wealthy Chinese developers; and defendant's crucial role in helping the CD-14 Enterprise maintain its power.  Esparza and several other witnesses (including Harris Chan, Richelle Rios, and FBI Supervisory Special Agent Andrew Civetti) testified about

defendant's key involvement in facilitating the bribe money from Chairman Wei Huang of SZNW that allowed Huizar to settle confidentially the sexual harassment lawsuit against him and save his CD-14 Councilmember seat.  Chiang testified about defendant's direction of Chiang within their secret business partnership, Synergy Alliance Advisors ("Synergy"), which defendant used to secure hundreds of thousands of dollars in bribes from Hazens in exchange for exploiting his influential official positions within the City to obtain favorable official acts for the Luxe Hotel project.

A government informant, Andy Wang, provided insider testimony about defendant's bribery schemes, including the Arts District Center bribery scheme, and defendant's directions to Wang to provide indirect bribes to Shawn Kuk and Joel Jacinto, after defendant left City employment and began openly working at Synergy.  Wang's testimony was corroborated by a dozen surreptitiously recorded conversations with defendant regarding defendant's involvement in the pay-to-play scheme.  And another cooperator, Morris Goldman, testified about the plan for Huizar, defendant, and their co-conspirators to maintain power by having Huizar's wife (Rios) succeed Huizar as CD-14 City Councilmember, namely by extracting campaign contributions from developers with pending projects in the City by leveraging Huizar's official acts.

The detailed and comprehensive testimony provided by these multiple insider witnesses was corroborated through extensive audio, video, and documentary evidence admitted at trial.  The government's nearly 800 admitted exhibits included text messages, emails, public records, open source documents, bank and financial records, business records, casino records, flight records, phone/toll records, phone

notes, City calendars, records from defendant's Google accounts
(called "Radar Screens," which were coded documents tracking his
duties and activities), records from Huizar's office and computer,
photographs, and audio/video recordings.  (See generally Dkt. No.
1400.)  Much of the government's voluminous evidence was synthesized
in timeline summaries that clearly laid out the chronologies of
events underlying defendant's involvement in the various bribery
schemes.  The government painstakingly walked the witnesses through
hundreds of these exhibits, demonstrating the depth and scale of
defendant's role as the key facilitator of the RICO conspiracy and
pay-to-play scheme.

Los Angeles City officials also testified about their
experiences and communications with defendant as he carried out his
criminal scheme.  David Ambroz, the former President of the Los
Angeles City Planning Commission, testified about the pressure
defendant brought to bear on him to approve the Luxe Hotel project on
favorable terms while defendant was Deputy Mayor of Economic
Development.  Ambroz testified that defendant lobbied and "leaned" on
him at an off-site meeting about the project, during which defendant
appeared to be acting as a "hired gun" for Hazens.  Kevin Keller, a
career official with the Planning Department, testified about the
outsized interest defendant exhibited for the Luxe Hotel project and
the detail-oriented tasks defendant undertook on the project that
were not in keeping with his official duties and responsibilities.

Perhaps most significantly, much of the mountain of the
government's evidence included defendant's own words and admissions
in the form of recordings, emails and text messages, and Radar
Screens.  Defendant's candid admissions in his own words featured

4

prominently throughout the government's presentation of its case and cemented defendant's guilt.  The Radar Screens in particular, which tracked defendant's activities (criminal and otherwise) through coded and painstakingly detailed task lists and firmly connected defendant to the various activities of the CD-14 Enterprise.

Finally, the government presented significant evidence of defendant's concealment tactics and obstructionist conduct, demonstrating his consciousness of guilt for his crimes.  Among other things, the government presented evidence that defendant used his personal email address and phone calls to conduct his criminal affairs as a City official and that he encouraged others to do the same.  When the FBI's investigation came on defendant's radar, surreptitiously recorded discussions reflected defendant's efforts to learn about the scope of the investigation, conceal his knowledge of it, and maneuver around it, including by scouring his office for bugs and instructing co-conspirators to leave their phones at the door during meetings.  The government's evidence further showed that defendant deleted thousands of text messages from his cell phone that were found on Huizar's and Chiang's cell phones.

When the FBI's investigation went fully overt, defendant tampered with witnesses, going so far as to provide them written summaries of his false version of events regarding the Arts District Center bribery scheme.  Defendant concealed and withheld documents sought by subpoenas, including by falsely writing "Attorney Client Privilege" on clearly non-privileged documents and instructing Chiang to do the same.  And when defendant was interviewed by the FBI in November 2018, he lied repeatedly about his knowledge of and key role in facilitating Huizar's corrupt relationship with Chairman Huang.

Through Agent Civetti's testimony on the last day of testimony (Monday, March 25), the government walked the jury through defendant's numerous lies and the key evidence that demonstrably proved the falsity of each statement and defendant's knowledge of such falsity.

**B.   Report by a CRD and the Jury's Verdicts**

On Tuesday, March 26, trial began at 8:00 a.m. and counsel for the parties delivered over five hours of closing arguments to the jury.  (Dkt. No. 1394.)  During rebuttal, government counsel reviewed each page of the 24-page verdict form with the jury.  The Court then read 75 pages of instructions to the jury, which took approximately one and a half hours.  (Dkt. No. 1398.)  The bailiff was sworn, and the jury began deliberations at approximately 3:40 p.m.; the jury concluded its deliberations for the day at approximately 4:00 p.m.

As relayed by the Court, after the jury concluded its deliberations on Tuesday evening, a CRD for a different judge saw a group of three jurors from the trial walking together from the courthouse to a parking lot.  The CRD, who was walking behind the group, reported that she overheard one juror from the group state that he/she hoped the jury would arrive at a quick verdict.  The CRD overheard a second comment when one juror (presumably the foreperson) stepped off the curb and another juror remarked that he should be careful; otherwise, they would need to select a new foreperson.  The CRD also observed that a fourth juror from the trial was walking behind the group of the three jurors.

On Wednesday, March 27, the CRD advised the CRD for this Court about what she had heard, which this Court's CRD then brought to the Court's attention.  The jury began deliberating around 8:00 a.m.  At

approximately 9:15 a.m., the jury sent a note indicating that it had reached a verdict.  (Dkt. No. 1396.)  The jury unanimously found defendant guilty on all twelve counts and made all available special findings.  The jury was polled, with each juror affirming that the verdicts as read by the Court reflected his/her verdicts.

By Thursday, March 28, the Court had directly interviewed the CRD who witnessed the jurors' interaction on Tuesday, the results of which the Court relayed to the parties during a status conference on Friday, March 29.  Thereafter, defendant filed his motion for a mistrial.

**III.  LEGAL STANDARD**

"As a mistrial is an extreme remedy, it should be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases." United States v. Reed, 762 F. App'x 173, 174 (5th Cir. 2019) (citation omitted).

The district court has "wide discretion in deciding whether to declare mistrial." United States v. Banks, 514 F.3d 959, 973, 974 (9th Cir. 2008).  Substantial weight is given to the trial judge's conclusion as to the effect of alleged juror misconduct. United States v. Madrid, 842 F.2d 1090, 1092 (9th Cir. 1988).  "Considerable deference is paid to the trial judge, since the trial judge is uniquely qualified to appraise the probable effect of information upon the jury, the materiality of the extraneous material, and its prejudicial nature." Id. (cleaned up).  The district court has particularly "broad flexibility" in investigating a claim of juror misconduct "when the alleged prejudice results from statements by the jurors themselves, and not from . . . outside influences" because of the less serious threat posed by intra-jury communications. United

7

States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003) (cleaned up and emphasis added).

## IV.  ARGUMENT

The Court should exercise its broad discretion and deny defendant's motion for a mistrial.  Defendant's motion fails on two independent grounds: (1) there is no evidence of juror misconduct at all, and (2) there was no prejudice to defendant by one juror's passing and neutral comment to two other jurors.  The Court should also reject defendant's request for an evidentiary hearing with the jury under Rule 606(b) and with the CRD as unwarranted.

### A.  There Is No Evidence of Juror Misconduct

The jury conduct at issue is completely innocuous.  Contrary to the defense's characterizations that the jury "impermissibly discussed the case amongst themselves" and "prematurely reached a verdict," neither contention is true.  (See Mot. at 1, 5.)

Nothing of substance was discussed by the three jurors.  The juror's comment was limited to an expression of hope that a verdict would be reached quickly and expressed no opinion or advocacy regarding the outcome of that verdict.  Nor did the CRD report overhearing any substantive discussions about the case, the witnesses, the evidence, the law, the defendant, or any other matters that could constitute deliberations.  Indeed, "[n]ot every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation."  United States v. Peterson, 385 F.3d 127, 135 (2d Cir. 2004) (holding that juror "was [not] engaging in premature deliberations when she told another juror that she knew the defendants").

But even if the jurors had discussed the substance of the case, such conduct standing on its own would not undermine the validity of the jury's deliberative process and verdict.  That is because while premature deliberations among jurors, in the absence of any allegations of external influence, may violate the proper process for jury decision making, that fact gives "no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial."  United States v. Gianakos, 415 F.3d 912, 921 (8th Cir. 2005).  Any intra-jury substantive discussion amongst the subset of jurors here would be even more benign given that the jury had already begun deliberating and would not have violated the Court's instructions not to discuss the case during trial.  This type of passing conversation amongst a small group of jurors during deliberations is "not serious."  United States v. Fails, 51 F. App'x 211, 215 (9th Cir. 2002) (affirming denial of mistrial where the "nature of the alleged misconduct is not serious: it involved three jurors discussing the case during a short break during jury deliberations").  Claims based on arguably more problematic comments have been deemed insufficient grounds for further inquiry or a new trial.  E.g., United States v. Caldwell, 83 F.3d 954, 956 (8th Cir. 1996) (no abuse of discretion to deny further inquiry or new trial; juror comments to effect that "I've heard all of this I need to hear" and "this is just a bunch of crap" could not "be used to impeach the jury's verdict").

Defendant inexplicably characterizes the analogous situation that arose in Fails as "easily distinguishable from the facts as currently known here."  (Mot. at 5 n.2.)  Defendant is wrong.  Like Fails, the alleged juror misconduct arose "after the close of the

case and following the jury instructions," <u>Fails</u>, 51 F. App'x at 216 n.2, and not, contrary to defendant's assertion, prior to the commencement of deliberations.  If anything, the jurors' conduct in <u>Fails</u> was likely more problematic, as they had "discuss[ed] the case"; by contrast, here, the jurors did not discuss anything of substance regarding the case.  <u>Id.</u> at 215.

Nor is there any indication that any juror "prematurely" reached a verdict.  Here, the juror made the comment at issue <u>after</u> all the evidence had been presented, closing arguments had been delivered, the jury had been instructed, and deliberations had begun.  Even if a juror had an opinion about what he/she believed the verdict should be, that would be perfectly permissible at that stage.  For this reason, the cases that defendant cites concerning premature deliberations--all of which relate to jury deliberations <u>before</u> the cases had been submitted to the jury--are plainly distinguishable and inapposite.  <u>See</u> <u>Gianakos</u>, 415 F.3d at 921  (no prejudice to defendant where nonjuror observed one juror silently mouth to another juror "he's guilty" during the government's presentation of the evidence); <u>United States v. Resko</u>, 3 F.3d 684, 686 (3d Cir. 1993) (district court learned on the seventh day of a nine-day trial, prior to the close of evidence and jury instructions, that all the jurors had been discussing the case amongst themselves); <u>United States v. Haynes</u>, 729 F.3d 178, 191 (2d Cir. 2013) (defense counsel moved for a mistrial because he had heard from one of the alternate jurors that prior to deliberations some of the women on the jury said that the defendant might be guilty because "she's here").

Just as significantly, the comment was completely outcome neutral.  Expressing hope that <u>a</u> verdict would be reached quickly

does not indicate one way or the other what verdict (not guilty or guilty) the speaker hoped the jury would reach.  If anything, the comment suggests that, as of Tuesday evening, after the jury had started its deliberations, the jury had not reached a verdict; hence, the juror's expressed desire that the group would reach a consensus quickly.  For that same reason, defendant's assertion that "other jurors do appear to have been swayed by this misconduct" rests not only on pure speculation but also on the faulty premise that there was misconduct in the first place.  (Mot. at 5.)  Defendant's claim is particularly meritless where, as here, the jurors were polled and indicated their verdicts on the record.  See United States v. Rigsby, 45 F.3d 120, 121, 125 (6th Cir. 1995) (no abuse of discretion in denying request to "conduct an inquiry into a suggestion of possible juror bias" where, among other things, "after the jury returned its verdict, the judge caused the jury to be polled").  In the same vein, defendant's focus that one of the involved jurors was the foreperson and that "the foreperson's misconduct carried greater sway over the other jurors" is premised on the same flawed premise there was misconduct and relies on pure conjecture.  (Mot. at 5.)  That the foreperson may have been amongst the group of three jurors at the time of the innocuous comment (whoever made it) does not transform a non-event into misconduct, much less prejudicial misconduct.

In a further effort to bolster his claim of juror misconduct, defendant points to the brevity of the deliberations.  This too fails.  "There is no established rule that any specified time is required to reach unanimity." United States v. Anderson, 561 F.2d 1301, 1303 (9th Cir. 1977); United States v. Dolan, 120 F.3d 856, 870 (8th Cir. 1997) (two-hour jury deliberation sufficient; "It seems

11

1 self-explanatory that '[n]o rule requires a jury to deliberate for

2 any set length of time.'" (citation omitted)).  This makes good sense

3 because "[j]urors formulate their opinions from the evidence they

4 hear in the court room," particularly when "the evidence of guilt

5 strong."  <u>United States v. Young</u>, 301 F.2d 298, 299 (6th Cir. 1962)

6 (upholding verdict reached in four minutes).  Indeed, the argument

7 that the jury reached a verdict quickly is "a two-edged sword.  The

8 jury may have thought there was not even a shadow of doubt as to

9 guilt."  <u>Anderson</u>, 561 F.2d at 1303.

10       Consistent with the foregoing, courts routinely uphold guilty

11 verdicts following short deliberations.  <u>See, e.g.</u>, <u>United States v.</u>

12 <u>Milles</u>, 363 F. App'x 506, 508 (9th Cir. 2010) (upholding verdict

13 reached in thirty minutes in theft of government funds and conspiracy

14 case involving twenty witnesses); <u>United States v. Hooker</u>, 198 F.

15 App'x 545, 547 (7th Cir. 2006) (no misconduct where jury deliberated

16 for two hours in two-defendant fraud and securities case and found

17 defendant guilty of eleven counts); <u>Welch v. United States</u>, 371 F.2d

18 287, 293 (10th Cir. 1966) (upholding verdicts reached in one hour and

19 48 minutes after a two-week trial and rejecting claim that the

20 verdict indicated prejudice from overall publicity of case).

21       Nothing about the jurors' conduct here implicates actual

22 misconduct.  There is no indication of exposure to extraneous

23 influences, such as "publicity received and discussed in the jury

24 room, matters considered by the jury but not admitted into evidence,

25 and communications or other contact between jurors and outside

26 persons."  <u>United States v. Muhammad</u>, 819 F.3d 1056, 1061-62 (8th

27 Cir. 2016); <u>see also</u> <u>United States v. Straach</u>, 987 F.2d 232, 241 (5th

28 Cir. 1993) (outside influences include newspapers and statements by

court personnel; "pressure" by other jurors "cannot count as an outside influence"). The jurors here did not, for example, discuss "[a] prior conviction of a defendant . . . not admitted as evidence at trial[.]" United States v. Rodriquez, 116 F.3d 1225, 1227 (8th Cir. 1997). The juror's stray comment here also does not suggest improper consideration of matters such as racial animus against defendant, see Pena-Rodriguez v. Colorado, 580 U.S. 206, 209 (2017), or the fact that defendant did not testify. Rodriquez, 116 F.3d at 1227 (district court did not err in denying a new trial or an evidentiary hearing even though jurors discussed the defendant's failure to testify during deliberations because although that fact should not have been discussed, it was "not a fact the jurors learned through outside contact, communication, or publicity").

There are no indicia that the jury was exposed to information, issues, or matters outside of the evidence and law presented at trial or that any third parties other than the jurors influence the deliberations--and defendant does not contend otherwise.[1] The juror's expressed aspiration that the jury reach a verdict quickly is a far cry from the types of misconduct that warrant a mistrial.

---

[1] The inapposite cases defendant relies upon involving extraneous information and outside influences thus should be disregarded as well. See United States v. Angulo, 4 F.3d 843, 846-47 (9th Cir. 1993) (further inquiry of jury required where juror received threatening phone call, told other jurors about it, and then was excused by the judge without any explanation about "sudden absence" of threatened juror to other jurors); United States v. Humphrey, 208 F.3d 1190, 1198, 1200-1201 (10th Cir. 2000) (further inquiry required where credible allegations of "jury taint" including "furnishing of extraneous information to the jurors" regarding the defendant's unfavorable reputation and corresponding bias); United States v. Moten, 582 F.2d 654, 666, 668 (2d Cir. 1978) (further inquiry required in "unusual" case where jury "corruption was present" after one dismissed juror corruptly attempted to meet with defendant outside of court and it was "entirely possible" another juror was involved).

13

1  Defendant points to no case, and the government has found none, in

2  which a similarly innocuous comment was construed as juror misconduct

3  at all, let alone the type of misconduct warranting a mistrial.

4  **B.   The Juror's Comment Did Not Prejudice Defendant**

5  Even "[a]ssuming that there was juror misconduct, it is still

6  true that not every incident of juror misconduct requires a new

7  trial."  United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)

8  (citation omitted).  "The test is whether or not the misconduct has

9  prejudiced the defendant to the extent that he has not received a

10 fair trial."  Id.

11 In Klee, the defendant presented an affidavit by one juror

12 claiming that "eleven of the fourteen jurors (including alternates)

13 discussed the case during recesses and that nine of the jurors

14 expressed premature opinions about [the defendant's] guilt."  494

15 F.2d at 395.  The trial judge, while expressing his disapproval of

16 such conduct, concluded that it had not prejudiced defendant's right

17 to a fair trial by an impartial jury.  Id. at 396.  The Ninth Circuit

18 affirmed, observing that "[w]hen a wise and experienced judge, who

19 presided at the trial and observed the jury, comes to such a

20 conclusion, it is not for us to upset it.  The trial judge was in a

21 better position than we are to determine whether what happened was

22 prejudicial."  Id. (cleaned up).

23 In United States v. Bagnariol, the Ninth Circuit similarly

24 concluded that there was no prejudice even after a juror conducted

25 outside research and relayed that information to the rest of the

26 jury.  665 F.2d 877, 885 (9th Cir. 1981).  There, a juror conducted

27 research at the public library by checking business publications for

28 the company "So-Cal," the fictitious corporation that the FBI had

1  used in its undercover operation to investigate gambling and
2  political corruption.  Id. at 880, 883-84.  That juror reportedly
3  told some of the other jurors about his investigation.  Id. at 884.
4  The trial court, however, concluded that the extrinsic evidence could
5  not have affected the verdict because it added nothing to the
6  evidence before the jury, which overwhelmingly established the
7  defendant's guilt, and was irrelevant to any material issue in the
8  case.  Id.  The Ninth Circuit agreed, noting that the trial judge was
9  "uniquely qualified" to determine prejudice as the one who "observes
10 the jurors throughout the trial, is aware of the defenses asserted,
11 and has heard the evidence."  Id. at 885; see also id. at 886-87
12 (collecting cases of no prejudicial error).

13       The conduct here is far more benign than the jury's conduct in
14 Klee or Bagnariol.  Again, the juror's stray and aspirational comment
15 took place after the case had been submitted to the jury, and the
16 group did not substantively discuss the case or express any opinions
17 about defendant's guilt or innocence.  There is no allegation that
18 the jury considered extraneous evidence or that there were outside
19 influences affecting the jury, such as a juror conducting independent
20 or outside research.  And, as discussed above, the brevity of the
21 deliberations says nothing of any prejudice to defendant.  (See supra
22 Section IV.A.)

23       Nothing about the jurors' conduct observed by the CRD prejudiced
24 defendant from receiving a fair trial.  This jury was particularly
25 attentive throughout trial, with several jurors taking extensive
26 notes and the jurors arriving early or on time each day throughout
27 trial.  Nothing suggests that any jurors contravened the Court's
28 daily instructions by prematurely discussing the case or expressing

their views about the case before deliberations began.  And there is no indication that, notwithstanding the expressed hope by one juror that the jury would reach a verdict quickly, any juror attempted to influence or pressure other jurors to reach a verdict with which they did not agree, especially given that each juror was polled and confirmed the verdicts rendered reflected his/her verdicts; nor would it be proper to probe into the deliberative process of the jury on this point in any event.  See Straach, 987 F.2d at 242.

Finally, there is no prejudice to defendant because the evidence against him was overwhelming.  That evidence included two different cooperators (Esparza and Chiang) who each testified that defendant was a member of the shared RICO conspiracy and described in detail over several days defendant's key roles in the charged bribery schemes.  A government informant (Wang) testified about another bribery scheme orchestrated by defendant, as corroborated by over a dozen recorded meetings in which defendant was a direct participant. A public official (Ambroz) testified that defendant pressured him with such intensity to vote favorably on the Luxe Hotel redevelopment that it felt as though defendant were a "hired gun" for the project. There were uncontroverted financial records confirming that defendant received payments from the briber developer (Hazens) through defendant's consulting business, Synergy.  The government presented hundreds of exhibits in the form of defendant's own text messages, emails, Radar Screens, and recordings that (1) corroborated his integral role, knowledge, intent, and motive in the pay-to-play scheme, and (2) demonstrated that his recorded statements to the FBI denying that same role and knowledge were lies.  See Bagnariol, 665 F.2d at 889 (affirming finding of no prejudice where the "evidence

16

presented at trial overwhelmingly substantiated the guilt of each

defendant" (cleaned up)); United States v. Montes, 628 F.3d 1183,

1187 (9th Cir. 2011) (affirming denial of evidentiary hearing and new

trial notwithstanding jurors' consideration of extraneous media

information where "overwhelming evidence" of guilt).

There also was extensive evidence of defendant's concealment

during the scheme and obstructionist tactics, including the deletion

of thousands of text messages from his phone, concealment of

documents responsive to federal subpoenas, and attempts to persuade

co-conspirators to adopt his false narratives regarding the Arts

District Center project.  And the government walked the jury step by

step through hundreds of key events in the bribery schemes through

admitted summary timelines.  The jury's return of guilty verdicts

after an hour and a half of deliberations is attributable to the

substantial, overwhelming, organized, and largely uncontroverted

evidence presented at trial--not some unfounded juror misconduct.

Given the lack of misconduct, the inconsequential effect (if

any) of the jurors' conduct, and the overwhelming evidence of

defendant's guilt, the Court should deny defendant's motion for a

mistrial.

### C.   The Court Should Deny Defendant's Request for an Evidentiary Hearing

In the alternative, defendant asks for an evidentiary hearing

with the jurors or with the CRD.  The Court should reject both

requests.

Rule 606(b) prohibits a juror from testifying about "any

statement made or incident that occurred during the jury's

deliberations; the effect of anything on that juror's or another

juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). As the Supreme Court has observed, this rule has "substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts." Pena-Rodriguez, 580 U.S. at 209.

The limited exception to this prohibition is when there is a colorable claim that "extraneous prejudicial information was improperly brought to the jury's attention" or "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2); Wintermute, 443 F.3d at 1002; see also Dyer v. Calderon, 151 F.3d 970, 974 (9th Cir. 1998) (en banc) ("A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances.") Even in such a case, courts are limited to inquiring with jurors only "whether" extraneous prejudicial information or outside influences were present, but not how any such information impacted the jury's deliberations. Fed. R. Evid. 606(b); Montes, 628 F.3d at 1188 ("Jurors therefore may not be questioned about their deliberations process or the subjective effects of extraneous information"). The Ninth Circuit has recognized that "these constrictions can severely limit the utility of holding an evidentiary hearing at which jurors may testify." Montes, 628 F.3d at 1188.

As explained above, there is no colorable claim that extraneous prejudicial information was brought to the jury's attention or that

there was any outside influence on the jury.  Any inquiry therefore would amount to an impermissible attempt to use "juror testimony to impeach a verdict when that testimony relates to intrinsic matters-- that is, the internal, mental processes by which the verdict was reached," in contravention of Rule 606(b).  United States v. Hernandez-Escarsega, 886 F.2d 1560, 1579 (9th Cir. 1989); cf. Tanner v. United States, 483 U.S. 107, 125 (1987) ("[J]uror intoxication is not an 'outside influence' [within meaning of Rule 606(b)] about which jurors may testify to impeach their verdict.")

An evidentiary hearing with the CRD also is unwarranted.  "[I]n determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source."  United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993); see also United States v. Langford, 802 F.2d 1176, 1180 (9th Cir. 1986) (no abuse of discretion in denying evidentiary hearing where "tenuous connection" underlying alleged extraneous information was "insufficient to support a finding of a reasonable possibility that the event complained of could have affected the verdict").  Where the trial court already knows the exact scope and nature of the allegations, an evidentiary hearing is not necessary.  United States v. Halbert, 712 F.2d 388, 389 (9th Cir. 1983) ("[D]istrict court was correct in refusing to conduct an evidentiary hearing" where it "knew the exact scope and nature of the newspaper article and the extraneous information.").

Here, the Court already conducted a full interview of the CRD about the brief encounter she witnessed among the group of jurors outside of the courtroom.  There is no reason to believe that the CRD

19

withheld any information during the Court's questioning, particularly because she acted timely and forthrightly to bring the information to the Court's attention in the first place.  Any alleged "misconduct" here is innocuous and pales in comparison to the types of juror misconduct not only in cases where further inquiry was found to be unnecessary but also where courts found the alleged misconduct insubstantial or nonprejudicial.

Accordingly, a further evidentiary hearing is neither warranted nor necessary and would amount to a fishing expedition that wastes time and needlessly expends resources.  More fundamentally, such a hearing would only feed into the "barrage of postverdict scrutiny of juror conduct" that threatens to undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople."  Tanner, 483 U.S. at 120-21.

**V.   CONCLUSION**

For the foregoing reasons, the Court should deny defendant's motion for mistrial and request for an evidentiary hearing in the alternative.