E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0363/3289/3819
    Facsimile: (213) 894-6436
    E-mail:   Cassie.Palmer@usdoj.gov
             Susan.Har@usdoj.gov
             Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-326(A)-JFW-2 |
|---|---|
| Plaintiff, | JOINT STATEMENT REGARDING LOSS AND RESTITUTION CALCULATIONS AS TO DEFENDANT RAYMOND SHE WAH CHAN |
| v. | |
| RAYMOND SHE WAH CHAN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, and defendant Raymond She Wah Chan, by and through his counsel of record, John Hanusz and Michael

G. Freedman, hereby submit this Joint Statement Regarding Loss and
Restitution Calculations, pursuant to the Court's Orders.

Dated: September 5, 2024          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney


                                  _____/s/_____
                                  CASSIE D. PALMER
                                  SUSAN S. HAR
                                  BRIAN R. FAERSTEIN
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA


Dated: September 5, 2024


                                  ____/s/ with email authorization
                                  JOHN HANUSZ
                                  MICHAEL G. FREEDMAN
                                  Attorneys for Defendant
                                  RAYMOND SHE WAH CHAN

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................ii

JOINT STATEMENT.....................................................1

I.   BACKGROUND.....................................................1

II.  GOVERNMENT'S POSITION..........................................6

    A.   The Court Should Impose a 16-Level Enhancement Based
        on the Nearly $2 Million in Bribes That Defendant
        Sought and Facilitated...................................6

        1.   Legal Background Regarding Loss.....................6

        2.   Government's Calculation of the Value of the
            Bribes.............................................9

    B.   The Court Should Order Defendant to Pay $752,457 in
        Restitution to the City of Los Angeles..................21

        1.   Applicability of Restitution......................22

        2.   Amount of Restitution.............................25

    C.   Conclusion..............................................27

III. DEFENDANT'S POSITION..........................................28

    A.   INTRODUCTION............................................28

    B.   THE PROBATION OFFICE INCORRECTLY CALCULATED THE LOSS
        AMOUNT..................................................28

        1.   SZNW Related Offenses.............................31

        2.   Hazens-Related Offenses...........................32

        3.   Arts District Center Offense......................35

        4.   Other Offenses....................................36

    C.   POSITION REGARDING RESTITUTION..........................37

IV.  GOVERNMENT'S RESPONSE.........................................40

    A.   Defendant's Loss Calculation is Not Supported by the
        Evidence or the Law.....................................40

    B.   Defendant's Restitution Position Ignores Binding
        Precedent and Misapprehends the Principles of
        Restitution.............................................45

**TABLE OF AUTHORITIES**

**Page(s)**

Cases

Pasquatino v. United States,
  544 U.S. 349 (2004) ............................................. 22

United States v. Adelson,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................ 30

United States v. Ali,
  620 F.3d 1062 (9th Cir. 2010) .................................. 26

United States v. Anderson,
  741 F.3d 938 (9th Cir. 2013) ............................... 25, 38

United States v. Anieze-Smith,
  923 F.3d 565 (9th Cir. 2019) ........................... 15, 41, 45

United States v. Bussell,
  504 F.3d 956 (9th Cir. 2007) ................................... 37

United States v. Carter,
  217 U.S. 286 (1910) ................................... 23, 24, 25

United States v. Colino,
  No. 06-50486, 2007 WL 2316327 (9th Cir. Aug. 14, 2007) .......... 26

United States v. Emmenegger,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................ 30

United States v. Fair,
  699 F.3d 508 (D.C. Cir. 2012) .................................. 37

United States v. Fu Sheng Kuo,
  620 F.3d 1158 (9th Cir. 2010) .................................. 38

United States v. Gallant,
  537 F.3d 1202 (10th Cir. 2008) ................................. 26

United States v. Gamma Tech Indus., Inc.,
  265 F.3d 917 (9th Cir. 2001) ........................... 22, 24, 37

United States v. Gaytan,
  342 F.3d 1010 (9th Cir. 2003) .............................. passim

United States v. Gordon,
  393 F.3d 1044 (9th Cir. 2004) .................................. 37

United States v. Huff,
    609 F.3d 1240 (11th Cir. 2010) ................................... 8

United States v. Kahlon,
    38 F.3d 467 (9th Cir. 1994) ...................................... 8

United States v. Kinter,
    235 F.3d 192 (4th Cir. 2000) .................................. 7, 9

United States v. Lloyd,
    807 F.3d 1128 (9th Cir. 2015) .......................... 29, 42, 44

United States v. Lucas,
    101 F.4th 1158 (9th Cir. 2024) ................................... 9

United States v. Msiakii,
    575 F. App'x 427 (5th Cir. 2014) ................................ 46

United States v. Parris,
    573 F.Supp.2d 744 (E.D.N.Y. 2008) ..................... 31, 32, 35

United States v. Ranum,
    353 F. Supp. 2d 984 (E.D. Wis. 2005) .......................... 30

United States v. Reese,
    666 F.3d 1007 (7th Cir. 2012) ................................... 8

United States v. Ring,
    811 F. Supp. 2d 359 (D.D.C. 2011) ............................. 26

United States v. Salcedo-Lopez,
    907 F.2d 97 (9th Cir. 1990) .................................... 38

United States v. Sunchild,
    648 F. App'x 595 (9th Cir. 2016) ................................ 8

United States v. Tejada-Beltran,
    50 F.3d 105 (1st Cir. 1995) ..................................... 7

United States v. Watt,
    707 F. Supp. 2d 149 (D. Mass. 2010) ........................... 31

United States v. Williams,
    217 F.3d 751 (9th Cir. 2000) ................................... 41

United States v. Williams,
    356 F. App'x 167 (10th Cir. 2009) ..................... 15, 17, 41

iii

**Statutes**

18 U.S.C. § 666............................................23, 24

18 U.S.C. § 3663A(a)(2)........................................37

18 U.S.C. § 3664...............................................25

Cal. Labor Code § 2860....................................23, 24

Cal. Labor Code § 3351(b).....................................24

**Guidelines**

U.S.S.G. § 1B1.3(a)(1)....................................passim

U.S.S.G. § 2B1.1..........................................passim

U.S.S.G. § 2C1.1..........................................passim

**Other Authorities**

How the Economic Loss Guideline Lost Its Way, and How to Save It,
   18 Ohio St. J. Crim. L. 605 (2021) ...............................30

1

**JOINT STATEMENT**

2   **I.    BACKGROUND**

3        A jury returned guilty verdicts on the twelve charged counts

4   against defendant Raymond Chan.  Specifically, the jury found

5   defendant guilty of:

6   • Racketeer Influenced and Corrupt Organizations (RICO)

7      Conspiracy (Count 1);

8   • Three counts of Aiding and Abetting Honest Services Wire

9      Fraud involving Jose Huizar and/or the real estate

10     developer Shen Zhen New World I, LLC ("SZNW") with respect

11     to the LA Grand Hotel redevelopment (Count 2 (bank wire of

12     $570,000 for the Godoy Settlement) and Counts 3 and 4

13     (emails relating to the redevelopment));

14  • Two counts of Aiding and Abetting Honest Services Wire

15     Fraud involving Huizar and/or the real estate developer

16     Shenzhen Hazens ("Hazens") with respect to the Luxe Hotel

17     redevelopment (Counts 14 and 15 (wires relating to Hazens'

18     $100,000 contribution commitment for Richelle Rios'

19     ("Rios") campaign for the CD-14 seat));

20  • Two counts of Honest Services Wire Fraud relating to

21     defendant's direct receipt of benefits from Hazens (Counts

22     12 and 13 (wires of $36,432.74 and $33,507.23,

23     respectively, from Synergy's bank account to defendant's

24     bank account));

25  • Aiding and Abetting Federal Program Bribery relating to

26     Huizar and/or SZNW in connection with SZNW's provision of

27     casino gambling chips, accommodations, or travel expenses

28

to Huizar, or approximately $575,000 in collateral applied to Huizar's personal loan from East West Bank (Count 22);

- Aiding and Abetting Federal Program Bribery relating to Huizar and/or Hazens in connection with Hazens' $100,000 contribution commitment to benefit Rios' campaign (Count 27);

- Federal Program Bribery relating to defendant's direct and indirect receipt of benefits relating to the redevelopment Luxe Hotel Project, including $69,939 in check payments to LABXG, Inc. and $15,000 in check payments to Jeremy Chan (Count 28); and

- Making False Statements to the FBI claiming that defendant had no involvement with the Godoy settlement and denying that Wei Huang needed or asked for Huizar's help (Count 39).

(CR 1389, 1401.)

The jury also made all special findings on the verdict form, including that: (i) defendant agreed that seven different types of racketeering acts would be committed as part of the RICO conspiracy (see CR 1401 at 3); (ii) the commission of each of the charged bribery counts included all enumerated official acts (see id. at 5, 8, 10, 12, 14, 16, 18, 21); and (iii) each of the statements charged against defendant were false and material (see id. at 24).

On May 6, 2024, the United States Probation and Pretrial Services Office ("USPO") disclosed the Presentence Investigation Report ("PSR") (CR 1415) and its Recommendation Letter (CR 1414) as to defendant. In the PSR, the USPO calculated the total amount of

2

direct and indirect financial benefits that defendant obtained or
assisted other public officials in obtaining as part of the RICO
conspiracy and pay-to-play bribery schemes to be at least $1,949,565,
resulting in the application of a 16-level enhancement pursuant to
U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(I).  (PSR ¶¶ 96-97.)  The USPO
calculated the total amount of restitution to be $752,457, payable to
the City of Los Angeles, which reflects the amount defendant was
enriched through the Luxe Hotel bribery scheme.  (PSR ¶¶ 74-75, 196-
97; Recommendation Letter at 1.)  The government concurs with these
guidelines calculations and agrees that defendant owes $752,457 in
restitution to the City of Los Angeles.

Defendant disagrees.  On May 20, 2024, defendant filed his
objections to the PSR.  (CR 1418.)  Defendant contends that the value
of the bribes should include only the charged wire payments he
received through Synergy, which he identifies as $69,939.  (Id. at 3-
4.)  Thus, defendant contends that a four-level enhancement
(corresponding to a loss amount of $69,939), not a 16-level
enhancement, should apply.  (Id.)[1]

On May 21, 2024, after previously having ordered the parties to
meet and confer on an agreed-upon amount of restitution (CR 1416),
the Court ordered the parties to file a joint statement regarding
restitution on September 5, 2024.  (CR 1419.)  On May 22, 2024, the
Court ordered the parties to meet and confer and agree on the amount
of loss for the guidelines calculations.  (CR 1420.)  The Court also
ordered the government to provide defendant, on or before June 10,

---

[1] Defendant did not specifically object to restitution in his
filed objections but the PSR notes that "Chan does not believe that
restitution is applicable."  (PSR ¶ 75.)

2024, the evidence that it intends to rely on in support of its loss calculations (id.), which the government provided to defendant's counsel on June 3, 2024.  (See Ex. A attached hereto.)  The Court further ordered: "In the unlikely event that the parties cannot agree on the loss calculation, they shall file a Joint Statement on or before September 5, 2024 setting forth the disputed amounts and their respective arguments in support of their positions."  (Id.)

On August 27, 2024, counsel for the government (AUSAs Palmer, Har, and Faerstein) met and conferred in person with counsel for defendant (Hanusz and Freedman).  During the meet and confer, the parties discussed their respective positions regarding the loss calculation and the applicability of restitution.  Despite meeting for nearly one hour, the parties were unable to reach an agreement or further narrow the issues.

With respect to the loss amount, defendant maintains that he should be responsible only for the combined total of the two checks charged as the predicate wires for Counts 12 & 13, and that were alleged as some of the bribes underlying Count 28 ($69,939).[2]  The government, on the other hand, maintains that defendant is responsible not only for his share of all the bribe payments that Hazens provided defendant through Synergy relating to the Luxe Hotel project entitlements (totaling $752,457) but also for the bribes he facilitated from developers to his co-conspirators and other public officials as part of the RICO conspiracy and through defendant's acts

_____

[2] Count 28 also alleged $15,000 in check payments to Jeremy Chan as a bribe to defendant; defendant does not address those payments. Those payments are included in the government's calculation of the bribes that Hazens paid defendant through Synergy (totaling $752,457).

to aid and abet the charged honest services wire fraud and bribery counts (totaling $1,197,108).

With respect to restitution, the government contends that under Ninth Circuit precedent previously applied by this Court to Jose Huizar, the City of Los Angeles is entitled to the secret profits defendant obtained as a result of his City employment, that is, $752,457, which represents defendant's share of the bribe payments from Hazens to Synergy relating to the Luxe Hotel project entitlements.  Defendant contends that restitution does not apply here.

The parties' respective positions are detailed below.

## II.   GOVERNMENT'S POSITION

### A.   The Court Should Impose a 16-Level Enhancement Based on the Nearly $2 Million in Bribes That Defendant Sought and Facilitated

The government agrees with the USPO that defendant's offense level under U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(I) is properly increased by 16 levels.  (PSR ¶¶ 96-97.)  The USPO correctly calculated the aggregate value of financial benefits received or to be received to be $1,949,565, which consists of bribes defendant received or intended to receive, and bribes that defendant facilitated for his co-conspirators and other public officials.  (PSR ¶¶ 41-73.)  The USPO's loss calculation is supported by the extensive evidence at trial supporting defendant's convictions and by the principles of relevant conduct under U.S.S.G. § 1B1.3.

#### 1.   Legal Background Regarding Loss

Section 2C1.1, which applies to bribery offenses involving public officials, provides that the appropriate "loss" calculation is "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest."  U.S.S.G. § 2C1.1(b)(2).  Where "the value of the benefit [to the briber] cannot be determined, the value of the bribe is used."  Id. cmt., background.  In cases involving more than one incident of bribery, as here, the applicable amounts "are determined separately for each incident and then added together."  U.S.S.G. § 2C1.1 cmt., n.2.

Here, the government's loss calculation is based upon **offense conduct** for which defendant was directly charged and convicted, including bribes defendant received; bribes Huizar and George Esparza received or solicited from real estate developers (as aided and abetted by defendant); and bribes defendant paid or facilitated to other public officials--all as part of the ongoing RICO conspiracy. Because virtually all of the financial benefits at issue here flow from the "acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," they are attributable to defendant's loss calculation under U.S.S.G. § 2C1.1(b)(2).  See U.S.S.G. § 1B1.3(a)(1)(A).

To the extent any financial benefits are not attributable to defendant's offense conduct under U.S.S.G. § 1B1.3(a)(1)(A), he is nonetheless accountable for those benefits as part of the RICO conspiracy's jointly undertaken criminal activity:

> (B) in the case of a jointly undertaken criminal activity . . ., all acts and omissions of others that were—
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and
>>
>> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B); see also United States v. Kinter, 235 F.3d 192, 195-96 (4th Cir. 2000) (finding loss calculation for bribery offenses include the "two separate bases" under Section 1B1.3(a)(1)); United States v. Tejada-Beltran, 50 F.3d 105, 109 (1st Cir. 1995)

("The aggregate amount of the covered bribes is to be derived from the sum total of all relevant conduct.").

Applying these principles, the Ninth Circuit has held that defendants convicted of bribery offenses are responsible not only for bribes that they directed, received, or facilitated (e.g., aided and abetted) but also for bribes that were reasonably foreseeable within a jointly undertaken criminal activity. See United States v. Kahlon, 38 F.3d 467, 470 (9th Cir. 1994) (defendant accountable for five bribes for which he was not present, explaining that "[b]ribes paid by others not in the presence of the defendant, but in furtherance of the conspiracy, can be "'reasonably foreseeable.'"); United States v. Sunchild, 648 F. App'x 595, 598 (9th Cir. 2016) (defendant accountable for own kickbacks and kickbacks received by co-conspirator as "part of a jointly undertaken scheme that resulted in other reasonably foreseeable kickbacks that together exceeded $200,000 in value").  Other courts have consistently found the same. See, e.g., United States v. Reese, 666 F.3d 1007, 1021-22 (7th Cir. 2012) (defendant "responsible not only for the bribes he personally received but also for the bribes" paid to a co-conspirator by other co-conspirators; a "conspirator is liable for all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" (citation omitted); United States v. Huff, 609 F.3d 1240, 1245-46 (11th Cir. 2010) (recognizing that bribe value not limited only to bribes defendant received but also includes those received by co-conspirator, where defendant was "liable for all acts he aided and abetted . . . and for the acts of his co-conspirators that were reasonably foreseeable to him").

1       The government has the burden of proving the loss calculation

2   under Section 2C1.1(b)(2) by a preponderance of the evidence.  <u>See</u>

3   <u>United States v. Lucas</u>, 101 F.4th 1158, 1163 (9th Cir. 2024)

4   (rejecting clear and convincing evidence standard for factual

5   findings at sentencing).

6            2.   <u>Government's Calculation of the Value of the Bribes</u>

7       The aggregate loss calculation of $1,949,565 comprises four

8   categories of financial benefits to public officials:[3] (1) $919,562

9   relating to the LA Grand Hotel bribery scheme; (2) $965,571 relating

10  to the Luxe Hotel bribery scheme; (3) $24,432 relating to the ADC

11  bribery scheme; and (4) $40,000 in financial benefits from other pay-

12  to-play conduct involving defendant.

13      The evidentiary and legal bases for each category of financial

14  benefits are described below.  Notably, as the government made clear

15  to defense counsel, the evidence identified in the tables includes

16  the key exhibits and testimony that most directly support the value

17  of each financial benefit.  The evidentiary citations in the tables

18  are not exhaustive and, at this stage of sentencing, do not repeat

19  the extensive evidence of defendant's guilt that was presented during

20  the 12-day trial proving the illicit intent of the parties to the

---

22      [3] The government used "the value of anything obtained or to be
obtained by a public official or others acting with a public
23  official" because there is insufficient information to reasonably or
reliably determine the alternate measure of "the benefit received or
24  to be received in return for the payment" by the developers who
sought entitlement approvals (<u>e.g.</u>, SZNW, Hazens, ADC).  <u>See</u> U.S.S.G.
25  § 2C1.1(b)(2) & cmt., background; <u>see also</u> <u>Kinter</u>, 235 F.3d at 197
(noting the "difficulty inherent in computing the total benefit from
26  the bribe-induced legislation at issue" in a prior case).  In
addition, the alternate measure of the "loss to the government from
27  the offense" represents the benefits defendant obtained from Hazens
(discussed further in the government's restitution position herein)
28  and is only a portion of the aggregate value of the total bribes.

scheme or defendant's intimate involvement with and/or knowledge of the scheme and benefits.  For example, Esparza, George Chiang, Morrie Goldman, and Andy Wang testified about how the RICO conspiracy and the pay-to-play scheme worked and described defendant's role in directing and facilitating financial benefits to Huizar and other public officials as well as his knowledge and support of the overall conspiracy and schemes.  In addition, the summary chart exhibits identified below incorporate the exhibits and evidence underlying those summary charts, for which FBI Acting Unit Chief Andrew Civetti also provided testimony during trial.[4]

**LA Grand Hotel Bribery Scheme (Counts 1, 2, 3, 4, 22)**

| Description | Amount |
|---|---|
| Sexual Harassment Lawsuit Settlement Money (Exs. 464, 927 / Esparza) | $575,269 |
| Gambling Chips for Huizar (Ex. 921 / Esparza, Civetti) | $194,500 |
| Gambling Chips for Esparza (Ex. 921 / Esparza, Civetti) | $38,000 |
| Las Vegas Group Benefits (Pro-Rated by 10) (Ex. 921 / Esparza, Civetti) | $111,793 |
| **TOTAL** | **$919,562** |

The jury found defendant guilty of four counts of aiding and abetting Huizar and/or SZNW in their commission of honest services wire fraud (Counts Two, Three, and Four) and federal program bribery (Count Twenty-Two).  Among other things, Count Two expressly

---

[4] The government provided the evidentiary citations set forth in these tables to defense counsel and requested that they advise the government if there were any mistakes or issues with any of the calculations.  Defendant did not raise any issues with respect to the accuracy of these calculations or the reliability of the evidence supporting them, including during the parties' meet and confer or as part of defendant's position on loss herein.  Rather, defendant principally contests the inclusion of virtually all of the financial benefits on the purported basis that they were not reasonably foreseeable or are not otherwise attributable to him.

10

pertained to the execution of the $570,000 bank wire relating to the

sexual harassment lawsuit settlement money (CR 1398 (Jury

Instructions) at 47), which ultimately led to Huizar being enriched

by $575,269 when Huang's collateral was used to pay off Huizar's bank

loan.  (Trial Ex. 464.)  And the jury instructions for Count Twenty-

Two specifically identified the "casino gambling chips,

accommodations, or travel expenses, or approximately $575,000 in

collateral applied to Huizar's personal loan from East West Bank"

that are among the bribes that defendant aided and abetted as part of

his offense conduct.  (CR 1398 at 57.)  In short, these bribes are

precisely what the jury convicted defendant of aiding and abetting on

behalf of Huizar and/or SZNW.  They thus fall squarely within

defendant's offense conduct of conviction under U.S.S.G.

§ 1B1.3(a)(1)(A).[5]

The jury also found defendant guilty of RICO conspiracy (Count

One), which encompassed the LA Grand Hotel bribery scheme, including

the bribes paid by SZNW to Huizar and Esparza in the form of the

gambling chips and group benefits, as well as the sexual harassment

lawsuit settlement money for Huizar.  The jury embraced in full the

government's theory of the broad scope of the RICO conspiracy and

defendant's participation in it, as reflected by its findings that

defendant agreed that one or more members of the conspiracy would

---

[5] As a conservative measure, the government (and USPO) has
prorated by ten the Las Vegas Group Benefits (summarized in Trial Ex.
921) that defendant aided and abetted Huizar in obtaining from SZNW
and, correspondingly, SZNW in providing to Huizar.  Even though these
group benefits were shared among Huizar, Esparza, and others, the
estimate is conservative because there were less than ten
participants for most of the trips, and Huizar typically expensed a
higher portion of the total charges to Huang's account than other
guests.

commit each of the seven types of alleged racketeering activities, including multiple bribery crimes. (See CR 1401 at 3.)

Thus, even under the alternative theory of reasonably foreseeable jointly undertaken activity, the government proved at trial (beyond a reasonable doubt, no less) that defendant reasonably foresaw the provision of each of the itemized categories of bribes in furtherance of the LA Grand Hotel bribery scheme. This included the provision of the sexual harassment lawsuit money, given defendant's close involvement in structuring and carrying out that transaction, and the provision of gambling chips and lavish group benefits, given defendant's encouragement of the trips. Notably, in connection with the § 1001 count, the jury also found that defendant willfully lied when he falsely denied having any involvement in the settlement (in fact, defendant had) and that he falsely claimed that Huang did not need anything from Huizar and did not ask Huizar for anything (in fact, Huang had on both fronts and defendant knew about it).

The jury flatly rejected defendant's attempt to feign ignorance of the bribes that Huang provided during the Las Vegas trips simply because defendant did not attend. Indeed, the government presented substantial evidence of defendant's knowledge and encouragement of the Vegas trips in furtherance of the conspiracy, including Esparza's testimony that defendant suggested Huizar and Esparza should go to Las Vegas with Huang from the inception of Huizar's and Huang's relationship; that defendant agreed Huizar/Esparza should let Vegas "cool off" after the politically exposed person incident; and that, after one trip, defendant inquired with Esparza whether Huang took care of him (which Esparza understood to mean provided gambling

chips).  Text messages between defendant and Huizar also reflected
defendant's knowledge and facilitation of the Las Vegas trips.  (See,
e.g., Trial Exs. 364L, 364N, 364O, 364Q, 364AA.)  And defendant was
covertly recorded telling Wang about details of Huizar's trips to Las
Vegas with Huang, including their use of private jet and Huizar's use
of fake names, their stays at luxury villas, their gambling at high
roller tables, and Huizar not paying back Huang.  (See Trial Ex.
186I.)  The Las Vegas benefits were reasonably foreseeable to
defendant and in furtherance of the RICO conspiracy, including as a
stream of benefits from SZNW to Huizar and defendant's own
significant interest in currying Huizar's favor and obtaining access
to and influence over him.

As for the sexual harassment settlement money, the government's
evidence demonstrated that defendant was integrally involved in
orchestrating the use of Huang's money as collateral for the
settlement, despite defense counsel's frequent refrain at trial that
defendant's name was not on certain documents.  This evidence
included Esparza's testimony that Huizar asked defendant to speak
with Huang about helping with the settlement, that Huizar had an
initial meeting with defendant and Huang to discuss the settlement,
that defendant came up with the idea for structuring the collateral
arrangement to insulate Huizar and Huang, and that Huizar, grateful
for defendant's integral assistance with the settlement, gave
defendant "full access" to Huizar's office; text messages between
defendant and Huizar coordinating frequent communications between
Huizar and the "Chairman" (Huang) at key points during the settlement
negotiations; and numerous recorded conversations involving defendant

13

and others in which defendant's integral role was discussed and
defendant bragged about how he saved Huizar's political career
through helping settle the lawsuit.  (See, e.g., Tr. Exs. 186D-Z,
364Q, 364R, 384B, 385, 386, 387A-Z-387D-Z, 847B.)

**_Luxe Hotel Bribery Scheme (Counts 1, 12, 13, 14, 15, 27, 28)_**

| Description | Amount |
|---|---|
| Payments to Synergy from Hazens (50% Share from Jan. 2015-July 2018) (Exs. 44B, 551A, 930, 931, 932A, 933 / Chiang) | $752,457 |
| Payments for Real Estate Reports (via Ernie Camacho) (Exs. 42C, 932, 932A / Chiang) | $66,000 |
| China Trip Benefits (2017) (Exs. 571, 572, 573, 575/ Chiang / Huizar Plea / Jia Yuan USA NPA) | $1,900 |
| The Weeknd Concert Tickets (Ex. 574 / Huizar Plea / Chiang) | $1,572 |
| Kendrick Lamar Concert Tickets (Ex. 576 / Huizar Plea) | $1,679 |
| Salesian Contribution (2015) (Exs. 113, 113A, 114, 118, 42A at 3, 42E at 3, 42F at 3, 42G at 3) | $10,000 |
| Contribution to Huizar Post-2015 Election Campaign Debt (Exs. 113, 113A, 114, 118, 42A at 3, 42E at 3, 42F at 3, 42G at 3) | $10,000 |
| Commitment to Benefit the Rios' PAC (Exs. 125, 126) | $100,000 |
| Payment to Joel Jacinto (via Ave Jacinto) (Ex. 941 / Wang) | $20,030 |
| Payment to Deron Williams Sr. (via Deron Williams Jr.) (Exs. 701, 714, 715 / Chiang) | $1,933 |
| **TOTAL** | **$965,571** |

With respect to the Luxe Hotel bribery scheme, the jury
convicted defendant of honest services wire fraud (Counts Twelve and
Thirteen) and federal program bribery (Count Twenty-Eight) for the
bribes defendant solicited and obtained from Hazens for himself in

exchange for defendant's official acts on that project.  The defense
contends that this amount is capped at $69,939 based on the two wire
predicates charged in Counts Twelve and Thirteen (two checks from
Synergy to LABXG totaling $69,939, which also was the amount
expressly alleged in Count Twenty-Eight).  But the full amount of
defendant's bribes from Hazens is not accurately reflected by the two
wires that the government chose to charge for purposes of meeting the
interstate wire communications requirement.  See, e.g., United States
v. Anieze-Smith, 923 F.3d 565, 575 (9th Cir. 2019) (conduct
considered for sentencing guidelines purposes is not limited to the
charges alleged in the indictment); United States v. Williams, 356 F.
App'x 167, 171 (10th Cir. 2009) (holding that defendant was liable
for losses to his employer from the entire wire fraud scheme and not
just a single execution, even though he pleaded guilty to one
execution, because the wire fraud statute is a continuing offense and
"focuses on the scheme itself, and not individual executions of that
scheme").  The government's evidence of the broader honest services
wire fraud scheme involving the Luxe Hotel project demonstrated that
defendant's take from that bribery scheme was at least $752,457.

Specifically, the evidence at trial established that defendant
instructed Chiang to establish Synergy and then agreed to act on
behalf of Hazens from inside the City, while also acting as a secret
50-50 business partner with Chiang in Synergy, and directing Chiang
to be the outward face of Synergy.  Defendant and Chiang sold
defendant's access to and power over other public officials to Hazens
in order to secure Hazens' Luxe Hotel entitlement business.  And it
was defendant's position within the City and influence over other

15

public officials, including Huizar, that allowed Synergy to secure
and keep Hazens' lucrative entitlement business from which funds
flowed into Synergy.  In other words, the funds that accrued in
Synergy's bank account from Hazens, both through monthly fees and the
six-figure "Milestone" payments reflected in the Hazens-Synergy
consulting agreement (Trial Ex. 551A) and summary chart (Trial Ex.
933), were bribes paid to ensure that defendant continued to use his
official position to aid the Luxe Hotel project.  Testimony from
Chiang and other evidence also demonstrated that defendant
meticulously tracked the Hazens bribe payments (including through his
Radar screens) and considered half of the Hazens money to be his,
even though defendant did not begin to draw on those bribes until
after he left the City.  (See, e.g., Trial Exs. 44B, 593G, 622A,
622B.)  As the jury found in rendering its verdicts, money Synergy
received from Hazens while defendant was a public official
constituted a bribe, even though defendant waited to begin drawing on
the money until after he left the City.

The government has taken a conservative approach in calculating
the total bribes defendant received from Hazens, that is, $752,457.
This amount derives from the Hazens-to-Synergy payment chart
reflected in Trial Exhibit 933.  The government attributed to
defendant as bribes only the Hazens payments to Synergy received from
the inception of payments in January 2015 through July 5, 2018, which
was the date of the final payment relating to the conclusion of
defendant's agreement to use his official position and influence to
assist in obtaining all entitlement-related approvals for the Luxe
Hotel project.  Put differently, the government only included Hazens

16

payments up through the date of City Council's approval of the final entitlement for the Luxe Hotel project (namely, Hazens' development agreement on June 12, 2018). (See Trial Exs. 931 at 8, 933 at 1-2.) Further, the government divided the total amount that Synergy received from Hazens during this period in half, reflecting defendant's 50% share. It is of no consequence that defendant did not fully draw this amount from Synergy: the testimony and evidence showed that defendant directed that the bribe funds be used to invest back into his secret business Synergy, so he could build its business profile from behind the scenes and parachute into his new lucrative consultant role when he left the City.

Defendant also was convicted of three counts of aiding and abetting Huizar and/or Hazens in their commission of honest services wire fraud (Counts Fourteen and Fifteen) and federal program bribery (Count Twenty-Seven). These convictions left no doubt that the jury found defendant had aided and abetted Huizar in securing from Hazens (and/or Hazens in providing to Huizar) the $100,000 commitment to the PAC to benefit Rios' campaign: Counts Fourteen and Fifteen were based on executions by email wire communications tracking Hazens' PAC commitment and Count Twenty-Seven expressly identified the $100,000 campaign contribution commitment. (See CR 1398, Instr. No. 27 at 48; id., Instr. No. 31 at 58.) Notably, with respect to the PAC-related bribe, the jury found that the bribery scheme existed under the higher campaign-contribution-specific McCormick standard.

As previously explained, the executions of the wire fraud scheme relating to the PAC commitment did not constitute the sum total of the bribes that defendant facilitated as part of the Luxe Hotel

17

bribery scheme.  As established at trial, defendant also facilitated
bribes in the form of consultant fees for the sham real estate
reports, China trip expenses, concert tickets, and contributions to
Huizar's campaign debt and alma mater high school.  Much like the
$752,457 in bribes defendant obtained for himself, the direct and
indirect financial benefits that he aided and abetted Huizar in
obtaining from Hazens also are attributable to him as part of his
offense conduct under U.S.S.G. § 1B1.3(a)(1)(A).

Moreover, the jury's conviction of defendant of the RICO
conspiracy similarly encompassed all the financial benefits listed
above as part of defendant's offense conduct.  The government's
evidence at trial proved defendant's integral role within the
overarching conspiracy, especially with respect to Hazens and the
Luxe Hotel bribery scheme.  Defendant brokered and facilitated the
corrupt relationship between Huizar and Hazens, acting both directly
and through Chiang.  Chiang testified about how defendant instructed
Chiang to "take care" of Huizar to obtain access and influence over
him, especially for securing Huizar's ultimate support for the Luxe
Hotel project, and how Chiang reported back to defendant about
everything he did.

The government presented substantial evidence at trial
corroborating Chiang's testimony about defendant's detail-oriented
and hands-on approach to managing Chiang's work and advancing Hazens'
interests on the Luxe Hotel project while defendant was still a
public official.  This evidence included, among other things,
defendant ghost-writing emails for Chiang to give to Huizar regarding
a time-sensitive TFAR appraisal matter for the Luxe Hotel project;

instructing Huizar to hold standing bi-weekly meetings for Hazens and directing its attendees; coaching Chiang on which public officials had influence over the Luxe Hotel project; recruiting his son to work with Chiang on the Hazens project at defendant's direction; providing strategy to Chiang and his son to assume further control of the Luxe Hotel project and wrest control away from other consultants; negotiating Synergy's compensation and terms with Hazens; receiving regular updates from Chiang on the project while continuing to direct his work; and holding standing Synergy strategy meetings at his home. (See, e.g., Trial Exs. 537, 545, 547, 549, 556, 590C, 592A, 592C, 592F, 592S.).  The benefits that Chiang facilitated from Hazens to Huizar through defendant's meticulous direction and oversight -- including the sham real estate report payments, China trip expenses, concert tickets, and campaign debt and Salesian high school contributions -- necessarily were reasonably foreseeable to defendant and in furtherance of the RICO conspiracy.  U.S.S.G. § 1B1.3(a)(1)(B).

Finally, after defendant left City employment, he directed and orchestrated additional payments from Hazens to public officials (Deron Williams Sr. and Joel Jacinto) who were well-positioned to assist the Luxe Hotel project's entitlement and regulatory approvals. Defendant did so by arranging to pay the public officials' family members through purported jobs that defendant concocted at Synergy and through Wang.  As the evidence demonstrated at trial, these elaborate arrangements were yet another way defendant corruptly sought to buy influence as part of the Luxe Hotel bribery scheme. Defendant should be held accountable for his direct role in directing

and facilitating these payments to other public officials as well.
U.S.S.G. § 1B1.3(a)(1)(A).

### *Arts District Center Bribery Scheme (Count 1)*

| Description | Amount |
|---|---:|
| PAC Contribution by Kevin Chen (Exs. 800, 812, 364T, 135) | $12,500 |
| Dodgers Tickets to Shawn Kuk (Exs. 802, 817, 942 at 2) | $1,932 |
| Payment to Shawn Kuk (Exs. 45B, 45C, 45D / Wang, Chiang, Civetti) | $10,000 |
| **TOTAL** | **$24,432** |

The ADC bribery scheme constituted yet another example of the
means of operation of the RICO conspiracy for which defendant was
convicted.  Defendant orchestrated this bribery scheme, as
demonstrated through the exhibits and testimony cited above.  After
defendant left City employment, he sought to push his client's
(ADC's) project through the City's entitlement approval process by
directing financial benefits to Huizar (coordinating a contribution
to Rios' PAC) and to Huizar's Planning Director Shawn Kuk (personally
buying him expensive Dodgers tickets and using Wang in an elaborate
scheme to pay Kuk $10,000).  Defendant directly "committed, aided,
abetted, counseled, commanded, induced, procured, or willfully
caused" these financial benefits to be provided.  U.S.S.G.
§ 1B1.3(a)(1)(A).  These benefits also necessarily were reasonably
foreseeable to defendant as the architect of the ADC bribery scheme
that constituted yet another aspect of the broader pay-to-play
bribery scheme.  U.S.S.G. § 1B1.3(a)(1)(B).

//

//

20

***Other Pay-to-Play Conduct (Count 1)***

| Description | Amount |
|---|---|
| Chinese Developer Contributions to Salesian (2015) (Exs. 113, 113A, 114, 118, 42A at 3, 42E at 3, 42F at 3, 42G p. 3) | $25,000 (Greenland) $10,000 (Oceanwide) $5,000 (City Century) |
| **TOTAL** | **$40,000** |
| **GRAND TOTAL** | **$1,949,565** |

Finally, defendant played an integral role in directing and facilitating other Chinese development companies to provide financial benefits to Huizar as part of the RICO conspiracy. The exhibits cited above, including handwritten notes, tracking documents, and defendant's own Radar screens, demonstrate defendant's knowledge of and assistance in obtaining contributions from Greenland, Oceanwide, and City Century, who had pending projects in Huizar's district, to a fundraising gala for Huizar's alma mater high school where his wife was a fundraiser. Chiang also testified that defendant had a close relationship with these developers, and that Huizar turned to defendant and Chiang to interface with these developers when he wanted contributions. These financial benefits, too, were part of defendant's RICO conspiracy offense conduct as well as reasonably foreseeable to him given his direct role in facilitating the payments. U.S.S.G. §§ 1B1.3(a)(1)(A), (B).

**B. The Court Should Order Defendant to Pay $752,457 in Restitution to the City of Los Angeles**

Defendant's conduct caused substantial harm to the public and to the City of Los Angeles. Both the Supreme Court and the Ninth Circuit have recognized that restitution is proper as a remedy to the type of harm inflicted by public servants who abuse their positions

1    to enrich themselves.  This Court previously imposed a restitution

2    order on the only other public official to be sentenced, Jose Huizar.

3         Here, the City of Los Angeles is entitled to the benefits

4    defendant received, that is, $752,457 from the Luxe Hotel bribery

5    scheme.  See United States v. Gaytan, 342 F.3d 1010, 1012 (9th Cir.

6    2003) ("[A]n employer suffers a loss in the amount of secret profits

7    accepted by its agent and is entitled to restitution in that

8    amount.") (emphasis added).

9              1.    Applicability of Restitution

10        Restitution for defendant's crimes of conviction is mandatory

11   under the Mandatory Victim Restitution Act.  See Pasquatino v. United

12   States, 544 U.S. 349, 383 (2004) ("Congress, however, has expressed

13   with notable clarity a policy of mandatory restitution in all wire

14   fraud prosecutions.") (emphasis in original) (Ginsburg, J.

15   dissenting).

16        "The general rule is that 'restitution in a criminal case may

17   only compensate a victim for actual losses caused by the defendant's

18   criminal conduct.'"  Gaytan, 342 F.3d at 1011 (citation omitted).

19   When a public official, like defendant, obtains bribe money through

20   his position, those funds are deemed actual losses suffered by the

21   City (here, the City of Los Angeles).  Id. at 1011-12 & n.3

22   (affirming an order against defendant to pay restitution to the City

23   where defendant accepted "$61,506.63 in bribe money"); see also

24   United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 928-29 (9th

25   Cir. 2001) (affirming restitution order to defendant's employer in

26   the amount of secret kickbacks the defendant received from two

27   subcontractors).  The Ninth Circuit's affirmance of the imposition of

28

22

restitution in <u>Gaytan</u> and <u>Gamma Tech</u> rests on a principal-agent
theory of actual loss, which the Supreme Court held applies to
elected public officials in <u>United States v. Carter</u>, 217 U.S. 286
(1910).  <u>Carter</u> 217 U.S. at 306 ("The larger interests of public
justice will not tolerate, under any circumstances, that a public
official shall retain any profit or advantage which he may realize
through the acquirement of an interest in conflict with his fidelity
as an agent. If he takes any . . . benefit in violation of his duty,
or acquires any interest adverse to his principal, without a full
disclosure, it is a betrayal of his trust and a breach of confidence,
and he must account to his principal for all he has received.").

Based on the logic in <u>Gaytan</u>, <u>Gamma Tech</u>, and <u>Carter</u>, the
government is seeking restitution to be paid to the City for (1) the
"bribe money" / "funds" (<u>Gaytan</u>); "profit, advantage . . . or
benefit" (<u>Carter</u>); (2) that defendant "acquired" (<u>Gaytan</u> / <u>Carter</u> /
<u>Gamma Tech</u> (citing Cal. Labor Code § 2860)); "accepted" /
"retain[ed]" (<u>Gaytan</u>); or "received" (<u>Gamma Tech</u> / <u>Carter</u>); (3) by
virtue of his employment, whether acquired lawfully or unlawfully
(<u>Gaytan</u> (citing Cal. Labor Code § 2860)).

<u>Gaytan</u> is binding on this Court and is closely analogous to the
facts here.  There, the defendant was the mayor and councilmember for
the City of Colton who accepted bribes intended to influence his vote
on land use issues.  342 F.3d at 1010-11.  After the defendant pled
guilty to federal program bribery in violation of 18 U.S.C. § 666,
the district court ordered restitution in the amount of the bribe
money the defendant received.  <u>Id.</u> at 1011.  The Ninth Circuit
affirmed, holding that the City of Colton suffered an actual loss

23

subject to restitution because it "lost the honest service of a
public servant whose vote was purchased by developers[.]"  Id.
(citing Carter, 217 U.S. at 305-06).  The Court reasoned that a
public official was an "agent" to his "principal" (the City) and that
the "larger interests of public justice will not tolerate, under any
circumstances, that a public official shall retain any profit or
advantage which he may realize through the acquirement of an interest
in conflict with his fidelity as an agent."  Id.

Accordingly, a public official obtaining such benefits "in
violation of his duty" "must account to his principal for all he has
received."  Id.  In these types of cases, the City, as the public
official's employer, "suffers a loss in the amount of secret profits
accepted by its agent and is entitled to restitution in that amount."
Id. at 1012.  Citing California Labor Code rules, the Court noted
that an official is deemed an "employee" of the City, and all that an
employee acquires by virtue of his employment, except his salary,
"belongs to the employer, whether acquired lawfully or unlawfully."
Id. at 1012 n.3 (citing Cal. Lab. Code § 2860)); see also Gamma Tech,
265 F.3d at 929.

Likewise here, the Court should impose a restitution order to
the City of Los Angeles in the amount of secret profits that
defendant actually received from Hazens through his official
position.  Defendant was an employee of the City of Los Angeles, see
Cal. Labor Code § 3351(b) (an employee includes "appointed paid
public officers"), and California law specifically recognizes the
principal-agent relationship, see Cal. Labor Code § 2860 ("Everything
which an employee acquires by virtue of his employment, except the

24

compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.").

As discussed above, the jury found that defendant accepted bribes from Hazens in exchange for and in connection with using his official position to benefit the Luxe Hotel project.  Those funds that defendant received through Synergy are directly attributable to defendant's abuse of his official position and leveraging of his official acts to secure Hazens' entitlement business.  Thus, the City suffered an actual loss because it "lost the honest service of a public servant" whose official acts were "purchased by developers." Gaytan, 342 F.3d at 1011.

Because defendant received bribes in violation of his duty as the City's agent, he must account to his employer for the value of these bribes, which rightfully belong to the City.  Gaytan, 342 F.3d at 1012; Carter, 217 U.S. at 306.  The secret bribes defendant received from Hazens must be disgorged to the City in the form of restitution.

2.    Amount of Restitution

The government bears the burden of establishing the amount of restitution by a preponderance of the evidence.  18 U.S.C. § 3664. In determining the proper amount of restitution, "exact precision is not required and district courts do have a degree of flexibility in accounting for a victim's complete losses; thus a 'reasonable estimate' will suffice."  United States v. Anderson, 741 F.3d 938, 954 (9th Cir. 2013).  "A sentencing court may resolve restitution uncertainties with a view towards achieving fairness to the victim,

so long as it still makes a reasonable determination of appropriate restitution rooted in a calculation of actual loss." United States v. Gallant, 537 F.3d 1202, 1252 (10th Cir. 2008) (internal quotations omitted).  A sentencing court may rely on spreadsheets created by law enforcement agents to determine the amount of restitution.  United States v. Ali, 620 F.3d 1062, 1073-74 (9th Cir. 2010).

As set forth above, the government has taken a conservative approach in calculating the total benefits defendant received, that is, $752,457 to reflect only defendant's share of the Hazens payments made in connection with the entitlement-related approvals for Luxe. Moreover, the government appropriately excluded from the restitution calculation all benefits directed to third parties (like Huizar, Esparza, Rios, others in Vegas, and Chiang), even though defendant was found guilty of facilitating those benefits.  See United States v. Colino, No. 06-50486, 2007 WL 2316327, at *2 (9th Cir. Aug. 14, 2007) (in honest services wire fraud case against federal employee, holding that in calculating restitution, "the district court may not take into account any gains of [the employee's] co-defendant but must limit its findings to any ill-gotten gains [the employee] herself accrued" (citations omitted)); United States v. Ring, 811 F. Supp. 2d 359, 379-81 (D.D.C. 2011) (reversing where the government failed "to subtract [from the restitution amount] the costs associated with the non-public officials who went on these trips, including friends, family, and the lobbyists themselves").

The Court should order defendant to pay $752,457 to the City, which is a conservative, reasonable estimate of bribes defendant

26

received from Hazens by virtue of his City position.  <u>Gaytan</u>, 342
F.3d at 1012.

C.    **Conclusion**

For the foregoing reasons, the Court should (1) apply a 16-level
loss enhancement pursuant to U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(I),
based upon the $1,949,565 in bribes defendant received and
facilitated as part of the pay-to-play scheme, and (2) order
defendant to pay $752,457 in restitution to the City of Los Angeles.

**III. DEFENDANT'S POSITION**

 **A. INTRODUCTION**

 Raymond Chan should not be assessed a sixteen-level enhancement for loss that he did not benefit from and that were not foreseeable to him.

 This case, and Chan's role specifically, is unique. Although the jury convicted Chan, there was little evidence that he intended to facilitate benefits for himself. On the contrary, the evidence at trial demonstrated that he gained very little, if at all, from Jose Huizar's bribery schemes. Instead, Chan's actions served to benefit the City of Los Angeles by promoting development and the jobs that accompany development. As a matter of fairness, he respectfully requests that his sentence should reflect the fact that he played no role in many of the crimes of other defendants, particularly Jose Huizar, George Esparza, and George Chiang, and did not ultimately financially benefit in the same manner as the other participants. At trial, the jury found that Chan received at most $69,939 in exchange for in connection with the counts of conviction while still employed by the City of Los Angeles. To the extent that there is any loss (or gain) that should be apportioned to Mr. Chan, it should be limited to this amount.

 **B. THE PROBATION OFFICE INCORRECTLY CALCULATED THE LOSS AMOUNT**

 As the Ninth Circuit has explained, a defendant is only responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid

detection or responsibility for that offense." *United States v.*

*Lloyd*, 807 F.3d 1128, 1142 (9th Cir. 2015). The court continued:

> [W]e have held that a district court may not automatically
> hold an individual defendant responsible for losses
> attributable to the entire conspiracy, but rather must
> identify the loss that fell within the scope of the
> defendant's agreement with his co-conspirators and was
> reasonably foreseeable to the defendant. Although a
> district court need not proceed item-by-item through a
> complete list of all losses attributed to a criminal
> conspiracy and. . .then make an individualized
> determination whether or not each item was within the scope
> of the defendant's joint undertaking and was reasonably
> foreseeable to that defendant, The court must make
> particularized findings about the scope of the criminal
> activity the particular defendant agreed to jointly
> undertake.

> In determining the scope of the criminal activity that the
> particular defendant agreed to jointly undertake (i.e., the
> scope of the specific conduct and objectives embraced by
> the defendant's agreement), the court may consider any
> explicit agreement or implicit agreement fairly inferred
> from the conduct of the defendant and others. . . .

> Knowledge of another participant's criminal acts is not
> enough to hold the defendant responsible for those acts,
> and knowledge of a conspiracy's overall objectives does not
> make the defendant accountable for all the coconspirators'
> acts furthering those objectives. . . . The conduct of each
> is in furtherance of their jointly undertaken criminal
> activity and is reasonably foreseeable in connection with
> that criminal activity. To determine a defendant's fraud-
> loss amount and resulting offense level, a district court
> must consider that defendant's role in the overall scheme.

*Id.* at 1142-43 (cleaned up).

U.S.S.G. § 2C1.1(b)(2) states that the value of the payment, the

benefit received or to be received in return for the payment, the

value of anything obtained or to be obtained by a public official or

others acting with a public official, or the loss to the government

from the offense, whichever is greatest, exceeded $6,500, the Base

Offense Level is increased by a corresponding number of levels to

that amount per the table in § 2B1.1. Relying on that Guideline, the

Probation Office calculated a loss amount of $1,949,565 in bribe

payments from four developers. PSR ¶ 97. This amount is a gross

exaggeration of Chan's liability. The Guideline does not value loss

based on simply what was paid to others by the developers; instead,

it asks this Court to arrive at a value based on payments/benefits

received or obtained by Chan or others acting with him. U.S.S.G. §

2C1.1(b)(2).

By elevating loss amount above all else, U.S.S.G. § 2B1.1, as

referenced in § 2C1.1, fails to identify meaningful differences among

cases and account for differing liabilities. The result is that §

2B1.1 "routinely recommends arbitrary, disproportionate, and often

draconian sentences" for people with no criminal history based purely

on loss amount. Barry Boss & Kara Kapp, How the Economic Loss

Guideline Lost Its Way, and How to Save It, 18 Ohio St. J. Crim. L.

605, 605–06 (2021). Courts have acknowledged this perverse result,

funding that loss "is a relatively weak indicator of the moral

seriousness of the offense or the need for deterrence." *United States

v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); *see also,

e.g.*, *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis.

2005) ("[T]he guidelines treat a person who steals $100,000 to

finance a lavish lifestyle the same as someone who steals the same

amount to pay for an operation for a sick child. It is true that, as

the government argued in the present case, from the victim's

perspective, the loss is the same no matter why it occurred. But from

the standpoint of personal culpability, there is a significant

difference."); *United States v. Adelson*, 441 F. Supp. 2d 506, 510

(S.D.N.Y. 2006) (explaining that the application of §2B1.1's specific

offense characteristics to the individual being sentenced "represents
. . . the kind of 'piling-on' of points for which the guidelines have
frequently been criticized"); *United States v. Watt*, 707 F. Supp. 2d
149, 151 (D. Mass. 2010) (stating that "[t]he Guidelines were of no
help" in fashioning an appropriate sentence based on excessive loss
increase); *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008)
(imposing a downward departure because an offense level of 42 with 0
criminal history would create "a draconian sentence" based purely on
loss amount).

### 1.    SZNW Related Offenses

The Probation Office calculated the loss amount from the SZNW
project at $919,562. (PSR ¶ 47). This amount is derived from two main
sources: the Las Vegas trip benefits and the settlement of the Jose
Huizar sexual harassment lawsuit. The Las Vegas trip benefits to
Huizar and others – and not Chan – were not foreseeable to Chan. The
evidence at trial confirmed that Chan did not participate in the Las
Vegas trips and did not know the extent of the benefits being
conferred on Huizar and his confederates during those trips. The
government offers Exhibit 921 as evidence for Chan's loss
calculation, but the exhibit fails to establish that Chan could have
reasonably foreseen the extent of the activities in Las Vegas. Chan
should not be liable for the benefits Huizar received in Las Vegas.

As for the $575,269 to settle the sexual harassment matter,
Harris Chan, SZNW's General Manager, testified at trial that Huizar
texted him for SZNW's commitment to settle the sexual harassment
complaint and Huang agreed; Chan was not involved with this request.
The government relies upon two exhibits, Exhibits 464 and 927, which

1    show the loan default letter and the flow of money from SZNW to

2    Huizar. Neither exhibit shows Chan's involvement to aid or abet

3    Huizar to obtain the loan, or whether he reasonably foresaw the

4    extent of SZNW's payment. Rather, Chan could not have foreseen that a

5    *quid pro quo* scheme would result from the settlement because Chan did

6    not know about the L.A. Grand Hotel Expansion at the time of the

7    settlement. FBI Supervisory Special Agent Andrew Civetti testified

8    during the trial that the first time the L.A. Grand Hotel Expansion

9    appeared on Chan's radar screen was seven months after the settlement

10   was finalized.

11               2.   <u>Hazens-Related Offenses</u>

12        The Probation Office calculated the loss amount from the Hazens

13   project at $965,571. (PSR ¶ 66). This amount is derived from three

14   main sources. The largest source is the probation officer's

15   calculation of Chan's 50-50 share of the profit that Hazens paid

16   Synergy, or $752,457. (*Id.*). Chiang testified that he and Chan

17   entered a secret 50-50 profit-sharing partnership involving Synergy,

18   the company that Chiang formed in 2014. (PSR ¶ 57, 66, 75). However,

19   Chan never received a "50-50 share" from Hazens or Chiang. In fact,

20   prior to Chiang's testimony, there was no evidence of a "50-50 share"

21   from Hazens or Chiang. Chiang admitted in his own plea agreement

22   that, in January 2017, Chiang agreed to pay Chan a portion of the

23   consulting fees and bonuses to Chan in exchange for Chan's pressuring

24   of city officials – there is no reference to the purported 2014

25   profit-sharing agreement. Furthermore, under cross examination,

26   Chiang admitted that Chan did not even have access to the profits

27   Synergy derived from Hazens, as Chiang admitted that Synergy and its

28

bank account were registered in 2014 solely under his name. Chiang
admitted that he received all distributions from Synergy in 2014 and
paid the appropriate taxes for it.

The only benefits that Chan was indicted for, charged with, and
convicted of were two checks totaling $69,939, which Chiang paid Chan
after Chan retired from public service. (PSR ¶ 57). It is worth
noting that no evidence connects this amount to the 50-50 share
agreement. In fact, under cross examination, Chiang admitted that
Chan worked with him after retirement on multiple real estate sales
projects and different administrative tasks to build up the firm for
several months.

The government offers Chan's June 11, 2017 radar screen, Exhibit
44B, as evidence that Chan was aware of Synergy's profit. Relying on
Chan's radar screens, the PSR also states that "Chan tracked
Synergy's compensation for clearing each milestone in his personal
records, including while he was Deputy Mayor." (PSR ¶ 57). As Agent
Civetti testified, Chan routinely updated his radar screens based on
new information that he received. Chan learned about and added
Chiang's compensation approximately three weeks prior to his
retirement with no prior records of this nature. There were no other
radar screens prior to June 11, 2017 that documented Chiang's
milestone bonuses and his ongoing lucrative Hazens consulting fees
starting since January 2015.  This demonstrates that Chan did not
know about Chiang's milestone bonus compensation until only a few
weeks prior to retirement. Also, there were no other radar screens
after June 11,2017 that showed Chan was "clearing each milestone."

Another portion of the loss calculation is related to $66,000
that Hazens paid to Ernie Camacho for sham real estate reports at
$11,000 per report. (PSR ¶ 59). The PSR states that Chan's
involvement was that he personally delivered paper copies of these
reports and was a "key facilitator" for this scheme. However, the
government does not point to any evidence that indicates that Chan
"personally delivered paper copies of the reports to Huizar" or that
"Chan was a key facilitator of the scheme." The only evidence offered
is a single notation Chan's November 22, 2015 radar screen, Exhibit
42C, which states "Negotiation w/ Petroleum building (set options—TT
JH about Richelle's deal?." But this is a far cry from being a key
facilitator for the Ernie Camacho real estate reports because this
notation was for a completely different matter, the Petroleum
building, which the law firm that Richelle Rios worked for was
initially referred to assist in negotiations. But ultimately that
firm was not retained to assist in the negotiations. In Exhibit 932,
which illustrates Hazens Business Development flow chart for the real
estate reports, Chan is not even pictured, despite his alleged role
as a key facilitator.

Yet another portion of the loss calculation for Hazens is
related to the $100,000 that Hazens paid to Richelle Rios' campaign.
(PSR ¶ 60, 66). On cross-examination, Chiang testified that Huizar
asked Chiang to approach Fuer Yuan for the donation. Chiang agreed to
this and subsequently solicited Yuan, who committed to the donation.
Chiang then communicated this to Huizar. Ample evidence was shown
during the trial that Huizar and Chiang continued this discussion by
text messages over several months, and that Chan was not included in

1  any of these messages. *See* Exhibits 598B, 598G, and 598I. In support

2  of its assertion that this payment should be counted as loss, the

3  government has proffered two exhibits as evidence, Exhibits 125 and

4  126. However, neither of these exhibits show Chan was involved

5  because Chan is not mentioned in either. On the contrary, both

6  exhibits show that Chiang was "contact person" responsible for the

7  $100,000 PAC donation.

8       The government also proffers Exhibits 113 and 113A as evidence

9  of "a $10,000 contribution from Hazens for Huizar's post-election

10 debt." (PSR ¶ 38). However, both exhibits show that Chan only

11 attempted to raise $10,000 from his friends Joel Miller (JM), Al

12 Hernandez (AH), and Dominic Rubalcava (DR). *See* Exhibit 42A. There is

13 also no evidence that Chan facilitated "another $10,000 donation from

14 Hazens to Huizar's alma mater high school." *Id.*

15            3.   Arts District Center Offense

16      The Probation Office calculated a loss amount of $24,432 for

17 benefits received related to the Arts District Center (ADC) project.

18 It relies on three sources for this amount: $12,500 PAC contribution

19 from Kevin Chen, $10,000 signing bonus to Shawn Kuk, and $1,933 for

20 Dodgers tickets. As it pertains to the PAC contribution, political

21 contributions are legal and common unless they are a part of a *quid*

22 *pro quo* act, and no official acts were taken in exchange for this

23 contribution. Huizar did not perform any official acts for the

24 project -- no votes on the project, no motions or resolutions, and no

25 influence to expedite project review. The government cites Exhibits

26 135, 364t, 800, and 812 as evidence of Chan's involvement, yet none

27 of the evidence presented showed there was an agreement with Huizar

28

35

that Huizar would take, or agree to take, any favorable actions for the ADC project in exchange for this contribution. Besides, 13 other entities had already contributed over $290,000 to the PAC prior to this $12,500 contribution. Notably, Chan was not separately charged with any offense relating to the ADC project, the facts underlying this were only relevant as one of hundreds of overt acts for the conspiracy count.

In addition, the $10,000 signing bonus was never actually paid to Kuk. Under cross examination, Andy Wang, a friend of Chan's, admitted that he wanted Kuk, who was about to quit his government job, to help find potential kitchen cabinet buyers on an earned commission basis. Wang also admitted that the $10,000 was a bonus for Kuk to work with his company and, under the direction of FBI Agent Andrew Civetti, Wang attempted to give Kuk the $10,000 sign-in bonus four times. For example, Agent Civetti texted Wang and asked him to text Kuk for a meeting. *See* Exhibit 2955. Without Chan's knowledge, Wang and Kuk met for lunch. At lunch, Wang tried to give Kuk a $10,000 check and later $10,000 in cash – but Kuk did not accept either. See Exhibit 2017, 2958at. Shortly after, Wang attempted to give a $10,000 check to Chan for Kuk –Chan also refused the check. *See* Exhibit 846Z. As a result, Kuk was never paid the $10,000.

### 4.    Other Offenses

The PSR states that Chan facilitated indirect benefits from Chinese developers to Huizar (PSR ¶ 71) and the government offers Exhibits 113, 113a, 114, 118, and 42a as evidence of such. However, these exhibits show that the liaisons are Esparza and Chiang, not Chan.

For the above reasons, Chan submits that the $1,949,565 calculation for benefits received (resulting in a sixteen-level enhancement) is erroneous. At most, Chan should be assessed a six-level loss enhancement for the $69,939 he received after ending his employment with the City of Los Angeles.

## C.    POSITION REGARDING RESTITUTION

Loss for purposes of evaluating the seriousness of a fraud under the Sentencing Guidelines and loss for purposes of restitution are, on the facts of this case, quite different. The purpose of restitution "is to make the victims whole" while "the Sentencing Guidelines serve a punitive purpose[.]" *United States v. Gordon*, 393 F.3d 1044, 1052 n. 6. (9th Cir. 2004) "Restitution ... may only compensate a victim for actual losses caused by the defendant's criminal conduct." *United States v. Gamma Tech Indus. Inc.*, 265 F.3d 917, 926 (9th Cir. 2001). Restitution must be limited "by the victim's actual loss." *United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007); *See also United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012) ("The MVRA demands that restitution be awarded only for the victim's actual, provable loss ...").

Under 18 U.S.C. § 3663A(a)(2) of the Mandatory Victim Restitution Act (MVRA), restitution is only applicable in cases where an identifiable victim has suffered a pecuniary loss. Under (c)(1)(B) of the MVRA, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's

37

criminal conduct in the course of the scheme, conspiracy, or pattern. While the MVRA does not preclude a government entity from receiving restitution as a victim, the prosecution needs to prove that the government entity is an actual victim. *United States v. Salcedo-Lopez*, 907 F.2d 97, 99 n.2 (9th Cir. 1990) ("When the government loses money as the direct result of an offense, it is as entitled to restitution [under the Victim and Witness Protection Act] as any other victim of an offense.").

The Probation Office identifies the City of Los Angeles as a victim and calculates that the victim suffered a loss related to Chan's purported 50-50 share agreement with Chiang related to the Hazens project, or the $752,457. (PSR ¶ 75). As discussed extensively above, this value does not represent the loss to the City of Los Angeles. Even if, relying solely on George Chiang's testimony that these are Chan's potential, but not realized, ill-gotten gains, a "'district court may not order restitution to reflect Defendants' ill-gotten gains.'" *United States v. Anderson*, 741 F.3d at 938, 951 (2013) (quoting *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1165-66 (9th Cir. 2010)). Here, the government has not proven that the City of Los Angeles has suffered any pecuniary harm as a result of Chan's conduct. The payments at issue made to Synergy came from Hazens, not the City of Los Angeles. As such, restitution is not applicable in this case. More importantly, Chiang did not pay Chan that amount. The only provable amount that Chan ever received from Chiang was $69,939 months after his retirement, which has no nexus to the purported 50-50 share agreement.  And even that value does not reflect any loss suffered by the City of Los Angeles.

For the above reasons, Chan respectfully submits that no restitution should be awarded.

IV.   **GOVERNMENT'S RESPONSE**

   A.   **Defendant's Loss Calculation is Not Supported by the Evidence or the Law**

   Defendant makes compelling arguments regarding loss and restitution for a trial that never happened and based upon facts that never occurred.  To accept defendant's arguments would require discarding entire swaths of evidence at trial, disregarding the jury's verdicts, ignoring the Sentencing Guidelines and legal precedent fatal to his claims, and distorting the government's trial presentation.  Instead of addressing these infirmities directly, defendant repeats his tired, self-serving narrative that the jury heard--and rejected.  The Court, too, should reject his arguments.

   Defendant's principal argument that he should be held responsible only for the money he received from Hazens as reflected in just three of his twelve counts of conviction, ignores that he was convicted of a sweeping RICO conspiracy and numerous substantive bribery counts relating to the LA Grand Hotel and Luxe Hotel bribery schemes.  That many of defendant's convictions are for aiding and abetting is of no event: the Sentencing Guidelines treat aiding and abetting an offense *as* offense conduct, not jointly undertaken criminal activity.  Compare U.S.S.G. § 1B1.3(a)(1)(A) with § 1B1.3(a)(1)(B).  Accordingly, for the substantive bribery counts, the Court need not apply the "jointly undertaken criminal activity" standard because those counts are attributable to defendant as "acts and commissions committed, aided, abetted . . . or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a)(1)(A).  Even considering only the benefits explicitly alleged in the bribery counts for which the jury found defendant guilty, that is, the Godoy settlement, the Las

Vegas accommodations, the casino chips, defendant's bribes from
Hazens ($69,939 for himself and $15,000 for his son), and the
$100,000 commitment from Hazens to benefit Huizar via the Rios' PAC,[6]
those benefits alone total $1,104,501, which corresponds to a 14-
level enhancement.

Of course, in rendering its verdicts, the jury necessarily found
a RICO conspiracy as well as schemes to defraud as to the LA Grand
Hotel and Luxe Hotel, such that defendant's relevant conduct for
purposes of sentencing spans well beyond the mere charged executions
of the schemes -- it embraces the benefits that flowed squarely from
the RICO conspiracy and the bribery schemes. See Williams, 356 F.
App'x at 171; cf. Anieze-Smith, 923 F.3d at 575 ("[O]ur cases
interpreting 'relevant conduct' for guidelines purposes have
recognized that relevant conduct includes acts other than those
underlying the charges"); United States v. Williams, 217 F.3d 751,
753-54 (9th Cir. 2000) (inclusion of fraudulent conduct outside the
statute of limitations in sentencing is "consistent with this
circuit's prior cases interpreting broadly the relevant conduct
provision, largely unrestrained by whether the defendant has been
held criminally accountable for such actions"). Thus, defendant
additionally is accountable for the benefits he facilitated,
received, and paid/promised as part of the RICO conspiracy and the LA

---

[6] Although a jointly undertaken activity analysis is not
required here, the evidence at trial powerfully showed that the
sexual harassment settlement and Las Vegas benefits not only were
reasonably foreseeable to defendant but that he had actual awareness
of them and encouraged them in furtherance of the conspiracy. See
supra, discussion at 12-14. These benefits advanced the goals of the
RICO conspiracy: maintaining defendant's and Huizar's power, greasing
the wheels for the LA Grand Hotel redevelopment, and keeping Huizar
happy through the provision of benefits.

Grand and Luxe Hotel bribery schemes because they were reasonably
foreseeable to him and in furtherance of "the jointly undertaken
criminal activity that occurred during the commission of the offense
of conviction."  United States v. Lloyd, 807 F.3d 1128, 1142 (2015);
U.S.S.G. § 1B1.3(a)(1)(B).

Defendant's responsibility for bribes relating to the Luxe Hotel
bribery scheme is not a close call.  Those benefits not only were
reasonably foreseeable to defendant but he had actual awareness of
them and enabled and encouraged them in furtherance of the scheme and
the RICO conspiracy.  Defendant was integrally involved in every
aspect of the Luxe Hotel bribery scheme--from its inception, when he
pitched the idea of teaming with Chiang at a restaurant in the San
Gabriel Valley, to its bitter end, when defendant obstructed justice
though witness tampering to cover up his crimes.  Chiang's testimony
placed defendant at the center of that scheme and described
defendant's involvement at every important step.  And the objective
evidence corroborated Chiang's account of defendant's intimate
involvement, including defendant's constant communications with
Chiang and his son about the Luxe Hotel project and his meticulous
tracking of the project in the "Home" section of his Radar screens.
As the jury heard and observed through numerous exhibits, defendant
was extremely hands-on in managing the project while still working
for the City.  Indeed, while a City executive, defendant worked on
behalf of Hazens by, among other things: ghost-writing letters to and
from public officials relating to Luxe; holding weekly meetings at
his home with Chiang and his son regarding Luxe; instructing Huizar
to hold unprecedented bi-weekly standing meetings for Luxe; resolving

tensions between Huizar and Hazens' chairman Fuer Yuan (through the provision of additional benefits to Huizar); regularly meeting with Yuan and/or Huizar regarding Luxe; relaying messages between Yuan and Huizar; helping draft agreements with Hazens for Synergy; preparing Chiang to pitch Synergy to take over Hazens entitlements (including providing a version of defendant's "People Who Influence the Project" chart to Hazens); acting as a "hired gun" for Hazens by pressuring David Ambroz to vote in favor of Luxe at CPC; and meticulously tracking Hazens payments to Synergy.  And defendant continued to assist Hazens after he left the City, by facilitating additional benefits to Huizar, paying benefits to other City officials via their family members to ensure favorable treatment for Luxe, and seeking to avoid law enforcement detection.  Defendant's efforts and those he directed were in furtherance of the shared goals: maintaining defendant's and Huizar's power, making money for himself and his co-conspirators, and avoiding detection.[7]

---

[7] Defendant appears to argue that the relevant consulting fees received from Synergy should, at a minimum, start from January 2017, as reflected in Chiang's plea agreement.  As an initial matter, the jury clearly rejected defendant's attacks on Chiang's credibility (including attacks based on the plea agreement) and credited Chiang's testimony in reaching their verdicts.  In any event, during trial, Chiang explained that he and defendant were business partners from the beginning and discussed their shares in Synergy when it first began receiving payments from Hazens relating to entitlements in 2015 (and that defendant directed him to invest those initial funds back into Synergy and hold onto the money).  Defendant and Chiang again discussed the issue in 2017 when Synergy secured the lucrative monthly retainer agreement and milestone bonuses, which vastly increased Hazens payments.  Chiang repeatedly testified that defendant considered half of the Hazens money to be his, which was corroborated by defendant's repeated questions about the status of payments in text messages.  Finally, even if the Court were to include Synergy proceeds only from January 2017 onward, that would reduce defendant's attributable loss amount by $73,085.63, which would not impact his offense level.

1    The evidence and testimony similarly showed that the additional
2    pay-to-play conduct, including the ADC bribery scheme and the
3    Salesian contributions from other developers, were in furtherance of
4    the RICO conspiracy and that these benefits not only were foreseeable
5    to defendant but that he was the person directly facilitating those
6    benefits.

7    Given defendant's broad offense conduct, his role as a leader in
8    the RICO conspiracy and relevant schemes, and his intimate
9    involvement with respect to the benefits summarized in the
10    government's losses table, his reliance on Lloyd is misplaced.  Lloyd
11    involved a defendant who pleaded guilty to operating a particular
12    boiler room scheme, but the government sought to include losses at
13    sentencing from a similar boiler room scheme that a co-defendant
14    operated.  807 F.3d at 1136.  The Ninth Circuit noted that the only
15    evidentiary support linking the defendant to the other scheme was his
16    general knowledge of the other scheme's existence and goals.  Id. at
17    1141-45 (the defendant "did not design or develop the overall scheme"
18    and his "efforts to further the scheme related to the boiler room he
19    managed").  The Ninth Circuit held those facts were not enough,
20    because the two schemes operated independently and did not share
21    information, resources, or profits.  Id.

22    Defendant, by contrast, was an architect and a leader of the
23    RICO conspiracy and was integrally involved in the LA Grand Hotel
24    bribery scheme, the Luxe Hotel bribery scheme, and the ADC bribery
25    scheme.  Defendant enjoyed a role in the conspiracy similar to
26    Huizar's: they both directed others and needed each other to achieve
27    the shared goals of the conspiracy.  And unlike the defendant in

28

Lloyd, defendant's efforts to further the relevant schemes are
supported by his counts of conviction, including the RICO conspiracy,
which in turn were proved by his knowledge and efforts to further
those schemes.  Unlike in Lloyd, the government is not seeking to
hold defendant liable for an uncharged scheme in which he was not
involved, like the 940 Hill or Mateo schemes, but only for his own
offenses of conviction and the relevant conduct.

For these reasons, the Court should impose a 16-level loss
enhancement, which is consistent with defendant's convictions, the
evidence at trial, the Sentencing Guidelines, and the law.

### B.    Defendant's Restitution Position Ignores Binding Precedent and Misapprehends the Principles of Restitution

Citing only to generalized principles of restitution that are
not specific to bribery offenses by public officials, defendant
willfully ignores Gaytan, which remains binding precedent.  While
defendant concedes that the "the jury found that Chan received at
most $69,939 in exchange for [or] in connection with the counts of
conviction while still employed by the City of Los Angeles," he still
maintains he owes no restitution and fails to explain why the City is
not entitled to restitution in at least this amount under Gaytan.  It
is.  See Gaytan, 342 F.3d at 1011-12 (defendant who accepted
"$61,506.63 in bribe money" liable to City for restitution in that
amount).

Nor is defendant's restitution limited to those specific counts
of conviction, although the restitution amount the government seeks
for the City of Los Angeles is nonetheless encompassed within
defendant's offense conduct.  Cf. Anieze-Smith, 923 F.3d at 575 ("a
district court may order restitution for all losses resulting from a

45

fraudulent scheme, even those caused by conduct occurring outside the
statute of limitations"); United States v. Msiakii, 575 F. App'x 427,
429 (5th Cir. 2014) (restitution order for losses beyond charged
executions proper based upon the timeline alleged for the scheme in
indictment and the proof of a scheme, including "guilty verdict on
all charges . . . evidence at trial, testimony at sentencing, and
unrebutted information in the presentence report").  Here, as
discussed at length in the discussion at pages 15-16 supra, defendant
did extensive, secret work for Hazens for years while working at the
City, in violation of his duty to the City.

    That defendant directed that some of the money be reinvested
back into Synergy does not make it any less money that benefitted
him.  Indeed, defendant directly benefitted from his re-investment
into the business that he co-owned with Chiang.  By the time
defendant left the City, defendant had a three-year leg up on his
company, as Synergy was a thriving business, employing several
employees, and bringing in a hefty monthly retainer from Hazens.
Because defendant received bribes of at least $752,457 in violation
of his duty as the City's agent, he must account to his employer for
the value of these bribes, which rightfully belong to the City.