E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
 1500 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-0363/3289/3819
 Facsimile: (213) 894-6436
 E-mail: Cassie.Palmer@usdoj.gov
    Susan.Har@usdoj.gov
    Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>RAYMOND SHE WAH CHAN,<br><br>   Defendant. | No. CR 20-326(A)-JFW-2<br><br>GOVERNMENT'S SENTENCING MEMORANDUM RE: DEFENDANT RAYMOND CHAN<br><br>Hearing Date: October 4, 2024<br>Hearing Time: 8:00 a.m.<br>Location: Courtroom of the<br>    Hon. John F. Walter |

   Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files its sentencing memorandum as to defendant Raymond She Wah Chan.

//

//

This sentencing memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 13, 2024            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney


_____/s/_____
SUSAN S. HAR
CASSIE D. PALMER
BRIAN R. FAERSTEIN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

### TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................3

    A.    Overview of Defendant's Crucial Role in the RICO
      Conspiracy.............................................3

    B.    The L.A. Grand Hotel Bribery Scheme.....................5

      1.    Defendant Facilitated the Corrupt Relationship
        Between SZNW and Huizar and Their Shared Las
        Vegas Trips........................................5

      2.    Defendant Facilitated a $600,000 Bribe from SZNW
        to Confidentially Settle a Sexual Harassment
        Lawsuit Against Huizar.............................6

      3.    Defendant, Huizar, and Huang Moved Forward with
        Plans for the L.A. Grand Hotel Redevelopment........8

    C.    Luxe Hotel Bribery Scheme..............................9

      1.    Defendant's Secret Business Venture Through
        Synergy and Bribery Scheme with Hazens.............9

      2.    Defendant Facilitated Bribes to Huizar from
        Hazens............................................12

      3.    Defendant Facilitated Bribes to Other Public
        Officials and Expanded the Pay-to-Play Scheme.......13

    D.    Arts District Center Bribery Scheme....................15

    E.    Defendant's Additional Pay-to-Play Conduct.............16

    F.    Defendant's Concealment and Obstruction of Justice.......16

      1.    Destruction/Manipulation of Evidence..............17

      2.    Tampering with Witnesses..........................18

      3.    Lies to the FBI...................................18

III. THE GUIDELINES CALCULATION....................................19

    A.    Defendant Is Responsible for Over $1.5 Million in
      Bribes................................................20

    B.    The Offense Involved an Elected Official and Public

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

          Official in a High-Level Decision Making/Sensitive
          Position.................................................20

    C.   Defendant Was a Critical Manager for the CD-14
       Enterprise..............................................22

    D.   Defendant Obstructed Justice...........................25

IV.  USPO'S RECOMMENDATION.........................................27

V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION...................28

    A.   The Nature and Circumstances of Defendant's Offenses.....28

    B.   General and Specific Deterrence.........................33

    C.   Need to Reflect the Seriousness of Offense, Promote
       Respect for the Law, and Provide Just Punishment........35

    D.   History and Characteristics of Defendant................36

    E.   Avoidance of Sentencing Disparities....................40

VI.  RESTITUTION..................................................42

VII. FINE .......................................................43

VIII. CONCLUSION ................................................44

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

United States v. Booker,
543 U.S. 220 (2005) ............................................. 27

United States v. Helmy,
951 F.2d 988 (9th Cir. 1991) ................................. 24

United States v. Hill,
645 F.3d 900 (7th Cir. 2011) ................................. 33

United States v. Lewis,
976 F.3d 787 (8th Cir. 2020) ................................. 24

United States v. Martin,
455 F.3d 1227 (11th Cir. 2006) ............................... 33

United States v. Martin,
740 F. App'x 130 (9th Cir. 2018) ............................. 21

United States v. Morgan,
635 F. App'x 423 (10th Cir. 2015) ........................ 36, 38

United States v. Musgrave,
761 F.3d 602 (6th Cir. 2014) ................................. 34

United States v. Sanders,
478 F. App'x 374 (9th Cir. 2012) ............................. 26

United States v. Santos,
501 F. App'x 630 (9th Cir. 2012) ............................. 21

United States v. Spano,
411 F. Supp. 2d 923 (N.D. Ill. 2006) ......................... 33

United States v. Stefonek,
179 F.3d 1030 (7th Cir. 1999) ............................... 34

United States v. Zamora,
982 F.3d 1080 (7th Cir. 2020) ............................... 21

**Statutes**

28 U.S.C. § 994(d) ............................................. 37

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                                    PAGE

**Sentencing Guidelines**

U.S.S.G. § 2C1.1................................................................... 21, 22
U.S.S.G. § 2C1.1(b)(1)............................................................. 19, 20
U.S.S.G. § 2C1.1(b)(3)......................................................... 19, 20, 21
U.S.S.G. § 3B1.1............................................................... 20, 23, 24
U.S.S.G. § 3B1.1(b)............................................................... 19, 22
U.S.S.G. § 3C1.1............................................................... 19, 25, 26
U.S.S.G. § 4C1.1(a)(10).............................................................. 20
U.S.S.G. §§ 2C1.1(b)(2).............................................................. 19
U.S.S.G. §§ 5H1.2.................................................................... 37

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant was entrusted with the leadership of the Los Angeles Department of Building and Safety ("LADBS") and, later, as the Deputy Mayor of Economic Development.  In those roles, defendant was obligated to faithfully discharge the duties of his offices--and the significant influence that came with them--to serve the interests of the public.  He did just the opposite.  For over five years, defendant perpetuated a brazen scheme of corruption within the City of Los Angeles that was built on exploiting his office and the offices of other public servants for his own self-enrichment. Seizing on his unique access to wealthy foreign developers and to the Councilmember for Council District 14 ("CD-14"), Jose Huizar, defendant helped conceive, lead, and operate a long-running RICO conspiracy that centered on three key goals: garner financial enrichment through bribes, maintain political power, and avoid law enforcement detection.

Defendant managed the CD-14 Enterprise from both inside and outside his City office, critically enabling public officials and developers to trade financial benefits for official acts.  From his unique perch, defendant stood to profit handsomely.  Operating in the shadows, he used his position and influence as a City official to get a three-year head start on building his consulting business (Synergy) from the ground up and to position Synergy for lucrative business opportunities in the City while he still was a public official.  Upon leaving his job as Deputy Mayor, defendant then slid into the profitable private career he had built as Synergy's secret co-owner and co-principal.  Paramount to defendant's plan was the success of

1

Hazens' Luxe Hotel redevelopment project.  Defendant doggedly pushed forward the Luxe project on a road paved with bribes to himself, Huizar, and others; strong-arm tactics against the President of the City Planning Commission ("CPC"); and the recruiting and training of co-conspirator George Chiang in the ways of the CD-14 Enterprise. All told, defendant raked in over half-a-million dollars from Hazens for his share in Synergy, and he facilitated another whopping $1.2 million in bribes for his co-conspirators.

But defendant's corruption did not stop there.  Even after he retired from government service, defendant sought to ensure the continued success of the CD-14 Enterprise by extracting campaign contributions from developers for Huizar's wife and hand-picked successor to the CD-14 seat, Richelle Rios.  Defendant continued to use the tactics of the pay-to-play scheme to influence additional public officials through deceitfully disguised benefits routed through their family members.  And when defendant felt the walls of the federal investigation closing in on him, he embarked on a campaign of obstruction by deleting and concealing evidence, tampering with witnesses who might reveal the truth of his crimes, and lying to federal agents to save himself.

Defendant's shameless and unapologetic betrayal of the public trust, years of monetizing his official position, leadership in the RICO conspiracy, and repeated efforts to obstruct justice are highly aggravating, as rightfully reflected in the applicable Guidelines range of 324 to 405 months.  While some modest mitigating factors are present, including defendant's health conditions and prior history as a law-abiding public servant, those competing considerations do not detract from the need for a significant custodial sentence to serve

as just punishment, promote respect for the law, send a strong
message of deterrence, and achieve the other goals of sentencing.
Upon weighing the applicable sentencing factors, the government
respectfully recommends the following sentence: (1) a **210-month** term
of imprisonment; (2) a **three-year term** of supervised release;
(3) restitution of **$752,457** to the City of Los Angeles; and (4) a
special assessment of **$1200**.

## II.  STATEMENT OF FACTS[1]

### A.  Overview of Defendant's Crucial Role in the RICO Conspiracy

From 2013 to May 2016, defendant was the General Manager of
LADBS; from May 2016 to June 2017, he was the Deputy Mayor of
Economic Development.  From the inception of the RICO conspiracy,
defendant established himself as indispensable to the CD-14
Enterprise due to his dual ability to (1) provide access to rich
foreign developers with future multi-million-dollar projects in the
City, and (2) wield significant influence on the entitlements process
through his powerful City positions and close relationship to Huizar.
As the Councilmember for downtown Los Angeles and the Chair of the
Planning and Land Use Management ("PLUM") Committee, Huizar had
immense power and discretion to streamline or stall all major
development projects across the City, and the CD-14 Enterprise
eagerly monetized that power and authority.

For defendant's part in the conspiracy, he used the following
playbook:

(1) sell or pitch to ambitious real estate developers with
pending and future projects in the City Huizar's power over such

---

[1] All facts are based on the evidence presented at trial and the
Presentence Investigation Report ("PSR") (Dkt. No. 1415).

projects and the need to buy Huizar's support;

(2) facilitate years-long corrupt relationships between Huizar and those developers, including by facilitating direct and indirect bribes from the developers to Huizar;

(3) arrange for defendant's own bribe payments by acting as a shadow consultant and leveraging his official acts and influence on behalf of Hazens;

(4) recruit another member (Chiang) to the CD-14 Enterprise to act as his secret business partner; train Chiang on how to operate the pay-to-play scheme, including by facilitating bribes to obtain influence over public officials; and use Chiang to pitch defendant and Huizar to developers as a necessary package to secure City approvals;

(5) help safeguard Huizar's CD-14 Council seat and PLUM Chair position by arranging a $600,000 bribe from a foreign developer to pave the way for Huizar to confidentially settle a sexual harassment lawsuit that threatened his reelection;

(6) prolong the CD-14 Enterprise by facilitating and exacting developer contributions to Rios' campaign to succeed Huizar in City Council; and

(7) engage in various acts of concealment to protect himself, Huizar, the developers, and other members of the enterprise from law enforcement detection, especially when the federal investigation threatened to reveal defendant's criminal acts.

As was proven at trial, defendant was an integral part of the bribery schemes for three different development projects, and he engaged in additional pay-to-play conduct in furtherance of the RICO conspiracy.

4

**B.    The L.A. Grand Hotel Bribery Scheme**

   1.    <u>Defendant Facilitated the Corrupt Relationship Between SZNW and Huizar and Their Shared Las Vegas Trips</u>

Defendant actively facilitated the five-year long corrupt relationship between Huizar and Chairman Wei Huang, the billionaire owner of the China-based Shen Zhen New World Group ("SZNW"). Throughout that relationship, defendant brokered and micromanaged both sides of the drawn-out bribery scheme to ensure that (1) Huang's audacious plans to redevelop SZNW's 13-story L.A. Grand Hotel into the tallest tower west of the Mississippi River came to fruition by (2) satisfying Huizar's insatiable demands for benefits while (3) protecting Huizar's CD-14 Council seat and evading detection by law enforcement.

Consistent with defendant's modus operandi within the conspiracy, the L.A. Grand Hotel bribery scheme kicked off in 2013 with a lavish dinner and defendant's sales pitch to Huang, peddling his and Huizar's power and authority as the sine qua non for development in the City.  Thereafter, defendant (who spoke Chinese) functioned as the indispensable middleman for communications between Huizar and Huang (a non-English speaker) regarding both the bribes supplied by Huang to Huizar, and Huang's needs for official assistance in the City.  For instance, defendant encouraged and facilitated multiple of Huang's all-expense-paid trips to Las Vegas for Huizar and Huizar's Special Assistant, George Esparza.  In connection with those trips, defendant checked in with Esparza to make sure Huang "took care" of Esparza and Huizar in Vegas, referring to the gambling chips Huang freely supplied.  Defendant also was kept abreast of the various goings-on of the trips, including Huang and

Huizar's efforts to conceal their extravagant escapades.  Indeed, in a later meeting with a government informant (Andy Wang) that was surreptitiously recorded, defendant confided in Wang that Huang took Huizar to Vegas in private jets; Huizar used fake names on the jets to avoid detection; Huizar did not pay Huang back for the many benefits he received in Vegas; Huang put Huizar up in private villas and gave him gambling chips; and Esparza cashed out the chips for Huizar.  After casino security approached Huizar as a "politically exposed person" in 2015, risking exposure of the bribery scheme, defendant agreed with the other co-conspirators to let Vegas "cool off."

All told, thanks to defendant, SZNW plied Huizar with nearly $1 million of lavish bribes in the form of the Vegas trips, nearly $200,000 in gambling chips, and a career-saving $600,000 to confidentially settle a sexual harassment lawsuit against Huizar.

2.    Defendant Facilitated a $600,000 Bribe from SZNW to Confidentially Settle a Sexual Harassment Lawsuit Against Huizar

One of the main goals of the RICO conspiracy was for the co-conspirators to maintain power within the City, and no positions were more important than Huizar's CD-14 Council seat and his role as the PLUM Chair.  In 2013, a former staffer filed a sexual harassment lawsuit against Huizar, which threatened Huizar's 2015 re-election to the CD-14 seat and, with it, the pay-to-play scheme.  Huizar turned to defendant for help, and defendant, ever the problem-solver, acted as the architect and mastermind of a furtive financial arrangement to funnel $600,000 from Huang to Huizar to settle the lawsuit, while concealing their corrupt relationship.

Under the plan concocted by defendant, money was routed through

a series of intermediary entities to disguise the source of funds.
Huang used a shell company based in Hong Kong called Grace Luck
Holdings, fraudulent company documents, and a disbarred California
attorney to route $600,000 to another attorney's client trust
account.  Yan Yan, a SZNW employee (and defendant's kung fu student
and later employee), served as the purported "authorized
representative" for Grace Luck Holdings.  The money was transferred
from the client trust account to a Certificate of Deposit account
held at East West Bank in the name of Grace Luck Holdings to act as
the collateral for a private loan to Huizar.  Contemporaneous text
messages throughout showed that defendant was the person who ensured
Huang delivered on the collateral, and later recordings confirmed
that defendant structured the whole thing and took credit for saving
Huizar's career.

As a result of the loan made possible by Huang's collateral,
Huizar was able to pay the former staffer $600,000 in a confidential
settlement to dismiss the sexual harassment lawsuit.  Defendant's
assistance in making the lawsuit go away all but secured Huizar's
2015 re-election.  A few months later, Huizar re-won his seat, paving
the way for Huang to move forward with his redevelopment plans for
the L.A. Grand Hotel, backed by Huizar's paid-for unwavering support.
Huizar never repaid Huang for the "loan" and made limited interest-
only payments (some through cashing in Huang's gambling chips) before
the bank eventually applied the collateral to Huizar's outstanding
balance, thereby enriching Huizar by $575,269.

Defendant's actions were far from altruistic.  While Huizar was
dealing with the sexual harassment lawsuit, defendant's leadership
position at LADBS was in jeopardy by a planned merger of LADBS and

7

the Planning Department.  Huang, who needed defendant to advance his
bribery plans, told Huizar to help save defendant's leadership role
at LADBS.  Defendant similarly lobbied Huizar to block the proposed
consolidation, including by secretly feeding Huizar talking points
and drafting a proposed motion for Huizar to present at PLUM and City
Council meetings.  Huizar used his official position to stall and
ultimately block the merger from taking place, thereby securing
defendant's position as the General Manager.  Thus, through their
corrupt bargain, each of the key co-conspirators in the L.A. Grand
Hotel scheme--defendant, Huizar, and Huang--got something they needed
out of their agreement.

   3.   Defendant, Huizar, and Huang Moved Forward with Plans
        for the L.A. Grand Hotel Redevelopment

Defendant's successful procurement of the settlement money from
Huang to save Huizar's seat skyrocketed his standing in the CD-14
Enterprise.  Following Huizar's re-election, defendant enjoyed
unparalleled access to Huizar and his office.  In later recordings
that defendant did not know were being made, defendant bragged about
how he, along with Huang and Ricky Zheng (Huang's right-hand man),
saved Huizar's career and the consequent debt Huizar owed defendant.

With both defendant's and Huizar's positions of power secured,
defendant began working closely with SZNW in 2015 and 2016 to advance
Huang's plan for the redevelopment of the L.A. Grand Hotel.  Among
other things, defendant helped coordinate a meeting with Huizar,
senior members of the Planning Department, and the SZNW project team
(including Huang) at the CD-14 Council Office to promote the
redevelopment.  Defendant participated in other meetings and
communications with SZNW's redevelopment team, and he tracked

information relating to the Transfer of Floor Area (TFAR) rights entitlement on his Radar Screens.  The Vegas trips continued throughout this same time period and into early 2017.

The L.A. Grand Hotel bribery scheme was the main catalyst that kicked the pay-to-play scheme into high gear.  Without defendant, it is highly unlikely that the corrupt relationship between Huang and Huizar would have been possible.  Without defendant, it is also unlikely Huizar would have been able to obtain, in such a critically secretive way, the money he needed to confidentially settle the sexual harassment lawsuit to win the CD-14 seat, which was the fulcrum of power for the Enterprise.

**C.   Luxe Hotel Bribery Scheme**

    1.   Defendant's Secret Business Venture Through Synergy and Bribery Scheme with Hazens

When it came to real estate developer Hazens and its Chairman, Fuer Yuan, defendant resolved to snag them as a lucrative client by cashing in on his public position.

But first, defendant needed an operational company that he could hide behind and steer Hazens toward.  In 2014, he hand-picked Chiang, an impressionable and eager real estate agent as his protégé in business and in crime.  At the time, Chiang had no experience in real estate development, but he did have something defendant wanted: a preexisting relationship with Hazens and Chairman Yuan.  Defendant, then the General Manager of LADBS, struck a secret business deal with Chiang to be 50/50 partners of Synergy--a private real estate development consulting company that they would form together under Chiang's name to conceal defendant's involvement.  Under the arrangement, defendant would work from inside the City to pull the

9

strings of government, while Chiang would serve as the outward facing agent of the company, with defendant directing Chiang step by step along the way.

From 2014 to mid-2017, that is exactly what defendant and Chiang did. Maneuvering behind the scenes as a paid shadow consultant within the City, defendant advanced the interests of his private client, Hazens, by wielding the power and influence of his official positions. Among other things, defendant ghost-wrote emails for Chiang to send to Huizar urging a resolution to a time-sensitive TFAR appraisal matter; instructed Huizar to hold standing bi-weekly meetings for Hazens and directed its attendees; recruited his son (Jeremy Chan) to work with Chiang on the Hazens project at defendant's direction; and coached Chiang and Jeremy on which public officials had influence over the Luxe Hotel project.

With defendant's meticulous oversight and instruction to Chiang and Jeremy, Synergy quickly secured a consulting contract with Hazens. Initially, the fees were fairly modest, and defendant and Chiang reinvested their respective shares back into the budding business. But as the entitlements process for Luxe ramped up, defendant hatched a plan with Chiang and Jeremy for Synergy to take the leading role in the entitlements process, including through helping draft the contract, participating in preparation sessions with Chiang and Jeremy, and providing materials to pitch to Hazens. With Hazens facing a funding exigency at the end of 2017, Synergy secured the lucrative contract under which Hazens' fees to Synergy encompassed both a $35,000 monthly retainer and four six-figure "milestone" payments for advancing the $700 million project, along with a fifth and final bonus payment of $50,000. By the time the

project was fully entitled, Synergy had amassed over $1.2 million from Hazens.

In exchange for these payments, defendant agreed to use and did use his official position to take favorable action on the Luxe Hotel project.  Most significantly, defendant advised and pressured other public officials whenever necessary for the benefit of Luxe.  When the project called for defendant--as the Deputy Mayor--to pressure officials in various City departments who ultimately answered to him (like the Department of Transportation, Fire Department, and LADWP) to expedite Hazens' tract map package, he did so.  When the project hit an early obstacle in computing the requisite TFAR payment, defendant urged a senior executive of the Planning Department (Kevin Keller) to move quickly, while pumping him for regular updates.  Of course, defendant and Chiang continued to "take care" of Huizar by funneling direct and indirect bribes to him from Hazens for Huizar's official acts on the project.  And as Luxe made its way through the crucial entitlements hearings (each of which came with a large payday for defendant via the milestones), defendant used his position as the Deputy Mayor to lean on David Ambroz, President of the CPC, to expedite and approve the project on favorable terms and to prevail upon the other CPC commissioners to do the same.  Ambroz's description of defendant as a "hired gun" for the Luxe project was exceedingly apt, as defendant worked hard to uphold his end of the corrupt bargain.

To conceal his receipt of the bribes, however, defendant waited to start drawing on his 50/50 share from Hazens until after he left

City employment.[2]  He then created a company called LABXG (the same name as his kung fu class) and directed his Synergy payments there.

2.    Defendant Facilitated Bribes to Huizar from Hazens

Notwithstanding defendant's monetization of his own positions to aid Hazens, Luxe's approval still needed Huizar and his official acts.

Early on, defendant trained Chiang on the importance of "taking care" of Huizar in order to maintain access to and influence over their powerful ally.  Together, defendant and Chiang facilitated numerous bribes to Huizar from Hazens, including contributions to Huizar's post-election debt and his alma mater high school (Salesian) where Rios worked as a fundraiser, and concert tickets and a trip to China to visit Chairman Yuan.

In a particularly convoluted plan to conceal and paper over bribe payments to Huizar over a six-month period, defendant and Chiang facilitated a scheme by which Chiang prepared sham real estate reports that were passed to Huizar, then to a Huizar associate, before delivery to a relative of Yuan.  As purported compensation, Hazens paid Huizar's associate $11,000 per report ($66,000 in total), a sum which made its way into Huizar's pocket.  As with all things relating to Hazens, defendant moderated the communications involving Huizar, Yuan, and Chiang and directed Chiang's activities.

By 2017, Huizar had forged his plan to place Rios in the CD-14 Council seat after his final term expired in 2020 to maintain power through her and prolong the pay-to-play scheme.  To that end, Huizar and others set up a general purpose Political Action Committee

---

[2] Defendant similarly directed Chiang to pay defendant's son, Jeremy, via Synergy at least $15,000 in Fall 2017.

12

("PAC") to raise--and extract from developers--unlimited funds in
support of Rios' campaign.  Defendant wasted no time in agreeing to
help execute this plan.  As the Luxe application approached the final
PLUM and City Council hearings, Huizar made clear that his votes
would cost Hazens.  Accordingly, defendant and Chiang obtained a
$100,000 commitment from Hazens to Rios' PAC, in what amounted to an
explicit quid pro quo transaction, i.e., Huizar agreed to take (and
did take) official acts to benefit Luxe in exchange for the $100,000
commitment.

> 3.    Defendant Facilitated Bribes to Other Public Officials
>        and Expanded the Pay-to-Play Scheme

In July 2017, defendant retired from the City and openly joined
Synergy as a private consultant.  Alongside Synergy, defendant also
established a real estate brokerage company, CCC Investment Group,
which stood for Raymond Chan, Jeremy Chan, and George Chiang.

Defendant's departure from the City did not signal the end of
his participation in the CD-14 Enterprise.  Far from it.  As a
private consultant, defendant needed access to public officials for
his clients more than ever, both for obtaining entitlements and for
ensuring approvals and efficient movement through the construction
phase.  So defendant doubled down on his well-honed criminal tactics
to direct benefits to public officials in exchange for official
action.  In doing so, defendant broadened the reach of the RICO
conspiracy through increasingly cunning ways.  Defendant facilitated
indirect benefits to two public officials in particular: Deron
Williams Sr. (Chief of Staff to City Council President Herb Wesson)
and Joel Jacinto (Public Works Commissioner), whom defendant
identified as persons with influence over the Luxe Hotel project.

13

For Deron Williams Sr., defendant hired his college-aged son as an outside "consultant" for Synergy, purportedly to provide research on California rent control regulations. The arrangement was a sham: Synergy had no need for this work, and the son was unqualified for and uninterested in the work. Adding to the fictitious nature of the job, the contract explicitly stated that the monthly fees would be paid regardless of the actual number of consulting hours performed. In other words, the amount or quality of the work produced literally did not matter.

What mattered to defendant was the timing and duration of the hire. Defendant hired Deron Sr.'s son in late August 2017, right before the Hazens project was to be heard by CPC and when defendant needed Deron Sr. to liaise with the Mayor's Office to urge the CPC to take favorable action. Timing was everything. By the terms of their contract, Synergy needed to secure all entitlement approvals for Luxe, including from PLUM and City Council (which Deron Sr.'s boss, Herb Wesson, oversaw), by December 30, 2017. The four-month consulting agreement with Synergy ran in parallel to the timeline of Synergy's entitlement approval obligations for Hazens. One week after City Council's final approval of the Luxe Hotel project's entitlements on December 12, 2017, Synergy issued its final payment to the son.

Defendant followed a similar strategy with Joel Jacinto. There, he directed Wang to hire Joel Jacinto's wife to perform sales/marketing for Wang's business. Defendant confided in Wang the reason for the hire, advising that hiring the wife of the influential Public Works Commissioner would benefit them both. At defendant's direction, Wang paid the wife approximately $20,000 from June to

14

October 2018.  During that same time period, defendant directed
Chiang to request from Joel Jacinto assistance in expediting B-
permits required to commence construction of the fully entitled Luxe
Hotel redevelopment project.

### D.    Arts District Center Bribery Scheme

In early 2018, defendant and Chiang signed Kevin Chen as a
Synergy client, developer of the Art District Center ("ADC"), to
usher the project through the entitlements approval process.  ADC had
faced years of delays.  Eager to prove Synergy's value, defendant
quickly identified Shawn Kuk, the Planning Director for Huizar and a
senior staffer on PLUM, as the key person with influence to advance
ADC and all City projects through the entitlements process.

Defendant employed the same years-old tactic he had embraced and
fine-tuned throughout the conspiracy.  He began providing benefits to
Kuk, starting with nearly $2,000 in Dodgers tickets.  Through a
series of meetings, defendant then directed Wang to finance another
secret arrangement to funnel $10,000 to Kuk, which defendant
initially contemplated through one of Kuk's relatives (his mother or
brother) and ultimately determined would be through a shell company
(which, unbeknownst to defendant, had been supplied by the FBI).
Defendant tracked the $10,000 payment to Kuk on his Radar Screens, as
well as an additional $15,000 payment from CCC, and communicated to
Kuk that both payments were safely waiting for him.  Meanwhile,
defendant also sought Kuk's official assistance to move the ADC
project forward through the City approval process.

Defendant also facilitated a bribe to Huizar for his support on
ADC in the form of a $12,500 PAC contribution for Rios' campaign.  To
avoid the appearance of a larger contribution from Kevin Chen while

he had a pending project in Huizar's district, the contribution was
divided between Kevin Chen and his wife.

### E.    Defendant's Additional Pay-to-Play Conduct

Defendant's pay-to-play conduct extended beyond the three
bribery schemes described above.  While defendant was still a public
official, defendant (with Chiang's help) wrangled other Chinese
developers with pending or future projects in the City, such as
Greenland, Oceanwide, and City Century, to make contributions towards
Huizar's post-election debt or for Salesian.  He and other members of
the CD-14 Enterprise also sought to steer developers to hire close
associates and allies.  For instance, defendant pressured developer
Shanghai Construction to hire Ricky Zheng (of SZNW) as a consultant
to Shanghai Construction's planned project in Huizar's district,
despite Zheng's lack of knowledge or experience with entitlements.
After Shanghai Construction declined to do so (and because they did
not contribute to Huizar's post-election campaign debt), Huizar
stalled its development project for over a year.

### F.    Defendant's Concealment and Obstruction of Justice

Throughout the racketeering conspiracy, defendant engaged in
extensive concealment tactics to avoid law enforcement detection.
Defendant's active concealment ranged from using his personal email
address (in lieu of his official City account) and personal phone
number to correspond about his corrupt activities, to electing to
discuss substantive matters over the phone or in person, to directing
Chiang and Wang to leave their phones at Synergy's reception area
before discussing sensitive matters in his office.  Defendant also
failed to disclose as required any of the benefits he solicited and

obtained from Hazens (through his secret partnership stake in Synergy) as a City employee on his Form 700s or Form 60s.

The FBI's investigation went fully overt on November 7, 2018. Even before November 7, defendant was aware of the FBI's investigation.  In August 2017, defendant discussed the investigation at length with Wang after Wang had been interviewed by the FBI. During that meeting, which Wang covertly recorded, defendant plumbed Wang for details on what the FBI asked him, and defendant revealed to Wang about the FBI's investigation into Huizar, Huang, Esparza, and Zheng's trips to Vegas.  (Id.)  And when defendant realized that the FBI's attention was on him and his crimes, he swiftly took steps to divert that focus away from him and onto others.

### 1.  Destruction/Manipulation of Evidence

In 2018, the FBI executed a search warrant for defendant's personal cell phone and issued subpoenas to Synergy and CCC seeking information relating to benefits for public officials.

When the FBI searched defendant's cell phone pursuant to the warrant, however, the FBI discovered thousands of missing text messages with Huizar and Chiang that were available and recovered on Huizar's and Chiang's digital devices for the same time period. Notably, certain text messages with Huizar and Chiang remained on defendant's phone, indicating that defendant had selectively deleted text messages, rather than the messages being deleted due to a factory reset or other indiscriminate wipe of the phone.

In response to the Synergy/CCC subpoenas, defendant set out to bury incriminating information.  Rather than collect responsive records and produce them, defendant hand-wrote the term "Attorney-client privilege" on historical documents, including Radar Screens,

17

and withheld them, even though the documents did not actually reflect

attorney-client communications.  Defendant instructed Chiang to do

the same.  Defendant ultimately disclosed a small fraction of records

responsive to the subpoenas, and, remarkably, he failed to disclose

any Radar Screens, which he knew contained material responsive

information regarding benefits to various public officials and

details of his corrupt activities.

> ### 2.   Tampering with Witnesses

Defendant hatched a plan for dealing with live witnesses as

well.  Defendant sought to influence both Wang and Chiang regarding

their stories about the benefits he corruptly arranged for public

officials.

Defendant provided Wang with a false narrative regarding the

Kuk/ADC bribery scheme--both verbally and in writing--and pressured

him to adopt that story.  Seeking to absolve himself of a bribery

scheme that he devised and directed, defendant's make-believe story

for Wang omitted material facts that defendant (1) constructed the

financial arrangement, (2) sought to route the money to Kuk's mother

and then his brother, (3) sought to use a shell company, and

(4) directed Wang to provide the $10,000 payment to Kuk, which

defendant tracked on his Radar Screens after Kuk told defendant to

hold onto the money for him.

Defendant similarly provided Chiang with a document containing a

misleading narrative regarding the ADC bribery scheme and defendant's

role in facilitating the $12,500 PAC contribution from Kevin Chen.

> ### 3.   Lies to the FBI

Finally, during defendant's voluntary interview with the FBI, he

made numerous materially false statements to conceal the bribery

relationship between Huizar and Huang, as well as his own key role in cultivating that relationship, including through the $600,000 settlement.  As the jury found in Count 39, defendant lied to the FBI when he falsely claimed that he had no involvement with the settlement; that Huang did not have anything in front of Huizar that needed Huizar's help; and that Huang never asked Huizar for anything. Those lies were plainly contradicted by numerous text messages, recorded meetings, Radar screens, and defendant's own statements showing that he was the key facilitator of that bribe and the L.A. Grand Hotel bribery scheme.

**III. THE GUIDELINES CALCULATION**

On May 6, 2024, the United States Probation Office ("USPO") issued the PSR and a disclosed recommendation letter.  (Dkt. Nos. 1414, 1415.)  The PSR found that the following Guidelines factors applied:

| | | |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. §§ 2E1.1(a)(2); 2C1.1(a)(1) |
| More than 1 Bribe | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Bribe Value > $1,500,000 | +16 | U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(I) |
| Public Official | +4 | U.S.S.G. § 2C1.1(b)(3) |
| Manager/Supervisor | +3 | U.S.S.G. § 3B1.1(b) |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 |
| **Total Offense Level** | **41** | |

(PSR ¶¶ 91-111.)

The PSR found that defendant had no criminal history points,

19

yielding a criminal history category of I.  (PSR ¶ 116.)[3]  Based on
the foregoing, the USPO calculated defendant's resulting advisory
Guidelines range as **324-405 months.**  (Id. ¶ 177.)  The government
concurs with the PSR's calculation of a 324-405-month Guidelines
range prior to any variance.

Defendant objects to nearly all of the applicable enhancements,
with the exception of the two-level enhancement for more than one
bribe under U.S.S.G. § 2C1.1(b)(1).  (Dkt. No. 1418.)

### A.    Defendant Is Responsible for Over $1.5 Million in Bribes

The Court should apply a 16-level enhancement because, even
under a conservative estimation, defendant is responsible for bribes
totaling over $1.5 million (but less than $3.5 million).  As set
forth in the parties' joint statement regarding loss and restitution
calculations (Dkt. No. 1429), the government concurs with the USPO
that defendant is liable for $1,949,565 in bribes that he received or
intended to receive and that he facilitated for his co-conspirators
and other public officials.  The government incorporates its position
on loss as set forth in the joint statement.

### B.    The Offense Involved an Elected Official and Public Official in a High-Level Decision Making/Sensitive Position

Under Section 2C1.1(b)(3), a four-level enhancement applies
because "the offense involved an elected public official or any
public official in a high-level decision-making or sensitive
position."

Defendant objects to this enhancement on the basis that he, as
the General Manager of LADBS, did not possess the requisite high-

---

[3] Because defendant received an aggravating role enhancement
under Section 3B1.1, he is not eligible for the zero-point offender
adjustment.  See U.S.S.G. § 4C1.1(a)(10); (PSR ¶ 110.)

level decision-making authority and cites to provisions of the
California regulatory code.  (Dkt. No. 1418 at 4.)  But defendant's
myopic reading of Section 2C1.1(b)(3) ignores that this enhancement
applies so long as the offense involved a qualifying public official;
it does not require defendant to hold that position.  See United
States v. Santos, 501 F. App'x 630, 634 (9th Cir. 2012) (holding that
Section "2C1.1(b)(3) applies a 4-level increase to all defendants
involved in a crime of high-level corruption, whether a public
official or otherwise") (emphasis in original).  For this reason,
courts routinely apply this enhancement even to private persons when
they pay bribes to public officials falling within the meaning of
Section 2C1.1(b)(3).  See, e.g., United States v. Martin, 740 F.
App'x 130, 131 (9th Cir. 2018) (applying enhancement to defendant who
paid bribes to Air Force base commander); United States v. Zamora,
982 F.3d 1080, 1082-84 (7th Cir. 2020) (applying enhancement to a
gang member defendant who paid bribes to a prison guard to smuggle
contraband).  Consistent with Section 2C1.1(b)(3) and the caselaw,
this Court previously applied this same four-level enhancement to co-
defendants who paid bribes to Huizar and Esparza: David Lee, 940
Hill, and SZNW.  Here, defendant's offenses unquestionably involved
and largely centered on Huizar, an elected public official.  On that
ground alone, this enhancement applies.

The enhancement applies for the additional reason that defendant
was a public official in a "high-level decision-making or sensitive
position."  That term refers to a position "characterized by a direct
authority to make decisions for, or on behalf of, a government
department, agency, or other government entity, or by a substantial
influence over the decision-making process."  U.S.S.G. § 2C1.1 cmt.,

21

n.4.  As detailed in his own resume, defendant, as the General
Manager of LADBS, led and directed 1,000 employees with a $180
million budget, oversaw the issuance of 170,000 building permits and
800,000 inspections annually, and created 30 programs to improve
building safety and efficiency.  (See PSR ¶¶ 36, 99.)  In furtherance
of the RICO conspiracy, defendant eagerly touted his significant
authority as the head of LADBS, marketing himself and Huizar as the
"perfect package" and one-stop shop for all the entitlements and
construction needs of bribe-paying developers in the City.  Moreover,
as the Deputy Mayor (a position that defendant does not even
acknowledge in his objection to this enhancement), defendant oversaw
the economic development of eight different agencies, including the
Planning Department and LADBS.  (See id.)  Defendant also had clout
over CPC and its decision-making in the entitlements process, which
he willfully leveraged to strong-arm the CPC President for the
benefit of his secret client, Hazens.

In sum, defendant held decision-making authority over government
departments and agencies and had substantial influence in both of his
official positions, which he shamelessly monetized.  This enhancement
applies.

**C.    Defendant Was a Critical Manager for the CD-14 Enterprise**

Because defendant was a manager and supervisor of criminal
activity "that involved five or more participants or was otherwise
extensive," a three-level enhancement applies.  U.S.S.G. § 3B1.1(b).
Relevant factors include "the exercise of decision making authority,
the nature of participation in the commission of the offense, the
recruitment of accomplices, the claimed right to a larger share of
the fruits of the crime, the degree of participation in planning or

organizing the offense, the nature and scope of the illegal activity,
and the degree of control and authority exercised over
others."  U.S.S.G. § 3B1.1, cmt. n.4.

The foregoing factors demonstrate that defendant was a manager
or supervisor of the RICO conspiracy.  The pay-to-play scheme
encompassed more than five participants, including defendant, Huizar,
Esparza, Chiang, Huang, and Yuan.  At trial, Esparza and Chiang
testified that although Huizar was the leader of the scheme,
defendant was the other high-ranking public official and Huizar's
other half of the "perfect package" sold to developers.  Given
defendant's influential positions as General Manager of LADBS and
Deputy Mayor, as well as his close connections with wealthy Chinese
developers, defendant was integral to, and had significant decision-
making authority and control within, the conspiracy.  Indeed, at
times, defendant even gave Huizar direction and instructions on
various aspects of the L.A. Grand Hotel and Luxe Hotel bribery
schemes.  On the other side of the transaction, defendant corralled
the co-conspirator developers SZNW and Hazens, as well as other
developers, to shell out for Huizar's request du jour and then hand-
held their projects to set them up for entitlement success.

Defendant was significantly involved in running the operations
of the pay-to-play scheme for over five years, including by forging
and fostering Huizar's corrupt relationships with the Chairmen of
both SZNW and Hazens.  Defendant was the indispensable facilitator of
these relationships, both in charting the broad course of the bribery
schemes and overseeing even the smallest details.  Perhaps most
notably, defendant helped save the pay-to-play scheme from collapse,
persuading Huang to pay the hefty settlement sum for Huizar,

23

structuring and concealing that financial arrangement, and thereby
saving Huizar's CD-14 seat.  After leading the charge in procuring
the settlement money, defendant exploited his unprecedented access to
Huizar and Huizar's office and exerted a measure of control over
Huizar within the conspiracy.  Chiang and Esparza testified that
Huizar never said no to defendant's requests on behalf of developers.

Defendant ignores the facts establishing his substantial control
over the CD-14 Enterprise, detail-oriented involvement in the various
bribery schemes, extensive planning to evade law enforcement
detection, and receipt of lucrative bribes.  Instead, defendant's
objection amounts to a recycled defense argument from trial: that
defendant merely "[taught] Chiang and his son about local politics
and real estate development."  (Dkt. No. 1418 at 5.)  The jury
rejected this defense and for good reason.  The evidence showed that
defendant recruited Chiang into the conspiracy and trained him on the
inner workings of the pay-to-play scheme; taught him the all-
important lesson of keeping Huizar happy with bribes; and directed
Chiang in carrying out the goals of the RICO conspiracy.[4]  Defendant
also recruited and used Wang to funnel benefits to other influential
public officials like Deron Williams Sr., Joel Jacinto, and Shawn

---

[4] To qualify for a manager/supervisor adjustment, the defendant
need only have managed or supervised one other participant in the
conspiracy.  See U.S.S.G. § 3B1.1, comment. n.2; see also United
States v. Helmy, 951 F.2d 988, 997 (9th Cir. 1991), as amended on
denial of reh'g (Jan. 21, 1992) ("[I]n order for a defendant to
receive an adjustment under § 3B1.1(b) for his role as a manager or
supervisor, the defendant must have managed or supervised at least
one other participant—that is, a person who was criminally
responsible for the commission of the offense."); United States v.
Lewis, 976 F.3d 787, 798 (8th Cir. 2020) ("A defendant may be subject
to the enhancement even if he managed or supervised only one
participant, limited to a single transaction." (cleaned up)).

Kuk.  Evincing defendant's instrumental role in the enterprise, defendant was directly responsible for facilitating nearly $2 million in bribes for the conspiracy, more than a third of which he intended to enrich himself.

Defendant's managerial role in the offense was highly aggravating and deserving of the three-level enhancement.

### D.   Defendant Obstructed Justice

Section 3C1.1 provides for a two-level enhancement where "(1) the defendant willfully obstruct[s] or impede[s], or attempt[s] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct relate[s] to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  U.S.S.G. § 3C1.1.  Examples of covered conduct include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant or witness, directly or indirectly, or attempting to do so" and "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding, or attempting to do so."   Id., cmt. n.4.

As detailed in section II.F above, defendant willfully engaged in multiple acts of obstruction that related to both his offenses of conviction and relevant conduct--from the RICO conspiracy to his multiple bribery and aiding/abetting bribery convictions. Defendant's conduct ran the gamut of obstruction, from deleting text messages with his two key co-conspirators, to deceitfully withholding incriminating evidence as purportedly "attorney-client privileged" and instructing Chiang to do the same, to pressuring Wang and Chiang

1   to adopt his false narratives of events (providing them scripts, no

2   less).  Moreover, as part of its guilty verdict, the jury also

3   specifically found that defendant agreed that a member of the

4   conspiracy would engage in the racketeering act of obstruction of

5   justice – witness tampering.  (Dkt. No. 1401 at 3.)  And the evidence

6   of witness tampering at trial centered on defendant's use of scripts

7   to influence witnesses' recollection of key events.  This Court

8   previously applied this two-level enhancement for Huizar based on his

9   similar conduct in tampering with Esparza and Wang and his lies to

10  the FBI.  (See Dkt. No. 910-1 at 4-41; see also 1/26/2024 Huizar

11  Sentencing Tr. at 5-7.)

12      Defendant misconstrues the PSR when he objects that USPO applied

13  this enhancement "based on Chan's false-statements conviction."

14  (Dkt. No. 1418 at 6.)  Although defendant's lies to the FBI provide

15  one ground of many to apply the enhancement, this enhancement applies

16  due to defendant's broad obstructive conduct by way of deleting text

17  messages, falsely manipulating documents subject to grand jury

18  subpoena for concealment purposes, and tampering with witnesses.

19  (PSR ¶¶ 76-80.)[5]

20      The two-level enhancement should apply to reflect defendant's

21  aggravating obstruction of justice conduct.

22

23      [5] In any event, defendant's material lies also "significantly
    obstructed or impeded the official investigation or prosecution of
24  the instant offense."  U.S.S.G. § 3C1.1 cmt. n.4(G).  At the time of
    defendant's FBI interview, the government was still investigating the
25  nature of defendant's involvement in the Huang-Huizar bribery scheme,
    including his role with the settlement money.  Defendant's lies were
26  "disruptive" to the government's investigation and "significantly
    delayed" it by compelling the government to broaden the scope of its
27  interviews with other individuals, including with Huang and Zheng, to
    further investigate defendant's role.  United States v. Sanders, 478
28  F. App'x 374, 376 (9th Cir. 2012) (affirming application of § 3C1.1
    enhancement based on false statements).

**IV.   USPO'S RECOMMENDATION**

USPO's letter recommended a 120-month or 10-year term of imprisonment, which amounts to an astounding 10-level downward Booker[6] variance from the advisory range of 324-405 months for a non-cooperator defendant who repeatedly lied to the government and never accepted responsibility.  (Dkt. No. 1414 at 2, 5.)

At the outset, the letter rightfully describes the seriousness of defendant's offenses, including that he "assisted Huizar in managing a 'pay-to-play' scheme wherein he used his [official] position . . . to solicit valuable benefits from developers with future and pending projects in Los Angeles," totaling "at least $1,949,565 in bribe payments for Huizar and his co-conspirators." (Dkt. No. 1414 at 4.)  The letter describes defendant's criminal conduct as sophisticated, consisting of "hiding his involvement as a partner for his consulting business, Synergy, while still employed by the City of Los Angeles."  (Id.)  In further aggravation, defendant "attempted to conceal his scheme from investigators and lied to law enforcement regarding his conduct."  (Id.)  USPO also notes that "Chan exhibited a pattern of corrupt activities and practices among developers and investors over a number of years."  (Id. at 6.)

In mitigation, the letter points to defendant's "otherwise lifelong productive life," "close family ties," lack of "prior law enforcement contacts or history of violence," and "health issues, which appear to be controlled by medication."[7]  (Id.)

---

[6] United States v. Booker, 543 U.S. 220 (2005).

[7] The government notes that USPO cited nearly verbatim the exact same mitigating factors with respect to Jose Huizar, but recommended only a one-level variance for Huizar.  (Dkt. No. 1212 at 7.)

As explained below, the government respectfully disagrees that a 10-level variance is appropriate or justified. Instead, the government recommends a four-level variance based on defendant's history and characteristics. If the Court adopts the government's recommended variance, the adjusted total offense level will be 37, resulting in a Guidelines range of **210-262 months.** The government recommends a sentence at the low-end of that adjusted range; that is, **210 months' imprisonment.**

## V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government's recommended sentence of 210 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. A 210-month term of imprisonment is a lengthy and serious sentence that accounts for the egregiousness and longstanding nature of defendant's crimes, furthers the need for deterrence, promotes respect for the law, and provides just punishment. At the same time, the recommended sentence appropriately accounts for the mitigating facts and circumstances in defendant's personal history and characteristics.

### A.    The Nature and Circumstances of Defendant's Offenses

The machinery of the CD-14 Enterprise operated in Los Angeles for years by exchanging bribes for official acts, securing political power, and employing duplicitous means to keep its illicit activities hidden. The stunning scale of the pay-to-play scheme is difficult to grasp, and it is harder still to overstate the vital role that defendant held within the scheme. Defendant's criminal conduct is undeniably aggravating by every metric.

**Defendant's crimes were aggravating in their <u>purpose and nature</u>.** Defendant fully embraced a criminal scheme that was purposefully

structured around systematically abusing his public office and the offices of other public officials.  The pervasive scheme was built on commodifying the official acts of public servants for a wide range of willing bribe payors.  Favorable acts were given based on who anted up, not on the merits of the proposed projects or their potential positive effects on the community, labor unions, affordable housing, or the environment.  The operation of the pay-to-play scheme harmed honest developers who played by the rules.  Developers who refused to acquiesce to the enterprise's demands were punished, with their projects held in abeyance or killed off.

No type of benefit was off limits.  Whether it was arranging a lavish Vegas trip, funneling hush money to a staffer harassed by Huizar, extracting contributions for a local private high school, or furnishing coveted event tickets, defendant did it all.  But the scheme's impact (actual and intended) on local elections, both through the Huang-provided $600,000 settlement and through campaign contributions as bribes, was particularly egregious.  Such bribes injected illicit money into local elections and threatened to pervert the democratic system.

**Defendant's crimes were aggravating in their <u>scale</u>.**  Defendant's criminal acts were extensive and lasted for over half a decade.  During that time, he was the proactive manager of the CD-14 Enterprise who connected with and coordinated between developers, lobbyists, and other public officials in the City.  During the life of the conspiracy, the enterprise garnered eye-popping benefits exceeding $2 million for its members and associates.  And defendant did it all: took bribes, paid bribes, and helped funnel bribes from developers to Huizar.

**Defendant's crimes were aggravating because of his <u>role</u>.**
Defendant was uniquely situated to drive the pay-to-play scheme to
operate at the level and degree that it did for years.  It was not
just that defendant shamelessly monetized his own public positions
for his secret gain, which he certainly did.  Nor was it simply that
defendant masterminded one of the most sophisticated aspects of the
scheme by funneling over half a million dollars to alter the course
of an election, which he also did.  But no other participant of the
RICO conspiracy could do (or did do) what defendant did to perpetuate
the pay-to-play scheme.  Time and time again, defendant firmly guided
both ends of a bribery transaction towards its corrupt ends by
coaching developers on the often-continuous need to feed bribes to
Huizar and then managing Huizar to take favorable action on those
developers' projects.

With Huizar's final term on the horizon, defendant and other
members of the enterprise could have let their productive and long-
lasting conspiracy quietly draw to a natural close.  Defendant did no
such thing, as his greed for profit and power carried on.  As a
private consultant, defendant had long plotted to capitalize on the
influence and access that the scheme afforded.  And so he joined in
Huizar's plan to maintain power by installing Rios to the valuable
Council seat that the enterprise needed to continue into the next
decade.

**Defendant's crimes were aggravating because of the level of
<u>deceit</u> that he employed.**  Defendant was arguably the most cunning and
calculating member of the RICO conspiracy.  He covered his tracks
with layers of concealment, down to the smallest detail like checking
under chairs where FBI agents sat and instructing co-conspirators to

leave their phones at reception.  He set up others to take the fall
should his carefully arranged house of cards ever collapse.
Primarily, he used Chiang to act as the face of Synergy, to be the
person listed on documents, and to communicate with Huizar, Esparza,
and others regarding both benefits and project-related matters, so
defendant could plead ignorance if the FBI ever came knocking.
Defendant used Wang as a piggybank and a pawn to do his dirty work
and pulled in unwitting family members of other officials to take in
payments that defendant intended as bribes.  By design, defendant
kept his name off the $600,000 loan-related documents and emails, but
while calling the shots during in-person and telephonic meetings with
Huang and Zheng.  What defendant would put in writing revealed more
obfuscation: messages asking ad nauseum for phone calls or meetings
and coded Radar Screens that the FBI took pains to interpret.  And
defendant created degrees of separation from himself and his illicit
proceeds by waiting to draw on his bribes and then directing those
payments to "LABXG."

Defendant escalated his deceptive tactics into full-blown
obstruction when the federal government started to close in.  As the
risk of getting caught loomed near, not once did defendant reflect on
his corrupt actions and the damage he had inflicted on the citizens
of Los Angeles and its institutions; nor did he express remorse for
what he had done.  Defendant doubled down, defiantly committing new
crimes in an attempt to hide his years-long criminal conduct.  He
attempted to throw Wang and Chiang (whose illicit actions defendant
directed) under the bus, deleted and concealed evidence, and spewed
lie after lie to the FBI.  Just one of these obstructive acts would
be aggravating, but defendant resolutely committed multiple.

31

Finally, and perhaps most importantly, **defendant's crimes were
aggravating because they <u>perpetuated and sowed the seeds of
corruption</u>**.  Defendant did not only violate his own oath and duty to
the public when he traded in his official position for private gain
and advancement.  And it is not even just that defendant made it
possible for an already corrupt and powerful Councilmember to execute
on the pay-to-play scheme at the highest levels.  Defendant made the
willful, calculated decision to further and expand that system, using
bribes as currency to prop up and perpetuate a culture of corruption.

He recruited and trained Chiang to join in and stake his
livelihood on the enterprise and its causes, forever altering the
trajectory of Chiang's future.  Because it served his own business
interests as a private consultant, defendant funneled bribes to
multiple other public officials--individuals who had no prior
involvement with the pay-to-play scheme.  In so doing, defendant
tacitly encouraged those officials down the slippery slope of
discarding their fiduciary duties in favor of their own economic
interests.  In the process, defendant sent a pernicious message to
the next wave of developers, like Kevin Chen, consultants, and
lobbyists: this is how business is done in this City.

In swiftly rendering its guilty verdicts on all charged counts,
the jury strongly repudiated that message.  Public corruption is not
a victimless crime.  The victim is our democratic system of
government, the integrity of which is further weakened with every
revelation that yet another public official's influence and official
acts are for sale.  Defendant's egregious crimes were another strong
blow to the public's confidence in government, its officials, and the
fairness of the system.  This Court can and should take a step toward

remediating that broad and immeasurable damage with a strong

custodial sentence here.

**B.    General and Specific Deterrence**

Public corruption remains a scourge in the Los Angeles area, as

evidenced by the wide swath of misconduct by public officials that

has been exposed in the federal cases charged and prosecuted in this

district alone.  The endemic nature of public corruption in a

particular locale is a factor that weighs in favor of a substantial

custodial sentence.  See United States v. Hill, 645 F.3d 900, 911

(7th Cir. 2011) (finding that "widespread corruption in East St.

Louis and the need to deter future public corruption" were

appropriately considered in support of sentence).

The strong need for both general and specific deterrence also

support the government's recommended sentence.  Public corruption

cases such as this one demand strong general deterrence:

> ***Unlike some criminal justice issues, the crime of public
> corruption can be deterred by significant penalties that
> hold all offenders properly accountable***.  The only way to
> protect the public from the ongoing problem of public
> corruption and to promote respect for the rule of law is to
> impose strict penalties on all defendants who engage in
> such conduct, many of whom have specialized legal training
> or experiences.  Public corruption demoralizes and unfairly
> stigmatizes the dedicated work of honest public servants.
> ***It undermines the essential confidence in our democracy and
> must be deterred if our country and district is ever to
> achieve the point where the rule of law applies to all*** —
> not only to the average citizen, but to all elected and
> appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006),

affirmed, 477 F.3d 517 (7th Cir. 2006) (emphasis added).  General

deterrence is a particularly effective tool in corruption and other

white-collar cases, as white-collar criminals often premeditate their

crimes and engage in a cost-benefit analysis.  See, e.g., United

33

1  States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because
2  economic and fraud based crimes are more rational, cool, and
3  calculated than sudden crimes of passion or opportunity, these crimes
4  are prime candidates for general deterrence.  ***Defendants in white***
5  ***collar crimes often calculate the financial gain and risk of loss,***
6  ***and white collar crime therefore can be affected and reduced with***
7  ***serious punishment.***") (emphasis added).  That was certainly the case
8  here, where defendant carefully perpetuated a criminal enterprise to
9  leverage his official positions and those of other officials in
10 exchange for financial benefits--and believed he would not be caught.

11     A 210-month sentence is appropriate here and will aid in
12 achieving the critical need for general deterrence, while also
13 rejecting the notion of a two-tier system of justice--a more flexible
14 and lenient tier for well-known or well-heeled white-collar
15 defendants, and a more rigid, severe, and Guidelines-oriented tier
16 for "other" criminals.  See United States v. Musgrave, 761 F.3d 602,
17 609 (6th Cir. 2014) ("[O]ne of the central reasons for creating the
18 sentencing guidelines was to ensure stiffer penalties for white-
19 collar crimes and to eliminate disparities between white-collar
20 sentences and sentences for other crimes." (citation omitted)).  That
21 dichotomy is inconsistent with the Constitution, with fundamental
22 fairness, and with the statutory goals of sentencing.  See United
23 States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (White-collar
24 criminals are "not to be treated more leniently than members of the
25 'criminal class'").  A 210-month sentence in this closely watched
26 case will thus serve an important public purpose.

27     This case also reflects a strong need for specific deterrence.
28 For years, defendant acted with impunity and believed he would get

34

away with his crimes.  He acted willfully and strategically,
continuing to carry out the pay-to-play scheme after he left public
office, and seeking to corrupt other public officials.  When the FBI
came knocking, defendant leapt into action to obstruct justice by
manipulating documents and witnesses alike, in addition to brazenly
lying to the FBI.

Defendant's utter lack of remorse and refusal to accept
responsibility heightens concerns of recidivism.  So long as
defendant staunchly maintains he did nothing wrong, what is to stop
him from engaging in the same "innocent" acts in the future?  Even in
view of defendant's plans to "remain retired" (PSR ¶ 154)--a
premature status forced upon defendant after the federal
investigation disrupted his criminal scheme--a strong custodial
sentence is needed to deter defendant from veering off course into
future criminal activity.

**C.    Need to Reflect the Seriousness of Offense, Promote Respect
for the Law, and Provide Just Punishment**

The public has suffered as a result of defendant's self-serving
greed, and it is important that the public observe the imposition of
an appropriate sentence reflecting the seriousness of his crimes, as
found by a jury of his peers.  This Court is familiar with the well-
publicized reporting on this case and the public's dwindling trust in
its local public institutions, and the government need not repeat the
finer points here.  At bottom, a strong sentence is necessary to
reflect the serious nature of defendant's crimes, punish defendant's
conduct, promote respect for the law, and restore public faith in the
system.  As one court has observed: "***The judicial response to
demonstrated corruption by the political elite and the lapse of duty,***

*honor, and integrity it represents is as important as the corruption itself*."  United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015) (emphasis added).  Here, the appropriate judicial response to defendant's brazen, self-serving, and long-lasting criminal conduct is a substantial custodial sentence of 210 months.

### D.   History and Characteristics of Defendant

As the PSR indicates, defendant has enjoyed numerous advantages in life.  Those advantages led to defendant's influential positions in public governance and provided the platform that allowed him to commit these crimes.

Specifically, the PSR reflects that defendant enjoyed a healthy and loving relationship with his mother and stepfather (after whom defendant legally changed his last name to honor), a relatively happy childhood (despite his estrangement from his biological father), a supportive sister, and an upbringing free from violence and substance abuse.  (PSR ¶¶ 124-128.)  Although defendant struggled earlier on with his academic performance, his parents "were always able to meet his needs," including sending him to boarding school in Canada in the hopes that he would find success there.  (PSR ¶¶ 126, 129.)  He did.  Defendant graduated from high school before obtaining a Bachelor of Science in physics from a Canadian public university and an engineering degree from California State University, Los Angeles.  (PSR ¶ 150.)  From there, he began an over 30-year career with the City, starting as a design engineer with the Los Angeles Department of Water and Power and retiring as the Deputy Mayor.  Defendant reportedly maintains positive and supportive relationships with his wife, his son Jeremy, and his son's family.  (PSR ¶¶ 131-132.)

36

Defendant's history and background present both aggravating and mitigating considerations.  Unlike many defendants brought before this Court, defendant was privileged with a secure childhood, a loving and stable home, a strong education that opened the door to his multiple degrees, and the opportunity to build a highly successful professional career.  Defendant parlayed those advantages to claim a lofty platform from which he freely and eagerly chose to sell his influence to the highest bidder, and nothing about that is mitigating.

At the same time, defendant's decades-long life as a law-abiding public servant prior to 2013 merits some leniency.  Of course, the government ascribes no value on defendant's socioeconomic status, education, or vocational skills.  See 28 U.S.C. § 994(d) (requiring sentencing Guidelines to be "entirely neutral as to ... socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"); 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"); 5H1.10. But defendant's prior history of serving as a productive member of society and dispassionately serving the public good--at one point in his past life--militates in favor of a downward variance and speaks to defendant's potential for reform after a significant term of custody.

Defendant reports reputational, financial, and social harms as a result of this case.  (PSR ¶ 134.)  It is an apt truism that defendant is responsible for the collateral consequences flowing from his own decisions and crimes.  If defendant's "reputation that he established through his career has been shattered," it is because he

1  destroyed it by perpetuating a years-long corruption scheme that

2  monetized his public offices.  Defendant deservedly was "forced to

3  close his consulting business" because that business was borne out of

4  a criminal partnership with Chiang and built on trading bribes for

5  official influence.  And even as defendant reports losing contact

6  with some colleagues, friends, and relatives as a result of his

7  offenses, it appears he continues to have the support of his family

8  and others who have written on his behalf--a luxury that "other" non-

9  white-collar criminals are hard-pressed to find.  (PSR ¶¶ 134, 136.)

10  On that point, the government recognizes that having the support of

11  family and friends is somewhat mitigating because those positive

12  relationships typically aid a defendant's ability to rehabilitate

13  following a conviction and imprisonment.  That consideration is

14  tempered here by the fact that defendant's key family support

15  includes Jeremy Chan and his daughter-in-law, both of whom were

16  employed by Synergy and participated at least partly in aspects of

17  defendant's scheme.  In any event, the Court should consider the

18  offered letters of support in their proper context and refrain from

19  giving them undue weight because "[o]ne does not become [a high-

20  ranking public official] without the confidence of many supporters,

21  some quite influential.  The letters must be viewed in that light."

22  Morgan, 635 F. App'x at 449-50.  Defendant also apparently enjoyed

23  these same supportive and healthy relationships with family, friends,

24  and colleagues during the entire course of his criminal conduct, and

25  they did nothing from 2013 to 2018 to deter him from committing

26  numerous criminal acts.

27       It appears USPO also based its variance recommendation in part

28  on defendant's advanced age (68) to avoid the imposition of what may

equate to a life sentence.  (PSR ¶ 199.)  This logic fails.  That defendant chose to commit crimes later in life--when he was older, wiser, and with everything to lose in his already established personal and professional life--should be seen as aggravating, not mitigating.  Defendant was not a desperate man in his youth with flagging resources, up against the ropes of life.  He had it all and then some--a loving family, a respectable career, and financial stability--but he wanted more and he wanted it in the wrong ways. The USPO's perspective also overlooks that defendant was able to execute on the scheme only by leveraging the influential positions he attained in the later stages of his public career.  Defendant's age is even less of a mitigating factor here, given that he started his criminal conduct 11 years earlier and carried out the RICO conspiracy for over half a decade without getting caught.  It is not mitigating that defendant chose to throw away his law-abiding and abundant life in favor of a carefully concealed criminal one that went undetected by law enforcement for years, thanks to the various concealment tactics he and other co-conspirators employed.[8]

Collectively, the government considers the mitigating aspects of defendant's history, characteristics, and circumstances to warrant a downward variance of four levels, bringing defendant's total down to level 37.  The government further posits that the interests of justice support a sentence at the low end of that applicable range, which is 210 months.

---

[8] As for defendant's medical conditions, the PSR notes that defendant manages most of them with medication or medical devices. (PSR ¶¶ 140-143.)  Defendant's hereditary disease diagnosed in adulthood apparently cannot be medically treated, whether or not defendant is in prison.  (PSR ¶ 139.)

1

### E.    Avoidance of Sentencing Disparities

2      While defendant is entitled to some leniency for the foregoing

3  reasons, any sentence less than 210 months would lead to unwarranted

4  sentencing disparities, including most notably with Jose Huizar.

5      The government previously described Huizar as the "face of

6  corruption in Los Angeles." (Dkt. No. 1226 at 27.) That remains

7  true. But while Huizar may have been the face of the pay-to-play

8  scheme, defendant was the brains that devised some of the most

9  sophisticated aspects of the RICO conspiracy, including the secret

10  funneling of the single largest bribe payment obtained in the scheme

11  (the lawsuit settlement money), shrouded in layers of concealment.

12  No doubt Huizar, and the immense political power he wielded as the

13  sole elected official, was at the heart of the enterprise. But

14  defendant was the muscle who provided the actual connections and

15  access to wealthy developers willing to pay bribes to get what they

16  needed, the wherewithal to steer those developers (and their

17  lucrative benefits) to Huizar, and the political clout to keep Huizar

18  on track to perform his end of these corrupt bargains. Huizar led

19  the enterprise with a closed fist, hoarding influence and clutching

20  onto his political power. Defendant extended his arm out and sought

21  to spread the cancer of corruption to others, enticing other

22  officials to join the CD-14 Enterprise fold.

23      As the only available common standard for federal judges to use

24  in crafting sentences, the advisory Guidelines are a valuable tool to

25  guard against unwarranted sentencing disparities. The below chart

26  compares the applicable Guidelines calculation and variances for

27  Huizar and for defendant, as proposed by the government.

28

|  | *Huizar* | *Defendant* |
|---|---|---|
| Guidelines Prior to Departures/ Variances | Level 42[9] (360 months-life) | Level 41 (324-405 months) |
| Acceptance of Responsibility | -3 levels Results in level 39 (262-327 months) | 0 Remains at level 41 (324-405 months) |
| Operation of the Statutory Maximum | Remains at level 39 but high-end of the range is reduced (262-300 months) | N/A |
| Variance | -5 levels for fulsome admission of guilt with 42-page factual basis, other stipulations, and conservation of resources, plus personal mitigation | -4 levels (government's recommendation) for personal mitigation only |
| *Total* | **Level 34 (151-188 months)** Sentenced to 156 months | **Level 37 (210-262 months)** |

Defendant's pre-variance Guidelines range of 324 to 405 months is appropriately high because it captures the multiple aggravating circumstances warranting a more serious sentence. Defendant's conduct is a far cry from a low- or mid-level government employee who took a bribe to augment her modest public salary or an official who lied to conceal a damaging fact. Although different in nature, defendant's criminal conduct was of similar seriousness as Huizar's and, together, the pair cultivated a criminal marketplace rooted in trading official acts for bribes and obstructing justice. But where their paths diverged was in their acceptance of responsibility.

---

[9] The additional level for Huizar's Guidelines calculation (as compared to defendant's) is due to Huizar's role as an organizer/leader (+4), whereas defendant's role was that of a manager (+3). The applicable sentencing enhancements are otherwise identical.

Huizar, albeit belatedly, ultimately admitted his guilt, thereby
sending a powerful message of accountability to the public, reducing
his risk of recidivism, and helping conserve government and judicial
resources.  Defendant, on the other hand, has done no such thing.  As
reflected in the Guidelines calculation, that significant and
meaningful step on Huizar's part is primarily why the disparity
between Huizar's 13-year sentence and the government's proposed 210-
month sentence (17.5 years) for defendant is well-justified.

This Court previously applied a five-level downward variance in
fashioning Huizar's sentence, which was based in part on Huizar's
fulsome pre-trial acceptance of responsibility, stipulation to a
comprehensive Guidelines calculation, and commitment to pay
restitution.  (See 1/26/2024 Huizar Sentencing Tr. at 53 (nothing
that "the first and most important step was [Huizar's] admission of
guilt".)  Huizar also presented compelling mitigation by way of his
history and circumstances, particularly regarding the early
adversities he overcame and noble intentions he held earlier in his
public career.  The government's four-level variance recommendation
for defendant--just one level less than what was afforded Huizar--
appropriately factors in the mitigating circumstances presented by
defendant's history and characteristics, while also accounting for
defendant's lack of acceptance, the need to avoid unwarranted
sentencing disparities, and other sentencing factors.

## VI.  RESTITUTION

The Court should impose restitution of $752,457 to the City of
Los Angeles for the reasons set forth in the government's position on
restitution in the joint statement.  (Dkt. No. 1429 at 21-27.)

**VII. FINE**

Based on the government's recommended four-level variance and resulting total offense level of 37, the fine range is $40,000 to $400,000.  U.S.S.G. § 5E1.2(c)(3).  The PSR found that defendant has a total positive net worth of $1.28 million, with the ability to make an immediate payment of $100,000 and a second payment of $425,000 within six months of sentencing.[10]  (PSR ¶¶ 160, 170.)  Defendant's assets include his primary residence and two rental properties in Vegas that he co-owns with his wife and Jeremy.  (PSR ¶ 161.)  The PSR bases its assessment of defendant's ability to make the second $425,000 payment on "his share of equity in jointly held real estate."  (PSR ¶¶ 161, 169.)  It is not clear from the PSR what defendant's share is in each of the three properties and, with respect to the primary residence shared by defendant's wife, the government does not believe defendant's share of that property should be part of his immediate or short-term ability to pay.  The PSR reports defendant's monthly income to be $15,799 (comprised entirely of passive income) and that he has the ability to pay at least $8,000 a month, which defendant currently gives to Jeremy as his "son's allowance."  (PSR ¶¶ 160, 171.)

The government seeks restitution of $752,457.  Assuming the Court imposes restitution in this significant amount, the government believes defendant's payments should be directed towards paying the City of Los Angeles.  Even under a payment schedule like the one proposed in the PSR, a $752,457 restitution order would take

---

[10] Elsewhere in the PSR, however, it states that defendant's share of joint cash assets is at least $185,000 and available for immediate payment.  (PSR ¶ 169.)

1  defendant several years to pay and may unfairly impose a hardship on

2  his wife, who relies entirely on defendant's income.  (PSR ¶ 169.)

3  Given the significant sum in restitution that should be imposed and

4  defendant's financial condition, the government does not recommend

5  imposition of a fine.

6  **VIII.    CONCLUSION**

7      As this Court so poignantly observed:

8      [C]orruption has the real potential to destroy the delicate
       fabric of democracy by making the average citizen lose

9      respect and trust in elected officials and give up all hope
       in participating with local government . . . [T]his Court

10     in discharging its duty to sentence the defendant must act
       as the voice of the community.  When it comes to political

11     corruption, the community historically and presently
       requires that real, tangible, and severe consequences meet

12     those -- must meet those who gain a position of public
       trust and then abuse that trust for personal gain.  Unless

13     that traditional principle is honored, political corruption
       will slowly erode -- corrode the foundations of our

14     democracy until it collapses under its own weight.

15  (1/26/2024 Huizar Sentencing Tr. at 69, 71.)

16      For the foregoing reasons, the government respectfully requests

17  that this Court impose the following sentence: (1) a 210-month term

18  of imprisonment; (2) a three-year term of supervised release; (3) an

19  order to pay $752,457 in restitution to the City of Los Angeles; and

20  (4) a special assessment of $1200.

21

22

23

24

25

26

27

28