John Hanusz (State Bar No. 277367)
HANUSZ LAW PC
553 South Marengo Avenue
Pasadena, California 91101
Telephone: (213) 204-4200
Email: john@hanuszlaw.com

Michael G. Freedman (State Bar No. 281279)
THE FREEDMAN FIRM PC
1801 Century Park East, Suite 450
Los Angeles, California 90067
Telephone: (310) 285-2210
Facsimile: (310) 425-8845
Email: michael@thefreedmanfirm.com

Attorneys for Raymond Chan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMOND SHE WAH CHAN,<br><br>Defendant. | Case No. 20-CR-00326-JFW<br><br>**RAYMOND CHAN'S MEMORANDUM REGARDING SENTENCING** |

1    Raymond Chan, by and through his counsel of record, John Hanusz and

2    Michael G. Freedman, hereby files his sentencing memorandum.

3    This memorandum is based on the attached memorandum of points and

4    authorities, all files and records in this case (including Chan's previously filed

5    objections to the presentence report and the parties' joint statement regarding

6    loss calculation and restitution), and such argument and evidence as may be

7    presented to the Court at the sentencing hearing in this matter.

8

9    Dated: September 13, 2024                    Respectfully submitted,

10

11                                    By:    *s/ John Hanusz*
                                            John Hanusz

12

13                                           *s/ Michael G. Freedman*
                                            Michael G. Freedman

14

15                                    Attorneys for Raymond Chan

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. THE SENTENCING GUIDELINES DO NOT ACCURATELY REFLECT
    CHAN'S CULPABILITY .................................................................................2

III. THE 18 U.S.C. § 3553(a) FACTORS WARRANT A BELOW-
    GUIDELINES SENTENCE ............................................................................6

    A.   Nature and Circumstances of the Offense ................................................8

    B.   Chan's History and Characteristics .........................................................9

        1.   Chan's Upbringing and Faith ........................................................9

        2.   Chan's Contributions to the City of Los Angeles ...........................9

        3.   Chan Did Not Seek Personal Gain for His Efforts, Even When
           Incentives Were Offered ..............................................................18

        4.   Chan Improves His Community by Helping Friends and Charitable
           Organizations ..............................................................................20

        5.   Chan Has Played, and Continues to Play, a Critical Role in the Lives
           of His Family Members ...............................................................25

        6.   Chan's Age and Declining Health Favor the Requested Sentence ...29

    C.   A Lengthy Custodial Sentence Is Not Necessary to Deter Chan or to
       Protect the Public ...................................................................................31

    D.   A Lengthy Custodial Term Will Hinder the Care Chan Requires for His
       Health Problems .....................................................................................34

    E.   A Custodial Term of 33 Months Will Promote Parity in Sentencing ...35

IV. CONCLUSION .................................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................6, 7

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...............................................6, 7

*McDonnell v. United States*, 579 U.S. 550 (2016) .................................................36

*Nelson v. United States*, 555 U.S. 350 (2009) .........................................................6

*Patton v. Federal Bureau of Prisons*, No. CV18-00209-TUC-RM, 2019 WL
    11837059 (D. Ariz. Sept. 27, 2019) .................................................................35

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .........................4

*United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019) .............................34

*United States v. Booker*, 543 U.S. 220 (2005) ........................................................6

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ..........................................36

*United States v. Calderon*, CR-14-103-CAS (C.D. Cal.) ......................................36

*United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) ...........................................8

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ...................................34

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)..................3

*United States v. Gain*, 829 F. Supp. 669 (S.D.N.Y. 1993)..................................32

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ..............................................7

*United States v. Lee*, 725 F.3d 1159 (9th Cir. 2013) ...........................................30

*United States v. MacKay*, 20 F. Supp. 3d 1287 (D. Utah 2014) .........................32

*United States v. Marsh*, 820 F. Supp. 2d 320 (S.D.N.Y. 2011) .........................30

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...........................4

*United States v. Ralph Inzunza*, 580 F.3d 894 (9th Cir. 2011) ...........................36

*United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005) .........................3

*United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014).....................................2, 36

*United States v. Ridley-Thomas*, CR-21-485-DSF (C.D. Cal.) ............................36

*United States v. Serafini,* 233 F.3d 758 (3d Cir. 2000) ..........................................8

*United States v. Takai*, 941 F.2d 738 (9th Cir. 1991)............................................7

*United States v. Vigil*, 476 F. Supp. 2d 1231 (D.N.M. 2007) .............................33

*United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010).................................4

*United States v. White*, 506 F.3d 635 (8th Cir. 2007) ...................................30

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008).............................7

*United States v. Yee*, CR-14-196 (N.D. Cal.) .............................................36

**Statutes, Rules, and Guidelines**

18 U.S.C. § 3553..................................................................................................31

Pub. L. No. 98-473, § 239, 98 Stat. 1987 (1984) ..........................................31

U.S.S.G. § 2C1.1 ....................................................................................2, 3, 5

U.S.S.G. § 3B1.1 ...................................................................................................4

U.S.S.G. § 4C1.1 ...................................................................................................5

**Other Authorities**

American Bar Association, Criminal Justice Section Task Force, *A Report on Behalf of the American Bar Association Criminal Justice Set the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014) ...............................3

Anderson, Meg, *Lawmakers Push for Federal Prison Oversight After Reports of Inadequate Medical Care*, National Public Radio, Dec. 12, 2023 ..................34

Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605 (2021)..............................................3

David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).......................................32

Dep't of Justice, Off. of Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Feb. 2024) ........................34

Ellen S. Podgor, *Throwing Away the Key*, 116 Yale L. J. Pocket Part 279 (2007)3

Joann B. Morton, *An Administrative Overview of the Older Inmate,* U.S. Dep't of Justice, National Institute of Corrections (1992) ...............................................29

Mayo Clinic Staff, *Charcot-Maries-Tooth Disease*, Mayo Clinic, May 8, 2023 30

Pavlo, Walter, *Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy,* Forbes, April 19, 2022 ........................................................................34

Statement of James E. Felman on behalf of the American Bar Association to U.S. Sent'g Comm on Proposed Amendments to the Federal Sentencing Guidelines regarding Economic Crimes (Mar. 12, 2015) .......................................................3

Symposium, U.S. Sent'g Comm'n, Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, *"What Social Science can Contribute to Sentencing Policy for Economic Crimes"* (Oct. 12, 2000) ...................................................................................... 32

Thrush, Glenn, *Staffing Crisis at Federal Prisons Highlighted in Oregon*, New York Times, May 22, 2024 .......................................................... 34

U.S. Bureau of Prisons, *Management of Major Depressive Disorder* (2014) ..... 30

U.S. Dep't of Justice, Nat'l Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) ...................................................................................... 29

U.S. Sent'g Comm'n, Interactive Data Analyzer ................................................ 36

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2016) .................................... 32

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. (2007) .......................................................................................... 32

MEMORANDUM REGARDING SENTENCING

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Raymond Chan is a loving husband, father, and grandfather; a helpful friend to all those around him; and a devoted public servant who spent his career trying to help the citizens of Los Angeles, make government more accessible, and promote development in his adopted hometown. In his desire to promote a building boom in downtown Los Angeles, which has been so long plagued by blighted areas, he made decisions that are not reflective of his core character. This character is vividly demonstrated in the touching letters provided to the Court by friends, family, co-workers, former subordinates, and members of the development community. Chan's positive accomplishments and contributions are staggering in magnitude.

Against that remarkable career stands his conviction at trial. He acknowledges the jury's verdict and recognizes that punishment is called for. But he respectfully asks the Court to consider several factors at sentencing. The first is his relative culpability: Chan is not Jose Huizar. Unlike Huizar, Chan never went to Las Vegas, nor did he solicit funds to benefit himself. Unlike Huizar and other defendants and witnesses (both charged and uncharged) in this case, he did not seek to line his own pockets. Unlike these other individuals, Chan did his best to keep the interests of Los Angeles and its citizens at the forefront of his mind. Second, Chan's personal characteristics merit consideration: he is sixty-nine years old, has several serious medical issues, and supports multiple family members. Third, the conduct which led to his convictions in this matter – his first and only contact with the criminal justice system – can only be described as an aberration in an otherwise unblemished career of public service.

The Probation Office recommended a custodial sentence of 120 months, a downward departure from its finding of an applicable sentencing range of 324-

405 months (at a total offense level of 41 and no criminal history). Chan submitted his legal and factual objections to this calculation on the basis that the Probation Office erroneously applied a number of sentencing enhancements. (PSR ¶¶ 91-111). Chan believes that a substantial variance is merited and respectfully implores the Court to show mercy in fashioning a sentence which is sufficient, but not greater than necessary, given all the factors the Court must consider. Chan submits that a 33-month custodial sentence achieves these goals.

## II.    THE SENTENCING GUIDELINES DO NOT ACCURATELY REFLECT CHAN'S CULPABILITY

Although Chan does not reiterate his specific objections to the sentencing enhancements again here, he incorporates them by reference. As discussed in those prior objections and below, Chan believes his total offense level should be 20, resulting in a guidelines range of 33-41 months.

### A.    U.S.S.G. § 2C1.1(b)(2)

However, Chan will restate his more general objection to being held liable for the benefits received by others. The applicable guideline, § 2C1.1, asks the court to choose "based on the 'greatest' of '[1] the value of the payment, [2] the benefit received or to be received in return for the payment, [3] the value of anything obtained or to be obtained by a public official or others acting with a public official, or [4] the loss to the government from the offense[.]'" *United States v. Renzi*, 769 F.3d 731, 757 (9th Cir. 2014) (citing U.S.S.G. § 2C1.1(b)(2)). The Probation Office does not specify which of these four prongs it is applying. (PSR ¶ 97). It is impossible to calculate the benefit received by the developers, or the any loss that the City of Los Angeles experienced, if any, because of the official actions taken by the CD-14 Enterprise. The only plausible measure is "the value of things obtained" by others, or the bribes paid to Huizar, George Chiang, and George Esparza.

The result is that Chan is facing a 16-level enhancement when he did not obtain, or even know about the extent of, many of these bribes. *Id*. The enhancement is a gross exaggeration of Chan's liability. By elevating bribe payments which Chan did not receive above all else, U.S.S.G. § 2C1.1, which references the loss table in § 2B1.1, fails to identify meaningful differences among cases and account for differing liabilities.[1] As a result, this guideline "routinely recommends arbitrary, disproportionate, and often draconian sentences" for people with no criminal history based purely on loss amount. Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 605–06 (2021). Courts have pushed back, commenting on how loss amount "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); *see also, e.g., United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("[T]he guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child. It is

---

[1] Over the years several commentators, including the American Bar Association, have called for a dramatic re-thinking of the economic guidelines because the focus on loss amount creates disproportionate sentences unrelated to relative culpability. *See generally* American Bar Association, Criminal Justice Section Task Force, *A Report on Behalf of the American Bar Association Criminal Justice Set the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014), Ellen S. Podgor, *Throwing Away the Key*, 116 Yale L. J. Pocket Part 279, 290 (2007). The American Bar Association recommended that the Sentencing Commission amend the economic crime guidelines to ensure that they "are proportional to offense severity and adequately take into consideration individual culpability and circumstances." Statement of James E. Felman on behalf of the American Bar Association to U.S. Sent'g Comm on Proposed Amendments to the Federal Sentencing Guidelines regarding Economic Crimes, at 8 (Mar. 12, 2015).

MEMORANDUM REGARDING SENTENCING

true that, as the government argued in the present case, from the victim's perspective, the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference."); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (explaining that the application of §2B1.1's SOCs to the individual being sentenced "represents . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized"); *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (stating that "[t]he Guidelines were of no help" in fashioning an appropriate sentence based on excessive loss increase); *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (imposing a downward departure because an offense level of 42 with zero criminal history would create "a draconian sentence" based purely on loss amount).

Any participation on Chan's part in the scheme resulted in very little gain for himself. For the reasons provided in his submitted legal and factual objections to this calculation, Chan should not be held liable for the acts of others in which he played no part or were not foreseeable to him. The Probation Office recommended a ten-year sentence for actions taken over the course of three years. During those three years, Chan did not receive any payments other than the $69,969 after he left the City, nor did he take any official actions. He was a facilitator who was trying to help everyone. As will be shown below, this is part of what made Chan an asset to Los Angeles for so long. It is a strength, but also a weakness, here.

**B.    U.S.S.G. § 3B1.1(b)**

Chan also reiterates his objection to any enhancement for being a manager or supervisor. Unlike Huizar, Esparza, and Chiang, Chan did not have "a larger share of the fruits of the crime[ or] degree of participation in planning or organizing the offense." U.S.S.G. § 3B1.1 cmt. n. 4. Huizar solicited and

received $1,730,624 in bribe payments as the main beneficiary who planned and organized the enterprise, not Chan. Esparza managed and organized multiple bribes for Huizar and received approximately $232,000 in benefits. The individual who profited the most from Synergy's work was not Chan, but Chiang, who received a total of $1,504,914. By comparison, Chan only received $69,939 from Chiang. Chiang described all his Huizar bribes as coming at Chan's direction, but none of the exhibits support his claim. On the contrary, the trial revealed that Chiang operated under *Huizar's* direction to steer benefits to *Huizar*. Chan only mentored Chiang regarding the City's procedures, helped him upon his request, and introduced him to City staff and consultants. Chan did not manage Chiang, nor did he have any control over him.

Chan was not an organizer, leader, manager, or supervisor in Huizar's enterprise and thus, no enhancement should apply.

### C.    U.S.S.G. § 4C1.1

Chan also believes that a further two-level downward adjustment should apply under the Zero Point Offender adjustment criteria under § 4C1.1. Chan is a defendant who has no prior criminal history; is not a terrorist; did not use violence or threat of violence in connection with the offenses. His offenses did not result in death or serious bodily injury; are not sex offenses; did not cause financial hardship; did not involve a firearm or other dangerous weapon; and are not affecting individual rights. Lastly, Chan did not engage in a continuing criminal enterprise for drug trafficking as set forth in 21 U.S.C. § 848. Chan should not receive any § 3B1.1 adjustment and, even if he does, it would not be for any drug-related offenses.

With the base level of 14 (§ 2C1.1(a)(1)), the enhancements of two levels (§ 2C1.1(b)(1)), six levels (§ 2C1.1(b)(2)), and a downward adjustment of two levels (§ 4C1.1), the appropriate adjusted offense level under the guidelines is

therefore 20, yielding a sentencing range of 33 to 41 months before consideration of the factors listed in the 18 U.S.C. § 3553(a).

**D.    Restitution**

Chan submitted his legal and factual objections to the application of restitution and incorporates them by reference here. Contrary to the Probation Office's identification of the City of Los Angeles as a victim, many support letters stated below from the construction/development community as well as City staffers, show that Chan became synonymous with unwavering dedication to improve customer service by directing and establishing many programs to help development projects, big and small, build safe and fast. As a result, the business and development communities brought more investment to the City of Los Angeles, which sheltered its economy during turbulent economic periods. The City is not a victim. For the above reasons and those previously stated, Chan respectfully submits that no restitution should be awarded.

**III.    THE 18 U.S.C. § 3553(a) FACTORS WARRANT A BELOW-GUIDELINES SENTENCE**

While the sentencing guidelines are the starting point for the Court's consideration of sentencing, the guidelines do not adequately address all of Chan's life circumstances, his contributions to society, including the City of Los Angeles, his health, his age, and the other punishments he has and will continue to suffer as a result of these offenses.

The core principles of sentencing have been resolved by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007). "The guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Factors justifying a sentence outside the guideline range are no longer required to

be "extraordinary." *Gall,* 552 U.S. at 47. "'One theme'" runs through the

Supreme Court's recent sentencing decisions: '*Booker* empowered district courts,

not appellate courts . . . [and] breathe[d] life into the authority of district court

judges to engage in individualized sentencing. . .'" *United States v. Whitehead*,

532 F.3d 991, 993 (9th Cir. 2008). The primary directive in 18 U.S.C. § 3553(a)

is for sentencing courts to "'impose a sentence sufficient, but not greater than

necessary,' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101.

 The dozens of letters submitted to the Court by Chan's family members,

and numerous friends, colleagues, and associates paint a robust picture of a man

who is devoted to his family and his extended community, supports charities, and

contends with serious health struggles. Each of these factors demonstrates that

this conviction is an aberration in an otherwise law-abiding life. Taken

individually or together, these exemplary attributes of Chan's true character

underscore that a custodial sentence of 33 months is the appropriate one

here. The point is made best by his wife, Sarah Chan:

> I am not contesting the verdict. I just want to say that what Ray was
> convicted of is uncharacteristic of his true nature, which is goodness
> and honesty, and a desire to be helpful without expecting anything in
> return. I beg you to consider his life in totality at the time of
> sentencing. I would humbly ask that you consider all the good my
> husband has done for the City of Los Angeles, his declining
> physical state, and the continued good that he can do for
> communities and society.

(Ex. A: Letter of Sarah Chan).

 The Court can—and should—credit the testimonials provided and the

details of Chan's history in determining if any variance, and the length of such

variance, should be applied. *See, e.g.*, *United States v. Takai*, 941 F.2d 738, 744

(9th Cir. 1991) ("entirely appropriate" to consider "outstanding good deeds . . .

as a relevant factor in determining whether [] criminal conduct was a single

aberrant act"); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (variance

based on "isolated mistake" in otherwise long and entirely upstanding life).

Indeed, the Ninth Circuit and other courts frequently acknowledge the

importance of variances when the facts of the case diverge from the norm,

including when the defendant has engaged in exceptional and outstanding civic

and charitable contributions. *See United States v. Serafini,* 233 F.3d 758, 772 (3d

Cir. 2000) (*citing Koon v. United States*, 518 U.S. 81 (1996)) (affirming district

court's recognition that downward departures for civic and charitable good works

must be found to an exceptional degree); *United States v. Cooper*, 394 F.3d 172,

177 (3d Cir. 2005) (affirming a four-level downward departure because of the

defendant's "hands-on personal sacrifices," which included organizing and

coaching a youth football team in a depressed area, mentoring youth, and

assisting youth attend college.). This is such a case.

### A.    Nature and Circumstances of the Offense

Chan's offense conduct is inextricable from his dedication to his career

serving the City of Los Angeles. He spent his career trying to help the citizens of

Los Angeles, make government more accessible, and promote development in

his adopted hometown. In his desire to promote a building boom in downtown

Los Angeles, which has been so long plagued by blighted areas, he made

decisions that are not reflective of his core character. Specifically, he blinded

himself to Huizar's corruption where he believed Huizar's efforts would benefit

his goals of developing the City.

Chan does not discount the seriousness of the offenses of which he was

convicted. However, as the Probation Office noted, "[t]he seriousness of the

offense, however, is balanced against Chan's overall background and

characteristics, which include an otherwise lifelong productive life, including

years of significant public service. Notwithstanding this conviction, Chan has

made significant contributions to the City of Los Angeles." (Discl. Rec. Letter at 6).

### B.    Chan's History and Characteristics

#### 1.    Chan's Upbringing and Faith

Chan was born in China and raised in Hong Kong. Chan grew up in a family with no religious inclinations. At ten years old, Chan sought to be baptized as a Catholic on his own volition and served as an altar boy for years, which shaped his professional goals and his life's mission – to help people. As a public official, Chan's professional goal was to make city government better serve the public. As an individual, his life's mission is to better the lives of people in his life circle and beyond. The attached letters illuminate and speak to these undertakings.

At age 16, he left Hong Kong for Canada for high school. While in college, Chan met and fell in love with his wife, Sarah. After Chan received his bachelor's degree in physics, he married Sarah and moved from Canada to Los Angeles where Sarah and her family lived. Unable to find a job as a physicist, Chan pursued another degree in civil engineering while working as a waiter, and later as a real estate salesman after he obtained his real estate license. In 1984, Chan received his engineering degree and began working for the City of Los Angeles.

#### 2.    Chan's Contributions to the City of Los Angeles

For over three decades, Chan dedicated his life to the City of Los Angeles, becoming known for his unwavering dedication and commitment as a civil servant. As a result, the business and development communities brought more investment to the City.

Chan dedicated his adult life to the City of Los Angeles. As Chan rose through the ranks of the Department of Building and Safety from an over-the-

9

counter staffer to its General Manager, his commitment to help others and implement measures to spur development and investment in Los Angeles remained steadfast. Chan's intent to help was executed by the many programs he established to help projects big and small build safe and fast, some of which are described below:

- Development Services Case Management that unified the City's development agencies under a single program to act as navigators to consult, problem solve and facilitate services to approximately a thousand big and small projects annually.

- Parallel Design Plan-check Permitting Construction that allowed projects to be designed, plan checked, and constructed at the same time, which shaved off 12 to 18 months of development time for over 100 major projects annually.

- Concierge Services for the General Public at City's five development services centers to assist the broader public on a walk-in basis with code compliance and permitting, helping approximately 25,000 customers annually.

- Saturday Inspection for Homes so homeowners did not need to take time off from work during weekdays to wait for a home inspection.

The results were fruitful. In 2016, when Chan retired from the Building and Safety Department, it issued over 175,000 permits that year and the City's overall ongoing construction valuation jumped to a record high of $7.7 billion, a 275% increase from 10 years prior ($2.5 billion).

The California Building Official Association selected Chan as "2013 Building Official of The Year," which is a peer-based award bestowed upon working governmental officials to honor a single individual who has shown

exemplary leadership over the preceding year and overall career. Mayor Eric
Garcetti also named Chan as a "Building Boom Booster."

In 2016, Chan felt that he had fulfilled his professional goals and
submitted his resignation to Mayor Garcetti. Sarah Chan describes the resulting
turn of events:

> Ray submitted his resignation letter to the Mayor's Chief of Staff.
> His resignation was accepted but he was immediately offered a 1-
> year contract to work as a Deputy Mayor. Ray politely declined the
> offer. Later that evening, Ray received a call from Mayor Eric
> Garcetti. We were shocked. Mayor Garcetti said he was told by
> many constituents about Ray's effort in helping their construction
> projects; their confidence investing in L.A. increased; and, as a
> result, they had been building more projects. Because of that, he
> believed that Ray would be the best person for the Deputy Mayor
> position to improve the City's economy. Mayor Garcetti insisted
> that Ray needed to accept his proposal. When Ray discussed Mayor
> Garcetti's offer with me afterward, I raised my objection because he
> needed time to take care of his disease. But Ray was an easy person
> to convince to do the things that he believed had a good cause. He
> accepted the Mayor's offer and signed a 1-year contract as a Deputy
> Mayor.

(Ex. A: Sarah Chan Letter).

As Deputy Mayor of Economic Development, Chan oversaw six economic
development-related departments including the Airport, Harbor, Planning
Department, Building & Safety Department, Economic Development, and
Convention Center & Tourism. Within one year, he set up 40 new programs to
expand the City's economy in support of Mayor Garcetti's agenda, including:

- Partnerships with consulates and dignitaries of 40 different
  countries, the World Trade Center, Sister Cities, and Los Angeles
  Region Export Council to create new international market
  opportunities for L.A. based companies;
- Chan created the Major Development Services Forum to build
  partnership between investors and project teams of major projects
  and City staff to ensure projects are built safely and quickly; and

11
MEMORANDUM REGARDING SENTENCING

• Support for underserved communities to assist and advise small business owners to plan, start, manage and grow their businesses.

Chan earned the respect of his staff and was recognized as a model leader. This is captured in support letters by Chan's former co-workers and professional contacts. Stephanie Mkhlian, one of Chan's former subordinates, states:

> I gave Ray a book, "The Go-Giver" because it reminded me so much of his positive belief in people, heart-driven leadership, and strong values. A "go-giver" is someone who uplifts and empowers talent and people, instead of doing what they can for themselves or to get to the top.
>
> And Ray was certainly a "go-giver." Ray cared for his staff and whoever he encountered; this was not new to those who knew him or know him.
>
> . . .
>
> He will always be my mentor, a father figure, and someone I respect and trust.

(Ex. B: Letter of Stephanie Mkhlian).

Bob Stone, a colleague who worked for the City of Los Angeles, details Chan's leadership and drive to make government more responsive to stakeholders:

> I'm a retired Federal civil servant, having served thirty years at the Pentagon and White House.
>
> . . .
>
> My passion in Washington had been to make government work better, and I was 'hired' by Deputy Mayor Cole to do that in LA. When my appointment was announced I began to be barraged by complaints about how the city government was making it hard to do business in the city. Critics of LA government told me that permitting and inspections were a special nightmare, and that the only bright light was Ray Chan, then general manager of the Department of Building and Safety
>
> . . .
>
> . . . One of Chan's major initiatives was his "major projects committee." If someone planned a major development in Los Angeles (defined, as I recall, as spending ten million dollars or

12

MEMORANDUM REGARDING SENTENCING

more), Ray would convene a committee comprising officials from about twenty city organizations—every one that had a role in inspecting, reviewing, or approving steps to completion. One of the major projects to benefit from the committee was the billion-dollar Lucas Museum, now soon to open in Exposition Park. Originally, Chicago, San Francisco, and other cities competed for the museum, but Los Angeles won the selection. A senior executive of the Lucas organization has said that Ray's major projects committee made the Lucas organization feel like a valued customer and partner for the City's growth, and that it was *the* deciding factor in Lucas's decision to put his museum in Los Angeles.

. . .

Chan was also unique among city government leaders in his serious commitment to teach leadership and management to the department staff. That dedication to helping his subordinates grow was unparalleled, I believe, among city department heads; in fact it surpassed anything I ever saw in any government organization, federal, state, or local. He was what teachers of leadership call a servant leader. In my opinion that is the rarest—and best—kind of leader.

(Ex. C: Letter of Bob Stone).

Larry Galstian, a former administrator at the Los Angeles Department of Building and Safety (LADBS), echoes these sentiments:

As a General Manager of LADBS, Ray was dedicated in developing LADBS into providing a comprehensive and equal assistance to the citizens of the City of Los Angeles.

. . .

. . . I greatly appreciated Ray's commitment to the City of Los Angeles for over 30 years, working countless hours, developing programs to help the citizens of Los Angeles, and earning the trust and respect of over 1,000 LADBS employees through his actions and vision of the department.

(Ex. D: Letter of Larry Galstian).

Peter Callas, former LADBS chief inspector, describes how Chan looked out for his employees during an economic downturn:

I have known Ray Chan since 2004 as our Department's Executive Officer and General Manager, and have always respected Ray's work ethics, character, and leadership.

. . . [I]t is from two very difficult times that impacted all of LADBS that in my opinion best highlighted Ray's character, and his devotions to the employees: The fiscal downturn in Los Angeles

from late 2009-2012 resulted in numerous layoffs at LADBS. Ray worked tirelessly to find alternative work assessments within the scope of a budget freeze, and was successful in placement of a work plan with the Los Angeles World Airport for our laid off employees. . . . Ray has been a good friend and teacher, who set good hard working examples. His actions, loyalty, respect for others impacted me in a very positive light, I think this his character.

(Ex. E: Letter of Peter Callas).

Even prosecution witness Kevin Keller agreed that Chan "wanted to provide for the City's success" and that he "Chan often spoke about extending the development cycle to maximize development opportunities." (*See* Trial Test. at 1389:2-8).

Chan's guidance and assistance did not just extend to large projects in Los Angeles, but small ones too, as several individuals attest. Bob Stone states,

Early on, while attending a Friday night going away event for a colleague I overheard a woman in the restaurant complain to her friend, 'The City of LA is yanking me around.' I stopped at her table, introduced myself and asked if I could help. She introduced herself, Patricia Schwartz.

Early Monday morning Ms. Schwartz called and asked if she could see me that day about her extreme difficulties with the city's permitting system; I agreed. I had been introduced to Ray, so I called him. He offered to attend my meeting via conference call.

Ms. Schwartz explained her problem: she and her husband owned a small two-story building at 4th and Broadway, and they had leased the upstairs to two young men who were trying to open a bar there—the first gay bar in DTLA. They had been paying rent for 18 months while struggling with the city over permits—from Fire, Police, Planning, and other departments. Ray Chan said, "Meet me at 8am tomorrow at the location and we'll work it out."

Next morning, Tuesday, we all met at Ms. Schwartz's building. Ray had brought along representatives from Fire, Police and other relevant departments. By Wednesday, all the issues had been resolved, and the bar opened under a Conditional Use Permit on Friday.

This experience taught me that Ray Chan was as committed as I was to making city government work better.

(Ex. C: Stone Letter).

MEMORANDUM REGARDING SENTENCING

Farrel Stevins, the CEO of a construction company, recalls the help that Chan provided throughout the course of their relationship:

> I cultivated our relationship knowing that I was a little fish trying to swim in a large pond and Mr. Chan's openness to guide me through the process was integral to our company's growth and success. My staff and I enjoyed many years working with the City of Los Angeles under Raymond Chan's leadership. He fostered innovative processes to help the small contractors succeed in moving their projects forward. Raymond was always available to speak, always willing to help regardless of who was asking for it. After knowing this man going on ten plus years and continuing our relationship after he left the City of Los Angeles, he has always been ready to help, provide advice and guidance. There was a period where I was concerned about the lack of growth and opportunities for work my company was facing, i.e., a slowdown in the industry. I told Raymond about my concerns and the first thing he did was put me in touch with the VP from one of the largest architectural firms in Los Angeles. He took us out for an introductory lunch, I am still working with that architectural firm today….

(Ex. F: Letter of Farrel Stevins).

Galstian describes the assistance that Chan provided to anyone who needed it:

> A strong character point of Ray's that inspired my own development, was Ray wanting to help not only large projects, but all projects large and small. He assigned me to other customer service programs, such as: The Restaurant Express Program was developed to assist restaurant owners in the permitting process with the County Health Department and all other involved city agencies . . . . Ray also was concerned with lack of Department's assistance to the general populace of homeowners who didn't understand the City's permitting and inspection process and didn't know where to begin. With this idea in mind, Ray developed a 'Concierge' program where anyone could contact the Building and Safety's Concierge team or walk-in to any satellite office and ask for help.

(Ex. D: Galstian Letter).

General contractor Jacob Poon discusses the care that Chan took to make sure that projects crossed the finish line:

> He guided us in the permit and plan check process and helped us when we did not know who to speak to or where to start on complicated projects. He helped us coordinate inspections with city inspectors and would even take my calls late at night when we had

15

MEMORANDUM REGARDING SENTENCING

1    questions about a code issue or correction that we did not understand.

2    Despite the circumstances that have led to this sentencing, I firmly
3    believe that Raymond Chan has the potential to continue making a
     positive impact in the world by helping others as he has helped me.

4    (Ex. G: Letter of Jacob Poon).

5    Chan's legacy is his work to create a more accessible government, helping

6    individuals and corporations navigate the bureaucracy of city government.

7    Michael Hunt, who works for a construction company, recalls the change that

8    Chan brought to LADBS:

9    Under Ray, the culture of LADBS completely transformed from a
10   red-tape heavy bureaucratic institution into one with a "Customer
     Service"-driven priority. The contractors, developers, and design
     firms were all treated as "Building Partners" and "Customers" by
11   the LADBS. The culture change was so different, and L.A. quickly
12   became my favorite municipality to do business in. It was friendly
     and approachable.

13   During Ray's leadership, I could go on about the policy changes that
     streamlined the review process from ADA compliance, Fire
14   Sprinkler Inspection changes, Plan Check expediting changes etc.
     All of these made Los Angeles a better place to do business while
15   still being safe.

16   (Ex. H: Letter of Michael Hunt).

17   Elected officials such as Alfred Balderrama took note of the culture that

18   Chan developed:

19   As a thirteen-year City Councilman and three-time Mayor of
20   Monterey Park, it was a pleasure having Ray volunteer his expertise
     and time to volunteer to serve as my Planning Commissioner. I do
     not believe the City of Monterey Park has ever had such a highly
21   qualified Commissioner.

22   . . .

23   I have attended the open workshop meetings held at City Hall which
24   enabled direct input from all departments, businesses and the
     general public. I was amazed how almost everyone commented
     positively on the protocols Ray as Deputy Mayor established in
25   order to move forward with projects.

26   I have been a Land Use Consultant for the last thirty-four years. I
27   can state without a doubt that I would not have made it in this line

28                                        16
     MEMORANDUM REGARDING SENTENCING

1    of work if it had not been for Mr. Raymond Chan's open-door
     policy and always lending a hand to anyone that asks.

2    (Ex. I: Letter of Alfred Balderrama).

3          John Q. Lee, former assistant deputy mayor and city council chief of staff,

4    recalls the service that Chan provided to a constituent:

5          As the years went by and I continued to engage Ray while I served
          on the executive and legislative side of City Hall, I was able to also
6          learn how Ray was a genuinely nice person with a good heart who
          loved to help people, anyone. I recall one such example in the late
7          1990's when I was at the home of a constituent who had just
          experienced a collapse to a portion of their home. They were
8          panicked. Wondering what to do to allay their fears, I called Ray at
          his office at the Los Angeles Building & Safety Department to get
9          some direction of what to do for them.

10         Ray was more than helpful. He drove to her house to help figure out
          their options and what to do. That's Ray. Always of service. Always
11         happy to help.

12   (Ex. J: Letter of John Q. Lee).

13         General contractor Eduardo Espinoza bears witness to Chan's helpfulness:

14         With the process of permit pulling, Raymond would answer any
          questions I had or whenever I needed any assistance. If he didn't
15         know the answer, Raymond would put me in contact with the
          correct person so that I was able to complete my building projects
16         on time. Raymond guided me to attend specific Department of
          Building and Safety seminars, which provided me with helpful and
17         beneficial information to me and my trade.

18         Aside from professional assistance, Raymond referred me to various
          of his personal acquaintances and family members needing any type
19         of remodel or any type of construction work in general so that I
          could have the opportunity to bid on those construction jobs. Thanks
20         to the trust he placed in me, I was able to receive many more
          referrals from those clients which kept me working for many years.
21         Raymond never asked for a single thing in return from me and for
          those reasons, I shall always be extremely grateful to him.
22
          I never noticed anything out of line just Raymond's impeccable
23         professionalism, pride and complete dedication to his job.

24   (Ex. K: Letter of Eduardo Espinoza).

25         Robert Goodwin of Maguire Partners, the group responsible for numerous

26   major developments in Downtown Los Angeles, discusses Chan's humility and

27   drive to see projects through:

28                                        17
     ──────────────────────────────────────────
     MEMORANDUM REGARDING SENTENCING

I have been in the Real Estate Development business in Los Angeles area since 1987, working on very large and small projects in Los Angeles during that time period, including US Bank Tower, Gas Company Tower, Wells Fargo Center, the City Central Library, Playa Vista, Century Plaza Hotel and Condominiums, Wilshire Grand Tower, the Broad Museum, and many other significant projects in suburbs in the region, and elsewhere in the country, working with many different City Building and Safety Departments. . . . [I]n all the various jurisdictions, by far the best person in Ray's position I have ever worked with, was Ray

. . . He was approachable and helpful in guiding people with their projects, through what is usually tedious and unfriendly. He would sometimes gather many of his staff members together to help work out solutions with project teams to help them be able to receive building permits in an efficient and professional manner. He also helped coordinate meetings with other departments like the Planning Department, Fire Department, etc., to work out issues. From my perspective, he did the job of serving the public in an honorable and efficient way, while shunning attention away from himself. He was always thoughtful, respectful and humble.

(Ex. L: Letter of Robert Goodwin.)

### 3. Chan Did Not Seek Personal Gain for His Efforts, Even When Incentives Were Offered

As the previous letters show, unlike Huizar and Esparza, Chan did not solicit or accept anything for his own gain. On the contrary, he rejected gifts. As Henry Wang, a business consultant notes:

One of my clients from China bought a piece of vacant land that he wanted to build a major residential project. . . . My client and I went to Ray's office and Ray offered guidance on code regulations and the permitting process. There were follow-up meetings and Ray's guidance was always provided in a welcoming manner and was instrumental in the project's timely completion.

Later, the client asked me to invite Ray to dinner. I relayed the invitation, but Ray declined. I asked again and Ray relented. After dinner, the client asked me to place a bottle of liquor they purchased to give to Ray as a token of appreciation. While Ray and the client talked in the parking lot, I took the wrapped gift and placed it in Ray's car. I did not know what the bottle of liquor was, nor did I know its value. The next day Ray called me and explained that while gift giving was in keeping with Chinese cultural norms, it was too valuable for him to accept. He googled the bottle of liquor and discovered it was worth several thousand dollars. The next day, Ray gave the gift back to me with instructions to return it to the client. By returning the gift, Ray demonstrated his trustworthiness and

1    ethics and made a strong impression on me that this was someone with integrity.

2    (Ex. M: Letter of Henry Wang).

3        Attorney Lessing Gold tells a similar tale regarding Chan's honesty:

4        One of the companies from China which I was dealing with, was
5    interested in setting up a business in Los Angeles. The company was a major manufacturer of underground pipes in China. . . . I
     suggested they contact Mr. Chan to determine whether it was
6    feasible to set up this type of company in the City of Los Angeles.

7        A number of conversations took place between the company and
     Mr. Chan. . . . Sometime later the principal of the company
8    contacted me and indicated that she was coming to Los Angeles and
     asked me if I could set up a lunch with Mr. Chan as they would like
9    to thank him for his advice and the time spent with them on the
     project.
10

11       I contacted Mr. Chan and set up a lunch at the Taix restaurant in Los
     Angeles. At the conclusion of lunch, the principal of the company
12   dispatched her son to the car and he brought back a gift for Mr.
     Chan. Mr. Chan refused the gift advising that he is an employee of
     the city and was not allowed to accept any gifts. The waiter then
13   brought two separate checks, one which he gave to Mr. Chan and
     the other to the company principal. Apparently, Mr. Chan arranged
14   with the restaurant to bring him a separate check for his meal.

15   (Ex. N: Letter of Lessing Gold).

16       Hunt concurs in this assessment:

17       Over the years Ray and I would meet either at his office (where I
     always felt welcomed) and sometimes we would meet at a little
18   diner for a quick breakfast. We always took turns paying the check
     and our conversation centered on family, my current work, my
19   opinion on how the Department was operating, how LADBS could
     improve, etc.
20

21       . . .

22       Aside from my feedback, Ray has never asked for anything in return
     for his help. In the 20 + years I worked with this man, the only
23   intent I ever saw, and I think I saw a lot for just being a contractor,
     was Ray's desire to assist EVERY ONE, be respectful to Everyone,
     and be a Champion for the City of Los Angeles.
24

25   (Ex. H: Hunt Letter).

26       Goodwin notes that Chan always paid his way:

27

28                                  19

> We would occasionally meet for breakfast at his favorite "greasy spoon" restaurant in East Los Angeles, frequented by police officers, other City employees and locals to the neighborhood. Ray always insisted on paying for his share. He insisted on not putting me, or himself, in an awkward position because of his position, which exemplified great character to me.

(Ex. L: Goodwin Letter).

Stevins' letter is a testimony to Chan's honesty and insistence on playing by the rules:

> I have had at least twenty dinners and lunches with Raymond Chan, and he has never allowed me to pay for one of them. It is just who he is: a kind soul willing to help anyone.
>
> Given light of this situation now, I would have to say he was a little naive but genuine in heart. I am expressing the same thing to you that I did to the FBI when they interviewed me a few years ago over the phone, nothing has changed in my opinion by who Raymond Chan is as a person. I have never paid Raymond Chan one cent through all the years I have known him, and he has never asked for any gratuity in any form.

(Ex. F: Stevins Letter).

### 4.    Chan Improves His Community by Helping Friends and Charitable Organizations

Chan has had a positive impact on his community as well. He has spent personal time helping both friends, family members, colleagues, and charitable organizations, without asking for anything in return. As his wife notes,

> After Jeremy graduated from law school, our financial obligation lessened. Then Ray decided that we should start to give back to society.
>
> . . .
>
> We have been making monthly donations to different humane organizations such as Food Bank, Homeless Shelter, and Red Cross. As a Catholic, Ray also donates to a few religious organizations. Every year, we donate approximately $6,000 to all these organizations. Meanwhile, Ray and I are still driving our old cars, his is 18-year-old and mine is 12-year-old.

(Ex. A: Sarah Chan Letter)

MEMORANDUM REGARDING SENTENCING

Sam Guo, Chan's tai chi master, recalls that Chan was instrumental in the start and growth of his organization:

> Ray was one of my first [tai chi] students.
>
> I quickly discovered that Ray is very willing to help others without expecting anything in return. Because I had little teaching experience in the US, Ray took the initiative to help me create teaching outlines, class schedules, and marketing. Every lesson, every teaching content in great detail. He constantly exchanged ideas with classmates to get their opinions, which he summarized to help me to modify the lessons. Combining our efforts, the number of students in the Tai Chi class quickly grew to several hundred. I started to need new teaching locations and expanded to private lessons as well. This success allowed me to shift from teaching part-time to full-time. With so many students, Ray helped me to build a small community by organizing different social picnics, parties, and gatherings.
>
> . . .
>
> Many times, I wanted to express my gratitude to him. I wanted to waive his tuition fees or treat him to meals; however, over the past twenty-plus years, he has never received any portion of tuition fees, nor has he accepted a meal from me.
>
> Later, I also learned that he is not only like this towards me but also towards people around him. He uses his own funds to help impoverished children in mainland China, from elementary school to university graduation. He sent them tuition and living expenses every month, until each one completed their studies.

(Ex. O: Letter of Sam Guo).

Rubidium Wu, a longtime friend, recalls how Chan helped him get his business off the ground:

> [Ray] helped me apply for jobs, introduced me to numerous people and companies who subsequently became clients, given me honest and helpful feedback on my work and made his time and network available to me time and time again.
>
> . . .
>
> He has devoted 100s of hours of his time and attention to help me, without which my career and family would be much worse off. I am far from being an outlier.
>
> . . .

It is evident that Ray considers it his life's mission to uplift those around him and contribute positively to his community.

(Ex. P: Letter of Rubidium Wu).

Albert Leung, another friend, recalls that Chan offered help without expecting anything in return:

> I first met Ray at a professional organization event. Ray was one of the speaker panelists. …I kept in touch and sought Ray's advice from time to time concerning my own career. Each response was always warm and thoughtful. I remember being surprised that a top busy City Official would take time to care for a nobody.
>
> . . .
>
> His advice was freely given, and nothing was ever asked for in return. Through his consistent selfless actions. Ray has my utmost respect as a fellow professional.

(Ex. Q: Letter of Albert Leung).

Roy Chen, a friend, recalls that Chan helped improve his family business without expecting remuneration:

> Since 1979, my wife and I own and operate a printing company, Superprint Graphics Inc., in Santa Fe Springs, CA.
>
> . . .
>
> Unfortunately, my wife and I were heavily preoccupied with running our business and could not attend these gatherings. In fact, we felt pressured and overwhelmed like time was not on our side. Ray, the ever enthusiastic and friendly guy, proactively asked me if he could help us with our business.
>
> In 2012, Ray spent two weekends training my wife and I on management, operations, and scheduling skills. Ray has fantastic insight — he asked us a lot of questions that we didn't even think of ourselves. He proactively planned and coordinated with us to uplift our business and operations.
>
> This training was invaluable because it greatly boosted our productivity and efficiency. We could meet our existing orders effectively, take on additional orders, and, most importantly, regain our personal lives. My wife and I felt that a massive weight was lifted from our shoulders and our minds were clear.
>
> In 2015, Ray helped us again by optimizing the layout for our manufacturing plant. This again helped boost our productivity and made us better business operators and vendors.

MEMORANDUM REGARDING SENTENCING

(Ex. R: Letter of Roy Chen).

Troy Augborne speaks to Chan's financial generosity while his family was going through a time of need:

> During my own family's darkest hours, Ray's unwavering support proved invaluable. In 2022, when my daughter faced life-saving surgery, Ray ensured I could be by her side. He offered not just words of encouragement but real, tangible help. Similarly, in 2023, a health crisis with my wife necessitated a sudden move to the Southwest. Ray provided not only comforting words and prayers, but also a selfless act of financial support through a $3,000 loan.

(Ex. S: Letter of Troy Augborne).

Tim Cho, a friend with pancreatitis and pancreatic cancer, speaks about how Chan physically took care of him despite Chan's own legal pressures at the time:

> During the time from 2019 to end of 2023, I was very sick with a rare form of Pancreatitis. I was in the hospital for over 2-1/2 years and then Tumors suddenly showed up. They completely filled my abdominal area. One instance during an emergency room visit, I even saw myself flat-lined. With the help of Chan and his wife, I slowly recovered. During the critical time, Chan even helped me to communicate with my clients with termination of my design contracts. He helped me to pay my customers at first and then I reimbursed him back…. After I left the hospital, Chan continues to care for me and brought me more soup because I was on a liquid diet. He also helped me to shop for food because I was bed bound.

(Ex. T: Letter of Tim Cho).

Ron Quan, the founder of an ALS charitable group, recalls that Chan readily agreed to help his organization:

> I represented the Tempt One ALS Foundation, another 501 c3 [sic] charity with the mission of organizing events [martial arts tournament] to raise funds to assist patients and families suffering from the horrid disease called ALS (Amyotrophic Lateral Sclerosis)
>
> . . .
>
> . . . [I]n 2018, [Ray] volunteered to serve as the tournament chair and quickly rallied all of our volunteers into action and with his upbeat and positive humor expressed the importance of what our event was all about and how it specifically benefited ALS patients and families. . . . That year, our event raised $ 45,000.

(Ex. U: Letter of Ron Quan).

Chan has also donated his time, talent, and treasure to his beloved martial arts students, providing them with support and a role model:

> When I was a graduate student in Illinois, I only had enough money to fly home once a year for the holidays, but Ray made sure that I could return home during the summer. He paid for my flight home so I could visit my family and my BXG family.
>
> . . . When I was first learning kung fu from him, I did not have a driver's license and had trouble going to lessons. Ray would drive me home several times per week after each lesson, after my father dropped me off. He did this each week for three years, until I was able to drive myself.

(Ex. V: Letter of Kevin Cheng).

> There was a time when my car broke down, leaving me in need of transportation to work. Ray, out of the goodness of his heart, offered me a $15,000 loan without interest, allowing me to regain my footing. His generosity caught me by surprise, and his support during a challenging period was deeply appreciated.
>
> . . . Ray has served as a mentor . . . . One lesson in particular that left a lasting impression was when he first taught me how to prepare for interviews. He meticulously reviewed my resume and provided insightful feedback and guidance. Through simulated mock interviews and regular meetings over several weeks, he helped me build confidence in presenting myself professionally.

(Ex. W: Letter of Alex Ng).

> [A]fter college I made the decision to move to Northern California for work. At that time, I was very unsure if I would be able to make ends meet before my first paycheck. Out of his generous nature, Ray had offered to gift me money as a buffer to help me out in my journey ahead. I was extremely grateful for the money he gave as it greatly helped me out in the interim. He never asked for any repayment.

(Ex. X: Letter of Anthony Cheng).

> In 2017, I was planning my wedding and struggling with financial difficulties. During that time my wife was still in China, and I needed to travel back to China for the wedding and make changes to my living arrangement, Ray understood the financial strain I was under and asked if he could help. Once again, he demonstrated his generous nature by lending me $15,000 and insisted on charging me

MEMORANDUM REGARDING SENTENCING

1   0% interest. After many struggles, I was finally able to repay him
    last year in 2023.

2   (Ex. Y: Letter of Sam Wei).

3       These letters, and many others attached to this memorandum, share a

4   single common thread – Chan never asked for, or expected, anything in return for

5   the things he did, a stark contrast from the person described by the government

6   or the likes of Huizar and Esparza.

7       **5.      Chan Has Played, and Continues to Play, a Critical Role
                in the Lives of His Family Members**

8

9       Besides Chan's dedication to his work and community, Chan remains a

10  committed family man as a husband, father, father-in-law, brother, brother-in law

11  and grandfather.

12      Sarah Chan describes the indispensable role that her husband plays in their

13  family:

14          Almost every night and every weekend, Ray spent time with our
            son, Jeremy, on bedtime stories, homework, school projects, fun
15          things, etc. His unconditional love for Jeremy is now extended to
            our daughter-in-law, Even, and our 5-year-old granddaughter,
16          Royce.

17          Ray's filial and caring attitude toward both his parents and mine is
            seldom seen. When my parents were alive, each month Ray gave
18          them a generous amount of money to help with their living
            expenses. Ray loves his parents. For 15 years, we had dinner with
19          Ray's mom and dad every Saturday until Coronavirus hit. His dad
            passed away three years ago, Ray and his sister, Bonnie, have been
20          taking care of their 91 years old mother, a non-ambulatory patient
            who is deaf, blind, and has severe dementia, despite her basic needs
21          being attended to by caretakers.

22  (Ex. A: Sarah Chan Letter)

23      Even Chan, Chan's daughter-in-law, points out that Chan's familial

24  relationships are not strictly defined by blood:

25          Apart from working or professional life, I was very impressed by
            [Chan] himself with his good values in life and his family. He holds
26          high value in family.

27          . . .

28
                                    25
─────────────────────────────────────────

. . . Raymond treats my mother like a little sister and my father as a little brother (they have a big age gap). He always greets and checks on them regularly and teaches my daughter to respect them.

Apart from these, my parents and my brother are thankful to him for his assistance on my brother's MBA application and interview preparations. Raymond would set a schedule to help my brother go over the applications, carrying out mock interviews, etc. to make sure he can excel. It turned out great because my brother was accepted.

Also, he and my mother-in-law would offer to help take care of my daughter to make sure I can have some personal time. Their help was like a cure for my postpartum depression back then. All these show his love and respect for me as a daughter-in-law.

All in all, my father-in-law, Raymond Chan, is really the most selfless, helpful, and sincere human being that I have ever met. I always use the adjective "naive" to describe him, as he always chooses to only see other people's good, kind sides instead of any "motives behind" when people reach out to him for help.

(Ex. Z: Letter of Even Chan).

Sonya Cheung, Chan's sister-in-law, echoes these sentiments:

Over the past 40-50 years knowing him as my brother- in-law, he has always been super well, very caring and sincere to my elderly father and mother. For example, whenever my father and mother were planning a trip back to Hong Kong, he would initiate paying for their flight tickets. . . .

Another example is that since my mother moved into an elderly apartment in around 1997, he would set aside $250 a month to make sure my mother could spend money freely and happily. $250 a month sounds not a lot nowadays; it was indeed quite a big portion of his monthly salary back then. He has been giving my mother money since then until she passed in 2016. Another thing that I am very very grateful and thankful to [Ray] is that when I had to look for a job at the county. He would set aside his time from his busy schedule to help editing my resume. Also, he would carry out mock interviews with me several times, he not only practiced general interview questions, but he also dug into the job that I was applying to predict what types of questions they would ask me to make sure I can succeed. It turned out I got the job offer. This significatively helped me with my personal growth, my career and my financial situation for my family.

(Ex. AA: Letter of Sonya Cheung).

Another family member, Tony Wu, speaks to the guidance that Chan provides to the members of his family:

MEMORANDUM REGARDING SENTENCING

> Ray has been a constant source of guidance, support, and wisdom in my life. One of the most significant instances of Ray's impactful presence in my life occurred during the preparation for my MBA program interviews in January 2021…. His commitment involved daily online sessions, each lasting around two hours, where he meticulously went through potential questions, helped me articulate my thoughts more clearly, and provided constructive feedback. His dedication and insight were instrumental in my receiving a full scholarship from the MBA program of Peking University, one of the most prestigious institutions in China…Ray has always been willing to invest his time in discussing life and career options, often staying up late to help me navigate through various challenges. His generosity in sharing his wisdom and experiences has been invaluable to me.

(Ex. BB: Letter of Tony Wu).

Bonnie Chan, Chan's sister, describes his nurturing nature and his role as a peacemaker:

> Raymond (Ray) Chan is my brother who is twelve years older than me. In 1984, he persuaded my parents to send me to Los Angeles to attend high school and he promised he would take care of me. Ray truly lived up to his promise. In addition to providing room and board, Ray helped me on my study, attended school functions on my parents' behalf, and took up the role as my guardian until I reached legal age. I also received a lot of advice and assistance from my brother on college application, choosing a career path and after graduation, on job searching.
>
> Ray is very close to my daughter Valerie, who is now twenty years old…When Valerie started the college application process, Ray spent a lot of time with her to improve her essay writing and interview technique…. When it was time to make her college decision, Valerie and I developed a lot of tension because we did not agree on what seemed to be 'the best college to attend.' Once again, Ray stepped in to help. He was impartial, not taking sides and helped Valerie and me to understand each other's perspective, which finally resolved our conflicts.

(Ex. CC: Letter of Bonnie Chan).

Chan's history of good deeds and respected character shown in the above quotes from many letters point to one fact – he has consistently helped and supported his family, friends, and community out of kindness. Unfortunately, Chan's unblinking willingness to assist others also meant that he wasn't the best judge of character. Chan always chose to give others the benefit of doubt, to look

27

at the good instead of the bad. As a result, some people with ulterior motives took advantage of Chan, which led him to face undesirable outcomes. Sarah Chan details such an event:

> [Years ago] Ray was persuaded by two friends about quitting his City's job to start a business venture with them. Three of them co-signed a 5-year lease for an office. After the lease was signed, Ray then found out his friends were not trustworthy. So he did not go into business with them and did not move into the office space. Ray continued to work for the City. The two friends moved into the office space but they did not pay rent. So the landlord filed a lawsuit against them and Ray, asking for a substantial amount for penalty. Ray and I had no choice but to file bankruptcy. After spending a large amount of legal fees, our bankruptcy was approved and our nightmare was over… Unfortunately my husband was a poor judge of character. He only saw the best in others and over-trusted people. Sometimes his helpfulness was taken advantage of by the wrong people. Whenever I, other family members, or his close friends pointed out this flaw to him, Ray just shrugged us off and said, 'all people deserve a helping hand.' Sad to say, it took an unbearable consequence for him to learn the lesson.

(Ex. A: Sarah Chan Letter).

Moreover, a lengthy custodial term will also affect Chan's ability to care for his mother. As his sister Bonnie notes,

> Ray played an essential role in the care of our 91-year-old mother, who is almost blind and deaf and is now at the advanced stage of Alzheimer's disease. Mom is living in her house with caretakers who attended her basic needs. However, she depends on Ray and me to make all financial, medical and living arrangement/decision for her.

(Ex. CC: Bonnie Chan Letter).

Chan also serves as a caregiver for his wife, who has diabetes:

> Ray's work life was extremely busy. But his family was always his priority. I have had a severe hereditary diabetic condition since mid-1990s. I have been taking insulin injection three times a day. He took care of me whenever my diabetic condition got out of control, which happened frequently. Ray always attended to all my doctor's appointments.

(Ex. A: Sarah Chan Letter).

MEMORANDUM REGARDING SENTENCING

Lastly, Chan plays a critical role as grandfather to his young granddaughter, having spent substantial time with her daily since the COVID pandemic. A lengthy custodial sentence would not only deprive her of his loving presence but also rob her of the stability and guidance he has consistently provided. As a central figure in her life, his absence would leave an emotional void, potentially affecting her sense of security and well-being. The granddaughter, who looks up to her grandpa, faces the daunting prospect of navigating her formative years without his support. This sentencing will ripple through her life, influencing her emotional and psychological development, and creating a profound and lasting impact on her childhood.

### 6.    Chan's Age and Declining Health Favor the Requested Sentence

As noted by the Probation Office mentioned, Chan "is a 68-year-old retiree and his risk of recidivism is low. Further, Chan suffers from several health problems and is facing a significant custodial sentence which, given his advanced age, equates to a life sentence." (PSR ¶ 199). The combination of Chan's age and health will make prison difficult for him. *See* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States*  43–88 (2012). Along with having greater challenges with day-to-day activities, older inmates are more vulnerable to contagious diseases, the effects of inadequate medical care, harassment by other inmates, and depression. Joann B. Morton, *An Administrative Overview of the Older Inmate,* U.S. Dep't of Justice, National Institute of Corrections 4, 11 (1992); U.S. Dep't of Justice, Nat'l Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 10 (2004); U.S. Bureau of Prisons, *Management of Major Depressive Disorder* 2 (2014). For those reasons, among others, courts increasingly vary downward to avoid sending older inmates to jail,

or to limit the amount of time they spend behind bars. *See, e.g.*, *United States v. Lee*, 725 F.3d 1159, 1169 (9th Cir. 2013) (remanding for greater consideration of defendant's advanced age); *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (affirming downward variance for 51-year-old defendant); *United States v. Marsh*, 820 F. Supp. 2d 320, 387-88 (S.D.N.Y. 2011) (exercising discretion under § 3553 in fraud case and imposing 12-month sentence on 52-year-old defendant with heart disease and related conditions, notwithstanding 108-135 month Guideline range because, among other things, the "defendant's many health problems . . . make it harder for him to serve a prison term").

The most devastating diagnosis is Chan's Type 2 Charcot-Marie-Tooth (CMT), "a genetic peripheral nerves disease that interferes with muscle control." (PSR ¶ 139). This disease continuously degenerates the function and sensation in the hands, arms, feet, and legs along with weakened legs, calf muscles, footdrop, awkward step, and pain.[2] Chan is prone to tripping, falling, and sprains. *Id*. This hereditary condition also worsens with age as bones become frailer. *Id*. CMT has impacted Chan to such a degree that he cannot wear traditional dress shoes or any other heavy shoe. His fingers are weak and lack the sense of touch, which makes holding and picking up objects difficult. There is no cure or medication to slow its progression. As one of his students observed:

> Throughout the years, I saw Ray randomly trip and fall or lose his footing and stumble multiple times during our martial arts practice. At first, I assumed it was his old age but, after asking Ray about it, I learned that he suffers from a genetic disorder called Charcot-Marie-Tooth disease (CMT). This disorder affects his nerves, causing muscle weakness, poor coordination, and difficulty in walking.

(Ex. Y: Wei Letter).

---

[2] Mayo Clinic Staff, *Charcot-Maries-Tooth Disease*, Mayo Clinic, May 8, 2023, https://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/symptoms-causes/syc-20350517 (last visited Aug. 29, 2024).

MEMORANDUM REGARDING SENTENCING

In addition to CMT, Chan has hyperlipidemia and expanding prostate for which he needs daily medication. (PSR ¶¶ 142, 143). Chan also has obstructive sleep apnea and is required to use a CPAP machine to sleep at night. (PSR ¶ 141). Years ago, he was diagnosed with Hepatitis B, a disease that is now under control but cannot be cured. (PSR ¶ 138). Chan inherited several eye ailments from his mother and grandmother, who both gradually lost vision in both eyes. Chan's vision is unreliably blurry with many blind spots, which worsens with time. Chan also has glaucoma, which he addresses with medicated eyedrops twice a day. (PSR ¶ 140).

### C.   A Lengthy Custodial Sentence Is Not Necessary to Deter Chan or to Protect the Public

Section 3553(a)(2) requires courts to consider the need for a sentence to prevent a defendant from engaging in future criminal conduct or endangering society. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). In this vein, Congress has advised that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society . . . ." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984). The Sentencing Commission has recognized offenders like Chan–a 69-year-old man with no criminal history, as among the least likely to recidivate in the entire criminal justice system.[3] This is particularly true given the nature of Chan's offense.[4]

---

[3] *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 7, 12-13 & Exs. 2, 9- 11 (2016).

[4] *See* Measuring Recidivism, *supra*, at Ex. 11 (first-time white collar offenders least likely to recidivate); David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in the deterrent effect of prison and probation for

31

1     As the Probation Office noted, "The likelihood of Chan committing

2 another related offense appears to be extremely low, given that he is retired and

3 there is no information that his wrongful actions over his lifetime extended to

4 other activities, along with his age and personal background." (Discl. Rec. Letter

5 at 6). The probation officer also noted that Chan has never had any previous

6 interactions with law enforcement or any history of violence. (*Id*).

7     Moreover, the Sentencing Commission has recognized that public nature

8 of criminal charges and a well-publicized trial cause many indignities for first-

9 time offenders that it is tantamount to an already significant punishment.[5] This is

10 a factor the Court should consider in fashioning an appropriate sentence. *See*

11 *United States v. MacKay*, 20 F. Supp. 3d 1287, 1297 (D. Utah 2014), *aff'd*, 610

12 F. App'x 797 (10th Cir. 2015) ("[R]ecognizing that the sentence imposed on

13 MacKay must be just, the Court does not entirely disregard the considerable

14 negative impacts this case has already had on him and his family. He has already

15 lost standing in his community, . . . lost his job, . . . and otherwise experienced

16 major financial setbacks, and has no doubt suffered many emotional pains and

17 negative health consequences that accompany such a process."); *United States v.*

18 *Gain*, 829 F. Supp.  669, 671 (S.D.N.Y. 1993) (granting downward departure

19 ───────────────

20 white-collar offenders); Zvi D. Gabbay, *Exploring the Limits of the Restorative*

21 *Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J.

Conflict Resol. 421, 448-49 (2007) (finding "no decisive evidence" supporting

22 "conclusion that harsh sentences actually have a general and specific deterrent

23 effect on potential white collar offenders").

24 [5] Symposium, U.S. Sent'g Comm'n, Federal Sentencing Policy for Economic

25 Crimes and New Technology Offenses, Plenary Session I, *"What Social Science*

*can Contribute to Sentencing Policy for Economic Crimes"* at 23 (Oct. 12, 2000)

26 ("[T]he general deterrent effect of sanctions stems not so much from the length

27 of the sentence but from fear of the social stigma and ostracism that attends to

their imposition").

28

where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235, 1315 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation and widespread media coverage).

In the last four years litigating this case, Chan has experienced thoughts of suicide. (PSR ¶ 146). His reputation has suffered immeasurable harm, and he has been subject to a very public shaming even prior to his indictment when a sealed subpoena for Chan's Google data was leaked to the media. Chan's son lost his job as a lawyer and has been forced to change careers. (PSR ¶ 131). Chan is experiencing financial setbacks, including having to take a loan to litigate this case. Chan is retired and will remain retired. (PSR ¶ 154). Professionally, Chan lost his qualifications to extend his licenses as a civil engineer, structural engineer, real estate broker, and general contractor. There is little chance that Chan will recidivate, and there is no question that he has suffered, and will continue to suffer, significant collateral consequences since the case was charged. Consequently, this factor weighs heavily in favor of granting Chan a variance.

**D.  A Lengthy Custodial Term Will Hinder the Care Chan Requires for His Health Problems**

This Court should also consider Chan's need for medical care. *See* U.S.S.G. § 3553(a)(2)(D). This factor undoubtedly weighs in favor of less incarceration. The Bureau of Prisons (BOP) is notorious for providing inadequate health care for inmates. The BOP's institutional problems responding to medical emergencies are well-documented, even as recently as 2023-2024. *See, e.g.*, Dep't of Justice, Off. of Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Feb. 2024), *available at* https://www.oversight.gov/sites/default/files/oig-reports/DOJ/24-041.pdf (last

33

accessed Aug. 19, 2024). A recent media report noted that federal prisoners have faked suicide attempts to receive medical attention because delays were so frequent.[6] As Forbes recently reported, "[T]hose standards [of care] are being compromised as a result of staffing shortages that the agency has faced for years now."[7] The Senate Judiciary Committee responded with calls to hold the BOP responsible for "federal prisoners d[ying] from treatable conditions that are not diagnosed or treated in a timely way within the prison system."[8] In one compassionate release case, a district court found that the BOP provided "grossly inadequate treatment" for a prisoner's cancer: "During the lengthy delays, her cancer spread to her lymph nodes." *United States v. Beck*, 425 F. Supp. 3d 573, 580-81 (M.D.N.C. 2019).

When a defendant like Chan has so many health problems that will become even more complicated because of his age, this Court should be hesitant to impose any custodial time, much less a lengthy term. *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming probationary sentence for repeat-offending 63-year-old defendant despite 27–33 month Guideline range because, while "Bureau of Prisons was capable of providing for [his]" diabetes-related medical care, a "sentence of probation would satisfy the requirement of

---

[6] Thrush, Glenn, *Staffing Crisis at Federal Prisons Highlighted in Oregon*, New York Times, May 22, 2024, *available at* https://www.nytimes.com/2024/05/22/us/politics/oregon-prison-staffing-shortage.html?searchResultPosition=6.

[7] Pavlo, Walter, *Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy,* Forbes, April 19, 2022, https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/.

[8] Anderson, Meg, *Lawmakers Push for Federal Prison Oversight After Reports of Inadequate Medical Care*, National Public Radio, Dec. 12, 2023, https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-care.

34

providing needed care in the most effective manner," and would avoid "simply pass[ing] the cost of [his] medical care on to the taxpayers"). Unlike the case in *Edwards*, however, there is evidence that the BOP is not equipped to handle Chan's myriad health problems, but especially his CMT. As one prisoner with CMT, the same debilitating nerve illness that Chan suffers from, reported in a *Bivens* action, "Plaintiff was not allowed to have his medical shoes in the SHU [special housing unit]. After two weeks in the SHU, Plaintiff developed an open wound on the sole of his right foot and another wound developed on the outside edge of his left foot…. The wounds became infected and abscessed." *Patton v. Federal Bureau of Prisons*, No. CV18-00209-TUC-RM, 2019 WL 11837059, at *3 (D. Ariz. Sept. 27, 2019). When the plaintiff in *Patton* was released from segregated housing, he repeatedly tried to access proper medical care for his condition but was ignored. *Id*. at *4. Finally, almost six months later, plaintiff was finally sent to the hospital where his foot had to be partially amputated. *Id*. at *4.

Given Chan's age, it is not likely that he will receive the kind of medical treatment he needs for his continuing health issues while incarcerated. The longer he spends in prison, the more likely he will suffer lasting consequences of the BOP's inadequate care. Therefore, this factor weighs in favor of a variance to 33 months.

### E.    A Custodial Term of 33 Months Will Promote Parity in Sentencing

A term of 33 months would also avoid unwarranted disparities under U.S.S.G § 3553(a)(6). According to the Sentencing Commission data, in the year 2023 in the Central District of California, of the 16 defendants sentenced in public corruption cases, three received no time in custody at all. (Ex. E: Sentencing Commission Data Analysis at 9). Of the remaining defendants who

received custodial terms, the median term of imprisonment was 26 months, and the average was 35 months. *Id*. at 11. Nationwide, the statistics are similar. From 2015 through 2023, out of the over 1,900 defendants convicted of corruption offenses nationwide, roughly 27% did not receive a custodial sentence. U.S. Sent'g Comm'n, Interactive Data Analyzer, https://ida.ussc.gov/analytics/ saw.dll?Dashboard (under the tab Sentence Outcomes and sub-tab Sentence Type, select Fiscal Years 2015-2023, Crime Type: Bribery Corruption, Primary Guideline: 2C1.1, Criminal History: Category I). Of the remaining defendants who received custodial terms, the average sentence was 25 months, and the median sentence was 15 months. *Id.* (under the tab Sentence Outcomes and sub-tab Sentence Length).

A review of cases across the country reveals the same result. *McDonnell v. United States*, 579 U.S. 550 (2016) (two-year custodial sentence); *United States v. Ralph Inzunza*, 580 F.3d 894 (9th Cir. 2011) (21-month custodial sentence); *United States v. Bryant*, 655 F.3d 232, 236 (3d Cir. 2011) (four-year custodial sentence for one defendant and 18-month custodial sentence for the other); *United States v. Spano*, 411 F. Supp. 2d 923, 928 (N.D. Ill.), *aff'd*, 447 F.3d 517 (7th Cir. 2006) (27-month custodial sentence); *Renzi*, 769 F.3d at 742 (36-month custodial sentence); *United States v. Calderon*, CR-14-103-CAS (C.D. Cal.) (42-month custodial sentence); *United States v. Yee*, CR-14-196 (N.D. Cal.) (five-year custodial sentence); *United States v. Ridley-Thomas*, CR-21-485-DSF (C.D. Cal.) (42-month custodial sentence).

## IV.    CONCLUSION

For the foregoing reasons, Chan respectfully requests that the Court impose a custodial sentence of 33 months.

MEMORANDUM REGARDING SENTENCING