## <ins>INDEX OF EXHIBITS</ins>
## <ins>RAYMOND CHAN'S MEMORANDUM REGARDING SENTENCING</ins>

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Letter of Sarah Chan | 2 |
| B | Letter of Stephanie Mkhlian | 9 |
| C | Letter of Bob Stone | 13 |
| D | Letter of Larry Galstian | 16 |
| E | Letter of Peter Callas | 19 |
| F | Letter of Farrel Stevins | 22 |
| G | Letter of Jacob Poon | 25 |
| H | Letter of Michael Hunt | 27 |
| I | Letter of Alfred Balderrama | 30 |
| J | Letter of John Q. Lee | 32 |
| K | Letter of Eduardo Espinoza | 35 |
| L | Letter of Robert Goodwin | 38 |
| M | Letter of Henry Wang | 41 |
| N | Letter of Lessing Gold | 44 |
| O | Letter of Sam Guo | 47 |
| P | Letter of Rubidim Wu | 50 |
| Q | Letter of Albert Leung | 52 |
| R | Letter of Roy Chen | 54 |
| S | Letter of Troy Augborne | 57 |
| T | Letter of Tim Cho | 60 |
| U | Letter of Ron Quan | 63 |
| V | Letter of Kevin Cheng | 66 |
| W | Letter of Alex Ng | 69 |
| X | Letter of Anthony Cheng | 72 |
| Y | Letter of Sam Wei | 74 |
| Z | Letter of Evan Chan | 77 |
| AA | Letter of Sonya Cheung | 81 |
| BB | Letter of Tony Wu | 84 |
| CC | Letter of Bonnie Chan | 87 |

# Exhibit A

# Letter of Sarah Chan

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012


Dear Judge Walter:

My name is Sarah Chan, the wife of Raymond Chan. We have known each other for 49 years and have been happily married for 45 years. We still deeply love each other. Ray has been everything and more than I could ask for in a husband, caring, supportive, responsible, faithful, and a man who devoted it all to his family, people around him, and his work.

In 1975, Ray and I met in Vancouver, Canada. We fell in love and was committed to each other shortly after. We were both 19 years old. Since I lived in Los Angeles with my family and Ray was attending college and working to support himself in Canada, we began our long-distance love. It wasn't easy but our love and commitment continued to grow. That lasted for 4 years until we got married and Ray moved to Los Angeles in 1980, after he got his college degree majored in Physics.

Ray soon found out that his Physics bachelor's degree was not helpful for finding a job in that profession. So he pursued another college degree, Civil Engineering. To make ends meet, he and I both worked. I worked as a garment seamstress and Ray worked as a waiter in various restaurants. After he obtained his license to sell real estate properties, he became a real estate salesman.

During this period, my brothers and my sisters wanted to use their limited savings to start their own businesses. Ray was already very busy with school and work, but he offered to help them. Using his spare time, he helped my brothers set up a tiny restaurant and my sisters set up a small garment factory.

In1984, Ray graduated with an engineering degree from Cal State L.A. and started working for the L.A. City's Department of Water and Power. While things were just beginning to get better, Ray and I embraced a new responsibility.

Ray's parents wanted his 15-year-old sister, Bonnie, to attend high school in Los Angeles. The parents asked if we could accept the responsibility of taking care of Bonnie. Without any hesitation, Ray said yes. So Bonnie came to Los Angeles and stayed with us. I took care of her daily needs, cooking, and cleaning for her, taking her to

and picking her up from school.  Ray helped Bonnie with her homework and attended
school functions.  We literally were second parents to Bonnie, raising her until she
graduated from college.

In 1987, Ray transferred to the Department of Building and Safey through a
promotion.  Soon afterward, we experienced a frustrating setback caused by Ray's poor
judgement of character.

Ray was persuaded by two friends about quitting his City's job to start a business
venture with them.  Three of them co-signed a 5-year lease for an office.  After the lease
was signed, Ray then found out his friends were not trustworthy.  So he did not go into
business with them and did not move into the office space.  Ray continued to work for the
City.  The two friends moved into the office space but they did not pay rent.  So the
landlord filed a lawsuit against them and Ray, asking for a substantial amount for penalty.
Ray and I had no choice but to file bankruptcy.  After spending a large amount of legal
fees, our bankruptcy was approved and our nightmare was over.

Subsequently, my husband received a few more promotions and became a
manager in his department.  Besides luck, Ray earned these promotions through his hard
work.  In addition to working a normal 40-hour work week, he had a habit of working
Saturday in the office and bringing work home during weeknights.  Ray was very
persistent in upgrading his professional qualifications.  He got his professional licenses as
a civil engineer, a structural engineer, a general contractor, and a real estate broker.  He
also took many courses and read books to improve his management skills.

Ray's work life was extremely busy.  But his family was always his priority.  I
have had a severe hereditary diabetic condition since mid-1990s.  I have been taking
insulin injection three times a day.  He took care of me whenever my diabetic condition
got out of control, which happened frequently.  Ray always attended to all my doctor's
appointments.  Almost every night and every weekend, Ray spent time with our son,
Jeremy, on bedtime stories, homework, school projects, fun things, etc.  His
unconditional love for Jeremy is now extended to our daughter-in-law, Even, and our 5-
year-old granddaughter, Royce.

Ray's filial and caring attitude toward both his parents and mine is seldom seen.
When my parents were alive, each month Ray gave them a generous amount of money to
help with their living expenses.  Ray loves his parents.  For 15 years, we had dinner with
Ray's mom and dad every Saturday until Coronavirus hit.  His dad passed away three
years ago, Ray and his sister, Bonnie, have been taking care of their 91 years old mother,

a non-ambulatory patient who is deaf, blind, and has severe dementia, despite her basic needs being attended to by caretakers.

Our family is traditional.  Ray was the breadwinner and I was the homemaker. We lived on a budget.  We never took any big vacation or spent money on lavish items.  We saved up to pay for Jeremy's college and law school's tuition.  After Jeremy graduated from law school, our financial obligation lessened.  Then Ray decided that we should start to give back to society.

We have been making monthly donations to different humane organizations such as Food Bank, Homeless Shelter, and Red Cross.  As a Catholic, Ray also donates to a few religious organizations.  Every year, we donate approximately $6,000 to all these organizations.  Meanwhile, Ray and I are still driving our old cars, his is 18-year-old and mine is 12-year-old.

My husband has a hereditary nerve-damaging disease, Charcot-Marie-Tooth.  This disease has been and will continuously cause loss of strength in his feet and hands.  His fingers are so weak that he can hardly twist the cap off a water bottle or turn a door knob. The worst is that he could not lift his feet which causes him to trip and fall frequently.  I cannot remember how many times he sprained his ankle or damaged his knee.  He does not walk normally, he limps.

So in 2016, after 32 years of working for the City, Ray wanted to retire from the Building and Safety General Manager position and focus on taking care of this disease.

Ray submitted his resignation letter to the Mayor's Chief of Staff.  His resignation was accepted but he was immediately offered a 1-year contract to work as a Deputy Mayor.  Ray politely declined the offer.  Later that evening, Ray received a call from Mayor Eric Garcetti.  We were shocked. Mayor Garcetti said he was told by many constituents about Ray's effort in helping their construction projects; their confidence investing in L.A. increased; and, as a result, they had been building more projects. Because of that, he believed that Ray would be the best person for the Deputy Mayor position to improve the City's economy.  Mayor Garcetti insisted that Ray needed to accept his proposal.  When Ray discussed Mayor Garcetti's offer with me afterward, I raised my objection because he needed time to take care of his disease.  But Ray was an easy person to convince to do the things that he believed had a good cause.  He accepted the Mayor's offer and signed a 1-year contract as a Deputy Mayor.

Ray was dedicated to his work and devoted to his family. But those to him were only basic duties and responsibilities that a decent human being should perform and fulfill.  Ray believes his life's calling is to help people.  I am not exaggerating when I say in our 45 years of marriage, I have witnessed Ray help more than one hundred people.

Most of the people that Ray helped asked for his help.  He also voluntarily helped many when he saw his help was needed.  His help came in all shapes and forms:
-   Loaned money to people and never charged them interest.
-   Took care of sick friends by cooking nutritious food for them.
-   Counselled couples who had marriage issues.
-   Advised people on how to start or improve their businesses.
-   Guided people on how to improve their chances to get hired or get accepted to colleges.
-   Taught people how to improve their job performance.
-   Prepared classes to teach high school students life skills.
-   Taught martial arts for years for free.
-   Participated in an organization to fundraise for ALS patients
-   Established a scholarship program for architectural and engineering students.

The list continues.  Many family members, relatives, students, friends, peers, and people who appeared in various aspects of his world can attest to the fact that Ray has always been their go-to person whenever a helping hand is needed. And he never asked for anything in exchange for his help.  Ray was highly and widely appreciated and respected by many, many people.

Unfortunately my husband was a poor judge of character.  He only saw the best in others and over-trusted people.  Sometimes his helpfulness was taken advantage of by the wrong people.  Whenever I, other family members, or his close friends pointed out this flaw to him, Ray just shrugged us off and said, "all people deserve a helping hand."  Sad to say, it took an unbearable consequence for him to learn the lesson – not to over-trust and help the wrong people, even though there is no criminal intention or motive behind his help.

Honorable Judge Walter, everything in this letter is based on my 45 years of factual experiences with my husband.  I am happy to testify to the validity of what I stated under oath.

Ray and I live a righteous, humble, and simple life.  We have gone through many challenges together.  All and all, we managed them very well.  But for the past 5 years,

this case has been a horrific nightmare.  We put all our effort and almost all our life savings attempting to turn things around but were unsuccessful.

Though he remains resilient, my husband's health noticeably deteriorates with each passing year.  At first, I thought that Ray was just getting clumsy, leaving a mess wherever he went.  But I soon realized that this clumsiness came from three factors – his genetic disorder, declining hearing, and fading eyesight.  Just a few days ago, I walked past him and sat on the coach. He had no idea I was there.  In addition to the stress my husband has been enduring, seeing him in this state broke my heart.  This stress has also caused me to develop anxiety, undergo weight loss, and experience extended insomnia.  I also feel that my cognitive ability also took a big hit, affecting my memory and processing capabilities.

Though our son is a great help, he has his own family that he needs to take care of. As such, Ray and I can only truly rely on each other to compensate for each other's weaknesses.  For example, I'm the one to care for Ray whenever he hurts himself and cannot walk, such as after spraining his ankle or damaging his knee when he trips and falls. Whenever my diabetic condition goes out of control, my husband helps me manage the symptoms.

I cannot imagine what life would be like without him in this family.  I am afraid that not seeing my husband and worrying about him would continue to negatively impact my mental and physical health, which would evolve into more substantial health issues. On the other hand, his physical and health limitations will also make his life in a traditional incarceration unbearable.

Your honor, Ray is a kind-hearted and giving person.  To our family, he is a faithful and loving husband, father, and grandfather.  To our parents, he has always been a respectful, caring son and son-in-law.  And, to many, many people, he has been a go-to person whenever they need help or guidance.  Ray was a dedicated civil servant who worked hard to serve the City of Los Angeles for its best interest.  He took pride in his job and he never asked for or took any money or gifts in exchange for doing his job.

I am not contesting the verdict.  I just want to say that what Ray was convicted of is uncharacteristic of his true nature, which is goodness and honesty, and a desire to be helpful without expecting anything in return.  I beg you to consider his life in totality at the time of sentencing.  I would humbly ask that you consider all the good my husband has done for the City of Los Angeles, his declining physical state, and the continued good that he can do for communities and society.

My husband has many years of experience and accumulated many skills in different areas which he has used to help many people, young and old, to better themselves and their lives.  With your permission and instruction, Ray could use his knowledge, skills, and experience and fully devote himself to helping and serving many different organizations and communities.  For example, my husband can help the underprivileged, minorities, or at-risk youth by teaching them his leadership, mentoring, and interview and resume skills in person or at home through online workshops.  Ray has a massive desire and urge to help others and permitting him to continue to do so would be more beneficial and meaningful to many than imprisoning him.

Your Honor, I respectfully request that you allow Ray to spend his golden years with his family – myself, Jeremy, Even, Royce and our soon-to-be born granddaughter. I respectfully request that all the above be taken into consideration before sentencing

If you kindly grant this alternative sentencing, I promise we will continue to respect the terms of the bail.

Thank you for taking you time to read my letter.

Sincerely,


Sarah Chan
5/23/2024

Exhibit B

Letter of Stephanie Mkhlian

Stephanie Mkhlian



April 16, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

To the Honorable Judge Walter:

My name is Stephanie Mkhlian, and I began my career in public service nearly a decade ago under the Los Angeles Mayor's Office.

**PROFESSIONAL EXPERIENCE WITH RAY AS A DEPUTY MAYOR**

During my time as a Communications Associate fellow, I had the opportunity to attend many events with City staff and community partners. Most notably, I remember attending a leadership lunch and learn session with then Deputy Mayor Ray Chan where he talked about his experience as an immigrant, and his journey getting his bachelor's degree. At the time, I was nearing the end of my fellowship year and left the session inspired to apply to various public service roles because of Ray's story. I applied and was offered the role as an Administrative Assistant to the Deputy Mayor's Executive Assistant and was later promoted to become Ray's Executive Assistant.

It was difficult at first but Ray was patient and consistent in his words of support. He introduced me to the "RayDar" screen, which was Ray's way of making sure that when a task was assigned, the ball was not dropped. It was a simple checklist with updates done weekly. Ray would proactively ask the Business Teams under his leadership for updates on events, programs, and initiatives. He would pose questions to understand the work being done by the Team and ask the Teams if they needed support and guidance from him. From working with him, I could tell that his goals were for the betterment of the City.

In the same way he would have these meetings with his staff, I scheduled meetings for Ray with members of the community, developers, and project managers to facilitate project completion or to assist them however he could. These included small businesses, diverse owners, large corporations, etc.

As with every diligent and committed leader, Ray was often criticized by staff for being on too on top of things. In truth, it was staff's fault for missing set deadlines or demonstrating an unwillingness to do the work by set deadlines with support offered by the Deputy Mayor. I heard this the most when I compiled the weekly updates from the Business Teams and they had no progress to provide.

**PROFESSIONAL EXPERIENCE WITH RAY IN THE PRIVATE SECTOR**

When Ray retired, I continued to work in the Mayor's Office until I was laid off in summer 2017. It was abrupt, and I was ashamed of having just been laid off from my dream job as a 20 something year old first-generation eldest child. Only one or two weeks later, I received a call from Ray. He asked if anyone provided me with a letter of reference or reviewed my resume.

No one had done so, not even my former team leads. He offered and asked me to come to his new office. After an interview with both Ray Chan and George Chiang, I began as an Office Manager. I recall Ray mentioning to me how he was sad he could not match the benefits/salary I had at the City but I told him I was just excited to be able to work with my mentor again and that he gave me a chance to get back on my feet.

My duties included making copies and coffee in preparation of meetings, reviewing any documents sent to me by the Principals, conducting research as assigned, and overseeing subconsultants.

I remember reviewing the work that a subconsultant had sent to me and bringing up to the Principals' attention specifically mentioning low caliber and quality of the deliverable. Deron Willims Jr. was hired as a student consultant to learn and gather experience about housing in California. His task was to provide a report to summarize his findings, observations, conclusions, and recommendations and when I noticed that the report was largely "copy and paste" without proofreading or substance, I made sure the Principals were aware. Subsequently, Ray and George had a discussion with Deron Williams Jr. and offered him another chance to improve the quality of his work, which he then failed to complete whatsoever.

**PERSONAL EXPERIENCES WITH RAY**

I gave Ray a book, "the Go-Giver" because it reminded me so much of his positive belief in people, heart-driven leadership, and strong values. A "go-giver" is someone who uplifts and empowers talent and people, instead of doing what they can for themselves or to get to the top.

And Ray was certainly a "go-giver."  Ray cared for his staff and whoever he encountered; this was not new to those who knew him or know him.

When my grandmother passed away in March 2017, it was Ray and my director that attended her funeral offering sympathy to my mother who was grieving such a deep loss.

In 2019, nearly two years after being laid off by the Mayor's Office, I needed to look for work again, and yet again despite everything on Ray's plate with his pending trial, he offered to review my resume as well as interview prep.

He will always be my mentor, a father figure, and someone I respect and trust. Much of how I conduct business today is based on the skills and tools I learned early in my career under Ray's mentorship. From responding promptly to emails and calls, to being transparent with the teams he led to being a "go-giver."

My interactions with Ray are not unique, many that know him know him trust him and continue to do so because of their first-hand experiences with Ray, working alongside Ray or having served on the many boards he was once a part of and dedicated to.

It is with great sadness that I write this letter hoping that you are able to see the Ray I know and not what's been misconstrued and presented. I hope that you will find Ray's life, his dedication to uplifting others, and work to warrant a low sentence or alternative sentencing.

Sincerely,

*Stephanie Mkhlian*    4/16/2024

Stephanie Mkhlian

Exhibit C

Letter of Bob Stone



Honorable John F. Walker
350 W. First Street
Los Angeles, CA 90012

Dear Judge Walker:

I'm writing to support Raymond Chan's sentencing. I'm a retired Federal civil servant, having
served thirty years at the Pentagon and White House. After retiring my wife and I moved from
the D.C. area to Los Angeles to be near family, and I spent several years consulting and
teaching business ethics at the University of Redlands extensions. In 2013 I joined the Los
Angeles city government as Performance Advisor to the Deputy Mayor for Budget and
Innovation, Rick Cole. I was paid one dollar-a-year.

My passion in Washington had been to make government work better, and I was "hired" by
Deputy Mayor Cole to do that in LA. When my appointment was announced I began to be
barraged by complaints about how the city government was making it hard to do business in the
city. Critics of LA government told me that permitting and inspections were a special nightmare,
and that the only bright light was Ray Chan, then general manager of the Department of
Building and Safety. It became my good fortune to work collaboratively with Ray for three years,
and then to work under him (he always objected to the idea of "under") for a fourth year.

I soon had a chance to see Chan's modus operandi for myself. Early on, while attending a
Friday night going away event for a colleague I overheard a woman in the restaurant complain
to her friend, "The City of LA is yanking me around." I stopped at her table, introduced myself
and asked if I could help. She introduced herself, Patricia Schwartz.

Early Monday morning Ms. Schwartz called and asked if she could see me that day about her
extreme difficulties with the city's permitting system; I agreed. I had been introduced to Ray, so I
called him. He offered to attend my meeting via conference call.

Ms. Schwartz explained her problem: she and her husband owned a small two-story building at
4th and Broadway, and they had leased the upstairs to two young men who were trying to open
a bar there—the first gay bar in DTLA. They had been paying rent for 18 months while
struggling with the city over permits—from Fire, Police, Planning, and other departments. Ray
Chan said, "Meet me at 8am tomorrow at the location and we'll work it out."

Next morning, Tuesday, we all met at Ms. Schwartz's building. Ray had brought along
representatives from Fire, Police and other relevant departments. By Wednesday all the issues
had been resolved, and the bar opened under a Conditional Use Permit on Friday.

This experience taught me that Ray Chan was as committed as I was to making city
government work better. I began to partner with him for the next three years, and when he
became Deputy Mayor for Economic Development I moved to his organization for the year he
held that position.

Ray Chan told me that Mayor Garcetti had directed him—as Deputy Mayor for Economic
Development—to bring business to Los Angeles. One of Chan's major initiatives was his "major
projects committee." If someone planned a major development in Los Angeles (defined, as I
recall, as spending ten million dollars or more), Ray would convene a committee comprising
officials from about twenty city organizations—every one that had a role in inspecting, reviewing,
or approving steps to completion. One of the major projects to benefit from the committee was
the billion-dollar Lucas Museum, now soon to open in Exposition Park. Originally, Chicago, San
Francisco, and other cities competed for the museum, but Los Angeles won the selection. A
senior executive of the Lucas organization has said that Ray's major projects committee made
the Lucas organization feel like a valued customer and partner for the City's growth, and that It
was *the* deciding factor in Lucas's decision to put his museum in Los Angeles.

Chan was also unique among city government leaders in his serious commitment to teach
leadership and management to the department staff. That dedication to helping his subordinates
grow was unparalleled, I believe, among city department heads; in fact it surpassed anything I
ever saw in any government organization, federal, state, or local. He was what teachers of
leadership call a servant leader. In my opinion that is the rarest—and best—kind of leader.

Chan believed that a boss's first responsibility was to help his subordinates improve and grow.
After his appointment as deputy mayor, but before he started on the job, he emailed everyone in
his to-be organization, asking what they needed to be more effective in their job. He compiled
their answers, then had an all-hands meeting his first day on the job, at which he went over
every item requested, and either approved the request or explained why he would not (or could
not). The staff was super-energized, and for his entire year in the job was devoted to supporting
his leadership.

All the above is to explain why I believe Ray Chan to be an extraordinary servant leader, and a
good man. I hope you can see him that way, and that you will consider leniency, or alternative
sentencing.

Thank you for your consideration.

Sincerely,

Bob Stone

Bob Stone

Exhibit D

Letter of Larry Galstian

Larry Galstian



Honorable John F. Walter,

My name is Larry Galstian a former employee of the City of Los Angeles Department of Building and Safety (LADBS). I have known Ray Chan over 20 years, meeting him first time in 1999 when he interviewed me for a position of Case Manager for LADBS Case Management Division. Ray created the Case Management Division to assist businesses of large complex and high-rise projects to navigate through the permitting process with all involved city agencies.

A strong character point of Ray's that inspired my own development, was Ray wanting to help not only large projects, but all projects large and small.

He assigned me to develop other customer service programs, such as:

-   Restaurant Express Program. The Restaurant Express Program was developed to assist restaurant owners in the permitting process with the County Health Department and all other involved city agencies. This program later expanded to facilitate the approval process for all restaurants and small businesses like retail shops, barber shops, salons, etc. The goal of the REP is to make the permitting and inspection process more efficient, enabling new businesses to open on time and on budget.
-   Inspection Case Management Program. The Inspection Case Management Program was to assist large complex projects with the Department of Building and Safety and various Public Works Department inspections to navigate the inspection process, coordinate meetings between private contractor and City inspection teams, assist construction trades to resolve on-site construction changes, facilitate resolution of code-related interpretation issues, mobilize same-day inspections, and coordinate inspections for all trades.

Ray also was concerned with lack of Department's assistance to the general populace of homeowners who didn't understand City's permitting and inspection process and didn't know where to begin. With this idea in mind, Ray developed a "Concierge" program where anyone could contact the Building and Safety's Concierge team or walk-in to any satellite office and ask for help.

As a General Manager of LADBS, Ray was dedicated in developing LADBS into providing a comprehensive and equal assistance to the citizens of the City of Los Angeles.

As a former employee of the Department, I greatly appreciated Ray's commitment to the City of Los Angeles for over 30 years, working countless hours, developing programs to help the citizens of Los Angeles, and earning the trust and respect of over 1,000 LADBS employees through his actions and vision of the department. Ray supported me in my development as a manager throughout my entire career. I have always appreciated Ray's strong leadership, training, and confidence in me.

I wanted to shed some light into Ray Chan's work and life with LADBS and the City of Los Angeles, and hope for your consideration that Ray's life and work warrants a lower sentencing or home confinement.

Sincerely,

Exhibit E

Letter of Peter Callas

Peter Callas



April 17, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

To the Honorable Judge Walter,

I am a retired City of Los Angeles Building and Safety (LADBS) Elevator Safety Engineer, who worked with the Department from 1985 to August of 2016, the last eight years at the level of Chief of the Elevator and Pressure Vessels Division.

I have known Ray Chan since 2004 as our Departments Executive Officer and General Manager, and have always respected Ray's work ethics, character, and leadership.

Ray's accomplishments during my career as a Chief at LADBS are numerous:
-   Ray was very instrumental in helping modernize the Elevator and Pressure Vessels Division and maintain and build on a critical working relationship with the State of California Elevator Unit.
-   Encouragement of training, mentoring, implementing enhancements and visions of the department and its staff, to better serve our customers and increase safety in Los Angeles built trust, raised morale, and earned the respect from our staff.

And while these accolades and success are easy to recount from Rays hard work, it is from **two very difficult times that impacted all of LADBS that in my opinion best highlighted Ray's character, and his devotions to the employees**:
-   The fiscal downturn in Los Angeles from late 2009 -2012 resulted in numerous layoffs at LADBS. Ray worked tirelessly to find alternative work assessments within the scope of a budget freeze, and was successful in placement of a work plan with the Los Angeles World Airport for our laid off employees.
-   In 2014, the Da Vinci Fire impacted the closure of our Downtown LA Metro offices, with subsequent relocations of these offices. Throughout this period of displacement, Ray made it a point to personally meet with staff at each location and keeping them advised of progress for the return to their offices, expressing his thanks and pride to staff for making each difficult move without disruption to our customers inspection requests and needs.

Ray has been a good friend and teacher, who set good hard working examples. His actions, loyalty, respect for others impacted me in a very positive light, I think this his character.

I respect the hard work of the court, and wanted to share my feelings in hope for any consideration for a minimum sentence or a sentence under the recommended guideline range.


Sincerely,

Exhibit F

Letter of Farrel Stevins

**TIS**
Construction Services, Inc.

April 26, 2024

**Honorable John F. Walter**
350 West First Street
Los Angeles, CA 90012

**Dear Judge Walter,**

My name is Farrel Stevins, I am the CEO for TIS Construction Services. I mention this because I am a general contractor and due to my industry, I was fortunate enough to meet Raymond Chan.

I met Raymond through one of my clients in the latter part of 2014. I was speaking with my client regarding my apprehensiveness about working in the City of Los Angeles due to the bureaucracy challenges contractors face with the Building Department. My client suggested I reach out to Raymond Chan and express my reluctancy to do work in the city of Los Angeles.

Upon my first meeting with Mr. Chan, I gained more firsthand knowledge and understanding of the permitting process than I had in my previous years in trying to work with the City of Los Angeles building department.

It was the beginning of a wonderful working relationship; I cultivated our relationship knowing that I was a little fish trying to swim in a large pond and Mr. Chan's openness to guide me through the process was integral to our company's growth and success. My staff and I enjoyed many years working with the City of Los Angeles under Raymond Chan's leadership. He fostered innovative processes to help the small contractors succeed in moving their projects forward. Raymond was always available to speak, always willing to help regardless of who was asking for it.

After knowing this man going on ten plus years and continuing our relationship after he left the City of Los Angeles, he has always been ready to help, provide advice and guidance. There was a period where I was concerned about the lack of growth and opportunities for work my company was facing, i.e. a slowdown in the industry. I told Raymond about my concerns and the first thing he did was put me in touch with the VP from one of the largest architectural firms in Los Angeles. He took us out for an introductory lunch, I am still working with that architectural firm today and made a great acquaintance there as well.

I remember asking for the check to pay for lunch and Ray would not hear of it, he insisted on paying. I simply wanted to thank him for taking time out of his day and for introducing us.

I have had at least twenty dinners and lunches with Raymond Chan, and he has never allowed me to pay for one of them. It is just who he is: a kind soul willing to help anyone.

Given light of this situation now, I would have to say he was a little naive but genuine in heart. I am expressing the same thing to you that I did to the FBI when they interviewed me a few years ago over the phone, nothing has changed in my opinion by who Raymond Chan is as a person. I have never paid Raymond Chan one cent through all the years I have known him, and he has never asked for any gratuity in any form.

The man has truly been a blessing to my teammates, my family, and myself, not to mention our clients. I respectfully request as much leniency as you can provide for Raymond Chan on his sentencing.

Should you have any additional questions or if you would like to hear more detailed accounts as to his positive attributes, please feel free to contact me directly.

Sincerely,

**Farrel Stevins, CEO**
TIS Construction Services, Inc.



TISusa.com    Lic: 732985

Exhibit G

Letter of Jacob Poon

# J. P. CONSTRUCTION CO.
● GENERAL CONSTRUCTION ● PLUMBING ● ELECTRICAL

May 2st 2024

Honorable John F Walter
350 West First Street
Los Angeles CA 90012

Dear Judge Walter,

My name is Jacob Poon, I am a general contractor working in Southern California. I first met Raymond Chan in 2004. I have known him both professionally through my work as a contractor and as a friend as we attended the same Tai Chi classes.

Raymond Chan has always been friendly, knowledgeable and helpful. Whenever we had any problems or questions when working in the City of Los Angeles he was always available to assist and guide us.

He guided us in the permit and plan check process and helped us when we did not know who to speak to or where to start on complicated projects. He helped us coordinate inspections with city inspectors and would even take my calls late at night when we had questions about a code issue or correction that we did not understand.

Despite the circumstances that have led to this sentencing, I firmly believe that Raymond Chan has the potential to continue making a positive impact in the world by helping others as he has helped me.

I understand that the legal system must hold individuals accountable for their actions. However, I implore you to consider the following factors when determining Raymond Chan's sentence:

- Raymond has a history of community service and volunteer work, demonstrating their commitment to giving back to society.

- Raymond's hard work and dedication to the city of Los Angeles has made the city a better place to live and work.

I respectfully request that you consider a lenient sentence that takes into account Raymond Chan's exceptional character, potential for rehabilitation, and the support of their community. A fair and compassionate sentence will allow Raymond Chan to continue making amends, growing as a person, and contributing positively to society.

Thank you for your time and consideration.
Sincerely,

Jacob Poon, President

Page 1 of 1

Exhibit H

Letter of Michael Hunt

WARNER CONSTRUCTORS INC.

████████████████████

To :   The Honorable Judge John F. Walters

350 West First Street

Los Angeles CA 90012

Dear Judge Walters, My Name is Michael Hunt. I am a Partner in a company named Warner Constructors Inc. My company is in Glendale, California and we have been in business for more than 40 years.

Our primary business is interior renovations, construction of office Interiors, and new office interior office construction in the Greater Los Angeles area. The vast majority of the work that we have done over the years has been in the City of Los Angeles and have dealt with the Los Angeles Department of Building and Safety (LADBS) since our first days in business in 1984.

With the complexities of the building industry in Los Angeles, there was always a need to learn how to work with LADBS staff and navigate between the various departments that require the clearances in order to receive a building permit.

In the very early part of 2000, I started being responsible for my company's interaction with LADBS and I was working very closely with the department while the Walt Disney Company was considering to build "Jimmy Kimmel Live" in the Masonic Temple in Hollywood CA. I believe in 2001 or 2002 I was introduced to an up and coming "Super Star" at LADBS, Mr. Raymond Chan.

I started learning from Ray and the various managers at the department. This became so frequent I had monthly interactions with him and saw his climb up the ladder in LADBS responsibilities.  Our company did a few hundred tenant improvements projects per year in Los Angeles and the knowledge that I learned from Ray was invaluable for my success in my career and these projects.

The various LADBS managers all respected Ray because he treated them all as equals.  Ray was also incredibly genuine and helpful with the private sector and I felt fortunate to be in that category.

In fact, Ray reached out to me and often called me his "Big Brother", **and asked me for my advice.** Specifically, he wanted my input on items that I felt needed attention at LADBS and what positive changes could be made within LADBS to make Los Angeles a much better place to do business.  He also asked for feedback on what I thought other cities did better so that LADBS could implement those changes.  His heart and focus have always been on making L.A. the place to go and do business.

WARNER

Over the years Ray and I would meet either at his office (where I always felt welcomed) and sometimes we would meet at a little diner for a quick breakfast. We always took turns paying the check and our conversation centered on family, my current work, my opinion on how the Department was operating, how LADBS could improve, etc.

Under Ray, the culture of LADBS completely transformed from a red-tape heavy bureaucratic institution into one with a "Customer Service"-driven priority. The contractors, developers, and design firms were all treated as "Building Partners" and "Customers" by the LADBS. The culture change was so different, and L.A. quickly became my favorite municipality to do business in. It was friendly and approachable.

During Ray's leadership, I could go on about the policy changes that streamlined the review process from ADA compliance, Fire Sprinkler Inspection changes, Plan Check expediting changes etc. All of these made Los Angeles a better place to do business while still being safe.

The relationship with Ray continued throughout his LADBS and on to his move to the Deputy Mayor for Economic Development. Even after his move to City Hall Ray would call and ask about how things were, if there were areas of improvement etc.

Aside from my feedback, Ray has never asked for anything in return for his help. In the 20 + years I worked with this man, the only intent I ever saw, and I think I saw a lot for just being a contractor, was Ray's desire to assist EVERY ONE, be respectful to Everyone, and be a Champion for the City of Los Angeles. I suspect that is the Key Part of Mr. Eric Garcetti's desire to have him as Deputy Mayor.

I respectfully request that the service Ray, "Mr. Raymond Chan" has provided to countless folks just like me, is taken into strong consideration when it comes to sentencing, I would hope there are choices and or options that can be considered from Mentoring Programs, to Community Service, or even Home Confinement? Ray has been a good man for the city for countless years, and can honestly say we miss him. Please feel free to contact me at any time, it would be an honor to speak with you on his behalf.

Sincerely,

Michael J Hunt

Executive Vice President

Warner Constructors Inc.

# Exhibit I

# Letter of Alfred Balderrama

Alfred P. Balderrama
Former Mayor of Monterey Park

May 13, 2024

Honorable John F. Walter
350 West First Street
Los Angeles CA 90012

Dear Judge Walter,

I have known Mr. Raymond Chan for forty-three years. I have never met anyone like Raymond Chan. Ray has proven to me to be of high moral character, strong religious beliefs and a man of his word. As a thirteen-year City Councilman and three-time Mayor of Monterey Park, it was a pleasure having Ray volunteer his expertise and time to volunteer to serve as my Planning Commissioner. I do not believe the City of Monterey Park has ever had such a highly qualified Commissioner.

Ray has throughout the years proven to be a kind, caring and thoughtful friend. I would always receive a call or text from Ray on special occasions or holidays. I've personally watched Ray climb the ladder of success at his job and he has been successful through hard work and his attention to duty and especially teamwork.

I have attended the open workshop meetings held at City Hall which enabled direct input from all departments, businesses and the general public. I was amazed how almost everyone commented positively on the protocols Ray as Deputy Mayor established in order to move forward with projects.

I have been a Land Use Consultant for the last thirty-four years. I can state without a doubt that I would not have made it in this line of work if it had not been for Mr. Raymond Chan's open-door policy and always lending a hand to anyone that asks.

I know that the trial did not go well for Ray and I pray for Ray to be strong and that God watch over him in these troubling times. By my sitting in the courtroom during the trial, I couldn't help but think the only thing Ray could possibly be guilty of is trying to please to many people who needed some type of assistance.

Thank you!

Fred Balderrama

Exhibit J

Letter of John Q. Lee



# John Q Public LLC

April 21, 2024

John Q. Lee

The Honorable John F. Walter
350 West First Street
Los Angeles CA 90012

Dear Judge Walter:

My name is John Q Lee, aged 63.   and I am reaching out to you regarding the probation and sentencing of Mr. Raymond Chan.   And I wish to present my support thereto.

## THE REQUEST

By way of background,  I worked  for the government from 1984-2004.  During that time, I did (2) two tours of duty with the City of Los Angeles and also LA Metro (bus and rail agency).

I also worked in the Office of the Los Angeles County  District Attorney while attending law school (1988-1993) serving as a Certified Senior Law Clerk prosecuting cases in municipal court.  And thus, I am not unaware of the discretion that the court has when imposing sentencing.

And for that reason, I'd respectfully request that when the court deliberates it consider Ray's entire body of work as a human being doing good for people and my comments discussed below.

## DISCUSSION

Ray and I have known each since 1993. We worked together  in Los Angeles City Hall. At that time, I served as Assistant Deputy Mayor for the Mayor of Los Angeles for six years and then served as Deputy Chief of Staff to the Los Angeles City Council President for five years.

I first found Ray to be a very knowledgeable person who knew the Department of Building and Safety at every level and understood the role the department should best play in best serving Angelenos and businesses in Los Angeles.

As the years went by and I continued to engage Ray while I served on the executive and legislative side of City Hall, I was able to also learn how Ray was a genuinely nice person with a good heart who loved to help people, anyone.  I recall one such example in the late 1990's when I was at the home of a constituent who had just experienced a collapse to a portion of their home.  They were panicked.  Wondering what to do to ally their fears, I called Ray at his office at the Los Angeles Building & Safety Department  to get some direction of what to do for them.

Ray was more than helpful.   He drove to her house to help figure out their options and what to do.  That's Ray.  Always of service.  Always happy to help.

In 2004, I  retired from government service.  Ray and I remained in contact and remained as friends.

## CONCLUSION

Now that Ray's trial has ended and he enters the sentencing and probation phase of the criminal action there is a lot that factors into the ultimate decision of his sentencing.

I believe that holding people to account, honoring the rule law but being fair to a defendant are not mutually exclusive results to be achieved.   Thank you for your consideration of my  comments for Mr. Raymond Chan.

Regards,

John Q. Lee

# Exhibit K

# Letter of Eduardo Espinoza

Eduardo L. Espinoza

April 15, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Dear Judge Walter,

My name is Eduardo Espinoza, and I would like to share with you that, in 1988, I was a General Contractor who was lucky enough to meet Raymond Chan who, at that time, just began working at the Van Nuys Building and Safety office counter.

Over the subsequent years, I was impressed by what I saw: a very hard-working man that excelled and escalated to where he got due to his strong work ethics. Raymond was **knowledgeable, courteous, helpful, straight forward and to the point**:

- With the process of permit pulling, Raymond would answer any questions I had or whenever I needed any assistance.
- If he didn't know the answer, Raymond would put me in contact with the correct person so that I was able to complete my building projects on time.
- Raymond guided me to attend specific Department of Building and Safety seminars, which provided me with helpful and beneficial information to me and my trade.

Aside from professional assistance, Raymond referred me to various of his personal acquaintances and family members needing any type of remodel or any type of construction work in general so that I could have the opportunity to bid on those construction jobs. Thanks to the trust he placed in me, I was able to receive many more referrals from those clients which kept me working for many years. **Raymond never asked for a single thing in return from me** and for those reasons, I shall always be extremely grateful to him.

I never noticed anything out of line just Raymonds impeccable professionalism, pride and complete dedication to his job.

Over the years, I forged a strong friendship with Raymond and his family that continues to be strong to this
day.  My wife and I have witnessed Raymond's pride and dedication for family as well.  Raymond has never
changed in his way of being or his way of living life.

In conclusion, knowing and respecting Raymond for so many years as I do, I can honestly say to you today
that Raymond is an exceptional human being.  I know, at this time, how significant his sentencing could
possibly be.

I ask that you will please take into consideration all the good and helpful things that Raymond Chan has
done for so many people, such as myself, as well as for the City of Los Angeles throughout his impeccable
career that spans for decades.

I pray that this letter, along with others, helps you see Raymond beyond what you heard during the trial and
to consider a lesser sentence or perhaps an alternate sentence such as home confinement.

Sincerely,

Eduardo L. Espinoza

Exhibit L

Letter of Robert Goodwin

**Goodwin** Consulting

April 26, 2024

***VIA ELECTRONIC DELIVERY***

Honorable John F. Walter
350 West First Street
Los Angeles, CA  90012

RE:    **Raymond Chan Sentencing**

Dear Judge Walter,

This letter is meant to be in support of ***sentencing leniency*** for Raymond Chan.  My name is Robert Goodwin.  I have been in the Real Estate Development business in Los Angeles area since 1987, working on very large and small projects in Los Angeles during that time period, including: US Bank Tower, Gas Company Tower, Wells Fargo Center, the City Central Library, Playa Vista, Century Plaza Hotel and Condominiums, Wilshire Grand Tower, the Broad Museum, and many other significant projects in suburbs in the region, and elsewhere in the country, working with many different City Building and Safety Departments.  I have been lucky to have had a great career working on significant projects with design and construction teams of world prominence. Of all these projects, in all the various jurisdictions, by far the best person in Ray's position I have ever worked with, was Ray.

Meeting Ray approximately twenty years ago and working with him on many of the above listed projects was one of the highlights of doing business within the City of Los Angeles for me.  I say this because Ray had a different outlook on running his department than any of his predecessors that I have worked with before, or since.  He was quite the opposite of his predecessors in that he was there to help, and not hide behind the institution.  He was approachable and helpful in guiding people with their projects, through what is usually tedious and unfriendly.  He would sometimes gather many of his staff members together to help work out solutions with project teams to help them be able to receive building permits in an efficient and profession manner.  He also helped coordinate meetings with other departments like the Planning Department, Fire Department, etc., to work out issues.  From my perspective, he did the job of serving the public in an honorable and efficient way, while shunning attention away from himself.  He was always thoughtful, respectful and humble.

To my knowledge and through many industry acquaintances, Ray was universally respected.  He never once requested anything from me, nor my clients, that I thought was unethical or improper.  After his departure from heading the Department of Building and Safety for the city, in my opinion, the department has back pedaled to its previous mindset of being an impediment to new development within the city, causing time delays, and much more cost, for all involved.

April 26, 2024
Page 2 of 2

As time went by, I got to know Ray, his past, his family, and his commitment to others. He was a leader to make things better in his industry.  We would occasionally meet for breakfast at his favorite "greasy spoon" restaurant in East Los Angeles, frequented by police officers, other City employees and locals to the neighborhood.  Ray always insisted on paying for his share.  He insisted on not putting me, or himself, in an awkward position because of his position, which exemplified great character to me.  During his recent trial, I volunteered to be a witness for his defense on my own time, no matter what it might have required.  It was not a token gesture on my part, as I have been involved in several depositions and/or trials in the past for several clients and hope I never have to go through the process again, but I would have for Ray. Ray earned my respect and trust over a long period of time.  He will have it for the rest of my, or his life.

I am hopeful this letter will help as a request for you to find sentencing leniency on his behalf for all the good he has done in his life's work.  I will gladly make myself available to you to meet in person, or otherwise, to answer any questions or give help in any way for Ray.

Thank you.

Sincerely,

Robert Goodwin

Exhibit M

Letter of Henry Wang

Henry Wang

██████████████
██████████████

May 21, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Dear Judge Walter:

My name is Henry Wang. I am an American citizen and currently residing in Portugal with my family. I am retired and occasionally perform consulting work. I am writing in support of my friend, Ray Chan. Though what I am about to share is only a singular experience, it left a strong impression on me and serves as the best example of why I continue to support Ray.

I previously worked for a quasi-governmental agency whose purpose was to spur economic development by facilitating cooperations between foreign investments and municipalities. Around 2014, on behalf of the Los Angeles County Economic Development Corporation (LAEDC), I coordinated a trade mission to China for L.A. City Mayor Eric Garcetti and other city officials. That was when I first met Ray Chan who was the Building and Safety Department General Manager.

Thereafter, I sometimes asked Ray for guidance on various development projects. One of my clients from China bought a piece of vacant land that he wanted to build a major residential project. I asked Ray for a meeting to discuss issues pertaining to the process. My client and I went to Ray's office and Ray offered guidance on code regulations and the permitting process. There were follow-up meetings and Ray's guidance was always provided in a welcoming manner and was instrumental in the project's timely completion.

Later, the client asked me to invite Ray to dinner. I relayed the invitation, but Ray declined. I asked again and Ray relented. After dinner, the client asked me to place a bottle of liquor they purchased to give to Ray as a token of appreciation. While Ray and the client talked in the parking lot, I took the wrapped gift and placed it in Ray's car. I did not know what the bottle of liquor was, nor did I know its value.

The next day Ray called me and explained that while gift giving was in keeping with Chinese cultural norms, it was too valuable for him to accept. He googled the bottle of liquor and discovered it was worth several thousand dollars. The next day, Ray gave the gift back to me with instructions to return it to the client. By returning the gift, Ray demonstrated his trustworthiness and ethics and made a strong impression on me that this was someone with integrity. After that, Ray and I became friends with mutual respect and admiration.

I hope my letter explains that Ray is ethical, trustworthy, and willing to help anyone. I respectfully request that all the above be taken into consideration of the matter at hand.

Sincerely,

Henry Wang

# Exhibit N

# Letter of Lessing Gold

# ⬦⬦msk

**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Lessing E. Gold
A Professional Corporation

April 11, 2024

The Honorable John F. Walter
350 Wet First Street
Los Angeles, CA 90012

**Re:     Raymond Chen**

Dear Judge Walter:

My name is Lessing Gold, I have been a member of the California State Bar since 1957.  I have
spent the last 31 years as a partner at the law firm of Mitchell Silberberg & Knupp.  For a
number of years, during the early 2000s, I was the Chairman of the World Trade Committee, a
committee of the Los Angeles County Economic Develop Corporation (LAEDC).  The purpose
of the World Trade Committee was to attempt to bring business, primarily from China to Los
Angeles.  It was in this capacity that I originally met Raymond Chan.

One of the companies from China which I was dealing with, was interested in setting up a
business in Los Angeles.  The company was a major manufacturer of underground pipes in
China.  They were anxious to duplicate this business in Los Angeles.  The principal of the
company contacted me for advice as to how to establish the company as the pipe manufacturing
business was a complex business and the company wanted to set up its operation in the City of
Los Angeles.  I suggested they contact Mr. Chan to determine whether it was feasible to set up
this type of company in the City of Los Angeles.

A number of conversations took place between the company and Mr. Chan.  Because of the
complexity in the manufacturing, Mr. Chan apparently advised them against pursuing the project
in the city.  Sometime later the principal of the company contacted me and indicated that she was
coming to Los Angeles and asked me if I could set up a lunch with Mr. Chan as they would like
to thank him for his advice and the time spent with them on the project.

I contacted Mr. Chan and set up a lunch at the Taix restaurant in Los Angeles.  At the conclusion
of lunch the principal of the company dispatched her son to the car and he brought back a gift for
Mr. Chan.  Mr. Chan refused the gift advising that he is an employee of the city and was not
allowed to accept any gifts.  The waiter then brought two separate checks, one which he gave to
Mr. Chan and the other to the company principal.  Apparently Mr. Chan arranged with the
restaurant to bring him a separate check for his meal.

I mention the above as during the course of my relationship with Mr. Chan, I had lunch with him
on 3 or 4 separate occasions and in each instance he insisted that we receive separate checks for
the meal.

Website: www.msk.com



The Honorable John F. Walter
April 11, 2024
Page 2

I have known Mr. Chan for about 10 or 12 years and I have always found him to be a very honorable individual who made an effort to assist the companies and people he dealt with. In my capacity as Chairman of the World Trade Center, I had an opportunity to work with Mr. Chan on several occasions and always found him to be honest, honorable and forthright. To my knowledge, his reputation at the Department of Building and Safety was impeccable and he had an excellent reputation for getting things done.

Your Honor, while sentencing Mr. Chan, I hope that you would be extremely lenient, taking into consideration his past performance, his dedication to the City of Los Angeles and his reputation. I believe the indictment and the criminal proceedings to date have already had a devastating impact upon Mr. Chan and his family and I believe that any prison time would be further devastating to Mr. Chan and his family.

It has been many years since I have tried a case and have sat in Federal Court. I must commend you on the professionalism and decorum you displayed during the course of the cases which I witnessed.

I hope your understanding will allow you to grant Mr. Chan a minimum sentence in this matter.

Sincerely,

Lessing E. Gold
A Professional Corporation for
MITCHELL SILBERBERG & KNUPP LLP

LEG/s2g

16427711.1

Exhibit O

Letter of Sam Guo

Samuel Guo



May 13, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Dear Honorable Judge Walter:

My name is Samuel Guo. I am writing to you today in support of Mr. Raymond Chan to respectfully ask for your consideration in granting him leniency.

I am an immigrant from China and left my birthplace partially due to challenges I experienced due to my faith.

Ray is a man of faith like me. Though our religious practices differ (Ray is Catholic and I am a Seventh Day Adventist), our core beliefs are very similar: we are entrusted by God to use our time, gifts, and abilities, resources, and opportunities to serve God and our fellowmen. I can use my own life as evidence of why Ray is a true exemplar of this ideology.

Raymond contributed substantially to allow myself and my family to achieve the American Dream.

When I first came to the United States, it was an incredibly difficult time for me because I arrived alone here without friends or family. My wife and son were still in China. I decided to use my martial arts expertise and teach tai-chi part-time. That was where I first met Raymond more than twenty years ago in 2001. Ray was one of my first students.

I quickly discovered that Ray is very willing to help others without expecting anything in return. Because I had little teaching experience in the US, Ray took the initiative to help me create teaching outlines, class schedules, and marketing. Every lesson, every teaching content in great detail. He constantly exchanged ideas with classmates to get their opinions, which he summarized to help me to modify the lessons. Combining our efforts, the number of students in the Tai Chi class quickly grew to several hundred. I started to need new teaching locations and expanded to private lessons as well. This success allowed me to shift from teaching part-time to full-time. With so many students, Ray helped me to build a small community by organizing different social picnics, parties, and gatherings.

At the same time, regarding my immigration matters, Ray devoted a lot of effort and time to help me translate immigration documents, accompany me to see lawyers, and so on. With his help, it saved me a lot of money, quickly resolved my immigration matters, and allowed my family to join me in the United States.

In between, Ray and his family frequently invited me to dinner on the weekends. Ray knew that I was here alone in the US and wanted to take me out to try different foods and socialize.

Many times, I wanted to express my gratitude to him. I wanted to waive his tuition fees or treat him to meals; however, over the past twenty-plus years, he has never received any portion of tuition fees, nor has he accepted a meal from me.

Later, I also learned that he is not only like this towards me but also towards people around him. He uses his own funds to help impoverished children in mainland China, from elementary school to university graduation.  He sent them tuition and living expenses every month, until each one completed their studies.

Your Honor, due in part to Ray's help, I now own my own home. It is a night and day difference from the conditions I experienced when I first arrived in the US.  Ray Chan is truly an upright person who is dedicated to helping others. His deeds of kindness are too numerous to count!

I hope my experiences help you to see more of Ray.  He truly lives up to our belief as a person put on this Earth to help people. I respectfully hope you can provide some consideration to this and grant him leniency or an alternative sentencing.

Sincerely,

Samuel Guo                                    5/13/2024

Exhibit P

Letter of Rubidim Wu

Rubidium Wu

<span style="background-color:black; color:black">████████████████</span>

April 10, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Dear Judge Walter,

I am writing to offer my support for Raymond Chan, who is currently being sentenced. I have known Ray for over a decade, and during this time, I have witnessed firsthand his unwavering commitment to helping others and the positive impact he has had on those around him.

I met Ray in 2009 when I moved to US from Australia to pursue a career in film. I was introduced to him because we had both studied the same style of martial arts.

From the moment I arrived in Los Angeles, Ray extended a helping hand without hesitation. He not only offered guidance and support but also went above and beyond to facilitate connections and opportunities for me to start my career. Whether it was introducing me to people he knew or providing valuable advice, Ray consistently demonstrated his selflessness and generosity, never once expecting anything in return.

Over the past 14 years, Ray has remained a steadfast advocate in my life, celebrating my successes and offering encouragement during challenging times. He's helped me apply for jobs, introduced me to numerous people and companies who subsequently became clients, given me honest and helpful feedback on my work and made his time and network available to me time and time again, without ever asking for anything in return.

He has devoted 100s of hours of his time and attention to help me, without which my career and family would be much worse off. I am far from being an outlier. Ray does this consistently with everyone he knows, selflessly giving his time and resouces to uplift those around him.

What sets Ray apart is not only his willingness to assist others but also his unwavering integrity and kindness. He approaches every interaction with sincerity and compassion, embodying the qualities of an honest and decent man. It is evident that Ray considers it his life's mission to uplift those around him and contribute positively to his community.

Even amidst personal challenges and adversity, Ray has remained a beacon of positivity and hope, serving as an exemplary role model to all those who know him. His resilience and unwavering faith have inspired many people, myself included, to persevere in the face of adversity.

In reflection of the potential gravity of the sentence at hand, I earnestly implore Your Honor to consider the profound impact Ray has had on countless lives, including my own. His commitment to bettering the lives of others and his unwavering dedication to his community are testaments to his character.

I humbly ask for your discretion in sentencing, with the hope that Ray's life and many contributions will warrant a fair and lenient outcome.

Thank you for considering my testimony in support of Ray. If you require any further information, please do not hesitate to contact me.

Sincerely,

Rubidium Wu

Exhibit Q

Letter of Albert Leung



Albert Leung

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

To the Honorable Judge Walter:

My name is Albert Leung. I am a professional and licensed Civil Engineer (No. C45924) with 30 years' public services employment and currently own a private consulting business. I respectfully hope to share with you some of my experiences with Mr. Ray Chan to shed light on who he is as a person.

About 20 years ago, I first met Ray at a professional organization event. Ray was one of the speaker panelists. I remember being very impressed with Ray's personal stories about his career, related challenges, as well as his continuous improvement management approaches. I kept in touch and sought Ray's advice from time to time concerning my own career. Each response was always warm and thoughtful. I remember being surprised that a top busy City Official would take time to care for a nobody.

In 2018, about a year after I retired from my public service job, I started my own consulting business. Ray also retired from the City of Los Angeles and started a private business. I called and Ray was again most personable and helpful. He made connections and introduced a local businessman that required engineering support to me. Ray would follow up and see if the connection was successful when we ran into each other at events. Through these interactions that spanned almost two decades, Ray was always personal, supportive, and helpful.

His advice was freely given, and nothing was ever asked for in return. Through his consistent selfless actions, Ray has my utmost respect as a fellow professional.

I recognize that Ray is currently facing a potentially significant sentence. I hope my letter helps you to find that Ray's life and work warrant a low sentence or alternative sentencing.

Respectfully submitted,

Albert Leung

Exhibit R

Letter of Roy Chen



April 23, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Honorable Judge Walter:

My name is Roy Chao Tung Chen. Since 1979, my wife and I own and operate a printing company, Superprint Graphics Inc., in Santa Fe Springs, CA. I met Raymond Chan at a tai-chi class that my wife and I started attending about 20 years ago. We practiced tai chi every Sunday.

As our time with the tai-chi class continued over the years, we developed a close relationship with our other classmates and Ray, in particular. Ray and his wife were the most senior students and were heavily involved in the social aspects of the class. Our tai-chi instructor would host dinner gatherings, parties, and picnics where we got to know the other students outside of our classes.

Unfortunately, my wife and I were heavily preoccupied with running our business and could not attend these gatherings. In fact, we felt pressured and overwhelmed like time was not on our side. Ray, the ever enthusiastic and friendly guy, proactively asked me if he could help us with our business.

In 2012, Ray spent two weekends training my wife and I on management, operations, and scheduling skills. Ray has fantastic insight – he asked us a lot of questions that we didn't even think of ourselves. He proactively planned and coordinated with us to uplift our business and operations.

This training was invaluable because it greatly boosted our productivity and efficiency. We could meet our existing orders effectively, take on additional orders, and, most importantly, regain our personal lives. My wife and I felt that a massive weight was lifted from our shoulders and our minds were clear.

In 2015, Ray helped us again by optimizing the layout for our manufacturing plant. This again helped boost our productivity and made us better business operators and vendors.



Ray never asked for anything for his help.  He is such a passionate person about helping others. He is also a fantastic leader and well-liked and respected by our fellow Tai-chi students. His sincerity is very genuine and touching and his enthusiasm extends to all people. He gets joy from helping others around him. At the same time, I worried for him because such generosity and kindness are rare but also easy for bad actors to take advantage of.

Our story is likely one of many when it comes to Ray's character. Because of our experiences working with Ray, we cannot begin to imagine what Ray accomplished in his professional career to help the City of Los Angeles.

Your Honor, please take into consideration all the good and helpful things that Raymond Chan has done for so many years for Los Angeles for decades, to consider a lesser sentence or perhaps an alternate sentence such as home confinement.


Sincerely

Roy Chao Tung Chen

Exhibit S

Letter of Troy Augborne

May 1, 2024.

Mr. Troy Augborne



Honorable John F. Walter

350 West First Street

Los Angeles, CA 90012

My name is Troy DeNoa Augborne, I am 62 years old, and have been married for 39 years. I am a loving husband and a father of three children, and a grandfather of five grandchildren with one on the way. I am a Chinese martial arts instructor, graphic designer, inventor (holding several patents), and a project packaging engineer. I am a corporate professional with 30+ years in consumer package goods, 24 being in the toy industry.

I write to you today with unwavering support for my dear friend, Raymond Chan (Ray). Having been present throughout his recent trial, I was utterly shocked by the accusations against him. I firmly believe these charges are a grave misrepresentation of the man I know.

For many years, Ray has embodied integrity and strong principles. He's a devoted family man, always willing to extend a compassionate hand. His caring nature isn't just a character trait; it's a defining aspect of him, something I've witnessed firsthand.

During my own family's darkest hours, Ray's unwavering support proved invaluable. In 2022, when my daughter faced life-saving surgery, Ray ensured I could be by her side. He offered not just words of encouragement but real, tangible help. Similarly, in 2023, a health crisis with my wife necessitated a sudden move to the Southwest. Ray provided not only comforting words and prayers, but also a selfless act of financial support through a $3,000 loan. These weren't mere gestures; they were testaments to the depth of his character, a man who goes above and beyond for those he cares about.

Throughout the trial, Ray displayed the utmost respect for the court. Despite the false accusations and the heavy toll, they took on him – emotionally, physically, spiritually, and financially – he maintained exemplary conduct. Even faced with an unfavorable verdict, his integrity shone through. This speaks volumes about the man he is.

While I understand the seriousness of potential sentencing, I implore you to consider Ray's exemplary life. He's built a successful career, actively serves his community, and remains fiercely committed to his family. He's a loyal husband, a loving father, and a cherished grandfather. His family needs him.

Therefore, with utmost respect, I request the court's compassion. A lesser sentence or alternative sentencing, like home confinement, would be a just outcome for an innocent man who deserves the opportunity to rebuild his life with his family.

Thank you for your time and thoughtful consideration.

Respectfully,

Troy Augborne

Exhibit T

Letter of Tim Cho

Honorable John F. Walter

350 West First Street

Los Angeles, CA 90012


To the Honorable Judge Walter:                                              5/24/2024


My name is Tang Fung Cho, also known as "Tim" Cho.  I am 66 years old.  I have known Mr. Ray Chan and his family for over 30 years. The reason I am writing to you today is to share some of my personal experiences with Ray over this time and to respectfully ask that you consider Ray's life and allow for a lower sentencing.

I know Mr. Chan is an exceptional person in every way.  He has straight ethics sense and a very clear moral compass.  At his work place, his co-workers looked at him as the city department guiding light.  He demonstrated fairness and impartiality.

Outside the office, he can be an over enthusiastic volunteer, a very strict Martial Art teacher/ Master, and an inspiration teacher to a bunch of high schools students on the subject of leadership.

Personally, he is my best friend, a mentor, and a big brother to me.

During the time from 2019 to end of 2023, I was very sick with a rare form of Pancreatitis. I was in the hospital for over 2-1/2 years and then Tumors suddenly showed up.  They completely filled my abdominal area. One instance during an emergency room visit, I even saw myself flat-lined.  With the help of Mr. Chan and his wife, I slowly recovered. During the critical time, Mr. Chan even helped me to communicate with my clients with termination of my design contracts.  He helped me to pay my customers at first and then I reimbursed him back.  When I was in the hospital, he and his wife bring me soup, cell phone charger, hot water bottle etc.  After I left the hospital, Mr. Chan continues to care for me and brought me more soup because I was on a liquid diet.  He also helped me to shop for food because I was bed bound.

Many who do not know him will find it very strange about Mr. Chan.  Why he will give such extraordinary effort to help a person who is not his family member?  The reason is his personality, and the way how he was brought up by his parents.  When he feels the person needs help, he will go the "extra miles" to help.  If you have a chance to interview his other friends, you can verify what I said was true.

In conclusion, I feel I am honored to be a friend of Mr. Chan based on his exceptional good character.  These days it is very hard to find such a trustworthy and honorable person.

I understand this letter is brief, and proof was not presented in details; therefore, I am available to talk to you if you need more information.  I can be reach at ████████████ or you could email me at ████████████ .  Thank you for your consideration.

Sincerely,

Tang Fung Cho

Exhibit U

Letter of Ron Quan



**TEMPT ONE** ALS FOUNDATION

*"Many Arts, One Mission."*

*May 1, 2024*

*TO:  Honorable John F. Walter*
*350 West First St.,*
*Los Angeles, Calif., 90012*

*Dear Judge Walter:*

*I had the great pleasure of volunteering alongside a very talented and highly regarded public civil servant, Mr. Ray Chan, former Deputy Mayor of the City of Los Angeles.  We both met in 2017 while serving on the board of directors, of the Traditional Chinese Martial Art Federation (TCMAF), a 501 c3 charitable non-profit with the mission of organizing public events to promote the traditional Chinese martial arts (kung fu & Tai-ji).*

*Ray Chan served as a volunteer advisor and I represented the Tempt One ALS Foundation, another 501 c3 charity with the mission of organizing events to raise funds to assist patients and families suffering from the horrid disease called ALS (Amytrophic Lateral Sclerosis).*

*I also founded the Tempt One Chinese Martial Art Championship tournament, an annual competition which, for 9 years, drew 300-400 competitors each year and served as our primary effort to assist ALS patients.*

*It was in that context that Ray Chan introduced himself and expressed interest in supporting our worthy event.  In fact, in 2018, he volunteered to serve as the tournament chair and quickly rallied all of our volunteers into action and with his upbeat and positive humor expressed the importance of what our event was all about and how it specifically benefited ALS patients and families.  With his unique leadership skills, he had a way of crediting those who were assigned with specific tasks, ensured that verbal reports were shared with him at specific time periods, and continuously reminded all in attendance of what we were all about and how we were helping those who were having difficulties helping themselves.  That year, our event raised $ 45,000.*

*I was amazed and honored to work alongside of Ray Chan.  Compassionate, always willing to give assistance to others, project-oriented, an achiever, a doer, and a friend to anyone he comes into contact with.  His warm smile, lit up eyes, upbeat humor, and warm handshake says it all.  His remarkable work history with serving both the City of Los Angeles and its many citizens is a huge achievement in itself.  With that in mind,  may I humbly submit this request that you are lenient with his sentencing or, if possible, that he is given an alternative sentence whereby he could continue to motivate, inspire, and give goodwill to others.*

*Sincerely,*

*Ron C. Quan*

Exhibit V

Letter of Kevin Cheng

Kevin Cheng



Honorable John F. Walter
350 West First Street
Los Angeles, CA, 90012

From

To the Honorable Judge Walter,

My name is Kevin Cheng, and I am a student at Ray Chan's kung fu school for Buk Xing Choy Lay Fut (BXG). He has been my teacher since I was 15, and I am now 33. I first met Ray through a tai chi school and was introduced to Ray's martial art classes by a mutual family friend. I was instantly drawn to his forthright demeanor. Since I have known him, Ray has been a second father to me through his mentorship and generosity and the BXG group has been a second family.

Ray taught me kung fu all those years ago, with no expectation or request for any compensation. He never asked us to help him pay for the equipment we use in class or his time. When I was a graduate student in Illinois, I only had enough money to fly home once a year for the holidays, but Ray made sure that I could return home during the summer. He paid for my flight home so I could visit my family and my BXG family. He has always been quick to give, feed, and celebrate us. It is regular practice for us students to come together for meals out or Ray to personally grill steaks or ribs for holiday meals.

He has dedicated his time to helping all of his students in numerous ways, but I will never forget the many ways he has shown kindness to me personally. When I was first learning kung fu from him, I did not have a driver's license and had trouble going to lessons. Ray would drive me home several times per week after each lesson, after my father dropped me off. He did this each week for three years, until I was able to drive myself. On those drives, he would help me work on my life as a high school kid. He always had advice on how to conduct myself, such as how to communicate ideas with people. He helped me understand the elements of how to speak to others, and how the way I talked might keep people from hearing my points.

Ray built the BXG school into more than just a way to learn kung fu. He created a community out of it, to give me and my fellow students a place to belong to. It is a place that motivates us to help each other and improve in different facets of our lives. He fostered this environment with his own time, money, and effort. He dedicated extra time to helping each of us outside of BXG school to become better people and live better lives. Through his school, I have people I

consider my brothers. We often connected and played games together during the pandemic to keep a sense of community when we could not see each other in person. I am eternally grateful for that slight bit of normalcy during that lonely time.

I know that I am not the only person to whom Ray has given this kind of generosity to. There are countless people in his life and career, outside of our Buk Xing school, that he has mentored and helped in a similar way. I am scared for Ray at what the possible sentence could be. I hope the examples in this letter highlight the person that Ray is, and I hope that you find that to be compelling enough to warrant a lenient or alternative sentence. He is not a violent criminal, and I hope you can see that his lifelong contributions and generosity to others helps to reduce the possibility of harsh punishments.

Thank you for your time and consideration,
Kevin Cheng
Research and Development Aerospace Chemist

Exhibit W

Letter of Alex Ng

4/19/2024


Honorable John F. Walter
350 West First Street
Los Angeles, CA, 90012
To the Honorable Judge Walter,


My name is Alex Ng and I'm writing to you about Raymond Chan, a person of virtuous character and integrity. I was first introduced to Ray when I was 10 years old at a family gathering, however, it wasn't until my late twenties that I had the opportunity to develop a deeper relationship with him. Over this past decade, Ray has played various significant roles in my life – as a friend, a mentor, and even as a father figure.

Since I've known Ray, he has always been an honorable and outstanding role model. He has a strong moral compass, is sincere, and honest. He always makes sure that everyone around him is walking the right path. Whether it's advice on career, family, or relationships, Ray's wisdom-filled insights are highly regarded and deeply valued. He maintains regular check-ins to ensure the well-being of those around him and consistently extends his unwavering support and encouragement. There were numerous occasions where Ray would take my father and I out to dinner and share his concerns about my career path and life trajectory. Although his advice could be harsh and tough to swallow, it was always well-intentioned. He genuinely cared for my future and always ensured I took the high road despite any challenges. Ray made sure that I conducted myself honorably in both business and relationships.

As a friend, he exudes compassion, kindness, and care. I will forever be grateful for and cherish Ray's friendship. There was a time when my car broke down, leaving me in need of transportation to work. Ray, out of the goodness of his heart, offered me a $15,000 loan without interest, allowing me to regain my footing. His generosity caught me by surprise, and his support during a challenging period was deeply appreciated. This unexpected gesture provided much-needed stability and I am forever grateful. Ray's generous support has been a true blessing, and his kindness is genuinely valued.

One of the things I admire most about Ray is his wisdom and willingness to generously share his wealth of knowledge. Through my personal interactions with him, Ray has served as a mentor, imparting invaluable life lessons that have earned him my utmost respect and sincere gratitude. One lesson in particular that left a lasting impression was when he first taught me how to prepare for interviews. He meticulously reviewed my resume and provided insightful feedback and guidance. Through simulated mock interviews and regular meetings over several weeks, he helped me build confidence in presenting myself professionally. His dedication and professionalism during these one-on-one sessions left a profound impact on me. Ray consistently emphasized the importance of diligence and dedication and he gave me the self-confidence to succeed in my interviews and career.

I have also had the honor to study kung fu under Ray's guidance and tutelage. I would attend training sessions two to three times a week, typically lasting around three hours each. Never one to be motivated by money, Ray never requested tuition fees, demonstrating his love for the art and his passion for the culture. Ray also took extra time to instruct me outside of class to ensure I fully grasped his teachings. In addition to practicing kung fu, I worked together with Ray to promote traditional martial arts at different local community events, where I was able to witness his passion and dedication in assisting others. Ray consistently strives to help and aid others, fostering a sense of community and collaboration to support each other. Apart from the physical fitness and self-defense skills, the most significant lessons I have learned are those of discipline, focus, respect, patience, and perseverance. Being fortunate enough to receive these lessons and integrate them into my life has truly been a blessing. Ray is an instructor who upholds strong moral principles and teaches and exhibits these qualities daily. He is an elder that is loved by his community and by his peers who appreciate his service and benevolence.

Ray has consistently demonstrated honesty, compassion, and a strong commitment to ethical principles in all aspects of his life. He's been a guiding light and mentor to many, including myself, and has always exemplified the highest moral standards.

Your Honor, I respectfully ask you to consider granting leniency and alternative sentencing to Raymond Chan. I recognize that Ray's possible sentence can be but I hope that you will recognize Ray's many positive contributions to the individuals in his life and his community. Thank you for your consideration for leniency and alternative sentencing.

Respectfully,

Alex Ng

Exhibit X

Letter of Anthony Cheng

Anthony Cheng



April 30th, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

To the Honorable Judge Walter:

My name is Anthony Cheng, a software tester currently in Northern California. I first met Ray when I was only about 12. My brother had a passionate interest in practicing martial arts so my parents had learned about Ray and his style of martial arts. At the time I had no interest in picking it up, but I was dragged along with my brother to their introduction with Ray. Though I had no interest at the time, I was intrigued about the philosophies of the style and managed to learn quite a bit from such a brief session. At the end of it, Ray even asked if I was interested in learning too! To which I quickly shook my head. But it wasn't until I was much older, around age 16 that I finally took an interest in learning from Ray. I have now known Ray for the last 14 years.

I originally grew up in the San Gabriel Valley, but after college I made the decision to move to Northern California for work. At that time, I was very unsure if I would be able to make ends meet before my first paycheck. Out of his generous nature, Ray had offered to gift me money as a buffer to help me out in my journey ahead. I was extremely grateful for the money he gave as it greatly helped me out in the interim. He never asked for any repayment or favor in exchange. I was very moved by that action and I still think about it very often to this day.

In the countless times me and my brother had practiced martial arts with Ray over the years, he never asked for any payment or fees or anything of the sort. He was always happy to have his students dedicate their time and energy to learning from him. To this very day, even when I come to visit to practice, he is always happy to have me participate with everyone. He still does not charge me or my brother or anyone else for any time we practice with him. That kind of attitude has since rubbed off on me and I continue to have the same attitude to this day. I never expect any sort of repayment or gifts anytime I help anyone out for anything.

Ray is a generous man who is always willing to help others and is extremely friendly to everyone around him. He'll always offer to help me out anytime I have issues and he has always asked about how my life is going, whether it be months since we've last met or even a few days. While that is a superb set of traits to have, it often can let him be taken advantage of if he's not aware.

In lieu of the recent news, I hope that you will find Ray's character to warrant a lower sentence or an alternative sentence.

Sincerely,

Anthony Cheng

Exhibit Y

Letter of Sam Wei

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

April 18, 2024



Dear Judge Walter:

I am writing to you about a person who has had an extraordinary influence on my life and the
lives of many others, Mr. Ray Chan.

My name is Samuel Wei, and I first had the pleasure of meeting Ray in early 2009 through a
mutual friend. I started to learn martial arts from Ray in his backyard and by 2011, I recognized
Ray as my *Sifu*, or master. During this time (aside from the pandemic), I would meet with Sifu
and other students for martial arts training at least once a week. Now, it is with a heavy heart that
I find myself composing this letter of support for him.

Over the last decade and a half, Ray has been so much more than just a martial arts instructor to
me. He has been a mentor, a confidant, and a father figure.

I vividly remember a time when I was preparing for a significant job interview. Ray gave more
than 15 hours of his time to help me refine my resume; taught me how to articulate my
qualifications confidently; and conducted three mock interviews to ensure I was well prepared.
His guidance extended beyond the substance of my responses, he also helped me improve my
communication and organizational skills to handle challenging scenarios effectively.

In 2017, I was planning my wedding and struggling with financial difficulties. During that time
my wife was still in China, and I needed to travel back to China for the wedding and make
changes to my living arrangement, Ray understood the financial strain I was under and asked if
he could help. Once again, he demonstrated his generous nature by lending me $15,000 and
insisted on charging me 0% interest. After many struggles, I was finally able to repay him last
year in 2023. Despite how expensive his attorney fees, Ray never rushed me to pay him back.
This generous gesture is a testament to Ray's character. His willingness to extend a helping hand
without expecting anything in return is truly commendable and rare.

Additionally, I am worried that his genetic disorder would cause difficulties in a traditional
confinement setting. Throughout the years, I saw Ray randomly trip and fall or lose his footing
and stumble multiple times during our martial arts practice. At first, I assumed it was his old age
but, after asking Ray about it, I learned that he suffers from a genetic disorder called Charcot-
Marie-Tooth disease (CMT). This disorder affects his nerves, causing muscle weakness, poor
coordination, and difficulty in walking. Though Ray continues to work on his condition, it has
not gotten much better over the years.

I am fully aware of the seriousness of Ray's conviction and the potential harshness of his sentence. I sincerely and respectfully hope that you weigh his noble character, his selfless generosity, and his unwavering dedication to helping others, I kindly implore you to consider a lower sentence or an alternative form of sentencing for Ray. I truly believe that Ray's actions and the life he has led stand as a testament to his true character and merit.

Thank you for your time and consideration.

Sincerely,

Samuel Wei

Exhibit Z

Letter of Evan Chan

June 1, 2024

TO:       Honorable John F. Walter
              350 West First Street
              Los Angeles, CA 90012

FROM:     Ms. Even Chan

I am Even Chan, Raymond Chan's daughter-in-law. I know that my father-in-law was convicted by the jurors on multiple counts; even so, I still have a strong, firm belief that he is a very great, nice, and kind person with integrity and selflessness.

From spending time with him since 2018, I am confident to say that he is by far the most helpful person with only pure and good motives that I have ever met. In fact, he always puts others before himself, which is something I cannot totally understand why an ordinary person or human being would be this "naive" throughout his whole life. Later, I learnt that this is a "pillar" or central tenet of his life – helping everyone around him and making sure everyone is getting better and happier in their lives gives him the meaning to his life/ existence. The following are some of the examples I experienced, saw, and heard from different roles and aspects in daily life.

First, I would like to share some of my observations from working at Synergy with him in 2018. Raymond is very caring and generous to all his employees, team members, and even the staff of the office building. I remember only a week after working there, he would regularly check how I was getting along with my co-workers and how I felt about my new working environment. The most unforgettable question he asked me was: "most importantly, do you think you are progressing and learning? This is critical for your personal growth."

Another example of how he cared about me, and my co-workers, is that he would be very supportive of us leaving the company if there were better opportunities out there. I think he was the only boss that I worked with that is this selflessly supportive to their employees' career and personal growth. On the other hand, he would share bonuses and give raises based on performance and accomplishments (such as milestones on projects) with every employee and team member. He would create a nice working environment by ordering lunches for us and team members after the weekly meetings. If the schedule allows, he would even make time to take us (me and my coworkers) to restaurants for lunch on Fridays and would also ask us to order some more to-go orders for our family! He was not only nice to us but also to the valet guy, security guards, and the management team of the office building. He greeted them every time they met. Sometimes, he would order pastries for them.

Secondly, he was also very sincere and nice to his clients and their projects. He is very down to earth and hard-working. He treated all projects the same, no matter how big or small the projects were. He was very serious and hard-working on each projects' progress. For example, we (staffs

at Synergy) would have at least 1-2 weekly meetings regarding the items on radar screens tracking and taking notes on the progress, problems or actions pending to be solved and done.

On the radar screen, each co-worker has their own assigned color which would be easy and efficient to make sure we, as a team, were on the same page. Raymond was not the only one editing the radar screens, it was available to all of us to work on. We would go onto our shared google drive to view and edit the radar screens; I also had to help him edit his part after the weekly meetings with the team. All edits or updates were made based on the reports/ situations provided by everyone in the team. They acted like a notepad and task list to all of us. Raymond always emphasized to "never drop the ball." Radar screens played a big role in that since everyone knew what to do or what was happening, so we would not drop the ball. Therefore, our clients would be satisfied with our professional consulting services as their projects were moving forward well.

Apart from working or professional life, I was very impressed by him himself with his good values in life and his family. He holds high value in family. When I was still an employee at Synergy, he would invite me, my brother, and my co-workers to his 40-years marriage anniversary dinner. I was so impressed by how loyal and respectful he was to his wife and family. He prepared different gifts for his wife and made a PowerPoint with pictures, videos, music, and messages to his wife. It was so touching and sincere that all of us at the dinner were so focused on the presentation. He wrote "happy wife, happy life" on the last slide of the PowerPoint. I could tell his love for his wife and his son was huge. He would also invite us to his kung fu family's holiday gatherings. He would try his best to make sure every one of us felt welcomed and included. Also, he would make funny jokes to make sure we feel comfortable too even though he was strict with high standards on our work performance.

Later, I started dating Raymond's son and we got married. With my role changed from an employee to a family member, I respected him even more. The reason is he not only respects me, but also my side of family, my parents, grandparents, aunt, uncle and my brother. One of the examples is when his son would like to propose to me. Raymond would make time to travel with his son all the way to China to meet with my side of family to show respect and seek for approval from my family. Raymond insisted on doing so to show sincerity. This gave me and my family great comfort to reassure that my then boyfriend, now husband's upbringing was with good virtues and high values. My parents appreciated this a lot.

Another example is that Raymond treats my mother like a little sister and my father as a little brother (they have a big age gap). He always greets and checks on them regularly and teaches my daughter to respect them.

Apart from these, my parents and my brother are thankful to him for his assistance on my brother's MBA application and interview preparations. Raymond would set a schedule to help my brother go over the applications, carrying out mock interviews, etc. to make sure he can excel. It turned out great because my brother was accepted.

Also, he and my mother-in-law would offer to help take care of my daughter to make sure I can have some personal time. Their help was like a cure for my postpartum depression back then. All these show his love and respect for me as a daughter-in-law.

All in all, my father-in-law, Raymond Chan, is really the most selfless, helpful, and sincere human being that I have ever met. I always use the adjective "naive" to describe him, as he always chooses to only see other people's good, kind sides instead of any "motives behind" when people reach out to him for help.

I eventually understood his "theory". This is because helping others within his ability but beyond his responsibility is his core value and meaning in life. It is like a life mission to him. He helps without asking why or anything in return and does so only with pure and good motives. His mission is making sure everyone around him feels his love and support. He loves making win-win-win situations if he can (even when he is not "winning" anything). He thinks people around him would feel and act the same way and this would make his life, his world, and our world a better place with more happiness. Therefore, even though with a dozen counts convicted by the jurors, I still hold him in a high regard. I just hope that his rare personality or mindset can be understood by you, your honor. I believe, with all the letters and testimonies' consistency, your honor would make the best judgment.

Thank you for reading my letter.

Even Chan

# Exhibit AA

## Letter of Sonya Cheung

To:  Honorable John F. Walter
      350 West First Street
      Los Angeles CA 90012

From:  Sonya Cheung


Dear Judge Walter,

I am the younger sister of Raymond Chan's wife.

I think Raymond Chan is hospitable, generous and he is never calculative. For example, he would always be willing to treat me and my whole family or even the extended family from my sister's side of family to lunches and dinners. Whenever me or my family members want to treat him, he would only accept if everyone is splitting the bill so that it would not cost any of us too much or only accept 1 out of 5 or 10 times we dined out together.

Over the past 40-50 years knowing him as my brother-in-law, he has always been super well, very caring and sincere to my elderly father and mother. For example, whenever my father and mother were planning a trip back to Hong Kong, he would initiate paying for their flight tickets. Another example is that since my mother moved into an elderly apartment in around 1997, he would set aside $250 a month to make sure my mother could spend money freely and happily. $250 a month sounds not a lot nowadays; it was indeed quite a big portion of his monthly salary back then. He has been giving my mother money since then until she passed in 2016. My side of family has 5 siblings: 1 older brother, 2 older sisters including Sarah (Raymond's wife), me and my younger brother. In a big family like this, to be honest, it is not Raymond's duty or responsibilities to care or pay for my parents' anything.

Another reason for why I pay high regards and respects to him because he is also very caring to my mother-in-law. He isn't only loving his immediate family or just his side of family, he also cares about his wife's side of family and also my husband's side of family. This is very touching to both me and my husband. For example, he would call me to check on how my mother-in-law was doing after she was admitted to a hospital years ago; he would also invite my mother-in-law out for gatherings, lunches, and dinners. Again, this is not within his duty or responsibility.

Another thing that I am very very grateful and thankful to him is that. when I had to look for a job at the county. He would set aside his time from his busy schedule to help editing my resume. Also, he would carry out mock interviews with me several times, he not only practiced general interview questions, he also dig into the job that I was applying to predict what types of questions they would ask me to make sure I can succeed. It turned out I got the job offer. This significatively helped me with my personal growth, my career and my financial situation for my family.

Apart from my job interview, Raymond Chan made me very touched and thankful was also how he helped with my daughter in one summer. That summer was when my daughter, Hollie, was still in high school figuring out which major she should apply for college/ university. She mentioned

that she would like to know if this industry (I already forgot the details) would be suitable for her. Raymond, after knowing about this, he immediately tried his best to connect with his friends, and even friends' friends for an summer internship opportunity for Hollie. It turned out Hollie realized that she didn't like this industry. Me, Hollie and my husband were very thankful for what Raymond did for Hollie – so that she did not need to waste time on studying/ picking the wrong major and career path.

I have also heard that my mother's helper needed help before she passed away. Raymond helped too but I do not remember the details.

But all these shows how his nature is, he puts other first before him himself.  More examples on how helpful he is are during the early stage when we (me and my sister's side of family) were opening a restaurant and a textile company, our English were not good at all back then, he would help us coming up with business plans, business ideas, promotions/ marketing for the business etc.

I am very grateful that my sister got married with such a kind, nice, helpful, sincere, and generous man. I am thankful and touched by everything he did for my father, mother, me myself, my daughter, my siblings and even my mother-in-law. I think he is the only human being that I know who would be so helpful and nice to everyone no matter who you are, what's your social status is, how much money you have. Even though I spend time with good people from work, churches, etc, I can say he is still a very rare person.

Sincerely,


Sonya Cheung
May 15, 2024

Sonya Cheung

Exhibit BB

Letter of Tony Wu

Tony Wu



May 15, 2024

To the Honorable John F. Walter,
350 West First Street
Los Angeles, CA 90012

Dear Judge Walter:

My name is Tony Wu, and I am currently a small business owner in Los Angeles and an MBA student studying abroad. I am writing this letter in support of Ray, who is not only the father of my brother-in-law but also a pivotal figure in my personal and professional development. I first had the pleasure of meeting Ray over five years ago. Since then, Ray has been a constant source of guidance, support, and wisdom in my life.

One of the most significant instances of Ray's impactful presence in my life occurred during the preparation for my MBA program interviews in January 2021. Despite being busy with his lawsuit preparations, Ray dedicated over 30 hours across two weeks to help me practice and refine my interviewing skills. His commitment involved daily online sessions, each lasting around two hours, where he meticulously went through potential questions, helped me articulate my thoughts more clearly, and provided constructive feedback. His dedication and insight were instrumental in my receiving a full scholarship from the MBA program of Peking University, one of the most prestigious institutions in China. This experience underscored how good of a person Ray is, prioritizing helping others even during his own challenging times.

Beyond academic and professional guidance, Ray has always been willing to invest his time in discussing life and career options, often staying up late to help me navigate through various challenges. His generosity in sharing his wisdom and experiences has been invaluable to me. Ray's selflessness and eagerness to help others, without expecting anything in return, truly set him apart. He embodies the virtues of kindness, mentorship, and community support, impacting the lives of many, including mine, in profound ways.

When I first met Ray, it was during training sessions he hosted for his staff and young people, including myself, at his company where my sister also worked. I observed firsthand how Ray was dedicated to mentoring young individuals and helping them develop their skills. This initial impression of Ray's commitment to helping others was further solidified over the years, particularly when he provided me with one-on-one mentorship during my MBA interview preparation.

Because of Ray's character and the positive influence he has consistently demonstrated, I have complete trust in him and his family to take good care of my sister. Although my parents originally wanted my sister to marry in Hong Kong, my hometown, after meeting Ray multiple times, I assured my parents that Ray and his

family are trustworthy. His integrity and the way he values family and community convinced us that my sister would be well cared for.

I understand the gravity of the situation before the court, and I respect the judicial process. However, I sincerely hope that the court will consider Ray's positive influence on those around him, his character, and his commitment to helping others when determining his sentence. Whether through leniency or alternative sentencing options, I believe that Ray's contributions to his community and his family speak volumes about his character and the positive role he can continue to play outside of a traditional punitive setting.

Thank you for considering my letter and the support for Ray that I, along with many others, steadfastly provide. It is my hope that the court recognizes the depth of Ray's character and the impact of his actions on the lives he has touched.

Sincerely,

Tony Y. Wu

Tony Wu

# Exhibit CC
# Letter of Bonnie Chan



Bonnie Chan

June 3, 2024

Honorable John F. Walter
350 West First Street
Los Angeles, CA 90012

Dear Judge Walter:

My name is Bonnie Chan. Raymond (Ray) Chan is my brother who is twelve years older than me. I understand that my brother is before your court for sentencing and I write to you today to kindly and respectfully ask to share a few personal and unique incidences between my brother and me, which may give more insight to who Ray is as a person. I hope that you would consider granting him a lower sentence after reading letters from those in his life who can attest to the man my brother is.

Ray left Hong Kong to continue his high school education in Canada when I was about three years old and he eventually settled down in Los Angeles with his wife Sarah. In 1984, he persuaded my parents to send me to Los Angeles to attend high school and he promised he would take care of me. Ray truly lived up to his promise. In addition to providing room and board, Ray helped me on my study, attended school functions on my parents' behalf, and took up the role as my guardian until I reached legal age. I also received a lot of advice and assistance from my brother on college application, choosing a career path and after graduation, on job searching.

About fifteen years ago, I underwent Lasik surgery to correct my vision. Unfortunately, I suffered from a rare complication that affected my vision so I could barely see. It was Ray who came to my rescue. He accompanied me to multiple appointments with my ophthalmologist to determine the cause of the complication, and more importantly, to work towards the remedy. It turned out that it was some unusual cell growth at the incision site that "blocked my vision" and surgery was the only way to cure. It was not a surprise that Ray was the one to take me to the surgery and to a series of follow-up appointments. During this period of temporary loss of vision, my brother was the one who made all the medical arrangement for me because I was so panicked and devastated to take the appropriate action.



Bonnie Chan

Honorable John F. Walter
June 3, 2024
Page 2

Raymond watches out for me in many ways. He is very close to my daughter Valerie, who is now twenty years old. Since she was a little girl, Valerie loved to hang out with Uncle Ray. They share one interest in common, trying out new food. Thus, Ray took Valerie to try out different cuisine regularly. Uncle Ray did not just do fun things with his niece, he gave Valerie valuable advice on choosing classes, picking extracurricular activities and exploring career options as she was growing up. When Valerie started the college application process, Ray spent a lot of time with her to improve her essay writing and interview technique, at a time when he was very busy preparing for this trial.

When it was time to make her college decision, Valerie and I developed a lot of tension because we did not agree on what seemed to be "the best college to attend". Once again, Ray stepped in to help. He was impartial, not taking sides and helped Valerie and me to understand each other's perspective, which finally resolved our conflicts.

Ray played an essential role in the care of our 91 year old mother, who is almost blind and deaf and is now at the advanced stage of Alzheimer's disease. Mom is living in her house with caretakers who attended her basic needs. However, she depends on Ray and me to make all financial, medical and living arrangement/decision for her. Ray and I share the responsibility of doing that but I am so blessed to have my brother taking on a leadership role when it comes to taking care of our mother.

In the last few years, mom had several medical emergencies and I almost mentally collapsed from the stress. I was so fortunate that I had my brother, who could handle himself much better than I could under stressful situation, to make the prompt and right decisions for mom. Mom's health will continue to deteriorate and her quality of life will likely be compromised without the presence of Ray.

Ray incurred a large amount of legal expenses over the last few years and it came to a point that he needed to take on a loan. He borrowed $200,000 from our mother in year 2023. As I mentioned previously, Ray and I collaboratively handle mom's finances. However, he did not want to take mom's money for his personal use and insisted on treating the money he borrowed as a formal, legal binding loan with collateral. Ray was the one who arranged someone to prepare the necessary paperwork to formalize the loan. Every month, he pays interest on the money that he borrowed. By doing so, he proves himself as an honest person with a lot of integrity and I have a lot of respect for him.



Honorable John F. Walter
June 3, 2024
Page 3


My brother is always willing to help and is a reliable son, sibling, and uncle. He plays a
critical role in our greater family, and I hope that you would consider that when
sentencing him. Thank you for the opportunity to share these stories that I have had
with my brother.

Sincerely,

Bonnie Chan